UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| GABBY KLEIN, DONALD SHERBONDY, SARAH SHERBONDY and CONSTRUCTION LABORERS PENSION TRUST OF GREATER ST. LOUIS, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ALTRIA GROUP, INC., HOWARD A. WILLARD III, WILLIAM F. GIFFORD, JR., JUUL LABS, INC., ADAM BOWEN, JAMES MONSEES, KEVIN BURNS, and K.C. CROSTHWAITE,<br><br>Defendants. | Case No. 3:20-cv-00075-DJN<br><br>CONSOLIDATED CLASS ACTION COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................ 1

PRELIMINARY STATEMENT ......................................................................................... 2

JURISDICTION AND VENUE ......................................................................................... 8

PARTIES AND OTHER RELEVANT INDIVIDUALS .................................................... 8

SUBSTANTIVE ALLEGATIONS ................................................................................... 10

I.   Operations of Altria and JUUL............................................................................ 10

II.   Altria's History of Stealthily Marketing Nicotine to  Young People and Misleading the Public as to the Dangers of Its Products ................................................................. 11

III.    Nicotine is a Harmful and Addictive Chemical, Especially When Used by Youth ..... 14

IV.    Relevant Regulations Concerning E-Cigarettes............................................... 17

   A.   It is Illegal to Market or Sell E-Cigarettes to Anyone Under the Age of 18 ............... 17

   B.   Modified Risk Tobacco Products Must Be Approved by the FDA ............................ 18

V.   JLI Designed Its Product to Spike Nicotine Delivery Levels with Improved Taste to Make It More Appealing, Addictive and Dangerous, Especially to Young People ................ 19

   A.   Defendants Understood That Maximizing Nicotine Addiction Was the "Magic" Behind Cigarettes' Stratospheric Commercial Success ................................................ 19

   B.   Following the Big Tobacco Playbook, Defendants Sought to Market a Product That Would Create and Sustain Nicotine Addiction, but Without the Stigma Associated with Cigarettes ................................................................................................ 22

   C.   JLI Designed a Nicotine Delivery Device Intended to Create and Sustain Addiction . 27

     1.   JLI Made Addictive E-Cigarettes Easy and Pleasant for Young People and Non-Smokers to Inhale ................................................................................... 28

     2.   JLI's Initial Experiments Measured Non-Smokers' "Buzz" Levels and Perceptions of Throat Harshness ................................................................... 29

     3.   JUUL's E-Cigarettes Rapidly Deliver Substantially Higher Doses of Nicotine than Cigarettes .......................................................................................... 31

     4.   JUUL's Design Did Not Look Like a Cigarette, Making It Attractive to Non-Smokers and Easy for Young People to Use Without Detection..................... 35

     5.   JUUL Enticed Youth and Newcomers to Nicotine with Kid-Friendly Flavors........ 39

        a.   JUUL Introduced Kid-Friendly Flavors............................................. 39

        b.   JUUL and Altria Developed and Promoted the Mint Flavor and Sought to Preserve Its Market ...................................................................... 43

          i.   Mint Has the Highest Nicotine Impact ............................................ 44

          ii.   JUUL's Youth Surveillance Programs Confirmed That Mint JUULpods are Preferred by Teens ......................................................... 45

i

D.   Defendants Developed and Implemented a Marketing Scheme to Mislead Consumers into Believing that JUUL Products Contained Less Nicotine Than They Actually Do and Were Healthy and Safe ........................................................................................... 47

    1.   JLI Defendants Knowingly Made False and Misleading Statements and Omissions Concerning JUUL's Nicotine Content.................................................................... 47

    2.   JUUL and Altria Transmitted, Promoted and Utilized Statements Concerning JUUL's Nicotine Content That They Knew Were False and Misleading ....................... 49

    3.   JLI Defendants Used Food and Coffee Themes to Give the False Impression that JUUL Products Were Safe and Healthy............................................................... 53

    4.   JUUL's "Make the Switch" Campaign Intentionally Misled and Deceived the Public to Believe that JUUL Is a Cessation Device For Adult Smokers .................................... 56

VI.   JUUL Enters the Industry, Using Big Tobacco's Playbook to Appeal to Kids ............ 61

VII.   JUUL Designed and Marketed JUUL to Appeal to Youth ........................................... 65

  A.   #Vaporized Campaign and the Big Tobacco Template ................................................. 65

  B.   Social Media - JUUL Purchased Advertising Space on Websites that Appeal to Children...................................................................................................................... 69

  C.   JUUL Hosted Parties to Generate Brand Awareness Among Young People ............... 76

  D.   JUUL Sought to Enlist "Influencers" With Large Numbers of Underage Social Media Followers to Promote JUUL Products ...................................................................... 81

  E.   JUUL's Outreach and Targeting of Adolescents - In-Person Presentations at Schools 83

  F.   JUUL Focused on Growth In Convenience Stores Where Advertising and Sales to Minors Was Likely ..................................................................................................... 84

  G.   JUUL Disregarded Failures and Loopholes Within Its Online Sales System That Allowed Youth to Purchase JUUL Online Through JUUL's Own Website ....................... 87

VIII.   JLI Defendants Successfully Misrepresented that JUUL Was Safe and Healthy......... 90

IX.   JUUL's Practices Lead to the Nationwide Youth Vaping Epidemic............................ 91

X.   Desperate for Growth, Altria Invests In JUUL Despite Knowledge of Its Improper Marketing Techniques .................................................................................................. 92

  A.   JUUL Dominates the E-Cigarette Market at the Expense of Altria.............................. 92

  B.   Willard Was Determined to Invest in JUUL at Any Cost ........................................... 95

XI.   JUUL Thrived Due to Extensive Efforts to Delay Meaningful Regulation of Its Products.................................................................................................................... 103

  A.   Defendants Successfully Shielded the Popular Mint Flavor from Regulation .......... 103

XII.   JUUL Usage Increases the Risk of Cardiovascular, Pulmonary, Neurological, and Other Bodily Injuries ................................................................................................. 112

  A.   JUUL Products Cause Acute and Chronic Lung (Pulmonary) Injuries ..................... 112

  B.   JUUL Products Cause Cardiovascular Injuries......................................................... 119

  C.   JUUL Products Cause and Contribute to Seizure(s)................................................. 120

    D.    Animal Studies Demonstrate Carcinogenic Potential of JUUL................................. 121

  XIII.    Materially False and Misleading Statements Made During the Class Period............ 122

  XIV.    The Truth Begins to Emerge As Defendants Continue to Mislead ........................... 130

ADDITIONAL SCIENTER ALLEGATIONS ......................................................................... 139

CORPORATE SCIENTER ...................................................................................................... 143

ANALYSTS WHO COVERED ALTRIA CLOSELY FOLLOWED THE ACTIONS AND
STATEMENTS OF JLI IN EVALUATING THE VALUE OF ALTRIA BOTH BEFORE AND
AFTER ALTRIA'S INVESTMENT IN JLI................................................................................ 143

PLAINTIFFS' CLASS ACTION ALLEGATIONS ................................................................. 148

COUNT I .................................................................................................................................. 150

(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
Against the Altria Defendants) ................................................................................................. 150

COUNT II ................................................................................................................................. 154

(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
Against the JLI Defendants) ..................................................................................................... 154

COUNT III ................................................................................................................................ 157

(Violations of Section 20(a) of the Exchange Act Against The Altria Individual Defendants) . 157

COUNT IV ................................................................................................................................ 158

(Violations of Section 20(a) of the Exchange Act Against The JLI Individual Defendants) ..... 158

PRAYER FOR RELIEF ........................................................................................................... 160

DEMAND FOR TRIAL BY JURY .......................................................................................... 160

## NATURE OF THE ACTION

1.      This is a proposed class action for violation of the federal securities laws. Court-appointed lead plaintiffs Donald Sherbondy and Sarah Sherbondy, and Construction Laborers Pension Trust of Greater St. Louis (collectively "Plaintiffs"), by and through their undersigned counsel, bring this action under Sections 10(b), 20(a) and 20(b) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b), 78t(a) and 78t(b)), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission (the "SEC") (17 C.F.R. § 240.10b-5) (the "Action").

2.      Plaintiffs' claims are brought on behalf of themselves and all persons and entities other than Defendants who purchased or otherwise acquired Altria Group, Inc. ("Altria") securities between December 20, 2018 and February 21, 2020, both dates inclusive (the "Class Period").

3.      Defendants are: (i) Altria; (ii) Howard A. Willard III ("Willard"), Altria's Chief Executive Officer ("CEO"); (ii) William F. Gifford, Jr. ("Gifford"), Altria's Chief Financial Officer ("CFO"); (iii) JUUL Labs, Inc. ("JUUL" or "JLI"); (iv) Adam Bowen ("Bowen"), Altria's Chief Technology Officer, a co-founder, and member of the board of directors of JUUL; (v) James Monsees ("Monsees"), Altria's Chief Product Officer, a co-founder, and member of the board of directors of JUUL; (vi) Kevin Burns ("Burns"), JUUL's CEO from December 2017 to September 2019; and (vii) K.C. Crosthwaite ("Crosthwaite"), Altria's former Chief Growth Officer and JUUL's current CEO. Defendants Willard, Gifford, Burns and Crosthwaite are identified collectively as the "Individual Defendants." Altria, JUUL and the Individual Defendants are referred to as the "Defendants."

4.      Plaintiffs' allegations are based upon Plaintiffs' counsel's investigation, except as to the allegations pertaining to Plaintiffs, which are based upon their personal knowledge.

Plaintiffs' counsel's investigation included, among other things, review and analysis of: (i) Altria's public filings with the SEC; (ii) research reports disseminated by securities and financial analysts that covered Altria during the Class Period; (iii) transcripts of Altria's conference calls with analysts and investors; (iv) presentations, press releases, and reports concerning Altria and JUUL; (v) news and media reports concerning Altria, JUUL and other facts related to the Action; (vi) data reflecting the pricing of Altria securities; (vii) interviews with former employees of Altria and JUUL, and other knowledgeable persons; (viii) consultations with relevant experts; (ix) documents, testimony and other facts presented at the July 24 and 25, 2019 hearing before the House Committee on Oversight and Reform: "Examining JUUL's Role in the Youth Nicotine Epidemic"; and (x) litigations involving JUUL and Altria filed by, among others, various State Attorneys General. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## PRELIMINARY STATEMENT

5.    The battle to end nicotine addiction and its associated diseases and death has consumed our nation's public health resources for more than half a century. After five decades of tireless efforts by public health advocates, litigators, and regulators, the war on tobacco was on the path to victory. By 2014, rates of smoking and nicotine addiction in this country were finally at an all-time low, particularly among teenagers. The United States, closer than ever to consigning the nicotine industry to the dustbin of history, now faces a youth nicotine epidemic of historic proportions. The swift rise of a new generation of nicotine addicts has overwhelmed parents, schools, and the medical community, drawing governmental intervention at nearly every level.

6.    This public health crisis is no accident. What had been lauded as progress in curbing cigarette use, JLI's co-founders Adam Bowen and James Monsees viewed as

opportunity. Seizing on the decline in cigarette consumption and the lax regulatory environment for e-cigarettes, Bowen, Monsees, and JLI management sought to introduce nicotine to a whole new generation, with JLI as the dominant supplier. To achieve that common purpose, they knew they would need to create and market a product that would make nicotine cool again, without any of the stigma associated with cigarettes. They succeeded by hooking millions of youth, intercepting millions of adults trying to overcome their nicotine addictions, and, of course, earning billions of dollars in profits in the process.

7.      Every step of the way, JLI, by calculated intention, adopted the cigarette industry's playbook, in coordination with one of that industry's innovators, cigarette giant Altria. JLI was created in the image of the iconic American cigarette companies, which JLI founders praised for creating "the most successful consumer product of all time. . . . an amazing product." The secret to that "amazing product"? Nicotine, a chemical that has deleterious effects on the developing brains of youths, and is the fundamental reason that people persist in using tobacco products posing the risk of pulmonary injuries, cardiovascular disease and other serious, often fatal, conditions. Through careful study of decades of cigarette industry documents, JLI knew that the key to developing and sustaining addiction was the amount and the efficiency of the nicotine delivery.

8.      Three tactics were central to decades of cigarette industry market dominance: product design to maximize addiction; mass deception; and targeting of youth. JLI adopted and mastered them all. First, JLI designed JUUL products to create and sustain addiction, not break it. JLI was the first to design an e-cigarette that could compete with combustible cigarettes on the speed and strength of nicotine delivery. Indeed, JUUL products use nicotine formulas and delivery methods much stronger than combustible cigarettes, confirming that what JLI designed

3

was a starter product, not a cessation or cigarette replacement product. JLI also innovated by making an e-cigarette that was smooth and easy to inhale, practically eliminating the harsh "throat hit," which otherwise deters nicotine consumption, especially among nicotine "learners," as R.J. Reynolds' ("RJR") chemist Claude Teague called new addicts, who are primarily young people.

9.     Second, JLI and Altria engaged in a campaign of deceit, through sophisticated mass media and social media communications, advertisements and otherwise, about the purpose and dangers of JUUL products. JUUL products' packaging and advertising grossly understates the nicotine content in its products. Advertising campaigns featured JUUL paired with food and coffee, positioning JUUL as part of a healthy meal, a normal part of a daily routine, and as safe as caffeine. In partnership with Altria, JLI adopted a "Make the Switch" campaign to mislead consumers into thinking that JLI products were benign smoking cessation devices, even though JUUL was never designed to break addictions. JLI and Altria also concealed the results of studies that revealed that JUUL products were far more powerfully addictive than was disclosed. JLI's deceptive marketing scheme was carried out across the country through broad distribution channels. These marketing efforts have been resounding successes—when JUUL products were climbing in sales, most adults and youth believed that e-cigarettes were not harmful and did not contain nicotine at all.

10.     Third, JLI, just like cigarette companies before it, targeted kids as their customer base. JUUL products were designed to appear slick and high-tech like a cool gadget, including video-game-like features such as "party mode." JLI offered kid-friendly flavors like mango and cool mint, and partnered with Altria to create and preserve the market for mint-flavored products—all because Defendants knew that flavors get young people hooked. Under the guise

4

of youth smoking prevention, JLI sent representatives directly to schools to study teenager e-cigarette preferences.

11.     Defendants reached their intended demographic through a diabolical pairing of notorious cigarette company advertising techniques (long banned for cigarettes because they cause young people to start smoking) with cutting-edge viral marketing campaigns and social media. They hired young models and advertised using bright, "fun" themes, including on media long barred to the cigarette industry, such as billboards, on children's websites such as "Nick Junior" and Cartoon Network, and on websites providing games and educational tools to students in middle school and high school. JLI also employed young social-media "influencers" and celebrities popular with teenagers. When regulators and Congress caught onto JLI's relentless focus on children, Defendants simply lied, even though they knew well that JLI had purposefully targeted youth in their marketing and those efforts had been breathtakingly successful. JUUL products are rampant in the nation's schools, with the percentage of 12th graders who reported consuming nicotine almost doubling between 2017 and 2018. The U.S. Surgeon General has warned that this new "epidemic of youth e-cigarette use" could condemn a generation to "a lifetime of nicotine addiction and associated health risks."

12.     Nicotine is not benign like coffee, contrary to what many JUUL users believe. Nor is the aerosol as harmless as puffing room air. According to the most recent scientific literature, JUUL products cause acute and chronic pulmonary injuries, cardiovascular conditions, and seizures. Many smokers, believing that JUUL would help them "make the switch," ended up only further trapped in their nicotine addiction. Older adults who switch to JUUL are more susceptible to cardiovascular and pulmonary problems, and CDC data shows that older patients hospitalized due to vaping lung-related conditions had much longer hospital stays than younger

5

patients. And a generation of kids is now hooked, ensuring long-term survival of the nicotine industry because, today just as in the 1950s, 90% of smokers start as children.

13.     It should come as little surprise that JLI's misconduct, expressly patterned after decades of cigarette company practices, could not have been carried out without the involvement and expertise of an actual cigarette company. Well before Altria announced its investment in JLI, Altria knew that JLI was marketing to minors but nevertheless agreed to provide marketing and distribution services and permit JLI to continue to market and operate as it had in the past—as an independent company. Altria and JLI also worked in tandem to ensure that JUUL's "mint" flavored product, which is the most popular among minors, remained on the market.

14.     Altria began aggressively courting JLI in 2017. According to multiple former employees of Altria, it was widely known within Altria that JLI was intentionally marketing its products to youth. Thus, JLI and the Altria Defendants knew of JLI's multi-faceted youth marketing scheme, as well as the associated risk of litigation, regulatory action, public backlash and financial and reputational harm that would certainly occur if ever discovered.

15.     Nevertheless, when announcing Altria's $12.8 billion investment in JLI through mirroring press releases issued simultaneously on December 20, 2018, both Altria and JLI assured Altria's investors that there would be no day of reckoning related to any improper youth marketing, bluntly representing that "*[JUUL's] intent was never to have youth use JUUL products*." Moreover, according to the press releases, the service agreements related to the transaction would accelerate "JUUL's mission to switch adult smokers to e-vapor products." Throughout the Class Period, Altria and JLI also repeatedly represented to Altria investors that JUUL was a tobacco cessation product for adult smokers that was not harmful.

16.     As detailed herein, Defendants' statements were materially false and misleading because they knew or recklessly failed to disclose: (i) that JLI's overarching marketing scheme was directed to youth; (ii) that JUUL's products were harmful and not a tobacco cessation product; (iii) that JLI's youth marketing scheme subjected JLI, Altria, and Altria's investment in JUUL to material risk, including reputational, litigation and regulatory actions and fines; (iv) that Altria consequently failed to inform investors, or account for, material risks associated with JLI's products and marketing practices, and the true value of JLI and its products; (v) that all of the foregoing, as well as mounting public scrutiny, negative publicity, and governmental pressure on e-vapor products and JLI made it reasonably likely that Altria's investment in JLI would have a material negative impact on Altria's reputation and operations; and (vi) that the materialization of these risks would require Altria to write-down its investment in JLI.

17.     Following Altria's multi-billion-dollar investment, JLI (which held over 75% of the e-cigarette market) and other e-vapor products increasingly became the subject of public and regulatory scrutiny throughout the country. Revelations about JLI's youth marketing techniques, along with mounting skepticism, fear, and negative publicity in the media regarding e-cigarettes' safety led to increased scrutiny, litigation and regulation by government authorities of JUUL and other vaping products. As a result of these disclosures, Altria's stock price dropped precipitously. Moreover, Altria announced write-downs on its investment in JLI of $4.5 billion and $4.1 billion on October 31, 2019 and January 30, 2020, respectively (a total write-down of 67% of Altria's investment), causing Altria's stock price to decline further. Then, on February 21, 2020, it was announced that the SEC had launched an investigation into whether Altria had fully disclosed to its shareholders the risks associated with its investment in JLI, resulting in a several-day slide of almost 13%.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

20.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

21.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES AND OTHER RELEVANT INDIVIDUALS

22.     Plaintiffs, as set forth in their previously filed and/or attached Certifications, which are incorporated herein by reference, purchased or otherwise acquired Altria securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective events.

23.     Altria is a Virginia-registered corporation with principal executive offices located at 6601 West Broad Street, Richmond, Virginia 23230. The Company's stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "MO."

24.     Defendant Willard has served as Altria's Chairman and CEO at all relevant times.

8

25.     Defendant Gifford has served as Altria's Vice Chairman and Chief Financial Officer at all relevant times.

26.     JUUL is a Delaware corporation with its principal place of business in San Francisco, California.

27.     Defendant Bowen is the Chief Technology Officer, a co-founder, and member of the Board of JUUL. Bowen has been an officer and director of JUUL at all relevant times.

28.     Defendant Monsees is the Chief Product Officer, a co-founder, and member of the Board of Directors of JUUL. Monsees has been an officer and director of JUUL at all relevant times.

29.     Defendant Burns was the Chief Executive Officer of JUUL from December 2017 to September 2019.

30.     Defendant K.C. Crosthwaite ("Crosthwaite") is the Chief Executive Officer of JUUL. Crosthwaite served as an observer on JUUL's board of directors after Altria's investment in JUUL.

31.     Defendants Willard, Gifford and Crosthwaite are sometimes referred to herein collectively as the "Altria Individual Defendants," and with Altria, as the "Altria Defendants."

32.     Defendants Bowen, Monsees and Burns are sometimes referred to herein collectively as the "JUUL Individual Defendants," and with JLI, as the "JLI Defendants."

33.     The Altria Individual Defendants possessed the power and authority to control the contents of Altria's SEC filings, press releases, and other market communications. The Altria Individual Defendants were provided with copies of Altria's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions

9

with Altria, and their access to material information available to them but not to the public, the Altria Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Altria Individual Defendants are liable for the false statements and omissions pleaded herein.

34.     The JUUL Individual Defendants possessed the power and authority to control the contents of JUUL's press releases and other market communications. The JUUL Individual Defendants were provided with copies of JUUL's press releases and other statements alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their position within JUUL and their access to material information available to them but not to the public, the JUUL Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The JUUL Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### I.     Operations of Altria and JUUL

35.     Altria was founded in 1919 and is headquartered in Richmond, Virginia.  The Company, through its subsidiaries, manufactures and sells cigarettes, smokeless products, and wine in the United States.

36.     Altria offers, among other products and services, cigarettes, under the Marlboro, Virginia Slims and Parliament brands; cigars, principally under the Black & Mild brand; and moist smokeless tobacco products under the Copenhagen, Skoal, Red Seal, and Husky brands.

The Company sells its tobacco products primarily to wholesalers, including distributors; large retail organizations, such as chain stores; and the armed services.

37.     JUUL is an American electronic cigarette company which spun off from Pax Labs in 2017. It makes the JUUL e-cigarette (or e-vaporizer), which packages nicotine salts from leaf tobacco into one-time use cartridges or "pods" that are heated and the resulting vapor is inhaled.

38.     JUUL Labs, Inc. was a corporate subsidiary of PAX Labs, Inc. until 2017.

39.     On July 1, 2017, Monsees and Bowen spun-out JUUL Labs as an independent company and named former Pax Labs CEO Tyler Goldman as CEO of JUUL.

40.     On December 11, 2017, CEO Tyler Goldman left JUUL. The Company replaced him with Defendant Burns.

## II.     Altria's History of Stealthily Marketing Nicotine to  Young People and Misleading the Public as to the Dangers of Its Products

41.     For decades, Altria and the tobacco industry, often referred to as "Big Tobacco," made billions of dollars through aggressive marketing campaigns in film, television, and print that failed to warn of the harmful effects of nicotine and cigarettes. This marketing campaign created the false impression that e-cigarettes were safe, yet left millions of Americans unwittingly addicted to nicotine, caused hundreds of thousands of deaths and illnesses due to lung cancer, lung disease and cardiovascular issues, and led to immeasurable human suffering.

42.     Beginning in the 1980s, Big Tobacco developed new, fruity flavors with matching bright advertisements to attract young, impressionable consumers, who were unaware of the addictive, poisonous effects of cigarettes.

43.     Since the true dangers of nicotine and smoking cigarettes came to light, Big Tobacco has faced decades of litigation over its advertising practices, including its ad campaigns targeting youth and its failure to adequately warn of the dangers associated with smoking

cigarettes. Much of this litigation culminated in 1998, when 46 state attorneys general entered into the Tobacco Master Settlement Agreement ("MSA"). The MSA prohibits Altria and the other major cigarette companies from marketing and advertising their products to youth (ages 18 years old and younger) and setting forth specific acts prohibited (such as use of cartoon characters and billboards near school grounds).

44.    In 2006, the United States Department of Justice reached a separate settlement with Altria and the other major cigarette companies that prohibited them from selling flavored cigarettes (excluding menthol); and required them to issue corrective statements explaining that cigarettes are not safe and were designed to create and sustain addiction.

45.    The MSA contains several provisions designed specifically to prevent tobacco marketing that targets youth. The first provision sets out a general prohibition on "any action, directly or indirectly, to target Youth . . . in the advertising, promotion or marketing of Tobacco Products." Subsequent provisions prohibit specific actions such as utilizing cartoons, sponsoring certain music or sporting events, advertising on billboards or on public transportation, using paid product placement in media, creating and distributing tobacco brand-name merchandise, distributing free samples, and providing gifts to youth in exchange for proofs of purchase, rewards points, or coupons.

46.    In August 2006, a federal judge found the major cigarette makers guilty of civil fraud and racketeering, saying the government had proven their participation in a decades-long conspiracy to deceive the public about the risks of smoking in order to sustain their profits. The court ruled that Altria and the tobacco industry engaged in a decades-long racketeering enterprise that conspired to hide the dangers of smoking.

47.     The judge wrote: "Over the course of more than 50 years, defendants lied, misrepresented, and deceived the American public, including smokers and the young people they avidly sought as 'replacement smokers,' about the devastating health effects of smoking and environmental tobacco smoke."

48.     "They suppressed research, they destroyed documents, they manipulated the use of nicotine so as to increase and perpetuate addiction, they distorted the truth about low-tar and light cigarettes so as to discourage smokers from quitting, and they abused the legal system in order to achieve their goal -- to make money with little, if any, regard for individual suffering, soaring health costs, or the integrity of the legal system," the court wrote.

49.     Citing internal industry documents, the court found that the industry knew that nicotine was addictive, but publicly denied it "and continue(s) to do so." In addition, the court found that the companies "concealed and suppressed research data and other evidence that nicotine is addictive," adding that the companies "have falsely denied that they can and do control the level of nicotine delivered in order to create and sustain addiction" and worked on ensuring that "all cigarettes delivered doses of nicotine adequate to create and sustain addiction." They do so, the court concluded, by altering the chemical form of nicotine delivered in smoke and by changing cigarette filters' design and paper porosity and composition.

50.     The court specifically faulted the industry for marketing to youth, concluding that "independent studies have found that marketing is a substantial contributing factor to youth smoking initiation." Despite the tobacco industry asserting that it does not want children to smoke, the court found that the companies tracked youth behavior and preferences, thereby ensuring that "marketing and promotion reaches youth."

51.     In addition, the court stated, the companies continued to use marketing themes intended to resonate among youths, advertise in youth-oriented publications and continue price promotions that lure young people to their products.

52.     The court also found that the companies' purported youth smoking prevention programs were "not designed to effectively prevent youth smoking."

53.     The implementation of the MSA's marketing restrictions in the late 1990s, combined with public health and public policy efforts inspired or funded by the MSA, disclosure of documents relating to Big Tobacco's wrongdoing, and subsequent litigation enforcing the MSA, contributed to dramatic declines in tobacco use, including among youth.

## III.     Nicotine is a Harmful and Addictive Chemical, Especially When Used by Youth

54.     Nicotine is a highly addictive drug derived primarily from the tobacco plant.

55.     Both cigarettes and e-cigarettes deliver nicotine in highly efficient ways to the user's airway, bloodstream, and brain.

56.     Nicotine is a central nervous system stimulant and, once ingested, travels quickly to the brain, where it triggers the release of chemicals and ultimately feelings of reward.[1] As a result, users come to associate nicotine with pleasurable feelings.[2] As Bonnie Halpern-Fisher, professor of pediatrics at Stanford University's medical school, puts it, "[r]ather than your brain getting pleasure from exercising or relationships, your brain becomes rewired to get pleasure from nicotine."[3] Nicotine addiction is the most common and most harmful effect of nicotine use.

---

[1] Ctr. on Addiction, *Understanding and Addressing Nicotine Addiction: A Science-Based Approach to Policy and Practice* (Oct. 2015), https://www.centeronaddiction.org/addiction-research/reports/understanding-and-addressingnicotine-addiction-science-based-approach (citations omitted).
[2] *Id.*
[3] Chris Kirkham, *Juul disregarded early evidence it was hooking teens*, REUTERS (Nov. 5, 2019, 11:00 AM), https://www.reuters.com/investigates/special-report/juul-ecigarette/.

Regular use of nicotine leads to uncomfortable symptoms upon withdrawal, which, in turn, perpetuate continued use regardless of adverse consequences.[4]

57.     Nicotine use can result in the rapid onset of both physiological and psychological dependence and various physical and behavioral side effects, including but not limited to increased heart rate and blood pressure, peripheral vasoconstriction, headache, dizziness, nausea, irritability, and sleep disturbance.

58.     Heavy use of nicotine can lead to nausea, vomiting, seizures, and bradyarrhythmia.

59.     Use of nicotine while pregnant is associated with severe health risks to children after they are born, including but not limited to hypertension, infertility, respiratory dysfunction, and type 2 diabetes.

60.     Nicotine is particularly dangerous for young people because their brains are still developing until about age 25. During adolescent brain development, the brain creates connections (synapses) that allow for the creation of new memories and development of new skills faster than the adult brain. This increased rate of synapse creation means that adolescents can more easily become addicted to nicotine than adults, which can prime their brains for addiction to other drugs.[5]

61.     Nicotine creates stronger feelings of reward in adolescents than in adults and, as a result, adolescent smokers are more likely than adult smokers to become dependent on nicotine.[6]

62.     Evidence clearly shows that the use of e-cigarettes, such as those sold by JUUL, may contribute to lung disease, heart attacks, and may even cause seizures. E-cigarette

---

[4] Center on Addiction, supra at 39.
[5] *Know the Risks: E-Cigarettes and Young People* | US Surgeon General Report (n.d.). Retrieved October 15, 2019, from U.S. Surgeon General's website: https://e-cigarettes.surgeongeneral.gov.
[6] Lucinda J. England, *et al.*, *Nicotine and the Developing Human: A Neglected Element in the Electronic Cigarette Debate*, 49 Am. J. of Preventative Med. 286, 290 (2015) (citations omitted).

aerosolized liquid may also contain carcinogens.[7] Additionally, e-cigarettes contain nicotine, which is more damaging for young users because their brain development is still in progress. Studies have also shown nicotine affects cell activity in the brain and negatively affects the capacities for attention, learning and memory.[8]

63.     Moreover, human brain development, including in areas of the brain involved in higher cognitive function, such as the prefrontal cortex, continues throughout adolescence and well past the age of 20.[9] According to the Centers for Disease Control, "[u]sing nicotine in adolescence can harm the parts of the brain that control attention, learning, mood, and impulse control."[10]

64.     Youth who become addicted to nicotine through JUUL products experience a range of negative social, emotional, behavioral, and physical effects. Teenagers describe wild mood swings, violent outbursts, shouting, and emotional confrontations with family and friends.[11] They express feelings of self-hatred for being dependent on a JUUL device and intense anxiety at the thought of doing without it. Young people also resort to stealing from their parents

---

[7] Elizabeth Fernandez, *Smoking E-Cigarettes Daily Doubles Risk of Heart Attack*,
https://www.ucsf.edu/news/2018/02/409916/smoking-e-cigarettes-daily-doubles-risk-heart-attacks;
[8] Yael Abreu-Villa, *et al.*, *Nicotine is a Neurotoxin in the Adolescent Brain: Critical Periods, Patterns of Exposure, Regional Selectivity, and Dose Thresholds for Macromolecular Alterations*, 979 Brain Research 114-28 (July 25, 2003),
https://www.ncbi.nlm.nih.gov/pubmed/12850578; U.S. Department of Health, and Human Services, Centers for Disease
Control and Prevention, National Center for Chronic Disease, Prevention and Health Promotion, Office on Smoking and
Health, E-Cigarette Use Among Youth And Young Adults: A Report of the Surgeon General- Executive Summary (2016),
https://ecigarettes.surgeongeneral.gov/documents/2016 SGR Exec Summ. 508.pdf.
[9] *See* Footnote 6.
Debate, 49 Am. J. of Preventative Med. 286, 290 (2015) (citations omitted).
[10] Ctr. for Disease Control and Prevention, *Quick Facts on the Risks of E-cigarettes for Kids, Teens, and Young Adults*, https://www.cdc.gov/tobacco/basic_information/e-cigarettes/Quick-Facts-on-the-Risks-of-E-cigarettes-for-Kids-Teens-and-Young-Adults.html.
[11] Moriah Balingit, *In the 'Juul room': E-cigarettes spawn a form of teen addiction that worries doctors, parents and schools*, WASH. POST (July 26, 2019, 7:00 AM), https://www.washingtonpost.com/local/education/helplessto-the-draw-of-nicotine-doctors-parents-and-schools-grapple-with-teens-addicted-to-ecigarettes/
2019/07/25/e1e8ac9c-830a-11e9-933d-7501070ee669_story.html;

or selling e-cigarette paraphernalia or clothing items to support their habits. They also find themselves feeling winded – coined "JUUL lung" – and unable to keep up with their regular physical activity.[12] Young JUUL users report increased anxiety and physical symptoms such as uncontrollable shaking when withdrawing from nicotine.

