UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

GABBY KLEIN, DONALD SHERBONDY, SARAH
SHERBONDY AND CONSTRUCTION LABORERS
PENSION TRUST OF GREATER ST. LOUIS,
Individually and on Behalf of All Others
Similarly Situated,

                              *Plaintiffs*,

                v.

ALTRIA GROUP, INC., HOWARD A. WILLARD III,
WILLIAM F. GIFFORD, JR., JUUL LABS, INC.,
ADAM BOWEN, JAMES MONSEES, KEVIN
BURNS, and K.C. CROSTHWAITE,

                              *Defendants*.

No. 3:20-cv-00075-DJN

MEMORANDUM OF LAW IN SUPPORT
OF THE ALTRIA DEFENDANTS' MOTION TO DISMISS

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
212-403-1000 (telephone)
212-403-2000 (facsimile)

HUNTON ANDREWS KURTH LLP
951 East Byrd Street
Richmond, VA  23219
804-788-8200 (telephone)
804-788-8218 (facsimile)

*Attorneys for Altria Group, Inc.,*
*Howard A. Willard III, and*
*William Gifford, Jr.*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ......................................................................................................................6

    A.   The Parties. ...................................................................................................6

    B.   E-cigarettes emerge as a potentially less harmful
          alternative to combustible cigarettes. ..........................................................6

    C.   JUUL takes measures to combat underage usage of its products. ................7

    D.   Altria struggles to develop its e-cigarette business and
          makes a minority investment in JUUL. ........................................................8

    E.   JUUL continues its strong performance. .....................................................10

    F.   An outbreak of lung injuries tied to e-cigarette misuse
          adversely affects JUUL and the rest of the industry. ...................................12

    G.   This litigation. ...............................................................................................14

ARGUMENT ...........................................................................................................................15

I      PLAINTIFFS' DISAGREEMENTS WITH ALTRIA'S BUSINESS
       JUDGMENTS DO NOT STATE A CLAIM FOR SECURITIES FRAUD ...................15

II     PLAINTIFFS FAIL TO ALLEGE AN ACTIONABLE MISREPRESENTATION ........20

    A.   The Altria defendants' statements were not materially false or misleading. .............20

    B.   Plaintiffs fail to plead "scheme liability." ..................................................26

III    PLAINTIFFS FAIL TO ALLEGE PARTICULARIZED FACTS
       GIVING RISE TO A STRONG INFERENCE OF SCIENTER ......................................28

    A.   Plaintiffs do not even attempt to plead a theory of motive. ........................29

    B.   Plaintiffs' scienter allegations are makeweight. .........................................30

    C.   The most compelling inference is that defendants believed
          Altria was paying a fair price for its investment in JUUL. ..........................35

IV    PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION ....................................................36

CONCLUSION .........................................................................................................................40

## TABLE OF AUTHORITIES

CASES                                                                              Page(s)

*Borow* v. *nVIEW Corp.*,
   829 F. Supp. 828 (E.D. Va. 1993) ........................................................................5

*Borow* v. *nVIEW Corp.*,
   27 F.3d at 562 (4th Cir. 1994) ..........................................................................21

*Burt* v. *Maasberg*,
   2013 WL 1314160 (D. Md. Mar. 31, 2013) ......................................................26

*C.D.T.S.* v. *UBS AG*,
   2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) ...................................................22

*Caiafa* v. *Sea Containers Ltd.*,
   525 F. Supp. 2d 398 (S.D.N.Y. 2007)...............................................................40

*Carey Camp* v. *Qualcomm Inc.*,
   2020 WL 1157192 (S.D. Cal. Mar. 10, 2020) ..................................................37

*Ciresi* v. *Citicorp*,
   782 F. Supp. 819 (S.D.N.Y. 1991) ...................................................................19

*Colgate* v. *JUUL Labs Inc. et al.*,
   No. 18-2499 (N.D. Cal. Apr. 26, 2018) ...............................................7, 16, 23

*Cooper* v. *JUUL Labs, Inc.*,
   No. CGC-18-566496 (S.F. Super. Ct., filed May 11, 2018)...........................8 n.2

*Cozzarelli* v. *Inspire Pharm. Inc.*,
   549 F.3d 618 (4th Cir. 2008) ...............................................................15, 28, 29

*D.P.* v. *JUUL Labs, Inc.*,
   No. 18-05758 (S.D.N.Y., filed June 26, 2018) ...............................................8 n.2

*Dura Pharm., Inc.* v. *Broudo*,
   544 U.S. 336 (2005)...........................................................................................37

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)...............................................................................29

*Eng* v. *Edison Int'l*,
   2017 WL 1857243 (S.D. Cal. May 5, 2017)......................................................39

*Ernst & Ernst* v. *Hochfelder*,
   425 U.S. 185 (1976)...........................................................................................28

*Fait* v. *Regions Fin. Corp.*,
   655 F.3d 105 (2d Cir. 2011)..........................................................................20, 21

*Greenhouse* v. *MCG Capital*,
  392 F.3d 650 (4th Cir. 2004) ...........................................................18

*Higginbotham* v. *Baxter Int'l, Inc.*,
  495 F.3d 753 (7th Cir. 2007) ...............................................32, 33, 35

*Hillson Partners Ltd. P'ship* v. *Adage, Inc.*,
  42 F.3d 204 (4th Cir. 1994) ........................................................22, 36

*In re 3Com*,
  2009 WL 5173804 (Del. Ch. Dec. 18, 2009)....................................21

*In re Acterna Corp.*,
  378 F. Supp. 2d 561 (D. Md. 2005) ..................................................30

*In re Adient plc*,
  2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)......................................39

*In re Airgate PCS, Inc.*,
  389 F. Supp. 2d 1360 (N.D. Ga. 2005) .............................................22

*In re Allied Nevada Gold Corp.*,
  2016 WL 4191017 (D. Nev. Aug. 8, 2016) ........................................33

*In re BearingPoint, Inc. Sec. Litig.*,
  525 F. Supp. 2d 759 (E.D. Va. 2007) ..........................................24, 26

*In re Cable & Wireless*,
  321 F. Supp. 2d 749 (E.D. Va. 2004) ............................................1, 16

*In re CIENA Corp.*,
  99 F. Supp. 2d 650 (D. Md. 2000) ....................................................30

*In re Citigroup*,
  753 F. Supp. 2d 206 (S.D.N.Y. 2010)...............................................34

*In re Connetics Corp.*,
  542 F. Supp. 2d 996 (N.D. Cal. 2008) ..............................................24

*In re Conventry Healthcare, Inc.*,
  2011 WL 1230998 (D. Md. Mar. 30, 2011)........................................26

*In re Criimi Mae, Inc.*,
  94 F. Supp. 2d 652 (D. Md. 2000) ....................................................31

*In re e.spire Commc'ns., Inc.*,
  127 F. Supp. 2d 734 (D. Md. 2001) ..................................................31

*In re First Union Corp.*,
  128 F. Supp. 2d 871 (W.D.N.C. 2001) ..............................................31

iii

*In re Glob. Brokerage, Inc.*,
2019 WL 1428395 (S.D.N.Y. Mar. 28, 2019) ........................................................................26

*In re Lab. Corp. of Am. Holdings*,
2006 WL 1367428 (M.D.N.C. May 18, 2006) ........................................................................22

*In re Lululemon*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014)........................................................................................22

*In re Morgan Stanley*,
592 F.3d 347 (2d Cir. 2010)....................................................................................................25

*In re Mun. Mortg. & Equity, LLC*,
876 F. Supp. 2d 616 (D. Md. 2012)........................................................................................33

*In re Neustar Sec.*,
83 F. Supp. 3d 671 (E.D. Va. 2015) .......................................................................................22

*In re PEC Sol.*,
418 F.3d 379 (4th Cir. 2005) ...........................................................................................29, 30

*In re UBS*,
2010 WL 2541166 (S.D.N.Y. June 10, 2010) ........................................................................18

*In re USF&G*,
1993 WL 740188 (D. Md. Feb. 11, 1993) ..........................................................................3, 19

*In re Veon Ltd.*,
2018 WL 4168958 (S.D.N.Y. Aug. 30, 2018) ........................................................................26

*In re Wachovia Equity*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011).....................................................................................34

*In re Zetia Antit. Litig.*,
400 F. Supp. 3d 418 (E.D. Va. 2019) ................................................................................19 n.7

*In re: JUUL Labs, Inc. Prod. Litig.*,
MDL No. 2913 (July 29, 2019) ..............................................................................................11

*Iron Workers Local 16 Pension Fund* v. *Hilb Rogal & Hobbs Co.*,
432 F. Supp. 2d 571 (E.D. Va. 2006) .............................................................................. *passim*

*J.Y.* v. *JUUL Labs, Inc.*,
No. 18-06776 (S.D. Fl., filed Oct. 10, 2018) ....................................................................8 n.2

*Janies* v. *Cempra, Inc.*,
2020 WL 2770554 (4th Cir. May 28, 2020) ..........................................................................29

*Katyle* v. *Penn Nat'l Gaming, Inc.*,
637 F.3d 462 (4th Cir. 2011) ..........................................................................5, 36, 37, 40

*Keeney* v. *Larkin*,
    102 F. App'x 787 (4th Cir. 2004) ........................................................................29

*Knox* v. *Yingli Green Energy Holding Co. Ltd.*,
    242 F. Supp. 3d 950 (C.D. Cal. 2017) ..................................................................35

*Knurr v. Orbital ATK*,
    294 F. Supp. 3d 498 (E.D. Va. 2018) ...................................................................32

*Libon* v. *Infineon Techs., AG*,
    2006 U.S. Dist. LEXIS 76430 (E.D. Va. Aug. 7, 2006) ........................................25

*Loos* v. *Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ...............................................................................38

*Maguire Fin.* v. *PowerSecure Int'l*,
    876 F.3d 541 (4th Cir. 2017) .................................................................5, 29, 30, 31

*Malaney* v. *JUUL Labs, Inc.*,
    No. 18STCV07497 (L.A. Super. Ct., filed Dec. 7, 2018)....................................8 n.2

*Mass.* v. *JUUL Labs, Inc. et al.*,
    No. 2084CV00402 (Feb. 12, 2020) .....................................................................24 n.10

*Matrix Cap. Mgmt.* v. *BearingPoint, Inc.*,
    576 F.3d 172 (4th Cir. 2009) ...................................................................15, 29, 33

*Meyer* v. *Greene*,
    710 F.3d 1189 (11th Cir. 2013) ............................................................................38

*Monroe Cty. Emps.' Ret. Sys.* v. *YPF Sociedad Anonima*,
    15 F. Supp. 3d 336 (S.D.N.Y. 2014)......................................................................39

*Murdeshwar* v. *Search Media Holdings Ltd.*,
    2011 WL 7704347 (S.D. Fla. Aug. 8, 2011)...........................................................32

*Nolte* v. *Capital One Fin. Corp.*,
    390 F.3d 311 (4th Cir. 2004) ................................................................................21

*Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pen. Fund*,
    575 U.S. 175 (2015)..............................................................................................21

*Ottmann* v. *Hanger Orthopedic Grp., Inc.*,
    353 F.3d 338 (4th Cir. 2003) ....................................................................20, 28, 29

*Phillips* v. *LCI Int'l*,
    190 F.3d 609 (4th Cir. 1999) ...................................................................23, 29, 30, 31

*Pub. Emps.' Ret. Ass'n of Colo.* v. *Deloitte & Touche LLP*,
    551 F.3d 305 (4th Cir. 2009) ......................................................................3, 4, 29

*Raab* v. *Gen. Physics Corp.*,
    4 F.3d 286 (4th Cir. 1993) ............................................................................1, 5, 18, 19, 36

*RSM Prod. Corp.* v. *Fridman*,
    643 F. Supp. 2d 382 (S.D.N.Y. 2009)............................................................................24

*SEC* v. *Daifotis*,
    2011 WL 2183314 (N.D. Cal. June 6, 2011) ..................................................................28

*Saltz* v. *First Frontier, L.P.*,
    485 F. App'x 461 (2d Cir. 2012) ....................................................................................32

