**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| GABBY KLEIN, et al., | ) |
| | ) |
| Plaintiffs | ) |
| | ) Case No. 3:20-cv-75 |
| v. | ) |
| | ) Hon. David J. Novak |
| ALTRIA GROUP, INC., et al., | ) |
| | ) |
| Defendants. | ) |

**BRIEF IN SUPPORT OF MOTION TO DISMISS OF
DEFENDANTS JUUL LABS, INC., ADAM BOWEN, AND KEVIN BURNS**

## Table Of Contents

Preliminary Statement................................................................................................................ 1

Background ................................................................................................................................ 3

      A.     Altria's Acquisition Of A Minority Stake In JLI.................................................... 3

      B.     The Alleged Wrongdoing By The JLI Defendants .................................................. 4

      C.     Information Regarding JLI's Business That Was Already Publicly
             Available Before The Class Period .......................................................................... 5

Argument ................................................................................................................................ 10

I.      Plaintiffs Lack Statutory Standing To Bring Claims Against The JLI Defendants. ......... 11

II.     Plaintiffs Do Not Plead With Particularity That The JLI Defendants Made A
        Material False Or Misleading Statement. ......................................................................... 14

      A.     Plaintiffs Do Not Plead That The Alleged Misstatements Were Material............ 14

           1.     The "Clear Message" Statement Is Too Vague To Be Material............... 14

           2.     The "Intent" Statements Are Immaterial In Light Of What Was
               Publicly Known At The Time They Were Made. .................................... 15

      B.     Plaintiffs Do Not Allege With Particularity That The JLI Defendants
           Made A False Or Misleading Statement. .............................................................. 20

III.    Plaintiffs Do Not Plead With Particularity That The JLI Defendants Engaged In
        Fraudulent Conduct In Violation Of SEC Rule 10b-5(a) and (c). .................................... 21

IV.    Plaintiffs Do Not Plead Facts Giving Rise To A "Strong Inference" Of Scienter. .......... 23

V.     Plaintiffs Do Not Adequately Plead Loss Causation. ...................................................... 30

Conclusion ............................................................................................................................. 34

**Table Of Authorities**

**Cases**

*In re Altisource Solutions*,
   2015 WL 12001262 (S.D. Fla. Sept. 4, 2015) .........................................................................12

*Bell Atlantic v. Twombly*,
   550 U.S. 544 (2007)..................................................................................................................21

*Blue Chip Stamps v. Manor Drug Stores*,
   421 U.S. 723 (1975)..................................................................................................................12

*Burt v. Maasberg*,
   2013 WL 1314160 (D. Md. Mar. 31, 2013)........................................................................21, 22

*City of Livonia v. Boeing Co.*,
   711 F.3d 754 (7th Cir. 2013) ....................................................................................................30

*Colgate v. Juul Labs*,
   345 F. Supp. 3d 1178 (N.D. Cal. 2018) ......................................................................................9

*In re Conventry Healthcare*,
   2011 WL 1230998 (D. Md. Mar. 30, 2011)...............................................................................11

*Cozzarelli v. Inspire Pharm.*,
   549 F.3d 618 (4th Cir. 2008) ....................................................................................................25

*Duane & Virginia Lanier Tr. v. Sandridge*,
   361 F. Supp. 3d 1162 (W.D. Okla. 2019)..................................................................................12

*Dura Pharm. v. Broudo*,
   544 U.S. 336 (2005)..................................................................................................................11

*ECA v. JP Morgan Chase*,
   553 F.3d 187 (2d Cir. 2009).......................................................................................................24

*In re Fontem Consumer Litig.*,
   2016 WL 11503066 (C.D. Cal. Apr. 22, 2016) .........................................................................15

*Greenhouse v. MCG Capital*,
   392 F.3d 650 (4th Cir. 2004) ...............................................................................................16, 18

*Hernandez v. Mesa*,
   140 S. Ct. 735 (2020).................................................................................................................12

*Hillson Partners v. Adage*,
   42 F.3d 204 (4th Cir. 1994) .......................................................................................................14

*Iron Workers Local 16 v. Hilb Rogal & Hobbs*,
432 F. Supp. 2d 571 (E.D. Va. 2006) ...................................................................................21, 25

*Janus Capital v. First Deriv. Traders*,
564 U.S. 135 (2011)...............................................................................................12, 15, 25

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001)...................................................................................................27

*Katyle v. Penn Nat'l Gaming*,
637 F.3d 462 (4th Cir. 2011) ................................................................................................30

*Knurr v. Orbital ATK*,
294 F. Supp. 3d 498 (E.D. Va. 2018) ...................................................................................27

*Longman v. Food Lion*,
197 F.3d 675 (4th Cir. 1999) ...............................................................................14, 15, 16

*Lorenzo v. SEC*,
139 S. Ct. 1094 (2019)...........................................................................................................22

*Maguire Fin. v. PowerSecure*,
876 F.3d 541 (4th Cir. 2017) .........................................................................................26, 29

*Makor Issues v. Tellabs*,
513 F.3d 702 (7th Cir. 2008) ................................................................................................21

*Matrix Capital v. BearingPoint*,
576 F.3d 172 (4th Cir. 2009) .........................................................................................24, 25

*In re Maximus Sec. Litig.*,
2018 WL 4076359 (E.D. Va. Aug. 27, 2018).................................................................31, 32

*Ontario Pub. Serv. Emps. v. Nortel Networks*,
369 F.3d 27 (2d Cir. 2004)...........................................................................................12, 13

*Phillips v. LCI Int'l*,
190 F.3d 609 (4th Cir. 1999) .........................................................................................16, 18

*Raab v. Gen'l Physics*,
4 F.3d 286 (4th Cir. 1993) ............................................................................................14, 16

*Santa Fe Indus. v. Green*,
430 U.S. 462 (1977).................................................................................................................22

*Stoneridge Inv. Partners v. Scientific-Atlanta*,
552 U.S. 148 (2008)...........................................................................................................12, 23

*Tellabs v. Makor Issues & Rights*,
   551 U.S. 308 (2007)..................................................................................5, 11, 24

*TSC Indus. v. Northway*,
   426 U.S. 438 (1976)........................................................................................14, 18

*Tuosto v. Philip Morris*,
   2007 WL 2398507 (S.D.N.Y. Aug. 21, 2007).......................................................23

*Walleye Trading v. AbbVie*,
   2020 WL 3410942 (7th Cir. June 22, 2020) ..........................................................12

*Wilson v. Merrill Lynch*,
   671 F.3d 120 (2d Cir. 2011)..................................................................................22

*Yates v. Mun. Mortg.*,
   744 F.3d 874 (4th Cir. 2014) ..........................................................11, 23, 24, 25, 29

*Ziglar v. Abbasi*,
   137 S. Ct. 1843.....................................................................................................12

## Statutes & Rule

15 U.S.C. § 78j(b)..............................................................10, 11, 12, 13, 15, 21, 23, 29

15 U.S.C. § 78u-4(b)(1) ...........................................................................................11

15 U.S.C. § 78u-4(b)(2)(A).................................................................................11, 24

17 C.F.R. § 240.10b-5.................................................................................10, 12, 21, 22

Fed. R. Civ. P. 9(b) .................................................................................................11

iv

**Table Of Exhibits**

| Ex. # | Description | Date Published |
|---|---|---|
| 1 | Social Underground: "Pax Labs: Origins With James Monsees" https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/ | Jan. 2015 |
| 2 | FDA Letter to Juul Labs, Inc. https://www.fda.gov/media/112339/download | April 24, 2018 |
| 3 | 31 Chem. Res. Toxicol. 431, "Free-Base Nicotine Determination in Electronic Cigarette Liquids by H NMR Spectroscopy" https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6008736/ | May 18, 2018 |
| 4 | 28 Tob. Control 146, "Vaping Versus JUULing: How the Extraordinary Growth and Marketing of JUUL Transformed the US Retail E-cigarette Market" https://tobaccocontrol.bmj.com/content/28/2/146 | May 31, 2018 |
| 5 | Washington Times: "JUUL Sales Among Young People Fueled By Social Media" https://www.washingtontimes.com/news/2018/jun/4/juul-sales-among-young-people-fueled-by-social-med/ | June 4, 2018 |
| 6 | Massachusetts Attorney General Press Release: "AG Healey Announces Investigation into JUUL, Other Online E-Cigarette Retailers Over Marketing and Sale to Minors" https://www.mass.gov/news/ag-healey-announces-investigation-into-juul-other-online-e-cigarette-retailers-over-marketing | July 24, 2018 |
| 7 | USA Today: "Vaping company JUUL investigated by Massachusetts for allegedly marketing to minors" https://www.usatoday.com/story/tech/2018/07/25/juul-under-investigation-allegedly-marketing-minors/834760002/ | July 25, 2018 |
| 8 | Washington Post: "E-cigarette maker Juul targeted teens with false claims of safety, lawsuit says" https://www.washingtonpost.com/news/to-your-health/wp/2018/07/30/e-cigarette-maker-juul-targeted-teens-with-false-claims-of-safety-lawsuit-claims/ | July 30, 2018 |

