# Exhibit 14

10-Q 1 a2018form10qq32018.htm FORM 10-Q

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-Q

**(Mark One)**

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2018**

**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from              to

**Commission File Number 1-08940**

# Altria Group, Inc.

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Virginia** | **13-3260245** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **6601 West Broad Street, Richmond, Virginia** | **23230** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code (804) 274-2200**

**Former name, former address and former fiscal year, if changed since last report**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.     Yes  ☑    No  ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).     Yes  ☑    No  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☑ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).     Yes ☐    No ☑

At October 15, 2018, there were 1,879,045,481 shares outstanding of the registrant's common stock, par value $0.33 1/3 per share.

ALTRIA GROUP, INC.

TABLE OF CONTENTS

|  |  | Page No. |
|---|---|---|
| PART I - | FINANCIAL INFORMATION |  |
| Item 1. | Financial Statements (Unaudited) |  |
|  | Condensed Consolidated Balance Sheets at September 30, 2018 and December 31, 2017 | **3** |
|  | Condensed Consolidated Statements of Earnings for the Nine and Three Months Ended September 30, 2018 and 2017 | **5** |
|  | Condensed Consolidated Statements of Comprehensive Earnings for the Nine and Three Months Ended September 30, 2018 and 2017 | **6** |
|  | Condensed Consolidated Statements of Stockholders' Equity for the Year Ended December 31, 2017 and the Nine Months Ended September 30, 2018 | **7** |
|  | Condensed Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2018 and 2017 | **8** |
|  | Notes to Condensed Consolidated Financial Statements | **10** |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | **61** |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | **92** |
| Item 4. | Controls and Procedures | **92** |
| PART II - | OTHER INFORMATION |  |
| Item 1. | Legal Proceedings | **92** |
| Item 1A. | Risk Factors | **92** |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | **92** |
| Item 6. | Exhibits | **93** |
| Signature | Signature | **94** |

2

PART I - FINANCIAL INFORMATION

Item 1. Financial Statements.

Altria Group, Inc. and Subsidiaries
Condensed Consolidated Balance Sheets
(in millions of dollars)
(Unaudited)

| | September 30, 2018 | | December 31, 2017 | |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | $ | 2,393 | $ | 1,253 |
| Receivables | | 187 | | 142 |
| Inventories: | | | | |
| Leaf tobacco | | 794 | | 941 |
| Other raw materials | | 188 | | 170 |
| Work in process | | 506 | | 560 |
| Finished product | | 589 | | 554 |
| | | 2,077 | | 2,225 |
| Income taxes | | 84 | | 461 |
| Other current assets | | 424 | | 263 |
| Total current assets | | 5,165 | | 4,344 |
| Property, plant and equipment, at cost | | 4,861 | | 4,879 |
| Less accumulated depreciation | | 2,970 | | 2,965 |
| | | 1,891 | | 1,914 |
| Goodwill | | 5,307 | | 5,307 |
| Other intangible assets, net | | 12,385 | | 12,400 |
| Investment in AB InBev | | 17,825 | | 17,952 |
| Finance assets, net | | 848 | | 899 |
| Other assets | | 532 | | 386 |
| **Total Assets** | $ | 43,953 | $ | 43,202 |

See notes to condensed consolidated financial statements.

3

https://www.sec.gov/Archives/edgar/data/764180/000076418018000095/a2018form10qq32018.htm[6/30/2020 3:11:19 PM]

Altria Group, Inc. and Subsidiaries
Condensed Consolidated Balance Sheets (Continued)
(in millions of dollars, except share and per share data)
(Unaudited)

| | September 30, 2018 | December 31, 2017 |
|---|---|---|
| **Liabilities** | | |
| Current portion of long-term debt | $ 2,007 | $ 864 |
| Accounts payable | 289 | 374 |
| Accrued liabilities: | | |
| Marketing | 690 | 695 |
| Employment costs | 147 | 188 |
| Settlement charges | 3,230 | 2,442 |
| Other | 775 | 971 |
| Dividends payable | 1,508 | 1,258 |
| Total current liabilities | 8,646 | 6,792 |
| Long-term debt | 11,896 | 13,030 |
| Deferred income taxes | 5,427 | 5,247 |
| Accrued pension costs | 260 | 445 |
| Accrued postretirement health care costs | 1,983 | 1,987 |
| Other liabilities | 207 | 283 |
| **Total liabilities** | 28,419 | 27,784 |
| Contingencies (Note 10) | | |
| Redeemable noncontrolling interest | 38 | 38 |
| **Stockholders' Equity** | | |
| Common stock, par value $0.33 1/3 per share (2,805,961,317 shares issued) | 935 | 935 |
| Additional paid-in capital | 5,959 | 5,952 |
| Earnings reinvested in the business | 43,805 | 42,251 |
| Accumulated other comprehensive losses | (2,034) | (1,897) |
| Cost of repurchased stock (925,893,647 shares at September 30, 2018 and 904,702,125 shares at December 31, 2017) | (33,171) | (31,864) |
| Total stockholders' equity attributable to Altria | 15,494 | 15,377 |
| Noncontrolling interests | 2 | 3 |
| **Total stockholders' equity** | 15,496 | 15,380 |
| **Total Liabilities and Stockholders' Equity** | $ 43,953 | $ 43,202 |

See notes to condensed consolidated financial statements.

4

https://www.sec.gov/Archives/edgar/data/764180/000076418018000095/a2018form10qq32018.htm[6/30/2020 3:11:19 PM]

Altria Group, Inc. and Subsidiaries
Condensed Consolidated Statements of Earnings
(in millions of dollars, except per share data)
(Unaudited)

| | For the Nine Months Ended September 30, | | For the Three Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2018 | 2017 | 2018 | 2017 |
| Net revenues | $ 19,250 | $ 19,475 | $ 6,837 | $ 6,729 |
| Cost of sales | 5,509 | 5,719 | 2,037 | 1,952 |
| Excise taxes on products | 4,409 | 4,695 | 1,545 | 1,606 |
| Gross profit | 9,332 | 9,061 | 3,255 | 3,171 |
| Marketing, administration and research costs | 1,959 | 1,681 | 700 | 574 |
| Asset impairment and exit costs | 2 | 24 | (2) | 8 |
| Operating income | 7,371 | 7,356 | 2,557 | 2,589 |
| Interest and other debt expense, net | 503 | 525 | 159 | 169 |
| Net periodic benefit income, excluding service cost | (37) | (37) | (21) | (18) |
| Earnings from equity investment in AB InBev | (759) | (332) | (189) | (169) |
| Loss (gain) on AB InBev/SABMiller business combination | 33 | (445) | — | (37) |
| Earnings before income taxes | 7,631 | 7,645 | 2,608 | 2,644 |
| Provision for income taxes | 1,915 | 2,386 | 664 | 777 |
| Net earnings | 5,716 | 5,259 | 1,944 | 1,867 |
| Net earnings attributable to noncontrolling interests | (3) | (3) | (1) | (1) |
| Net earnings attributable to Altria | $ 5,713 | $ 5,256 | $ 1,943 | $ 1,866 |
| Per share data: | | | | |
| Basic and diluted earnings per share attributable to Altria | $ 3.02 | $ 2.72 | $ 1.03 | $ 0.97 |
| Dividends declared | $ 2.20 | $ 1.88 | $ 0.80 | $ 0.66 |

See notes to condensed consolidated financial statements.

5

Altria Group, Inc. and Subsidiaries
Condensed Consolidated Statements of Comprehensive Earnings
(in millions of dollars)
(Unaudited)

| | For the Nine Months Ended September 30, | | For the Three Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2018 | 2017 | 2018 | 2017 |
| Net earnings | $ 5,716 | $ 5,259 | $ 1,944 | $ 1,867 |
| Other comprehensive earnings (losses), net of deferred income taxes: | | | | |
| Benefit plans | 126 | 96 | 39 | 31 |
| AB InBev | (262) | 9 | (422) | (139) |
| Currency translation adjustments and other | (1) | 1 | 1 | — |
| Other comprehensive (losses) earnings, net of deferred income taxes | (137) | 106 | (382) | (108) |
| | | | | |
| Comprehensive earnings | 5,579 | 5,365 | 1,562 | 1,759 |
| Comprehensive earnings attributable to noncontrolling interests | (3) | (3) | (1) | (1) |
| Comprehensive earnings attributable to Altria | $ 5,576 | $ 5,362 | $ 1,561 | $ 1,758 |

See notes to condensed consolidated financial statements.

6

Altria Group, Inc. and Subsidiaries
Condensed Consolidated Statements of Stockholders' Equity
for the Year Ended December 31, 2017 and
the Nine Months Ended September 30, 2018
(in millions of dollars, except per share data)
(Unaudited)

| | | | | Attributable to Altria | | | | |
| | Common Stock | Additional Paid-in Capital | Earnings Reinvested in the Business | Accumulated Other Comprehensive Losses | Cost of Repurchased Stock | Non-controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|
| Balances, December 31, 2016 | $ 935 | $ 5,893 | $ 36,906 | $ (2,052) | $ (28,912) | $ 3 | $ 12,773 |
| Net earnings [1] | — | — | 10,222 | — | — | — | 10,222 |
| Other comprehensive earnings, net of deferred income taxes | — | — | — | 155 | — | — | 155 |
| Stock award activity | — | 59 | — | — | (35) | — | 24 |
| Cash dividends declared ($2.54 per share) | — | — | (4,877) | — | — | — | (4,877) |
| Repurchases of common stock | — | — | — | — | (2,917) | — | (2,917) |
| Balances, December 31, 2017 | 935 | 5,952 | 42,251 | (1,897) | (31,864) | 3 | 15,380 |
| Net earnings [1] | — | — | 5,713 | — | — | — | 5,713 |
| Other comprehensive losses, net of deferred income taxes | — | — | — | (137) | — | — | (137) |
| Stock award activity | — | 7 | — | — | 10 | — | 17 |
| Cash dividends declared ($2.20 per share) | — | — | (4,159) | — | — | — | (4,159) |
| Repurchases of common stock | — | — | — | — | (1,317) | — | (1,317) |
| Other | — | — | — | — | — | (1) | (1) |
| Balances, September 30, 2018 | $ 935 | $ 5,959 | $ 43,805 | $ (2,034) | $ (33,171) | $ 2 | $ 15,496 |

[1] Amounts attributable to noncontrolling interests for the nine months ended September 30, 2018 and for the year ended December 31, 2017 exclude net earnings of $3 million and $5 million, respectively, due to the redeemable noncontrolling interest related to Stag's Leap Wine Cellars, which is reported in the mezzanine equity section on the condensed consolidated balance sheets at September 30, 2018 and December 31, 2017.

See notes to condensed consolidated financial statements.

7

Altria Group, Inc. and Subsidiaries
Condensed Consolidated Statements of Cash Flows
(in millions of dollars)
(Unaudited)

| | For the Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2018 | 2017 |
| **Cash Provided by (Used in) Operating Activities** | | |
| Net earnings | $ 5,716 | $ 5,259 |
| Adjustments to reconcile net earnings to operating cash flows: | | |
| Depreciation and amortization | 168 | 155 |
| Deferred income tax provision (benefit) | 215 | (223) |
| Earnings from equity investment in AB InBev | (759) | (332) |
| Dividends from AB InBev | 477 | 434 |
| Loss (gain) on AB InBev/SABMiller business combination | 33 | (445) |
| Asset impairment and exit costs, net of cash paid | (24) | (30) |
| Cash effects of changes: | | |
| Receivables | (45) | 4 |
| Inventories | 147 | 67 |
| Accounts payable | (79) | (154) |
| Income taxes | 308 | 341 |
| Accrued liabilities and other current assets | (319) | (525) |
| Accrued settlement charges | 757 | (318) |
| Pension plan contributions | (19) | (18) |
| Pension provisions and postretirement, net | (19) | (70) |
| Other | 9 | (1) |
| Net cash provided by operating activities | 6,566 | 4,144 |
| **Cash Provided by (Used in) Investing Activities** | | |
| Capital expenditures | (132) | (151) |
| Proceeds from finance assets | — | 133 |
| Other | (5) | (184) |
| Net cash used in investing activities | $ (137) | $ (202) |

8

Altria Group, Inc. and Subsidiaries
Condensed Consolidated Statements of Cash Flows (Continued)
(in millions of dollars)
(Unaudited)

| | For the Nine Months Ended September 30, | | | |
| --- | --- | --- | --- | --- |
| | 2018 | | 2017 | |
| **Cash Used in Financing Activities** | | | | |
| Repurchases of common stock | $ | (1,317) | $ | (2,359) |
| Dividends paid on common stock | | (3,909) | | (3,544) |
| Other | | (25) | | (47) |
| Cash used in financing activities | | (5,251) | | (5,950) |
| Cash, cash equivalents and restricted cash: | | | | |
| Increase (decrease) | | 1,178 | | (2,008) |
| Balance at beginning of period | | 1,314 | | 4,651 |
| Balance at end of period | $ | 2,492 | $ | 2,643 |

The following table provides a reconciliation of cash, cash equivalents and restricted cash to the amounts reported on Altria's condensed consolidated balance sheets:

| | At September 30, 2018 | | At December 31, 2017 | |
| --- | --- | --- | --- | --- |
| Cash and cash equivalents | $ | 2,393 | $ | 1,253 |
| Restricted cash included in other current assets [1] | | 59 | | 25 |
| Restricted cash included in other assets [1] | | 40 | | 36 |
| Cash, cash equivalents and restricted cash | $ | 2,492 | $ | 1,314 |

[1] Restricted cash consisted of cash deposits collateralizing appeal bonds posted by PM USA to obtain stays of judgments pending appeals. See Note 10. *Contingencies*.

See notes to condensed consolidated financial statements.

9

Altria Group, Inc. and Subsidiaries
Notes to Condensed Consolidated Financial Statements
(Unaudited)

## Note 1. Background and Basis of Presentation:

### Background

At September 30, 2018, Altria Group, Inc.'s ("Altria") wholly-owned subsidiaries included Philip Morris USA Inc. ("PM USA"), which is engaged in the manufacture and sale of cigarettes in the United States; John Middleton Co. ("Middleton"), which is engaged in the manufacture and sale of machine-made large cigars and pipe tobacco and is a wholly-owned subsidiary of PM USA; Sherman Group Holdings, LLC and its subsidiaries ("Nat Sherman"), which are engaged in the manufacture and sale of super premium cigarettes and the sale of premium cigars; and UST LLC ("UST"), which through its wholly-owned subsidiaries, including U.S. Smokeless Tobacco Company LLC ("USSTC") and Ste. Michelle Wine Estates Ltd. ("Ste. Michelle"), is engaged in the manufacture and sale of smokeless tobacco products and wine. Altria's other operating companies included Nu Mark LLC ("Nu Mark"), a wholly-owned subsidiary that is engaged in the manufacture and sale of innovative tobacco products, and Philip Morris Capital Corporation ("PMCC"), a wholly-owned subsidiary that maintains a portfolio of finance assets, substantially all of which are leveraged leases. Other Altria wholly-owned subsidiaries included Altria Group Distribution Company, which provides sales and distribution services to certain Altria operating subsidiaries, and Altria Client Services LLC, which provides various support services in areas such as legal, regulatory, consumer engagement, finance, human resources and external affairs to Altria and its subsidiaries. Altria's access to the operating cash flows of its wholly-owned subsidiaries consists of cash received from the payment of dividends and distributions, and the payment of interest on intercompany loans by its subsidiaries. At September 30, 2018, Altria's principal wholly-owned subsidiaries were not limited by long-term debt or other agreements in their ability to pay cash dividends or make other distributions with respect to their equity interests.

At September 30, 2018, Altria had an approximate 10.1% ownership of Anheuser-Busch InBev SA/NV ("AB InBev"), which Altria accounts for under the equity method of accounting using a one-quarter lag. Altria receives cash dividends on its interest in AB InBev if and when AB InBev pays such dividends.

### Dividends and Share Repurchases

During the first quarter of 2018, Altria's Board of Directors (the "Board of Directors") approved a 6.1% increase in the quarterly dividend rate to $0.70 per share of Altria common stock versus the previous rate of $0.66 per share. During the third quarter of 2018, the Board of Directors approved an additional 14.3% increase in the quarterly dividend rate to $0.80 per share of Altria common stock, resulting in an overall quarterly dividend rate increase of 21.2% since the beginning of 2018. The current annualized dividend rate is $3.20 per share. Future dividend payments remain subject to the discretion of the Board of Directors.

In July 2015, the Board of Directors authorized a $1.0 billion share repurchase program that it expanded to $3.0 billion in October 2016 and to $4.0 billion in July 2017 (as expanded, the "July 2015 share repurchase program"). In January 2018, Altria completed the July 2015 share repurchase program. Under this program, Altria repurchased a total of 58.7 million shares of its common stock at an average price of $68.15 per share (including 0.3 million shares at an average price of $71.68 in January 2018).

Following the completion of the July 2015 share repurchase program, the Board of Directors authorized a new $1.0 billion share repurchase program in January 2018 that it expanded to $2.0 billion in May 2018 (as expanded, the "January 2018 share repurchase program"). During the nine and three months ended September 30, 2018, Altria repurchased 21.5 million shares and 6.2 million shares, respectively, of its common stock (at an aggregate cost of approximately $1,299 million and $367 million, respectively, and at an average price of $60.40 per share and $59.18 per share, respectively) under the January 2018 share repurchase program. At September 30, 2018, Altria had approximately $700 million remaining in the January 2018 share repurchase program. The timing of share repurchases under this program depends upon marketplace conditions and other factors, and the program remains subject to the discretion of the Board of Directors.

10

Altria's share repurchase activity was as follows:

| | For the Nine Months Ended September 30, | | For the Three Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2018 | 2017 | 2018 | 2017 |
| | (in millions, except per share data) | | | |
| Total number of shares repurchased | 21.8 | 33.2 | 6.2 | 11.1 |
| Aggregate cost of shares repurchased | $ 1,317 | $ 2,359 | $ 367 | $ 759 |
| Average price per share of shares repurchased | $ 60.53 | $ 70.97 | $ 59.18 | $ 67.99 |

**Basis of Presentation**

The interim condensed consolidated financial statements of Altria are unaudited. It is the opinion of Altria's management that all adjustments necessary for a fair statement of the interim results presented have been reflected in the interim condensed consolidated financial statements. All such adjustments were of a normal recurring nature. Net revenues and net earnings for any interim period are not necessarily indicative of results that may be expected for the entire year.

These statements should be read in conjunction with the consolidated financial statements and related notes, which appear in Altria's Annual Report on Form 10-K for the year ended December 31, 2017.

On January 1, 2018, Altria adopted the following Accounting Standards Updates ("ASU"):

?   ASU No. 2014-09, *Revenue from Contracts with Customers (Topic 606)* and all related ASU amendments (collectively "ASU No. 2014-09");

?   ASU No. 2016-01, *Financial Instruments-Overall (Subtopic 825-10)*: *Recognition and Measurement of Financial Assets and Financial Liabilities* and the related ASU amendment (collectively "ASU No. 2016-01");

?   ASU No. 2016-15, *Statement of Cash Flows (Topic 230)*: *Classification of Certain Cash Receipts and Cash Payments* ("ASU No. 2016-15");

?   ASU No. 2016-18, *Statement of Cash Flows (Topic 230)*: *Restricted Cash* ("ASU No. 2016-18"); and

?   ASU No. 2017-07, *Compensation-Retirement Benefits (Topic 715)*: *Improving the Presentation of Net Periodic Pension Cost and Net Periodic Postretirement Benefit Cost* ("ASU No. 2017-07").

Altria has reclassified certain prior-period amounts to conform with the current period's presentation due to Altria's adoptions of ASU No. 2016-18 and ASU No. 2017-07.

ASU No. 2014-09 establishes principles for reporting information about the nature, amount, timing and uncertainty of revenue and cash flows arising from an entity's contracts with customers. Altria has elected to apply the guidance using the modified retrospective transition method. For further discussion, see Note 2. *Revenues from Contracts with Customers*.

ASU No. 2016-01 addresses certain aspects of the recognition, measurement, presentation and disclosure of financial instruments. The adoption of ASU No. 2016-01 did not impact Altria's condensed consolidated financial statements.

ASU No. 2016-15 addresses how eight specific cash flow issues are to be presented and classified in the statement of cash flows. The adoption of ASU 2016-15 did not impact Altria's condensed consolidated statements of cash flows. In addition, Altria made an accounting policy election to continue to classify distributions received from equity method investees using the nature of distribution approach.

ASU No. 2016-18, which Altria adopted retrospectively, requires that a statement of cash flows explain the change during the period in the total of cash, cash equivalents and amounts generally described as restricted cash and restricted cash equivalents. As a result of the adoption, restricted cash of $99 million, $61 million, $61 million and $82 million at September 30, 2018, September 30, 2017, December 31, 2017 and December 31, 2016, respectively, was included in cash, cash equivalents and restricted cash on the condensed consolidated statements of cash flows.

ASU No. 2017-07 requires an employer to report the service cost component of net periodic pension cost and net periodic postretirement benefit cost in the same line item or items as other compensation costs arising from services rendered by employees during the period. The other components of net periodic pension cost and net periodic postretirement benefit cost

11

are required to be presented in the statement of earnings separately from the service cost component and outside the subtotal of operating income. Additionally, only the service cost component is eligible for capitalization. Altria retrospectively adopted the guidance for the presentation of the service cost component and the other components of net periodic pension cost and net periodic postretirement benefit cost in the statement of earnings, and prospectively adopted the capitalization of service cost. Altria used the practical expedient provided in ASU No. 2017-07 that permits Altria to use the amounts disclosed in its benefit plans note for the prior comparative periods as the estimation basis for applying the retrospective presentation requirements. For the nine months ended September 30, 2017, the adoption of ASU No. 2017-07 resulted in a reclassification of net periodic benefit income of $20 million and $17 million from cost of sales and marketing, administration and research costs, respectively, to net periodic benefit income, excluding service cost in Altria's condensed consolidated statement of earnings. For the three months ended September 30, 2017, the adoption of ASU No. 2017-07 resulted in a reclassification of net periodic benefit income of $12 million and $6 million from cost of sales and marketing, administration and research costs, respectively, to net periodic benefit income, excluding service cost in Altria's condensed consolidated statement of earnings. In addition, certain prior-period segment data has been reclassified to conform with the current period's presentation. For further discussion, see Note 7. *Segment Reporting*.

For a description of recently issued accounting guidance applicable to, but not yet adopted by, Altria, see Note 12. *Recent Accounting Guidance Not Yet Adopted*.

**Note 2. Revenues from Contracts with Customers:**

On January 1, 2018, Altria adopted ASU No. 2014-09, which establishes principles for reporting information about the nature, amount, timing, and uncertainty of revenue and cash flows arising from an entity's contracts with customers. Altria elected to apply the guidance using the modified retrospective transition method. The adoption of this guidance had no impact on the amount and timing of revenue recognized by Altria's businesses; therefore, no adjustments were recorded to Altria's condensed consolidated financial statements.

Altria's businesses generate substantially all of their revenue from sales contracts with customers. While Altria's businesses enter into separate sales contracts with each customer for each product type, all sales contracts are similarly structured. These contracts create an obligation to transfer product to the customer. Contract durations do not exceed one year; therefore, there is no significant financing component, costs to obtain contracts are expensed as incurred and unsatisfied performance obligations are not disclosed.

Altria's businesses define net revenues as revenues, which include excise taxes and shipping and handling charges billed to customers, net of cash discounts for prompt payment, sales returns (also referred to as returned goods) and sales incentives. Altria's businesses exclude from the transaction price, sales taxes and value-added taxes imposed at the time of sale (which do not include excise taxes on cigarettes, cigars, smokeless tobacco or wine).

Altria's businesses recognize revenues from sales contracts with customers upon shipment of goods when control of such products is obtained by the customer. Altria's businesses determine that a customer obtains control of the product upon shipment when title of such product and risk of loss transfers to the customer. Altria's businesses account for shipping and handling costs as fulfillment costs and such amounts are classified as part of cost of sales in Altria's condensed consolidated statements of earnings. Altria's businesses record an allowance for returned goods, based principally on historical volume and return rates, which is included in other accrued liabilities on Altria's condensed consolidated balance sheets. Altria's businesses record sales incentives, which consist of consumer incentives and trade promotion activities, as a reduction to revenues (a portion of which is based on amounts estimated as being due to wholesalers, retailers and consumers at the end of a period) based principally on historical volume, utilization and redemption rates. Expected payments for sales incentives are included in accrued marketing liabilities on Altria's condensed consolidated balance sheets.

Payment terms vary depending on product type. Altria's businesses consider payments received in advance of product shipment as deferred revenue, which is included in other accrued liabilities on Altria's condensed consolidated balance sheets until revenue is recognized. PM USA receives payment in advance of a customer obtaining control of the product. USSTC receives substantially all payments within one business day of the customer obtaining control of the product. Ste. Michelle receives substantially all payments from customers within 45 days of the customer obtaining control of the product. Amounts due from customers are included in receivables on Altria's condensed consolidated balance sheets.

Altria's businesses promote their products with consumer incentives, trade promotions and consumer engagement programs. These consumer incentive and trade promotion activities, which include discounts, coupons, rebates, in-store display incentives and volume-based incentives, do not create a distinct deliverable and are, therefore, recorded as a reduction of revenues.

12

Consumer engagement program payments are made to third parties. Altria's businesses expense these consumer engagement programs, which include event marketing, as incurred and such expenses are included in marketing, administration and research costs on Altria's condensed consolidated statements of earnings. For interim reporting purposes, Altria's businesses charge consumer engagement programs and certain consumer incentive expenses to operations as a percentage of sales, based on estimated sales and related expenses for the full year.

Altria disaggregates net revenues based on product type. For further discussion, see Note 7. *Segment Reporting*.

Altria's businesses offer cash discounts to customers for prompt payment and calculate cash discounts as a percentage of the list price based on historical experience and agreed-upon payment terms. Altria's businesses record an allowance for cash discounts, which is included as a contra-asset against receivables on Altria's condensed consolidated balance sheets. There was no allowance for cash discounts at September 30, 2018 and December 31, 2017, and there were no differences between amounts recorded as an allowance for cash discounts and cash discounts subsequently given to customers.

Altria's businesses that receive payments in advance of product shipment record such payments as deferred revenue. These payments are included in other accrued liabilities on Altria's condensed consolidated balance sheets until control of such products is obtained by the customer. Deferred revenue was $116 million and $267 million at September 30, 2018 and December 31, 2017, respectively. When cash is received in advance of product shipment, Altria's businesses satisfy their performance obligations within three days of receiving payment. At September 30, 2018 and December 31, 2017, there were no differences between amounts recorded as deferred revenue and amounts subsequently recognized as revenue.

Receivables, which primarily reflect sales of wine produced and/or distributed by Ste. Michelle, were $187 million and $142 million at September 30, 2018 and December 31, 2017, respectively. At September 30, 2018 and December 31, 2017, there were no expected differences between amounts recorded and subsequently received, and Altria's businesses did not record an allowance for doubtful accounts against these receivables.

Altria's businesses record an allowance for returned goods, which is included in other accrued liabilities on Altria's condensed consolidated balance sheets. While all of Altria's tobacco operating companies sell tobacco products with dates relative to freshness as printed on product packaging, due to the limited shelf life of USSTC's smokeless tobacco products, it is USSTC's policy to accept authorized sales returns from its customers for products that have passed such dates. Altria's businesses record estimated sales returns, which are based principally on historical volume and return rates, as a reduction to revenues. Actual sales returns will differ from estimated sales returns to the extent actual results differ from estimated assumptions. Altria's businesses reflect differences between actual and estimated sales returns in the period in which the actual amounts become known. These differences, if any, have not had a significant impact on Altria's condensed consolidated financial statements. All returned goods are destroyed upon return and not included in inventory. Consequently, Altria's businesses do not record an asset for their right to recover goods from customers upon return.

Sales incentives include variable payments related to goods sold by Altria's businesses. Altria's businesses include estimates of variable consideration as a reduction to revenues upon shipment of goods to customers. The sales incentives that require significant estimates and judgments are as follows:

*Price promotion payments-* Altria's businesses make price promotion payments, substantially all of which are made to their retail partners to incent the promotion of certain product offerings in select geographic areas.

*Wholesale and retail participation payments-* Altria's businesses make payments to their wholesale and retail partners to incent merchandising and sharing of sales data in accordance with each business's trade agreements.

These estimates primarily include estimated wholesale to retail sales volume and historical acceptance rates. Actual payments will differ from estimated payments to the extent actual results differ from estimated assumptions. Differences between actual and estimated payments are reflected in the period such information becomes available. These differences, if any, have not had a significant impact on Altria's condensed consolidated financial statements.

**Note 3. Investment in AB InBev:**

At September 30, 2018, Altria had an approximate 10.1% ownership of AB InBev, consisting of approximately 185 million restricted shares of AB InBev (the "Restricted Shares") and approximately 12 million ordinary shares of AB InBev. Altria accounts for its investment in AB InBev under the equity method of accounting because Altria has the ability to exercise

13

significant influence over the operating and financial policies of AB InBev, including having active representation on AB InBev's Board of Directors ("AB InBev Board") and certain AB InBev Board Committees. Through this representation, Altria participates in AB InBev policy making processes.

Altria reviews its investment in AB InBev for impairment by comparing the fair value of its investment to its carrying value. If the carrying value of its investment exceeds its fair value and the loss in value is other than temporary, the investment is considered impaired and impairment is recognized in the period identified. The factors used to make this determination include the duration and magnitude of the fair value decline, AB InBev's financial condition and near-term prospects, and Altria's intent and ability to hold its investment in AB InBev until recovery.

The fair value of Altria's equity investment in AB InBev is based on: (i) unadjusted quoted prices in active markets for AB InBev's ordinary shares and was classified in Level 1 of the fair value hierarchy and (ii) observable inputs other than Level 1 prices, such as quoted prices for similar assets for the Restricted Shares, and was classified in Level 2 of the fair value hierarchy. Altria may, in certain instances, pledge or otherwise grant a security interest in all or part of its Restricted Shares. In the event the pledgee or security interest holder forecloses on the Restricted Shares, the relevant Restricted Shares will be automatically converted, one-for-one, into ordinary shares. Therefore, the fair value of each Restricted Share is based on the value of an ordinary share.

The fair value of Altria's equity investment in AB InBev at September 30, 2018 and December 31, 2017 was $17.2 billion and $22.1 billion, respectively, compared with its carrying value of $17.8 billion and $18.0 billion, respectively. The fair value of Altria's equity investment has continued to decline after September 30, 2018. On October 25, 2018, AB InBev announced a 50% rebase in the dividends it pays to its shareholders, which will result in a reduction of cash dividends AB InBev shareholders receive. The fair value of Altria's equity investment at October 25, 2018 was approximately $14.5 billion. Based on its evaluation of the factors identified above, Altria concluded that the decline in fair value of its investment in AB InBev below its carrying value is temporary and, therefore, no impairment was recorded.

## Note 4. Benefit Plans:

*Components of Net Periodic Benefit Cost (Income)*

Net periodic benefit cost (income) consisted of the following:

| | For the Nine Months Ended September 30, | | | | For the Three Months Ended September 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Pension | | Postretirement | | Pension | | Postretirement | |
| | 2018 | 2017 | 2018 | 2017 | 2018 | 2017 | 2018 | 2017 |
| | (in millions) | | | | | | | |
| Service cost | $ 61 | $ 57 | $ 13 | $ 12 | $ 20 | $ 19 | $ 4 | $ 3 |
| Interest cost | 207 | 216 | 52 | 57 | 69 | 72 | 15 | 17 |
| Expected return on plan assets | (438) | (451) | (14) | — | (146) | (151) | (5) | — |
| Amortization: | | | | | | | | |
|    Net loss | 168 | 147 | 16 | 19 | 56 | 49 | (1) | 3 |
|    Prior service cost (credit) | 3 | 3 | (31) | (28) | 1 | 1 | (10) | (9) |
| Net periodic benefit cost (income) | $ 1 | $ (28) | $ 36 | $ 60 | $ — | $ (10) | $ 3 | $ 14 |

*Employer Contributions*

Altria makes contributions to the pension plans to the extent that the contributions are tax deductible and pays benefits that relate to plans for salaried employees that cannot be funded under Internal Revenue Service ("IRS") regulations. Altria made employer contributions of $19 million to its pension plans during the nine months ended September 30, 2018. Currently, Altria anticipates making additional employer contributions to its pension plans during the remainder of 2018 of up to approximately $25 million, based on current tax law. Altria did not make any employer contributions to its postretirement plans during the nine months ended September 30, 2018. Currently, Altria anticipates making employer contributions to its postretirement plans of up to approximately $70 million in 2018. However, estimates for current-year contributions to Altria's pension and postretirement plans may be subject to change as a result of changes in tax and other benefit laws, as well as asset performance significantly above or below the assumed long-term rate of return on assets, changes in interest rates or other considerations.

14

**Note 5. Earnings Per Share:**

Basic and diluted earnings per share ("EPS") were calculated using the following:

| | For the Nine Months Ended September 30, | | For the Three Months Ended September 30, | |
|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2017 |
| | (in millions) | | | |
| Net earnings attributable to Altria | $ 5,713 | $ 5,256 | $ 1,943 | $ 1,866 |
| Less: Distributed and undistributed earnings attributable to share-based awards | (7) | (7) | (2) | (2) |
| Earnings for basic and diluted EPS | $ 5,706 | $ 5,249 | $ 1,941 | $ 1,864 |
| Weighted-average shares for basic and diluted EPS | 1,891 | 1,927 | 1,883 | 1,915 |

**Note 6. Other Comprehensive Earnings/Losses:**

The following tables set forth the changes in each component of accumulated other comprehensive losses, net of deferred income taxes, attributable to Altria:

| | For the Nine Months Ended September 30, 2018 | | | |
|---|---|---|---|---|
| | Benefit Plans | AB InBev | Currency Translation Adjustments and Other | Accumulated Other Comprehensive Losses |
| | (in millions) | | | |
| Balances, December 31, 2017 | $ (1,839) | $ (54) | $ (4) | $ (1,897) |
| Other comprehensive losses before reclassifications | — | (288) | (1) | (289) |
| Deferred income taxes | — | 57 | — | 57 |
| Other comprehensive losses before reclassifications, net of deferred income taxes | — | (231) | (1) | (232) |
| Amounts reclassified to net earnings | 168 | (41) | — | 127 |
| Deferred income taxes | (42) | 10 | — | (32) |
| Amounts reclassified to net earnings, net of deferred income taxes | 126 | (31) | — | 95 |
| Other comprehensive earnings (losses), net of deferred income taxes | 126 | (262) [1] | (1) | (137) |
| Balances, September 30, 2018 | $ (1,713) | $ (316) | $ (5) | $ (2,034) |

15

| | For the Three Months Ended September 30, 2018 | | | |
| --- | --- | --- | --- | --- |
| | Benefit Plans | AB InBev | Currency Translation Adjustments and Other | Accumulated Other Comprehensive Losses |
| | (in millions) | | | |
| Balances, June 30, 2018 | $ (1,752) | $ 106 | $ (6) | $ (1,652) |
| Other comprehensive (losses) earnings before reclassifications | — | (513) | 1 | (512) |
| Deferred income taxes | — | 107 | — | 107 |
| Other comprehensive (losses) earnings before reclassifications, net of deferred income taxes | — | (406) | 1 | (405) |
| Amounts reclassified to net earnings | 50 | (21) | — | 29 |
| Deferred income taxes | (11) | 5 | — | (6) |
| Amounts reclassified to net earnings, net of deferred income taxes | 39 | (16) | — | 23 |
| Other comprehensive earnings (losses), net of deferred income taxes | 39 | (422) [1] | 1 | (382) |
| Balances, September 30, 2018 | $ (1,713) | $ (316) | $ (5) | $ (2,034) |

| | For the Nine Months Ended September 30, 2017 | | | |
| --- | --- | --- | --- | --- |
| | Benefit Plans | AB InBev | Currency Translation Adjustments and Other | Accumulated Other Comprehensive Losses |
| | (in millions) | | | |
| Balances, December 31, 2016 | $ (2,048) | $ — | $ (4) | $ (2,052) |
| Other comprehensive earnings before reclassifications | — | 9 | 1 | 10 |
| Deferred income taxes | — | (3) | — | (3) |
| Other comprehensive earnings before reclassifications, net of deferred income taxes | — | 6 | 1 | 7 |
| Amounts reclassified to net earnings | 154 | 5 | — | 159 |
| Deferred income taxes | (58) | (2) | — | (60) |
| Amounts reclassified to net earnings, net of deferred income taxes | 96 | 3 | — | 99 |
| Other comprehensive earnings, net of deferred income taxes | 96 | 9 [1] | 1 | 106 |
| Balances, September 30, 2017 | $ (1,952) | $ 9 | $ (3) | $ (1,946) |

16

| | For the Three Months Ended September 30, 2017 | | | |
| --- | --- | --- | --- | --- |
| | Benefit Plans | AB InBev | Currency Translation Adjustments and Other | Accumulated Other Comprehensive Losses |
| | (in millions) | | | |
| Balances, June 30, 2017 | $ (1,983) | $ 148 | $ (3) | $ (1,838) |
| Other comprehensive losses before reclassifications | — | (216) | — | (216) |
| Deferred income taxes | — | 75 | — | 75 |
| Other comprehensive losses before reclassifications, net of deferred income taxes | — | (141) | — | (141) |
| Amounts reclassified to net earnings | 48 | 3 | — | 51 |
| Deferred income taxes | (17) | (1) | — | (18) |
| Amounts reclassified to net earnings, net of deferred income taxes | 31 | 2 | — | 33 |
| Other comprehensive earnings (losses), net of deferred income taxes | 31 | (139) [1] | — | (108) |
| Balances, September 30, 2017 | $ (1,952) | $ 9 | $ (3) | $ (1,946) |

[1] Primarily reflects currency translation adjustments.

