UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

(Richmond Division)

| | |
|---|---|
| GABBY KLEIN, DONALD SHERBONDY, SARAH SHERBONDY and CONSTRUCTION LABORERS PENSION TRUST OF GREATER ST. LOUIS, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiffs,<br><br>          vs.<br><br>ALTRIA GROUP, INC., HOWARD A. WILLARD III, WILLIAM F. GIFFORD, JR., JUUL LABS, INC., ADAM BOWEN, JAMES MONSEES, KEVIN BURNS, and K.C. CROSTHWAITE,<br><br>                              Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 3:20-cv-00075-DJN<br><br>CLASS ACTION |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**THE ALTRIA DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

Page

I.    PRELIMINARY STATEMENT ........................................................................................1

II.   STATEMENT OF FACTS ...............................................................................................3

      A.    Defendants ...........................................................................................................3

      B.    The History of Tobacco Marketing and Minors ..................................................3

      C.    JUUL's Efforts to Replicate the "Success" of Big Tobacco Pre-MSA ...................4

            1.    JUUL Appealed to Youth Using Technology..............................................5

            2.    JUUL Introduced Youth-Friendly Flavors...................................................5

            3.    JUUL Developed a Pleasurable User Experience, Coupled with
                  Higher than Average Nicotine Potency .......................................................5

            4.    JUUL Aggressively Marketed to Underage Consumers...............................7

            5.    JUUL Allowed Underage Consumers to Buy JUUL Products
                  Online with No Restrictions.........................................................................8

      D.    JUUL Leads the E-cigarette Market, Putting Pressure on Altria............................8

      E.    Altria and JUUL Engaged in a Scheme to Defraud Investors ...............................9

      F.    The Truth Begins to Emerge...............................................................................11

III.  ARGUMENT..................................................................................................................12

      A.    The Complaint Pleads Actionable Misstatements and Omissions........................13

            1.    The Altria Defendants Misled Investors About the Risks
                  Associated with Altria's Investment in JUUL.........................................14

                  a.    Defendants' Misstatements and Omissions were Material............19

                  b.    The Risk Disclosures in Altria's 2018 Form 10-K Were
                        Inadequate ..................................................................................21

            2.    Plaintiffs Allege Fraud, Not Mismanagement ..........................................23

            3.    The Altria Defendants' Attempt to Invoke a Premature Truth on
                  the Market Defense Should Be Rejected ...................................................25

      B.    Plaintiffs Adequately Plead the Existence of a Scheme to Defraud
            Shareholders.......................................................................................................27

**Page**

C.     Plaintiffs Plead a Strong Inference of Scienter ........................................................28

    1.     Plaintiffs Allege a Strong Inference of Scienter for the Altria
Defendants ..................................................................................................29

       a.     Altria Conducted Substantial Due Diligence on JUUL Prior
to its Investment ..........................................................................32

       b.     Additional Facts Probative of a Cogent Inference of
Scienter .......................................................................................34

       c.     Plaintiffs Have Adequately Pled the Altria Defendants'
Motive ..........................................................................................36

       d.     The Complaint Adequately Alleges Corporate Scienter ................38

D.     Plaintiffs Adequately Allege Loss Causation ........................................................39

IV.     CONCLUSION.............................................................................................................40

## TABLE OF AUTHORITIES

**Page**

### CASES

*Affiliated Ute Citizens of Utah v. U.S.*,
406 U.S. 128 (1972)..................................................................................................28

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)..................................................................................19, 26, 28

*Burt v. Maasberg*,
2013 WL 1614160
(D. Md. Mar. 31, 2013)..............................................................................................1

*Caiafa v. Sea Containers Ltd.*,
525 F. Supp. 2d 398 (S.D.N.Y. 2007)......................................................................40

*Chamberlain v. Reddy Ice Holdings, Inc.*,
757 F.Supp.2d 683 (E.D. Mich. 2010)......................................................................36

*Ciresi v. Citicorp*,
782 F. Supp. 819 (S.D.N.Y. 1991) ............................................................................23

*City of Livonia Emps.' Ret. Sys. v. Wyeth*,
2010 WL 3910265
(S.D.N.Y. Sept. 29, 2010)..........................................................................................32

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*,
2013 WL 566805
(N.D. Ill. Feb. 13, 2013).............................................................................................30

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
423 F. Supp. 2d 348 (S.D.N.Y. 2006).......................................................................20

*Cooke v. Manufactured Homes, Inc.*,
998 F.2d 1256 (4th Cir. 1993) ..................................................................................27

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)...................................................................................................39

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
343 F.3d 189 (2d Cir. 2003).......................................................................................40

*Epstein v. World Acceptance Corp.*,
2015 WL 2365701
(D.S.C. May 18, 2015).................................................................................13, 21, 29, 30

**Page**

*Epstein v. World Acceptance Corp.*,
203 F. Supp. 3d 655 (D.S.C. 2016)....................................................................................35, 36

*Greenhouse v. MCG Capital Corp.*,
392 F.3d 650 (4th Cir. 2004) ...................................................................................................19

*Higginbotham v. Baxter*,
495 F.3d 753 (7th Cir. 2007) ...................................................................................................30

*Hirsch v. Complex Media, Inc.*,
2018 WL 6984227
(S.D.N.Y. Dec. 10, 2018)..........................................................................................................17

*In re Acterna Corp. Sec. Litig.*,
378 F. Supp. 2d 561 (D. Md. 2005)..........................................................................................36

*In re Apple Computer Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) ...........................................................................................26, 27

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004).......................................................................................32

*In re Bear Stearns Mortgage Pass–Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012).......................................................................................17

*In re BearingPoint, Inc. Sec. Litig.*,
525 F. Supp. 2d 759 (E.D. Va. 2007) .......................................................................................17

*In re Conventry Healthcare Sec. Litig.*,
2011 WL 1230998
(D. Md. Mar. 30, 2011)..............................................................................................................20

*In re DVI, Inc. Sec. Litig.*,
2010 U.S. Dist. LEXIS 92768
(E.D. Pa. Sept. 3, 2010) ............................................................................................................37

*In re Gen. Elec. Co. Sec. Litig.*,
857 F. Supp. 2d 367 (S.D.N.Y. 2012).......................................................................................32

*In re Gentiva Sec. Litig.*,
932 F. Supp. 2d 353 (E.D.N.Y. 2013) ......................................................................................35

*In re Genworth Fin. Inc. Sec. Litig.*,
103 F. Supp. 3d 759 (E.D. Va. 2015) .................................................................................34, 37

**Page**

*In re Humphrey Hosp. Tr., Inc. Sec. Litig.*,
219 F. Supp. 2d 675 (D. Md. 2002) ................................................................................13

*In re Massey Energy Co. Sec. Litig.*,
883 F. Supp. 2d 597 (S.D. W. Va. 2012) .........................................................................25

*In re MBIA, Inc. Sec. Litig.*,
700 F. Supp. 2d 566 (S.D.N.Y. 2010) .........................................................................38, 39

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) ..........................................................................33, 37

*In re Mylan N.V. Sec. Litig.*,
379 F. Supp. 3d 198 (S.D.N.Y. 2019) .............................................................................17

*In re Openwave Sys. Sec. Litig.*,
528 F. Supp. 2d 236 (S.D.N.Y. 2007) .............................................................................40

*In re OSG Sec. Litig.*,
12 F. Supp. 3d 622 (S.D.N.Y. 2014) ...............................................................................17

*In re Pozen Sec. Litig.*,
386 F. Supp. 2d 641 (M.D.N.C. 2005) ............................................................................13

*In re Scana Corp. Sec. Litig.*,
2019 WL 1427443
(D.S.C. Mar. 29, 2019) ...................................................................................................20

*In re Silvercorp Metals, Inc. Sec. Litig.*,
26 F. Supp. 3d 266 (S.D.N.Y. 2014) ...............................................................................38

*In re Sinclair Broad. Grp., Inc. Sec. Litig.*,
2020 WL 571724
(D. Md. Feb. 4, 2020) .....................................................................................................39

*In re Symbol Techs., Inc. Sec. Litig.*,
2013 U.S. Dist. LEXIS 171688
(E.D.N.Y. Dec. 5, 2013) .................................................................................................22

*In re Tronox, Inc. Sec. Litig.*,
2010 WL 2835545
(S.D.N.Y. June 28, 2010) ................................................................................................40

**Page**

*In re UBS Auction Rate Sec. Litig.,*
2010 WL 2541166
(S.D.N.Y. June 10, 2010)...............................................................................................22

*In re Under Armour Sec. Litig.,*
342 F. Supp. 3d 658 (D. Md. 2018).................................................................................19

*In re Van der Moolen Holding N.V. Sec. Litig.,*
405 F. Supp. 2d 388 (S.D.N.Y. 2005).............................................................................18

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.,*
2017 WL 66281
(N.D. Cal. Jan. 4, 2017) .................................................................................................38

*In re Willis Towers Watson*
937 F.3d 297 (4th Cir. 2019) .........................................................................................19

*In re Zillow Grp., Inc. Sec. Litig.,*
2019 WL 1755293
(W.D. Wash. Apr. 19, 2019)...........................................................................................33

*Institutional Invs. Grp. v. Avaya, Inc.,*
564 F.3d 242 (3d Cir. 2009).............................................................................................33

*Kanefsky v. Honeywell Int'l Inc.,*
2020 WL 2520669
(D.N.J. May 18, 2020) ...................................................................................................23

*KBC Asset Mgmt. NV v. 3D Sys. Corp.,*
2016 WL 3981236
(D.S.C. July 25, 2016) .......................................................................................27, 31, 34

*Kiken v. Lumber Liquidators Holdings, Inc.,*
155 F. Supp. 3d 593 (E.D. Va. 2015) ................................................................13, 14, 15, 16

*Lorenzo v. SEC*
139 S. Ct. 1094 (2019)....................................................................................................28

*Maguire Fin., LP v. PowerSecure Int'l, Inc.,*
876 F.3d 541 (4th Cir. 2017) ........................................................................................29

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,*
513 F.3d 702 (7th Cir. 2008) .........................................................................................30

**Page**

*Martinez v. LVNV Funding LLC*,
    2016 U.S. Dist. LEXIS 136613
    (E.D.N.Y. Oct. 2, 2016) ...........................................................................................17

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc*
    576 F.3d 172 (4th Cir. 2009) ........................................................................17, 28, 29

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
    164 F. Supp. 3d 568 (S.D.N.Y. 2016)...................................................................17, 18

*Meyer v. JinkoSolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)...................................................................................15, 21

*Nieman v. Duke Energy Corp.*,
    2013 WL 4004274
    (W.D.N.C. July 26, 2013)......................................................................................13, 14

*Ollila v. Babcock & Wilson Enters.*,
    2018 WL 792069
    (W.D.N.C. Feb. 8, 2018)..............................................................................................22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)......................................................................................................20

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
    594 F. Supp. 2d 945 (N.D. Ill. 2009) ..........................................................................32

*Phillips v. LCI Int'l, Inc.*,
    190 F.3d 609 (4th Cir. 1999) .......................................................................................36

*Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*,
    551 F.3d 305 (4th Cir. 2009) .......................................................................................29

*Reese v. Malone*,
    2014 WL 555911
    (9th Cir. Feb. 13, 2014)..........................................................................................32, 34

*Republican Party of N.C. v. Martin*,
    980 F.2d 943 (4th Cir. 1992) .......................................................................................12

*Robbins v. Moore Med. Corp.*,
    788 F. Supp. 179 (S.D.N.Y. 1992) ..............................................................................37

*Saltz v. First Frontier, L.P.*,
    485 F. App'x 461 (2d Cir. 2012) .................................................................................34

**Page**

*Santa Fe Indus., Inc. v. Green*,
  430 U.S. 462 (1977)..............................................................................................24

