UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

(Richmond Division)

| | |
|---|---|
| GABBY KLEIN, DONALD SHERBONDY, SARAH SHERBONDY and CONSTRUCTION LABORERS PENSION TRUST OF GREATER ST. LOUIS, Individually and on Behalf of All Others Similarly Situated,<br><br>                         Plaintiffs,<br><br>        vs.<br><br>ALTRIA GROUP, INC., HOWARD A. WILLARD III, WILLIAM F. GIFFORD, JR., JUUL LABS, INC., ADAM BOWEN, JAMES MONSEES, KEVIN BURNS, and K.C. CROSTHWAITE,<br><br>                         Defendants. | Civil Action No. 3:20-cv-00075-DJN<br><br>CLASS ACTION |

**MEMORANDUM OF LAW IN OPPOSITION TO
THE JUUL DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ........................................................................1

II.   STATEMENT OF FACTS ..............................................................................3

III.  ARGUMENT ...................................................................................................4

   A.    Plaintiffs Have Standing to Assert Claims Against the JUUL Defendants ............4

   B.    Plaintiffs Adequately Allege that Bowen, Monsees and Crosthwaite Are
         "Makers" of False Statements.........................................................................8

   C.    Plaintiffs Adequately Allege Scheme Liability ...............................................12

   D.    Plaintiffs Plead Actionable Misstatements and Omissions.................................15

         1.    JUUL Deliberately Misrepresented Its Intent to Market to
               Underage Consumers ..........................................................................15

         2.    The Noerr-Pennington Doctrine Does Not Protect Monsees' False
               Statements to Congress .......................................................................21

         3.    Plaintiffs Adequately Allege that Monsees' False Statements to
               Congress Were Made "In Connection With" the Purchase or Sale
               of a Security .......................................................................................25

   E.    The Complaint Pleads a Strong Inference of Scienter on Behalf of the
         JUUL Defendants......................................................................................26

         1.    JUUL's Creation of a Product Designed to Attract Underage
               Consumers, Sustain Them as Users, and JUUL's Illegal Marketing
               Practices Support a Strong Inference of Scienter ....................................26

         2.    Altria and JUUL's Coordinated Scheme to Avoid Regulation of
               JUUL Products Further Supports a Strong Inference of Scienter.............28

         3.    Plaintiffs Allege a Motive to Commit Fraud ...........................................30

   F.    Plaintiffs Plead a Cogent Inference of Scienter as to Defendants Monsees
         and Bowen ................................................................................................30

   G.    Plaintiffs Allege a Cogent Inference of Scienter on the Part of K.C.
         Crosthwaite ..............................................................................................32

   H.    The Complaint Raises a Strong Inference of Scienter as to Defendant
         Burns .......................................................................................................33

IV.   LOSS CAUSATION.......................................................................................34

**Page**

A.      Plaintiffs Adequately Allege Loss Causation ........................................................34

V.    The Complaint Adequately Alleges Control Person Liability ...........................................35

VI.   CONCLUSION..........................................................................................................................37

## TABLE OF AUTHORITIES

**Page**

## CASES

*Aldana v. RJ Reynolds Tobacco Co.*,
  2007 WL 3010497
  (D.S.C. Oct. 12, 2007) ................................................................................................23, 24

*Alpha Capital Anstalt v. Schwell Wimpfheimer & Assocs. LLP*,
  2018 WL 1627266
  (S.D.N.Y. Mar. 30, 2018) .....................................................................................................11

*Baltimore Scrap Corp. v. David J. Joseph Co.*,
  237 F.3d 394 (4th Cir. 2001) .............................................................................................22

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)..............................................................................................................25

*Bill Johnson's Rests., Inc. v. N.L.R.B.*,
  461 U.S. 731 (1983)..............................................................................................................23

*Burt v. Maasberg*,
  2013 WL 1314160
  (D. Md. Mar. 31, 2013)..........................................................................................................1

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  56 F. Supp. 3d 549 (S.D.N.Y. 2014)....................................................................................9

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
  964 F. Supp. 2d 1128 (N.D. Cal. 2013) .......................................................................31, 32

*Cent. Bank, N.A. of Denver v. First Interstate Bank, N.A. of Denver*,
  511 U.S. 164 (1994)............................................................................................................4, 9

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012)..........................................................................10, 12

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011)...........................................................................9, 10

*Cooke v. Manufactured Homes, Inc.*,
  998 F.2d 1256 (4th Cir. 1993) ...........................................................................................19

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.*,
  323 F. Supp. 3d 393 (S.D.N.Y. 2018)................................................................................35

*Duane & Virginia Lanier Tr. v. SandRidge Mississippian Tr I.*,
  361 F. Supp. 3d 1162 (W.D. Okla. 2019) ...........................................................................6

**Page**

*Dunn v. Borta*,
    369 F.3d 421 (4th Cir. 2004) ............................................................12

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)..........................................................................34

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
    637 F.3d 435 (4th Cir. 2011) ............................................................11

*Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961)....................................................................22, 23

*Epstein v. World Acceptance Corp.*,
    203 F.Supp.3d 665 (D.S.C. 2016)................................................30, 34

*Flywheel Fitness, LLC v. Flywheel Sports, Inc.*,
    2013 WL 12138589
    (E.D. Tex. July 18, 2013) ..................................................................23

*Galestan v. OneMain Holdings, Inc*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018)................................................20

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999)..............................................................15

*Hillson Partners Ltd. P'ship v. Adage, Inc.*,
    42 F.3d 204 (4th Cir. 1994) ..............................................................21

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
    2013 WL 1223844
    (S.D.N.Y. Mar. 27, 2013) ..................................................................13

*Igen Int'l, Inc. v. Roche Diagnostics GmbH*,
    335 F.3d 303 (4th Cir. 2003) ............................................................22

*In re Akorn, Inc., Sec. Litig.*,
    240 F. Supp. 3d 802 (N.D. Ill. 2017) ................................................18

*In re Altisource Portfolio Sols., S.A. Sec. Litig.*,
    2015 WL 12001262
    (S.D. Fla. Sept. 4, 2015)......................................................................6

*In re Ames Dep't Stores Inc. Stock Litig.*,
    991 F.2d 953 (2d Cir. 1993)..............................................................25

**Page**

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696
(W.D. Tex. July 20, 2010) ......................................................................15

*In re Avon Sec. Litig.*,
2019 WL 6115349
(S.D.N.Y. Nov. 18, 2019) ......................................................................19

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017).......................................................19

*In re Carter-Wallace, Inc. Sec. Litig.*,
150 F.3d 153 (2d Cir. 1998)..............................................................25, 26

*In re Conventry Healthcare, Inc. Sec. Litig.*,
2011 WL 1230998
(D. Md. Mar. 30, 2011)...................................................12, 13, 20, 32

*In re Eletrobras Sec. Litig.*,
245 F. Supp. 3d 450 (S.D.N.Y. 2017)...................................................14

*In re Facebook, Inc. Sec. Litig.*,
405 F.Supp.3d 809 (N.D. Cal. 2019) ....................................................26

*In re Fontem US, Inc. Class Action Litig.*,
2016 WL 11503066
(C.D. Cal. Apr. 22, 2016)..................................................................21

*In re Galena Biopharma, Inc. Sec. Litigation*,
117 F. Supp. 3d 1145 (D. Or. 2015) ......................................................13

*In re Genworth Fin. Inc. Sec. Litig.*,
103 F. Supp. 3d 759 (E.D. Va. 2015) ......................................... *passim*

*In re GlenFed, Inc. Sec. Litig.*,
60 F.3d 591 (9th Cir. 1995) ..................................................................11

*In re Indep. Energy Holdings PLC Sec. Litig.*,
154 F. Supp. 2d 741 (S.D.N.Y. 2001)....................................................9

*In re Massey Energy Co. Sec. Litig.*,
883 F. Supp. 2d 597 (S.D. W. Va. 2012)..........................................18, 28

*In re Mut. Funds Inv. Litig*,
566 F.3d 111 (4th Cir. 2009) ..............................................................35, 36

Page

*In re Mut. Funds Inv. Litig.*,
487 F. Supp. 2d 618 (D. Md. 2007) ...................................................................8

*In re Mylan N.V. Sec. Litig.*,
2018 WL 159585
(S.D.N.Y. Mar. 28, 2018) ...............................................................................17

*In re Nat'l Golf Props. Secs. Litig.*,
2003 WL 23018761
(C.D. Cal. Mar. 19, 2003) ................................................................................8

*In re Nature's Sunshine Prods. Sec. Litig.*,
486 F. Supp. 2d 1301 (D. Utah 2007) ............................................................32

*In re NYSE Specialists Securities Litigation*,
503 F.3d 89 (2d Cir. 2007) ...............................................................................5

*In re Peoplesoft, Inc.*,
2000 WL 1737936
(N.D. Cal. May 25, 2000) ................................................................................29

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
351 F. Supp. 2d 334 (D. Md. 2004) ...........................................................12, 13

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889
(S.D.N.Y. Nov. 26, 2018) ................................................................................19

*In re Signet Jewelers Ltd. Sec. Litig.*,
2019 WL 3001084
(S.D.N.Y. July 10, 2019) ................................................................................35

*In re Sinclair Broad. Grp., Inc. Sec. Litig.*,
2020 WL 571724
(D. Md. Feb. 4, 2020) .....................................................................................17

*In re SolarCity Corp. Sec. Litig.*,
274 F. Supp. 3d 972 (N.D. Cal. 2017) .......................................................10, 11

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
2017 WL 3058563
(N.D. Cal. July 19, 2017) ..................................................................................9

Page

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
   2017 WL 66281
   (N.D. Cal. Jan. 4, 2017) ...................................................................................26

*In re Williams Sec. Litig.*,
   339 F. Supp. 2d 1206 (N.D. Okla. 2003) ............................................................8

*In re Willis Towers Watson PLC Proxy Litig.*,
   439 F. Supp. 3d 704 (E.D. Va. 2020) .........................................................35, 36

*In re WorldCom, Inc. Sec. Litig.*,
   2004 WL 1435356
   (S.D.N.Y. June 28, 2004)....................................................................................6

*Janus Capital Grp., Inc. v. First Deriv. Traders*,
   564 U.S. 135 (2011).................................................................................8, 9, 11

*Kiken v. Lumber Liquidators Holdings, Inc.*,
   155 F. Supp. 3d 593 (E.D. Va. 2015) ..........................................................35, 36

*Knurr v. Orbital ATK Inc.*,
   272 F. Supp. 3d 784 (E.D. Va. 2018) ................................................................27

*Lapin v. Goldman Sachs Grp., Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006)................................................................20

*Latham v. Matthews*,
   662 F. Supp. 2d 441 (D.S.C. 2009)....................................................................37

*Longman v. Food Lion*,
   197 F.3d 675 (4th Cir. 1999) .............................................................................18

*Lorenzo v. SEC*,
   139 S. Ct. 1094 (2019).......................................................................................12

