IN THE UNITED STATES DISRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

GABBY KLEIN, *et al.*,
       Plaintiffs,

     v.                              Civil No. 3:20cv75 (DJN)

ALTRIA GROUP, INC. *et al.*,
       Defendants.

### MEMORANDUM OPINION

This action arises out of Defendant Altria Group, Inc.'s ("Altria") $12.8 billion investment in JUUL Labs, Inc. ("JUUL"). The investment proved unwise, and now investors in Altria allege that the two companies defrauded them by not disclosing the risks created by JUUL's illegal marketing practices targeting underage consumers. The investors have now filed this securities fraud action to recover the damages suffered as a result of this alleged fraud. Defendants have all moved to dismiss this action.

Specifically, this matter comes before the Court on the Altria Defendants' Motion to Dismiss (ECF No. 117) filed by Defendants Altria, William Gifford ("Gifford") and Howard Willard ("Willard"); the Motion to Dismiss (ECF No. 119) filed by JUUL, Adam Bowen ("Bowen") and Kevin Burns ("Burns"); Defendant James Monsees' ("Monsees") Joinder and Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (ECF No. 121); and Defendant K.C. Crosthwaite's ("Crosthwaite") Motion to Dismiss the Corrected Consolidated Class Action Complaint (ECF No. 123).[1] For the following reasons, Defendants' Motions to

---

[1]    The Court will refer to Altria, Gifford, Willard and Crosthwaite as the "Altria Defendants" or "Altria." The Court will refer to JUUL, Bowen, Burns and Monsees as the "JUUL Defendants" or "JUUL." Monsees and Burns will be referred to as the "Individual JUUL Defendants." All of the above defendants will be collectively referred to as "Defendants."

Dismiss will be DENIED, with the exception of Defendant Crosthwaite's Motion to Dismiss, which will be GRANTED IN PART and DENIED IN PART.  Defendant Crosthwaite's Motion is GRANTED with respect to Plaintiffs' claims against Crosthwaite brought under Securities Exchange Commission ("SEC") Rule 10b-5(b).  The Motion is DENIED with respect to all other claims that Plaintiffs bring against him.

## I.   BACKGROUND

### A.   Factual Allegations

At this stage, the Court must accept as true the facts set forth in the Corrected Consolidated Class Action Complaint ("Complaint" (ECF No. 108)).  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Against this backdrop, the Court accepts the following facts as alleged for purposes of resolving the instant Motions.

#### i.   Parties

Plaintiffs bring this action against multiple defendants, including Altria, a tobacco company located in Richmond, Virginia, whose stock trades on the New York Stock Exchange under the ticker symbol "MO." (Compl. ¶ 23.)  Altria has historically played a large part in the market for combustible cigarettes and smokeless tobacco.  (Compl. ¶ 36.)  Defendant Willard served as Altria's Chief Executive Officer.  (Compl. ¶ 24.)  Defendant Gifford served as Altria's Vice Chairman and Chief Financial Officer during the times relevant to this action.  (Compl. ¶ 25.)

JUUL, a Delaware corporation with its principal place of business in San Francisco, California, sells e-cigarettes, which pack nicotine salts from leaf tobacco into single use "pods," creating a vapor for inhalation when heated.  (Compl. ¶¶ 26, 37.)  Defendant Bowen co-founded JUUL and served on the Board of Directors and as Chief Technology Officer of JUUL through

October 2019, before transitioning to an advisory role assisting JUUL's CEO. (Compl. ¶ 26.) Defendant Monsees also co-founded JUUL, serving on the Board of Directors until March of 2020, and as Chief Product Officer of JUUL through October 2019, before transitioning to an advisory role assisting JUUL's CEO. (Compl. ¶ 28.) Defendant Burns served as JUUL's CEO from December 2017 until September 2019. (Compl. ¶ 29.) Defendant Crosthwaite now serves as the CEO of JUUL, having previously served as Altria's Chief Growth Officer and as an observer on JUUL's Board of Directors following Altria's investment in JUUL. (Compl. ¶¶ 3, 30).

Lead Plaintiffs Donald Sherbondy, Sarah Sherbondy and Construction Laborers Pension Trust of Greater St. Louis ("Plaintiffs") represent a putative class of all persons and entities who purchased or otherwise acquired Altria securities between December 20, 2018, and February 21, 2020. (Compl. ¶¶ 1-2.)

### ii. *Tobacco Industry's History of Targeting Youth*

The tobacco industry, including Altria, has sold billions of dollars in combustible cigarettes over the years, driven by aggressive and successful marketing, that has resulted in hundreds of thousands of deaths and illnesses due to the harmful effects of nicotine found in cigarettes. (Compl. ¶ 41.) This campaign included efforts to target young, impressionable consumers with fruity flavors. (Compl. ¶ 42.) Over the years, the tobacco industry has faced decades of litigation over its efforts targeting youth and its failure to adequately warn of the dangers associated with smoking. (Compl. ¶ 43.)

In 1998, 46 states entered into the Tobacco Master Settlement Agreement ("MSA") stemming from much of the litigation, and the Department of Justice reached a separate settlement with the tobacco companies prohibiting them from selling flavored cigarettes.

3

(Compl. ¶¶ 43-44.)  The litigation revealed that the tobacco industry aggressively marketed its products to underage consumers to create "replacement smokers" who would then become customers for life.  (Compl. ¶¶ 46-48.)  The strategy further involved suppressing research, destroying documents and manipulating the nicotine levels to perpetuate addiction.  (Compl. ¶ 48.)

### iii.    JUUL's Efforts to Target Youth

Plaintiffs allege that JUUL, specifically Monsees and Bowen, carefully studied those marketing strategies, advertisements and product designs of the tobacco industry that the documents from the tobacco litigation revealed.  (Compl. ¶ 88.)  Plaintiffs allege that JUUL, using this information, then designed its e-cigarettes to appeal to underage consumers.  (Compl. ¶ 87.)  This included developing a nicotine delivery system designed to maximize nicotine delivery while minimizing the harshness of the "throat hit" associated with traditional cigarettes.  (Compl. ¶ 99, 103-16.)  Additionally, this involved creating e-cigarettes with a sleek, high-tech design that would appeal to teenagers.  (Compl. ¶¶ 121-23.)  Likewise, JUUL introduced fruity, kid-friendly flavors, such as "Fruit," "Bruule," "Miint," "Cool Mint," "Cucumber," and "Mango," to entice youth to use its products.  (Compl. ¶¶ 127-35.)

Plaintiffs further allege that JUUL undertook marketing campaigns "directed specifically at a youthful audience both in its substance and its delivery."  (Compl. ¶¶ 200-02, 208.)  These campaigns included colorful, inviting advertisements, social media activity, JUUL-hosted parties and other targeted marketing, all designed to attract underage consumers.  (Compl. ¶¶ 205-08.)  In its social media activity, JUUL marketed its products in areas that were the near-exclusive domain of underage consumers.  (Compl. ¶¶ 210-13.)  Similarly, JUUL placed advertisements on websites and television channels frequented by underage consumers.  (Compl. ¶¶ 214-25.)  In

4

fact, JUUL advertised on Nickelodeon's websites and Cartoon Network's website, which both offer children's programming and games. (Compl. ¶¶ 218-19.) Additionally, JUUL purchased advertisements on other websites designed for children, including allfreekidscrafts.com, hellokids.com and kidsgameheroes.com, among other websites targeting young boys and girls. (Compl. ¶¶ 220-21.) Moreover, JUUL implemented no safeguards to ensure that underage individuals could not view their websites or social media accounts. (Compl. ¶¶ 232-35.) Likewise, JUUL went into New York high schools to give presentations about the safety of JUUL products. (Compl. ¶¶ 288-91.)

Plaintiffs claim that internal documents demonstrate that JUUL intended to target young audiences and failed to implement standards to ensure that its product would not target youth. (Compl. ¶ 209.) Likewise, JUUL allowed consumers to purchase products from its website without having proper controls in place to prevent underage purchases. (Compl. ¶¶ 306-19.) For example, it removed the requirement that an adult sign for the products at the point of delivery. (Compl. ¶ 316.)

### iv.   *Altria Seeks to Invest in JUUL*

By November 2017, JUUL's vaping devices had become the best-selling e-cigarette on the market. (Compl. ¶ 328.) Conversely, Altria had failed to capture a significant share of the e-cigarette market at the same time that its sale of regular cigarettes had cratered. (Compl. ¶¶ 331-32.) Willard became adamant about acquiring JUUL, so that Altria could gain a major share of the market. (Compl. ¶¶ 348-51.) Importantly, Plaintiffs allege that Altria became well-aware of JUUL's illegal marketing practices as a result of its due diligence into the company. (Compl. ¶¶ 353-59.) And, Altria had prided itself on its efforts to combat youth smoking. (Compl. ¶¶ 367-69.) However, Altria believed that it could remedy the youth marketing problem if it

acquired a controlling stake in JUUL.  (Compl. ¶¶ 376-82.)  JUUL refused to sell a majority

stake, but Altria opted to invest in JUUL anyway.  (Compl. ¶¶ 360, 383-85.)

