UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

|  |  |
|---|---|
| GABBY KLEIN, DONALD SHERBONDY, SARAH SHERBONDY and CONSTRUCTION LABORERS PENSION TRUST OF GREATER ST. LOUIS, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ALTRIA GROUP, INC., HOWARD A. WILLARD III, WILLIAM F. GIFFORD, JR., JUUL LABS, INC., ADAM BOWEN, JAMES MONSEES, KEVIN BURNS, and K.C. CROSTHWAITE,<br><br>Defendants. | Case No. 3:20-cv-00075-DJN |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS REPRESENTATIVES AND CLASS COUNSEL**

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................... 1

II.     STATEMENT OF FACTS ............................................................................................. 3

        A.      Defendants' False and Misleading Statements ................................................. 3

        B.      The Truth Is Partially Revealed But Defendants Continue to Make Misleading Statements
                ................................................................................................................................... 5

        C.      This Action and the Proposed Class Representatives ........................................ 8

III.    CERTIFICATION IS PROPER UNDER RULE 23(a) ................................................. 9

        A.      Legal Standards for Class Certification ............................................................. 9

        B.      Class Treatment of Securities Fraud Actions Is Favored.................................. 10

        C.      The Class Is So Numerous That Joinder of All Members Is Impracticable..................... 10

        D.      Common Questions of Law or Fact Exist for All Class Members .................................. 11

        E.      The Proposed Class Representatives' Claims Are Typical of Those of The Class.......... 13

        F.      The Proposed Class Representatives Will Fairly and Adequately Protect the Interests of
                the Class.............................................................................................................. 14

        G.      The Court Should Appoint Plaintiffs' Choice of Counsel ................................ 16

IV.     CERTIFICATION IS PROPER UNDER RULE 23(b)(3) ............................................ 16

        1.      Common Questions of Law and Fact Predominate Over Individual Questions .. 17

                a.      The "Fraud-on-the-Market" Presumption Applies ................................ 18

                        i.      Altria Common Stock Traded in an Efficient Market During
                                Each Class Period ..................................................................... 19

                        ii.     Altria Shares Experienced a High Weekly Trading Volume..... 20

                        iii.    A Sufficient Number of Financial Analysts Covered and
                                Reported on Altria During Each Class Period ........................... 20

                        iv.     Altria Common Stock Traded on the NYSE Under the
                                Supervision of Designated Market Makers with Brokers
                                Standing Ready to Buy and Sell the Shares.............................. 21

                        v.      Altria Was Eligible to File Form S-3 During Each Class
                                Period....................................................................................... 22

                        vi.     The Price of Altria's Common Stock Reacted to New Company-
                                Specific Information During Each Class Period......................... 23

                        vii.    Altria's Market Capitalization and Float ................................. 24

                b.      Damages Are Measurable on a Class-Wide Basis................................. 26

        2.      A Class Action Is Superior to Other Available Methods for the Fair and Efficient
                Adjudication of This Action ............................................................................ 27

V.      CONCLUSION................................................................................................................ 28

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972) ...................................................................................................... 25, 26

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ........................................................................................................... 17

*Amgen v. Connecticut Retirement Plans and Trust Funds*,
   568 U.S. 455 (2013) .................................................................................................. 2, 18, 27

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ............................................................................................... 18, 19, 25

*Bell v. WestRock CP, LLC*,
   2019 WL 1874694 (E.D. Va. Apr. 26, 2019) (Gibney, J.) ...........................................*passim*

*Berry v. LexisNexis Risk & Info. Analytics Grp., Inc.*,
   2014 WL 4403524 (E.D. Va. Sept. 5, 2014) (Spencer, J.) .................................................. 10

*Berry v. Schulman*,
   807 F.3d 600 (4th Cir. 2015) ............................................................................................... 9

*Boyce v. Wachovia Sec., LLC*,
   2010 WL 1253737 (E.D.N.C. Mar. 29, 2010) ................................................................... 10

*Brady v. Thurston Motor Lines*,
   726 F.2d 136 (4th Cir. 1984) ............................................................................................. 10

*Branch v. Gov't Emps. Ins. Co.*,
   323 F.R.D. 539 (E.D. Va. 2018) (Payne, J.) ....................................................................... 11

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
   155 F.3d 331 (4th Cir. 1998) ............................................................................................. 13

*Brown v. Transurban USA, Inc.*,
   318 F.R.D. 560 (E.D. Va. 2016) (Cacheris, J.) ................................................................... 11

*Burt v. Maasberg*,
   2013 WL 1314160 (D. Md. Mar. 31, 2013) ....................................................................... 26

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ....................................................................... 19, 20, 21, 23

*City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*,
   270 F.R.D. 247 (D.S.C. 2010) ......................................................................................*passim*

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ......................................................................................................... 26

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    296 F.R.D. 261 (S.D.N.Y. 2014) .................................................................................... 26

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ....................................................................................................... 10

*Fangman v. Genuine Title, LLC*,
    2016 WL 6600509 (D. Md. Nov. 8, 2016) ...................................................................... 13

*Fariasantos v. Rosenberg & Assocs., LLC*,
    303 F.R.D. 272 (E.D. Va. 2014) (Payne, J.) ................................................................... 15

*Gariety v. Grant Thornton, LLP*,
    368 F.3d 356 (4th Cir. 2004) ..................................................................................... 18, 19

*Gen. Tel. Co. of the Sw. v. Falcon*,
    457 U.S. 147 (1982) ....................................................................................................... 13

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
    141 S. Ct. 1951 (2021) .................................................................................................... 25

*Gunnells v. Healthplan Servs., Inc.*,
    348 F.3d 417 (4th Cir. 2003) .......................................................................................... 17

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S. Ct. 2398 (2014) ........................................................................................ 18, 19, 25

*Hart v. Louisiana-Pac. Corp.*,
    641 F. App'x 222 (4th Cir. 2016) ..................................................................................... 9

*Hewlett v. Premier Salons Int'l, Inc.*,
    185 F.R.D. 211 (D. Md. 1997) ........................................................................................ 17

*In re BearingPoint, Inc. Sec. Litig.*,
    232 F.R.D. 534 (E.D. Va. 2006) (Ellis, J.) ............................................................... *passim*

*In re Comput. Sci. Corp. Sec. Litig.*,
    288 F.R.D. 112 (E.D. Va. 2012) (Ellis, J.) ...................................................................... 20

*In re Flag Telecom Holdings, Ltd.Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009) ............................................................................................... 9

*In re The Mills Corp. Sec. Litig*,
    257 F.R.D. 101 (E.D. Va. 2009) ...................................................................................... 12

*In re Mut. Funds Inv. Litig.*,
    384 F. Supp. 2d 845 (D. Md. 2005) ................................................................................. 26

*In re NeuStar, Inc. Sec. Litig.*,
   2015 WL 5674798 (E.D. Va. Sept. 23, 2015) (Cacheris, J.) ......................................................... 11, 12

*In re NII Holdings, Inc. Sec. Litig.*,
   311 F.R.D. 401 (E.D. Va. 2015) (Brinkema, J.) .............................................................. *passim*

*In re Petrobras Sec. Litig.*,
   312 F.R.D. 354 (S.D.N.Y. 2016) ........................................................................................ 16

*In re Red Hat Inc., Sec. Litig.*,
   261 F.R.D. 83 (E.D.N.C. 2009) .................................................................................... 12, 27

*In re Willis Towers Watson PLC Proxy Litig.*,
   2020 WL 5361582 (E.D. Va. Sept. 4, 2020) (Trenga, J.) ....................................................... 26

*In re Zetia (Ezetimibe) Antitrust Litig.*,
   2020 WL 4917625 (E.D. Va. Aug. 21, 2020) (Smith, J.) ....................................................... 10

