**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**

|  |  |
|---|---|
| GABBY KLEIN, *et al.*, Individually and on Behalf of All Others Similarly Situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> ALTRIA GROUP, INC., *et al.*, <br><br> *Defendants*. | No. 3:20-cv-00075-DJN |

**ALTRIA DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND ................................................................................................................4

       A.     E-vapor emerges, offering a potentially less harmful
             alternative to cigarettes. ............................................................................. 4

       B.     JUUL sees significant initial success followed by scrutiny over its
             marketing and youth usage as Altria explores a potential investment.................... 4

       C.     Equity research analysts publicly report on the regulatory scrutiny
             facing JUUL............................................................................................ 5

       D.     Altria invests in JUUL while warning the market about the risks.......................... 6

       E.     This class action commences and the Sherbondys and the Trust are
             appointed lead plaintiffs............................................................................ 7

       F.     Plaintiffs seek to file a second amended complaint adding allegations
             that are more than two years old. ............................................................... 9

ARGUMENT....................................................................................................................9

I.     The Sherbondys and the Trust are not adequate class representatives
     and do not have typical claims....................................................................10

       A.     The Sherbondys ..................................................................................... 11

           1.     The Sherbondys are inadequate class representatives. .............................11

           2.     The Sherbondys' claims are not typical.....................................................13

       B.     Construction Laborers Pension Trust.................................................... 15

           1.     The Trust is an inadequate class representative.......................................15

           2.     The Trust's claims are not typical.............................................................16

II.     Individualized issues predominate.............................................................20

       A.     Plaintiffs cannot rely on a presumption of reliance. ............................ 20

           1.     Absence of price impact will defeat the presumption of reliance..............20

           2.     The alleged misrepresentations had no price impact. ..............................22

i

B.     Plaintiffs have not demonstrated that damages are measurable on a classwide basis. ............................................................................... 30

      1.     Plaintiffs fail to provide any information about how they would actually calculate damages on a classwide basis in this case.....................31

      2.     Dr. Nye makes no attempt to identify how he would measure damages from the materialization of the allegedly understated risks. ........................................................................32

      3.     Dr. Nye makes no attempt to explain how he would develop a model to control for confounding information unrelated to Plaintiffs' theory of liability.........................................................35

      4.     Dr. Nye makes no attempt to explain how his methodology would account for such a lengthy class period. .....................................36

C.     The size of the proposed class and the large number of alleged corrective disclosures and misrepresentations create individualized issues that defeat predominance............................................................ 37

III.    The request to certify the class in the proposed amended complaint is procedurally and legally flawed......................................................................39

IV.    In the alternative, the Court should cut off the class period on September 25, 2019, the last alleged corrective disclosure pled in the original complaint. ......................................................................................40

CONCLUSION...............................................................................................40

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Amchem Prods., Inc.* v. *Windsor*,
521 U.S. 591 (1997)................................................................................................10, 37

*Basic Inc.* v. *Levinson*,
485 U.S. 224 (1988)................................................................................. *passim*

*Comcast Corp.* v. *Behrend*,
569 U.S. 27 (2013)................................................................................... *passim*

*Dura Pharms., Inc.* v. *Broudo*,
544 U.S. 336 (2005)................................................................................................24 n.8

*Epstein* v. *Am. Reserve Corp.*,
1988 WL 40500 (N.D. Ill. Apr. 21, 1988) ...............................................................18

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
563 U.S. 804 (2011) ("*Halliburton I*") ...................................................................20

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
309 F.R.D. 251 (N.D. Tex. 2015) ("*Halliburton Remand*")................23 n.7, 23 n.8, 24 n.9, 29

*Ft. Worth Emps.' Ret. Fund* v. *J.P. Morgan Chase & Co.*,
301 F.R.D. 116 (S.D.N.Y. 2014) ...............................................................................31 n.10

*Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
903 F.2d 176 (2d Cir. 1990)........................................................................................18

*George* v. *China Auto. Sys., Inc.*,
2013 WL 3357170 (S.D.N.Y. July 3, 2013) ..................................................................14, 19

*Goldman Sachs Group, Inc.* v. *Arkansas Teacher Retirement System*,
141 S. Ct. 1951 (June 21, 2021)................................................................. *passim*

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ("*Halliburton II*") ............................................................. *passim*

*Hayes* v. *MagnaChip Semiconductor Corp.*,
2016 WL 7406418 (N.D. Cal. Dec. 22, 2016)..........................................................23 n.7, 40

*In re Allergan PLC*,
2020 WL 5796763 (S.D.N.Y. Sept. 29, 2020)............................................................19 n.4

*In re Allergan PLC*,
2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021).............................................................32 n.11

*In re Allstate Corp.*,
966 F.3d 595 (7th Cir. 2020) ..........................................................................................21

*In re Almost Family, Inc.*,
2012 WL 443461 (W.D. Ky. Feb. 10, 2012) ..................................................................25

*In re Bridgestone*,
430 F. Supp. 2d 728 (M.D. Tenn. 2006)..........................................................................14

*In re Burlington Coat Factory*,
114 F.3d 1410 (3d Cir. 1997)..........................................................................................29

*In re Cardinal Health, Inc.*,
226 F.R.D. 298 (S.D. Ohio 2005) ...................................................................................14

*In re Computer Scis. Corp.*,
288 F.R.D. 112 (E.D. Va. 2012) ..........................................................................14 n.1, 18 n.3

*In re Diamond Foods, Inc.*,
295 F.R.D. 240 (N.D. Cal. 2013).....................................................................................36

*In re Eaton Corp.*,
2017 WL 4217146 (S.D.N.Y. Sept. 20, 2017)........................................................... 39-40

*In re Enron Corp.*,
529 F. Supp. 2d 644 (S.D. Tex. 2006) .............................................................................16

*In re Federal Nat'l Mortg. Ass'n*,
247 F.R.D. 32 (D.D.C. 2008)...............................................................................23 n.7

*In re Grupo Televisa*,
2020 WL 3050550 (S.D.N.Y. June 8, 2020) .......................................................19 n.4

*In re Grupo Televisa*,
2021 WL 2000005 (S.D.N.Y. May 19, 2021) .....................................................19 n.4

*In re IMAX*,
272 F.R.D. 138 (S.D.N.Y. 2010) .....................................................................................15

*In re Jeld-wen Holding, Inc.*,
2021 WL 1186326 (E.D. Va. Mar. 29, 2021)..................................................................10

*In re Kosmos Energy Ltd.*,
299 F.R.D. 133 (N.D. Tex. 2014) ....................................................................................15

*In re Merck & Co.*,
432 F.3d 261 (3d Cir. 2005)............................................................................................29

iv

*In re Moody's Corp.*,
   274 F.R.D. 480 (S.D.N.Y. 2011) ............................................................23 n.8, 24 n.9

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   725 F.3d 244 (D.C. Cir. 2013) .................................................................................30

*In re REMEC Inc.*,
   702 F. Supp. 2d 1202 (S.D. Cal. 2010)...............................................................23 n.8

*In re Safeguard Scientifics*,
   216 F.R.D. 577 (E.D. Pa. 2003)..............................................................................18

*In re ValuJet, Inc.*,
   984 F. Supp. 1472 (N.D. Ga. 1997)........................................................................39

*J.H. Cohn & Co.* v. *Am. Appraisal Assocs., Inc.*,
   628 F.2d 994 (7th Cir. 1980) ............................................................................38 n.13

*Krakauer* v. *Dish Network, L.L.C.*,
   925 F.3d 643 (4th Cir. 2019) ...............................................................................9, 10

*Lienhart* v. *Dryvit Sys., Inc.*,
   255 F.3d 138 (4th Cir. 2001) ...................................................................................11

*Loos* v. *Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) ...................................................................................25

*Loritz* v. *Exide Techologies*,
   2015 WL 6790247 (C.D. Cal. July 21, 2015)...................................................... 30-31

*Ludlow* v. *BP, P.L.C.*,
   800 F.3d 674 (5th Cir. 2015) .........................................................................3, 33, 34

*Matrixx Initiatives, Inc.* v. *Siracusano*,
   563 U.S. 27 (2011)...................................................................................................37

*Merck & Co.* v. *Reynolds*,
   559 U.S. 633 (2010)..................................................................................................39

*Meyer* v. *Greene*,
   710 F.3d 1189 (11th Cir. 2013) ...............................................................................25

*Microsoft Corp.* v. *Baker*,
   137 S. Ct. 1702 (2017)..............................................................................................10

*Miller* v. *Asensio & Co.*,
   364 F.3d 223 (4th Cir. 2004) ...................................................................................35

*Monroe* v. *City of Charlottesville*,
    2007 WL 2461746 (W.D. Va. Aug. 27, 2007) ...............................................................11, 16

*Morris* v. *Wachovia Sec., Inc.*,
    223 F.R.D. 284 (E.D. Va. 2004) ...................................................................................38 n.13

*Ogden* v. *AmeriCredit Corp.*,
    225 F.R.D. 529 (N.D. Tex. 2005) ................................................................................15

*Ohio Pub. Emps. Ret. Sys.* v. *Fed. Home Loan Mortg. Corp.*,
    2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ........................................................31 n.10, 32

*Raab* v. *Gen. Physics Corp.*,
    4 F.3d 286 (4th Cir. 1993) ...........................................................................................33, 37

*Rocco* v. *Nam Tai Elecs., Inc.*,
    245 F.R.D. 131 (S.D.N.Y. 2007) .................................................................................19

*Sedona Corp.* v. *Ladenburg Thalmann*,
    2005 WL 2647945 (S.D.N.Y. Oct. 14, 2005)..............................................................39

*Shiring* v. *Tier Techs., Inc.*,
    244 F.R.D. 307 (E.D. Va. 2007) ............................................................................10, 11, 13, 15

*Sicav* v. *Wang*,
    2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) ...............................................................31 n.10

*Spears* v. *Metro. Life Ins.*,
    2007 WL 1468697 (N.D. Ind. May 17, 2007) ............................................................39

*Stoneridge Investment Partners, LLC* v. *Scientific-Atlanta*,
    552 U.S. 148 (2008)......................................................................................................20

*Tsereteli* v. *Residential Asset Securitization Tr. 2006-A8*,
    283 F.R.D. 199 (S.D.N.Y. 2012) .................................................................................19

*Wal-Mart Stores, Inc.* v. *Dukes*,
    564 U.S. 338 (2011)......................................................................................................9, 10

*Welling* v. *Alexy*,
    155 F.R.D. 654 (N.D. Cal. 1994)..................................................................................13

**Statutes and Rules**

28 U.S.C. § 1658(b)(1) ...........................................................................................................39

Fed. R. Civ. P. 23 ................................................................................................... *passim*

**Legislative Materials**

S. Rep. 104–98 (1995) ...............................................................................................1

**Other Authorities**

Fed. Jud. Ctr.,
  *Reference Manual on Scientific Evidence* 251 (3d ed. 2011) ...........................................24 n.9

M. Estrada et al.,
  "High Court Should Review Goldman's Maintenance Theory," Law360 (June
  24, 2020), tinyurl.com/highcourtshouldreview...............................................................22 n.5

**PRELIMINARY STATEMENT**

Although plaintiffs bear the burden of proving that their proposed class satisfies the requirements of Rule 23, their motion papers barely skim the surface of the requirements of the rule.  This casual approach to a motion for class certification is insufficient under Supreme Court and Fourth Circuit precedent, which require the district court to engage in a "rigorous analysis" of the Rule 23 requirements before certifying a class.  Plaintiffs have failed to meet their burden on multiple requirements for class certification.