65.     Families of young people addicted to e-cigarettes struggle to identify treatment options, must respond to school disciplinary matters, and must monitor their children to ensure that they are not continuing to use e-cigarettes. Some families expend significant sums of money to place their children in private drug treatment programs.

66.     Research suggests that youths who use e-cigarettes are also more likely to subsequently begin smoking.

67.     The full extent of negative health effects to underage consumers from widespread use of JUUL e-cigarettes is still unknown. Scientists warn that the long-term health effects of JUUL and other e-cigarettes may not be known for decades.[13]

## IV.     Relevant Regulations Concerning E-Cigarettes

### A.     It is Illegal to Market or Sell E-Cigarettes to Anyone Under the Age of 18

68.     The 2010 implementation of the Family Smoking Prevention and Tobacco Control Act ("Tobacco Control Act") provides the United States Food and Drug Administration ("FDA") with authority over all products made or derived from tobacco.

69.     Although the FDA had immediate jurisdiction over cigarettes, smokeless tobacco, and roll-your-own tobacco, it needed to take additional regulatory action to "deem" any additional tobacco products to be under its jurisdiction.

---

[12] Jan Hoffman, *The Price of Cool: A Teenager, a Juul and Nicotine Addiction*, N. Y. TIMES (Nov. 16, 2018), https://www.nytimes.com/2018/11/16/health/vaping-juul-teens-addiction-nicotine.html.
[13] See e.g., Jeffrey E. Gotts, *et al.*, *What are the respiratory effects of e-cigarettes?*, 366 BMJ 1 (2019), available at https://doi.org/10.1136/bmj.l5275.

70.     The FDA issued a deeming rule on May 10, 2016 that went into effect on August 8, 2016 (the "Deeming Rule") and initiated the first stages of regulation of the e-cigarette industry, such as a national minimum sales age of at least eighteen.

71.     Additionally, state laws nationwide prohibit the sale and marketing of electronic nicotine delivery systems to minors.[14]

### B.     Modified Risk Tobacco Products Must Be Approved by the FDA

72.     The Food, Drug, and Cosmetic Act ("FD&C Act") prohibits the introduction into interstate commerce of any modified risk tobacco product without permission from the FDA. A "modified risk tobacco product" means any tobacco product, including an e-cigarette, that is sold or distributed for use to reduce harm or the risk of tobacco-related disease associated with commercially marketed tobacco products. 21 U.S.C. § 387k(a), (b)(1).

73.     This statute covers a tobacco product sold with labeling or advertising that "represents explicitly or implicitly" that the product presents a lower risk of tobacco-related disease or is less harmful than other tobacco products, or about which its manufacturer has taken any action directed to consumers that would result in consumers believing the product is safer than other tobacco products. 21 U.S.C. § 387k(b)(2). For a company to market a product as a modified risk tobacco product, it must receive authorization from the FDA. 21 U.S.C. § 387k(g).

74.     FDA regulations prohibit tobacco product manufacturers, including Defendants, from making claims regarding relative risk of particular tobacco products without the FDA first issuing a marketing order ("MRTP Order") approving the use of such claims after extensive scientific analysis is conducted and submitted to the FDA.

75.     JUUL has never received an MRTP Order from the FDA.

---

[14] https://www.publichealthlawcenter.org/resources/us-e-cigarette-regulations-50-state-review.

## V.     JLI Designed Its Product to Spike Nicotine Delivery Levels with Improved Taste to Make It More Appealing, Addictive and Dangerous, Especially to Young People

### A.     Defendants Understood That Maximizing Nicotine Addiction Was the "Magic" Behind Cigarettes' Stratospheric Commercial Success

76.     The first step in replicating the success of combustible cigarettes was to create a product that, like combustible cigarettes, was based on getting users addicted to the nicotine in the product. Nicotine is an alkaloid, a class of plant-derived nitrogenous compounds that is highly addictive, and the key ingredient that drives addiction to cigarettes. Nicotine's addictive properties are similar to heroin and cocaine.[15]

77.     Route of administration and speed of delivery are key to understanding nicotine's addictive potential. Dr. Neal Benowitz, Scientific Editor of the 1988 Surgeon General's Report on nicotine addiction, wrote: "After a puff, high levels of nicotine reach the brain in 10–20 s[econds], faster than with intravenous administration, producing rapid behavioral reinforcement. The rapidity of rise in nicotine levels permits the smoker to titrate the level of nicotine and related effects during smoking, and makes smoking the most reinforcing and dependence-producing form of nicotine administration."[16]

78.     Again, according to Dr. Benowitz, "The rapid rate of delivery of nicotine by smoking … results in high levels of nicotine in the central nervous system with little time for development of tolerance. The result is a more intense pharmacologic action. The short time interval between puffing and nicotine entering the brain also allows the smoker to titrate the dose of nicotine to a desired pharmacologic effect [often subconsciously], further reinforcing drug self-administration and facilitating the development of addiction."[17]

---

[15] *See, e.g.,* U.S. Department of Health and Human Services. *Nicotine Addiction: A Report of the Surgeon General.* DHHS Publication Number (CDC) 88-8406, (1988).

[16] Neal L. Benowitz *et al.*, *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers*, 192 Handb. Exp. Pharmacol., 29 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/.

[17] *Id.*

79.     Nicotine fosters addiction through the brain's "reward" pathway. Both a stimulant and a relaxant, nicotine affects the central nervous system; increases blood pressure, pulse, and metabolic rate; constricts blood vessels of the heart and skin; and causes muscle relaxation. Long-term exposure to nicotine causes upregulation—an increase in the number of these high-affinity nicotinic receptors in the brain. When nicotine binds to these receptors, it triggers a series of physiological effects in the user that are perceived as a "buzz" that includes pleasure, happiness, arousal, and relaxation of stress and anxiety. With regular nicotine use, however, these feelings diminish, and the user must consume increasing amounts of nicotine to achieve the same effects.

80.     Kids are particularly vulnerable to nicotine addiction, as Defendants know well. As described by the U.S Surgeon General, "Tobacco use is a pediatric epidemic." Nine out of ten smokers begin by age 18 and 80% who begin as teens will smoke into adulthood.[18]

81.     The above statements apply equally, if not more so, to e-cigarettes. Further, the U.S. Surgeon General has explained how the nicotine in e-cigarettes affects the developing brain and can addict kids more easily than adults: "Until about age 25, the brain is still growing. Each time a new memory is created, or a new skill is learned, stronger connections—or synapses—are built between brain cells. Young people's brains build synapses faster than adult brains. Because addiction is a form of learning, adolescents can get addicted more easily than adults."[19] The effects of nicotine exposure on the brain of youth and young adults include not only addiction, priming for use of other addictive substances, but also reduced impulse control, deficits in

---

[18] *Preventing Tobacco Use Among Youth and Adults, A Report of the Surgeon General* at 1 (2012), https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/index.html.
[19] *Know The Risks: E-Cigarettes & Young People*, https://e-cigarettes.surgeongeneral.gov/knowtherisks.html.

attention and cognition, and mood disorders.[20] A highly addictive, psychoactive substance that targets brain areas involved in emotional and cognitive processing, nicotine poses a particularly potent threat to the adolescent brain, as it can "derange the normal course of brain maturation and have lasting consequences for cognitive ability, mental health, and even personality."[21]

82.     In 2014, the U.S. Surgeon General reported that nicotine addiction is the "fundamental reason" that individuals persist in using tobacco products, and this persistent tobacco use contributes to millions of needless deaths and many diseases, including diseases that affect the heart and blood vessels (cardiovascular disease), lung diseases (chronic obstructive pulmonary disease ("COPD") and lung cancer), cancer almost anywhere in the body, and birth defects.[22]

83.     It took five decades of public health initiatives, government intervention, impact litigation, consumer education and tobacco regulation to finally see a significant drop in cigarette smoking and nicotine addiction.

84.     By 2014, the number of adults who reported using cigarettes had dropped to 18%, and the number of adult smokers who reported quitting smoking increased from 50.8% in 2005 to 59% by 2016.[23] By 2014, teen smoking also hit a record low.[24] In June 2014, the CDC

---

[20] Menglu Yuan *et al.*, *Nicotine and the Adolescent Brain*, 593 J. of Physiology 3397 (2015), www.ncbi.nlm.nih.gov/pmc/articles/PMC4560573/; U S Surgeon General and U.S. Centers for Disease Control & Prevention, Office on Smoking and Health, *Know the Risks: E-Cigarettes and Young People* (2019), https://e-cigarettes.surgeongeneral.gov/.

[21] Natalia A. Goriounova & Huibert D. Mansvelder, *Short- and Long-Term Consequences of Nicotine Exposure During Adolescence for Prefrontal Cortex Neuronal Network Function*, 2 Cold Spring Harbor Persp. Med. 12 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3543069/.

[22] U.S. Department of Health and Human Services. *2014 Surgeon General's Report: The Health Consequences of Smoking—50 Years of Progress* (2014), https://www.cdc.gov/tobacco/data_statistics/sgr/50th-anniversary/index.htm#report.

[23] Centers for Disease Control and Prevention, U.S. Dep't of Health and Human Services, *Trends in Cigarette Smoking Among High School Students—United States*, 1991-2001, 51 MORBIDITY AND MORTALITY WEEKLY REPORT 409 (May 17, 2002), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5119a1.htm; Teresa W. Wang, *et al.*, *Tobacco Product Use Among Adults—United States, 2017*, 67 MORBIDITY AND MORTALITY WEEKLY REPORT 1225 (Nov. 9, 2018), https://www.cdc.gov/mmwr/volumes/67/wr/pdfs/mm6744a2-H.pdf; US

reported that "in achieving a teen smoking rate of 15.7 percent, the United States has met its national Healthy People 2020 objective of reducing adolescent cigarette use to 16 percent or less."

85.     The U.S. Surgeon General reported in 2014 that: "We are at a historic moment in our fight to end the epidemic of tobacco use that continues to kill more of our citizens than any other preventable cause. The good news is that we know which strategies work best. By applying these strategies more fully and more aggressively, we can move closer to our goal of making the next generation tobacco-free."[25]

86.     Where the public health community saw progress in curbing the use of cigarettes and nicotine addiction, JUUL saw an opportunity.

**B.    Following the Big Tobacco Playbook, Defendants Sought to Market a Product That Would Create and Sustain Nicotine Addiction, but Without the Stigma Associated with Cigarettes**

87.     Seeking to build and dominate a new market for nicotine products without the baggage of combustible cigarettes (*i.e.*, with a well-established link to death and disease), JLI engineered a cool-looking e-cigarette device capable of delivering more nicotine and fueling higher levels of consumer addiction than ever before. JLI marketed that highly-addictive device as healthy, safe, cool and available in kid-friendly flavors.

88.     In doing so, JLI followed the cigarette industry's playbook. Monsees admitted that when creating JLI, he and Bowen carefully studied the marketing strategies, advertisements, and product design revealed in cigarette industry documents that were uncovered through

---

Department of Health and Human Services. *2014 Surgeon General's Report: The Health Consequences of Smoking—50 Years of Progress* (2014), https://www.cdc.gov/tobacco/data_statistics/sgr/50thanniversary/index.htm#report.

[24] Press Release, Centers for Disease Control and Prevention, *Cigarette smoking among U.S. high school students at lowest level in 22 years* (June 12, 2014), https://www.cdc.gov/media/releases/2014/p0612-YRBS.html.

[25] US Department of Health and Human Services. *LET'S MAKE THE NEXT GENERATION TOBACCO-FREE: Your Guide to the 50th Anniversary Surgeon General's Report on Smoking and Health,* https://www.hhs.gov/sites/default/files/consequences-smoking-consumerguide.pdf.

litigation and made public under the November 1998 Master Settlement Agreement between the state attorneys general of forty-six states, five U.S. territories, the District of Columbia and the four largest cigarette manufacturers in the United States. "[Cigarette industry documents] became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."[26]

89.     In a thesis presentation Bowen and Monsees gave in 2004, Monsees candidly admitted, "The cigarette is actually a carefully engineered product for nicotine delivery and addiction."[27] JLI researched how cigarette companies engineered their products and chemically manipulated nicotine to maximize delivery: "We started looking at patent literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened historically in the tobacco industry."[28] With access to the trove of documents made public to curb youth smoking and aid research to support tobacco control efforts, JLI was able to review literature on manipulating nicotine pH to maximize its delivery in a youth-friendly vapor with minimal "throat hit."

90.     Through studying industry documents, JLI learned that the cigarette industry had tried for years to figure out ways to create and sustain addiction by delivering more nicotine in a way that would be easy to ingest—without the nausea, cough, or other adverse side effects that many new smokers experienced. In the 1970s, RJR scientists eventually found a solution: combine the high-pH nicotine with a low-pH acid. The result was a neutralized compound referred to as nicotine salt. In a 1973 RJR memorandum titled "Cigarette concept to assure RJR a

---

[26] Gabriel Montoya, *Pax Labs: Origins with James Monsees*, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/
[27] Jordan Crook, *This is the Stanford Thesis Presentation That Launched Juul*, Tech Crunch (Feb. 27, 2019, 7:51 am PST), https://techcrunch.com/2019/02/27/this-is-the-stanford-thesispresentation-that-launched-juul/
[28] *Id.*

larger segment of the youth market," RJR highlighted that this chemical manipulation of the nicotine content was expected to give its cigarettes an "additional nicotine 'kick'" that would be more appealing and addictive. A young RJR chemist, Thomas Perfetti, synthesized 30 different nicotine salt combinations, tested the salts' ability to dissolve into a liquid, and heated them in pursuit of the "maximum release of nicotine."[29] Perfetti published his results in a 1979 memo stamped "CONFIDENTIAL," which was found among the documents that the FDA obtained from JLI in 2018. Relying on cigarette industry research like this, and assistance from Perfetti himself, JLI developed a cartridge-based e-cigarette using nicotine salts. As described herein, JLI's use of nicotine salts, pioneered by major combustible tobacco companies, was a critical tool for addicting non-smokers, including youth.

91.     JLI also engaged former cigarette industry researchers to consult on the design of its product. As Monsees noted in an interview with WIRED magazine: "The people who understood the science and were listed on previous patents from tobacco companies aren't at those companies anymore. If you go to Altria's R&D facility, it's empty."[30] The WIRED article stated that "[s]ome of those people are now on [PAX Lab, Inc.'s] team of advisers, helping develop J[UUL]."[31]

92.     One of the keys to JLI's success was its ability to fuse addiction and technology. The JUUL e-cigarette system is comprised of three parts: (1) the JUUL e-cigarette device, (2) the JUULpod (with e-liquid), and (3) the Universal Serial Bus [USB] charger (collectively referred to herein as "JUUL"). The JUUL e-cigarette device is a thin, sleek rectangular e-cigarette device consisting of an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an

---

[29] Thomas A. Perfetti, *Smoking Satisfaction and Tar/Nicotine Control* (Dec. 7, 1978), https://ca-times.brightspotcdn.com/3a/12/a5ec27874843a56e26b4ecdfd221/nicotine-saltsinvestigation.pdf.
[30] David Pierce, *This Might Just Be the First Great E-Cig*, WIRED (Apr. 21, 2015, 8:00 AM), www.wired.com/2015/04/pax-juul-ecig/.
[31] *Id.*

LED light, and a pressure sensor. JLI manufactures and distributes JUULpods that contain liquid that includes nicotine, flavoring and other additives. Each JUULpod is a plastic enclosure containing 0.7 milliliters of JLI's patented nicotine liquid and a coil heater. When a sensor in the JUUL e-cigarette detects the movement of air caused by suction on the JUULpod, the battery in the JUUL e-cigarette device activates the heating element, which in turn converts the nicotine solution in the JUULpod into a vapor consisting of nicotine, benzoic acid, glycerin, and propylene glycol along with myriad chemical flavorings and other chemicals, many of which are recognized as toxic.[32]



93.     JLI sells the JUULpods in packs of four or two pods, and until recently, in a variety of enticing flavors. Many of the flavors have no combustible cigarette analog, including

---

[32] *E-cigarettes and vapor products*, King County, https://www.kingcounty.gov/depts/health/tobacco/data/e-cigarettes.aspx.

"cool" cucumber, fruit medley, "cool" mint, and crème brûlée. The image below shows the JLI device and a JLI "Starter Kit" with four flavored JUULpods:



94.     JLI attempted to distinguish JUUL products from the death and disease associated with cigarettes by deliberately providing a false assurance of safety. For example, on May 8, 2018, a document titled "Letter from the CEO" appeared on JUUL's website. The document stated: "[JUUL]'s simple and convenient system incorporates temperature regulation to heat nicotine liquid and deliver smokers the satisfaction that they want without the combustion and the harm associated with it."[33]

95.     JLI even took this message to ninth graders: in 2018, a representative from JLI spoke at a high school during a presentation for ninth graders, stating that JUUL "was much safer than cigarettes," that JUUL was "totally safe," that JUUL was a "safer alternative than

---

[33] U.S. Food and Drug Administration Warning Letter to JUUL Labs, (September 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminalinvestigations/warning-letters/juul-labs-inc-590950-09092019.

smoking cigarettes," and that the "FDA was about to come out and say [JUUL] was 99% safer than cigarettes . . . and that. . . would happen very soon."[34]

96.     JLI's mission was not to improve public health. Rather, JLI sought to introduce a new generation of consumers to nicotine. JLI's business model was never about reducing addiction. As one JLI engineer put it: "We don't think a lot about addiction here because we're not trying to design a cessation product at all . . . anything about health is not on our mind."[35]

97.     JLI, Bowen, and Monsees achieved their vision. Pioneering a nicotine delivery technology that eliminated the harshness of traditional free-base nicotine, JLI's e-cigarette system provided consumers with palatable access to high-concentrations of nicotine like never before. Since JUUL's launch in 2015, JLI has become the dominant e-cigarette manufacturer in the United States. Its revenues grew by 700 percent in 2017 alone. By 2019, JLI owned three-quarters of the e-cigarette market.[36]

### C.     JLI Designed a Nicotine Delivery Device Intended to Create and Sustain Addiction

98.     JLI was well-aware from the historical cigarette industry documents that the future of any nicotine-delivery business depends on snaring kids before they age beyond the window of opportunity. One memo from a Lorillard marketing manager to the company's president put it most succinctly, "[t]he base of our business is the high school student."[37] It is no surprise, then, that the industry designed products specifically to attract and addict teen smokers. Claude Teague of RJR titled one internal memo "Research Planning Memorandum on Some

---

[34] *Id.*

[35] Kevin Roose, *Juul's Convenient Smoke Screen*, N.Y. Times (Jan. 11, 2019), https://www.nytimes.com/2019/01/11/technology/juul-cigarettes-marketing.html

[36] Dick Durbin, *et al.*, *Durbin & Senators to JUUL: You are More Interested in Profits Than Public Health*, Durbin Newsroom (Apr. 8, 2019), https://www.durbin.senate.gov/newsroom/press-releases/durbin-and-senators-to-juul-you-aremore-interested-in-profits-than-public-health.

[37] Internal Memo from T.L. Achey (Lorillard Tobacco Company) to Curtis Judge, Product Information, (August 1978).

Thoughts About New Brands of Cigarettes for the Youth Market." In it, he frankly observed, "Realistically, if our Company is to survive and prosper, over the long term, we must get our share of the youth market. In my opinion this will require new brands tailored to the youth market."[38] Dr. Teague noted that "learning smokers" have a low tolerance for throat irritation so the smoke should be "as bland as possible," *i.e.*, not harsh; and he specifically recommended an acidic smoke "by holding pH down, probably below 6." As seen below, JLI heeded Dr. Teague's advice.

## 1.   JLI Made Addictive E-Cigarettes Easy and Pleasant for Young People and Non-Smokers to Inhale

99.    As combustible cigarettes were on the decline, e-cigarettes were introduced to the U.S. market beginning in 2007. Over time, e-cigarettes developed a small group of regular users, who were primarily current or former smokers. By 2014, the e-cigarette market in the U.S. was in decline.

100.    E-cigarettes struggled to compete with combustible cigarettes, because of the technical challenge of delivering enough aerosolized nicotine to satisfy a smoker's addiction in a palatable form.[39] Before JUUL, most e-cigarettes used an alkaline form of nicotine called free-base nicotine.[40] When aerosolized and inhaled, free-base nicotine is relatively bitter, irritates the throat, and is perceived as harsh by the user.[41] This experience is often referred to as a "throat hit." The higher the concentration of free-base nicotine, the more intense the "throat hit."[42] While some "harshness" would not have much impact on seasoned cigarette smokers, it would deter

---

[38] Internal Memo from Claude Teague (R.J. Reynolds), *Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market*, (Feb. 2, 1973).
[39] Robert K. Jackler & Divya Ramamurthi, *Nicotine Arms Race: JUUL and the High-nicotine Product Market*, 28 Tobacco Control 623 (2019).
[40] *Id.*
[41] *Id.*
[42] *Id.*

newcomers, or nicotine "learners," as Claude Teague at R.J. Reynolds called young non-smokers decades ago.

101.    Before 2015, most e-liquids on the market were between 1% and 2% concentrations; 3% concentrations were marketed as appropriate for consumers who were accustomed to smoking approximately forty cigarettes a day.[43] None of these e-liquids delivered as much nicotine as quickly as a combustible cigarette.

102.    Around 2013, JLI scientists developed new e-liquids and new devices to increase the amount of nicotine that e-cigarettes could deliver to users and to reduce the throat hit. JLI scientists focused on nicotine salts rather than free-base nicotine, and they tested their formulations in a variety of ways.

### 2.    JLI's Initial Experiments Measured Non-Smokers' "Buzz" Levels and Perceptions of Throat Harshness

103.    JLI intentionally designed its product to minimize "throat hit" and maximize "buzz."

104.    In early tests, the aim was to develop a nicotine salt formulation that maximized buzz and minimized harshness. "Employees tested new liquid-nicotine formulations on themselves or on strangers taking smoke breaks on the street. Sometimes, the mix packed too much punch – enough nicotine to make some testers' hands shake or send them to the bathroom to vomit . . . ."[44]

105.    A later study by Anna K. Duell, *et al.*, which examined 4% benzoate solutions—the basis for JUUL's subsequent commercial formulations—explains why there was so little throat hit. The Duell study determined that the fraction of free-base nicotine in JUUL's "Fruit

---

[43] *Id.*

[44] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.

Medley" flavor was 0.05 and in "Crème Brulee" was 0.07.[45] Given total nicotine content of 58 mg/ml and 56 mg/ml in each flavor, respectively, these flavors have roughly 3-4 mg/ml freebase nicotine. For comparison, "Zen" brand e-liquid contains 17 mg/ml of nicotine—less than one-third of the total nicotine content of JUUL's flavors—but has a free-base fraction of 0.84,[46] resulting in over 14 mg/ml of free-base nicotine. The Duell Study's authors found that the low free-base fraction in JUUL aerosols suggested a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability."[47]

106.    Dramatically reducing the throat hit is not necessary for a product that is aimed at smokers, who are accustomed to the harshness of cigarette smoke, but it very effectively appeals to nonsmokers, especially youths. The cigarette industry has long recognized this; a published study of industry documents concluded that "product design changes which make cigarettes more palatable, easier to smoke, or more addictive are also likely to encourage greater uptake of smoking."[48] The Duell Study concluded that JLI's use of nicotine salts "may well contribute to the current use prevalence of JUUL products among youth."[49]

107.    Reducing the harshness of nicotine also allows more frequent use of e-cigarettes for longer periods of time, and masks the amount of nicotine being delivered. By removing the physiological drawbacks of inhaling traditional free-base nicotine, JLI's technology removes the principal barrier to nicotine consumption and addiction. The Duell study further concluded that

---

[45] U.S. Patent No. 9,215, 895; Anna K. Duell *et al.*, *Free-Base Nicotine Determination in Electronic Cigarette Liquids by H NMR Spectroscopy*, 31 Chem. Res. Toxicol. 431, 432 (Fig. 3).
[46] Anna K. Duell, *et al.*, *Free-Base Nicotine Determination in Electronic Cigarette Liquids by HNMR Spectroscopy*, 31 Chem. Res. Toxicol. 431 (*hereinafter* "Duell Study").
[47] *Id.* at 431–34.
[48] David A. Kessler, *Juul Says It Doesn't Target Kids. But Its E-Cigarettes Pull Them In*, N.Y. Times (July 31, 2019), https://www.nytimes.com/2019/07/31/opinion/juul-kids.html.
[49] Duell Study at 433 (citing Willett, J. G., *et al.*, *Recognition, use and perceptions of JUUL among youth and young adults*, Tobacco Control, 054273 (2018)).

JLI's creation of a non-irritating vapor that delivers unprecedented amounts of nicotine is "particularly problematic for public health."[50]

### 3. JUUL's E-Cigarettes Rapidly Deliver Substantially Higher Doses of Nicotine than Cigarettes

108.    In 2014, JUUL's scientists calculated key pharmacokinetic parameters, including maximum concentration of nicotine in the blood (Cmax) and total nicotine exposure (Area Under the Curve or AUC). JLI reported the results in U.S. Patent No. 9,215,895 (the '895 patent), for which JLI applied on October 10, 2014,[51] and which was granted in December 2015. The named inventors on the patent were Adam Bowen and Chenyue Xing.

109.    Among the formulations was a 4% benzoate formulation, which was made with 3.8% benzoic acid and 5% nicotine, as well as propylene glycol and vegetable glycerin.[52] As a comparator, JLI also measured nicotine blood levels after smoking Pall Mall cigarettes.



---

[50] *Id*. at 431.
[51] This application was a continuation of U.S. Patent Application No. 14/271,071, filed May 6, 2014, which claimed the benefit of U.S. Provisional Patent Application Serial No. 61/820,128, filed May 6, 2014, and U.S. Provisional Patent Application Serial No. 61/912,507, filed December 5, 2013.
[52] U.S. Patent No. 9,215,895 at 19:63-20:4.

110.    According to Table 1 in the patent, the Cmax (the maximum nicotine concentration in blood) for Pall Mall cigarettes was 11.65 ng/mL, and for 4% benzoate it was 15.06 ng/mL, which is nearly 30% higher. The total nicotine exposure (as measured by Area Under the Curve or AUC) was 367.5 ng * min/mL for Pall Mall cigarettes and 400.2 ng * min/mL for 4% benzoate, which is almost 9% higher. The 4% benzoate formulation had the highest Cmax and AUC of any of the formulations measured.

111.    Describing these results, JLI's '895 patent all but brags that it surpassed a commercially available combustible cigarette (Pall Mall) in maximum delivery and nearly rivaled it in how soon it could deliver peak nicotine. According to the '895 patent, "certain nicotine salt formulations [*i.e.*, JLI's] provide satisfaction in an individual superior to that of free base nicotine, and more comparable to the satisfaction in an individual smoking a traditional cigarette."[53] The patent further explains that the "rate of nicotine uptake in the blood" is higher for some claimed nicotine salt formulations "than for other nicotine salt formulations aerosolized by an electronic cigarette . . . and likewise higher than nicotine free-base formulations, while the peak nicotine concentration in the blood and total amount of nicotine delivered appears comparable to a traditional cigarette."[54]

112.    In other words, JLI distinguishes itself, and established the patentability of its e-liquids, by reference to their superlative ability to deliver nicotine, both in terms of peak blood concentration and total nicotine delivery. The rate of nicotine absorption is key to providing users with the nicotine "kick"[55] that drives addiction and abuse.[56] Because "nicotine yield is

---

[53] U.S. Patent No. 9,215, 895, at 7:51-55 (filed Dec. 22, 2015).
[54] *Id.* at 7:63-8:4.
[55] Internal Memo from Frank G. Colby (R.J. Reynolds), *Cigarette Concept to Assure RJR a Larger Segment of the Youth Market*, (Dec. 4, 1973).
[56] As the National Institutes of Health has noted, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products." *How Tobacco Smoke Causes Disease: The Biology and Behavioral*

strongly correlated with tobacco consumption,"[57] a JUULpod with more nicotine will strongly correlate with higher rates of consumption of JUULpods, generating more revenue for JUUL. For example, a historical cigarette industry study that looked at smoker employees found that "the number of cigarettes the employees smoked per day was directly correlated to the nicotine levels."[58] In essence, JLI distinguished itself based on its e-liquids' extraordinary potential to addict.

113.    A study conducted by Samantha Reilly in 2019 tested JUUL's tobacco, crème brûlée, fruit medley, and mint flavors and found that a puff of JUUL delivered 164 ± 41 micrograms of nicotine per 75 mL puff.[59] By comparison, a 2014 study using larger 100 mL puffs found that a Marlboro cigarette delivered 152-193 µg/puff.[60] Correcting to account for the different puff sizes between these two studies, this suggests that, at 75 mL/puff, Marlboro would deliver about 114-145 µg/puff. In other words, the Reilly study suggests that JUUL delivers more nicotine per puff than a Marlboro cigarette.