*Santa Fe Indus., Inc.* v. *Green*,
    430 U.S. 462 (1977).................................................................................................1, 2, 16

*SEC* v. *Pirate Investor*,
    580 F.3d 233 (4th Cir. 2009) ..........................................................................................16

*Shaffer Smith, 2424, LLC* v. *Foster*,
    168 F. Supp. 3d 654 (S.D.N.Y. 2016).............................................................................35

*Singer* v. *Reali*,
    883 F.3d 425 (4th Cir. 2018) ....................................................................................29, 36

*Smith* v. *Circuit City Stores, Inc.*,
    286 F. Supp. 2d 707 (E.D. Va. 2003) ................................................................4, 22, 24, 32

*Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta*,
    552 U.S. 148 (2008).........................................................................................................28

*Svezzese* v. *Duratek, Inc.*,
    2002 WL 1012967 (D. Md. Apr. 30, 2002) ..........................................................29, 40 n.14

*Svezzese* v. *Duratek*,
    67 F. App'x 169 (4th Cir. 2003) .....................................................................................29

*Taylor* v. *First Union Corp.*,
    857 F.2d 240 (4th Cir. 1988) ......................................................................................4, 16

*Teachers' Ret. Sys. of LA* v. *Hunter*,
    477 F.3d 162 (4th Cir. 2007) ................................................................................. *passim*

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................. *passim*

*U.S.* v. *O'Hagan*,
    521 U.S. 642 (1997).........................................................................................................16

*Viscomi* v. *JUUL Labs, Inc.*,
    No. 18-06808 (E.D. Pa., filed Aug. 31, 2018) ...........................................................8 n.2

*Weill* v. *Dominion Res., Inc.*,
  875 F. Supp. 331 (E.D. Va. 1994) ........................................................25

*Yates* v. *Mun. Mortg. & Eq.*,
  744 F.3d 874 (4th Cir. 2014) ........................................................29, 33

*Zak* v. *Chelsea Ther. Intern.*,
  780 F.3d 597 (4th Cir. 2015) ...........................................................29

*Zampa* v. *Juul Labs, Inc.*,
  No. 19-02466 (S.D. Fl., filed Nov. 5, 2018) ....................................8 n.2

**STATUTES AND REGULATIONS**

15 U.S.C. § 78u-4(b) ...................................................................5, 15, 28, 36

17 C.F.R. § 240.10b-5 ..........................................................................15, 26

**OTHER AUTHORITIES**

81 Fed. Reg. 28973-01 (May 10, 2016) .......................................................6

FED. R. CIV. P. 9(b) .................................................................... *passim*

**PUBLICATIONS AND ARTICLES**

*As the Number of Vaping-Related Deaths Climbs, These States Have Implemented
  E-Cigarette Bans*, TIME (Oct. 15, 2019) .................................................12

*Federal Prosecutors Conducting Criminal Probe of Juul*,
  WALL STREET JOURNAL (Sept. 23, 2019) ................................................12

*Hedge Fund Darsana Slashes Juul's Valuation*,
  WALL STREET JOURNAL (Oct. 4, 2019) .........................................21 n.8, 40

*Juul to Stop Selling Mint E-Cigarettes*,
  WALL STREET JOURNAL (Nov. 7, 2019) ..................................................12

*The FDA Conducted a Surprise Inspection on JUUL Headquarters*,
  FORTUNE (Oct. 2, 2018) ......................................................................8

*The Vaping-Related Lung Disease Outbreak May Be Coming to an End*,
  TIME (Dec. 20, 2019) .........................................................................13

*Outbreak of Lung Injury Associated with the Use of E-Cigarette, or
  Vaping Products*, CDC (Feb. 25, 2020) .................................................19

## PRELIMINARY STATEMENT

Plaintiffs are investors in a tobacco company, claiming to bring a securities fraud action on behalf of a class of tobacco investors.  But reading their complaint, it appears that plaintiffs have conveniently forgotten that fact.  The preliminary statement calls for "consigning the nicotine industry to the dustbin of history."  And the body contains reams of irrelevant allegations about the risks of smoking and vaping that plaintiffs have copied wholesale from consumer lawsuits pending in other courts.  As investors who hoped to profit from the sale of nicotine products, plaintiffs are not champions of the public health.  They masquerade that way to obscure the defect in their pleading:  It fails to state a claim of securities fraud.

Plaintiffs' claim rests on the fact that Altria's December 2018 investment in JUUL has soured.  With the clarity of hindsight, it has become clear that Altria underestimated the risks of investing in JUUL.  But as the Fourth Circuit has long held, "hindsight does not establish fraud." *Raab* v. *Gen. Physics Corp.*, 4 F.3d 286, 291 (4th Cir. 1993) (Wilkinson, J.).  "The market has risks; the securities laws do not serve as investment insurance." *Id.*  Investors may not, under the guise of asserting a claim for federal securities fraud, "'Monday morning quarterback' ... the legitimate business decisions, however bad, of company officers and executives." *In re Cable & Wireless*, 321 F. Supp. 2d 749, 770 (E.D. Va. 2004).

For this reason, the Supreme Court has long held that claims that sound in "corporate mismanagement"—which are in the exclusive domain of state law—are not actionable under Section 10(b).  *Santa Fe Indus., Inc.* v. *Green*, 430 U.S. 462, 477 (1977).  The purpose of the Securities and Exchange Act is only "to substitute a philosophy of full disclosure for the philosophy of caveat emptor." *Id.*  Once "full and fair disclosure" has been made, the substance of a transaction is "at most a tangential concern" under federal law. *Id.* at 478.  Put simply, the

securities laws do not concern themselves with whether managers make good or bad investment decisions—they only prohibit *lying to investors*. *Id.*

In this case, plaintiffs' 160-page complaint contains no well-pleaded facts suggesting that Altria lied to the market about its investment in JUUL. The pleaded facts show that Altria had compelling reasons to invest in JUUL when it did: sales of combustible cigarettes were in long-term decline, e-cigarettes were believed to be a safer alternative to combusted products, and Altria had struggled to develop its own e-cigarette business. When it announced the JUUL investment, Altria clearly explained to investors that it was preparing "for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes."

Nobody was led to believe the JUUL investment was without risk. As the pleaded facts show, it was widely known prior to Altria's investment that youth usage of e-cigarettes was a significant issue. While JUUL had taken measures to control underage access, it still faced substantial legal and regulatory scrutiny. It was publicly known that the FDA and state AGs were investigating JUUL's products and marketing practices, Congress had sent an information request, and seven lawsuits had been filed asserting that JUUL had targeted underage consumers. Altria made no secret of these issues—when the JUUL transaction was announced, its CEO said in simple terms that youth usage was a "big problem" that "put the whole category at risk."

Still, the market's reaction to the deal was favorable—analysts heralded Altria's investment as "a strategic move" and "the absolute right decision." And for a number of months JUUL continued to perform in line with expectations. But in mid-2019, pressure against JUUL swiftly mounted. More lawsuits were filed and consolidated into a multi-district litigation. Congress held hearings on JUUL's role in the epidemic of youth vaping. And in the summer of 2019, there was an outbreak of vaping-related illnesses that led to intense regulatory pressure on

the entire e-vapor industry.  While the CDC later publicly confirmed that these illnesses were caused by issues unrelated to JUUL, states adopted vapor bans, hundreds of additional consumer lawsuits were filed, and more investigations were announced.  Demand for JUUL products fell.

Altria communicated these developments to the market as they unfolded.  Throughout the class period, Altria warned that the FDA was "concerned about an epidemic of youth e-vapor usage," that there was "uncertainty as to whether ... there'll be a slowdown in growth," that the "viability of these products [was] at risk," and that the "expected benefits" of the transaction "may not materialize."  When vaping-related illnesses broke out in the summer of 2019, Altria promptly recorded an impairment charge.  And as hundreds of new lawsuits were filed, Altria recorded another impairment to reflect the drag of continued litigation on JUUL's prospects.

Nonetheless, pointing to the decline in JUUL's value, plaintiffs now contend that Altria must have known before it invested in JUUL that "material risks" made its stake in the company worth less than it paid at the time the investment was made.  But the complaint utterly fails to substantiate that inherently implausible claim.  Plaintiffs merely repeat disputed allegations from consumer product lawsuits that have been known to investors for years.  They do not identify a *single fact* about JUUL that was known to Altria that wasn't also widely known to the market. While plaintiffs may now disagree, in hindsight, with Altria's judgment to invest in JUUL in the face of these risks, they cannot "'bootstrap[]' a mismanagement claim into … securities fraud." *In re USF&G*, 1993 WL 740188, at *5 (D. Md. Feb. 11, 1993).

Importantly, having brought a claim under Section 10(b), plaintiffs are subject to the "heightened pleadings requirements" of the Private Securities Litigation Reform Act of 1995 and FED. R. CIV. P. 9(b). *Pub. Emps.' Ret. Ass'n of Colo.* v. *Deloitte & Touche LLP*, 551 F.3d 305, 311 (4th Cir. 2009) (Wilkinson, J.).  This requires plaintiffs to plead "with particularity both the

facts constituting the alleged violation, and the facts evidencing scienter." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  By imposing these demanding requirements, Congress charged courts "to weed out meritless claims at the pleading stage, without forcing defendants to go through a potentially costly discovery process."  *Deloitte*, 551 F.3d at 312.

In this case, the complaint fails to meet the PSLRA's heightened pleading standards and should be dismissed on multiple independent grounds:

*First*, plaintiffs fail to plead any actionable misrepresentation by Altria.  Citing JUUL's poor performance, plaintiffs argue that Altria's opinions about JUUL's value and prospects were false and misleading.  But plaintiffs plead no facts to suggest that these statements "were false *at the time they were made*."  *Smith* v. *Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 717 (E.D. Va. 2003).  Instead, the complaint merely pleads that the JUUL investment has not worked out.  Plaintiffs also recycle disputed allegations from the consumer lawsuits pending against JUUL to challenge Altria's statements about JUUL's products and marketing practices.  But even taking these allegations at face value, they fail to show that Altria's statements about JUUL were false.

*Second*, plaintiffs fail to plead particularized facts giving rise to a "strong inference" that any Altria defendant acted with scienter.  The idea that Altria would invest $12.8 billion for a 35% stake in JUUL knowing that its "true value" was far less is absurd.  Plaintiffs plead no motive for any defendant to have engaged in such irrational behavior.  Nor do they plead any other facts required to support a strong inference of fraud.  The complaint fails to allege, "for example, when each defendant … learned that a statement was false, how that defendant learned that the statement was false, and the particular document or other source of information from which the defendant came to know that the statement was false."  *Iron Workers Local 16 Pension Fund* v. *Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 579 (E.D. Va. 2006).

Equally important, any inference of scienter in this case is overwhelmed by the far more compelling "opposing inference of *non*fraudulent intent." *Tellabs*, 551 U.S. at 314.  The most compelling inference is the simplest and most obvious one:  Altria believed it was paying a fair price for its stake in JUUL but underestimated the risks.  While plaintiffs may now contend, with the benefit of hindsight, that Altria paid too much, the PSLRA "reflects Congress's determination that liability for securities fraud should not be predicated solely on an overly optimistic view of a future which may, in fact, encounter harsh economic realities down the road." *Maguire Fin.* v. *PowerSecure Int'l*, 876 F.3d 541, 548 (4th Cir. 2017).

*Third*, beyond their failure to identify an actionable misrepresentation, plaintiffs utterly fail to plead "loss causation"—that the alleged misstatements or omissions they cite "caused the loss for which [they] seek[] to recover damages." 15 U.S.C. § 78u-4(b)(4).  Plaintiffs identify no sudden "drop" in Altria's stock when the supposed fraud was "exposed."  Instead, they string together a litany of adverse developments that have come to pass over nearly *a year*:  more investigations and litigation, regulatory action, and reduced demand for JUUL products.  None of these developments "revealed 'new facts' suggesting [that Altria] had perpetrated a fraud on the market." *Katyle* v. *Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011).