| 9 | New York Times: "Did Juul Lure Teenagers and Get 'Customers for Life'?"<br><br>https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html | Aug. 27, 2018 |
|---|---|---|
| 10 | FDA Press Release: "FDA takes new steps to address epidemic of youth e-cigarette use, including a historic action against more than 1,300 retailers and 5 major manufacturers for their roles perpetuating youth access"<br><br>https://www.fda.gov/news-events/press-announcements/fda-takes-new-steps-address-epidemic-youth-e-cigarette-use-including-historic-action-against-more | Sept. 11, 2018 |
| 11 | CDC Press Release: "Sales of JUUL e-cigarettes skyrocket, posing danger to youth"<br><br>https://www.cdc.gov/media/releases/2018/p1002-e-Cigarettes-sales-danger-youth.html | Oct. 2, 2018 |
| 12 | North Carolina Attorney General Press Release: "Attorney General Josh Stein Announces Investigation into E-Cigarette Maker Juul"<br><br>https://ncdoj.gov/attorney-general-josh-stein-announces-investigatio-d1/ | Oct. 15, 2018 |
| 13 | Reuters: "JUUL's social media campaign resonates alarmingly with teens"<br><br>https://www.reuters.com/article/us-health-juul-kids/juuls-social-media-campaign-resonates-alarmingly-with-teens-idUSKCN1MW2UT | Oct. 22, 2018 |
| 14 | Altria Third Quarter 2018 SEC Form 10-Q<br><br>https://www.sec.gov/Archives/edgar/data/764180/000076418018000095/a2018form10qq32018.htm | Oct. 25, 2018 |
| 15 | Forbes: "The Disturbing Focus Of Juul's Early Marketing Campaigns"<br><br>https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#1607927814f9 | Nov. 16, 2018 |

| 16 | Business Insider: "The FDA is preparing to crack down on e-cigs like the Juul — here's why vaping is so dangerous" https://www.businessinsider.com/vaping-e-cigs-juul-health-effects-2018-10 | Nov. 18, 2018 |
|---|---|---|
| 17 | Juul Labs Press Release: "JUUL Statement About Altria Minority Investment And Service Agreements" https://www.juullabs.com/juul-statement-about-altria-minority-investment-and-service-agreements/ | Dec. 20, 2018 |
| 18 | Altria Press Release: "Altria Makes $12.8 Billion Minority Investment In JUUL To Accelerate Harm Reduction And Drive Growth" https://www.sec.gov/Archives/edgar/data/764180/000119312518353970/d660871dex991.htm | Dec. 20, 2018 |
| 19 | CNBC: "As Juul grapples with teen vaping 'epidemic,' CEO tells parents 'I'm sorry'" https://www.cnbc.com/2019/07/13/as-juul-deals-with-teen-vaping-epidemic-ceo-tells-parents-im-sorry.html | July 13, 2019 |
| 20 | Hearing Before the House Committee on Oversight and Reform, Subcommittee on Economic and Consumer Policy https://docs.house.gov/meetings/GO/GO05/20190725/109846/HHRG-116-GO05-Wstate-MonseesJ-20190725.pdf | July 25, 2019 |
| 21 | L.A. Times: "Column: Studies show how Juul exploited social media to get teens to start vaping" https://www.latimes.com/business/story/2019-09-24/hiltzik-juul-target-teens | Sept. 24, 2019 |
| 22 | Transcript of December 20, 2019, Telebriefing: Update on Lung Injury Associated with E-cigarette Use, or Vaping https://www.cdc.gov/media/releases/2019/t1220_telebriefing_update_lung_injury.html | Dec. 20, 2019 |

**Preliminary Statement**

This putative securities fraud class action arises out of Altria Group's 2018 acquisition of a minority stake in Juul Labs, Inc. ("JLI"), a private company with no public market for its stock. The case is brought on behalf of a putative class of investors who purchased *Altria* securities after Altria's investment in JLI, between December 2018 and February 2020 (the "Class Period"). Plaintiffs' central assertion is that JLI and its principals (and Altria and its principals) deceived these Altria investors about whether JLI intended to design and market JLI's products to persons under the legal purchase age.

Plaintiffs' complaint reads more like a product liability complaint than a securities fraud complaint—because it is. Plaintiffs have "borrowed," nearly word-for-word in many instances, allegations from product liability complaints filed against JLI. Indeed, Plaintiffs' allegations of supposedly false statements do not appear until page 122 of their 160-page complaint.

Plaintiffs' use of product liability allegations to attempt to plead a securities fraud claim runs into an immediate problem: Plaintiffs' allegations of supposedly misleading statements rely extensively on information known publicly *before* Plaintiffs and members of the putative class acquired Altria securities. Indeed, the footnotes to Plaintiffs' complaint, where Plaintiffs provide sources for their allegations, are littered with citations to years-old newspaper and academic articles making the same allegations that Plaintiffs now allege Altria investors did not know.

Additionally, rather than sue just the company in which they invested, Plaintiffs also sue JLI and its former officers Adam Bowen, Kevin Burns, and James Monsees (the "JLI Defendants"). Their claims against the JLI Defendants principally concern statements made by one or more of the JLI Defendants asserting that JLI never intended underage persons to use JLI's products. Yet each of those statements also explained that underage persons *were* using electronic nicotine devices, including JLI's products. Plaintiffs also claim as fraudulent a statement

1

by JLI's CEO about the "message" Altria's investment sent about JLI's technology, but the statement is a classic example of subjective corporate optimism to which investors pay no attention. Plaintiffs' claim that these statements violated the securities laws is deficient for five independent reasons.[1]

First, Plaintiffs lack statutory standing to sue JLI or its officers. Plaintiffs invested in Altria securities, not JLI securities, which are not publicly traded. The JLI Defendants have no relationship with Altria's investors, none of their alleged misstatements was about Altria's business, and none of their supposedly wrongful actions was directed at Altria or Altria investors. No precedent establishes any right of Altria investors to sue JLI or its officers, and this Court should not break new ground to establish such a cause of action.

Second, Plaintiffs do not plead that the JLI Defendants made a material false or misleading statement. The alleged misstatements are immaterial as a matter of law. Prior to the Class Period, the public record was replete with the same allegations about JLI that Plaintiffs make now and pretend were unknown at the time. Specifically, the federal government and several states had alleged that JLI's products were widely used by underage persons, that the products' design was particularly appealing to underage persons, and that underage users may be particularly vulnerable to nicotine addiction. Many academic articles and stories in major newspapers and magazines had asserted the same. Controlling precedent provides that where the market is informed of allegations of wrongful conduct before an alleged misstatement, the alleged misstatement is not material as a matter of law.

Third, Plaintiffs do not plead with particularity that the JLI Defendants engaged in deceptive conduct.

---

[1] The undersigned also join the arguments presented in the motion to dismiss of James Monsees.

Fourth, Plaintiffs do not plead with particularity facts giving rise to a strong inference that the JLI Defendants acted with intent to deceive Altria investors, as is required to state a claim for securities fraud.  Rather, the strongest inference from the facts alleged in the complaint is that the JLI Defendants had no interest in deceiving investors in Altria's securities and did not intend to affect Altria's stock price.  The JLI Defendants repeatedly acknowledged widespread use by underage persons of electronic nicotine devices, including JLI's products, and not only urged that it be addressed, but explained it was the "biggest risk" to JLI.  These statements belie any attempt to conceal that underage use of JLI's products, and the government investigations and actions, private lawsuits, negative media coverage, and academic attention it precipitated, might endanger JLI's business by harming JLI's reputation and its ability to reach adult smokers.

Finally, Plaintiffs do not adequately plead loss causation because they do not plead that "corrective disclosures" conveyed new information to the market about the alleged fraud of which they complain.

Consequently, Plaintiffs' allegations do not state a claim against the JLI Defendants, and the Court should dismiss the claims against them with prejudice.

### **Background**[2]

#### A.    **Altria's Acquisition Of A Minority Stake In JLI**

JLI makes and sells electronic nicotine devices that "package[] nicotine salts from leaf tobacco into one-time use cartridges or 'pods' that are heated and the resulting vapor is inhaled." (Compl. ¶ 37 (Docket #108))  Altria makes and sells combustible cigarettes, smokeless tobacco products, and wine.  (*Id*. ¶ 35)  Sales of combustible cigarettes have been declining for years. (*Id*. ¶ 332)  On December 20, 2018, as a part of its strategy to address this decline, Altria pur-

---

[2] For purposes of this motion, Defendants accept (as they must) Plaintiffs' well-pled allegations of fact.

chased a 35% stake in JLI for $12.8 billion. (*Id*. ¶ 454)  Concurrent with the investment, Altria and JLI signed agreements whereby JLI would gain access to Altria's retail, marketing, and distribution apparatus, including access to Altria's retail shelf space and direct communications to adult smokers through cigarette package inserts and mailings. (*Id*. ¶ 386)  The agreements also provided that Altria would allow JLI to remain fully independent of Altria. (*Id*.)