The following table sets forth pre-tax amounts by component, reclassified from accumulated other comprehensive losses to net earnings:

| | For the Nine Months Ended September 30, | | For the Three Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2018 | 2017 | 2018 | 2017 |
| | (in millions) | | | |
| Benefit Plans: [1] | | | | |
| Net loss | $ 196 | $ 179 | $ 59 | $ 56 |
| Prior service cost/credit | (28) | (25) | (9) | (8) |
| | 168 | 154 | 50 | 48 |
| AB InBev [2] | (41) | 5 | (21) | 3 |
| Pre-tax amounts reclassified from accumulated other comprehensive losses to net earnings | $ 127 | $ 159 | $ 29 | $ 51 |

[1] Amounts are included in net defined benefit plan costs. For further details, see Note 4. *Benefit Plans.*
[2] Amounts are primarily included in earnings from equity investment in AB InBev.

17

### Note 7. Segment Reporting:

The products of Altria's subsidiaries include smokeable tobacco products, consisting of combustible cigarettes manufactured and sold by PM USA and Nat Sherman, machine-made large cigars and pipe tobacco manufactured and sold by Middleton and premium cigars sold by Nat Sherman; smokeless tobacco products, consisting of moist smokeless tobacco and snus products manufactured and sold by USSTC; and wine produced and/or distributed by Ste. Michelle. The products and services of these subsidiaries constitute Altria's reportable segments of smokeable products, smokeless products and wine. The financial services and the innovative tobacco products businesses are included in all other.

As discussed in Note 1. *Background and Basis of Presentation*, on January 1, 2018, Altria adopted ASU 2017-07, which resulted in a change to prior-period operating income. As a result, certain immaterial prior-period operating companies income (loss) data has been reclassified to conform with the current period's presentation.

Altria's chief operating decision maker (the "CODM") reviews operating companies income to evaluate the performance of, and allocate resources to, the segments. Operating companies income for the segments is defined as operating income before general corporate expenses and amortization of intangibles. Interest and other debt expense, net, net periodic benefit cost/income, excluding service cost, and provision for income taxes are centrally managed at the corporate level and, accordingly, such items are not presented by segment since they are excluded from the measure of segment profitability reviewed by the CODM.

Segment data were as follows:

|  | For the Nine Months Ended September 30, | | For the Three Months Ended September 30, | |
|---|---|---|---|---|
|  | 2018 | 2017 | 2018 | 2017 |
|  | (in millions) | | | |
| **Net revenues:** | | | | |
| Smokeable products | $ 16,995 | $ 17,355 | $ 6,035 | $ 5,975 |
| Smokeless products | 1,690 | 1,580 | 586 | 550 |
| Wine | 489 | 471 | 181 | 181 |
| All other | 76 | 69 | 35 | 23 |
| Net revenues | $ 19,250 | $ 19,475 | $ 6,837 | $ 6,729 |
| **Earnings before income taxes:** | | | | |
| Operating companies income (loss): | | | | |
| Smokeable products | $ 6,516 | $ 6,536 | $ 2,277 | $ 2,276 |
| Smokeless products | 1,085 | 941 | 370 | 348 |
| Wine | 73 | 82 | 29 | 36 |
| All other | (121) | (31) | (38) | (10) |
| Amortization of intangibles | (30) | (15) | (20) | (5) |
| General corporate expenses | (152) | (157) | (61) | (56) |
| Operating income | 7,371 | 7,356 | 2,557 | 2,589 |
| Interest and other debt expense, net | (503) | (525) | (159) | (169) |
| Net periodic benefit income, excluding service cost | 37 | 37 | 21 | 18 |
| Earnings from equity investment in AB InBev | 759 | 332 | 189 | 169 |
| (Loss) gain on AB InBev/SABMiller business combination | (33) | 445 | — | 37 |
| Earnings before income taxes | $ 7,631 | $ 7,645 | $ 2,608 | $ 2,644 |

18

The comparability of operating companies income for the reportable segments was affected by the following:

*Non-Participating Manufacturer ("NPM") Adjustment Items* - Pre-tax (income) expense for NPM adjustment items was recorded in Altria's condensed consolidated statements of earnings as follows:

| | For the Nine Months Ended September 30, | | | For the Three Months Ended September 30, | | |
| | 2018 | | 2017 | 2018 | | 2017 |
| | (in millions) | | | | | |
| Smokeable products segment | $ | (145) | $ | (5) | $ | — | $ | 3 |
| Interest and other debt expense, net | | — | | 9 | | — | | 2 |
| Total | $ | (145) | $ | 4 | $ | — | $ | 5 |

NPM adjustment items result from the resolutions of certain disputes with states and territories related to the NPM adjustment provision under the 1998 Master Settlement Agreement (such dispute resolutions are referred to as "NPM Adjustment Items" and are more fully described in *Health Care Cost Recovery Litigation - NPM Adjustment Disputes* in Note 10. *Contingencies*). The amounts shown in the table above for the smokeable products segment were recorded by PM USA as (reductions) increases to cost of sales, which (increased) decreased operating companies income in the smokeable products segment.

*Tobacco and Health Litigation Items* - Pre-tax charges related to certain tobacco and health litigation items were recorded in Altria's condensed consolidated statements of earnings as follows:

| | For the Nine Months Ended September 30, | | | For the Three Months Ended September 30, | | |
| | 2018 | | 2017 | 2018 | | 2017 |
| | (in millions) | | | | | |
| Smokeable products segment | $ | 94 | $ | 16 | $ | 10 | $ | — |
| Smokeless products segment | | 10 | | — | | 10 | | — |
| Interest and other debt expense, net | | 15 | | 2 | | 1 | | — |
| Total | $ | 119 | $ | 18 | $ | 21 | $ | — |

The amounts shown in the table above for the smokeable and smokeless products segments were recorded in marketing, administration and research costs. For further discussion, see Note 10. *Contingencies*.

*Smokeless Products Recall* - During the first quarter of 2017, USSTC voluntarily recalled certain smokeless tobacco products manufactured at its Franklin Park, Illinois facility due to a product tampering incident (the "Recall"). USSTC estimated that the Recall reduced smokeless products segment operating companies income by approximately $60 million in the first quarter of 2017.

*Asset Impairment, Exit and Implementation Costs* - In October 2016, Altria announced the consolidation of certain of its operating companies' manufacturing facilities to streamline operations and achieve greater efficiencies. In the first quarter of 2018, Middleton completed the transfer of its Limerick, Pennsylvania operations to the Manufacturing Center site in Richmond, Virginia ("Richmond Manufacturing Center"), and USSTC completed the transfer of its Franklin Park, Illinois operations to its Nashville, Tennessee facility and the Richmond Manufacturing Center. The pre-tax charges related to the consolidation are complete.

19

Pre-tax asset impairment, exit and implementation costs recorded in connection with the facilities consolidation consisted of the following:

| | For the Nine Months Ended September 30, 2018 | | | For the Nine Months Ended September 30, 2017 | | |
|---|---|---|---|---|---|---|
| | Asset Impairment and Exit Costs | Implementation Costs [1] | Total | Asset Impairment and Exit Costs | Implementation Costs [1] | Total |
| | (in millions) | | | | | |
| Smokeable products | $ (4) | $ 1 | $ (3) | $ 2 | $ 17 | $ 19 |
| Smokeless products | 6 | 3 | 9 | 22 | 30 | 52 |
| Total | $ 2 | $ 4 | $ 6 | $ 24 | $ 47 | $ 71 |

| | For the Three Months Ended September 30, 2018 | | | For the Three Months Ended September 30, 2017 | | |
|---|---|---|---|---|---|---|
| | Asset Impairment and Exit Costs | Implementation Costs [1] | Total | Asset Impairment and Exit Costs | Implementation Costs [1] | Total |
| | (in millions) | | | | | |
| Smokeable products | $ (5) | $ (1) | $ (6) | $ — | $ 5 | $ 5 |
| Smokeless products | 3 | — | 3 | 8 | 2 | 10 |
| Total | $ (2) | $ (1) | $ (3) | $ 8 | $ 7 | $ 15 |

[1] The pre-tax implementation costs were included in cost of sales in Altria's condensed consolidated statements of earnings.

### Note 8. Debt:

*Short-term Borrowings and Borrowing Arrangements*

At September 30, 2018 and December 31, 2017, Altria had no short-term borrowings.

On August 1, 2018, Altria entered into a senior unsecured 5-year revolving credit agreement (the "Credit Agreement"). The Credit Agreement, which is used for general corporate purposes, provides for borrowings up to an aggregate principal amount of $3.0 billion. The Credit Agreement expires on August 1, 2023 and includes an option, subject to certain conditions, for Altria to extend the Credit Agreement for two additional one-year periods. The Credit Agreement replaced Altria's prior $3.0 billion senior unsecured 5-year revolving credit agreement, which was to expire on August 19, 2020 and was terminated effective August 1, 2018. Pricing for interest and fees under the Credit Agreement may be modified in the event of a change in the rating of Altria's long-term senior unsecured debt. Interest rates on borrowings under the Credit Agreement are expected to be based on the London Interbank Offered Rate ("LIBOR") plus a percentage based on the higher of the ratings of Altria's long-term senior unsecured debt from Moody's Investors Service, Inc. and Standard & Poor's Ratings Services. The applicable percentage based on Altria's long-term senior unsecured debt ratings at September 30, 2018 for borrowings under the Credit Agreement was 1.0%. The Credit Agreement does not include any other rating triggers, or any provisions that could require the posting of collateral. At September 30, 2018, credit available to Altria under the Credit Agreement was $3.0 billion.

The Credit Agreement includes various covenants, one of which requires Altria to maintain a ratio of consolidated earnings before interest, taxes, depreciation and amortization ("EBITDA") to Consolidated Interest Expense of not less than 4.0 to 1.0, calculated as of the end of the applicable quarter on a rolling four quarters basis. At September 30, 2018, the ratio of consolidated EBITDA to Consolidated Interest Expense, calculated in accordance with the Credit Agreement, was 14.8 to 1.0. At September 30, 2018, Altria was in compliance with, and expects to continue to meet, its covenants associated with the Credit Agreement. The terms "Consolidated EBITDA" and "Consolidated Interest Expense," each as defined in the Credit Agreement, include certain adjustments.

Any commercial paper issued by Altria and borrowings under the Credit Agreement are guaranteed by PM USA as further discussed in Note 11. *Condensed Consolidating Financial Information.*

20

*Long-term Debt*

Altria's estimate of the fair value of its debt is based on observable market information derived from a third-party pricing source and is classified in Level 2 of the fair value hierarchy. The aggregate fair value of Altria's total long-term debt at September 30, 2018 and December 31, 2017, was $14.2 billion and $15.3 billion, respectively, as compared with its carrying value of $13.9 billion for each period.

At September 30, 2018 and December 31, 2017, accrued interest on long-term debt of $155 million and $219 million, respectively, was included in other accrued liabilities on Altria's condensed consolidated balance sheets.

## Note 9. Income Taxes:

On December 22, 2017, the U.S. Government enacted comprehensive tax legislation commonly referred to as the Tax Cuts and Jobs Act (the "Tax Reform Act"). The main provisions of the Tax Reform Act that impact Altria include: (i) a reduction in the U.S. federal statutory corporate income tax rate from 35% to 21% effective January 1, 2018, and (ii) changes in the treatment of foreign-source income, commonly referred to as a modified territorial tax system. The transition to a modified territorial tax system required Altria to record a deemed repatriation tax and an associated tax basis benefit in 2017. Substantially all of the deemed repatriation tax was related to Altria's share of AB InBev's accumulated earnings. Dividends received from AB InBev beginning in 2017, to the extent that such dividends represent previously taxed income attributable to the deemed repatriation tax, result in an associated tax basis expense, which reverses the tax basis benefit recorded in 2017. The Tax Reform Act also includes a provision to tax global intangible low-taxed income ("GILTI") of foreign subsidiaries. Altria made an accounting policy election to treat taxes due under the GILTI provision as a current period expense.

The income tax rate of 25.1% for the nine months ended September 30, 2018 decreased 6.1 percentage points from the nine months ended September 30, 2017. This decrease was due primarily to the following:

- ? a reduction in tax expense in 2018 from the decrease in the U.S. federal statutory corporate income tax rate as a result of the Tax Reform Act; and
- ? tax expense of $114 million in 2017 for tax reserves related to the calculation of certain foreign tax credits;

partially offset by:

- ? tax benefits of $232 million in 2017 for the release of a valuation allowance related to deferred income tax assets for foreign tax credit carryforwards;
- ? tax benefits of $152 million in 2017 related primarily to the effective settlement of the IRS audit of Altria and its consolidated subsidiaries' 2010-2013 tax years;
- ? tax expense of $122 million in 2018, resulting from a partial reversal of the tax basis benefit associated with the deemed repatriation tax;
- ? tax expense of $51 million in 2018 for a valuation allowance on foreign tax credit carryforwards that are not realizable as a result of updates to the provisional estimates recorded in 2017 for the Tax Reform Act; and
- ? tax benefits of $36 million in 2017 for the reversal of tax accruals no longer required.

The income tax rate of 25.5% for the three months ended September 30, 2018 decreased 3.9 percentage points from the three months ended September 30, 2017. This decrease was due primarily to the following:

- ? a reduction in tax expense in 2018 from the decrease in the U.S. federal statutory corporate income tax rate as a result of the Tax Reform Act; and
- ? tax expense of $114 million in 2017 for tax reserves related to the calculation of certain foreign tax credits;

partially offset by:

- ? tax benefits of $232 million in 2017 for the release of a valuation allowance related to deferred income tax assets for foreign tax credit carryforwards;
- ? tax expense of $40 million in 2018, resulting from a partial reversal of the tax basis benefit associated with the deemed repatriation tax;
- ? tax benefits of $36 million in 2017 for the reversal of tax accruals no longer required; and
- ? tax expense of $17 million in 2018 for a valuation allowance on foreign tax credit carryforwards that are not realizable as a result of updates to the provisional estimates recorded in 2017 for the Tax Reform Act.

https://www.sec.gov/Archives/edgar/data/764180/000076418018000095/a2018form10qq32018.htm[6/30/2020 3:11:19 PM]

During the nine and three months ended September 30, 2018, Altria recorded net tax expense of $1 million and a tax benefit of $1 million, respectively, as adjustments to the provisional estimates recorded in 2017 for the tax basis adjustment and the deemed repatriation tax attributable to the Tax Reform Act. Altria may be required to adjust these provisional estimates based on (i) additional guidance related to, or interpretation of, the Tax Reform Act and associated tax laws and (ii) additional information to be received from AB InBev, including information regarding AB InBev's accumulated earnings and associated taxes for the 2016 and 2017 tax years. This additional guidance and information could result in increases or decreases to the provisional estimates, which may be significant in relation to these estimates. Altria will record any such adjustments in 2018.

Altria is subject to income taxation in many jurisdictions. Uncertain tax positions reflect the difference between tax positions taken or expected to be taken on income tax returns and the amounts recognized in the financial statements. Resolution of the related tax positions with the relevant tax authorities may take many years to complete, and such timing is not entirely within the control of Altria. At September 30, 2018, Altria's total unrecognized tax benefits were $(34) million. The amount of unrecognized tax benefits that, if recognized, would impact the effective tax rate at September 30, 2018 was $58 million, along with $(92) million affecting deferred taxes. It is reasonably possible that within the next 12 months certain examinations will be resolved, which could result in a change to Altria's total unrecognized tax benefits to approximately $(75) million. At December 31, 2017, Altria's total unrecognized tax benefits were $66 million. The amount of unrecognized tax benefits that, if recognized, would impact the effective tax rate at December 31, 2017 was $43 million, along with $23 million affecting deferred taxes.

**Note 10. Contingencies:**

Legal proceedings covering a wide range of matters are pending or threatened in various United States and foreign jurisdictions against Altria and its subsidiaries, including PM USA and UST and its subsidiaries, as well as their respective indemnitees. Various types of claims may be raised in these proceedings, including product liability, consumer protection, antitrust, tax, contraband shipments, patent infringement, employment matters, claims for contribution and claims of competitors, shareholders or distributors.

Litigation is subject to uncertainty and it is possible that there could be adverse developments in pending or future cases. An unfavorable outcome or settlement of pending tobacco-related or other litigation could encourage the commencement of additional litigation. Damages claimed in some tobacco-related and other litigation are or can be significant and, in certain cases, have ranged in the billions of dollars. The variability in pleadings in multiple jurisdictions, together with the actual experience of management in litigating claims, demonstrate that the monetary relief that may be specified in a lawsuit bears little relevance to the ultimate outcome. In certain cases, plaintiffs claim that defendants' liability is joint and several. In such cases, Altria or its subsidiaries may face the risk that one or more co-defendants decline or otherwise fail to participate in the bonding required for an appeal or to pay their proportionate or jury-allocated share of a judgment. As a result, Altria or its subsidiaries under certain circumstances may have to pay more than their proportionate share of any bonding- or judgment-related amounts. Furthermore, in those cases where plaintiffs are successful, Altria or its subsidiaries may also be required to pay interest and attorneys' fees.

Although PM USA has historically been able to obtain required bonds or relief from bonding requirements in order to prevent plaintiffs from seeking to collect judgments while adverse verdicts have been appealed, there remains a risk that such relief may not be obtainable in all cases. This risk has been substantially reduced given that 47 states and Puerto Rico limit the dollar amount of bonds or require no bond at all. As discussed below, however, tobacco litigation plaintiffs have challenged the constitutionality of Florida's bond cap statute in several cases and plaintiffs may challenge state bond cap statutes in other jurisdictions as well. Such challenges may include the applicability of state bond caps in federal court. States, including Florida, may also seek to repeal or alter bond cap statutes through legislation. Although Altria cannot predict the outcome of such challenges, it is possible that the consolidated results of operations, cash flows or financial position of Altria, or one or more of its subsidiaries, could be materially affected in a particular fiscal quarter or fiscal year by an unfavorable outcome of one or more such challenges.

Altria and its subsidiaries record provisions in the condensed consolidated financial statements for pending litigation when they determine that an unfavorable outcome is probable and the amount of the loss can be reasonably estimated. At the present time, while it is reasonably possible that an unfavorable outcome in a case may occur, except to the extent discussed elsewhere in this Note 10. *Contingencies*: (i) management has concluded that it is not probable that a loss has been incurred in any of the pending tobacco-related cases; (ii) management is unable to estimate the possible loss or range of loss that could result from an unfavorable outcome in any of the pending tobacco-related cases; and (iii) accordingly, management has not provided any

22

amounts in the condensed consolidated financial statements for unfavorable outcomes, if any. Litigation defense costs are expensed as incurred.

Altria and its subsidiaries have achieved substantial success in managing litigation. Nevertheless, litigation is subject to uncertainty and significant challenges remain. It is possible that the consolidated results of operations, cash flows or financial position of Altria, or one or more of its subsidiaries, could be materially affected in a particular fiscal quarter or fiscal year by an unfavorable outcome or settlement of certain pending litigation. Altria and each of its subsidiaries named as a defendant believe, and each has been so advised by counsel handling the respective cases, that it has valid defenses to the litigation pending against it, as well as valid bases for appeal of adverse verdicts. Each of the companies has defended, and will continue to defend, vigorously against litigation challenges. However, Altria and its subsidiaries may enter into settlement discussions in particular cases if they believe it is in the best interests of Altria to do so.

**Overview of Altria and/or PM USA Tobacco-Related Litigation**

*Types and Number of Cases*

Claims related to tobacco products generally fall within the following categories: (i) smoking and health cases alleging personal injury brought on behalf of individual plaintiffs; (ii) smoking and health cases primarily alleging personal injury or seeking court-supervised programs for ongoing medical monitoring and purporting to be brought on behalf of a class of individual plaintiffs, including cases in which the aggregated claims of a number of individual plaintiffs are to be tried in a single proceeding; (iii) health care cost recovery cases brought by governmental (both domestic and foreign) plaintiffs seeking reimbursement for health care expenditures allegedly caused by cigarette smoking and/or disgorgement of profits; (iv) class action suits alleging that the uses of the terms "Lights" and "Ultra Lights" constitute deceptive and unfair trade practices, common law or statutory fraud, unjust enrichment, breach of warranty or violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); and (v) other tobacco-related litigation described below. Plaintiffs' theories of recovery and the defenses raised in pending smoking and health, health care cost recovery and "Lights/Ultra Lights" cases are discussed below.

The table below lists the number of certain tobacco-related cases pending in the United States against PM USA and, in some instances, Altria as of October 22, 2018, October 23, 2017 and October 24, 2016:

|  | October 22, 2018 | October 23, 2017 | October 24, 2016 |
|---|---|---|---|
| Individual Smoking and Health Cases [1] | 101 | 87 | 66 |
| Smoking and Health Class Actions and Aggregated Claims Litigation [2] | 2 | 4 | 5 |
| Health Care Cost Recovery Actions [3] | 1 | 1 | 1 |
| "Lights/Ultra Lights" Class Actions | 2 | 4 | 9 |

[1] Includes 29 cases filed in Massachusetts and 38 non-*Engle* cases filed in Florida. Does not include individual smoking and health cases brought by or on behalf of plaintiffs in Florida state and federal courts following the decertification of the *Engle* case (these *Engle* progeny cases are discussed below in *Smoking and Health Litigation - Engle Class Action*). Also does not include 1,491 cases brought by flight attendants seeking compensatory damages for personal injuries allegedly caused by exposure to environmental tobacco smoke ("ETS"). The flight attendants allege that they are members of an ETS smoking and health class action in Florida, which was settled in 1997 (*Broin*). The terms of the court-approved settlement in that case allowed class members to file individual lawsuits seeking compensatory damages, but prohibited them from seeking punitive damages. In March 2018, 923 of these cases were voluntarily dismissed without prejudice.
[2] The 2016 and 2017 pending cases include as one case the 30 civil actions that were to be tried in six consolidated trials in West Virginia (*In re: Tobacco Litigation*). PM USA was a defendant in nine of the 30 cases. The parties resolved these cases for an immaterial amount and in the second quarter of 2018, the court dismissed all 30 cases.
[3] See *Health Care Cost Recovery Litigation - Federal Government's Lawsuit* below.

*International Tobacco-Related Cases*

As of October 22, 2018, PM USA is a named defendant in 10 health care cost recovery actions in Canada, eight of which also name Altria as a defendant. PM USA and Altria are also named defendants in seven smoking and health class actions filed in various Canadian provinces. See *Guarantees and Other Similar Matters* below for a discussion of the Distribution Agreement between Altria and Philip Morris International Inc. ("PMI") that provides for indemnities for certain liabilities concerning tobacco products.

23

*Tobacco-Related Cases Set for Trial*

As of October 22, 2018, 5 *Engle* progeny cases are set for trial through December 31, 2018. In addition, there are two individual smoking and health case against PM USA set for trial during this period. Cases against other companies in the tobacco industry may also be scheduled for trial during this period. Trial dates are subject to change.

*Trial Results*

Since January 1999, excluding the *Engle* progeny cases (separately discussed below), verdicts have been returned in 64 smoking and health, "Lights/Ultra Lights" and health care cost recovery cases in which PM USA was a defendant. Verdicts in favor of PM USA and other defendants were returned in 43 of the 64 cases. These 43 cases were tried in Alaska (1), California (7), Connecticut (1), Florida (10), Louisiana (1), Massachusetts (3), Mississippi (1), Missouri (4), New Hampshire (1), New Jersey (1), New York (5), Ohio (2), Pennsylvania (1), Rhode Island (1), Tennessee (2) and West Virginia (2). A motion for a new trial was granted in one of the cases in Florida and in the case in Alaska. In the Alaska case (*Hunter*), the jury returned a verdict in favor of PM USA in April 2018 in the third trial of this case. In May 2018, plaintiff filed a motion for a new trial, which the court denied.

Of the 21 non-*Engle* progeny cases in which verdicts were returned in favor of plaintiffs, 19 have reached final resolution.

See *Smoking and Health Litigation - Engle Progeny Trial Results* below for a discussion of verdicts in state and federal *Engle* progeny cases involving PM USA as of October 22, 2018.

*Judgments Paid and Provisions for Tobacco and Health Litigation Items (Including Engle Progeny Litigation)*

After exhausting all appeals in those cases resulting in adverse verdicts associated with tobacco-related litigation, since October 2004, PM USA has paid in the aggregate judgments and settlements (including related costs and fees) totaling approximately $578 million and interest totaling approximately $195 million as of September 30, 2018. These amounts include payments for *Engle* progeny judgments (and related costs and fees) totaling approximately $186 million, interest totaling approximately $33 million and payment of approximately $43 million in connection with the Federal *Engle* Agreement, discussed below.

The changes in Altria's accrued liability for tobacco and health litigation items, including related interest costs, for the periods specified below are as follows:

|  | For the Nine Months Ended September 30, | | For the Three Months Ended September 30, | |
|  | 2018 | 2017 | 2018 | 2017 |
| --- | --- | --- | --- | --- |
|  | (in millions) | | | |
| Accrued liability for tobacco and health litigation items at beginning of period [1] | $ 106 | $ 47 | $ 107 | $ 47 |
| Pre-tax charges for: | | | | |
| Tobacco and health litigation | 104 | 16 | 20 | — |
| Related interest costs | 15 | 2 | 1 | — |
| Payments [1] | (118) | (18) | (21) | — |
| Accrued liability for tobacco and health litigation items at end of period [1] | $ 107 | $ 47 | $ 107 | $ 47 |

[1] Includes amounts related to the costs of implementing the corrective communications remedy related to the *Federal Government's Lawsuit* discussed below.

The accrued liability for tobacco and health litigation items, including related interest costs, was included in liabilities on Altria's condensed consolidated balance sheets. Pre-tax charges for tobacco and health litigation were included in marketing, administration and research costs on Altria's condensed consolidated statements of earnings. Pre-tax charges for related interest costs were included in interest and other debt expense, net on Altria's condensed consolidated statements of earnings.

24

*Security for Judgments*

To obtain stays of judgments pending appeal, PM USA has posted various forms of security. As of September 30, 2018, PM USA has posted appeal bonds totaling approximately $99 million, which have been collateralized with cash deposits that are included in assets on the condensed consolidated balance sheet.

**Smoking and Health Litigation**

*Overview*

Plaintiffs' allegations of liability in smoking and health cases are based on various theories of recovery, including negligence, gross negligence, strict liability, fraud, misrepresentation, design defect, failure to warn, nuisance, breach of express and implied warranties, breach of special duty, conspiracy, concert of action, violations of deceptive trade practice laws and consumer protection statutes, and claims under the federal and state anti-racketeering statutes. Plaintiffs in the smoking and health cases seek various forms of relief, including compensatory and punitive damages, treble/multiple damages and other statutory damages and penalties, creation of medical monitoring and smoking cessation funds, disgorgement of profits, and injunctive and equitable relief. Defenses raised in these cases include lack of proximate cause, assumption of the risk, comparative fault and/or contributory negligence, statutes of limitations and preemption by the Federal Cigarette Labeling and Advertising Act.

*Non-Engle Progeny Litigation*

Summarized below are the non-*Engle* progeny smoking and health cases pending during 2018 in which a verdict was returned in favor of plaintiff and against PM USA. Charts listing certain verdicts for plaintiffs in the *Engle* progeny cases can be found in *Smoking and Health Litigation - Engle Progeny Trial Results* below.

*Gentile*: In October 2017, a jury in a Florida state court returned a verdict in favor of plaintiff, awarding approximately $7.1 million in compensatory damages and allocating 75% of the fault to PM USA (an amount of approximately $5.3 million). In April 2018, the trial court entered final judgment in favor of plaintiff and PM USA posted a bond in the amount of approximately $8 million. In May 2018, PM USA filed a notice of appeal to the Florida Fourth District Court of Appeal.

*Bullock*: In December 2015, a jury in the U.S. District Court for the Central District of California returned a verdict in favor of plaintiff, awarding $900,000 in compensatory damages. On appeal, the U.S. Court of Appeals for the Ninth Circuit affirmed the judgment. In the fourth quarter of 2017, PM USA recorded a provision on its consolidated balance sheet of approximately $1 million for the judgment, interest and associated costs. In the first quarter of 2018, PM USA paid this amount, concluding this litigation.

*Federal Government's Lawsuit*: See *Health Care Cost Recovery Litigation - Federal Government's Lawsuit* below for a discussion of the verdict and post-trial developments in the *United States of America* health care cost recovery case.

*Engle Class Action*

In July 2000, in the second phase of the *Engle* smoking and health class action in Florida, a jury returned a verdict assessing punitive damages totaling approximately $145 billion against various defendants, including $74 billion against PM USA. Following entry of judgment, PM USA appealed. In May 2003, the Florida Third District Court of Appeal reversed the judgment entered by the trial court and instructed the trial court to order the decertification of the class. Plaintiffs petitioned the Florida Supreme Court for further review.

In July 2006, the Florida Supreme Court ordered that the punitive damages award be vacated, that the class approved by the trial court be decertified and that members of the decertified class could file individual actions against defendants within one year of issuance of the mandate. The court further declared the following Phase I findings are entitled to *res judicata* effect in such individual actions brought within one year of the issuance of the mandate: (i) that smoking causes various diseases; (ii) that nicotine in cigarettes is addictive; (iii) that defendants' cigarettes were defective and unreasonably dangerous; (iv) that defendants concealed or omitted material information not otherwise known or available knowing that the material was false or misleading or failed to disclose a material fact concerning the health effects or addictive nature of smoking; (v) that defendants agreed to misrepresent information regarding the health effects or addictive nature of cigarettes with the intention of causing the public to rely on this information to their detriment; (vi) that defendants agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers would rely on the information to their

25

detriment; (vii) that all defendants sold or supplied cigarettes that were defective; and (viii) that defendants were negligent. The court also reinstated compensatory damages awards totaling approximately $6.9 million to two individual plaintiffs and found that a third plaintiff's claim was barred by the statute of limitations. In February 2008, PM USA paid approximately $3 million, representing its share of compensatory damages and interest, to the two individual plaintiffs identified in the Florida Supreme Court's order.

In August 2006, PM USA and plaintiffs sought rehearing from the Florida Supreme Court on parts of its July 2006 opinion. In December 2006, the Florida Supreme Court refused to revise its July 2006 ruling, except that it revised the set of Phase I findings entitled to *res judicata* effect by excluding finding (v) listed above (relating to agreement to misrepresent information), and added the finding that defendants sold or supplied cigarettes that, at the time of sale or supply, did not conform to the representations of fact made by defendants. In January 2007, the Florida Supreme Court issued the mandate from its revised opinion. In May 2007, defendants filed a petition for *writ of certiorari* with the United States Supreme Court, which was denied. In February 2008, the trial court decertified the class.

*Engle Progeny Cases*

The deadline for filing *Engle* progeny cases expired in January 2008. As of October 22, 2018, approximately 2,200 state court cases were pending against PM USA or Altria asserting individual claims by or on behalf of approximately 3,000 state court plaintiffs. Because of a number of factors, including, but not limited to, docketing delays, duplicated filings and overlapping dismissal orders, these numbers are estimates. While the Federal *Engle* Agreement (discussed below) resolved nearly all *Engle* progeny cases pending in federal court, as of October 22, 2018, approximately 7 cases were pending against PM USA in federal court representing the cases excluded from that agreement.

*Agreement to Resolve Federal Engle Progeny Cases*

In 2015, PM USA, R.J. Reynolds Tobacco Company ("R.J. Reynolds") and Lorillard Tobacco Company ("Lorillard") resolved approximately 415 pending federal *Engle* progeny cases (the "Federal *Engle* Agreement"). Under the terms of the Federal *Engle* Agreement, PM USA paid approximately $43 million. Federal cases that were in trial and those that previously reached final verdict were not included in the Federal *Engle* Agreement.

*Engle Progeny Trial Results*

As of October 22, 2018, 124 federal and state *Engle* progeny cases involving PM USA have resulted in verdicts since the Florida Supreme Court *Engle* decision. Sixty-eight verdicts were returned in favor of plaintiffs and eight verdicts (*Skolnick, Calloway, Pollari, McCoy, Duignan, Caprio, Oshinsky-Blacker* and *McCall*) that were initially returned in favor of plaintiffs were reversed post-trial or on appeal and remain pending. *Skolnick* was remanded for a new trial on plaintiff's concealment and conspiracy claims; *Calloway* was reversed and remanded for a new trial on an appellate finding that improper arguments by plaintiff's counsel deprived defendants of a fair trial; *Pollari* and *McCoy* were reversed and remanded for a new trial on an appellate finding that the trial court erred in admitting certain materials into evidence that deprived defendants of a fair trial; *Duignan* was reversed and remanded for a new trial on an appellate finding that the trial judge erred in responding to a question from the jury during deliberations; *Caprio* was reversed post-trial after defendants agreed to voluntarily dismiss their appeal in exchange for a full retrial; *Oshinsky-Blacker* was reversed post-trial based on plaintiff's counsel's improper arguments at trial; and *McCall* was reversed based on an appellate finding that the trial judge erred in instructing the jury on the warning labels on cigarette packs.

Forty-four verdicts were returned in favor of PM USA, of which 37 were state cases. In addition, there have been a number of mistrials, only some of which have resulted in new trials as of October 22, 2018. Four verdicts (*D. Cohen, Collar, Chacon* and *Starbuck*) that were returned in favor of PM USA were subsequently reversed for new trials. Juries in two cases (*Reider* and *Banks*) returned zero damages verdicts in favor of PM USA. Juries in two other cases (*Weingart* and *Hancock*) returned verdicts against PM USA awarding no damages, but the trial court in each case granted an *additur*.

The charts below list the verdicts and post-trial developments in certain *Engle* progeny cases in which verdicts were returned in favor of plaintiffs. The first chart lists such cases that are pending as of October 22, 2018; the second chart lists such cases that were pending within the previous 12 months, but that are now concluded. Unless otherwise noted for a particular case, the jury's award for compensatory damages will not be reduced by any finding of plaintiff's comparative fault (see *Engle Progeny Appellate Issues* below for a discussion of the Florida Supreme Court's decision in *Schoeff*).

26

*Currently-Pending Engle Cases*

_____

**Plaintiff:** *Chadwell*

**Date:** September 2018

**Verdict:**

A Miami-Dade County jury returned a verdict in favor of plaintiff and against PM USA awarding compensatory damages of $2.4 million. The jury did not award any punitive damages.

**Post-Trial Developments:**

In September 2018, the trial court entered final judgment in favor of plaintiff and, in October 2018, PM USA filed various post-trial motions, including motions for a new trial and to set aside the verdict.

_____

**Plaintiff:** *Kaplan*

**Date:** July 2018

**Verdict:**

A Broward County jury returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds awarding compensatory damages of approximately $2.1 million. The jury also awarded $2.3 million in punitive damages against PM USA.

**Post-Trial Developments:**

In July 2018, the trial court entered final judgment in favor of plaintiff and defendants filed various post-trial motions, including motions for a new trial and to set aside the verdict. In August 2018, the trial court denied all post-trial motions. In September 2018, defendants filed a notice of appeal to the Florida Fourth District Court of Appeal and PM USA posted a bond in the amount of approximately $3 million. In October 2018, plaintiff cross-appealed.

_____

**Plaintiff:** *Landi*

**Date:** June 2018

**Verdict:**

A Broward County jury returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds awarding compensatory damages of $8 million. The jury also awarded $5 million in punitive damages against PM USA.

**Post-Trial Developments:**

In June 2018, the trial court entered final judgment in favor of plaintiff and defendants filed various post-trial motions, including motions for a new trial and to set aside the verdict. In July 2018, the trial court denied all post-trial motions. In August 2018, defendants filed a notice of appeal to the Florida Fourth District Court of Appeal and PM USA posted a bond in the amount of approximately $2 million. In September 2018, plaintiff cross-appealed.

_____

**Plaintiff:** *Theis*

**Date:** May 2018

**Verdict:**

A Sarasota County jury returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds awarding compensatory damages of $7 million. The jury also awarded $10 million in punitive damages against PM USA.

**Post-Trial Developments:**

In June 2018, the trial court entered final judgment in favor of plaintiff and defendants filed various post-trial motions, including motions to set aside various portions of the verdict and for a new trial or, in the alternative, for *remittitur* of the damages awards. In July 2018, the trial court denied all post-trial motions. In August 2018, defendants filed a notice of appeal to the Florida Second District Court of Appeal and PM USA posted a bond in the amount of approximately $3 million.

_____

**Plaintiff:** *Freeman*

**Date:** March 2018

**Verdict:**

An Alachua County jury returned a verdict in favor of plaintiff and against PM USA awarding compensatory damages of $4 million. The jury did not award any punitive damages.

27

**Post-Trial Developments:**

In March 2018, the trial court entered final judgment in favor of plaintiff and PM USA filed various post-trial motions, including motions to enter judgment in defendant's favor and for a new trial. In April 2018, the trial court denied all post-trial motions. In May 2018, PM USA filed a notice of appeal to the Florida First District Court of Appeal and posted a bond in the amount of $4 million.