*SEC v. Pirate Inv. LLC*,
  580 F.3d 233 (4th Cir. 2009) ...............................................................................29

*Singer v. Reali*,
  883 F.3d 425 (4th Cir. 2018) ....................................................................... *passim*

*SourceOne, Inc. v. ESI, Inc. of Tenn.*,
  2020 WL 4283927
  (E.D. Va. July 27, 2020) .......................................................................................13

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*,
  552 U.S. 148 (2008)..............................................................................................28

*Strougo v. Barclays PLC*,
  105 F. Supp. 3d 330 (S.D.N.Y. 2015)...................................................................17

*Teachers' Ret. Sys. of La. v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) .....................................................................13, 30, 38

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
  531 F.3d 190 (2d Cir. 2008)..................................................................................38

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..........................................................................................29, 36

*Turka v. S.C. Pub. Serv. Auth.*,
  2020 U.S. Dist. LEXIS 31968
  (D.S.C. Feb. 25, 2020) .........................................................................................33

*USF & G Corp. Sec. Litig.*,
  1993 WL 740188
  (D. Md. Feb. 11, 1993) .........................................................................................23

*Van Noppen v. Innerworkings, Inc.*,
  136 F. Supp. 3d 922 (N.D. Ill. 2015) ...................................................................30

*Vanleeuwen v. Keyuan Petrochemicals Inc.*,
  2014 WL 3891351
  (S.D.N.Y. Aug. 8, 2014) .......................................................................................17

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
  57 F. Supp. 3d 950 (D. Minn. 2014)................................................................27, 28

**Page**

*Wikimedia Found. v. Nat'l Sec. Agency*,
  857 F.3d 193 (4th Cir. 2017) ...................................................................................13

*Yates v. Municipal Mortg. & Equity, LLC*,
  744 F.3d 874 (4th Cir. 2014) ...............................................................................30, 34

*Youngers v. Virtus Inv. Partners Inc.*,
  195 F. Supp. 3d 499 (S.D.N.Y. 2016)....................................................................17

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
  780 F.3d 597 (4th Cir. 2015) ...............................................................................28, 29

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
  §78J(B)............................................................................................12, 27, 28, 40

17 C.F.R.
  §240.10b-5 .............................................................................................................12

Federal Rules of Civil Procedure
  Rule 10b-5...............................................................................................12, 13, 28
  Rule 10b-5(a) .....................................................................................................22
  Rule 10b-5(c) .....................................................................................................22
  Rule 12(b)(6)...........................................................................................12, 13, 40
  Rule 15(a)...........................................................................................................40

Private Securities Litigation Reform Act of 1995 ....................................................13

Lead Plaintiffs Gabby Klein, Donald Sherbondy and Construction Laborers Pension Trust of Greater St. Louis (together, "Lead Plaintiffs" or "Plaintiffs") respectfully submit this memorandum of law in opposition to the Altria Defendants' motion to dismiss the Corrected Consolidated Class Action Complaint (the "Complaint," ECF No. 108).[1]

## I.    PRELIMINARY STATEMENT

This securities class action concerns false and misleading statements by Altria, one of the founding companies of the tobacco industry (¶35), and JUUL Labs, Inc. ("JUUL"), an upstart in the electronic cigarette ("e-cigarette") market (¶37), and certain of their executives, to mislead regulators, the public, and investors regarding the extent of JUUL's illegal marketing practices that targeted youth and underage consumers with its e-cigarette products.

Specifically, by representing that it was never JUUL's intent to market to underage consumers or for underage consumers to use its products, both the Altria Defendants and the JUUL Defendants misled Altria investors about the risks associated with Altria's $12.8 billion investment in JUUL, and misrepresented the likely effect that the materialization of these risks would have on JUUL's value.

There can be no real doubt as to JUUL's intent with its marketing.  As the Complaint alleges, not only did JUUL specifically design its products to look like sleek Apple Inc. ("Apple") devices,

---

[1]    As used herein, "¶__" and "¶¶__" refer to paragraphs in the Complaint.  "Altria Defendants" refers to Atria Group, Inc. ("Altria" or the "Company"); Howard A. Willard III ("Willard"), Altria's Chairman and Chief Executive Officer ("CEO") at all relevant times (¶24); William F. Gifford Jr. ("Gifford"), Altria's Vice Chairman and Chief Financial Officer ("CFO") at all relevant times (¶25); and K.C. Crosthwaite ("Crosthwaite").  ¶30.  All references to the Memorandum of Law in Support of the Altria Defendants' Motion to Dismiss are referred to herein as "Altria Defs. Br."  ECF No. 118.  The exhibits attached to the Altria Defs. Br. are referred to herein as "Altria Ex."  ECF No. 117.  Plaintiffs incorporate by reference all arguments against JUUL, James Monsees ("Monsees"), Crosthwaite, Adam Bowen ("Bowen"), and Kevin Burns ("Burns") (the "JUUL Defendants") in their opposition to the JUUL Defendants' motions to dismiss ("JUUL Opp."), filed herewith.  *See, e.g., Burt v. Maasberg*, 2013 WL 1614160, at *9 (D. Md. Mar. 31, 2013).  Unless otherwise noted, internal citations are omitted and all emphasis has been added.

including youthful features such as party mode, but it marketed to youth on social media and children's television channel websites, including Nick Jr. and Cartoon Network. JUUL also made use of social media influencers, threw large parties designed to entice youth into being part of the JUUL movement, and made presentations at schools under the guise of e-cigarette education (an idea copied from the playbook of the tobacco companies who had been banned from doing so).

In response, the Altria Defendants contend it was well known there was increased youth usage of e-cigarettes and no further disclosure was required. But this ignores the important distinction between youth *usage* of e-cigarettes and JUUL's specific *targeting* of youths to use e-cigarettes, a claim repeatedly denied by the Altria and JUUL Defendants, despite its falsity. It was not until during and after the Class Period that government officials and the public finally pieced together JUUL's marketing scheme.

The Complaint further alleges that the Altria Defendants (because of the due diligence related to Altria's anticipated ownership stake and their knowledge of the tobacco industry) were aware of JUUL's illegal marketing practices but nonetheless allowed Altria to make its investment because it was desperate to ensure a foothold in the booming e-cigarette market. Faced with the possibility of being left behind in the e-cigarette market, the Altria Defendants disregarded the information they had regarding JUUL's marketing practices and Altria made its investment in JUUL.

The Altria Defendants made other statements to investors regarding the safety and health benefits of JUUL's products and the impact of sales to underage consumers on JUUL's business, that the Complaint alleges were also materially false and misleading. Ultimately, the regulatory scrutiny and protracted litigation risk related to JUUL's targeting of underage consumers materialized through a series of corrective disclosures, culminating with Altria's multi-billion dollar write-downs of its JUUL investment.

Although Defendants attempt to assert a number of defenses to these and other dispositive allegations of fraud, none has merit, for all the reasons given below.  Accordingly, Plaintiffs respectfully request that the Court deny the Altria Defendants' motion to dismiss in its entirety.

## II.    STATEMENT OF FACTS

### A.    Defendants

Atria, founded in 1919 and headquartered in Richmond, VA, has long been a mainstay of the tobacco industry.  ¶¶23, 35.  At all relevant times, Willard was Altria's President and CEO (¶24), and Gifford was Altria's CFO.  ¶25.

JUUL is a Delaware corporation, with its principal place of business in San Francisco, California.  ¶26.  Bowen is one of JUUL's co-founders, a member of its board of directors, and served as JUUL's Chief Technology Officer prior to transitioning to an advisory role in October 2019.  ¶27.  Monsees is also a co-founder of JUUL, and served as JUUL's Chief Product Officer prior to transitioning to an advisory role in October 2019.  ¶28.  Monsees also served on JUUL's board of directors until March 2020.  *Id*.  Burns served as JUUL's CEO from December 2017, through September 2019 when he was replaced by Crosthwaite.  ¶29.  Crosthwaite is the CEO of JUUL and, when previously employed by Altria, served as an observer for Altria on the JUUL board of directors after Altria's JUUL investment.  ¶30.  JUUL produces a line of e-cigarette, packaging nicotine salts from leaf tobacco into single use cartridges or "pods" which are heated to create a vapor that is then inhaled.  ¶37.

### B.    The History of Tobacco Marketing and Minors

"Big Tobacco," of which Altria was a mainstay, had historically made billions of dollars in sales of cigarettes, which were driven by aggressive and successful marketing.  ¶41.  Those marketing efforts continuously failed to apprise consumers of the true risks of tobacco use.  *Id*.  In the 1980s, Big Tobacco began introducing fruity flavors, matching them with colorful and bright advertising campaigns to directly target underage, and impressionable, consumers.  ¶42.  Big

Tobacco has been consistently embroiled in litigation after the dangers of smoking cigarettes were revealed, with a focus on the aggressive marketing practices aimed at underage consumers. ¶43.

In 1998, 46 states entered the Tobacco Master Settlement Agreement (the "MSA") ending much of the litigation, and, in 2006, the Department of Justice reached a separate settlement with Altria and other cigarette companies prohibiting them from selling flavored cigarettes. ¶¶43-44. The MSA directly addressed Big Tobacco's marketing efforts aimed at youth users, and a federal judge found the major cigarette makers guilty of civil fraud and racketeering, concluding that Big Tobacco had engaged in a decades-long conspiracy to hide the dangers of smoking. ¶¶45-53. It became clear that one of Big Tobacco's important strategies was to aggressively market its products to "replacement smokers," defined as underage consumers who had the potential to become lifelong customers and ensure a continuous stream of customers for Big Tobacco. *Id.*

### C.    JUUL's Efforts to Replicate the "Success" of Big Tobacco Pre-MSA

JUUL designed its e-cigarettes, and its nicotine formulations, to immediately appeal to underage consumers. ¶87. Most notably, JUUL developed a nicotine salt formulation and delivery system that would not only produce a large amount of addicting nicotine in each inhalation, but would minimize the harshness associated with traditional cigarette smoke. ¶¶99, 103-116.

JUUL was frank about its intent and ability to follow similar patterns of Big Tobacco's now illegal marketing practices (because JUUL, an e-cigarette company, was not subject to the restrictions of the MSA, ¶199). ¶88. Specifically, JUUL explained that because the MSA released many internal Big Tobacco documents, which were the documents that ultimately established Big Tobacco's culpability, it was able to "catch up . . . to a huge, huge industry in no time." *Id.* Further, these same documents explained how Big Tobacco would target youth as "replacement smokers," and how their nicotine formulation and delivery was of paramount importance to their sustained success of indoctrinating new smokers. ¶90. Making use of these documents as a head start, and

utilizing former researchers from Big Tobacco, JUUL embarked on its quest to cultivate a massive following on the backs of underage consumers, to sustain its endeavor into the future. ¶¶90-91.

### 1. JUUL Appealed to Youth Using Technology

JUUL sought to distance itself from the negative connotations of cigarette use, distinguishing itself by creating a product that would appeal to today's youth: sleek, small and discrete. ¶121. These devices also closely resembled technology commonly used by youth. *Id*. JUUL e-cigarettes, poignantly, were referred to as the "iPhone of e-cigarettes," an apt description considering Bowen employed his prior experience as a designer at Apple to make JUUL e-cigarettes replicate the aesthetics of Apple products. ¶122. Teenagers were unequivocal that JUUL's popularity stemmed directly from its high-tech look and design. *Id*. JUUL also included features that teenagers would enjoy using in a group setting. This included "party mode," which would create a flash of rainbow lights using the integrated LED lights of the JUUL e-cigarette. ¶123.