*Maguire Financial, LP v. PowerSecure Int'l, Inc.*,
   876 F.3d 541 (4th Cir. 2017) .............................................................................27

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) .............................................................................26

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*,
   576 F.3d 172 (4th Cir. 2009) .............................................................................26

**Page**

*McDonald v. Smith,*
  472 U.S. 479 (1985).....................................................................................22

*McGann v. Ernst & Young,*
  102 F.3d 390 (9th Cir. 1996) .....................................................................25

*Meyer v. JinkoSolar Holdings Co.,*
  761 F.3d 245 (2d Cir. 2014)...............................................................16, 17

*Muzinich & Co. v. Raytheon Co.,*
  2002 U.S. Dist. LEXIS 26962
  (D. Idaho Apr. 30, 2002)...........................................................................8, 25

*Nathanson v. Polycom, Inc.,*
  87 F. Supp. 3d 966 (ND. Cal. 2015) ........................................................32

*Navient Sols., LLC v. Law Offices of Jeffrey Lohman, P.C.,*
  2020 WL 1172696
  (E.D. Va. Mar. 11, 2020)...........................................................................24

*Ollila v. Babcock & Wilson Enters.,*
  2018 WL 792069
  (W.D.N.C. Feb. 8, 2018).............................................................................21

*Ontario Pub. Serv. Emps. Union Pension Tr. v. Nortel Networks Corp.*
  369 F.3d 27 (2d Cir. 2004).....................................................................5, 6, 7

*Ottensmeyer v. Chesapeake & Potomac Tel. Co.,*
  756 F.2d 986 (4th Cir. 1985) ...............................................................22, 23

*Raab v. General Physics Corp.,*
  4 F.3d 286 (4th Cir. 1993) .........................................................................21

*Rowinski v. Salomon Smith Barney Inc.,*
  398 F.3d 294 (3d Cir. 2005)......................................................................25

*Rubin v. Schottenstein, Zox & Dunn,*
  143 F.3d 263 (6th Cir. 1998) .......................................................................4

*Sagez v. Glob. Agric. Invs., LLC,*
  2014 WL 3779072
  (N.D. Iowa July 31, 2014) .........................................................................12

**Page**

*SEC v. Stinson*,
  2011 WL 2462038
  (E.D. Pa. June 20, 2011) ........................................................................26

*SEC v. Tex. Gulf Sulphur Co.*,
  401 F.2d 833 (2d Cir. 1968)...................................................................25

*Semerenko v. Cendant Corp*,
  223 F.3d 165 (3d Cir. 2000)......................................................................4

*Singer v. Reali*
  883 F.3d 425 (4th Cir. 2018) ......................................................17, 21, 34

*Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.*,
  941 F. Supp. 1369 (S.D.N.Y. 1996)........................................................37

*Stoneridge Inv.Partners, LLC v. Scientific-Atlanta, Inc.*,
  552 U.S. 148 (2008)............................................................................9, 14

*Taylor v. First Union Corp. of S.C.*,
  857 F.2d 240 (4th Cir. 1988) ..................................................................17

*Teachers' Ret. Sys. of La. v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) .....................................................15, 16, 34

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)................................................................................30

*Todd v. STAAR Surgical Co.*,
  2016 WL 6699284
  (C.D. Cal. Apr. 12, 2016).......................................................................10

*Underground Sols., Inc. v. Palermo*,
  2014 WL 4703925
  (N.D. Ill. Sept. 22, 2014) ........................................................................24

*United States v. Philip Morris USA Inc.*,
  566 F.3d 1095 (D.C. Cir. 2009).................................................22, 23, 24

*Whelan v. Abell*,
  48 F.3d 1247 (D.C. Cir. 1995)................................................................23

*Wright v. Ernst & Young LLP*,
  152 F.3d 169 (2d Cir. 1998)......................................................................4

Page

*Yates v. Mun. Mortg. & Equity, LLC*,
    744 F.3d 874 (4th Cir. 2014) .......................................................................30, 33

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
    780 F.3d 597 (4th Cir. 2015) ...................................................................34

*Zelman v. JDS Uniphase Corp.*,
    376 F. Supp. 2d 956 (N.D. Cal. 2005) .....................................................6

*Zwick Parnters, LP v. Quorum Health Corp.*,
    2018 WL 2933406
    (M.D. Tenn. Apr. 19, 2018) .....................................................................9

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78t(a).........................................................................................11, 35, 36, 37
    §78j(b)................................................................................................... *passim*

17 C.F.R.
    §240.10b-5 ..........................................................................................4, 12, 14
    §240.10b-5(a).............................................................................................12
    §240.10b-5(c).............................................................................................12

Federal Rule of Civil Procedure
    Rule 15(a)...................................................................................................37

Lead Plaintiffs Gabby Klein, Donald Sherbondy and Construction Laborers Pension Trust of Greater St. Louis (together, "Lead Plaintiffs" or "Plaintiffs") respectfully submit this memorandum of law in opposition to the JUUL Defendants'[1] motions to dismiss the Corrected Consolidated Class Action Complaint (the "Complaint," ECF No. 108).

## I.  PRELIMINARY STATEMENT

This case concerns Altria Group, Inc., ("Altria") and JUUL Labs, Inc.'s ("JUUL") misrepresentations and omissions about JUUL's intent to market its e-cigarettes to underage consumers and its intent for youth to use its products, and Altria and JUUL's scheme to ensure that at least one of JUUL's products – the most addicting, and one of its most popular –  would remain unencumbered by regulation after Altria made a $12.8 billion investment in JUUL in exchange for a 35% ownership stake.  Through the use of targeted advertising and sleek product design, JUUL targeted underage users, and both Altria and JUUL endeavored to mislead investors, regulators and the public about that fact.

JUUL's co-founders, Defendants Bowen and Monsees, had studied the marketing tactics previously employed by Big Tobacco to target underage consumers, in the hopes they would create lifelong customers for JUUL's products.  To that end, they designed and created a technologically advanced product that appealed to underage consumers and was also highly addictive.  JUUL's

---

[1]     As used herein, "¶__" and "¶¶__-__" refer to paragraphs in the Complaint.  The "JUUL Defendants" refers to Juul Labs, Inc., ("JUUL" or the "Company"); Adam Bowen ("Bowen"), JUUL's co-founder, Chief Technology Officer through October 19, 2020, and Chief Executive Officer ("CEO") at all relevant times (¶27); James Monsees ("Monsees"), JUUL's Chief Product Officer, a co-founder, and member of the board of directors of JUUL (¶3); Kevin Burns ("Burns"), JUUL's CEO from December 2017 to September 2019 (¶29); and K.C. Crosthwaite ("Crosthwaite"), Altria's former Chief Growth Officer and JUUL's current CEO.   ¶3.   All references to the Memorandum of Law in Support of the JUUL Defendants' Motion to Dismiss are referred to as "JUUL Br." ECF No. 120.  Plaintiffs incorporate by reference all arguments against Altria, Howard A. Willard III ("Willard") and William F. Gifford, Jr. in their opposition to the Altria Defendants' motion to dismiss ("Altria Opp."), filed herewith.  *See., e.g. Burt v. Maasberg*, 2013 WL 1314160, at *9 (D. Md. Mar. 31, 2013).  Unless otherwise noted, all citations are omitted and all emphasis has been added.

nicotine delivery system (in the form of JUULpods) not only reduced the harsh effects of traditional combustible tobacco products, minimizing the "throat hit" associated with traditional cigarette use, but also released nicotine more effectively, making the nicotine impact more potent and likely to cause addiction.  JUUL also offered an array of kid-friendly flavor options for their JUULpods, including mango, crème brulee and mint.

JUUL undertook an advertising campaign specifically aimed at targeting underage consumers: hiring creative agencies specializing in millennial culture, advertising on television channels websites popular with youth such as Cartoon Network and Nick Jr., hosting JUUL-sponsored parties with celebrities and social media influencers popular with underage consumers, advertising on websites designed to help middle and high school students with their studies, and utilizing social media platforms popular with youth consumers. The advertisements that JUUL authored were near replicas of the advertisements that Big Tobacco had used to attract underage consumers.

As youth usage of JUUL dramatically increased, JUUL repeatedly denied it had intentionally targeted underage consumers with its marketing and product design.  Instead, JUUL maintained that its mission was to create and sell a product designed to assist adult smokers in moving away from traditional and harmful tobacco products.  However, despite JUUL's claims that its products were less harmful than traditional combustible tobacco products, JUUL's products never received such a designation from the United States Food and Drug Administration (the "FDA").  JUUL also positioned its products as being part of a healthy lifestyle routine, picturing its products in advertisements with fruit, salads or a cup of coffee.

JUUL also took steps to make its products accessible through online purchases.  JUUL deployed an age verification system purposefully designed to be flexible, allowing underage

consumers to easily access JUUL products online.  JUUL also removed the requirement that an adult

sign for the products, only offering the service at an additional charge to the consumer.

Finally, shortly before Altria's $12.8 billion investment in JUUL, JUUL and Altria

orchestrated a concerted scheme to keep one of the most popular JUULpods – which was also the

JUULpod with the highest nicotine potency – free from FDA regulation.  Both JUUL and Altria

offered sham statistics and studies to create the illusion that the mint JUULpod was not a flavor that

appealed to underage consumers and was akin to traditional menthol tobacco products.  The

deception worked and only the fruit and other kid friendly flavors of e-cigarette products became

regulated by the FDA.

Despite JUUL's demonstrated efforts to appeal to underage consumers, JUUL consistently

denied that its intent was to market to underage consumers, and to have underage consumers use its

products, misrepresenting the likelihood of regulatory scrutiny and litigation concerning its

marketing practices and product design.

When JUUL and Altria's scheme was discovered, and regulators began to act, Altria's

investors (who now owned 35% of JUUL) paid the price.  The risks of regulatory scrutiny and

extensive litigation began to materialize, resulting in Altria taking two separate write-down of its

JUUL investment for $4.5 billion and $4.1 billion respectively.

Although Defendants attempt to assert a number of defenses to these and other dispositive

allegations of fraud, none of those defenses has merit, for all the reasons given below.  Accordingly,

Plaintiffs respectfully request that the Court deny the JUUL Defendants' motions to dismiss in their

entirety.

## II.   STATEMENT OF FACTS

To avoid unnecessary repetition, Plaintiffs incorporate by reference the Statement of Facts set

forth on pages 3-12 of the Altria Opp.

## III.     ARGUMENT

### A.     Plaintiffs Have Standing to Assert Claims Against the JUUL Defendants

The plain language of the statute and rule confirm Plaintiffs' standing to bring a Section 10(b) claim under the Securities Exchange Act of 1934 ("Exchange Act") against the JUUL Defendants for their fraudulent scheme and false statements in connection with their sale of a 35% ownership stake in JUUL to Altria.  Section 10(b) of the Exchange Act and SEC Rule 10b-5 broadly prohibit "any person" from making false statements; there is no language limiting liability to an issuer (or its insiders) of the securities at issue.  *See* 15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5.