> **v.      JUUL's and Altria's Alleged Scheme to Defraud Investors**

According to Plaintiffs, shortly before the announcement of Altria's investment into

JUUL, the two companies engaged in a scheme to stave off regulation of mint flavored pods.

(Compl. ¶ 387.)  The scheme involved keeping mint products on the market, so that e-cigarettes

could continue to appeal to youth smokers.  (Compl. ¶ 388.)  To achieve this scheme, JUUL

submitted a sham study to the FDA purporting to show that the number of youth smokers who

used the fruit flavors far outpaced youth users of mint.  (Compl. ¶ 390.)  Plaintiffs allege that

Altria and JUUL knew that the numbers that they reported conflicted with the internal numbers

that they had collected.  (Compl. ¶ 391.)

On September 25, 2018, then-FDA Commissioner Scott Gottlieb sent letters to Altria,

JUUL and other e-cigarette manufacturers requesting a detailed plan to mitigate widespread use

by minors.  (Compl. ¶ 393.)  Due to ongoing merger negotiations, Altria and JUUL coordinated

their responses to mislead the FDA into allowing JUUL to continue marketing mint JUUL pods.

(Compl. ¶ 394.)  JUUL mischaracterized mint as a non-flavored cigarette product that did not

appeal to youth.  (Compl. ¶¶ 398-400.)  Altria also repeated the misleading statement in its

response that mint constituted a "traditional tobacco flavor."  (Compl. ¶ 401.)  Altria then stated

that it would discontinue its non-traditional tobacco flavors, not including mint.  (Compl. ¶ 401.)

Altria then told investors that it took this action to address the youth usage issue, even though, as

Plaintiffs allege, Altria pulled those e-cigarettes off the market due to a non-compete clause in its

deal with JUUL. (Compl. ¶ 404.)  According to Plaintiffs, Altria's defense of mint as a tobacco-

analog stemmed from its scheme to protect the profits of JUUL's mint pods, the most popular

flavor among youth.  (Compl. ¶ 407.)  Altria and JUUL undertook this scheme to prevent the

FDA from banning mint, knowing that kids prefer mint, thus ensuring that mint would remain

available to youths for many months.  (Compl. ¶ 410.)

### vi.    The Investment and Subsequent Statements

On December 20, 2018, Altria and JUUL both issued press releases announcing that

Altria had invested $12.8 billion in JUUL for a 35% stake in JUUL.  (Compl. ¶ 454.)  According

to Altria's press release, the agreement "would accelerate JUUL's mission to switch adult

smokers to e-vapor products."  (Compl. ¶ 454.)  The press release further touted the potential of

e-cigarettes to reduce harm for adult smokers.  (Compl. ¶ 456.)  The press release also quoted

Defendant Burns, JUUL's CEO at the time, as stating that the investment gives JUUL the

"historic opportunity to improve the lives of the world's one billion adult smokers."  (Compl.

¶ 457.)  Finally, Altria's press release stated:

> Altria and JUUL are committed to preventing youth from using any tobacco products.
> As recent studies have made clear, youth vaping is a serious problem, which both Altria
> and JUUL are committed to solve.  As JUUL previously said, "Our intent was never to
> have youth use JUUL products.  But intent is not enough, the numbers are what matter,
> and the numbers tell us underage use of e-cigarette products is a problem."

(Compl. ¶ 462.)  Further, the press release stated that "JUUL believes that it cannot fulfill its

mission to provide the world's one billion adult smokers with a true alternative to combustible

cigarettes if youth use continues unabated.  Together, JUUL and Altria will work to prevent

youth usage through their announced initiatives . . .".  (Compl. ¶ 462.)

Minutes after Altria issued its press release, JUUL issued its own press release, mirroring

that of Altria's.  (Compl. ¶ 465.)  Again, JUUL stated that its "intent was never to have youth use

JUUL products" and identified Altria's investment as furthering its purported mission to prevent

underage vaping.  (Compl. ¶ 465.)  Further, JUUL announced that it would gain access to

Altria's retail, marketing and distribution apparatus.  (Compl. ¶ 465.)  Plaintiffs allege that Altria

"knew that [JUUL] was marketing to minors but nevertheless agreed to provide marketing and distribution services and permit [JUUL] to market and operate as it had in the past." (Compl. ¶ 13.)

During a December 20, 2018 call with analysts and investors discussing the investment in JUUL, Willard indicated that "Altria and JUUL are committed to preventing kids from using any tobacco products.  As recent studies have made clear, youth vaping is a serious problem, which both Altria and JUUL are committed to solve." (Compl. ¶ 466.)  In response to a question about how much business JUUL derived from underage consumers, Willard stated that "we believe it's quite a small percentage." (Compl. ¶ 468.)

On February 26, 2019, Altria filed an Annual Report on Form 10-K with the SEC. (Compl. ¶ 471.)  The 10-K report downplayed the FDA's concern with Altria's investment in JUUL and again stated Altria's continued commitment to preventing underage vaping.  (Compl. ¶ 471.)  The report also contained what Plaintiffs characterize as "generic, boilerplate representations regarding the risk that Altria's expected benefits from its investment in JUUL may fail to materialize in the manner or time expected." (Compl. ¶ 473.)  Altria continued to file 10-K reports with similar boilerplate representations.  (Compl. ¶ 490, 492.)  Altria appended signed certifications to the reports pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendants Willard and Gifford certified that "the information contained in the [2018 10-K report] fairly presents, in all material aspects, the financial condition and results of operations of the Company." (Compl. ¶ 475.)

On July 13, 2019, Burns stated in an interview on CNBC: "First of all, I'd tell them that I'm sorry that their child's using the product.  It's not intended for them.  I hope there was nothing that we did that made it appealing to them." (Compl. ¶ 496.)

On July 25, 2019, Monsees stated to Congress through written testimony: "We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use [JUUL] products. . . . That is a serious problem. Our company has no higher priority than combating underage use." (Compl. ¶ 498.) On September 24, 2019, JUUL stated to the *Los Angeles Times* that "We never marketed to youth and we never will." (Compl. ¶ 509.)

### vii.   *Increased Negative Attention and Decreased Share Value*

Following the investment, JUUL and Altria faced mounting regulatory and public scrutiny. (Compl. ¶ 477.) As news of the increased scrutiny emerged, Altria's share price fell. Plaintiffs allege that the following events caused the share price to fall.

First, on April 3, 2019, the FDA announced an investigation into individuals who had suffered seizures after vaping, including children and young adults. (Compl. ¶ 478.) That day, Altria's share price fell 4.78%. (Compl. ¶¶ 478-79.) On August 29, 2019, the *Wall Street Journal* reported that the FTC was investigating JUUL's practices of marketing to minors. (Compl. ¶ 500.) Altria's share price fell 3.49%. (Compl. ¶¶ 500-01.) Then, on September 9, 2019, the FDA issued a warning letter to JUUL, that directed it to cease making or publishing statements regarding the risk of harm of JUUL's products, because they constituted unauthorized modified risk claims, and to take immediate corrective action. (Compl. ¶ 504.) The statements included those made to students during JUUL's youth outreach and education program about the safety of JUUL's products. (Compl. ¶ 504.) Shortly thereafter, on September 11 and 12, reports surfaced that the federal government and additional state governments were preparing increased restrictions on e-cigarettes, including a ban on flavored e-cigarettes. (Compl. ¶¶ 505-06.) The next day, on September 13, Altria's share price dropped 5.51%. (Compl. ¶ 507.)

Next, on September 25, 2019, Altria announced that Philip Morris had called off discussions of a $200 billion merger with Altria due to scrutiny of its 35% stake in JUUL. (Compl. ¶ 511.)   That day JUUL also announced that it was the subject of another federal investigation.  (Compl. ¶ 511.)  JUUL further announced that it would stop all advertising in the United States and that it was replacing Burns with Crosthwaite as CEO.  (Compl. ¶ 511.) Altria's share price fell 0.42% that day.  (Compl. ¶¶ 511-12.)

On October 31, 2019, Altria announced that it was taking a $4.5 billion write-down on its investment in JUUL.  (Compl. ¶ 517.)  Altria also announced another potential FTC investigation, this time into Altria's role in the departure of JUUL's CEO.  (Compl. ¶ 517.) Altria's share price fell 2.5%.  (Compl. ¶¶ 517-18.)  On January 30, 2020, Altria announced an additional $4.1 billion write-down, citing the increased litigation against JUUL.  (Compl. ¶ 519.) Altria's share price fell 4.2% on this news.  (Compl. ¶¶ 519-20.)  On February 21, 2020, the *Wall Street Journal* reported that the SEC had launched an investigation into whether Altria had fully disclosed the risks associated with its investment in JUUL.  Altria's share price declined 12.7% over the course of the next week.  (Compl. ¶¶ 522-23.)