*Klein v. Altria Grp., Inc.*,
   2021 WL 955992 (E.D. Va. Mar. 12, 2021) ...................................................................... 26

*Knurr v. Orbital ATK, Inc.*,
   220 F. Supp. 3d 653 (E.D. Va. 2016) (Ellis, J.) ................................................................ 16

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) ................................................................................... 19

*Lee v. JLN Constr. Servs., LLC*,
   2019 WL 3869412 (D. Md. Aug. 16, 2019) ...................................................................... 13

*Minter v. Wells Fargo Bank, N.A.*,
   279 F.R.D. 320 (D. Md. 2012) ................................................................................... 13, 27

*Mylan Labs., Inc. v. Matkari*,
   7 F.3d 1130 (4th Cir. 1993) .......................................................................................... 10

*Phillips Petro. Co. v. Shutts*,
   472 U.S. 707 (1985) ....................................................................................................... 2

*Smith v. The Baltimore & Ohio R.R. Co.*,
   473 F. Supp. 572 (D. Md. 1979) ..................................................................................... 13

*Vinh Nguyen v. Radient Pharm. Corp.*,
   287 F.R.D. 563 (C.D. Cal. 2012) ................................................................................... 21

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ..................................................................................................... 11

## **Statutes**

Securities Exchange Act of 1934 Section 10(b) ........................................................... 13, 18, 26

iv

## **Rules**

Fed. R. Civ. P. 23(a)(1) ................................................................................................................. *passim*

Rule 10b-5 .............................................................................................................................. 13, 18

Rules 10b-5(a) and (c) ............................................................................................................... 25, 26

Lead Plaintiffs Donald and Sarah Sherbondy and Construction Laborers Pension Trust of Greater St. Louis ("CLPT") (collectively, "Plaintiffs" or "Proposed Class Representatives"), by their counsel, respectfully submit this memorandum of law in support of their motion for an Order: (i) certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23; (ii) appointing Plaintiffs as Class Representatives; and (iii) appointing Co-Lead Counsel Pomerantz LLP ("Pomerantz") and Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as Class Counsel. In support of the motion, Plaintiffs submit this memorandum of law, the Declaration of Jeremy A. Lieberman ("Lieberman Decl."), and the exhibits thereto, filed concurrently herewith.

## I.    INTRODUCTION

Plaintiffs seek certification of the following Class:

> All persons and entities who purchased or otherwise acquired Altria Group, Inc. ("Altria") securities between October 25, 2018 and April 1, 2020, both dates inclusive (the "First Amended Complaint ("FAC") Class Period"), excluding Defendants[1], current and former officers and directors of Altria and JLI, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.[2]

This lawsuit is a textbook example of a case warranting class action treatment. Plaintiffs seek to prove that, like other Class members, they were injured by a common course of misconduct – the issuance of false and misleading statements and material omissions by Defendants concerning Altria's investment in JLI, JLI's marketing to underage consumers, the health and safety of JLI's products, JLI's and Altria's dedication to preventing youth usage, and the risks

---

[1] "Defendants" refers to Altria Group, Inc. ("Altria"), JUUL Labs, Inc. ("JLI" or "JUUL"), Howard A. Willard III ("Willard"), William F. Gifford, Jr. ("Gifford"), Adam Bowen ("Bowen"), James Monsees ("Monsees"), Kevin Burns ("Burns"), and K.C. Crosthwaite ("Crosthwaite").

[2] Plaintiffs seek certification of the FAC Class Period. However, in the event that the Court denies Plaintiffs' motion to amend the Complaint, or grants any forthcoming motion by Defendants to dismiss the new allegations in the FAC, Plaintiffs seek in the alternative certification of the class period asserted in the Consolidated Class Action Complaint ("Complaint") of December 20, 2018 through February 21, 2020 (the "Complaint Class Period").

1

associated with the foregoing. The questions of law and fact relevant to the merits - issuance of false and misleading statements, reliance, materiality, scienter, loss causation and economic loss - are identical for each and every member of the putative Class. Indeed, class action treatment is especially appropriate because many members of the putative Class have relatively small losses, making it unfair and inefficient to force them to vindicate their claims individually.

The use of class action procedures to adjudicate claims under the federal securities laws has been upheld by the Supreme Court, as well as by the Fourth Circuit. *See, e.g.*, *Phillips Petro. Co. v. Shutts,* 472 U.S. 707, 809 (1985) ("most of the plaintiffs would have no realistic day in court if a class action were not available"). The Supreme Court has warned against imposing restrictions on certification of federal securities claims where it is not mandated by the text of *Amgen v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 478 (2013) ("We have no warrant to encumber securities-fraud litigation by adopting an atextual requirement of precertification proof of materiality that Congress, despite its extensive involvement in the securities field, has not sanctioned."). "[I]n light of the importance of the class action device in securities fraud suits, the requirements of Rule 23 are to be construed liberally . . . [and,] [t]hus, any doubts about the propriety of certification should be resolved in favor of certification." *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 538 (E.D. Va. 2006) (Ellis, J.) (internal citations and quotations omitted).

This case is no exception, and readily satisfies all of the requirements of Rule 23. Certification under Rule 23 is appropriate if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Rule 23(a); *see also Bell v. WestRock CP, LLC*, 2019 WL 1874694, at *2 (E.D. Va. Apr. 26, 2019) (Gibney,

2

J.). Additionally, where "common" issues of law or fact "predominate over any questions affecting only individual members," and a class action is "superior" to other methods of adjudication, class certification is appropriate. Fed. R. Civ. P. 23(b)(3); *see also Bell*, 2019 WL 1874694, at *2.

Accordingly, Plaintiffs request certification of the Class, appointment of Plaintiffs as Class Representatives, and appointment of Pomerantz and Robbins Geller as Class Counsel and Cohen Milstein as Liaison Counsel.

## II.    STATEMENT OF FACTS

### A.    Defendants' False and Misleading Statements

Altria, founded in 1919 and headquartered in Richmond, Virginia, has long been a mainstay of the tobacco industry. ¶¶23, 35.[3] JUUL produces a line of e-cigarettes, packaging nicotine salts from leaf tobacco into single use cartridges or "pods" which are heated to create a vapor that is then inhaled. ¶37.

As the teen vaping epidemic surged, on December 20, 2018, Altria and JUUL jointly announced Altria's $12.8 billion investment in JUUL in return for a 35% stake in the company. ¶469. In simultaneous press releases announcing the investment, Defendants assured investors that the two companies were interested only in adult smokers, stating that JUUL's "intent was never to have youth use JUUL products," and that "youth vaping is a serious problem, which both Altria and JUUL are committed to solve." ¶¶469-480.

The truth was much different. JUUL's co-founders, Defendants Bowen and Monsees, had studied the marketing tactics previously employed by Big Tobacco to target underage consumers in the hopes they would create lifelong customers for JUUL's products. ¶¶87-91. They designed

---

[3] Citations to "¶__" refer to paragraphs in the Proposed First Amended Complaint ("FAC"). All emphasis is added. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the FAC.

a technologically advanced product that appealed to underage consumers and made it highly addictive and enticing, offering an array of kid-friendly flavor options for their JUULpods, including mango, crème brulee and mint. ¶¶92-136. Lured in by these flavors, youth users experienced JUUL's nicotine delivery system (in the form of JUULpods), which were designed to minimize the "throat hit" associated with traditional cigarette use (which current smokers were desensitized to) and release nicotine more effectively, making the nicotine impact more potent and likely to cause addiction, especially in teens. ¶¶99-116.