The proposed class cannot be certified because plaintiffs are inadequate and atypical class representatives.  The PSLRA was "intended to empower investors so that they, not their lawyers, control securities litigation."  S. Rep. 104–98, at *6 (1995).  But with the Sherbondys, counsel at Pomerantz is firmly in control.  The depositions of the Sherbondys were devastating to plaintiffs' motion.  They knew next to nothing about the essential facts of the case and acknowledged they can't perform even their most basic duties as class representatives.  Their testimony directly contradicts their lead plaintiff certifications, a circumstance that is disqualifying.

The depositions of the Construction Laborers' Pension Trust and its investment manager D.L. Carlson were equally problematic.  A securities fraud claim requires reliance.  But D.L. Carlson, which had full investment discretion, invested in Altria stock believing all along that Altria had dramatically overpaid for JUUL and that JUUL had intentionally marketed to youth. In view of that testimony, it is hard to see how the Trust could have brought this case in good faith.  But nobody from Robbins Geller spoke to D.L. Carlson before suing.  Indeed, even after filing its complaint, the Trust continued to hold Altria stock for *months*, with D.L. Carlson blithely unaware the Trust (or more accurately its lawyers) were bringing fraud claims.

In addition, the proposed class cannot be certified as it fails to satisfy another critical element of Rule 23 — that issues common to the class "predominate" over individual

issues.  Plaintiffs' core claim is that Altria knew that JUUL was intentionally marketing to underage users and that they defrauded investors by understating the risks to JUUL arising from JUUL's illegal marketing.  Plaintiffs claim they bought Altria at inflated prices and were damaged "upon the revelation of the alleged corrective disclosures and/or materializations of risk," pointing to no fewer than nineteen price declines during the proposed class period.  According to plaintiffs, on the day it announced its $12.8 billion minority investment in JUUL, Altria's stock price reflected **_more than $40 billion_** of fraud inflation, an obvious absurdity.

To make a showing of classwide reliance, plaintiffs seek to invoke the fraud-on-the-market presumption of reliance.  But the record shows that the alleged misrepresentations and omissions did not impact Altria's stock, as is necessary for that presumption to apply.

In its recent decision in *Goldman Sachs Group, Inc.* v. *Arkansas Teacher Retirement System*, 141 S. Ct. 1951 (June 21, 2021), the Supreme Court held that courts must examine *all* evidence in evaluating price impact at the class certification stage — and apply a healthy dose of "common sense."  As explained by defendants' expert, Professor Douglas Skinner of the University of Chicago, five of the corrective disclosures alleged in the operative complaint (with eight alleged impact dates) had no price impact on Altria's stock.  The rest of the corrective disclosures are equally defective: for instance, because they involve health conditions not related to JUUL or Altria, because they involve the announcement of government investigations that went nowhere, or because they came after the Pomerantz firm had already sued Altria for "fraud."  These flaws create obvious mismatches with the alleged misrepresentations.

Any argument that the alleged misrepresentations impacted Altria's stock price also conflicts with the massive amount of public information — from well before Altria's investment in JUUL — questioning JUUL's marketing practices and highlighting its regulatory risks.

Investors would have had to have been catatonic not to recognize that JUUL faced wide-ranging scrutiny over its marketing practices from the press, regulators, and private litigants, a fact completely inconsistent with the notion that the alleged insufficiency of Altria's risk warnings inflated its stock price, let alone to the tune of $40 billion.

Individualized issues predominate for another reason:  plaintiffs cannot satisfy their burden under *Comcast Corp.* v. *Behrend*, 569 U.S. 27 (2013) of proving that damages can be calculated on a classwide basis.  Dr. Nye has been a professional plaintiffs' expert his entire career.  He has put forth a superficial damages "framework" that is generic, conclusory, and incomplete.  Plaintiffs fail to provide any information about how they would actually calculate damages on a classwide basis in this case, promising they will do it sometime in the future. Dr. Nye's suggestion that the damages question could be handled through a simple event study was flatly rejected by the Fifth Circuit in *Ludlow* v. *BP*, 800 F.3d 674 (5th Cir. 2015), a case also alleging that the defendants understated risks that later materialized.   *BP* — and the other cases discussed below reaching the same result — should be followed here.

Plaintiffs' cursory attention to the requirements of Rule 23 should be the end of the story. But that is not the only flaw here.  Over a year after filing their first amended complaint, plaintiffs have now asked for leave to file a new amended complaint that seeks to expand the class to include individuals who bought Altria stock before the JUUL investment and add still more corrective disclosures.  Remarkably, plaintiffs ask the Court to certify this expanded class. But plaintiffs haven't gotten permission to file that complaint, and if they do, defendants intend to move to dismiss the new claims, triggering the PSLRA's automatic stay.  Defendants are unaware of any case since the PSLRA certifying a securities class pled in an unapproved pleading that has not yet been tested on a motion to dismiss.  This case shouldn't be the first.

3

## BACKGROUND

A.    **E-vapor emerges, offering a potentially less harmful alternative to cigarettes.**

For years, the market for combustible cigarettes has been in long-term decline, see Ex. 2 at '729, with e-cigarettes recently emerging as a potentially less harmful alternative to combustible cigarettes.  In July 2017, FDA took action to encourage smokers to migrate to e-cigarettes, recognizing that nicotine, while addictive, "is delivered through products that represent a *continuum of risk* and is most harmful when delivered through smoke particles in combustible cigarettes."  Ex. 3 at '774 (emphasis added).  FDA signaled it would tighten restrictions on cigarettes, while working to facilitate the success of e-cigarettes.  *Id.* at '774-75.  At the same time, FDA said that policies to "help smokers quit cigarettes" must also "protect kids," so it promised to assess the role that e-cigarettes "play in attracting youth."  *Id.*

B.    **JUUL sees significant initial success followed by scrutiny over its marketing and youth usage as Altria explores a potential investment.**

By 2018, JUUL had achieved success in converting adult smokers with its e-cigarettes.  Ex. 4 at '338-39.  But JUUL began to face increased public scrutiny over youth usage of its products, including criticism it had encouraged youth usage through its marketing.

All of this was widely reported.  For example, in April 2018, eight months before Altria's investment in JUUL, eleven U.S. senators sent JUUL a public letter urging it to "immediately take action" to reduce youth usage.  Ex. 5 at '313.  Five days later, FDA sent JUUL a heavily publicized information request about youth vaping.  Ex. 6, p. 3.  FDA's statement warned that "[t]he illegal sale of these JUUL products to minors is concerning," and that FDA wanted "to better understand the reportedly high rates of youth use and the particular youth appeal of [JUUL] products."  *Id*. at 2-3.

4

Also in April 2018, a class of consumers filed a public complaint in federal court raising many of the same allegations raised by plaintiffs in this case, including accusing JUUL of intentionally marketing its product to underage users.  Ex. 7.  The complaint included allegations related to JUUL's short-lived 2015 "Vaporized" campaign, which also features prominently in this litigation.  *Id.* at ¶ 35.

On September 12, 2018, FDA sent public letters to e-vapor manufacturers and made a simultaneous public statement calling youth vaping an "epidemic," demanding that the manufacturers take "prompt action" to address the issue, and threatening potential criminal enforcement action.  Ex. 8 at '525-'27; Ex. 9 at '616-17.  Later that month, it was widely reported that FDA had conducted a surprise inspection of JUUL's headquarters, collecting documents related to JUUL's sales and marketing practices.  Ex. 10.

Indeed, throughout 2018, hardly a day went by without a major news publication like The New York Times, the Washington Post, or CNN reporting on youth usage and repeating allegations that JUUL targeted youth.  Headlines read "Schools Struggle with Vaping Explosion" and "FDA Targets E-Cigarettes Like JUUL as Teachers Fear 'Epidemic' Use by Students."  Ex. 11; Ex. 12.  For example, in July 2018, the Washington Post published an article discussing recent lawsuits brought against JUUL, describing allegations that JUUL "targeted youth from the get-go."  Ex. 13.  And in August 2018, The New York Times published an article discussing criticism of the 2015 "Vaporized" campaign for its use of young models.  Ex. 14.  These are just a few examples of the public scrutiny that JUUL faced months before Altria made its investment.

**C.    Equity research analysts publicly report on the regulatory scrutiny facing JUUL.**

Equity research analysts closely followed FDA's scrutiny of e-vapor and, in particular, JUUL.  In November 2018, before Altria's investment in the company, a slew of reports

expressed concern about JUUL's prospects due to the regulatory risks it faced.  Morgan Stanley highlighted "concerning trends" regarding youth usage of JUUL and predicted FDA would move to regulate flavors.  Ex. 4 at '338.  Bank of America predicted "FDA will do more to control the growth of" e-vapor products like JUUL's since "FDA's initial steps … [are] not enough to curb youth usage."  Ex. 15 at '258.  And Goldman Sachs raised "questions around JUUL's growth prospects" in part due to "FDA's recent crackdown on the e-vapor category in light of increased youth usage."  Ex. 16 at '327.

Analysts also linked these concerns with Altria's potential investment in JUUL.  Alliance Bernstein asked if an Altria investment "ma[d]e sense given [the] future regulatory risk," since FDA had made clear it would "continue to assess whether its recent regulatory actions are having the desired impact of reducing youth usage of e-cigarettes."  Ex. 17 at '719.

### D.     Altria invests in JUUL while warning the market about the risks.

On December 20, 2018, after months of negotiating, Altria and JUUL announced their deal.  Altria wasn't blind to the risks of investing in JUUL, but believed in JUUL's business potential through converting many of the world's billion adult smokers to a potentially safer product.  In a press release announcing the JUUL investment, Altria highlighted the challenges that the e-cigarette industry faced with respect to underage usage.  "As recent studies have made clear, youth vaping is a serious problem."  Ex. 18, p. 2.  During an investor call, Altria CEO Howard Willard further cautioned against "discount[ing] the fact that youth usage of e-vapor products is a big problem," warning that if it was "not resolved, [it would] put the whole category at risk."  Ex. 19 at '785-786.  Willard explained that "a big focus of [Altria] working with JUUL" would be to help it address youth usage.  *Id.*

Altria also repeatedly warned the market about these risks in its securities filings.  For example, in its 10-K after the deal was announced, Altria cautioned that "the expected benefits of

6

the JUUL transaction … may not materialize" for numerous reasons, including the very reasons that ultimately surfaced here — namely, "regulatory risks at the international, federal and state levels, including actions by the FDA" and risk from "domestic or international litigation developments [and] investigations." Ex. 20, p. 10.