114.    Additionally, depending on how the product is used, an e-cigarette with the 4% benzoate solution is capable of delivering doses that are materially higher. As a paper published by the European Union notes: "[A]n e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in five minutes (the time needed to smoke a traditional

---

*Basis for Smoking-Attributable Disease, A Report of the Surgeon General* at 181 (2010), https://www.ncbi.nlm.nih.gov/books/NBK53017/pdf/Bookshelf_NBK53017.pdf
[57] Martin J. Jarvis *et al.*, *Nicotine Yield from Machine Smoked Cigarettes and Nicotine Intakes in Smokers: Evidence From a Representative Population Survey*, 93 Nat'l Cancer Inst. 134 (Jan. 17, 2001), https://academic.oup.com/jnci/article/93/2/134/2906355.
[58] Letter from Peggy Martin to Study Participants, *Resume of Results from Eight-Week Smoking Study*, UCSF Library, 1003285443-5443 (Sept. 10, 1971).
[59] Samantha M. Reilly *et al.*, *Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes*, 21 Nicotine Tobacco Research 1274 (Aug. 19, 2019), https://www.ncbi.nlm.nih.gov/pubmed/30346584.
[60] Megan J. Schroeder & Allison C. Hoffman, *Electronic Cigarettes and Nicotine Clinical Pharmacology*, 23 Tobacco Control ii30 (May 23, 2014), www.ncbi.nlm.nih.gov/pmc/articles/PMC3995273/.

cigarette, for which the maximum allowable delivery is 1 mg of nicotine)."[61] With at least 59 mg/ml of nicotine in a salt form that increases the rate and efficiency of uptake (and even with a lower mg/ml amount), a JUULpod easily exceeds the nicotine dose of a combustible cigarette. Not surprisingly, the European Union has banned all e-cigarette products with a nicotine concentration of more than 20 mg/ml of nicotine, and other countries have considered similar regulations.[62] Given the concentration of nicotine in a JUULpod, four to five milligrams of JUUL e-liquid contains about 200-250 micrograms (μg) of nicotine.

115.    JLI scientists realized in 2014 that the amount of nicotine that JUUL e-cigarettes delivered could be problematic. Chenyue Xing stated that "[y]ou hope that they get what they want, and they stop," but JLI scientists were concerned that "a Juul—unlike a cigarette—never burns out," so the device gives no signal to the user to stop. According to Xing, JLI scientists "didn't want to introduce a new product with stronger addictive power."[63] For this reason, "the company's engineers explored features to stop users from ingesting too much of the drug, too quickly. JLI's founders applied for a patent in 2014 that described methods for alerting the user or disabling the device when the dose of a drug such as nicotine exceeds a certain threshold."[64] For example, "[o]ne idea was to shut down the device for a half-hour or more after a certain number of puffs[.]"[65] But upper management rejected the concerns that the scientists raised, and "[t]he company never produced an e-cigarette that limited nicotine intake."[66]

---

[61] E-Cigarettes, European Comm'n, https://ec.europa.eu/health/sites/health/files/tobacco/docs/fs_ecigarettes_en.pdf (citing United Kingdom Medicines and Healthcare Products Regulatory Agency and industry reports).
[62] Charis Girvalaki *et al.*, *Discrepancies in Reported Versus Measured Nicotine Content of E-cigarette Refill Liquids Across Nine European Countries Before and After the Implementation of the EU Tobacco Products Directive*, 55 Eur. Respir. J. 1900941 (2020), https://doi.org/10.1183/13993003.00941-2019.
[63] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019, 11:00 AM), https://www.reuters.com/investigates/special-report/juul-ecigarette/.
[64] *Id.*
[65] *Id.*
[66] *Id.*

116.    Defendant Burns' knowledge of the exessive amount of nicotine in JUUL products and his disregard for the health and safety of JUUL's customers, many of whom are children and young adults, is demonstrated by internal company statements that he made, such as "***Half our customers are drunk and vaping like mo-fo's, who the fuck is going to notice the quality of our pods.***" This statement was often repeated in Company meetings by senior management to other employees, including to JLI's then-CFO when he reported conduct he reasonably believed to be illegal and unsafe. In this particular instance, it was made in the context of a discussion about shipping out expired or nearly expired pods.[67]

### 4.    JUUL's Design Did Not Look Like a Cigarette, Making It Attractive to Non-Smokers and Easy for Young People to Use Without Detection

117.    Not only did JUUL contain high levels of nicotine that delivered a strong "buzz" from the first puff, JLI designed its product to look appealing to youth and non-smokers.

118.    JLI's strategy to position a nicotine-delivery device as the cool thing to do is not new. Decades before, Dr. Teague from RJR observed: because "pre-smokers" face "psychological pressure" to smoke if their peers are doing so, "a new brand aimed at a young smoker must somehow be the 'in' brand and its promotion should emphasize togetherness, belonging and group acceptance, while at the same time emphasizing 'doing one's own thing.'"[68] Again, JUUL followed the cigarette playbook verbatim.

119.    JLI knew that, among its target audience, young people, cigarette smoking had become increasingly stigmatized. JLI wanted to create a product that would create "buzz" and excitement, totally different from the image of addicted cigarette smokers huddling outside their workplaces in the cold to get their nicotine fix.

---

[67] *Breja v. JUUL labs, Inc*., NDCA 3:19-cv-07148, ECF No. 1 (Oct. 29, 2019), at ¶ 69.
[68] *See* Footnote 38.

120.    Unlike the distinct smell and odor emitted from combustible cigarettes, JUUL emits a reduced aerosol with a nearly undetectable scent. And unlike other e-cigarettes, the JUUL device does not produce large plumes of smoke. Instead, the vapor cloud is very small and dissipates very quickly, allowing for concealed use. As a result, young users can, and do, use JUUL—in class or at home—without detection.

121.    The JUUL device is small and discrete. Fully assembled, the device is just over 9.5 cm in length and 1.5 cm wide. The JUUL device resembles a memory stick and can be charged in a computer's USB drive. As can be seen from the following image, this design allows the device to be concealed in plain sight, camouflaged as a thumb-drive, for use in public spaces, like schools:





122.     Referred to as "the iPhone of e-cigarettes," JLI's design was also slick and high-tech, which made it appealing to youth. JLI co-founder Bowen drew on his experience as a design engineer at Apple to make JUUL resonate with Apple's popular aesthetics. This high-tech style made JUULs look "more like a cool gadget and less like a drug delivery device. This wasn't smoking or vaping, this was JUULing."[69] The evocation of technology makes JUUL familiar and desirable to the younger tech-savvy generation, particularly teenagers. According to a 19-year-old interviewed for the Vox series By Design, "our grandmas have iPhones now, normal kids have JUULs now. Because it looks so modern, we kind of trust modern stuff a little bit more so we're like, we can use it, we're not going to have any trouble with it because you can trust it."[70] A 16-year-old agreed, explaining that "the tech aspect definitely helps people get introduced to it and then once they're introduced to it, they're staying, because they are conditioned to like all these different products. And then this is another product. And it's just another product. Until you're addicted to nicotine."[71]

123.     JUUL's design also included an LED light, which allowed users to activate "party mode," whereby the LED light would flash a rainbow of colors. "Party mode" is activated by the user by waving the JUUL device back and forth until the white LED light starts flashing multiple colors, so that the rainbow colors are visible while the person inhales from the JUUL device. "Party mode" can also be permanently activated on the JUUL by the user quickly and firmly slapping the JUUL against the palm of the hand, until the LED light starts flashing multiple colors permanently. Party mode on the JUUL is described by users to be "like an Easter egg in a

---

[69] *How JUUL Made Nicotine Go Viral*, Vox (Aug. 10, 2018), https://www.youtube.com/watch?v=AFOpoKBUyok.
[70] *Id.*
[71] *Id.*

video game" and allows for "some cool tricks that are going to drive [] friends crazy."[72] This feature was another characteristic that set JUUL apart from other e-cigarettes on the market, and made it even more appealing and "cool" to young users.  The following image is illustrative:



124.   Prior to JUUL, e-cigarettes largely used freebase nicotine and were largely unsuccessful because they were unable to deliver the same levels of nicotine to users and were not palatable.

125.   In 2014, JUUL achieved a technological breakthrough that would revitalize the e-cigarette industry. Instead of using freebase nicotine, JUUL developed an e-cigarette that uses nicotine in a salt form, created by adding benzoic acid to freebase nicotine. The chemical composition of JUUL's nicotine salt eliminated the harsh qualities and negative effects associated with freebase nicotine, making high nicotine concentrations palatable to users for the first time.

126.   Moreover, users absorb the nicotine derived from nicotine salt far more rapidly than from freebase nicotine. As a result of the nicotine salt, the JUUL e-cigarette causes users to

---

[72] Jon Hos, *Getting Your Juul Into Party Mode*, (Jul. 12, 2018), https://vapedrive.com/gettingyour-juul-into-party-mode.

experience a rapid rise of nicotine levels in their bloodstream shortly after inhalation, comparable to the rate of traditional combustible cigarettes. The ultrafine particulates created by the JUUL e-cigarette almost immediately penetrate the user's arterial bloodstream, passing the blood-brain barrier into the pleasure center of the brain. This physiological experience is most often described by the user as a "head buzz" or "kick."

### 5. JUUL Enticed Youth and Newcomers to Nicotine with Kid-Friendly Flavors

#### a. JUUL Introduced Kid-Friendly Flavors

127. Cigarette companies have known for decades that flavored products are key to getting young people to acclimate to nicotine.[73] A 2004 study found that seventeen-year-old smokers were more than three times as likely as those over the age of twenty-five to smoke flavored cigarettes, and they viewed flavored cigarettes as safer.[74]

128. In June 2015, JUUL came to market in four flavors including tabaac (later renamed tobacco), fruut (later renamed fruit medley), bruulé (later renamed crème brulee), and miint (later renamed mint).

---

[73] A September 1972 Brown & Williamson internal memorandum titled "Youth Cigarette New Concepts," observed that "it's a well known fact that teenagers like sweet products." A 1979 Lorillard memorandum found "younger" customers would be "attracted to products with 'less tobacco taste,'" and suggested investigating the "possibility of borrowing switching study data from the company which produces 'Life Savers' as a basis for determining which flavors enjoy the widest appeal" among youth.

[74] Gardiner Harris, *Flavors Banned From Cigarettes to Deter Youth*, N.Y. Times (Sept. 22, 2009), https://www.nytimes.com/2009/09/23/health/policy/23fda.html.



129.    JUUL later offered other kid-friendly flavors, including cool mint, cucumber, and mango.



130.    In 2009, the FDA banned flavored cigarettes (other than menthol) as its first major anti-tobacco action pursuant to its authority under the Family Smoking Prevention and Tobacco Control Act of 2009. "Flavored cigarettes attract and allure kids into addiction," Health and Human Services Assistant Secretary Howard Koh, MD, MPH, said at a news conference

held to announce the ban.[75] In January 2020, the FDA banned flavored e-cigarette pods, other than "Tobacco" and "Menthol" flavors, in response to "epidemic levels of youth use of e-cigarettes" because these products are "so appealing" to children."[76]

131.    The availability of e-liquids in flavors that appeal to youth increases rates of e-cigarette adoption by minors. A national survey found that that 81% of youth aged twelve to seventeen who had ever used e-cigarettes had used a flavored e-cigarette the first time they tried the product, and that 85.3% of current youth e-cigarette users had used a flavored e-cigarette in the past month. Moreover, 81.5% of current youth e-cigarette users said they used e-cigarettes "because they come in flavors I like."[77]

132.    Adding flavors to e-liquids foreseeably increases the risk of nicotine addiction by making it easier and more pleasant to ingest nicotine.[78] Research has shown that adolescents whose first tobacco product was flavored are more likely to continue using tobacco products than those whose first product was not flavored.

133.    In a recent study, 74% of youth surveyed indicated that their first use of a JUUL was of a flavored JUULpod.[79] A significant majority of under-age users chose flavored e-cigarette products.[80]

---

[75] Daniel J. DeNoon, *FDA Bans Flavored Cigarettes: Ban Includes Cigarettes with Clove, Candy, and Fruit Flavors*, WebMD (Sept. 22, 2009), https://www.webmd.com/smokingcessation/news/20090922/fda-bans-flavored-cigarettes#2.

[76] https://www.fda.gov/news-events/press-announcements/fda-finalizes-enforcement-policyunauthorized-flavored-cartridge-based-e-cigarettes-appeal-children

[77] *See* Bridget K. Ambrose, *et al.*, *Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, 2013-2014*, 314 JAMA 1871 (2015). Another peer-reviewed study concluded that young adults who use electronic cigarettes are more than four times as likely to begin using regular cigarettes as their peers who have not used e-cigarettes. *See* Brian A. Primack, *et al., Initiation of Traditional Cigarette Smoking after Electronic Cigarette Use Among Tobacco-Naïve US Young Adults*, 131 Am. J. Med. 443.e1 (2018).

[78] *See How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease: A Report of the Surgeon General*, Chapter 4 (Centers for Disease Control and Prevention ed. 2010), https://www.ncbi.nlm.nih. gov/books/NBK53018/ #ch4.s92.

[79] Karma McKelvey, *et al.*, *Adolescents and Young Adults Use in Perceptions of Pod-based Electronic Cigarettes*. 1 JAMA Network Open e183535 (2018), https://doi:10.1001/jamanetworkopen.2018.3535.

134.    JLI asserts that it did not intend its flavors to appeal to underage consumers. After eleven U.S. Senators sent a letter to JLI questioning its marketing approach and kid-friendly e-cigarette flavors, JLI visited Capitol Hill and told Senators that it never intended its products to appeal to kids and did not realize they were using the products, according to a staffer for Senator Dick Durbin. JLI's statements to Congress—which parallel similar protests of innocence by cigarette company executives—were false.

135.    A former JUUL manager, who spoke to *The New York Times* on the condition that his name not be used, said that within months of JUUL's 2015 introduction, it became evident that teenagers were either buying JUULs online or finding others to make the purchases for them. Some people bought more JUUL kits on JUUL's website than they could individually use—sometimes ten or more devices at a time. "First, they just knew it was being bought for resale," said the former senior manager, who was briefed on the company's business strategy. "Then, when they saw the social media, in fall and winter of 2015, they suspected it was teens."[81]

136.    JLI's use of flavors unfairly targeted not only youth, but unsuspecting adults as well. By positioning JUULpods as a flavor-oriented product rather than a system for delivering a highly addictive drug, JLI deceptively led consumers to believe that JUULpods were not only healthy (or at least essentially harmless), but also a pleasure to be enjoyed regularly, without guilt or adverse effect.

---

[80] Karen A. Cullen *et al.*, *E-cigarette Use Among Youth in the United States*, 2019, 322 JAMA, 2095 (2019), https://tinyurl.com/y3g75gmg ("Among current exclusive e-cigarette users, an estimated 72.2% . . . of high school students and 59.2% . . . of middle school students used flavored e-cigarettes. . . .").

[81] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teenmarketing.html.

### b.     JUUL and Altria Developed and Promoted the Mint Flavor and Sought to Preserve Its Market

137.     While the JLI Defendants were developing and marketing their flavored products to appeal to and recruit youth, Altria, recognizing the value of those young "replacement smokers," committed itself to the cause. With the shared goal to grow the number of nicotine-addicted users, and as detailed further herein, the JLI Defendants and the Altria Defendants set out to do whatever was necessary to create and preserve the lucrative market for flavors. In order to maximize the value of its mint line of JUULpods, the JLI Defendants chemically and socially engineered the mint pods to become the most popular "flavor" among youth, including through extensive surveillance of youth behavior and preferences, all while seeking to conceal mint's appeal to youth.

138.     In July 2013, Reynolds American Inc. ("Reynolds")[82] released the Vuse, the first-known cartridge-based nicotine salt e-cigarette to reach the domestic market.[83] Altria entered the nicotine salt market one month later, with the MarkTen cig-a-like.[84] JLI would enter the market in June 2015.

139.     Although mint was one of the least popular e-cigarette flavor categories with youth in 2015, trailing the fruit and dessert categories,[85] Reynolds, Altria and JLI had all introduced mint-flavored products within a year of each company's initial release. By mid-2014,

---

[82] Reynolds is now a wholly-owned subsidiary of British American Tobacco.
[83] *See* FAQs, RJR Vapor Co., LLC, http://www.vusevapor.com/faqs/product/ ("Since Vuse's launch in 2013, all of our closed systems available for sale nationally (i.e., Vuse Solo, Vuse Ciro, Vuse Vibe, and Vuse Alto) include nicotine salts").
[84] Additional Info, Nu Mark LLC, https://markten.com ("certain varieties" of MarkTen Original "contain acetic acid, benzoic acid, and lactic acid").
[85] *See* M.B. Harrell *et al.*, *Flavored e-cigarette use: Characterizing youth, young adult, and adult users*, 5 Preventive Medicine Reports, 33-40, § 3.3 (Mar. 2017), https://www.sciencedirect.com/science/article/pii/S2211335516301346.

Reynolds had added "Mint, Rich Mint, Spearmint, [and] Wintergreen" to its Vuse lineup.[86] By February 2015, Altria's Nu Mark LLC, under the leadership of Joe Murillo (JLI's current regulatory head), released a Winter Mint flavor for MarkTen.

140.     Unlike Reynolds and Altria, which released mint products after first releasing a menthol variant, JLI skipped menthol and went straight to mint, adding Menthol in late 2017 around the same time it released its mango JUULpods.

141.     JLI's flavored JUULpods were particularly popular with its underage users and, when mango was introduced, it was the underage user's flavor of choice.

142.     The JLI Defendants and the Altria Defendants recognized both the potential of using flavors to hook kids and the inevitability that the government would seek to regulate said flavors. Therefore, they sought to solidify the market presence of a "substitute" youth-friendly flavor—mint—which might escape regulation and preserve JLI's astronomical sales figures.

### i.        Mint Has the Highest Nicotine Impact

143.     One recent study found that JLI's mango flavor had the lowest free-base content, making it the least harsh formula; and that mint had the highest free-base content (30% more free-base than mango), making mint the formula with the strongest nicotine impact:[87]

---

[86] *See* Sen. Richard Durbin, *et al.*, *Gateway to Addiction?* (April 14, 2014), *available at* https://www.durbin.senate.gov/imo/media/doc/Report%20-%20ECigarettes%20with%20Cover.pdf.
[87] *See* Duell AK, *et al. Nicotine in tobacco product aerosols: 'It's déjà vu all over again'* Tob Control, 5 ((Dec. 17, 2019), *available at* https://tobaccocontrol.bmj.com/content/tobaccocontrol/early/2019/12/16/tobaccocontrol-2019-055275.full.pdf.

| | $C_{HA}/C_{Nic}$ | $\alpha_{fb}$ |
|---|---|---|
| **Benzoic acid** | | |
| JUUL 'Cool Mint' (5% nicotine) | 0.97* | 0.13 |
| JUUL 'Classic Menthol' (5% nicotine) | 0.98* | 0.13 |
| JUUL 'Crème Brûlée' (5% nicotine) | 0.97* | 0.12 |
| JUUL 'Fruit Medley' (5% nicotine) | 0.99* | 0.12 |
| JUUL 'Cool Cucumber' (5% nicotine) | 1.00* | 0.11 |
| JUUL 'Classic Tobacco' (5% nicotine) | 1.00* | 0.11 |
| JUUL 'Virginia Tobacco' (5% nicotine) | 1.00* | 0.11 |
| JUUL "Mango" (5% nicotine) | 0.99* | 0.09 |
| JUUL "Virginia Tobacco" (3% nicotine) | 0.94* | 0.14 |
| JUUL 'Mint' (3% nicotine) | 1.04* | 0.11 |
| Averages for JUUL | 0.99±0.03 SD | 0.12±0.01 |

Anna K. Duell *et al.*, Nicotine in tobacco product aerosols: 'It's déjà vu all over again'

144.    These findings evidence the plan by the JLI Defendants and the Altria Defendants to make mint as potent as possible as it was the flavor whose lifespan they were working hard to preserve when it got into the hands of nonsmokers, including youth.

### ii.    JUUL's Youth Surveillance Programs Confirmed That Mint JUULpods are Preferred by Teens

145.    In January 2018, Kevin Burns, JLI's new CEO, deployed his experience as the former CEO of a yogurt company to begin developing JUUL's flavor portfolio. One part of this initiative included studying consumer reactions to flavor names.

146.    In April 2018, JLI received a document request from the FDA seeking information about the design and marketing of JLI's products, among other things.[88]

147.    In response, JLI announced a commitment of $30 million to youth prevention efforts and began sending JLI representatives to schools to present what were essentially

---

[88] Matthew Holman, *Letter from Director of Office of Science, Center for Tobacco Products, to Zaid Rouag, at JUUL Labs, Inc.*, U.S. Food & Drug Admin. (Apr. 24, 2018), https://www.fda.gov/media/112339/download.

advertising campaigns for JUUL products. This conduct resulted in a Warning Letter from the FDA's Center for Tobacco Products to JLI in September 2019.[89]

148.    JUUL learned that its "Mint" flavor was popular among youth. This is not surprising, as JLI designed the "Mint" flavor not to taste like a Menthol cigarette. Users have described JLI's Menthol flavor as "tast[ing] like a [N]ewport" cigarette that "doesn't have the good peppermint taste like [C]ool [M]int."[90]

149.    According to Siddharth Breja, who was senior vice president for global finance at JLI, after JLI pulled most flavored pods, including mango, from the market in a claimed attempt to reduce youth usage of JUUL, then-CEO Kevin Burns said that "[y]ou need to have an IQ of 5 to know that when customers don't find mango they buy mint."[91] And it was public knowledge that mint and menthol have a well-documented history of facilitating youth tobacco use, as Dr. Jonathan Winickoff testified before Congress:

> [it is] completely false to suggest that mint is not an attractive flavor to children. From candy canes to toothpaste, children are introduced to mint flavor from a young age. Not only do children enjoy mint, but it has special properties that make it an especially dangerous flavor for tobacco. Menthol's anesthetic properties cool the throat, mask the harshness of nicotine, and make it easier for children to start using and continue using tobacco products. The impact of mint and menthol flavors on increasing youth tobacco addiction is well documented.[92]

150.    With that knowledge and with no genuine interest in youth prevention, and as detailed below, the JLI Defendants and the Altria Defendants committed to work to preserve

---

[89] *Juul Labs, Inc. Warning Letter*, U.S. Food & Drug Admin. (Sept. 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminalinvestigations/warning-letters/juul-labs-inc-590950-09092019.

[90] Reddit, *How does Classic Menthol compare to Cool Mint*,
https://www.reddit.com/r/juul/comments/7wo39m/how_does_classic_menthol_compare_to_cool_mint/.

[91] Sheila Kaplan and Jan Hoffman, *Juul Knowingly Sold Tainted Nicotine Pods, Former Executive Says*, N.Y. Times (Nov. 20, 2019), https://www.nytimes.com/2019/10/30/health/juulpods-contaminated.html

[92] *Examining Juul's Role in the Youth Nicotine Epidemic*, Testimony of Jonathan Winickoff Before the U.S. House of Representatives Committee on Oversight and Reform Subcommittee on Economic and Consumer Policy, ("Winickoff Testimony") at 3, U.S. House Committee on Oversight & Reform (July 24, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019.07.24%20Winickoff%20AAP%20Testimony.pdf.

mint as a flavor for as long as possible. Indeed, to further this goal, Defendants Pritzker and Valani poured additional money into JLI a mere two months later as part of a $600 million funding round.[93]

151.   By keeping mint on the market long after other flavors were pulled, these Defendants continued to expand the number of addicted e-cigarette users.

**D.   Defendants Developed and Implemented a Marketing Scheme to Mislead Consumers into Believing that JUUL Products Contained Less Nicotine Than They Actually Do and Were Healthy and Safe**

152.   Having created a product designed to hook users to its nicotine, JLI had to mislead consumers into believing JUUL was something other than what it actually was. So, the company engaged in a years' long campaign to downplay JUUL's nicotine content, nicotine delivery, and the unprecedented risks of abuse and addiction JUUL poses. Defendants devised and knowingly carried out a material scheme to defraud consumers by (a) misrepresenting the nicotine content, nicotine delivery profile, and risks of JUUL products, (b) representing to the public that JUUL was a smoking cessation tool, and (c) using third-party groups to spread false and misleading narratives about e-cigarettes, and JUUL in particular.

**1.   The JLI Defendants Knowingly Made False and Misleading Statements and Omissions Concerning JUUL's Nicotine Content**

153.   Every 5% strength JUULpod package represents that one pod is equivalent to one pack of cigarettes. This statement is deceptive, false and misleading.

154.   In addition, as Defendants know, it is not just the amount of nicotine, but the efficiency with which the product delivers nicotine into the bloodstream, that determines the product's narcotic effect, risk of addiction, and therapeutic use. Most domestic cigarettes contain

---

[93] Crunchbase, *JUUL Raises $650M of Its $1.25B Mega-Round*, 2018-07-10
https://news.crunchbase.com/news/juul-raises-650m-of-its-1-25b-mega-round/

10–15 mg of nicotine per cigarette[94] and each cigarette yields between 1.0 and 1.4 mg of nicotine,[95] meaning that around 10% of the nicotine in a cigarette is typically delivered to the user. JUUL e-cigarettes, on the other hand, have been found to deliver at least 82% of the nicotine contained in a JUULpod to the user.[96]

155.    Defendants also knew that the use of benzoic acid and nicotine salts in JUULpods affects pH and facilitates "absorption of nicotine across biological membranes."[97] JUUL's e-liquid formulation is highly addictive not only because it contains a high concentration of nicotine, but because it contains a particularly potent form of nicotine, *i.e.*, nicotine salts. The Altria Defendants were aware of the research showing the potency of nicotine salts from their many years in the tobacco business.

156.    Nevertheless, JUUL began to market JUUL as providing a nicotine experience on par with a cigarette, even though they designed JUUL to ensure that was not true. In reality, there were never any measured test results in accord with JLI's marketing to distributors, retailers, and the public at large.

157.    JUUL created charts, which it posted on its website, shared with journalists, sent to retailers, and distributed to third party promoters, showing that JUUL's 5% solution achieved a pk profile just below that of a cigarette. For example, the following chart appeared on the online publication TechCrunch:

---

[94] Neal L Benowitz and Jack E Henningfield, *Reducing the nicotine content to make cigarettes less addictive*, Tobacco Control 22 Supp. 1, i14-17 (May 2013), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3632983/.
[95] Lynn T. Kozlowski and Janine L. Pilliteri, *Compensation for Nicotine by Smokers of Lower Yield Cigarettes*, 7 Smoking and Tobacco Control Monograph 161, 164 (1983), https://cancercontrol.cancer.gov/brp/tcrb/monographs/7/m7_12.pdf.
[96] Samantha M. Reilly *et al.*, *Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes*, 21 Nicotine Tobacco Research 1274 (Aug. 19, 2019), https://www.ncbi.nlm.nih.gov/pubmed/30346584 (about 82%, for average of 164 µg per puff).
[97] Neal L. Benowitz *et al.*, *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers*, 192 Handb. Exp. Pharmacol., 29 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/.



158.    As discussed above, this information conflicted with JUUL's internal information as evidenced by the company's patent application.

### 2.    JUUL and Altria Transmitted, Promoted and Utilized Statements Concerning JUUL's Nicotine Content That They Knew Were False and Misleading

159.    As set forth above, the statements in JLI advertisements and on JUULpod packaging that each JUULpod contains about as much nicotine as a pack of cigarettes are deceptive, false and misleading. Defendants knew this.

160.    The JLI Defendants made deceptive, false and misleading statements that a JUULpod had an amount of nicotine equivalent to that of one pack of cigarettes. These Defendants have thus materially misrepresented the nicotine content of JUUL products.

161.    By no later than October 30, 2016 (and likely earlier), the JLI website advertised that "[e]ach JUULpod contains 0.7mL with 5% nicotine by weight, approximately equivalent to

49

1 pack of cigarettes or 200 puffs."[98] The language on the website would later change, but still maintained the same fraudulent misrepresentation—*i.e.*, that "[e]ach 5% JUULpod is roughly equivalent to one pack of cigarettes in nicotine delivery."[99]

162.    JUULpod packages that were sent via U.S. mail stated that a single JUULpod is "approximately equivalent to about 1 pack of cigarettes."[100] These statements, as well as the statements on the JLI website, were false and misleading.

163.    The statement on the JLI website, and in its advertisements and packaging, that each JUULpod contains 5% nicotine and is approximately equivalent to a pack of cigarettes is false and likely to deceive and mislead, because the actual amount of nicotine contained in a JUULpod is as much as twice as high as that in a pack of cigarettes.

164.    The Altria Defendants greatly expanded the reach of this fraud by providing its retail and distribution might for JLI products, causing millions of JUULpods to be sent via U.S. mail with packaging stating that JUULpods contain only 5% nicotine by weight and are "approximately equivalent to about 1 pack of cigarettes."[101] The JLI Defendants and the Altria Defendants knew that these statements were false and misleading, but nevertheless utilized JUUL product packing, marketing and advertising to maintain their fraud.

165.    The Altria Defendants knew in 2017 that a JUULpod delivered more nicotine than one pack of cigarettes. In 2017, the Altria Defendants launched their MarkTen Bold e-cigarette, a relatively high-strength 4% formulation compared to the 2.5% and 3.5% strength MarkTen products initially offered. Even though JUUL was already on store shelves and was rapidly

---

[98] JUULpod, JUUL Labs, Inc. (Oct. 30, 2016),
https://web.archive.org/web/20161030085646/https://www.juulvapor.com/shop-pods/.
[99] *What is Vaping?*, JUUL Labs, Inc. (July 2, 2019), https://www.JUUL.com/resources/Whatis-Vaping-How-to-Vape.
[100] Juul Labs, Feb. 14, 2018, 10:35 a.m. Tweet, https://twitter.com/JUULvapor/status/963844069519773698
[101] *Id.*

gaining market share with its 5% nicotine formulation, the Altria Defendants chose to bring a less potent 4% formulation to market.

166.    According to the Altria Defendants' own pharmacokinetic testing, as reflected in the chart below, this 4% less potent formulation was nevertheless sufficient to raise plasma nicotine to levels approaching those generated by combustible cigarettes. In other words, the Altria Defendants' own pharmacokinetic testing suggested the highly addictive nature of a 5% formulation, as such a formulation would readily equal or exceed the nicotine delivery profile of a combustible cigarette.



Presented at Altria Group Inc.'s November 1, 2017 Investor Day Presentation. MarkTen Bold 4%

167.    Based on their own internal knowledge, the Altria Defendants knew that a 5% nicotine formulation would carry more nicotine than one pack of cigarettes. In addition to data they received from JLI, the Altria Defendants' due diligence undoubtedly included a careful examination of JLI's intellectual property, including the '895 patent, which provides a detailed overview of nicotine benzoate's pharmacokinetic profile.

168.    Thus, the JLI Defendants and the Altria Defendants knew that the statement on JUULpod packaging that each JUULpod contains 5% nicotine and about as much nicotine as a pack of cigarettes is literally false, and they intended such statements to mislead.

169.    Not only have the JLI Defendants misrepresented or concealed the actual amount of nicotine consumed via JUULpods, but they also did not effectively or fully inform users about the risks associated with the potent dose of nicotine delivered by JLI's products. Despite going through numerous revisions since 2015, the JUUL packaging did not include nicotine addiction warnings until JLI was forced to add them in August 2018.

170.    Moreover, the form of nicotine JUULpods contain is particularly potent. JUUL's use of "strength" to indicate concentration by weight is also at odds with the industry standard of reporting concentration by volume,[102] leading consumers to believe JUULpods contain less nicotine than other formulations advertised as 6% nicotine by volume, when they in fact contain approximately the same nicotine.

171.    The "5% strength" statement in Defendants' advertisements misrepresents the most material feature of the JUUL product—the nicotine content—and has misled consumers to their detriment. Resellers, apparently assuming that "5% strength" means "50mg/ml" nicotine by volume, compound confusion among consumers by stating that JUULpods contain "50 mg/ml," which they do not.[103]

---

[102] *See, e.g.*, https://www.whitecloudelectroniccigarettes.com/blog/nicotine-measurements/; American E-Liquids Manufacturing Standards Association, *E-Liquids Manufacturing Standards*, § 1.05 (2017) (quantifying e-liquid nicotine content in terms of volume), https://www.aemsa.org/wp-content/uploads/2017/03/AEMSA-Standards-v2.3.3.pdf.