At bottom then, this case is not about a scheme to defraud, it's about an investment that hasn't worked out.  As the Fourth Circuit has explained, "[e]very prediction of success that fails to materialize cannot create on that account an action for securities fraud." *Raab*, 4 F.3d at 291. "Because only a fraction of financial deteriorations are the result of fraud, plaintiffs must allege facts indicating that the change in circumstances resulted from defendants' fraudulent scheme." *Borow* v. *nVIEW Corp.*, 829 F. Supp. 828, 833 (E.D. Va. 1993).  Plaintiffs have not done that here.  The claims against the Altria defendants should be dismissed with prejudice.

# BACKGROUND[1]

## A.     The Parties.

Headquartered in Richmond, Virginia, Altria Group, Inc. and its subsidiaries manufacture and sell cigarettes, smokeless products, and wine.  ¶ 35.  At all relevant times, defendants Howard Willard and William Gifford served as Altria's CEO and CFO.  ¶¶ 24-25.

JUUL Labs, Inc. manufactures and sells the JUUL e-cigarette.  ¶ 37.  The other individual defendants are the founders of JUUL and its current and former executives.  ¶¶ 29-30.

Plaintiffs are Altria investors.  ¶ 22.  They purport to bring this action on behalf of a class of "all persons and entities … who purchased or otherwise acquired Altria … securities between December 20, 2018 and February 21, 2020, both dates inclusive."  ¶ 2.

## B.     E-cigarettes emerge as a potentially less harmful
         alternative to combustible cigarettes.

E-cigarettes do not burn tobacco and scientific studies have observed "lower levels of toxicants … in e-cigarette aerosols than in combusted tobacco smoke."  81 Fed. Reg. 28973-01, 29,029 (May 10, 2016); ¶ 70.  For this reason, the FDA has stated that "the inhalation of nicotine (*i.e.*, nicotine without the products of combustion) is of *less risk* to the user than the inhalation of nicotine delivered by smoke from combusted tobacco products."  *Id.* at 28,981 (emphasis added).

But after being introduced into the U.S. market in 2007, e-cigarettes struggled to compete with combustible products, largely because consumers didn't like them.  ¶¶ 99-100.  To address this issue, in 2013, manufacturers began introducing e-cigarettes using nicotine salts, which offer

---

[1]     This background is based on the allegations of the corrected consolidated class action complaint, Dkt. No. 108, and other documents properly before this Court on a motion to dismiss, *see Tellabs*, 551 U.S. at 322 ("[W]hen ruling on Rule 12(b)(6) motions" courts "must consider the complaint in its entirety, as well as … documents incorporated by reference, and matters of which a court may take judicial notice.").  Citations of "¶ __" refer to the complaint.  Citations of "Ex. __" refer to exhibits attached to the declaration of Edward Fuhr.

users an experience far closer to combustible cigarettes.  ¶¶ 125-126.  In July 2013, Reynolds released the Vuse, the first known cartridge-based nicotine salt e-cigarette in the U.S. market. ¶ 138.  A month later, Altria entered the market with the MarkTen cig-a-like.  ¶ 138.  And in 2015, JUUL followed and quickly gained consumer acceptance.  ¶ 138.

C.      **JUUL takes measures to combat underage usage of its products.**

While e-cigarettes present a significant harm reduction opportunity for adult smokers, youth usage of these products harms the public health.  ¶ 96.  Over its history, JUUL has taken measures to combat this problem.  When the company launched in mid-2015, it debuted a trendy "Vaporized" campaign to match the sleek design of its products.  ¶¶ 207-213.  But after just a few months, it became evident that teenagers were using JUUL, and the campaign was immediately canceled.  ¶¶ 135, 179.  By early 2016, JUUL rolled out a new "Switch Campaign," which featured "more muted and reserved" advertising and allegedly focused on promoting JUUL as a potentially less harmful alternative to combustible cigarettes.  ¶¶ 179-182.

In mid-2017, youth usage rates across the e-cigarette industry rose and, long before Altria invested, JUUL became a public focus of regulatory attention.  *See* Ex. 1 at 2-3 (FDA Stmnt., Sept. 11, 2018); ¶ 393.  On April 18, 2018, eleven U.S. senators sent JUUL a public letter urging it to "immediately take action" to reduce youth usage.  *See* Ex. 2 (Letter, Apr. 18, 2018); ¶ 134.  Five days later, the FDA sent JUUL an information request.  Ex. 3 (FDA Stmnt., Apr. 23, 2018); ¶ 134.  And three days after that, a class of consumers accused JUUL of marketing its e-cigarettes "as safe, candy-like products that are attractive to minors and nonsmokers."  Ex. 4 at ¶ 1 (Compl. *Colgate* v. *JUUL Labs Inc. et al.*, No. 18-2499 (N.D. Cal. Apr. 26, 2018)).[2]

---

[2]      The allegations of the complaint are copied directly from consumer actions that have been filed against JUUL.  As set forth in JUUL's opening brief, these allegations were widely reported in newspaper articles, academic literature, and SEC filings.  *See generally* JLI Op. Br.

JUUL responded with a "Comprehensive Strategy to Combat Youth Usage."  Ex. 5 (JLI Press Release, Apr. 25, 2018).  But highly public regulatory scrutiny of JUUL's marketing practices continued.  In July 2018, the Massachusetts Attorney General's Office announced it was investigating whether JUUL marketed to minors.  *See* Ex. 6 (Press Release, July 24, 2018). Several months later, a similar investigation was announced by the North Carolina Attorney General.  *See* Ex. 7 (Press Release, Oct. 15, 2018).  In September 2018, the FDA declared that youth usage of e-cigarettes was an "epidemic" and directed JUUL and other e-cigarettes manufacturers to submit action plans to address this issue.  *See* Ex. 1 (FDA Statement, Sept. 11, 2018); ¶ 393.  And in the ensuing weeks, the FDA conducted a surprise inspection of JUUL's headquarters and seized documents related to the company's marketing practices.  *See* Ex. 8 (*FDA Seizes 'More than a Thousand Pages' of Documents in Surprise Inspection of E-Cigarette Maker JUUL*, CNBC (Oct. 2, 2018)).[3]

**D.    Altria struggles to develop its e-cigarette business and makes a minority investment in JUUL.**

With the market for combustible cigarettes in long-term decline, Altria has long had its eye on the e-cigarette market, launching its *MarkTen* cig-a-like product in 2013.  ¶ 138.  But despite its efforts, Altria's e-vapor products foundered, and, as of November 2018, it had just 4% of e-cigarette sales.  ¶¶ 330-331.  As Altria struggled, JUUL's popularity surged, and sales of

---

In fact, more than half a dozen lawsuits making allegations similar to those asserted in the complaint were publicly filed against JUUL *before* Altria's investment.  *See Cooper* v. *JUUL Labs, Inc.*, No. CGC-18-566496 (S.F. Super. Ct., filed May 11, 2018); *D.P.* v. *JUUL Labs, Inc.*, No. 18-05758 (S.D.N.Y., filed June 26, 2018); *Viscomi* v. *JUUL Labs, Inc.*, No. 18-06808 (E.D. Pa., filed Aug. 31, 2018); *J.Y.* v. *JUUL Labs, Inc.*, No. 18-06776 (S.D. Fl., filed Oct. 10, 2018); *Zampa* v. *Juul Labs, Inc.*, No. 19-02466 (S.D. Fl., filed Nov. 5, 2018); *Malaney* v. *JUUL Labs, Inc.*, No. 18STCV07497 (L.A. Super. Ct., filed Dec. 7, 2018).

[3]     Even before the class period began, Altria disclosed the FDA's efforts to combat youth usage of e-cigarettes in its Form 10-Q and provided an overview of the plan that it had developed to address youth usage of e-vapor products.  Ex. 9 at 72-73 (Form 10-Q, Oct. 25, 2018).

combusted cigarettes began to decrease at an accelerating rate.  ¶¶ 97, 328.  While cigarette volume had been steadily falling roughly 3% a year since 2000, the industry contracted 4% in 2017 and 4.5% in 2018.  ¶ 334.  With JUUL's rising popularity, Altria predicted that future sales of combusted cigarettes would continue to fall 4% to 6% a year in the future.  ¶ 334.

Seeing JUUL's potential to convert adult smokers, Altria contacted the company in early 2017 to explore a strategic relationship.  *See* Ex. 10 at 3 (Altria Letter, Oct. 14, 2019); ¶ 347.  Over the next 18 months, the parties held intermittent talks, which repeatedly broke down.  *Id.*  In the fall of 2018, they renewed discussions and proceeded to negotiate a deal.  *Id.*

On December 20, 2018, Altria announced that it had acquired a 35% stake in JUUL for $12.8 billion, valuing JUUL at $38 billion.  ¶ 454.  In a press release, Altria explained that it was preparing "for a future where adult smokers overwhelmingly choose non-combustible products":

> We are taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, a world leader in switching adult smokers…. We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction. Through JUUL, we are making the biggest investment in our history toward that goal. We strongly believe that working with JUUL to accelerate its mission will have long-term benefits for adult smokers and our shareholders.

Ex. 11 at 1 (Altria Press Release, Dec. 20, 2018); ¶ 456.

As part of the deal, Altria agreed to provide JUUL access to its retail shelf space, help it reach adult smokers through cigarette pack inserts and mailings, and enhance its efficiency by applying Altria's logistics experience.  *See id.* at 3.  These services, Altria explained, would "accelerate JUUL's success switching adult smokers" to non-combustible JUUL products.  *Id.* at 1; ¶ 454.  As JUUL CEO Kevin Burns observed, "Altria's investment sends a very clear message that JUUL's technology has given us a truly historic opportunity to improve the lives of the world's one billion adult cigarette smokers."  *Id.*; ¶ 458.

In announcing the investment, Altria specifically highlighted the challenges that the e-cigarette industry faced with respect to underage usage.  "As recent studies have made clear," Altria disclosed, "youth vaping is a serious problem."  *Id.*  JUUL similarly explained:  "Our intent was never to have youth use JUUL products.  ***But intent is not enough, the numbers are what matter, and the numbers tell us underage use of e-cigarette products is a problem***."  *Id.* (emphasis added).  Altria also described JUUL's recent actions to combat youth usage, including halting "sales of flavored products to retail stores, enhancing age-verification for … online sales, eliminating social media accounts and developing further technology solutions."  *Id.*

During an investor call, Willard emphasized that "youth vaping is a serious problem, which both Altria and JUUL are committed to solve."  Ex. 12 at 5 (Tr., Dec. 20, 2018); ¶ 466.  In response to an analyst question, Willard explained that Altria believed only a "small percentage" of JUUL's sales were attributable to underage consumers, but he cautioned that investors should not "discount the fact that youth usage of e-vapor products is a big problem," warning that, if this issue was "not resolved, [it would] put the whole category at risk."  *Id.* at 8; ¶ 468.

Despite these known risks, the market's reaction to Altria's investment was favorable. Morgan Stanley praised the deal as "a strategic move that gives [Altria] exposure to a rapidly growing product" and allows JUUL to benefit from Altria's "regulatory expertise, including helping [JUUL] work with the FDA."  ¶ 545.  Wells Fargo described the deal as "the absolute right decision as it rounds out [Altria's] reduced-risk portfolio."  ¶ 546.  Barclays observed that Altria and JUUL were "prepared to make the investments necessary to reduce youth use."  ¶ 548.

**E.     JUUL continues its strong performance.**

In the months after Altria's investment, JUUL's strong performance continued.  During a January 31, 2019 earnings call, Willard reported that JUUL's revenues had quintupled in 2018. *See* Ex. 13 at 4 (Tr., Jan. 31, 2019).  But Willard continued to warn that "the FDA and many

10

others [we]re concerned about an epidemic of youth e-vapor usage," and he emphasized that both Altria and JUUL were "committed to being part of the solution to this issue." *Id.* at 5-6.