**B.      The Alleged Wrongdoing By The JLI Defendants**

Plaintiffs allege that JLI developed a product that "succeeded by hooking millions of youth [and] intercepting millions of adults trying to overcome their nicotine additions." (Compl. ¶ 6)  They allege JLI used three "tactics."  First, JLI allegedly "designed JUUL products to create and sustain addiction" by making those products "much stronger than combustible cigarettes." (*Id*. ¶ 8)  Second, JLI supposedly used "sophisticated mass media and social media" to deceive people "about the purpose and dangers of JUUL products"—particularly a "campaign to mislead consumers into thinking that JLI products were benign smoking cessation devices" and concealing that the products "were far more powerfully addictive than was disclosed." (*Id*. ¶ 9)  Finally, JLI supposedly "targeted kids." (*Id*. ¶ 10)

Plaintiffs then allege that the JLI Defendants made five misstatements during the Class Period about JLI's business that deceived Altria investors.  The first alleged misstatement was made in conjunction with the announcement of Altria's investment in JLI.  Plaintiffs quote an Altria press release that contained a statement from JLI's CEO, Kevin Burns, stating that Altria's investment "sends a very clear message that JUUL's technology has given us a truly historic opportunity to improve the lives of the world's one billion adult cigarette smokers." (*Id*. ¶ 458)  Plaintiffs allege this statement was false and misleading because "(i) JUUL's products were harmful to its users, especially those teenagers to whom JUUL marketed its products; and (ii) none of JUUL's products was approved by the FDA as a reduced harm tobacco product."

4

(*Id*. ¶ 457)  The remaining four alleged misstatements by the JLI Defendants all assert in various words that JLI's "intent was never to have youth use JUUL products."  (*Id*. ¶ 464; *see also id.* ¶¶ 496, 498, 509)  Plaintiffs allege these statements were false and misleading "because JLI knew but failed to disclose that its intent was to have youth use JUUL products."  (*Id*. ¶ 465)

### C.    Information Regarding JLI's Business That Was Already Publicly Available Before The Class Period

Plaintiffs' allegations that they were deceived by the JLI Defendants run directly into what was publicly known before the Class Period began in December 2018.[3]  Plaintiffs cite much of this publicly available information in their complaint.

As Plaintiffs allege, on April 24, 2018, eight months before the Class Period began, the FDA published on its website a letter it had sent to JLI requesting documents "relating to marketing practices and research on marketing, effects of product design, public health impact, and adverse experiences and complaints related to JUUL products."  (Ex. 2 at 1, cited at Compl. ¶ 146 n.88)  In the letter, the FDA explained that it had "growing concern about the popularity of JUUL products among youth."  (*Id*.)  It continued: "JUUL product use appears to be common in middle and high schools based on widespread media reporting describing a rapid growth of use among youth in general and on school property, … research studies, … and social media evidence of youth use."  (*Id*. at 1-2)  Finally, the FDA asserted that "JUUL products may have features that make them more appealing to kids and easier to use, thus causing increased initiation and/or use among youth."  (*Id*. at 2)

---

[3] The Court can consider the articles and press releases cited herein, which are public documents subject to judicial notice, for the fact that such information was publicly available. *Tellabs v. Makor Issues & Rights*, 551 U.S. 308, 322 (2007) (courts may consider on a motion to dismiss "matters of which a court may take judicial notice").

The next month, on May 31, 2018, essentially the entirety of Plaintiffs' case was published in a research paper online—a paper Plaintiffs cite in the complaint.  (Ex. 4, cited at Compl. ¶ 245 n.138)  The paper noted "JUUL's striking appeal to teens and the dramatic increase in JUUL among the youth population since its mid-2015 market debut."  (*Id.* at 1)  It asserted that several aspects of JLI's products and marketing appeared to target those under the legal purchase age and mislead people into believing the products do not pose a risk of addiction:

- "The characteristics that purportedly make JUUL more popular among youth than its predecessors include its trendy design (called the 'iPhone of e-cigarettes'); youth-friendly flavours like Fruit Medley and Crème Brulee; and JUUL's discreet profile—teens even report having vaped in class."  (*Id.*; internal footnotes omitted)

- "JUUL is reported to contain high levels of nicotine (0.7 mL or 59 mg/mL per pod) and uses a proprietary e-liquid formula (JUULsalts) based on the nicotine salts found in leaf-based tobacco rather than free-based nicotine.  Consequently, JUUL is said to deliver a nicotine peak in about 5 min, and can create an experience more like combustible cigarette smoking than found with other e-cigarettes on the market, an attribute appealing to both youth and adult smokers."  (*Id.*; internal footnotes omitted)

- "Concerns have been voiced regarding the youth of the men and women portrayed in JUUL's advertising in combination with the product design, which critics believe 'misleads about' risk of addiction."  (*Id.*)

On June 4, 2018, The Washington Times published an article with the headline "JUUL Sales Among Young People Fueled By Social Media."  (Ex. 5)  The article quoted a researcher who asserted that JLI is "taking advantage of the reach and accessibility of [social media] platforms to target the youth and young adults."  (*Id.* at 2)  The article also characterized the FDA's April announcement (*supra* at 5) as "a blistering attack on e-cigarette retailers, and JUUL in particular, for failing to curb illegal sales to youth."  (Ex. 5 at 3)

On July 24, 2018, the Attorney General of Massachusetts issued a press release announcing an investigation into JLI and others.  (Ex. 6)  The press release asserted that "[t]he tobacco and vaping industries use sweet flavors to make their products appeal to youth."  (*Id.* at 3)  It reported that "a 2016 report by the U.S. Surgeon General" concluded that "e-cigarette use has in-

6

creased 900 percent among high school students in the United States" over the "last few years." (*Id.*) Finally, the press release asserted that "[t]he e-liquid contained in JUUL pods has a notably high nicotine concentration of 5 percent. Vaping one pod is equivalent to 200 puffs or one whole pack of traditional combustible cigarettes." (*Id.* at 4) On July 25, 2018, an article in USA Today further publicized the Attorney General's allegations, reporting that JLI "is being investigated for allegedly marketing to minors." (Ex. 7 at 1)

On July 30, 2018, still more than four months before the Class Period began, a Washington Post article asserted that "Juul Labs has claimed its product is for adult smokers only, but several lawsuits contradict that mission. The filings allege the start-up deceptively marketed the Juul as safe and targeted youth from the get-go." (Ex. 8 at 2)[4] The article also explained that the lawsuits alleged that "the Juul device is 'more potent than a cigarette,' allowing high levels of nicotine to enter the bloodstream at a faster speed than cigarettes" and that this information "ought to have been disclosed but was not." (*Id.*) Finally, the article reported, the lawsuit "alleges that Juul's advertising campaigns, primarily through social media, targeted youths under the legal smoking age." (*Id.* at 3)

On August 27, 2018, a New York Times article reported that JLI's marketing campaign was "at the heart of a federal investigation into whether the company intentionally marketed its devices to youth." (Ex. 9 at 1) According to the article, "[t]he FDA has ordered Juul to turn over the company's research and marketing documents, including focus group data and toxicology reports, to determine whether it intentionally courted the youth market." (*Id.* at 2) The article asserted that the design of JLI's products "give[] smokers a more cigarette-like experience, but medical researchers say it also makes the product more addictive for youth." (*Id.* at 3) Finally,

---

[4] *See* the brief of the Altria Defendants, at 8 n.2 (Docket #118).

the article publicized FDA-commissioned research "that found 'limited evidence' that e-cigarettes lead smokers to quit." (*Id*. at 2)

On September 11, 2018, the FDA issued a press release announcing "a series of critical and historic enforcement actions related to the sale and marketing of e-cigarettes to kids"—"the largest coordinated enforcement effort in the FDA's history." (Ex. 10 at 1)  The press release stated that the FDA saw "clear signs that youth use of electronic cigarettes has reached an epidemic proportion." (*Id*.)  Underage use was "especially concerning to the FDA because the developing adolescent brain is particularly vulnerable to nicotine addiction." (*Id*. at 3)

On October 2, 2018, the U.S. Centers for Disease Control and Prevention issued a press release asserting evidence of extensive underage use of electronic nicotine devices and alleging that "JUUL contains among the highest nicotine content of any e-cigarette on the U.S. market." (Ex. 11 at 1)  The CDC's director said: "We are alarmed that these new high nicotine content e-cigarettes, marketed and sold in kid-friendly flavors, are so appealing to our nation's young people." (*Id*.)

On October 15, 2018, the Attorney General of North Carolina announced he was investigating JLI. (Ex. 12)  In the announcement, he stated: "The use of e-cigarettes among young people is increasing at staggering rates…. Juul dominates the market.  I am extremely concerned about the way Juul has marketed its product to young people, who face increased risk for addiction and exposure to health problems." (*Id*.)

On October 22, 2018, Reuters published an article about underage use of JLI's products. (Ex. 13)  The article asserted that "JUUL is attracting an alarming number of teens online." (*Id*. at 1)  It continued:

> Experts say part of JUUL's appeal to teens may be the way the product looks and how it's marketed.  The device looks like a flash drive and it can be plugged into

8

a computer to recharge.  It is available in multiple colors and comes in an attractive package.  The e-liquid comes in numerous youth-friendly flavors, such as mango and fruit medley, and is packaged in a "pod."

(*Id*. at 2)  The article also quoted a doctor as asserting that "The marketing strategies JUUL is using 'are definitely reminiscent of the way tobacco companies used to target youth.'"  (*Id*.)

On October 25, 2018, Altria filed its SEC Form 10-Q for the third quarter of 2018.  (Ex. 14)  In that filing, Altria specifically disclosed the FDA's new campaign to end the use of electronic nicotine devices by those under the legal purchase age.  (*Id*. at 73)

On October 30, 2018, the court presiding over a federal lawsuit relating to JLI's advertising and labelling of its products issued a public ruling on JLI's motion to dismiss.  *See Colgate v. Juul Labs*, 345 F. Supp. 3d 1178 (N.D. Cal. 2018).  The decision summarized the plaintiffs' allegations, including "that nicotine salts are absorbed into a user's body faster and create a more pronounced effect than the nicotine in traditional cigarettes" and that a scientific study had found "that JUUL's pods contain 6.2% nicotine salt, rather than the 5% nicotine advertised."  *Id*. at 1184.  The decision also described allegations that JLI's "advertisements featured young men and women using JUUL's" devices and that "JUUL's ads utilize the same themes that tobacco companies used to advertise to young people, including 'independent, adventurousness, sophistication, … and being cool."  *Id*.  It also described JLI's alleged use of "a number of social media platforms," as well as a study that found such social media advertising to be highly effective.  *Id*. at 1185.