_____

**Plaintiff:** *Gloger*

**Date:** February 2018

**Verdict:**

A Miami-Dade County jury returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds awarding compensatory damages of $7.5 million. The jury also awarded $5 million in punitive damages against PM USA.

**Post-Trial Developments:**

In February 2018, the trial court entered final judgment in favor of plaintiff and defendants filed various post-trial motions, including motions to enter judgment in defendants' favor and for a new trial, which the trial court denied in May 2018. Also in February 2018, defendants filed a notice of appeal to the Florida Third District Court of Appeal and posted a bond in the amount of approximately $3 million.

_____

**Plaintiff:** *Bryant*

**Date:** December 2017

**Verdict:**

An Escambia County jury returned a verdict in favor of plaintiff and against PM USA awarding compensatory damages of $581,000. The jury also awarded $225,000 in punitive damages against PM USA.

**Post-Trial Developments:**

In December 2017, PM USA filed various post-trial motions, including motions to enter judgment in its favor and for a new trial. Plaintiff also filed a motion for a new trial on the amount of punitive damages. In February 2018, the trial court denied all post-trial motions and entered final judgment in favor of plaintiff. In March 2018, PM USA filed a notice of appeal to the Florida First District Court of Appeal and posted a bond in the amount of approximately $1 million.

_____

**Plaintiff:** *R. Douglas*

**Date:** November 2017

**Verdict:**

A Duval County jury returned a verdict in favor of plaintiff and against PM USA awarding compensatory damages of $131,371 and allocating 4% of the fault to PM USA (an amount of $5,255).

**Post-Trial Developments:**

In November 2017, PM USA filed a motion to set aside the verdict, and plaintiff filed a motion for a new trial or, in the alternative, for an *additur* of the damages award. In February 2018, the trial court denied the parties' post-trial motions.

_____

**Plaintiff:** *Wallace*

**Date:** October 2017

**Verdict:**

A Brevard County jury returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds awarding compensatory damages of $12 million.  The jury also awarded plaintiff $16 million in punitive damages against PM USA.

**Post-Trial Developments:**

In November 2017, defendants filed post-trial motions, including for a new trial or *remittitur* of the damages awards. In December 2017, the court denied certain post-trial motions. In January 2018, the court denied the remaining post-trial motions and entered final judgment against PM USA and R.J. Reynolds. In February 2018, defendants filed a notice of appeal to the Florida Fifth District Court of Appeal and posted a bond in the amount of approximately $3 million, and plaintiff cross-appealed.

_____

https://www.sec.gov/Archives/edgar/data/764180/000076418018000095/a2018form10qq32018.htm[6/30/2020 3:11:19 PM]

**Plaintiff:** *L. Martin*

**Date:** May 2017

**Verdict:**

A Miami-Dade County jury returned a verdict in favor of plaintiff and against PM USA awarding compensatory damages of $1.1 million and allocating 55% of the fault to PM USA (an amount of $605,000). The jury also awarded plaintiff $1.3 million in punitive damages against PM USA.

**Post-Trial Developments:**

In May 2017, PM USA filed various post-trial motions, including motions to set aside the verdict and for a new trial. In June 2017, the trial court entered final judgment in favor of plaintiff with a deduction for plaintiff's comparative fault. In August 2017, the court denied PM USA's post-trial motions and PM USA filed a notice of appeal to the Florida Third District Court of Appeal and posted a bond in the amount of approximately $2 million. In September 2017, plaintiff cross-appealed.

_____

**Plaintiff:** *Sommers*

**Date:** April 2017

**Verdict:**

A Miami-Dade County jury returned a verdict in favor of plaintiff and against PM USA awarding compensatory damages of $1 million. The court dismissed the punitive damages claim prior to trial.

**Post-Trial Developments:**

In April 2017, PM USA filed motions for a new trial and for a directed verdict, and plaintiff filed a motion for a new trial on punitive damages. In January 2018, the trial court granted plaintiff's motion for a new trial on punitive damages, denied PM USA's post-trial motions, and PM USA filed a notice of appeal to the Florida Third District Court of Appeal. In February 2018, plaintiff cross-appealed. In April 2018, the trial court entered an amended final judgment in favor of plaintiff. In May 2018, PM USA filed a notice of appeal to the Florida Third District Court of Appeal to review the amended final judgment and posted a bond in the amount of $1 million.

_____

**Plaintiff:** *Santoro*

**Date:** March 2017

**Verdict:**

A Broward County jury returned a verdict in favor of plaintiff and against PM USA, R.J. Reynolds and Liggett Group LLC ("Liggett Group") awarding compensatory damages of $1.6 million. The jury also awarded plaintiff $100,000 in punitive damages against PM USA.

**Post-Trial Developments:**

In April 2017, the trial court entered final judgment in favor of plaintiff with a deduction for plaintiff's comparative fault and defendants filed various post-trial motions, including motions to set aside the verdict and for a new trial. In December 2017, the trial court granted defendants' motion to set aside the verdict as to all claims except plaintiff's conspiracy claim. In January 2018, plaintiff filed a motion to amend the final judgment to award the full compensatory damages without reduction for plaintiff's comparative fault. In May 2018, the trial court denied defendants' remaining post-trial motions, but set aside the punitive damages award. The trial court also granted plaintiff's motion to amend the final judgment to award full compensatory damages. In June 2018, defendants filed a notice of appeal to the Florida Fourth District Court of Appeal and plaintiff filed a notice of cross-appeal. PM USA subsequently posted a bond in the amount of approximately $1 million.

_____

**Plaintiff:** *J. Brown*

**Date:** February 2017

**Verdict:**

A Pinellas County jury returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds awarding compensatory damages of $5.4 million. The jury also awarded plaintiff $200,000 in punitive damages against PM USA.

**Post-Trial Developments:**

In March 2017, defendants filed various post-trial motions, including motions to set aside the verdict and for a new trial. In August 2017, the trial court denied defendants' post-trial motions and entered final judgment in favor of plaintiff. In September 2017, defendants filed a notice of appeal to the Florida Second District Court of Appeal and posted a bond in the amount of $3 million.

_____

29

**Plaintiff:** *Pardue*

**Date:** December 2016

**Verdict:**

An Alachua County jury returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds awarding compensatory damages of approximately $5.9 million. The jury also awarded plaintiff $6.75 million in punitive damages against PM USA.

**Post-Trial Developments:**

In December 2016, the trial court entered final judgment in favor of plaintiff. In January 2017, PM USA and R.J. Reynolds filed various post-trial motions, including motions to set aside the verdict and for a new trial or, in the alternative, for *remittitur* of the jury's damages awards. In February 2017, the court granted defendants' alternative motion for *remittitur*, reducing the compensatory damages award against PM USA and R.J. Reynolds to approximately $5.2 million. Also in February 2017, defendants filed a renewed motion to alter or amend the judgment, which the court denied in April 2017. In March 2017, defendants filed a notice of appeal to the Florida First District Court of Appeal and plaintiff cross-appealed. In April 2017, PM USA posted a bond in the amount of approximately $3 million. In June 2018, the Florida First District Court of Appeal issued a *per curiam* decision affirming the trial court's judgment against defendants. In the second quarter of 2018, PM USA recorded a provision on its condensed consolidated balance sheet of approximately $9 million for the judgment and interest and increased its bond by $5 million.

_____

**Plaintiff:** *S. Martin*

**Date:** November 2016

**Verdict:**

A Broward County jury returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds awarding compensatory damages of approximately $5.4 million and allocating 46% of the fault to PM USA (an amount of approximately $2.48 million). The jury also awarded plaintiff $450,000 in punitive damages against PM USA.

**Post-Trial Developments:**

In December 2016, the trial court entered final judgment in favor of plaintiff with a deduction for plaintiff's comparative fault and PM USA and R.J. Reynolds filed various post-trial motions, including motions to set aside the verdict and for a new trial. In January 2017, the trial court denied all post-trial motions. In February 2017, defendants filed a notice of appeal to the Florida Fourth District Court of Appeal and plaintiff cross-appealed. Also in February 2017, PM USA posted a bond in the amount of approximately $3 million.

_____

**Plaintiff:** *Oshinsky-Blacker*

**Date:** September 2016

**Verdict:**

A Broward County jury returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds awarding compensatory damages of $6.155 million and allocating 60% of the fault to PM USA (an amount of $3.7 million). The jury also awarded plaintiff $1 million in punitive damages against PM USA.

**Post-Trial Developments:**

In October 2016, PM USA and R.J. Reynolds filed motions to set aside the verdict and for a directed verdict. In March 2017, the trial court vacated the verdict, ordered a new trial based on plaintiff's counsel's improper arguments at trial and denied defendants' remaining post-trial motions. Also in March 2017, plaintiff filed a notice of appeal to the Florida Fourth District Court of Appeal and defendants cross-appealed. In July 2018, the Florida Fourth District Court of Appeal affirmed the trial court's grant of a new trial.

_____

**Plaintiff:** *McCall*

**Date:** March 2016

**Verdict:**

A Broward County jury returned a verdict in favor of plaintiff and against PM USA awarding compensatory damages of $350,000 and allocating 25% of the fault to PM USA (an amount of $87,500).

**Post-Trial Developments:**

In March 2016, PM USA filed a motion to set aside the verdict and to enter judgment in its favor, which the court denied in May 2016. Also in March 2016, plaintiff filed a motion for a new trial on punitive damages, citing the Soffer decision (allowing Engle progeny plaintiffs to seek punitive damages on their negligence and strict liability claims) discussed below

30

under Engle Progeny Appellate Issues, which the court granted in May 2016. In June 2016, PM USA filed a notice of appeal to the Florida Fourth District Court of Appeal and plaintiff cross-appealed. In December 2017, the Florida Fourth District Court of Appeal reversed the judgment and remanded the case for a new trial on an appellate finding that the trial judge erred in instructing the jury on the warning labels on cigarette packs.

_____

**Plaintiff:** *Danielson*

**Date:** November 2015

**Verdict:**

An Escambia County jury returned a verdict in favor of plaintiff and against PM USA awarding $325,000 in compensatory damages. The jury also awarded plaintiff $325,000 in punitive damages.

**Post-Trial Developments:**

In November 2015, plaintiff filed a motion to enforce the parties' pretrial stipulation of $2.3 million in economic damages, which the trial court granted. The plaintiff also filed a motion for an additur or, in the alternative, for a new trial and PM USA filed post-trial motions, including a motion concerning the proper form of judgment and for a new trial. In December 2015, the trial court granted plaintiff's motion for a new trial on damages and denied PM USA's post-trial motions. In January 2016, PM USA filed a notice of appeal to the Florida First District Court of Appeal. In July 2017, the Florida First District Court of Appeal affirmed the trial court's order granting a new trial on non-economic compensatory damages, but reinstated the jury's punitive damages award. In September 2018, in the retrial, an Escambia County jury returned a verdict against PM USA awarding $250,000 in non-economic compensatory damages. The trial court subsequently entered final judgment awarding a total of approximately $2.6 million in compensatory damages and $325,000 in punitive damages, which includes both the 2015 and 2018 damages awards. Also in September 2018, PM USA filed various post-trial motions, including motions to set aside the verdict, which the court denied in October 2018. Also in October 2018, PM USA posted a bond in the amount of approximately $3 million.

_____

**Plaintiff:** *Duignan*

**Date:** September 2015

**Verdict:**

A Pinellas County jury returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds awarding $6 million in compensatory damages. The jury also awarded plaintiff $3.5 million in punitive damages against PM USA.

**Post-Trial Developments:**

In September 2015, the trial court entered final judgment and PM USA filed various post-trial motions, including motions to set aside the verdict and for a new trial, which the court denied in October 2015. In November 2015, PM USA and R.J. Reynolds filed a notice of appeal to the Florida Second District Court of Appeal and PM USA posted a bond in the amount of approximately $3 million. In November 2017, the Florida Second District Court of Appeal reversed the judgment against PM USA and R.J. Reynolds and ordered a new trial on an appellate finding that the trial judge erred in responding to a question from the jury during deliberations. Also in November 2017, plaintiff filed a motion for rehearing with the Florida Second District Court of Appeal, which the court denied in January 2018.

_____

**Plaintiff:** *Cooper*

**Date:** September 2015

**Verdict:**

A Broward County jury returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds awarding $4.5 million in compensatory damages and allocating 10% of the fault to PM USA (an amount of $450,000).

**Post-Trial Developments:**

In September 2015, defendants filed various post-trial motions, including motions to set aside the verdict and for a directed verdict. In January 2016, the trial court denied PM USA's post-trial motions. In February 2016, the trial court entered final judgment in favor of plaintiff, reducing the compensatory damages award against PM USA to approximately $300,000. In March 2016, PM USA and R.J. Reynolds filed a notice of appeal to the Florida Fourth District Court of Appeal and plaintiff cross-appealed. Also in March 2016, PM USA posted a bond in the amount of approximately $300,000. In January 2018, the Florida Fourth District Court of Appeal affirmed the judgment in favor of plaintiff and granted plaintiff a new trial on punitive damages.

_____

31

**Plaintiff:** *Jordan*

**Date:** August 2015

**Verdict:**

A Duval County jury returned a verdict in favor of plaintiff and against PM USA awarding approximately $7.8 million in compensatory damages. The jury also awarded approximately $3.2 million in punitive damages.

**Post-Trial Developments:**

In August 2015, the trial court entered final judgment against PM USA and reduced the compensatory damages to approximately $6.4 million. PM USA filed various post-trial motions, including motions to set aside the verdict and for a new trial, which the court denied in December 2015. PM USA subsequently filed a notice of appeal to the Florida First District Court of Appeal and plaintiff cross-appealed. In April 2018, the Florida First District Court of Appeal issued a *per curiam* decision affirming the trial court's judgment in favor of plaintiff and PM USA filed a motion for rehearing, which the court denied in May 2018. In the second quarter of 2018, PM USA posted a bond in the amount of approximately $10 million and recorded a provision on its condensed consolidated balance sheet of approximately $11 million for the judgment and interest.

_____

**Plaintiff:** *McCoy*

**Date:** July 2015

**Verdict:**

A Broward County jury returned a verdict in favor of plaintiff and against PM USA, R.J. Reynolds and Lorillard awarding $1.5 million in compensatory damages and allocating 20% of the fault to PM USA (an amount of $300,000). The jury also awarded $3 million in punitive damages against each defendant.

**Post-Trial Developments:**

In July 2015, defendants filed various post-trial motions, including motions to set aside the verdict and for a new trial. In August 2015, the trial court entered final judgment without any deduction for plaintiff's comparative fault. In January 2016, the trial court denied defendants' post-trial motions and amended the final judgment to apply the comparative fault deduction. Subsequently, defendants filed a notice of appeal to the Florida Fourth District Court of Appeal, PM USA posted a bond in the amount of approximately $2 million and plaintiff filed a notice of cross-appeal. In November 2017, the Florida Fourth District Court of Appeal reversed the judgment against PM USA and R.J. Reynolds and ordered a new trial on an appellate finding that the trial court erred in admitting certain materials into evidence that deprived defendants of a fair trial. In December 2017, plaintiff filed a notice to invoke the discretionary jurisdiction of the Florida Supreme Court and the case was stayed pending the Florida Supreme Court's decision in *Pollari*, discussed below.

_____

**Plaintiff:** *M. Brown*

**Date:** May 2015

**Verdict:**

In May 2015, a Duval County jury returned a verdict in favor of plaintiff and against PM USA in a partial retrial. In 2013, a jury returned a partial verdict against PM USA, but was deadlocked as to (i) the amount of compensatory damages, (ii) whether punitive damages should be awarded and, if so, (iii) the amount of punitive damages. In the partial retrial, the jury was asked to address these issues. In May 2015, the jury awarded $6.375 million in compensatory damages, but did not award any punitive damages.

**Post-Trial Developments:**

In May 2015, the trial court entered final judgment and PM USA posted a bond in the amount of $5 million. Additionally, PM USA filed post-trial motions, including motions to set aside the verdict and for a new trial, as well as filed a notice of appeal to the Florida First District Court of Appeal. In August 2015, the trial court denied the last of PM USA's post-trial motions and plaintiff cross-appealed. In April 2018, the Florida First District Court of Appeal issued a *per curiam* decision affirming the trial court's judgment against PM USA. In May 2018, PM USA filed a motion for rehearing, rehearing *en banc* or for certification of a question to the Florida Supreme Court, which the court denied. In the second quarter of 2018, PM USA increased its bond by approximately $1 million and recorded a provision on its condensed consolidated balance sheet of approximately $7 million for the judgment and interest.

_____

**Plaintiff:** *Pollari*

**Date:** March 2015

32

**Verdict:**

A Broward County jury returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds awarding $10 million in compensatory damages and allocating 42.5% of the fault to PM USA (an amount of $4.25 million). The jury also awarded $1.5 million in punitive damages against each defendant.

**Post-Trial Developments:**

In April 2015, defendants filed post-trial motions, including motions to set aside the verdict and for a new trial, and the trial court entered final judgment without any deduction for plaintiff's comparative fault. In January 2016, the trial court denied defendants' post-trial motions and amended the final judgment to apply the comparative fault deduction. Also in January 2016, defendants filed a notice of appeal to the Florida Fourth District Court of Appeal and PM USA posted a bond in the amount of approximately $3 million. In February 2016, plaintiff cross-appealed. In August 2017, the Florida Fourth District Court of Appeal reversed the original judgment against PM USA and ordered a new trial on an appellate finding that the trial court erred in admitting certain materials into evidence that deprived defendants of a fair trial. In September 2017, plaintiff moved for rehearing, rehearing *en banc*, or certification of a question to the Florida Supreme Court, which the Florida Fourth District Court of Appeal denied in November 2017. In December 2017, plaintiff filed a notice to invoke the discretionary jurisdiction of the Florida Supreme Court.

_____

**Plaintiff:** *Caprio*

**Date:** February 2015

**Verdict:**

A Broward County jury returned a partial verdict in favor of plaintiff and against PM USA, R.J. Reynolds, Lorillard and Liggett Group. The jury found against defendants on class membership, allocating 25% of the fault to PM USA. The jury also found $559,172 in economic damages. The jury deadlocked with respect to the intentional torts, certain elements of compensatory damages and punitive damages.

**Post-Trial Developments:**

In March 2015, PM USA filed post-trial motions, including motions to set aside the partial verdict and for a new trial. In May 2015, the court denied all of PM USA's post-trial motions and defendants filed a notice of appeal to the Florida Fourth District Court of Appeal. In January 2017, the defendants agreed to voluntarily dismiss their appeal in exchange for a full retrial and the court dismissed the appeal.

_____

**Plaintiff:** *McKeever*

**Date:** February 2015

**Verdict:**

A Broward County jury returned a verdict in favor of plaintiff and against PM USA awarding approximately $5.8 million in compensatory damages and allocating 60% of the fault to PM USA. The jury also awarded plaintiff approximately $11.63 million in punitive damages. However, the jury found in favor of PM USA on the statute of repose defense to plaintiff's intentional tort and punitive damages claims.

**Post-Trial Developments:**

In March 2015, PM USA filed various post-trial motions, including motions to set aside the verdict and motions for a new trial. In April 2015, the trial court entered final judgment. In June 2015, the trial court denied PM USA's post-trial motions, and PM USA posted a bond in the amount of $5 million. PM USA also filed a notice of appeal to the Florida Fourth District Court of Appeal in June 2015. In January 2017, the Florida Fourth District Court of Appeal issued a decision largely affirming the trial court's judgment against PM USA, but remanded the case to the trial court to amend the final judgment to apply the comparative fault deduction to the compensatory damages award. In February 2017, PM USA filed a notice to invoke the discretionary jurisdiction of the Florida Supreme Court; plaintiff also filed a notice to invoke the jurisdiction of the Florida Supreme Court challenging the comparative fault reduction. In March 2017, the Florida Supreme Court stayed the appeal pending its decisions in *Marotta* and *Schoeff*, discussed below under *Engle Progeny Appellate Issues*. In April 2017, the Florida Supreme Court rejected R.J. Reynolds's federal preemption defense in *Marotta*. In December 2017, the Florida Supreme Court held in *Schoeff* that comparative fault does not reduce compensatory damages awards for intentional torts. As a result, in the fourth quarter of 2017, PM USA recorded a provision on its consolidated balance sheet of approximately $20 million for the judgment and interest. In February 2018, PM USA increased its bond by $10 million. In June 2018, the Florida Supreme Court denied PM USA's and plaintiff's request for review, thereby reinstating the comparative fault reduction and PM USA decreased the provision recorded on its consolidated balance sheet to approximately $17 million. In June 2018, plaintiff filed a motion for rehearing in the Florida Supreme Court seeking to remove the comparative fault reduction. In October 2018, the Florida Supreme Court remanded the case to the Fourth District Court of Appeal to remove the comparative fault reduction.

_____

**Plaintiff:** *D. Brown*

**Date:** January 2015

**Verdict:**

A jury in the U.S. District Court for the Middle District of Florida returned a verdict against PM USA awarding plaintiff approximately $8.3 million in compensatory damages. The jury also awarded plaintiff $9 million in punitive damages.

**Post-Trial Developments:**

In February 2015, the trial court entered final judgment. In March 2015, PM USA filed various post-trial motions, including motions to alter or amend the judgment and for a new trial or, in the alternative, remittitur of the damages awards, all of which the court denied. In July 2015, PM USA filed a notice of appeal to the U.S. Court of Appeals for the Eleventh Circuit. In August 2015, the Court of Appeals granted PM USA's motion to stay the appeal pending final disposition in the *Graham* and *Searcy* cases, discussed below under Engle Progeny Appellate Issues.

_____

**Plaintiff:** Boatright

**Date:** November 2014

**Verdict:**

A Polk County jury returned a verdict against PM USA and Liggett Group awarding plaintiff $15 million in compensatory damages and allocating 85% of the fault to PM USA (an amount of approximately $12.75 million). In addition, in November 2014, the jury awarded plaintiff approximately $19.7 million in punitive damages against PM USA and $300,000 in punitive damages against Liggett Group.

**Post-Trial Developments:**

In November 2014, PM USA filed various post-trial motions and, in January 2015, the trial court denied PM USA's motions for a new trial and for *remittitur*, but entered final judgment with a deduction for plaintiff's comparative fault. In February 2015, defendants filed a notice of appeal to the Florida Second District Court of Appeal and plaintiff cross-appealed. PM USA posted a bond in the amount of approximately $4 million. In April 2017, the Florida Second District Court of Appeal rejected PM USA's grounds for appeal and affirmed the judgment, but ruled that the trial court should not have applied the comparative fault deduction. The court remanded the case to the trial court to amend the judgment to award plaintiff the full amount of the jury's compensatory damages award and also separately ruled that plaintiff is entitled to attorneys' fees. In May 2017, defendants filed notices to invoke the discretionary jurisdiction of the Florida Supreme Court on the merits and on the attorneys' fees issue. The Florida Supreme Court stayed consideration of its jurisdiction on the merits appeal pending its ruling in *Schoeff*, discussed below under *Engle Progeny Appellate Issues*. In December 2017, the Florida Supreme Court held in *Schoeff* that comparative fault does not reduce compensatory damages awards for intentional torts. In February 2018, PM USA requested that the Florida Supreme Court remand the case to the Second District Court of Appeal for further consideration and PM USA increased its bond by approximately $11 million. In June 2018, the Florida Supreme Court denied PM USA's request to remand the case for further consideration. In the second quarter of 2018, PM USA recorded a provision on its condensed consolidated balance sheet of approximately $41 million for the judgment and interest.

_____

**Plaintiff:** *Kerrivan*

**Date:** October 2014

**Verdict:**

A jury in the U.S. District Court for the Middle District of Florida returned a verdict against PM USA and R.J. Reynolds awarding plaintiff $15.8 million in compensatory damages. The jury also awarded plaintiff $25.3 million in punitive damages and allocated $15.7 million to PM USA.

**Post-Trial Developments:**

The trial court entered final judgment. In December 2014, defendants filed various post-trial motions, including a renewed motion for judgment or for a new trial. Plaintiff agreed to waive the bond for the appeal. In May 2015, the trial court deferred further briefing on the post-trial motions pending the Eleventh Circuit's final disposition in the *Graham* and *Searcy* cases, discussed below under *Engle Progeny Appellate Issues*. In June 2017, the trial court lifted the stay on the post-trial motions and, in June 2018, denied defendants' post-trial motions. In July 2018, defendants filed a notice of appeal to the U.S. Court of Appeals for the Eleventh Circuit and plaintiff cross-appealed.

_____

**Plaintiff:** *Berger*

**Date:** September 2014

34

**Verdict:**

A jury in the U.S. District Court for the Middle District of Florida returned a verdict against PM USA awarding plaintiff $6.25 million in compensatory damages and allocating 60% of the fault to PM USA. The jury also awarded $20.76 million in punitive damages.

**Post-Trial Developments:**

The trial court entered final judgment in September 2014 without any deduction for plaintiff's comparative fault. In October 2014, plaintiff agreed to waive the bond for the appeal. Also in October 2014, PM USA filed a motion for a new trial or, in the alternative, *remittitur* of the jury's damages awards. In April 2015, the trial court granted PM USA's post-verdict motion in part and vacated the punitive damages award. In November 2015, the court entered final judgment with a deduction for plaintiff's comparative fault. In April 2016, plaintiff filed a motion to reinstate the jury's punitive damages award or, alternatively, for a new trial on punitive damages, citing the *Soffer* decision, discussed below under *Engle Progeny Appellate Issues*. Also in April 2016, PM USA filed a motion to stay post-trial proceedings pending the Eleventh Circuit's final disposition in the *Graham* case, discussed below under *Engle Progeny Appellate Issues*. In May 2016, (i) the trial court denied PM USA's remaining post-trial motions and (ii) PM USA filed a notice of appeal to the U.S. Court of Appeals for the Eleventh Circuit and a motion to stay the appeal pending *Graham*, which the court granted in June 2016. In August 2016, the trial court denied plaintiff's motion to reinstate the jury's punitive damages or to order a new trial and, in September 2016, plaintiff cross-appealed. In June 2017, the U.S. Court of Appeals for the Eleventh Circuit lifted the stay on the appeal.

_____

**Plaintiff:** *Harris*

**Date:** July 2014

**Verdict:**

The U.S. District Court for the Middle District of Florida returned a verdict in favor of plaintiff and against PM USA, R.J. Reynolds and Lorillard awarding approximately $1.73 million in compensatory damages.

**Post-Trial Developments:**

Defendants filed motions for a defense verdict because the jury's findings indicated that plaintiff was not a member of the *Engle* class. In December 2014, the trial court entered final judgment and, in January 2015, defendants filed a renewed motion for judgment as a matter of law or, in the alternative, a motion for a new trial. Defendants also filed a motion to alter or amend the final judgment. In April 2015, the trial court stayed the post-trial proceedings pending the Eleventh Circuit's final disposition in the *Graham* case, discussed below under *Engle Progeny Appellate Issues*. In February 2018, the trial court lifted the stay on the post-trial proceedings.

_____

**Plaintiff:** *Skolnick*

**Date:** June 2013

**Verdict:**

A Palm Beach County jury returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds. The jury awarded plaintiff $2.555 million in compensatory damages and allocated 30% of the fault to each defendant (an amount of $766,500).

**Post-Trial Developments:**

In June 2013, defendants and plaintiff filed post-trial motions. The trial court entered final judgment with a deduction for plaintiff's comparative fault. In November 2013, the trial court denied plaintiff's post-trial motion and, in December 2013, denied defendants' post-trial motions. Defendants filed a notice of appeal to the Florida Fourth District Court of Appeal, and plaintiff cross-appealed in December 2013. Also in December 2013, PM USA posted a bond in the amount of approximately $1 million. In July 2015, the District Court of Appeal reversed the compensatory damages award and ordered judgment in favor of defendants on the strict liability and negligence claims, but remanded plaintiff's conspiracy and concealment claims for a new trial. In August 2015, defendants filed a motion for rehearing, and plaintiff filed a motion for clarification, which the District Court of Appeal denied in September 2015.

_____

**Plaintiff:** *Searcy*

**Date:** April 2013

**Verdict:**

A jury in the U.S. District Court for the Middle District of Florida returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds. The jury awarded $6 million in compensatory damages and $10 million in punitive damages against each defendant.

35

**Post-Trial Developments:**

In June 2013, the trial court entered final judgment. In July 2013, defendants filed various post-trial motions, including motions requesting reductions in damages. In September 2013, the district court reduced the compensatory damages award to $1 million and the punitive damages award to $1.67 million against each defendant. The district court denied all other post-trial motions. Plaintiff filed a motion to reconsider the district court's remittitur and, in the alternative, to certify the issue to the U.S. Court of Appeals for the Eleventh Circuit, both of which the court denied in October 2013. In November 2013, defendants filed a notice of appeal to the U.S. Court of Appeals for the Eleventh Circuit arguing that application of the Engle findings to the Engle progeny plaintiffs' concealment and conspiracy claims violated defendants' due process rights. In December 2013, defendants filed an amended notice of appeal after the district court corrected a clerical error in the final judgment, and PM USA posted a bond in the amount of approximately $2 million. In January 2018, the U.S. Court of Appeals for the Eleventh Circuit ordered supplemental briefing on the due process issue. In September 2018, the U.S. Court of Appeals for the Eleventh Circuit affirmed the judgment. In the third quarter of 2018, PM USA recorded a provision on its condensed consolidated balance sheet of approximately $2 million for the judgment and interest.

_____

**Plaintiff:** *Calloway*

**Date:** May 2012

**Verdict:**

A Broward County jury returned a verdict in favor of plaintiff and against PM USA, R.J. Reynolds, Lorillard and Liggett Group. The jury awarded approximately $21 million in compensatory damages. The jury also awarded approximately $17 million in punitive damages against PM USA, approximately $17 million in punitive damages against R.J. Reynolds, approximately $13 million in punitive damages against Lorillard and approximately $8 million in punitive damages against Liggett Group.

**Post-Trial Developments:**

In May and June 2012, defendants filed motions to set aside the verdict and for a new trial. In August 2012, the trial court denied the post-trial motions, reduced the compensatory damages to $16.1 million and entered final judgment. In September 2012, PM USA posted a bond in an amount of approximately $2 million and defendants filed a notice of appeal to the Florida Fourth District Court of Appeal. In August 2013, plaintiff filed a motion to determine the sufficiency of the bond in the trial court on the ground that the bond cap statute is unconstitutional, which the court denied. In January 2016, a panel of the Florida Fourth District Court of Appeal vacated the punitive damages award and remanded the case for retrial on plaintiff's claims of concealment and conspiracy, and punitive damages. The court also found that the trial court should have applied the comparative fault deduction, reducing the compensatory damages against PM USA to $4.025 million. In February 2016, defendants and plaintiff filed respective motions for rehearing and rehearing *en banc*. In March 2016, plaintiff filed a notice of supplemental authority citing the *Soffer* decision, discussed below under *Engle Progeny Appellate Issues*. In September 2016, the Florida Fourth District Court of Appeal, ruling *en banc*, reversed the judgment against PM USA and R.J. Reynolds in its entirety on the grounds that improper arguments by plaintiff's counsel deprived defendants of a fair trial, and ordered a new trial. In October 2016, plaintiff filed a notice to invoke the discretionary jurisdiction of the Florida Supreme Court, which the court denied in March 2017. In June 2017, plaintiff filed a petition for *writ of certiorari* with the United States Supreme Court seeking review of the 2016 *en banc* ruling by the Florida Fourth District Court of Appeal, which the court denied in October 2017.

_____

***Engle Cases Concluded Within Past 12 Months***

_____

**Plaintiff:** *Simon*

**Date:** September 2018

**Verdict:**

A Broward County jury returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds awarding compensatory damages of approximately $1 million and allocating 20% of the fault to PM USA (an amount of $200,000). The jury did not award any punitive damages.

**Post-Trial Developments:**

In October 2018, the trial court entered final judgment in favor of plaintiff and PM USA paid approximately $200,000 for the judgment and associated costs.

_____

36

**Plaintiff:** *Perrotto*

**Date:** November 2014

**Verdict:**

A Palm Beach County jury returned a verdict against PM USA, R.J. Reynolds and Lorillard awarding plaintiff approximately $4.1 million in compensatory damages and allocating 25% of the fault to PM USA (an amount of approximately $1 million).

**Post-Trial Developments:**

In December 2014, plaintiff filed a motion for a new trial. In May 2016, the court granted plaintiff's motion for a new trial on punitive damages. In June 2018, a jury returned a verdict on punitive damages in favor of PM USA. In July 2018, the court entered final judgment awarding plaintiff approximately $1 million in compensatory damages against PM USA. In the third quarter of 2018, PM USA recorded a provision on its condensed consolidated balance sheet of approximately $1 million for the judgment and interest and paid this amount in September 2018.

_____

**Plaintiff:** Gore

**Date**: March 2015

**Verdict:**

An Indian River County jury returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds awarding $2 million in compensatory damages.

**Post-Trial Developments:**

In October 2015, defendants filed a notice of appeal to the Florida Fourth District Court of Appeal and plaintiff cross-appealed. In February 2018, the Florida Fourth District Court of Appeal affirmed the judgment in favor of plaintiff and granted plaintiff leave to seek a new trial on punitive damages. In the first quarter of 2018, PM USA recorded a provision on its condensed consolidated balance sheet of approximately $1 million for the judgment and interest. In July 2018, the trial court entered final judgment on the compensatory damages award and reserved jurisdiction for plaintiff to seek punitive damages. In August 2018, defendants filed a notice of appeal and petition for writ of certiorari with the Florida Fourth District Court of Appeal seeking review of the amended partial final judgment. In September 2018, plaintiff waived the claim for punitive damages and defendants voluntarily dismissed their appeal. In September 2018, PM USA paid approximately $1 million for the judgment and interest.

_____

**Plaintiff:** *Putney*

**Date:** April 2010

**Verdict:**

A Broward County jury returned a verdict in favor of plaintiff and against PM USA, R.J. Reynolds and Liggett Group. The jury awarded approximately $15.1 million in compensatory damages and allocated 15% of the fault to PM USA (an amount of approximately $2.3 million). The jury also awarded $2.5 million in punitive damages against PM USA.

**Post-Trial Developments:**

In August 2010, the trial court entered final judgment with a deduction for plaintiff's comparative fault and defendants appealed. In June 2013, the Fourth District Court of Appeal reversed and remanded the case for further proceedings, holding that the trial court erred in (1) not reducing the compensatory damages award as excessive and (2) not instructing the jury on the statute of repose in connection with plaintiff's conspiracy claim that resulted in the $2.5 million punitive damages award. In September 2013, both parties filed notices to invoke the discretionary jurisdiction of the Florida Supreme Court. In February 2016, the Florida Supreme Court upheld the trial court's decision in favor of plaintiff and, in March 2016, clarified that its February 2016 order reinstated the trial court's decision on the statute of repose only. In August 2016, the Florida Fourth District Court of Appeal reinstated the jury's punitive damages verdict and reaffirmed that the compensatory damages award was excessive, remanding the case to the trial court to reduce the compensatory damages. In May 2017, the trial court ruled that the 2010 jury award of $15.1 million in compensatory damages was excessive and reduced the award to $225,000. In June 2017, plaintiff requested a new trial on compensatory damages. In September 2018, the parties agreed to settle plaintiff's claim for compensatory damages. In the third quarter of 2018, PM USA recorded a provision on its condensed consolidated balance sheet of approximately $5 million, which included punitive damages previously determined at trial, compensatory damages, and attorney's fees, and paid this amount in September 2018.

_____

**Plaintiff:** *Sermons*

**Date:** July 2016

37

**Verdict:**

A Duval County jury returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds awarding compensatory damages of $65,000 and allocating 15% of the fault to PM USA (an amount of $9,750). The jury also awarded plaintiff $51,225 in punitive damages against PM USA.

**Post-Trial Developments:**

In August of 2018, PM USA paid approximately $118,000 for the judgment and interest.

_____

**Plaintiff:** *Tognoli*

**Date:** November 2015

**Verdict:**

A Broward County jury returned a verdict in favor of plaintiff and against PM USA awarding $1.05 million in compensatory damages and allocating 15% of the fault to PM USA (an amount of $157,500).

**Post-Trial Developments:**

In January 2016, the trial court entered final judgment against PM USA with a deduction for plaintiff's comparative fault and plaintiff filed a notice of appeal to the Florida Fourth District Court of Appeal and PM USA cross-appealed. In June 2017, the Florida Fourth District Court of Appeal issued a per curiam affirmance of the final judgment against PM USA. In July 2017, plaintiff filed a notice to invoke the discretionary jurisdiction of the Florida Supreme Court. In the fourth quarter of 2017, PM USA recorded a provision on its consolidated balance sheet of approximately $1 million for the judgment and interest. In March 2018, the Florida Supreme Court accepted jurisdiction of plaintiff's petition for review and remanded the case for reconsideration. In April 2018, the Fourth District Court of Appeal reversed and remanded the case to the trial court to amend the final judgment to award plaintiff the full amount of the jury's compensatory damages. PM USA paid the judgment and interest in the amount of approximately $1 million in May 2018.

_____

**Plaintiff:** *Howles*

**Date:** November 2016

**Verdict:**

A Broward County jury returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds awarding compensatory damages of $4 million and allocating 50% of the fault to PM USA (an amount of $2 million). The jury also awarded plaintiff $3 million in punitive damages against PM USA.