### 2. JUUL Introduced Youth-Friendly Flavors

In a nearly identical strategy employed by the Big Tobacco industry, JUUL created a swath of fruity, kid-friendly flavors to entice youth to use its products and ingest nicotine, thereby addicting them to JUUL products. ¶¶127-136. JUUL introduced flavors including "Fruut," (later renamed fruit medley), "Bruule" (later renamed crème brulee), and "miint" (later renamed mint); "Cool Mint," "Cucumber," and "Mango." ¶¶128-129. These flavors contributed directly to youth users trying JUUL for the first time and becoming repeat buyers. ¶¶131-134. Internally, JUUL learned within months of its introduction that teenagers were either buying JUULs online or finding others to make the purchases for them. ¶135.

### 3. JUUL Developed a Pleasurable User Experience, Coupled with Higher than Average Nicotine Potency

JUUL understood, based at least in part on the same documents that established Big Tobacco's culpability, that the key to ensuring an addicted customer base was to perfect the nicotine

delivery system and levels of nicotine potency.  ¶¶76-86, 88-90.  JUUL was candid that it had reviewed the design data from the MSA disclosures, and understood that the cigarette was "a carefully engineered product for nicotine delivery and addiction."  ¶89.

JUUL employs a specialized formulation of nicotine salt solution.  The early designs and understanding of nicotine salts were developed by a chemist at R.J. Reynolds ("RJR") during the height of the Big Tobacco era.  ¶90.  The chemist at RJR understood that "to assure RJR a larger segment of the youth market. . ." it had to create a product that would provide a larger "nicotine 'kick,'" which would be both more appealing and addictive.  *Id.*  These nicotine salt formulations were then dissolved into a liquid and heated to pursue the "maximum release of nicotine" – precisely what JUUL endeavored to do some four decades later.  *Id.*  These confidential designs were available for JUUL to study in the aftermath of the MSA.  *Id.*

Prior to JUUL entering the market, e-cigarettes had struggled to gain a foothold because they could not deliver sufficient nicotine to satisfy an ordinary smoker's nicotine cravings.  ¶100.  The chief issue for attracting and keeping customers was to minimize the "throat hit" associated with nicotine products.  *Id.*  In 2013, JUUL scientists were able to perfect a new formulation, focusing on nicotine salts, that would allow JUUL e-cigarettes, through the revolutionary JUULpod, to deliver a higher dose of nicotine, minus the dissuading "throat hit" associated with early e-cigarette formulations.  ¶102.  The minimizing of the "throat hit" was of paramount importance to attracting users who previously were not smokers, namely youth users.  ¶¶106-107.

JUUL developed its JUULpods and its e-cigarette to deliver a substantially higher dose of nicotine than traditional cigarettes, adding to their addicting capabilities.  ¶¶108-116. JUUL's '895 patent essentially boasted about JUUL's ability to surpass the maximum nicotine delivery of popular cigarette brands.  ¶111.  JUUL understood that it had created a product that outperformed the "carefully engineered product for nicotine delivery and addiction" created by Big Tobacco (¶89) and

understood this meant that Big Tobacco's target of securing a repeat supply of replacement users was well within JUUL's grasp.

Altria had unsuccessfully attempted to market and sell its own non-combustible e-cigarette type device, the "MarkTen Bold e-cigarette." ¶165. Altria was aware that JUUL's formulation was far stronger than even its own relatively high-strength e-cigarette formulation, making its addictive capabilities that much greater. ¶¶165-171.

### 4.    JUUL Aggressively Marketed to Underage Consumers

Nearly nine out of every ten smokers started smoking by age 18, as JUUL was well-aware. ¶191. Further, more than 80% of underage smokers had used the brands most heavily advertised. *Id*. JUUL undertook a targeted marketing campaign called the "#Vaporized" campaign, (¶205) and later the "Switch" campaign (¶¶176-184), all in pursuit of valuable underage consumers, to ensure it would have a constant customer base. ¶¶200-202. JUUL's marketing strategy resulted in targeted advertisements that are strikingly similar to the advertisements used by Big Tobacco, which of course resulted in the MSA. ¶¶203-204.

The #Vaporized campaign was a combination of colorful, inviting advertisements, a blitz of social media activity, JUUL-hosted parties, and other targeted marketing, all designed to attract underage consumers. ¶¶205-208. JUUL engaged in an all-out flood of social media activity to market its products in areas that were, and are, the near exclusive domain of underage, impressionable consumers. ¶¶210-213. JUUL also featured its #Vaporized campaign advertisements on websites, and television channels, frequented by underage consumers. ¶¶214-225. JUUL was able to figure out a work-around to Facebook and Instagram's prohibition on tobacco product advertising by paying online publishers to advertise JUUL products on their own pages, rather than utilizing the advertising functions of the social media sites themselves. ¶229. JUUL utilized all aspects of social media, such as not requiring proof of age to view its advertisements,

tracking the visitors of its social media posts and creating a #juul campaign, all designed to ensure underage consumers were being exposed to its products in droves.  ¶¶227-249.

JUUL also hosted large parties to generate brand awareness, and facilitate exposure of its products to social media influencers and celebrities for viewing on social media.  ¶¶252-287. Known socialites attended these parties, some not even of legal age to consume tobacco products, but all of whom had significant social media followings with underage consumers.  ¶¶267-287.

The *coup de grâce* was JUUL physically going into New York-area high schools, under the guise of "youth prevention," to give presentations about the safety of JUUL products.  ¶¶288-291. These outreach programs mirrored the outreach programs undertaken by Big Tobacco prior to the MSA.  ¶291.

### 5.    JUUL Allowed Underage Consumers to Buy JUUL Products Online with No Restrictions

JUUL allowed consumers to purchase products from its website, and to have them shipped directly to their homes, all without adequate age verification controls.  ¶¶306-319.  JUUL employed Veratad to implement an age verification system.  ¶308.  The Veratad age verification system provided extremely loose controls on the age verification process, giving consumers numerous chances to "verify" their identity in the event of a "fail" in the first instance, including altering the identifying information provided by customers in some instances.  ¶¶309-315.  Finally, JUUL *removed* the requirement of having an adult sign for the products at the point of delivery, only offering the option at an additional cost to the consumer.  ¶316.

### D.    JUUL Leads the E-cigarette Market, Putting Pressure on Altria

By November 2017, JUUL had captured a large and growing share of the e-cigarette market. ¶328.  Altria, at the same time, was struggling with both its traditional tobacco market, and its e-cigarette failures.  ¶¶330-336.  JUUL also did not have to contend with the massive fees and taxes

imposed by the MSA, thereby allowing JUUL to price more competitively and enjoy more profitability.  ¶¶337-338.

Allegations attributed to confidential witnesses ("CWs") establish that, internally at Altria, Willard was adamant about acquiring JUUL so that Altria could become a major player in the e-cigarette market.  ¶¶348-351.  Altria was also well aware of JUUL's illegal marketing practices based on its due-diligence prior to its investment.  ¶¶353-359.  However, Altria initially believed it would be able to gain control of JUUL's marketing operations after its investment, accepting whatever remedial measures would be required by regulators.  ¶¶376-382.  The issue however, was that JUUL refused to sell a majority stake, or cede operational control, to Altria.  ¶¶383-385.  Thus, faced with the choice of not investing in JUUL, and missing out on an opportunity to own part of an e-cigarette company not subject to the MSA, or investing and recklessly disregarding the likely risk of regulatory action and litigation based on JUUL's established marketing practices, Willard opted to throw caution to the wind and had Altria invest in JUUL.  ¶¶360, 383.

### E.      Altria and JUUL Engaged in a Scheme to Defraud Investors

During the period just before Altria's investment, JUUL and Altria hatched a plan to ensure that JUUL's mint-pods, JUUL's most addictive formulation, would remain available for sale without being subject to any regulation.  They did so by engaging in a coordinated scheme to mislead regulators into believing that mint JUULpods were not popular amongst underage consumers, and were an analog of menthol cigarettes that had not been regulated in the past when flavored cigarettes were banned by regulators.  ¶¶387-388.

On August 2, 2018, JUUL met with the FDA and transmitted the results of their "Youth Prevalence Study."  ¶¶389-390.  This study purportedly indicated that an insignificant number of underage users had used JUUL, and of those that had used JUUL, 47% had used mango flavored JUULpods.  ¶390.  JUUL's study, however, was a sham, utilizing carefully crafted questions to

obscure the true extent of mint JUULpod usage among youth consumers. ¶391. In fact, a competing study by the National Youth Tobacco Survey found that 20.8% of high school students were current users of e-cigarettes. ¶392. As the youth vaping epidemic continued to spiral, the FDA requested a detailed plan from the major e-cigarette manufacturers describing the steps they planned to take to curb youth usage. ¶393. At this point, Altria and JUUL had already begun negotiations, and put their coordinated scheme into effect. ¶394. JUUL and Altria coordinated to deceive the FDA by representing that mint JUULpods were more akin to menthol than other flavored products, and that underage consumers did not prefer mint flavoring. ¶¶394-395. JUUL responded to the FDA by presenting the FDA with an "Action Plan," in which JUUL planned to offer products that "mirror what is currently available for combustible cigarettes," fraudulently characterizing mint JUULpods as a non-flavored e-cigarette product, similar to menthol cigarettes. ¶¶397-398. However, internally JUUL was aware that mint was the flavor of choice for all of JUUL's customers when they could not find mango, which was the flavor that JUUL's own study stated was the flavor of choice for underage consumers. ¶¶399-400.

Altria in turn, followed suit and represented to the FDA, just ten days later, that mint was a traditional tobacco flavor, and that Altria would discontinue all MarkTen flavors except "traditional tobacco, menthol and mint flavors." ¶401. To support Altria's representations, Willard submitted a study that Altria conducted purporting to show that mint was not a flavor selected by underage consumers. ¶408. This "study," much like JUUL's, was a "quasi-experimental online survey" contradicted by the National Youth Tobacco Survey. *Id.*

Altria then represented to investors that the reason for its removal of MarkTen flavored products was to curb youth's use of e-cigarette products, when it was only weeks away from announcing a 35% investment in JUUL. ¶402. The true reason, however, was because of a non-compete clause in its investment agreement with JUUL. ¶¶404-406.

-10-

Defendants were successful in shielding mint JUULpods from regulation.  ¶¶411, 416. However, soon after Altria's investment in JUUL, the FDA realized the deception and publicly excoriated Altria for its contradicting statements regarding youth use prevention in light of its investment in JUUL, citing "deeply concerning data" regarding youth usage of JUUL products. ¶¶412-413.  In a subsequent meeting between Altria and the FDA, then-FDA commissioner Scott Gottlieb announced that he "did not come away with any evidence that public health concerns drove Altria's decision to invest" in JUUL.  ¶414.