Consistent with this broad statutory language, the Supreme Court has affirmed that liability extends beyond the issuing company: "Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming all of the requirements for primary liability under Rule 10b-5 are met." *Cent. Bank, N.A. of Denver v. First Interstate Bank, N.A. of Denver*, 511 U.S. 164, 191 (1994).  "[I]t is irrelevant that the misrepresentations were not made for the purpose or the object of influencing the investment decisions of market participants" as long as the misrepresentation was material and disseminated publicly.  *Semerenko v. Cendant Corp*, 223 F.3d 165, 176 (3d Cir. 2000); *accord Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998).  Section 10(b) and Rule 10b-5 ordinarily impose "a duty . . . upon a third party" to speak truthfully, and investors may bring suit against a third party that violates such duty.  *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 267-68 (6th Cir. 1998) (en banc).  The JUUL Defendants publicly disseminated materially false and misleading statements, which were relied upon by Altria investors under the "fraud-on-the-market" doctrine.  Thus, the JUUL Defendants can be held liable for those false statements.

Nonetheless, the JUUL Defendants cite to the Second Circuit's decision in *Ontario Public Service Employees Union Pension Trust v. Nortel Networks Corp.* ("*Nortel Networks*"), for the proposition that "[s]tockholders do not have standing to sue under Section 10(b) and Rule 10b-5 when the company whose stock they purchased is negatively impacted by the material misstatement of another company, whose stock they do not purchase." JUUL Def. Br. at 12, quoting 369 F.3d 27, 34 (2d Cir. 2004). In doing so, the JUUL Defendants ignore *In re NYSE Specialists Securities Litigation* ("*NYSE*")*,* in which the Second Circuit expressly warned courts against the precise misreading of *Nortel Networks* that the JUUL Defendants propose:

> We recognize that *Nortel Networks* contains language that could be read to suggest that a purchaser of a security may bring a fraud action under Rule 10b-5 only against the issuer of the security purchased. . . . That is not what *Nortel Networks* held. . . . *[T]he district court incorrectly read Nortel Networks to mean that an action under Rule 10b-5* for false statements about a security purchased by the plaintiff *lies only against the issuer of the security, or that only statements about a security issuer are actionable*.

503 F.3d 89, 102 (2d Cir. 2007) (Sotomayor, J.) (vacating ruling that plaintiffs lacked standing). In *Nortel Networks*, the plaintiffs had purchased stock in JDS Uniphase and claimed that an unrelated company, Nortel, issued inflated financial projections. The plaintiffs argued that Nortel's false financial projections should be actionable because JDS allegedly increased its own projections based on the two companies' business relationship. 369 F.3d at 29. In *NYSE*, the Second Circuit stressed that the holding in *Nortel Networks* was limited to the facts of the case:

> In the particular circumstances of the case, the connection between Nortel Networks' false statements about itself and the plaintiff's purchase of JDS Uniphase stock was too remote to sustain an action under Rule 10b-5.

503 F.3d at 102 (stating that the plaintiffs in *Nortel Networks* lacked standing because the connection relied merely on "a business relationship between JDS Uniphase and Nortel Networks."). Thus, the Second Circuit rejected the bright line rule suggested by the JUUL Defendants. Instead, standing

should only be denied if, as a matter of law, the connection between the defendants' false statements and the value of the security purchased is "too remote to sustain an action under Rule 10b-5." *Id.*

In contrast to the "remote" connection created by a mere "business relationship" that may or may not impact the value of the security purchased, the Second Circuit recognized that when the value of the security purchased is directly linked to the value of the non-issuer company, such as in a merger, that created the type of "direct relationship" sufficient to establish standing. *Id.* Consistent with the Second Circuit's analysis, courts have found that a plaintiff has standing against a non-issuer when there is a definable connection between the value of the non-issuer company and the security purchased. *See, e.g., Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956 (N.D. Cal. 2005) (JDS – which allegedly made misrepresentations concerning its financial health – was held to be potentially liable to purchasers of debt securities issued by UBS because the value of the debt securities was linked to the value of JDS stock); *In re WorldCom, Inc. Sec. Litig.*, 2004 WL 1435356, at *8 (S.D.N.Y. June 28, 2004) (finding *Nortel Networks* distinguishable where security at issue is "a derivative instrument whose redemption value was directly tied to the value of" another company).[2]

Here, there was a direct, definable and contractual link between the value of JUUL (and the JUUL Defendants' false statements) and Altria's stock price, akin to a merger. *First*, with Altria owning 35% of JUUL, 35% of any impact on the value of JUUL would directly and necessarily

---

[2]       The cases cited by the JUUL Defendants are consistent with this distinction as none of the securities purchased in them were linked to the value of the non-issuer defendant company. *See In re Altisource Portfolio Sols., S.A. Sec. Litig.*, 2015 WL 12001262,*1-*2 (S.D. Fla. Sept. 4, 2015) (involving claims by Altisource's investors about *Ocwen's* regulatory compliance where the two companies had been wholly separate entities for over four years); *Duane & Virginia Lanier Tr. v. SandRidge Mississippian Tr I.*, 361 F. Supp. 3d 1162, 1168-71 (W.D. Okla. 2019) (involving claims of purchasers of interests in Trust II that were allegedly due to statements made by Trust I about Trust I, where "the Trust units are not contractually linked to each other and neither is a derivative instrument whose value is tied to that of the other" and acknowledging standing against non-issuers in cases that "involve securities that were either contractually or otherwise linked").

impact the value of Altria.  This contractual relationship that directly connected the bottom line values of the two companies clearly distinguishes it from the amorphous business relationship that existed in *Nortel Networks*.  Moreover, Defendant Crosthwaite of Altria (who later became CEO of JUUL) was placed as an "observer" on JUUL's board of directors, and the purchase agreement permitted Altria to appoint three members to JUUL's board of directors.[3]

*Second*, the JUUL Defendants' false statements concerned the very business that Altria acquired and were disseminated in the same press release announcing Altria's investment, thereby impacting Altria's stock price.  On the first day of the Class Period, Altria and JUUL jointly issued mirroring press releases announcing Altria's acquisition of a 35% ownership stake in JUUL.  Both companies also announced that the companies were merging their advertisement and distribution resources to accelerate "JUUL's mission to switch adult smokers to e-vapor products" and reassuring Altria investors that "[JUUL's] intent was never to have youth use JUUL products."

*Third*, JUUL's statements were clearly directed at Altria investors as they were released simultaneously with Altria's announcement of its JUUL investment, and JUUL's denials of targeting children were even included in Altria's press release.  Indeed, analysts covering Altria regularly discussed the critical impact the value of JUUL had on Altria's stock price.  *See* ¶¶534-551, 546 (evaluating the "economics and valuation of JUUL" on Altria), ¶549 ("Modeling JUUL Economics" and "Altria also gains a share of earnings from incremental users").

---

[3]      The JUUL Defendants misstate the facts of *Nortel Networks*, incorrectly asserting there are similarities to the facts alleged here.  JUUL Def. Br. at 12-13.  While the background of the case discusses Nortel's plan to purchase JDS's laser business in exchange for Nortel stock, Nortel's false statements did not concern the business to be sold.  369 F.3d at 29.  Indeed, it was the issuer JDS that was selling a line of business to Nortel, not *vice versa*, as is the case here.  Also, the purchase did not occur until the end of the class period so there was never any direct relationship between the values of the two companies even for that discrete line of business.  *Id*.  Thus, the false statements did not concern a business owned (or to be owned) by the issuer.

Courts have held that plaintiffs have standing under similar circumstances. *See, e.g.,* *Muzinich & Co. v. Raytheon Co.*, 2002 U.S. Dist. LEXIS 26962 (D. Idaho Apr. 30, 2002) (Raytheon held potentially liable to shareholders of WGI for misrepresentations it allegedly made about the value of a subsidiary it was selling to WGI); *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1236-37 (N.D. Okla. 2003) (company could be liable to purchasers of stock of a company it spun off for false statements it made prior to the spinoff); *In re Nat'l Golf Props. Secs. Litig.*, 2003 WL 23018761 (C.D. Cal. Mar. 19, 2003) (finding American Golf could be held liable to National Golf investors where American Golf allegedly made false statements or omissions in its financial statements that were incorporated in National Golf's prospectus). *Cf In re Mut. Funds Inv. Litig.*, 487 F. Supp. 2d 618, 623 (D. Md. 2007) (distinguishing *Muzinich* because Raytheon "did make misrepresentations that it allegedly knew would be specifically relied upon by purchasers of WGI stock and that allegedly had the direct effect of inflating the value of that stock").

## B.    Plaintiffs Adequately Allege that Bowen, Monsees and Crosthwaite Are "Makers" of False Statements

Relying on *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011), Defendants Bowen, Monsees and Crosthwaite argue that they are not "makers" of certain statements because they were not specifically identified in the statement as being the person responsible and because they were not the individual with "ultimate authority" over the given statements. *See* Memorandum in Support of Defendant James Monsees' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint ("Monsees Br.," ECF No. 122) at 5-7; *see also* Memorandum of Law in Support of Defendant K.C. Crosthwaite's Motion to Dismiss the Corrected Consolidated Class Action Complaint ("Crosthwaite Br.," ECF No. 125) at 10-13; *see also* Defendant Adam Bowen's Joinder in Defendant James Monsees' Motion to Dismiss Plaintiffs' Corrected Consolidated Class Action Complaint ("Bowen Br.," ECF No. 124) at 1.

-8-

Contrary to these defendants' assertions, *Janus* "does not imply that there can be only one 'maker' of a statement" or "alter the well-established rule that a corporation can act only through its employees and agents." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 56 F. Supp. 3d 549, 558 (S.D.N.Y. 2014) ("*Barclays*"); *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 416-17 (S.D.N.Y. 2011) (finding two entities and eleven individuals had ultimate authority over same statements). As the Court in *Barclays* noted:

> *Janus* "addressed only whether third parties can be held liable for statements made by their clients . . . and has no bearing on how corporate officers who work together in the same entity can be held jointly responsible on a theory of primary liability."

*Barclays*, 56 F. Supp. at 558 n.56.[4] In *Barclays,* the Court found that a parent corporation, its president, and its subsidiaries could all be makers of a statement under *Janus,* holding that an allegation that an executive was able to cause a company to issue a false statement "is sufficient at the pleading stage to withstand scrutiny under *Janus.*" *Id.* at 559.

"After *Janus*, courts have consistently held that corporate officers who sign a document on behalf of the corporation 'make' the statements in those documents." *Zwick Parnters, LP v. Quorum Health Corp.*, 2018 WL 2933406, at *3 (M.D. Tenn. Apr. 19, 2018). "[E]ven without a signature, a corporate official makes a statement if the official 'actually participated in and had authority over the [corporation's] filing process.'" *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 WL 3058563, at *8 (N.D. Cal. July 19, 2017).