B.     **Procedural History**

On October 2, 2019, Plaintiff Gabby Klein filed a complaint initiating this action against Altria in the United States District Court for the Eastern District of New York.  (ECF No. 1.)  On December 11, 2019, the Eastern District of New York consolidated this action with another substantially identical complaint filed a week earlier by Patrick Cipolla in the Eastern District of New York.  (ECF No. 33.)  On December 30, 2019, the Eastern District of New York entered a stipulation appointing lead plaintiffs and lead counsel.  (ECF No. 43.)  Then, on February 7, 2020, the Eastern District of Virginia transferred the action to this Court.  (ECF No. 50.)

On April 21, 2020, the Plaintiffs filed the 165-page Consolidated Class Action Complaint (ECF No. 74.)  Thereafter, on July 1, 2020, before any Defendant had responded to the Consolidated Class Action Complaint, Plaintiffs filed a Notice of Errata, modifying certain allegations in the Consolidated Class Action Complaint.  (ECF No. 106.)  The next day, the Court ordered that the Corrected Consolidated Class Action Complaint be filed and served as the operative complaint.  (ECF No. 107.)  Accordingly, the Corrected Consolidated Class Action Complaint ("Complaint" (ECF No. 108)) now serves as the operative complaint.  On July 8, 2020, Defendants moved to dismiss the Complaint.  (ECF Nos. 117, 119, 121, 123.)

### C.   Causes of Action

In Count One, Plaintiffs allege a violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("Exchange Act"), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 against the Altria Defendants.  (Compl. ¶¶ 561-71.)  Specifically, Plaintiffs assert claims under Rule 10b-5(a), (b) and (c).  (Compl. ¶ 563.)  In Count Two, Plaintiffs assert the same claims against the JUUL Defendants.  (Compl. ¶ 572-82.)  In Count Three, Plaintiffs assert claims against the Altria Defendants for violations of Section 20(a) of the Exchange Act.  (Compl. ¶¶ 583-88.)  Finally, in Count Four, Plaintiffs assert claims against the JUUL Defendants for violations of Section 20(a).  (Compl. ¶¶ 589-94.)

### D.   Altria Defendant's Motion

In the Altria Defendant's Motion to Dismiss (ECF No. 117), Altria argues that Plaintiffs' Complaint alleges only corporate mismanagement, rather than fraud, which cannot state a claim for securities fraud.  (Mem. of Law in Supp. of the Altria Def.'s Mot. to Dismiss ("Altria Mem.") (ECF No. 118)).  In support, the Altria Defendants argue that the Altria Defendants did not make any materially false or misleading statements, largely because Plaintiffs do not base their

allegations on any factual misrepresentations by the Altria Defendants. (Altria Mem. at 20.) Additionally, the Altria Defendants argue that the public became aware of the facts before the class period, rendering any misstatements non-actionable. (Altria Mem. at 20-26.) Likewise, the Altria Defendants argue that Plaintiffs failed to plead "scheme liability," because they have not specified the conduct giving rise to liability. (Altria Mem. at 26.)

Further, the Altria Defendants argue that Plaintiffs have failed to allege particular facts giving rise to a strong inference of scienter, as required to plead a cause of action under Section 10(b). (Altria Mem. at 28.) Specifically, the Altria Defendants argue that Plaintiffs failed to plead a motive. (Altria Mem. at 29.) Instead, Plaintiffs ask the Court to make improper inferences based on speculation and confidential witnesses. (Altria Mem. at 30-32.) According to the Altria Defendants, the inference that Altria believed that it was paying a fair price for its investment in JUUL is the most compelling inference from the specific facts alleged. (Altria Mem. at 35.)

Finally, the Altria Defendants also argue that Plaintiffs have failed to adequately allege loss causation. (Altria Mem. at 35.) Specifically, the Altria Defendants contend that the revelations on which Plaintiffs base their losses failed to reveal new facts. (Altria Mem. at 35-40.) Additionally, the revelations failed to produce the kinds of drops in Altria stock prices that could give rise to liability. (Altria Mem. at 37.)

In addition to Altria's Motion to Dismiss, Defendant Crosthwaite filed his own Motion to Dismiss (ECF No. 123), incorporating the Altria Defendants' arguments and setting forth additional arguments for his dismissal. (Mem. of Law in Supp. of Defendant K.C. Crosthwaite's Motion to Dismiss ("Crosthwaite's Mem.") (ECF No. 125)). Specifically, Defendant Crosthwaite argues that no allegedly misleading statement can be attributed to him and that he

lacked the requisite control to have made any of the alleged misstatements. (Crosthwaite Mem. at 10-12.) Additionally, he claims that Plaintiffs have failed to plead that he engaged in any deceptive conduct or that he could be subject to "control person" liability. (Crosthwaite Mem. at 13.) And, like the Altria Defendants, Defendant Crosthwaite contends that Plaintiffs have failed to plead facts supporting a strong inference of scienter. (Crosthwaite Mem. at 15.)

On September 17, 2020, Plaintiffs filed an opposition to the Altria Defendants' Motion to Dismiss. (Mem. of Law in Opp. to the Altria Def.s' Mot. to Dismiss ("Pl.'s Altria Op. Br.") (ECF No. 126)). Plaintiffs did not file a separate response to Defendant Crosthwaite's Motion. On November 2, 2020, the Altria Defendants filed a reply. (Altria Reply Br. in Further Supp. of Their Mot. to Dismiss ("Altria Reply Br." (ECF No. 128)). Likewise, Defendant Crosthwaite filed a Reply. (ECF No. 131.)

### E.     JUUL Defendants' Motion

In their Motion to Dismiss (ECF No. 119), the JUUL Defendants also argue that Plaintiffs have failed to plead a claim for securities fraud. (Br. in Supp. of Mot. to Dismiss of Defendants JUUL Labs, Inc., Adam Bowen, and Kevin Burns ("JUUL Mem.") (ECF No. 120)). As a threshold matter, the JUUL Defendants argue that Plaintiffs lack statutory standing to bring a security action against the JUUL Defendants, because Plaintiffs purchased securities in Altria, not JUUL. (JUUL Mem. at 11-14.) As to the elements of the claim, the JUUL Defendants argue that Plaintiffs do not plead with particularity that the JUUL Defendants made a materially false or misleading statement. (JUUL Mem. at 14.) In support, the JUUL Defendant's argue that what the public already knew rendered the alleged misleading statements immaterial. (JUUL Mem. at 15-20.) Additionally, the JUUL Defendants also argue that Plaintiffs failed to plead with particularity that the JUUL Defendants engaged in fraudulent conduct. (JUUL Mem. at 21-

23.) And, like the Altria Defendants, the JUUL Defendants argue that Plaintiffs have failed to plead facts giving rise to a strong inference of scienter. (JUUL Mem. at 23-29.) The JUUL Defendants argue that in weighing the competing inferences, JUUL's non-culpable intent presents the stronger inference, especially given that it acknowledged the risk of underage use. (JUUL Mem. at 29.) Further, like the Altria Defendants, the JUUL Defendants argue that Plaintiffs have failed to plead loss causation, as the disclosures that Plaintiffs rely on did not reveal anything new to the market. (JUUL Mem. at 30-33.)

Defendant Monsees filed his own Motion to Dismiss (ECF No. 121), incorporating the JUUL Defendants' Motion to Dismiss and advancing independent grounds for his dismissal from the suit. (Mem. in Supp. of Def. James Monsees' Mot. to Dismiss ("Monsees Mem.") (ECF No. 122)). Specifically, Defendant Monsees argues that he did not constitute the "maker" of certain alleged misstatements. (Monsees Mem. at 5-6.) Additionally, he argues that the *Noerr-Pennington* Doctrine immunizes him from any liability stemming from his testimony to Congress. (Monsees Mem. at 7.) Moreover, he argues that such testimony cannot give rise to securities fraud liability, because he did not give it "in connection with the purchase or sale" of Altria securities. (Monsees Mem. at 9.) And, like the other defendants, he alleges that Plaintiffs fail to allege that Monsees acted with scienter or participated in a scheme in violation of Rule 10b-5(a) and (c). (Monsees Mem. at 9-12.) Finally, Defendant Monsees argues that Plaintiffs fail to sufficiently plead that he was a control person subject to liability under Section 20(a). (Monsees Mem. at 13.) Defendant Bowen filed a brief joining in Defendant Monsees' Motion. (ECF No. 124.)

On September 17, 2020, Plaintiffs filed an opposition to the JUUL Defendants' Motion to Dismiss and Monsees' Motion to Dismiss. (Mem. of Law in Opp. to the JUUL Defendants'

Motions to Dismiss ("Pl.'s JUUL Mem.") (ECF No. 127)).  Plaintiffs included their opposition to

Defendants Monsees' and Crosthwaite's Motions.  On November 2, 2020, the JUUL Defendants

and Defendant Monsees filed replies.  (ECF Nos. 129-30.)

These motions are now ripe for review.  The Court will dispense with oral argument,

because it will not aide in the decisional process.