JLI also launched a marketing campaign that was a near replica of those previously employed by Big Tobacco (including Altria) to attract underage consumers. But JUUL took its marketing efforts to kids much further, hiring creative agencies specializing in millennial culture, advertising on websites popular with youth, and hosting JUUL-sponsored parties with celebrities and social media influencers popular with underage consumers. ¶¶191-305. In addition to marketing JUUL as "cool" to underage consumers, JLI marketed JUUL products as a part of a healthy lifestyle and as a cigarette cessation device (neither of which was true). ¶¶152-190. JUUL also took steps to make its products accessible through online purchases, purposely designing an age verification system to be flexible and easily bypassed by underage users. ¶¶306-319.

Altria knew that JLI was and would continue marketing to underage consumers prior to making its $12.8 billion investment in the company. ¶¶342-392. Indeed, the experts that Altria hired to perform due diligence on JLI concluded, *inter alia*, (i) "there is little evidence that [JLI] will focus meaningful resources on preventing youth initiation and use"; and (ii) "[JLI's] own statements regarding youth initiation and use are inconsistent with its business plans." ¶390. Defendant Willard internally admitted that JLI "has created a youth usage epidemic" because "Juul overlooked their responsibility obligations to prevent youth vaping and it could ultimately

4

destroy their business," (¶413) and that the only way to achieve a "swift end to the youth epidemic" was removal of *all pod-based cigarette products*, which would "devastate" JLI's business because JLI only sold pod-based products. ¶415.

In a public letter to U.S. Food and Drug Administration ("FDA") Commissioner Scott Gottlieb dated October 25, 2018 – less than two months before the public announcement of Altria's investment in JLI – Altria stated that in order to address the "rise in youth e-vapor use to epidemic levels" the company was removing its "pod-based products" from the market and limiting its other products to the tobacco, menthol and mint varieties. ¶¶407-410, 416, 465-467. Altria reiterated in the letter that the company was taking these actions because "we do not want to risk contributing to [the rise in youth use of e-vapor products]." ¶465.

In truth, Altria was removing these products from the market as part of a non-compete condition to the company's anticipated investment in JLI, which only sold pod-based products. ¶¶410-418. Notes from Willard's presentation to Altria's Board of Directors reveal that Willard was telling the FDA (and the public) that Altria was removing the products to combat the youth vaping epidemic in order to conceal the true reason – the non-compete agreement – stating, "it "[g]ives us [a] good cover and story for taking Mark Ten Elite off market now." ¶¶417-418. Altria and JLI also orchestrated a scheme to keep one of the most popular flavors, mint, free from FDA regulation. ¶¶393-427. Both JUUL and Altria offered sham statistics and studies to create the illusion that mint was not a flavor that appealed to underage consumers and was akin to traditional menthol tobacco products. ¶¶396-398, 418-421.

### B.    The Truth Is Partially Revealed But Defendants Continue to Make Misleading Statements

Following Altria's multi-billion-dollar investment in JLI, e-vapor products and JLI increasingly became the subject of scrutiny by government authorities throughout the country.

5

Mounting skepticism, fear, and negative publicity in the media regarding e-cigarettes' safety led to increased scrutiny by government authorities into vaping products, and municipalities throughout the country began tightening sales practices related to those products. ¶493.

For example, on March 19, 2019, Commissioner Gottlieb said he had a "difficult" meeting the prior week with Altria and JUUL, was concerned about the slow pace of efforts to curb youth vaping, and that the FDA may need to pull pod-based nicotine products off the market as it combats a surge in teen vaping. ¶494. As a result, Altria's stock price fell 2.25% on March 19, 2019. ¶495.

On April 3, 2019, the FDA announced its investigation into nearly three dozen recent cases of people suffering from seizures after vaping.  Between 2010 and 2019, the FDA said it received thirty-five reports of people, especially children and young adults, experiencing seizures after using e-cigarettes. ¶496. On this news, Altria's stock price fell $2.71 per share, or 4.78%, to close at $53.98 per share on April 3, 2019. ¶497.

On June 21, 2019, CNBC reported that then-former Commissioner Gottlieb stated "I don't know how Juul gets through a[] [Premarket Tobacco Product] [A]pplication process" because "[t]hey have so much historical youth use with their product." ¶507. On this news, Altria's stock price fell $2.26 per share, or 4.3%, to close at $48.00 per share on June 21, 2019. ¶508.

Defendants continued to mislead the market. On July 13, 2019, in an interview with CNBC, Burns stated: "[JUUL is] not intended for [children]. I hope there was nothing that we did that made it appealing to them." ¶516. On July 25, 2019, Monsees stated to Congress through written testimony: "We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products. . . .That is a serious problem. Our company has no higher priority than combatting underage usage." ¶518. On August 8, 2019, the *Washington Post* reported

that Ashley Gould, JLI's Chief Administrator Officer, stated that underage use "was not anticipated and completely unexpected to us." ¶520.

On August 29, 2019, the *Wall Street Journal* reported that the FTC was investigating whether JUUL used influencers and other marketing practices to make e-cigarettes appealing to minors. ¶522. On this news, Altria's stock price fell $1.60 per share, or 3.49%, to close at $44.25 per share on August 29, 2019. ¶523.

On September 24, 2019, JLI falsely stated, "[w]e have never marketed to youth and never will." ¶531.

On October 31, 2019, Altria announced that it was taking a $4.5 billion write-down on its investment in JUUL. Altria also announced that the FTC was scrutinizing Altria's role in the departure of JUUL's CEO, stating that on October 1, 2019, Altria had received a civil investigative demand "seeking information regarding, among other things, Altria's role in the resignation of JUUL's former chief executive officer and the hiring by JUUL of any current or former Altria director, executive or employee." ¶539. On this news, Altria's stock price fell an additional $1.15 per share, or 2.5%, to close at $44.06 per share on October 31, 2019. ¶540.

On November 19, 2019, the New York Attorney General announced a lawsuit against JLI for deceptive and misleading marketing of its e-cigarettes, which contributed to the ongoing youth vaping epidemic in New York state. ¶541. On this news, Altria's stock price fell $1.41 per share, or 2.92%, in response to this news, to close at $46.93 per share on November 19, 2019. ¶542.

On January 30, 2020, Altria announced that it was taking an additional $4.1 billion charge related to its JUUL investment. The company cited "the increased number of legal cases pending against JUUL and the expectation that the number of legal cases against JUUL will continue to

increase." ¶543. Altria's stock price fell an additional $2.11 per share, or 4.2%, to close at $48.00 per share on January 30, 2020. ¶544.

On February 21, 2020, at 3:37 pm (just before the close of trading), the Wall Street Journal reported that the U.S. Securities and Exchange Commission ("SEC") had launched an investigation into whether Altria fully disclosed to its shareholders the risks associated with its investment in JUUL. ¶545. On this news, Altria's stock price fell $0.29 from $46.18 at 3:30 pm to $45.89 at the close of trading on February 21, 2020. Altria's stock price fell an additional $2.09 per share, or 4.8%, to close at $43.80 per share on the next trading day February 24, 2020. ¶546.

Finally, on April 1, 2020, after the close of trading, the U.S. Federal Trade Commission ("FTC") announced that it was filing suit to force Altria to unwind its $12.8 billion investment in JUUL. The press release announcing the complaint, which was filed the same day, stated Altria and JUUL "entered a series of agreements, including Altria's acquisition of a 35% stake in JUUL, that eliminated competition in violation of federal antitrust laws." ¶547. In response, Altria's stock price declined $1.39 per share, or 6.96%, to close at $36.22 per share on April 2, 2020. ¶548.