The regulatory risks to JUUL weren't lost on market analysts. Shortly after the deal was announced, Stifel opined that "the E-vapor category face[d] more aggressive regulation starting now by the FDA," that "JUUL has been under the microscope at the FDA," and that "the product has been the poster-child for the significant increase in youth attachment rates." Ex. 21 at '175. Height Securities said that "[t]he most obvious risk for Altria is if regulators come down so tough on JUUL Labs that the company may no longer sell its products in the United States." Ex. 22 at '970. Height also cautioned that "policymakers, regulators, school administrators, and the general public are skeptical of JUUL" and that "many on Wall Street think JUUL Labs is being completely disingenuous when they say they are not targeting youth." *Id*. at '971.

> ### E. This class action commences and the Sherbondys and the Trust are appointed lead plaintiffs.

On October 2, 2019, Gabby Klein, an Altria stockholder represented by Pomerantz, commenced this suit. Dkt. 1. Claiming "fraud," Klein alleged that Altria had "failed to inform investors … [of] material risks associated with JUUL's products and marketing practices." Dkt. 1 ¶¶ 5, 77. The Trust and the Sherbondys were later appointed lead plaintiffs. *See* Dkts. 43, 50.

On April 21, 2020, plaintiffs filed a 160-page Amended Complaint on behalf of a proposed class that bought Altria securities between December 20, 2019 and February 21, 2020. Dkt. 108 ("Compl."). They added a number of new corrective disclosures from after October 2019, when Klein first alleged fraud. The alleged corrective disclosures are set out below:

7

| Alleged Disclosure Date | Description | Alleged Disclosure Event Date | Stock Drop | Compl. ¶¶ |
|---|---|---|---|---|
| 4/3/19 | Announcement of FDA/CDC investigation into vaping-related illnesses. | 4/3/2019 | -4.78% | 478-79 |
| 8/29/19 | Report that FTC was investigating JUUL's marketing practices. | 8/29/2019 | -3.49% | 500-01 |
| 8/30/19 | Announcement of FDA/CDC investigation into vaping-related illnesses. | 8/30/2019 | -1.15% | 502-03 |
| 9/9/19 | FDA issues warning letter to JUUL. | NONE | NONE | 504 |
| 9/11/19 | Reports on possible flavor ban. | NONE | NONE | 505 |
| 9/12/19 | Reports on New Jersey restricting e-cigarette use; CDC report on cases of vaping-related lung disease. | 9/13/2019 | -3.62% | 506-07 |
| 9/23/19 | Reports that federal prosecutors in California were investigating JUUL. | 9/24/2019 | -0.37% | 508, 512 |
| 9/25/19 | Press release announcing Philip Morris International called off merger discussions with Altria; JUUL announced it was the subject of another federal investigation; JUUL stops all U.S. advertising and replaces its CEO. | 9/25/2019 | -0.42% | 511-12 |
| 10/31/19 | Altria announced first impairment on JUUL investment; Altria announced it had received a Civil Investigative Demand from the FTC relating to the resignation of JUUL's former CEO. | 10/31/2019 | -2.55% | 517-18 |
| 1/30/20 | Altria announced second impairment on JUUL investment. | 1/30/2020 | -4.2% | 519-20 |
| 2/21/20 | WSJ reported that the SEC launched an investigation into Altria's JUUL-related disclosures. | 2/21/20 2/24/20 2/25/20 2/26/20 2/27/20 | 0.72% -4.55% -2.99% -0.87% -4.23% | 521-22 |

The Court would go on to deny, in part, defendants' motions to dismiss on March 31, 2021. Dkt. 140. The Court held that plaintiffs had successfully pled a claim that Altria knew that JUUL was intentionally marketing to youth and that it understated the risks to JUUL arising from this fact. *Id.* at 42. The Court explained that plaintiffs' claims pertained to JUUL's alleged

8

efforts to *target* underage users, not merely the widely known fact of youth usage: "[T]he problem of youth usage differs from JUUL's direct efforts to target youths. These different problems pose different risks to the value of JUUL and, resultingly, the value of Altria." *Id.* at 25; *see also id.* at 34 ("Essentially, Plaintiffs allege that Altria staked its future on JUUL, increasing the need and incentive to omit or misrepresent the serious risks created by JUUL's marketing to youth.").

> **F.      Plaintiffs seek to file a second amended complaint adding allegations that are more than two years old.**

On August 6, 2021, the same day they filed this motion for class certification, plaintiffs filed a motion asking for leave to file yet another amended pleading. Dkt. No. 217. Plaintiffs seek to expand the class period to "October 25, 2018 through April 1, 2020," adding a supposed failure to disclose an alleged antitrust conspiracy to their suit. Second Amended Compl., Dkt, 218-1 ("SAC") ¶ 2. Plaintiffs also seek to add several additional corrective disclosures, which apparently went unnoticed when suit was first brought in October 2019 or when the complaint was amended in April 2020. *See* SAC ¶¶ 494-95, 507-08, 541-42, 547-58. Altria has opposed plaintiffs' motion for leave to amend, Dkt. 245, which is *sub judice*.

## ARGUMENT

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 348 (2011). A court may certify a class only if — after a "rigorous analysis" — it finds that plaintiffs have "affirmatively demonstrate[d] [their] compliance" with the requirements of Rule 23. *Id.* at 351; *Krakauer* v. *Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir. 2019).

To certify a class, the Court must find that "the representative parties will fairly and adequately protect the interests of the class" and that "the claims or defenses of the

9

representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3), (4). The Court must also find that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 623 (1997).

"Since the requirements of Rule 23 are often enmeshed in the factual and legal issues comprising the plaintiffs' cause of action," courts must "rigorously examine the core issues of the case at the certification stage." *Krakauer*, 925 F.3d at 654; *Wal-Mart*, 564 U.S. at 351. This is particularly "crucial" in securities cases, where establishing predominance requires analyzing whether the elements of a Section 10(b) claim, including reliance, are "common to the class." *See In re Jeld-wen Holding, Inc.*, 2021 WL 1186326, at *4 (E.D. Va. Mar. 29, 2021).

Once a class has been certified, there are "substantial *in terrorem* settlement pressures" on defendants, as even plaintiffs with "weak" claims are in a position "to extort settlements." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 296 n.7 (2014) ("*Halliburton II*") (Thomas, J., concurring). Seeking "to provide significantly greater protection against improvident certification decisions," the drafters of Rule 23 made class certification determinations eligible for interlocutory appeal at the discretion of the appellate court. *Microsoft Corp.* v. *Baker*, 137 S. Ct. 1702, 1709 (2017); *see* Fed. R. Civ. P. 23(f).

## I.      The Sherbondys and the Trust are not adequate class representatives and do not have typical claims.

As courts in this circuit have recognized, in securities litigation, "the adequacy inquiry must be particularly searching … because the PSLRA was intended to empower investors so that they, not their lawyers, control securities litigation." *Shiring* v. *Tier Techs., Inc.*, 244 F.R.D. 307, 315 (E.D. Va. 2007). Plaintiffs cannot merely "lend[] their name[] to a suit controlled

10

entirely by the class attorney," *Monroe* v. *City of Charlottesville*, 2007 WL 2461746, at *2 (W.D. Va. Aug. 27, 2007), with the intent just to "defer to counsel, relying on information from and communications with counsel to monitor and manage the litigation," *Shiring*, 244 F.R.D. at 316. Instead, they must show they have a "willingness and ability … to take an active role in and control the litigation." *Monroe*, 2007 WL 2461746, at *2.

As for typicality, the class representative must "possess the same interest and suffer the same injury as the class members." *Lienhart* v. *Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001). "[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Shiring*, 244 F.R.D. at 313. "[I]t does not matter whether a unique defense ultimately will prove meritorious[;] instead, the presence of an arguable defense is sufficient to find atypicality." *Id.* at 314.

### A.    The Sherbondys

#### 1.    The Sherbondys are inadequate class representatives.

At their depositions, the Sherbondys knew almost nothing about the basic facts of the case and its procedural posture and said they were unwilling and unable to perform their most basic responsibilities as class representatives. They are not "competent" to lead this securities class action by any stretch of the imagination. *See Shiring*, 244 F.R.D. at 316.

Mr. Sherbondy could not say what made him think he and his wife were "victims of a securities fraud." Ex. 23 (D. Sherbondy) 90:23-91:5. In his view, this case isn't about e-vapor products, which he believes were being sold back in 1959. *Id.* 37:21-39:5. Instead, it is about "Altria pushing cigarettes and cigarette paraphernalia onto children and lying about it." *Id.* 15:4-22.

Mr. Sherbondy doesn't know who he's suing and could not identify a single individual defendant in this case. *Id.* 15:23-18:20. He doesn't know that Howard Willard, the former Altria

CEO, is a defendant, speculating that "he's an attorney for one of the other groups." *Id.* 15:23-16:6.  Billy Gifford, the current CEO, is also not a defendant according to Mr. Sherbondy — he's a "reporter." *Id.* 17:8-10.  As for JUUL, Mr. Sherbondy doesn't know what industry it is in or anything at all about the products it makes. *Id.* 39:14-40:19.

And Mr. Sherbondy says he's unwilling and incapable of performing the responsibilities of lead plaintiff.  He's unable to identify "anything specific [he's] done to supervise counsel in this action," freely admitting, "I haven't overseen any of [the prosecution of this action]." *Id.* 102:24-103:7; 115:20-116:11.  Mr. Sherbondy never "discuss[ed] the complaint [against Altria] with [his] attorneys" and did not "ask a single question" about it. *Id.* 104:8-14.  He can't recall "review[ing] any filings" in the case. *Id.* 122:20-22.  He doesn't know whether defendants produced any documents. *Id.* 123:8-10.  And he doesn't even know that there was a "court-ordered mediation" in June. *Id.* 140:18-141:9.

In support of his motion to be appointed lead plaintiff, Mr. Sherbondy submitted a PSLRA certification under penalty of perjury.  In Paragraph 7 of that certification, Mr. Sherbondy swore that he would "direct counsel, review and comment on important documents in the case, attend important hearings if [] attendance is required[,] participate in discovery[,] participate in settlement discussions, attend trial, if necessary, and authorize settlement on behalf of the class as well as approve any attorneys' fee and costs requests by counsel." Dkt. 38-1 ¶ 7.  But when shown this very paragraph of his sworn declaration at deposition, here is what Mr. Sherbondy said:  "Q.  So is there a single thing in paragraph 7 that you are in fact able and willing to do?  A.  No, there's not too much I'm willing and able to do." Ex. 23 (D. Sherbondy) 140:9-12 (discussing Ex. 24; *see* Ex. 23 (D. Sherbondy) 134:16-25).

12

Indeed, Mr. Sherbondy says performing the duties he swore he could perform would be "close to an impossibility" for him. *Id.* 113:21-114:7. He's unwilling to perform any of them, including authorizing a settlement. *Id.* 134:16-140:12. Even if the case could be settled, he "[a]bsolutely [does] not" have "any experience that would qualify [him] to approve attorneys' fees and cost requests." *Id.* 140:4-8.