[103] *See, e.g.*, Tracy Vapors, Starter Kits, http://web.archive.org/web/20190422143424/https://www.tracyvapors.com/collections/starterkit. Lindsey Fox, *JUUL Vapor Review, Ecigarette Reviewed (March 20, 2017)*, https://ecigarettereviewed.com/juul-review ("The nicotine content of the JUUL pods is always the same: 5% or 50 mg/ml"); Jason Artman, *JUUL E-Cigarette Review*, eCig One (Oct. 26, 2016) https://ecigone.com/e¬cigarette-reviews/juul-e-cigarette-review/ ("the e-liquid contains 50 mg of nicotine per ml of e-liquid"); West Coast Vape Supply, http://web.archive.org/web/20190718190102/https://westcoastvapesupply.com/products/juulstarter-kit ("5% . . . 50

### 3.   JLI Defendants Used Food and Coffee Themes to Give the False Impression that JUUL Products Were Safe and Healthy

172.   In late 2015, the JLI Defendants employed a deceptive marketing scheme to downplay the harms of e-cigarettes with a food-based advertising campaign called "Save Room for JUUL." The campaign framed JUUL's addictive pods as "flavors" to be paired with foods.[104] JLI described its Crème Brûlée nicotine pods as "the perfect evening treat" that would allow users to "indulge in dessert without the spoon."[105] In one 2016 email, JLI bluntly suggested that users satisfy their sugar cravings with JUUL's highly-addictive nicotine vapor: "Have a sweet tooth? Try Brulee."[106] JLI similarly promoted the fruit medley pods using images of ripe berries. JLI described its "Cool" Mint pods as having a "crisp peppermint taste with a pleasant aftertaste" and encouraged consumers to "Beat The August Heat With Cool Mint."[107]



mg"); Vapor4Life, *How Much Nicotine is In a JUUL?* ("Each official JUUL pod contains a whopping 50mg of nicotine per milliliter of liquid (most other devices range from 3 to 30mg per milliliter)."), https://www.vapor4life.com/blog/how-much-nicotineis-in-a-JUUL/.
[104] Erin Brodwin, *$15 billion startup JUUL used 'relaxation, freedom, and sex appeal' to market its crème-brulee-flavored e-cigs on Twitter and Instagram—but its success has come at a big cost*, Business Insider, Oct. 26, 2018, https://www.businessinsider.com/juul-e-cigmarketing-youtube-twitter-instagram-social-media-advertising-study-2018-10.
[105]
http://tobacco.stanford.edu/tobacco_main/images_pods.php?token2=fm_pods_st658.php&token1=fm_pods_img360 19.php&theme_file=fm_pods_mt068.php&theme_name=JUUL&subtheme_name=Flavors.
[106] *Id.*
[107] *Id.*



173.   In several caffeine-pairing advertisements, JUUL devices or pods sit next to coffee and other caffeinated drinks, sometimes with what appear to be textbooks in the picture.[108] JLI's coffee-based advertisements suggest that JUUL should be part of a comfortable routine, like a cup of coffee.

174.   JLI's reference to coffee is no mere marketing gimmick; it reflects the larger effort to mislead customers into believing that JUUL is no more harmful than coffee, reinforcing the false and dangerous concept that if a substance is "not harmful," then addiction to that substance cannot be harmful.

---

[108] *Id.*

  

 



175.    Defendants knew that tying JUUL to caffeine and food would mislead their target audience—youth and non-smokers—into believing that JUUL was a healthy, safe treat.

**4.    JUUL's "Make the Switch" Campaign Intentionally Misled and Deceived the Public to Believe that JUUL Is a Cessation Device For Adult Smokers**

176.    Defendants recognized that one of the keys to growing and preserving the number of nicotine-addicted e-cigarette users (and thus JLI's staggering market share), was to mislead potential customers about the true nature of JUUL products. Defendants knew that if it became public that JUUL was designed as a way to introduce nicotine to youth and otherwise hook new users with its potent nicotine content and delivery, it would not survive the public and regulatory backlash. Therefore, the JLI Defendants and the Altria Defendants repeatedly made false and misleading statements to the public that JUUL was created and designed as a smoking cessation

device, and falsely and misleadingly spread the subterfuge. The JLI Defendants and the Altria Defendants committed these deceptive, misleading and fraudulent acts intentionally and knowingly. In making these representations, the JLI Defendants and the Altria Defendants intended that consumers, the public, investors, and regulators would rely on their misrepresentations that JUUL products were designed to assist smoking cessation.

177.    JUUL marketed its products as modified risk tobacco products without express permission from the FDA, in violation of 21 U.S.C. § 387k. In 2017, a JUUL representative assured teens at a New York City high school that JUUL products were "much safer than cigarettes";[109] "totally safe";[110] and a "safer alternative than smoking cigarettes."[111] The representative also claimed that the "FDA was about to come out and say [JUUL's e-cigarette product] was 99% safer than cigarettes."[112]

178.    JUUL continued to market its products as a safer alternative to cigarettes, even as recently as 2018. In a letter that JUUL published on its website in the spring of 2018, JUUL's then-CEO Kevin Burns declared that JUUL's "simple and convenient system incorporates temperature regulation to heat nicotine liquid and deliver smokers the satisfaction that they want without the combustion and the harm associated with it."[113]

179.    In early 2016, the JLI Defendants gradually began another campaign that focused more on switching from smoking to using JUUL, known as the "Switch Campaign."

---

[109] Congressional Hearing, July 24, 2019, Testimony of Meredith Berkman, at min. 52:27-53:31. Retrieved from https://oversight.house.gov/legislation/hearings/examining-juul-s-role-in-the-youth-nicotine-epidemic-part-i
[110] Congressional Hearing, July 24, 2019, Testimony of Caleb Mintz, at min. 1:18:50 – 1:19:11. Retrieved from https://oversight.house.gov/legislation/hearings/examining-juul-s-role-in-the-youth-nicotine-epidemic-part-i.
[111] Congressional Hearing, July 24, 2019, Testimony of Philip Fuhrman, at min. 1:20:20 – 1:21:14. Retrieved from https://oversight.house.gov/legislation/hearings/examining-juul-s-role-in-the-youth-nicotine-epidemic-part-i.
[112] *Id*. at 1:21:45 – 1:22:02. (Fuhrman).
[113] "Letter from the CEO," from Kevin Burns, CEO, JUUL Labs, Inc., (May 8, 2018). Retrieved from http://www.juullabs.com.

180.    As they had during the Vaporized Campaign, the JLI Defendants marketed JUUL throughout the Switch Campaign in many of the same channels, including social media (Facebook, Instagram, Twitter, Reddit, YouTube, and its own social media platform known as "JUUL Talk"), content created and shared by social media influencers, direct email marketing, retail advertisements, and billboards. The JLI Defendants also began advertising in print media, radio, and via third-party affiliate sellers.

181.    While more muted and reserved than the Vaporize Campaign, the Switch Campaign still focused on advertising channels that would frequently expose youth to JUUL's marketing, disregarding the risk that such advertisements would manipulate youth into using JUUL.

182.    JUUL also began making more brazen claims about the supposed health benefits of using JUUL and the appropriateness of using JUUL as a smoking cessation device. JLI's advertising encouraged smokers to "switch" to JUUL in order to improve their lives, implying that JUUL was safer to use than cigarettes. However, the JLI Defendants had not conducted the scientific research necessary to determine whether such a safety claim was true and did not know to what extent e-cigarettes may have been safer than smoking cigarettes.

183.    The JLI Defendants also made specific representations on JUUL's website and in other advertising media about JUUL's temperature control systems, claiming JUUL presents less risk of harm to users than smoking cigarettes by producing harmful compounds in smaller amounts.

184.    JUUL's 2018 "Make the Switch" advertising campaign, described above, also suggested to consumers that its products had a therapeutic function as smoking cessation devices,

when, in fact, a single JUULpod contains at least as much nicotine as an entire pack of cigarettes and JUUL's products have not been approved for such use.

185.    Through its marketing efforts, JUUL misled consumers into believing that its products were less harmful than traditional cigarettes and could even be used as a therapeutic smoking-cessation device.

186.    By promoting JUUL's product as a safe, or safer, lifestyle choice and omitting information about other potentially harmful effects of using JUUL, the JLI Defendants deceived consumers and manipulated them into purchasing and using their product, exposing those consumers to possible nicotine dependence, harmful and potentially harmful compounds delivered by JUUL, and, among youth especially, increasing the risk of subsequent combustible tobacco use.



187.   The JLI Defendants' tacit message in their Switch advertisements was: switch because, unlike cigarettes, JUUL is harmless to your health.

188.   The JLI Defendants ensured that JUUL was the opposite of a "tool[] to reduce or eliminate" nicotine consumption. According to the National Institutes of Health, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products."[114] As described above, JLI and Bowen designed the JUUL product to deliver nicotine

---

[114] CDC, *et al.*, *Nicotine Addiction: Past and Present, How Tobacco Smoke Causes Disease* (2010), https://www.ncbi.nlm.nih.gov/books/NBK53018/#ch4.s92

in larger amounts and at a faster rate than even cigarettes, and then knowingly misled the public about those facts.

189.    JUUL is not a product adults typically use to quit smoking. Researchers have found that as of 2018, only 7.9% of American adults had ever used USB shaped vape devices, like JUUL, and only 2% of adults currently used them.[115] And as mentioned above, youth were 16 times more likely to use the USB-shaped JUUL than adults.[116]

190.    The Switch campaign also did not disclose or warn about the risks of using multiple tobacco products, "dual use," or that the JUUL is not a smoking cessation product. In addition to the heightened risks of addiction that multiple tobacco product use poses, one recent study found that persons who use e-cigarettes and smoke have blood toxin levels far higher than one would expect given the blood toxin levels that e-cigarettes and cigarettes generate individually.[117]

## VI.    JUUL Enters the Industry, Using Big Tobacco's Playbook to Appeal to Kids

191.    As Defendants know, nearly 9 out of 10 smokers start smoking by age 18, and more than 80% of underage smokers choose brands from among the top three most heavily advertised.[118] The overwhelming consensus of public health authorities, independent studies, and credible expert witnesses is that "marketing is a substantial contributing factor to youth smoking initiation."

---

[115] Kristy L Marynak, *et al.*, *Use and reasons for use of electronic vapour products shaped like USB flash drivers among a national sample of adults*, 28 Tobacco Control 685 (Nov. 2019), https://tobaccocontrol.bmj.com/content/28/6/685
[116] D.M. Vallone, *et al.*, *Prevalence and correlates of JLI use among a national sample of youth and young adults*, Tobacco Control (Oct. 29, 2018), http://dx.doi.org/10.1136/tobaccocontrol-2018-054693
[117] Julie B Wang, *et al.*, *Cigarette and E-Cigarette Dual Use and Risk of Cardiopulmonary Symptoms in the Health eHeart Study*, 13 PLoS ONE 1 (2018).
[118] *Preventing Tobacco Use Among Youths, Surgeon General Fact Sheet*, Surgeon Gen., https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/preventing-youthtobacco-use-factsheet/index.html.

192.    Struggling to define their own identities, teenagers are particularly vulnerable to image-heavy advertisements that psychologically cue them on the "right" way to look and behave amongst peers.[119]

193.    Advertisements that map onto adolescent aspirations and vulnerabilities drive adolescent tobacco product initiation.[120]

194.    For decades, cigarette companies spun smoking as a signifier of adulthood. This turned smoking into a way for teenagers to project independence and enhance their image among their peers.[121]

195.    Youth marketing was critical to the success of cigarette companies. In the 1950s, Philip Morris—now JUUL's corporate affiliate—intentionally marketed cigarettes to young people as a pool from which to "replace smokers" to ensure the economic future of the cigarette industry.[122]

196.    Philip Morris's documents set out their youth strategy, explaining: "Today's teenager is tomorrow's potential regular customer, and the overwhelming majority of smokers first begin to smoke while still in their teens."[123]

197.    It wasn't just Philip Morris. The strategy of hooking kids was an open secret in the cigarette industry.[124]

198.    As discussed above, these tactics resulted in the MSA.

---

[119] *Id.* at 578.

[120] *Id.* at 570, 590.

[121] *Id.* at 1072.

[122] *U.S. v. Philip Morris*, No. 99- 2496 (D.D.C. Aug. 17, 2006), ECF No. 5750 (Amended Final Opinion), at 972.

[123] *Tobacco Company Quotes on Marketing to Kids*, Campaign for Tobacco-Free Kids (May 14, 2001), https://www.tobaccofreekids.org/assets/factsheets/0114.pdf.

[124] C.A. Tucker, *Marketing Plans Presentation to RJRI B of D* at 2, U.C.S.F. Truth Tobacco Industry Documents (Sept. 30, 1974), https://www.industrydocumentslibrary.ucsf.edu/tobacco/docs/#id=ypmw0091 (RJR executive explaining that the "young adult . . . market . . . represent[s] tomorrow's cigarette business. As this 14-24 age group matures, they will account for a key share of the total cigarette volume—for at least the next 25 years.").

199.    Because e-cigarettes are relatively new to the market, their manufacturers are not subject to the MSA.

200.    Unbridled by the MSA, JUUL seized upon an opportunity to use Big Tobacco's strategy of marketing to youth while creating the false impression that its products were harmless, thereby addicting a new generation of consumers to nicotine.

201.    As detailed below, JUUL sought to emulate this approach. Indeed, Monsees admitted to using historical cigarette ads to inform JLI's own advertising campaign.[125] He stated, "After the Master Settlement Agreement, the big settlement where everyone was suing the tobacco companies, one of the results was that a lot of tobacco industry documentation was mandated to become public. It became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes." JUUL's heroes and mentors are the very tobacco companies that have been responsible for the second biggest preventable cause of death in the United States.

202.    Monsees and Bowen capitalized on a central database of Big Tobacco advertising information maintained by a research group known as Stanford Research Into the Impact of Tobacco Advertising ("SRITA"), run by Dr. Robert Jackler,[126]using it as the building blocks for JUUL's advertising strategy.[127]

---

[125] Matthew Perone and Richard Lardner, AP News, *Juul exec: Never intended electronic cigarette for teens* (July 26, 2019), https://apnews.com/4b615e5fc9a042498c619d674ed0dc33; Gabriel Montoya, *Pax Labs: Origins with James Monsees*, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees.
[126] Robert Jackler, *et al.*, Stanford Univ. Sch. of Med., *JUUL Advertising Over Its First Three Years on the Market*, 27 (2019), http://tobacco.stanford.edu/tobacco main/publications/JUUL Marketing Stanford.pdf (accessed on Dec. 18, 2019).
[127] *Examining JUUL's Role in the Youth Nicotine Epidemic Part I*: Hearing Before the House Comm. on Oversight and Reform, 116th Cong. 1:32:25-1:33:18 (July 24, 2019) (statement of Dr. Jackler).

203.    The emulation is now obvious. As can be seen from the following image, a side-by-side comparison of JUUL advertisements with historical cigarette advertisements reveals the appropriated pattern of focusing on imagery related to attractiveness, stylishness, sex appeal, fun, "belonging," relaxation, and sensory pleasure, including taste.





204.    JUUL deployed this same strategy, but adapted it to modern advertising tactics.

## VII.    JUUL Designed and Marketed JUUL to Appeal to Youth

### A.    #Vaporized Campaign and the Big Tobacco Template

205.    In 2015, JUUL launched its products with an expensive, multi-faceted marketing campaign. On social media platforms widely used by adolescents, such as Twitter, Instagram, and Facebook, JUUL branded itself with the catchy hashtag "#Vaporized," to introduce the sleekness and style of its JUULpods.

206.    As set forth above, JUUL devices are small, discreet, and closely resemble a USB drive that can be easily hidden and used in a variety of settings — all of which make them more appealable to youth users who are regularly in settings in which smoking or vaping is prohibited (*e.g.*, high school).



207.    JUUL developed its initial marketing strategy with the help of two creative agencies — Cult Collective and Grit Creative Group ("Grit"). Cult Collective promises to provide companies with a competitive edge by "focusing on proven platforms that . . . forge fanatical loyalty"[128] while Grit declares itself an "authority on Millennial culture.[129]

---

[128] Cult, https://cultideas.com/about (accessed on Mar. 1, 2020).
[129],http://www.gritcreativegroup.com/#/about (accessed on Mar. 1, 2020).

208.   With the help of Grit and Cult Collective, JUUL launched its first advertising campaign in June 2015—known as "Vaporized." The multimillion-dollar Vaporized campaign was directed specifically at a youthful audience both in its substance and its delivery.

209.   Internal JUUL emails and email exchanges between JUUL and its marketing firms in 2015 demonstrate that it was JUUL's intent to target young audiences and also that JUUL failed to implement any standards to ensure that its products would not target youth.

210.   The Vaporized campaign flooded social media with posts that used models who appeared to be in their twenties or younger to depict a fun, trendy lifestyle, with hip trendsetters typically "dressed for a night out," in midriff-exposing crop tops, ripped jeans, and jean jackets. Richard Mumby, JUUL's first Chief Marketing Officer, noted that rather than being "overtly reliant on just the product," Vaporized would use the youth models to portray a "dynamic energy."[130]

211.   Advertisements featured a vivid color scheme and displayed young models whose "poses were often evocative of behaviors more characteristic of underage teens than mature adults."[131]

212.   JUUL rolled out magazine advertisements and social media marketing posts with flashy images of young people looking hip, cool, and sexy while holding their JUUL devices. These ads were full of bright colors, funky patterns, and attractive, young models. JUUL's ads featured little copy, typically including only the words, "JUUL" and "Vaporized," in black or

---

[130] Declan Harty, *JUUL Hopes to Reinvent E-Cigarette Ads With "Vaporized" Campaign*, Adage (June 23, 2015), https ://adage. com/arti cle/cmo-strategy/j uul-hope s-re invent-e-cigarette-ads-campaign/299142; Jackler, supra note 20, at 7.
[131] Robert Jackler, *et al.*, Stanford Univ. Sch. of Med., *JUUL Advertising Over its First Three Years on the Market,* 27 (2019),
http ://tobacco.stanford.edu/tobacco main/publications/JUUL_Marketing Stanford.pdf (accessed on Dec. 18, 2019).

white, offset against the splashy background. These ads portray JUUL as a hip and fun brand for millennials and young people.





213.    The Vaporized campaign used the slogan "Smoking Evolved," which associated JUUL with "themes of high tech and the latest generation" and "establish[ed] a notably youth-oriented brand identity for JUUL."[132]

---

[132] *Id.*



### B.   Social Media - JUUL Purchased Advertising Space on Websites that Appeal to Children

214.   Having developed advertisements for the Vaporized campaign featuring youthful, fashionable models, JUUL engaged the services of numerous companies to place advertisements, including static "banner" advertisements and video advertisements, on websites across the internet. These companies, known as programmatic media buyers, purchased "impressions" (*i.e.*, the appearance of an advertisement on a particular website when visited by a single user or device) from online advertising exchanges. Advertisements from the Vaporized campaign began appearing on websites as early as June 2015.

215.   Although these online advertisements linked to JUUL's website, where JUUL sold its e-cigarettes directly, the primary purpose of initial online media purchases for the Vaporized campaign was not to drive sales of e-cigarettes on JUUL's website. Instead, the

69

primary purpose of the initial online media purchases was to create "brand awareness" for the JUUL e-cigarette.

216.    JUUL used these programmatic media buyers to purchase space for JUUL advertisements on websites that were highly attractive to children, adolescents in middle school and high school, and underage college students. These advertisements included the images of models from the Vaporized campaign.

217.    JUUL purchased advertisements on websites designed for young children.

218.    JUUL marketed its products by purchasing banner advertisements and video advertisements on nick.com. The company also purchased banner advertisements on nickjr.com. These two Nickelodeon websites feature shows and games from the Nickelodeon television network, which is a television network for children.



219.    JUUL purchased banner advertisements on the Cartoon Network's website at cartoonnetwork.com. This website offers children's television programs and games for children.



220.    JUUL purchased banner advertisements on other websites generally designed for children, including allfreekidscrafts.com, hellokids.com, and kidsgameheroes.com.

221.    JUUL also purchased banner advertisements on websites providing games targeted to younger girls, such as dailydressupgames.com, didigames.com, forhergames.com, games2girls.com, girlgames.com, and girlsgogames.com.

222.    JUUL also purchased advertisements on a range of websites designed to help middle school and high school students develop their mathematics and social studies skills. JUUL purchased tens of thousands of impressions for video and banner advertisements on coolmath-games.com. JUUL also purchased advertisements on basic-mathematics.com, coolmath.com, math-aids.com, mathplayground.com, mathway.com, onlinemathlearning.com, and purplemath.com. JUUL also displayed video advertisements on socialstudiesforkids.com.

223.    JUUL purchased banner advertisements on websites expressly designed for teenagers, such as teen.com, seventeen.com, justjaredjr.com, and hireteen.com.

224.    JUUL purchased advertisements on websites for high school students hoping to attend college such as collegeconfidential.com and collegeview.com.

225.    JUUL targeted college students with its paid online advertisements and purchased video advertisements on websites such as collegehumor.com and thecollegeprepster.com, as well as banner ads on survivingcollege.com.

226.    JUUL promoted Vaporized through Vice Magazine, which bills itself as the "#1 youth media brand" in the world.[133]

227.    The Vaporized campaign included the largest e-cigarette smartphone campaign of 2015, which accounted for 74% of all such smartphone advertising that year.

228.    Beginning in 2015, JUUL tracked consumers who visited JUUL's website but did not complete a purchase. JUUL then purchased advertising space on other websites that those same consumers subsequently visited. Many of JUUL's website visitors who did not complete a purchase were underage and did not complete or even failed JUUL's age verification process.

229.    Facebook and Instagram, two of the largest social media platforms, maintain policies that their platforms do not accept paid advertisement for tobacco products, including e-cigarettes such as JUUL. Beginning in 2015, however, JUUL circumvented these restrictions by paying online publishers such as UrbanDaddy and Gawker to promote youth-oriented advertising content for JUUL through their social media accounts on Instagram, Facebook, and YouTube.

230.    For example, in 2015, JUUL paid a website called Hypebeast for custom youth-oriented Instagram content that associated the JUUL device with the fashion designer Akomplice.

---

[133] Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018 2:38 PM), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/thedisturbing-focus-of-juuls-early-marketing-campaigns/#3da1e11b14f9.

231.    Finally, JUUL maintained its own social media accounts on Twitter, Instagram, and Facebook until November 2018. JUUL posted advertisements from the Vaporized campaign to Twitter, Instagram, and Facebook.

232.    JUUL employed no age-gating on its social media accounts to prevent underage consumers from viewing its advertisements.

233.    JUUL knew that young people visit, monitor, and use these social media platforms. Nearly all teenagers in the United States have access to a smart phone and the internet. Instagram is one of the most popular online platforms among teenagers.

234.    JUUL knew that its advertising on social media would be viewed by underage consumers.

235.    JUUL labelled its social media posts with hashtags such as #juul, #juulvapor, #vaporized, and #juulallnight.

236.    Social media users can search for and follow posts that are labelled with hashtags. Users are also able to label their own posts with hashtags of their own choosing, including #juul and JUUL's other hashtags.

237.    By 2018, JUUL's premier hashtag, #juul, had over a quarter of a million followers and hundreds of thousands of associated posts.[134]

238.    Many of the posts containing the #juul hashtag or JUUL's other hashtags were created by underage consumers and featured underage consumers using JUUL e-cigarettes.[135]

239.    Again following the playbook of Big Tobacco, JUUL monitored the use of JUUL-related hashtags and the social media posts that contained those hashtags.

---

[134] Robert K. Jackler, *et al.*, *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research into the Impact of Tobacco Advertising 1, 19 (2019),
http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.
[135] *Id.*

240.    JUUL knew that underage consumers were following its social media accounts, advertising posts, and sponsored hashtags. JLI was internally collecting hundreds of social media posts—directed at JLI—informing it of JUUL's wild popularity with young people and in many cases requesting that JLI do something to stop it.[136]

241.    Indeed, many of JUUL's followers were young people. One recent study found that approximately 45% of the individuals who were following the official @JUULvapor Twitter account in April 2018 were between the ages of 13 and 17, while only 20% of followers were 21 or over.[137]

242.    Based on the photographs, comments, and other content posted to social media platforms featuring underage consumers, JUUL knew its product was used by and extremely popular with underage consumers.

243.    JUUL also sought out individual consumers with large numbers of Facebook and Instagram followers to participate in JUUL's "affiliate program." JUUL "affiliates" posted content promoting JUUL on Facebook, Instagram, YouTube, and other social media platforms and provided followers and other consumers with discounts to entice them to purchase JUUL e-cigarettes from the JUUL website. JUUL compensated affiliates for any resulting sales completed on JUUL's website.

244.    JUUL further engaged with social media users by commenting on posts with large followings.

---

[136] *People v. JUUL, et al.*, (Super. Ct. of Cal. 2019) (November 19, 2019) ("California Complaint"), at 60.
[137] Sidani, J. E., Colditz, J. B., Barrett, E. L., Shensa, A., Chu, K.-H., James, A. E., & Primack, B. A. (2019). *I Wake Up and Hit the JUUL: Analyzing Twitter for JUUL Nicotine Effects and Dependence. Drug and Alcohol Dependence*. https://doi.org/10.1016/j.drugalcdep.2019.06.005.

245.     JUUL's social media campaign was focused and deliberate. By the end of 2017, there were 366,786 JUUL-related tweets. "[T]he growth trend in JUUL tweets noticeably tracks well the growth in JUUL retail sales."[138]

246.     Seven JUUL-related Instagram accounts, including the official JUUL account and user-created accounts, had 4,230 total posts and over a quarter of a million followers by mid-2018.

247.     As of March 2018, there were approximately 100,000 JUUL-related YouTube videos, 35 of which garnered over 100,000 views each. In total, as of March 2018, those 35 JUUL-related videos had over 8 million views combined.

248.     As of March 2020, on Instagram alone, the hashtag #juul had over 667,000 posts and #juulvapor had over 50,000 posts.

249.     JUUL's promotion of its e-cigarettes on social media platforms was especially attractive to underage consumers. According to an analysis in a journal published by the American Medical Association, 80.9% of Twitter users who followed the official JUUL Twitter account, @JUULVapor, were likely between the ages of 13 and 20; and 44.9% of JUUL's Twitter followers were likely between the ages of 13 and 17.[139] When JUUL successfully delivered its advertisements to underage consumers, those advertisements made them more likely to use JUUL e-cigarettes.

250.     JUUL deleted the vast majority of its social media posts in several waves sometime just before September 2018.

251.     After launch, management discussed whether to rein in the advertising to teenagers. But some company leaders, including Huh, opposed any actions to curb youth sales.

---

[138] Jidong Huang, *et al.*, *Vaping Versus JUULing: How the Extraordinary Growth and Marketing of JUUL Transformed the US Retail E-cigarette Market*, 28 Tob. Control 146, 148 (2018).
[139] Kim. E. Annice, *et al.*, *Estimated Ages of JUUL Twitter Followers*, 173 JAMA Pediatrics 690 (2019).

Youth sales were a large potential source of revenue.[140] As one manager explained, perhaps "people internally had an issue" with sales of JUULs to teenagers, "[b]ut a lot of people had no problem with 500 percent year-over-year growth."[141] And company leaders understood that teenagers who were hooked on nicotine were the most likely segment to become lifelong addicts and thus were the most profitable customers to target.[142]

### C.   JUUL Hosted Parties to Generate Brand Awareness Among Young People

252.   JUUL also devised a plan to put its product directly into the hands of a young, hip audience through high-profile promotional events held at major hotspots in New York, California, Las Vegas, and Miami. JUUL-sponsored launch parties were youth-oriented and featured popular young DJs such as Chapman, Illuminati AMS, May Kwok, and other celebrities.

253.   The launch parties were free to attend and offered an unlimited supply of free samples of JUUL product.[143]

254.   JUUL also held sampling events, dubbed its "Container Tour," where it created pop-up lounges at festivals, concerts, and other events. On average, each event distributed over 5,000 samples of JUUL products.

255.   This is eerily similar to Big Tobacco, where Camel used luxurious tour buses to create smoking lounges and parked them in front of "hip" bars. RJR, the owner of Camel, also hired "cigarette fairies" to go to bars and clubs to offer coupons for its latest products as recently as 2008. A report quoted one of the cigarette fairies as saying, "I get paid to . . . go to free gigs

---

[140] Chris Kirkham, *Juul Disregarded Early Evidence It Was Hooking Teens*, Reuters (Nov. 5, 2019, 11:00 AM GMT), https://www.reuters.com/investigates/special-report/juul-ecigarette/.
[141] *Id.*
[142] *Id.*
[143] *Id.* at 4-7.

and to smoke. Camel [is] clever about the smoking ban. We're all over the place . . . all over America. It's a sweet job."[144]

256.   Potential new JUUL consumers also were invited via brightly-colored and inherently youth-driven flyers to various promotional events such as movie nights held on roof tops or a slumber party in Hollywood's Forever Cemetery.

257.   When partygoers arrived at launch parties and sampling events, they were frequently given free samples of JUUL products by attractive young women.

258.   Not only did JUUL post photos from the events on social media, but guests were encouraged to post photos using various hashtags such as #Vaporized and #LightsCameraVapor to generate additional interest.

259.   JUUL held at least 25 promotional events between June 4, 2015 and December 8, 2015, alone. Sampling events continued over the following three years. JUUL sponsored a "Music in Film Summit" at the Sundance Film Festival in January 2018 which was laden with celebrities such as Nicholas Cage, Elijah Wood, and members of the rock band Imagine Dragons — an extremely popular band among youth.[145]

260.   The purpose of these events was to place JUUL's product directly into the hands of hip and trendy youth "influencers" who, through social media, would help JUUL permeate its target market with JUUL products.[146]

261.   For example, in preparation for one of its launch parties, Grit provided to JUUL a potential guest list of approximately 230 individuals — comprised of artists, bloggers, designers, DJs, models, musicians, photographers, promoters, pro skaters, stylists, and the like — to which

---

[144] Truth Initiative, Experiential Tobacco Marketing 3 (2018),
https://www.truthinitiative.org/sites/default/files/media/files/2019/03/truthjnitiative-experiential_tobacco marketing-fact sheet-FINAL.pdf (accessed on Dec. 19, 2019).
[145] Jackler, supra note 23, at 6.
[146] Id.

JUUL Chief Marketing Officer Richard Mumby responded in an email dated May 20, 2015, "Overall, this looks fuc[*]ing incredible. A+ . . . this makes me all the more intent on our having enough products to sample. What's the max number of people the space can hold?"

262.    JUUL held a party for the launch of its e-cigarette (the "Launch Party") on June 4, 2015 at Jack Studios in New York City. JUUL and Grit invited guests to the Launch Party, including influencers employed in the fashion and music industries, as well as young, "beautiful people." JUUL encouraged guests at the Launch Party to pose for photographs while using JUUL products and to compete for their image to be included in advertisements to be placed on billboards in Times Square.