On April 25, Altria reported first quarter earnings and gave a further update on JUUL. Willard disclosed that JUUL's first quarter performance was strong, with shipment volume up 175%. *See* Ex. 14 at 6 (Tr., Apr. 25, 2019). But he noted that the pace of JUUL's growth had moderated after the company voluntarily stopped shipping flavored pods to retail stores as part of its effort to combat youth usage. *Id.* Willard emphasized that Altria would "accept any short-term slowdown resulting from actions to address youth e-vapor use." *Id.*[4]

While JUUL's growth continued, so did legal and investigative scrutiny of its products and marketing practices. On June 7, the House Subcommittee on Economic and Consumer Policy sent JUUL a document request. *See* Ex. 16. And on July 24 and 25, the Subcommittee held a two-day hearing to examine JUUL's role in the increase of youth usage of e-cigarettes. ¶¶ 4, 553. As of July 29, 2019, ten consumer lawsuits had been filed against JUUL in federal court, which were consolidated into an MDL in the Northern District of California before Judge Orrick. *See* ECF 1, *In re: JUUL Labs, Inc. Prod. Litig.*, MDL No. 2913 (July 29, 2019).

On July 30, Altria reported second quarter earnings and provided another update on JUUL. Ex. 17 (Tr. July 30, 2019). Willard observed that, after "a slowdown in … growth in the first quarter," JUUL had gone "back to strong volume growth." *Id.* at 6. But he again cautioned that "[p]roviding thoughtful solutions to address youth e-vapor use is a top priority," and that without such solutions the "viability of these products is at risk." *Id.* at 6.

---

[4]    In its Form 10-Q, Altria disclosed that it had been named alongside JUUL in a putative consumer class action making allegations about JUUL's products and practices much like those that plaintiffs claim Altria "failed to disclose." *See* Ex. 15 at 36 (Form 10-Q, Apr. 25, 2019).

**F.      An outbreak of lung injuries tied to e-cigarette misuse
adversely affects JUUL and the rest of the industry.**

In the summer of 2019, reports began to emerge of individuals suddenly experiencing

acute respiratory illness after using e-cigarettes.  ¶ 433.  On August 17, the CDC announced it

was investigating this issue and that 94 cases had been reported across 14 states over the

preceding six weeks.  *See* Ex. 18 (CDC Statement, Aug. 17, 2019); ¶ 433.  The agency disclosed

that, in many cases, "patients have reported use of THC-containing products…. However, no

specific product has been identified in all cases…."  Ex. 19 (Tr, Aug. 23, 2019); ¶ 433.  Former-

FDA Commissioner Gottlieb quickly observed that "[t]he legal vapes have been actively

regulated by FDA since Aug. 2017….  These tragedies point to illegal vapes and THC."  Ex. 20.

Nonetheless, states across the country began restricting sales of all e-cigarettes.  On

September 4, Michigan said it would ban all flavored e-cigarettes.  *See* Ex. 21 (Press Release,

Sept. 4, 2019); ¶ 506.  Similar bans followed in New York, Massachusetts, Rhode Island,

Montana, Washington, and Oregon.  *See* Ex. 22 (*As the Number of Vaping-Related Deaths

Climbs, These States Have Implemented E-Cigarette Bans*, TIME (Oct. 15, 2019)); ¶ 506.  The

federal government also took action, with the media reporting on September 11 that the Trump

administration was preparing a ban on flavored e-cigarettes.  ¶ 506.  On September 23, the media

reported that federal prosecutors in California were investigating JUUL.  *See* Ex. 23 (*Federal

Prosecutors Conducting Criminal Probe of Juul*, WALL STREET JOURNAL (Sept. 23, 2019)).[5]

On October 31, Altria reported third quarter earnings and announced that it would record

a $4.5 billion impairment charge on its investment in JUUL.  *See* Ex. 26 (Press Release, Oct. 31,

---

[5]      On October 17, JUUL announced it would voluntarily suspend sales of all flavored
products other than tobacco, menthol, and mint pending FDA approval.  *See* Ex. 24 (JLI Press
Release, Oct. 17, 2019).  A few weeks later, it suspended sale of mint products as well.  *See* Ex.
25 (*Juul to Stop Selling Mint E-Cigarettes*, WALL STREET JOURNAL (Nov. 7, 2019)).

2019); ¶ 519.  During an earnings call, Willard disclosed that "the dramatic shifts in the current

e-vapor regulatory and marketplace environments" required Altria to revise its transaction

assumptions.  Ex. 27 at 6 (Tr., Oct. 31, 2019).  As Willard explained:  "Certainly, the lung injury

… was something [Altria] had not predicted.  And the … dramatic potential regulatory change

… was on the extreme end of what [it] might have expected."  *Id.* at 11.  As a result, Altria was

"now projecting lower e-vapor category volumes in the U.S." and reduced performance in

international markets.  *Id.* at 6.  That day, Altria's stock traded down 2.5%.  ¶ 519.

Along with tightening regulations came a spate of consumer products litigation.  By the

end of October, more than 180 consumer products lawsuits had been filed against JUUL.  *See*

Ex. 28 (Pending Consumer Products Litigation as of Oct. 31, 2019).  In its Form 10-Q, Altria

disclosed that it had been named alongside JUUL in a dozen of these class actions and more than

two dozen individual lawsuits.  *See* Ex. 29 at 29 (Form 10-Q, Oct. 31, 2019).

Although the wave of litigation continued, the reports of vaping-related illness subsided.

After peaking in September, e-vapor lung injury cases steadily declined.  *See* Ex. 30 (*The

Vaping-Related Lung Disease Outbreak May Be Coming to an End*, TIME (Dec. 20, 2019)).  On

December 20, the CDC announced that the injuries appeared to have been caused by black

market marijuana vaping liquids laced with vitamin E acetate.  *Id.*  The CDC identified several

brands patients reported using and recommended that individuals "not use e-cigarette, or vaping,

products that contain THC."  Ex. 31 (CDC Update, Dec. 13, 2019).  Notably, as predicted by

Commissioner Gottlieb, JUUL was *not* among the brands identified by the CDC.  *Id.*

On January 30, 2020, Altria reported fourth quarter earnings and announced it was taking

an additional $4.1 billion impairment on its investment in JUUL, "primarily due to the increased

number of legal cases pending against JUUL and the expectation that the number of legal cases

against JUUL will continue to increase."  Ex. 32 (Press Release, Jan. 30, 2020); ¶ 519.  During

an earnings call, Altria reported that, over the last quarter, "the number of cases pending against

JUUL has increased by more than 80%."  Ex. 33 at 7 (Tr., Jan. 30, 2020).  As a result, Altria had

increased the discount rate in its transaction model "to reflect greater uncertainty around JUUL's

future cash flows."  *Id.*  That day, Altria's stock closed down 4.2%.  ¶ 521.

## G.     This litigation.

In October 2019, shortly after the wave of e-vapor lung injuries broke out, an Altria

stockholder filed this litigation in the Eastern District of New York.  *See* Dkt. No. 1.  The initial

plaintiff alleged that Altria had conducted "insufficient due diligence" on JUUL before its

investment and "failed to inform investors … [of] material risks associated with JUUL's

products and marketing practices."  *Id.* ¶ 5.  Two months later, a substantially identical action

was filed and consolidated with this case.  *See* Dkt. No. 33.  On December 30, the Eastern

District of New York entered a stipulation appointing lead plaintiffs and lead counsel, and the

case was subsequently transferred to this Court.  *See* Dkt. Nos. 43, 50.

On April 21, lead plaintiffs filed a 160-page complaint that is almost entirely copied and

pasted from other actions that have been filed against JUUL.  *See* Dkt. No. 74.  Virtually the

entire preliminary statement and broad swathes of the body are lifted *verbatim* from a complaint

filed two weeks earlier in the MDL pending before Judge Orrick.  *See* Ex. 34.  While plaintiffs

slap on a count for securities fraud, the allegations of the complaint—which were written for a

consumer product class action against JUUL—unsurprisingly fail to show that Altria deceived its

stockholders about the JUUL investment.  To the contrary, the allegations relating to JUUL's

products and practices that plaintiffs now claim Altria "failed to disclose" were widely reflected

in lawsuits, news articles, and academic papers that have been public since well before Altria's

investment in JUUL was announced—and before plaintiffs, themselves, purchased Altria stock.

## ARGUMENT

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must plead facts sufficient to show:  "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Matrix Cap. Mgmt.* v. *BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009).  "These substantive elements of a securities fraud claim are demanding" and require "careful scrutiny" by the Court.  *Cozzarelli* v. *Inspire Pharm. Inc.*, 549 F.3d 618, 623 (4th Cir. 2008) (Wilkinson, J.).

Ordinary notice pleading standards do not apply.  Under Rule 9(b), a complaint must state the circumstances constituting fraud "with particularity."  And under the PSLRA, it must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation … is made on information and belief, … state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  The PSLRA further requires a plaintiff to plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* § 78u-4(b)(2).  A complaint that fails to meet these exacting standards "shall" be dismissed.  *Id.* § 78u-4(b)(3).

### POINT I

### PLAINTIFFS' DISAGREEMENTS WITH ALTRIA'S BUSINESS JUDGMENTS DO NOT STATE A CLAIM FOR SECURITIES FRAUD

Plaintiffs do not challenge Altria's decision to invest in JUUL.  Their theory is that Altria *overpaid* for its stake in the company—that at the time Altria invested, JUUL faced "material risks" that made its "true value" less than the deal price.  *E.g.*, ¶ 16.  The problem for plaintiffs is that retrospective disagreements with Altria's business judgments do not support a claim of securities fraud.  The purpose of the Exchange Act is to promote "a philosophy of full

disclosure." *Santa Fe*, 430 U.S. at 478.  Once "full and fair disclosure" has been made, the substance of a transaction is "at most a tangential concern." *Id.* at 478.

For precisely this reason, the Supreme Court has long held that allegations sounding in "corporate mismanagement"—like those asserted here—are not actionable under Section 10(b). *Id.* at 477.  The statute does not "provide a federal forum for every intracorporate squabble." *Taylor* v. *First Union Corp.*, 857 F.2d 240, 246 (4th Cir. 1988).  As one court in this district explained:  "Congress did not intend for the securities laws to be used by investors to play 'Monday morning quarterback' on the legitimate business decisions, however bad, of company officers and executives." *Cable,* 321 F. Supp. 2d at 770.

It is thus well-settled that, to state a claim under Section 10(b), a plaintiff must plead that investors were *deceived*. *See Santa Fe*, 430 U.S. at 479.  "Deceptive acts include misstatements, omissions by those with a duty to disclose, manipulative trading practices, and deceptive courses of conduct." *SEC* v. *Pirate Investor*, 580 F.3d 233, 239-40 (4th Cir. 2009).  Absent well-pleaded facts showing that defendants deceived stockholders, a Section 10(b) claim is not actionable. *See U.S.* v. *O'Hagan*, 521 U.S. 642, 655 (1997) ("[Section] 10(b) is not an all-purpose breach of fiduciary duty ban; rather, it trains on conduct involving manipulation or deception.").

Plaintiffs fail to make this threshold showing.  Remarkably, in 160 pages, plaintiffs fail to identify a *single fact* about JUUL that was known to Altria that wasn't also widely known to the market—let alone show that Altria "deceived" investors about that fact.  Indeed, the core theory of plaintiffs' complaint is copied directly from the consumer lawsuits that began to be publicly filed against JUUL *eight months before* Altria's investment was announced. *Compare* Ex. 4 ¶ 1 (Compl. *Colgate*, filed Apr. 26, 2018) (alleging that JUUL:  (i) designed its products to be "particularly addictive"; (ii) marketed them "as safe"; and (iii) targeted "minors and

16

nonsmokers") *with* ¶¶ 8-10 (alleging that JUUL:  (i) designed its products "to maximize

addiction"; (ii) misled consumers "about the dangers"; and (iii) "targeted kids").

Far from suggesting that investors were deceived about these issues, the pleaded facts

show that there was a mountain of publicly reported information about the legal and regulatory

risks facing JUUL prior to Altria's investment, and thus prior to the class period.  For example:

- On April 18, 2018, eleven U.S. senators sent JUUL a public letter expressing concerns about youth usage of its products, Ex. 2;

- On April 26, a class action was filed alleging that JUUL marketed its e-cigarettes "as safe, candy-like products that are attractive to minors and nonsmokers," Ex. 4;

- On May 11, June 26, August 31, October 10, November 5, and December 7, six more consumer actions were filed making similar allegations, *see supra* n.2;

- On July 24, the Massachusetts Attorney General's Office publicly announced that it was investigating JUUL's marketing and sales practices, Ex. 6;

- On August 27, the *New York Times* reported that the FDA was investigating whether JUUL intentionally marketed its products to underage consumers, Ex. 35;

- On September 12, FDA Commissioner Gottlieb sent JUUL a public request for an action plan to stem the "epidemic" of youth usage of e-cigarettes, Ex. 36;

- On October 2, the media reported that the FDA had raided JUUL's offices and seized documents relating to its marketing practices, Ex. 8; and

- On October 15, the North Carolina Attorney General's Office publicly announced that it had sent JUUL a civil investigative demand, Ex. 7.