On November 16, 2018, still more than a month before the Class Period began, Forbes published a lengthy article regarding JLI's marketing.  (Ex. 15)  The article published pictures of JLI advertisements, including some of the same pictures Plaintiffs include in their complaint.  (*Compare id*. at 1 *with* Compl. ¶ 212)  The article asserted that, although JLI had stopped selling fruit flavored pods in stores, it continued to sell mint flavor, "which also appeals to young peo-

9

ple." (Ex. 15 at 4)  It also noted that at least four lawsuits had been filed alleging that JLI "deceptively marketed its product as safe and targeted underage and nonsmokers." (*Id*. at 5)  Finally, the article wrote, "Juul's efficacy as a cessation tool is being questioned" because CDC research "found it's unclear as to whether or not e-cigarettes are as effective at getting people off cigarettes as proven FDA-approved cessation therapies." (*Id*. at 11)

On November 18, 2018, a Business Insider article highlighted a study published in Summer 2018 wherein "scientists concluded that there was substantial evidence tying daily e-cig use to an increased risk of heart attack." (Ex. 16 at 5)  It also explained that JLI "is facing a growing backlash from the FDA and scientists who say the company intentionally marketed to teens." (*Id*. at 7)

To summarize, before any putative class member purchased any Altria securities at issue, it was public knowledge, including by way of articles in newspapers and magazines with wide circulation, that there were multiple federal and state investigations into JLI's alleged marketing to underage persons; that multiple product-liability lawsuits had been filed alleging deceptive marketing to underage persons; that JLI products were allegedly more addictive than cigarettes and were dangerous to adolescents, who are more susceptible to nicotine addiction; that JLI's flavored products, including mint, were alleged to be particularly appealing to underage persons; and that JLI's marketing used social media and attractive packaging, which reportedly appealed to underage persons.

## **Argument**

Plaintiffs' primary claim against the JLI Defendants is under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b).  SEC Rule 10b-5, which implements § 10(b), creates liability for fraudulent statements (Rule 10b-5(b)) and for fraudulent conduct (Rule 10b-5(a) and (c)).  17 C.F.R. § 240.10b-5.  Plaintiffs allege both forms of liability against the JLI Defendants.

(Compl. ¶ 574)  To state a claim for fraudulent statements, a plaintiff must allege: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance on the misrepresentation, (5) economic loss, and (6) loss causation.  *Dura Pharm. v. Broudo*, 544 U.S. 336, 341-42 (2005).  To state a claim for fraudulent conduct, a plaintiff must allege (1) it was "injured; (2) in connection with the purchase or sale of securities; (3) by relying on a market for securities; (4) controlled or artificially affected by defendant's deceptive or manipulative conduct; and (5) the defendants engaged in the manipulative conduct with scienter."  *In re Conventry Healthcare*, 2011 WL 1230998, *16 (D. Md. Mar. 30, 2011).

For either type of liability, Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") impose a heightened pleading standard.  *See Tellabs*, 551 U.S. at 313.  Rule 9(b) requires a plaintiff to plead "with particularity the circumstances constituting the fraud."  Fed. R. Civ. P. 9(b).  The PSLRA requires a plaintiff to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," and to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(1), (b)(2)(A).  Plaintiffs have not satisfied their pleading burden, and cannot do so, for the five reasons discussed below.[5]

## I.    Plaintiffs Lack Statutory Standing To Bring Claims Against The JLI Defendants.

Plaintiffs' claims against the JLI Defendants fail as a threshold matter because Plaintiffs—purchasers of Altria securities—lack statutory standing to bring a § 10(b) claim against a company whose securities they did not purchase or against officers of that company.  None of

---

[5] Plaintiffs also assert a claim under § 20(a) of the Exchange Act, but that claim is derivative of their § 10(b) claim, and so fails because their § 10(b) claim fails.  *See Yates v. Mun. Mortg.*, 744 F.3d 874, 894 n.8 (4th Cir. 2014) ("Section 20(a) liability is derivative of § 10(b).  Because the complaint is legally insufficient with respect to the § 10(b) claim, the § 20(a) claim must also fail.").

the JLI Defendants is alleged to have made any statements about or taken any actions regarding the company in which Plaintiffs invested. "Stockholders do not have standing to sue under Section 10(b) and Rule 10b-5 when the company whose stock they purchased is negatively impacted by the material misstatement of another company, whose stock they do not purchase." *Ontario Pub. Serv. Emps. v. Nortel Networks*, 369 F.3d 27, 34 (2d Cir. 2004); *see also In re Altisource Solutions*, 2015 WL 12001262, *3-4 (S.D. Fla. Sept. 4, 2015) (dismissing for lack of statutory standing a § 10(b) claim brought by investors in Altisource securities against a spin-off and business partner of Altisource); *Duane & Virginia Lanier Tr. v. Sandridge*, 361 F. Supp. 3d 1162, 1166-67 (W.D. Okla. 2019) (dismissing a § 10(b) claim for lack of statutory standing because the plaintiff did not purchase securities issued by the defendant). As the Supreme Court has explained, the fact that the private right of action under § 10(b) is judicially created "caution[s] against its expansion." *Stoneridge Inv. Partners v. Scientific-Atlanta*, 552 U.S. 148, 165 (2008). The § 10(b) private right is "a judicial oak which has grown from little more than a legislative acorn." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737 (1975). Courts "must give narrow dimensions … to a right of action Congress did not authorize when it first enacted the statute and did not expand when it revisited the law." *Janus Capital v. First Deriv. Traders*, 564 U.S. 135, 142 (2011) (analyzing § 10(b) and Rule 10b-5); *see also Hernandez v. Mesa*, 140 S. Ct. 735, 741-42 (2020) (inferring new statutory rights implicates the separation of powers between the judiciary and the legislature); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855-57 (same); *Walleye Trading v. AbbVie*, 2020 WL 3410942, *2 (7th Cir. June 22, 2020) (applying *Hernandez* and *Abbasi* to the Exchange Act).

The claim in *Ontario Public Service Employees v. Nortel Networks* centered on an investment much like Plaintiffs' here. There, JDS Uniphase invested $2.5 billion in the stock of

12

Nortel Networks, which was principally a telecommunications company. *Ontario Pub. Serv. Emps.*, 369 F.3d at 29. JDS and Nortel had a "healthy business relationship," in addition to JDS's acquisition of Nortel stock. *Id.* In early 2001, Nortel "indicated that it saw strong demand for its fiber optics products and expected 30% growth in revenue and earnings for 2001." *Id.* As a result, the stock price of JDS, which now owned a large stake in Nortel, rose. *Id.* Later that year, Nortel revised its estimate downward, and "JDS shares tumbled in heavy trading." *Id.* Purchasers of JDS securities sued. The Second Circuit affirmed the dismissal of the § 10(b) claim against Nortel because the plaintiffs did not invest in Nortel securities. In reaching that result, the court reasoned that § 10(b) plaintiffs must be "those who have at least dealt in the security to which the prospectus, representation, or omission relates." *Id.* at 32.

The Second Circuit's decision is on all fours with Plaintiffs' claims against the JLI Defendants. Plaintiffs allege they purchased Altria securities, not JLI securities, which are not publicly traded. (Compl. ¶ 22) Plaintiffs further allege that the JLI Defendants' supposed liability stems from statements they made about, and actions they took regarding, JLI's business. Plaintiffs do not allege any statement the JLI Defendants made, or any action they took, regarding Altria's business; rather, they allege only that, because of its investment in JLI, Altria's stock price was affected by JLI's performance. Such a relationship is insufficient to confer statutory standing on Altria investors to bring a § 10(b) claim against JLI or its principals. Finding that an investor has statutory standing to assert a § 10(b) claim under such circumstances would fundamentally change the country's securities laws. Corporations and their officers would face potential liability not only to investors in their company, but to investors in investors in their company. No precedent supports such a result, and the Court should not break new ground.

## II.  Plaintiffs Do Not Plead With Particularity That The JLI Defendants Made A Material False Or Misleading Statement.

Plaintiffs allege the JLI Defendants made five misstatements.  *Supra* at 4-5.  Plaintiffs do not adequately plead that any of those statements were material false or misleading statements.[6]

### A.  Plaintiffs Do Not Plead That The Alleged Misstatements Were Material.

As an initial matter, Plaintiffs do not plead that any alleged misstatement was material. Materiality requires a "substantial likelihood" that the fact at issue "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *TSC Indus. v. Northway*, 426 U.S. 438, 449 (1976).  Plaintiffs do not and cannot plead that any challenged statement was material.