**Post-Trial Developments:**

In December 2016, defendants filed a notice of appeal to the Florida Fourth District Court of Appeal. In March 2018, the Florida Fourth District Court of Appeal affirmed the judgment in favor of plaintiff. In the first quarter of 2018, PM USA recorded a provision on its condensed consolidated balance sheet of approximately $6 million for the judgment, interest and associated costs and paid this amount in May 2018.

_____

**Plaintiff:** *Purdo*

**Date:** April 2016

**Verdict:**

A Palm Beach County jury returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds awarding compensatory damages of $21 million and allocating 12% of the fault to PM USA (an amount of $2.52 million). The jury also awarded plaintiff $6.25 million in punitive damages against each defendant.

**Post-Trial Developments:**

In May 2016, the court entered final judgment in favor of plaintiff with a deduction for plaintiff's comparative fault. In June 2016, defendants filed a notice of appeal to the Florida Fourth District Court of Appeal. In August 2017, the Florida Fourth District Court of Appeal affirmed the final judgment in favor of plaintiff. In November 2017, defendants filed a notice to invoke the discretionary jurisdiction of the Florida Supreme Court, which was denied in March 2018. In the first quarter of 2018, PM USA recorded a provision on its condensed consolidated balance sheet of approximately $10 million for the judgment, interest and associated costs. PM USA paid the judgment, interest and associated costs in the amount of approximately $10 million in May 2018.

_____

**Plaintiff:** *Griffin*

**Date:** June 2014

38

**Verdict:**

A jury in the U.S. District Court for the Middle District of Florida returned a verdict in favor of plaintiff and against PM USA awarding approximately $1.27 million in compensatory damages and allocating 50% of the fault to PM USA (an amount of approximately $630,000).

**Post-Trial Developments:**

The trial court entered final judgment against PM USA in July 2014 with a deduction for plaintiff's comparative fault. In October 2014, PM USA filed a notice of appeal to the U.S. Court of Appeals for the Eleventh Circuit. In the second quarter of 2017, PM USA recorded a provision on its condensed consolidated balance sheet of approximately $1 million for the judgment, interest and associated costs. In April 2018, the Eleventh Circuit affirmed the judgment. PM USA paid the judgment, interest and associated costs in the amount of approximately $1 million in May 2018.

_____

**Plaintiff:** *Ledoux*

**Date:** December 2015

**Verdict:**

A Miami-Dade County jury returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds awarding $10 million in compensatory damages. The jury also awarded plaintiff $12.5 million in punitive damages against each defendant.

**Post-Trial Developments:**

In March 2016, defendants filed a notice of appeal to the Florida Third District Court of Appeal and PM USA posted a bond in the amount of approximately $3 million. In October 2017, the Florida Third District Court of Appeal affirmed the final judgment in favor of plaintiff. In November 2017, defendants filed a notice to invoke the discretionary jurisdiction of the Florida Supreme Court. In the fourth quarter of 2017, PM USA recorded a provision on its consolidated balance sheet of approximately $20 million for the judgment, interest and associated costs. In March 2018, the Florida Supreme Court denied defendants' petition for review. PM USA paid the judgment, interest and associated costs in the amount of approximately $20 million in May 2018.

_____

**Plaintiff:** *Burkhart*

**Date:** May 2014

**Verdict:**

A jury in the U.S. District Court for the Middle District of Florida returned a verdict in favor of plaintiff and against PM USA, R.J. Reynolds and Lorillard awarding $5 million in compensatory damages. The jury also awarded plaintiff $2.5 million in punitive damages, allocating $750,000 to PM USA.

**Post-Trial Developments:**

In October 2014, defendants filed a notice of appeal to the U.S. Court of Appeals for the Eleventh Circuit. In March 2018, the Eleventh Circuit affirmed the judgment in favor of plaintiff. In the second quarter of 2018, PM USA recorded a provision on its condensed consolidated balance sheet of approximately $2 million for the judgment, interest and associated costs and paid this amount in May 2018.

_____

**Plaintiff:** *Barbose*

**Date:** November 2015

**Verdict:**

A Pasco County jury returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds awarding $10 million in compensatory damages. The jury also awarded plaintiff $500,000 in punitive damages against each defendant.

**Post-Trial Developments:**

In February 2016, PM USA filed a notice of appeal to the Florida Second District Court of Appeal. In 2017, the Florida Second District Court of Appeal affirmed the final judgment against defendants. In November 2017, defendants filed a notice to invoke the discretionary jurisdiction of the Florida Supreme Court. In the fourth quarter of 2017, PM USA recorded a provision on its consolidated balance sheet of approximately $12 million for the judgment, interest and associated costs. In March 2018, the Florida Supreme Court denied defendants' petition for review. PM USA paid the judgment, interest and associated costs in the amount of approximately $12 million in May 2018.

_____

**Plaintiff:** *Allen*

**Date:** November 2014

39

**Verdict:**

A Duval County jury returned a verdict against PM USA and R.J. Reynolds awarding plaintiff approximately $3.1 million in compensatory damages. The jury also awarded approximately $7.76 million in punitive damages against each defendant. This was a retrial of a 2011 trial that awarded plaintiff $6 million in compensatory damages and $17 million in punitive damages against each defendant.

**Post-Trial Developments:**

Defendants filed a notice of appeal to the Florida First District Court of Appeal in September 2015. In February 2017, the Florida First District Court of Appeal affirmed the trial court's judgment. In November 2017, defendants filed a notice to invoke the discretionary jurisdiction of the Florida Supreme Court, which was denied in February 2018. In the first quarter of 2018, PM USA recorded a provision on its condensed consolidated balance sheet of approximately $10 million for the judgment and interest. PM USA paid the judgment and interest of approximately $10 million in May 2018.

_____

**Plaintiff:** *Ahrens*

**Date:** February 2016

**Verdict:**

A Pinellas County jury returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds awarding $9 million in compensatory damages. The jury also awarded plaintiff $2.5 million in punitive damages against each defendant.

**Post-Trial Developments:**

In April 2016, defendants filed a notice of appeal to the Florida Second District Court of Appeal. In May 2017, the Florida Second District Court of Appeal affirmed the final judgment against defendants. In August 2017, defendants filed a notice to invoke the discretionary jurisdiction of the Florida Supreme Court. In the fourth quarter of 2017, PM USA recorded a provision on its consolidated balance sheet of approximately $7 million for the judgment, interest and associated costs. In March 2018, the Florida Supreme Court denied defendants' petition for review. PM USA paid the judgment, interest and associated costs in the amount of approximately $7 million in May 2018.

_____

**Plaintiff:** *Starr-Blundell*

**Date:** June 2013

**Verdict:**

A Duval County jury returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds. The jury awarded plaintiff $500,000 in compensatory damages and allocated 10% of the fault to each defendant (an amount of $50,000).

**Post-Trial Developments:**

In December 2013, plaintiff filed a notice of appeal to the Florida First District Court of Appeal. In May 2015, the Florida First District Court of Appeal affirmed the final judgment. In June 2015, plaintiff filed a notice to invoke the discretionary jurisdiction of the Florida Supreme Court. In the first quarter of 2016, PM USA recorded a provision on its condensed consolidated balance sheet of approximately $55,000 for the judgment, interest and associated costs. In May 2016, the Florida Supreme Court accepted jurisdiction of plaintiff's petition for review and remanded the case for reconsideration. In September 2016, the Florida First District Court of Appeal further remanded the case. In March 2018, in a new trial on punitive damages, the jury found in favor of defendants and did not award any punitive damages. In the first quarter of 2018, PM USA recorded an additional provision on its condensed consolidated balance sheet of approximately $40,000 and in the same quarter paid the judgment, interest and associated costs of approximately $100,000.

_____

**Plaintiff:** *Zamboni*

**Date:** February 2015

**Verdict:**

A jury in the U.S. District Court for the Middle District of Florida returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds awarding $340,000 in compensatory damages and allocating 10% of the fault to PM USA (an amount of $34,000).

**Post-Trial Developments:**

In the first quarter of 2018, PM USA recorded a provision on its condensed consolidated balance sheet of approximately $34,000 for the judgment and interest and paid this amount in March 2018.

_____

40

**Plaintiff:** *Graham*

**Date:** May 2013

**Verdict:**

A jury in the U.S. District Court for the Middle District of Florida returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds. The jury awarded $2.75 million in compensatory damages and allocated 10% of the fault to PM USA (an amount of $275,000).

**Post-Trial Developments:**

In October 2013, defendants filed a notice of appeal to the U.S. Court of Appeals for the Eleventh Circuit. In April 2015, the U.S. Court of Appeals for the Eleventh Circuit found in favor of defendants on the basis of federal preemption, reversed the trial court's denial of judgment as a matter of law, and plaintiff filed a petition for rehearing *en banc* or panel rehearing. In January 2016, the Eleventh Circuit granted a rehearing *en banc*. In May 2017, the U.S. Court of Appeals for the Eleventh Circuit affirmed the final judgment entered in plaintiff's favor. In the second quarter of 2017, PM USA recorded a provision on its condensed consolidated balance sheet of approximately $500,000 for the judgment, interest and associated costs. In September 2017, defendants filed a petition for *writ of certiorari* with the United States Supreme Court, which the court denied in January 2018. PM USA paid the judgment, interest and associated costs in the amount of approximately $1 million in January 2018.

_____

**Plaintiff:** *Naugle*

**Date:** November 2009

**Verdict:**

A Broward County jury returned a verdict in favor of plaintiff and against PM USA. The jury awarded approximately $56.6 million in compensatory damages and $244 million in punitive damages. The jury allocated 90% of the fault to PM USA.

**Post-Trial Developments:**

In April 2010, PM USA filed a notice of appeal to the Fourth District Court of Appeal. In June 2012, the Fourth District Court of Appeal affirmed the final judgment (as amended to correct a clerical error) in the amount of approximately $12.3 million in compensatory damages and approximately $24.5 million in punitive damages. In December 2012, the Fourth District withdrew its prior decision, reversed the verdict as to compensatory and punitive damages and returned the case to the trial court for a new trial on the question of damages. Upon retrial, in October 2013, the new jury awarded approximately $3.7 million in compensatory damages and $7.5 million in punitive damages. In May 2014, PM USA filed a notice of appeal to the Fourth District Court of Appeal and plaintiff cross-appealed. In January 2016, the Fourth District Court of Appeal reversed the trial court's decision and remanded the case to the trial court to conduct a juror interview. In May 2016, PM USA filed a notice of appeal to the Fourth District Court of Appeal. In April 2017, the Fourth District Court of Appeal issued a *per curiam* decision affirming the trial court's judgment against PM USA. In the second quarter of 2017, PM USA recorded a provision on its condensed consolidated balance sheet of approximately $13.2 million for the judgment, interest and associated costs. In September 2017, PM USA filed a petition for *writ of certiorari* with the United States Supreme Court, which PM USA dismissed after the court denied PM USA's petition in *Graham*. PM USA paid the judgment, interest and associated costs in the amount of approximately $14 million in January 2018.

_____

**Plaintiff:** *Lourie*

**Date:** October 2014

**Verdict:**

A Hillsborough County jury returned a verdict against PM USA, R.J. Reynolds and Lorillard awarding plaintiff approximately $1.37 million in compensatory damages and allocating 27% of the fault to PM USA (an amount of approximately $370,000).

**Post-Trial Developments:**

In November 2014, defendants filed a notice of appeal to the Florida Second District Court of Appeal. In August 2016, the Florida Second District Court of Appeal affirmed the judgment entered in favor of the plaintiff. In September 2016, defendants filed a petition to invoke the discretionary jurisdiction of the Florida Supreme Court. In June 2017, the Florida Supreme Court denied PM USA's petition to invoke the court's discretionary jurisdiction. In the second quarter of 2017, PM USA recorded a provision on its condensed consolidated balance sheet of approximately $2 million for the judgment, interest and associated costs. In September 2017, defendants filed a petition for *writ of certiorari* with the United States Supreme Court on due process and federal preemption grounds, which PM USA dismissed after the court denied PM USA's petition in *Graham*. PM USA paid the judgment, interest and associated costs in the amount of approximately $3 million in January 2018.

_____

41

**Plaintiff:** *Marchese*

**Date:** October 2015

**Verdict:**

A Broward County jury returned a verdict in favor of plaintiff and against PM USA and R.J. Reynolds awarding $1 million in compensatory damages and allocating 22.5% of the fault to PM USA (an amount of $225,000). The jury also awarded plaintiff $250,000 in punitive damages against each defendant.

**Post-Trial Developments:**

In June 2016, defendants filed a notice of appeal to the Florida Fourth District Court of Appeal and plaintiff cross-appealed. In November 2017, the Florida Fourth District Court of Appeal rejected defendants' appeal, granted plaintiff's cross-appeal finding that the trial court erred in applying the comparative fault deduction and remanded the case to the trial court with directions to enter an amended final judgment. In the fourth quarter of 2017, PM USA recorded a provision of approximately $1 million on its consolidated balance sheet for the judgment and interest and paid this amount in January 2018.

_____

*Engle Progeny Appellate Issues*

In *Douglas*, an *Engle* progeny case against PM USA and R.J. Reynolds, in March 2012, the Florida Second District Court of Appeal issued a decision affirming the judgment of the trial court in favor of the plaintiff and upholding the use of the *Engle* jury findings with respect to strict liability claims but certified to the Florida Supreme Court the question of whether granting *res judicata* effect to the *Engle* jury findings violates defendants' federal due process rights. In March 2013, the Florida Supreme Court affirmed the final judgment entered in favor of plaintiff upholding the use of the *Engle* jury findings with respect to strict liability and negligence claims. PM USA's subsequent petition for *writ of certiorari* with the United States Supreme Court was unsuccessful.

In *Graham*, an *Engle* progeny case against PM USA and R.J. Reynolds, in April 2015, the U.S. Court of Appeals for the Eleventh Circuit found in favor of defendants on the basis of federal preemption, reversing the trial court's denial of judgment as a matter of law. Thereafter, plaintiff filed a petition for rehearing *en banc*, which the Eleventh Circuit granted in January 2016. In May 2017, the U.S. Court of Appeals for the Eleventh Circuit rejected defendants' preemption and due process arguments and affirmed the final judgment entered in plaintiff's favor. In September 2017, defendants filed a petition for *writ of certiorari* with the United States Supreme Court on due process and federal preemption grounds, which the court denied in January 2018. In January 2016, in *Marotta*, a case against R.J. Reynolds on appeal to the Florida Fourth District Court of Appeal, the court rejected R.J. Reynolds's federal preemption defense, but noted the conflict with *Graham* and certified the preemption question to the Florida Supreme Court. In March 2016, the Florida Supreme Court accepted review of *Marotta* and in April 2017, affirmed the Fourth District Court of Appeal's ruling on preemption.

In *Burkhart* and *Searcy*, *Engle* progeny cases against PM USA and R.J. Reynolds, defendants argued that application of the *Engle* findings to the *Engle* progeny plaintiffs' concealment and conspiracy claims violated defendants' due process rights. In March 2018, in *Burkhart*, the Eleventh Circuit rejected defendants' due process arguments and affirmed the final judgment entered in plaintiff's favor. Defendants filed a motion for rehearing challenging that decision, which the Eleventh Circuit denied. In September 2018, in *Searcy*, the Eleventh Circuit also affirmed the judgment in plaintiff's favor.

In *Soffer*, an *Engle* progeny case against R.J. Reynolds, the Florida Supreme Court ruled in 2016 that *Engle* progeny plaintiffs can recover punitive damages in connection with all of their claims. Plaintiffs now generally seek punitive damages in connection with all of their claims in *Engle* progeny cases. In *Schoeff*, another *Engle* progeny case against R.J. Reynolds, the Florida Supreme Court ruled in 2016 that comparative fault does not reduce compensatory damages awards for intentional torts.

*Florida Bond Statute*

In June 2009, Florida amended its existing bond cap statute by adding a $200 million bond cap that applies to all state *Engle* progeny lawsuits in the aggregate and establishes individual bond caps for individual *Engle* progeny cases in amounts that vary depending on the number of judgments in effect at a given time. Plaintiffs in three state *Engle* progeny cases against R.J. Reynolds in Alachua County, Florida (*Alexander*, *Townsend* and *Hall*) and one case in Escambia County (*Clay*) challenged the constitutionality of the bond cap statute. The Florida Attorney General intervened in these cases in defense of the constitutionality of the statute.

Trial court rulings were rendered in *Clay*, *Alexander*, *Townsend* and *Hall* rejecting the plaintiffs' bond cap statute challenges in those cases. The plaintiffs unsuccessfully appealed these rulings. In *Clay*, *Alexander* and *Hall*, the District Court of Appeal for

42

the First District of Florida affirmed the trial court decisions and certified the decision in *Hall* for appeal to the Florida Supreme Court, but declined to certify the question of the constitutionality of the bond cap statute in *Clay* and *Alexander*. The Florida Supreme Court granted review of the *Hall* decision, but, in September 2012, the court dismissed the appeal as moot. In October 2012, the Florida Supreme Court denied the plaintiffs' rehearing petition. In August 2013, in *Calloway*, discussed further above, plaintiff filed a motion in the trial court to determine the sufficiency of the bond posted by defendants on the ground that the bond cap statute is unconstitutional, which was denied.

In February 2016, in the *Sikes* case against R.J. Reynolds, the trial court held that Florida's bond cap statute does not stay the execution of judgment after a case is final in the Florida judicial system and before the defendant files a petition for *writ of certiorari* with the United States Supreme Court. The District Court of Appeal for the First District of Florida issued an order staying execution of the judgment and requesting that plaintiff show cause why the stay should not remain in effect through the completion of United States Supreme Court *writ of certiorari* review or until the time for moving for such review has expired. In April 2016, the District Court of Appeal held that the bond cap applies to the period between a Florida Supreme Court ruling and completion of United States Supreme Court *writ of certiorari* review. In April 2016, PM USA filed motions in the trial court in the *R. Cohen* and *Kayton* cases seeking confirmation that the stay on executing the judgment remains in effect through the completion of United States Supreme Court *writ of certiorari* review or until the time for moving for such review has expired, which the court granted.

No federal court has yet addressed the constitutionality of the bond cap statute or the applicability of the bond cap to *Engle* progeny cases tried in federal court.

From time to time, legislation has been presented to the Florida legislature that would repeal the 2009 appeal bond cap statute; however to date, no legislation repealing the statute has passed.

*Other Smoking and Health Class Actions*

Since the dismissal in May 1996 of a purported nationwide class action brought on behalf of allegedly addicted smokers, plaintiffs have filed numerous putative smoking and health class action suits in various state and federal courts. In general, these cases purport to be brought on behalf of residents of a particular state or states (although a few cases purport to be nationwide in scope) and raise addiction claims and, in many cases, claims of physical injury as well.

Class certification has been denied or reversed by courts in 61 smoking and health class actions involving PM USA in Arkansas (1), California (1), Delaware (1), the District of Columbia (2), Florida (2), Illinois (3), Iowa (1), Kansas (1), Louisiana (1), Maryland (1), Michigan (1), Minnesota (1), Nevada (29), New Jersey (6), New York (2), Ohio (1), Oklahoma (1), Oregon (1), Pennsylvania (1), Puerto Rico (1), South Carolina (1), Texas (1) and Wisconsin (1).

As of October 22, 2018, PM USA and Altria are named as defendants, along with other cigarette manufacturers, in seven class actions filed in the Canadian provinces of Alberta, Manitoba, Nova Scotia, Saskatchewan, British Columbia and Ontario. In Saskatchewan, British Columbia (two separate cases) and Ontario, plaintiffs seek class certification on behalf of individuals who suffer or have suffered from various diseases, including chronic obstructive pulmonary disease, emphysema, heart disease or cancer, after smoking defendants' cigarettes. In the actions filed in Alberta, Manitoba and Nova Scotia, plaintiffs seek certification of classes of all individuals who smoked defendants' cigarettes. See *Guarantees and Other Similar Matters* below for a discussion of the Distribution Agreement between Altria and PMI that provides for indemnities for certain liabilities concerning tobacco products.

**Health Care Cost Recovery Litigation**

*Overview*

In the health care cost recovery litigation, governmental entities seek reimbursement of health care cost expenditures allegedly caused by tobacco products and, in some cases, of future expenditures and damages. Relief sought by some but not all plaintiffs includes punitive damages, multiple damages and other statutory damages and penalties, injunctions prohibiting alleged marketing and sales to minors, disclosure of research, disgorgement of profits, funding of anti-smoking programs, additional disclosure of nicotine yields, and payment of attorney and expert witness fees.

Although there have been some decisions to the contrary, most judicial decisions in the United States have dismissed all or most health care cost recovery claims against cigarette manufacturers. Nine federal circuit courts of appeals and eight state appellate courts, relying primarily on grounds that plaintiffs' claims were too remote, have ordered or affirmed dismissals of health care

43

cost recovery actions. The United States Supreme Court has refused to consider plaintiffs' appeals from the cases decided by five circuit courts of appeals.

In addition to the cases brought in the United States, health care cost recovery actions have also been brought against tobacco industry participants, including PM USA and Altria in Israel (dismissed), the Marshall Islands (dismissed) and Canada (10 cases), and other entities have stated that they are considering filing such actions.

In September 2005, in the first of several health care cost recovery cases filed in Canada, the Canadian Supreme Court ruled that legislation passed in British Columbia permitting the lawsuit is constitutional, and, as a result, the case, which had previously been dismissed by the trial court, was permitted to proceed. PM USA's and other defendants' challenge to the British Columbia court's exercise of jurisdiction was rejected by the Court of Appeals of British Columbia and, in April 2007, the Supreme Court of Canada denied review of that decision.

Since the beginning of 2008, the Canadian Provinces of British Columbia, New Brunswick, Ontario, Newfoundland and Labrador, Quebec, Alberta, Manitoba, Saskatchewan, Prince Edward Island and Nova Scotia have brought health care reimbursement claims against cigarette manufacturers. PM USA is named as a defendant in the British Columbia and Quebec cases, while both Altria and PM USA are named as defendants in the New Brunswick, Ontario, Newfoundland and Labrador, Alberta, Manitoba, Saskatchewan, Prince Edward Island and Nova Scotia cases. The Nunavut Territory and Northwest Territory have passed similar legislation. See *Guarantees and Other Similar Matters* below for a discussion of the Distribution Agreement between Altria and PMI that provides for indemnities for certain liabilities concerning tobacco products.

*Settlements of Health Care Cost Recovery Litigation*

In November 1998, PM USA and certain other tobacco product manufacturers entered into the 1998 Master Settlement Agreement (the "MSA") with 46 states, the District of Columbia and certain U.S. territories to settle asserted and unasserted health care cost recovery and other claims. PM USA and certain other tobacco product manufacturers had previously entered into agreements to settle similar claims brought by Mississippi, Florida, Texas and Minnesota (together with the MSA, the "State Settlement Agreements"). The State Settlement Agreements require that the original participating manufacturers or "OPMs" (now PM USA and R.J. Reynolds and, with respect to certain brands, ITG Brands, LLC ("ITG")) make annual payments of approximately $9.4 billion, subject to adjustments for several factors, including inflation, market share and industry volume. In addition, the OPMs are required to pay settling plaintiffs' attorneys' fees, subject to an annual cap of $500 million. For the three months ended September 30, 2018 and 2017, the aggregate amount recorded in cost of sales with respect to the State Settlement Agreements was approximately $1.2 billion and $1.1 billion, respectively. For the nine months ended September 30, 2018 and 2017, the aggregate amount recorded in cost of sales with respect to the State Settlement Agreements was approximately $3.2 billion and $3.4 billion, respectively. These amounts include PM USA's estimate of amounts related to NPM Adjustments discussed below.

*NPM Adjustment Disputes*

PM USA is participating in proceedings regarding the NPM Adjustment for 2003-2017. The "NPM Adjustment" is a reduction in MSA payments made by the OPMs and those manufacturers that are subsequent signatories to the MSA (collectively, the "participating manufacturers" or "PMs") that applies if the PMs collectively lose at least a specified level of market share to non-participating manufacturers since 1997, subject to certain conditions and defenses. The independent auditor (the "IA") appointed under the MSA calculates the maximum amount of the NPM Adjustment, if any, for each year.

*NPM Adjustment Disputes - Settlement with 36 States and Territories and Settlement with New York.*

PM USA has entered into two settlements of NPM Adjustment disputes with a total of 37 states and territories, one with 36 states and territories (the "multi-state settlement") and the other with the State of New York. The multi-state settlement was originally entered into in 2012 with 19 states and territories and to date has been expanded to include a total of 36 of the 52 MSA states and territories (the "signatory states"). In the multi-state settlement, PM USA by the end of October 2017 had settled the NPM Adjustment disputes for 2003-2015 with 26 states in exchange for a total of $740 million. In 2018, there have been three principal developments with respect to this settlement. First, in the first quarter of 2018, PM USA settled the NPM Adjustment disputes for 2004-2017 with the states of Alaska, Colorado, Delaware, Hawaii, Maine, North Dakota, South Dakota, Utah and Vermont. As a result of these additional nine states joining the multi-state settlement, PM USA will receive approximately $81 million for 2004-2017 ($13 million of which relates to the 2015-2017 "transition years"), $68 million of which it received in April 2018. In connection with this settlement, PM USA recorded a reduction to cost of sales in the amount of $81 million in the first quarter of 2018. Second, in the second quarter of 2018, Pennsylvania joined the multi-state

44

settlement for 2004-2017. As a result, PM USA will receive approximately $90 million for 2004-2017 ($13 million of which relates to the 2015-2017 "transition years"). In connection with this settlement, PM USA recorded a reduction to cost of sales in the amount of $90 million in the second quarter of 2018. Third, in the second quarter of 2018, PM USA agreed to settle the NPM Adjustment disputes for 2016 and 2017 with the 26 signatory states mentioned above. As a result, PM USA will receive approximately $77 million for 2016 and 2017. In connection with this settlement, PM USA recorded a reduction to cost of sales in the amount of $38 million for the 2017 NPM Adjustment in the second quarter of 2018, having previously recorded a reduction to cost of sales in the amount of $39 million for the 2016 NPM Adjustment in the third quarter of 2017 based on PM USA's then best estimate regarding 2016.

In the NPM Adjustment settlement with New York, which was entered into in 2015, PM USA has received a total of approximately $217 million for 2004-2016. Both the New York settlement and the multi-state settlement also contain provisions resolving certain disputes regarding the application of the NPM Adjustment going forward, although the applicability of those provisions with respect to the signatory states that joined the multi-state settlement after 2017 is contingent on satisfaction, in the PMs' sole discretion, of certain conditions.

*2003 and Subsequent NPM Adjustments - Continuing Disputes with States that have not Settled.*

- ? *2003 NPM Adjustment.* In September 2013, an arbitration panel issued rulings regarding the 15 states and territories that remained in the arbitration, ruling that six of them did not establish valid defenses to the NPM Adjustment for 2003. Two of these states later joined the multi-state settlement discussed above. With respect to the remaining four states, following the outcome of challenges in state courts, PM USA ultimately recorded $74 million primarily as a reduction to cost of sales. Two potential disputes remain outstanding regarding the amount of interest due to PM USA and there is no assurance that PM USA will prevail in either of these disputes.

- ? *2004 and Subsequent NPM Adjustments.* PM USA has continued to pursue the NPM Adjustments for 2004 and subsequent years in multi-state arbitrations against the states that did not join either of the settlements discussed above. New Mexico is currently appealing a trial court ruling that the state must participate in the multi-state arbitration for 2004. The Montana state courts ruled that Montana may litigate its claims in state court, rather than participate in a multi-state arbitration and the PMs have agreed not to contest the applicability of the 2004 NPM Adjustment to Montana.

  The 2004 multi-state arbitration is currently proceeding with all of the states that have not settled other than Montana and New Mexico. Decisions are not expected until the middle of 2019 at the earliest.

  No assurance can be given as to when proceedings for 2005 and subsequent years will be scheduled or the precise form those proceedings will take.

  The IA has calculated that PM USA's share of the maximum potential NPM Adjustments for 2004-2016 is (exclusive of interest or earnings): $388 million for 2004; $181 million for 2005; $154 million for 2006; $185 million for 2007; $250 million for 2008; $211 million for 2009; $218 million for 2010; $166 million for 2011; $214 million for 2012; $224 million for 2013; $253 million for 2014; $300 million for 2015; $295 million for 2016 and $288 million for 2017. These maximum amounts will be reduced, likely substantially, to reflect the settlements with the signatory states and New York, and potentially for current and future calculation disputes and other developments. Finally, PM USA's recovery of these amounts, even as reduced, is dependent upon subsequent determinations regarding state-specific defenses and disputes with other PMs.

*Other Disputes Under the State Settlement Agreements*

The payment obligations of the tobacco product manufacturers that are parties to the State Settlement Agreements, as well as the allocations of any NPM Adjustments and related settlements, have been and may continue to be affected by R.J. Reynolds' acquisition of Lorillard and its related sale of certain cigarette brands to ITG (the "ITG brands"). In particular, R.J. Reynolds and ITG have asserted that they do not have to make payments on the ITG brands under the Florida, Minnesota and Texas State Settlement Agreements or include the ITG brands for purposes of certain calculations under the State Settlement Agreements. PM USA believes that R.J. Reynolds' and ITG's position violates the State Settlement Agreements and applicable law. PM USA further believes that these actions: (i) improperly increased PM USA's payments for 2015-2017; (ii) may improperly increase PM USA's payments for subsequent years; (iii) may improperly decrease PM USA's share of the 2015-2017 NPM Adjustments and the settlements of related disputes; and (iv) may improperly decrease PM USA's share of NPM Adjustments and related settlements for subsequent years.

45

PM USA and the State of Florida each filed a motion in Florida state court against R.J. Reynolds and ITG seeking to enforce the Florida State Settlement Agreement. In December 2017, the Florida trial court ruled that R.J. Reynolds (and not ITG) must make settlement payments under the Florida State Settlement Agreement on the ITG brands. In May 2018, the Florida trial court issued an order stating that, for purposes of the Florida State Settlement Agreement, R.J. Reynolds' settlement payment on the ITG brands should be calculated as if R.J. Reynolds is continuing to sell those brands. In August 2018, the Florida trial court entered final judgment ordering R.J. Reynolds to pay PM USA approximately $9.8 million for the 2015-2017 period. R.J. Reynolds and PM USA have each filed notices of appeal of the trial court's decision, which proceedings may result in further modifications to PM USA's settlement payments under the Florida State Settlement Agreement.

In March 2018, PM USA and the State of Minnesota filed pleadings in Minnesota state court asserting claims against R.J. Reynolds and ITG seeking to enforce the Minnesota State Settlement Agreement.

*Federal Government's Lawsuit*

In 1999, the United States government filed a lawsuit in the U.S. District Court for the District of Columbia against various cigarette manufacturers, including PM USA, and others, including Altria, asserting claims under three federal statutes, namely the Medical Care Recovery Act ("MCRA"), the MSP provisions of the Social Security Act and the civil provisions of RICO. The case ultimately proceeded only under the civil provisions of RICO, and the trial ended in June 2005. In August 2006, the district court entered judgment in favor of the government. The court held that certain defendants, including Altria and PM USA, violated RICO and engaged in seven of the eight "sub-schemes" to defraud that the government had alleged. Specifically, the court found that:

- ?    defendants falsely denied, distorted and minimized the significant adverse health consequences of smoking;
- ?    defendants hid from the public that cigarette smoking and nicotine are addictive;
- ?    defendants falsely denied that they control the level of nicotine delivered to create and sustain addiction;
- ?    defendants falsely marketed and promoted "low tar/light" cigarettes as less harmful than full-flavor cigarettes;
- ?    defendants falsely denied that they intentionally marketed to youth;
- ?    defendants publicly and falsely denied that ETS is hazardous to non-smokers; and
- ?    defendants suppressed scientific research.

The court did not impose monetary penalties on defendants, but ordered the following relief: (i) an injunction against "committing any act of racketeering" relating to the manufacturing, marketing, promotion, health consequences or sale of cigarettes in the United States; (ii) an injunction against participating directly or indirectly in the management or control of the Council for Tobacco Research, the Tobacco Institute, or the Center for Indoor Air Research, or any successor or affiliated entities of each; (iii) an injunction against "making, or causing to be made in any way, any material false, misleading, or deceptive statement or representation or engaging in any public relations or marketing endeavor that is disseminated to the United States public and that misrepresents or suppresses information concerning cigarettes"; (iv) an injunction against conveying any express or implied health message or health descriptors on cigarette packaging or in cigarette advertising or promotional material, including "lights," "ultra lights" and "low tar," which the court found could cause consumers to believe one cigarette brand is less hazardous than another brand; (v) the issuance of "corrective statements" in various media regarding the adverse health effects of smoking, the addictiveness of smoking and nicotine, the lack of any significant health benefit from smoking "low tar" or "light" cigarettes, defendants' manipulation of cigarette design to ensure optimum nicotine delivery and the adverse health effects of exposure to ETS; (vi) the disclosure on defendants' public document websites and in the Minnesota document repository of all documents produced to the government in the lawsuit or produced in any future court or administrative action concerning smoking and health until 2021, with certain additional requirements as to documents withheld from production under a claim of privilege or confidentiality; (vii) the disclosure of disaggregated marketing data to the government in the same form and on the same schedule as defendants now follow in disclosing such data to the Federal Trade Commission ("FTC") for a period of 10 years; (viii) certain restrictions on the sale or transfer by defendants of any cigarette brands, brand names, formulas or cigarette businesses within the United States; and (ix) payment of the government's costs in bringing the action.

Defendants appealed and, in May 2009, a three judge panel of the Court of Appeals for the District of Columbia Circuit ("D.C. Court of Appeals") largely affirmed the trial court's remedial order, but vacated the following aspects of the order:

- ?    its application to defendants' subsidiaries;
- ?    the prohibition on the use of express or implied health messages or health descriptors, but only to the extent of extraterritorial application;

46

https://www.sec.gov/Archives/edgar/data/764180/000076418018000095/a2018form10qq32018.htm[6/30/2020 3:11:19 PM]

?    its point-of-sale display provisions; and
?    its application to Brown & Williamson Holdings.

The appellate panel remanded the case for the trial court to reconsider these four aspects of the injunction and to reformulate its remedial order accordingly.

In November 2012, the district court issued its order specifying the content of the corrective communications described above and defendants appealed. In April 2014, the parties submitted a motion for entry of a consent order in the district court, setting forth their agreement on the implementation details of the corrective communications remedy, which the district court approved in June 2014. In May 2015, the D.C. Court of Appeals affirmed in part and reversed in part the appeal on the content of the corrective communications, concluding that certain portions of the statements exceeded the district court's jurisdiction under RICO, but upheld other portions challenged by defendants. The D.C. Court of Appeals remanded the case to the trial court for further proceedings.

In February 2016, the district court issued an order adopting modified corrective statements. Defendants appealed and, in April 2017, the D.C. Court of Appeals reversed in part the district court's decision on the content of the corrective communications, striking certain content and remanding to the district court the decision on how to revise certain other content. In June 2017, the district court issued an order adopting modified corrective statements. In October 2017, the court approved the parties' proposed consent order implementing the corrective communications remedy for newspapers and television. The corrective statements began appearing in newspapers and on television in the fourth quarter of 2017. In January 2018, the parties submitted a status report and a request for a status conference to address open issues regarding onsert and website implementation details. The defendants also filed a motion in the U.S. District Court for the District of Columbia seeking to mediate the remaining implementation details and for an order clarifying that the DOJ may not enforce the previous consent order with respect to onserts and websites prior to resolution of all implementation details. In February 2018, the U.S. District Court agreed not to enforce the previous consent order and, in April 2018, the parties reached agreement on the implementation details of the corrective communications remedy for onserts and websites. The corrective statements began appearing on websites in the second quarter of 2018 and the onserts will begin appearing in the fourth quarter of 2018.

In the second quarter of 2014, Altria and PM USA recorded provisions on each of their respective balance sheets totaling $31 million for the estimated costs of implementing the corrective communications remedy.

The consent order approved by the district court in June 2014 did not address the requirements related to point-of-sale signage. In May 2014, the district court ordered further briefing by the parties on the issue of corrective statements on point-of-sale signage, which was completed in June 2014. In May 2018, the parties submitted a joint status report on point-of-sale signage to the district court and the court approved the parties' proposed briefing schedule. The briefing is complete and the matter is pending before the district court.

**"Lights/Ultra Lights" Cases**

*Overview*

Plaintiffs have sought certification of their cases as class actions, alleging among other things, that the uses of the terms "Lights" and/or "Ultra Lights" constitute deceptive and unfair trade practices, common law or statutory fraud, unjust enrichment or breach of warranty, and have sought injunctive and equitable relief, including restitution and, in certain cases, punitive damages. These class actions have been brought against PM USA and, in certain instances, Altria or its other subsidiaries, on behalf of individuals who purchased and consumed various brands of cigarettes, including *Marlboro* Lights, *Marlboro* Ultra Lights, *Virginia Slims* Lights and Superslims, *Merit* Lights and *Cambridge* Lights. Defenses raised in these cases include lack of misrepresentation, lack of causation, injury and damages, the statute of limitations, non-liability under state statutory provisions exempting conduct that complies with federal regulatory directives, and the First Amendment. As of October 22, 2018, a total of two such cases are pending in various U.S. state courts, none of which is active.