### F.    The Truth Begins to Emerge

Throughout the Class Period, JUUL and Altria were subject to mounting regulatory and public scrutiny, and the threat of protracted litigation.  On August 29, 2019, *The Wall Street Journal* reported that the FTC was investigating whether JUUL had used influencers and other marketing practices to promote e-cigarettes to minors.  ¶500.  On this news, Altria's stock price fell $1.60 per share, or 3.49%.  ¶501.  On August 30, 2019, both the FDA and CDC announced that they were collaborating to investigate e-cigarette related cases of illnesses.  ¶502.  On this news, Altria's stock price fell an additional $0.51 per share, or 1.15%, to close at $43.74 per share on August 30, 2019. ¶503.  Between the dates of September 9, 2019 and September 12, 2019, the FDA issued a warning letter to JUUL, informing JUUL that its statements concerning the risk of harm associated with JUUL products were in contravention of modified risk claims under federal law and regulation. ¶504.  News sources reported that the Trump administration was preparing a ban on flavored e-cigarettes as federal agencies probed an outbreak of lung problems related to e-cigarettes.  ¶505. *Reuters* reported that New Jersey was poised to become the latest state to restrict e-cigarette use due to hundreds of respiratory illnesses and deaths.  ¶506.  On this news, Altria's stock price dropped $2.45 per share, or 5.51%.  ¶507.  On September 25, 2019, Altria announced that Phillip Morris had called off discussions concerning a $200 billion merger it had previously announced with Altria due

to scrutiny of the vaping industry and Altria's 35% stake in JUUL, the market leader.  ¶511.  JUUL also announced it was subject to another round of federal investigations, that longtime Altria executive Crosthwaite was replacing CEO Burns, and that JUUL would stop all advertising in the United States.  *Id*.  On October 31, 2019, Altria announced that it was taking a $4.5 billion write-down on its investment in JUUL and that the FTC was scrutinizing Altria's role in the departure of former JUUL CEO Burns.  ¶517.  In response to this news, Altria stock fell $1.15 per share, or 2.5%.  ¶518.  On January 30, 2020, Altria announced that it was taking an additional $4.1 billion charge related to its JUUL investment, citing an increase in litigation against JUUL.  ¶519.  On this news, Altria's stock price fell $2.11 per share, or 4.2%.  ¶520.  On February 21, 2020, just before the close of trading, *The Wall Street Journal* reported that the SEC had launched an investigation into whether Altria fully disclosed to its shareholders the risks associated with its investment in JUUL.  ¶521.  In response to this news, Altria's share price fell a total of $5.88 per share over the next few days, or 12.7%, from February 21, 2020 to February 27, 2020.  ¶522.

On April 17, 2020, Altria announced that Willard was resigning as CEO, which analysts and media attributed to fallout from Willard's relentless pursuit of Altria's investment in JUUL.  ¶523.

## III.    ARGUMENT

To state a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Singer v. Reali*, 883 F.3d 425, 438 (4th Cir. 2018).

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992); *see also*

-12-

*SourceOne, Inc. v. ESI, Inc. of Tenn.*, 2020 WL 4283927, at *2 n.2 (E.D. Va. July 27, 2020).  A

motion to dismiss should not be granted unless "it appears beyond doubt that the plaintiff can prove

no set of facts in support of his claim which would entitle him to relief."  *In re Humphrey Hosp. Tr.,*

*Inc. Sec. Litig*., 219 F. Supp. 2d 675, 681 (D. Md. 2002).  In ruling on a motion to dismiss, a court

"accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most

favorable to the plaintiff."  *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir.

2017).

## A.     The Complaint Pleads Actionable Misstatements and Omissions

The Complaint specifies the Altria Defendants' misleading statements, identifies who made

those statements, and explains why those statements were misleading.  ¶¶454-524.  That is all the

PSLRA requires at this stage of the litigation.  *See In re Pozen Sec. Litig.*, 386 F. Supp. 2d 641, 643

(M.D.N.C. 2005).  Although "section 10(b) and SEC Rule 10b-5 'do not create an affirmative duty

to disclose any and all material information,'" disclosure "is required 'when necessary to make

statements made, in the light of the circumstances under which they were made, not misleading.'"

*Singer*, 883 F.3d at 440.  To plead falsity under the PSLRA, a plaintiff must "specify each statement

alleged to have been misleading, [and] the reason or reasons why the statement is misleading."  *Id.* at

439.  However, a plaintiff need not, "prove the falsity of the alleged misrepresentations at the

pleading stage."  *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 601 (E.D. Va.

2015).  When a plaintiff alleges "'sufficient facts to support a reasonable belief in the allegation that

the defendant's statement was misleading, the court should deny the Rule 12(b)(6) motion as to this

'misrepresentation' element.'"  *Epstein v. World Acceptance Corp.*, 2015 WL 2365701, at *5

(D.S.C. May 18, 2015) (quoting *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 174 (4th Cir.

2007)).  Here, Plaintiffs "allege facts and 'circumstances that, drawing reasonable inferences in their

favor, would render their claims of [falsity] plausible.'"  *Nieman v. Duke Energy Corp*., 2013 WL

4004274, at *24 (W.D.N.C. July 26, 2013). "As a general rule, the trier of fact decides whether a public statement is misleading." *Kiken*, 155 F. Supp. 3d at 601.

The Complaint ably meets these standards, alleging in detail the Altria Defendants' misstatements and omissions concerning: (i) Altria's reasons for investing in JUUL; (ii) Altria's knowledge of JUUL's marketing to youth and underage consumers; (iii) the certainty of regulatory scrutiny and litigation stemming from JUUL's marketing practices towards youth; (iv) the extent of JUUL's revenue derived from underage consumers in contravention of applicable laws; (v) Altria's understanding that JUUL was marketing its products as reduced risk without proper regulatory designation; and (vi) Altria and JUUL's intention to continue to market JUUL's products to youth. All of these statements were misleading because Defendants failed to disclose the true nature of JUUL's ongoing youth marketing practices, and the risks associated with Altria's JUUL investment as a result. ¶¶454-476, 480, 483, 486, 488-490, 492, 494, 514. As one example, Altria's press release announcing its JUUL investment expressly stated "[JUUL's] intent was never to have youth use JUUL products." ¶462. The Complaint then alleges (in detail rarely found at the pleading stage) the falsity of that statement. ¶¶463, 465.

In their motion to dismiss, the Altria Defendants attempt to mischaracterize Plaintiffs' allegations as: (i) claims of corporate mismanagement; and (ii) challenging the valuation of JUUL, thereby attempting to argue that Plaintiffs have failed to plead any actionable misstatements. *See* Altria Defs. Br. at 15-28. For the reasons set forth herein, those challenges fail.

### 1.    The Altria Defendants Misled Investors About the Risks Associated with Altria's Investment in JUUL

The Complaint pleads in detail that Altria made numerous material misstatements and omissions during the Class Period misrepresenting the risks associated with Altria's $12.8 billion investment in JUUL. These statements misled investors into believing that the Altria Defendants'

-14-

intent in making this investment was to convert adult smokers to users of JUUL products, and not to target a new generation of youth as a future stream of consumers of JUUL products.

Altria portrayed its investment in JUUL as a means to "switch adult smokers to e-vapor products[,]" and to prepare for a "future where adult smokers overwhelmingly choose non-combustible products. . . ." ¶¶454, 456. However, the Complaint details how Altria's interest in JUUL actually stemmed from JUUL's marketing techniques and strategies appealing to youth (¶¶358-362), which is what enabled JUUL to be the leader of the emerging e-cigarette market that Altria was desperate to enter. ¶¶328-342, 348-351.

At bottom, the Altria Defendants failed to apprise investors of the known risks Altria was assuming when investing in JUUL, because of JUUL's ongoing illegal marketing to youth. ¶¶358-359, 455, 457, 463. The Altria Defendants' statements are thus actionable because "disclosure of material information is required 'when necessary to make statements made, in the light of the circumstances under which they were made, not misleading.'" *Singer*, 883 F.3d at 440; *see also Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 n.3 (2d Cir. 2014) ("once a company speaks on an issue or topic, there is a duty to tell the whole truth").

The Complaint makes clear that the Altria Defendants, through their own due diligence process and their understanding of JUUL's marketing practices, were aware of JUUL's illegal marketing to youth, which subjected JUUL to heavy regulatory scrutiny and litigation risk in the future, increasing the riskiness of Altria's investment in JUUL. ¶358. Defendants' statements that failed to provide a complete picture of the risks associated with the JUUL investment – which the Altria Defendants knew of – are actionable as a result. Courts in this Circuit have found actionable misstatements in similar situations.

For example, in *Kiken*, plaintiffs alleged that the corporate defendant, a hardwood and laminate flooring company, failed to disclose that its higher reported gross margins were not a result

-15-

of "legitimate 'sourcing initiatives' in China that reduced costs[,]" but rather were illegitimate and contrary to applicable regulations. 155 F. Supp. 3d at 598. Plaintiffs further alleged that statements concerning product quality were misleading because defendants knew of the source of the product and, as a result, "failed to disclose the high probability of regulatory violations or the existence of such violations . . . ." *Id*. at 604. The court reasoned that, "[e]ven if defendants were unaware of the falsity of their statements at the time they were made . . . .defendants' subsequent discovery of possible regulatory violations rendered their past statements misleading . . . ." *Id*. at 605.

Here, the Complaint's allegations of the Altria Defendants' unique understanding of JUUL's marketing practices (¶¶358 (CW-1 said "there was no doubt [that JUUL was marketing to underage users]."), 369, 379-382) rendered their statements regarding their commitment and intent to prevent underage use of tobacco products, and JUUL's intent and commitment to preventing underage consumption of JUUL's products, false and misleading for failing to disclose the high likelihood of regulatory and legal scrutiny that would result from JUUL's marketing. *Id*. This is particularly so because Altria's minority interest in JUUL provided JUUL complete control, such that Altria could not stop any illegal marketing practices, even if it wanted to. ¶¶384-385.

Altria was staking its only viable foothold in the e-cigarette market, on JUUL. However, the Altria Defendants failed to apprise investors of the illegal marketing practices at JUUL that would provide Altria with an opportunity to financially benefit from underage consumers, notwithstanding the MSA restrictions. ¶360. For example, on December 20, 2018, an analyst asked Willard directly how much of JUUL's business over the previous 12 months was derived from underage consumers. ¶468. Willard – without disclosing Altria's understanding that JUUL had aggressively marketed to youth, and that underage consumers made up a significant part of JUUL's business – responded that "[Altria] believe[s] it's quite a small percentage." *Id*. By discussing the relationship between underage purchasers and JUUL's revenue, Willard had an obligation to speak fully and truthfully.

-16-

*Singer*, 883 F.3d at 441; *see also Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016).  This statement was not just incomplete; it was false.

The Complaint further alleges, with particularity, that JUUL had been marketing its products to underage consumers, and that Altria was aware of these practices.  ¶¶352-361, 367, 377-382. Indeed, as the Altria Defendants point out, there was a litany of publicly available information about the youth vaping epidemic (high school usage increased from 1.5% in 2011 to 27.5% in 2019 (¶325)), and how JUUL was the poster company for youth usage given the design of JUUL products and the ease of access for youth users.[2]

The Altria Defendants' Class Period statements – about the benefit to Altria from its $12.8 billion investment and 35% ownership interest in JUUL, that JUUL's value had increased to $38 billion, that JUUL's mission was only to get current adult smokers to switch, and "that working with JUUL to accelerate its mission will have long-term benefits for adult smokers and our shareholders" (*e.g.*, ¶¶454, 456, 458, 462) – which failed to apprise investors of JUUL's underage marketing

---

[2]  The Altria Defendants attempt to argue that, at the pleadings stage, allegations from other lawsuits containing these allegations are inappropriate to make out a claim for securities fraud. Altria Defs. Br. at 24.  Relying principally on *In re BearingPoint, Inc. Securities Litigation*, they argue that "courts have repeatedly recognized, disputed allegations from other lawsuits are not a proper basis for asserting securities fraud."  525 F. Supp. 2d 759, 777 (E.D. Va. 2007), *aff'd in part, rev'd in part on other grounds*, *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172 (4th Cir. 2009).  However, in *BearingPoint*, the court found that allegations from government investigations unrelated to the alleged fraud and in the preliminary stages were "non-compelling." 525 F. Supp. 2d at 777.  But where allegations were independently verified, as is the case here, courts have held that at the pleadings stage, untested allegations from other lawsuits are properly used to establish securities fraud violations.  *See, e.g.*, *In re Bear Stearns Mortgage Pass–Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012) ("It makes little sense to say that information . . . which [the complaint] could unquestionably rely on if it were mentioned in a news clipping . . . is immaterial simply because it is conveyed in an unadjudicated complaint."); *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 214-15 (S.D.N.Y. 2019); *Hirsch v. Complex Media, Inc.*, 2018 WL 6984227, at *10-*11 (S.D.N.Y. Dec. 10, 2018); *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 516 n.10 (S.D.N.Y. 2016); *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 343 (S.D.N.Y. 2015); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622 (S.D.N.Y. 2014); *Vanleeuwen v. Keyuan Petrochemicals Inc.*, 2014 WL 3891351, at *3-*4 (S.D.N.Y. Aug. 8, 2014); *Martinez v. LVNV Funding LLC*, 2016 U.S. Dist. LEXIS 136613, at *11 (E.D.N.Y. Oct. 2, 2016).

activities and their impact on: (i) the benefits of the JUUL investment; (ii) the expected benefits of the investment; and (iii) the likelihood of regulatory action and substantial litigation, are actionable because they put the reasons for the investment in JUUL, and the associated risks of the JUUL investment, at issue. The Fourth Circuit, in *Singer*, recently held that there is a duty to disclose illegal conduct, even if it is uncharged or unadjudicated, as is the case here, if failing to disclose the information would make other statements misleading. 883 F.3d at 441. This concept is hardly novel. *See Menaldi*, 164 F. Supp. 3d at 581 ("duty to disclose uncharged wrongdoing can arise when a corporation puts the reasons for its success at issue, but 'fails to disclose that a material source of its success is the use of improper or illegal business practices[]'"); *see also In re Van der Moolen Holding N.V. Sec. Litig*., 405 F. Supp. 2d 388, 399-401 (S.D.N.Y. 2005) (holding statements that failed to disclose certain revenue was generated by illegal practices would "significantly alter the mix of available information"). The Altria Defendants argue it was appropriate for Altria to disregard public information about the youth vaping epidemic, and JUUL's involvement, because the information had not yet been proven. Altria Defs. Br. at 25. This may have been appropriate from a business perspective but, as explained in detail *infra*, that is not what Plaintiffs challenge.