High level officials are deemed to be makers of a company's public statements in press releases and SEC filings, even if they have not expressly signed them. *See In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 748-51, 755-61, 763, 767-68 (S.D.N.Y. 2001)

---

[4]    It is clear from the Supreme Court's discussion of corporate form and its reliance on *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc*., 552 U.S. 148 (2008) and *Central Bank*, 511 U.S. 164, both of which examined liability as to separate corporate entities, that the Court was not addressing liability among officers and directors within the same corporate entity. *See Janus*, 564 U.S. at 143-46.

(finding that alleged misrepresentations in the company's publicly-made statements may be attributable to the company's founder and director, even though he was not an officer).  Even middle-management level defendants are routinely found to be "makers" of statements for their area of responsibility.  *See, e.g., Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *12 (C.D. Cal. Apr. 12, 2016) (vice president of compliance adequately alleged to be a "maker" of the statements about compliance because "it is reasonable to infer that the statements at issue were initially made by Defendant [] or at least with his advice and consent"); *see also City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 362, 374-75 (S.D.N.Y. 2012) (finding liable an executive vice president for actionable statements because she was in charge of the division with misconduct and one of several individuals listed as part of defendant-corporation's leadership); *City of Roseville,* 814 F. Supp. 2d at 416-17.

Here, Monsees, Bowen and Crosthwaite, as founders, officers and directors of JUUL and Altria, were not just able to control the content of their company's respective press releases concerning the JUUL investment; indeed, doing so was at the heart of their jobs.  As co-founders, officers and board members, no multi-billion dollar investment could occur without Monsees and Bowen's approval.  ¶¶27-28.  And when JUUL was called to testify before Congress in 2019, it was Monsees who testified and represented it.  ¶¶498, 551.  Crosthwaite was the Altria officer specifically charged with executing the investment and sat on JUUL's board at the time of the investment, before becoming JUUL's CEO.  ¶¶30, 348, 408, 511.  Accordingly, the Complaint adequately alleges that "[b]ecause of their positions of control and authority, [Monsees, Bowen and Crosthwaite] were able to and did, directly or indirectly, control the content of the statements of [JUUL and Altria]," including the companies' press releases. ¶¶568, 579, 586, 592.[5]  These

---

[5]      The cases cited by Defendants are inapposite because plaintiffs there failed to allege that defendants had control over the statements.  *See In re SolarCity Corp. Sec. Litig.*, 274 F. Supp. 3d

allegations are sufficient at the pleading stage where the court must "draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

Moreover, applying *Janus* to intra-company liability as Defendants contend, would defeat the purpose of Section 20(a) liability, which applies to "*[e]very person* who, directly or indirectly, *controls* any person liable" for a Section 10(b) violation.  15 U.S.C §78t(a).  Under defendants' formulation, only the employee with ultimate control over the statement could be subject to Section 10(b) liability.  *See Janus*, 564 U.S. at 142 ("Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right.").  Section 20(a) liability would be severely limited because anyone who controlled the "maker" of the statement would be the person with the true "ultimate authority" over the statement and, thus, the "maker," subjecting them, and only them, to liability.[6]

While not necessary, the Complaint also adequately alleges Bowen, Monsees and Croswaithe are "makers" of the statements under the "group-published information" doctrine.  "In cases of corporate fraud where the false and misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group published information,' it is reasonable to presume that these are the collective actions of the officers." *In re GlenFed, Inc. Sec. Litig.*, 60 F.3d 591, 593 (9th Cir. 1995).  The Fourth Circuit has left open the possibility that "group-published information" may be alleged in support of falsity, which would allow "a plaintiff to rely on a

---

972, 1007 (N.D. Cal. 2017) ("Plaintiffs make no allegations that Barnard actually had authority over" the information contained in the disclosure); *Alpha Capital Anstalt v. Schwell Wimpfheimer & Assocs. LLP*, 2018 WL 1627266, at \*10 (S.D.N.Y. Mar. 30, 2018) (plaintiffs' allegations do not suggest that he "possessed ultimate authority over their content").

[6]     Moreover, according to Defendants, no individual at all "made" the unattributed statements in JUUL's December 20, 2018 press release since it was not signed by anyone.  However, companies can only act through their employees, like Defendants.

presumption that statements in company generated documents represent the collective work of those individuals directly involved in the company's daily management." *Dunn v. Borta*, 369 F.3d 421, 434 (4th Cir. 2004).  Courts in the Second and Ninth Circuits routinely apply the doctrine in determining which officers are "makers" of statements.[7] *See City of Pontiac*, 875 F. Supp. 2d at 373 (collecting cases); *Sagez v. Glob. Agric. Invs., LLC*, 2014 WL 3779072, at \*20 (N.D. Iowa July 31, 2014) ("the group pleading doctrine continues to be good law as applied to the particular claim in this case").

### C.  Plaintiffs Adequately Allege Scheme Liability[8]

Liability under subsections (a) and (c) of Rule 10b-5, widely referred to as "scheme liability," does not require that anyone be the "maker" of any misstatements. *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019).  Subsection (a) of Rule 10b-5 makes it unlawful to "employ any device, scheme, or artifice to defraud" and subsection (c) makes it unlawful to "engage in any act, practice, or course of business" that "operates . . . as a fraud or deceit[.]"  17 C.F.R. §240.10b-5 (emphasis supplied).  This provision is "expansive" and "capture[s] a wide range of conduct." *Lorenzo*, 139 S. Ct. at 1101.  In the Fourth Circuit, in order to state a claim under Rule 10b-5(a) and (c), "the plaintiffs must plead that (1) they were injured; (2) in connection with the purchase or sale of securities; (3) by relying on a market for securities; (4) controlled or artificially affected by defendant's deceptive or manipulative conduct; and (5) the defendants engaged in the manipulative conduct with scienter." *In re Conventry Healthcare, Inc. Sec. Litig.*, 2011 WL 1230998, at \*16 (D. Md. Mar. 30, 2011) (citing *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 372

---

[7]    While Defendants cite cases refusing to apply this doctrine, those conflate the use of the doctrine to establish who is alleged to be a "maker" with whether the doctrine can be used to plead scienter.

[8]    Plaintiffs incorporate by reference the specific arguments in the Altria Opp. regarding scheme liability. *See* Altria Opp. at 27-28.

(D. Md. 2004)).  "[A] defendant who did not make any statements in connection with a particular fraud . . . may still be held liable under subsections (a) and (c) if it is alleged that they participated in [a] scheme that encompassed conduct beyond misrepresentations."  *Id*. at *17.

Here, the Altria and JUUL Defendants' scheme and "deceptive or manipulative" conduct are alleged in detail.  The JUUL Defendants embarked on an aggressive scheme to addict youth to their product in order to boost sales and market share, inflating the value of JUUL (through the illegal conduct) and ultimately resulting in Altria's $12.8 billion investment for 35% ownership of JUUL.  In furtherance of this scheme, the JUUL Defendants increased the nicotine absorption level of their product, misrepresented these nicotine levels, minimized the harsh sensation of traditional nicotine inhalation to make JUUL products more tolerable, employed kid-friendly flavors, and promoted JUUL products in a manner intended to appeal to children (without being obvious to the public) and suggested that JUUL products were part of a healthy lifestyle.  ¶¶87-136, 153-171, 172-291.  The JUUL Defendants also coordinated with the Altria Defendants to conceal this scheme from the FDA and the public by falsifying data concerning the popularity of flavored pods and the widespread use of JUUL products by children.  ¶¶387-416.

*In re Galena Biopharma, Inc. Securities Litigation*, 117 F. Supp. 3d 1145 (D. Or. 2015), is instructive.  In *Galena*, as here, Defendants' scheme artificially inflated the company's stock through a misleading promotional campaign, and then acting on "material, adverse, non-public information," defendants sold their stock.  *Id*. at 1160.  Here, the JUUL Defendants utilized their deceptive and illegal advertising campaign to increase the value of JUUL, which they then sold 35% of for $12.8 billion.  *See IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 1223844, at *13 (S.D.N.Y. Mar. 27, 2013) (holding that scheme liability satisfied where plaintiff alleged that defendants sold RMBS and CDOs consisting of substandard mortgages in order to increase short

term revenues and inflate Deutsche Bank's market value and nevertheless reassured investors that their credit and lending practices were conservative); *In re Conventry*, 2011 WL 1230998, at *17.

Relying on *Stoneridge*, 552 U.S. 148, the JUUL Defendants contend they cannot be held liable because, they claim, their conduct was not "directed to Altria investors" but rather concerned a "realm" other than the securities markets.  JUUL Br. at 22-23; *see also* Memorandum of Law in Support of the Altria Defendants' Motion to Dismiss ("Altria Defs. Br.," ECF No. 118) at 28. Defendants misread *Stoneridge*.  In *Stoneridge*, the Supreme Court held that where an issuer, in violation of GAAP, fraudulently recorded revenue from certain business with a third party, that third party was not subject to scheme liability because "nothing respondents did made it necessary or inevitable for [the Company] to record the transactions as it did."  552 U.S. at 149. The Supreme Court explained that conduct, <u>without connection to a public statement</u>, is not entitled to the presumption of reliance on account of the fraud-on-the-market theory.  Here, by contrast, Plaintiffs allege that the JUUL Defendants' conduct – inflating its revenue and value through deceptively targeting children – itself misled investors by inflating the value of JUUL, of which Altria owned 35%.  The JUUL Defendants' deceptive "course of business" (17 C.F.R. §240.10b-5), "made it 'necessary or inevitable' that falsehoods on the part of [JUUL and Altria] would result" when explaining its business to investors.  *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 472 (S.D.N.Y. 2017) (quoting *Stoneridge*, 552 U.S. at 152-53, 159, 160-61).

To the extent that the JUUL Defendants argue their conduct is inactionable because it was not done "in connection with" the purchase or sale of a security, those arguments fail for the reasons discussed *supra*, III.D.3.

*      *      *

In sum, Defendants try to play a shell game with the elements of securities fraud to evade liability.  In response to the overwhelming evidence that the JUUL Defendants knowingly lied about

their scheme to target children, the JUUL Defendants argue that their fraud is inactionable because it was not specifically directed at Altria investors. The Altria Defendants, unable to deny that their statements were directed to their investors, argue that they should not be held liable for repeating in their press release and SEC filings the intentional false statements of JUUL. According to Defendants, this is a fraud for which Section 10(b) simply provides no recourse; as explained herein, Defendants are wrong.

### D.    Plaintiffs Plead Actionable Misstatements and Omissions

The JUUL Defendants principally argue that Plaintiffs fail to allege an actionable misstatement or omission because Plaintiffs' challenged statements, in their view, are immaterial and are otherwise literally true statements. *See* JUUL Br. at 14-21. The JUUL Defendants proceed to make factual arguments under the guise of "particularity" concerning JUUL's intention that underage consumers use their products. *See* JUUL Br. at 21. As detailed below, these arguments should be disregarded.