## II.    STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or

counterclaim; it does not serve as the means by which a court will resolve contests surrounding

the facts, determine the merits of a claim or address potential defenses. *Republican Party of N.C.*

*v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).  In considering a motion to dismiss, the Court will

accept a plaintiff's well-pleaded allegations as true and view the facts in a light most favorable to

the plaintiff.  *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).  However, "the

tenet that a court must accept as true all of the allegations contained in a complaint is

inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts

sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which

it rests[.]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*,

355 U.S. 41, 47 (1957)).  As the Supreme Court opined in *Twombly*, a complaint or counterclaim

must state "more than labels and conclusions" or a "formulaic recitation of the elements of a

cause of action," though the law does not require "detailed factual allegations." *Id.* (citations

omitted).  Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the

speculative level," rendering the right "plausible on its face" rather than merely "conceivable."

*Id.* at 555, 570.  Thus, a complaint or counterclaim must assert facts that are more than "merely

consistent with" the other party's liability.  *Id.* at 557.  And the facts alleged must be sufficient to "state all the elements of [any] claim[s]."  *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).  Rule 9 of the Federal Rules of Civil Procedure normally governs the pleading standards in fraud cases, requiring that a party "state with particularity the circumstances constituting fraud or mistake."  Yet, the party can generally allege any "[m]alice, intent, knowledge, and other conditions of a person's mind."  Fed. R. Civ. P. 9(b).

However, plaintiffs bringing securities fraud actions face a higher pleading standard.  "To survive a motion to dismiss, private securities fraud actions must clear the hurdle of the Private Securities Litigation Reform Act of 1995 ("PSLRA")."  *In re PEC Sol., Inc. Sec. Litig.*, 418 F.3d 379, 387 (4th Cir. 2005).  The PSLRA superseded Rule 9(b) to the extent that it imposed a heightened pleading requirement in actions brought pursuant to Section 10(b) and Rule 10b-5. *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 n.5 (4th Cir. 2011); 15 U.S.C. § 78u-4(b)(1), (2).  "Under the PSLRA's heightened pleading instructions, any private securities complaint alleging that the defendants made a false or misleading statement must:  (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,'; and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (citing 15 U.S.C. § 78u-4(b)(1), (2)).  While courts considering a motion under Rule 12(b)(6) generally "take into account the set of facts that could be proved consistent with the allegations of a complaint, even though such facts have not been alleged in the complaint, the PSLRA modifies this scheme (1) by requiring a plaintiff to plead facts to state

16

a claim and (2) by authorizing the court to assume that the plaintiff has indeed stated all of the facts upon which he bases his allegation of a misrepresentation or omission." *Teachers' Retirement Sys. of Louisiana v. Hunter*, 477 F.3d 162, 172 (4th Cir. 2007) (citing 15 U.S.C. § 78u-4(b)(1)).

Accordingly, when considering a defendant's Rule 12(b)(6) motion, the Court will (1) accept all factual allegations in the complaint as true and (2) consider the entire complaint and other sources that courts ordinarily examine for such motions, particularly documents incorporated into the complaint by reference, and matters which are the proper subject of judicial notice. *Katyle*, 637 F.3d at 466 (citing *Tellabs*, 551 U.S. at 322).

## III.    ANALYSIS

Plaintiffs assert four causes of action: (1) two claims under Section 10(b) of the Exchange Act and Rule 10b-5 of the SEC against Altria and JUUL, and (2) two claims under Section 20(a) of the Act, one against the Individual Altria Defendants and one against the Individual JUUL Defendants. The Section 20(a) claims derive from the Section 10(b) claims and, therefore, the Court begins with the Section 10(b) claims.

### A.    Section 10(b) and Rule 10b-5 Claims

Section 10(b) of the Exchange Act forbids the "use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements § 10(b) by making it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

17

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  The Supreme Court has "implied a private cause of action from the text and purpose of [Section] 10(b)" to securities purchases or sellers injured by a violation by Section 10(b).  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011).

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* at 37-38.  With respect to these elements, Defendants contend that Plaintiffs have failed to adequately plead three of these elements — an actionable misrepresentation or omission, scienter and loss causation.  (Altria Mem. at 4-5; JUUL Mem. at 2-3.)  The Court will examine each in turn.  However, because JUUL raises issues regarding Plaintiffs' statutory standing to bring this suit against it, the Court must first address whether the Plaintiffs, as purchasers of Altria securities, may bring suit against JUUL.

### i.     *Plaintiff's Standing to Bring Claims Against JUUL.*

As a threshold matter, JUUL contends that Plaintiffs lack statutory standing to bring suit against the JUUL Defendants, because Plaintiffs did not purchase securities in JUUL.  (JUUL Mem. at 11-14.)  According to the JUUL Defendants, Altria stockholders only have statutory standing to pursue this action against Altria.  (JUUL Mem. at 11.)  For support, the JUUL Defendants rely on the Second Circuit's statement that "[s]tockholders do not have standing to sue under Section 10(b) and Rule 10b-5 when the company whose stock they purchased is negatively impacted by the material misstatement of another company, whose stock they do not purchase." *Ontario Pub. Serv. Emps. v. Nortel Networks*, 369 F.3d 27, 34 (2d Cir. 2004).

However, the Second Circuit has since recognized the confusion that this statement created and explicitly clarified that *Nortel Networks* did not hold "that a purchaser of a security may bring a fraud action under Rule 10b-5 only against the issuer of the security purchased." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 102 (2d Cir. 2007). Instead, it limited its holding in *Nortel Networks* to the "particular circumstances" of that case, wherein the connection between the defendant's false statements about itself and the plaintiff's purchase of another company's stock "was too remote to sustain an action under Rule 10b-5." *Id.*

Here, the connection between JUUL's allegedly false statements and Plaintiffs purchase of Altria's stock lacks the remoteness found in *Nortel Networks*. Plaintiffs allege that JUUL misrepresented its intent to market to youth. Further, Plaintiffs allege that Altria and JUUL conducted a scheme together that would allow them to keep mint on the market as a way to further target youth. Likewise, Plaintiffs allege that Altria's investment in JUUL would result in the merger of the advertisement and distribution resources of the two companies, a development in the dynamic between these two companies that would go to the heart of the alleged misrepresentations involving the marketing strategies at issue here. Moreover, the alleged misrepresentations here occurred in the context of Altria's investment in JUUL, which Plaintiffs then allege affected Altria's stock price. Indeed, Altria took a significant (though minority) stake in JUUL. And, JUUL's misrepresentations went to the risk of litigation and regulatory action, risks that ultimately came to fruition and led Altria to write-down a significant amount of its investment in JUUL. Finally, given the concerns with youth usage, JUUL's statements about its youth marketing would have affected Altria's stock price, as alleged by Plaintiffs. Given the intertwined nature of Altria's and JUUL's businesses and the alleged causal effect of JUUL's misrepresentations on the value of Altria's stock, the Court finds that the connections between

19

JUUL's alleged misstatements and Plaintiffs' purchase of Altria's stock much more closely related than the remote connection in *Nortel Networks*. For these reasons, the Court finds JUUL's reliance on *Nortel Networks* unpersuasive.

Importantly, the Supreme Court's decision in *Stoneridge Inv. Partners, LLC v. Sci-Atlanta*, 552 U.S. 148 (2008), handed down after *Nortel Networks*, also cuts against the JUUL Defendants' arguments. In that case, the Supreme Court ruled that the "§ 10(b) implied private right of action does not extend to aiders and abettors." *Id.* at 158. However, it clarified that the "conduct of a secondary actor must satisfy each of the elements or preconditions for liability." *Id.* Likewise, the Fourth Circuit has stated that, although a third-party who assists another in violating § 10(b) cannot be liable, that third-party can face liability if plaintiffs "show that defendants actually made a misrepresentation or omission [] on which investors relied." *Pub. Employees' Ret. Ass'n of Colo. v. Deloitte & Touche, LLP*, 551 F.3d 305, 313 (4th Cir. 2009).

Accordingly, although JUUL cannot face liability for any conduct that Plaintiffs allege aided and abetted Altria in violating § 10(b), it can face liability for its own statements that Altria investors may have relied upon. Therefore, the Court declines at this stage to find that Plaintiffs lack statutory standing and will turn to the substantive claims.

### ii. Material Representation or Omission

Defendants ask the Court to find that Plaintiffs' allegations regarding statements about JUUL's intent to market to youths insufficient to give rise to a claim for securities fraud, primarily because the public already had access to such information. (Altria Mem. at 20-26; JUUL Mem. at 14-21.)

"To prevail on a [Section] 10(b) claim, a plaintiff must show that the defendant made a statement that was 'misleading as to a material fact.'" *Matrixx Initiatives*, 563 U.S. at 38

(quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 238 (1998)).  When plaintiffs base their claims on

alleged misrepresentations or omissions, the complaint must "specify each statement alleged to

have been misleading, the reason or reasons why the statement is misleading, and, if an

allegation regarding the statement or omission is made on information and belief, the complaint

shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b).

However, "it is not enough that a statement is false or incomplete, if the misrepresented fact is

otherwise insignificant."  *Basic*, 485 U.S. at 238.