### C.    This Action and the Proposed Class Representatives

The initial complaint in this matter was filed by Gabby Klein on October 2, 2019, in the U.S. District Court for the Eastern District of New York. ECF No. 1. On December 30, 2019, the Court appointed Donald and Sarah Sherbondy and CLPT as Lead Plaintiffs and approved Pomerantz and Robbins Geller as co-lead counsel. ECF No. 43. The Action was transferred to this District on February 7, 2020. ECF No. 51.

On July 2, 2020, Plaintiffs filed the Consolidated Class Action Complaint (the "Complaint"), asserting a class period of December 20, 2018 through February 21, 2020, both dates inclusive ("Complaint Class Period"). ECF No. 108. Motion to dismiss briefing followed, and on March 12, 2021, the Court denied Defendants' motions to dismiss. ECF Nos. 139 and 140.

On August 6, 2021, Plaintiffs filed a motion to amend the Complaint, attaching the proposed First Amended Consolidated Class Action Complaint ("FAC"), asserting a class period of October 25, 2018 through April 1, 2020, both dates inclusive ("FAC Class Period").

Plaintiffs seek certification of the FAC Class Period. If following certification of the FAC Class Period, the Court were to deny Plaintiffs' motion to amend or subsequently dismiss the new claims in the FAC, the Court would simply amend the Class Period to match the Complaint Class Period. *See In re Flag Telecom Holdings, Ltd.Sec. Litig.*, 574 F.3d 29, 37 (2d Cir. 2009) (The Court has "the authority to alter or amend the class certification order pursuant to Rule 23(c)(1)(C)" at any time prior to judgment.).

Plaintiffs traded tens of thousands of shares of Altria common stock throughout the Class Period, and suffered damages as a result of the violations of the federal securities laws as alleged in the FAC. *See* ECF Nos. 27-3 and 74-1. As a result, the Proposed Class Representatives seek appointment by this Court to serve as Class Representatives, and appointment of their counsel as Class Counsel.

## III. CERTIFICATION IS PROPER UNDER RULE 23(a)

### A. Legal Standards for Class Certification

In order to obtain class certification under Rule 23(a), a party must establish the following four prerequisites: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a); *Hart v. Louisiana-Pac. Corp.*, 641 F. App'x 222, 232 (4th Cir. 2016); *Berry v. Schulman*, 807 F.3d 600, 608 (4th Cir. 2015). "In addition to meeting those requirements of numerosity, commonality, typicality, and adequacy, the proposed class must also satisfy at least one of the requirements of Rule 23(b)." *Hart*,

641 F. App'x at 232. Courts in the Fourth Circuit have construed Rule 23 liberally. *See Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *BearingPoint*, 232 F.R.D. at 538.

As demonstrated below, the Proposed Class Representatives satisfy the prerequisites of Rule 23 and the proposed Class should be certified.

## B.    Class Treatment of Securities Fraud Actions Is Favored

The Supreme Court and district courts within this Circuit (and throughout the country) recognize the utility and appropriateness of class actions involving violations of the federal securities laws. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) ("[t]he securities statutes seek to maintain public confidence in the marketplace"); *Boyce v. Wachovia Sec., LLC*, 2010 WL 1253737, at *6 n.7 (E.D.N.C. Mar. 29, 2010) ("[i]t is well-recognized that alleged violations of federal securities laws are particularly well suited for class action proceedings and that Rule 23 is to be construed liberally to effectuate that end"); *BearingPoint*, 232 F.R.D. at 538 ("in securities fraud suits, the requirements of Rule 23 are to be construed liberally. . . . [and,] [t]hus, any doubts about the propriety of certification should be resolved in favor of certification").

## C.    The Class Is So Numerous That Joinder of All Members Is Impracticable

Rule 23(a)'s "numerosity" requirement is met if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No specified number is needed to maintain a class action under Rule 23[.]" *Bell*, 2019 WL 1874694, at *3; *Berry v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 2014 WL 4403524, at *10 (E.D. Va. Sept. 5, 2014) (Spencer, J.) (same) (quoting *Brady v. Thurston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984)). "Generally, class sizes of forty or more are considered sufficiently numerous to satisfy Rule 23(a)(1)'s numerosity requirement[.]" *In re Zetia (Ezetimibe) Antitrust Litig.*, 2020 WL 4917625, at *2 (E.D. Va. Aug. 21, 2020) (Smith, J.). This Court has held a class of at least 260 residents satisfied the numerosity requirement. *See Bell*, 2019 WL 1874694, at *3.

10

The numerosity requirement is "rarely disputed in securities fraud class actions." *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 406 (E.D. Va. 2015) (Brinkema, J.). Indeed, "a showing that a large number of shares were outstanding and traded during the relevant period would prove that joinder is impractical." *In re NeuStar, Inc. Sec. Litig.*, 2015 WL 5674798, at *3 (E.D. Va. Sept. 23, 2015) (Cacheris, J.).

Altria is a publicly traded company listed on the New York Stock Exchange ("NYSE") that had approximately 1.87 billion shares of common stock outstanding during both Class Periods. Lieberman Decl. Ex. A, Expert Report of Zachary Ny, Ph.D ("Nye Report"), ¶29. The average weekly trading volume during the Complaint Class Period for Altria's common stock was over 47.2 million shares. *Id.*. The average weekly trading volume during the FAC Class Period for Altria's common stock was over 50.8 million shares. *Id*. Although the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of members in the proposed Class. Given the number of Altria shares outstanding and traded during the Class Period, joinder of all affected purchasers would be impracticable.

### D.    Common Questions of Law or Fact Exist for All Class Members

Rule 23 requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. (a)(2). "Even a single common question" satisfies this requirement. *Bell*, 2019 WL 1874694, at *3; *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). The existence of "'[m]inor factual variances' do not prevent a plaintiff from showing commonality as long as the claims arise from the same set of facts and the putative class members rely on the same legal theory." *Branch v. Gov't Emps. Ins. Co.*, 323 F.R.D. 539, 546 (E.D. Va. 2018) (Payne, J.) (quoting *Brown v. Transurban USA, Inc.*, 318 F.R.D. 560, 567 (E.D. Va. 2016) (Cacheris, J.)).

Here, Plaintiffs allege that Defendants made misrepresentations and omissions regarding the JLI transaction; JLI's and Altria's dedication to preventing youth usage; JLI's marketing to underage consumers; and JLI's products and the risks associated with the foregoing. All of the foundational factual issues and legal theories alleged are common to the Proposed Class Representatives and the Class members including:

- whether Defendants violated the federal securities laws by their alleged acts and omissions;

- whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

- whether, and to what extent, the market price of Altria common stock was artificially inflated during the Class Period because of the alleged material misstatements or omissions;

- whether Defendants acted with the requisite scienter;

- whether the Individual Defendants were controlling persons; and

- whether the members of the Class have sustained damages as a result of the alleged conduct, and if so, the proper measure of such damages.

Commonality is "not a heavy burden in securities fraud class actions as '[m]embers of a proposed class in a securities case are especially likely to share common claims and defenses.'" *NeuStar*, 2015 WL 5674798, at *3 (quoting *BearingPoint*, 232 F.R.D. at 539). Courts routinely find securities fraud cases that allege such common questions to be appropriate for class certification. *See e.g.*, *In re The Mills Corp. Sec. Litig*, 257 F.R.D. 101, 105 (E.D. Va. 2009); *City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247, 251 (D.S.C. 2010); *In re Red Hat Inc., Sec. Litig.*, 261 F.R.D. 83, 86 (E.D.N.C. 2009); *NII Holdings*, 311 F.R.D. at 406.

"Because various of defendants' acts and omissions are at the center of this case, it follows that there are a number of questions of both law and fact common to all members of the proposed [C]lass," and Rule 23's commonality requirement is satisfied. *See BearingPoint*, 232 F.R.D. at 539.