Mrs. Sherbondy could not salvage this disaster. As she acknowledges, her husband is the person who "makes the decisions" about whether to invest; as she put it, he's the "boss." *Id.* 32:10-12; Ex. 25 (S. Sherbondy) 26:7-20. Like her husband, Mrs. Sherbondy has completely deferred to counsel in all aspects of the case. She was "not sure" whether she reviewed the complaint before its filing, guessing that, if she had, she spent maybe 30 minutes doing so. *Id.* 71:9-72:17. And Mrs. Sherbondy "did not review the [proposed] amended complaint" because her "attorneys took care of it" and she "trust[s] their word." *Id.* 106:17-107:5.

Mrs. Sherbondy was also asked at her deposition whether she was "willing and able to authorize a potential settlement on behalf of the class," as she had certified she would. Like her husband, she gave a one-word answer: "No." *Id.* 87:12-15; Ex. 23 (D. Sherbondy) 139:9-15. That testimony is completely disqualifying.

In light of the Sherbondys' deposition testimony, it is impossible to see how they will "check the otherwise unfettered discretion of counsel in prosecuting the suit." *See, e.g.*, *Welling* v. *Alexy*, 155 F.R.D. 654, 659 (N.D. Cal. 1994). The Sherbondys have "effectively abdicated [their] supervisory role, choosing instead to allow counsel to manage and control the litigation, in contravention of the PSLRA's stated goals." *Shiring*, 244 F.R.D. at 316.

### 2.    The Sherbondys' claims are not typical.

As the Trust noted in its opposition to the Sherbondys' application to be lead plaintiffs, "the Sherbondys did not purchase shares of Altria stock until *after* information concerning the

13

actual risks to Altria's future financial and operational results began to be disclosed to the market." Dkt. 39 at 4. The Sherbondys made *all* of their purchases after the first alleged corrective disclosure, Dkt. 27-1 at 2, when FDA Commissioner Scott Gottlieb revealed that "he had a 'difficult' meeting the prior week with Altria and JUUL," SAC ¶¶ 494-95, and after the second corrective disclosure, Dkt. 27-1 at 2, when FDA announced an investigation into people suffering from seizures after vaping. Compl. ¶¶ 478-79. And the Sherbondys made almost *two-thirds* of their purchases after CNBC reported that Gottlieb stated he didn't "know how JUUL" would get regulatory approval to stay on the market. SAC ¶¶ 507-08.

Under the law, "[t]he timing of the [Sherbondys'] purchases undermines any causal nexus between the Defendants' alleged misrepresentation[s] and the resulting injury." *In re Cardinal Health, Inc.*, 226 F.R.D. 298, 310 (S.D. Ohio 2005); *George* v. *China Auto. Sys., Inc.*, 2013 WL 3357170, at *16-17 (S.D.N.Y. July 3, 2013) ("Such post-disclosure purchases can both defeat typicality and adequacy as well as rebut the presumption that plaintiff relied on the alleged misrepresentations or the integrity of the market in making his or her purchases."); *In re Bridgestone*, 430 F. Supp. 2d 728, 735 (M.D. Tenn. 2006) ("Plaintiff's claim must fail if the 'truth' was revealed to the market before she purchased.").[1]

The timing of the Sherbondys' *sale* of Altria stock also undermines their claims. They sold all of their Altria stock on October 14, 2019, Dkt. 27-1 at 2, after they uncovered that Altria and JUUL supposedly "weren't honest with their deal." Ex. 25 (S. Sherbondy) 45:18-46:7. While the Sherbondys say they uncovered the fraud in October 2019, the rest of the class they seek to represent evidently had not, with five of the alleged corrective disclosures, which span

---

[1] It's true that one district court in the Fourth Circuit held that post-disclosure purchases do not render a class representative atypical. *See In re Computer Scis. Corp.*, 288 F.R.D. 112, 124 (E.D. Va. 2012). But there, only a small fraction of the stock was purchased post-disclosure. *Id.*

into the spring of 2020, still yet to occur. *In re IMAX*, 272 F.R.D. 138, 148-55 (S.D.N.Y. 2010)

(plaintiff subject to unique defenses where it sold its stock before corrective statements).

B.    **Construction Laborers Pension Trust.**

1.    **The Trust is an inadequate class representative.**

Congress issued an "emphatic command that competent plaintiffs, rather than lawyers,

direct [securities] cases." *Shiring*, 244 F.R.D. at 316. But the Trust's counsel, Robbins Geller, is

in the driver's seat. As with the Sherbondys, all of the Trust's knowledge about the case comes

directly from Robbins Geller. The Trust's chairman, Donald Willey, testified that the Trust did

not even know it had invested in Altria securities until after it was contacted by Robbins Geller

on November 20, 2019. Ex. 26 (Willey) 36:1-10, 48:11-49:25. *See Ogden* v. *AmeriCredit*

*Corp.*, 225 F.R.D. 529, 535 (N.D. Tex. 2005) (denying motion for class certification where

"counsel has provided the vast majority of the knowledge that [plaintiff] does possess").

The Trust has a "longstanding relationship" with Robbins Geller. Ex. 26 (Willey) 103:5-

8. The firm identifies potential suits like this one under a portfolio monitoring agreement, *Id*.

99:22-100:2, the type of arrangement that has been criticized for "creat[ing] a clear incentive for

the [law firm] to discover 'fraud' in the investments it monitors and to recommend … that [the

client], at no cost to itself, bring a class action lawsuit." *In re Kosmos Energy Ltd.*, 299 F.R.D.

133, 149 (N.D. Tex. 2014). Here, after being contacted by Robbins Geller, the Trust asked no

questions and entered into a retention agreement providing that Robbins Geller would indemnify

the Trust against all claims related to the action, including sanctions. Ex. 26 (Willey) 92:15-

95:15.

Even after bringing suit, the Trust has shown no interest in controlling and directing this

litigation. Other than preparing for his deposition, Willey has had no contact with lead counsel.

*Id.* 112:9-13. And his knowledge of the facts of the case are minimal at best. Willey could not

15

explain how any of the corrective disclosures revealed fraud on the part of Altria, *id.* 121:18-126:12, and he spent just 15-20 minutes reviewing the complaint. *Id.* 70:8-14. That is "nowhere near the time a meaningful review would require." *See In re Enron Corp.*, 529 F. Supp. 2d 644, 733 (S.D. Tex. 2006). In cases like this, where a plaintiff has not "taken a supervisory role — in any shape or fashion — over his counsel," courts have not hesitated to rule that he is inadequate. *See, e.g.*, *Monroe*, 2007 WL 2461746, at *4.

Remarkably, neither the Trust nor its counsel bothered to talk to the Trust's investment manager, D.L. Carlson, about the Altria investment before suing. Ex. 27 (Johnsrud) 52:17-22. Although Willey is an ERISA fiduciary, he never suggested disinvestment from Altria, a company the Trust was actively accusing of defrauding investors. Ex. 26 (Willey) 120:13-16; 31:21-25; 38:16-21. And so D.L. Carlson continued to hold Altria for the Trust until October 2020, nearly a year after it was appointed lead plaintiff and six months after it filed fraud claims. Ex. 27 (Johnsrud) 191:8-13.

### 2. The Trust's claims are not typical.

Nor are the Trust's claims typical of the class. There is clear evidence the Trust did not rely on the alleged misrepresentations, and its investment advisor has admitted that a number of corrective disclosures did not reveal any "fraud" on Altria's part.

The Trust does not make its own investment decisions. Rather, the Trust gave complete discretion to D.L. Carlson. Ex. 26 (Willey) 30:11-31:20; Ex. 27 (Johnsrud) 28:13-29:9. D.L. Carlson, in turn, entrusted its decisions to invest the Trust's money in Altria to a single individual, Jennifer Johnsrud, who was deposed in this case. *Id.* 19:11-15, 36:10-12, 38:17-19, 50:23-51:4, 128:6-12.

Had the Trust or its counsel spoken to Johnsrud (*i.e.*, performed basic due diligence), they would have learned that Johnsrud's testimony was inconsistent with the Trust's "fraud" theory.

16

From the get-go, she thought Altria dramatically overpaid for JUUL and believed that JUUL was targeting youth with its marketing. Ex. 27 (Johnsrud) 107:18-22; 119:16-23; 122:25-123:3.[2]

Indeed, while plaintiffs allege that they were tricked into believing that JUUL was fairly valued in the deal, on her copy of the press release announcing the deal, Johnsrud circled the $38 billion valuation and wrote "WOW," Ex. 28, explaining at deposition that she made that notation because it "was a ridiculous amount of money for JUUL to be valued at," Ex. 27 (Johnsrud) 107:18-25. "[I]t was incredibly expensive." *Id.* 102:22-103:4.

She went on to testify that by November 2018, "youth usage of vaping products was certainly on [her] mind" and a topic of conversations with her family and friends. *Id.* 94:4-21. And in December 2018, after the deal was announced but before the Trust invested, she huddled with a Wall Street analyst at Stifel about what they believed was JUUL's strategy to "get kids hooked" on its products. *Id.* 119:16-23; 122:25-123:3.

At Johnsrud's deposition, Robbins Geller realized how problematic this testimony was and attempted to get her to take it back. But Johnsrud doubled down, explaining she had reached this conclusion after evaluating JUUL's history, its advertising efforts, and, more generally, the tobacco industry's historical marketing practices. *Id.* 204:17-205:22.

In other words, on Johnsrud's testimony, the Trust was not defrauded. Quite the opposite: Johnsrud invested the Trust in Altria stock in February 2019 because "the stock had dropped rather precipitously in 2018;" "news … had come out about some of the problems with JUUL;" and she thought the stock was "a pretty good deal" at that time. *Id.* 127:4-14.

---

[2] However, Johnsrud otherwise testified that she never reviewed any JUUL press releases, earnings results, analyst presentations, media interviews, congressional testimony, or public statements in making her decisions to invest in Altria. Ex. 27 (Johnsrud) 202:2-203:15.

17

Johnsrud also testified that none of the disclosures she was asked about demonstrated fraud on Altria's part, contradicting the Trust's claims and raising additional unique defenses that the Trust will face. For example, the March 19, 2019 disclosure that Commissioner Gottlieb had a "difficult" meeting with Altria and JUUL did not reveal a "[f]raud" — that didn't even "cross[] my mind." *Id.* 129:23-130:4. Likewise, the August 30, 2019 announcement that FDA and CDC were investigating cases of vaping-related disease did not reveal fraud either: "I don't know how vaping cases and CDC have anything to do with fraud." *Id.* 151:11-152:20.