263.    JUUL also encouraged these very young Launch Party attendees to create and post social media content featuring JUUL e-cigarettes. Over 200 attendees from the Launch Party posted content related to JUUL on their social media accounts, which were viewed by approximately 26,000 social media users.

264.    For four weeks in June and July 2015, JUUL placed advertisements on numerous digital billboards in New York City's Times Square, effectively saturating Times Square with videos and photographs promoting JUUL products. The billboards, towering over midtown Manhattan, depicted attractive young people and created the false impression that JUUL's products were harmless to consumers. Like its other advertising, these billboards failed to mention that JUUL products contain nicotine or warn of their addictive nature.

265.    JUUL included photographs of Launch Party guests on its billboard advertisements in Times Square.

266.     JUUL used such images from the Launch Party for advertisements it promoted on social media platforms and on websites across the internet. JUUL knew, or should have known, that these images would be viewed by underage consumers, would appeal to them, and would induce them to buy and use JUUL e-cigarettes.

267.     In the summer of 2015, JUUL held over a dozen "launch parties"—carefully crafted events designed to introduce its brand and products to consumers—across New York City and the Hamptons.

268.     The parties were held in trendy clubs or hip outdoor venues. JUUL invited young celebrities, such as model Luka Sabbat who was 17 years old at the time, and hired young performers, such as Lauren Burge of website College Humor, to attract a young audience. JUUL invited consumers to these events via youthful-sounding social media postings.

269.     JUUL recruited young people as "brand ambassadors," who were tasked with handing out sample JUUL products and JUUL-branded giveaways to consumers at these launch parties. JUUL even provided its brand ambassadors with a "tool kit" that dictated their look, instructing them to wear dark skinny jeans and Converse sneakers or booties—styles known to be appealing to young people.

270.     In the summer of 2015, JUUL sponsored additional events at locations in New York City and Los Angeles to promote JUUL products and brand awareness among "cool" influencers and consumers. JUUL provided attendees at JUUL-sponsored events with JUUL products for sampling. JUUL encouraged event attendees to post about JUUL on social media.

**D.     JUUL Sought to Enlist "Influencers" With Large Numbers of Underage Social Media Followers to Promote JUUL Products**

271.    The cornerstone of JUUL's strategic social media marketing was its use of paid social media influencers to increase brand awareness and secure the cult following promised by Cult Collective.

272.    JUUL typically solicited influencers by sending them free JUUL e-cigarettes or discount codes that would enable influencers to obtain free e-cigarettes from JUUL's website. JUUL intended that, after receiving these free or deeply discounted products, influencers would promote JUUL e-cigarettes by using them in public, post JUUL-related content on their social media accounts, or otherwise share positive impressions regarding JUUL with others. JUUL monitored influencer social media accounts for JUUL-related content and reposted JUUL-related social media content created by influencers.

273.    The purpose of JUUL's influencer program was to generate awareness of the JUUL brand, both with the influencers themselves and also with the influencers' followers on social media platforms. JUUL knew that many of these followers were younger than the minimum legal sales age.

274.    In the summer of 2015, JUUL ran an in-house influencer program, sending free JUUL e-cigarettes to individuals JUUL identified as potential influencers.

275.    JUUL sent offers to redeem free JUUL products to over five hundred individuals it identified as influencers.

276.    JUUL targeted influencers who were fashion bloggers, stylists, celebrities, and affiliated with certain television programs, networks, or movies filmed or produced in New York City and Los Angeles.

277.    JUUL knew that many of the influencers it targeted were young and especially popular with adolescents.

278.    JUUL's influencer target list included Tavi Gevinson, who was 19 years old in the summer of 2015. At age 11, Tavi Gevinson started the fashion blog The Style Rookie, which eventually became the online magazine Rookie Magazine when Gevinson was 15. Rookie's website states that "Rookie was… founded in 2011 as an online magazine for and by teenagers…Thank you for reading Rookie, and for growing up with us."[147] In 2014, the magazine *Rolling Stone* called Tavi Gevinson "possibly the most influential 18-year-old in America."[148]

279.    JUUL's influencer target list also included many celebrities with large numbers of teenage fans, such as Kristen Stewart and Robert Pattinson, stars of the film adaptations of the "Twilight" series of young adult novels; and Jennifer Lawrence, an actress who stars in the popular film adaptation of the "Hunger Games" young adult novels.

280.    JUUL's influencer target list also included film industry professionals, including individuals responsible for product placements in various television shows and movies popular with teenagers and young audiences, such as Video Game High School and X-Men First Class.

281.    Following the launch of the JUUL e-cigarette in June 2015, JUUL's marketing department tracked the use of JUUL products in public by celebrities. Employees of JUUL would periodically attempt to contact celebrities or their managers to offer them free JUUL e-cigarettes.

282.    JUUL sent approximately 260 people free e-cigarettes between the summer of 2015 and August 2016.

---

[147] ROOKIE, About, https://www.rookiemag.com/us/.
[148] Alex Morris, *Tavi Gevinson: A Power Teen's New Direction*, ROLLING STONE (Aug. 14, 2014, 3:57 PM), https://www.rollingstone.com/culture/culture-features/tavi-gevinson-a-power-teens-new-direction-232286/.

283.    JUUL invited influencers to its launch events during the summer of 2015. JUUL gave influencers free JUUL e-cigarettes at the launch events.

284.    JUUL also separately contracted with Grit during the Vaporized campaign to enlist influencers by sending them free JUUL e-cigarettes.

285.    Grit provided free JUUL e-cigarettes to over one-hundred and fifty individuals identified as influencers, many of whom were DJs, nightlife personalities, fashion bloggers, and stylists.

286.    All of Grit's efforts to enlist influencers were conducted at JUUL's direction and/or with JUUL's knowledge.

287.    JUUL knew, or should have known, that many of the individuals Grit targeted as influencers for JUUL e-cigarettes were very young and that many or most of their followers were younger than the minimum legal sales age.

**E.    JUUL's Outreach and Targeting of Adolescents - In-Person Presentations at Schools**

288.    As stated above, under the guise of "youth prevention," JUUL gave presentations to high schoolers across the country, supposedly to address addiction issues; however, these presentations largely consisted of propaganda for JUUL.

289.    In at least one New York City high school, a JUUL representative met with over 70 ninth-grade students and repeatedly assured them that JUUL's products were "totally safe." After the assembly, one student approached the JUUL representative and asked what to do about a friend addicted to nicotine. The representative responded that JUUL's products are a "safer alternative than smoking cigarettes and it would be better for that kid to use JUUL."

290.    The JUUL representative also mentioned that the "FDA was about to come out and say that JUUL was 99% safer than cigarettes," and that JUUL's products were "in FDA approval" at the time the assembly took place – even though these statements were false.[149]

291.    In adopting this in-school marketing program, JUUL's "efforts seemed to duplicate" the "youth education" programs formerly used by traditional cigarette makers. In one document, on May 18, 2018, Chief Administrative Officer Ashley Gould sent an email stating "[h]ere is the paper that ended the Think Don't Smoke campaign undertaken by Philip Morris."[150] Youth Prevention and Education Director Julie Henderson also met with former members of Philip Morris' "youth education" team. JUUL's "Youth Prevention" team even acknowledged the similarity between their programming and that of "Big Tobacco."[151]

### F.    JUUL Focused on Growth In Convenience Stores Where Advertising and Sales to Minors Was Likely

292.    In the United States, most of JUUL's products are sold in convenience stores. In fact, JUUL's position as the leading e-cigarette manufacturer in the U.S. is due in large part to its focus on aggressively partnering with brick-and-mortar retailers.

293.    By doing this, JUUL sought to emulate and shadow other tobacco products, especially cigarettes, which are omnipresent in U.S. convenience stores.

294.    Convenience stores also offer many youth-oriented or youth-friendly products, such as candies, snacks, gums, desserts, ice cream treats, milkshakes, sweet coffee drinks, sweet

---

[149] Economic and Consumer Policy Subcommittee Held Part I of *Hearings on JUUL's Role in Youth Nicotine Addiction Epidemic*. (2019, July 24). Retrieved September 20, 2019, from House Committee on Oversight and Reform website: https://oversight.house.gov/news/press-releases/economic-and-consumer-policy-subcommittee-held-part-i-of-hearings-on-juul-s-role.
[150] E-mail from Julie Henderson, Youth Prevention and Education Director, JUUL Labs, Inc., to Julie Henderson, Youth Prevention and Education Director, JUUL Labs, Inc. (May 23, 2018) (online at
[151] E-mails between Julie Henderson, Youth Prevention and Education Director, JUUL Labs, Inc., Bruce Harter, and Wendell Greer (Apr. 16–17, 2018) (online at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/JLI-HOR-00153200_Redacted.pdf).

sodas, and other snacks that are often flavored and characterized as tasting sweet, fruity, or minty. By design, convenience stores are meant to draw in and sell to youth.

295.    Historically, Big Tobacco placed its products in convenience stores near items appealing to youth as an improper marketing technique.

296.    Again mimicking the tricks that Big Tobacco knew all too well, JUUL advertised extensively in convenience stores and used video displays and product displays that featured bright colors and young adults acting youthfully while using and displaying the JUUL device.

 

297.    Many convenience stores were initially wary of carrying another e-cigarette brand because of poor experiences with other brands. To assuage these concerns, JUUL touted the nicotine levels and addictive qualities of JUUL by referring to the comparable satisfaction it provides to cigarettes. This convinced enough convenience store chains to sell JUUL that JUUL has been the most popular e-cigarette sold in convenience stores since late-2017 according to Nielsen data.

298.    JUUL's widespread availability and advertising in convenience stores exposed countless youth to pervasive JUUL advertising in an enclosed area where youth were commonly present.

299.    JUUL's availability for purchase in brick-and-mortar retail locations, especially convenience stores, provided thousands of new points of access from which youth could obtain JUUL and third-party resellers could buy bulk JUUL product for second-hand distribution to youth.

300.    JUUL did not take appropriate steps to ensure retailers would use appropriate age-verification practices or prevent such bulk-sales to resellers.

301.    JUUL could have negotiated terms in its distribution agreements with retailers to prohibit bulk sales, to reduce youth access to JUUL advertising in stores, to ensure proper age verification measures were taken, and to monitor the retailer's age verification process.

302.    JUUL's primary concern was to gain entry into convenience stores as quickly as possible to drive growth, at the expense of youth prevention and increasing youth access to JUUL.

303.    According to the Truth Initiative, most youth who currently use JUUL obtained JUUL from physical retail locations.

304.    JUUL refused to abate the problem of youth access through physical retail locations despite being aware of the problem and continuing to distribute millions of pods and devices to such entities, putting profit above youth prevention.

305.    JUUL's rapid and aggressive entry into and advertising within convenience stores and its failure to adequately address the problem of youth access to its products demonstrate

JUUL's intent to market to youth and its disregard for the risk of providing thousands of new potential points of access for youth to obtain JUUL.

> **G.     JUUL Disregarded Failures and Loopholes Within Its Online Sales System That Allowed Youth to Purchase JUUL Online Through JUUL's Own Website**

306.    JUUL's website allows visitors to purchase JUUL products and have them delivered to their homes.

307.    From the outset, JUUL's online sales system has been marred by defects and loopholes that have allowed underage users to purchase JUUL online despite not being of age to purchase tobacco products.

308.    JUUL, using the vendor Veratad, also implemented an age verification system that did not ensure purchasers were of age.

309.    From June 2015 through the end of 2018, the age verification process on JLI's website typically prompted prospective purchasers to submit their name, address, and date of birth, which JLI forwarded to Veratad. Veratad then attempted to match all or some limited part of the consumer's information to a person of the minimum legal sales age in its database. If Veratad was able to locate a sufficient match of the prospective purchaser to a person of the minimum legal sales age in its database, then it would return a "pass" result to JLI. If Veratad was unable to make such a match, Veratad returned a "fail" result to JLI.

310.    If Veratad returned a "fail" result to JLI, rather than decline the prospective purchaser, JLI would prompt the person to enter an "alternate" address. If Veratad still could not find a match based on this alternate address, JLI would prompt the consumer to enter the last four digits of his or her social security number.

311.    If Veratad, supplied with the last four digits of a consumer's social security number, still could not match the consumer to a person of the minimum legal sales age in its

database, JLI would prompt the consumer to upload an image or photograph of his or her driver's license or another governmental identification document. A JLI employee would then conduct a personal review of the image and decide whether the consumer was of the minimum legal sales age.

312.    Crucially, Veratad's age verification system was purposefully flexible, so JLI and Veratad could work together to decide just how closely a prospective purchaser's personal information had to match records in Veratad's database in order to "pass" the age verification process. JLI and Veratad could also set, or modify, the applicable minimum legal sales age to be used for verification.

313.    Between June 2015 and August 2017 (and perhaps even through early 2018), JLI and Veratad tailored the age verification system to "pass" prospective purchasers even if certain portions of the purchaser's personal information—*e.g.*, the purchaser's street address or date of birth—did not match the information corresponding to a person of the minimum legal sales age in Veratad's database.[152]

314.    A January 29, 2018 email exchange between Tom Canfarotta, Director of Strategic Accounts & Client Quality Services at Veratad, and Annie Kennedy, JUUL's Compliance Manager, reveals this to have been the case. Kennedy asked Canfarotta why a particular customer had "passed via the address step (public record check)…but we've since learned that is not a correct address—so we're curious as to how it passed." In response, Canfarotta wrote, "Your current rule set does not require a full address match." He went on to explain that approval of the customer was not an anomaly or a mistake; instead, Veratad's age verification system was working exactly the way it was designed.

---

[152] California Complaint at 43.

315.    Customer service representatives would go so far as to alter identifying information for customers; a Slack chat among customer service representatives confirmed that representatives were authorized to "adjust the street address, apartment number, or zip code" associated with shipment.[153]

316.    JUUL originally required all online buyers to have an adult sign at the point of delivery, an important youth prevention measure that JUUL paid for rather than passing the cost on to its customers. However, in mid-2016, JUUL decided to stop requiring an adult signature at point of delivery but rather to offer it as an optional service *at an additional cost to the consumer*.

317.    JUUL was aware at the time that no longer requiring adult signatures would increase the risk of approving and completing sales to minors through JUUL's own website, and that JUUL's age verification processes would require substantial changes as a result.

318.    JUUL's warranty processing system also allowed youth to access JUUL products and circumvent age verification. Many individuals were identified by JUUL as submitting dozens of warranty claims every month using slightly different email addresses. JUUL was aware as early as late-2017 that some of these individuals were likely either youth or people selling JUUL to youth.

319.    The existence of these significant loopholes demonstrates JUUL's disregard for youth prevention and the fact that profits were far more important to JUUL than preventing youth from accessing its tobacco products.

---

[153] California Complaint at 169.

**VIII.   JLI Defendants Successfully Misrepresented that JUUL Was Safe and Healthy**

320.   In 2016, the National Institute on Drug Abuse issued findings regarding "Teens and Cigarettes," reporting that 66% of teens believed that e-cigarettes contained only flavoring, rather than nicotine.[154]

321.   Two years later, despite the ongoing efforts of public health advocates, a 2018 study of JUUL users between the ages of fifteen and twenty-four revealed that 63% remained unaware that JUUL products contain nicotine.[155] Further, the study found that respondents using e-cigarettes were less likely to report that e-cigarettes were harmful to their health, that people can get addicted to e-cigarettes, or that smoke from others' e-cigarettes was harmful.[156]

322.   Similarly, in 2018, a literature review of seventy-two articles published in the *International Journal of Environmental Research and Public Health* found that e-cigarettes were perceived by adults and youth as being healthier, safer, less addictive, safer for one's social environment, and safer to use during pregnancy than combustible cigarettes.[157] Further, researchers found that specific flavors (including dessert and fruit flavors) were perceived to be less harmful than tobacco flavors among adult and youth e-cigarette users.[158] In addition, researchers found that youth e-cigarette users perceived e-cigarettes as safe to use and fashionable.[159]

---

[154] *Teens and E-cigarettes*, National Institute on Drug Abuse, https://www.drugabuse.gov/related-topics/trends-statistics/infographics/teens-e-cigarettes.

[155] Jeffrey G. Willett, *et al. Recognition, Use and Perceptions of Juul Among Youth and Young Adults,* 28 Tobacco Control 054273 (2019).

[156] *Id.*

[157] *Id.*

[158] Kim A. G. J. Romijnders, *et al.*, *Perceptions and Reasons Regarding E-Cigarette Use Among Users and Non-Users: A Narrative Literature Review*, 15 Int'l J. of Envtl. Research & Public Health 1190 (2018), https://doi:10.3390/ijerph15061190.

[159] *Id.*

323.    In 2019, a study published in *Pediatrics* found that 40% of participants reported using nicotine-free e-cigarette products, when in fact the products they were using contained significant levels of nicotine.[160]

## IX.    JUUL's Practices Lead to the Nationwide Youth Vaping Epidemic

324.    As a result of JUUL's improper practices, youth use of e-cigarettes skyrocketed. Moreover, those using JUUL were not merely youths switching from cigarettes to JUUL but, rather, were completely new users captured by JUUL's marketing techniques.

325.    For example, while the percent of high school students who had smoked a cigarette in the past 30 days declined from 15.8% in 2011 to 5.8% in 2019,[161] the percent of high school students who had used an e-cigarette in the past 30 days skyrocketed from 1.5% in 2011 to 27.5% in 2019.[162] Even if every student who stopped smoking switched to e-cigarettes during that period, there still would be a 16 percentage point increase in high school student use of e-cigarettes. Moreover, 10.5% of middle school students nationwide now use e-cigarettes, with most youth reporting JUUL as their usual brand of e-cigarette. JUUL's products are so popular among teenagers that "JUULing"—using one of JUUL's patented e-cigarette products to consume aerosolized nicotine—has become part of the standard high school lexicon.

326.    The use of e-cigarettes by American youth has surged so dramatically in recent years that the U.S. Surgeon General has declared such use an epidemic.[163]

327.    As later reported during an April 5, 2019 interview, FDA Commissioner Scott Gottlieb pointed to JUUL as a significant cause of the youth e-cigarette crisis, stating to a

---

[160] Rachel Boykan *et al.*, *Self-Reported Use of Tobacco, E-Cigarettes, and Marijuana versus Urinary Biomarkers*, 143 Pediatrics (2019), https://doi.org/10.1542/peds.2018-3531.
[161] https://www.cdc.gov/tobacco/data_statistics/fact_sheets/youth_data/tobacco_use/index.htm.
[162] *Id.*
[163] Rob Stein, *Surgeon General Warns Youth Vaping Is Now An "Epidemic*," https://www.npr.org/sections/healthshots/2018/12/18/677755266/surgeon-general-warns-youth-vapingis-now-an-epidemic; https://www.npr.org/sections/health-shots/2018/12/18/677755266/surgeon-general-warns-youth-vapingis-now-anepidemic.

reporter, "The dramatic spike of youth [vaping] — that was driven in part at the very least if not largely by JUUL . . . I hope they recognize the problem that's been created has been created largely by their product."[164]

## X.   Desperate for Growth, Altria Invests In JUUL Despite Knowledge of Its Improper Marketing Techniques

### A.   JUUL Dominates the E-Cigarette Market at the Expense of Altria

328.   JUUL's "Big Tobacco" strategy helped drive its incredible growth to a multi-billion dollar company. By November 2017, the JUUL vaping device had become the best-selling e-cigarette device on the market, with reported sales of one million units. The company had captured 33% of the e-cigarette market by 2017 and 46% by 2018.

329.   JUUL's explosive growth in sales also created an overall increase in the e-cigarette market rather than simply shifting e-cigarette sales away from its competitors. JUUL made approximately $3.3 billion in U.S. retail sales between September 2018 and August 2019.

330.   Altria, by contrast, was struggling. Despite being the largest manufacturer of cigarettes, its attempts to create a competing e-cigarette through its MarkTen and Green Smoke products had failed miserably.

331.   As of November 17, 2018, Altria had captured just four percent of the e-cigarette market; JUUL controlled over 75 percent of the market.

332.   Moreover, Altria cigarette volume had nearly halved since 2000 from 211.9 billion units in the U.S. to 109.79 billion units, a 48 percent decline.

333.   This was catastrophic for Altria since it makes the bulk of its money selling cigarettes. Of the $25.58 billion in total revenue the company generated in 2017, $22.64 billion

---

[164] Julia Belluz, *Scott Gottlieb's Last Word as FDA Chief Juul Drove a Youth Addiction Crisis*, Vox (April 5, 2019), https ://www.vox.com/science-and-health/2019/4/5/18287073/vaping-juul-fda-scott-gottlieb (accessed on Dec. 18, 2019).

— or 89 percent — came from its smokeable products business segment, which contains cigarettes and cigars.

334.    On average, Altria's cigarette volume decreases three percent every year. The company had managed to offset these declines through price increases. However, the declines started accelerating. Altria estimates that the cigarette industry declined by 4% in 2017 and by 4.5% in 2018, and it predicted a continued 4% to 5% decline in the average annual U.S. cigarette industry volume for 2019 through 2023.[165] Altria later adjusted the estimated rate of decline to 4% to 6%, to reflect efforts to increase the legal age for cigarette smoking to 21.[166]

335.    In the first nine months of this year, Altria's cigarette shipment volume fell 6.3%. As of December 7, 2018, shares of Altria were down about 24% in 2018.

336.    On a call with Wall Street analysts in October, Altria CEO Willard attributed at least part of the trend to more smokers giving up conventional cigarettes and switching to e-cigarettes. That is, when smokers ditched Marlboro for JUUL, Altria was losing out.

337.    JUULpods were also more profitable than conventional cigarettes because they typically are not taxed and do not incur costs associated with the MSA. State and local excise taxes on a pack of cigarettes typically equal $1.75, while costs associated with the MSA total 75 cents. Manufacturers' operating profit usually approximates $1.26. Thus, JUUL does not pay the approximately $2.50 in MSA costs and taxes that Altria pays.

338.    As Willard later explained: "I can give you some perspective on how to think about the economics of JUUL compared to cigarettes. You're exactly right that when you look at the retail price of cigarettes, that retail price includes a federal excise tax, a state excise tax, and a

---

[165] *Altria's Fourth-Quarter 2018 Earnings Conference Call*, Altria (Jan. 31, 2019),
http://investor.altria.com/Cache/1001247877.PDF?O=PDF&T=&Y=&D=&FID=1001247877&iid=4087349.
[166] *Altria Shares Slide As Cigarette Sales Continue to Decline*, Tobacco Bus. (July 31, 2019),
https://tobaccobusiness.com/altria-shares-slide-as-cigarette-sales-continue-to-decline/.

very significant Master Settlement Agreement payment. And so that average price for a pack of cigarettes is a little above $7 today. When you look at a JUULpod, it sells for more like $4.50. And even with that lower price, which actually offers an opportunity for a cigarette smoker to switch and have some retail cost savings, there's the opportunity for high profit margins, because, of course, at the current moment there isn't a federal excise tax, there are relatively few states with a state excise tax, and of course, there aren't Master Settlement Agreements on this. So, we think it's actually quite an attractive profit model both now and into the future. And you could imagine over time that given the advantage it has over cigarettes, that can be helpful to drive their growth."

339.    While Altria had developed the IQOS product – a non-combustible "heatstick" product that heated tobacco without burning it, its sales growth was slowing in Q1 2018. Moreover, because IQOS contained tobacco, rather than a nicotine liquid, it fell under the definition of a Tobacco Product under the MSA and would still be subject to the high MSA costs. As Willard acknowledged during Altria's Q2 2018 earnings call: "To be clear, based on the definitions of a cigarette in the U.S., our belief is when we enter the market with IQOS, IQOS will be classified as a cigarette under the federal definition and most state definitions. So, it will incur MSA payments and excise tax payments for the Heatsticks as a cigarette."

340.    As later reported by the *Wall Street Journal*, by early 2018, Willard, who was then Chief Operating Officer and in line to take over as CEO, was privately concerned that Altria's own e-cigarettes could never catch up with JUUL.

341.    Additional FDA regulation was further threatening the future of cigarettes. In July 2017, the FDA announced a regulatory overhaul that threatened to turn the tobacco industry

upside down. FDA Commissioner Scott Gottlieb said that he would seek to reduce nicotine levels in all cigarettes so they would no longer be addictive and ban menthol cigarettes.

     **B.**    **Willard Was Determined to Invest in JUUL at Any Cost**

    342.    For Altria, an investment in JUUL would give it something it was desperate for volume growth and a piece of the growing and more profitable e-cigarette market through a company not subject to the MSA restrictions.

    343.    Confidential Witness #1 ("CW1") worked for Altria in a variety of senior leadership roles from October 2003 until February 2019, most recently as Senior Vice President, Marketing and Commerce Strategy. CW1's other roles at Altria included President and CEO, NuMark; President and CEO, U.S. Smokeless Tobacco Company; and Director of Marketing, Phillip Morris USA. CW1 worked out of Altria's headquarters in Richmond, Virginia.

    344.    Confidential Witness #2 ("CW2") worked for Altria from July or August 2018 until the end of 2018 as a Product Manager, Regulatory Quality Compliance Management. CW2 worked out of Altria's headquarters in Richmond, Virginia, reporting to Evelyn Pollard, who at the time was a Senior Manager, Quality Business Systems.

    345.    Confidential Witness #3 ("CW3") worked for Altria from October 2016 to June 2018 as a consumer psychologist within Altria's Center of Excellence, serving as a manager of consumer and marketplace insights. CW3 worked out of Altria's headquarters in Richmond, Virginia, reporting to Melissa Burroughs, Altria's Senior Director of Marketing and Consumer Research. CW3 said he/she performed qualitative research using advanced research methods, including cross-category research and new product innovation research related to marketing.

346.    In Altria's words, the company followed "JUUL's journey rather closely" from its early beginnings.[167]

347.    According to Howard Willard, Altria's CEO, Altria first contacted JLI about a commercial relationship in early 2017, with "confidential discussions" beginning in the spring of 2017.[168]

348.    CW1 described how Altria CEO Howard Willard had been targeting JUUL since his tenure as the company's Chief Operating Officer, stating that it was clear as early as 2017 that Altria was moving toward an investment in JUUL. "I believe that Howard wanted [JUUL] so bad, that he just wanted it," CW1 said. "When he was COO … he was very vocal about, 'JUUL's the answer.' And when he became CEO, he in essence sat me down and sat [Chief Growth Officer] K.C. [Crosthwaite] down and said, 'K.C., your job is to get JUUL done. And [CW1], your job is to figure out what to do if JUUL doesn't happen.'" CW1 said that Crosthwaite was responsible for Altria's investment in JUUL.

349.    "I think they just wanted JUUL," CW1 said. "If you go back and look at the transcripts from the earning calls in 2017 and 2018 and you look at the questions that were being asked of senior management, it was very clear that Wall Street felt like JUUL was winning and we were losing, and what were we doing about it?"

350.    CW1 said that within Altria, discussions about a potential investment in JUUL started as early as 2017.

351.    CW3 heard rumors that Altria was looking to purchase JUUL before Howard Willard became CEO in May 2018.

---

[167] Olivia Zaleski & Ellen Huet, *Juul Expects Skyrocketing Sales of $3.4 Billion, Despite Flavored Vape Restrictions*, Bloomberg (Feb. 22, 2019), https://www.bloomberg.com/news/articles/2019-02-22/juul-expects-skyrocketing-sales-of-3-4-billion-despite-flavored-vape-ban.
[168] Altria's October 14, 2019 letter to Senator Durbin, *et al.*, by Howard Willard III (2019).

352.    While CW1 was not personally involved in conducting the due diligence, CW1 stated, in general, that Altria's due diligence for investments was comprised of a large team of "dozens" of people with experts across all key functions, including law, sales, distribution, supply chain, purchasing and manufacturing. The company's due diligence was typically a "rigorous process" that lasted "months," and Altria did not use outside consultants for due diligence work.

353.    "On previous [due diligence], it was taking people with relevant, category-specific knowledge from within the company to look at what was there for the entity we were buying," CW1 said. "It was usually pretty broad teams with senior leaders across all different functions."

354.    CW1 heard rumors that Reynolds American was contemplating an investment in JUUL, but that the company walked away because it "wasn't comfortable" with the move after conducting its due diligence process.

355.    CW3 said he/she spent about six months conducting market research on JUUL in 2018. CW3 said the research was a competitive analysis of the vapor space and involved studying JUUL's marketing and advertising, and how the company had become so successful. CW3 said that JUUL's flavored products did come up during the research. "We were trying to better understand the popularity and uptake of JUUL because JUUL was very successful," CW3 said.

356.    When asked to discuss what Altria learned from the JUUL-focused research, CW3 said, "Not without a subpoena I won't," adding that CW3 feared being sued by Altria. "If [plaintiffs' counsel are] willing to get a court order to get me to talk, I'll happily do it," CW3 said. "Altria sues people, and I have zero desire to end up in court as a defendant."

357.     Although CW3 wouldn't share specifics of the research on JUUL, CW3 said it resulted in a report of which CW3 was the lead author. CW3 said the report was presented to CW3's boss, Melissa Burroughs, Altria's Senior Director of Marketing and Consumer Research. The report was also given to Burroughs' boss, Pascal Fernandez, Altria's Senior Vice President, Consumer and Marketplace Insights. CW3 said he was "relatively certain" that the report was also presented to the head of NuMark, CW1.

358.     CW1 said that JUUL's issues with underage users were well-known within Altria. Asked how he knew that JUUL was marketing to underage users, CW1 said, "It was like asking, 'How do you know that the sky is blue?'" "Everybody knew at this point that there was a youth issue," CW1 said. "So there was no doubt [that JUUL was marketing to underage users]." When the FDA sent the letter to all the CEOs talking about the youth usage data, people knew that it was going to come out and that it was going to be up significantly because of JUUL," CW1 said.

359.     CW2 also said JUUL's marketing to underage users was well-known prior to Altria's investment in the company.

360.     By investing in JUUL, Altria could financially benefit from activities that it was not permitted to under the law or the MSA.

361.     CW1 said Altria had specific policies and guidelines against targeting underage users, including a ban on using social media channels for marketing. "We weren't doing it," CW1 said. "It would have been against our policy."

362.     JUUL, meanwhile, had a very different approach, CW1 said, noting that JUUL had an active social media operation that used influencers and a variety of platforms, including Instagram.

363.    In addition to its marketing restrictions, CW1 said Altria had other guidelines and practices designed to prevent underage users. CW1 said, "Everything had to be age-verified," and that Altria required age verification when making e-commerce (or online) sales.

364.    CW1 also said that Altria could not move forward with a product if the company thought it couldn't confirm in a court of law that it was "highly confident" that the product was reaching only tobacco users of a legal age.

365.    In June 2018, CW1 became President and CEO of Altria subsidiary NuMark, which focused on switching consumers to "reduced-risk products." CW1 served in that role for five months before becoming Altria's Senior Vice President, Marketing and Commerce Strategy.

366.    CW1 took over MarkTen – Altria's product line of e-cigarette pods – in its fifth year of existence, in 2018. At that point, "JUUL was growing and the marketplace was running rampant," CW1 said.