*See Iron Workers*, 432 F. Supp. 2d at 582 (courts must "examine the ... information that was

publicly available to reasonable investors at the time the defendant made [the] statements").[6]

Altria, for its part, made no secret of these risks when it invested.  On the day the deal

was announced, Willard candidly acknowledged that youth vaping was a "big problem" that

---

[6]     As the complaint reflects, articles and studies about the potential adverse health effects of e-cigarette have also been published for years.  *E.g.*, ¶ 419 (2015 study of e-cigarette aerosol); ¶ 421 (2017 study on e-cigarettes and asthma).  Indeed, plaintiffs cite a report of respiratory illness following e-cigarette use from 2012—three years before JUUL was even founded.  ¶ 426.

should not be "discount[ed]" and "put the whole [e-vapor] category at risk." Ex. 12 at 8 (Tr.,

Dec. 20, 2018).  Over the next seven months, he cautioned time and again that youth vaping was

an "epidemic," needed to be addressed "aggressively and promptly," could "impact the short-

term growth of the e-vapor category," was a "focus" and "concern" for the FDA, "threatened"

the long-term opportunity for harm reduction, and put the "viability of these products at risk."

Ex. 13 at 5 (Tr., Jan. 31, 2019); Ex. 14 at 5 (Tr., Apr. 25, 2019); Ex. 17 at 6 (Tr., July 30, 2019).

Altria's SEC filings further described these issues, warning that JUUL faced "regulatory

and litigation risks" and that "the expected benefits of the … transaction may not materialize."

Ex. 11 (Press Release, Dec. 20, 2018).  These filings further identified by name every JUUL-

related class action in which Altria was named as a defendant and described them for investors.

*E.g.*, Ex. 29, Ex. 99.1 at 2 (identifying 12 e-vapor class actions by name, court, and filing date).

Any investor who opened Altria's SEC filings would thus have been well aware of the pending

consumer lawsuits making the exact allegations relating to JUUL's products and practices that

plaintiffs have cut and pasted into their own complaint.  *See In re UBS*, 2010 WL 2541166, at

*18 (S.D.N.Y. June 10, 2010) ("Plaintiffs cannot premise a claim of securities fraud under

Section 10(b) on conduct and risks that were previously disclosed to the investing public.").

Plaintiffs make no attempt to reconcile their fraud theory with these disclosures—they

simply pretend that they don't exist.  But as the Fourth Circuit has observed, "a 'reasonable

investor' is neither an ostrich, hiding her head in the sand from relevant information, nor a child,

unable to understand the facts and risks of investing."  *Greenhouse* v. *MCG Capital*, 392 F.3d

650, 656-57 (4th Cir. 2004).  Here, any reasonable Altria stockholder would have understood

both that JUUL faced significant legal and regulatory risks relating to its products and marketing

practices, and that these risks could lead to a decline in the value of Altria's investment.  *See also*

18

*Raab*, 4 F.3d at 289 (explaining that the "fraud on the market" presumption of reliance "cuts both ways" and requires consideration of all information "credibly available to the market").

Notably, while the possibility of regulatory and legal action was well known, plaintiffs ignore that the catalyst for these risks materializing had nothing to do with JUUL. As Altria explained in taking the initial impairment, the lung injury outbreak in the summer of 2019 "was something [it] had not predicted," and the "dramatic potential regulatory change" that followed "was on the extreme end of what [it] might have expected." Ex. 27 at 11. Plaintiffs do not allege that Altria had any knowledge of these issues months earlier when it invested in JUUL. And while plaintiffs now attempt to link these lung injuries to JUUL products, ¶¶ 433-439, the CDC inquiry relied on in the complaint concluded that vitamin E acetate—not JUUL products— caused the influx of injuries beginning in the summer of 2019, Ex. 37 (CDC, *Outbreak of Lung Injury Associated with the Use of E-Cigarette, or Vaping Products* (Feb. 25, 2020) (identifying "vitamin E acetate as a primary cause of" vaping-related lung injuries).[7]

At the end of the day, plaintiffs' grievance is not that Altria misled investors about the risks of investing in JUUL, it is that Altria misjudged those risks and paid an unreasonably high price for its stake in JUUL. ¶ 16. But allegations "requiring a court to distinguish between conduct that is 'reasonable' and 'unreasonable,' 'informed' or 'uninformed,' are the hallmark of state fiduciary law" and assert nothing more than "garden-variety mismanagement," which is "not actionable under Section 10(b)." *Ciresi* v. *Citicorp*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991); *see also USF&G*, 1993 WL 740188 at *5 (dismissing 135-page complaint asserting that company misled investors about the risks in investments made to diversify its portfolio).

---

[7]     This Court "need not accept as true allegations contradicting documents that are referenced in the complaint." *In re Zetia Antit. Litig.*, 400 F. Supp. 3d 418, 427 (E.D. Va. 2019).

## POINT II

## PLAINTIFFS FAIL TO ALLEGE
## AN ACTIONABLE MISREPRESENTATION

**A.     The Altria defendants' statements were not materially false or misleading.**

Because plaintiffs assert a claim sounding in mismanagement and not fraud, they fail to

plead any actionable misrepresentation by Altria.  To allege a misrepresentation, plaintiffs "must

point to a *factual* statement or omission—that is, one that is demonstrable as being true or false."

*Ottmann* v. *Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 342-43 (4th Cir. 2003).  And they must

plead "*sufficient facts*" upon which a "*reasonable belief*" can be formed that the statement was

false or misleading.  *Teachers' Ret. Sys. of LA* v. *Hunter*, 477 F.3d 162, 174 (4th Cir. 2007).

Plaintiffs must also show that the statement or omission was "*material*, *i.e.*, … that a reasonable

purchaser or seller of a security (1) would consider the fact important in deciding whether to buy

or sell the security or (2) would have viewed the total mix of information made available to be

significantly altered by disclosure of the fact."  *Ottman,* 353 F.3d at 343.

Plaintiffs challenge six categories of statements by Altria.  None is actionable:

*1.  JUUL's value.*  Plaintiffs first challenge Altria's disclosure that its investment in

JUUL "represents a 35% economic interest …, valuing the company at $38 billion."  ¶¶ 454-455.

But on its face, this disclosure is plainly accurate.  Plaintiffs do not assert that Altria did not

receive "a 35% economic interest" in JUUL.  Nor do they contend that Altria applied something

other than a $38 billion valuation to JUUL at the time the investment was made.  Instead,

plaintiffs try to transform a straightforward disclosure about the economic terms of a negotiated

transaction into "fraud" by disagreeing, in retrospect, with the price Altria agreed to pay.  ¶ 455.

As courts have recognized, "estimates of fair value" are not "matter[s] of objective fact,"

they are statements of opinion, subject to even *higher* standards for pleading fraud.  *Fait* v.

*Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011); *Nolte* v. *Capital One Fin. Corp.*, 390 F.3d 311 (4th Cir. 2004) (loss reserve estimates are opinions).  To be actionable, plaintiffs must plead particularized facts showing that Altria:  (i) "did not hold the belief [it] professed," (ii) supplied "supporting fact[s] [that] were untrue," or (iii) omitted "particular (and material) facts going to the basis for [its] opinion … whose omission makes the opinion … misleading to a reasonable person."  *Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pen. Fund*, 575 U.S. 175, 186, 194 (2015).  As the Supreme Court has cautioned, making this showing is "no small task."  *Id.*

In the face of their heavy burden, plaintiffs plead no facts to suggest that Altria's opinions about JUUL's value in December 2018 were insincerely held or omitted facts that should have been disclosed—in fact, the complaint pleads no facts about how Altria valued JUUL *at all.*  The complaint does not say what methodologies or metrics were used, analysis applied, or judgments made.  The only information the complaint supplies about the reasonableness of the price Altria paid is that, in December 2018, analysts all thought that Altria made "the absolute right decision."  ¶¶ 535-552.  While the outbreak of lung injuries and increased regulation and litigation have since caused JUUL's value to decline, plaintiffs may not "seize[] upon later disclosure of adverse developments" and claim that "defendants *must* have known of these developments or their likelihood."  *Borow* v. *nVIEW Corp.*, 27 F.3d at 562 (4th Cir. 1994).[8]

In the best of circumstances, "[v]aluing a company as a going concern is a subjective and uncertain enterprise."  *In re 3Com*, 2009 WL 5173804, at *6 (Del. Ch. Dec. 18, 2009).  That is doubly so where, as here, its stock is not publicly traded, it has grown exponentially in prior

---

[8]     While plaintiffs argue that Altria overpaid for its stake in JUUL, the media reported that Capital Group, a sophisticated institutional investor, acquired a stake in JUUL at the same valuation.  *See Hedge Fund Darsana Slashes JUUL's valuation by More Than a Third*, WALL STREET JOURNAL (Oct. 4, 2019).  Plaintiffs' assertion that Altria knowingly overpaid for its stake in JUUL is premised on nothing but hindsight.

years, and it faces uncertain regulation and litigation that could adversely affect its prospects. Because plaintiffs plead no facts to suggest that Altria's statements of opinion about JUUL's value were "false at the time they were made," they fail to state a claim of fraud under Section 10(b). *Circuit City*, 286 F. Supp. 2d at 717; *see also C.D.T.S.* v. *UBS AG*, 2013 WL 6576031, at *3 (S.D.N.Y. Dec. 13, 2013) ("Falsity is a failure to be truthful—it is not a misapprehension, misunderstanding, or mistake of fact at the time a statement was made.").

     *2. Anticipated benefits.* Plaintiffs similarly challenge Altria's optimistic opinions about the anticipated benefits of the JUUL transaction, including its description of the deal as a "strategic investment," one that could "position" Altria well "among tobacco peers," and a way to "accelerate JUUL's mission to switch adult smokers to e-vapor products." ¶¶ 454, 480, 489, 516. But here again, plaintiffs plead no facts to suggest that any of these statements of opinion were false *when made*; they simply plead that the JUUL investment has not turned out as Altria had hoped. And as is well established, "without *contemporaneous* falsity, there can be no fraud." *In re Lululemon*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014); *Hillson Partners Ltd. P'ship* v. *Adage, Inc.*, 42 F.3d 204, 209 (4th Cir. 1994) (rejecting allegations of "fraud by hindsight").

     In any event, "[i]ndefinite statements of corporate optimism" like the ones plaintiffs challenge are nonactionable puffery and thus "immaterial as a matter of law." *In re Neustar Sec.*, 83 F. Supp. 3d 671, 680 (E.D. Va. 2015); *In re Airgate PCS, Inc.*, 389 F. Supp. 2d 1360, 1378-79 (N.D. Ga. 2005) (phrases like "strategic combination" and "growth potential" are "classic examples of mere 'puffery'"); *In re Lab. Corp. of Am. Holdings*, 2006 WL 1367428, at *10 (M.D.N.C. May 18, 2006) (statement about "competitive position" is immaterial puffery).

     *3. Harm reduction.* Plaintiffs next challenge Altria's opinions about JUUL's potential to "reduce harm" and "improve the lives" of adult smokers. ¶¶ 456-461. But plaintiffs plead no

facts to suggest that these statements are false, let alone that Altria believed that they were false when made.  Plaintiffs cite various studies for the proposition that e-cigarettes are "harmful." ¶¶ 417-453.  But Altria never suggested that JUUL is *harmless*—it said only that using JUUL has the "potential" to "reduce harm" *as compared to smoking combusted cigarettes*.  Nothing in the complaint remotely suggests that this proposition is untrue.  Indeed, the FDA has made statements similar to those that plaintiffs now claim are "fraud."  *See* 81 Fed. Reg. at 29,030 ("FDA recognizes that completely switching from combusted cigarettes to ENDS may reduce the risk of tobacco-related disease for individuals currently using combusted tobacco products.").