#### 1.  The "Clear Message" Statement Is Too Vague To Be Material.

The statement by JLI CEO Kevin Burns that Altria's investment in JLI "sends a very clear message that JUUL's technology has given us a truly historic opportunity to improve the lives of the world's one billion adult smokers" lacks any objective facts on which investors could rely.  (Compl. ¶ 458); *Longman v. Food Lion*, 197 F.3d 675, 685 (4th Cir. 1999) (The defendant's "public statements about the cleanliness of its stores … are the kind of puffery and generalizations that reasonable investors could not have relied upon when deciding whether to buy stock."); *Hillson Partners v. Adage*, 42 F.3d 204, 212 (4th Cir. 1994) (affirming dismissal because general optimistic statements, like claiming that the company was "'on target toward achieving the most profitable year in its history,' … [are] not to be material as a matter of law"); *Raab v. Gen'l Physics*, 4 F.3d 286, 290 (4th Cir. 1993) (same, because "[a]nalysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from

---

[6] Defendant Adam Bowen is not alleged to have made any of the alleged misstatements; therefore, Plaintiffs do not plead a fraudulent statement claim against him.

14

company spokesmen"). What "message" the act of Altria's investment in JLI sent is plainly a subjective determination, as is whether it presented a "historic opportunity." And even if those parts of the statement were ignored, and the statement was read counterfactually as an assertion that JLI products would improve adult smokers' lives, Burns did not specify any metric for how JLI's technology might do so. Thus, Plaintiffs' allegation that the statement was false because "none of JUUL's products was approved by the FDA as a reduced harm tobacco product" is misguided, for Burns' statement made no claim about health or harm, and there are many ways JLI's technology could improve smokers' lives that are unrelated to health—for example, cost, enjoyment, odor, social approbation, or ease of use. *See In re Fontem Consumer Litig.*, 2016 WL 11503066, *8 (C.D. Cal. Apr. 22, 2016) (holding that statements touting e-cigarettes as the "smarter alternative to regular cigarettes" was puffery and did not contain an explicit health-related message). In sum, Burns' statement is immaterial as a matter of law because it is not the kind of statement a reasonable investor would consider when making a decision whether to invest in Altria securities.

### 2. The "Intent" Statements Are Immaterial In Light Of What Was Publicly Known At The Time They Were Made.

The four "intent" statements—that JLI did not intend for underage use of its products—are also immaterial to investors as a matter of law, for two reasons.

*First*, the facts that Plaintiffs allege the JLI Defendants misrepresented in the "intent" statements were already disclosed to the market before the alleged misstatements were made. Where the market is informed of allegations of wrongful conduct before an alleged misstatement—even where the defendants have denied the supposed wrongful conduct—the alleged misstatements are not material. In *Longman v. Food Lion*, the Fourth Circuit considered a § 10(b) claim against a grocery company for allegedly deceiving the market regarding "widespread vio-

15

lations of federal labor laws." 197 F.3d at 677. However, before the alleged misstatements were made, the union for the company's employees "publicly announced that it had filed a complaint with the Department of Labor, asserting that 183 people had claimed to have illegally worked off the clock." *Id*. at 684. The Fourth Circuit held that "Plaintiffs' securities fraud claim cannot succeed because, despite the fact that Food Lion denied the charges, the nature of the off-the-clock claims and the claims' risk to earnings were in fact well known to the market … and therefore Food Lion's omissions were not material."[7] *Id*.; *see also Phillips v. LCI Int'l*, 190 F.3d 609, 617 (4th Cir. 1999) ("'[E]ven lies are not actionable' when an investor 'possesses information sufficient to call the [mis]representation into question.'") (alteration in original); *Raab*, 4 F.3d at 289 ("[I]n a fraud on the market case, the defendant's failure to disclose material information may be excused where that information has been made credibly available to the market by other sources.").

So too here. Plaintiffs allege the JLI Defendants' "intent" statements were fraudulent because JLI "knew but failed to disclose that its intent was to have youth use JUUL products." (Compl. ¶ 465) But the allegation that JLI marketed its products to underage persons and that the design of its products was intended to appeal to such persons was publicly disclosed *repeatedly* before the alleged misstatements were made. *Supra* at 5-10. For instance, more than four months before the Class Period began, a national newspaper (the Washington Post) detailed many lawsuits that purported to "contradict" JLI's claim that its "product is for adult smokers

---

[7] *Longman* was decided on summary judgment, but that does not distinguish it here because the facts the Court needs in order to properly apply *Longman* are subject to judicial notice. "No shortage of cases … make clear that materiality may be resolved by a court as a matter of law." *Greenhouse v. MCG Capital*, 392 F.3d 650, 657 (4th Cir. 2004) (affirming dismissal).

16

only," noting that the lawsuits "allege the start-up deceptively marketed the JUUL as safe and targeted youth from the get-go." (Ex. 8 at 2)

Each specific allegation Plaintiffs make that they contend establishes JLI's intent was also already disclosed to the market prior to the Class Period. For example, Plaintiffs allege James Monsees admitted that JLI "followed the cigarette industry's playbook" for marketing its products. (Compl. ¶¶ 88-89) But one of the sources Plaintiffs cite for that allegation is an article from 2015—more than three years before the Class Period began. (*Id.* ¶ 88, citing Ex. 1) The same is true for Plaintiffs' other allegations:

- Plaintiffs' allegation that JLI developed a product with minimal "throat hit" is based on an article published in May 2018. (Compl. ¶ 105, citing Ex. 3)

- Plaintiffs' allegation that JLI developed an addictive product is based on a JLI patent application that *Plaintiffs themselves* allege was filed in 2015, and which Plaintiffs allege "all but brags that it surpassed a commercially available combustible cigarette (Pall Mall) in maximum delivery and nearly rivaled how soon it could deliver peak nicotine." (Compl. ¶ 111 n.53); *see also supra* at 6.

- Plaintiffs' allegation that JLI developed an attractive, sophisticated-looking product is based on articles published in 2018, before the Class Period. (Compl. ¶ 122 n.69 & ¶ 123 n.72)

- Plaintiffs' allegation that JLI developed fruit flavors is based on articles that pre-date the Class Period and, in fact, could be seen by anyone looking at the product on the shelves of the local store. (Compl. ¶ 127 n.74 (2009); *id.* ¶ 131 n.77 (2015); ¶ 133 n.79 (2018); ¶ 135 n.81 (2018))

- The allegation that JLI used mint flavor to reach underage persons was made public no later than November 2018—a month before the Class Period. *Supra* at 9-10. Further, Plaintiffs allege that "it was public knowledge that mint and menthol have a well-documented history of facilitating youth tobacco use." (Compl. ¶ 149)

- Plaintiffs' allegation that JLI hired a marketing firm that "declared itself an 'authority on Millennial culture'" is based on an article published in 2015. (Compl. ¶ 207; *id.* ¶ 226 n.133 (2018 article))

- The allegation that JLI used social media to target underage persons was made public in June, July, and October 2018. *Supra* at 6, 7, 9.

17

Thus, Plaintiffs' own allegations belie any assertion that the market was unaware of allegations that JLI intended underage use of its products.

*Second*, the statements regarding JLI's intent are also immaterial as a matter of law because each statement explicitly acknowledged underage *use* of electronic nicotine devices, including JLI's products. At that point, whether JLI *intended* such use was beside the point: Underage persons were using the products and such use was drawing extensive negative attention from federal and state regulators, the private plaintiffs' bar, the media, and academics. As noted above, to be material the fact at issue must have been viewed by the reasonable investor as having significantly altered the "total mix of information" available. *TSC Indus.*, 426 U.S. at 449. The Fourth Circuit has explained that "a 'reasonable investor' is neither an ostrich, hiding her head in the sand from relevant information, nor a child, unable to understand the facts and risks of investing." *Greenhouse*, 392 F.3d at 656. Moreover, "[b]ecause in a fraud-on-the-market case the 'reasonable investor' for materiality purposes is not an individual plaintiff, but the market itself, a statement cannot be material if the hypothetical reasonable investors—that is, the market—would not regard the statement, in context, as significant." *Phillips*, 190 F.3d at 617. "The market may well take a more jaundiced view of corporate statements … than an individual investor." *Id*.

Here, non-ostrich investors could not have missed allegations that underage use of JLI's products was widespread—indeed, the JLI Defendants' purported misstatements acknowledged that fact—and that JLI stated such use was a problem for JLI. For instance, in James Monsees' July 25, 2019 Congressional testimony, he explained that "the data clearly show a significant number of underage Americans" were using JLI products. (Ex. 20 at 1) He then asserted: "That is a serious problem." (*Id*.) And that problem, he explained, was not just to those underage us-

18

ers, *but to JLI itself*: "When minors use our product, far from benefiting our business, it causes direct harm. Indeed, *the single biggest risk to our company* is that unabated growth in underage usage will cause us to lose our ability to reach our true intended market of adult smokers." (*Id.* at 5, emphasis added) The other alleged "intent" misstatements all also acknowledged widespread underage use of JLI's products. Thus, in the December 20, 2018 press release, JLI immediately followed the alleged misstatement that "our intent was never to have youth use JUUL" by stating: "But intent is not enough, the numbers are what matter, and the numbers tell us underage use of e-cigarette products is a problem." (Ex. 17 at 1) The July 13, 2019 article where Kevin Burns made the alleged misstatement that JLI products are "not intended for them" also explained that "[t]he Food and Drug Administration has declared teen vaping an 'epidemic,' citing federal survey data that showed nearly 21% of high school students vaped last year" and that "Former FDA Commissioner Scott Gottlieb and health care advocates blame the surge in teen vaping on Juul." (Ex. 19 at 1) And the September 24, 2019 L.A. Times article that contained the alleged misstatement "[w]e have never marketed to youth and we never will," also stated: "That's what the San Francisco company says, anyway. But its advertising strategy has assiduously cultivated young consumers, with great success. That's the finding in a serious of studies from Stanford University that have turned a spotlight on how JUUL exploited social media and the tastes of young adults to target a youth market." (Ex. 21 at 2-3)

Plaintiffs do not, and could not possibly, allege that the market failed to understand that the attention that all the above facts and allegations were bringing from federal and state regulators, private litigants, the media, and academic studies could negatively impact JLI's value. Indeed, investors could not reasonably have missed the FDA's September 2018 announcement that it was undertaking its largest enforcement action ever, to seek to eliminate underage use of elec-

19

tronic nicotine devices.  *Supra* at 8.  Nor could investors miss that all the attention and scrutiny could impact JLI's reputation or lead to new restrictions on sales, either one of which could hamper JLI's ability to reach adult smokers.  Thus, Plaintiffs do not plead facts establishing any plausible claim that Altria investors were deceived regarding the risk of Altria's investment in JLI, based solely on the publicly available information regarding underage use and the response to that use.