*State "Lights" Cases Dismissed, Not Certified or Ordered De-Certified*

As of October 22, 2018, 21 state courts in 23 "Lights" cases have refused to certify class actions, dismissed class action allegations, reversed prior class certification decisions or have entered judgment in favor of PM USA.

47

*State Trial Court Class Certifications*

State trial courts have certified classes against PM USA in several jurisdictions. Over time, all such cases have been dismissed by the courts at the summary judgment stage, were settled by the parties or were resolved in favor of PM USA.

**Certain Other Tobacco-Related Litigation**

*Ignition Propensity Case*

PM USA and Altria are currently facing litigation alleging that a fire caused by cigarettes led to individuals' deaths. In a Kentucky case (*Walker*) brought against various parties including PM USA and Altria, the federal district court denied plaintiffs' motion to remand the case to state court and dismissed plaintiffs' claims in February 2009. Plaintiffs subsequently filed a notice of appeal. In October 2011, the U.S. Court of Appeals for the Sixth Circuit reversed the portion of the district court decision that denied remand of the case to Kentucky state court and remanded the case to Kentucky state court. The Sixth Circuit did not address the merits of the district court's dismissal order. Defendants' petition for rehearing with the Sixth Circuit was denied in December 2011. Defendants filed a renewed motion to dismiss in state court in March 2013. Based on new evidence, in June 2013, defendants removed the case for a second time to the U.S. District Court for the Western District of Kentucky and re-filed their motion to dismiss in June 2013. In July 2013, plaintiffs filed a motion to remand the case to Kentucky state court, which was granted in March 2014. In November 2016, PM USA and Altria filed renewed motions to dismiss the case, which the court granted in March 2017. In October 2018, plaintiffs dismissed their claims against the other defendants.

**UST Litigation**

UST and/or its tobacco subsidiaries have been named in a number of individual tobacco and health suits over time. Plaintiffs' allegations of liability in these cases are based on various theories of recovery, such as negligence, strict liability, fraud, misrepresentation, design defect, failure to warn, breach of implied warranty, addiction and breach of consumer protection statutes. Plaintiffs seek various forms of relief, including compensatory and punitive damages, and certain equitable relief, including but not limited to disgorgement. Defenses raised in these cases include lack of causation, assumption of the risk, comparative fault and/or contributory negligence, and statutes of limitations. In July 2016, USSTC and Altria were named as defendants, along with other named defendants, in one such case in California (*Gwynn*). In August 2018, the parties agreed to settle the *Gwynn* case and in September 2018, plaintiffs dismissed their claims with prejudice.

**Environmental Regulation**

Altria and its subsidiaries (and former subsidiaries) are subject to various federal, state and local laws and regulations concerning the discharge of materials into the environment, or otherwise related to environmental protection, including, in the United States: the Clean Air Act, the Clean Water Act, the Resource Conservation and Recovery Act and the Comprehensive Environmental Response, Compensation and Liability Act (commonly known as "Superfund"), which can impose joint and several liability on each responsible party. Subsidiaries (and former subsidiaries) of Altria are involved in several matters subjecting them to potential costs of remediation and natural resource damages under Superfund or other laws and regulations. Altria's subsidiaries expect to continue to make capital and other expenditures in connection with environmental laws and regulations.

Altria provides for expenses associated with environmental remediation obligations on an undiscounted basis when such amounts are probable and can be reasonably estimated. Such accruals are adjusted as new information develops or circumstances change. Other than those amounts, it is not possible to reasonably estimate the cost of any environmental remediation and compliance efforts that subsidiaries of Altria may undertake in the future. In the opinion of management, however, compliance with environmental laws and regulations, including the payment of any remediation costs or damages and the making of related expenditures, has not had, and is not expected to have, a material adverse effect on Altria's consolidated results of operations, capital expenditures, financial position or cash flows.

**Guarantees and Other Similar Matters**

In the ordinary course of business, certain subsidiaries of Altria have agreed to indemnify a limited number of third parties in the event of future litigation. At September 30, 2018, Altria and certain of its subsidiaries (i) had $56 million of unused letters of credit obtained in the ordinary course of business; (ii) were contingently liable for $30 million of guarantees, consisting primarily of surety bonds, related to their own performance; and (iii) had a redeemable noncontrolling interest of $38 million

48

recorded on its condensed consolidated balance sheet. In addition, from time to time, subsidiaries of Altria issue lines of credit to affiliated entities. These items have not had, and are not expected to have, a significant impact on Altria's liquidity.

Under the terms of a distribution agreement between Altria and PMI (the "Distribution Agreement"), entered into as a result of Altria's 2008 spin-off of its former subsidiary PMI, liabilities concerning tobacco products will be allocated based in substantial part on the manufacturer. PMI will indemnify Altria and PM USA for liabilities related to tobacco products manufactured by PMI or contract manufactured for PMI by PM USA, and PM USA will indemnify PMI for liabilities related to tobacco products manufactured by PM USA, excluding tobacco products contract manufactured for PMI. Altria does not have a related liability recorded on its condensed consolidated balance sheet at September 30, 2018 as the fair value of this indemnification is insignificant.

As more fully discussed in Note 11. *Condensed Consolidating Financial Information*, PM USA has issued guarantees relating to Altria's obligations under its outstanding debt securities, borrowings under its Credit Agreement and amounts outstanding under its commercial paper program.

**Note 11. Condensed Consolidating Financial Information:**

PM USA, which is a 100% owned subsidiary of Altria, has guaranteed Altria's obligations under its outstanding debt securities, borrowings under its Credit Agreement and amounts outstanding under its commercial paper program (the "Guarantees"). Pursuant to the Guarantees, PM USA fully and unconditionally guarantees, as primary obligor, the payment and performance of Altria's obligations under the guaranteed debt instruments (the "Obligations"), subject to release under certain customary circumstances as noted below.

The Guarantees provide that PM USA guarantees the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of the Obligations. The liability of PM USA under the Guarantees is absolute and unconditional irrespective of: any lack of validity, enforceability or genuineness of any provision of any agreement or instrument relating thereto; any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to departure from any agreement or instrument relating thereto; any exchange, release or non-perfection of any collateral, or any release or amendment or waiver of or consent to departure from any other guarantee, for all or any of the Obligations; or any other circumstance that might otherwise constitute a defense available to, or a discharge of, Altria or PM USA.

The obligations of PM USA under the Guarantees are limited to the maximum amount as will not result in PM USA's obligations under the Guarantees constituting a fraudulent transfer or conveyance, after giving effect to such maximum amount and all other contingent and fixed liabilities of PM USA that are relevant under Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law to the extent applicable to the Guarantees. For this purpose, "Bankruptcy Law" means Title 11, U.S. Code, or any similar federal or state law for the relief of debtors.

PM USA will be unconditionally released and discharged from the Obligations upon the earliest to occur of:

?    the date, if any, on which PM USA consolidates with or merges into Altria or any successor;
?    the date, if any, on which Altria or any successor consolidates with or merges into PM USA;
?    the payment in full of the Obligations pertaining to such Guarantees; and
?    the rating of Altria's long-term senior unsecured debt by Standard & Poor's Ratings Services of A or higher.

At September 30, 2018, the respective principal 100% owned subsidiaries of Altria and PM USA were not limited by long-term debt or other agreements in their ability to pay cash dividends or make other distributions with respect to their equity interests.

The following sets forth the condensed consolidating balance sheets as of September 30, 2018 and December 31, 2017, condensed consolidating statements of earnings and comprehensive earnings for the nine and three months ended September 30, 2018 and 2017, and condensed consolidating statements of cash flows for the nine months ended September 30, 2018 and 2017 for Altria, PM USA and, collectively, Altria's other subsidiaries that are not guarantors of Altria's debt instruments (the "Non-Guarantor Subsidiaries").

The financial information may not necessarily be indicative of results of operations or financial position had PM USA and the Non-Guarantor Subsidiaries operated as independent entities. Altria and PM USA account for investments in their subsidiaries under the equity method of accounting.

49

Condensed Consolidating Balance Sheets
September 30, 2018
(in millions of dollars)

| | Altria | PM USA | Non-Guarantor Subsidiaries | Total Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash and cash equivalents | $ 2,346 | $ — | $ 47 | $ — | $ 2,393 |
| Receivables | — | 14 | 173 | — | 187 |
| Inventories: | | | | | |
| Leaf tobacco | — | 465 | 329 | — | 794 |
| Other raw materials | — | 114 | 74 | — | 188 |
| Work in process | — | 4 | 502 | — | 506 |
| Finished product | — | 117 | 472 | — | 589 |
| | — | 700 | 1,377 | — | 2,077 |
| Due from Altria and subsidiaries | 7 | 4,085 | 1,233 | (5,325) | — |
| Income taxes | — | 223 | — | (139) | 84 |
| Other current assets | 56 | 334 | 34 | — | 424 |
| Total current assets | 2,409 | 5,356 | 2,864 | (5,464) | 5,165 |
| Property, plant and equipment, at cost | — | 2,910 | 1,951 | — | 4,861 |
| Less accumulated depreciation | — | 2,100 | 870 | — | 2,970 |
| | — | 810 | 1,081 | — | 1,891 |
| Goodwill | — | — | 5,307 | — | 5,307 |
| Other intangible assets, net | — | 2 | 12,383 | — | 12,385 |
| Investment in AB InBev | 17,825 | — | — | — | 17,825 |
| Investment in consolidated subsidiaries | 14,081 | 2,861 | — | (16,942) | — |
| Finance assets, net | — | — | 848 | — | 848 |
| Due from Altria and subsidiaries | 4,790 | — | — | (4,790) | — |
| Other assets | 159 | 717 | 144 | (488) | 532 |
| **Total Assets** | $ 39,264 | $ 9,746 | $ 22,627 | $ (27,684) | $ 43,953 |

50

Condensed Consolidating Balance Sheets (Continued)
September 30, 2018
(in millions of dollars)

| | Altria | PM USA | Non-Guarantor Subsidiaries | Total Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|
| **Liabilities** | | | | | |
| Current portion of long-term debt | $ 2,007 | $ — | $ — | $ — | $ 2,007 |
| Accounts payable | — | 78 | 211 | — | 289 |
| Accrued liabilities: | | | | | |
| Marketing | — | 578 | 112 | — | 690 |
| Employment costs | 14 | 11 | 122 | — | 147 |
| Settlement charges | — | 3,222 | 8 | — | 3,230 |
| Other | 277 | 335 | 302 | (139) | 775 |
| Dividends payable | 1,508 | — | — | — | 1,508 |
| Due to Altria and subsidiaries | 4,814 | 426 | 85 | (5,325) | — |
| Total current liabilities | 8,620 | 4,650 | 840 | (5,464) | 8,646 |
| Long-term debt | 11,896 | — | — | — | 11,896 |
| Deferred income taxes | 2,963 | — | 2,952 | (488) | 5,427 |
| Accrued pension costs | 197 | — | 63 | — | 260 |
| Accrued postretirement health care costs | — | 1,213 | 770 | — | 1,983 |
| Due to Altria and subsidiaries | — | — | 4,790 | (4,790) | — |
| Other liabilities | 94 | 30 | 83 | — | 207 |
| **Total liabilities** | 23,770 | 5,893 | 9,498 | (10,742) | 28,419 |
| Contingencies | | | | | |
| Redeemable noncontrolling interest | — | — | 38 | — | 38 |
| **Stockholders' Equity** | | | | | |
| Common stock | 935 | — | 9 | (9) | 935 |
| Additional paid-in capital | 5,959 | 3,310 | 12,236 | (15,546) | 5,959 |
| Earnings reinvested in the business | 43,805 | 801 | 2,241 | (3,042) | 43,805 |
| Accumulated other comprehensive losses | (2,034) | (258) | (1,397) | 1,655 | (2,034) |
| Cost of repurchased stock | (33,171) | — | — | — | (33,171) |
| Total stockholders' equity attributable to Altria | 15,494 | 3,853 | 13,089 | (16,942) | 15,494 |
| Noncontrolling interests | — | — | 2 | — | 2 |
| **Total stockholders' equity** | 15,494 | 3,853 | 13,091 | (16,942) | 15,496 |
| **Total Liabilities and Stockholders' Equity** | $ 39,264 | $ 9,746 | $ 22,627 | $ (27,684) | $ 43,953 |

51

https://www.sec.gov/Archives/edgar/data/764180/000076418018000095/a2018form10qq32018.htm[6/30/2020 3:11:19 PM]

Condensed Consolidating Balance Sheets
December 31, 2017
(in millions of dollars)

| | | Altria | | PM USA | | Non-Guarantor Subsidiaries | | Total Consolidating Adjustments | | Consolidated |
|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | |
| Cash and cash equivalents | $ | 1,203 | $ | 1 | $ | 49 | $ | — | $ | 1,253 |
| Receivables | | 1 | | 10 | | 131 | | — | | 142 |
| Inventories: | | | | | | | | | | |
| Leaf tobacco | | — | | 579 | | 362 | | — | | 941 |
| Other raw materials | | — | | 111 | | 59 | | — | | 170 |
| Work in process | | — | | 5 | | 555 | | — | | 560 |
| Finished product | | — | | 128 | | 426 | | — | | 554 |
| | | — | | 823 | | 1,402 | | — | | 2,225 |
| Due from Altria and subsidiaries | | 2 | | 2,413 | | 1,022 | | (3,437) | | — |
| Income taxes | | — | | 542 | | 17 | | (98) | | 461 |
| Other current assets | | 11 | | 147 | | 105 | | — | | 263 |
| Total current assets | | 1,217 | | 3,936 | | 2,726 | | (3,535) | | 4,344 |
| Property, plant and equipment, at cost | | — | | 2,930 | | 1,949 | | — | | 4,879 |
| Less accumulated depreciation | | — | | 2,086 | | 879 | | — | | 2,965 |
| | | — | | 844 | | 1,070 | | — | | 1,914 |
| Goodwill | | — | | — | | 5,307 | | — | | 5,307 |
| Other intangible assets, net | | — | | 2 | | 12,398 | | — | | 12,400 |
| Investment in AB InBev | | 17,952 | | — | | — | | — | | 17,952 |
| Investment in consolidated subsidiaries | | 13,111 | | 2,818 | | — | | (15,929) | | — |
| Finance assets, net | | — | | — | | 899 | | — | | 899 |
| Due from Altria and subsidiaries | | 4,790 | | — | | — | | (4,790) | | — |
| Other assets | | 34 | | 671 | | 157 | | (476) | | 386 |
| **Total Assets** | $ | 37,104 | $ | 8,271 | $ | 22,557 | $ | (24,730) | $ | 43,202 |

52

Condensed Consolidating Balance Sheets (Continued)
December 31, 2017
(in millions of dollars)

| | Altria | PM USA | Non-Guarantor Subsidiaries | Total Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|
| **Liabilities** | | | | | |
| Current portion of long-term debt | $ 864 | $ — | $ — | $ — | $ 864 |
| Accounts payable | 2 | 91 | 281 | — | 374 |
| Accrued liabilities: | | | | | |
| Marketing | — | 578 | 117 | — | 695 |
| Employment costs | 21 | 14 | 153 | — | 188 |
| Settlement charges | — | 2,437 | 5 | — | 2,442 |
| Other | 389 | 433 | 247 | (98) | 971 |
| Dividends payable | 1,258 | — | — | — | 1,258 |
| Due to Altria and subsidiaries | 3,040 | 317 | 80 | (3,437) | — |
| Total current liabilities | 5,574 | 3,870 | 883 | (3,535) | 6,792 |
| Long-term debt | 13,030 | — | — | — | 13,030 |
| Deferred income taxes | 2,809 | — | 2,914 | (476) | 5,247 |
| Accrued pension costs | 206 | — | 239 | — | 445 |
| Accrued postretirement health care costs | — | 1,214 | 773 | — | 1,987 |
| Due to Altria and subsidiaries | — | — | 4,790 | (4,790) | — |
| Other liabilities | 108 | 49 | 126 | — | 283 |
| **Total liabilities** | 21,727 | 5,133 | 9,725 | (8,801) | 27,784 |
| Contingencies | | | | | |
| Redeemable noncontrolling interest | — | — | 38 | — | 38 |
| **Stockholders' Equity** | | | | | |
| Common stock | 935 | — | 9 | (9) | 935 |
| Additional paid-in capital | 5,952 | 3,310 | 12,045 | (15,355) | 5,952 |
| Earnings reinvested in the business | 42,251 | 96 | 2,243 | (2,339) | 42,251 |
| Accumulated other comprehensive losses | (1,897) | (268) | (1,506) | 1,774 | (1,897) |
| Cost of repurchased stock | (31,864) | — | — | — | (31,864) |
| Total stockholders' equity attributable to Altria | 15,377 | 3,138 | 12,791 | (15,929) | 15,377 |
| Noncontrolling interests | — | — | 3 | — | 3 |
| **Total stockholders' equity** | 15,377 | 3,138 | 12,794 | (15,929) | 15,380 |
| **Total Liabilities and Stockholders' Equity** | $ 37,104 | $ 8,271 | $ 22,557 | $ (24,730) | $ 43,202 |

53

https://www.sec.gov/Archives/edgar/data/764180/000076418018000095/a2018form10qq32018.htm[6/30/2020 3:11:19 PM]

Condensed Consolidating Statements of Earnings and Comprehensive Earnings
For the Nine Months Ended September 30, 2018
(in millions of dollars)

| | Altria | PM USA | Non-Guarantor Subsidiaries | Total Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|
| Net revenues | $ — | $ 16,339 | $ 2,938 | $ (27) | $ 19,250 |
| Cost of sales | — | 4,666 | 870 | (27) | 5,509 |
| Excise taxes on products | — | 4,245 | 164 | — | 4,409 |
| Gross profit | — | 7,428 | 1,904 | — | 9,332 |
| Marketing, administration and research costs | 122 | 1,400 | 437 | — | 1,959 |
| Asset impairment and exit costs | — | — | 2 | — | 2 |
| Operating (expense) income | (122) | 6,028 | 1,465 | — | 7,371 |
| Interest and other debt expense (income), net | 378 | (37) | 162 | — | 503 |
| Net periodic benefit cost (income), excluding service cost | 3 | (33) | (7) | — | (37) |
| Earnings from equity investment in AB InBev | (759) | — | — | — | (759) |
| Loss on AB InBev/SABMiller business combination | 33 | — | — | — | 33 |
| Earnings before income taxes and equity earnings of subsidiaries | 223 | 6,098 | 1,310 | — | 7,631 |
| Provision for income taxes | 67 | 1,537 | 311 | — | 1,915 |
| Equity earnings of subsidiaries | 5,557 | 310 | — | (5,867) | — |
| Net earnings | 5,713 | 4,871 | 999 | (5,867) | 5,716 |
| Net earnings attributable to noncontrolling interests | — | — | (3) | — | (3) |
| Net earnings attributable to Altria | $ 5,713 | $ 4,871 | $ 996 | $ (5,867) | $ 5,713 |
| | | | | | |
| Net earnings | $ 5,713 | $ 4,871 | $ 999 | $ (5,867) | $ 5,716 |
| Other comprehensive (losses) earnings, net of deferred income taxes | (137) | 10 | 109 | (119) | (137) |
| Comprehensive earnings | 5,576 | 4,881 | 1,108 | (5,986) | 5,579 |
| Comprehensive earnings attributable to noncontrolling interests | — | — | (3) | — | (3) |
| Comprehensive earnings attributable to Altria | $ 5,576 | $ 4,881 | $ 1,105 | $ (5,986) | $ 5,576 |

54

Condensed Consolidating Statements of Earnings and Comprehensive Earnings
For the Nine Months Ended September 30, 2017
(in millions of dollars)

| | Altria | PM USA | Non-Guarantor Subsidiaries | Total Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|
| Net revenues | $ — | $ 16,748 | $ 2,754 | $ (27) | $ 19,475 |
| Cost of sales | — | 4,888 | 858 | (27) | 5,719 |
| Excise taxes on products | — | 4,533 | 162 | — | 4,695 |
| Gross profit | — | 7,327 | 1,734 | — | 9,061 |
| Marketing, administration and research costs | 125 | 1,223 | 333 | — | 1,681 |
| Asset impairment and exit costs | — | — | 24 | — | 24 |
| Operating (expense) income | (125) | 6,104 | 1,377 | — | 7,356 |
| Interest and other debt expense (income), net | 375 | (12) | 162 | — | 525 |
| Net periodic benefit cost (income), excluding service cost | 1 | (28) | (10) | — | (37) |
| Earnings from equity investment in AB InBev | (332) | — | — | — | (332) |
| Gain on AB InBev/SABMiller business combination | (445) | — | — | — | (445) |
| Earnings before income taxes and equity earnings of subsidiaries | 276 | 6,144 | 1,225 | — | 7,645 |
| (Benefit) provision for income taxes | (207) | 2,173 | 420 | — | 2,386 |
| Equity earnings of subsidiaries | 4,773 | 234 | — | (5,007) | — |
| Net earnings | 5,256 | 4,205 | 805 | (5,007) | 5,259 |
| Net earnings attributable to noncontrolling interests | — | — | (3) | — | (3) |
| Net earnings attributable to Altria | $ 5,256 | $ 4,205 | $ 802 | $ (5,007) | $ 5,256 |
| | | | | | |
| Net earnings | $ 5,256 | $ 4,205 | $ 805 | $ (5,007) | $ 5,259 |
| Other comprehensive earnings, net of deferred income taxes | 106 | 10 | 83 | (93) | 106 |
| Comprehensive earnings | 5,362 | 4,215 | 888 | (5,100) | 5,365 |
| Comprehensive earnings attributable to noncontrolling interests | — | — | (3) | — | (3) |
| Comprehensive earnings attributable to Altria | $ 5,362 | $ 4,215 | $ 885 | $ (5,100) | $ 5,362 |

55

Condensed Consolidating Statements of Earnings and Comprehensive Earnings
For the Three Months Ended September 30, 2018
(in millions of dollars)

| | Altria | PM USA | Non-Guarantor Subsidiaries | Total Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|
| Net revenues | $ — | $ 5,811 | $ 1,035 | $ (9) | $ 6,837 |
| Cost of sales | — | 1,736 | 310 | (9) | 2,037 |
| Excise taxes on products | — | 1,491 | 54 | — | 1,545 |
| Gross profit | — | 2,584 | 671 | — | 3,255 |
| Marketing, administration and research costs | 45 | 491 | 164 | — | 700 |
| Asset impairment and exit costs | — | — | (2) | — | (2) |
| Operating (expense) income | (45) | 2,093 | 509 | — | 2,557 |
| Interest and other debt expense (income), net | 127 | (20) | 52 | — | 159 |
| Net periodic benefit cost (income), excluding service cost | 1 | (18) | (4) | — | (21) |
| Earnings from equity investment in AB InBev | (189) | — | — | — | (189) |
| Earnings before income taxes and equity earnings of subsidiaries | 16 | 2,131 | 461 | — | 2,608 |
| Provision for income taxes | 21 | 539 | 104 | — | 664 |
| Equity earnings of subsidiaries | 1,948 | 119 | — | (2,067) | — |
| Net earnings | 1,943 | 1,711 | 357 | (2,067) | 1,944 |
| Net earnings attributable to noncontrolling interests | — | — | (1) | — | (1) |
| Net earnings attributable to Altria | $ 1,943 | $ 1,711 | $ 356 | $ (2,067) | $ 1,943 |
| | | | | | |
| Net earnings | $ 1,943 | $ 1,711 | $ 357 | $ (2,067) | $ 1,944 |
| Other comprehensive (losses) earnings, net of deferred income taxes | (382) | 2 | 36 | (38) | (382) |
| Comprehensive earnings | 1,561 | 1,713 | 393 | (2,105) | 1,562 |
| Comprehensive earnings attributable to noncontrolling interests | — | — | (1) | — | (1) |
| Comprehensive earnings attributable to Altria | $ 1,561 | $ 1,713 | $ 392 | $ (2,105) | $ 1,561 |

56

Condensed Consolidating Statements of Earnings and Comprehensive Earnings
For the Three Months Ended September 30, 2017
(in millions of dollars)

| | Altria | PM USA | Non-Guarantor Subsidiaries | Total Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|
| Net revenues | $ — | $ 5,764 | $ 974 | $ (9) | $ 6,729 |
| Cost of sales | — | 1,668 | 293 | (9) | 1,952 |
| Excise taxes on products | — | 1,551 | 55 | — | 1,606 |
| Gross profit | — | 2,545 | 626 | — | 3,171 |
| Marketing, administration and research costs | 46 | 422 | 106 | — | 574 |
| Asset impairment and exit costs | — | — | 8 | — | 8 |
| Operating (expense) income | (46) | 2,123 | 512 | — | 2,589 |
| Interest and other debt expense (income), net | 122 | (6) | 53 | — | 169 |
| Net periodic benefit cost (income), excluding service cost | — | (14) | (4) | — | (18) |
| Earnings from equity investment in AB InBev | (169) | — | — | — | (169) |
| Gain on AB InBev/SABMiller business combination | (37) | — | — | — | (37) |
| Earnings before income taxes and equity earnings of subsidiaries | 38 | 2,143 | 463 | — | 2,644 |
| (Benefit) provision for income taxes | (167) | 776 | 168 | — | 777 |
| Equity earnings of subsidiaries | 1,661 | 82 | — | (1,743) | — |
| Net earnings | 1,866 | 1,449 | 295 | (1,743) | 1,867 |
| Net earnings attributable to noncontrolling interests | — | — | (1) | — | (1) |
| Net earnings attributable to Altria | $ 1,866 | $ 1,449 | $ 294 | $ (1,743) | $ 1,866 |
| | | | | | |
| Net earnings | $ 1,866 | $ 1,449 | $ 295 | $ (1,743) | $ 1,867 |
| Other comprehensive (losses) earnings, net of deferred income taxes | (108) | 3 | 27 | (30) | (108) |
| Comprehensive earnings | 1,758 | 1,452 | 322 | (1,773) | 1,759 |
| Comprehensive earnings attributable to noncontrolling interests | — | — | (1) | — | (1) |
| Comprehensive earnings attributable to Altria | $ 1,758 | $ 1,452 | $ 321 | $ (1,773) | $ 1,758 |

57

Condensed Consolidating Statements of Cash Flows
For the Nine Months Ended September 30, 2018
(in millions of dollars)

| | Altria | PM USA | Non-Guarantor Subsidiaries | Total Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|
| **Cash Provided by Operating Activities** | | | | | |
| Net cash provided by operating activities | $ 4,806 | $ 5,801 | $ 1,123 | $ (5,164) | $ 6,566 |
| **Cash Provided by (Used in) Investing Activities** | | | | | |
| Capital expenditures | — | (33) | (99) | — | (132) |
| Other | 8 | — | (13) | — | (5) |
| Net cash provided by (used in) investing activities | 8 | (33) | (112) | — | (137) |
| **Cash Provided by (Used in) Financing Activities** | | | | | |
| Repurchases of common stock | (1,317) | — | — | — | (1,317) |
| Dividends paid on common stock | (3,909) | — | — | — | (3,909) |
| Changes in amounts due to/from Altria and subsidiaries | 1,576 | (1,565) | (11) | — | — |
| Cash dividends paid to parent | — | (4,166) | (998) | 5,164 | — |
| Other | (21) | — | (4) | — | (25) |
| Net cash used in financing activities | (3,671) | (5,731) | (1,013) | 5,164 | (5,251) |
| Cash, cash equivalents and restricted cash [(1)]: | | | | | |
| Increase (decrease) | 1,143 | 37 | (2) | — | 1,178 |
| Balance at beginning of period | 1,203 | 62 | 49 | — | 1,314 |
| Balance at end of period | $ 2,346 | $ 99 | $ 47 | $ — | $ 2,492 |

[(1)] Restricted cash consisted of cash deposits collateralizing appeal bonds posted by PM USA to obtain stays of judgments pending appeals. See Note 10. *Contingencies*.

58

Condensed Consolidating Statements of Cash Flows
For the Nine Months Ended September 30, 2017
(in millions of dollars)

| | Altria | PM USA | Non-Guarantor Subsidiaries | Total Consolidating Adjustments | Consolidated |
|---|---|---|---|---|---|
| **Cash Provided by Operating Activities** | | | | | |
| Net cash provided by operating activities | $ 4,777 | $ 3,664 | $ 639 | $ (4,936) | $ 4,144 |
| **Cash Provided by (Used in) Investing Activities** | | | | | |
| Capital expenditures | — | (21) | (130) | — | (151) |
| Proceeds from finance assets | — | — | 133 | — | 133 |
| Other | (4) | 2 | (182) | — | (184) |
| Net cash used in investing activities | (4) | (19) | (179) | — | (202) |
| **Cash Provided by (Used in) Financing Activities** | | | | | |
| Repurchases of common stock | (2,359) | — | — | — | (2,359) |
| Dividends paid on common stock | (3,544) | — | — | — | (3,544) |
| Changes in amounts due to/from Altria and subsidiaries | (813) | 182 | 631 | — | — |
| Cash dividends paid to parent | — | (3,849) | (1,087) | 4,936 | — |
| Other | (40) | — | (7) | — | (47) |
| Net cash used in financing activities | (6,756) | (3,667) | (463) | 4,936 | (5,950) |
| Cash, cash equivalents and restricted cash [1]: | | | | | |
| Decrease | (1,983) | (22) | (3) | — | (2,008) |
| Balance at beginning of period | 4,521 | 83 | 47 | — | 4,651 |
| Balance at end of period | $ 2,538 | $ 61 | $ 44 | $ — | $ 2,643 |

[1] Restricted cash consisted of cash deposits collateralizing appeal bonds posted by PM USA to obtain stays of judgments pending appeals. See Note 10. *Contingencies*.

59

https://www.sec.gov/Archives/edgar/data/764180/000076418018000095/a2018form10qq32018.htm[6/30/2020 3:11:19 PM]

**Note 12. Recent Accounting Guidance Not Yet Adopted:**

The following table provides a description of the recently issued accounting guidance applicable to, but not yet adopted by, Altria:

| Standards | Description | Effective Date for Public Entity | Effect on Financial Statements |
|---|---|---|---|
| ASU Nos. 2016-02; 2018-01; 2018-10; 2018-11 *Leases (Topic 842)* | The guidance requires entities to recognize lease assets and lease liabilities on the balance sheet and disclose key information about leasing arrangements. | The guidance is effective for annual reporting periods beginning after December 15, 2018, including interim periods within that reporting period. Early adoption is permitted. | Altria is in the process of evaluating the impact of this guidance on its consolidated financial statements and related disclosures, including identifying and analyzing all contracts that contain a lease. As a lessor, PMCC maintains a portfolio of finance assets, substantially all of which are leveraged leases, the accounting of which will be unchanged under the new guidance and is not expected to change unless there is a contract modification to an existing lease. As lessees, Altria and its subsidiaries' various leases under existing guidance are classified as operating leases that are not recorded on Altria's consolidated balance sheets but are recorded in Altria's consolidated statements of earnings as expense is incurred. Altria plans to apply the new guidance retrospectively at the beginning of the period of adoption and will record substantially all leases on its consolidated balance sheets as a right-of-use asset and a lease liability. Altria does not expect its adoption of this guidance to have a material impact on Altria's consolidated financial statements. The guidance will result in expanded footnote disclosures. |
| ASU No. 2016-13 *Measurement of Credit Losses on Financial Instruments (Topic 326)* | The guidance replaces the current incurred loss impairment methodology for recognizing credit losses for financial assets with a methodology that reflects the entity's current estimate of all expected credit losses and requires consideration of a broader range of reasonable and supportable information for estimating credit losses. | The guidance is effective for annual reporting periods beginning after December 15, 2019, including interim periods within that reporting period. Early adoption is permitted only as of annual reporting periods beginning after December 15, 2018, including interim periods within that reporting period. | Altria is in the process of evaluating the impact of this guidance on its consolidated financial statements and related disclosures. Altria and its subsidiaries' financial assets that are within the scope of the new guidance were approximately 2% of Altria's consolidated assets at September 30, 2018. |
| ASU No. 2018-02 *Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income (Topic 220)* | The guidance allows an entity to elect to reclassify the income tax effects of the Tax Reform Act on items within accumulated other comprehensive income to retained earnings. | The guidance is effective for fiscal years beginning after December 15, 2018, and interim periods within those fiscal years. Early adoption is permitted in any interim period for which financial statements have not yet been issued. | Altria is in the process of evaluating the impact of this guidance on its consolidated financial statements and related disclosures. |
| ASU No. 2018-15 *Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract (Subtopic 350-40)* | The guidance aligns the requirements for capitalizing implementation costs incurred in a hosting arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software (and hosting arrangements that include an internal-use software license). | The guidance is effective for fiscal years beginning after December 15, 2019 and interim periods within those fiscal years. Early adoption is permitted, including adoption in any interim period. | Altria is in the process of evaluating the impact of this guidance on its consolidated financial statements and related disclosures. |

60

Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.

**Description of the Company**

For a description of Altria Group, Inc. ("Altria"), see *Background* in Note 1. *Background and Basis of Presentation* to the condensed consolidated financial statements in Part I, Item 1. Financial Statements of this Quarterly Report on Form 10-Q ("Item 1").

As discussed in Note 1. *Background and Basis of Presentation* to the condensed consolidated financial statements in Item 1 ("Note 1"), on January 1, 2018, Altria adopted several accounting standard updates ("ASU"). In connection with the adoption of two of these ASUs (ASU No. 2016-18, *Statement of Cash Flows (Topic 230): Restricted Cash* and ASU No. 2017-07, *Compensation-Retirement Benefits (Topic 715): Improving the Presentation of Net Periodic Pension Cost and Net Periodic Postretirement Benefit Cost*), Altria reclassified certain prior-period amounts to conform with the current period's presentation.

Altria's reportable segments are smokeable products, smokeless products and wine. The financial services and the innovative tobacco products businesses are included in an all other category.

**Executive Summary**

*Consolidated Results of Operations for the Nine Months Ended September 30, 2018*: The changes in Altria's net earnings and diluted earnings per share ("EPS") attributable to Altria for the nine months ended September 30, 2018, from the nine months ended September 30, 2017, were due primarily to the following:

| | Net Earnings | Diluted EPS |
|---|---|---|
| | (in millions, except per share data) | |
| For the nine months ended September 30, 2017 | $ 5,256 | $ 2.72 |
| | | |
| 2017 NPM Adjustment Items | 2 | — |
| 2017 Asset impairment, exit, implementation and acquisition-related costs | 47 | 0.02 |
| 2017 Tobacco and health litigation items | 12 | 0.01 |
| 2017 AB InBev special items | 71 | 0.04 |
| 2017 Gain on AB InBev/SABMiller business combination | (289) | (0.15) |
| 2017 Tax items | (321) | (0.16) |
| Subtotal 2017 special items | (478) | (0.24) |
| | | |
| 2018 NPM Adjustment Items | 109 | 0.06 |
| 2018 Asset impairment, exit and implementation costs | (5) | — |
| 2018 Tobacco and health litigation items | (89) | (0.05) |
| 2018 AB InBev special items | 122 | 0.06 |
| 2018 Loss on AB InBev/SABMiller business combination | (26) | (0.01) |
| 2018 Tax items | (152) | (0.08) |
| Subtotal 2018 special items | (41) | (0.02) |
| | | |
| Fewer shares outstanding | — | 0.06 |
| Change in tax rate | 923 | 0.47 |
| Operations | 53 | 0.03 |
| For the nine months ended September 30, 2018 | $ 5,713 | $ 3.02 |

*See the discussion of events affecting the comparability of statement of earnings amounts in the Consolidated Operating Results section of the following Discussion and Analysis.*

*Fewer Shares Outstanding*: Fewer shares outstanding during the nine months ended September 30, 2018 compared with the prior-year period were due primarily to shares repurchased by Altria under its share repurchase programs.

Document

61

*Change in Tax Rate*: The change in tax rate was driven primarily by the Tax Reform Act (as defined below), which reduced the U.S. federal statutory corporate income tax rate from 35% to 21% effective January 1, 2018.

*Operations*: The increase of $53 million in operations shown in the table above was due primarily to the following:

? higher earnings from Altria's equity investment in Anheuser-Busch InBev SA/NV ("AB InBev"); and

? higher income from the smokeless products segment;

partially offset by:

? lower income from the smokeable products segment; and

? higher investment spending in the innovative tobacco products businesses.

*For further details, see the Consolidated Operating Results and Operating Results by Business Segment sections of the following Discussion and Analysis.*

*Consolidated Results of Operations for the Three Months Ended September 30, 2018*: The changes in Altria's net earnings and diluted EPS attributable to Altria for the three months ended September 30, 2018, from the three months ended September 30, 2017, were due primarily to the following:

|  | Net Earnings | Diluted EPS |
|---|---|---|
|  | (in millions, except per share data) | |
| For the three months ended September 30, 2017 | $    1,866 | $    0.97 |
|  |  |  |
| 2017 NPM Adjustment Items | 3 | — |
| 2017 Asset impairment, exit, implementation and acquisition-related costs | 11 | 0.01 |
| 2017 AB InBev special items | 22 | 0.01 |
| 2017 Gain on AB InBev/SABMiller business combination | (24) | (0.01) |
| 2017 Tax items | (155) | (0.08) |
| Subtotal 2017 special items | (143) | (0.07) |
|  |  |  |
| 2018 Asset impairment, exit and implementation costs | 2 | — |
| 2018 Tobacco and health litigation items | (16) | (0.01) |
| 2018 AB InBev special items | (27) | (0.01) |
| 2018 Tax items | (57) | (0.03) |
| Subtotal 2018 special items | (98) | (0.05) |
|  |  |  |
| Fewer shares outstanding | — | 0.02 |
| Change in tax rate | 319 | 0.16 |
| Operations | (1) | — |
| For the three months ended September 30, 2018 | $    1,943 | $    1.03 |

*See the discussion of events affecting the comparability of statement of earnings amounts in the Consolidated Operating Results section of the following Discussion and Analysis.*

*Fewer Shares Outstanding*: Fewer shares outstanding during the three months ended September 30, 2018 compared with the prior-year period were due primarily to shares repurchased by Altria under its share repurchase programs.