What Plaintiffs do challenge is the failure to disclose the risks of Altria's investments in JUUL based on Altria's awareness of JUUL's marketing practices. ¶¶352-361, 367, 377-382. Indeed, Willard had broached the subject of the youth vaping epidemic at the time of Altria's investment. Altria Defs. Br. at 17-18. The crux of Plaintiff's allegations, and the reason Altria's Class Period statements were materially false and misleading, is that Altria was aware of JUUL's marketing practices, yet failed to disclose this understanding to its own investors. Indeed, the *Singer* court made no distinction between disclosing charged wrongdoing and uncharged or unadjudicated wrongdoing. Thus, while the Altria Defendants argue that "disclosure is not a rite of confession"

(Altria Defs. Br. at 25), they ignore that failing to disclose the illegal marketing to underage consumers under these circumstances made their Class Period statements misleading.

### a.      Defendants' Misstatements and Omissions were Material

"Materiality is an objective standard." *In re Willis Towers Watson plc Proxy Litig.*, 937 F.3d 297, 304 (4th Cir. 2019).  A fact is material if there is "a substantial likelihood that the disclosure of the . . . fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 656 (4th Cir. 2004) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).  Materiality requires an "inherently fact-specific finding." *Willis*, 937 F.3d at 304 (quoting *Basic*, 485 U.S. at 236).  And although materiality is a mixed question of law and fact, assessments of materiality are in most cases "peculiarly ones for the trier of fact." *Id*.  Resolving a question of materiality against the plaintiff at the motion to dismiss stage is inappropriate unless "no reasonable jury could find it substantially likely that a reasonable investor would find the fact at issue material in the 'total mix' of information." *Greenhouse*, 392 F.3d at 657; *see also Singer*, 883 F.3d at 440.

The Complaint pleads in detail that Altria was aware that JUUL had greater success in the e-cigarette market (¶¶328-341), and that the e-cigarette market was growing faster than the traditional combustible cigarette market.  ¶¶332-338.  Thus, the materiality of the facts surrounding the JUUL investment, Altria's only viable option for a future in the e-cigarette market, cannot legitimately be contested.  As such, this Court should disregard the Altria Defendants' arguments that their statements and omissions were merely "puffery" or "opinions" that no reasonable investor would have considered in their investment decision.  Altria Defs. Br. at 20-22.

"Indefinite statements of corporate optimism, also known as puffery, are generally non-actionable, as they do not demonstrate falsity." *In re Under Armour Sec. Litig*., 342 F. Supp. 3d 658, 676 (D. Md. 2018).  However, even statements that may be considered puffery must "be consistent

-19-

with reasonably available data and should not misrepresent existing facts." *In re Conventry Healthcare Sec. Litig.*, 2011 WL 1230998, at \*35 (D. Md. Mar. 30, 2011); citing *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 356-57 (S.D.N.Y. 2006). Here, Plaintiffs allege that Altria was well-aware of JUUL's aggressive marketing to underage consumers prior to Altria's investment in JUUL.  ¶¶352-361, 367, 377-382.  Thus, statements that failed to disclose those facts, and which did not align with the facts and data that Altria possessed regarding JUUL, are actionable and cannot be cast aside as mere puffery.

The Altria Defendants' attempt to shield various statements as statements of "opinion" is also meritless.  A statement of opinion is actionable if the opinion omits material information that renders it misleading to an ordinary investor or if the speaker did not hold the beliefs professed.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188-90 (2015); *see also In re Scana Corp. Sec. Litig.*, 2019 WL 1427443, at \*9 (D.S.C. Mar. 29, 2019). Here, the Altria Defendants stated that they had conducted thorough due diligence of JUUL's marketing and regulatory compliance and litigation risk (¶481) and assured investors that JUUL never intended to market to youth (¶462) but omitted that Altria was in possession of material facts about JUUL's intentional marketing to children and the specific risks it posed.  ¶¶352-361, 367, 377-382.  All of the statements of opinion identified by the Altria Defendants clearly omitted this information, making them actionable.

Conveniently, the Altria Defendants do not address Willard's statement of opinion that only "quite a small percentage" of JUUL's revenue was derived from sales to underage consumers[3] (¶468), a belief that Willard could not possibly have held given the abundance of publicly available

---

[3]    Defendants relegate this to a passing citation in a string cite of paragraph references they lump together as discussing "the parties' commitment to preventing underage usage of e-vapor product." Altria Defs. Br. at 23.

information about the youth vaping epidemic prior to Altria's investment, and the knowledge possessed by Altria after its due diligence process, a process similar to that undertaken by Reynolds American before it abandoned its efforts to conduct business with JUUL.  ¶354.

### b.      The Risk Disclosures in Altria's 2018 Form 10-K Were Inadequate

The Altria Defendants' reliance on generic and boilerplate risk disclosures does not absolve them of liability because the risks they warned of had already come to fruition.  Altria Defs. Br. at 18, 25-26.  The Complaint's allegations make clear that by the time the risk disclosures relied upon by the Altria Defendants were included in Altria's SEC filings, Altria was already aware of JUUL's marketing practices, and had already received a letter from the FDA requiring Altria (and JUUL) to explain their plan for curbing youth usage.  ¶473.  Courts have routinely held that risk disclosures cannot protect against a risk that has already transpired.  *See Epstein*, 2015 WL 2365701, at *6 (statements not protected if risk disclosures "purport to warn investors of risks concerning [Defendants'] practices of which Defendants were already aware").  Here, at the latest, it was clear to Altria by September 2018, that JUUL's youth marketing practices had been ongoing, opening the door to regulatory scrutiny.  *See, e.g.*, ¶¶352-361, 367, 377-382.

The Fourth Circuit observed in *Singer*, relying on *Meyer*, that "[a] generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability."  *Singer*, 883 F.3d at 442.  In *Meyer*, the defendant had failed to disclose ongoing pollution violations that subjected the defendant to massive regulatory action and expenses.  Similar to the case here, the defendant in *Meyer* had access to internal information that these risks had already materialized, yet couched the materialized risks as possibilities in their risk disclosures in their 10-K filings.  *Meyer*, 761 F.3d at 251.

The Complaint pleads in detail that, internally, Altria was aware of JUUL's marketing to youth; thus, the risk warned of was not speculative, but inevitable.  Atria's Class Period statements,

-21-

which failed to disclose the illegal marketing practices at JUUL, were materially misleading and Altria's boilerplate risk disclosure warning of the possibility that the "expected benefits of the JUUL transaction. . . may not materialize. . . due to. . . regulatory risks. . ." did not correct the misstatements.  ¶473; *see In re Symbol Techs., Inc. Sec. Litig.*, 2013 U.S. Dist. LEXIS 171688, at *51 (E.D.N.Y. Dec. 5, 2013) ("Superficially warning of possible risks while failing to disclose critical facts. . . was akin 'to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'").

Further, given the boilerplate nature of the risk disclosures that the Altria Defendants claim fully apprised investors of the risks associated with the JUUL investment (Altria Defs. Br. at 18),[4] resolution of the issue at the motion to dismiss stage is inappropriate.  Courts have routinely held "the adequacy of cautionary language is a question of fact, and, typically, is not a question to be resolved on a motion to dismiss." *Ollila v. Babcock & Wilson Enters.*, 2018 WL 792069, at *5 (W.D.N.C. Feb. 8, 2018).

The Sarbanes-Oxley ("SOX") certifications signed by Willard and Gifford are false and misleading for similar reasons.  ¶¶475, 486, 494.  SOX certifications guarantee that the signatories lacked knowledge of any material misstatement or omission in the company's financial statements. Here, the Complaint clearly pleads that Altria was internally aware of the facts regarding JUUL's

---

[4]    The Altria Defendants rely on *In re UBS Auction Rate Securities Litigation*, 2010 WL 2541166 (S.D.N.Y. June 10, 2010), to argue their risk disclosures and SEC filings were adequate to apprise investors of the risks of Altria's JUUL investment.  Altria Defs. Br. at 18.  However, in *UBS*, where plaintiffs alleged a stock manipulation scheme under Rule 10b-5(a) and (c), the court held that because defendants had ***fully disclosed*** the conduct complained of, there had been no misrepresentation or deceitful act.  2010 WL 2541166, at *18.  That is precisely the opposite here, where Plaintiffs allege the Altria Defendants failed to disclose the known risks regarding JUUL's underage marketing and revenues, which were contrary to statements made by Altria and JUUL. *See, e.g.*, ¶¶468, 488-489.

illegal marketing practices, and yet failed to include a discussion of the risks of increased regulatory scrutiny and protracted litigation still haunting JUUL.  *See, e.g.*, ¶¶358-359, 367, 369, 377-382. Thus, Willard and Gifford were aware of material facts and risks that they did not disclose in their relevant SEC filings at the time that they signed their SOX certifications; as such, their statements in the SOX certifications were false and misleading.  *See Kanefsky v. Honeywell Int'l Inc*., 2020 WL 2520669, at *5 (D.N.J. May 18, 2020) (SOX certifications adequately alleged to be false or misleading where defendants relied on information they previously indicated was unavailable or unreliable, making their statement regarding liability estimates that "[defendants did] not believe that [they had] a reasonable basis for. . . " false).

### 2. Plaintiffs Allege Fraud, Not Mismanagement

The Altria Defendants mischaracterize the Complaint, arguing that Plaintiffs allege only "garden variety mismanagement," not fraud.  Altria Defs. Br. at 19.[5]  However, the Complaint is replete with specific allegations of false statements and omissions of fact known to or recklessly disregarded by the Altria Defendants, *after* their investment in JUUL, easily satisfying Section 10(b)'s requirements for alleging fraud, not mismanagement.