### 1.    JUUL Deliberately Misrepresented Its Intent to Market to Underage Consumers

The Complaint pleads in detail how the JUUL Defendants went to great lengths to design both JUUL's products and marketing schemes to target underage consumers. Everything from their nicotine formulation and delivery method (¶¶76-116, 143-151), advertising campaigns (¶¶191-305),[9]

---

[9]    The JUUL Defendants argue that Plaintiffs have failed to allege their personal knowledge of the purchase of "ads on youth-oriented websites." JUUL Br. at 21 n.8. This argument, however, is at odds with both their own arguments and the Complaint's allegations. The JUUL Defendants admit that they knew they were accused of intentionally marketing to youth prior to the Class Period. *See* JUUL Br. at 5-10. As such, the JUUL Defendants certainly would have investigated these claims prior to asserting during the Class Period that they never marketed to youth. *See e.g., Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999) (existence of ancillary lawsuit relevant to a finding of knowledge); *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 721 (W.D. Tex. 2010) (finding ancillary lawsuit further indicia of scienter). Indeed, to make such an assertion without having investigated their marketing is reckless. At the very least, there can be no dispute that someone in management knew and approved of the ads on youth websites, which satisfies corporate scienter. *See Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007) (corporate

-15-

product designs (¶¶117-126), and flavor formulations (¶¶127-136) were deliberately crafted to appeal to a youth audience, ensuring their life-long nicotine dependency, and supplying a constant stream of customers; the same concept as "replacement smokers" from the big tobacco playbook. ¶¶47, 137.

The JUUL Defendants made repeated representations to the market that their intent was *not* to have youth use their products. ¶¶456, 458, 464, 496, 498, 509. As alleged, these statements were materially false and misleading. ¶¶457, 459, 465, 497, 499, 510. Indeed, the well-pled facts regarding JUUL's product design, nicotine formulation and marketing belie any argument that it was never the JUUL Defendants' intent to have youth use JUUL's products. JUUL explained that, prior to the Class Period, it had studied the marketing and business practices of the tobacco industry before the MSA. ¶¶88-91. The tobacco industry, of course, is no stranger to the risks of marketing their products to youth. ¶43. Even a cursory review of the similarities of the advertising methods makes clear that JUUL's intent was to market its products to underage consumers. ¶¶191-305. Further, as discussed *infra*, JUUL and Altria conspired to ensure that the most potent nicotine formulation, the same JUUL pod formulation that would addict the largest number of people to JUUL products, would be shielded from regulation. ¶¶387-416.

At the outset, "[t]he literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). Thus "a statement that is literally true can be misleading and thus actionable under the securities laws" where the statement omits material

---

scienter adequate when a plaintiff alleges "facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation, since corporate liability derives from the actions of its agents").

facts making the statement misleading.  *In re Sinclair Broad. Grp., Inc. Sec. Litig.*, 2020 WL 571724, at \*16 (D. Md. Feb. 4, 2020).

The JUUL Defendants' statements completely omitted any discussion of their illegal marketing practices that propelled them to the forefront of a booming e-cigarette market.  Because the JUUL Defendants failed to disclose their inappropriate marketing practices, their statements of their lack of intent to market to youth, and statements concerning their opportunity with respect to switching adult smokers to JUUL products, were false and misleading.  The court in *Singer v. Reali* established that a defendant must disclose illegal acts contributing to the success of the company in order to make other statements not misleading, even if uncharged or unadjudicated. 883 F.3d 425, 441 (4th Cir. 2018).  *See also In re Mylan N.V. Sec. Litig.*, 2018 WL 159585, at \*6 (S.D.N.Y. Mar. 28, 2018) ("[W]here a company puts at issue the cause of its financial success, it may mislead investors if the company fails to disclose that a material source of its success is the use of improper or illegal business practices.").  Moreover, because the JUUL Defendants repeatedly discussed that underage consumers were using JUUL's products, they were under an obligation to speak fully and truthfully about those facts, including that they had been improperly targeting youth with their marketing.  *See Singer*, 883 F.3d at 440; *see also Taylor v. First Union Corp. of S.C.*, 857 F.2d 240, 243-44 (4th Cir. 1988) ("if the corporation's silence on a subject 'would make other [of its] statements misleading or false,' then it must speak"); *Meyer*, 761 F.3d at 250 n.3 ("once a company speaks on an issue or topic, there is a duty to tell the whole truth").

JUUL also deliberately misrepresented its intent as creating and marketing a product for adult smokers to switch to, rather than its true intent of cultivating a new customer base by marketing to underage consumers.  ¶¶456, 458, 464, 496, 498, 509.  For example, on July 13, 2019, months after the investment by Altria, Burns was interviewed by CNBC and discussed the issue of youth usage of JUUL products.  ¶496.  His response: "[i]t's not intended for [underage consumers].  I hope there

was nothing that we did that made it appealing to them. . . . " *Id.*  This statement was materially false and misleading because it misrepresented JUUL's intent of appealing to underage consumers when creating and marketing its products.  ¶497.  This statement, and others by the JUUL Defendants, was contrary to JUUL's marketing strategies (¶¶191-305), product development (¶¶76-116, 143-151), and flavor offerings (¶¶127-136), and are actionable as a result.  *See In re Akorn, Inc., Sec. Litig.*, 240 F. Supp. 3d 802, 814 (N.D. Ill. 2017).

The JUUL Defendants principally argue that the statements made by JUUL regarding its intent to market to youth and have underage consumers use their products are immaterial because it was already publicly disclosed that youth were using JUUL products.  *See* JUUL Br. at 15-20.  As discussed *infra*, this is nothing more than a premature attempt to invoke the truth on the market doctrine and should be disregarded as such.  *See In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 618 (S.D. W. Va. 2012) ("Defendants' 'truth-on-the-market' defense . . . would require a factual determination that is not permissible at the 12(b)(6) stage of litigation. . . . Defendants' contention that the extent and nature of its compliance record could be found on the MSHA website will not preclude the Court from finding that Plaintiff's allegations are [sufficient for 10(b) liability].").  Indeed, the cases relied on by the JUUL Defendants do not suggest otherwise.[10]

Moreover, the JUUL Defendants ignore that they repeatedly denied that their intent was to illegally market to underage consumers.  ¶¶464, 496, 498, 509.  The Court cannot rule, as a matter of

---

[10]    Plaintiffs incorporate by reference their arguments regarding the truth on the market defense in the Altria Opp.  *See* Altria Opp. at 25-27.  Moreover, the JUUL Defendants' reliance on *Longman v. Food Lion*, 197 F.3d 675 (4th Cir. 1999), is misplaced. First, it was decided on a motion for summary judgment, demonstrating that Defendants' argument is premature. Second, the alleged false statements by the company in response to a lawsuit filed were merely that the company denied liability, that it "intends to defend itself vigorously in this matter;" and its practices were not "illegal" and "the Company has meritorious defenses to the allegations" *Id.* at 684. Here, Defendants did not merely deny liability as to a lawsuit, they misrepresented a fact: that they never marketed to youth.

law, that the existence of allegations and reports from outside sources – which were strenuously denied and contested by the JUUL Defendants – was sufficient to apprise investors that their intent was to not market JUUL products to youth. *See, e.g.*, *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1262 (4th Cir. 1993) ("The impression that this mix of information conveyed cannot be resolved as a matter of law.").

The JUUL Defendants also argue that their statements regarding their intent to market to youth, and desire to have underage consumers use their products, are immaterial because they disclosed that there was underage use and underage consumption of JUUL products, making the JUUL Defendants' "intent" meaningless. *See* JUUL Br. at 18-20. But public knowledge that youth were ***using*** JUUL's products is not the same as JUUL intentionally ***marketing*** to youth – which is the statement that the JUUL Defendants continued to misrepresent.

Even assuming arguendo that these statements were immaterial (they are not), courts have held that repeated assertions about the same topic can convert even immaterial statements into actionable misstatements, because the repeated attention by the speaker evidences the statements' importance. Indeed, "[w]hile certain statements, viewed in isolation, may be mere puffery, when the statements are 'made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors.'" *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *11 (S.D.N.Y. Nov. 26, 2018) (citing *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) (explaining that defendants' repeated discussions of dam safety underscored the importance of the topic to defendants and investors.)); *see also In re Avon Sec. Litig.*, 2019 WL 6115349, at *16 (S.D.N.Y. Nov. 18, 2019) ("repeated representations on the same topic, even where those representation[s] would otherwise be puffery . . . communicates to investors what 'matters [are] particularly important,' and 'those statements may become material to investors.'"). Further, statements that

-19-

constitute "misrepresentations of existing facts" are not puffery. *Galestan v. OneMain Holdings, Inc*, 348 F. Supp. 3d 282, 298 (S.D.N.Y. 2018).

Importantly, what the JUUL Defendants ignore is that by consistently misrepresenting that their intent was *not* to have underage consumers use their products (¶¶456, 458, 464, 496, 498, 509), Defendants misled investors into believing that JUUL's own actions were not contributing to the youth vaping epidemic, and JUUL's actions were not creating the eventuality of litigation and regulatory action that would drastically lower JUUL's market value.

The JUUL Defendants' argument also overlooks that their statements misrepresenting JUUL's intent were made to appease investors' concerns about whether or not JUUL was directly marketing to underage consumers in contravention of applicable law; any statement to the contrary would have obviously affected the regulatory response and pending litigation. JUUL Br. at 17-20. Thus, "it defies logic to suggest that, for example, an investor would not reasonably rely on a statement . . . that recognized . . . dedication to complying with the letter and spirit of the laws." *Lapin v. Goldman Sachs Grp*., *Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006). Further, as the Complaint details, the JUUL Defendants modeled their advertising campaign after the highly successful, and now illegal, Big Tobacco marketing efforts prior to the MSA, and designed a product that would be highly attractive to underage consumers, with extreme addictive propensity. ¶¶203-204. Thus, the JUUL Defendants' statements concerning their intent to market to underage consumers clearly did not align with the facts and data in their possession. *See In re Conventry*, 2011WL 1230998, at *12 ("While mere puffery is insufficient to state of claim of securities fraud, public statements must be consistent with reasonably available data and should not misrepresent existing facts.").

Here, the JUUL Defendants' statements regarding their intention to market to underage consumers, or their statements concerning improving the lives of adult smokers (¶¶458, 464),[11] cannot be cast aside as mere puffery or otherwise immaterial at this stage of the litigation given the highly fact specific determinations necessary to analyze these claims.[12] *See Singer*, 883 F.3d at 440 ("A complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."); *see also Ollila v. Babcock & Wilson Enters.*, 2018 WL 792069, at *5 (W.D.N.C. Feb. 8, 2018) ("[W]hile courts may determine on a motion to dismiss that a given statement constitutes puffery, it should only do so if 'no relief could be granted under any set of facts.'").

### 2. The Noerr-Pennington Doctrine Does Not Protect Monsees' False Statements to Congress

Defendant Monsees contends that his July 25, 2019 statements made to Congress are not actionable because they are protected by the Noerr-Pennington doctrine. Monsees Br. at 7-8.