In *Basic*, the Supreme Court held that a statement satisfies the materiality requirement

when there exists "a substantial likelihood that the disclosure of the omitted fact would have

been viewed by the reasonable investor as having significantly altered the 'total mix' of

information available."  485 U.S. at 231-32.  "Materiality is an objective concept, involving the

significance of an omitted or misrepresented fact to a reasonable investor."  *Longman v. Food

Lion, Inc.*, 197 F.3d 675, 682-83 (4th Cir. 1999).  The Fourth Circuit has adopted the following

standard for assessing materiality:

> [A] fact stated or omitted is material if there is a substantial likelihood that a reasonable
> purchaser or seller of a security (1) would consider the fact important in determining
> whether to buy or sell the security or (2) would have viewed the total mix of information
> made available to be significantly altered by disclosure of the fact.

*Id.* at 683.  Additionally, "fraudulent corporate statements must be explained in context and in

light of the 'total mix' of information made available to investors."  *Phillips v. LCI Int'l, Inc.*,

190 F.3d 609, 613 (4th Cir. 1999).

Of course, Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose

any and all material information."  *Singer v. Reali*, 883 F.3d 425, 440 (2018).  But, "disclosure of

material information is required when necessary to make statements made, in light of the

circumstances in which they were made, not misleading."  *Id.*  Indeed, "failure to disclose

21

negative information about the products at issue can create a 'misleading impression' to investors about the success of the company." *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 604 (E.D. Va. 2015).

### a.   Altria's Alleged Misrepresentations

With respect to the Altria Defendants, Plaintiffs allege the following misrepresentations. First, according to Altria's press release, the agreement between JUUL and Altria "would accelerate JUUL's mission to switch adult smokers to e-vapor products." (Compl. ¶ 454.) The press release further touted the potential of e-cigarettes to reduce harm. (Compl. ¶ 456.) The press release also quoted Defendant Burns, JUUL's CEO at the time, as stating that the investment gives JUUL the "historic opportunity to improve the lives of the world's one billion adult smokers." (Compl. ¶ 457.) Further, Altria's press release stated:

> Altria and JUUL are committed to preventing youth from using any tobacco products. As recent studies have made clear, youth vaping is a serious problem, which both Altria and JUUL are committed to solve.  As JUUL previously said, "Our intent was never to have youth use JUUL products.  But intent is not enough, the numbers are what matter, and the numbers tell us underage use of e-cigarette products is a problem."

(Compl. ¶ 462.) Finally, the press release stated that "JUUL believes that it cannot fulfill its mission to provide the world's one billion adult smokers with a true alternative to combustible cigarettes if youth use continues unabated.  Together, JUUL and Altria will work to prevent youth usage through their announced initiatives . . .". (Compl. ¶ 462.)

Plaintiffs allege that these statements misled investors, because Altria failed to disclose that JUUL's directed its marketing towards youth; that JUUL's products could not act as a tobacco cessation product and instead would harm the teenagers to whom JUUL marketed its products; that JUUL's youth marketing scheme subjected JUUL and Altria to material risks and expenses associated with reputational harm, litigation and regulatory actions and fines; that Altria knew of these risks but failed to disclose them; and, that the materialization of these risks

would cause Altria to write-down a material portion of its investment in JUUL.  (Compl. ¶¶ 455, 457, 459.)

On December 20, 2018, during a call with analysts and investors discussing the investment in JUUL, Willard indicated that "Altria and JUUL are committed to preventing kids from using any tobacco products.  As recent studies have made clear, youth vaping is a serious problem, which both Altria and JUUL are committed to solve."  (Compl. ¶ 466.)  In response to a question about how much business JUUL derived from underage consumers, Willard stated that "we believe it's quite a small percentage."  (Compl. ¶ 468.)  Plaintiffs allege that Defendant Willard's statements misled investors, because he "knew but failed to disclose that Altria and JUUL were not committed to preventing kids from using tobacco products" and that JUUL "specifically targeted youth as customers of JUUL products."  (Compl. ¶ 467.)  Additionally, Altria knew that a large percentage of JUUL's business over the prior 12 months had come from underage customers.  (Compl. ¶ 469.)

On February 26, 2019, Altria filed an Annual Report on Form 10-K with the SEC. (Compl. ¶ 471.)  The 10-K report downplayed the FDA's concern with Altria's investment in JUUL and again stated Altria's continued commitment to preventing underage vaping.  (Compl. ¶ 471.)  The report also contained what Plaintiffs characterize as "generic, boilerplate representations regarding the risk that Altria's expected benefits from its investment in JUUL may fail to materialize in the manner or time expected."  (Compl. ¶ 473.)  Altria continued to file 10-K reports with similar boilerplate representations.  (Compl. ¶ 490, 492.)  Altria appended signed certifications to the report pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendants Willard and Gifford certified that "the information contained in the [2018 10-K

report] fairly presents, in all material aspects, the financial condition and results of operations of the Company." (Compl. ¶ 475.)

Plaintiffs allege that these statements misled investors, because Altria knew that JUUL targeted youth and that its money would be used to target underage consumers of JUUL products. (Compl. ¶ 472.) Additionally, the 10-K statements omitted that JUUL's "overarching marketing scheme was directed at youth" and that this subjected JUUL and Altria to material risks and expenses, including litigation and regulatory actions and fines, in addition to other associated risks. (Compl. ¶ 474.)

### b.     JUUL's Alleged Misrepresentations

With respect to the JUUL Defendants, Plaintiffs allege the following misrepresentations. First, in Altria's December 2018 press release, Altria quotes JUUL as stating that "[o]ur intent was never to have youth use JUUL products," and that Altria and JUUL were both committed to preventing youth from using tobacco products. (Compl. ¶ 462.) JUUL repeated this assertion in its own press release on December 20, 2018. (Compl. ¶ 464.) Plaintiffs allege that these statements misled investors, because JUUL had intended to reach youth through its marketing strategies.

In Altria's December 2018 press release, Burns stated that the goal of the investment was to improve the lives of the world's one billion adult smokers and increase the number of adult smokers who switch to JUUL devices. (Compl. ¶ 458.) Plaintiffs allege that this statement misled investors, because it omitted the fact that JUUL's technology destroyed the lives of the teenagers that it targeted. (Compl. ¶ 459.)

24

On July 13, 2019, Burns stated in an interview on CNBC: "First of all, I'd tell them that I'm sorry that their child's using the product. It's not intended for them. I hope there was nothing that we did that made it appealing to them." (Compl. ¶ 496.)

On July 25, 2019, Monsees stated to Congress through written testimony: "We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use [JUUL] products. . . . That is a serious problem. Our company has no higher priority than combating underage use." (Compl. ¶ 498.) On September 24, 2019, JUUL stated to the *Los Angeles Times* that "[w]e never marketed to youth and we never will." (Compl. ¶ 509.) Again, Plaintiffs claim that JUUL's intent to market to youth renders these statements misleading. (Compl. ¶¶ 497, 499, 510.)

Defendants claim that their public acknowledgments and other public dissemination of information regarding the youth usage problem obviates the materiality of the alleged misstatements. (Altria Mem. 17-18; JUUL Mem. at 18.) However, the problem of youth usage differs from JUUL's direct efforts to target youths. These different problems pose different risks to the value of JUUL and, resultingly, the value of Altria. Solutions remedying the youth usage problem would presumably result in lost sales to those youths. However, punitive solutions remedying JUUL's allegedly illegal marketing practices could result in substantial judgments and regulatory fines, in addition to the loss of sales to youth. Plaintiffs have alleged an abundance of facts showing that JUUL targeted youth and sufficient facts that Altria and JUUL knew of this marketing scheme and the risks that it posed to JUUL and Altria. However, they chose not to inform investors about these risks. At this stage, the Court finds that a disclosure of these risks by Altria and JUUL would have altered the "total mix" of information available that a reasonable investor would have considered. Therefore, the fact that Defendants acknowledged

the problem of youth usage does not absolve them from liability for misrepresenting that they intentionally caused that problem.

          c.      **Defendant Monsees' Claim to *Noerr-Pennington* Immunity**

Defendant Monsees claims that the *Noerr-Pennington* doctrine protects his statements to Congress, rendering them unactionable. (Monsees Mem. at 7.) However, this defense fails at this stage, and the Court need not embark on an in-depth analysis of the *Noerr-Pennington* doctrine here.

The *Noerr-Pennington* doctrine "safeguards the First Amendment right to petition the government for a redress of grievances . . . by immunizing citizens from the liability that may attend the exercise of that right." *Waugh Chapel South, LLC v. United Food & Commercial Workers Union Local 27*, 728 F.3d 354, 362 (4th Cir. 2013). However, "the *Noerr-Pennington* doctrine is an affirmative defense," and a motion to dismiss "cannot reach the merits of an affirmative defense [unless] all facts necessary to the affirmative defense clearly appear on the face of the complaint." *Id.* at 359-60. Moreover, "the First Amendment offers no protection when petitioning activity . . . is a mere sham to cover an attempt to violate federal law." *Id.*

Plaintiffs make allegations that raise the possibility of the application of the sham exception to the doctrine, including Defendant Monsees' participation in an illegal scheme to mislead investors about the risks that JUUL's illegal marketing practices posed to the value of Altria's stock. Therefore, the Court cannot resolve the application of Defendant's affirmative defense from the face of the Complaint. Accordingly, the Court will reject Defendant's reliance on the *Noerr-Pennington* doctrine at this stage. *See Navient Sols., LLC v. Law Offices of Jeffrey Lohman*, 2020 WL 1867939, at *4 (E.D. Va. Apr. 14, 2020) ("Courts have routinely declined to

address the *Noerr-Pennington* doctrine at the motion to dismiss stage, particularly where the sham litigation exception may be involved.").