12

**E.    The Proposed Class Representatives' Claims Are Typical of Those of The Class**

The typicality element requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Bell*, 2019 WL 1874694, at *4.[4] The class representative "must be part of the class and possess the same interest and suffer the same injury as the class members." *Lee*, 2019 WL 3869412, at *4; (quoting *Broussard v. Meineke Disc. Muffler Shops, Inc*., 155 F.3d 331, 338 (4th Cir. 1998)). "Notably, '[f]actual differences will not necessarily render a claim atypical,' provided the named plaintiff's claim is predicated on the same course of conduct and legal theory as the claims of the class." *Minter v. Wells Fargo Bank, N.A*., 279 F.R.D. 320, 325 (D. Md. 2012) (quoting *Smith v. The Baltimore & Ohio R.R. Co*., 473 F. Supp. 572, 581 (D. Md. 1979)).

The Proposed Class Representatives' claims, like the Class's claims, are based on the same legal theory: Defendants' violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder. Here, the Proposed Class Representatives' and the Class's claims arise from the Defendants' knowing concealment of information and risks concerning the JLI transaction; JLI's and Altria's dedication to preventing youth usage; and JLI's marketing practices – all of which were artificially propping up Altria's stock price. Neither the facts nor the legal theories on which this action is based are unique to the Proposed Class Representatives because all Class members' claims arise from Defendants' alleged

---

[4] According to courts in this Circuit, the requirements of commonality and typicality tend to merge: "'Both serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected . . . .'" *Lee v. JLN Constr. Servs., LLC*, 2019 WL 3869412, at *4 (D. Md. Aug. 16, 2019) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 n. 13 (1982)); *Fangman v. Genuine Title, LLC*, 2016 WL 6600509, at *10 (D. Md. Nov. 8, 2016).

13

wrongful course of conduct, and are based on the same legal theories. The Proposed Class Representatives and all other Class members allege that they purchased Altria common stock at artificially inflated prices during the Class Period as a result of Defendants' material misrepresentations and omissions, and were damaged upon the revelation of the alleged corrective disclosures and/or materializations of risk. Thus, because the Proposed Class Representatives' "claims arise out of the same alleged course of conduct undertaken by the defendants which the plaintiff asserts gives rise to its cause of action" they are typical of the proposed Class. *See Sonoco*, 270 F.R.D. at 251.

F.      **The Proposed Class Representatives Will Fairly and Adequately Protect the Interests of the Class**

The Proposed Class Representatives' interests are entirely aligned with those of the Class. As discussed above, all members of the Class allege claims that arise from the same wrongful conduct and are based on the same legal theories advanced by the Proposed Class Representatives. Since their appointment, the Sherbondys and CLPT have each taken their roles and obligations to the putative Class seriously and have acted to protect the interests of the Class. Should they be appointed as Class Representatives, they intend to act in a similar fashion in order to protect the best interests of the Class. Through counsel, Plaintiffs have investigated and filed the Complaint, successfully opposed and argued a motion to dismiss the Complaint, and pursued discovery. The Proposed Class Representatives have certified that they will continue to oversee further motion practice, and are willing to participate in settlement discussions, should they arise. Lieberman Ex. D, Declaration of Donald Sherbondy ("D. Sherbondy Decl.") ¶¶7-10; Ex. E, Declaration of Sara Sherbondy ("S. Sherbondy Decl.") ¶¶7-10; Ex. F, Declaration of Donald Willey on Behalf of Construction Laborers Pension Trust of Greater St. Louis ("Willey Decl.") ¶¶7-10. The Proposed Class Representatives'

14

actions thus far, and the common interest they share with the Class in seeing this litigation successfully prosecuted, fully satisfy Rule 23(a)(4)'s adequacy standard.

Moreover, the Proposed Class Representatives together owned tens of thousands of shares of Altria common stock during the Class Period, so their interests in seeing this action prosecuted to its fullest are directly aligned with those of the Class. *See* ECF Nos. 27-3 and 74-1. Because the Proposed Class Representatives and the absent Class members sustained losses as a result of the same alleged material misrepresentations and omissions, as Plaintiffs prove their claims, they will also necessarily prove the claims of thousands of absent Class members. *See Fariasantos v. Rosenberg & Assocs., LLC*, 303 F.R.D. 272, 276 (E.D. Va. 2014) (Payne, J.) (finding proposed class representative adequate under Rule 23(a)(4) where he had no interest antagonistic to the class and was represented by counsel that was well-qualified to prosecute the case in favor of the class).

Plaintiffs have proposed the law firms of Pomerantz and Robbins Geller as Class Counsel in this matter. *See* Firm Résumé of Pomeranz, attached as Ex. B to the Lieberman Decl. and Firm Résumé of Robbins Geller, attached as Ex. C to the Lieberman Decl. Pomerantz and Robbins Geller have conducted an extensive investigation into Defendants' conduct and have successfully opposed Defendants' motions to dismiss. *See* ECF Nos. 139 and 140. Since defeating Defendants' motions to dismiss, Pomerantz and Robbins Geller have been actively pursuing discovery on an expedited schedule. Thus, Pomerantz and Robbins Geller are qualified, and, along with the Proposed Class Representatives, have demonstrated that they will vigorously protect the interests of the Class. As a result, the requirements of Rule 23(a)(1)-(4) have readily been satisfied.

### G.    The Court Should Appoint Plaintiffs' Choice of Counsel

In addition to satisfying the adequacy prong of Rule 23(a)(4), Pomerantz and Robbins Geller also satisfy the considerations of Rule 23(g) and should be appointed as Class Counsel.[5]

Pomerantz and Robbins Geller have been appointed class counsel in hundreds of securities class actions. Courts in this Circuit and around the country have recognized the expertise and ability of Pomerantz and Robbins Geller lawyers to effectively litigate complex securities class actions. *See In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 362 (S.D.N.Y. 2016) ("on the basis not only of [Pomerantz's] prior experience but also on the Court's observation of its advocacy over the many months since it was appointed lead counsel, the Court concludes that Pomerantz, the proposed class counsel, is qualified, experienced and able to conduct the litigation") (internal citation omitted); *Knurr v. Orbital ATK, Inc.*, 220 F. Supp. 3d 653, 663 (E.D. Va. 2016) (Ellis, J.) ("There is no question that Robbins Geller is qualified to litigate this class action lawsuit – it has a long record of success in these types of cases."). *See also* Lieberman Decl. Exs. B and C. In light of the firms' expertise and the absence of any conflict between the firms and the Class, the Court should approve Plaintiffs' choice of counsel and appoint Pomerantz and Robbins Geller as Class Counsel.

## IV.    CERTIFICATION IS PROPER UNDER RULE 23(b)(3)

In addition to meeting the prerequisites of Rule 23(a), the proposed Class also satisfies Rule 23(b)(3)'s requirements that: (1) common questions of law or fact predominate over

---

[5] In appointing class counsel pursuant to Rule 23(g), a court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class[.]" Fed. R. Civ. P. 23(g)(1)(A). Consideration of all these factors supports the appointment of Pomerantz and Robbins Geller as Class Counsel.

individual questions; and (2) class action treatment is superior to other methods of adjudication. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

## 1.    Common Questions of Law and Fact Predominate Over Individual Questions

Under Rule 23(b)(3), predominance exists where the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "In determining whether the predominance standard is met, courts focus on the issue of liability. If the liability issue is common to the class, common questions are held to predominate over individual ones." *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 220 (D. Md. 1997). "Damages are less central to the predominance inquiry; courts generally hold that differences in damages among the potential class members do not generally defeat predominance if liability is common to the class." *BearingPoint*, 232 F.R.D. at 542 (internal quotations omitted); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 429 (4th Cir. 2003) ("The possibility that individualized inquiry into Plaintiffs' damages claims will be required does not defeat the class action because common issues nevertheless predominate."). Securities fraud cases "are particularly appropriate candidates for treatment under Rule 23(b)(3), given that the elements of the cause of action generally relate to the acts or omissions of the defendants and because individual damages might be too paltry to justify bringing individual cases." *NII Holdings*, 311 F.R.D. at 408; *see also Amchem*, 521 U.S. at 591.