As Johnsrud acknowledged, "I wouldn't buy stock of a company that I thought was engaging in fraud." *Id.* 132:3-5. But through all of the supposed revelations of fraud, she kept buying Altria until September 2020, long after this lawsuit was filed. *Id.* 190:17-20. And that's a problem. As the Trust itself explained when opposing the Sherbondys' application to be lead plaintiffs: "Purchasing stock after the revelation of alleged fraudulent information … subjects a plaintiff to unique defenses and precludes that plaintiff from serving as a representative party." Dkt. 39 at 4 (citing *Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 179-80 (2d Cir. 1990)); *see also In re Safeguard Scientifics*, 216 F.R.D. 577, 582 (E.D. Pa. 2003) (plaintiff subject to unique defenses because he "increased his holdings … even after public disclosure of the alleged fraud"); *Epstein* v. *Am. Reserve Corp.*, 1988 WL 40500, at *4 (N.D. Ill. Apr. 21, 1988) (denying class certification because post-disclosure purchases subjected proposed class representatives to unique defenses).[3]

---

[3] Johnsrud's knowledge with respect to the alleged fraud means the Trust is very differently positioned than the plaintiff in *In re Computer Sciences Corporation*, where there was no evidence that the plaintiff had either failed to "rely on the market" or "would have purchased at the inflated pre-disclosure price had it known the truth." 288 F.R.D. at 124.

Fundamentally, the fact that D.L. Carlson bought Altria on behalf of the Trust while believing that JUUL had been dramatically overpriced and was marketing to underage users shows that the Trust "did not rely on the integrity of the market," and rebuts the presumption of reliance as to the Trust. *See Halliburton II*, 573 U.S. at 276; *Tsereteli* v. *Residential Asset Securitization Tr. 2006-A8*, 283 F.R.D. 199, 475 n.109 (S.D.N.Y. 2012) (investment advisors' knowledge "imputed" to client). "[A] named plaintiff," like the Trust, "who is subject to an arguable defense of non-reliance on the market" is "atypical of the class under Rule 23(a)(3)." *Rocco* v. *Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007). That itself precludes class certification. *Id.* (denying class certification where lead plaintiff was "atypical" because he bought stock in a company despite the fact that an "ongoing issue [with the company] was known to him"); *George*, 2013 WL 3357170, at *6 (denying class certification where named plaintiff would have to spend "considerable time and resources" defending arguments of non-reliance).

*     *     *

This case is a signal example of lawyer-driven securities litigation. The depositions of the proposed representatives demonstrate that it should never have been brought. They are not adequate and their testimony underscores the deep flaws in the case put forward by plaintiffs' counsel. Their certifications to this court, overseen by class counsel, were not honest. This Court should make clear that these kinds of actions are not proper and deny class certification.[4]

---

[4] Two recent securities class certification decisions, each involving one of the two lead counsel firms here, have sharply criticized the candor and the role of these counsel in connection with the presentation of lead plaintiffs, with the result that both firms were disqualified. *See In re Grupo Televisa*, 2021 WL 2000005, at *3 (S.D.N.Y. May 19, 2021); *In re Grupo Televisa*, 2020 WL 3050550, at *7 (S.D.N.Y. June 8, 2020); *In re Allergan PLC*, 2020 WL 5796763, at *7-8 (S.D.N.Y. Sept. 29, 2020).

## II.        Individualized issues predominate.

The proposed class should not be certified for the further reason that issues common to the class do not "predominate" over individual issues, another critical issue at this stage.  Fed. R. Civ. P. 23(b)(3).  In securities cases, the predominance requirement of Rule 23 focuses primarily on two inquiries:  *first*, whether plaintiffs can show the ability to use common evidence of reliance on the alleged misrepresentations, *see, e.g.*, *Erica P. John Fund, Inc.* v. *Halliburton Co.*, 563 U.S. 804, 810 (2011) ("*Halliburton I*"); and *second*, whether plaintiffs have put forward a model that is capable of measuring only those damages attributable to their theory of liability.  *See, e.g.*, *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 35 (2013).  Plaintiffs here fail both tests.

### A.        Plaintiffs cannot rely on a presumption of reliance.

#### 1.        Absence of price impact will defeat the presumption of reliance.

To recover on their claims, plaintiffs must prove they relied on defendants' alleged misstatements, which is typically an individualized issue.  But in *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988), the Supreme Court endorsed the fraud-on-the-market theory for securities cases, in which "reliance is presumed when the statements at issue become public."  *Stoneridge Investment Partners, LLC* v. *Scientific-Atlanta*, 552 U.S. 148, 159 (2008).  The *Basic* presumption of reliance is premised on the efficient market hypothesis: "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations."  485 U.S. at 246.

But even when plaintiffs show that the securities trade on an efficient market, the *Basic* presumption is rebuttable.  Defendants can "rebut [the *Basic*] presumption in a number of ways, including by showing that the alleged misrepresentation did not actually affect the stock's price — that is, that the misrepresentation had no 'price impact.'"  *Halliburton II*, 573 U.S. at 263-64.  "Any showing that severs the link between the alleged misrepresentation and either the price

20

received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248.

The Supreme Court held in *Halliburton II* that defendants may rebut the *Basic* presumption at class certification, by showing "that an alleged misrepresentation did not actually affect the market price of the stock." 573 U.S. at 284. If a misrepresentation had no price impact, then *Basic*'s fundamental premise "completely collapses, rendering class certification inappropriate." *Id.* at 283. But in the wake of *Halliburton II*, a number of district courts had glossed over the price impact requirement at the class-certification stage, stopping short of a full-blown analysis of the evidence out of concern that doing so might tread on merits issues. *See, e.g.*, *In re Allstate Corp.*, 966 F.3d 595, 600, 614 (7th Cir. 2020).

This June, the Supreme Court addressed these questions in *Goldman Sachs Group, Inc.* v. *Arkansas Teacher Retirement System*, 141 S. Ct. 1951 (2021). The Court has now clarified what types of evidence should be considered in assessing price impact at class certification, and the answer is ***all of it***. "[C]ourts 'should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense.'" *Id*. at 1960 (quoting *Allstate*, 966 F.3d at 613 n.6). As the Court ruled: "On remand, the Second Circuit must take into account *all* record evidence relevant to price impact, regardless whether that evidence overlaps with materiality or any other merits issue." *Id.* at 1961.

*Goldman* also lays out the key question in considering price impact. Under an "inflation-maintenance" theory, which plaintiffs are advancing in this case,[5] "price impact is the amount of price inflation maintained by an alleged misrepresentation — in other words, the amount that the

---

[5] Ex. 30 (Nye) 56:7-10 ("[P]laintiffs' theory of liability ... is a price maintenance style theory of liability."), 108:6-14.

stock's price would have fallen 'without the false statement.'" *Goldman*, 141 S. Ct. at 1961 (citation omitted). Plaintiffs typically try to prove the amount of inflation indirectly, backcasting from corrective disclosures. That is, "[t]hey point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation." *Id.*[6]

Of course, if there is no statistically significant price movement resulting from the disclosure, then there is no inference of price impact. But quantitative analysis does not end the inquiry. Qualitative factors matter too. As the Supreme Court explained: The inference "that the back-end price drop equals front-end inflation … starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Id.* If such a "mismatch" exists, "it is less likely that the specific disclosure actually corrected the generic misrepresentation, which means that there is less reason to infer front-end price inflation — that is, price impact — from the back-end price drop." *Id.*

### 2.    The alleged misrepresentations had no price impact.

Here, undertaking the rigorous analysis required by *Goldman*, the record is clear that the alleged misrepresentations did not impact Altria's stock price. Professor Skinner reviewed Altria's stock price reactions on the dates of the alleged misrepresentations, and he did not find

---

[6] The Supreme Court reserved for another day whether the inflation-maintenance theory is even valid. 141 S. Ct. at 1959 n.1. This theory is not accepted in all Circuits. It impermissibly weakens plaintiffs' burden at class certification by suggesting they need not affirmatively demonstrate alleged misstatements actually inflated the stock price. *See, e.g.*, M. Estrada et al., "High Court Should Review Goldman's Maintenance Theory," Law360 (June 24, 2020), tinyurl.com/highcourtshouldreview. The Fourth Circuit has not opined on its validity. Nothing herein should be construed as acceptance of the inflation-maintenance theory, and defendants reserve their rights to argue its invalidity.

any statistically significant stock price increases on those dates.  Indeed, Altria's stock price declined on some of those dates, including December 20, 2018.  Skinner Rpt. ¶ 80-81.

Plaintiffs nonetheless contend the "truth" regarding Altria's JUUL investment was revealed when Altria made eleven allegedly "corrective" disclosures extending over the course of the next fourteen months.  Compl. ¶¶ 477-524.[7]  Plaintiffs propose calculating damages by assuming that the stock drops that occurred in the wake of these "corrective disclosures" is equal to the amount of inflation maintained by the earlier misrepresentations.  Dkt. 222.1, Expert Report of Zachary Nye ("Nye Rpt.") ¶¶ 64-65.  But the record demonstrates that there was no price impact on these dates.[8]

### (a)   Five of Altria's supposed "corrective disclosures" had no statistically significant impact on its stock price.

If an alleged corrective disclosure is not accompanied by a statistically significant price drop, it does not support price impact.  In other words, if the "truth" is allegedly revealed, and the stock price movement doesn't deviate from ordinary market movement on that day, no inference of fraud inflation from the alleged misrepresentations can be drawn.[9]

---

[7] Altria addresses only those corrective disclosures alleged in the operative complaint.  As explained in Section III, plaintiffs' attempt to certify a class based on a complaint they have not been allowed to file and which has not been tested on a motion to dismiss is improper.

[8] At class certification, courts routinely remove corrective disclosures that lack merit.  *See, e.g.*, *Hayes* v. *MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *8 (N.D. Cal. Dec. 22, 2016); *Erica P. John Fund, Inc.* v. *Halliburton Co.* ("*Halliburton Remand*"), 309 F.R.D. 251, 280 (N.D. Tex. 2015); *In re Fed. Nat'l Mortg. Ass'n*, 247 F.R.D. 32, 39-41 (D.D.C. 2008).

[9] *See, e.g.*, *Erica P. John Fund, Inc.* v. *Halliburton Co.*, 309 F.R.D. 251, 269-70 (N.D. Tex. 2015) ("[Halliburton's expert] argues there was no statistically significant price reaction on this date, both with and without adjusting for multiple comparisons. … The Court agrees with Halliburton that there was no price impact on December 21, 2000, and finds that Defendants have rebutted the *Basic* presumption as to the allegedly corrective disclosure made on that date."); *In re Moody's Corp.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011) ("[T]here is no period within the proposed class period where the alleged misrepresentation caused a statistically significant increase in the price or where a corrective disclosure caused a statistically significant decline in the price.  Thus, the reliance presumption for the class as Lead Plaintiffs have defined it is

23

Professor Skinner has shown that eight of the corrective event dates alleged by plaintiffs (following five alleged disclosures) had ***no statistically significant impact*** on Altria's stock price:

| Alleged Disclosure Date | Description | Alleged Disclosure Event Dates | Compl. ¶¶ |
|---|---|---|---|
| 8/30/19 | Announcement of FDA/CDC investigation into vaping-related illnesses. | 8/30/19 | 502-03 |
| 9/9/19 | FDA issues warning letter to JUUL. | NONE | 504 |
| 9/11/19 | Reports on Trump Administration flavor ban. | NONE | 505 |
| 9/23/19 | Reports that federal prosecutors in California were investigating JUUL. | 9/24/19 | 508, 512 |
| 2/21/20 | WSJ reported that the SEC launched an investigation into Altria's JUUL-related disclosures. | 2/24/20 2/25/20 2/26/20 2/27/20 | 521-22 |

Skinner Rpt. § VI.B; *see also* Nye Rpt. Ex. 11B at 5-6, 8 (also finding no statistical significance for seven of these eight dates).[10]  And Professor Skinner found no offsetting news that could account for the lack of price movement.