367.    CW2 described a conflict between the cultures of the two companies and Altria's desire to gain market share of the vaping industry. CW2 said, "The way I felt when I was at Altria was that they wanted to produce good products for adults; they wanted the product to be in the hands of adults and not children." "I heard that a lot. I felt it was a credible company. Cigarettes are legal. Vaping is legal. Kids shouldn't be doing it," CW2 said. "The culture felt like that was the case," CW2 continued, "but JUUL was killing them in regard to vaping. They were the No. 1 vaping product by far." "You're the granddaddy of cigarettes, and you've got this upstart [beating you in vaping]," CW2 said. "In my mind, JUUL was the Best Buy to Altria's Circuit City."

368.    The question posed to CW1 by Altria's leadership was, "Can we compete with JUUL? And what's our strategy?"

369.    CW1 said he was adamantly opposed to Altria investing in JUUL, citing JUUL's issues with underage users, and that CW1 made CW1's opinion known within the company. "For 20 years, we had prided ourselves on the fact that responsibility was the most important thing in the category, and it was clear that [JUUL] had a huge issue," CW1 said.

370.    Instead of investing in JUUL, CW1 said he devised a plan for advancing Altria's internal vaping products.

371.    "I had a strategy that assumed that one, we would not invest in JUUL," CW1 said. "The strategy basically entailed kind of rationalizing what we had in our [vaping] portfolio but doing so in a way where we could move to profitability, investing in new technologies and [FDA-approved] applications to get superior products on the market over a two-year timeframe."

372.    CW1 said the plan called for Altria to "improve the business performance of what we have," and also to "create kind of a new structure for innovation to develop superior products to get to the market for the future."

373.    CW1 and other senior executives from Altria were deposed by the FTC on issues related to the JUUL investment, CW1 said. CW1 said the agency wanted all documents and information related to why CW1 thought Altria should continue advancing its own vaping operation as opposed to investing in JUUL. The FTC was "curious about that point of view versus what was done," CW1 said.

374.    During the deposition, CW1 said he reviewed documents showing how early Altria executives had signaled a desire to invest in JUUL rather than advance the company's internal vaping products.

375.    "I got put in the e-vapor business on June 1, 2018," CW1 said, referring to the date CW1 became NuMark's president and CEO. "Even at that point, there was no interest at all from [people at] senior levels of doing anything internal [in the vaping] business."

376.    Those within Altria thought that they would be able to correct the problem after the investment.

377.    CW2 said that within Altria, JUUL's marketing of vaping products to underage users was viewed as "unethical" and something that Altria would change post-investment. "It wasn't ethical, and the feedback I got and felt around the company was that they thought it was unethical and they would stop that kind of stuff," CW2 said.

378.    CW2 said: "It was often said that … if we were in JUUL's position, that would not be a problem," referring to JUUL's catering to underage users. "The problems JUUL was having, that wouldn't be a problem."

379.    CW2 said there was a mindset among Altria employees that they would be able to correct JUUL's issues with underage users by implementing a variety of "low-level technologies" to prevent underage vaping, such as age-tracking and fingerprinting mechanisms, which could be applied to the capsules of vaporizers. "If Altria was in that position, the problems that Juul was having with teenagers and teenagers taking in vaping would not be as prevalent," CW2 said, describing the thinking among his Altria colleagues. "There's mechanisms and technologies you can use that could prevent underage smoking."

380.    "I think that people internally were overly confident that, 'We can fix that,'" CW1 said. Asked why Altria was so confident about being able to fix Juul's issues, CW1 laughed. "I don't know," CW1 said. "I didn't agree with it. I would call it hubris, overconfidence."

381.   "We had marketing practices that were more constrained than what [Juul] was doing," CW1 said. "I think there was an assumption that, 'We'll make them adopt our marketing practices."

382.   CW1 said there was an assumption within Altria that the FDA would raise the minimum age for buying vaping products from 18 to 21. "'We'll lobby for 21 and that will fix the problem and we can move on,'" CW1 said, characterizing the mindset within Altria.

383.   As later reported by the *Wall Street Journal*, Willard wooed JUUL for more than a year, first trying to buy the entire company in late 2017 or early 2018 with an offer of as much as $8 billion, which would have given Altria complete control over JUUL's operations. That approach was rebuffed. Willard continued to pursue JUUL through 2018 as an ardent suitor. In negotiations with JUUL, he brandished a JUUL vaporizer and once in a while took puffs. He courted JUUL's investors and JUUL CEO Kevin Burns with pledges to help convert smokers. "I was surprised how quickly Howard got there and said he was committed to our mission," Burns later said in an interview. Still, ***JUUL couldn't be swayed: It wouldn't sell a majority stake***.

384.   Because JUUL refused to sell a majority stake, Willard's plans of controlling the operations of JUUL and stopping its widespread improper marketing were gone. He would have to choose between making a risky bet on a company with soaring profits but widespread illegal marketing practices, and foregoing the possible upside while remaining true to Altria's publicly stated mission of preventing youth from smoking or vaping nicotine.

385.   Desperate for some stake in JUUL, Willard asked the board of directors to approve purchasing a 35% minority interest in JUUL for $12.8 billion, in which JUUL would remain fully independent.

386.    As part of the agreement, JUUL would gain access to Altria's retail, marketing and distribution apparatus including access to its tobacco products retail shelf space and direct communications to users through cigarette pack inserts and mailings to adult smokers in Altria's companies' databases and Altria would apply its logistics and distribution experience to help JUUL expand its reach and efficiency; and JUUL would have the option to be supported by Altria's sales organization, which covers more than 230,000 retail locations. JUUL also stated that a condition of the agreement was that Altria must allow JUUL to remain fully independent and retain full operating control, and Altria could participate in the e-vapor category only through JUUL.  That is, Altria had to abandon its other e-vapor products MarkTen and Green Smoke.

## XI.    JUUL Thrived Due to Extensive Efforts to Delay Meaningful Regulation of <u>Its</u> <u>Products</u>

### A.    Defendants Successfully Shielded the Popular Mint Flavor from Regulation

387.    The JLI Defendants and the Altria Defendants had a two-fold plan for staving off regulation: (1) ensure the FDA allowed certain flavors, namely mint, to remain on the market; and (2) stave off a total prohibition on JUUL that was being contemplated in light of JLI's role in the youth vaping epidemic.

388.    First, the JLI Defendants and the Altria Defendants publicly defended mint flavoring as a substitute for menthol cigarette smokers, when in fact JLI's studies indicated that mint users are not former menthol smokers. Second, by fighting to keep mint as the last flavor on the market, the cigarette industry could continue to appeal to non-smokers, including youth. The JLI Defendants coordinated with the Altria Defendants to pursue a fraudulent scheme to convince the FDA to leave the mint flavor on the market, sacrificing other flavors in the process.

389.    On August 2, 2018, JLI met with the FDA to discuss a proposed youth-behavioral study regarding the prevalence of use, perceptions of use, and intentions to use JUUL and other tobacco products among adolescents aged 13-17 (the "Youth Prevalence Study").[169]

390.    On November 5, 2018, JLI transmitted the results of the Youth Prevalence Study to the FDA and reported that a study of over 1,000 youth had found that only 1.5% of youth had ever used a JUUL, and that only 0.8% of youth had used a JUUL in the last 30 days.[170] Specifically, the study found that 47% of youth who reported use of a JUUL device in the last 30-days professed to using mango most often, with only about 12% reporting the same for mint.

391.    JLI's study was a sham. The JLI Defendants and the Altria Defendants knew their reported data was inconsistent with the information they had collected internally. JLI's report featured responses to a carefully selected survey question—which single flavor youth used most often?—that obscured the widespread use of mint JUULpods among youth.

392.    Just a few days after JLI submitted the misleading Youth Prevalence Study to the FDA, the National Youth Tobacco Survey was released. Revealing the depths of the deception of JLI's Youth Prevalence Study, which found that only 1.5% of youth were current users of e-cigarettes, the National Youth Tobacco Survey found that 20.8% of high school student were current users (*i.e.*, consumed e-cigarettes within the last 30 days).

393.    As the e-cigarette crisis grew, on September 25, 2018, then-FDA Commissioner Scott Gottlieb sent letters to Altria, JLI and other e-cigarette manufacturers, requesting a

---

[169] Letter from Joanna Engelke, JUUL Labs, Inc., to David Portnoy, Ph.D., M.P.H., FDA Center for Tobacco Products (November 5, 2018).
[170] *Id*. at 3.

"detailed plan, including specific timeframes, to address and mitigate widespread use by minors."[171]

394.    As evidenced by Altria's recent admission that negotiations with JLI were ongoing in late 2017,[172] Altria and JLI's responses to the FDA reflect a coordinated effort to mislead the FDA with the intention that regulators, in reliance on their statements, would allow JLI to continue marketing mint JUULpods.

395.    Defendants' plan centered on efforts to deceive the FDA by reporting to it that (1) mint was more akin to tobacco and menthol than other flavors; and (2) kids did not prefer mint.

396.    JLI took the first step in this coordinated effort to deceive the FDA. In response to then-Commissioner Gottlieb's September 25, 2018 letter, JLI prepared an "Action Plan," which it presented to the FDA at an October 16, 2018 meeting, and presented to the public on November 12, 2018. The substance of JLI's presentation to the FDA and its public-facing Action Plan were largely identical.[173]

397.    In JLI's Action Plan, then-CEO Burns stated that only products that "mirror what is currently available for combustible cigarettes—tobacco and menthol-based products (menthol and mint pods)— will be sold to retail stores."[174]

398.    In both JLI's October 2018 presentation to the FDA and JLI's Action Plan that was shared with the public, JLI and its CEO fraudulently characterized mint as a non-flavored cigarette product, akin to tobacco and menthol cigarettes, suggesting that it was a product for

---

[171] Letter from Scott Gottlieb, M.D. to JUUL Labs, Inc. (Sept. 25, 2018); Letter from Scott Gottlieb, M.D. to Altria Group Inc. (Sept. 25, 2018).
[172] Altria's October 14, 2019 letter to Senator Durbin, *et al.*, by Howard Willard III (2019).
[173] JUUL did not include in its Action Plan a proposal for Bluetooth or Wi-Fi equipped devices that was included in JLI's October presentation.
[174] *JUUL Labs Action Plan*, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juullabs-action-plan/.

adult smokers. The image below was included in both the public-facing Action Plan and JLI's presentation to the FDA:



399.    JLI knew that mint was the most popular JUULpod. Although other flavors might draw new customers, JLI's most addictive "flavor" predictably became its most popular.

400.    The characterization of mint as an adult tobacco product was also fraudulent. As alleged in a whistleblower complaint, JLI's then-CEO told his employees: "You need to have an IQ of 5 to know that when customers don't find mango they buy mint."[175]

401.    On October 25, 2018, less than ten days after JLI presented its fraudulent, misleading Action Plan to the FDA, Altria's CEO Howard Willard submitted a letter in response to the FDA's call to combat the youth epidemic. Willard's letter was a clear indication of Altria's willingness to continue the fraudulent scheme and deception of the FDA. While Willard's letter confirmed that Altria understood that JLI's conduct and product was addicting many children to nicotine, this letter repeated the misleading statement that mint was a "traditional tobacco flavor"

---

[175] Angelica LaVito, *Former JLI executive sues over retaliation, claims company knowingly sold tainted nicotine pods*, CNBC (Oct. 30, 2019), https://www.cnbc.com/2019/10/30/formerjuul-executive-sues-over-retaliation-claims-company-knowingly-sold-tainted-pods.html.

despite Altria and JLI knowing it was no such thing. Willard then claimed that the youth epidemic was caused, in part, by "flavors that go beyond traditional tobacco flavors"—which, according to JLI and Altria, did not include mint—and announced that Altria would discontinue all MarkTen flavors except for "traditional tobacco, menthol and mint flavors." Willard asserted that these three flavors were essential for transitioning smokers. But Willard and Altria knew this was not true.[176]

402.    That same day—October 25, 2018—Altria continued its deception on an earnings call with investors. Altria fraudulently described its decision to remove its pod-based products from the market as one intended to address the dramatic increase in youth e-cigarette use, while it was only weeks away from publicly announcing its 35% stake in JLI:

> We recently met with Commissioner Gottlieb to discuss steps that could be taken to address underage access and use. Consistent with our discussion with the FDA and because we believe in the long-term promise of e-vapor products and harm reduction, we're taking immediate action to address this complex situation.
>
> First, Nu Mark will remove from the market MarkTen Elite and Apex by MarkTen pod-based products until these products receive a market order from the FDA or the youth issue is otherwise addressed. Second, for our remaining MarkTen and Green Smoke cig-a-like products, Nu Mark will sell only tobacco, menthol and mint varieties. Nu Mark will discontinue the sale of all other flavor variants of our cig-a-like products until these products receive a market order from the FDA or the youth issue is otherwise addressed. Although we don't believe we have a current issue with youth access or use of our e-vapor products, we are taking this action, because we don't want to risk contributing to the issue.
>
> After removing Nu Mark's pod-based products and cig-a-like flavor variants, approximately 80% of Nu Mark's e-vapor volume in the third quarter of 2018 will remain on the market.[177]

403.    Willard reiterated that "pod-based products and flavored products" were behind the increase in youth use of e-cigarettes:

---

[176] Altria's October 14, 2019 letter to Senator Durbin, *et al*., by Howard Willard III (2019).
[177] Altria Group Inc (MO) Q3 2018 Earnings Conference Call Transcript for the period ending September 30, 2018 (Oct. 25, 2018), https://www.fool.com/earnings/call-transcripts/2018/10/25/altria-group-inc-mo-q3-2018-earnings-conference-ca.aspx.

I mean, I think the way we thought about this was that we believe e-vapor has a lot of opportunity to convert adult cigarette smokers in the short, medium and long-term, but clearly, this significant increase in youth usage of the products puts that at risk and we think rapid and significant action is necessary. And I think as we looked at the data that is available in some of the remarks from the FDA, I think we concluded that the driver of the recent increase we think is pod-based products and flavored products and so we thought that the two actions that we took addressed the drivers of the increased youth usage here in the short run.[178]

404.    Willard emphasized that Altria's withdrawal of its own pod-based products was intended to address youth use: "[W]e really feel like in light of this dramatic increase in youth usage, withdrawing those products until the PMTA is filed is one path forward." He later said: "And frankly, the actions we took were the actions that we thought we could take that would have the biggest impact on addressing the increased use of e-vapor products by youth . . . we wanted to make a significant contribution to addressing the issue."[179] As noted above, however, it has since been reported that Altria "pulled its e-cigarettes off the market" not out of concern for the epidemic of youth nicotine addiction that JLI created, but because a non-compete clause was a part of its deal with JLI.

405.    Indeed, the FTC has recently uncovered that Altria pulling its e-cigarettes off the market had been part of the deal with JLI. As investment negotiations between Altria and JLI intensified in the summer of 2018, the future of Altria's e-cigarette business emerged as a key point of contention. "During negotiations, JLI insisted, and Altria recognized, that Altria's exit from the e-cigarette market was a non-negotiable condition for any deal."[180] Indeed, on July 30, 2018, in advance of a meeting between JLI and Altria, JLI's board member Nick Pritzker emailed Willard a term sheet which conveyed that "Continued competition from Altria's e-

---

[178] *Id.*
[179] *Id.*
[180] *In the Matter of Altria Group, Inc., et al.* Federal Trade Commission, Dkt No. 9393, April 1, 2020 ("FTC Complaint"), at 2.

cigarette products was the only option clearly off the table." [181] Negotiations occurred directly between Burns, Willard and Gifford (among others). [182]

406.    When Altria sought to weaken or remove any obligation to exit that market, JLI conveyed that any such attempt was completely unacceptable. After negotiations had stalled temporarily, Altria reaffirmed its willingness to accede to JLI's demand in early October 2018. In order to meet JLI's demand that Altria cease to compete in the e-cigarette market, Altria began taking steps to withdraw its e-cigarettes from the relevant market, including pulling its MarkTen Elite product from the market in October 2018, and then, after five years of continuous operation, announcing on December 7, 2018, its decision to wind down the remainder of its e-cigarette business."[183]

407.    Thus, while Altria publicly announced that it would pull its pod-based products to combat youth usage, and publicly seemed to support removal of youth-friendly flavors, its defense of mint as a tobacco-analog was actually part of the scheme to protect the profits associated with JLI's mint JUULpods, one of JLI's strongest products with the highest nicotine content and highest popularity among non-smokers and youth.

408.    In support of his arguments to the FDA that mint was a flavor for adult smokers, Willard cited a study that Altria had conducted and presented at a conference that JLI attended.[184] But Willard did not disclose that Altria's "study" was merely a "quasi-experimental online survey" and not a true scientific study.[185] Notably, JLI's current CEO, K.C. Crosthwaite,

---

[181] *Id.* at 9.
[182] *Id*. at 10.
[183] *Id*. at 2, 11.
[184] Jessica Parker Zdinak, Ph.D., ALTRIA CLIENT SERVICES, *E-vapor Product Appeal Among Tobacco Users and Non-users and the Role of Flavor in Tobacco Harm Reduction*, 72nd Tobacco Science Research Conference, (September 18, 2018), available at
https://sciences.altria.com/library/media/Project/Altria/Sciences/library/conferences/2018%20TSRC%20J%20Zdinak%20Presentation.pdf.
[185] *Id.*

was the President and Chief Growth Officer of Altria Client Services, which conducted Altria's mint "study" in Spring 2017, the same time that JLI and Altria began their "confidential negotiations."[186] Willard did not disclose that this study was contradicted by the "youth prevention" data provided by JLI during its acquisition due-diligence showing that mint was popular among teens.

409.    Through these letters, Altria sought to prevent the FDA—which was actively considering regulating flavors[187]—from banning JLI's mint JUULpods.

410.    At the heart of these acts of fraud was Defendants' characterization of mint as a tobacco product targeted toward adult smokers. This characterization was fraudulent because Defendants knew kids prefer mint flavor and that JLI designed mint to be one of JLI's most potent products. Altria supported this plan and helped execute it. Together, these actions by JLI and Altria ensured that mint would remain available to youths for many months, furthering their efforts to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base.

411.    The deceptive scheme worked—the FDA did not protest JLI and Altria's plan.

412.    By February 2019, the FDA became aware that it had been deceived by JLI and Altria. On February 6, 2019, then-FDA Commissioner Gottlieb wrote JLI and Altria demanding in-person meetings, excoriating Altria for its "newly announced plans with JUUL [that] *contradict the commitments you made to the FDA*" in a prior meeting and Willard's October 25,

---

[186] Altria's October 14, 2019 letter to Senator Durbin, *et al.*, by Howard Willard III (2019).
[187] Alex Lardieri, *FDA Considers Ban on E-Cigarette Flavors Amid 'Epidemic' Use by Teens*, U.S. News & World Report (September 12, 2018), https://www.usnews.com/news/health-carenews/articles/2018-09-12/fda-considers-ban-on-e-cigarette-flavors-amid-epidemic-use-by-teens.

2018 letter to the FDA.[188] Gottlieb's letter to JLI alleged that JLI's conduct was "inconsistent with its previous representations to the FDA."[189]

413.    The FDA demanded Altria be prepared to explain itself regarding its "plans to stop marketing e-cigarettes and to address the crisis of youth use of e-cigarettes." Then-Commissioner Gottlieb told Altria that "deeply concerning data" shows that "youth use of JUUL represents a significant proportion of overall use of e-cigarette products by children" and despite any alleged steps the companies had taken to address the issue he "ha[d] no reason to believe these youth patterns of use are abating in the near term, and they certainly do not appear to be reversing."

414.    JLI and Altria met with Gottlieb in March 2019 in a meeting the then-Commissioner described as "difficult."[190] Gottlieb "did not come away with any evidence that public health concerns drove Altria's decision to invest in JLI, and instead said it looked like a business decision. According to reporting by *The New York Times*, Gottlieb angrily criticized JLI's lobbying of Congress and the White House, stating:

> We have taken your meetings, returned your calls and I had personally met with you more times than I met with any other regulated company, and yet you still tried to go around us to the Hill and White House and undermine our public health efforts. I was trying to curb the illegal use by kids of your product and you are fighting me on it.[191]

415.    But just a week after the "difficult" meeting with JLI and Altria, Gottlieb posted a statement about the FDA's new e-cigarette policy, proposing to ban all flavors except "tobacco-,

---

[188] Letter from Scott Gottlieb to Howard Willard, Altria (February 9, 2019).
[189] Letter from Scott Gottlieb to Kevin Burns, JUUL Labs, Inc. (February 9, 2019).
[190] Kate Rooney & Angelica LaVito, *Altria Shares Fall After FDA's Gottlieb Describes 'Difficult' Meeting on Juul*, CNBC (Mar. 19, 2019), https://www.cnbc.com/2019/03/19/altriashares-fall-after-fdas-gottlieb-describes-difficult-meeting-on-juul.html.
[191] Julie Creswell & Sheila Kaplan, *How Juul Hooked a Generation on Nicotine*, N.Y. Times (Nov. 24, 2019), https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html.

mint- and menthol-flavored products."[192] He cited the strong support of President Trump (whose administration JLI had aggressively lobbied[193]), and also cited "recent evidence indicat[ing] that mint- and menthol-flavored ENDS products are preferred more by adults than minors."[194] Just a few weeks later, Gottlieb resigned from his position as commissioner of the FDA.

416.    The scheme had succeeded in saving mint JUULpods, as well as each Defendant's bottom line. JLI's sale of mint JUULpods rose from one third of its sales in September 2018 to approximately two thirds in February 2019. JLI's 2019 revenues were estimated to be between $2.36 billion and $3.4 billion, and mint JUULpods accounted for approximately 75% of JLI's total 2019 sales. And because mint remained on the market until JLI withdrew it in November 2019 in the face of growing scrutiny,[195] thousands, if not millions, of underage JUUL users suffered the consequences.

## XII.  JUUL Usage Increases the Risk of Cardiovascular, Pulmonary, Neurological, and Other Bodily Injuries

### A.    JUUL Products Cause Acute and Chronic Lung (Pulmonary) Injuries

417.    The use of e-cigarettes, including JUUL, cause significant lung toxicity[196] and have been implicated in multiple severe pathological lung injuries.

418.    Recent studies have demonstrated that exposure to JUUL aerosol induces oxidative stress, inflammation, epithelial barrier dysfunction, and DNA damage in lung cells.[197]

---

[192] Statement from FDA Commissioner Scott Gottlieb, M.D., on advancing new policies aimed at preventing youth access to, and appeal of, flavored tobacco products, including e-cigarettes and cigars (Mar. 13, 2019), https://www.fda.gov/news-events/press-announcements/statementfda-commissioner-scott-gottlieb-md-advancing-new-policies-aimed-preventing-youth-access.

[193] Evan Sully and Ben Brody, *JLI Spent Record $1.2 Million Lobbying as Regulators Stepped Up*, Washington Post (Oct. 22, 2019), https://www.washingtonpost.com/business/on-smallbusiness/juul-spent-record-12-million-lobbying-as-regulators-steppedup/2019/10/22/2a0dbc52-f4de-11e9-b2d2-1f37c9d82dbb_story.html.

[194] *Id*.

[195] Ellen Huet, *JLI Pulls Mint-Flavor Vaping Products, but Menthol Remains*, Bloomberg (Nov. 7, 2019), https://www.bloomberg.com/news/articles/2019-11-07/juul-stops-selling-mintflavored-vaping-products

[196] Lauren F. Chun *et al.*, *Pulmonary Toxicity of E-cigarettes*, 313 Am. J. Physio. Lung Cell Mol. Physiol L193 (May 18, 2017). https://www.ncbi.nlm.nih.gov/pubmed/28522559.

An impaired epithelial barrier function allows greater passage of inhaled chemicals into the body, increasing inflammation both locally in the lungs and systemically. This can lead to acute and chronic lung injury as well as exposure to, and increased susceptibility to, respiratory infections in users of e-cigarettes, including JUUL.[198]

419.    Research has also demonstrated that ultrafine metal particles from heating devices have been found in e-cigarette aerosol, and in e-cigarette user's lungs.[199]

420.    In addition, exposure to JUUL aerosol has been shown to significantly impair endothelial function comparable to impairment of endothelial function caused by use of combustible cigarettes.[200]

421.    It is well-established that endothelial dysfunction and injury from direct toxic effects of inhalants such as cigarette smoke, can cause lung injuries such as chronic obstructive pulmonary disease ("COPD"), emphysema, asthma and chronic bronchitis.[201]

422.    Recent epidemiological and toxicological studies detected links between asthma frequency and e-cigarette use in adolescents and reported that vaporized e-liquids containing the same flavor aldehydes found in JUUL induce inflammation in human respiratory epithelia.[202]

---

[197] Thivanka Muthumalage, *et al.*, *E-cigarette Flavored Pods Induce Inflammation, Epithelial Barrier Dysfunction, and DNA Damage in Lung Epithelial Cells and Monocytes*, 9 Scientific Reports 19035 (2019), https://www.nature.com/articles/s41598-019-51643-6.

[198] Laura E. Crotty Alexander, *et al. Chronic Inhalation of E-cigarette Vapor Containing Nicotine Disrupts Airway Barrier Function and Induces Systemic Inflammation and Multiorgan Fibrosis in Mice*, 314 Am. J. Physiol. Regul. Comp. Physiol. R834 (2018), https://journals.physiology.org/doi/full/10.1152/ajpregu.00270.2017; Pieter S. Hiemstra *et al.*, *The Innate Immune Function of Airway Epithelial Cells in Inflammatory Lung Disease*, 45 Eur. Respir. J. 1150 (2015), https://erj.ersjournals.com/content/45/4/1150.

[199] Alessandra Caporale, *et al.*, *Acute Effects of Electronic Cigarette Aerosol Inhalation on Vascular Function Detected at Quantitative MRI*, 293 Radiology 97 (2019), https://www.ncbi.nlm.nih.gov/pubmed/31429679

[200] Poonam Rao *et al.*, *Juul and Combusted Cigarettes Comparably Impair Endothelial Function*, 6 Tob. Regul. Sci. 30 (2020). https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6953758/.

[201] Francesca Polverino, *et al. COPD as an Endothelial Disorder: Endothelial Injury Linking Lesions in the Lungs and Other Organs?* 8 Pulm. Circ. 1 (2018), https://www.ncbi.nlm.nih.gov/pubmed/29468936.

[202] Phillip W. Clapp and Ilona Jaspers, *Electronic Cigarettes: Their Constituents and Potential Links to Asthma*, 79 Curr Allergy Asthma Rep. 17 (2017), https://www.ncbi.nlm.nih.gov/pubmed/28983782.

423.   A study published in December 2019 found that among individuals who never smoked combustible cigarettes, current e-cigarette use was associated with 75% higher odds of chronic bronchitis, emphysema, and COPD compared to those who never used e-cigarettes.[203]

424.   In addition, the flavoring compounds used in e-cigarettes such as JUUL include numerous chemicals known to be toxins if inhaled, such as diacetyl, acetyl propionyl, and benzaldehyde. These chemicals are linked to serious lung disease.[204]

425.   A multitude of published case reports have linked e-cigarette use, including JUUL, to a variety of acute inhalational lung injuries such as lipoid pneumonia, bronchiolitis obliterans (popcorn lung), alveolar hemorrhage, eosinophilic pneumonia, hypersensitivity pneumonitis, chemical pneumonitis and collapsed lungs, among others.

426.   In 2012, one article reported on the case of a 42-year-old woman admitted with a seven-month history of dyspnea, cough, and fevers that began when the patient had begun using e-cigarettes. The authors hypothesized the source of lipoid pneumonia was e-cigarette use, due to "glycerin-based oils found in e-cigarette nicotine vapor" added to "make the visual smoke when the solution is vaporized."[205]

427.   A 2014 report described a 20-year-old previously healthy U.S. active-duty male sailor who presented with a three-day history of "persistent cough, shortness of breath, and facial flushing" which began an hour after using an e-cigarette device. The patient was diagnosed with

---

[203] Albert D. Osei, *et al.*, *Association Between E-Cigarette Use and Chronic Obstructive Pulmonary Disease by Smoking Status: Behavioral Risk Factor Surveillance System 2016 and 2017*, 132 Am. J. Prev. Med. 949 (2019), https://www.ncbi.nlm.nih.gov/pubmed/30853474.
[204] Centers for Disease Control & Prevention, *Flavorings-Related Lung Disease* (Oct. 3, 2017), https://www.cdc.gov/niosh/topics/flavorings/default.html; Won Hee Lee, *et al.*, *Modeling Cardiovascular Risks of E-Cigarettes with Human-Induced Pluripotent Stem Cell-Derived Endothelial Cells.* 73 J. Am. College of Cardiology 2722 (2019), https://www.ncbi.nlm.nih.gov/pubmed/31146818; Sheila Kaplan & Matt Richtel, *Mysterious Vaping Illness That's 'Becoming an Epidemic,'* N.Y. Times (Aug. 31, 2019), https://www.nytimes.com/2019/08/31/health/vaping-marijuana-ecigarettes-sickness.html.
[205] Lindsay McCauley, *et al.*, *An Unexpected Consequence of Electronic Cigarette Use*. 141 Chest 1110 (2012).

acute eosinophilic pneumonia. The patient was given prednisone and discharged after five days in the hospital, with improvement of his symptoms and significant resolution of lung opacity.[206]

428.    In 2015, Atkins and Drescher reported the case of a 60-year-old man admitted repeatedly with weakness, chills, cough, a fever, and hypoxemia, with "bilateral upper lung zone crackles." The patient revealed before each emergency room admittance he had used e-cigarettes and was diagnosed with "suspected acute hypersensitivity pneumonitis, related to ENDS" and had no further episodes with cessation of e-cigarette use.[207]

429.    In another case in 2015, a 31-year-old woman was admitted to the hospital for dyspnea and cough. The patient "became increasingly hypoxic and was intubated due to concerns of acute respiratory distress syndrome." The patient was started on IV steroids and diagnosed with lipoid pneumonia, given the close temporality of her recent initiation of e-cigarettes three months prior to her onset of symptoms. The patient rapidly improved with steroids and cessation of use of e-cigarettes.[208] A different published case report in 2015 describes bilateral pneumonia and pleural effusions associated with e-cigarette use.[209]

430.    In 2016, another case report described the case of a 27-year-old otherwise healthy man who was admitted to the hospital with dyspnea, cough, fever, and hemoptysis after increasing use of e-cigarettes for seven months prior to presentation, initiated in an effort to decrease his combustible tobacco dependence. The patient worsened and required intubation and

---

[206] Darshan Thota & Emi Latham, *Case Report of Electronic Cigarettes Possibly Associated with Eosinophilic Pneumonitis in a Previously Healthy Active-duty Sailor*, 47 J. Emerg. Med. 15 (2014).
[207] Atkins, Graham *et al.*, *Acute Inhalational Lung Injury Related to the Use of Electronic Nicotine Delivery System (ENDS)*. 148 CHEST, Issue 4, 83A. (2015).
[208] Sujal Modi, *et al.*, *Acute Lipiod Pneumonia Secondary to E-Cigarettes Use: An Unlikely Replacement for Cigarettes*, 148 Chest 382 (2015).
[209] Kendall Moore, *et al.*, *Bilateral Pneumonia and Pleural Effusions Subsequent to Electronic Cigarette Use*, 3 Open Journal of Emergency Medicine 18 (2015).

mechanical ventilator support. There were no notable findings on microorganism workup, "making infectious etiology for his pneumonia very unlikely."[210]

431.    Also in January 2020, another article reported on a teenager who developed acute fibrinous organizing pneumonia (AFOP) after using JUUL as well as other vaping products. AFOP presents with diffuse ground glass infiltrates and intra-alveolar fibrin balls. Subpleural sparing and pneumomediastinum described elsewhere in vaping-associated lung injury were also seen. The authors noted that this patient's presentation fit with existing literature, but his young age, choice of e-cigarette, and lung pathology were considered unique. The images characterized AFOP, a newly evolving rare lung pathology, which is now associated with vaping.[211]

432.    Additional published case reports have been published since 2016 noting serious and significant acute lung injuries associated with vaping or e-cigarette use. Despite the increasing reports in the published medical literature and the widespread use of JUUL among teenagers, JLI did not take any steps to warn the public and consumers of the risks of JUUL products.