Plaintiffs also fail to explain why Altria's opinions about the harm reduction potential of JUUL are material.  The allegations plaintiffs copy relating to the alleged harm caused by JUUL products were already well known prior to Altria's investment.  *E.g.*, Ex. 4 ¶ 53 (Compl. *Colgate*) ("Although framed as a safer alternative to smoking, Defendants' JUUL e-cigarettes and JUULpods still deliver dangerous toxins and carcinogens to teenage users.").  Plaintiffs may not merely duplicate the disputed allegations made in these lawsuits—adding no new facts—and argue that they rendered defendants' statements fraudulent.  *See Phillips* v. *LCI Int'l*, 190 F.3d 609, 617 (4th Cir. 1999) ("[E]ven lies are not actionable when an investor possesses information sufficient to call the [mis]representation into question.").  That is particularly so where, as here, the allegations were publicly known before plaintiffs purchased their stock.[9]

*4. Youth usage.*  Plaintiffs similarly challenge—again, relying on disputed allegations— statements by Altria about the parties' commitment to preventing underage usage of e-vapor products.  ¶¶ 462-463, 466-472, 484-485, 492-493.  Notably, plaintiffs never challenge *Altria's*

---

[9]      Plaintiffs also contend that Altria "repeatedly represented … that JUUL was a tobacco cessation product."  ¶ 15.  But the complaint identifies no statements to substantiate that claim.

commitment to preventing underage usage—indeed, plaintiffs' own confidential witnesses expressly say that Altria intended to *combat* this issue. *See* ¶¶ 376-382. Instead, plaintiffs claim that Altria—for some unexplained reason—was untruthful about *JUUL's* commitment to preventing underage usage. No pleaded facts support that claim.

As an initial matter, plaintiffs' allegations about JUUL's alleged intent to market to youth are simply cut and pasted from the consumer actions that have been pending against JUUL since prior to Altria's investment. As courts have repeatedly recognized, disputed allegations from other lawsuits are not a proper basis for asserting securities fraud. *E.g.*, *In re BearingPoint, Inc. Sec. Litig.*, 525 F. Supp. 2d 759, 777 (E.D. Va. 2007), *aff'd in part, rev'd in part on other grounds*, 576 F.3d 172 (4th Cir. 2009) (references to unadjudicated allegations "are, as a matter of law, immaterial"); *RSM Prod. Corp.* v. *Fridman*, 643 F. Supp. 2d 382, 404 (S.D.N.Y. 2009) (striking allegations from other complaints not "resolved on the merits"); *In re Connetics Corp.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (striking portions of complaint that "skirt the requirements of Rule 11(b)(3)" by relying on unproven allegations in SEC complaint).[10]

Allegations about JUUL's intent to market to youth were contested at the time of Altria's investment and are still contested today. There was never any revelation during the class period as to JUUL's intent to market to youth, let alone a revelation that had any impact on Altria's stock. These borrowed allegations are inflammatory, to be sure, but that is all. They don't state a claim for securities fraud. *See Circuit City*, 286 F. Supp. 2d at 721 ("Disclosure of information already publicly available does not materially alter the "total mix" of available information.").

---

[10] A prime example is plaintiffs' assertion that JUUL took out ads on youth-oriented channels and websites. These allegations are copied *verbatim* from a complaint filed by the Commonwealth of Massachusetts that is being actively litigated in state court. *Compare* ¶¶ 214-225 *with* Compl. ¶¶ 63-74, *Mass.* v. *JUUL Labs, Inc. et al.*, No. 2084CV00402 (Feb. 12, 2020).

In any case, plaintiffs' borrowed allegations do not even show what they claim.  While plaintiffs contend that JUUL intended underage consumers to use its products, virtually all of the complaint's allegations about this issue relate to the "Vaporized" campaign that JUUL conducted for a few months when it first entered the market.  *See* ¶¶ 205-287.  But as the complaint itself alleges, JUUL *abandoned* Vaporized—long before Altria invested—when it learned that underage consumers were using its products and replaced it with a new "Switch Campaign," featuring more "muted and reserved" advertising.  ¶¶ 135, 179, 181.  The complaint further alleges that JUUL took numerous additional actions to curb youth usage, including deleting its social media presence, imposing (and then enhancing) age verification controls on its website, and voluntarily halting sales of flavored products to retail stores.  ¶¶ 250, 309, 397.

At the end of the day, plaintiffs objection appears to be that Altria didn't simply accept the allegations that had been leveled against JUUL as true.  But "disclosure is not a rite of confession."  *In re Morgan Stanley*, 592 F.3d 347, 365 (2d Cir. 2010).  And courts have repeatedly held that the securities laws "do not require [companies] to accuse [themselves] of wrongdoing."  *Iron Workers*, 432 F. Supp. 2d at 586.  "To hold otherwise would be to eviscerate the obvious purpose of the *Santa Fe* decision, and to permit evasion of that decision by artful legal draftsmanship."  *Weill* v. *Dominion Res., Inc.*, 875 F. Supp. 331, 337 (E.D. Va. 1994).

*5.  Cautionary language.*  Plaintiffs next advance a bizarre claim that the cautionary language Altria issued to *warn* investors of risks relating to the JUUL investment was itself misleading.  ¶¶ 473-474, 481-485, 490-491.  But as courts have held, risk "warnings are alone not material."  *Libon* v. *Infineon Techs., AG*, 2006 U.S. Dist. LEXIS 76430, at \*26 (E.D. Va. Aug. 7, 2006).  And in any event, nothing in Altria's cautions was false or misleading.  Altria clearly warned that "the expected benefits of the JUUL transaction … may not materialize" for

numerous reasons, including the very reasons that ultimately surfaced here—namely, "regulatory risk at the international, federal and state levels, including actions by the FDA" and risk from "domestic or international litigation developments [and] investigations." ¶ 473.  Apart from dismissing these warnings as "generic," plaintiffs fail to explain how investors were misled.

*6. SOX certifications.*  As a last resort, plaintiffs challenge the SOX certifications signed by Altria executives certifying the accuracy of the company's financial statements.  ¶¶ 475-476, 486-487, 494-495.  But SOX certifications "do not constitute a standalone basis for liability." *In re Glob. Brokerage, Inc.*, 2019 WL 1428395, at *14 (S.D.N.Y. Mar. 28, 2019).  And in any case, plaintiffs fail to plead that anything in Altria's financial statements was actually false.  Even where companies have *acknowledged* that financial statements contained errors, courts have *still* held SOX certifications inactionable because they "are predicated on the certifying officer's belief." *In re Veon Ltd.*, 2018 WL 4168958, at *14 (S.D.N.Y. Aug. 30, 2018); *BearingPoint*, 525 F. Supp. 2d at 773 ("[S]igning SOX Certifications does not suggest culpability.").

**B.      Plaintiffs fail to plead "scheme liability."**

Plaintiffs also tack on a deceptive conduct claim under Rule 10b-5(a) and (c)—so-called "scheme liability."  To allege a scheme claim, plaintiffs must plead that:  "(1) they were injured; (2) in connection with the purchase or sale of securities; (3) by relying on a market for securities; (4) controlled or artificially affected by defendants' deceptive or manipulative conduct; and (5) the defendants … [acted with] scienter." *In re Conventry Healthcare, Inc.*, 2011 WL 1230998, at *16 (D. Md. Mar. 30, 2011).  Under the PSLRA and Rule 9(b), plaintiffs must state with particularity "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *Burt* v. *Maasberg*, 2013 WL 1314160, *15 (D. Md. Mar. 31, 2013).

While plaintiffs invoke scheme liability, it is difficult to understand what scheme they purport to allege. The centerpiece of plaintiffs' theory appears to be that, *months before Altria invested in JUUL*, the parties coordinated to stop the FDA from removing mint JUULpods from the market. ¶ 394. But plaintiffs plead no facts to support this claim. They do not contend, for example, that Altria and JUUL had secretly agreed to a deal months before the investment was announced. Nor do they explain why Altria would want to stop the FDA from regulating JUUL products, which plaintiffs themselves allege were *hurting* Altria's sales of cigarettes. ¶ 336 ("[W]hen smokers ditched Marlboro for JUUL, Altria was losing out."). Plaintiffs don't even allege that the FDA was actively preparing to remove mint JUULpods from the market, raising the question of why a scheme to stop it from doing so would be necessary in the first place.

All plaintiffs offer in support of their scheme theory is a bare assertion that, in response to the FDA's request to submit action plans to curb youth usage, both Altria and JUUL came up with plans that contemplated leaving mint products on the market. ¶¶ 387-416. But even that assertion is based on a complete misunderstanding of the action plan that Altria submitted to the FDA. As Altria's plan clearly states, the company committed to remove *all* of its pod-based products from the market, *including the mint ones*. *See* Ex. 38 (Letter, Oct. 25, 2018). Only for *non*-pod based products would Altria continue selling tobacco, mint, and menthol. *Id.* Since all of JUUL's products are pod-based, it is difficult to comprehend how plaintiffs can argue that Altria's action plan—which, again, contemplated *stopping* sales of its own mint-flavored pod-based products—could possibly have swayed the FDA to leave mint JUULpods on the market.

Apart from mint, it's not clear what conduct by Altria plaintiffs purport to challenge. Altria's only alleged involvement with JUUL apart from the investment is its agreement to provide certain distribution and marketing services. ¶ 464. The complaint contains virtually no

allegations about those services.  And it certainly does not plead that they were "*illegitimate*" or had "the principal purpose and effect of creating a false appearance of fact in the furtherance of a scheme to defraud." *SEC* v. *Daifotis*, 2011 WL 2183314, at \*9 (N.D. Cal. June 6, 2011).

Plaintiffs' scheme theory is also defective in many other respects.  *First*, plaintiffs plead none of the particulars of the supposed scheme—indeed, the complaint does not allege a single communication between defendants, let alone support a scheme to defraud Altria investors. *Second*, plaintiffs fail to allege how a supposed scheme inflated Altria's stock price.  *Third*, the conduct plaintiffs cite—interactions with the FDA and the provision of services to JUUL—are business matters that are "not in the investment sphere" and are thus not actionable under Section 10(b).  *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta*, 552 U.S. 148, 162, 166 (2008).

**POINT III**

**PLAINTIFFS FAIL TO ALLEGE PARTICULARIZED FACTS
GIVING RISE TO A STRONG INFERENCE OF SCIENTER**

Plaintiffs also fail to adequately allege that any Altria defendant acted with scienter, which is an independent basis for dismissal of their Section 10(b) claim.  Under the PSLRA, a complaint must allege particularized facts giving rise to a "strong inference," 15 U.S.C. § 78u-4(b)(2), that each defendant acted with scienter—namely, an "intent to deceive, manipulate, or defraud," *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 193 (1976).  "[N]egligence is not enough." *Cozzarelli*, 549 F.3d at 623.  Plaintiffs must show "intentional misconduct" or such "severe recklessness" that the danger of misleading investors was "known to the defendant or so obvious that the defendant must have been aware of it."  *Ottmann*, 353 F.3d at 343-44.

In *Tellabs*, the Supreme Court gave the PSLRA's "strong inference" standard "teeth." *Cozzarelli*, 549 F.3d at 624.  To be "strong," an inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference

of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. "If the inference that a defendant acted innocently, or even negligently, [is] more compelling than the inference that they acted with the requisite scienter," then the complaint must be dismissed. *Deloitte*, 551 F.3d at 313.