**B.      Plaintiffs Do Not Allege With Particularity That The JLI Defendants Made A False Or Misleading Statement.**

Independent of the materiality arguments above, Plaintiffs do not plead with particularity that the JLI Defendants' statements were false or misleading.  First, with respect to the statement that Altria's investment in JLI "sends a very clear message that JUUL's technology has given us a truly historic opportunity to improve the lives of the world's one billion adult cigarette smokers" (Compl. ¶ 458), Plaintiffs do not plead the statement was false.  They do not allege any facts that contradict the "message" Burns said the investment sent.  They allege the statement was false because "JUUL's products were harmful to its users, especially those teenagers to whom JUUL marketed its products."  (*Id.* ¶ 457)  But the statement was expressly about adults, not teenagers, and Plaintiffs do not allege JLI's products are more harmful than cigarettes.  Regardless, the statement made no mention of health benefits, and Plaintiffs do not plead any facts establishing that the investment did not create an opportunity to improve the lives of adult smokers according to at least some metrics, such as cost, ease of use, or others.  *Supra* at 15.

Second, Plaintiffs do not plead with particularity facts establishing that JLI intended underage use of its products.  Plaintiffs allege James Monsees admitted that JLI "carefully studied the marketing strategies, advertisements, and product design revealed in cigarette industry documents."  (Compl. ¶ 88)  But Plaintiffs do not plead with particularity facts establishing that

20

Monsees made any such admission.  Plaintiffs cite two sources for their assertion, neither of which states that Monsees said JLI followed the cigarette industry's marketing or advertising practices.  (*Id.* ¶¶ 88 n.26, 89 n.27)  Thus, Plaintiffs' allegation lacks particularity, because Plaintiffs do not allege when and where Monsees made this supposed admission.  *E.g.*, *Iron Workers Local 16 v. Hilb Rogal & Hobbs*, 432 F. Supp. 2d 571, 579 (E.D. Va. 2006).  No other allegations concern JLI's intent.  *See Bell Atlantic v. Twombly*, 550 U.S. 544, 555-57 (2007) (allegations of wrongdoing must be more than just consistent with wrongdoing, but actually suggestive of it).[8]  As a result, Plaintiffs do not allege with particularity facts that establish JLI intended underage use of its products.  Therefore, Plaintiffs do not allege with particularity that the statements that JLI never intended underage use were false or misleading.

### III.    Plaintiffs Do Not Plead With Particularity That The JLI Defendants Engaged In Fraudulent Conduct In Violation Of SEC Rule 10b-5(a) and (c).

Plaintiffs also fail to allege that the JLI Defendants engaged in deceptive or manipulative conduct in violation of SEC Rules 10b-5(a) and (c).  *Supra* at 10-11.  Claims under these subsections must be pled with particularity, like any other § 10(b) claim: "plaintiffs must specify what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue."  *Burt v. Maasberg*, 2013 WL 1314160, *15 (D. Md. Mar. 31, 2013).

---

[8] Plaintiffs allege JLI purchased ads on various youth-oriented websites.  (Compl. ¶ 217)  They do not allege the JLI individual defendants knew of any such purchases.  Nor do they allege the knowledge of any other individual whose knowledge qualifies as JLI's knowledge under the securities laws.  *See Makor Issues v. Tellabs*, 513 F.3d 702, 708 (7th Cir. 2008) ("To establish corporate liability for a violation of Rule 10b-5 requires look[ing] to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like).").  Thus, they do not allege the JLI Defendants were aware of any such ad purchases.

21

Plaintiffs plead no such conduct here.  They appear to base their conduct claim on the allegation that "the JLI Defendants participated directly or indirectly in the preparation and/or issuance of JLI's press releases and other statements and documents."  (Compl. ¶ 576)  Any such claim fails for the same reasons discussed above regarding Plaintiffs' claim for fraudulent statements.  *Supra* Part II; *see also Burt,* 2013 WL 1314160 at *23 ("These claims are largely duplicative of plaintiffs' claims under Rule 10b-5(b).  For similar reasons, they have not met the stringent pleading requirements of the PSLRA.").[9]

*Lorenzo v. SEC*, 139 S. Ct. 1094 (2019), the most recent Supreme Court decision on conduct liability, does not support any conduct claim here.  In *Lorenzo*, an investment banker had sent emails advertising an investment in a company with "$10 million in confirmed assets," even though the banker knew the "assets were in fact worth less than $400,000."  *Id.* at 1099.  Although the Court assumed the banker could not be held liable for fraudulent statements under Rule 10b-5(b) because he was not the "maker" of the statements under the law (rather, his supervisor wrote the emails), the Court held he was liable for fraudulent conduct under Rules 10b-5(a) and (c) because he had engaged in deceptive actions by "disseminating" the emails to the plaintiffs.  *Id.* at 1100.  This holding has no application here, where Plaintiffs do not plead any conduct directed to Altria investors by the JLI Defendants.

Finally, Plaintiffs cannot credibly argue that any conduct directed at persons other than Altria investors—such as users of JLI products or regulators—is actionable as conduct-based se-

---

[9] Additionally, Plaintiffs cannot allege the JLI Defendants' actions "manipulated" Altria's stock price: "The Supreme Court has observed that the word 'manipulative' is 'virtually a term of art when used in connection with securities markets.'"  *Wilson v. Merrill Lynch*, 671 F.3d 120, 129 (2d Cir. 2011).  "The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity."  *Santa Fe Indus. v. Green*, 430 U.S. 462, 476 (1977).

curities fraud. Any such argument would be barred by the Supreme Court's decision in *Stoneridge Investment Partners v. Scientific-Atlanta*, 552 U.S. 148 (2008), which held that conduct-based liability must be conduct that occurred in the "securities markets," not other "realms." *Id.* at 770. Furthermore, for the JLI Defendants' interactions with the FDA or other regulators, any such claim would be barred by the *Noerr-Pennington* doctrine, which protects the right to petition the government. *See, e.g.*, *Tuosto v. Philip Morris*, 2007 WL 2398507, \*5 (S.D.N.Y. Aug. 21, 2007). Lastly, any such argument would fail because Plaintiffs do not allege with particularity how any such actions artificially inflated the price of Altria securities. That is, Plaintiffs assert that JLI persuaded the FDA not to regulate its mint-flavor products, but they do not plead that this artificially inflated the price of Altria securities, rather than that the price of the securities reflected the *accurate* fact that the FDA chose not to regulate the mint flavor. Similarly, Plaintiffs assert that JLI deceptively marketed its products to consumers, but they do not plead that this artificially inflated the price of Altria securities, rather than that the price of Altria securities reflected the *accurate* sales of JLI products. Permitting a claim for actions that allegedly deceived persons other than investors would convert into securities fraud *any* violation of *any* law, federal or state. There is no support for such a radical enlargement of § 10(b). *See Stoneridge*, 552 U.S. at 770 ("Were this concept of reliance to be adopted, the implied cause of action would reach the whole marketplace in which the issuing company does business; there is no authority for such a rule.").

## IV.    Plaintiffs Do Not Plead Facts Giving Rise To A "Strong Inference" Of Scienter.

Independent of their failure to plead other elements of securities fraud, Plaintiffs also fail to adequately plead the scienter element of their claim. Scienter, for a § 10(b) claim, means "a mental state embracing intent to deceive, manipulate, or defraud." *Yates v. Mun. Mortg.*, 744 F.3d 874, 884 (4th Cir. 2014). Further, not only must the defendants have intended to deceive,

23

but they must have intended to deceive *investors in Altria securities*. *See ECA v. JP Morgan Chase*, 553 F.3d 187, 198 (2d Cir. 2009) ("[T]he facts alleged must support an inference of an intent to defraud the plaintiffs rather than some other group."). The Fourth Circuit has held that "severe recklessness" may suffice to establish scienter, but has limited severe recklessness to an act that is "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Yates*, 744 F.3d at 884.

To plead scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). This "strong inference" must be both "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 309. "[A]n inference of scienter can only be strong … when it is weighed against the opposing inferences that may be drawn from the facts in their entirety." *Yates*, 744 F.3d at 885 (alterations in original). "A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Id*. Pleading scienter requires making particularized allegations about each individual defendant. *See, e.g., Matrix Capital v. BearingPoint*, 576 F.3d 172, 182 (4th Cir. 2009).