*Change in Tax Rate*: The change in tax rate was driven primarily by the Tax Reform Act (as defined below), which reduced the U.S. federal statutory corporate income tax rate from 35% to 21% effective January 1, 2018.

*For further details, see the Consolidated Operating Results and Operating Results by Business Segment sections of the following Discussion and Analysis.*

*2018 Forecasted Results*: In October 2018, Altria raised the lower end of its guidance and now expects its 2018 full-year adjusted diluted EPS

Document

growth rate to be in the range of 16.5% to 19% over its 2017 full-year adjusted diluted EPS base of

62

$3.39. This forecasted growth rate excludes the 2018 forecasted income and expense items in the second table below. Altria's 2018 guidance reflects investments in focus areas for long-term growth, including innovative product development and launches, regulatory science, brand equity, retail fixtures and future retail concepts. Altria expects its 2018 full-year adjusted effective tax rate will be in a range of approximately 23% to 24%.

**Reconciliation of 2017 Reported Diluted EPS to 2017 Adjusted Diluted EPS**

|  | 2017 |
|---|---|
| 2017 Reported diluted EPS | $ 5.31 |
| Asset impairment, exit, implementation and acquisition-related costs | 0.03 |
| Tobacco and health litigation items | 0.03 |
| AB InBev special items | 0.05 |
| Gain on AB InBev/SABMiller business combination | (0.15) |
| Settlement charge for lump sum pension payments | 0.03 |
| Tax items | (1.91) |
| 2017 Adjusted diluted EPS | $ 3.39 |

Altria's full-year adjusted diluted EPS guidance and full-year forecast for its adjusted effective tax rate exclude the impact of certain income and expense items that management believes are not part of underlying operations. These items may include, for example, loss on early extinguishment of debt, restructuring charges, gain/loss on AB InBev/SABMiller plc ("SABMiller") business combination, AB InBev special items, certain tax items, charges associated with tobacco and health litigation items, and resolutions of certain non-participating manufacturer ("NPM") adjustment disputes under the 1998 Master Settlement Agreement (such dispute resolutions are referred to as "NPM Adjustment Items" and are more fully described in *Health Care Cost Recovery Litigation - NPM Adjustment Disputes* in Note 10. *Contingencies* to the condensed consolidated financial statements in Item 1 ("Note 10")).

Altria's management cannot estimate on a forward-looking basis the impact of certain income and expense items, including those items noted in the preceding paragraph, on Altria's reported diluted EPS and reported effective tax rate because these items, which could be significant, may be infrequent, are difficult to predict and may be highly variable. As a result, Altria does not provide a corresponding United States generally accepted accounting principles ("U.S. GAAP") measure for, or reconciliation to, its adjusted diluted EPS guidance or its adjusted effective tax rate forecast.

In addition, the factors described in the *Cautionary Factors That May Affect Future Results* section of the following *Discussion and Analysis* represent continuing risks to this forecast and to the other forward-looking statements made in this Quarterly Report on Form 10-Q ("Form 10-Q").

**Expense (Income), Net Excluded from 2018 Forecasted Adjusted Diluted EPS**

|  | 2018 |
|---|---|
| NPM Adjustment Items | $ (0.06) |
| Tobacco and health litigation items | 0.05 |
| AB InBev special items | (0.06) |
| Loss on AB InBev/SABMiller business combination | 0.01 |
| Tax items | 0.08 |
|  | $ 0.02 |

Altria reports its financial results in accordance with U.S. GAAP. Altria's management reviews certain financial results, including diluted EPS, on an adjusted basis, which excludes certain income and expense items, including those items noted above. Altria's management does not view any of these special items to be part of Altria's underlying results as they may be highly variable, may be infrequent, are difficult to predict and can distort underlying business trends and results. Altria's management also reviews income tax rates on an adjusted basis. Altria's adjusted effective tax rate may exclude certain tax items from its reported effective tax rate. Altria's management believes that adjusted financial measures provide useful additional insight into underlying business trends and results and provide a more meaningful comparison of year-over-year results. Adjusted financial measures are used by management and regularly provided to Altria's chief operating decision

63

maker (the "CODM") for planning, forecasting and evaluating business and financial performance, including allocating resources and evaluating results relative to employee compensation targets. These adjusted financial measures are not consistent with U.S. GAAP and may not be calculated the same as similarly titled measures used by other companies. These adjusted financial measures should thus be considered as supplemental in nature and not considered in isolation or as a substitute for the related financial information prepared in accordance with U.S. GAAP.

## Discussion and Analysis

### Critical Accounting Policies and Estimates

Altria's Critical Accounting Policies and Estimates are discussed in Altria's Annual Report on Form 10-K for the year ended December 31, 2017 (the "2017 Form 10-K"). Except as noted below, there have been no material changes to these accounting policies and estimates:

? **Investment in AB InBev:** Altria reviews its investment in AB InBev for impairment by comparing the fair value of its investment to its carrying value. If the carrying value of Altria's investment exceeds its fair value and the loss in value is other than temporary, the investment is considered impaired and impairment is recognized in the period identified. The factors used to make this determination include the duration and magnitude of the fair value decline, AB InBev's financial condition and near-term prospects, and Altria's intent and ability to hold its investment in AB InBev until recovery.

The fair value of Altria's equity investment in AB InBev at September 30, 2018 and December 31, 2017 was $17.2 billion and $22.1 billion, respectively, compared with its carrying value of $17.8 billion and $18.0 billion, respectively. The fair value of Altria's equity investment has continued to decline after September 30, 2018. On October 25, 2018, AB InBev announced a 50% rebase in the dividends it pays to its shareholders, which will result in a reduction of cash dividends AB InBev shareholders receive. The fair value of Altria's equity investment at October 25, 2018 was approximately $14.5 billion. Altria concluded that the decline in fair value of its investment in AB InBev below its carrying value is temporary and, therefore, no impairment was recorded. This conclusion is based on: (i) the fair value of Altria's equity investment in AB InBev having historically exceeded its carrying value since October 2016, when Altria obtained its ownership interest in AB InBev, (ii) the period of time that AB InBev shares have traded below Altria's carrying value (began in September 2018) and the magnitude by which the carrying value of Altria's investment in AB InBev exceeds its fair value, (iii) AB InBev's global platform (world's largest brewer by volume and one of the world's top five consumer products companies by revenue) with strong market positions in key markets, geographic diversification, experienced management team, financial condition, expected earnings and history of performance, and (iv) Altria's ownership of restricted shares being subject to a five-year lock-up (subject to limited exceptions) ending October 10, 2021, which Altria believes provides sufficient time to allow for an anticipated recovery in the fair value of its investment in AB InBev.

If Altria were to conclude that the decline in fair value is other than temporary, Altria would determine and recognize, in the period identified, the impairment of its investment in AB InBev, which could result in a material adverse effect on Altria's consolidated financial position or earnings.

For further discussion, see Note 3. *Investment in AB InBev* to the condensed consolidated financial statements in Item 1.

64

## Consolidated Operating Results

| | For the Nine Months Ended September 30, | | | For the Three Months Ended September 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2018 | | 2017 | | 2018 | | 2017 |
| | (in millions) | | | | | | |
| Net revenues: | | | | | | | |
| Smokeable products | $ | 16,995 | $ | 17,355 | $ | 6,035 | $ | 5,975 |
| Smokeless products | | 1,690 | | 1,580 | | 586 | | 550 |
| Wine | | 489 | | 471 | | 181 | | 181 |
| All other | | 76 | | 69 | | 35 | | 23 |
| Net revenues | $ | 19,250 | $ | 19,475 | $ | 6,837 | $ | 6,729 |
| | | | | | | | |
| Excise taxes on products: | | | | | | | |
| Smokeable products | $ | 4,294 | $ | 4,581 | $ | 1,505 | $ | 1,565 |
| Smokeless products | | 100 | | 99 | | 34 | | 35 |
| Wine | | 15 | | 15 | | 6 | | 6 |
| Excise taxes on products | $ | 4,409 | $ | 4,695 | $ | 1,545 | $ | 1,606 |
| | | | | | | | |
| Operating income: | | | | | | | |
| Operating companies income (loss): | | | | | | | |
| Smokeable products | $ | 6,516 | $ | 6,536 | $ | 2,277 | $ | 2,276 |
| Smokeless products | | 1,085 | | 941 | | 370 | | 348 |
| Wine | | 73 | | 82 | | 29 | | 36 |
| All other | | (121) | | (31) | | (38) | | (10) |
| Amortization of intangibles | | (30) | | (15) | | (20) | | (5) |
| General corporate expenses | | (152) | | (157) | | (61) | | (56) |
| Operating income | $ | 7,371 | $ | 7,356 | $ | 2,557 | $ | 2,589 |

As discussed further in Note 7. *Segment Reporting* to the condensed consolidated financial statements in Item 1 ("Note 7"), the CODM reviews operating companies income to evaluate the performance of, and allocate resources to, the segments. Operating companies income for the segments is defined as operating income before general corporate expenses and amortization of intangibles. Management believes it is appropriate to disclose this measure to help investors analyze the business performance and trends of the various business segments.

The following events that occurred during the nine and three months ended September 30, 2018 and 2017 affected the comparability of statement of earnings amounts:

?   **NPM Adjustment Items:** For a discussion of NPM Adjustment Items and a breakdown of these items by segment, see *Health Care Cost Recovery Litigation - NPM Adjustment Disputes* in Note 10 and *NPM Adjustment Items* in Note 7, respectively.

?   **Tobacco and Health Litigation Items:** For a discussion of tobacco and health litigation items and a breakdown of these costs by segment, see Note 10 and Note 7, respectively.

?   **Smokeless Products Recall:** For a discussion of U.S. Smokeless Tobacco Company LLC's ("USSTC") 2017 voluntary product recall, see Note 7.

?   **Asset Impairment, Exit and Implementation Costs:** In October 2016, Altria announced the consolidation of certain of its operating companies' manufacturing facilities to streamline operations and achieve greater efficiencies. The consolidation was completed in the first quarter of 2018 and is expected to deliver approximately $50 million in annualized cost savings by the end of 2018. For a breakdown of asset impairment, exit and implementation costs by segment, see Note 7.

Document

? **Loss/Gain on AB InBev/SABMiller Business Combination:** For the nine months ended September 30, 2018, Altria recorded a pre-tax loss of $33 million related to AB InBev's divestitures of certain SABMiller assets and businesses in connection with obtaining necessary regulatory clearances for the 2016 AB InBev/SABMiller business combination ("AB InBev divestitures"). For the nine and three months ended September 30, 2017, Altria recorded a pre-tax gain of $445 million and $37 million, respectively, related to the AB InBev divestitures.

? **AB InBev Special Items:** Altria's earnings from its equity investment in AB InBev for the nine months ended September 30, 2018 included net pre-tax income of $154 million, consisting primarily of Altria's share of AB InBev's estimated effect of the Tax Reform Act (as defined below), and gains related to AB InBev's merger and acquisition activities, partially offset by Altria's share of AB InBev's mark-to-market losses on AB InBev's derivative financial instruments used to hedge certain share commitments. Altria's earnings from its equity investment in AB InBev for the three months ended September 30, 2018 included net pre-tax charges of $35 million, consisting primarily of Altria's share of fees incurred by AB InBev for the early termination of debt, and restructuring charges.

Altria's earnings from its equity investment in AB InBev for the nine and three months ended September 30, 2017 included net pre-tax charges of $109 million and $34 million, respectively, consisting primarily of Altria's share of AB InBev's mark-to-market losses on AB InBev's derivative financial instruments used to hedge certain share commitments.

? **Tax Items:** On December 22, 2017, the U.S. Government enacted comprehensive tax legislation commonly referred to as the Tax Cuts and Jobs Act (the "Tax Reform Act"). For further discussion, see Note 9. *Income Taxes* to the condensed consolidated financial statements in Item 1 ("Note 9").

Tax items for the nine months ended September 30, 2018 of $152 million were due primarily to tax expense of $122 million resulting from a partial reversal of the tax basis benefit associated with the deemed repatriation tax and tax expense of $51 million for a valuation allowance on foreign tax credit carryforwards that are not realizable, partially offset by tax benefits of $22 million related to prior audit years. Tax items for the three months ended September 30, 2018 of $57 million were due to tax expense of $40 million resulting from a partial reversal of the tax basis benefit associated with the deemed repatriation tax and tax expense of $17 million for a valuation allowance on foreign tax credit carryforwards that are not realizable.

Tax items for the nine and three months ended September 30, 2017 of $321 million and $155 million, respectively, included tax benefits of $232 million for the release of a valuation allowance related to deferred income tax assets for foreign tax credit carryforwards and for the reversal of tax accruals no longer required of $36 million, partially offset by tax expense of $114 million for tax reserves related to the calculation of certain foreign tax credits. In addition, tax items for the nine months ended September 30, 2017 included tax benefits of $152 million related primarily to the effective settlement in June 2017 of the Internal Revenue Service audit of Altria and its consolidated subsidiaries' 2010-2013 tax years ("IRS 2010-2013 Audit").

*Consolidated Results of Operations for the Nine Months Ended September 30, 2018 versus the Nine Months Ended September 30, 2017*

Net revenues, which include excise taxes billed to customers, decreased $225 million (1.2%), due primarily to lower net revenues in the smokeable products segment, partially offset by higher net revenues in the smokeless products segment.

Cost of sales decreased $210 million (3.7%), due primarily to lower shipment volume in the smokeable products segment and higher NPM Adjustment Items, partially offset by higher costs in the smokeable products segment.

Excise taxes on products decreased $286 million (6.1%), due to lower smokeable products shipment volume.

Marketing, administration and research costs increased $278 million (16.5%), due primarily to higher costs in the smokeable products segment (which included higher tobacco and health litigation items) and higher investment spending in the innovative tobacco products businesses.

Operating income increased $15 million (0.2%), due primarily to higher operating results from the smokeless products segment, partially offset by higher investment spending in the innovative tobacco products businesses and lower operating results from the smokeable products segment.

Earnings from Altria's equity investment in AB InBev, which increased $427 million, were positively impacted by AB InBev special items.

https://www.sec.gov/Archives/edgar/data/764180/000076418018000095/a2018form10qq32018.htm[6/30/2020 3:11:19 PM]

Altria's income tax rate decreased 6.1 percentage points to 25.1%, due primarily to a reduction in tax expense from the decrease in the U.S. federal statutory corporate income tax rate as a result of the Tax Reform Act, and the tax items discussed above. For further discussion, see Note 9.

Net earnings attributable to Altria of $5,713 million increased $457 million (8.7%), due primarily to a lower income tax rate and higher earnings from Altria's equity investment in AB InBev, partially offset by a 2017 gain on AB InBev/SABMiller business combination. Diluted and basic EPS attributable to Altria of $3.02, each increased by 11.0%, due to higher net earnings attributable to Altria and fewer shares outstanding.

*Consolidated Results of Operations for the Three Months Ended September 30, 2018 versus the Three Months Ended September 30, 2017*

Net revenues, which include excise taxes billed to customers, increased $108 million (1.6%), due primarily to higher net revenues in the smokeable and smokeless products segments.

Cost of sales increased $85 million (4.4%), due primarily to higher costs in the smokeable products segment, partially offset by lower shipment volume in the smokeable products segment.

Excise taxes on products decreased $61 million (3.8%), due to lower smokeable products shipment volume.

Marketing, administration and research costs increased $126 million (22.0%), due primarily to higher costs in the smokeable products segment and higher investment spending in the innovative tobacco products businesses.

Operating income decreased $32 million (1.2%), due primarily to higher investment spending in the innovative tobacco products businesses.

Altria's income tax rate decreased 3.9 percentage points to 25.5%, due primarily to a reduction in tax expense from the decrease in the U.S. federal statutory corporate income tax rate as a result of the Tax Reform Act, and the tax items discussed above. For further discussion, see Note 9.

Net earnings attributable to Altria of $1,943 million increased $77 million (4.1%), due primarily to a lower income tax rate, partially offset by a 2017 gain on AB InBev/SABMiller business combination. Diluted and basic EPS attributable to Altria of $1.03, each increased by 6.2%, due to higher net earnings attributable to Altria and fewer shares outstanding.

## Operating Results by Business Segment

**Tobacco Space**

**Business Environment**

*Summary*

The United States tobacco industry faces a number of business and legal challenges that have adversely affected and may adversely affect the business and sales volume of our tobacco subsidiaries and our consolidated results of operations, cash flows or financial position. These challenges, some of which are discussed in more detail below, in Note 10 and in *Cautionary Factors That May Affect Future Results* below, include:

- ? pending and threatened litigation and bonding requirements;
- ? restrictions and requirements imposed by the Family Smoking Prevention and Tobacco Control Act ("FSPTCA"), and restrictions and requirements (and related enforcement actions) that have been, and in the future will be, imposed by the U.S. Food and Drug Administration ("FDA");
- ? actual and proposed excise tax increases, as well as changes in tax structures and tax stamping requirements;
- ? bans and restrictions on tobacco use imposed by governmental entities and private establishments and employers;
- ? other federal, state and local government actions, including:
  - ? increases in the minimum age to purchase tobacco products above the current federal minimum age of 18;
  - ? restrictions on the sale of tobacco products by certain retail establishments, the sale of certain tobacco products with certain characterizing flavors (such as menthol) and the sale of tobacco products in certain package sizes;

- ?    additional restrictions on the advertising and promotion of tobacco products;
- ?    other actual and proposed tobacco product legislation and regulation; and
- ?    governmental investigations;

- ?    the diminishing prevalence of cigarette smoking and increased efforts by tobacco control advocates and others (including retail establishments) to further restrict tobacco use;
- ?    changes in adult tobacco consumer purchase behavior, which is influenced by various factors such as economic conditions, excise taxes and price gap relationships, may result in adult tobacco consumers switching to discount products or other lower priced tobacco products;
- ?    the highly competitive nature of the tobacco categories in which our tobacco subsidiaries operate, including competitive disadvantages related to cigarette price increases attributable to the settlement of certain litigation;
- ?    illicit trade in tobacco products; and
- ?    potential adverse changes in prices, availability and quality of tobacco, other raw materials and component parts.

In addition to and in connection with the foregoing, evolving adult tobacco consumer preferences pose challenges for Altria's tobacco subsidiaries. Our tobacco subsidiaries believe that a significant number of adult tobacco consumers switch between tobacco categories, use multiple forms of tobacco products and try innovative tobacco products, such as e-vapor products and oral tobacco-derived nicotine products. The e-vapor category grew rapidly from 2012 through early 2015 off a small base, but then slowed. The growth trend resumed in 2017. Growth of the e-vapor category and other innovative tobacco products has negatively impacted consumption levels and sales volume of other tobacco product categories. Altria and its tobacco subsidiaries believe the innovative tobacco product categories will continue to be dynamic as adult tobacco consumers explore a variety of tobacco product options and as the regulatory environment for these innovative tobacco products evolves.

Altria and its tobacco subsidiaries work to meet these evolving adult tobacco consumer preferences over time by developing, manufacturing, marketing and distributing products both within and outside the United States through innovation and adjacency growth strategies (including, where appropriate, arrangements with, or investments in, third parties). See the discussions regarding new product technologies, adjacency growth strategy and evolving consumer preferences in *Cautionary Factors That May Affect Future Results* for certain risks associated with the foregoing discussion.

We have provided additional detail on the following topics below:

- ?    FSPTCA and FDA Regulation;
- ?    Excise Taxes;
- ?    International Treaty on Tobacco Control;
- ?    State Settlement Agreements;
- ?    Other Federal, State and Local Regulation and Activity;
- ?    Illicit Trade in Tobacco Products;
- ?    Price, Availability and Quality of Tobacco, Other Raw Materials and Component Parts; and
- ?    Timing of Sales.

### *FSPTCA and FDA Regulation*

### *The Regulatory Framework*

The FSPTCA expressly establishes certain restrictions and prohibitions on our tobacco businesses and authorizes or requires further FDA action. Under the FSPTCA, the FDA has broad authority to (1) regulate the design, manufacture, packaging, advertising, promotion, sale and distribution of tobacco products; (2) require disclosures of related information; and (3) enforce the FSPTCA and related regulations. The FSPTCA went into effect in 2009 for cigarettes, cigarette tobacco and smokeless tobacco products and in August 2016 for all other tobacco products, including cigars, e-vapor products, pipe tobacco and oral tobacco-derived nicotine products ("Other Tobacco Products"). See *FDA Regulatory Actions - Deeming Regulations* below.

Among other measures, the FSPTCA or its implementing regulations:

- ?    imposes restrictions on the advertising, promotion, sale and distribution of tobacco products, including at retail;
- ?    bans descriptors such as "light," "mild" or "low" or similar descriptors when used as descriptors of modified risk unless expressly authorized by the FDA;

68

?   requires extensive product disclosures to the FDA and may require public disclosures;

?   prohibits any express or implied claims that a tobacco product is or may be less harmful than other tobacco products without FDA authorization;

?   imposes reporting obligations relating to contraband activity and grants the FDA authority to impose recordkeeping and other obligations to address illicit trade in tobacco products;

?   changes the language of the cigarette and smokeless tobacco product health warnings, enlarges their size and requires the development by the FDA of graphic warnings for cigarettes, establishes warning requirements for Other Tobacco Products and gives the FDA the authority to require new warnings for any type of tobacco products;

?   authorizes the FDA to adopt product regulations and related actions, including imposing tobacco product standards that are appropriate for the protection of the public health (*e.g.*, related to the use of menthol in cigarettes, nicotine yields and other constituents or ingredients) and imposing manufacturing standards for tobacco products (see *FDA's Comprehensive Regulatory Plan for Tobacco and Nicotine Regulation*, and *FDA Regulatory Actions - Potential Product Standards* below);

?   establishes pre-market review pathways for new and modified tobacco products for the FDA to follow (see *Pre-Market Review Pathways Including Substantial Equivalence* below); and

?   equips the FDA with a variety of investigatory and enforcement tools, including the authority to inspect tobacco product manufacturing and other facilities.

### Pre-Market Review Pathways Including Substantial Equivalence

The FSPTCA imposes restrictions on marketing new and modified tobacco products, requiring FDA review to begin marketing a new product or continue marketing a modified product. Specifically, cigarettes, cigarette tobacco and smokeless tobacco products modified or first introduced into the market after March 22, 2011, and Other Tobacco Products modified or first introduced into the market after August 8, 2016, are subjected to new tobacco product application and pre-market review and authorization requirements unless a manufacturer can demonstrate they are "substantially equivalent" to products commercially marketed as of February 15, 2007. The FDA could deny any such new tobacco product application, thereby preventing the distribution and sale of any product affected by such denial.

For cigarettes, cigarette tobacco and smokeless tobacco products modified or first introduced into the market between February 15, 2007 and March 22, 2011 ("provisional products") for which a manufacturer submitted substantial equivalence reports that the FDA determines are not "substantially equivalent" to products commercially marketed as of February 15, 2007, the FDA could require the removal of such products from the marketplace (see *FDA Regulatory Actions - Substantial Equivalence and Other New Product Processes/Pathways* below).

Similarly, the FDA could determine that Other Tobacco Products modified or first introduced into the market between February 15, 2007 and August 8, 2016 for which a manufacturer submits substantial equivalence reports that the FDA determines are not "substantially equivalent" to products commercially marketed as of February 15, 2007, or rejects a new tobacco product application submitted by a manufacturer, both of which could require the removal of such products from the marketplace (see *FDA's Comprehensive Regulatory Plan for Tobacco and Nicotine Regulation*, and *FDA Regulatory Actions - Substantial Equivalence and Other New Product Processes/Pathways* below).

Modifications to currently-marketed products, including modifications that result from, for example, a supplier being unable to maintain the consistency required in ingredients or a manufacturer being unable to obtain the ingredients with the required specifications, can trigger the FDA's pre-market review process described above. As noted, adverse determinations by the FDA during that process could restrict a manufacturer's ability to continue marketing such products.

### FDA's Comprehensive Regulatory Plan for Tobacco and Nicotine Regulation

In July 2017, the FDA announced a new comprehensive plan for tobacco and nicotine regulation that will serve as the FDA's multi-year regulatory road map (the "July 2017 Comprehensive Plan"). The FDA has stated its belief that this approach will strike an appropriate balance between regulation and encouraging development of innovative tobacco products that may be less risky than cigarettes. Major components of the July 2017 Comprehensive Plan include the following:

?   issuance of advance notices of proposed rulemaking ("ANPRM") seeking comments for potential future regulations establishing product standards for (i) nicotine in combustible cigarettes, (ii) flavors in tobacco products and (iii) e-vapor products (see *FDA Regulatory Actions - Potential Product Standards* below);

69

? extension of the timelines to submit applications for Other Tobacco Products that were on the market as of August 8, 2016, which the FDA extended in August 2017 (see *FDA Regulatory Actions - Substantial Equivalence and Other New Product Processes/Pathways* below);

? the FDA's reconsideration of its approach to reviewing substantial equivalence reports for "provisional" products (see *FDA Regulatory Actions - Substantial Equivalence and Other New Product Processes/Pathways* below). As previously noted, a "provisional" product refers to cigarettes, cigarette tobacco and smokeless tobacco products modified or first commercially available after February 15, 2007 and before March 22, 2011; and

? the FDA's planned issuance of foundational regulations identifying the information the FDA expects to be included in substantial equivalence reports and applications for "new tobacco products" and "modified risk tobacco products." The FDA also plans to finalize guidance on how it intends to review new product applications for e-vapor products.

In September 2018, the FDA announced that, while it continues to be committed to the approach outlined in the July 2017 Comprehensive Plan, it is taking a number of steps to address underage use of e-vapor products, including (i) re-examining the FDA's compliance policy that extended the dates for manufacturers of certain e-vapor products to submit applications for pre-market authorization and (ii) issuing letters to the manufacturers of certain e-vapor products, including Nu Mark LLC ("Nu Mark"), requiring them to submit to the FDA plans for addressing youth access and use of e-vapor products. See *FDA Regulatory Actions - Underage Access and Use of E-vapor Products* below for steps Altria and Nu Mark are taking in response to this request from the FDA.

### *Implementation Timing, Rulemaking and Guidance*

The implementation of the FSPTCA began in 2009 for cigarettes, cigarette tobacco and smokeless tobacco products and in August 2016 for Other Tobacco Products and will continue over time. The provisions of the FSPTCA that require the FDA to take action through rulemaking generally involve consideration of public comment and, for some issues, scientific review. As required by the FSPTCA, the FDA has established a tobacco product scientific advisory committee (the "TPSAC"), which consists of voting and non-voting members, to provide advice, reports, information and recommendations to the FDA on scientific and health issues relating to tobacco products. TPSAC votes are considered by the FDA, but are not binding. From time to time, the FDA issues guidance that also generally involves public comment, which may be issued in draft or final form.

Altria's tobacco subsidiaries participate actively in processes established by the FDA to develop and implement the FSPTCA's regulatory framework, including submission of comments to various FDA proposals and participation in public hearings and engagement sessions.

The implementation of the FSPTCA and related regulations and guidance also may have an impact on enforcement efforts by states, territories and localities of the United States of their laws and regulations as well as of the State Settlement Agreements discussed below (see *State Settlement Agreements* below). Such enforcement efforts may adversely affect our tobacco subsidiaries' ability to market and sell regulated tobacco products in those states, territories and localities.

### *Impact on Our Business; Compliance Costs and User Fees*

Regulations imposed and other regulatory actions taken by the FDA under the FSPTCA could have a material adverse effect on the business, consolidated results of operations, cash flows or financial position of Altria and its tobacco subsidiaries in a number of different ways. For example, actions by the FDA could:

? impact the consumer acceptability of tobacco products;

? delay, discontinue or prevent the sale or distribution of existing, new or modified tobacco products;

? limit adult tobacco consumer choices;

? impose restrictions on communications with adult tobacco consumers;

? create a competitive advantage or disadvantage for certain tobacco companies;

? impose additional manufacturing, labeling or packaging requirements;

? impose additional restrictions at retail;

? result in increased illicit trade in tobacco products; or

? otherwise significantly increase the cost of doing business.

70

The failure to comply with FDA regulatory requirements, even inadvertently, and FDA enforcement actions could also have a material adverse effect on the business, consolidated results of operations, cash flows or financial position of Altria and its tobacco subsidiaries.

The FSPTCA imposes user fees on cigarette, cigarette tobacco, smokeless tobacco, cigar and pipe tobacco manufacturers and importers to pay for the cost of regulation and other matters. The FSPTCA does not impose user fees on e-vapor product manufacturers. The cost of the FDA user fee is allocated first among tobacco product categories subject to FDA regulation and then among manufacturers and importers within each respective category based on their relative market shares, all as prescribed by the statute and FDA regulations. Payments for user fees are adjusted for several factors, including inflation, market share and industry volume. For a discussion of the impact of the FDA user fee payments on Altria, see *Financial Review - Debt and Liquidity - Payments Under State Settlement Agreements and FDA Regulation* below. In addition, compliance with the FSPTCA's regulatory requirements has resulted and will continue to result in additional costs for our tobacco businesses. The amount of additional compliance and related costs has not been material in any given quarter or year to date period but could become material, either individually or in the aggregate, to one or more of our tobacco subsidiaries.

### Investigation and Enforcement

The FDA has a number of investigatory and enforcement tools available to it, including document requests and other required information submissions, facility inspections, examinations and investigations, injunction proceedings, monetary penalties, product withdrawal and recall orders, and product seizures. The use of any of these investigatory or enforcement tools by the FDA could result in significant costs to the tobacco businesses of Altria or otherwise have a material adverse effect on the business, consolidated results of operations, cash flows or financial position of Altria and its tobacco subsidiaries.

### Final Tobacco Marketing Rule

As required by the FSPTCA, the FDA re-promulgated in March 2010 a wide range of advertising and promotion restrictions in substantially the same form as regulations that were previously adopted in 1996 (but never imposed on tobacco manufacturers due to a United States Supreme Court ruling) (the "Final Tobacco Marketing Rule"). The May 2016 amendments to the Final Tobacco Marketing Rule (instituted as part of the FDA's deeming regulations) apply certain provisions to certain "covered tobacco products," which include cigars, e-vapor products containing nicotine or other tobacco derivatives, pipe tobacco and oral tobacco-derived nicotine products, but do not include any component or part that is not made or derived from tobacco. The Final Tobacco Marketing Rule as so amended:

- ? bans the use of color and graphics in cigarette and smokeless tobacco product labeling and advertising;
- ? prohibits the sale of cigarettes, smokeless tobacco and covered tobacco products to persons under the age of 18;
- ? restricts the use of non-tobacco trade and brand names on cigarettes and smokeless tobacco products;
- ? requires the sale of cigarettes and smokeless tobacco in direct, face-to-face transactions;
- ? prohibits sampling of cigarettes and covered tobacco products and prohibits sampling of smokeless tobacco products except in qualified adult-only facilities;
- ? prohibits the sale or distribution of items such as hats and tee shirts with cigarette or smokeless tobacco brands or logos; and
- ? prohibits cigarettes and smokeless tobacco brand name sponsorship of any athletic, musical, artistic or other social or cultural event, or any entry or team in any event.

Subject to certain limitations arising from legal challenges, the Final Tobacco Marketing Rule took effect in June 2010 for cigarettes and smokeless tobacco products and in August 2016 for covered tobacco products. At the time of the re-promulgation of the Final Tobacco Marketing Rule, the FDA also issued an ANPRM regarding the so-called "1000 foot rule," which would establish restrictions on the placement of outdoor tobacco advertising in relation to schools and playgrounds. Philip Morris USA Inc. ("PM USA") and USSTC submitted comments on this ANPRM.

### FDA Regulatory Actions

#### Graphic Warnings

In June 2011, as required by the FSPTCA, the FDA issued its final rule to modify the required warnings that appear on cigarette packages and in cigarette advertisements.  The FSPTCA requires the warnings to consist of nine new textual warning statements accompanied by color graphics depicting the negative health consequences of smoking.  The graphic health

71

https://www.sec.gov/Archives/edgar/data/764180/000076418018000095/a2018form10qq32018.htm[6/30/2020 3:11:19 PM]

warnings will (i) be located beneath the cellophane, and comprise the top 50% of the front and rear panels of cigarette packages and (ii) occupy 20% of a cigarette advertisement and be located at the top of the advertisement. After a legal challenge to the rule, the FDA announced its plans to propose a new graphic warnings rule in the future.

*Substantial Equivalence and Other New Product Processes/Pathways*

In general, in order to continue marketing provisional products, manufacturers of such products were required to send to the FDA a report demonstrating substantial equivalence by March 22, 2011 for the FDA to determine if such tobacco products are "substantially equivalent" to products commercially available as of February 15, 2007.  Nearly all cigarette and smokeless tobacco products currently marketed by PM USA and USSTC are provisional products, as are some of the products currently marketed by Sherman Group Holdings, LLC and its subsidiaries ("Nat Sherman"). Our subsidiaries submitted timely substantial equivalence reports for these provisional products and can continue marketing these products unless the FDA makes a determination that a specific provisional product is not substantially equivalent. If the FDA ultimately makes such a determination, it could require the removal of such products from the marketplace. In April 2018, the FDA announced that it will not review a certain subset of provisional product substantial equivalence reports and that those products can generally continue to be legally marketed without further FDA review. PM USA and USSTC have provisional products included in this subset of products, but also have provisional products that will continue to be subject to the substantial equivalence review process as discussed below. In addition, PM USA and USSTC submitted substantial equivalence reports on products proposed to be marketed after March 22, 2011 ("non-provisional" products). While our cigarette and smokeless tobacco subsidiaries believe all of their current products meet the statutory requirements of the FSPTCA, they cannot predict whether, when or how the FDA ultimately will apply its guidance to their various respective substantial equivalence reports or seek to enforce the law and regulations consistent with its guidance.

PM USA and USSTC have received decisions on certain provisional and non-provisional products. The provisional products that were found to be not substantially equivalent (all smokeless tobacco products) had been discontinued for business reasons prior to the FDA's determination; therefore, the determinations did not impact business results. In February 2018, USSTC filed a lawsuit challenging the FDA's determination that certain of its non-provisional products are not substantially equivalent. In June 2018, the FDA reversed its determination and found that such products were substantially equivalent. As a result, USSTC dismissed its lawsuit.

There remain a significant number of substantial equivalence reports for products for which the FDA has not announced decisions and that do not fall within the scope of the FDA's April 2018 announcement discussed above. At the request of the FDA, our cigarette and smokeless tobacco subsidiaries have provided additional information with respect to certain of these substantial equivalence reports. We cannot predict whether this additional information will be satisfactory to the FDA to result in substantial equivalence determinations for the products covered by those reports. It is also not possible to predict how long reviews by the FDA of substantial equivalence reports or new tobacco product applications for any tobacco product will take. A "not substantially equivalent" determination or denial of a new tobacco product application on one or more products could have a material adverse impact on the business, consolidated results of operations, cash flows or financial position of Altria and its tobacco subsidiaries.

In order to continue marketing Other Tobacco Products modified or introduced into the market for the first time between February 15, 2007 and August 8, 2016, manufacturers originally were required to send to the FDA a report demonstrating substantial equivalence by May 8, 2018 or a new tobacco product application by November 8, 2018. In August 2017, the FDA extended the filing deadlines for combustible Other Tobacco Products, such as cigars and pipe tobacco, to August 8, 2021, and for non-combustible Other Tobacco Products, such as e-vapor and oral nicotine products, to August 8, 2022. The FDA also announced that it will permit manufacturers to continue to market such Other Tobacco Products until the FDA renders a decision on the applicable substantial equivalence report or new tobacco product application. However, as discussed below under *Underage Access and Use of E-vapor Products*, in September 2018, the FDA announced that it is re-examining these timelines for certain e-vapor products.

Because of the limited number of e-vapor products on the market as of February 15, 2007, Nu Mark may not be able to file substantial equivalence reports with the FDA on its e-vapor products in the market as of August 8, 2016. In such case, Nu Mark would have to file new tobacco product applications which, among other things, demonstrate that the marketing of the e-vapor products would be appropriate for the protection of the public health. It is uncertain how the FDA will interpret the requirements for obtaining a "new tobacco product marketing order," although as noted above the FDA has indicated its intention to issue appropriate regulations to clarify the requirements.

72

Manufacturers intending to first introduce new and modified cigarette, cigarette tobacco and smokeless tobacco products into the market after March 22, 2011 or intending to first introduce new and modified Other Tobacco Products into the market after August 8, 2016, must, before introducing the products into the market, submit substantial equivalence reports to the FDA and obtain "substantial equivalence orders" from the FDA or submit new tobacco product applications to the FDA and obtain "new tobacco product marketing orders" from the FDA.