The Complaint is exhaustive in its chronicling of adverse information known to, or recklessly disregarded by, the Altria Defendants concerning JUUL's marketing practices, and the risks associated with investing in JUUL despite that knowledge, rendering false and misleading the Altria Defendants' Class Period statements regarding: (i) the purpose of the JUUL investment; (ii) Altria's understanding of the effect of underage consumption on JUUL's financial performance; (iii) the risk of regulatory scrutiny; (iv) JUUL's intention regarding youth usage of its products; (v) Altria and

---

[5]   Because Plaintiffs do not allege mismanagement but rather false and misleading statements by Defendants, as discussed herein, Defendants' citations to *Ciresi v. Citicorp*, 782 F. Supp. 819 (S.D.N.Y. 1991) and *USF & G Corp. Securities Litigation*, 1993 WL 740188 (D. Md. Feb. 11, 1993), are misplaced and inapposite.

JUUL's commitment to preventing youth usage of tobacco and vaping products; and (vi) the Altria Defendants' intent with respect to Altria's JUUL investment. *See*, *e.g.*, ¶¶454, 456, 458, 460, 462, 466, 468, 471, 473, 481, 490. Thus, it is clear that, contrary to the Altria Defendants' arguments, Plaintiffs' claims do not stem from the decision to invest in JUUL *per se*; rather they arise from the false and misleading statements and omissions aimed at leading investors to purchase Altria's stock at inflated prices resulting from these misrepresentations. In other words, Plaintiffs do not seek a recovery in this action because of poor business decision-making, but for the misrepresentation and concealment of material facts, regarding the true risk of purchasing Altria securities.

The Altria Defendants rely heavily on *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462 (1977), and its progeny, arguing that Plaintiffs' allegations are really just claims for mismanagement, *i.e.*, that Altria overpaid for the JUUL investment, and do not rise to the level of deception. Altria Defs. Br. at 1-2, 16. In *Santa Fe*, Plaintiffs alleged a breach of fiduciary duty by majority shareholders in a short-form merger for failure to provide required notice or fair value for their shares "without any deception, misrepresentation, or nondisclosure" alleged. 430 U.S. at 476. This did not give rise to actionable securities fraud claims because plaintiffs failed to plead any deception. However, where a complaint pleads deception, misrepresentation, or omission – like here – securities fraud liability can attach, even in the context of corporate mismanagement. *See id.* at 475-76 & n.15 (citing cases).

Indeed, Plaintiffs allege the specific misstatements and omissions that were false and/or misleading as a result of Altria's knowledge of JUUL's marketing practices prior to, and during, the Class Period, putting it in a unique position to understand the likelihood of protracted litigation and regulatory action that JUUL would be exposed to. For example, the Complaint pleads in detail that the Altria Defendants were aware that JUUL's intent was not to convert adult smokers to its products (¶455); that JUUL had never been approved as a reduced harm tobacco product (¶456); that Altria's

-24-

and JUUL's intent was to market JUUL products to youth (¶¶462, 466); and that the Altria Defendants were aware of how much of JUUL's revenue came from underage consumers based on their extensive due diligence process.  ¶468.  These allegations and other similar allegations of misstatements or omissions a claim for securities fraud.

### 3.   The Altria Defendants' Attempt to Invoke a Premature Truth on the Market Defense Should Be Rejected

The Altria Defendants contend that information about JUUL's marketing to youth – which Plaintiffs allege should have been disclosed – was already publicly available in the market before the start of the Class Period.  *See* Altria Defs. Br. at 16-19.  As an initial matter, this effort at dismissal, which inappropriately invokes the truth on the market doctrine, should be rejected as courts in this Circuit routinely hold that the truth on the market defense is highly fact specific and inappropriate for consideration at the motion to dismiss stage.  *See, e.g., In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 618 (S.D. W. Va. 2012) ("Defendants' 'truth-on-the-market' defense . . . would require a factual determination that is not permissible at the 12(b)(6) stage of litigation . . . .).

Moreover, a comparison of the actual information Defendants identify as disclosed in the public regarding youth usage of e-cigarettes prior to the JUUL investment versus what was subsequently disclosed further underscores the actionability of the Altria Defendants' statements. Contrary to what the Altria Defendants argue, the documents identified by the Altria and JUUL Defendants do not establish that it was publicly known prior to the Class Period that JUUL was intentionally marketing to children.  For example, some articles merely identify the increase in teen use and the popularity of JUUL.  *See* JUUL Exs. 4, 13.[6]  The vast majority of the press releases, letters and articles demonstrate that the public did not know of Defendants' scheme as they state that certain attorneys general, government officials or the FDA were concerned about the increase in teen

---

[6]   The exhibits attached to the JUUL Defendants Brief in Support of their Motion to Dismiss are referred to herein as "JUUL Ex."  ECF No. 120.

use, were beginning investigations or were requesting information from JUUL. *See* JUUL Exs. 2, 6, 9, 10, 11, 12; Altria Exs. 2, 6, 7, 8, 35, 36.  None of these documents include accusations that JUUL was intending underage use of its products.  Indeed, no attorney general filed any lawsuit against JUUL until May 15, 2019, midway through the Class Period.  While Defendants cite to a few articles that mention a consumer lawsuit filed, even those articles contain only bald assertions that JUUL advertised to teens.  JUUL Exs. 5, 8, 15; Altria Ex. 4.  It was not until the Congressional hearing in 2019 and the lawsuits filed by over forty attorneys general that the mountain of evidence demonstrating JUUL's intention to get teens to use its products was pieced together.  For example, the AG complaints laid out JUUL's advertisements on Nick Jr. and Cartoon Network and the Congressional hearing disclosed internal JUUL emails concerning their tactics.  Even if certain evidence of JUUL's intentional scheme had been disclosed prior to the Class Period, weighing it against what was still undisclosed is a fact-intensive analysis not appropriate on a motion to dismiss.

Dismissal at this stage would be particularly inappropriate given that Defendants did not merely fail to disclose this information, but vehemently denied that JUUL ever targeted teens.  As the Ninth Circuit explained in the widely-cited *In re Apple Computer Securities Litigation*, "the investing public justifiably places heavy reliance on the statements and opinions of corporate insiders."  886 F.2d 1109, 1116 (9th Cir. 1989).  Therefore, to succeed on a truth-on-the-market defense, "any material information which insiders fail to disclose must be transmitted to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by the insiders' one-sided representations."  *Id*. (citing *Basic*, 485 U.S. 224 at 992); *Id*. at 1114 ("Ordinarily, omissions by corporate insiders are not rendered immaterial by the fact that the omitted facts are otherwise available to the public.").  With this language, the court in *Apple* emphasized that even where information is publicly available from third party sources the issue is whether "full disclosures by [the defendant] would have 'significantly altered the "total mix"

of information made available.'"  *Id*. at 1115.  There can be no doubt that if JUUL had admitted its intention to target teens prior to the Class Period, a reasonable investor would have found that to be material.

In any event, the determination of what facts were and were not available is obviously a highly fact specific inquiry and improper at the motion to dismiss stage.  *See KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 WL 3981236, at *11 (D.S.C. July 25, 2016) (because the defense is "intensely fact-specific and [] rarely an appropriate basis for dismissing a §10(b) complaint for failure to plead materiality," the Court was "unprepared to hold that Defendants made [their] disclosures with such intensity and credibility that it counterbalanced any alleged misleading information given by the Company earlier.").  As the Fourth Circuit has long held, "[t]he impression that [the] mix of information conveyed [to the market] cannot be resolved as a matter of law."  *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1262 (4th Cir. 1993).

**B.    Plaintiffs Adequately Plead the Existence of a Scheme to Defraud Shareholders**

As detailed in the JUUL Opp. III.C., the Altria Defendants and the JUUL Defendants are liable for scheme liability.  In addition to the arguments discussed there, which Plaintiffs incorporate by reference, the Altria Defendants – knowing that Altria's investment in JUUL negotiated by defendant Crosthwaite  was imminent (¶348) – misled the FDA into believing that they were taking action against youth vaping by removing all flavored pods, when in truth they did so as a condition of the JUUL investment so that JUUL could continue to offer its own mint flavor, which was critically important to keeping the youth demographic.  ¶¶390-391.  This is precisely the type of conduct for which courts have found "scheme liability" because it is "distinct from their false statement claims."  *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950, 981-82 (D. Minn. 2014).  In *Medtronic*, the court allowed a scheme liability claim where Medtronic designed clinical trials in a manner that elicited biased results and Medtronic personnel

-27-

edited journal articles published by physician consultants and failed to disclose that Medtronic paid

the consultants millions of dollars during the drafting process.  The court explained:

> Plaintiffs' scheme and course of conduct claims are distinct from their false statement claims.  Their scheme liability theory is that Defendants' actions in manipulating the studies (as opposed to their statements) — had the effect of artificially propping up Medtronic stock prices on account of confidence in INFUSE sales.  This is distinct from their false statement claims . . . .

*Id.* at 981-82.[7]

The Altria Defendants are also subject to scheme liability for their dissemination in Altria's

December 20, 2018 press release of Defendant Burns' false statement that "[JUUL's] intent was

never to have youth use JUUL products."  ¶462.  As the Supreme Court just held in *Lorenzo v. SEC*,

"dissemination of false or misleading statements with intent to defraud can fall within the scope of

subsections (a) and (c) of Rule 10b-5. . . even if the disseminator did not "make" the statements and

consequently falls outside subsection (b) of the Rule."  139 S. Ct. 1094, 1100-01 (2019).

### C.    Plaintiffs Plead a Strong Inference of Scienter

To establish scienter, "a plaintiff must demonstrate 'that the defendant acted with "a mental

state embracing intent to deceive, manipulate, or defraud.""'  *Singer*, 883 F.3d at 443 (citing *Zak v.*

*Chelsea Therapeutics Int'l, Ltd*., 780 F.3d 597, 606 (4th Cir. 2015).  "Allegations of reckless

conduct can satisfy the level of scienter necessary to survive a motion to dismiss."  *Id.* (citing *Matrix*

*Capital*, 576 F.3d at 181).  The Fourth Circuit has "defined a reckless act in the § 10(b) context as

one 'so highly unreasonable and such an extreme departure from the standard of ordinary care as to

present a danger of misleading the plaintiff to the extent that the danger was either known to the

---

[7]    A strong inference of scienter is alleged for the reasons discussed *infra*, III.C.  The reliance element may be shown through the *Basic* and *Affiliated Ute* presumptions.  *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc*., 552 U.S. 148, 159 (2008) (citing *Basic*, 485 U.S. at 243); *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 154 (1972).

defendant or so obvious that the defendant must have been aware of it." *Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 313 (4th Cir. 2009).

When evaluating the strength of scienter inferences, courts must engage in a "comparative analysis" of the allegations and "a complaint will not be dismissed so long as the malicious inference is at least as compelling as any opposing innocent inference." *Zak*, 780 F.3d at 606. When evaluating inferences of scienter, courts "consider the scienter allegations holistically and accord those allegations 'the inferential weight warranted by context and common sense.'" *Id.* (quoting *Matrix Capital*, 576 F.3d at 183); *see also Epstein*, 2015 WL 2365701, at *7.

Finally, because "allegations must be considered collectively," the "absence of a motive allegation is not fatal." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007). A complaint must allege particular facts supporting a "strong inference" of scienter. But the Supreme Court has emphasized this inference "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. "The court must determine 'whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 547 (4th Cir. 2017).

As detailed herein, the Complaint raises an inference of scienter at least as compelling as any competing inference.

### 1. Plaintiffs Allege a Strong Inference of Scienter for the Altria Defendants

"Classic evidence of scienter" exists when defendants possess facts showing their statements were false when made. *SEC v. Pirate Inv. LLC*, 580 F.3d 233, 243 (4th Cir. 2009). Here, the Complaint more than adequately alleges that the Altria Defendants were aware of the illegal marketing practices undertaken by JUUL prior to Altria's investment, which increased the substantial risk of regulatory action and litigation against JUUL.