---

[11]     The JUUL Defendants rely on *In re Fontem US, Inc. Class Action Litigation*, 2016 WL 11503066 (C.D. Cal. Apr. 22, 2016), to argue that Burns' statement concerning improving the lives of adult smokers is, as a matter of law, immaterial puffery. *See* JUUL Br. at 15. *Fontem* is not a securities case, and the court's reasoning concerning the standard of puffery that applies in a consumer fraud action should not be granted any weight here. Further, given the context of JUUL touting its products as reduced harm tobacco products in contravention of applicable law, it is a reasonable inference that Burns intended those receiving his message about improving the lives of adult smokers to convey a health improvement message and not some other message now proposed by the JUUL Defendants.

[12]     The JUUL Defendants' reliance on *Hillson Partners Ltd. Partnership v. Adage*, *Inc.*, 42 F.3d 204 (4th Cir. 1994), and *Raab v. General Physics Corp.*, 4 F.3d 286 (4th Cir. 1993), are misplaced because they both involved statements alleged to be false that were themselves immaterial. Here, Plaintiffs allege that Burns' statement regarding the opportunity to improve the lives of adult smokers (¶458) was actionable not because the statement itself was false but because it created a duty to speak about the effect JUUL's technology was also having on ***destroying*** lives, especially teenage lives (¶459); thus, Burns' statement is not immaterial and is actionable.

Contrary to Monsees' assertions, the Noerr-Pennington doctrine does not sanction fraud just because it was committed in the halls of Congress.

The Noerr-Pennington doctrine was judicially created in antitrust law for the purpose of guaranteeing "citizens their First Amendment right to petition the government for redress without fear of antitrust liability." *Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 398 (4th Cir. 2001) (citing *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136-39 (1961)). The doctrine was created in 1961, when the Supreme Court held in *Noerr* that "the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint [of trade] or a monopoly." *Noerr*, 365 U.S. at 136. Thus, the doctrine served to place outside antitrust liability the lobbying efforts of companies seeking legislation that would restrict competition. *See id.* at 136-39.

The doctrine has been applied to similar types of "business torts" alleged by competitors such as "malicious prosecution, tortious interference with contract, tortious interference with prospective economic advantage, and unfair competition." *Igen Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 310 (4th Cir. 2003). Because the same policy concerns are implicated in such actions – one should not be subject to liability for the mere <u>act</u> of petitioning the government for redress.

While the purpose of the doctrine is to preserve the "first amendment right to petition government officials," *Ottensmeyer v. Chesapeake & Potomac Tel. Co.*, 756 F.2d 986, 993 (4th Cir. 1985), the Supreme Court has made clear that the Petition Clause does not have "special First Amendment status" and that petitions are not entitled to "greater constitutional protection" than "other First Amendment expressions." *McDonald v. Smith*, 472 U.S. 479, 485 (1985) ("The right to petition is guaranteed; the right to commit libel with impunity is not."). "[I]t is well settled that the First Amendment does not protect fraud." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095,

1123 (D.C. Cir. 2009).  Therefore, "false statements are not immunized by the First Amendment right to freedom of speech."  *Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 743 (1983). Specifically, "broad the First Amendment right to petition may be, it cannot be stretched to cover petitions based on known falsehoods."  *Whelan v. Abell*, 48 F.3d 1247, 1255 (D.C. Cir. 1995).

Here, the Noerr-Pennington doctrine is wholly inapplicable. First, Monsees was not petitioning the government for any redress.  Rather, Congress (the House Committee on Oversight and Reform) instigated the hearing for the purpose of furthering its "investigation into JUUL's role in the youth nicotine addiction epidemic, marketing to youth, misleading health claims, and new partnerships with traditional tobacco companies."[13] *See Noerr Motor Freight*, 365 U.S. at 136 (Noerr-Pennington doctrine only applies to "attempt[s] to persuade the legislature or the executive to take particular action").  Second, even if Monsees was seeking redress, Plaintiffs' claim is not based on the fact that Monsees (or JUUL) sought such redress; rather, Plaintiffs' claims arise from Monsees' intentionally fraudulent statement that inflated the price of Altria stock.

In any event, even if the Noerr-Pennington doctrine would generally apply to this type of scenario (it does not), it would still not apply here because of the "sham" and "fraud" exceptions to the doctrine.  As the Fourth Circuit has stated, the doctrine is not applicable where the defendant provides "deliberately false information" for purposes unrelated to seeking redress from the government.  *Ottensmeyer*, 756 F.2d at 994.  "The Fourth Circuit Court of Appeals has held that deliberate false and material representations fall within the sham exception of Noerr-Pennington immunity." *Aldana v. RJ Reynolds Tobacco Co.*, 2007 WL 3010497, at *6 (D.S.C. Oct. 12, 2007).[14]

---

[13]    HOUSE     COMMITTEE     ON     OVERSIGHT     AND     REFORM, https://oversight.house.gov/legislation/hearings/examining-juul-s-role-in-the-youth-nicotine-epidemic-part-ii (last visted Sept. 17, 2020).

[14]    *See also Flywheel Fitness, LLC v. Flywheel Sports, Inc.*, 2013 WL 12138589, at *4 (E.D. Tex. July 18, 2013) ("[t]he law is clear that Noerr-Pennington 'does not protect deliberately false or

Indeed, this precise issue has already been resolved by a court in this Circuit. *In Aldana,* the plaintiff brought claims of fraudulent and negligent misrepresentation, alleging that tobacco company executives misrepresented the addictive nature and health risks of their cigarette products to the Congressional Subcommittee on Health and Environment as well as to the Federal Trade Commission. *Id.* at *1. The court held that the statements to Congress and the FTC were not protected by the Noerr-Pennington Doctrine because they fell under the "sham" exception: "alleged deliberate false and material misrepresentations made by the defendants to the federal government are not protected by the Noerr-Pennington doctrine." *Id.* at *6.

Two years after *RJ Reynolds*, the Court of Appeals for the D.C. Circuit came to the same conclusion in *Philip Morris*, holding that Noerr-Pennington did not immunize a tobacco company from a fraudulent misrepresentation claim where it made knowingly false statements about the risks of smoking:

> Defendants' attempt to invoke *Noerr-Pennington* as protection fails because the doctrine does not protect deliberately false or misleading statements. ***"[N]either the Noerr-Pennington doctrine nor the First Amendment more generally protects petitions predicated on fraud or deliberate misrepresentation*.***"

566 F.3d at 1124.

Immunizing Monsees for these fraudulent statements would not further the purpose of the Noerr-Pennington doctrine. To the contrary, because the doctrine grants "immunity from civil <u>or criminal</u> liability to parties who engage in petitioning activity," *Navient Sols., LLC v. Law Offices of Jeffrey Lohman, P.C.*, 2020 WL 1172696, at *10 n.9 (E.D. Va. Mar. 11, 2020) (emphasis supplied), creating a broad immunity for any fraudulent testimony provided to the government (or court) would

---

misleading statements.'"); *Underground Sols., Inc. v. Palermo*, 2014 WL 4703925, at *7 (N.D. Ill. Sept. 22, 2014) ("Courts applying Noerr-Pennington outside of the antitrust context have declined to grant immunity in cases involving fraud and misrepresentation.").

prevent the government (or court) from holding anyone liable for lying under oath – surely not an outcome that was intended.

### 3. Plaintiffs Adequately Allege that Monsees' False Statements to Congress Were Made "In Connection With" the Purchase or Sale of a Security

Without citation to any authority, Defendant Monsees asserts that his Congressional testimony is also inactionable because it was not made "in connection with the purchase or sale of any security." Monsees Br. at 9. The "in connection with" requirement, however, must be construed broadly and flexibly to allow the securities fraud statute to capture novel frauds as well as more commonplace ones. *See In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953, 964-65 (2d Cir. 1993). "As the Supreme Court has noted, 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'" *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 156 (2d Cir. 1998) (quoting *Basic v. Levinson,* 485 U.S. 224, 247 n.24 (1998)). It is irrelevant whether the false statements were "made for the purpose or the object of influencing the investment decisions of market participants." *Muzinich*, 2002 U.S. Dist. LEXIS 26962, at *9. Defendants' "fraud could be 'in connection with' the sale of securities even if [Defendants] had no intent to influence investors." *Id.* at *10. Therefore, "[t]he 'in connection' criteria is satisfied where material misrepresentations are 'disseminated to the public in a medium upon which a reasonable investor would rely.'" *Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 301 (3d Cir. 2005), *accord McGann v. Ernst & Young*, 102 F.3d 390, 392-96 (9th Cir. 1996); *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir. 1968) (en banc).

Monsees' testimony in the highly publicized hearing is precisely the type of public statement that a reasonable investor would consider. Indeed, analysts expressly referenced Monsees' and JUUL's testimony in their reports analyzing Altria's stock price. ¶551. Courts have repeatedly found the "in connection with" requirement satisfied under similar circumstances. *See*, *e.g.*,

*Carter-Wallace, Inc.*, 150 F.3d at 156 (reversing dismissal of Section 10(b) claim: "we cannot say that, as a matter of law, detailed drug advertisements using technical jargon and published in sophisticated medical journals can never constitute statements made 'in connection with' a securities transaction"); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 WL 66281, at *18 (N.D. Cal. Jan. 4, 2017) ("in connection with" the purchase of securities satisfied because in the fraud-on-the-market context, as here, a reasonable investor could have "considered the emissions stickers on Volkswagen vehicles to be material investing information; such an assessment is 'peculiarly one[] for the trier of fact'"); *In re Facebook, Inc. Sec. Litig.*, 405 F.Supp.3d 809, 822-23, 833-36 (N.D. Cal. 2019) (allegedly false and misleading statements made in the company's privacy policy, despite appearing to be directed to consumers, were "made in connection with" the purchase or sale of Facebook securities); *SEC v. Stinson*, 2011 WL 2462038, at *5 (E.D. Pa. June 20, 2011) ("in connection with" satisfied where misinformation appeared in direct email solicitations, a webinar, and on websites).

### E.   The Complaint Pleads a Strong Inference of Scienter on Behalf of the JUUL Defendants

#### 1.   JUUL's Creation of a Product Designed to Attract Underage Consumers, Sustain Them as Users, and JUUL's Illegal Marketing Practices Support a Strong Inference of Scienter[15]

The Complaint alleges that JUUL created a product specifically made to appeal to consumers who were under the legal age to purchase such products.  ¶529.  JUUL designed its e-cigarette device to be small, sleek, and discreet.  *Id.*  Indeed, Bowen, who was a former designer at Apple, applied what he learned during his prior employment to create a product that was dubbed the

---

[15]   Although the JUUL Defendants accuse Plaintiffs of trying to allege scienter through "group pleading" (JUUL Br. at 25) – a concept that has nothing to do with scienter, *see Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 190 (4th Cir. 2009) (citing *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)) – the Complaint details the roles of each Defendant in the alleged fraudulent conduct, and the speaker or speakers of each material misstatement.  *See generally*, ¶¶454-519.