### d.   Defendant's Crosthwaite's Liability for Misrepresentations

Defendant Crosthwaite claims that Plaintiffs have not alleged that he can bear responsibility for any of the above statements, because none of the statements at issue can be attributed to him and he lacked the requisite control over any of the statements.  (Crosthwaite Mem. at 10-12.)  The Court agrees.

"For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate control over the statement, including its content and whether and how to communicate it." *Janus Capital Group v. First Derivative Traders*, 564 U.S. 135, 142 (2011).  High level officials who can instruct others to make statements may have control over a company's statements by nature of their position. *See Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 56 F. Supp. 3d 549, 558 (S.D.N.Y. 2014) (allegation that company's President could instruct other to make statement "alone implies a level of control on the part of Diamond that is sufficient at the pleading stage . . .").

Here, Plaintiffs do not allege that Crosthwaite explicitly made any of JUUL's alleged misrepresentations.  Nor do they allege that he had sufficient control over the statements. Indeed, Crosthwaite did not become JUUL's CEO until after JUUL's alleged misstatements at issue. (*Compare* Compl. ¶ 509 (JUUL's alleged misstatement to the *Los Angeles Times* on September 24, 2019), *with* Compl. ¶ 511 (JUUL's announcement on September 25, 2019 that Crosthwaite would become CEO).)  Likewise, with respect to the Altria misstatements, Plaintiffs do not allege that Crosthwaite signed the SEC forms, only that Gifford and Willard did. (*See, e.g.,* Compl. ¶ 475 (alleging that Gifford and Willard signed the SOX certifications).)  And,

Plaintiffs do not allege that Crosthwaite had sufficient control over the press releases at issue. Nor do they allege that Crosthwaite held a position at Altria — he served as Chief Growth Officer — that would give rise to the inference that he had control over such press releases without additional supporting factual allegations demonstrating such control. Accordingly, Plaintiffs cannot advance their claims under Rule 10b-5(b) against Defendant Crosthwaite.

### e.    Truth-on-the-Market-Defense

Defendants also claim that Plaintiffs have not alleged actionable statements, because the public already had available to it information regarding the issues with youth usage of e-cigarettes. (Altria Mem. at 20-26; JUUL Mem. at 15-20.) This defense runs into two problems at this stage. First, Defendants actively denied that it intended to target youth with its marketing. Second, the truth-on-the-market defense requires a factual determination not suitable for a Rule 12(b)(6) motion.

Once Defendants chose to speak regarding youth issues and their marketing efforts, they had an obligation to tell the whole truth. In *Singer*, the Fourth Circuit found the material misrepresentation or omission prong satisfied by a plaintiff who alleged that a healthcare provider, TranS1, failed to disclose a fraudulent reimbursement scheme that Trans1 relied on "to generate a substantial portion of [its] continuing revenue." *Singer*, 883 F.3d at 439-40. Trans1 publicly touted its legal policies regarding reimbursements. *Id.* at 432-33. The court noted that Trans1 did not have "an affirmative duty to disclose any and all material information," but that "disclosure of material information is required 'when necessary to make statements made, in light of the circumstances in which they were made, not misleading.'" *Id.* at 440 (quoting *Matrixx Initiatives*, 563 U.S. at 44). By choosing to inform the markets of its plan to legally obtain reimbursements, Trans1 "was obliged to further disclose its fraudulent reimbursement

28

scheme." *Id.* Therefore, the court held that, "the Complaint is sufficient to establish that, by choosing to speak about its reimbursement practices, the Company possessed a duty to disclose its alleged illegal conduct." *Id.* at 442.

Defendants claim that the existence of lawsuits and investigations into its marketing practices absolved them of the obligation to inform the market of its illegal marketing to youths. As this Court recently held, *Singer* contravenes that argument. In *Cambridge Retirement System v. Jeld-Wen Holding, Inc.*, the Court held that the plaintiff had adequately alleged a material misstatement or omission when the defendant failed to disclose its anticompetitive scheme even as it defended a lawsuit stemming from that anticompetitive scheme. __ F. Supp. 3d __, 2020 WL 6270482, at *3-4 (E.D. Va. Oct. 26, 2020). Although the defendant had "repeatedly disclosed the existence and relevant details of the *Steves* litigation," *id.* at *3, the Court relied on *Singer* and held that "disclosing a lawsuit's existence and allegations while also vigorously denying their validity does not satisfy a company's duty to make full, honest disclosures." *Id.* at *4. The same holds true here. Defendants explicitly denied the allegations that they now claim relieved them of their obligation to make full disclosures. Because Defendants chose to speak about their marketing practices, denying that they targeted youth, it had a duty to tell the entire truth about its marketing practices and the exposure to litigation and regulatory risks to which those practices exposed them.

Second, Defendants prematurely raise their truth-on-the-market defense. True, "[i]n a fraud on the market case, the defendant's failure to disclose material information may be excused where that information has been made credibly available to the market by other sources." *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993). However, "[t]he truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b)

29

complaint for failure to plead materiality." *In re Massey Energy Co. Securities Litig.*, 883 F. Supp. 2d 597, 616 (E.D. Va. 2012) (*quoting Ganino v. Citizens Util. Co.*, 228 F.3d 154, 167 (2d Cir. 2000)).  Importantly, under this defense, the defendant "must prove that the information that was withheld or misrepresented was transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by their previous statements." *Id.* at 617 (internal quotations omitted).  Indeed, the case that the JUUL Defendants primarily cite in support of their truth-on-the market defense, *Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999), assessed the defense at the summary judgment stage.

Here, the Court's assessment of Defendants' truth-on-the-market defense will need to wait.  Whether the allegations regarding Defendants' marketing issues had "been made credibly available to the market by other sources" will require the Court to make a credibility assessment that it simply cannot do at this stage.  Further, in light of Defendants' affirmative denial of the information available to the market, weighing the intensity and credibility of the transmission of the information to the public to determine if it counterbalances the impression created by Defendants' statements makes the Court's task even more fact-intensive and inappropriate for a motion to dismiss.  Of course, this does not prejudice Defendants' future attempts to raise a truth-on-the-market defense following further factual development.  The Court notes that Defendants raise significant issues regarding the information that the public had available to it, including as to the timing of the marketing efforts and Defendants' efforts to curb youth usage. These issues could render Defendants' statements immaterial and Plaintiffs' reliance on them unfounded.  However, taking Plaintiffs' allegations in the Complaint as true, Plaintiffs have sufficiently alleged an actionable misrepresentation.

### iii.    *Scheme Liability*

In addition to liability for misrepresentations under Rule 10-b(5)(b), Plaintiffs allege

violations for Defendants' conduct.  However, Defendants argue that Plaintiffs have failed to

adequately allege a claim for scheme liability under Rule 10b-5(a) and (c).  (Altria Mem. at 26-

28; JUUL Mem. at 21-23.)  Subsection (a) of Rule 10b-5 makes it unlawful to "employ any

device, scheme, or artifice to defraud."  17 C.F.R. § 240.10b-5.  Subsection (c) makes it unlawful

to "engage in any act, practice, or course of business" that "operates . . . as a fraud or deceit."  *Id.*

Courts refer to this as "scheme liability" and it "capture[s] a wide range of conduct."  *Lorenzo v.*

*Securities and Exch. Comm'n*, 139 S. Ct. 1094, 1101 (2019).  To allege a scheme liability claim,

plaintiffs must allege that "(1) they were injured; (2) in connection with the purchase or sale of

securities; (3) by relying on a market for securities; (4) controlled or artificially affected by

defendant's deceptive or manipulative conduct; and (5) the defendants engaged in the

manipulative conduct with scienter."  *In re Royal Ahold N.V. Securities & ERISA Litig.*, 351 F.

Supp. 2d 334, 372 (D. Md. 2004).  Defendants argue that Plaintiffs have not specifically alleged

any conduct undertaken in connection with the purchase or sale of securities.

Here, Plaintiffs have satisfied the pleading requirements for bringing a scheme liability

claim.  Plaintiffs allege that Defendants acted in concert to deceive the FDA into not regulating

mint so that they could continue to target youth with the mint product, including submitting

falsified data and studies.  Moreover, Plaintiffs allege that part of this scheme, involving Altria

pulling certain of its flavored pods, resulted from the merger.  And, the merger had a substantial

impact on the price of Altria's stock.  Moreover, Plaintiffs allege that JUUL embarked on a

years-long effort to increase youth addiction and Altria knew about this effort.  Still, rather than

apprising investors of the risks associated with the effort, Defendants continued to publicly deny

31

JUUL's intention of targeting youths in an effort to avoid further litigation or regulation that could curb their values.