The Class's claims depend on the same factual circumstances – *i.e.*, a single wrongful course of conduct will need to be proven for each claim to succeed. The facts and circumstances that underpin each of the false statements or omissions alleged are common to each of the Class members' claims. Plaintiffs allege that this course of conduct inflated the price of Altria common stock, and when the risks concealed by Defendants materialized in the form of

17

regulatory action, lawsuits and Altria's multiple impairments of the JLI investment, Altria's common stock price dropped. ¶¶493-550.

The Class's claims also depend on proof of common legal issues. To establish liability under Section 10(b) of the Exchange Act and Rule 10b-5, "a plaintiff must prove that, in connection with the purchase or sale of a security, (1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages." *Gariety v. Grant Thornton*, *LLP*, 368 F.3d 356, 362 (4th Cir. 2004). The Supreme Court has held that questions of whether a defendant knowingly and/or recklessly made public material misstatements and/or omissions (*i.e.*, the scienter, falsity and materiality elements of a Section 10(b) claim) and whether the revelations of the alleged fraud proximately caused that company's stock price to decline (*i.e.*, the loss causation element) are each common questions of law and fact that predominate over individualized ones. *Amgen*, 568 U.S. 455, 467-70, 475.

In securities fraud cases, the predominance requirement is easily met because plaintiffs and the class may avail themselves of the "fraud-on-the-market" presumption of reliance established by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224, 246-47 (1988).

### a.    The "Fraud-on-the-Market" Presumption Applies

The "fraud-on-the-market" theory "holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations,'" and that whenever an "investor buys or sells stock at the market price, his 'reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action.'" *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014) ("*Halliburton II*") (quoting *Basic*, 485 U.S. at 246-47).

To invoke the presumption of reliance under this theory, a plaintiff must demonstrate: (1) that the alleged misrepresentations were publicly known; (2) that they were material; (3) that the stock

18

traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed. *Id.* Here, each of the requirements set forth in *Basic* is readily satisfied.

### i.    Altria Common Stock Traded in an Efficient Market During Each Class Period

To establish that the market for Altria's common stock was efficient, entitling Plaintiffs and the Class to the "fraud-on-the-market" presumption, the following non-exhaustive list of factors, commonly referred to as the *Cammer* factors, are generally considered.

> (1) average trading volume, (2) number of securities analysts following the stock, (3) number of market makers, (4) whether the company was entitled to file an S-3 Registration Statement, if relevant, and (5) evidence of a cause and effect relationship between unexpected news and stock-price changes.

*Gariety*, 368 F.3d at 368 (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989)).[6] In addition to the five *Cammer* factors that indicate market efficiency, courts have considered the supplemental tests cited in *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001). The *Krogman* factors include: (1) the company's market capitalization; (2) the stock's float; and (3) the typical bid-ask spread. *Id.* at 474. Altria's common stock, when analyzed in terms of the factors described above, undoubtedly traded in an efficient market during the FAC Class Period and the Complaint Class Period. In support of this motion, Plaintiffs submit the Nye Report. Dr. Nye analyzed Altria's common stock using both the *Cammer* and *Krogman* factors and concluded that the market for Altria common stock was efficient during the FAC Class Period and Complaint Class Period. Nye Report ¶¶16-59.

---

[6] The *Cammer* factors are meant to be a non-exhaustive list of relevant factors, and under Fourth Circuit law, "no one factor is more important than another when a court undertakes the holistic and fact-intensive inquiry of determining whether a market is efficient." *NII Holdings*, 311 F.R.D. at 409.

ii.      **Altria Shares Experienced a High Weekly Trading Volume**

The existence of an actively traded market, as evidenced by a large weekly trading volume "suggests there is an efficient market . . . because it implies significant investor interest in the company." *Cammer*, 711 F. Supp. at 1286. During the Complaint Class Period, Altria's common stock's average daily trading volume was approximately 47.3 million shares, with an average weekly trading volume of 2.5%, and 1.87 billion shares outstanding during this timeframe. Nye Report ¶29. During the FAC Class Period, Altria's common stock's average daily trading volume was approximately 50.8 million shares, with an average weekly trading volume of 2.7%, and 1.87 billion shares outstanding during this timeframe. Nye Report ¶29. The large volume of trading in Altria's common stock supports a finding that it traded in an efficient market during the Class Period. Nye Report ¶30.; *see also Sonoco*, 270 F.R.D. at 256 (finding, *inter alia*, weekly trading volume of 2.61% of total shares outstanding over a class period established that stock traded on an efficient market); *In re Comput. Sci. Corp. Sec. Litig.*, 288 F.R.D. 112, 119 (E.D. Va. 2012) (Ellis, J.) ("average weekly trading volume of 2% or more of the outstanding shares 'would justify a strong presumption that the market for the security is an efficient one'") (quoting *Cammer*, 711 F. Supp. at 1285-87).

iii.     **A Sufficient Number of Financial Analysts Covered and Reported on Altria During Each Class Period**

During each Class Period, there was comprehensive analyst coverage of Altria. Nye Report ¶¶33-35. During the Complaint Class Period and FAC Class Period, over 18 different analyst firms issued at least 680 and 800 reports pertaining to Altria, respectively. *Id.* at ¶33. During both Class Periods at least nine investment firms also followed and issued reports on Altria. *Id.* These reports disseminated public information along with commentary, analyses, and recommendations about Altria. *Id.* at ¶34. Information about Altria was also disseminated in SEC filings, Company

conference calls, and via news articles. *Id.* at ¶35. In sum, the number of analyst reports and the substantial dissemination of news and other information regarding Altria evidences the robust and active market for public information about the Company and supports market efficiency. *Id.* at ¶36. *See Cammer*, 711 F. Supp. at 1286 ("[I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period.").

                    iv.    **Altria Common Stock Traded on the NYSE Under the Supervision of Designated Market Makers with Brokers Standing Ready to Buy and Sell the Shares**

During each Class Period, Altria common stock traded on the NYSE, meaning that trading in the Company's stock was conducted by a highly developed network of brokers and overseen by the "Designated Market Maker" for Altria common stock. Nye Report ¶38. The presence of a designated market maker supports a finding of efficiency. *Id. See Vinh Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 573 (C.D. Cal. 2012) (finding that the existence of a designated market maker satisfies the third *Cammer* factor). In addition, as is the case with all NYSE-listed equities, Altria stock also traded on numerous other national securities markets and Alternative Trading Systems ("ATSs") during each Class Period. *Id.* at ¶39. There were 120 and 130 active market makers trading Altria stock during the Complaint Class Period and the FAC Class Period, respectively (*id.* at ¶40), which supports a finding of efficiency. *Cammer*, 711 F. Supp. at 1283 n.30 (11 market makers justifies substantial presumption of efficiency).