**(b)    The remaining "corrective disclosures" are also defective.**

With regard to the rest of the alleged corrective disclosures, as *Goldman* makes clear, the courts must consider qualitative factors as well.  141 S. Ct. at 1960-61.  Here, those factors refute

---

successfully rebutted and the class cannot be certified."); *In re REMEC Inc.*, 702 F. Supp. 2d 1202, 1266 (S.D. Cal. 2010) ("the decline in stock price … must be statistically significant"); *see also Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 346-47 (2005) (complaint "fail[ed] to claim that Dura's share price fell *significantly* after the truth became known" (emphasis added)).

[10] As explained in the Federal Judicial Center's *Reference Manual on Scientific Evidence* 251-52 (3d ed. 2011), the conventional measure of statistical significance is the 95% confidence level. Courts have held that a confidence level below 95% "is not sufficient evidence of a link between the corrective disclosure and the price."  *In re Moody's Corp.*, 274 F.R.D. 480, 493 n.11 (S.D.N.Y. 2011); *see, e.g.*, *Halliburton Remand*, 309 F.R.D. at 270.  Indeed, Dr. Nye's own report relies on a 95% confidence interval to analyze statistical significance.  Nye Rpt. pp. 26-27.

any inference of price impact, such that none of these alleged corrective disclosures can be used to demonstrate the impact of Altria's alleged misstatements either. As Professor Skinner has shown, there is a mismatch between the alleged misrepresentations and the alleged corrective disclosures. Skinner Rpt. § VI.C.

**April 3, 2019**. Plaintiffs allege that Altria's stock price declined because "FDA announced its investigation into nearly three dozen recent cases of people suffering from seizures after vaping." Compl. ¶¶ 478-479; Skinner Rpt. ¶¶ 147-151. But the announcement doesn't mention JUUL. It pertains to the entire vaping industry. Plaintiffs' own complaint notes that these "recent cases" dated back to 2010, years before JUUL even existed. Compl. ¶ 478. More than that, FDA acknowledged in the release that it had drawn no conclusions at the time, Ex. 34, p. 2, and there has *never* been any evidence linking these seizures to JUUL's products. This is exactly the type of alleged corrective disclosure that presents a "mismatch" with the alleged fraud, severing any inference of price impact relating to the alleged misrepresentations. *Goldman*, 141 S. Ct. at 1961.

**August 29, 2019**. Plaintiffs allege that Altria's stock price declined when the press reported an FTC investigation into JUUL's historical marketing practices. Compl. ¶¶ 500-501; Skinner Rpt. ¶¶ 143-145. But two years later, this investigation has never led to any charges. Courts have repeatedly held that "the commencement of [a governmental] investigation, without more, is insufficient to constitute a corrective disclosure for purposes of § 10(b)." *Meyer* v. *Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013). That is because "[t]he announcement of an investigation reveals just that—an investigation—and nothing more." *Id.*; *see also Loos* v. *Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) ("[A]nnouncement of an investigation … is insufficient to establish loss causation."); *In re Almost Family, Inc.*, 2012 WL 443461, at *13

25

(W.D. Ky. Feb. 10, 2012) ("Numerous federal district courts have held that a disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure.").

Indeed, in this case, *six* of the eleven "corrective disclosures" involve the announcement of an "investigation" with no follow-on disclosures. In the year or more since these announcements, none of the investigations have led to enforcement proceedings against JUUL, let alone findings that JUUL or Altria did anything wrong.

Moreover, on the "common sense" inquiry mandated by *Goldman*, investors had everything they needed to evaluate JUUL's marketing for themselves before the announcement of any investigation. After all, marketing is, by its nature, out in the open. Plaintiffs here devote pages of their complaint to pictures of the Vaporized campaign to argue that it was targeted at underage users. Defendants dispute that assessment, but the point is that investors and anyone else could look at the campaign and decide for themselves whether it targeted youth. As one analyst put it, "everyone has an opinion on JUUL." Ex. 17 at '727. This is information that plaintiffs' own expert admitted "would be reflected in [Altria's] price." Ex. 30 (Nye) 32:9-21.

**September 12, 2019**. Plaintiffs further allege that on September 13, 2019, Altria's stock price declined because the previous day, New Jersey announced possible restrictions on e-cigarette use, and the CDC announced cases of vaping-related lung disease. Compl. ¶¶ 506-507; Skinner Rpt. ¶¶ 147-151. Again, this "corrective disclosure" isn't specific to JUUL—and again, the diseases weren't caused by JUUL's products. The CDC has since confirmed that most of these lung injuries were due to users of e-cigarettes adding marijuana and vitamin E acetate purchased from black-market sources. Ex. 29. Once again, it is hard to imagine more of a "mismatch" than exists here. As a matter of common sense, plaintiffs cannot rely on news about vaping-related illnesses *not caused by JUUL's products* to demonstrate the impact of alleged

26

misrepresentations about JUUL's marketing on Altria's stock price.  This is yet another mismatched "corrective disclosure."

**September 25, 2019**.  Plaintiffs allege that Altria's stock price declined 17 cents on the news that Altria and PMI were calling off merger discussions, that JUUL was the subject of another federal investigation, that JUUL was replacing its CEO, and that JUUL would stop all U.S. advertising.  Compl. ¶¶ 511-512; Skinner ¶¶ 132-136.  As an initial matter, *there is no statistically significant price movement on this date*.  Skinner Rpt. ¶ 134; Nye Rpt., Ex. 11B, p. 6.  Moreover, these supposed "corrective events" have little to do with the alleged misrepresentations in the case.  None of the alleged misrepresentations have to do with PMI and Altria calling off merger discussions.  The notion that merger discussions being called off in September 2019 revealed that Altria misled the market in December 2018 about underage marketing is almost farcical.  So too with the other JUUL-related news — how does JUUL getting a new CEO reveal the alleged "fraud" on the part of Altria?

**October 31, 2019**.  Plaintiffs allege Altria's stock price declined when Altria announced third-quarter earnings and informed the market it was taking a $4.5 billion impairment charge on its JUUL investment.  Compl. ¶¶ 517-518.  Professor Skinner's report refutes any inference of price impact on this date.  Skinner Rpt. ¶¶ 113-131.  First, *the stock price decline on this date was not statistically significant*.  *Id.* ¶ 115.  While there was other confounding news on this date, given it was the date of Altria's earnings release, analyst commentary around the impairment charge makes clear that the market expected the charge prior to its announcement.  *Id.* ¶¶ 120-123.  The size and timing of Altria's impairment charges were right in line with the widely reported write-downs taken by other major sophisticated investors in JUUL like Fidelity.  *See, e.g.*, Ex. 31.  And the market's expectations regarding the impairment would have already

27

been reflected in Altria's stock price, further refuting any inference of price impact relating to the write-down. Skinner Rpt. ¶¶ 117-124. In fact, D.L. Carlson's witness, Jennifer Johnsrud, acknowledged she was not surprised at all by the size or timing of the write-down. Ex. 27 (Johnsrud) 170:12-20.

**January 30, 2020**. Plaintiffs allege Altria's stock price declined when Altria announced a second impairment charge on its JUUL investment. Compl. ¶¶ 519-20; Skinner Rpt. ¶¶ 152-163. This alleged disclosure came months after plaintiffs brought this very lawsuit alleging fraud and months after Altria had warned investors further impairments on its JUUL investment were possible, expressly pointing to the possibility of further adverse regulatory and litigation developments. Ex. 32, pp. 56-57, 82, 85. For example, Altria warned that further adverse developments "could result in additional impairment charges to Altria's investment in JUUL in future periods." *Id.* at 57. Altria also warned about "the risks generally related to our investments in JUUL…, including … domestic or international litigation developments … and impairment of our investments." *Id.* at 82, 85; Skinner Rpt. ¶¶ 156-58. Thus, when the write-down occurred, analyst commentary suggested it was no surprise, pointing to other adverse disclosures on that day, including mixed earnings news and an inability to provide forward guidance on certain metrics pertaining to its cigarette business that analysts were remarking made Altria "uninvestable." Skinner Rpt. ¶¶ 160-61. The notion that the reaction to this January 30, 2020 announcement suggests price impact stretching all the way back to alleged misrepresentations from more than a year earlier is attenuated and fundamentally unsound.

**February 21, 2020**. Plaintiffs allege that Altria's stock price declined when the SEC announced an investigation into Altria's disclosures around the JUUL investment and then

28

declined further on February 24, 25, 26, and 27 based on the same news.  Compl. ¶¶ 521-22; Skinner Rpt. ¶¶ 102-09, 137-42.  There are three fundamental problems with this claim:

*First*, this multiday price decline is inconsistent with the efficient market hypothesis on which the *Basic* presumption depends.  Skinner Rpt. ¶¶ 105-09; *see also In re Merck & Co.*, 432 F.3d 261, 269 n.5 (3d Cir. 2005) ("We have defined an efficient market as that in which 'information important to reasonable investors ... is immediately incorporated into stock prices.'" (quoting *In re Burlington Coat Factory*, 114 F.3d 1410, 1425 (3d Cir. 1997) (Alito, J.)); *Halliburton Remand*, 309 F.R.D. 251, 270 (N.D. Tex. 2015) ("[T]he Court finds that the use of a two-day window is inconsistent with an efficient market…").

*Second*, the price declines on February 24, February 25, February 26, and February 27 are not even statistically significant; on those days, the broader market was down significantly based on news regarding COVID's emergence in the U.S.  Skinner Rpt. ¶ 103 (2/24/20-2/27/20); Nye Rpt., Ex. 11B at 8 (2/25/20-2/27/20).  Moreover, since the allegedly corrective news story appeared on a Friday, investors had the entire weekend to analyze the news, so it would (at the absolute latest) have been incorporated into Altria's opening price on Monday, February 24.  Skinner Rpt. ¶ 107.  But Altria actually *performed better* than the market and its peer companies from the close of trading on Friday to the open of trading on Monday.  *Id.*

*Third*, as with several of the corrective disclosures above, the February 21 announcement merely discloses an investigation by the SEC, and yet another investigation with no follow-on disclosure.  Again, investigations that do not result in any further developments do not, without more, reveal price impact.  *See supra*, pp. 25-26.  Academic research shows, unsurprisingly, that companies' stock often declines when an SEC investigation is announced, whether it leads anywhere or not.  Skinner Rpt. ¶ 141.

\*    \*    \*

Because the record demonstrates no price impact attributable to the alleged misstatements when the truth was supposedly revealed, defendants have "sever[ed] the link" between the alleged misstatements and Altria's stock price, and putative class members thus must make individualized showings of reliance that would overwhelm any common issues. *Goldman*, 141 S. Ct. at 1958 (quoting *Basic*, 485 U.S. at 248). The absence of price impact causes the *Basic* presumption to "'completely collapse[], rendering class certification inappropriate.'" *Id*. at 1959. As a result, this Court should decline to certify the proposed class.