433.    Over the summer of 2019, healthcare providers started to note an influx of acute respiratory failure and a myriad of lung injuries in patients who were using e-cigarettes. This prompted a CDC investigation of an outbreak of vaping associated lung injuries. The reported injuries mirrored the injuries that had been reported in medical literature since 2012. In October 2019, the CDC issued treatment guidelines to assist doctors in clinical practice. The CDC defined a new recognized medical condition referred to as E-cigarette, or Vaping, Product Use Associated Lung Injury illnesses ("EVALI").

---

[210] Ronnie D. Mantilla, *et al.*, *Vapor Lung: Bronchiolitis Obliterans Organizing Pneumonia (BOOP) in Patient with E-Cigarette Use*, 193 Am. J. of Respiratory and Critical Care Med. A6513 (2016).
[211] Monica A. Lu, *et al.*, *Vaping-related Lung Injury in an Adolescent*, 201 American J. of Respiratory & Critical Care Med. 481 (2020).

434.    Researchers noted that the recent proliferation of vaping-related cases, known as EVALI, demonstrated a heterogeneous collection of pneumonitis patterns that included acute eosinophilic pneumonia, organizing pneumonia, lipoid pneumonia, diffuse alveolar damage and acute respiratory distress syndrome ("ARDS"), diffuse alveolar hemorrhage, hypersensitivity pneumonitis, and the rare giant-cell interstitial pneumonitis. Active infection (which would include live bacterial contamination of e-cigarette fluids) did not appear to explain the clinical presentation, but acute toxic lung injury did seem to fit.[212]

435.    Further, a recent publication in 2020 noted that there were almost 2,000 cases of EVALI at the time it was written. The authors further noted that Vitamin E acetate was one possible cause of the recent outbreak but there may be more than one cause and therefore, everyone should refrain from using any e-cigarette or vaping products.[213]

436.    Another publication in January 2020 noted that there were a number of patients who were diagnosed with EVALI who reported the use of nicotine only e-cigarettes. The authors concluded that EVALI was also associated with nicotine-only products.[214]

437.    In addition, multiple reports have been published in the medical literature of acute alveolar hemorrhage caused by e-cigarette use.[215] Diffuse alveolar hemorrhage ("DAH") is a life-threatening disorder which refers to bleeding that originates in the pulmonary microvasculature. It often results in acute respiratory failure.[216] Hypersensitivity pneumonitis has

---

[212] David C. Christiani, *Vaping-Induced Injury*, 68 New England J. Med. 787 (2019).

[213] Sascha Ellington, *et al.*, *Update: Product, Substance-Use, and Demographic Characteristics of Hospitalized Patients in a Nationwide Outbreak of E-cigarette, or Vaping, Product Use-Associated Lung Injury—United States, August 2019–January 2020*, 69 Morbidity and Mortality Weekly Rep. 44 (2020).

[214] Isaac Ghinai, *et al.*, *Characteristics of Persons Who Report Using Only Nicotine-Containing Products Among Interviewed Patients with E-cigarette, or Vaping, Product Use-Associated Lung Injury - Illinois, August-December 2019, 69 Morbidity and Mortality Weekly Rep. 84 (2020).*

[215] Michael Agustin, *et al.*, *Diffuse Alveolar Hemorrhage Induced by Vaping*, 2018 Case Rep. Pulmonol. 1 (2018); Peter J. Edmonds, *et al.*, *Vaping-induced Diffuse Alveolar Hemorrhage*, 29 Respiratory Med. Case Reports 1 (2020).

[216] Brandi R. Newsome & Juan E. Morales, *Diffuse Alveolar Hemorrhage*, 104 Southern Med. J. 269 (2011).

been linked to the use of e-cigarettes, such as JUUL, since 2015.[217] In 2018, researchers published the first reported case of hypersensitivity pneumonitis and ARDS as a risk of e-cigarette use in an adolescent.[218] Recent case reports have also linked spontaneous pneumothorax (lung collapse) to vaping and use of e-cigarettes.[219] [220]

438.   The multiple pathological lung injuries and toxicity associated with e-cigarette use, including JUUL, can lead to acute respiratory failure, intubation with mechanic ventilation and death.

439.   It has been established that the use of e-cigarettes, including JUUL, can lead to acute and chronic lung injuries such as EVALI, lipoid pneumonia, organizing pneumonia, chemical pneumonitis, alveolar hemorrhage, bronchiolitis obliterans (popcorn lung), pneumothorax, acute respiratory failure, ARDS, asthma, emphysema and COPD. Defendants never warned the public of the risk of serious acute and chronic lung injuries that were associated with the use of e-cigarettes, including JUUL.

440.   The failure to properly and adequately test the safety of JUUL prior to marketing it to the public, including teenagers and young adults, and continuing in the face of the onslaught of publications in the medical literature demonstrating an association with e-cigarette use and significant lung injuries, amounts to a reckless disregard for public safety.

---

[217] Graham Atkins, *et al.*, *Acute Inhalational Lung Injury Related to the Use of Electronic Nicotine Delivery Systems (ENDS),* 148 Chest 83A (2015).

[218] Casey G. Sommerfield, *et al.*, *Hypersensitivity Pneumonitis and Acute Respiratory Distress Syndrome From E-Cigarette Use*, 141 Pediatrics 1 (2018).

[219] Alex Bonilla, *et al.*, *Recurrent Spontaneous Pneumothoraces and Vaping in an 18-yearold Man: A Case Report and Review of the Literature*, 13 J. of Med. Case Reports 283 (2019), https://doi.org/10.1186/s13256-019-2215-4

[220] Munish Sharma, *et al.*, *A Case Report of Secondary Spontaneous Pneumothorax Induced by Vape*, 11 Cureus e6067 (2019), https://doi:10.7759/cureus.6067.

## B.     JUUL Products Cause Cardiovascular Injuries

441.     In addition to severe lung injuries and addiction, JUUL products cause significant and severe risks of cardiovascular injuries. Studies have shown that use of e-cigarettes such as JUUL increases the risk of strokes and heart attacks.[221]

442.     Research has demonstrated that e-cigarettes significantly increase blood pressure and arterial stiffness, which also increases the risk of strokes and heart attacks.[222] Further, scientists have found that e-cigarettes cause oxidative stress, which leads to vascular disease and damage, known risk factors for cardiovascular injuries.[223]

443.     Biological and epidemiologic studies have found that significant associations exist between e-cigarette use and myocardial infarctions (heart attacks), which appear to be dose-dependent. Biological investigations support this association, whereby a prothrombotic phenotype may develop after exposure to nicotine-containing e-cigarette vapors.[224]

444.     Researcher Floridan Rader and others found that chronic e-cigarette users demonstrated substantially impaired coronary microvascular endothelial function, even more pronounced than that seen in chronic tobacco cigarette users. These findings also suggested that

---

[221] *E-cigarettes linked to higher risk of stroke, heart attack, diseased arteries,* American Stroke Association News Release, Abstract 9, Session A2 (Jan. 30, 2019), https://newsroom.heart.org/news/e-cigarettes-linked-to-higher-risk-of-stroke-heart-attackdiseased-arteries; Mohindar R. Vindhyal, *et al.*, *Impact on Cardiovascular Outcomes Among E-cigarette Users: A Review From National Health Interview Surveys,* 73 J. of the Am. College of Cardiology Suppl. 2 (2019), www.onlinejacc.org/content/73/9_Supplement_2/11.; Paul M. Ndunda & Tabitha M. Muutu, *Electronic Cigarette Use is Associated with a Higher Risk of Stroke,* 50 Int'l Stroke Conference 2019 Oral Abstracts: Community/Risk Factors, Suppl. 1, Abst. 9, www.ahajournals.org/doi/10.1161/str.50.suppl_1.9.

[222] Charalambos Vlachopoulos, *et al.*, *Electronic Cigarette Smoking Increases Aortic Stiffness and Blood Pressure in Young Smokers*, 67 J. Am. Coll. Cardiol. (2016).

[223] Dennis Thompson, *Vaping May Hurt the Lining of Your Blood Vessels*, WebMD HealthDay Reporter (May 28, 2019), www.webmd.com/mental-health/addiction/news/20190528/vapingmay-hurt-the-lining-of-your-blood-vessels#1; JUUL e-cigarettes and JUULpods deliver dangerous toxins and carcinogens to users. The ingredients in JUULpods include glycerol, propylene glycol, nicotine, benzoic acid, and flavoring chemicals. *See* What Are JUULpods?, www.juul.com/learn/pods.

[224] Giuseppe Lippi & Emmanuel J. Favaloro, *An Update on Biological and Clinical Associations Between E-Cigarettes and Myocardial Infarction*, Semin. Thromb. Hemost. (2019), https://:doi.org/10.1055/s-0039-3402451.

chronic e-cigarette use leads to measurable and persistent adverse vascular effects that are not directly related to nicotine.[225]

445.    Talal Alzahrani found that daily e-cigarette use was associated with an increased risk of myocardial infarction.[226]

446.    A systematic review of the literature found that acute mainstream exposure to aerosol from JUUL, or from previous generations of e-cigarettes using free-base nicotine, impaired vascular function comparably to combusted cigarette smoke and delivered considerably more nicotine to the blood on a per puff basis.[227]

447.    The overarching conclusion from dozens of studies published in the past eight years is that use of e-cigarettes, including JUUL, increases the risk of cardiovascular injury which can lead to strokes, heart attacks and death. JLI never warned the public or consumers of the serious and significant risk of cardiovascular injuries associated with its products.

### C.    JUUL Products Cause and Contribute to Seizure(s)

448.    On April 3, 2019 the FDA Center for Tobacco Products issued a Special Announcement notifying the public of an increase in reports of tobacco-related seizures, specifically relating to an increase in e-cigarette use, particularly among youth.[228]

449.    Symptomatic nicotine toxicity is a consequence of excessive vaping.[229] As the FDA acknowledges in its statement, "seizures or convulsions are known potential side effects of

---

[225] Florian Rader, *et al.*, *E-Cigarette Use and Subclinical Cardiac Effects*, medRxiv (preprint) https://:doi:https://doi.org/10.1101/2020.01.16.20017780 (2020).

[226] Talal Alzahrani, *et al.*, *Association Between Electronic Cigarette Use and Myocardial Infarction*, 55 Am. J. Preventive Med. 455 (2018).

[227] Nicholas Buchanan, *et al. Cardiovascular Risk of Electronic Cigarettes: A Review of Preclinical and Clinical Studies,* 116 Cardiovascular Research 40 (2019)

[228] *Some E-cigarette Users Are Having Seizures, Most Reports Involving Youth and Young Adults*, U.S. Food & Drug Administration (April 10, 2019), https://www.fda.gov/tobaccoproducts/ctp-newsroom/some-e-cigarette-users-are-having-seizures-most-reports-involvingyouth-and-young-adults

[229] Adrienne Hughes, *et al.*, *An Epidemiologic and Clinical Description of E-cigarette Toxicity*, 57 Clin. Toxicol. 287 (2018), https://:doi: 10.1080/15563650.2018.1510503.

nicotine toxicity."[230] It is well-documented that nicotine poisoning can cause seizures, including ingestion of e-cigarette fluid.[231] Nicotine-induced seizure has long been considered a possible side effect of long-term nicotine exposure.[232] JUUL's high nicotine content and addictive nature cause JUUL users to be highly susceptible to seizures. Moreover, it has been suggested that the use of e-cigarettes is associated with an exacerbation of seizures in individuals who are predisposed.[233]

450.    Seizures following e-cigarette use are a significant cause for concern due to the unnecessarily high levels of nicotine delivered, by design, via JUUL. As described herein, JLI intentionally designed its products to deliver a higher amount of nicotine, particularly targeting young people, and then failed to warn of the subsequent risks. JUUL devices were deliberately designed to deliver higher concentrations of nicotine per puff as compared to cigarettes, creating the risk for addiction as well as the risk of seizure due to potentially toxic levels of nicotine exposure.

### D.    Animal Studies Demonstrate Carcinogenic Potential of JUUL

451.    Several studies conducted on animals show a significant likelihood that JUUL can cause cancer for users.

452.    In 2017, a report by Donatella Canistro and others found that e-cigarettes induce toxicological effects that can raise the risk of cancer.[234] Similarly, a 2018 study measured the

---

[230] *Some E-cigarette Users Are Having Seizures, Most Reports Involving Youth and Young Adults*, U.S. Food & Drug Administration (April 10, 2019), https://www.fda.gov/tobaccoproducts/ctp-newsroom/some-e-cigarette-users-are-having-seizures-most-reports-involvingyouth-and-young-adults
[231] Gerdinique C. Maessen, *et al.*, *Nicotine Intoxication by E-cigarette Liquids: A Study of Case Reports, Pathophysiology*, 58 Clinical Toxicology 1 (2020), https://www.tandfonline.com/doi/full/10.1080/15563650.2019.1636994.
[232] Lucinda L. Miner, *et al.*, *The Effect of Chronic Nicotine Treatment on Nicotine-induced Seizures*, 95 Psychopharmacology 52 (2018), https://doi.org/10.1007/BF00212766.
[233] Jessica D. Wharton, *et al. Increased Seizure Frequency Temporally Related to Vaping: Where There's Vapor, There's Seizures?* 104 Pediatric Neurology 66 (2020).
[234] Donatella Canistro, *et al.*, *E-cigarettes Induce Toxicological Effects That Can Raise the Cancer Risk*, 7 Scientific Reports 1 (2017).

DNA damage induced by nitrosamines in the organs (lung, bladder, and heart) of mice subjected to e-cigarette vapor and concluded that e-cigarette vapor induces DNA damage in all three organs and reduces DNA-repair functions and proteins in mouse lungs. They further found that nicotine-derived nitrosamine ketone can induce the same effects and enhance mutational susceptibility and tumorigenic transformation of cultured human bronchial epithelial and urothelial cells (leading them to believe that vaping could contribute to heart disease and lung and bladder cancer in humans).[235] And in 2019, a report by Moon-shong Tang and others found that exposure to e-cigarette vapor, induced lung adenocarcinoma and bladder urothelial hyperplasia in mice.[236]

453.    There is a likely association between e-cigarettes, including JUUL, and cancer. Long term epidemiological studies will likely reveal an increased risk of cancer among this generation of youth who were unwitting targets of JLI in complete and utter reckless disregard for their safety.

## XIII.   Materially False and Misleading Statements Made During the Class Period

454.    The Class Period begins on December 20, 2018, when Altria and JUUL both issued press releases announcing that Altria had signed and closed a $12.8 billion investment in JUUL, the purported U.S. leader in e-vapor products, including e-cigarettes.  According to Altria's December 20, 2018 Press Release (the "December 2018 Press Release"), "[t]he service agreements w[ould] accelerate JUUL's mission to switch adult smokers to e-vapor products[,]" thereby presumably increasing JUUL's sales and the value of Altria's investment.  Additionally,

---

[235] Hyun-Wook Lee, *et al.*, *E-cigarette Smoke Damages DNA and Reduces Repair Activity in Mouse Heart, Lung, and Bladder as well as in Human Lung and Bladder Cells*, 115 PNAS E1560 (2018).

[236] Moon-shong Tang, *et al.*, *Electronic-cigarette Smoke Induces Lung Adenocarcinoma and Bladder Urothelial Hyperplasia in Mice*, 116 PNAS 21727 (2019).

the December 2018 Press Release highlighted that "Altria's investment represents a 35% economic interest in JUUL, valuing the company at $38 billion."

455.    The statements referenced in ¶ 454 were materially false and misleading because the Altria Defendants knew or recklessly disregarded but failed to disclose: (i) that JLI's overarching marketing scheme was directed towards youth; (ii) that JUUL's products were harmful and not a tobacco cessation product; (iii) that JLI's youth marketing scheme subjected JLI, Altria, and Altria's investment in JUUL to material risks and expenses, including reputational, litigation and regulatory actions and fines; (iv) that these risks associated with JLI's products and marketing practices, and the true value of JLI and its products were known to the Altria Defendants but were not communicated to Altria investors; (v) that all of the foregoing, as well as mounting public scrutiny, negative publicity, and governmental pressure on e-vapor products and JLI made it reasonably likely that Altria's investment in JLI would negatively impact Altria's reputation and operations; and (vi) that the materialization of these risks would likely require Altria to write-down a material portion of its investment in JLI.

456.    Altria's December 2018 Press Release also quoted Defendant Willard, who touted Altria's investment in JUUL as the "biggest" in the Company's history, and a move that the Company made in an effort to promote products that reduced harm, stating, in relevant part:

> We are taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, a world leader in switching adult smokers . . . . We have long said that providing adult smokers with superior, satisfying products *with the potential to reduce harm* is the best way to achieve tobacco harm reduction. Through JUUL, we are making the biggest investment in our history *toward that goal*. *We strongly believe that working with JUUL to accelerate its mission will have long-term benefits for adult smokers and our shareholders.*

(Emphases added.)

457.    The statements referenced in ¶ 456 were materially false and misleading because the Altria Defendants knew but failed to disclose that: (i) JUUL's products were harmful to its users, especially those teenagers to whom JUUL marketed its products; and (ii) none of JUUL's products were approved by the FDA as a reduced harm tobacco product.

458.    Altria's December 2018 Press Release also quoted JUUL's CEO, Kevin Burns, who stated, in relevant part:

> ***Altria's investment sends a very clear message that JUUL's technology has given us a truly historic opportunity to improve the lives of the world's one billion adult cigarette smokers*** . . . . This investment and the service agreements will accelerate our mission to increase the number of adult smokers who switch from combustible cigarettes to JUUL devices.

(Emphasis added.)

459.    The statements referenced in ¶ 458 were materially false and misleading for the reasons stated in ¶ 457 and because speaking about the effect of JUUL's technology on improving lives created a duty on the Altria Defendants to disclose that JUUL's technology was, in fact, destroying lives, especially teenagers who were being targeted as its customers.

460.    Additionally, Altria's December 2018 Press Release touted multiple purported benefits associated with Altria's investment in JUUL, including that it purportedly "Advances Altria's Long-Term Tobacco Harm Reduction Goal."

461.    The statements referenced in ¶ 460 were materially false and misleading because the Altria Defendants knew or recklessly disregarded but failed to disclose that: (i) JUUL's products were harmful to its users, especially teenagers to whom JUUL marketed its products; and (ii) JUUL products had never been approved by the FDA as a reduced harm tobacco product.

462.    Finally, Altria's December 2018 Press Release attempted to assure investors that Altria's investment in JUUL was made with an ongoing commitment to prevent underage

tobacco consumption, promising that Altria and JUUL would work together to prevent underage use of JUUL's products.  Specifically, Altria's December 2018 Press Release stated, in relevant part:

Commitment to Underage Tobacco Prevention

**Altria and JUUL are committed to preventing youth from using any tobacco products**. As recent studies have made clear, youth vaping is a serious problem, which **both Altria and JUUL are committed to solve**. As JUUL previously said, "**Our intent was never to have youth use JUUL products**. But intent is not enough, the numbers are what matter, and the numbers tell us underage use of e-cigarette products is a problem."

* * * * *

**JUUL believes that it cannot fulfill its mission to provide the world's one billion adult smokers with a true alternative to combustible cigarettes if youth use continues unabated. Together, JUUL and Altria will work to prevent youth usage through their announced initiatives, further technological developments and increased advocacy for raising the minimum age of purchase for all tobacco products to 21**.

463.   The statements referenced in ¶ 462 were materially false and misleading because the Altria Defendants knew but failed to disclose that: (i) not only was JUUL not committed to preventing youth from using any tobacco products, but JUUL's practice was to specifically target teenagers as customers by, among other things, designing their JUUL products like high-tech gadgets, offering video-game-like features, kid-friendly flavors, and using cutting-edge viral marketing campaigns and social media; and (ii) JUUL's intent **was** to have youth use JUUL products which is why it specifically targeted its advertising towards youth, including advertising its JUUL products on websites that were highly attractive to children, adolescents in middle school and high school, and underage college students.

464.   Also on December 20, 2018, sixteen minutes after Altria's December 2018 Press Release was distributed, JUUL issued its own press release, in a coordinated fashion, mirroring

that of Altria's, titled "JUUL Statement About Altria Minority Investment and Service Agreements." Discussing the rise in youth vaping and Altria's investment, JUUL likewise stated that its "***intent was never to have youth use JUUL products***" and the company identified Altria's investment as furthering JUUL's purported mission to prevent underage vaping: "Today, we have been joined by an unlikely – and seemingly counterintuitive – investor in our journey. Altria today announced a minority investment of $12.8 billion into JUUL for a 35% ownership in the company along with services to accelerate our mission." JUUL stated that as part of the agreement, JUUL would gain access to Altria's retail, marketing and distribution apparatus including "access to its premier innovative tobacco products retail shelf space," access to users with "direct communications through cigarette pack inserts and mailing to adult smokers via Altria's companies' databases," and Altria will apply its logistics and distribution experience to help JUUL expand its reach and efficiency, and JUUL will have the option to be supported by Altria's sales organization, which covers more than 230,000 retail locations. JUUL also stated that a condition of the agreement was that Altria must "allow JUUL to remain in control. As part of this investment JUUL remains fully independent and retains full operating control."

465.    The statements referenced in ¶ 464 were materially false and misleading because JLI knew but failed to disclose that its intent ***was*** to have youth use JUUL products which is why it designed its JUUL products like high-tech gadgets, offered video-game-like features, kid-friendly flavors, and used cutting-edge viral marketing campaigns and social media to specifically target its advertising towards youth, including advertising its JUUL products on websites that were highly attractive to children, adolescents in middle school and high school, and underage college students.

466.    During a December 20, 2018 call with analysts and investors discussing the investment, Defendant Willard again assured everyone that "Importantly, Altria and JUUL are committed to preventing kids from using any tobacco products. As recent studies have made clear, youth vaping is a serious problem, which both Altria and JUUL are committed to solve."

467.    The statements referenced in ¶ 466 were materially false and misleading because Defendants Altria and Willard knew but failed to disclose that Altria and JUUL were not committed to preventing kids from using tobacco products as Defendants knew that JUUL, which uses a nicotine salt formulation of nicotine extracted from natural tobacco leaves and thus qualified as a tobacco product, specifically targeted youth as customers of JUUL products, as described herein.

468.    During the call, Steve Powers of Deutsche Bank asked Defendant Willard point blank: "*how much of JUUL's business over the last 12 months have you concluded comes from underage consumers*, and how confident are you that progress can be made to eradicate that consumption? And I guess, lastly, what are the risks that you assign to the idea that JUUL's products ultimately may not receive FDA approval through the PMTA process, given their known association with underage consumption?" Willard responded: "I think it's hard to nail down exactly how much of the volume could be contributed to -- could be attributed to underage use. *We believe it's quite a small percentage*…."

469.    The statements referenced in ¶ 468 were materially false and misleading because, as a result of Altria's due diligence on its investment on JUUL, Defendants Altria and Willard knew or recklessly disregarded that a large – not a small – percentage of JUUL's business over the prior 12 months came from underage consumers.

127

470.     Beginning in December 2018 and continuing through the present, JUUL and Altria, through television advertisements and inserts in Altria's cigarette pack, conducted the "Make the Switch" advertising campaign.

471.     On February 26, 2019, Altria filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2018 (the "2018 10-K").  The 2018 10-K downplayed FDA concern with Altria's investment into JUUL while simultaneously touting Altria's continued commitment to preventing underage vaping.  For example, while discussing a letter received from the FDA on that point, Altria asserted to investors that it had assured the FDA of its continuing commitment to prevent underage vaping and would continue discussions with the FDA moving forward.  Specifically, the 2018 10-K stated, in relevant part:

> The FDA announced in September 2018 that it is using its regulatory authority to address underage access and use of e-vapor products. As part of this effort, the FDA issued letters to manufacturers of certain e-vapor products, including Nu Mark and JUUL, requiring them to (1) discuss with the FDA the steps each manufacturer intends to take to address youth access and use of its e-vapor products and (2) within 60 days provide a detailed written plan to address underage access and use.

> In October 2018, Altria responded to the FDA's request for a written plan *setting forth the actions it was taking to address underage access and met with the FDA* . . . . Later in December, Altria purchased, through a wholly owned subsidiary, a 35% economic interest in JUUL. Following the announcement of this investment, Altria requested a meeting with the FDA to discuss the transaction and its ongoing support for underage tobacco prevention. In February 2018 [*sic*], the FDA sent Altria a letter expressing concern about this investment given the rise in underage use of e-vapor products and issued a statement indicating that, if the increased trend in underage use of e-vapor products does not reverse, the FDA may unilaterally take action to address the trend. *Altria responded by reaffirming its ongoing and long-standing investment in underage tobacco prevention efforts*. For example, Altria is advocating raising the minimum legal age to purchase all tobacco products to 21 at the federal and state levels to further address underage tobacco use. Altria will meet with the FDA to continue discussing underage e-vapor use.

472.    The statements referenced in ¶ 471 were materially false and misleading because the Altria Defendants knew or recklessly disregarded, among other things, that JUUL targeted youth to purchase its products and that the money Altria had invested in JUUL would be used to target underage consumers of JUUL products, as described herein.

473.    Additionally, the 2018 10-K contained generic, boilerplate representations regarding the risk that Altria's expected benefits from its investment in JUUL may fail to materialize in the manner or time expected, if at all.  For example, the 2018 10-K stated, in relevant part:

> [T]he expected benefits of the JUUL transaction, such as any equity earnings and receipt of cash dividends, may not materialize in the expected manner or timeframe or at all, including due to the risks encountered by JUUL in its business, such as operational risks and *regulatory risks* at the international, federal and state levels, *including actions by the FDA*; unanticipated impacts on JUUL's relationships with employees, customers, suppliers and other third parties; potential disruptions to JUUL's management or current or future plans and operations due to the JUUL transaction; or domestic or international litigation developments, investigations, or otherwise . . . . Failure to realize the expected benefits of our JUUL investment could adversely affect the value of the investment. [. . .] [I]f a qualitative assessment of impairment of our JUUL investment were to indicate that its fair value is less than its carrying value, the investment would be written down to its fair value, which could have a material adverse effect on Altria's consolidated financial position or earnings.

The foregoing risk warning was plainly a generic catch-all provision not tailored to Altria's actual known legal risks.

474.    The statements referenced in ¶ 473 were materially false and misleading because the Altria Defendants knew or recklessly disregarded but failed to disclose the true risks of its investment in JUUL, including: (i) that JLI's overarching marketing scheme was directed at youth; (ii) that JUUL's products were harmful and not a tobacco cessation product; (iii) that JLI's youth marketing scheme subjected JLI, Altria, and Altria's investment in JUUL to material risks and expenses, including reputational, litigation and regulatory actions and fines; (iv) that

129

these risks associated with JLI's products and marketing practices, and the true value of JLI and its products were known to the Altria Defendants but were not communicated to Altria investors; (v) that all of the foregoing, as well as mounting public scrutiny, negative publicity, and governmental pressure on e-vapor products and JLI made it reasonably likely that Altria's investment in JLI would impact Altria's reputation and operations; and (vi) that the materialization of these risks would require Altria to write-down a material portion of its investment in JLI.

475.    Appended as exhibits to the 2018 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") wherein the Altria Individual Defendants certified that "the [2018 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "the information contained in the [2018 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

476.    The statements referenced in ¶ 475 were materially false and misleading for the reasons set forth in ¶ 474.

## XIV.   The Truth Begins to Emerge As Defendants Continue to Mislead

477.    Following Altria's multi-billion dollar investment into JUUL, e-vapor products and JUUL increasingly became the subject of scrutiny by government authorities throughout the country.  Mounting skepticism, fear, and negative publicity in the media regarding e-cigarettes' safety led to increased scrutiny by government authorities into vaping products, and municipalities throughout the country began tightening sales practices related to those products.

478.    For example, on April 3, 2019, the FDA announced its investigation into nearly three dozen recent cases of people suffering from seizures after vaping.  Between 2010 and 2019, the FDA said it received thirty-five reports of people, especially children and young adults, experiencing seizures after using e-cigarettes.

479.    On this news, Altria's stock price fell $2.71 per share, or 4.78%, to close at $53.98 per share on April 3, 2019.

480.    Nevertheless, Altria continued to tout the benefits of the Company's investment in JUUL.  On April 25, 2019, Altria issued a press release announcing its financial and operating results for the first quarter of 2019 (the "1Q19 Press Release").  The 1Q19 Press Release quoted Defendant Willard, who touted Altria's recent investments, which included JUUL, as factors that would accelerate Altria's growth and long-term success, stating, in relevant part:

> After taking steps to position Altria for long-term success at the end of 2018, we entered 2019 with an evolved business platform that includes our strong core tobacco businesses and ***new strategic investments*** with tremendous potential for growth . . . . We believe we've made significant progress in the first quarter on key initiatives to realize the potential of our evolved business platform.

481.    The 1Q19 Press Release also asserted that Altria's investment into JUUL had included, among other factors, an evaluation of the following:

> [T]he possibility that the expected benefits of the transaction may not materialize in the expected manner or timeframe, if at all; the potential inaccuracy of the financial projections (including projections relating to JUUL's domestic growth and international expansion); prevailing economic, market, ***regulatory or business conditions***, or changes in such conditions, negatively affecting the parties . . . [and] the fact that Altria's reported earnings, financial position and expected use of equity accounting and any future dividends paid by JUUL on shares owned by Altria may be adversely affected by tax and other factors, including the risks encountered (***including regulatory and litigation risks***) and decisions made by JUUL in its business[.]

482.    The statements referenced in ¶¶ 480-481 were materially false and misleading for the reasons set forth in ¶ 474.

483.    That same day, Altria filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2019 (the "1Q19 10-Q").  The 1Q19 10-Q briefly discussed ongoing litigation related to the dangers of

e-vapor products, without going into detail, and while assuaging investors that Altria was already preparing responses to such lawsuits.  Specifically, the 1Q19 10-Q stated, in relevant part:

> *E-vapor Litigation*
>
> In April 2019, Altria, PM USA and JUUL were named as defendants in a tobacco and health class action lawsuit filed in the United States District Court for the Middle District of Florida. The lawsuit involves JUUL e-vapor products and proposes various classes of plaintiffs. The theories of recovery include: violation of RICO; fraud; failure to warn; design defect; negligence; unjust enrichment and deceptive and unfair trade practices. Plaintiffs seek various forms of relief including compensatory and punitive damages. Altria and PM USA are preparing their responses to the lawsuit.