"The [pleading] burden placed upon plaintiff[s] is great." *Svezzese* v. *Duratek, Inc.*, 2002 WL 1012967, at *4 (D. Md. Apr. 30, 2002). Since the PSLRA was enacted, the Fourth Circuit has found scienter to be lacking in private Section 10(b) cases on all but two occasions—both of which drew spirited dissents. *See Janies* v. *Cempra, Inc.*, 2020 WL 2770554 (4th Cir. May 28, 2020); *Singer* v. *Reali*, 883 F.3d 425 (4th Cir. 2018) (Agee, J., dissenting); *Maguire*, 876 F.3d at 541; *Zak* v. *Chelsea Ther. Intern.*, 780 F.3d 597 (4th Cir. 2015) (Thacker, J., dissenting); *Yates* v. *Mun. Mortg. & Eq.*, 744 F.3d 874 (4th Cir. 2014); *Matrix*, 576 F.3d at 172; *Deloitte*, 551 F.3d at 306; *Cozzarelli*, 549 F.3d at 628; *Hunter*, 477 F.3d at 162; *In re PEC Sol.*, 418 F.3d 379 (4th Cir. 2005); *Keeney* v. *Larkin*, 102 F. App'x 787 (4th Cir. 2004); *Ottmann*, 353 F.3d at 338; *Svezzese* v. *Duratek*, 67 F. App'x 169 (4th Cir. 2003); *Phillips* v. *LCI Int'l*, 190 F.3d 609 (4th Cir. 1999).

A.      **Plaintiffs do not even attempt to plead a theory of motive.**

Far from alleging an inference of scienter that is "cogent" and "compelling," on its face, plaintiffs' theory of "fraud" makes no sense. Boiled down to its essence, the claim is that Altria *purposefully overpaid by billions of dollars* for a 35% stake in JUUL. *E.g.*, ¶ 16. No pleaded facts support that nonsensical assertion. And the inference that Altria would knowingly invest in a venture it believed "was doomed to failure" is not "even plausible, much less convincing." *Cozzarelli*, 549 F.3d at 627; *see also ECA, Local 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 203 (2d Cir. 2009) (rejecting "implausible" theory that bank would deliberately make bad investments that resulted in "losing vast sums of money").

Notably, plaintiffs do not even *attempt* to allege that any Altria defendant had motive to commit such self-sabotaging fraud.  "For example, Plaintiffs do not allege that the individual Defendants sold any stock during the class period, thereby taking advantage of their fraudulent scheme to artificially inflate the company's share price."  *In re Acterna Corp.*, 378 F. Supp. 2d 561, 576 (D. Md. 2005).  And the absence of any such allegation, "should be a negative inference regarding scienter."  *Id.* at 577; *see also In re CIENA Corp.*, 99 F. Supp. 2d 650, 663 (D. Md. 2000) (lack of significant stock sales by insiders "negat[es] the inference" of fraud).

Not only do plaintiffs fail to plead motive, public filings show that the Altria defendants were *harmed* by JUUL's poor performance.  When Altria invested in JUUL, Willard and Gifford aggregately owned more than 618,000 shares of Altria stock.  *See* Ex. 39 (Willard Form 4, May 17, 2018); Ex. 40 (Gifford Form 4, Feb. 1, 2018).  As JUUL's value and Altria's stock declined, these defendants *lost money*.  "Assuming, as [the Court] must, that [defendants] sought to further [their] own professional and economic interests," purposefully overpaying for a stake in JUUL is "not the way any rational person, who owned [hundreds of thousands of] shares of [Altria], would further those interests."  *Phillips*, 190 F.3d at 623.  "If this … gives rise to a 'strong inference' of anything, it is that no scienter exists."  *PEC*, 418 F.3d at 390.

**B.**      **Plaintiffs' scienter allegations are makeweight.**

Plaintiffs' failure to allege motive makes their pleading burden even *heavier*:  though they may try to allege circumstantial evidence of conscious misbehavior or severe recklessness, their allegations must be "*strong*[*er*]" to support their contention that defendants "behaved irrationally."  *Phillips*, 190 F. 3d at 623. "[S]peculation" does not suffice.  *Id.*  Nor may plaintiffs "stack inference upon inference" to satisfy the PSLRA.  *Maguire*, 876 F.3d at 548.  Rather, plaintiffs must allege "a substantial factual basis" that creates "a 'strong inference' that [each]

defendant acted with the required state of mind." *Phillips*, 190 F. 3d at 621.  This requires

alleging more than that a defendant "may have known his statement was false"; plaintiffs must

show that each defendant "intended to deceive." *Maguire*, 876 F.3d at 547-548.  And again, they

must make this showing subject to a "more stringent standard" in light of their failure to even

*suggest* a motive.  *In re e.spire Commc'ns., Inc.*, 127 F. Supp. 2d 734, 744-45 (D. Md. 2001).

      **1. Defendants' knowledge.**   Lacking true allegations of scienter, plaintiffs make claims

about what Altria could or should have known about JUUL.  Plaintiffs assert, for example, that

Willard and Gifford must have known that their statements about JUUL were false because they

were "senior officers" of Altria.  ¶ 527.  But assertions "that a defendant must have known that a

statement was false and misleading because of his or her position in the company are precisely

the types of inferences which [courts], on numerous occasions, have determined to be

inadequate." *Iron Workers*, 432 F. Supp. 2d at 592.  Were the law otherwise, "every corporate

executive … would be exposed to liability for securities fraud." *In re Criimi Mae, Inc.*, 94 F.

Supp. 2d 652, 661 (D. Md. 2000).  Indeed, this form of speculation is "contrary even to pre-

[PSLRA] law." *In re First Union Corp.*, 128 F. Supp. 2d 871, 888 (W.D.N.C. 2001).

      Plaintiffs similarly argue that the Altria defendants were in a "unique position" to spot

JUUL's "improper practices" because they worked in the "tobacco industry," an allegation that is

itself dubious in a lawsuit challenging an investment in the emerging e-vapor market.  ¶ 531.

But, accepting the illogical premise of the claim, where are the specifics?  As courts have long

recognized, to plead *any* inference of scienter under the PSLRA, plaintiffs must allege "*specific*

*facts* concerning, for example, *when* each defendant or other corporate officer learned that a

statement was false, *how* that defendant learned that the statement was false, and the *particular*

*document* or other source of information from which the defendant came to know that the

statement was false." *Iron Workers*, 432 F. Supp. 2d at 579 (emphasis added).  In this case, the complaint identifies no "facts, reports or information available to Defendants," nor does it plead "that Defendants received information from any individuals or meetings which would suggest that they had the type of knowledge that would make their misrepresentations consciously misleading." *Circuit City*, 286 F. Supp. 2d at 717.

Plaintiffs' generic allegations about information Altria would have gotten during due diligence fare no better.  ¶ 531.  Conclusory "allegations that red flags … should have warned off [Altria] … in due diligence" do not support an inference of fraud.  *Saltz* v. *First Frontier, L.P.*, 485 F. App'x 461, 465 (2d Cir. 2012).  Without specific allegations of "what defendants knew, how they knew it, and when they knew it, Plaintiffs' allegations that [Altria] must have known about [JUUL's improper practices] as a result of their due diligence are insufficient to make out the element of scienter under the heightened PSLRA and Rule 9(b) standards." *Murdeshwar* v. *Search Media Holdings Ltd.*, 2011 WL 7704347, at *17 (S.D. Fla. Aug. 8, 2011).

At bottom, the "complaint alleges no documentary or personal source to support the allegation that [Altria] intentionally overpaid for [the JUUL] investment[]." *Hunter*, 477 F.3d at 183.  Plaintiffs' generic allegations, based solely on publicly available information, do not suffice to establish a strong inference of fraud.  *See Knurr* v. *Orbital ATK*, 294 F. Supp. 3d 498, 505 (E.D. Va. 2018) ("Where, as here, red flags … are public knowledge, this fact negates or significantly undercuts any inference of scienter."); *Higginbotham* v. *Baxter Int'l, Inc.*, 495 F.3d 753, 759 (7th Cir. 2007) (Easterbrook, J.) ("If [public allegations] were enough to demonstrate fraud, then plaintiffs and other investors could have drawn that inference themselves.").

**2. Confidential witnesses.**   Plaintiffs next turn to the allegations of their three "confidential witnesses"—so-called "CWs," supposed former employees of Altria.  ¶ 531.  As

courts have recognized, there is substantial reason to be wary of allegations from such sources: "Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist." *Higginbotham*, 496 F.3d at 757. At a minimum, if the allegations are not subject to a "steep[] discount" altogether, *Yates*, 744 F.3d at 886, the Court must carefully scrutinize them—to ensure, among other things, "the probability that a person in the position occupied by the source would possess the information alleged," *Hunter*, 477 F.3d at 174.

Based on their CWs, plaintiffs contend that "[e]verybody [at Altria] knew … there was a youth issue" at JUUL. ¶¶ 358-359. But Altria specifically *told* investors there was a "youth issue" at JUUL. In announcing the investment, Willard said "that youth usage of e-vapor products is a big problem that needs to be resolved." Ex. 12 at 8 (Tr., Dec. 20, 2018). Altria's voluntary disclosure of this issue affirmatively *refutes* any scienter claim. *See Matrix*, 576 F.3d at 189 (voluntary disclosure supports "inference that defendants were not acting with scienter").

Plaintiffs also contend, by inserting bracketed phrases in their CWs quotes, that it was known at Altria that JUUL was "marketing to underage users." ¶¶ 358-359. But plaintiffs plead *no facts* to support the probability that their CWs would "possess the information alleged" about JUUL's marketing practices. *Hunter*, 477 F.3d at 174. None of the CWs is alleged to have had access to non-public information about JUUL. Indeed, CW1 specifically says that he "was *not* … involved" in Altria's diligence process. ¶ 352. Without a specific basis for their alleged knowledge, "[h]earsay allegations and bald assertions made by confidential witnesses will not defeat a Rule 12(b)(6) motion." *In re Mun. Mortg. & Equity, LLC*, 876 F. Supp. 2d 616, 640 (D. Md. 2012); *In re Allied Nevada Gold Corp.*, 2016 WL 4191017, at *6 (D. Nev. Aug. 8, 2016) (accusation that "everybody knew" of wrongdoing disregarded as "[u]nreliable hearsay").

33

Equally important, even assuming that the CWs knew what they say about JUUL, that still would not be sufficient to support an inference of scienter because there is no allegation that they ever communicated this information to defendants.  Apart from CW1, no CW is alleged to have even *spoken* to defendants.  ¶¶ 342-386.  And none are alleged to have raised concerns about JUUL's marketing practices—producing a "missing link" that undermines scienter.  *In re Wachovia Equity*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011); *In re Citigroup*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010) ("Fatal to plaintiffs' claims ... is that they do not allege with specificity that any of the confidential witnesses … presented information to the individual defendants.").

**3. Statements to the FDA.**  Lastly, plaintiffs assert that Willard misled the FDA by saying Altria was halting sales of some of its e-vapor products to prevent youth usage when it was really satisfying JUUL's demands for a non-compete.  ¶ 532.  But plaintiffs' theory makes no sense.  The FDA expressed specific concerns about the youth appeal of pod-based products and flavors.  *See* Ex. 38 (Ltr., Oct. 25, 2018).  Altria responded by removing these—*and only these*—products from the market.  If Altria was acting to satisfy JUUL's demands, why would it remove only products singled out by the FDA?  Indeed, the transcript cited in the complaint says that even after Altria stopped selling pod-based products and flavors, roughly "80% of [Altria's] e-vapor volume … [would] remain on the market," refuting any claim that its response to the FDA covertly satisfied JUUL's demand for a non-compete.  Ex. 41 at 3-4 (Tr., Oct. 25, 2018).[11]

Even setting aside this flawed premise, plaintiffs also fail to explain why a supposed effort to skirt the antitrust laws would support a strong inference that statements Altria made months later to investors about JUUL were fraudulent.  As the Seventh Circuit has observed,

---

[11]    Altria later discontinued its sales of all e-vapor products for business reasons.  *See* Ex. 42 (Press Release, Dec. 7, 2018).  Plaintiffs do not allege that this decision was in any way connected to the commitments that Altria made to the FDA.

"antitrust offenses have no apparent link to fraud." *Higginbotham*, 495 F.3d at 758.  Without a

pleaded connection to the statements plaintiffs challenge, a "stray allegation of wrongdoing …

does not help establish scienter." *Knox* v. *Yingli Green Energy Holding Co. Ltd.*, 242 F. Supp.

3d 950, 973 (C.D. Cal. 2017); *Shaffer Smith, 2424, LLC* v. *Foster*, 168 F. Supp. 3d 654, 660

(S.D.N.Y. 2016) (unrelated misconduct "does not suggest … intent to commit securities fraud").