The most compelling inference from the facts alleged is that the JLI Defendants had no interest in deceiving investors in another company's stock and took all their actions without intent to affect that company's stock price. Most obviously, Plaintiffs provide no plausible reason why the JLI Defendants would be interested in artificially inflating the value of Altria's stock.

24

They do not allege that any of these defendants owned Altria securities or would gain anything if the price of Altria's securities were inflated.  Moreover, in considering competing inferences, the Fourth Circuit has held that courts should consider the defendants' other class period statements. *Yates*, 744 F.3d at 892 ("It is appropriate to consider such disclosures, which in some contexts will indicate that the defendants were acting in good faith.").  Here, the JLI Defendants repeatedly acknowledged, throughout the Class Period, underage use of JLI products and said it was a problem for JLI.  *Supra* at 18-19.  Indeed, during this time Defendant Monsees described underage use as "the single biggest risk to our company."  (Ex. 20 at 5)  The JLI Defendants' disclosure of such information implies they were not seeking to deceive anyone about the threat that underage use presented to JLI.

By contrast, Plaintiffs' allegations of scienter ignore the context in which the JLI Defendants were acting and what information and allegations had already been disclosed about JLI. *Cozzarelli v. Inspire Pharm.*, 549 F.3d 618, 625 (4th Cir. 2008) (courts should not analyze scienter by considering "isolated allegations without considering the necessary context").  Nor do Plaintiffs even attempt to plead scienter specifically as to each individual JLI Defendant, which in and of itself dooms the claim.  *See Matrix Capital*, 576 F.3d at 182 ("the plaintiff must allege facts supporting a strong inference of scienter as to each defendant"); *Iron Workers Local 16*, 432 F. Supp. 2d at 594-95 (rejecting group pleading).

Regardless, each allegation of scienter fails on its own:

*First*, Plaintiffs allege the JLI Defendants knew JLI's prior actions "would result in regulatory action, litigation and other actions that would harm sales of JUUL products."  (Compl. ¶ 526)  As an initial matter, Plaintiffs do not allege facts showing that any of the JLI Defendants knew what effect any actions and proceedings would have on JLI.  Rather, Plaintiffs apparently

25

ask the Court to *infer* it, and then to infer scienter from that first inference.  The Fourth Circuit expressly forbids "stack[ing] inference upon inference to satisfy the PSLRA's pleading standard."  *Maguire Fin. v. PowerSecure*, 876 F.3d 541, 548 (4th Cir. 2017).  As the Fourth Circuit explained:

> Appellant alleges facts that permit an inference that Hinton knew his statement was false, and then asks us to infer from that inference that Hinton acted with scienter. We decline to do so because stacking inference upon inference in this manner violates the statute's mandate that the strong inference of scienter be supported by facts, not other inferences.

*Id*.  Thus, because Plaintiffs' allegation seeks an inference on which Plaintiffs may argue for *another* inference, it is insufficient as a matter of law.

Furthermore, the proposed inference that the JLI Defendants knew regulatory actions and litigation would harm JLI's sales does not suggest scienter anyway, for Plaintiffs do not allege the JLI Defendants offered any estimates of JLI's future sales that were dishonest.  Plaintiffs also ignore the public reality that by the time Plaintiffs acquired their Altria securities, Altria had already acquired its stake in JLI, and JLI was already facing *publicly disclosed* regulatory action and litigation.  *Supra* at 5-10.  Plaintiffs cannot credibly argue that investors were not aware that the regulatory investigations and private litigation created a risk to JLI's value—including at least a reputational risk that could jeopardize sales.  As a result, the pending regulatory investigations and private litigation do not support an inference that the JLI Defendants intended to mislead investors.

*Second*, Plaintiffs allege JLI was "motivated to perpetrate the fraudulent scheme described herein because it stood to benefit from Altria's success, as part of its agreement with Altria provided it with access to Altria's retail, marketing and distribution apparatus."  (Compl. ¶ 527)  This allegation is nonsensical: Plaintiffs do not allege that the JLI Defendants' supposed fraud helped Altria improve its retail, marketing, or distribution capabilities.  Rather, they allege

26

the supposed fraud artificially inflated the price of Altria securities.  But Altria's *stock price* had no effect on Altria's "retail, marketing and distribution apparatus," or on JLI's ability to use it. At the very least, Plaintiffs fail to allege it did.  Thus, even if JLI had some interest in leveraging Altria's retail and marketing relationships, that does not establish that JLI had any reason to artificially inflate Altria's stock price.  While the lack of a motive to defraud is not dispositive, in the absence of any such motive the plaintiff's burden in alleging particularized facts supporting a strong inference of scienter is higher.  *See Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) ("Where motive is not apparent … the strength of the circumstantial allegations must be correspondingly greater.").

<u>Third</u>, Plaintiffs allege scienter may be inferred from the JLI Defendants' knowledge of two supposed facts: (1) that JLI designed its products "to deliver as much nicotine as possible"; and (2) that JLI designed and marketed its products "to appeal to underage users."  (Compl. ¶ 529)  Plaintiffs fail to allege how supposed knowledge of these "facts" supports an inference that the JLI Defendants intended to conceal the potential impact on JLI's value of pending regulatory and litigation matters.  In addition, Plaintiffs again ignore context.  The allegation that JLI's products contain more nicotine than similar products (or combustible cigarettes) and allegations that they are therefore more addictive was widely discussed before the Class Period.  *Supra* at 6-9.  Similarly, the allegation that JLI designed and marketed its products to appeal to underage persons was also widely and repeatedly made.  *Supra* at 5-10.  Alleging that the JLI Defendants knew "facts" that were widely available to everyone does not support any inference that the JLI Defendants had intent to deceive, much less the requisite strong inference.  *See Knurr v. Orbital ATK*, 294 F. Supp. 3d 498, 505 (E.D. Va. 2018) ("Where, as here, red flags … are public knowledge, this fact negates or significantly undercuts any inference of scienter.").

27

To the contrary, any inference of scienter is undercut by the JLI Defendants' repeated acknowledgement that underage use was a *significant* issue that needed to be addressed. These statements suggest the JLI Defendants were not trying to hide the risk to JLI of regulatory and litigation proceedings, but were openly identifying the issue as a risk.

*Fourth*, Plaintiffs allege "Defendants Burns' knowledge of the addictive level of the JUUL product and his disregard for the health and safety of JLI's customers, many of whom are underage users, is evidenced by his internal statement that 'Half our customers are drunk and vaping like mo-fo's,who the fu[*]k is going to notice the quality of our pods,' and is contrary to Monsees pre-Class Period statement to *The New York Times* on August 27, 2018, that selling JUUL products to youth was 'antithetical to the company's mission.'" (Compl. ¶ 529(1)) But Burns' statement has nothing to do with whether JLI products are addictive, whether they are used by those below the legal purchase age, or whether they are healthy or safe. Rather, the statement is about the products' "quality." Moreover, supposedly knowing about the addictive level of JLI's products and disregarding health and safety do not support an inference of deceptive intent—much less *strongly* support such an inference.

*Fifth*, Plaintiffs allege scienter may be inferred from JLI's "efforts to protect the mint flavored pods from regulation by falsely characterizing mint as a traditional cigarette flavor that did not appeal to underage users." (Compl. ¶ 531) As an initial matter, Plaintiffs do not allege any statement by the JLI Defendants that mint "did not appeal to underage users," which itself defeats their argument. Regardless, Plaintiffs do not plead how any such allegation supports an inference that the JLI Defendants acted with intent to deceive, for none of the five alleged misstatements discusses the mint-flavored products. Further, Plaintiffs again ignore that allegations regarding mint flavor's appeal to younger users was already public before the Class Period. *Su-*

28

*pra* at 9-10.  Indeed, Plaintiffs themselves allege "it was public knowledge that mint and menthol have a well-documented history of facilitating youth tobacco use."  (Compl. ¶ 149)  Thus, there is no basis for Plaintiffs' assertion that the supposed characterization of mint as not appealing to underage users supports an inference of intent to deceive.

*Finally*, Plaintiffs allege scienter may be inferred "from the repeated statements by Burns and Altria that JLI never intended to have underage users use JUUL products."  (Compl. ¶ 532)  However, as established above, Plaintiffs do not plead with particularity that JLI intended under-age use of its products.  *Supra* at 20-21.  Further, this allegation improperly combines the falsity element of a § 10(b) misstatement claim with the scienter element.  "[S]cienter and knowledge with respect to misrepresentation are distinct components of the requisite analytical framework.  To conflate the two … would read the scienter element out of the analysis in contravention of the PSLRA's exacting pleading standard."  *Maguire Fin.*, 876 F.3d at 548.

Ultimately, the scienter analysis is comparative—that is, the Court must weigh the inference of scienter against the inference of non-culpable conduct.  *Yates*, 744 F.3d at 885.  Here, the competing inferences are not even close.  The stronger inference is that the JLI Defendants were faced with a significant issue—underage use—and, rather than conceal the issue, they openly discussed it and acknowledged it was a risk for their company.  To find that the inference of intent to deceive is the strongest inference, the Court would have to infer that, in the midst of a storm of allegations regarding its products, including multiple federal investigations, state investigations, private litigation, bad press, and negative academic studies, the JLI Defendants concluded that it was in their interest to artificially inflate the stock price of a company that had invested in JLI, and that they did so by lying about their intent regarding use of JLI products, even though *at the same time they admitted* that use of their products by underage users was wide-

29

spread regardless of their intent and warned that such use "the single biggest risk" to the company. The Court would also have to infer that the JLI Defendants did all this even though they had no reason to do so, for they are not alleged to have owned Altria stock and then sold it while it was supposedly artificially inflated. *See, e.g., City of Livonia v. Boeing Co.*, 711 F.3d 754, 758 (7th Cir. 2013) ("Without a motive to commit securities fraud, businessmen are unlikely to commit it."). These inferences are not cogent, they are not strong, and they are not the most likely inference from Plaintiffs' allegations.