The FDA issued guidance on the substantial equivalence process in 2015 entitled "Guidance for Industry: Demonstrating the Substantial Equivalence of a New Tobacco Product: Responses to Frequently Asked Questions" ("Substantial Equivalence Guidance"). The guidance provides that (i) certain label changes and (ii) changes to the quantity of tobacco product(s) in a package would each require submission of newly required substantial equivalence reports and authorization from the FDA prior to marketing tobacco products with such changes, even when the tobacco product itself is not changed. In a 2016 industry legal challenge, the court concluded that a modification to an existing product's label does not result in a "new tobacco product" subject to the substantial equivalence review process and upheld the Substantial Equivalence Guidance in all other respects. Our cigarette and smokeless tobacco subsidiaries market various products that fall within the scope of the Substantial Equivalence Guidance.

*Deeming Regulations*

As discussed above under *FSPTCA and FDA Regulation - The Regulatory Framework*, in May 2016, the FDA issued final regulations for all Other Tobacco Products, imposing the FSPTCA regulatory framework on the tobacco products manufactured, marketed and sold by John Middleton Co. ("Middleton"), Nu Mark and Nat Sherman. At the same time the FDA issued its final deeming regulations, it also amended the Final Tobacco Marketing Rule as described above in *FSPTCA and FDA Regulation - Final Tobacco Marketing Rule.* Under the new regulations, for Other Tobacco Products modified or introduced into the market for the first time between February 15, 2007 and August 8, 2016, manufacturers must demonstrate substantial equivalence to a product on the market as of February 15, 2007 or obtain a "new tobacco marketing order" by certain specified dates to continue marketing those products. For further details, see *FSPTCA and FDA Regulation - FDA Regulatory Actions - Substantial Equivalence and Other New Product Processes/Pathways above.*

Among the FSPTCA requirements that apply to Other Tobacco Products is a ban on descriptors, including "mild," when used as descriptors of modified risk unless expressly authorized by the FDA. In connection with a 2016 lawsuit initiated by Middleton, the Department of Justice, on behalf of the FDA, informed Middleton that at present the FDA does not intend to bring an enforcement action against Middleton for the use of the term "mild" in the trademark "Black & Mild." Consequently, Middleton dismissed its lawsuit without prejudice. If the FDA were to change its mind at some later date, Middleton would have the opportunity to make a submission to the FDA and ultimately, if necessary, to bring another lawsuit.

*Underage Access and Use of E-vapor Products*

The FDA announced in September 2018 that it is using its regulatory authority to address underage access and use of e-vapor products. As part of this effort, the FDA issued letters to manufacturers of certain e-vapor products, including Nu Mark, requiring them to (1) discuss with the FDA the steps each manufacturer intends to take to address youth access and use of its e-vapor products and (2) within 60 days provide a detailed written plan to address underage access and use. Upon review of the information provided by manufacturers, if the FDA determines that it should enforce the pre-market authorization requirements against certain e-vapor products, manufacturers of such products would be required to remove the products from the market until they receive pre-market authorization. In addition, the FDA has taken enforcement action against more than 1,300 retailers who sold e-vapor products to minors and has launched an education campaign to inform youth about the health risks of e-vapor products.

Nu Mark's e-vapor products include two primary product types - "cig-a-like" products and "pod-based products." In October 2018, Altria responded to the FDA's request for a written plan setting forth the actions it will take to address underage access. The plan includes:
- ? removing from the market Nu Mark's "pod-based" e-vapor products until such products receive pre-market authorization from the FDA or the youth issue is otherwise addressed;
- ? discontinuing the sale of Nu Mark's "cig-a-like" e-vapor products with flavor variants other than tobacco, menthol and mint until such other flavor variants receive pre-market authorization from the FDA or the youth issue is otherwise addressed; and
- ? supporting federal legislation to establish 21 as the minimum age to purchase any tobacco product.

Altria does not expect these actions to have a material adverse effect on its consolidated results of operations, cash flows or financial position.

73

*Potential Product Standards*

- *?* *Nicotine and Flavors*: Pursuant to the July 2017 Comprehensive Plan, in March 2018 the FDA issued an ANPRM on the following matters:

  - ? *Nicotine in cigarettes and potentially other combustible tobacco products:* The potential public health benefits and any possible adverse effects of lowering nicotine in combustible cigarettes to non-addictive or minimally addictive levels through achievable product standards. Specifically, the FDA is seeking comments on the consequences of such product standard, including (i) smokers compensating by smoking more cigarettes to obtain the same level of nicotine as with their current product and (ii) the illicit trade of cigarettes containing nicotine at levels higher than a non-addictive threshold that may be established by the FDA. The FDA is also seeking comments on whether a nicotine product standard should apply to other combustible tobacco products, including cigars.

    PM USA, Middleton and Nat Sherman submitted public comments in response to the ANPRM regarding nicotine in cigarettes and potentially other combustible tobacco products in July 2018. This ANPRM process may ultimately lead to the FDA's development of product standards for nicotine in combustible tobacco products such as cigarettes and cigars. If such regulations were to become final and upheld in the courts, it could have a material adverse effect on the business, consolidated results of operations, cash flows or financial position of Altria, PM USA, Middleton and Nat Sherman.

  - ? *Flavors in all tobacco products:* The role that flavors (including menthol) in tobacco products play in attracting youth and may play in helping some smokers switch to potentially less harmful forms of nicotine delivery. The FDA previously released its preliminary scientific evaluation on menthol, which states "that menthol cigarettes pose a public health risk above that seen with non-menthol cigarettes." FDA's evaluation followed an earlier report to the FDA from TPSAC on the impact of the use of menthol in cigarettes on the public health and included a recommendation that the "[r]emoval of menthol cigarettes from the marketplace would benefit public health in the United States" and an observation that any ban on menthol cigarettes could lead to an increase in contraband cigarettes and other potential unintended consequences. No future action can be taken by the FDA to regulate the manufacture, marketing or sale of menthol cigarettes (including a possible ban) until the completion of a full rulemaking process.

    Altria's tobacco subsidiaries submitted public comments in response to the ANPRM regarding flavors in tobacco products in July 2018. This ANPRM process may ultimately lead to the FDA's development of product standards for characterizing flavors in all tobacco products, including menthol in cigarettes. If such regulations were to become final and upheld in the courts, it could have a material adverse effect on the business, consolidated results of operations, cash flows or financial position of Altria and its tobacco subsidiaries. As discussed above under *Underage Access and Use of E-vapor Products*, the FDA announced in September 2018 that it is considering removal of certain flavored e-vapor products from the market because of concerns with use of those products by underage youth. Pursuant to the plan that Nu Mark submitted to the FDA in October 2018, Nu Mark is discontinuing the sale of its e-vapor products with flavor variants other than tobacco, menthol and mint until such other flavor variants receive pre-market authorization from the FDA or the youth issue is otherwise addressed.

  The July 2017 Comprehensive Plan also includes the FDA's intent to develop e-vapor product standards to protect against known public health risks such as battery issues and concerns about children's exposure to liquid nicotine.

- *?* *NNN in Smokeless Tobacco:* In January 2017, the FDA proposed a product standard for N-nitrosonornicotine ("NNN") levels in finished smokeless tobacco products. USSTC submitted comments to the FDA in July 2017. If the proposed rule as presently proposed were to become final and upheld in the courts, it could have a material adverse effect on the business, consolidated results of operations, cash flows or financial position of Altria and USSTC.

74

*Good Manufacturing Practices*

The FSPTCA requires that the FDA promulgate good manufacturing practice regulations (referred to by the FDA as "Requirements for Tobacco Product Manufacturing Practice") for tobacco product manufacturers, but does not specify a timeframe for such regulations.

### *Excise Taxes*

Tobacco products are subject to substantial excise taxes in the United States. Significant increases in tobacco-related taxes or fees have been proposed or enacted (including with respect to e-vapor products) and are likely to continue to be proposed or enacted at the federal, state and local levels within the United States.

Federal, state and local excise taxes have increased substantially over the past decade, far outpacing the rate of inflation. By way of example, in 2009, the federal excise tax ("FET") on cigarettes increased from $0.39 per pack to approximately $1.01 per pack; in 2010, the New York state excise tax increased by $1.60 to $4.35 per pack; in October 2014, Philadelphia, Pennsylvania enacted a $2.00 per pack local cigarette excise tax; and in November 2016, California passed a ballot measure to increase its cigarette excise tax by $2.00 per pack and its smokeless tobacco ad valorem excise tax from 27.30% to 65.08%, which went into effect on April 1, 2017 and July 1, 2017, respectively. Between the end of 1998 and October 22, 2018, the weighted-average state and certain local cigarette excise taxes increased from $0.36 to $1.79 per pack. As of October 22, 2018, Kentucky, Oklahoma and Washington D.C. have enacted cigarette excise tax increases during 2018. There are also proposed ballot initiatives to increase excise taxes in Montana and South Dakota, which have qualified for the November 2018 ballots, and include a $2.00 per pack and $1.00 per pack cigarette excise tax increase, respectively.

Tax increases are expected to continue to have an adverse impact on sales of the tobacco products of our tobacco subsidiaries through lower consumption levels and the potential shift in adult consumer purchases from the premium to the non-premium or discount segments or to other low-priced or low-taxed tobacco products or to counterfeit and contraband products. Such shifts may have an adverse impact on the sales volume and reported share performance of tobacco products of Altria's tobacco subsidiaries.

A majority of states currently tax smokeless tobacco products using an ad valorem method, which is calculated as a percentage of the price of the product, typically the wholesale price. This ad valorem method results in more tax being paid on premium products than is paid on lower-priced products of equal weight. Altria's subsidiaries support legislation to convert ad valorem taxes on smokeless tobacco to a weight-based methodology because, unlike the ad valorem tax, a weight-based tax subjects cans of equal weight to the same tax. As of October 22, 2018, the federal government, 23 states, Puerto Rico, Philadelphia, Pennsylvania and Cook County, Illinois have adopted a weight-based tax methodology for smokeless tobacco.

### *International Treaty on Tobacco Control*

The World Health Organization's Framework Convention on Tobacco Control (the "FCTC") entered into force in February 2005. As of October 22, 2018, 180 countries, as well as the European Community, have become parties to the FCTC. While the United States is a signatory of the FCTC, it is not currently a party to the agreement, as the agreement has not been submitted to, or ratified by, the United States Senate. The FCTC is the first international public health treaty and its objective is to establish a global agenda for tobacco regulation with the purpose of reducing initiation of tobacco use and encouraging cessation. The treaty recommends (and in certain instances, requires) signatory nations to enact legislation that would, among other things: establish specific actions to prevent youth tobacco product use; restrict or eliminate all tobacco product advertising, marketing, promotion and sponsorship; initiate public education campaigns to inform the public about the health consequences of tobacco consumption and exposure to tobacco smoke and the benefits of quitting; implement regulations imposing product testing, disclosure and performance standards; impose health warning requirements on packaging; adopt measures intended to combat tobacco product smuggling and counterfeit tobacco products, including tracking and tracing of tobacco products through the distribution chain; and restrict smoking in public places.

There are a number of proposals currently under consideration by the governing body of the FCTC, some of which call for substantial restrictions on the manufacture, marketing, distribution and sale of tobacco products. In addition, the Protocol to Eliminate Illicit Trade in Tobacco Products (the "Protocol") was approved by the Conference of Parties to the FCTC in November 2012. It includes provisions related to the tracking and tracing of tobacco products through the distribution chain and numerous other provisions regarding the regulation of the manufacture, distribution and sale of tobacco products. The Protocol has not yet entered into force, but in any event will not apply to the United States until the Senate ratifies the FCTC and until the President signs, and the Senate ratifies, the Protocol. It is not possible to predict the outcome of these proposals or

75

the impact of any FCTC actions on legislation or regulation in the United States, either indirectly or as a result of the United States becoming a party to the FCTC, or whether or how these actions might indirectly influence FDA regulation and enforcement.

### *State Settlement Agreements*

As discussed in Note 10, during 1997 and 1998, PM USA and other major domestic tobacco product manufacturers entered into the State Settlement Agreements. These settlements require participating manufacturers to make substantial annual payments, which are adjusted for several factors, including inflation, operating income, market share and industry volume. For a discussion of the impact of the State Settlement Agreements on Altria, see *Financial Review - Debt and Liquidity - Payments Under State Settlement Agreements and FDA Regulation* below and Note 10. The State Settlement Agreements also place numerous requirements and restrictions on participating manufacturers' business operations, including prohibitions and restrictions on the advertising and marketing of cigarettes and smokeless tobacco products. Among these are prohibitions of outdoor and transit brand advertising, payments for product placement and free sampling (except in adult-only facilities). Restrictions are also placed on the use of brand name sponsorships and brand name non-tobacco products. The State Settlement Agreements also place prohibitions on targeting youth and the use of cartoon characters. In addition, the State Settlement Agreements require companies to affirm corporate principles directed at reducing underage use of cigarettes; impose requirements regarding lobbying activities; mandate public disclosure of certain industry documents; limit the industry's ability to challenge certain tobacco control and underage use laws; and provide for the dissolution of certain tobacco-related organizations and place restrictions on the establishment of any replacement organizations.

In November 1998, USSTC entered into the Smokeless Tobacco Master Settlement Agreement (the "STMSA") with the attorneys general of various states and United States territories to resolve the remaining health care cost reimbursement cases initiated against USSTC. The STMSA required USSTC to adopt various marketing and advertising restrictions. USSTC is the only smokeless tobacco manufacturer to sign the STMSA.

### *Other Federal, State and Local Regulation and Activity*

### *Federal, State and Local Regulation*

A number of states and localities have enacted or proposed legislation that imposes restrictions on tobacco products (including innovative tobacco products, such as e-vapor products), such as legislation that (1) prohibits the sale of certain tobacco products with certain characterizing flavors, including menthol cigarettes, (2) requires the disclosure of health information separate from or in addition to federally-mandated health warnings and (3) restricts commercial speech or imposes additional restrictions on the marketing or sale of tobacco products (including proposals to ban all tobacco product sales). The legislation varies in terms of the type of tobacco products, the conditions under which such products are or would be restricted or prohibited, and exceptions to the restrictions or prohibitions. For example, a number of proposals involving characterizing flavors would prohibit smokeless tobacco products with characterizing flavors without providing an exception for mint- or wintergreen-flavored products.

Whether other states or localities will enact legislation in these areas, and the precise nature of such legislation if enacted, cannot be predicted. Altria's tobacco subsidiaries have challenged and will continue to challenge certain state and local legislation, including through litigation.

### *State and Local Legislation to Increase the Legal Age to Purchase Tobacco Products*

An increasing number of states and localities have proposed legislation to increase the minimum age to purchase tobacco products above the current federal minimum age of 18. The following states have enacted such legislation: California (21), Hawaii (21), Alabama (19), Alaska (19), New Jersey (21), Utah (19), Oregon (21), Maine (21) and Massachusetts (21). Many localities (including New York City (21) and Chicago (21)) have taken similar actions. As of October 22, 2018, minimum age legislation has been enacted in one state (Massachusetts) in 2018. As discussed above under *Underage Access and Use of E-vapor Products*, Altria announced its support for federal legislation to establish 21 as the minimum age to purchase any tobacco product.

76

*Health Effects of Tobacco Product Consumption and Exposure to Environmental Tobacco Smoke ("ETS")*

Reports with respect to the health effects of smoking have been publicized for many years, including various reports by the U.S. Surgeon General. Altria and its tobacco subsidiaries believe that the public should be guided by the messages of the U.S. Surgeon General and public health authorities worldwide in making decisions concerning the use of tobacco products.

Most jurisdictions within the United States have restricted smoking in public places. Some public health groups have called for, and various jurisdictions have adopted or proposed, bans on smoking in outdoor places, in private apartments and in cars transporting minors. It is not possible to predict the results of ongoing scientific research or the types of future scientific research into the health risks of tobacco exposure and the impact of such research on regulation.

*Other Legislation or Governmental Initiatives*

In addition to the actions discussed above, other regulatory initiatives affecting the tobacco industry have been adopted or are being considered at the federal level and in a number of state and local jurisdictions. For example, in recent years, legislation has been introduced or enacted at the state or local level to subject tobacco products to various reporting requirements and performance standards (such as reduced cigarette ignition propensity standards); establish educational campaigns relating to tobacco consumption or tobacco control programs, or provide additional funding for governmental tobacco control activities; restrict the sale of tobacco products in certain retail establishments and the sale of tobacco products in certain package sizes; require tax stamping of moist smokeless tobacco ("MST") products; require the use of state tax stamps using data encryption technology; and further restrict the sale, marketing and advertising of cigarettes and Other Tobacco Products. Such legislation may be subject to constitutional or other challenges on various grounds, which may or may not be successful.

It is not possible to predict what, if any, additional legislation, regulation or other governmental action will be enacted or implemented (and, if challenged, upheld) relating to the manufacturing, design, packaging, marketing, advertising, sale or use of tobacco products, or the tobacco industry generally. It is possible, however, that legislation, regulation or other governmental action could be enacted or implemented that could have a material adverse impact on the business and volume of our tobacco subsidiaries and the consolidated results of operations, cash flows or financial position of Altria and its tobacco subsidiaries.

*Governmental Investigations*

From time to time, Altria and its subsidiaries are subject to governmental investigations on a range of matters. Altria and its subsidiaries cannot predict whether new investigations may be commenced.

**Illicit Trade in Tobacco Products**

Illicit trade in tobacco products can have an adverse impact on the businesses of Altria and its tobacco subsidiaries. Illicit trade can take many forms, including the sale of counterfeit tobacco products; the sale of tobacco products in the United States that are intended for sale outside the country; the sale of untaxed tobacco products over the Internet and by other means designed to avoid the collection of applicable taxes; and diversion into one taxing jurisdiction of tobacco products intended for sale in another. Counterfeit tobacco products, for example, are manufactured by unknown third parties in unregulated environments. Counterfeit versions of our tobacco subsidiaries' products can negatively affect adult tobacco consumer experiences with and opinions of those brands. Illicit trade in tobacco products also harms law-abiding wholesalers and retailers by depriving them of lawful sales and undermines the significant investment Altria's tobacco subsidiaries have made in legitimate distribution channels. Moreover, illicit trade in tobacco products results in federal, state and local governments losing tax revenues. Losses in tax revenues can cause such governments to take various actions, including increasing excise taxes; imposing legislative or regulatory requirements that may adversely impact Altria's consolidated results of operations and cash flows and the businesses of its tobacco subsidiaries; or asserting claims against manufacturers of tobacco products or members of the trade channels through which such tobacco products are distributed and sold.

Altria and its tobacco subsidiaries devote significant resources to help prevent illicit trade in tobacco products and to protect legitimate trade channels. For example, Altria's tobacco subsidiaries engage in a number of initiatives to help prevent illicit trade in tobacco products, including communication with wholesale and retail trade members regarding illicit trade in tobacco products and how they can help prevent such activities; enforcement of wholesale and retail trade programs and policies that address illicit trade in tobacco products; engagement with and support of law enforcement and regulatory agencies; litigation to protect their trademarks; and support for a variety of federal and state legislative initiatives. Legislative initiatives to address illicit trade in tobacco products are designed to protect the legitimate channels of distribution, impose more stringent penalties for the violation of illegal trade laws and provide additional tools for law enforcement. Regulatory measures and related

governmental actions to prevent the illicit manufacture and trade of tobacco products continue to evolve as the nature of illicit tobacco products evolves.

### *Price, Availability and Quality of Tobacco, Other Raw Materials and Component Parts*

Shifts in crops (such as those driven by economic conditions and adverse weather patterns), government mandated prices, economic trade sanctions, import duties and tariffs, geopolitical instability and production control programs may increase or decrease the cost or reduce the supply or quality of tobacco, other raw materials or component parts used to manufacture our companies' products. Any significant change in the price, quality or availability of tobacco, other raw materials or component parts used to manufacture our products, could restrict our subsidiaries' ability to continue marketing existing products or impact adult consumer product acceptability and adversely affect our subsidiaries' profitability and businesses.

With respect to tobacco, as with other agriculture commodities, the price of tobacco leaf can be influenced by economic conditions and imbalances in supply and demand, and crop quality and availability can be influenced by variations in weather patterns, including those caused by climate change. Tobacco production in certain countries is subject to a variety of controls, including government mandated prices and production control programs.  Changes in the patterns of demand for agricultural products and the cost of tobacco production could impact tobacco leaf prices and tobacco supply. Certain types of tobacco are only available in limited geographies, including geographies experiencing political instability, and loss of their availability could impair our subsidiaries' ability to continue marketing existing products or impact adult tobacco consumer product acceptability.

### *Timing of Sales*

In the ordinary course of business, our tobacco subsidiaries are subject to many influences that can impact the timing of sales to customers, including the timing of holidays and other annual or special events, the timing of promotions, customer incentive programs and customer inventory programs, as well as the actual or speculated timing of pricing actions and tax-driven price increases.

### Operating Results

The following discussion compares operating results for the smokeable and smokeless products segments for the nine and three months ended September 30, 2018, with the nine and three months ended September 30, 2017.

| | For the Nine Months Ended September 30, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Net Revenues | | | | Operating Companies Income | | | |
| | 2018 | | 2017 | | 2018 | | 2017 | |
| | (in millions) | | | | | | | |
| Smokeable products | $ | 16,995 | $ | 17,355 | $ | 6,516 | $ | 6,536 |
| Smokeless products | | 1,690 | | 1,580 | | 1,085 | | 941 |
| Total smokeable and smokeless products | $ | 18,685 | $ | 18,935 | $ | 7,601 | $ | 7,477 |

| | For the Three Months Ended September 30, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Net Revenues | | | | Operating Companies Income | | | |
| | 2018 | | 2017 | | 2018 | | 2017 | |
| | (in millions) | | | | | | | |
| Smokeable products | $ | 6,035 | $ | 5,975 | $ | 2,277 | $ | 2,276 |
| Smokeless products | | 586 | | 550 | | 370 | | 348 |
| Total smokeable and smokeless products | $ | 6,621 | $ | 6,525 | $ | 2,647 | $ | 2,624 |

78

## Smokeable products segment

The following table summarizes the smokeable products segment shipment volume performance:

| | Shipment Volume | | | | | |
| | For the Nine Months Ended September 30, | | | For the Three Months Ended September 30, | | |
| | 2018 | 2017 | Change | 2018 | 2017 | Change |
|---|---|---|---|---|---|---|
| | (sticks in millions) | | | | | |
| Cigarettes: | | | | | | |
| *Marlboro* | 72,793 | 77,307 | (5.8)% | 25,611 | 26,455 | (3.2)% |
| Other premium | 4,286 | 4,567 | (6.2)% | 1,473 | 1,567 | (6.0)% |
| Discount | 7,407 | 8,250 | (10.2)% | 2,614 | 2,806 | (6.8)% |
| Total cigarettes | 84,486 | 90,124 | (6.3)% | 29,698 | 30,828 | (3.7)% |
| Cigars: | | | | | | |
| *Black & Mild* | 1,197 | 1,146 | 4.5 % | 408 | 381 | 7.1 % |
| Other | 9 | 12 | (25.0)% | 3 | 4 | (25.0)% |
| Total cigars | 1,206 | 1,158 | 4.1 % | 411 | 385 | 6.8 % |
| Total smokeable products | 85,692 | 91,282 | (6.1)% | 30,109 | 31,213 | (3.5)% |

Cigarettes shipment volume includes *Marlboro*; Other premium brands, such as *Virginia Slims*, *Parliament* and *Benson & Hedges*; and Discount brands, which include *L&M* and *Basic*. Cigarettes volume includes units sold as well as promotional units, but excludes units sold for distribution to Puerto Rico, and units sold in U.S. Territories, to overseas military and by Philip Morris Duty Free Inc., none of which, individually or in the aggregate, is material to the smokeable products segment.

The following table summarizes cigarettes retail share performance:

| | Retail Share | | | | | |
| | For the Nine Months Ended September 30, | | | For the Three Months Ended September 30, | | |
| | 2018 | 2017 | Percentage Point Change | 2018 | 2017 | Percentage Point Change |
|---|---|---|---|---|---|---|
| Cigarettes: | | | | | | |
| *Marlboro* | 43.2% | 43.5% | (0.3) | 43.1% | 43.2% | (0.1) |
| Other premium | 2.6 | 2.7 | (0.1) | 2.6 | 2.7 | (0.1) |
| Discount | 4.4 | 4.6 | (0.2) | 4.4 | 4.7 | (0.3) |
| Total cigarettes | 50.2% | 50.8% | (0.6) | 50.1% | 50.6% | (0.5) |

Retail share results for cigarettes are based on data from IRI/Management Science Associates, Inc., a tracking service that uses a sample of stores and certain wholesale shipments to project market share and depict share trends. This service tracks sales in the food, drug, mass merchandisers, convenience, military, dollar store and club trade classes. For other trade classes selling cigarettes, retail share is based on shipments from wholesalers to retailers through the Store Tracking Analytical Reporting System ("STARS"). This service is not designed to capture sales through other channels, including the internet, direct mail and some illicitly tax-advantaged outlets. It is IRI's standard practice to periodically refresh its services, which could restate retail share results that were previously released in this service.

For a discussion of factors that impact volume and retail share performance, see *Tobacco Space - Business Environment* above.

PM USA and Middleton executed the following pricing and promotional allowance actions during 2018 and 2017:

?    Effective September 23, 2018, PM USA increased the list price on *Marlboro* and *L&M* by $0.10 per pack and *Parliament* and *Virginia Slims* by $0.15 per pack. In addition, PM USA increased the list price on all of its other cigarette brands by $0.50 per pack.

?    Effective May 6, 2018, Middleton increased various list prices across substantially all of its cigar brands resulting in a weighted-average increase of approximately $0.11 per five-pack.

?    Effective March 25, 2018, PM USA increased the list price on all of its cigarette brands by $0.09 per pack.

?    Effective September 24, 2017, PM USA increased the list price on all of its cigarette brands by $0.10 per pack.

?    Effective May 21, 2017, Middleton increased various list prices across substantially all of its cigar brands resulting in a weighted-average increase of approximately $0.10 per five-pack.

?    Effective March 19, 2017, PM USA increased the list price on *Parliament* by $0.12 per pack.  In addition, PM USA increased the list price on all of its other cigarette brands by $0.08 per pack.

Net revenues, which include excise taxes billed to customers, for the nine months ended September 30, 2018 decreased $360 million (2.1%), due primarily to lower shipment volume ($1,188 million), partially offset by higher pricing ($829 million), which includes lower promotional investments. Operating companies income for the nine months ended September 30, 2018 was essentially unchanged as lower shipment volume ($642 million), higher costs ($231 million, which includes investments in strategic initiatives and higher tobacco and health litigation items) and higher per unit settlement charges, were offset by higher pricing ($819 million), which includes lower promotional investments, and higher NPM Adjustment Items ($140 million).

Net revenues, which include excise taxes billed to customers, for the three months ended September 30, 2018 increased $60 million (1.0%), due primarily to higher pricing ($272 million), partially offset by lower shipment volume ($221 million). Operating companies income for the three months ended September 30, 2018 was essentially unchanged as higher per unit settlement charges, lower shipment volume ($105 million) and higher costs ($74 million, which includes investments in strategic initiatives), were offset by higher pricing ($268 million).

The smokeable products segment's reported domestic cigarettes shipment volume for the nine months ended September 30, 2018 decreased 6.3%, driven primarily by the industry's rate of decline, retail share losses and trade inventory movements. When adjusted for trade inventory movements, the smokeable products segment's domestic cigarettes shipment volume for the nine months ended September 30, 2018 decreased an estimated 5.5%. Total domestic cigarette industry volumes for the nine months ended September 30, 2018 declined by an estimated 4.5%.

The smokeable products segment's reported domestic cigarettes shipment volume for the three months ended September 30, 2018 decreased 3.7%, driven primarily by the industry's rate of decline and retail share losses, partially offset by trade inventory movements. When adjusted for trade inventory movements, the smokeable products segment's domestic cigarettes shipment volume for the three months ended September 30, 2018 decreased an estimated 5%. Total domestic cigarette industry volumes for the three months ended September 30, 2018 declined by an estimated 4.5%.

Shipments of premium cigarettes accounted for 91.2% of smokeable products' reported domestic cigarettes shipment volume for both the nine and three months ended September 30, 2018, versus 90.8% and 90.9% for the nine and three months ended September 30, 2017, respectively.

For the nine months ended September 30, 2018, *Marlboro*'s retail share declined 0.3 share points to 43.2%, driven in part by continued effects from the April 2017 California state excise tax increase.

For the three months ended September 30, 2018, *Marlboro*'s retail share was unchanged from the fourth quarter of 2017.

80

**Smokeless products segment**

The following table summarizes smokeless products segment shipment volume performance:

| | Shipment Volume | | | | | |
| | For the Nine Months Ended September 30, | | | For the Three Months Ended September 30, | | |
| | 2018 | 2017 | Change | 2018 | 2017 | Change |
|---|---|---|---|---|---|---|
| | (cans and packs in millions) | | | | | |
| *Copenhagen* | 398.2 | 396.1 | 0.5 % | 135.7 | 134.1 | 1.2 % |
| *Skoal* | 174.5 | 183.0 | (4.6)% | 59.7 | 61.6 | (3.1)% |
| *Copenhagen* and *Skoal* | 572.7 | 579.1 | (1.1)% | 195.4 | 195.7 | (0.2)% |
| Other | 52.1 | 50.3 | 3.6 % | 18.0 | 16.9 | 6.5 % |
| Total smokeless products | 624.8 | 629.4 | (0.7)% | 213.4 | 212.6 | 0.4 % |

Smokeless products shipment volume includes cans and packs sold, as well as promotional units, but excludes international volume, which is not material to the smokeless products segment. New types of smokeless products, as well as new packaging configurations of existing smokeless products, may or may not be equivalent to existing MST products on a can-for-can basis. To calculate volumes of cans and packs shipped, one pack of snus, irrespective of the number of pouches in the pack, is assumed to be equivalent to one can of MST.

The following table summarizes smokeless products segment retail share performance (excluding international volume):

| | Retail Share | | | | | |
| | For the Nine Months Ended September 30, | | | For the Three Months Ended September 30, | | |
| | 2018 | 2017 | Percentage Point Change | 2018 | 2017 | Percentage Point Change |
|---|---|---|---|---|---|---|
| *Copenhagen* | 34.3% | 33.9% | 0.4 | 34.4% | 34.1% | 0.3 |
| *Skoal* | 16.3 | 16.9 | (0.6) | 16.3 | 16.6 | (0.3) |
| *Copenhagen* and *Skoal* | 50.6 | 50.8 | (0.2) | 50.7 | 50.7 | — |
| Other | 3.4 | 3.2 | 0.2 | 3.4 | 3.3 | 0.1 |
| Total smokeless products | 54.0% | 54.0% | — | 54.1% | 54.0% | 0.1 |

Retail share results for smokeless products are based on data from IRI InfoScan, a tracking service that uses a sample of stores to project market share and depict share trends.  This service tracks sales in the food, drug, mass merchandisers, convenience, military, dollar store and club trade classes on the number of cans and packs sold.  Smokeless products is defined by IRI as moist smokeless and spit-free tobacco products. New types of smokeless products, as well as new packaging configurations of existing smokeless products, may or may not be equivalent to existing MST products on a can-for-can basis. For example, one pack of snus, irrespective of the number of pouches in the pack, is assumed to be equivalent to one can of MST. Because this service represents retail share performance only in key trade channels, it should not be considered a precise measurement of actual retail share.  It is IRI's standard practice to periodically refresh its InfoScan services, which could restate retail share results that were previously released in this service.

For a discussion of factors that impact volume and retail share performance, see *Tobacco Space - Business Environment* above.

USSTC executed the following pricing actions during 2018 and 2017:

? Effective June 5, 2018, USSTC increased the list price on all its brands by $0.07 per can.

? Effective September 26, 2017, USSTC increased the list price on *Copenhagen* and *Skoal* popular price products by $0.12 per can. In addition, USSTC increased the list price on all its brands, except for *Copenhagen* and *Skoal* popular price products, by $0.07 per can.

? Effective April 25, 2017, USSTC increased the list price on all its brands by $0.07 per can.

Net revenues, which include excise taxes billed to customers, for the nine months ended September 30, 2018 increased $110 million (7.0%), due primarily to higher pricing. Operating companies income for the nine months ended September 30, 2018 increased $144 million (15.3%), due primarily to higher pricing ($97 million) and lower costs in connection with the facilities consolidation ($43 million).

Net revenues, which include excise taxes billed to customers, for the three months ended September 30, 2018 increased $36 million (6.5%), due primarily to higher pricing. Operating companies income for the three months ended September 30, 2018 increased $22 million (6.3%), due primarily to higher pricing ($35 million), partially offset by higher costs.

USSTC's reported domestic shipment volume declined 0.7% for the nine months ended September 30, 2018, driven primarily by the industry's rate of decline.

The smokeless products category volume declined an estimated 1% over the six months ended September 30, 2018.

**Wine segment**

**Business Environment**

Ste. Michelle Wine Estates Ltd. ("Ste. Michelle") is a leading producer of Washington state wines, primarily *Chateau Ste. Michelle*, *Columbia Crest* and *14 Hands*, and owns wineries in or distributes wines from several other domestic and foreign wine regions. Ste. Michelle holds an 85% ownership interest in Michelle-Antinori, LLC, which owns *Stag's Leap Wine Cellars* in Napa Valley. Ste. Michelle also owns *Conn Creek* in Napa Valley, *Patz & Hall* in Sonoma and *Erath* in Oregon. In addition, Ste. Michelle imports and markets *Antinori*, *Torres* and *Villa Maria Estate* wines and *Champagne Nicolas Feuillatte* in the United States. Key elements of Ste. Michelle's strategy are expanded domestic distribution of its wines, especially in certain account categories such as restaurants, wholesale clubs, supermarkets, wine shops and mass merchandisers, and a focus on improving product mix to higher-priced, premium products.

Ste. Michelle's business is subject to significant competition, including competition from many larger, well-established domestic and international companies, as well as from many smaller wine producers. Wine segment competition is primarily based on quality, price, consumer and trade wine tastings, competitive wine judging, third-party acclaim and advertising. Substantially all of Ste. Michelle's sales occur in the United States through state-licensed distributors. Ste. Michelle also sells to domestic consumers through retail and e-commerce channels and exports wines to international distributors.

Federal, state and local governmental agencies regulate the beverage alcohol industry through various means, including licensing requirements, pricing rules, labeling and advertising restrictions, and distribution and production policies. Further regulatory restrictions or additional excise or other taxes on the manufacture and sale of alcoholic beverages may have an adverse effect on Ste. Michelle's wine business.

**Operating Results**

The following discussion compares wine segment results for the nine and three months ended September 30, 2018, with the nine and three months ended September 30, 2017.

| | For the Nine Months Ended September 30, | | For the Three Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2018 | 2017 | 2018 | 2017 |
| | (in millions) | | | |
| Net revenues | $ 489 | $ 471 | $ 181 | $ 181 |
| Operating companies income | $ 73 | $ 82 | $ 29 | $ 36 |

Net revenues, which include excise taxes billed to customers, for the nine months ended September 30, 2018 increased $18 million (3.8%), due primarily to higher shipment volume and favorable premium mix. Operating companies income for the nine months ended September 30, 2018 decreased $9 million (11.0%), due primarily to higher selling, general and administrative expenses (including one-time employee bonuses), partially offset by favorable premium mix and higher shipment volume.

Net revenues, which include excise taxes billed to customers, for the three months ended September 30, 2018 were unchanged, as favorable premium mix and higher pricing were offset by lower shipment volume. Operating companies income for the

82

three months ended September 30, 2018 decreased $7 million (19.4%), due primarily to higher selling, general and administrative expenses and lower shipment volume, partially offset by favorable premium mix.

For the nine and three months ended September 30, 2018, Ste. Michelle's reported wine shipment volume of 5,867 and 2,169 thousand cases, increased 2.4% and decreased 3.5%, respectively.

**Financial Review**

Net Cash Provided by Operating Activities

During the first nine months of 2018, net cash provided by operating activities was $6,566 million compared with $4,144 million during the first nine months of 2017. This increase was due primarily to lower payments of settlement charges and income taxes in 2018.

Altria had a working capital deficit at September 30, 2018 and December 31, 2017. Altria's management believes that Altria has the ability to fund these working capital deficits with cash provided by operating activities and/or short-term borrowings under its commercial paper program as discussed in the *Debt and Liquidity* section below.

Net Cash Used In Investing Activities

During the first nine months of 2018, net cash used in investing activities was $137 million compared with $202 million during the first nine months of 2017. This decrease was due primarily to the acquisition of a business in 2017 and proceeds from asset sales in the financial services business in 2017.

Cash Used in Financing Activities

During the first nine months of 2018, cash used in financing activities was $5,251 million compared with $5,950 million during the first nine months of 2017. This decrease was due primarily to lower repurchases of common stock during the first nine months of 2018, partially offset by higher dividends paid during the first nine months of 2018.

Debt and Liquidity

*Credit Ratings* - Altria's cost and terms of financing and its access to commercial paper markets may be impacted by applicable credit ratings. The impact of credit ratings on the cost of borrowings under Altria's credit agreement is discussed in Note 8. *Debt* to the condensed consolidated financial statements in Item 1 ("Note 8"). See the discussion below regarding the potential adverse impact of certain events on Altria's credit ratings in *Cautionary Factors That May Affect Future Results*.