-29-

The Complaint's allegations in this regard are bolstered by the allegations of three CWs[8] who make clear that, internally, Altria was well-aware of JUUL's marketing practices, but was fixated on investing in JUUL to gain a foothold in the booming e-cigarette market. ¶¶343-386. CW1, who ultimately became the President and CEO of Altria's subsidiary MarkTen (Altria's attempt at e-cigarettes prior to its JUUL investment), makes clear that Willard, even prior to his tenure as President and CEO of Altria, was singularly focused on acquiring JUUL. CW1 recounts Willard, in his prior role as Chief Operating Officer of Altria stating that "JUUL's the answer." ¶348. Pertinently, CW1 was tasked with figuring out a path forward if Altria would be unable to invest in JUUL. *Id.* CW1 also makes clear that Altria was aware that "JUUL was winning and [Altria was] losing" with respect to the e-cigarette market. ¶349. Further, allegations attributed to CW1 and CW3 establish that Altria was considering an investment in JUUL as early as 2017. ¶¶350-351.

CW1 makes clear that JUUL's practices of marketing to youth were well known within Altria: "[e]verybody knew at this point that there was a youth issue," and that "there was no doubt [that JUUL was marketing to underage users]." ¶358. This sentiment was echoed by CW2. ¶359.

---

8    The Altria Defendants' reliance on *Higginbotham v. Baxter*, 495 F.3d 753 (7th Cir. 2007), an out of circuit opinion, to dissuade the Court from crediting the strong allegations of scienter leveled against Defendants, is misplaced. Altria Defs. Br. at 33. There, plaintiffs made no attempt to adequately describe the CWs, prompting the court to question their credibility. Here, Plaintiffs more than adequately describe the CWs relied upon, removing the concerns raised in *Higginbotham*. *See* ¶¶343-345; *Epstein*, 2015 WL 2365701, at *5 (sufficiency of misrepresentation allegations not undermined "where the sources have been identified and described with sufficient particularity to lend credibility to the statements") (citing *Hunter*, 477 F.3d at 174); *see also Yates v. Municipal Mortg. & Equity, LLC*, 744 F.3d 874, 885–886 (4th Cir. 2014). Moreover, courts in the Seventh Circuit post-*Higginbotham* make clear that the narrow facts in *Higginbotham* were limited. *See City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *17 (N.D. Ill. Feb. 13, 2013); *see also Van Noppen v. Innerworkings, Inc.*, 136 F. Supp. 3d 922, 934 (N.D. Ill. 2015) ("[t]here is no categorical discount of confidential witness allegations where, as here, plaintiff has described the witnesses with enough detail that this court can determine that the confidential witnesses have a foundation for their allegations"). Indeed, the Seventh Circuit has explained that "the absence of proper names does not invalidate the drawing of a strong inference from informants' assertions." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 712 (7th Cir. 2008).

Moreover, not only was it clear within Altria that JUUL was marketing to youth, it was clear how JUUL was doing so. CW1 explained that Altria, which had specific policies and guidelines against targeting underage users (including a policy against social media marketing), was aware that JUUL's presence on social media was leading to youth usage of JUUL products. ¶¶361-362. Moreover, allegations attributed to CW1 make clear that not only was Altria aware of the youth marketing issues at JUUL, but Altria had already determined that its own line of e-cigarettes, which only would be marketed to adults, was not worth the effort and that obtaining or investing in JUUL was the only way forward in the e-cigarette business. ¶375. Allegations attributed to CW2 describe a common understanding within Altria that while JUUL was marketing e-cigarettes to youth, Altria itself would not have been able to (because of the MSA). ¶360. CW1 also said that Altria believed it could remedy the issues (¶¶379-382) if it assumed a controlling interest in JUUL, which did not happen as Altria acquired only a minority stake, leaving JUUL with full operational control. ¶¶383-385.

When considered holistically, the allegations of the Complaint, including those attributable to the CWs, establish that the Altria Defendants were aware of JUUL's illegal marketing practices prior to Altria's investment, or recklessly disregarded these facts, yet failed to disclose the risks associated with the increased regulatory scrutiny and litigation against JUUL. Thus, any statement that did not disclose these facts is actionable.[9]

Moreover, throughout the Class Period, the Altria Defendants frequently discussed youth usage of e-cigarettes and their understanding of the importance of youth purchases to JUUL's financial results, ¶468, further supporting scienter. *See KBC Asset Mgmt.*, 2016 WL 3981236, at *9 (finding that "the most powerful evidence of scienter is the content and context of [defendants']

---

[9]    Far from "assertions 'that a defendant must have known [their] statement was false and misleading because of his or her position in the company'" (Altria Defs. Br. at 31), Plaintiffs allege, in detail, a multitude of facts evidencing a cogent inference of scienter. ¶¶525-533.

statements themselves"). This is particularly poignant here, given investors' reliance on Altria to apprise them of the risks that it knew of with regard to JUUL and the youth vaping epidemic.

Courts have repeatedly held that if executives speak about a topic of "critical importance," they cannot hide their heads in the sand and ignore crucial information that is at their fingertips. *City of Livonia Emps.' Ret. Sys. v. Wyeth*, 2010 WL 3910265, at \*6, \*18-\*19 (S.D.N.Y. Sept. 29, 2010). Where, as here, "facts that contradict a high-level officer's public statements were available when the statements were made, it is reasonable to conclude that the speaker had intimate knowledge of those facts or should have known of them." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004).[10]

### a.   Altria Conducted Substantial Due Diligence on JUUL Prior to its Investment

The substantial and detailed due diligence process undertaken by Altria prior to its investment in JUUL supports a cogent inference of scienter. ¶¶353-357. Throughout this process, as detailed in the Complaint, Altria had access to information concerning JUUL's marketing practices as well as information about its products, including the nicotine formulations for its JUUL pods.

Companies undertaking acquisitions or large investments routinely endeavor to be as thorough as possible when "diligencing" the target company; and this case is no exception. Courts have held that an inference of scienter is supported in situations where it is clear that a company has undertaken a robust diligence process. *See Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 594 F. Supp. 2d 945, 950 n.2 (N.D. Ill. 2009) ("Companies considering a merger frequently share 'significant quantities of competitively sensitive information regarding their respective businesses in the course

---

[10]   *See also In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012) ("highly improbable" that defendant who publicly described company's finances did not inquire into basis for statements); *Reese v. Malone*, 2014 WL 555911, at \*9 (9th Cir. Feb. 13, 2014) ("[T]he inference that Johnson did not have access to the corrosion data is directly contradicted by the fact that she specifically addressed it in her statement.").

of investigatory "due diligence[.]""""); *see also In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293, at *20 (W.D. Wash. Apr. 19, 2019) ("inferences [of scienter] seem particularly appropriate when also considering . . . that [defendant] performed detailed due diligence regarding the company's legal compliance before its merger with Trulia"). Even more so here, where a fellow tobacco giant, Reynolds American, was rumored to have called off an investment in JUUL after Reynolds "wasn't comfortable" with investing after it undertook its due diligence process; the inference that red flags existed and were easily ascertainable is cogent. ¶354.[11]

Further, Willard's misleading statements about the amount of revenue generated from underage sales adds to the inference that Altria had undertaken substantial diligence or at least recklessly disregarded these issues. *See*, *e.g.*, *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 639 (E.D. Va. 2000) ("[P]roblems . . . with a major impact on revenues are more likely to help support a strong [inference] of scienter," and, "certainly makes less credible the inference that the Defendants were not aware of or did not recklessly disregard the [undisclosed facts]"). Because Altria undertook a substantial due diligence process prior to investing in JUUL (¶¶167, 352, 408, 530), investors were justified in relying on Willard's statements concerning the amount of revenue JUUL had derived from sales to underage consumers. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 n.43 (3d Cir. 2009) ("Of course, if McGuire simply had no idea whether there was unusual discounting, and nonetheless confidently denied its existence, this would also have presented an obvious risk of misleading investors."). Willard either knew that a large amount of JUUL's revenue had been derived from underage consumers and was reckless in disregarding those

---

[11]   Just having access to JUUL's confidential information regarding its marketing practices also supports the Altria Defendants' scienter. *See Turka v. S.C. Pub. Serv. Auth.*, 2020 U.S. Dist. LEXIS 31968, at *21 (D.S.C. Feb. 25, 2020) ("corporation's scienter sufficiently pled where allegation that individual defendant 'held high positions within [the corporation] during the class period, and therefore had access to confidential information about the state of the Company as a result'").

facts, or was reckless in making the statement while not knowing the truth behind JUUL's revenue origination. *See KBC Asset Mgmt.*, 2016 WL 3981236, at *9 (when a defendant "is 'specifically asked' . . . denials of any issues can support a strong inference of scienter").

Moreover, additional allegations provided by CW3 make clear that Altria was particularly interested in JUUL's marketing and advertising, and CW3's report detailing CW3's research and conclusions about JUUL's marketing practices was given to senior officers, (which he/she was relatively certain included CW1 – who confirmed that there was no doubt that JUUL was marketing to youth). ¶¶355-357.

These allegations, in addition to the mounting public attention and regulatory scrutiny of JUUL and the e-cigarette market, all support a strong inference of scienter because the Altria Defendants were at least reckless in disregarding these facts when speaking about Altria's investment in JUUL, and failed to inform investors of these risks. *See generally Reese*, 2014 WL 555911, at *17 ("[i]n light of the magnitude of the violations, the immense public attention . . . and the contemporaneous documents demonstrating [defendants'] awareness . . . we find it 'absurd' that [defendants' were] not aware . . . of [JUUL's] significant, existing compliance issues[.]").[12]

### b. Additional Facts Probative of a Cogent Inference of Scienter

The Complaint provides numerous additional facts that further support a strong inference of scienter. *First*, Willard and Gifford's positions within Altria, CEO and CFO respectively, are "relevant to the court's holistic analysis of scienter." *Yates*, 744 F.3d at 890; *see also In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 785 (E.D. Va. 2015) (holding the individual

---

[12] The Altria Defendants' attempt at sidestepping these allegations, relying on *Saltz v. First Frontier, L.P*., 485 F. App'x 461 (2d Cir. 2012), misses the mark entirely. Altria Defs. Br. at 32. In *Saltz*, the plaintiffs attempted to plead scienter based solely on allegations related to due diligence undertaken related to a Ponzi scheme, and the advisor's fee associated with the investments. These allegations fall far short of the totality of the allegations here, including due diligence, CW allegations, and other indicia of scienter.

defendants' senior executive positions "augment[] the other allegations of intimate involvement pleaded elsewhere in the [ ] Complaint").  Beyond mere allegations of corporate position, the Complaint alleges that Willard was obsessed with obtaining or investing in JUUL (¶348), and although aware of the issues with JUUL's illegal marketing and the risks associated, nonetheless approved an investment of a 35% stake in JUUL.  ¶¶352-361, 367, 377-382, 384-385.

*Second*, Willard's resignation from Altria on April 17, 2020, which analysts and media attributed to the fallout from the JUUL investment, further supports scienter when considered with the Complaint's other allegations.  ¶523.  Courts have held that corporate resignations, when taken together with other scienter allegations, can add to the inference of scienter.  *See, e.g., Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 671 (D.S.C. 2016).  Here, Willard's resignation occurred shortly after the news that the SEC was investigating whether or not Altria fully disclosed the risks of its investment in JUUL.  ¶¶521, 523.  These facts, coupled with the media reaction to Willard's resignation, support a cogent inference of scienter.

*Third*, on February 21, 2020, *The Wall Street Journal* reported that the SEC had launched an investigation into whether Altria fully disclosed the risks of the JUUL investment to its shareholders.  ¶521.  Courts have held that the existence of a government investigation supports an inference of scienter.  *See, e.g., In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 353, 380 (E.D.N.Y. 2013) ("[C]ourts have considered a governmental investigation as one piece of the puzzle when taking a 'holistic' view of the purported facts as they relate to scienter.").  Here, the fact that the SEC is investigating the very same disclosures as Plaintiffs supports the plausibility and seriousness of these allegations.