-26-

"iPhone of e-cigarettes[.]" ¶122. JUUL included the "party mode" feature on the JUUL devices and offered JUULpods in a range of flavor options similar to the flavors that were banned in traditional cigarettes. ¶44, 127-136. Moreover, JUUL created JUULpods to minimize the harsh effect of traditional cigarettes when inhaled. ¶¶89, 100, 102-106. JUUL also undertook an illegal marketing campaign aimed directly at targeting underage consumers in a format and in mediums that would directly reach underage consumers. ¶¶191-305, 529.

These design decisions were not made by accident or happenstance.[16] These were coordinated decisions by the JUUL Defendants to place JUUL's products in front of underage consumers. Indeed, Monsees and Bowen studied the Big Tobacco documents made public after the MSA, and understood Big Tobacco's effective efforts in terms of product design and marketing to underage consumers. ¶¶88, 529. JUUL made statements clearly evidencing its belief that it had "ca[ught] up" to Big Tobacco because of the documents. *Id.* at 88.[17] Indeed, JUUL endeavored to create a product that would deliver more nicotine than the "carefully engineered" cigarette, and succeeded. ¶89. Its triumph in creating such a product, and disregard for the addictive propensity of its products, is evidenced by JUUL's internal mantra, first espoused by Defendant Burns: "[h]alf our

---

[16]    The JUUL Defendants' reliance on *Knurr v. Orbital ATK Inc.*, 272 F. Supp. 3d 784 (E.D. Va. 2018), is misplaced. Unlike in *Knurr*, where it was apparent to the court that the defendant did not know its accounting methodologies were fraudulent, *id.* at 505, Plaintiffs here allege that JUUL's products and marketing practices were knowingly and intentionally targeted to underage users and not disclosed to the market (and then expressly denied by the JUUL Defendants), supporting scienter.

[17]    The JUUL Defendants' argument that Plaintiff is asking the Court to engage in "inference stacking" based on its reliance on *Maguire Financial, LP v. PowerSecure International, Inc.*, 876 F.3d 541, 548 (4th Cir. 2017), JUUL Br. at 25-26, misses the mark. Contrary to what the JUUL Defendants contend, Plaintiffs are not asking the Court to infer that the JUUL Defendants knew the effect that regulatory actions and litigation would have on JUUL. It is not necessary to draw an inference as it is self-evident that regulatory actions and litigation over JUUL's illegal marketing to underage users would restrict future underage advertising and adversely affect sales.

-27-

customers are drunk and vaping like mo-fo's, who the fu[*]k is going to notice the quality of our pods[,]" and establishes JUUL's understanding of the addictive power of its products.  ¶¶116, 529.

Moreover, JUUL's #vaporized campaign, as well as the more muted "Switch" campaign, were near duplicates of advertising campaigns undertaken by Big Tobacco prior to the MSA.  ¶¶191-305. 529.  Tellingly, the JUUL Defendants do not contest that the purpose of these decisions was exactly what Plaintiffs allege: to attract and maintain underage consumers as customers; rather, they simply argue that it was well-known that this was JUUL's intent.  *See generally*, JUUL Br. at 26-27.

This knowledge and intent, coupled with implementation of the design of the JUUL e-cigarette and JUULpods, supports a strong inference that the JUUL Defendants were at least reckless in disregarding these facts when making their Class Period statements regarding their intent to market to underage consumers and have underage consumers use their products.  Moreover, the JUUL Defendants repeatedly denied that their intent had been to market to underage consumers. ¶¶456, 458, 464, 496, 498, 509.  Courts have held that "frequent statements" about the subject of the fraud supports an inference of scienter.  *See Massey Energy*, 883 F. Supp. 2d at 620-21; *see also In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 785 (E.D. Va. 2015) ("The fact that Defendants made repeated misrepresentations over the course of a year 'also suggests a substantial degree of scienter.'").

### 2.    Altria and JUUL's Coordinated Scheme to Avoid Regulation of JUUL Products Further Supports a Strong Inference of Scienter

Plaintiffs chronicle a scheme on the part of the Altria and JUUL Defendants to mislead regulators into believing that the mint flavored JUULpods were not adding to the youth vaping epidemic, thereby shielding the most potent nicotine formulation from regulation.  ¶¶387-416.  The Complaint alleges that, while negotiating its investment in JUUL, Altria and JUUL conspired to shield mint JUULpods from regulation because that was customers' preferred flavor when other

flavor offerings were not available.  *Id.*  This is significant because both Altria and JUUL were aware that the nicotine potency of the mint JUULpod was the strongest of all the JUULpods, and was significantly more potent than Altria's own e-cigarette product.  ¶¶165-168.  Thus, Altria and JUUL conspired and carried out a scheme to shield mint JUULpods from regulation, which succeeded until it was discovered, and the ensuing regulation and litigation caused a significant decline in the price of Altria's stock.

The JUUL Defendants' argument that Plaintiffs fail to allege a misstatement regarding whether or not mint appealed to underage consumers misses the mark.  JUUL Br. at 28.  The Complaint alleges that JUUL and Altria both undertook different flawed studies to attempt to dissuade regulation of the mint JUULpods.  ¶¶390-392, 408.  This coordination and mirroring of efforts could not have been accomplished absent knowledge and active participation of all Defendants.  For example, on October 25, 2018, less than ten days after JUUL submitted its misleading action plan to the FDA, Willard followed suit, fraudulently characterizing mint as a "traditional tobacco flavor," and characterizing the youth vaping epidemic as having been caused by "flavors that go beyond traditional tobacco flavors."  ¶401.  Willard and Altria followed this up by submitting their own sham study that fraudulently indicated that underage consumers did not prefer mint flavored e-cigarette products.  ¶408.

Plaintiffs have more than adequately alleged strong circumstantial facts concerning the perpetration of this scheme on the part of both the JUUL and Altria Defendants.  ¶529.  Courts in this circuit have observed that circumstantial facts can give rise to the requisite strong inference of scienter because it "is rare that perpetrators of a fraud would confess outright."  *In re Peoplesoft, Inc.*, 2000 WL 1737936, at *3 (N.D. Cal. May 25, 2000).

### 3.     Plaintiffs Allege a Motive to Commit Fraud

Although motive to commit the alleged fraud is unnecessary to allege, Plaintiffs have nonetheless alleged a motive to commit fraud on behalf of the JUUL Defendants.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007) ("[T]he absence of a motive allegation is not fatal" to setting forth a strong inference of scienter.).  Further, "under a holistic analysis, any factor by itself is inadequate to reveal or refute the presence of scienter."  *Epstein v. World Acceptance Corp.*, 203 F.Supp.3d 665, 671 (D.S.C. 2016).  As the Complaint alleges, the JUUL Defendants were motivated to misrepresent their intent with regard to marketing to underage customers in order to create the illusion that they were not responsible for underage customers using JUUL products and thereby shield themselves from litigation liability and regulatory action.  ¶526.

The JUUL Defendants were also motivated to perpetrate the scheme to defraud investors detailed *supra*, because JUUL stood to benefit from Altria's success, as Altria committed to provide additional benefits to JUUL in the areas of marketing and distribution.  ¶527.  This unique motive, in this unique context, further adds to the compelling inference of scienter here.

### F.     Plaintiffs Plead a Cogent Inference of Scienter as to Defendants Monsees and Bowen

The Complaint's allegations create a cogent inference of scienter as to Defendants Monsees and Bowen.  *First*, the Complaint details Monsees' and Bowen's comprehensive review of the Big Tobacco documents made public after the MSA to develop JUUL's products and marketing plans (¶¶88-90, 201-202), and their efforts to use what they learned to benefit JUUL.  ¶¶91-97.

*Second*, both Monsees' and Bowen's positions within JUUL during the Class Period, and their status as co-founders and architects of JUUL, add to the cogent inference of scienter.  ¶¶3, 526.  As noted previously, a defendant's position within a company adds to the cogent inference of scienter when viewed holistically.  *See Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 890 (4th Cir. 2014); *see also Genworth*, 103 F. Supp. 3d at 785 (that the defendants held senior executive

-30-

positions "augments the other allegations of intimate involvement pleaded elsewhere in the []
Complaint"). Here, both Bowen and Monsees, at all times, were in positions within JUUL to affect
decision-making at the highest levels, and are alleged to have been part of the team that designed
JUUL's products, as well as part of the team that reviewed and studied the Big Tobacco documents
before creating JUUL's marketing. ¶¶88-97.

Finally, Plaintiffs have adequately alleged that both Bowen and Monsees possessed the
requisite scienter to deceive Altria shareholders. Defendants, relying on a misinterpretation and
citation of out of circuit precedent, argue there are no facts suggesting that Bowen and Monsees
intended to deceive Altria investors. *See* Monsees Br. at 10-11. Relying on *Cement & Concrete
Workers District Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128 (N.D. Cal.
2013), Monsees argues that "it strains the imagination to consider how [Monsees] could have
intended his testimony to Congress . . . to mislead Altria investors." Monsees Br. at 11. In making
this argument, Monsees ignores that *Cement & Concrete* plainly establishes that if Monsees *should
have known* that his statements would artificially inflate Altria's securities, scienter can be
adequately pleaded. *See Cement & Concrete*, 964 F. Supp. 2d at 1143. Moreover, the court in
*Cement & Concrete* noted that its scienter analysis was informed by the failure to plead an
actionable misstatement or omission, an issue not present here. *Id.*

Monsees' statements to Congress (¶498) occurred well after Altria's investment and after
analysts began following JUUL's activities as they related to Altria. ¶¶534-551. It is clear that, at a
minimum, Monsees should have known his statements to Congress about a particularly sensitive
issue for both Altria and JUUL would have misled Altria investors about JUUL's intent to market to
underage consumers and have underage consumers use their products, particularly after the repeated

denials of the same allegations by JUUL (and which were also repeated by Altria).[18]   ¶¶456, 458,

464, 496, 498, 509.   These facts establish a clear attempt to cover up the illegality of JUUL's

marketing practices, and Monsees should have been aware that his statements would have misled

Altria investors.   *See Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 979-80 (ND. Cal. 2015)

(distinguishing *Cement & Concrete* based on adequately pleaded misstatements or omissions.); *see

also In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310 (D. Utah 2007)

("Evidence that a defendant has taken steps to cover-up [sic] a misdeed is strong proof of scienter.").

### G.   Plaintiffs Allege a Cogent Inference of Scienter on the Part of K.C. Crosthwaite

Plaintiffs allege facts establishing a strong inference of scienter on the part of Defendant

Crosthwaite.   *See Conventry*, 2011 WL 1230998, at \*17.   *First*, the allegations attributed to CW1

establish that Crosthwaite was aware of JUUL's illegal marketing practices as he was tasked with

"get[ting] JUUL done" by Willard.   ¶348.   CW1 also makes clear that Crosthwaite played an integral

part in completing Altria's investment in JUUL.   ¶349.   These allegations, together with the strong

allegations concerning the due diligence that Altria undertook when evaluating the JUUL

investment, create a strong inference that Crosthwaite was aware of the terms of the Altria

investment, including any non-compete provisions, and was aware and helped to orchestrate the

scheme to avoid regulation of mint JUULpods.