Additionally, although Plaintiffs have not pled that Defendant Crosthwaite can bear liability for any of the alleged misstatements, they have adequately pled scheme liability against Defendant Crosthwaite. Plaintiffs allege that Crosthwaite bore responsibility for consummating the JUUL investment. (Compl. ¶ 348.) Likewise, Plaintiffs allege that Crosthwaite bore responsibility for the mint study, a key part of the alleged scheme to deceive the FDA into not regulating mint products so that they could continue to target underage consumers. (Compl. ¶ 408.) Therefore, at this stage, Plaintiffs have adequately pled scheme liability against all Defendants, including Crosthwaite.

Accordingly, the Court rejects Defendants' arguments that Plaintiffs have failed to adequately allege scheme liability.

### iv. *Scienter*

Defendants also claim that the Court must dismiss Plaintiffs' Complaint, because they have failed to adequately allege that they acted with scienter. (Altria Mem. at 28-34; JUUL Mem. at 23-30.) "To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). At the pleading stage, the PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To plead the necessary mental state, "negligence is not enough[,]" instead, "[a] plaintiff must show either 'intentional misconduct' or such 'severe recklessness' that the danger of misleading investors was 'either known to the defendant or so obvious that the defendant must

have been aware of it.'" *Cozzarelli v. Inspire Pharm., Inc.*, 549 F.3d 618, 623 (4th Cir. 2008). "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324.

"To evaluate the strength of the scienter inferences, courts engage in a comparative analysis." *Zak v. Chelsea Therapeutics Int'l Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015). The Supreme Court has instructed that "[a] complaint adequately pleads scienter under the PLSRA only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inferences one could draw from the facts alleged." *Matrixx*, 563 U.S. at 48. Importantly, the Court must review "all of the allegations holistically." *Id.* Indeed, "[t]he inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 182 (4th Cir. 2009).

Plaintiffs allege that Defendants knew of the illegal marketing practices undertaken by JUUL, which increased the substantial risk of regulatory action and litigation against JUUL. Specifically, Plaintiffs allege that everyone at Altria knew that JUUL marketed to youth. Indeed, Plaintiffs even allege that Altria hoped to discontinue JUUL's illegal marketing practices, acknowledging that they understood the risks of such practices. However, Altria did not take a controlling interest, thereby preventing it from correcting the illegal marketing practices on its own. Moreover, Plaintiffs allege that Altria undertook substantial due diligence of JUUL before investing in it. Thus, Altria knew of the illegal marketing practices and the substantial revenue that JUUL generated from youth sales. With respect to the JUUL Defendants, Plaintiffs allege a multitude of facts regarding JUUL's marketing to youth. Despite these marketing efforts, JUUL

repeatedly denied that it had marketed to youth. Likewise, Plaintiffs allege facts regarding Altria's and JUUL's scheme to mislead the FDA into believing that mint should not be regulated like the fruit flavors, even though youths would prefer the mint flavors.

Plaintiffs further allege the reasons why Defendants misled investors. Plaintiffs allege that Altria desperately wanted to acquire JUUL, regardless of the risks, and wanted investors to react favorably to the news of the investment. Essentially, Plaintiffs allege that Altria staked its future on JUUL, increasing the need and incentive to omit or misrepresent the serious risks created by JUUL's marketing to youth. Moreover, the allegations support the inference that JUUL knew that it needed to misrepresent or omit its youth marketing practices to shield itself from future litigation and regulatory action, which could decrease the value of both JUUL and Altria. Finally, Plaintiffs allege that JUUL relied on Altria for marketing and logistics and would therefore benefit from an inflated share price. Together, these allegations adequately allege that Defendants acted with scienter.

Defendants also argue that Plaintiffs have failed to allege a motive to defraud investors. (Altria Mem. at 29; JUUL Mem. at 26-27.) However, even if they had failed to allege a motive, "the absence of a motive allegation is not fatal." *Tellabs*, 551 U.S. at 325. Moreover, the desire "to avoid legal liability for an illegal [] policy provides a motive to engage in fraud." *Cambridge Ret. Sys.*, __ F. Supp. 3d __, 2020 WL 6270482, at *7. In any event, the Court will consider the allegations of motive described above in its holistic analysis. Defendants also assert that other nonfraudulent inferences are more compelling. (Altria Mem. at 35-36; JUUL Mem. at 29-30.) Specifically, Defendants invite the Court to find that the strongest inference is that Defendants had no intention of deceiving investors and instead facilitated an investment without misrepresenting the value of the companies. Defendants contend that the acknowledgment of the

34

problem of youth usage undercuts the inference that Defendants acted with an intent to deceive. Yet, Defendants only acknowledged the issue with youth usage, not that they had directed their marketing at causing youth usage. Indeed, they denied that they had targeted youth. Accordingly, this acknowledgment does not carry nearly as much weight in the holistic assessment as Defendants claim.

Defendants further argue that Plaintiffs improperly rely on confidential witnesses to bolster their scienter claims. (Altria Mem. at 33.) In support, Defendants cite to *Higginbotham v. Baxter Intern'l, Inc.*, in which the Seventh Circuit instructed that district courts should discount allegations from confidential witnesses, because anonymity can frustrate the court's ability to compare the inferences. 495 F.3d 753, 757 (7th Cir. 2007). The Seventh Circuit stated that "[t]o determine whether a 'strong' inference of scienter has been established, the judiciary must evaluate what the complaint reveals and disregard what it conceals." *Id.* However, the descriptions of the confidential witnesses that Plaintiffs provide in the Complaint ease those potential frustrations caused by their anonymity and limit what the Complaint actually conceals.

Plaintiffs list the dates of the confidential witness' employment with Altria, the various positions that they held, the duties that they fulfilled, where they worked, with whom they conversed and to whom they reported. (Compl. ¶¶ 343-82.) This type of information, more than the proper names of the confidential witnesses, allows the Court to assess what information the confidential witnesses had available to them and properly weigh the inferences derived from the confidential witnesses' allegations. Indeed, given the information revealed about the confidential witnesses, the proper names concealed by the Complaint would provide little value to the Court at this step. Even if the Court discounts the allegations due to the concealment of

the identities, this discount is not steep given the particularity with which Plaintiffs describe the confidential witnesses.

Taking these allegations as a whole and accepting them as true, a reasonable person would deem the inference of scienter at least as strong as the opposing inference. Accordingly, Plaintiffs have adequately alleged the scienter element.

### v.    *Loss Causation*

Defendants also claim that Plaintiffs have failed to adequately allege the loss causation element. (Altria Mem. at 36; JUUL Mem. at 30.) The loss causation element requires that a plaintiff plead "a sufficiently direct relationship between the plaintiff's economic loss and the defendant's fraudulent conduct." *Katyle*, 637 F.3d at 472. A plaintiff can do this by "alleging facts establishing that the defendant's misrepresentation or omission was one substantial cause of the investment's decline in value." *Singer*, 883 F.3d at 445. The Fourth Circuit has stated that "specificity sufficient to plead loss causation will vary depending on the facts and circumstances of each case." *Katyle*, 637 F.3d at 471. Moreover, "[l]oss causation . . . requires a plaintiff to show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss." *Erica P. John Fund, Inc. v. Haliburton Co.*, 563 U.S. 804, 812 (2011).

To satisfy the pleading standard, "a plaintiff must plead (1) the exposure of the defendant's misrepresentations or omission, i.e., the revelation of new facts suggesting [the defendant] perpetrated a fraud on the market, and (2) that such exposure resulted in the decline of [the defendant's] share price.'" *Singer*, 883 F.3d at 445 (internal quotations omitted). Plaintiffs have two theories under which to plead this exposure: the corrective disclosure theory and the materialization of a concealed risk theory. *Id.* Under the corrective disclosure theory,

36

plaintiffs can allege "that the defendant company itself made a disclosure that publicly revealed for the first time that the company perpetrated a fraud on the market by way of a material misrepresentation or omission." *Id.* Under the concealed risk theory, plaintiffs can allege "that news from another source revealed the company's fraud." *Id.* The ultimate inquiry for each theory remains "whether a misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.* at 446.

Disclosures under either theory "must present facts to the market that are new, that is, publicly revealed for the first time, because if investors already know the truth, false statements won't affect the price." *Katyle*, 637 F.3d at 473 (internal quotations omitted). Additionally, the disclosure must "*at least relate back to the misrepresentation* and not to some other negative information about the company." *Id.*

Plaintiffs advance both the corrective disclosure theory and the concealed risk theory. Plaintiffs allege that the following disclosures caused a drop in Altria's share price.

- On April 3, 2019, the FDA announced an investigation into individuals, including children and young adults. That day, Altria's share price fell 4.78%. (Compl. ¶¶ 478-79.)

- On August 29, 2019, the *Wall Street Journal* reported that the FTC was investigating JUUL's practices of marketing to minors. Altria's share price fell 3.49%. (Compl. ¶¶ 500-01.)