The existence of arbitrageurs, who are generally understood to be sophisticated investors who can act rapidly to take advantage of pricing discrepancies and thus ensure that market prices reflect all public information, are the fundamental hallmark of market efficiency. Nye Report ¶41. During each Class Period, arbitrageurs were not constrained in their ability to short shares of Altria stock. *Id.* ¶¶43-44. Additionally, institutional holdings of Altria stock were over 64% of outstanding shares available during the Complaint Class Period and the FAC Class

21

Period, respectively. *Id.* ¶¶45-46.   During each Class Period, more than 2,000 institutional investors held Altria stock.  *Id.* ¶46. Furthermore, the fact that institutional holdings, on average, were approximately 73 times the short interest in Altria stock during each Class Period, implies that short selling was not constrained during the Class Period.  *Id.*  Thus, the fact that trading in Altria stock was facilitated by a designated market maker on the NYSE and that arbitrage opportunities could have been exploited during the Class Periods are evidence in support of market efficiency. *Id.* ¶¶38-46. *See Sonoco*, 270 F.R.D. at 256 (finding "sufficient market makers and arbitrageurs exist[ing] during the class period to ensure that the market reacted swiftly to company news and reported financial results," and a "high level of institutional ownership and active trading by these holders" established that securities at issue traded in an efficient market). [7]

### v.    Altria Was Eligible to File Form S-3 During Each Class Period

A company is entitled to Form S-3 registration if the company has filed financial reports with the SEC for 12 months and has an outstanding float of over $75 million. Nye Report, ¶51. It is the SEC's view that these Form S-3 eligible companies – those that disclose financial information to the SEC and issue press releases to the public – have already disseminated information to the marketplace, and, therefore, that the market operates efficiently for them. *Id*. ¶52. Altria filed Forms S-3 before and after both Class Periods. *Id*. at ¶53. As such, this factor

---

[7] Similarly, the cost of trading and arbitrage opportunity for Altria, demonstrated by the "bid/ask" spread, demonstrates that it traded in an efficient market. Nye Report ¶49. Bid/ask spreads are a measure of transaction costs and low transaction costs indicate that arbitrage opportunities can be exploited readily. *Id*. ¶47. During the Complaint Class Period, Altria stock had an average bid/ask spread of 0.02% which was smaller than the average bid/ask spread of a random sample of stocks listed on the NYSE, 0.11%. *Id. ¶48*. During the FAC Class Period, Altria stock had an average bid/ask spread of 0.03 which was smaller than the average bid/ask spread of a random sample of stocks listed on the NYSE, 0.11%. *Id.*  This further supports the conclusion that Altria's common stock traded in an efficient market. *Id*. ¶49.

weighs in favor of finding that Altria traded in an efficient market. *Id*. *See Cammer*, 711 F. Supp. at 1287; *NII Holdings*, 311 F.R.D. at 411.

> **vi.    The Price of Altria's Common Stock Reacted to New Company-Specific Information During Each Class Period**

Additionally, "one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." *Cammer*, 711 F. Supp. at 1291. To study this factor, Dr. Nye employed an event study covering the Class Periods to determine the impact of new material information on Altria's stock price. *See* Nye Report, ¶¶55-57.  In an efficient market, it would be expected that the price of a stock would respond to news. *Id.* ¶55.  The event study is a multiple step process to test this response. *Id*.  Those steps include: "(i) the *a priori* definition and selection of events to study; (ii) identification of a study period; (iii) estimation of a regression model to remove non-company-specific effects from the security's return; (iv) testing for statistical significance; and (v) interpretation of empirical results." *Id.* To determine which events to study in his analysis, Dr. Nye relied on a large body of event study literature that has evaluated what types of information affect stock prices. *Id*. Consistent with this literature, Dr. Nye examined six dates on which Altria released quarterly or year-end financial results and/or guidance during the Complaint Class Period or the FAC Class Period. *Id.* ¶56-57. Such news announcements are objective events shown in the academic finance literature to have a material impact on stock prices.  *Id.* ¶57. Out of the six event dates examined, five (*i.e.* 83.3%) were associated with a statistically significant Company-specific return at or above the 95% confidence level. *Id.* at ¶58. At the 95% level of confidence, a statistically significant return is expected to occur 5% of the time. *Id.* Here, 83.3% of the events examined were associated with statistically significant returns at the 95% confidence level. *Id.*  This

result is 16 times more frequent than one would expect from a random sampling of days. *Id.* This difference is also statistically significant. *Id.* at fn. 90. Moreover, Dr. Nye concluded:

> the event date on which predominantly *positive* Company-specific news reached the market is associated with a statistically significant *positive* return. The event dates on which predominantly *negative* Company-specific news reached the market are associated with statistically significant *negative* returns.

*Id.* at ¶59. Conversely, for the event dates that are associated with a statistically insignificant Company-specific return, the Company's financial results were generally in line with expectations such that the insignificant price reaction is consistent with that expected in an efficient market. *Id.* Based on his analysis, Dr. Nye concluded that "Altria's stock price reflected the information disclosed to the market, and promptly responded to the disclosure of new, material unexpected information, thereby supporting my conclusion that the market for Altria stock was efficient throughout both Class Periods." *Id.* at ¶60.

### vii.    Altria's Market Capitalization and Float

Altria's sizeable market capitalization throughout each Class Period is further evidence of the efficiency of the market for Altria stock. *Id.* at ¶¶56-57. During the Complaint Class Period, Altria's market capitalization ranged between $74.95 billion and $108.21 billion. *Id.* at ¶56. During the FAC Class Period, Altria's market capitalization ranged between $58.32 billion and $123.77 billion. *Id.* at ¶57. By comparison, the median market capitalization on the NYSE during the two Class Periods was between $1.93 billion and $3.3 billion. *Id.* at ¶¶56-57. Altria was larger than 96% of all other publicly traded companies in the U.S. as measured by market capitalization. *Id.* Thus, this factor supports a finding of market efficiency. *Id.* at ¶210. On average during the Class Periods, the public float of Altria stock was 99.9% of the 1.87 billion shares outstanding. *Id.* at ¶59. This factor also supports a finding of market efficiency.

\* \* \*

24

In *Halliburton II,* the Supreme Court confirmed that market efficiency for purposes of the fraud-on-the-market presumption is not tied to any academic strain of market efficiency. *Id.* at 2410 (rejecting notion that efficiency related to "any particular theory of how quickly and completely publicly available information is reflected in market price"). Instead, it is based on the "fairly modest premise that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Id.* (quotation and citation omitted). Accordingly, "[d]ebates about the precise degree to which stock prices accurately reflect public information are thus largely beside the point." *Id.* The Court also held that defendants could "defeat the [*Basic*] presumption at the class certification stage through evidence that the misrepresentation did not in fact affect the stock price." 134 S. Ct. at 2414. That is, by proving "lack of price impact." *Id.* at 2416. Defendants must prove the absence of any price impact "by a preponderance of the evidence." *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1963 (2021). But being allowed to prove no price impact does not mean that it is easily done. The Supreme Court has held that defendants must completely "***sever[] the link*** between the alleged misrepresentation and [] the price received (or paid) by the plaintiff." *Basic*, 485 U.S. at 248-49 (emphasis supplied). In *Halliburton II*, the Justices recognized the defendants' right to prove ***zero*** price impact will not ordinarily present a serious obstacle to class certification. *See Halliburton II*, 134 S. Ct. at 2417 (Ginsburg J., concurring) ("The Court's judgment, therefore, should impose no heavy toll on securities-fraud plaintiffs with tenable claims."); *id.* at 2424 (Thomas, J., concurring in the judgment) ("[I]n practice, the so-called 'rebuttable presumption' is largely irrebuttable.").[8]

---

[8] Additionally, Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), with respect to their scheme liability claims under Rules 10b-5(a) and (c). *See* Complaint ¶¶393-422. To invoke the *Affiliated Ute* presumption, "positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153.

###### b.    Damages Are Measurable on a Class-Wide Basis

It is well-settled that damages in Section 10(b) securities fraud actions are subject to a common methodology that can be applied class-wide. *See, e.g.*, *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 271 (S.D.N.Y. 2014) ("[I]n light of the class-wide methodology for calculation of damages, any necessary individual inquiries are a far cry from the scope of individualized issues of proof that would defeat a finding of predominance . . . .").