### B. Plaintiffs have not demonstrated that damages are measurable on a classwide basis.

This Court should not certify a class for the additional reason that plaintiffs have proffered no model for measuring classwide injury. In order to meet the predominance requirement, plaintiffs bear the affirmative burden of proving that damages can be calculated on a classwide basis consistent with their theory of liability. *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33-34 (2013). Under *Comcast*, "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." 569 U.S. at 35. In the words of the D.C. Circuit, "[n]o damages model, no predominance, no class certification." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013).

Plaintiffs and their expert have put forward no classwide damages model. And the only "methodology" proffered by Dr. Nye is entirely generic and falls "far short of establishing that damages are capable of measurement on a classwide basis," as the law requires. *Comcast*, 569 U.S. at 34. It is precisely the type of vague and empty promise that courts have rejected. *See,*

*e.g.*, *Loritz* v. *Exide Techs.*, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015) (plaintiffs'

"general techniques for computing damages in securities fraud cases" insufficient under

*Comcast*).[11]  *See* Skinner Rpt. § VII.

### 1.    Plaintiffs fail to provide any information about how they would actually calculate damages on a classwide basis in this case.

Plaintiffs try to satisfy their *Comcast* burden in a conclusory, four-paragraph discussion

of a hypothetical damages calculation in their expert report.  Nye Rpt. ¶¶ 64-67.  This is as

lawyer-driven as their class representative certifications.  Dr. Nye is a professional plaintiffs'

expert, the only job he has had since his twenties.  Ex. 30 (Nye) 214:25-215:19, 218:25-219:5,

222:8-223:6.  He has never published in a peer-reviewed academic journal, but he has sat for

eleven depositions in 2020 and expects to sit for ten in 2021.  Nye Rpt. Ex. 1, p. 2; Ex. 30 (Nye)

218:8-19.  Dr. Nye copies and pastes this same one-size-fits-all damages "methodology" into his

class certification reports from case to case with virtually no changes.  *See, e.g.*, Ex. 33 (redlining

Nye's damages section against another recent Nye report); Ex. 30 (Nye) 174:7-13 ("Q.  Is that

methodology tailored to this case or is that methodology put forward in other cases?  A.  Oh, it's

the same as in other cases.  It's the general events study damages estimation methodology ….").

Dr. Nye admitted he had not applied his methodology to the facts of this case, such that

he would have an actual model to defend.  *Id*. 93:7-21.  He admitted he had not done any work to

---

[11] *See also, e.g.*, *Ohio Pub. Emps. Ret. Sys.* v. *Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *19 (N.D. Ohio Aug. 14, 2018) (rejecting an expert's assertion "that there are unspecified 'tools' available to measure damages" as equivalent to "no damages model at all"); *Ft. Worth Emps.' Ret. Fund* v. *J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 141-42 (S.D.N.Y. 2014) (declining to certify class because plaintiffs' expert merely "mention[ed] three methods" and failed to provide the court with "assurance beyond [the expert's] say-so" that "there [was] a damages model that [would] permit the calculation of damages on a classwide basis"); *Sicav* v. *Wang*, 2015 WL 268855, at *6 (S.D.N.Y. Jan. 21, 2015) (declining to certify class because plaintiffs failed to show, "concretely, how [they] propose[d] to reliably establish damages").

match the alleged misstatements to the alleged corrective disclosures in this case. *Id.* 116:13-117:1. And he testified that the Court's distinction as to what theory of liability may be pursued here is entirely irrelevant to him. *Id.* 110:13-22 (explaining that this Court's "observation about youth usage posing different risks to the value of JUUL than the alleged marketing schemes to directly target youths has no relevance to [his] evaluation").

When pressed for details about how his "methodology" accounted for any of the difficulties posed by plaintiffs' theory of liability, Dr. Nye made vague references to "various tools" he could use, none of which he described, and claimed that "everyone knows what I'm talking about." *Id.* 145:6-146:7, 131:23-25; *but see Ohio Pub. Emps. Ret. Sys.* v. *Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *19 (N.D. Ohio Aug. 14, 2018) (rejecting as equivalent to "no damages model at all" an expert's assertion "that there are unspecified 'tools' available to measure damages").[12] As Professor Skinner explains, none of this amounts to a model that could actually be used to assess damages in this case. Skinner Rpt. § VII. And a copy-and-pasted methodology that hasn't been tested can't satisfy plaintiffs' burden here.

### 2. Dr. Nye makes no attempt to identify how he would measure damages from the materialization of the allegedly understated risks.

Plaintiffs themselves argue this is a "materialization of the risk" case. Dkt. 255 at 8. Materialization of the risk is a theory of loss causation. On plaintiffs' theory, Altria did not

---

[12] The recent decision in *In re Allergan PLC*, 2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021), is not to the contrary. The Court there found "no indication that Nye's damages model incorporates price inflation attributable to already-dismissed theories of liability." *Id.* at *14. Here, there is more than an indication — there is an admission. Dr. Nye admitted at his deposition that this Court's "observation about youth usage posing different risks to the value of JUUL than the alleged marketing schemes to directly target youths has no relevance to [his] evaluation." Ex. 30 (Nye) 110:13-22. *Allergan* also involved a single corrective disclosure, meaning that it presented substantially fewer complexities for a damages methodology than the complicated, sprawling, and overlapping set of corrective disclosures put forward here.

sufficiently disclose the risks of the JUUL investment as a result of its secret youth marketing plot, and plaintiffs were harmed when those concealed risks materialized on the corrective disclosure dates.  *E.g.*, Compl. ¶ 455.  But that theory has consequences for how damages need to be calculated — which Dr. Nye ignores.  *See* Skinner Rpt. ¶¶ 182-197.

Even when a company has accurately described the risks it faces, its stock price can drop when risks materialize.  Suppose investors put money in a company bringing a risky medication to market, and the company accurately tells the market there is a 50% chance the drug will get approved.  The stock will still drop on the announcement that the drug wasn't approved.  Thus, even where the risk of non-approval is understated, the correct measure of damages isn't the entire stock drop.  *See, e.g.*, *Ludlow* v. *BP, P.L.C.*, 800 F.3d 674, 689-90 (5th Cir. 2015); Skinner Rpt. ¶¶ 189-191.  Giving all plaintiffs in materialization-of-the-risk cases the entire stock drop, including plaintiffs who would have purchased even if they knew the true likelihood of the risk, would be overcompensating them by providing them insurance against the risk, something this Circuit has made clear is not the purpose of the securities laws.  *See Raab* v. *Gen. Physics Corp.*, 4 F.3d 286, 291 (4th Cir. 1993) ("[T]he securities laws do not serve as investment insurance.").

A classwide damages model in a materialization of the risk case would thus have to quantify the degree to which the risk was understated, something that Dr. Nye has not addressed. Coming up with such an approach would be particularly difficult in this case, where regulatory risks had been disclosed and the market further understood from vast amounts of public information that JUUL faced regulatory and litigation threats relating to its historical marketing efforts.  As Professor Skinner explains, quantifying the difference between the risks that were

disclosed and the risks that allegedly should have been disclosed is not something that an "event study"[13] would be able to address.  Skinner Rpt. ¶¶ 182-197.  Dr. Nye offers no other solution.

To the contrary, Dr. Nye freely admitted that his methodology doesn't change whether he is looking at a corrective disclosure or a materialization of the risk.  Ex. 30 (Nye) 138:20-139:4.  This doesn't make any sense — they are two different theories.  There is no basis to discern how Dr. Nye could possibly calculate the hypothetical "but-for" stock price if, on plaintiffs' theory, Altria had provided a fuller disclosure of the risks of its JUUL investment than it did.

There is also no way to discern how Dr. Nye would account for investors who would have purchased even knowing the true risks.  In that respect, this case is very similar to *Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015).  There, the Fifth Circuit held that a damages model based on the "materialization of the risk" theory did not satisfy *Comcast*.  *Id.* at 689-91.  The plaintiffs claimed that BP created a fraudulent impression that the risk of catastrophic failure was lower than it actually was.  *Id.* at 689.  And they argued that the investors could recover the price decline in the form of damages when the risk of an oil spill materialized.  The Fifth Circuit disagreed, holding that "the materialization-of-the-risk model cannot be applied uniformly across the class, as *Comcast* requires, because it lumps together those who would have bought the stock at the heightened risk with those who would not have," even though those two classes of investors require different damages models.  *Id.* at 691.  This is no mere hypothetical here:  the Trust itself bought Altria stock knowing the investment had heightened risks.  *See supra* Section I.B.2.  Yet Dr. Nye's "framework" makes no attempt to distinguish those who would have bought the stock at the heightened risk from those who would not have.

_____

[13] "Event studies" are "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." *Halliburton II*, 573 U.S. at 280.  Professor Skinner explains this methodology in his report at ¶¶ 60-63.

34

**3.      Dr. Nye makes no attempt to explain how he would develop a model to control for confounding information unrelated to Plaintiffs' theory of liability.**

"[R]ecovering out-of-pocket damages based on the market price of a security (as Plaintiffs have sought) 'require[s] elimination of that portion of the price decline that is the result of forces unrelated to the wrong … so as to limit recovery to "actual damages on account of the act complained of.'" *See Miller* v. *Asensio & Co.*, 364 F.3d 223, 232 (4th Cir. 2004).  But Dr. Nye's "framework" provides no way of separating out portions of the stock drops attributable to other causes, as Fourth Circuit law requires.  *See* Skinner Rpt. ¶¶ 204-07.

This failure is particularly problematic in this case.  This Court and plaintiffs themselves have already recognized that several factors specific to Altria could cause declines in Altria's stock — only some of which are potentially actionable as securities fraud.  Plaintiffs have been clear that they are alleging "fraud, not mismanagement" by Altria, and that they "do not challenge the decision to invest in JUUL, nor the valuation ascribed to JUUL."  Dkt. 126 at 23, 36 n.13.  And this Court's ruling on the motions to dismiss distinguished "the problem of youth usage" from plaintiffs' theory about "JUUL's direct efforts to target youths," noting that "[t]hese different problems pose different risks to the value of JUUL and, resultingly, the value of Altria."  Dkt. 140 at 25.  But the alleged corrective disclosures at issue here inherently capture both issues, and Dr. Nye has not proposed a model for disentangling the effects.

Take, for example, the decline in Altria's stock price that plaintiffs allege accompanied the announcement of the first impairment charge.  Compl. ¶¶ 517-18.  Dr. Nye himself summarizes the analyst commentary on the first impairment charge, noting that there was a "mix of information disclosed" and that the "$4.5 billion write-down of [Altria's] investment in JUUL 'suggest[ed] money was not wisely invested.'"  Nye Rpt., Ex. 12, p. 137.  Since plaintiffs say they are not challenging the decision to invest in JUUL, Dr. Nye's damages model would need to

35

somehow exclude the decline in Altria's stock price on this date attributable to, as he puts it in his report, the suggestion that money was not wisely invested in JUUL. But nothing in Dr. Nye's methodology explains how he could possibly do this. Nye Rpt. ¶ 65.