484.    The 1Q19 10-Q also contained substantively the same representations as quoted in ¶ 471 above, except that the 1Q19 10-Q clarified that Altria had received the FDA letter at issue in February 2019, rather than February 2018, and excluded any representation that Altria would continue discussions with the FDA.

485.    The statements referenced in ¶¶ 483-484 were materially false and misleading for the reasons set forth in ¶ 472.

486.    Appended as exhibits to the 1Q19 10-Q were signed SOX certifications wherein the Individual Defendants certified that "the [1Q19 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "the information contained in the [1Q19 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

487.    The statements referenced in ¶ 486 were materially false and misleading for the reasons set forth in ¶ 474.

488.    On May 16, 2019, Altria held its annual shareholder meeting. As reported by CNBC, Willard was grilled by investors: "Analysts and investors worried Altria paid too much for its 35% stake in JUUL and very little say over its operations, especially with the e-cigarette

132

giant facing regulatory scrutiny." Willard defended the terms of the deal, saying the e-cigarette market wasn't growing much before JUUL entered. Altria's own MarkTen products had hardly gained traction, prompting Altria to stop selling them in the fall before signing the deal with JUUL. As reported by CNBC, "Willard in response to a shareholder question on how Altria would make itself less vulnerable to JUUL's legal risks said *Altria was aware of early litigation when he made the investment in JUUL*. He said Altria is committed to reducing youth e-cigarette use…."

489.    Altria continued to tout the purported benefits of its investment in JUUL.  On July 30, 2019, Altria issued a press release announcing its financial and operating results for the second quarter of 2019 (the "2Q19 Press Release").  The 2Q19 Press Release quoted Defendant Willard, who continued to describe the JUUL transaction as a factor that would contribute to Altria's future growth and success, stating, in relevant part:

> Altria delivered excellent second quarter adjusted diluted earnings per share growth of nearly 9%, driven by our core tobacco businesses . . . . We've maintained our focus on the adult tobacco consumer and believe that with our leading premium tobacco brands, U.S. commercialization rights to IQOS, *investment in JUUL* and pending transactions, we are best positioned among tobacco peers to lead through a dynamic time in the U.S.

490.    The 2Q19 Press Release contained generic, boilerplate representations concerning risk factors related to Altria's investment in JUUL, including, in relevant part:

> [T]he risks generally related to our investments in JUUL and Cronos, including our inability to realize the expected benefits of our investments in the expected time frames, or at all, due to the risks encountered by our investees in their businesses, such as operational, compliance and regulatory risks at the international, federal and state levels, including actions by the FDA; [and] . . . domestic or international litigation developments, government investigations, tax disputes or otherwise; and potential impairment of our investments[.]

This risk warning, too, was plainly a generic catch-all provision not tailored to Altria's actual known legal risks.

491.   The statements referenced in ¶¶ 489-490 were materially false and misleading for the reasons set forth above in ¶ 474.

492.   The 2Q19 10-Q also contained substantively the same representations as quoted in ¶ 471 above, except that, as with the 1Q19 10-Q, the 2Q19 10-Q clarified that Altria had received the FDA letter at issue in February 2019, rather than February 2018, and excluded any representation that Altria would continue discussions with the FDA.

493.   The statements referenced in ¶ 492 were materially false and misleading for the reasons set forth above in ¶ 472.

494.   Appended as exhibits to the 2Q19 10-Q were signed SOX certifications wherein the Altria Individual Defendants certified that "the [2Q19 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "the information contained in the [2Q19 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

495.   The statements referenced in ¶ 494 were materially false and misleading for the reasons set forth above in ¶ 474.

496.   On July 13, 2019, in an interview with CNBC, that was later posted on the internet, Burns stated: "First of all, I'd tell them that I'm sorry that their child's using the product. ***It's not intended for them. I hope there was nothing that we did that made it appealing to them.*** As a parent of a 16-year-old, I'm sorry for them, and I have empathy for them, in terms of what the challenges they're going through."

497.   The statements referenced in ¶496 were materially false and misleading for the reasons set forth above in ¶ 465.

498.    On July 25, 2019, Monsees stated to Congress through written testimony: "We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products. . . .That is a serious problem. Our company has no higher priority than combatting underage use."

499.    The statements referenced in ¶ 498 were materially false and misleading for the reasons set forth above in ¶ 465.

500.    On August 27, 2019, in a statement to *The New York Times* that was later posted to the internet, Monsees said selling JUUL products to youth was "antithetical to the company's mission."

501.    The statements referenced in ¶ 500 were materially false and misleading for the reasons set forth above in ¶ 465.

502.    On August 29, 2019, The *Wall Street Journal* reported that the FTC was investigating whether JUUL used influencers and other marketing practices to appeal e-cigarettes to minors.

503.    On this news, Altria's stock price fell $1.60 per share, or 3.49%, to close at $44.25 per share on August 29, 2019.

504.    Additionally, on August 30, 2019, both the FDA and the CDC announced that they were collaborating to investigate e-cigarette related cases of illnesses and "working tirelessly to investigate the distressing incidents of severe respiratory disease associated with use of e-cigarette products."

505.    On this news, Altria's stock price fell an additional $0.51 per share, or 1.15%, to close at $43.74 per share on August 30, 2019—a total loss of $2.11 per share, or 4.6%, since closing at $45.85 per share two trading days earlier on August 28, 2019.

135

506.   On September 9, 2019, the FDA issued a warning letter to JUUL asserting that its statements regarding the risk of harm presented by JUUL constitute unauthorized modified risk claims under federal law and regulation, directing JLI to cease making or publishing such statements and to take immediate corrective action. These statements included those made to students during JUUL's youth outreach and education program indicating that JUUL was about to be approved by the FDA and that it was at least 99% safer than cigarettes, as well as JLI's former CEO, Kevin Burns, making statements regarding the supposedly reduced levels of harmful compounds produced by JUUL's temperature control system.

507.   On September 11, 2019, news sources reported that the Trump administration was preparing a ban on flavored e-cigarettes as federal agencies probe an outbreak of a lung problem that killed at least six people and reportedly led to the sickness of hundreds of others.  President Trump and U.S. Health Secretary Azar reportedly both confirmed that a ban was possible after the vaping issues were investigated.

508.   On September 12, 2019, during after-market hours, *Reuters* reported that, "[w]ithin weeks, New Jersey could become the latest state to restrict e-cigarette use, with the governor on Thursday launching a task force to find ways to curb vaping, linked by U.S. health officials to hundreds of respiratory illnesses and a half-dozen deaths." Additionally, that same day, the CDC reported that as of September 11, 2019, 380 confirmed cases, and probably cases of lung disease associated with vaping, had been reported by thirty-six states and the U.S. Virgin Islands, with six total deaths confirmed in six states.

509.   On this news, Altria's stock price fell $2.45 per share, or 5.51%, to close at $42.01 per share on September 13, 2019.

510.   On September 23, 2019, during after-market hours, news sources began reporting that federal prosecutors in California were conducting a criminal probe into JUUL.

511.   On September 24, 2019, JLI stated to the *Los Angeles Times* (which was later posted on the internet) that "We have never marketed to youth and we never will."

512.   The statements referenced in ¶ 511 were materially false and misleading for the reasons set forth above in ¶ 465.

513.   On September 25, 2019, Altria issued a press release announcing that Philip Morris had called off discussions of a $200 billion merger with Altria due to scrutiny of the vaping industry and the Company's 35% stake in market leader JUUL, which had announced the same day that it was the subject of another federal investigation. JUUL also announced that it was replacing its CEO Kevin Burns with longtime Altria executive K.C. Crosthwaite, and also announced that JUUL would stop all advertising in the U.S. According to an SEC filing, Altria made a "special recognition" payment of $2.5 million upon Crosthwaite's departure from Altria to JUUL. Crosthwaite had served as an observer on JUUL's board of directors after Altria's investment in JUUL.

514.   On this news, Altria's stock price fell an additional $0.17 per share, or 0.42%, to close at $40.56 per share on September 25, 2019—a total loss of $0.32 per share, or 0.78%, since closing at $40.88 per share two trading days earlier on September 23, 2019.

515.   Within days, Crosthwaite hired Altria colleague Joe Murillo as JUUL's chief regulatory officer.

516.   On October 14, 2019, Willard stated to Congress through a letter to Senator Durbin: "In late 2017 and into early 2018, we saw that the previously flat e-vapor category had begun to grow rapidly. JUUL was responsible for much of the category growth and had quickly

become a very compelling product among adult vapers. We decided to pursue an economic interest in JUUL, believing that an investment would significantly improve our ability to bring adult smokers a leading portfolio of non-combustible products and strengthen our competitive position with regards to potentially reduced risk products."

517.   The statements referenced in ¶ 516 were materially false and misleading for the reasons set forth above in ¶ 463.

518.   On October 29, 2019, JUUL announced that four executives were leaving the company: CFO Tim Danaher; Chief Marketing Officer Craig Brommers; Senior Vice President of Advanced Technologies David Foster; and Chief Administrative Officer Ashley Gould.

519.   On October 31, 2019, Altria announced that it was taking a $4.5 billion write-down on its investment in JUUL. Altria also announced that the FTC was scrutinizing Altria's role in the departure of JUUL's CEO, stating that on October 1, 2019, Altria received a civil investigative demand "seeking information regarding, among other things, Altria's role in the resignation of JUUL's former chief executive officer and the hiring by JUUL of any current or former Altria director, executive or employee."

520.   On this news, Altria's stock price fell an additional $1.15 per share, or 2.5%, to close at $44.06 per share on October 31, 2019.

521.   On January 30, 2020, Altria announced that it was taking an additional $4.1 billion charge related to its JUUL investment. It cited "the increased number of legal cases pending against JUUL and the expectation that the number of legal cases against JUUL will continue to increase."

522.   On this news, Altria's stock price fell an additional $2.11 per share, or 4.2%, to close at $48.00 per share on January 30, 2020.

523.   On February 21, 2020, at 3:37 pm (just before the close of trading), the *Wall Street Journal* reported that the SEC had launched an investigation into whether Altria fully disclosed to its shareholders the risks associated with its investment in JUUL.

524.   On this news, Altria's stock price fell $0.29 from $46.18 at 3:30 pm to $45.89 at the close of trading on February 21, 2020. Altria's stock price fell an additional $2.09 per share, or 4.8%, to close at $43.80 per share on the next trading day February 24, 2020, and continued to decline to $40.30 on February 27, 2020, for a total decline of $5.88, or 12.7%.

525.   On April 17, 2020, Altria announced that Defendant Willard would be resigning as CEO of Altria. Analysts and the press attributed Willard's resignation to Altria's investment in JUUL.

526.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

527.   As alleged herein, Defendants acted with scienter in that they knew, or at least recklessly disregarded, that the public documents and statements issued or disseminated and directed toward Altria investors were materially false and misleading; knew, or at least recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of Section 10(b) of the Exchange Act and Rule 10b-5.

528.   The Individual Defendants had the motive and opportunity to perpetrate the fraudulent scheme described herein because the Individual Defendants were the most senior officers of JLI and Altria, issued statements and press releases on behalf of JLI and Altria,

respectively, and had the opportunity to commit the fraud alleged herein. The Individual Defendants knew that revelation of the truth about the creation, design and marketing of JUUL products would result in regulatory action, litigation and other actions that would harm  sales of JUUL products and cause other economic and reputational fallout for JLI and Altria.

529.    JLI was also motivated to perpetrate the fraudulent scheme described herein because it stood to benefit from Altria's success, as part of its agreement with Altria provided it with access to Altria's retail, marketing and distribution apparatus.

530.    Altria was similarly motivated to perpetrate the fraudulent scheme described herein as Willard was desperate to invest in JUUL at any cost and then needed to justify Altria's investment in JUUL to Altria's investors.

531.    As set forth elsewhere herein in detail, scienter may also be inferred from the JUUL Defendants' receipt of information reflecting the true facts, including but not limited to the following:

1.    JLI's design of JUUL products to deliver as much nicotine as possible (well above the level of a traditional cigarette) to increase addiction to new users. Defendant Burns' knowledge of the addictive level of the JUUL product and his disregard for the health and safety of JLI's customers, many of whom are underage users, is evidenced by his internal statement that "Half our customers are drunk and vaping like mo-fo's,who the fu[*]k is going to notice the quality of our pods."

2.    JLI's creation, design and marketing of JUUL products in a consistent and unified way to appeal to underage users, often utilizing the same tactics previously utilized by tobacco companies to target underage users,

including for example, (i) the sleek "tech" design of the JUUL device, (ii) the JUUL device's resemblance to a USB drive, which allows it to be concealed by underage users, (iii) the "party mode" installed on the device, (iv) creation of flavors that appeal to underage users, (v) advertisements with young people in situations, clothing and postures that appeal to underage users, (vi) advertising on website and other media that were geared toward teens and children, (vii) utilization of social media influencers that had large underage followers, (viii) use of "launch parties" that appealed to underage users, (ix) giving presentations in schools to underage users, and (x) marketing JUUL products in the context of food and coffee to present JUUL usage as a safe, healthy part of a daily routine. Indeed, Monsees and Bowen have admitted that they carefully studied the marketing strategies, advertisements, and product design revealed in cigarette industry documents that were uncovered through litigation and made public under the November 1998 Master Settlement Agreement.

532.    As set forth elsewhere herein in detail, scienter may also be inferred from the Altria Defendants' receipt of information reflecting the true facts, including but not limited to the following:

1.    Their position in a major tobacco company and working within the tobacco industry that had been previously sanctioned for utilizing the very same practices that JUUL was employing.   As a result of the Altria

Defendants' unique position and knowledge, it may be inferred that they recognized the improper practices being utilized by JLI;

2.  The fact that Altria conducted substantial due diligence prior to investing in JLI, and the issue of underage vaping was a major issue that was often discussed within Altria. Thus, it may be inferred that Altria's due diligence included obtaining information concerning JLI's products and practices;

3.  The first-hand accounts of several former employees that stated that JLI's marketing to underage users was well known within Altria prior to its investment in JLI; and

4.  Defendant Willard's scienter may also be inferred from his false statements to the FDA that Altria was exiting the e-cigarette business because of the increase in teen use. The truth was that Altria was exiting the business because it was a condition of its investment in JLI that Willard negotiated.

533.   Defendants' scienter may further be inferred from Altria's and JLI's combined efforts to protect the mint flavored pods from regulation by falsely characterizing mint as a traditional cigarette flavor that did not appeal to underage users when they knew it was extremely popular with underage users and had not been a traditional cigarette flavor.

534.   Scienter may also be inferred from the repeated statements by Burns and Altria that JLI never intended to have underage users use JUUL products. It is assumed that when an officer of a company makes a specific statement (and repeatedly) that they have obtained the information necessary to ensure that statement is accurate. Indeed, In a December 24, 2018

142

article in the *Winston-Salem Journal* titled "*Altria-Juul partnership puts additional pressure on BAT, Reynolds,*" Stephen Pope, managing principal for industry research firm Spotlight Ideas of London, discussing the investment, stated "I can only assume Altria has undertaken its due diligence and looked at the situation from every angle."

## CORPORATE SCIENTER

535.    The allegations described above establish a strong inference that both Altria and JLI, as entities, acted with corporate scienter throughout the Class Period, as their officers, management, and agents, including, but not limited to, the Individual Defendants, had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the truth regarding JUUL and the true risks of Altria's investment in JUUL.   By concealing these material facts from investors, both JLI and Altria maintained and/or artificially inflated the prices of Altria's securities throughout the Class Period.

## ANALYSTS WHO COVERED ALTRIA CLOSELY FOLLOWED THE ACTIONS AND STATEMENTS OF JLI IN EVALUATING THE VALUE OF ALTRIA BOTH BEFORE AND AFTER ALTRIA'S INVESTMENT IN JLI

536.    Analysts covering Altria followed and discussed JLI, and its impact on Altria's stock price, both before and after the merger.

537.    For example, on July 2, 2018, Morgan Stanley issued a report on Altria stating the following:

- "Last week we published a deep dive evaluating JUUL's impact on the US Tobacco industry (please see Is JUUL Hype Overblown?) We estimate that JUUL could become a

~100 bps annual headwind to US cigarette volumes in our Base Case, and see MO moving towards MSD EPS growth in 2020"

- "[We] estimate ~22% of JUUL sales are sourcing from cigarettes. However, we believe that JUUL will increasingly source its volumes from cigarettes as its distribution and awareness grows."

- "Although it's possible, we do not expect the FDA to take targeted measures against JUUL…. JUUL is making a concerted effort to mitigate the FDA's concerns by: 1) emphasizing that it is a switching device and does not target youth (See: JUUL's marketing code page) and 2) last week, JUUL published results of a survey it commissioned that shows its impact on reducing cigarette consumption and its appeal primarily to existing smokers."

The report had a price target of $63 for Altria.

538.    On July 23, 2018, Morgan Stanley issued a report stating "JUUL is employing a more sophisticated marketing strategy targeted at adult smokers given its increasing scale, access to capital, and efforts to reduce youth usage. We believe these initiatives could increase its cigarette cannibalization rate."

539.    On or about November, 28 2018, rumors began circulating of Altria's possible investment in JLI.

540.    On November 28, 2018, Wells Fargo Securities issued a report on Altria stating the following:

- "So if today's (11/28) rumors are true that MO is taking a 'significant minority' stake in JUUL (as reported by WSJ without comment from mgmt.), we view this as very positive…. If true, we think a stake in JUUL would help to round out MO's reduced-risk portfolio strategy. We expect the stock to react positively to this rumor/ultimate event. We reiterate our Outperform rating on MO."

The report had a price target of $65 for Altria.

541.    On November 29, 2018, Bank of America Merrill Lynch issued a report on Altria stating the following:

- "JUUL could give MO a leading position in the fast growing vapor category, with its 62% share in Nielsen channels (52W ended Nov 3). JUUL has had a stellar run in the latest 52W pd, with $ sales +962% YoY. JUUL's outperformance has been a drag on

144

MO's stock price since at least the beginning of 2018 as its vapor share gains accelerated and investors fretted over JUUL's performance/impact on combustibles."

The report had a price target of $65 for Altria.

542.    On November 29, 2018, Deutsche Bank issued a report on Altria stating the following:

- "While deal terms remain a key question (e.g., How large would MO's stake be? At what valuation? Would it contain a prescribed path to larger/full ownership over time? What would become of MO's existing Nu Mark business?3), we see multiple reasons why an alliance between MO and JUUL makes strategic sense at this point"

The report had a price target of $62 for Altria.

543.    On November 29, 2018, Morgan Stanley issued a report on Altria stating that "The timing would make sense in our view, given greater FDA e-cig regulatory clarity."  The report had a price target of $63 for Altria.

544.    On November 29, 2018, Piper Jaffray issued a report on Altria stating the following:

- **"JUUL could get best-in-class regulatory resources.** Altria has a very positive relationship with the FDA, something JUUL could surely benefit from. It is not clear, if any deal did happen, how closely the companies might work together, but it would seem to us like regulatory cooperation could reasonably be included as part of a relationship between the two. If Altria and JUUL have more closely aligned interests, it could theoretically facilitate both FDA objectives: switching smokers to non-combustible alternatives and preventing underage initiation of the products."

The report had a price target of $75 for Altria.

545.    Altria's investment in JLI was widely discussed by Altria analysts.

546.    For example, on December 20, 2018, Morgan Stanley issued a report on Altria stating the following:

- "JUUL investment is a strategic move that gives MO exposure to a rapidly growing product: An investment in JUUL gives MO exposure to a fast growing product, creates a hedge for its cigarette business which is facing competition from JUUL, and could enhance MO's ability to preserve the US cigarette/nicotine profit pool by having greater

influence over reduced-risk competitive dynamics (JUUL pods price at a 30% discount to cigarettes). MO will also benefit from JUUL's international expansion… In addition MO could provide JUUL with regulatory expertise, including helping the company work with the FDA and navigate the PMTA process."

The report had a price target of $54.

547.    On December 20, 2018, Wells Fargo issued a report on Altria stating the following:

- "We view the deal to be very positive as we think JUUL will greatly expand MO's addressable market not only in the U.S. but also internationally & presents a compelling & potentially highly synergistic opportunity with MO's pending 45% stake in cannabis producer Cronos (see our 12/7 note on that here)…**Bottom line** – We believe taking this stake in JUUL was the absolute right decision as it rounds out MO's reduced-risk portfolio strategy. We reiterate our Outperform rating on MO. "

The report had a price target of $65 for Altria.

548.    On December 20, 2018, Barclays issued a report on Altria evaluating the "economics and valuation of JUUL" stating JUUL is on track for CY18 revenues of $2bn. Annualizing recent month sales suggest that JUUL is on $3bn revenue run rate for next 12 months."

549.    On December 20, 2018, Wells Fargo issued a report on Altria stating the following:

- **"Reducing Youth Access Remains Top Priority** – MO appears to understand very well the gravity of the youth e-cig "epidemic" and reiterated its commitment to helping to "solve" the problem. MO believes only a small percent of JUUL's volume is from underage consumers, with the "overwhelming" majority coming from adult e-cig users and adult cig smokers. Regardless, MO & JUUL are "prepared to make the investments" necessary to reduce youth use. MO believes raising the minimum legal age to purchase tobacco to 21 will be key to that effort."
- **"Regulatory Expertise** – Youth access remains a concern for JUUL but with MO's involvement, we think this risk is minimized as we believe MO can help JUUL better navigate the regulatory environment. We believe this would fall under JUUL's service agreement with MO."

The report had a price target of $65 for Altria.

146

550.    After Altria's investment in JLI, Altria analysts continued to closely follow JLI

and its impact on Altria's value.

551.    For example, on January 7, 2019, Piper Jaffray issued a report on Altria titled

"Modeling JUUL Economics: Outlook Likely Better Than Expected" stating the following:

- "JUUL's better economics mitigate Altria's cannibalization impact, incremental sales (in the US and globally) add new sources of profit (driving accretion), and debt costs are fixed even as JUUL's profits grow"
- "The per-smoker economics of switching to JUUL are better than expected"
- "Altria also gains a share of earnings from incremental users. Importantly, however, there is not just one-for-one switching from Altria's cigarettes to JUUL. We estimate JUUL sources 25-45% of sales from cigarettes, given new category entrants, vapor switching and incremental usage occasions."
- "Debt costs are fixed, so upside rises with JUUL growth."

552.    On April 19, 2019, Bank of America Merrill Lynch issued a report on Altria titled

"Altria and JUUL support legislation to raise age of purchase to 21" stating the following:

- "Altria/JUUL have publicly stated their support to boost the legal age to 21 yrs as a way to limit youth exposure to all forms of tobacco/nicotine in high schools given social/peer access (a key source of supply) will be curbed (~80% of US high school students in the US turn 18 yrs before graduation)."

The report had a price target of $66 for Altria.

553.    On July 26, 2019, following JLI's testimony at the Congressional hearings,

Morgan Stanley issued a report on Altria titled "Takeaways from JUUL Congressional Hearings"

stating the following:

- **"JUUL's testimony**: Company representatives focused on JUUL's mission to move smokers away from combustible cigarettes, the negative impact that JUUL is having on cigarette sales, and the company's efforts to address the youth problem. Specifically, the company pointed to 'escalating' steps that it has taken to reverse this trend, such as supporting Tobacco 21 legislation, implementing heightened age verification controls on its website, and pulling flavors representing over 50% of its sales out of retail distribution. Mr. Monsees indicated that the company is "willing to do more." JUUL also pointed to studies suggesting that its products help smokers transition away from cigarettes."

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

554.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Altria securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

555.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Altria common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Altria or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

556.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

557.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

558.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Altria;

- whether the Individual Defendants caused Altria and/or JUUL to issue false and misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of Altria securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

559.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

560.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

149

- Altria securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Altria securities between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

561.   Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

562.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Altria Defendants)

563.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

564.   This Count is asserted against the Altria Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC. Rule 10b-5(a) makes it unlawful for any person, directly or indirectly to employ any device, scheme, or artifice to defraud. Rule 10b-5(b) makes it unlawful for any person, directly or indirectly to make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Rule 10b-5(c) makes it unlawful for any person, directly or indirectly, to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

565.    Plaintiffs assert Section 10(b) and Rule 10b-5(a), (b) and (c) claims against the Altria Defendants.

566.    During the Class Period, the Altria Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Altria securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Altria securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Altria Defendants, and each of them, took the actions set forth herein.

567.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Altria Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were

designed to influence the market for Altria securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Altria's finances and business prospects.

568.     By virtue of their positions at Altria, the Altria Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the Altria Individual Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.   Said acts and omissions of the Altria Individual Defendants were committed willfully or with reckless disregard for the truth.   In addition, each of the Altria Individual Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

569.     Information showing that the Altria Individual Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Altria, the Altria Individual Defendants had knowledge of the details of Altria's internal affairs.

570.     The Altria Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Altria Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Altria.   As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Altria's businesses, operations, future financial condition and future prospects.  As a result of the

dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Altria securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Altria's business and financial condition which were concealed by the Altria Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Altria securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Altria Defendants, and were damaged thereby.

571.    During the Class Period, Altria securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Altria Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Altria securities at prices artificially inflated by the Altria Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Altria securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Altria securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

572.    By reason of the conduct alleged herein, the Altria Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

573.     As a direct and proximate result of the Altria Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period.

## COUNT II

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the JLI Defendants)**

574.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

575.     This Count is asserted against the JLI Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC. Rule 10b-5(a) makes it unlawful for any person, directly or indirectly to employ any device, scheme, or artifice to defraud. Rule 10b-5(b) makes it unlawful for any person, directly or indirectly to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Rule 10b-5(c) makes it unlawful for any person, directly or indirectly, to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

576.     Plaintiffs assert Section 10(b) and Rule 10b-5(a), (b) and (c) claims against the JLI Defendants.

577.     During the Class Period, the JLI Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of Altria securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Altria securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Altria securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the JLI Defendants, and each of them, took the actions set forth herein.

578. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the JLI Defendants participated directly or indirectly in the preparation and/or issuance of JLI's press releases and other statements and documents described above, including public statements that were designed to influence the market for Altria securities. Such releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Altria's business prospects with regard to its investment in JLI.

579. By virtue of their positions at JLI, the JLI Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the JLI Individual Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the JLI Defendants. Said acts and omissions of the JLI Individual Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the JLI Individual Defendants knew

or recklessly disregarded that material facts were being misrepresented or omitted as described above.

580. Information showing that the JLI Individual Defendants acted knowingly or with reckless disregard for the truth is within the JLI Defendants' knowledge and control. As the senior managers and/or directors of JLI, the JLI Individual Defendants had knowledge of the details of JLI's internal affairs.

581. The JLI Individual Defendants are liable for the wrongs complained of herein with regard to themselves and JLI. Because of their positions of control and authority, the JLI Individual Defendants were able to and did, directly or indirectly, control the content of the statements of JLI. The JLI Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to JLI, especially as it related to Altria. As a result of the dissemination of the aforementioned false and misleading releases and public statements, the JLI Defendants caused the market price of Altria securities to be artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning JLI, which were concealed by the JLI Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Altria securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the JLI Defendants, and were damaged thereby.

582. During the Class Period, Altria securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the JLI Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Altria securities at prices artificially inflated by the JLI Defendants' wrongful conduct. Had

Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Altria securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Altria securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

583.    By reason of the conduct alleged herein, the JLI Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

584.    As a direct and proximate result of the JLI Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of Altria's securities during the Class Period.

**COUNT III**

**(Violations of Section 20(a) of the Exchange Act Against The Altria Individual Defendants)**

585.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

586.    During the Class Period, the Altria Individual Defendants participated in the operation and management of Altria, and conducted and participated, directly and indirectly, in the conduct of Altria's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding Altria's investment in JUUL and adverse non-public information regarding JUUL.

587.    As officers and/or directors of a publicly owned company, the Altria Individual Defendants had a duty to disseminate accurate and truthful information with respect to Altria's

157

financial condition and results of operations, and to correct promptly any public statements issued by Altria which had become materially false or misleading.

588.    Because of their positions of control and authority as senior officers, the Altria Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Altria disseminated in the marketplace during the Class Period concerning Altria's results of operations. Throughout the Class Period, the Altria Individual Defendants exercised their power and authority to cause Altria to engage in the wrongful acts complained of herein. The Altria Individual Defendants therefore, were "controlling persons" of Altria within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Altria securities.

589.    Each of the Altria Individual Defendants, therefore, acted as a controlling person of Altria.  By reason of their senior management positions and/or being directors of Altria, each of the Altria Individual Defendants had the power to direct the actions of, and exercised the same to cause, Altria to engage in the unlawful acts and conduct complained of herein. Each of the Altria Individual Defendants exercised control over the general operations of Altria and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

590.    By reason of the above conduct, the Altria Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Altria.

## <u>COUNT IV</u>

### (Violations of Section 20(a) of the Exchange Act Against The JLI Individual Defendants)

591.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

592.    During the Class Period, the JLI Individual Defendants participated in the operation and management of JLI, and conducted and participated, directly and indirectly, in the conduct of JLI's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding JLI.

593.    The JLI Individual Defendants had a duty to disseminate accurate and truthful information with respect to JLI, and to correct promptly any public statements issued by JLI which were or became materially false or misleading.

594.    Because of their positions of control and authority as senior officers, the JLI Individual Defendants were able to, and did, control the contents of the various press releases and statements which JLI disseminated in the marketplace during the Class Period.  Throughout the Class Period, the JLI Individual Defendants exercised their power and authority to cause JLI to engage in the wrongful acts complained of herein. The JLI Individual Defendants therefore, were "controlling persons" of JLI within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Altria securities.

595.    Each of the JLI Individual Defendants, therefore, acted as a controlling person of JLI.  By reason of their senior management positions and/or being directors of JLI, each of the JLI Individual Defendants had the power to direct the actions of, and exercised the same to cause, JLI to engage in the unlawful acts and conduct complained of herein.  Each of the JLI Individual Defendants exercised control over the general operations of JLI and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

596.    By reason of the above conduct, the JLI Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by JLI.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

597.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

598.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

599.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

600.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: April 21, 2020

By:/s/ *Steven J. Toll*
Steven J. Toll (VSB #15300)
Daniel S. Sommers
S. Douglas Bunch
COHEN MILSTEIN SELLERS &
TOLL PLLC
1100 New York Ave., NW
Suite 500
Washington, DC 20005
Telephone: 202-408-4600
Facsimile: 202-408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com

*Local Counsel for Lead Plaintiffs*

Jeremy A. Lieberman

Michael J. Wernke
POMERANTZ LLP
600 Third Avenue
New York, New York 10016
Telephone:  212-661-1100
Facsimile: 212-661-8665
jalieberman@pomlaw.com
mjwernke@pomlaw.com

*Counsel for Lead Plaintiffs Donald Sherbondy
and Sarah Sherbondy*

Samuel H. Rudman
David A. Rosenfeld
Philip T. Merenda
ROBBINS GELLER RUDMAN & DOWD
LLP
58 South Service Road, Suite 200
Melville, New York 11747
Telephone:  631-367-7100
Facsimile: 631-367-1173
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
pmerenda@rgrdlaw.com

*Counsel for Lead Plaintiff Laborers Pension
Trust of Greater St. Louis*