**C.      The most compelling inference is that defendants believed
         Altria was paying a fair price for its investment in JUUL.**

Under the PSLRA, not only must plaintiffs plead an inference of fraud that is "cogent and

compelling," they must plead one that is "*at least as compelling* as any opposing inference of

*non*fraudulent intent." *Tellabs*, 551 U.S. at 324 (emphasis added).  Here, the most compelling

inference is the simplest and most obvious one—Altria believed it was paying a fair price for its

investment in JUUL and simply underestimated the risks that later materialized.

All of the pleaded facts support this conclusion.  As the complaint alleges, Altria had

compelling business reasons to invest in JUUL when it did:  sales of combusted cigarettes were

declining at an accelerating pace, Altria's proprietary e-cigarette businesses had foundered, and

JUUL's products were dominating the market.  At the time, it was well known that underage

usage was a significant issue, and Altria candidly warned that this was a "big problem" that "put

the whole category at risk."  Knowing the risks, analysts and investors praised the deal, calling it

"a strategic move" and "the absolute right decision."  ¶ 545.  And for several months, it appeared

to be a success, with JUUL continuing its strong performance in the first two quarters of 2019.

But in the summer of 2019, things turned.  Congress held hearings on youth vaping, the

pending actions against JUUL were consolidated in an MDL, and an outbreak of vaping-related

lung illnesses led to vapor bans across the country and diminished demand for JUUL products.

Altria didn't hide these issues.  At the end of the third quarter, it promptly recorded an

impairment charge that was in line with write downs taken by other JUUL investors.  In the fourth quarter, observing an 80% increase in suits against JUUL, Altria took another impairment to reflect the continued drag of litigation on JUUL's prospects.

That is not a story of fraud—it is a story of an investment gone sideways.  While hindsight may now show that Altria misjudged the risks of investing and was overly optimistic about JUUL's prospects, "[e]very prediction of success that fails to materialize cannot create … an action for securities fraud." *Raab*, 4 F.3d at 291.  "The market has risks; the securities laws do not serve as investment insurance." *Id.*  Altria's "inability to foresee the future" for JUUL does not state a claim under Section 10(b). *Hillson*, 42 F.3d at 213.[12]

## POINT IV

## PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION

Plaintiffs also fail to allege that Altria's acts or omissions "caused the loss for which [they] seek[] to recover damages," which is a third and independent basis for dismissal.  15 U.S.C. § 78u-4(b)(4).  To show loss causation, plaintiffs must allege:  "(1) the 'exposure' of the defendant's misrepresentation or omission, *i.e.*, the revelation of 'new facts suggesting [that the defendant] perpetrated a fraud on the market,' and (2) that such exposure 'resulted in the decline of [the defendant's] share price.'" *Singer*, 883 F.3d at 445 (quoting *Katyle*, 637 F.3d at 471). Loss causation must be pleaded with "sufficient specificity," a standard "largely consonant with Fed. R. Civ. P. 9(b)[]." *Katyle*, 637 F.3d at 471.

Because stocks move up and down every day for any number of reasons, plaintiffs cannot plead loss causation merely by citing a decline in Altria's stock price—they must show that it

---

[12]     Because plaintiffs fail to plead scienter for any individual defendant, they also fail to establish corporate scienter for Altria. *Hunter*, 477 F.3d at 184.

"fell significantly." *Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 347 (2005). As a general matter, "securities complaints tend to be predicated on double digit declines," which occur after the "truth" is exposed to the market. *Carey Camp* v. *Qualcomm Inc.*, 2020 WL 1157192, at *6 (S.D. Cal. Mar. 10, 2020). That never happened here. Plaintiffs instead attempt to satisfy their statutory burden by stringing together *eight* unconnected drops in Altria's stock—taking place over nearly *a year*—including three after this suit was filed. Not one of these drops revealed "new facts suggesting [Altria] perpetrated a fraud on the market." *Katyle*, 637 F.3d at 471.

    *a. FDA investigation.* On April 3, 2019, the FDA announced that it was investigating 35 reports of seizures following use of e-cigarettes and Altria's stock fell 4.78%. ¶¶ 478-479. Nothing in the FDA's announcement remotely suggested that Altria had lied to investors about JUUL—that it knew and concealed the information the FDA announced beforehand. On its face, the announcement did not even *mention* JUUL. *See* Ex. 43. And some of the reports of seizures being investigating by the FDA dated back to 2010—five years before JUUL was founded. *Id.* The FDA also specifically said that it didn't "yet know if there's a direct relationship between the use of e-cigarettes and a risk of seizure," and that some of the individuals who experienced seizures had a "history of seizure diagnosis" or used e-cigarettes with "marijuana or amphetamines." *Id.* Plaintiffs fail to explain why the announcement of an industry-wide inquiry into the health effects of e-cigarettes would reveal that Altria lied to investors about JUUL.[13]

    *b. FTC investigation.* On August 29, 2019, the *Wall Street Journal* reported that the FTC was investigating JUUL's marketing practices and Altria's stock fell 3.49%. ¶¶ 501-502. The substance of this announcement revealed nothing new to investors—it was yet another

---

[13]    Notably, Altria's stock regained virtually all of its losses in days, closing *higher* by April 11 than before the FDA inquiry was announced. *See* Ex. 44 (Altria Stock Chart).

investigation into the *same exact subject* that the market already knew was being reviewed by the FDA and state AGs.  In any case, courts have repeatedly recognized that the mere "announcement of an investigation … is insufficient to establish loss causation."  *Loos* v. *Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014).  While a company's stock price may fall, "that is because the investigation can be seen to portend an added risk of future corrective action.  That does not mean that the investigation[] … reveal[s] to the market that a company's previous statements were false or fraudulent."  *Meyer* v. *Greene,* 710 F.3d 1189, 1201 (11th Cir. 2013).

    ***c. FDA/CDC investigation.***  On August 30, 2019, the FDA and CDC announced they were investigating e-vapor lung injuries and Altria's stock fell 1.15%.  ¶ 504.  Substantively, this announcement revealed nothing new to the market—the CDC had already announced that it was investigating these injuries 13 days earlier, on August 17.  *See* Ex. 18; *Hunter*, 477 F.3d at 187 (no loss causation where "facts had already been disclosed").  Further, it is unclear how plaintiffs can contend that the FDA/CDC investigation revealed "fraud," when it ultimately concluded that these injuries was caused by black market vapes with vitamin E acetate—not JUUL.  Plaintiffs also fail to explain why a 1% drop in Altria's stock suggests "fraud," when Altria's stock moved up or down at least 1% on *twelve* of twenty two trading days in August alone.  *See* Ex. 44.

    ***d. Vaping regulation.***  On September 11 and 12, 2019, the media reported that the Trump administration was preparing a ban on flavored e-cigarettes, ¶ 506, and that "New Jersey could become the latest state to restrict e-cigarette use."  ¶ 507.  Oddly, plaintiffs claim that these disclosures caused a 5.51% drop in Altria's stock price on September 13.  ¶ 508.  Plaintiffs plead no explanation as to why the market didn't react on the days these announcements were actually made.  And in any case, there is no credible assertion that Altria misled investors about the risk that regulation posed to JUUL's business—to the contrary, it warned that "the expected benefits

of the JUUL transaction ... may not materialize … due to … regulatory risks at the international federal and state levels, including actions by the FDA." Ex. 45 (Feb. 26, 2019 Form 10-K).

Even leaving apart Altria's disclosures, the possibility of bans on e-cigarettes was well known to investors.  The FDA, for example, said it was "seriously considering a policy change that would lead to the immediate removal of … flavored products from the market" in September 2018—four months before Altria even invested in JUUL.  Ex. 1.  And while plaintiffs point to the New Jersey's announcement about a vapor ban, they ignore that Michigan and New York had already announced bans with no alleged reaction in Altria's stock.  Exs. 22-23.  While additional regulation may have been bad for JUUL's business, the "materialization of a known risk, rather than the disclosure of a concealed one," does not establish loss causation.  *Monroe Cty. Emps.' Ret. Sys.* v. *YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 358 (S.D.N.Y. 2014).

   *e.*  **PMI merger.**  On September 25, 2019, Altria issued a press release announcing that it had ceased merger negotiations with Philip Morris and its stock fell 0.42%.  ¶¶ 512-513.  Of the twenty trading days in September, Altria's stock moved more than 0.42% on *fourteen* occasions. *See* Ex. 44.  Plaintiffs offer no explanation as to why the negligible decline they cite is "statistically significant."  *Eng* v. *Edison Int'l*, 2017 WL 1857243, at *4 (S.D. Cal. May 5, 2017) (no loss causation where plaintiff cobbled together six "scanty" declines ranging from 0.79% to 2.71%).  And more importantly, they offer no explanation why ceasing merger discussions with a third party would remotely suggest that Altria's statements about JUUL were fraud.

   *f.*  **Impairments.**  At the end of the third and fourth quarters of 2019, Altria announced it was taking impairments on JUUL and its stock fell 2.5% and 4.2%, respectively.  ¶¶ 518-521. The fact that JUUL's value declined doesn't imply "fraud."  *In re Adient plc*, 2020 WL 1644018, at *24 (S.D.N.Y. Apr. 2, 2020).  Plaintiffs must "plead with particularity how [Altria's] write-

down[s] establish[] why [its] statements were fraudulent." *Caiafa* v. *Sea Containers Ltd.*, 525 F.
Supp. 2d 398, 410 (S.D.N.Y. 2007).  They fail to do that here.  Indeed, while plaintiffs now
contend that the impairments exposed fraud, they appear to forget that this suit was filed a month
*before* the first impairment was taken.  Dkt. 1, Compl. ¶ 5 (Oct. 2, 2019).  If the impairments
revealed that Altria's statements were fraudulent, how did plaintiffs know to sue before they
were taken?  Media sources also reported that other JUUL investors recorded impairments
similar to the one taken by Altria, further refuting any inference of fraud by Altria.  *See Hedge
Fund Darsana Slashes Juul's Valuation*, WALL STREET JOURNAL (Oct. 4, 2019).

      ***g.  SEC investigation.***  On February 21, 2020, the *Wall Street Journal* reported that the
SEC was investigating Altria's disclosures about JUUL and, over the next six days, Altria's
stock fell 12.7%.  ¶¶ 522-523.  But plaintiffs conveniently omit that the multi-day "drop" they
cite coincided exactly with the onset of the COVID-19 pandemic in the United States.  During
the six-day period plaintiffs identify, the *entire market* was down 12.2%.  *See* Ex. 46 (S&P 500
Historical Prices).  If the court needed any reminder that the complaint here is a work of fiction,
this is it.  *See Katyle*, 637 F.3d at 472 ("When the plaintiff's loss coincides with a marketwide
phenomenon causing comparable losses to other investors, … a plaintiff's claim fails when it has
not adequately pled facts which if proven would show that its loss was caused by the alleged
misstatements as opposed to intervening events.") (quotation marks omitted).[14]

## CONCLUSION

      The Altria defendants respectfully request that the claims against them be dismissed with
prejudice.

---

[14]    Plaintiffs' failure to allege a primary violation under Section 10(b) also requires dismissal
of its control person claim under Section 20(a).  *See, e.g.*, *Duratek*, 67 Fed. App'x at 174.

Dated:  July 8, 2020

Respectfully Submitted,

 /s/ EDWARD J. FUHR
Edward J. Fuhr (VSB #28082)
Eric H. Feiler (VSB #44048)
Johnathon Schronce (VSB #80903)
HUNTON ANDREWS KURTH LLP
951 East Byrd Street
Richmond, VA  23219
804-788-8200 (telephone)
804-788-8218 (facsimile)

*Attorneys for Altria Group, Inc.,*
*Howard A. Willard III,*
*William F. Gifford, Jr.*

OF COUNSEL

Stephen R. DiPrima *(pro hac vice)*
Benjamin D. Klein *(pro hac vice)*
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
212-403-1000 (telephone)
212-403-2000 (facsimile)

**CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2020, a true and correct copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ Edward J. Fuhr
Edward J. Fuhr