## V.    Plaintiffs Do Not Adequately Plead Loss Causation.

The final, independent reason the case should be dismissed is that Plaintiffs do not adequately plead loss causation. Loss causation requires "the alleged facts to show [] that the misrepresentation or omission was 'one substantial cause of the investment's decline in value.'" *Katyle v. Penn Nat'l Gaming*, 637 F.3d 462, 472 (4th Cir. 2011). "Corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time, because, 'if investors already know the truth, false statements won't affect the price.'" *Id*. at 473. The disclosures "must reveal to the market in some sense the fraudulent nature of the practices about which a plaintiff complains." *Id*.

Plaintiffs allege the "truth" about the JLI Defendants' supposed deceptions "emerged" on eight days between April 2019 and February 2020 and led to declines in Altria's stock price. Plaintiffs' allegations are inadequate.[10]  All the information allegedly disclosed on those days either (1) had been disclosed previously, or (2) does not "correct" what Plaintiffs allege the JLI Defendants misrepresented.

---

[10] Plaintiffs also allege other dates on which news about JLI was disclosed. (*E.g.*, Compl. ¶¶ 504-505)  However, Plaintiffs do not allege Altria's stock price declined on those dates. Therefore, Plaintiffs do not claim any injury from those events.

The first alleged "corrective disclosure" is the FDA's April 3, 2019 announcement of an investigation into "nearly three dozen cases of people suffering seizures after vaping." (Compl. ¶ 478) Plaintiffs do not allege this disclosure was about JLI products. Nor do they allege the disclosure corrected anything the JLI Defendants had previously misrepresented, for they do not allege the JLI Defendants had previously made misrepresentations about seizure risk. None of the alleged misstatements addresses any such risk, much less are alleged to have stated something false or misleading about any such risk. Indeed, Plaintiffs allege that "seizures or convulsions are known potential side effects of nicotine toxicity." (*Id*. ¶ 449)

Plaintiffs next allege it was disclosed on August 29, 2019, that the FTC "was investigating whether Juul used influencers and other marketing practices to appeal e-cigarettes to minors." (Compl. ¶ 500) But the allegation that JLI used influencers and other marketing practices to appeal to minors had been disclosed previously, as were investigations into such allegations. *Supra* at 5-10. The purported existence of an FTC investigation may have been new, but the risk of any such investigation would have been apparent from the allegations themselves and other regulators' investigations. Plaintiffs do not allege that the JLI Defendants had misstated that fact or the risk that such an investigation could be opened. In fact, concurrent with acquiring its stake in JLI, Altria warned investors that "regulatory and litigation risks" were risks to its JLI investment. (Ex. 18 at 6) *See In re Maximus Sec. Litig*., 2018 WL 4076359, *17 (E.D. Va. Aug. 27, 2018) ("The 21.9% stock drop associated with the November 2015 earnings call is adequately explained by the poor performance of the HAAS Contract disclosed in the call, rather than the perceived disclosure of some previous fraud.").

Plaintiffs' third supposed "corrective disclosure" is the August 30, 2019 announcement by the FDA and the CDC that they were investigating "incidents of severe respiratory disease

31

associated with use of e-cigarette products." (Compl. ¶ 502)  However, Plaintiffs do not allege this statement was about JLI products.  Nor do they allege the JLI Defendants had misrepresented the possibility of respiratory issues with JLI products; none of the alleged misstatements says anything about the risk of respiratory issues.  Further, Plaintiffs allege that the risk of potential respiratory issues was disclosed publicly *before* any of the alleged misstatements.  (*Id*. ¶ 418 n.198; citing a medical journal published in 2018)

Next Plaintiffs allege that, on September 12, 2019, Reuters reported that New Jersey might "become the latest state to restrict e-cigarette use" and the CDC reported 380 cases of lung disease associated with vaping.  (Compl. ¶ 506)  However, Plaintiffs do not allege the JLI Defendants made any misstatements about New Jersey regulators, and the risk of a state restricting e-cigarette use was already known—it is apparent from Plaintiffs' own allegation, which states that New Jersey might become the "latest" state to restrict such use, meaning others had done so previously.  Similarly, the risk of lung disease from electronic nicotine devices was also previously disclosed.  *Supra* at 31; Compl. ¶¶ 424-430 & nn.204-210 (citing 2012, 2014, 2015, 2016, and 2017 publications); *Maximus*, 2018 WL 4076359 at *17 (rejecting an allegation of a corrective disclosure because it "reflect[s] the same performance risks, issues, and problems as those disclosed" previously).  And, in any event, Plaintiffs do not allege the CDC's report of lung disease concerned JLI products.  Indeed, the CDC announced in December 2019 that the lung disease issue *did not* relate to JLI products but to non-nicotine marijuana products.  (Ex. 22 at 1 ("[W]e can conclude that what I call the explosive outbreak of cases of EVALI can be attributed to exposure to THC-containing vaping products that also contained Vitamin E acetate."))

Fifth, on September 25, 2019, Altria disclosed that Philip Morris had terminated merger discussions with Altria due to Altria's investment in JLI and scrutiny of the electronic nicotine

32

device industry; that same day JLI announced a new CEO.  (Compl. ¶ 511)  Neither of these disclosures has any alleged connection to the JLI Defendants' supposed misstatements or conduct.

Sixth, on October 31, 2019, Altria announced a $4.5 billion write-down of its JLI investment, and that the FTC was scrutinizing whether Altria had a role in JLI's change in CEO. (Compl. ¶ 517)  Neither of these disclosures has any alleged connection to the JLI Defendants' supposed misstatements or conduct.

Seventh, on January 30, 2020, Altria announced an additional $4.1 billion charge on its JLI investment, citing "the increased number of legal cases pending against JUUL and the expectation that the number of legal cases against JUUL will continue to increase."  (Compl. ¶ 519) Yet again this information has no alleged connection to the JLI Defendants' supposed misstatements or conduct.  Indeed, the lawsuits against JLI were public, and so not new information, and the risk that new cases could be filed is not something Plaintiffs allege was concealed.

Finally, on February 21, 2020, it was disclosed that the SEC was investigating whether Altria fully disclosed to its shareholders the risks associated with its investment in JLI.  (Compl. ¶ 521)  This has no connection to Plaintiffs' claims against the JLI Defendants.

33

## Conclusion

For the foregoing reasons, the claims against the JLI Defendants should be dismissed with prejudice.

Dated: July 8, 2020                                        Respectfully submitted,

*/s/ Brian C. Riopelle*                                    */s/ K. Ross Powell*
Brian C. Riopelle (VSB No. 36454)                         W. Neil Eggleston (VSB #18367)
Brian E. Pumphrey (VSB No. 47312)                         Joshua Z. Rabinovitz
MCGUIREWOODS LLP                                          Thomas P. Weir
Gateway Plaza                                             K. Ross Powell (VSB #89495)
800 East Canal Street                                     KIRKLAND & ELLIS LLP
Richmond, VA 23219                                        1301 Pennsylvania Avenue, N.W.
Tel: (804) 775-1000                                       Washington D.C. 20004
Fax: (804) 775-1061                                       (202) 389-2000
briopelle@mcguirewoods.com                                Neil.Eggleston@kirkland.com
bpumphrey@mcguirewoods.com                                Joshua.Rabinovitz@kirkland.com
                                                          Tom.Weir@kirkland.com
Eugene Illovsky (admitted pro hac vice)                   Ross.Powell@kirkland.com
Kevin Calia (admitted pro hac vice)
BOERSCH & ILLOVSKY LLP                                     *Counsel for Defendant Juul Labs, Inc.*
1611 Telegraph Ave., Suite 806
Oakland, CA 94612
Tel:  (415) 500-6640                                      */s/ Robert A. Angle*
Fax: (415) 967-3062                                       Robert A. Angle (VBS #37691)
eugene@boersch-illovsky.com                               TROUTMAN PEPPER HAMILTON SANDERS LLP
kevin@boersch-illovsky.com                                1001 Haxall Point, 15th Floor
                                                          Richmond, VA 23219
*Counsel for Defendant Adam Bowen*                        (804) 697-1246
                                                          Robert.Angle@troutman.com

                                                          Elliot R. Peters (admitted pro hac vice)
                                                          Eric H. MacMichael (admitted pro hac vice)
                                                          KEKER, VAN NEST & PETERS LLP
                                                          633 Battery Street
                                                          San Francisco, CA 94111-1809
                                                          Tel: (415) 391-5400
                                                          Fax: (415) 397-7188
                                                          epeters@keker.com
                                                          emacmichael@keker.com

                                                          *Counsel for Defendant Kevin Burns*

34

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of July, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF System, which will send a Notice of Electronic Filing to all counsel of record.

*/s/ K. Ross Powell*
K. Ross Powell