At September 30, 2018, the credit ratings and outlook for Altria's indebtedness by major credit rating agencies were:

|  | Short-term Debt | Long-term Debt | Outlook |
|---|---|---|---|
| Moody's Investors Service, Inc. ("Moody's") | P-2 | A3 | Stable |
| Standard & Poor's Ratings Services ("Standard & Poor's") | A-1 | A- | Stable |
| Fitch Ratings Ltd. | F2 | A- | Stable |

*Credit Lines* - From time to time, Altria has short-term borrowing needs to meet its working capital requirements and generally uses its commercial paper program to meet those needs. At September 30, 2018 and 2017, and at December 31, 2017, Altria had no short-term borrowings.

On August 1, 2018, Altria entered into a senior unsecured 5-year revolving credit agreement (the "Credit Agreement"). The Credit Agreement provides for borrowings up to an aggregate principal amount of $3.0 billion. The Credit Agreement expires on August 1, 2023 and includes an option, subject to certain conditions, for Altria to extend the Credit Agreement for two additional one-year periods. The Credit Agreement replaced Altria's prior $3.0 billion senior unsecured 5-year revolving credit agreement, which was to expire on August 19, 2020 and was terminated effective August 1, 2018. At September 30, 2018, credit available to Altria under the Credit Agreement was $3.0 billion. For further discussion, including Credit Agreement pricing and covenants, see Note 8.

https://www.sec.gov/Archives/edgar/data/764180/000076418018000095/a2018form10qq32018.htm[6/30/2020 3:11:19 PM]

Any commercial paper issued by Altria and borrowings under the Credit Agreement are guaranteed by PM USA as further discussed in Note 11. *Condensed Consolidating Financial Information* to the condensed consolidated financial statements in Item 1 ("Note 11").

*Financial Market Environment* - Altria believes it has adequate liquidity and access to financial resources to meet its anticipated obligations and ongoing business needs in the foreseeable future. Altria continues to monitor the credit quality of its bank group and is not aware of any potential non-performing credit provider in that group. Altria believes the lenders in its bank group will be willing and able to advance funds in accordance with their legal obligations. See the discussion below regarding access to debt capital markets in *Cautionary Factors That May Affect Future Results* for certain risk factors associated with the foregoing discussion.

*Investment in AB InBev* - On October 25, 2018, AB InBev announced a 50% rebase in the dividends it pays to its shareholders, which will result in a reduction of cash dividends Altria receives from AB InBev. Altria does not expect the reduction to have a material impact on its consolidated financial position, liquidity or earnings. See *Cautionary Factors That May Affect Future Results* for a discussion of risks associated with the dividends paid by AB InBev on shares owned by Altria.

*Tax Reform Act* - As a result of the Tax Reform Act's reduction in the U.S. federal statutory corporate income tax rate from 35% to 21% effective January 1, 2018, Altria expects increased liquidity. Altria plans to make strategic long-term investments with the increased liquidity, reinvesting approximately one-third of the total tax reform benefit in 2018, with a moderating level of investment in subsequent years.

*Long-term Debt* - At September 30, 2018 and December 31, 2017, Altria's total debt was $13.9 billion.

*Guarantees and Other Similar Matters* - As discussed in Note 10, Altria and certain of its subsidiaries had unused letters of credit obtained in the ordinary course of business, guarantees (including third-party guarantees) and a redeemable noncontrolling interest outstanding at September 30, 2018. From time to time, subsidiaries of Altria also issue lines of credit to affiliated entities. In addition, as discussed in Note 11, PM USA has issued guarantees relating to Altria's obligations under its outstanding debt securities, borrowings under the Credit Agreement and amounts outstanding under its commercial paper program. These items have not had, and are not expected to have, a significant impact on Altria's liquidity.

*Payments Under State Settlement Agreements and FDA Regulation* - As discussed previously and in Note 10, PM USA and Nat Sherman have entered into State Settlement Agreements with the states and territories of the United States that call for certain payments. In addition, PM USA, Middleton, Nat Sherman and USSTC are subject to quarterly user fees imposed by the FDA as a result of the FSPTCA. Altria's subsidiaries recorded approximately $3.4 billion and $3.6 billion of charges to cost of sales for the nine months ended September 30, 2018 and 2017, respectively, and approximately $1.3 billion and $1.2 billion of charges to cost of sales for the three months ended September 30, 2018 and 2017, respectively, in connection with the State Settlement Agreements and FDA user fees. For further discussion of the resolutions of certain disputes with states and territories related to the NPM Adjustment provision under the MSA, see *Health Care Cost Recovery Litigation - NPM Adjustment Disputes* in Note 10.

Based on current agreements, 2017 market share and historical annual industry volume decline rates, the estimated amounts that Altria's subsidiaries may charge to cost of sales for payments related to State Settlement Agreements and FDA user fees approximate $4.6 billion in 2018 and $4.8 billion each year thereafter. These amounts exclude the potential impact of the NPM Adjustment provision applicable under the MSA and the revised NPM Adjustment provisions applicable under the resolutions of the NPM Adjustment disputes.

The estimated amounts due under the State Settlement Agreements charged to cost of sales in each year would generally be paid in the following year. The amounts charged to cost of sales for FDA user fees are generally paid in the quarter in which the fees are incurred. As previously stated, the payments due under the terms of the State Settlement Agreements and FDA user fees are subject to adjustment for several factors, including volume, operating income, inflation and certain contingent events and, in general, are allocated based on each manufacturer's market share. The future payment amounts discussed above are estimates, and actual payment amounts will differ to the extent underlying assumptions differ from actual future results.

*Litigation-Related Deposits and Payments* - With respect to certain adverse verdicts currently on appeal, to obtain stays of judgments pending appeals, as of September 30, 2018, PM USA has posted appeal bonds totaling approximately $99 million, which have been collateralized with cash deposits. These cash deposits are included in assets on the condensed consolidated balance sheet.

https://www.sec.gov/Archives/edgar/data/764180/000076418018000095/a2018form10qq32018.htm[6/30/2020 3:11:19 PM]

Although litigation is subject to uncertainty and an adverse outcome or settlement of litigation could have a material adverse effect on the financial position, cash flows or results of operations of PM USA, UST LLC ("UST") or Altria in a particular fiscal quarter or fiscal year, as more fully disclosed in Note 10 and in *Cautionary Factors That May Affect Future Results*, management expects cash flow from operations, together with Altria's access to capital markets, to provide sufficient liquidity to meet ongoing business needs.

Equity and Dividends

On January 30, 2018, Altria granted an aggregate of 0.6 million restricted stock units and 0.1 million performance stock units to eligible employees. The service restrictions for the restricted stock units and the performance stock units lapse in the first quarter of 2021. In addition, the payout of the performance stock units requires the achievement of certain performance measures, which were predetermined at the time of grant, over a three-year performance cycle. These performance measures consist of Altria's adjusted diluted EPS compounded annual growth rate and Altria's total shareholder return relative to a predetermined peer group. The weighted-average market value per share of the restricted stock units and the performance stock units granted on January 30, 2018 was $69.26 on the date of grant.

During the nine months ended September 30, 2018, 0.8 million shares of restricted stock units and performance stock units vested. The total fair value of restricted stock units and performance stock units that vested during the nine months ended September 30, 2018 was $57 million. The weighted-average grant date fair value per share of these awards was $55.38.

Dividends paid during the first nine months of 2018 and 2017 were $3,909 million and $3,544 million, respectively, an increase of 10.3%, reflecting a higher dividend rate, partially offset by fewer shares outstanding as a result of shares repurchased by Altria under its share repurchase programs.

During the first quarter of 2018, Altria's Board of Directors (the "Board of Directors") approved a 6.1% increase in the quarterly dividend rate to $0.70 per share of Altria common stock versus the previous rate of $0.66 per share. During the third quarter of 2018, the Board of Directors approved an additional 14.3% increase in the quarterly dividend rate to $0.80 per share of Altria common stock, resulting in an overall quarterly dividend rate increase of 21.2% since the beginning of 2018. Altria expects to continue to maintain a dividend payout ratio target of approximately 80% of its adjusted diluted EPS. The current annualized dividend rate is $3.20 per share. Future dividend payments remain subject to the discretion of the Board of Directors.

For a discussion of Altria's share repurchase programs, see Note 1 and Part II, Item 2. Unregistered Sales of Equity Securities and Use of Proceeds of this Form 10-Q.

Recent Accounting Guidance Not Yet Adopted

See Note 12. *Recent Accounting Guidance Not Yet Adopted* to the condensed consolidated financial statements in Item 1 for a discussion of recently issued accounting guidance applicable to, but not yet adopted by, Altria.

Contingencies

See Note 10 for a discussion of contingencies.

**Cautionary Factors That May Affect Future Results**

*Forward-Looking and Cautionary Statements*

We [1] may from time to time make written or oral forward-looking statements, including earnings guidance and other statements contained in filings with the Securities and Exchange Commission ("SEC"), reports to security holders, press releases and investor webcasts. You can identify these forward-looking statements by use of words such as "strategy," "expects," "continues," "plans," "anticipates," "believes," "will," "estimates," "forecasts," "intends," "projects," "goals," "objectives," "guidance," "targets" and other words of similar meaning. You can also identify them by the fact that they do not relate strictly to historical or current facts.

We cannot guarantee that any forward-looking statement will be realized, although we believe we have been prudent in our

---

[1] This section uses the terms "we," "our" and "us" when it is not necessary to distinguish among Altria and its various operating subsidiaries or when any distinction is clear from the context.

85

plans, estimates and assumptions. Achievement of future results is subject to risks, uncertainties and assumptions that may prove to be inaccurate. Should known or unknown risks or uncertainties materialize, or should underlying estimates or assumptions prove inaccurate, actual results could vary materially from those anticipated, estimated or projected. You should bear this in mind as you consider forward-looking statements and whether to invest in or remain invested in Altria's securities. In connection with the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, we are identifying important factors that, individually or in the aggregate, could cause actual results and outcomes to differ materially from those contained in, or implied by, any forward-looking statements made by us; any such statement is qualified by reference to the following cautionary statements. We elaborate on these and other risks we face throughout this Form 10-Q particularly in the "Business Environment" sections preceding our discussion of the operating results of our subsidiaries' businesses above. You should understand that it is not possible to predict or identify all risk factors. Consequently, you should not consider the following to be a complete discussion of all potential risks or uncertainties. We do not undertake to update any forward-looking statement that we may make from time to time except as required by applicable law.

**Unfavorable litigation outcomes could materially adversely affect the consolidated results of operations, cash flows or financial position of Altria or the businesses of one or more of its subsidiaries.**

Legal proceedings covering a wide range of matters are pending or threatened in various United States and foreign jurisdictions against Altria and its subsidiaries, including PM USA and UST and its subsidiaries, as well as their respective indemnitees. Various types of claims may be raised in these proceedings, including product liability, consumer protection, antitrust, tax, contraband-related claims, patent infringement, employment matters, claims for contribution and claims of competitors, shareholders and distributors.

Litigation is subject to uncertainty and it is possible that there could be adverse developments in pending or future cases. An unfavorable outcome or settlement of pending tobacco-related or other litigation could encourage the commencement of additional litigation. Damages claimed in some tobacco-related or other litigation are significant and, in certain cases, have ranged in the billions of dollars. The variability in pleadings in multiple jurisdictions, together with the actual experience of management in litigating claims, demonstrate that the monetary relief that may be specified in a lawsuit bears little relevance to the ultimate outcome.

In certain cases, plaintiffs claim that defendants' liability is joint and several. In such cases, Altria or its subsidiaries may face the risk that one or more co-defendants decline or otherwise fail to participate in the bonding required for an appeal or to pay their proportionate or jury-allocated share of a judgment.  As a result, Altria or its subsidiaries under certain circumstances may have to pay more than their proportionate share of any bonding- or judgment-related amounts. Furthermore, in those cases where plaintiffs are successful, Altria or its subsidiaries may also be required to pay interest and attorneys' fees.

Although PM USA has historically been able to obtain required bonds or relief from bonding requirements in order to prevent plaintiffs from seeking to collect judgments while adverse verdicts have been appealed, there remains a risk that such relief may not be obtainable in all cases. This risk has been substantially reduced given that 47 states and Puerto Rico now limit the dollar amount of bonds or require no bond at all. As discussed in Note 10, tobacco litigation plaintiffs have challenged the constitutionality of Florida's bond cap statute in several cases and plaintiffs may challenge state bond cap statutes in other jurisdictions as well. Such challenges may include the applicability of state bond caps in federal court. Although we cannot predict the outcome of such challenges, it is possible that the consolidated results of operations, cash flows or financial position of Altria, or the businesses of one or more of its subsidiaries, could be materially adversely affected in a particular fiscal quarter or fiscal year by an unfavorable outcome of one or more such challenges.

In certain litigation, Altria and its subsidiaries may face potentially significant non-monetary remedies, which may cause reputational harm. For example, in the lawsuit brought by the United States Department of Justice, discussed in detail in Note 10, the district court did not impose monetary penalties but ordered significant non-monetary remedies, including the issuance of "corrective statements" that Altria and PM USA began making in various media in the fourth quarter of 2017.

Altria and its subsidiaries have achieved substantial success in managing litigation. Nevertheless, litigation is subject to uncertainty, and significant challenges remain.

It is possible that the consolidated results of operations, cash flows or financial position of Altria, or the businesses of one or more of its subsidiaries, could be materially adversely affected in a particular fiscal quarter or fiscal year by an unfavorable outcome or settlement of certain pending litigation. Altria and each of its subsidiaries named as a defendant believe, and each has been so advised by counsel handling the respective cases, that it has valid defenses to the litigation pending against it, as well as valid bases for appeal of adverse verdicts. Each of the companies has defended, and will continue to defend, vigorously against litigation challenges. However, Altria and its subsidiaries may enter into settlement discussions in particular cases if

86

they believe it is in the best interests of Altria to do so. See Note 10 and Exhibits 99.1 and 99.2 to this Form 10-Q for a discussion of pending tobacco-related litigation.

**Significant federal, state and local governmental actions, including actions by the FDA, and various private sector actions may continue to have an adverse impact on our tobacco subsidiaries' businesses and sales volumes.**

As described in *Tobacco Space - Business Environment* above, our cigarette subsidiaries face significant governmental and private sector actions, including efforts aimed at reducing the incidence of tobacco use and efforts seeking to hold these subsidiaries responsible for the adverse health effects associated with both smoking and exposure to environmental tobacco smoke. These actions, combined with the diminishing social acceptance of smoking, have resulted in reduced cigarette industry volume, and we expect that these factors will continue to reduce cigarette consumption levels.

Actions by the FDA and other federal, state or local governments or agencies, including those specific actions described in *Tobacco Space - Business Environment* above, may impact the adult tobacco consumer acceptability of or access to tobacco products (for example, through product standards that may be proposed by the FDA for nicotine and flavors), limit adult tobacco consumer choices, delay or prevent the launch of new or modified tobacco products or products with claims of reduced risk, require the recall or other removal of tobacco products from the marketplace (for example as a result of product contamination, a determination by the FDA that one or more tobacco products do not satisfy the statutory requirements for substantial equivalence, or because the FDA requires that a modification to a currently-marketed tobacco product proceed through the pre-market review process), restrict communications to adult tobacco consumers, restrict the ability to differentiate tobacco products, create a competitive advantage or disadvantage for certain tobacco companies, impose additional manufacturing, labeling or packing requirements, interrupt manufacturing or otherwise significantly increase the cost of doing business, or restrict or prevent the use of specified tobacco products in certain locations or the sale of tobacco products by certain retail establishments. Any one or more of these actions may have a material adverse impact on the business, consolidated results of operations, cash flows or financial position of Altria and its tobacco subsidiaries. See *Tobacco Space - Business Environment* above for a more detailed discussion.

**Tobacco products are subject to substantial taxation, which could have an adverse impact on sales of the tobacco products of Altria's tobacco subsidiaries.**

Tobacco products are subject to substantial excise taxes, and significant increases in tobacco product-related taxes or fees have been proposed or enacted and are likely to continue to be proposed or enacted within the United States at the federal, state and local levels. Tax increases are expected to continue to have an adverse impact on sales of the tobacco products of our tobacco subsidiaries through lower consumption levels and the potential shift in adult consumer purchases from the premium to the non-premium or discount segments or to other low-priced or low-taxed tobacco products or to counterfeit and contraband products. Such shifts may have an adverse impact on the reported share performance of tobacco products of Altria's tobacco subsidiaries. For further discussion, see *Tobacco Space - Business Environment - Excise Taxes* above.

**Our tobacco businesses face significant competition and their failure to compete effectively could have an adverse effect on the consolidated results of operations or cash flows of Altria, or the business of Altria's tobacco subsidiaries.**

Each of Altria's tobacco subsidiaries operates in highly competitive tobacco categories. This competition also exists across categories as adult tobacco consumer preferences evolve. Significant methods of competition include product quality, taste, price, product innovation, marketing, packaging, distribution and promotional activities.  A highly competitive environment could negatively impact the profitability, market share and shipment volume of our tobacco subsidiaries, which could have an adverse effect on the consolidated results of operations or cash flows of Altria. See *Tobacco Space - Business Environment - Summary* above for additional discussion concerning evolving adult tobacco consumer preferences, including e-vapor products. Growth of the e-vapor product category and other innovative tobacco products has further contributed to reductions in cigarette consumption levels and cigarette industry sales volume and has adversely affected the growth rates of other tobacco products. Continued growth in these categories may have a material adverse impact on the business, results of operations, cash flows or financial position of PM USA and USSTC.

PM USA also faces competition from lowest priced brands sold by certain United States and foreign manufacturers that have cost advantages because they are not parties to settlements of certain tobacco litigation in the United States. These settlements, among other factors, resulted in substantial cigarette price increases. These manufacturers may fail to comply with related state escrow legislation or may avoid escrow deposit obligations on the majority of their sales by concentrating on certain states where escrow deposits are not required or are required on fewer than all such manufacturers' cigarettes sold in such states. Additional competition has resulted from diversion into the United States market of cigarettes intended for sale outside the United States, the sale of counterfeit cigarettes by third parties, the sale of cigarettes by third parties over the Internet and by

https://www.sec.gov/Archives/edgar/data/764180/000076418018000095/a2018form10qq32018.htm[6/30/2020 3:11:19 PM]

other means designed to avoid collection of applicable taxes, and imports of foreign lowest priced brands. USSTC faces significant competition in the smokeless tobacco category and has experienced consumer down-trading to lower-priced brands. In the cigar category, additional competition has resulted from increased imports of machine-made large cigars manufactured offshore.

**Altria and its subsidiaries may be unsuccessful in anticipating changes in adult consumer preferences, responding to changes in consumer purchase behavior or managing through difficult competitive and economic conditions, which could have an adverse effect on the consolidated results of operations and cash flows of Altria or the business of Altria's tobacco subsidiaries.**

Each of our tobacco and wine subsidiaries is subject to intense competition and changes in adult consumer preferences. To be successful, they must continue to:

- ?   promote brand equity successfully;
- ?   anticipate and respond to new and evolving adult consumer preferences;
- ?   develop, manufacture, market and distribute new and innovative products that appeal to adult consumers (including, where appropriate, through arrangements with, or investments in, third parties);
- ?   improve productivity; and
- ?   protect or enhance margins through cost savings and price increases.

See *Tobacco Space - Business Environment - Summary* above and the immediately preceding risk factor for additional discussion concerning evolving adult tobacco consumer preferences, specifically the growth of e-vapor and other innovative tobacco products and the effects on our tobacco operating companies.

The willingness of adult consumers to purchase premium consumer product brands depends in part on economic conditions. In periods of economic uncertainty, adult consumers may purchase more discount brands and/or, in the case of tobacco products, consider lower-priced tobacco products, which could have a material adverse effect on the business, consolidated results of operations, cash flows or financial position of Altria and its subsidiaries. While our tobacco and wine subsidiaries work to broaden their brand portfolios to compete effectively with lower-priced products, the failure to do so could negatively impact our companies' ability to compete in these circumstances.

Our financial services business (conducted through Philip Morris Capital Corporation ("PMCC")) holds investments in finance leases, principally in transportation (including aircraft), power generation, real estate and manufacturing equipment. Its lessees are subject to significant competition and uncertain economic conditions. If parties to PMCC's leases fail to manage through difficult economic and competitive conditions, PMCC may have to increase its allowance for losses, which would adversely affect our earnings.

**Altria's tobacco subsidiaries may be unsuccessful in developing and commercializing adjacent products or processes, including innovative tobacco products that may reduce the health risks associated with current tobacco products and that appeal to adult tobacco consumers, which may have an adverse effect on their ability to grow new revenue streams and/or put them at a competitive disadvantage.**

Altria and its subsidiaries have growth strategies involving moves and potential moves into adjacent products or processes, including innovative tobacco products. Some innovative tobacco products may reduce the health risks associated with current tobacco products, while continuing to offer adult tobacco consumers (within and outside the United States) products that meet their taste expectations and evolving preferences. Examples include tobacco-containing and nicotine-containing products that reduce or eliminate exposure to cigarette smoke and/or constituents identified by public health authorities as harmful, such as e-vapor products. These efforts may include arrangements with, or investments in, third parties. Our tobacco subsidiaries may not succeed in their efforts to introduce such new products, which would have an adverse effect on the ability to grow new revenue streams.

Further, we cannot predict whether regulators, including the FDA, will permit the marketing or sale of products with claims of reduced risk to adult consumers, the speed with which they may make such determinations or whether regulators will impose an unduly burdensome regulatory framework on such products. Nor can we predict whether adult tobacco consumers' purchasing decisions would be affected by reduced risk claims if permitted. Adverse developments on any of these matters could negatively impact the commercial viability of such products.

If our tobacco subsidiaries do not succeed in their efforts to develop and commercialize innovative tobacco products or to obtain regulatory approval for the marketing or sale of products with claims of reduced risk, but one or more of their

88

competitors do succeed, our tobacco subsidiaries may be at a competitive disadvantage, which could have an adverse effect on their financial performance.

**Significant changes in price, availability or quality of tobacco, other raw materials or component parts could have an adverse effect on the profitability and business of Altria's tobacco subsidiaries.**

Any significant change in prices, quality or availability of tobacco, other raw materials or component parts could adversely affect our tobacco subsidiaries' profitability and business. For further discussion, see *Tobacco Space - Business Environment - Price, Availability and Quality of Tobacco, Other Raw Materials and Component Parts* above.

**Because Altria's tobacco subsidiaries rely on a few significant facilities and a small number of key suppliers, an extended disruption at a facility or in service by a supplier could have a material adverse effect on the business, the consolidated results of operations, cash flows or financial position of Altria and its tobacco subsidiaries.**

Altria's tobacco subsidiaries face risks inherent in reliance on a few significant facilities and a small number of key suppliers. A natural or man-made disaster or other disruption that affects the manufacturing operations of any of Altria's tobacco subsidiaries or the operations of any key suppliers of any of Altria's tobacco subsidiaries, including as a result of a key supplier's unwillingness to supply goods or services to a tobacco company, could adversely impact the operations of the affected subsidiaries. An extended disruption in operations experienced by one or more of Altria's subsidiaries or key suppliers could have a material adverse effect on the business, the consolidated results of operations, cash flows or financial position of Altria and its tobacco subsidiaries.

**Altria's subsidiaries could decide or be required to recall products, which could have a material adverse effect on the business, reputation, consolidated results of operations, cash flows or financial position of Altria and its subsidiaries.**

In addition to a recall required by the FDA, as referenced above, our subsidiaries could decide, or other laws or regulations could require them, to recall products due to the failure to meet quality standards or specifications, suspected or confirmed and deliberate or unintentional product contamination, or other adulteration, product misbranding or product tampering. Product recalls could have a material adverse effect on the business, reputation, consolidated results of operations, cash flows or financial position of Altria and its subsidiaries.

**The failure of Altria's information systems or service providers' information systems to function as intended, or cyber-attacks or security breaches, could have a material adverse effect on the business, reputation, consolidated results of operations, cash flows or financial position of Altria and its subsidiaries.**

Altria and its subsidiaries rely extensively on information systems, many of which are managed by third-party service providers (such as cloud providers), to support a variety of business processes and activities, including: complying with regulatory, legal, financial reporting and tax requirements; engaging in marketing and e-commerce activities; managing and improving the effectiveness of our operations; manufacturing and distributing our products; collecting and storing sensitive data and confidential information; and communicating internally and externally with employees, investors, suppliers, trade customers, adult consumers and others. We continue to make investments in administrative, technical and physical safeguards to protect our information systems and data from cyber-threats, including human error and malicious acts. Our safeguards include employee training, testing and auditing protocols, backup systems and business continuity plans, maintenance of security policies and procedures, monitoring of networks and systems, and third-party risk management.

To date, interruptions of our information systems have been infrequent and have not had a material impact on our operations. However, because technology is increasingly complex and cyber-attacks are increasingly sophisticated and more frequent, there can be no assurance that such incidents will not have a material adverse effect on us in the future. Failure of our systems or service providers' systems to function as intended, or cyber-attacks or security breaches, could result in loss of revenue, assets, personal data, intellectual property, trade secrets or other sensitive and confidential data, violation of applicable privacy and data security laws, damage to the reputation of our companies and their brands, operational disruptions, legal challenges and significant remediation and other costs to Altria and its subsidiaries.

**Unfavorable outcomes of any governmental investigations could materially affect the businesses of Altria and its subsidiaries.**

From time to time, Altria and its subsidiaries are subject to governmental investigations on a range of matters. We cannot predict whether new investigations may be commenced or the outcome of any such investigation, and it is possible that our business could be materially adversely affected by an unfavorable outcome of a future investigation.

**A challenge to our tax positions could adversely affect our tax rate, earnings or cash flow.**

Tax laws and regulations, such as the Tax Reform Act, are complex and subject to varying interpretations. A successful challenge to one or more of Altria's tax positions could give rise to additional liabilities, including interest and potential penalties, as well as adversely affect our tax rate, earnings or cash flows.

**International business operations subject Altria and its subsidiaries to various United States and foreign laws and regulations, and violations of such laws or regulations could result in reputational harm, legal challenges and/or significant costs.**

While Altria and its subsidiaries are primarily engaged in business activities in the United States, they do engage (directly or indirectly) in certain international business activities that are subject to various United States and foreign laws and regulations, such as the U.S. Foreign Corrupt Practices Act and other laws prohibiting bribery and corruption.  Although we have a Code of Conduct and a compliance system designed to prevent and detect violations of applicable law, no system can provide assurance that it will always protect against improper actions by employees or third parties. Violations of these laws, or allegations of such violations, could result in reputational harm, legal challenges and/or significant costs.

**Altria may be unable to attract and retain the best talent due to the impact of decreasing social acceptance of tobacco usage and tobacco control actions.**

Our ability to implement our strategy of attracting and retaining the best talent may be impaired by the impact of decreasing social acceptance of tobacco usage and tobacco regulation and control actions. The tobacco industry competes for talent with the consumer products industry and other companies that enjoy greater societal acceptance.  As a result, we may be unable to attract and retain the best talent.

**Acquisitions or other events may adversely affect Altria's credit rating, and Altria may not achieve its anticipated strategic or financial objectives of a transaction.**

From time to time, Altria considers acquisitions and may engage in confidential acquisition negotiations that are not publicly announced unless and until those negotiations result in a definitive agreement. Although we seek to maintain or improve our credit ratings over time, it is possible that completing a given acquisition or the occurrence of other events could negatively impact our credit ratings or the outlook for those ratings. Any such change in ratings or outlook may negatively affect the amount of credit available to us and may also increase our costs and adversely affect our earnings or our dividend rate.

Furthermore, acquisition opportunities are limited, and acquisitions present risks of failing to achieve efficient and effective integration, strategic objectives and anticipated revenue improvements and cost savings. There can be no assurance that we will be able to acquire attractive businesses on favorable terms or that we will realize any of the anticipated benefits from an acquisition.

**Disruption and uncertainty in the credit and debt capital markets could adversely affect Altria's access to these markets, earnings and dividend rate.**

Access to the credit and debt capital markets is important for us to satisfy our liquidity and financing needs. Disruption and uncertainty in these markets and any resulting adverse impact on credit availability, pricing, credit terms or credit rating may negatively affect the amount of credit available to us and may also increase our costs and adversely affect our earnings or our dividend rate.

**Altria may be required to write down intangible assets, including goodwill, due to impairment, which could have a material adverse effect on our results of operations or financial position.**

We periodically calculate the fair value of our reporting units and intangible assets to test for impairment. This calculation may be affected by several factors, including general economic conditions, regulatory developments, changes in category growth rates as a result of changing adult consumer preferences, success of planned new product introductions, competitive activity and tobacco-related taxes. Certain events can also trigger an immediate review of intangible assets. If an impairment is determined to exist in either situation, we will incur impairment losses, which could have a material adverse effect on our results of operations or financial position.

90

**Competition, unfavorable changes in grape supply and new governmental regulations or revisions to existing governmental regulations could adversely affect Ste. Michelle's wine business.**

Ste. Michelle's business is subject to significant competition, including from many large, well-established domestic and international companies. The adequacy of Ste. Michelle's grape supply is influenced by consumer demand for wine in relation to industry-wide production levels as well as by weather and crop conditions, particularly in eastern Washington. Supply shortages related to any one or more of these factors could increase production costs and wine prices, which ultimately may have a negative impact on Ste. Michelle's sales. In addition, federal, state and local governmental agencies regulate the alcohol beverage industry through various means, including licensing requirements, pricing, labeling and advertising restrictions, and distribution and production policies. New regulations or revisions to existing regulations, resulting in further restrictions or taxes on the manufacture and sale of alcoholic beverages may have an adverse effect on Ste. Michelle's wine business. For further discussion, see *Wine Segment - Business Environment* above.

**Altria's reported earnings from and carrying value of its equity investment in AB InBev and the dividends paid by AB InBev on shares owned by Altria may be adversely affected by various factors, including foreign currency exchange rates and AB InBev's business results and stock price.**

For purposes of financial reporting, the earnings from and carrying value of our equity investment in AB InBev are translated into U.S. dollars from various local currencies. In addition, AB InBev pays dividends in euros, which we convert into U.S. dollars. During times of a strengthening U.S. dollar against these currencies, our reported earnings from and carrying value of our equity investment in AB InBev will be reduced because these currencies will translate into fewer U.S. dollars and the dividends that we receive from AB InBev will convert into fewer U.S. dollars.

Dividends and earnings from and carrying value of our equity investment in AB InBev are also subject to the risks encountered by AB InBev in its business. For example, in October 2018, AB InBev announced a 50% rebase in the dividends it pays to its shareholders, which will result in a reduction of cash dividends Altria receives from AB InBev. As discussed in the *Discussion and Analysis - Critical Accounting Policies and Estimates* above, if the carrying value of our investment in AB InBev exceeds its fair value and the loss in value is other than temporary, the investment is considered impaired, which would result in impairment losses and could have a material adverse effect on Altria's consolidated financial position or earnings. We cannot provide any assurance that AB InBev will successfully execute its business plans and strategies. Earnings from and carrying value of our equity investment in AB InBev are also subject to fluctuations in AB InBev's stock price, for example through mark-to-market losses on AB InBev's derivative financial instruments used to hedge certain share commitments.

**We received a substantial portion of our consideration from the AB InBev business combination with SABMiller plc (the "Transaction") in the form of restricted shares subject to a five-year lock-up. Furthermore, if our percentage ownership in AB InBev were to decrease below certain levels, we may be subject to additional tax liabilities, suffer a reduction in the number of directors that we can have appointed to the AB InBev Board of Directors and be unable to account for our investment under the equity method of accounting.**

Upon completion of the Transaction, we received a substantial portion of our consideration in the form of restricted shares that cannot be sold or transferred for a period of five years following the Transaction, subject to limited exceptions. These transfer restrictions will require us to bear the risks associated with our investment in AB InBev for a five-year period that expires on October 10, 2021. Further, in the event that our ownership percentage in AB InBev were to decrease below certain levels, we may be subject to additional tax liabilities, the number of directors that we have the right to have appointed to the AB InBev Board of Directors could be reduced from two to one or zero and our use of the equity method of accounting for our investment in AB InBev could be challenged.

**The tax treatment of the consideration Altria received in the Transaction may be challenged and the tax treatment of the AB InBev investment may not be as favorable as Altria anticipates.**

While we expect the equity consideration that we received from the Transaction to qualify for tax-deferred treatment, we cannot provide any assurance that federal and state tax authorities will not challenge the expected tax treatment and, if they do, what the outcome of any such challenge will be. In addition, there is a risk that the tax treatment of our investment in AB InBev may not be as favorable as we anticipate.

Item 3. Quantitative and Qualitative Disclosures About Market Risk

There have been no material changes in Altria's market risk during the nine months ended September 30, 2018. For additional information regarding quantitative and qualitative disclosures about market risk, see Part II, Item 7A. Quantitative and Qualitative Disclosures About Market Risk of the 2017 Form 10-K.

Item 4. Controls and Procedures.

Altria carried out an evaluation, with the participation of its management, including its Chief Executive Officer and Chief Financial Officer, of the effectiveness of Altria's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this Form 10-Q. Based upon that evaluation, Altria's Chief Executive Officer and Chief Financial Officer concluded that Altria's disclosure controls and procedures are effective.

There have been no changes in Altria's internal control over financial reporting during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, Altria's internal control over financial reporting.

Part II – OTHER INFORMATION

Item 1. Legal Proceedings.

See Note 10 for a discussion of legal proceedings pending against Altria and its subsidiaries. See also Exhibits 99.1 and 99.2 to this Form 10-Q.

Item 1A. Risk Factors.

Information regarding Risk Factors appears under *Cautionary Factors That May Affect Future Results* in Part I, Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations of this Form 10-Q ("Item 2") and in Part I, Item 1A. Risk Factors of the 2017 Form 10-K. Other than as set forth in Item 2, there have been no material changes from the risk factors previously disclosed in the 2017 Form 10-K.

Item 2. Unregistered Sales of Equity Securities and Use of Proceeds.

In January 2018, the Board of Directors authorized a $1.0 billion share repurchase program that it expanded to $2.0 billion in May 2018 (as expanded, the "January 2018 share repurchase program"), which Altria expects to complete by the end of the second quarter of 2019. The timing of share repurchases under this program depends upon marketplace conditions and other factors, and the program remains subject to the discretion of the Board of Directors.

Altria's share repurchase activity for each of the three months in the period ended September 30, 2018, was as follows:

| Period | Total Number of Shares Purchased [(1)] | Average Price Paid Per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Approximate Dollar Value of Shares that May Yet be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| July 1 - 31, 2018 | 2,186,222 | $ 57.52 | 2,184,742 | $ 942,393,026 |
| August 1 - 31, 2018 | 2,223,984 | $ 59.37 | 2,222,989 | $ 810,426,495 |
| September 1 - 30, 2018 | 1,789,074 | $ 60.98 | 1,787,792 | $ 701,410,643 |
| For the Quarter Ended September 30, 2018 | 6,199,280 | $ 59.18 | 6,195,523 | |

[(1)] The total number of shares purchased includes (a) shares purchased under the January 2018 share repurchase program (which totaled 2,184,742 shares in July, 2,222,989 shares in August and 1,787,792 shares in September) and (b) shares withheld by Altria in an amount equal to the statutory withholding taxes for holders who vested in stock-based awards (which totaled 1,480 shares in July, 995 shares in August and 1,282 shares in September).

https://www.sec.gov/Archives/edgar/data/764180/000076418018000095/a2018form10qq32018.htm[6/30/2020 3:11:19 PM]

Item 6. Exhibits.

| | |
|---|---|
| 4.1 | 5-Year Revolving Credit Agreement, dated as of August 1, 2018, among Altria, the lenders named therein and JPMorgan Chase Bank, N.A. and Citibank, N.A., as administrative agents. Incorporated by reference to Altria's Current Report on Form 8-K filed on August 1, 2018 (File No. 1-08940). |
| 10.1 | Guarantee made by PM USA in favor of the lenders party to the 5-Year Revolving Credit Agreement, dated as of August 1, 2018, among Altria, the lenders named therein and JPMorgan Chase Bank, N.A. and Citibank, N.A., as administrative agents, dated as of August 1, 2018. Incorporated by reference to Altria's Current Report on Form 8-K filed on August 1, 2018 (File No. 1-08940). |
| 12 | Statements regarding computation of ratios of earnings to fixed charges. |
| 31.1 | Certification of Chief Executive Officer pursuant to Rule 13a-14(a)/15d-14(a) of the Securities Exchange Act of 1934, as amended, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification of Chief Financial Officer pursuant to Rule 13a-14(a)/15d-14(a) of the Securities Exchange Act of 1934, as amended, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification of Chief Financial Officer pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 99.1 | Certain Litigation Matters. |
| 99.2 | Trial Schedule for Certain Cases. |

101.INS XBRL Instance Document.

101.SCH XBRL Taxonomy Extension Schema.

101.CAL XBRL Taxonomy Extension Calculation Linkbase.

101.DEF XBRL Taxonomy Extension Definition Linkbase.

101.LAB XBRL Taxonomy Extension Label Linkbase.

101.PRE XBRL Taxonomy Extension Presentation Linkbase.

Signature

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

ALTRIA GROUP, INC.


/s/ WILLIAM F. GIFFORD, JR.

William F. Gifford, Jr.
Vice Chairman and
Chief Financial Officer

October 25, 2018

94