*Fourth*, the Complaint alleges that Willard and Gifford signed SOX certifications that misrepresented and omitted a discussion of the risks related to the JUUL investment, and omitted facts germane to JUUL's illegal marketing practices.  ¶¶475, 486, 494.  As discussed at length *supra*, omissions of these known risks and the facts surrounding JUUL's illegal marketing practices

rendered other Class Period statements false or misleading, including the statements in Altria's relevant SEC filings. ¶¶471, 473, 483, 492. Courts have found that "[a]n inference of scienter from these certifications is appropriate where, as here, 'the complaint asserts facts indicating that, at the time of certification, defendants knew or consciously avoided any meaningful exposure to the information that was rendering their SOX certification erroneous." *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F.Supp.2d 683, 712 n.6 (E.D. Mich. 2010).

### c.    Plaintiffs Have Adequately Pled the Altria Defendants' Motive

Again mischaracterizing Plaintiffs' allegations as a claim of mismanagement, the Altria Defendants contend that Plaintiffs fail to plead a motive to commit fraud. Altria Defs. Br. at 29-30.[13] *First*, to survive a motion to dismiss, plaintiffs are not required to allege that defendants had any unique motive to commit fraud. *See Tellabs*, 551 U.S. at 325 ("[T]he absence of a motive allegation is not fatal" to a strong inference of scienter.). Further, "under a holistic analysis, any factor by itself is inadequate to reveal or refute the presence of scienter." *See Epstein*, 203 F.Supp.3d at 671.[14]

Contrary to the Altria Defendants' assertion that the Complaint is devoid of motive allegations, the Complaint alleges that Willard was motivated to misrepresent the risk of Altria's

---

[13]    As explained *supra*, Plaintiffs do not challenge the decision to invest in JUUL, nor the valuation ascribed to JUUL by the Altria Defendants. Plaintiffs challenge the failure to disclose material facts that, *inter alia*, concealed the true risks of Altria's investment in JUUL. Thus, Defendants' arguments on this point, Altria Defs. Br. at 29, are a red herring.

[14]    The Altria Defendants' reliance on *Phillips v. LCI International, Inc.*, 190 F.3d 609 (4th Cir. 1999), is misplaced. Altria Defs. Br. at 23, 29, 30. There, the court was faced with a vastly different set of facts, where defendants were alleged to have made statements that intentionally depressed the value of the stock. In that context, it is not hard to understand the court's hesitancy to ascribe scienter to holders of a large amount of defendants' stock. Here, though, Plaintiff expressly alleges that the misstatements and omissions were made to sustain the value of Altria stock, making *Phillips* inapposite. Moreover, Defendants rely on case law preceding the Supreme Court's decision in *Tellabs*, which (improperly) weighed a lack of motive allegations against Plaintiffs. *See In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 576 (D. Md. 2005).

JUUL investment because he desperately wanted to invest in JUUL, regardless of the risk, and wanted investors to applaud his decision.[15] Indeed, had he disclosed the full extent of the risks of the JUUL investment that were known to, or recklessly disregarded by him, there would likely have been significant backlash from investors. ¶¶526, 528. Courts in this circuit have observed that "while allegations of motive and opportunity that are applicable to every corporate officer are not necessarily sufficient to establish a strong inference of scienter, these allegations are nonetheless relevant and meaningful in considering the totality of the circumstances." *Genworth*, 103 F. Supp. 3d at 785 (citing *MicroStrategy*, 115 F. Supp. 2d at 642-643). Here, the Complaint alleges facts suggesting that not only was Altria staking its future on JUUL, but Willard had targeted JUUL as Altria's savior from even prior to his tenure as President and CEO. ¶348. It was understood within Altria that JUUL was "winning" in the e-vapor category, and Altria needed to respond. While generic corporate purposes may be insufficient, these allegations make clear that Altria and Willard were staking their professional futures and reputation on the JUUL investment, intensifying the allure of misrepresenting the high magnitude of risk with the JUUL investment. *See Genworth*, 103 F. Supp. 3d at 786 (finding similar allegations that defendant had "bet his job on long-term care insurance" as further indicia of motive allegations and scienter).

Faced with these allegations, the Altria Defendants mischaracterize Plaintiffs' allegations of fraud as mismanagement, and illogical mismanagement at that. *See* Altria Defs. Br. at 29. In doing so, Defendants ignore that "irrational schemes have as much potential to defraud investors as do rational schemes." *Robbins v. Moore Med. Corp.*, 788 F. Supp. 179, 191 n.8 (S.D.N.Y. 1992).

---

[15] The Altria Defendants' argument that because Willard and Gifford owned shares of Altria stock when Altria invested in JUUL, Plaintiffs have failed to allege motive, is inapposite. *See In re DVI, Inc. Sec. Litig.*, 2010 U.S. Dist. LEXIS 92768, at \*36 (E.D. Pa. Sept. 3, 2010) ("continued ownership does not negate the inference that Defendant's failure to know about the fraud was extremely reckless"); *see also MicroStrategy*, 115 F. Supp. 2d at 647 (insiders may hold shares "to hedge against the unforeseen or to obscure the insider trading from the SEC").

**d.    The Complaint Adequately Alleges Corporate Scienter**

In the Fourth Circuit, contrary to what Defendants argue, Altria Defs. Br. at 36, n.12, a plaintiff must allege facts supporting a strong inference of scienter with respect to an authorized agent of the corporate defendant.  Plaintiffs have more than adequately alleged a cogent inference of scienter against Willard, Gifford, and Crosthwaite (respectively, the CEO and CFO of Altria, and the officer responsible for making the JUUL investment happen), and have thus alleged scienter against Altria.  *See Hunter*, 477 F.3d at 184 (corporate scienter adequate when a plaintiff alleges "facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation, since corporate liability derives from the actions of its agents").

Even if the Court determines that the Complaint fails to plead scienter as to the individual defendants, there can be no doubt that someone in Altria's management had the requisite scienter. "All that is required [to plead corporate scienter] is that the pleaded facts create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 276 (S.D.N.Y. 2014)."[I]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

Here, it required dozens, if not hundreds, of Altria employees to conduct the due diligence of JUUL for this massive investment (which Altria maintains was extremely thorough). Moreover, youth usage of JUUL had skyrocketed and was of critical importance to Altria. Thus, there is no plausible inference that no one in Altria management learned of JUUL's improper marketing scheme. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig*., 2017 WL 66281, at *14 (N.D. Cal. Jan. 4, 2017) ("it is reasonable to infer that at least some corporate officials knew Volkswagen was falsely touting the emissions compliance"); *In re MBIA, Inc. Sec.*

*Litig.*, 700 F. Supp. 2d 566, 591 (S.D.N.Y. 2010) (finding corporate scienter where employees carefully reviewed collateral underlying CDOs but failed to disclose problems).

### D.    Plaintiffs Adequately Allege Loss Causation

A plaintiff must allege "a causal connection between the material misrepresentation and the loss" to establish loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). To adequately plead loss causation, a plaintiff must "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind," which should not "impose a great burden upon a plaintiff." *Id.* at 347. A plaintiff "need not conclusively show that the securities' decline in value is attributable solely to the alleged fraud rather than to other intervening factors," but "that the misrepresentation or omission was one substantial cause of the investment's decline in value." *In re Sinclair Broad. Grp., Inc. Sec. Litig.*, 2020 WL 571724, at *17 (D. Md. Feb. 4, 2020).

Loss causation may be alleged using the "corrective disclosure theory" or the "materialization of a concealed risk theory." *Singer*, 883 F.3d at 445. A plaintiff relying on the corrective disclosure theory "may allege that the defendant company itself made a disclosure. . ." revealing the fraud. *Id.* The materialization of the risk theory, however, alleges, "news from another source revealed the company's fraud." *Id.* Here, Plaintiffs rely on outside sources (¶¶478, 500, 502, 504-506, 511, 521), as well as Altria's own disclosures revealing to the market that the risks of Altria's investment in JUUL were not adequately disclosed when made. ¶¶517, 519.

The Altria Defendants argue that Plaintiffs attempt to string together eight unconnected stock drops to plead loss causation. Altria Defs. Br. at 37. But the Fourth Circuit has observed that "'neither a single complete disclosure nor a fact-for-fact disclosure of the relevant truth to the market is a necessary prerequisite to establishing loss causation (although either may be sufficient).'" *Singer*, 883 F.3d at 446. Allegations need only "demonstrate that the exposure of the Company's

fraud was at least 'one substantial cause of the investment's decline in value.'" *Id.*[16] Thus, Plaintiffs have satisfied the pleading requirement by alleging stock price declines on the revelation of the information, by Altria or outside sources, that the risks of the Altria investment omitted from Defendants' public statements had materialized.[17] ¶¶478-479, 500-507, 511-512, 517-522.

## IV.    CONCLUSION

For the foregoing reasons, the Altria Defendants' motion to dismiss should be denied in its entirety.  If this Court grants any part of the motion, in whole or in part, Plaintiffs respectfully request leave to amend under Federal Rule of Civil Procedure 15(a) to cure any defects.

DATED:  September 17, 2020

By:    /s/ *Steven J. Toll*

Steven J. Toll (VSB #15300)
Daniel S. Sommers
S. Douglas Bunch
COHEN MILSTEIN SELLERS &
  TOLL PLLC
1100 New York Ave., NW, Suite 500
Washington, DC 20005

---

[16]    The Altria Defendants' reliance on *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398 (S.D.N.Y. 2007), is unavailing.  Altria Defs. Br. at 40.  There, the discussion of a write-down was not in the context of a loss causation analysis, but was broached in the context of a discussion of falsity. *Caiafa*, 525 F. Supp. 2d at 410.  Here, Plaintiffs allege that Altria's disclosure of a write-down was a materialization of the true risks of investment in JUUL.  Thus, the write-down explains that the risk had materialized, establishing the false or misleading nature of earlier statements omitting the risks.

[17]    The Altria Defendants argue that the market reaction following the disclosure of the SEC investigation should be discounted because it coincided with onset of the Covid-19 pandemic in the United States.  Altria Defs. Br. at 40.  This is clearly a factual issue inappropriate for resolution on a motion to dismiss.  *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) ("[o]f course, if the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation will not have been established.  But such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss"); *see also In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 253 (S.D.N.Y. 2007) (where defendants alleged routine price fluctuations in the month of May had caused the stock price decline the court held "whether the decline was attributable to some other cause, as defendants allege, is a matter for proof at trial"); *In re Tronox, Inc. Sec. Litig.*, 2010 WL 2835545, at *13 (S.D.N.Y. June 28, 2010) (observing that "[n]early every motion to dismiss since the onset of the [2008] financial crisis has sought shelter from Section 10(b) claims on the ground that the United States has experienced a significant decline in the market capitalization of its companies" but that alone is insufficient to defeat loss causation allegations at the motion to dismiss stage, without more).

-40-

Telephone: 202/408-4600
202/408-4699 (fax)
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com

*Local Counsel for Lead Plaintiffs*

Jeremy A. Lieberman
Michael J. Wernke
POMERANTZ LLP
600 Third Avenue
New York, NY  10016
Telephone:  212/661-1100
212/661-8665 (fax)
jalieberman@pomlaw.com
mjwernke@pomlaw.com

*Counsel for Lead Plaintiffs Donald Sherbondy
and Sarah Sherbondy*

Samuel H. Rudman
David A. Rosenfeld
Philip T. Merenda
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
pmerenda@rgrdlaw.com

*Counsel for Lead Plaintiff Laborers Pension
Trust of Greater St. Louis*

-41-

CERTIFICATE OF SERVICE

I, Steven J. Toll, hereby certify that on September 17, 2020, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.



*/s/ Steven J. Toll*
STEVEN J. TOLL