*Second*, Crosthwaite's positions within both Altria and JUUL add to a strong inference of

scienter.   Crosthwaite was both a senior officer at Altria and played an integral part in Altria's

---

[18]     In an attempt to undermine Plaintiffs' allegation that analysts covering Altria followed and discussed JUUL to satisfy the requirement that an actionable statement be made "in connection with the purchase or sale" of Altria stock, Monsees offers an unrelated hypothetical suggesting that a Ford executive testifying about electric cars would then be considered to have made a statement in connection with the purchase or sale of Tesla stock.   *See* Monsees Br. at 9 n.3.   What Monsees overlooks, though, is that unlike Altria's $12.8 billion ownership stake in Altria, Tesla did not own a stake in Ford such that Ford's statements would directly impact Tesla stock.

investment in JUUL (¶349), and was appointed the CEO of JUUL after then-CEO Kevin Burns was removed.  As discussed *supra*, the high-level positions held by Crosthwaite at both corporate defendant entities adds to a cogent inference of scienter.

### H.    The Complaint Raises a Strong Inference of Scienter as to Defendant Burns

The Complaint adequately alleges a strong inference of scienter for Defendant Burns.  *First*, Burns was JUUL's CEO from December 2017 to September 2019 before being ousted and replaced by long-time Altria executive Crosthwaite.  ¶¶29, 511. As discussed *supra*, a defendant's positon within a company adds to a compelling inference of scienter.  Moreover, the Complaint pleads in detail that Burns helped to coordinate and negotiate Altria's investment in JUUL, including the non-compete agreement that removed Altria's competing products from the market (¶¶383, 405); he also authored JUUL's action plan that falsely characterized mint JUULpods as traditional tobacco products.  ¶397.  Burns, leveraging his experience as the former CEO of a yogurt company, studied consumer's reaction to flavor names for JUUL's products, making it clear he understood JUUL's intent in creating kid-friendly flavors for its JUULpods.  ¶145.  Burns' status as CEO of JUUL, and his active participation in the alleged fraudulent scheme, evidence scienter.  *See Yates*, 744 F.3d at 890 (4th  Cir. 2014); *see also Genworth*, 103 F. Supp. 3d at 785.

*Second*, the Complaint makes clear that Burns was aware of the popularity of the mint JUULpod among youth, yet still fraudulently asserted that JUUL's products were not meant for underage consumers.  Burns made this clear by stating "[y]ou need to have an IQ of 5 to know that that when customers don't find mango they buy mint."  ¶149.  Burns' statement in an interview with CNBC in July 13, 2019, concerning the underage use of JUUL products further evidences his scienter.  Burns stated in relevant part "I'm sorry that their child's using the product. It's not intended for them. I hope there was nothing that we did that made it appealing to them. As a parent

of a 16-year-old, I'm sorry for them, and I have empathy for them, in terms of what the challenges they're going through."   ¶496.  The Fourth Circuit has observed that "the nature of the alleged misstatements and omissions themselves give rise to a strong inference of scienter."  *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 610, n.7 (4th Cir. 2015).  Here, Burns' statements themselves clearly evidence his scienter when viewed holistically with the remaining scienter allegations.

*Finally*,  Burns' removal as CEO of JUUL in September 2019, at the height of the regulatory and public scrutiny of JUUL, is further evidence of scienter.  The Fourth Circuit has held that resignations, or in this case, forced removals, is indicative of scienter when combined with other allegations.  *See, e.g., Epstein*, 203 F. Supp. 3d at 671.

## IV.    LOSS CAUSATION

### A.    Plaintiffs Adequately Allege Loss Causation

To plead loss causation, a plaintiff must allege "a causal connection between the material misrepresentation and the loss," providing "[the] defendant with some indication of the loss and the causal connection that the plaintiff has in mind," which "should not prove burdensome."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342, 347 (2005).  The plaintiff need only provide "sufficient specificity to enable the court to evaluate whether the necessary causal link exists" between the material misrepresentations or omissions and the economic loss.  *Hunter*, 477 F.3d at 186.

The JUUL Defendants inappropriately raise uniquely fact-specific arguments in their attempt to obscure the issue of loss causation at the motion to dismiss stage.  JUUL Br. at 30-33.  Plaintiffs' allegations – that the JUUL Defendants failed to disclose the existence of their illegal marketing practices targeting underage consumers, leading to the repeated disclosures of adverse investigations, litigation, and regulatory scrutiny, and that they engaged in a conspiracy with the Altria Defendants – clearly plead a materialization of the risk, and are adequate at this stage of the litigation.  *See Singer*, 883 F.3d at 445.  In addition, the JUUL Defendants' denial of the facts that they argue were

fully disclosed to the market, JUUL Br. at 30-31, defeats any argument on that basis. *See In re Signet Jewelers Ltd. Sec. Litig*., 2019 WL 3001084, at \*16 (S.D.N.Y. July 10, 2019); *see also DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 437-38 (S.D.N.Y. 2018) ("express denials of the reported allegations could have allayed a reasonable investor's concerns").

Moreover, the JUUL Defendants ignore that, on September 25, 2019, Altria disclosed in an SEC filing that JUUL was *halting all of its advertising in the United States*, striking at the heart of the Complaint's allegations and resulting in significant losses to Plaintiffs.  ¶511.  At this stage of the litigation, Plaintiffs have satisfied their pleading burden by alleging stock price declines after the revelation of information from various sources related to JUUL's undisclosed conduct.  ¶¶478-520; *see also* Altria Opp. at 39-40.

## V.     The Complaint Adequately Alleges Control Person Liability

To plead a *prima facie* case of control-person liability under Section 20(a), a plaintiff need only allege: (1) the existence of a primary securities violation by the controlled person; and (2) the defendants' control over the primary violator.  *See In re Mut. Funds*, 566 F.3d at 129-30.  The Fourth Circuit "has determined that a plaintiff is not required to allege 'culpable participation' as an element of the *prima facie* case for 'control person liability.'"  *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 602 (E.D. Va. 2015) (citing *In re Mut. Funds*, 566 F.3d at 129-30).  Nor must a plaintiff plead that the control person acted with scienter or was directly liable for the fraud.  *Id*. at 603.  Notice-pleading standards apply.  *Id*.  Further, the Fourth Circuit has observed that control-person liability is a "complex factual question" that is "not ordinarily subject to resolution on a motion to dismiss."  *In re Mut. Funds,* 566 F.3d at 130; *see also In re Willis Towers Watson PLC Proxy Litig.*, 439 F. Supp. 3d 704, 717 (E.D. Va. 2020) (same); *Kiken*, 155 F. Supp. 3d at 603 (same).

*First*, as discussed *supra*, Plaintiffs have adequately pleaded a primary violation as to each Defendant.  For that reason alone, Plaintiffs' Section 20(a) claims should be sustained.  *See In re Genworth*, 103 F. Supp. 3d at 790–91 ("On a motion to dismiss, a Section 20(a) claim will [] stand or fall based on the court's decision regarding the Section 10(b) claim."); *see also Kiken*, 155 F. Supp. 3d at 609.

*Second*, Plaintiffs adequately allege that both Monsees and Crosthwaite had the "potential power to influence and control the activities of a person, as opposed to the actual exercise thereof." *In re Mut. Funds,* 566 F.3d at 130.  To plead control, a plaintiff must "plead[] facts showing that the controlling defendant had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws . . . [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability.'" *Id.* (alterations in original).

Defendants Monsees and Crosthwaite contend that Plaintiffs have failed to allege facts sufficient to allege their control.  *See* Monsees Br. at 13-14; Crosthwaite Br. at. 18-19.  However, the Complaint adequately alleges that Crosthwaite was responsible for the Altria investment in JUUL, and was then named CEO of JUUL.  ¶¶348, 511.  The Complaint further alleges that Monsees was not only a co-founder, but played an important role in the design process for JUUL's products, having been part of the team that reviewed the Big Tobacco documents and implemented those practices into JUUL's operations.  ¶88.

Notably, each of the opinions from the Fourth Circuit relied upon by Monsees and Crosthwaite upheld the plaintiffs' allegations of control person liability.  *See In re Willis Towers*, 439 F. Supp. 3d at 717; *see also In re Mut. Funds,* 566 F.3d at 129-30.  Moreover, each of Defendant Monsees' out of circuit opinions imposes a higher burden on Plaintiffs than the Fourth Circuit has adopted for adequately pleading control person liability, or rested their allegations on ownership of a

minority share in the corporate defendant.  *See Latham v. Matthews*, 662 F. Supp. 2d 441, 469 (D.S.C. 2009) ("[§20(a)] refers to the 'power' to control, not the actual involvement of a defendant in any particular act or omission").  Here, Monsees is alleged to have aided in orchestrating the design of JUUL's products, and the marketing of the same based on his position as co-founder of JUUL.  These allegations are sufficient for control person liability.  *See Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.*, 941 F. Supp. 1369, 1378 (S.D.N.Y. 1996) ("[a]ccordingly, when a defendant does not clearly occupy control status, the plaintiff must plead facts from which control status can be inferred . . . aided the primary violator in performing some culpable conduct linking the defendant to the primary violation for which relief is sought").

Accordingly, Plaintiffs have adequately alleged control person liability under Section 20(a).

## VI. CONCLUSION

For the foregoing reasons, the JUUL Defendants' motions to dismiss should be denied in their entirety.  If this Court grants any part of the motions, in whole or in part, Plaintiffs respectfully request leave to amend under Federal Rule of Civil Procedure 15(a) to cure any defects.

DATED:  September 17, 2020

By: */s/ Steven J. Toll*
Steven J. Toll (VSB #15300)
Daniel S. Sommers
S. Douglas Bunch
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave., NW Suite 500
Washington, DC  20005
Telephone:  202/408-4600
202/408-4699 (fax)
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com

*Local Counsel for Lead Plaintiffs*

Jeremy A. Lieberman
Michael J. Wernke
POMERANTZ LLP
600 Third Avenue
New York, NY  10016
Telephone:  212/661-1100
212/661-8665 (fax)
jalieberman@pomlaw.com
mjwernke@pomlaw.com

*Counsel for Lead Plaintiffs Donald Sherbondy and
Sarah Sherbondy*

Samuel H. Rudman
David A. Rosenfeld
Philip T. Merenda
ROBBINS GELLER RUDMAN & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
pmerenda@rgrdlaw.com

*Counsel for Lead Plaintiff Laborers Pension Trust
of Greater St. Louis*

<u>CERTIFICATE OF SERVICE</u>

I, Steven J. Toll, hereby certify that on September 17, 2020, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.



*/s/ Steven J. Toll*
STEVEN J. TOLL