- On September 9, 2019, the FDA issued a warning letter to JUUL directing it to cease making or publishing statements regarding the risk of harm and to take immediate corrective action. The statements included those made to students during JUUL's youth outreach and education program about the safety of JUUL's products. (Compl. ¶ 504.) On September 11 and 12, reports surfaced that the federal government and additional state governments were preparing increased restrictions on e-cigarettes, including a ban on flavored e-cigarettes. (Compl. ¶¶ 505-06.) On September 13, Altria's share price dropped 5.51%. (Compl. ¶ 507.)

- On September 25, 2019, Altria announced another federal investigation and that Philip Morris had called off discussions of a $200 billion merger with Altria due to scrutiny of its 35% stake in JUUL. That day, JUUL also announced that it would stop all advertising in the United States and that it was replacing Burns with Crosthwaite as CEO. That day, Altria's share price fell 0.42%. (Compl. ¶¶ 511-12.)

- On October 31, 2019, Altria announced that it was taking a $4.5 billion write-down on its investment in JUUL. Altria also announced another potential FTC investigation, this time into Altria's role in the departure of JUUL's CEO. Altria's share price fell 2.5%. (Compl. ¶¶ 517-18.)

- On January 30, 2020, Altria announced an additional $4.1 billion write-down, citing the increased litigation against JUUL. Altria's share price fell 4.2% on this news. (Compl. ¶¶ 519-20.)

- On February 21, 2020, the *Wall Street Journal* reported that the SEC had launched an investigation into whether Altria had fully disclosed the risks associated with its investment in JUUL. Altria's share price declined 12.7% over the course of the next week. (Compl. ¶¶ 522-23.)

In sum, Plaintiffs allege that support for its loss causation comes from the decline in Altria's share price following certain disclosures.

Defendants argue that the disclosures in the Complaint do not relate back to their alleged misrepresentations, because they have no relevance to JUUL's illegal marketing practices. (Altria Mem. at 37; JUUL Mem. at 30.) However, the disclosures identified above relate back to Defendants' alleged misrepresentations regarding their marketing practices and the safety of their products for youth. Indeed, these facts speak to JUUL's exposure, which Plaintiffs allege that they misrepresented. Although several of the disclosures revealed additional investigations into JUUL, JUUL continued to deny throughout this period that it had ever intended youth use of its product. (*See, e.g.*, Compl ¶ 509 (describing article from September 24, 2019, wherein JUUL stated that "We have never marketed to youth and we never will.").) Altria's share price declined following each disclosure of new negative information regarding the potential for increased litigation or regulatory action relating to Defendants' claims about its products and

marketing to youths. The facts came to light as a result of outside sources and from Defendants themselves, therefore supporting Plaintiffs' allegations of loss causation.

Defendants further contend that the size of the individual drops in share value cannot support allegations of loss causation and, relatedly, that the disclosures did not cause the drops. (Altria Mem. at 37.) However, "loss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures prompted the stock price deflation." *Katyle*, 637 F.3d at 472. Moreover, "neither a single complete disclosure nor a fact-for-fact disclosure of the relevant truth to the market is a necessary prerequisite to establishing loss causation (although either may be sufficient)." *Id.* Although the price drops that Plaintiffs point to fall short of the double-digit drops seen in many securities fraud cases, at this stage Plaintiffs have pled sufficient loss causation. Discovery may reveal other intervening factors that ultimately undercut Plaintiffs' loss causation allegations, but the Court will resist making that factual determination at this stage of the litigation. *See Kiken*, 155 F. Supp. 3d at 609 ("With respect to loss causation, so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings where the plaintiff's case can be rejected on evidentiary grounds.").

### B.      Section 20(a) Claims.

Defendants also argue that Plaintiffs have failed to allege a claim for control person liability under Section 20(a). (Altria Mem. at 40; JUUL Mem. at 11; Crosthwaite Mem. at 18; Monsees Mem. at 13.) Pursuant to Section 20(a) of the Exchange Act:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation of the cause of action.

15 U.S.C. § 78t(a). To successfully plead a *prima facie* case of Section 20(a), a plaintiff "must allege: (1) a predicate violation of § 10(b) and (2) control by the defendant over the primary violator." *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 129-130 (4th Cir. 2009), *rev'd on other grounds sub nom. Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011).

Defendants' arguments as to this claim largely hinge on their argument that Plaintiffs have failed to allege a predicate violation of § 10(b). For the reasons stated in the preceding sections, Plaintiffs have established the first element. However, Monsees and Crosthwaite also claim that Plaintiffs have failed to allege facts sufficient to establish control liability. (Monsees Mem. at 13; Crosthwaite Mem. at 18.) Accordingly, the Court will turn to the control requirement.

A plaintiff adequately pleads the control requirement by pleading facts "showing that the controlling defendant [(1)] had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws . . . [(2)] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability." *Id.* at 130. The Fourth Circuit does not require that a plaintiff allege "culpable participation" as an element of the *prima facie* case for "control person liability." *Id.*

"Section 20(a)'s remedial nature requires a liberal construction, in favor of finding liability" and, as a result, "requires only some indirect means of discipline or influence short of actual direction to hold a controlling person liable." *Cambridge Ret. Sys.*, __ F. Supp. 3d __, 2020 WL 6270482, at *12. The SEC defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. §240.12b-2. "In making the determination of whether a defendant possessed the requisite control, the courts

have given heavy consideration to the power or *potential power* to influence and control the activities of a person, *as opposed to the actual exercise* thereof." *In re Mut. Funds Inv. Litig.*, 566 F.3d at 130 (internal quotations omitted).

This Court has described the determination of whether someone qualifies as a controlling person as "a complex factual question that is not ordinarily subject to resolution on a motion to dismiss." *Kiken*, 155 F. Supp. 3d at 603. Indeed, Section 20(a) "does not require that the person act with scienter . . . [or] be directly liable for fraud." *Masterson v. Commonwealth Bankshares, Inc.*, 2 F. Supp. 3d 824, 831 n.4 (E.D. Va. 2014) (internal quotations omitted). Importantly, "for purposes of Section 20(a), there are no heightened pleading requirements, particularly as to scienter or culpability; and a plaintiff need only satisfy Rule 8's short and plain statement requirement." *In re Willis Towers Watson PLC Proxy Litig.*, 439 F. Supp. 3d 704, 717 (E.D. Va. 2020). Ultimately, courts will only resolve the control issue on a motion to dismiss "only when a plaintiff cannot plead any facts from which it can be reasonably inferred the defendant was a control person." *Kiken*, 155 F. Supp. 3d at 603 (citing *In re Mut. Funds Inv. Litig.*, 566 F.3d at 129); *In re Massey Energy Co.*, 883 F. Supp. 2d at 627 (same); *Cambridge Ret. Sys.* __ F. Supp. 3d __, 2020 WL 6270482, at *13 (same).

Here, Plaintiffs meet the pleading standards for alleging control against the Individual JUUL Defendants. Plaintiffs allege that Defendant Crosthwaite served as an observer on JUUL's Board of Directors and later became the CEO of JUUL. Further, the Complaint alleges that Defendant Monsees co-founded JUUL, served as the Chief Product Officer and sat on the Board of Directors of JUUL until March 2020. Of course, "[a]n individual's position alone does not establish control person liability." *In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 639 (D. Md. 2010). Nevertheless, Plaintiffs allege that Defendant Crosthwaite

bore responsibility for ensuring that Altria's investment in JUUL happened. Additionally, Plaintiffs allege that Defendant Monsees carefully studied the marketing strategies, advertisements and product designs of the cigarette industry and helped implement those same strategies. Likewise, Plaintiffs allege that the JUUL Individual Defendants possessed the power and authority to control the contents of JUUL's press releases and other market communications. Although discovery may ultimately demonstrate that these defendants lacked the control required by this cause of action, at this point Plaintiffs have pled facts "from which it can be reasonably inferred the defendant was a control person," *In re Mut. Funds*, 566 F.3d at 130, and, therefore, the control person claims will survive the motions to dismiss.

## IV.    CONCLUSION

Plaintiffs have pled sufficient facts that JUUL targeted youth for its products and that all Defendants knew that JUUL targeted youth. Moreover, Plaintiffs have pled sufficient facts that Defendants recognized the risks that this marketing scheme posed to the value of JUUL and Altria, yet they chose not to disclose it to investors for fear of deflating the values of the company. Although Defendants will have the opportunity to present additional facts and defenses as this litigation continues, at this stage the Court finds that Plaintiffs have pled facts sufficient to survive the Motions to Dismiss. Accordingly, the Altria Defendants' Motion to Dismiss (ECF No. 117) will be DENIED, the JUUL Defendants' Motion to Dismiss (ECF No. 119) will be DENIED and Defendant Monsees' Motion to Dismiss (ECF No. 121) will be DENIED. Defendant Crosthwaite's Motion to Dismiss (ECF No. 123) will be GRANTED IN PART and DENIED IN PART. The Motion is GRANTED with respect to Plaintiffs' claims against Crosthwaite brought under SEC Rule 10b-5(b). The Motion is DENIED with respect to

42

all other claims that Plaintiffs bring against him.

An appropriate Order shall issue.

Let the Clerk file a copy of this Order electronically and notify all counsel of record.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Dated:  March 12, 2021