Plaintiffs have shown that damages for all members of the proposed Class are capable of measurement on a Class-wide basis using a common formula. Nye Report ¶¶61-65; *see also NII Holdings*, 311 F.R.D. at 413 (finding that the Fourth Circuit only requires a showing that a measurement of damages is capable on a class-wide basis using a common formula) (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 35-36 (2013)). Although individual damages will be calculable based on when each Class member purchased and, if applicable, sold their Altria stock, this does not defeat class certification. *See In re Willis Towers Watson PLC Proxy Litig.*, 2020 WL 5361582, at *10 (E.D. Va. Sept. 4, 2020) (Trenga, J.) ("[T]he element of economic loss in this case, based on [p]laintiff's damages model, pertains to an objective question common to the class and resolvable by common evidence. Therefore, 'there is no risk whatsoever that a failure of proof on the common questions of [economic loss] will result in individual questions predominating.'" (third

---

Rather, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [their] investment decisions." *Id.*  "[T]he *Affiliated Ute* presumption applies . . . where a plaintiff's claim is primarily based upon material omissions" – as Plaintiffs' scheme liability claims are here.  *In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d 845, 863-864 (D. Md. 2005) (applying *Affiliated Ute* where "the gravamen of plaintiffs' claim" involved "manipulative and deceptive conduct"); *see also Burt v. Maasberg*, 2013 WL 1314160, at *26 (D. Md. Mar. 31, 2013) (*Affiliated Ute* presumption applied).  Here, as this Court recognized, Plaintiffs' scheme liability claims are grounded in Defendants' material omissions.  *See Klein v. Altria Grp., Inc.*, 2021 WL 955992, at *15 (E.D. Va. Mar. 12, 2021) (upholding scheme liability claims alleging deceptive conduct). Accordingly, Plaintiffs are entitled to rely on the *Affiliated Ute* presumption to establish reliance with respect to their scheme liability claims under Rules 10b-5(a) and (c).

alteration in original) (quoting *Amgen*, 568 U.S. at 467-68)). Therefore, Plaintiffs' proffer of a class-wide approach to calculating damages further supports predominance.

### 2.    A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action

Rule 23(b)(3) requires the Court to determine that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Allowing this case to proceed as a class action is plainly a superior method for resolving the Proposed Class Representatives' and the Class's claims and will provide the most efficient and fair adjudication. As noted above, courts in this Circuit recognize that class actions are favorably viewed for adjudicating securities fraud cases. *Red Hat*, 261 F.R.D. at 86. Indeed, "[s]ecurities fraud cases are particularly appropriate candidates for treatment under Rule 23(b)(3) since the elements of the cause of action generally relate to the acts or omissions of the defendants and because individual damages might be too paltry to justify bringing individual cases." *BearingPoint*, 232 F.R.D. at 542.

To determine the issue of "superiority," Rule 23(b)(3) sets forth the following factors:

> (A) the class members' interests in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; (C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

In this case, the Class members' interests in individually controlling the prosecution of separate actions are minimal due to the actions' costs and expenses as compared to the potential individual recoveries. *See Sonoco*, 270 F.R.D. at 257 ("the costs associated with bringing individual actions would be prohibitive when weighed against the potential individual recoveries"). Moreover, the Proposed Class Representatives are not aware of any other pending individual securities fraud actions raising these same issues against the same Defendants. *See Minter*, 279 F.R.D. at 330 ("Allowing Plaintiffs to proceed as a class action meets the requirement of superiority because it

27

promotes justice by providing class members, who would not have sufficient incentive to pursue their claims individually, access to the courts to seek vindication of their rights."). Here, the Proposed Class Representatives have committed to, and have every incentive to, seek the maximum recovery for the Class. D. Sherbondy Decl. ¶8; S. Sherbondy Decl. ¶8; Willey Decl. ¶8. The Class members' interests would thus be best furthered if their claims could be litigated as a class action.

Additionally, it is without question that the parties and the Court have an interest in this litigation proceeding in a single forum, so as to prevent inconsistent rulings and promote judicial economy. Altria transacts business in Virginia, including in this District. Additionally, the Court has already expended judicial resources in this action for months, including by giving a detailed order denying Defendants' motions to dismiss, following extensive legal briefing by the parties. Accordingly, this District is the most desirable forum in which to prosecute this action.

Finally, this case does not present any unique difficulties related to the management of the action. Proposed Class Counsel has handled numerous similar actions, and the appropriate procedures and techniques for the management of such suits are well established. In addition, "management of the class litigation should not prove especially difficult as securities cases allow for the easy identification of the class members." *BearingPoint*, 232 F.R.D. at 544-45. Moreover, the flexibility provided to the Court under Rule 23 will enable it to address and resolve any management difficulties should they arise. *See* Fed. R. Civ. P. 23(c)-(d). Consistent with the requirements of Rule 23(b)(3), the certification of this action as a class action would be superior to other available methods for fairly and efficiently adjudicating the controversy.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (i) certify this action as a class action pursuant to Rule 23(a) and 23(b)(3); (ii) appoint the Proposed Class

Representatives as Class Representatives; (iii) appoint Co-Lead Counsel Pomerantz and Robbins

Geller as Class Counsel; and (iv) appoint Cohen Milstein as Liaison Counsel.

DATED:  August 6, 2021                          By: *Steven J. Toll*
                                                _____
                                                Steven J. Toll (VSB #15300)
                                                Daniel S. Sommers
                                                S. Douglas Bunch
                                                COHEN MILSTEIN SELLERS & TOLL PLLC
                                                1100 New York Ave., NW Suite 500
                                                Washington, DC  20005
                                                Telephone:  202/408-4600
                                                202/408-4699 (fax)
                                                stoll@cohenmilstein.com
                                                dsommers@cohenmilstein.com
                                                dbunch@cohenmilstein.com

                                                *Local Counsel for Lead Plaintiffs*


                                                Jeremy A. Lieberman
                                                Michael J. Wernke
                                                POMERANTZ LLP
                                                600 Third Avenue
                                                New York, NY  10016
                                                Telephone:  212/661-1100
                                                212/661-8665 (fax)
                                                jalieberman@pomlaw.com
                                                mjwernke@pomlaw.com

                                                *Lead Counsel for Lead Plaintiffs Donald Sherbondy*
                                                *and Sarah Sherbondy*

29

Samuel H. Rudman
David A. Rosenfeld
Erin W. Boardman
Philip T. Merenda
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
eboardman@rgrdlaw.com
pmerenda@rgrdlaw.com

Douglas R. Britton
Kevin A. Lavelle
Matthew J. Balotta
ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dougb@rgrdlaw.com
klavelle@rgrdlaw.com
mbalotta@rgrdlaw.com

*Lead Counsel for Lead Plaintiff Laborers Pension
Trust of Greater St. Louis*

Brian Schall
THE SCHALL LAW FIRM
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: 310/301-3335
brian@schallfirm.com

*Additional Counsel for Lead Plaintiffs Donald
Sherbondy and Sarah Sherbondy*

30

## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2021 I caused the foregoing to be electronically filed with the Clerk of Court via CM/ECF, which will send a notice of electronic filing to all registered users.

By: *Steven J. Toll*

Steven J. Toll (VSB #15300)
COHEN MILSTEIN SELLERS &
TOLL PLLC
1100 New York Ave., NW Suite 500
Washington, DC  20005
Telephone:  202/408-4600
202/408-4699 (fax)
stoll@cohenmilstein.com

*Local Counsel for Lead Plaintiffs*

31