### 4.    Dr. Nye makes no attempt to explain how his methodology would account for such a lengthy class period.

Even if there are cases where Dr. Nye's simplistic methodology would work, this isn't one of them. Plaintiffs here allege a sweeping class period with numerous alleged misstatements and numerous alleged corrective disclosures. New information was emerging about JUUL and the e-vapor industry throughout the entire class period. The market was therefore becoming progressively more informed about the risks of Altria's JUUL investment as time went on. Plaintiffs' own smorgasbord of alleged corrective disclosures make clear that new information regarding the e-vapor industry appeared over this period.

This creates enormous complications for Dr. Nye because less "new" information was revealed on each alleged disclosure date. *See* Skinner Rpt. ¶¶ 199-203. But any measure of damages on the materialization of risk theory here needs to account for the changes in price inflation on days between alleged corrective disclosures. In other words, simply adding up the stock drops, as Dr. Nye proposed, would not account for new, adverse developments that investors learned of in between the stock drops. While Dr. Nye brushes all this off, *Comcast* stands for the fact that a court cannot simply accept plaintiffs' word that they can calculate classwide damages where there are "specific complications that would make such a calculation impossible or ill-advised." *In re Diamond Foods, Inc.*, 295 F.R.D. 240, 252 (N.D. Cal. 2013).

*          *          *

Plaintiffs have put forward no reliable model or methodology for calculating damages on a classwide basis. Their reference to a generic report by their litigation expert, who has made

36

little or no effort to engage with the facts of this case or the complexities arising from plaintiffs' theory of liability, does not satisfy their burden under *Comcast*.

> **C.     The size of the proposed class and the large number of alleged corrective disclosures and misrepresentations create individualized issues that defeat predominance.**

Plaintiffs have alleged a class of investors covering a period of sixteen months that includes no fewer than fifteen corrective disclosures, to defendants' knowledge an unprecedented number in this Circuit.  As plaintiffs would have it, because defendants concealed the regulatory risks to JUUL, anything bad that happened to JUUL thereafter can be related back to that alleged concealment, essentially turning the securities laws into the type of investment insurance that the Fourth Circuit has held to be improper.  *Raab*, 4 F.3d at 291.   This approach will not result in a class that is "sufficiently cohesive to warrant adjudication by representation."  *Amchem*, 521 U.S. at 623.  Each new batch of investors who bought after a previous corrective disclosure (or revelation of "fraud") would face unique issues of materiality, loss causation, and damages.

For example, materiality turns on the "total mix of information made available."  *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 38 (2011).  But investors who bought after Dr. Gottlieb's warning that he didn't think JUUL would get a PMTA on June 21, 2019 would have a harder time claiming they were in the dark about regulatory risks to JUUL than those who had bought before.  And those who bought after the announcement of a federal investigation into JUUL's marketing practices on September 23, 2019 would have a harder time still.  Moving forward in time, as the total mix of information changes, individuals within the class would face their own (more difficult) liability and damages issues based on the events disclosed to the

marketplace.  Such variations in materiality over lengthy class periods have persuaded courts to deny class certification in securities fraud cases.[14]

Moreover, throughout the class period, there were adverse announcements concerning JUUL that had no significant impact on Altria's stock price, but that would nonetheless impact the question of liability and damages.  *See* Ex. 38.  For example, on January 4, 2019, The New York Times reported FDA was "accusing Juul and Altria of reneging on promises they made to the government to keep e-cigarettes away from minors."  Ex. 35.  On April 15, 2019, Florida parents filed a lawsuit alleging JUUL and Altria "engaged in a conspiracy to hook teenagers on nicotine."  Ex. 36.  In July 2019, Congress held hearings on JUUL's marketing practices, focusing on "the problem of youth vaping and Juul's role in it."  Ex. 37.  Such developments, none of them accompanied by significant stock price declines, confirmed that JUUL faced pronounced regulatory and litigation risks.  Investors who bought after those developments would have a harder time advancing a concealment-of-the-risk theory than those who bought before.  With each development, the notion that investors could continue to be misled by things Altria said back in December 2018 becomes more and more attenuated and improbable, raising individualized issues within the proposed class.

And the balkanization of the class does not stop there.  Plaintiffs allege numerous separate misrepresentations and disclosures over the course of more than a year, which would likewise inject individualized issues that are not common to the proposed class as a whole.

_____

[14] *See, e.g.*, *J.H. Cohn & Co.* v. *Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 998 (7th Cir. 1980) (a purchaser early in the class period "would face a different question of proof on the materiality issue" than a later purchaser "after a great deal more information concerning [the issuer] was available"); *Morris* v. *Wachovia Sec., Inc.*, 223 F.R.D. 284, 300-01 (E.D. Va. 2004) (denying class certification where "materiality will involve a piecemeal and individualized assessment of the import of any given disclosure to each member of the purported subclass").

38

**III.    The request to certify the class in the proposed amended complaint is procedurally and legally flawed.**

On the day they submitted their motion for class certification, plaintiffs filed a motion for leave to file a new amended complaint that seeks to expand the class at the front and back ends and add still more corrective disclosures.  Defendants have opposed that motion, and plaintiffs have not yet been given permission to file their proposed pleading.  If their motion is granted, defendants will move to dismiss the new claims, triggering the PSLRA's automatic statutory stay.  *Sedona Corp.* v. *Ladenburg Thalmann*, 2005 WL 2647945, at *3 (S.D.N.Y. Oct. 14, 2005).

The automatic stay implicates not only discovery, but all other proceedings, including class certification.  *Spears* v. *Metro. Life Ins.*, 2007 WL 1468697, at *54 n.2 (N.D. Ind. May 17, 2007); *In re ValuJet, Inc.*, 984 F. Supp. 1472, 1482 (N.D. Ga. 1997) (staying motion for class certification in light of the PSLRA).  To defendants' knowledge, since the PSLRA, no court has certified a class alleged in a proposed complaint for which leave to amend hasn't been granted and which hasn't been tested on a motion to dismiss.  This case should not be the first.

The proposed amendment is legally flawed in multiple ways that would infect class certification.  For example, as discussed in defendants' opposition to plaintiffs' request for leave, Dkt. 245 at 22-23, the new proposed class members who purchased *before* the JUUL investment would have no standing to challenge any of the alleged disclosures in the amended complaint.  *See Halliburton II*, 573 U.S. at 268 (under *Basic*, a plaintiff must show "that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed" "to demonstrate that the presumption of reliance applies in a given case").

Likewise, those investors would also be barred by statute of limitations from pursuing most of the claims as originally pled.  *Merck & Co.* v. *Reynolds*, 559 U.S. 633, 637 (2010) (citing 28 U.S.C. § 1658(b)(1)); *In re Eaton Corp.*, 2017 WL 4217146, at *4, *6 (S.D.N.Y. Sept.

39

20, 2017) (courts have rejected attempts like this to "expand the class" after "the two-year statute of limitations expire[s]").[15]

These issues and others must be tested on a motion to dismiss before a class pled in an unapproved pleading may be certified.

**IV.     In the alternative, the Court should cut off the class period on September 25, 2019, the last alleged corrective disclosure pled in the original complaint.**

Alternatively, if the Court is inclined to grant plaintiffs' motion, the Court should exercise its discretion either to certify a liability class only or cut off the class period on September 25, 2019, the last corrective disclosure date in the initial complaint.  Courts have held that when "a subsequent disclosure made continued reliance on [alleged misrepresentations] unreasonable," the presumption of reliance is rebutted as of the date of the disclosure.  *Hayes* v. *MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *8 (N.D. Cal. Dec. 22, 2016).  Here, plaintiffs filed the initial complaint in this case on October 2, 2019, alleging virtually the same "fraud" as the one pled in their operative complaint.  *See, e.g.*, Dkt. 1, ¶ 5.  In other words, plaintiffs have alleged that the "fraud" was revealed as of that filing — a fact that is irreconcilable with their assertion that the same fraud continued to be "revealed" over and over again for the next six months.

**CONCLUSION**

For all of these reasons, defendants respectfully request that the Court deny plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel.

---

[15] Moreover, plaintiffs' attempt to extend the class backward to October 25, 2018 is logically flawed.  *See* Skinner Rpt. ¶¶ 222-226.  There is no way Altria investors could have been damaged by alleged misrepresentations about JUUL's marketing if they bought Altria stock before they had any inkling Altria was investing in JUUL — as the class members at the start of that period necessarily did.  To the extent plaintiffs' theory of liability differs for this class of investors, Dr. Nye's model would need to account for that, which it cannot.

Dated:  September 17, 2021

Respectfully Submitted,

/s/ Edward J. Fuhr
Edward J. Fuhr (VSB No. 28082)
Eric H. Feiler (VSB No. 44048)
Johnathon Schronce (VSB No. 80903)
HUNTON ANDREWS KURTH LLP
951 East Byrd Street
Richmond, VA  23219
804-788-8200 (telephone)
804-788-8218 (facsimile)
efuhr@hunton.com
efeiler@hunton.com
jschronce@hunton.com

Stephen R. DiPrima (*pro hac vice*)
Jonathan M. Moses (*pro hac vice*)
Adam L. Goodman (*pro hac vice*)
Adam Sowlati (*pro hac vice*)
Jacob Miller (*pro hac vice*)
Wilfred T. Beaye, Jr.  (*pro hac vice*)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
212-403-1000 (telephone)
212-403-2000 (facsimile)
srdiprima@wlrk.com
jmmoses@wlrk.com
algoodman@wlrk.com
asowlati@wlrk.com
jmiller@wlrk.com
wtbeaye@wlrk.com

*Attorneys for Altria Group, Inc.*

Rani Habash (VSB No. 78541)
DECHERT LLP
1900 K Street NW
Washington, DC 20006
Telephone: (202) 261-3300
rani.habash@dechert.com

Andrew J. Levander (*pro hac vice*)
Jeffrey A. Brown (*pro hac vice*)
DECHERT LLP
Three Bryant Park

41

1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
andrew.levander@dechert.com
jeffrey.brown@dechert.com

*Counsel for Howard A. Willard III*
Beth Wilkinson (*pro hac vice*)
James Rosenthal (*pro hac vice*)
Matthew Skanchy (VSB #89575)
Hayter Whitman (*pro hac vice*)
WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-2000
bwilkinson@wilkinsonstekloff.com
jrosenthal@wilkinsonstekloff.com
mskanchy@wilkinsonstekloff.com
hwhitman@wilkinsonstekloff.com

*Counsel for William F. Gifford, Jr.*

Andrew Clubok (*pro hac vice*)
J. Christian Word (VSB #46008)
Susan E. Engel (*pro hac vice*)
Matthew J. Peters (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: 202-637-2200
Facsimile: 202-637-2201
andrew.clubok@lw.com
christian.word@lw.com
susan.engel@lw.com
matthew.peters@lw.com

*Counsel for Kevin C. Crosthwaite*

42

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2021, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the Eastern District of Virginia by using the CM/ECF system, which will send a Notification of Electronic Filing to all parties in this case.

/s/ Edward J. Fuhr
Edward J. Fuhr (VSB No. 28082)
