UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

Richmond Division

|  |  |
|---|---|
| GABBY KLEIN, et al.,<br><br>                Plaintiffs,<br><br>                v.<br><br>ALTRIA GROUP, INC., et al.,<br><br>                Defendants. | Civil Action No. 3:20-cv-00075 |

EXPERT REPORT OF DOUGLAS J. SKINNER, PH.D.

September 17, 2021

# Table of Contents

I.　Qualifications, Compensation, and Materials Relied Upon...........................................1

　　A.　Compensation ...........................................................................................2

　　B.　Materials Relied Upon ..............................................................................3

II.　Assignment ...................................................................................................................3

III.　Summary of Opinions...................................................................................................3

　　A.　In my opinion, there was no price impact with respect to eight alleged corrective event dates and, for the remaining seven, there is substantial doubt as to whether any stock price changes on these dates can be used as evidence of earlier price impact...................................................................4

　　B.　Dr. Nye does not offer a viable model or methodology capable of calculating damages on a class-wide basis. ......................................................5

IV.　Background ...................................................................................................................6

　　A.　Altria, JUUL, and FDA..............................................................................6

　　B.　Altria's Investment in JUUL......................................................................9

　　C.　Public Disclosures of Youth Usage and JUUL's Marketing Practices Prior to Altria's Investment .........................................................................10

　　　　1.　Youth Usage of Vaping Products .........................................................11

　　　　2.　News, Regulatory Inquiries, and Litigation Involving JUUL's Alleged Marketing Practices.................................................................13

　　D.　Public Disclosures of Regulatory Risks to JUUL and the E-Vapor Industry from Before and After Altria's Investment ......................................15

　　E.　Summary of Allegations .............................................................................19

　　F.　Market Capitalization Declines on Alleged Corrective Event Dates..............22

V.　Securities Price Behavior in an Efficient Market .........................................................25

　　A.　Market Efficiency ......................................................................................25

　　B.　Event Study Methodology ..........................................................................27

　　　　1.　Event Studies ......................................................................................27

　　　　2.　Dr. Nye's Event Study .........................................................................29

　　　　3.　My Event Study ...................................................................................32

VI.　There Was No Price Impact with Respect to Eight Alleged Corrective Event Dates and, For the Remaining Seven, There Is Substantial Doubt as to Whether Any Stock Price Changes on These Dates Can Be Used as Evidence of Earlier Price Impact.....35

　　A.　There Was No Statistically Significant Movement In Altria's Stock Price on Days with Alleged Misrepresentations, Except One Day When The Movement Was Negative and Statistically Significant ...................................35

B.     Altria's Stock Price Did Not React to Allegedly Corrective Information on Eight Alleged Corrective Event Dates ...................................................... 36

     1.     General Testing Approach .................................................. 36

     2.     August 30, 2019 ................................................................ 37

     3.     September 9, 2019 ............................................................ 39

     4.     September 11, 2019 .......................................................... 40

     5.     September 24, 2019 .......................................................... 41

     6.     February 24–27, 2020 ...................................................... 43

C.     Substantial Doubt Exists as to Whether Any of Altria's Stock Price Changes on the Other Seven Alleged Corrective Event Dates Can Be Used as Evidence of Prior Price Impact of the Alleged Misrepresentations ... 46

     1.     Additional Alleged Corrective Event Dates without Statistically Significant Stock Price Changes ........................................... 47

     2.     Additional Alleged Corrective Event Date with Investigation – August 29, 2019 .................................................................. 59

     3.     Additional Examples of Mismatch between the Contents of Alleged Misrepresentations and the Alleged Corrective Events ......... 60

VII.     Dr. Nye Does Not Offer a Viable Model or Methodology Capable of Calculating Damages on a Class-Wide Basis ......................................................................... 67

A.     Dr. Nye Fails to Propose a Methodology that Can Be Used to Assess Damages in This Case ......................................................................... 69

B.     Dr. Nye Fails to Provide a Methodology to Measure Inflation under Plaintiffs' Materialization of Concealed Risks Theory of Liability ................ 73

C.     Dr. Nye Fails to Present a Methodology to Assist the Trier of Fact in Determining Whether a Particular Stock Price Drop in the Future Was "Foreseeable" Earlier in the Putative Class Period ........................................ 78

D.     Dr. Nye Fails to Provide a Damages Methodology that Could Take into Account the Changing Mix of Information over the Putative Class Period .... 79

E.     Dr. Nye Fails to Provide a Methodology Capable of Reliably Separating the Stock Price Effect of Allegedly Corrective Information from the Effect of News that Is Not Corrective of the Allegations ................................ 80

F.     Proposed Amended Complaint Compounds Problems Associated with Dr. Nye's Damages "Framework" .......................................................... 82

     1.     March 19, 2019 ................................................................ 83

     2.     June 21, 2019 ................................................................... 84

     3.     November 19, 2019 .......................................................... 85

     4.     April 1, 2020 ................................................................... 86

### I.      Qualifications, Compensation, and Materials Relied Upon

1.      I am Deputy Dean for Faculty and Eric J. Gleacher Distinguished Service Professor of Accounting at the University of Chicago, Booth School of Business.  I have been a tenured full professor at the University of Chicago since 2005.  Prior to my appointment at Booth, I was the KPMG Professor of Accounting at the Ross School of Business, University of Michigan, where I held tenured and tenure-track appointments from 1989 until 2005 and served as chair of the accounting department.

2.      I hold a B. Econ. (First Class Honors in Accounting and Finance) from Macquarie University in Sydney and a M.S. and Ph.D. (Applied Economics: Accounting and Finance) from the University of Rochester.  I have taught undergraduate students, full-time and part-time MBA students, Executive MBA students, executives, consultants, and Ph.D. students.  I have taught introductory financial accounting, intermediate financial accounting, accounting for financial instruments, corporate financial reporting and analysis, financial statement analysis, managerial (cost) accounting, corporate finance, investments, and valuation.  Of note, since the mid-1990s, first at the University of Michigan and now at the University of Chicago, I have taught Ph.D. and other graduate students a first-year course in research methodology that forms the basis for all empirical work in accounting, financial economics, and corporate finance.  A thorough grounding in and understanding of research methodology is the basis for understanding, conducting, and evaluating all empirical work in economics, including in financial economics and accounting.  Most recently, I have taught Corporate Finance and Valuation, as well as Managerial Accounting, in our Executive MBA program.

3.      My teaching experience also includes teaching at international campuses in Asia (Japan, Korea, Hong Kong, Singapore) as well as in London and at the University of Melbourne, and so includes experience with international accounting rules (IFRS) as well as U.S. GAAP.

4.      I am a Senior Editor of the *Journal of Accounting Research*, one of the leading academic accounting journals in the world.  Before moving to Chicago, I was Co-Editor of the *Journal of Accounting and Economics*, also one of the world's leading accounting journals, a position I held since 2000.  I have also served as an editor of the *Review of Accounting Studies*, and for several terms on the editorial board of *The Accounting Review*.  I

am a member of the American Accounting Association and the American Finance Association. I frequently present my research at major accounting and finance conferences and at prominent universities. I have supervised doctoral students who have accepted faculty positions at major business schools around the world, including Stanford, Harvard, Wharton, Columbia, Cornell, Michigan, MIT, Yale, and Chicago.

5.    I have published research on a variety of topics in accounting, auditing, capital markets, investments, and corporate finance, including: how security prices respond to corporate disclosures (including event studies of earnings disclosures); managers' incentives to release or withhold their private information about corporate earnings (known as earnings "guidance"); whether the "earnings management" practices of corporate managers can improve their firms' valuation on capital markets; how the economic incentives of various corporate claimants, such as shareholders and debtholders, affect firms' financial reporting, disclosure, and capital management decisions; how accounting information is used in contracts between the various corporate stakeholders; and the nature of corporate debt agreements.

6.    My research is published in top-tier accounting and finance journals, including *The Accounting Review*, the *Journal of Accounting and Economics*, the *Journal of Accounting Research*, *The Journal of Business*, *The Journal of Finance*, and the *Journal of Financial Economics*. My research has been featured in articles in *The Wall Street Journal*, *The New York Times*, *The Financial Times*, *The Economist*, and *Business Week*.

7.    I serve as an Independent Trustee and chair of the Audit Committee of Harbor Funds.

8.    A copy of my curriculum vitae, including publications, is attached as Appendix A. A list of my previous testimony in the past four years is attached as Appendix B.

### A.    Compensation

9.    My rate of compensation for work on this matter is $925 per hour. In my work on this matter, I have been assisted by personnel at Cornerstone Research. I supervised all work performed by Cornerstone Research in connection with this report, and the opinions I express in this report are my own. I receive a portion of collected staff billings from Cornerstone Research for the work they performed under my direction in this matter.

Payment for my work or those working under my direction on this matter is in no way contingent on the opinions I express or the outcome of this matter.

### B.    Materials Relied Upon

10.     In preparing this report, I have relied upon my education and professional experience in the areas of accounting, corporate finance, valuation, and investments; documents produced in this matter; publicly available information, such as academic articles and analyst reports; and other materials. Appendix C lists documents and other sources of information that I have relied upon in forming my opinions in this matter. My work in this matter is ongoing. I may supplement the analysis in this report if further information comes to light.

### II.    Assignment

11.     I have been retained by counsel for Altria Group, Inc. ("Altria" or the "Company") to evaluate whether movements in Altria's stock price at the time of the alleged corrective events in the Corrected Consolidated Class Action Complaint[1] are evidence the alleged misrepresentations impacted Altria's stock price earlier in the Putative Class Period.[2] In addition, I have been asked to review and respond to the report submitted by Dr. Zachary Nye dated August 6, 2021 ("Nye Report")[3] and, specifically, whether Dr. Nye has provided a model or methodology capable of reliably measuring class-wide damages in a manner consistent with Plaintiff's theories of liability in this matter.

### III.    Summary of Opinions

12.     According to the Complaint, around the time that Altria's investment in JUUL was announced in December 2018, the Defendants made misrepresentations about JUUL's

---

[1] Corrected Consolidated Class Action Complaint, *Gabby Klein, et al v. Altria Group, Inc., et al.*, July 2, 2020 ("Complaint"). Note that I refer to the Proposed First Amended Consolidated Class Action Complaint, *Gabby Klein, et al v. Altria Group, Inc., et al.*, August 6, 2021 as the "Proposed Amended Complaint" and the proposed class period in the Proposed Amended Complaint (October 25, 2018 through April 1, 2020) as the "Amended Complaint Class Period."

[2] Here and throughout the remainder of this report, I refer to misstatements or omissions collectively as "misrepresentations."

[3] Expert Report of Zachary Nye, Ph.D., *Gabby Klein, et al v. Altria Group, Inc., et al*, August 6, 2021.

marketing practices and concealed (or understated) the risk of future adverse regulatory action or litigation against JUUL and Altria, and that, as a result, Altria's share price was artificially inflated.  Plaintiffs claim that over the course of 14 months following the announcement of the deal, there were 11 "corrective events" (or "corrective disclosures")— that allegedly impacted Altria's stock price on 15 event dates—through which the alleged fraud was revealed.  According to Plaintiffs, when the "truth" emerged as the "corrective events" occurred (including developments where risks allegedly materialized), share price inflation was removed from Altria's stock price and investors were harmed.  Altria's cumulative market capitalization decline on those 15 corrective event dates was $29.7 billion, more than twice the amount of Altria's $12.8 billion investment in JUUL and approximately a third of the market capitalization of the entire company on December 20, 2018.[4]

13.     Based on my review and analysis to date, I find that:  1) I reach an affirmative opinion that there was no price impact with respect to eight of the alleged corrective event dates.  As for the remaining seven event dates, given the mismatch between the contents of the alleged corrective events and the alleged misrepresentations, there is substantial doubt as to whether any stock price movements on these dates can be used as evidence of earlier price impact; and 2) Dr. Nye does not offer a viable model or methodology capable of calculating damages on a class-wide basis.

> **A.     In my opinion, there was no price impact with respect to eight alleged corrective event dates and, for the remaining seven, there is substantial doubt as to whether any stock price changes on these dates can be used as evidence of earlier price impact.**

14.     Based on my review and analysis:

- First, I note that there was no statistically significant movement in Altria's stock price on days with alleged misrepresentations, except one day when the movement was negative and statistically significant.  In order to address Plaintiffs' possible contention that price impact could be inferred from stock price declines on the dates

---

[4] Altria's cumulative market capitalization decline of $29.7 billion is calculated as the sum of Altria's market capitalization declines across the corrective event dates alleged in the Complaint.  The calculation does not account for Altria's stock price increases on September 9, 2019 or September 11, 2019.  Altria's market capitalization decline on a given day is calculated as Altria's stock price change (less any dividends on ex-dividend dates) multiplied by Altria's shares outstanding on the prior trading day except for February 21, 2020.  For February 21, 2020, the calculation uses a decline of $0.29, the intraday stock price decline alleged in the Complaint, ¶522, instead of Altria's close-to-close stock price change.  Altria's market capitalization on December 20, 2018 was $94.8 billion (1.879 billion shares outstanding times a closing per share price of $50.44).

they identify as alleged corrective event dates, I analyze Altria's stock price changes on those dates to investigate whether there was evidence of price impact of the alleged misrepresentations.

- Second, for eight of the alleged corrective event dates I do not find statistically significant and negative stock price movements, and my review of the news on those dates indicates that there was no positive news that could have offset what would otherwise have been negative and statistically significant stock price movements on these dates. As a result, I conclude that there is no evidence that what Plaintiffs allege to be corrective information impacted the price of Altria's stock on these dates.

- Third, in my view there is substantial doubt about whether any of Altria's stock price movements on the remaining seven alleged corrective event dates can be used as evidence that the alleged misrepresentations had previously impacted Altria's stock price. Most notably, there is a mismatch between the contents of the alleged corrective events and the alleged misrepresentations, which raises substantial doubt as to whether any stock price movements on the dates of these alleged corrective events can be used as evidence of earlier price impact of the alleged misrepresentations.

### B. Dr. Nye does not offer a viable model or methodology capable of calculating damages on a class-wide basis.

15.     Dr. Nye fails to put forth a model or damages methodology that could reliably measure class-wide damages in a manner consistent with Plaintiffs' theories of liability in this matter. Instead, he asserts, apparently without taking into account the allegations and Plaintiffs' theories in this case, that damages can be measured on a class-wide basis using an event study (which he suggests he would perform at some later date). I disagree that an event study alone constitutes a damages methodology that can adequately address the challenges of this case and so reliably measure damages according to Plaintiffs' theories of liability in this case.

- First, as discussed below, this matter requires a damages methodology capable of reliably measuring the extent to which certain risks were supposedly concealed and the damages associated with any such alleged concealment of risks. Dr. Nye fails to provide a methodology that can properly address this. In fact, the generic event study that he proposes to use on the alleged corrective event days cannot differentiate between stock price declines due to the materialization of allegedly concealed risks and those due to adequately disclosed risks. Therefore, Dr. Nye's approach, under which he proposes to use stock price declines in response to materializations of risks to estimate damages, would systematically overstate damages attributable to allegedly concealed risks.

- Second, Dr. Nye fails to provide a damages methodology capable of disentangling that portion of any stock price decline caused by the alleged corrective events from stock price declines due to other factors that affected the stock price on alleged corrective event days but that are not causally linked to the allegations.

- Third, Dr. Nye fails to propose a damages methodology that could account for changes that likely occurred over the course of the Putative Class Period in the market's perception of regulatory and litigation risk.  Measuring these changes is necessary to ensure that inflation could be reliably measured on a daily basis for class members purchasing and selling Altria's stock throughout the Putative Class Period.

- Fourth, Dr. Nye fails to address further challenges that result from the additional theory of liability that Plaintiffs put forth in the Proposed Amended Complaint, as well as additional alleged misrepresentations and alleged corrective events, which only serve to compound the problems with the approach that he puts forth.  For example, Dr. Nye fails to indicate how his damages "framework" could be adapted to properly calculate inflation from the misrepresentations alleged on October 25, 2018, *before* investors even knew Altria was contemplating an investment in JUUL.  To put this point in sharp relief, the sum of all price declines on the corrective event dates alleged in the Proposed Amended Complaint is $41.5 billion, which is *more than three times* Altria's investment in JUUL.[5]  If one were to rely on a simplistic back-casting approach to assess the effect of these but-for disclosures on Altria's equity value before its investment in JUUL, and do this on the basis of the results from Dr. Nye's event study regression on those alleged corrective event dates for which he finds statistically significant residual returns, one would conclude that Altria's value would have fallen by approximately $29.4 billion on *October 25, 2018*, and so by *more than twice* the amount of Altria's entire eventual investment in JUUL.[6]

In conclusion, Dr. Nye's proposed damages "framework" fails to tackle the most important challenges in this case and so fails to provide a viable basis to calculate damages on a class-wide basis in this matter.

### IV.    Background

#### A.    Altria, JUUL, and FDA

16.    Altria is a holding company with wholly-owned subsidiaries that operate primarily in the U.S. tobacco sector, with common stock traded on the New York Stock

---

[5] Altria's cumulative market capitalization decline of $41.5 billion is calculated as the sum of Altria's market capitalization declines across the corrective event dates alleged in the Proposed Amended Complaint.  The calculation does not account for Altria's stock price increases on September 9, 2019 or September 11, 2019.  Altria's market capitalization decline on a given day is calculated as Altria's stock price change (less any dividends on ex-dividend dates) multiplied by Altria's shares outstanding on the prior trading day except for February 21, 2020.  For February 21, 2020, the calculation uses a decline of $0.29, the intraday stock price decline alleged in the Proposed Amended Complaint, ¶546, instead of Altria's close-to-close stock price change.
[6] $29.4 billion is calculated based on the corrective event dates alleged in the Proposed Amended Complaint for which Dr. Nye finds negative and statistically significant residual returns.  The decline for a given day is calculated as the residual dollar decline on a given day (calculated using Dr. Nye's event study regression results) multiplied by Altria's shares outstanding on the prior trading day except for February 21, 2020.  See Nye Report, Exhibit 11B.  For February 21, 2020, $0.29, the intraday stock price decline alleged in the Proposed Amended Complaint, ¶546, is used as the dollar decline instead of the residual dollar decline based on Dr. Nye's event study regression results.

Exchange ("NYSE") under the ticker symbol "MO."[7]  Altria's subsidiaries manufacture and sell "cigarettes," "machine-made large cigars and pipe tobacco," "moist smokeless tobacco products," "snus products," and "wine" in the United States.[8]  Altria also holds non-controlling equity stakes[9] in Anheuser-Busch InBev SA/NV ("AB InBev") and Cronos Group Inc. ("Cronos"), both of which are publicly traded.[10]  AB InBev is a drink and brewing company and Cronos is a Canadian cannabinoid company.[11]  As shown in Exhibit 1, tobacco products accounted for approximately 97% of Altria's net revenues in 2018–2020,[12] with cigarettes and/or combustibles products accounting for approximately 88% of net revenues.[13]

17.    Prior to the Putative Class Period (and the Amended Complaint Class Period), Altria had worked to develop nicotine-based products that reduced health risks to customers relative to conventional tobacco-based products, including electronic cigarettes ("e-cigarette"

---

[7] Altria, Form 10-K for the Fiscal Year ended December 31, 2018, filed on February 26, 2019 ("Altria 2018 Form 10-K"), p. 13; "Altria Stock Performance," Altria, https://investor.altria.com/stock-performance/default.aspx?src=topnav.

[8] "At December 31, 2020, Altria's wholly owned subsidiaries included Philip Morris USA Inc. ("PM USA"), which is engaged in the manufacture and sale of cigarettes in the United States (including super premium cigarettes previously manufactured and sold by Sherman Group Holdings, LLC and its subsidiaries ("Nat Sherman")); John Middleton Co. ("Middleton"), which is engaged in the manufacture and sale of machine-made large cigars and pipe tobacco and is a wholly owned subsidiary of PM USA; UST LLC("UST"), which through its wholly owned subsidiaries, including U.S. Smokeless Tobacco Company LLC ("USSTC") and Ste. Michelle Wine Estates Ltd. ("Ste. Michelle"), is engaged in the manufacture and sale of moist smokeless tobacco products ("MST"), snus products and wine; and Philip Morris Capital Corporation ("PMCC"), which maintains a portfolio of finance assets, substantially all of which are leveraged leases."  Altria Group, Inc., Form 10-K for the Fiscal Year ended December 31, 2020, filed on February 26, 2021 ("Altria 2020 Form 10-K"), p. 1.  See also Altria Group, Inc., Form 10-K for the Fiscal Year ended December 31, 2019, filed on February 25, 2020 ("Altria 2019 Form 10-K"), p. 1; Altria 2018 Form 10-K, p. 1.

[9] During the third quarter of 2019, Altria's subsidiary Helix Innovations LLC ("Helix") acquired Burger Söhne Holding, its subsidiaries and certain affiliated companies (the "Burger Group") that commercialized on! oral nicotine pouches (tobacco-derived nicotine).  As a result of the acquisition, Helix was 80% owned by Altria and 20% owned by former shareholders of the Burger Group.  Altria Group, Inc., Form 10-Q filed on October 31, 2019, p. 11.  Altria's investment of $353 M for 80% of Helix is less than 0.5% of Altria's market cap of $76.4 billion on September 30, 2019. CRSP.

[10] See Altria 2018 Form 10-K, pp. 53–55; Altria 2019 Form 10-K, pp. 59–60; Altria 2020 Form 10-K, pp. 69–70.  See also Altria Press Release, "Altria Becomes Largest Shareholder in Cronos Group, a Leading Global Cannabinoid Company," March 8, 2019.  "Anheuser-Busch InBev is a publicly traded company (Euronext: ABI) based in Leuven, Belgium, with secondary listings on the Mexico (MEXBOL: ANB) and South Africa (JSE: ANH) stock exchanges and **with American Depositary Receipts on the New York Stock Exchange (NYSE: BUD)**." See "ABInBev Share Information—Listings," AB InBev, https://www.ab-inbev.com/investors/share-information/listings/, emphasis added.  "**Cronos Group is listed on the NASDAQ** and the Toronto Stock Exchange and trades under the ticker symbol CRON." See "Cronos Group Investor FAQs," Cronos, https://ir.thecronosgroup.com/investor-faqs, emphasis added.

[11] Anheuser-Busch InBev SA/NV Form 20-F filed on March 22, 2019, p. 29; Anheuser-Busch InBev SA/NV, Form 20-F filed on March 23, 2020, p. 29; Anheuser-Busch InBev SA/NV Form 20-F filed on March 19, 2021, p. 31; Cronos Group Inc., Form 10-K, for the Fiscal Year ended December 31, 2019, filed on March 2, 2020, p. 3; Cronos Group Inc., Form 10-K for the Fiscal Year ended December 31, 2020, filed on February 26, 2021, p. 4.

[12] Altria 2020 Form 10-K, p. 27.

[13] Altria 2020 Form 10-K, p. 27.

or "e-vapor"). The market for combustible cigarettes sales had been in decline,[14] and e-cigarettes emerged as a potentially less harmful alternative. Altria entered the e-vapor market in August 2013 with *MarkTen* e-cigarettes.[15] In 2014, Altria expanded its product offerings through an acquisition of an e-vapor product called *GreenSmoke*.[16]

18.    JUUL Labs Inc. ("JUUL" or "JLI") is a private company that engages in "the manufacture and sale of e-vapor products globally."[17] Its main product is the JUUL Device, a vaporizer (or e-cigarette) that includes an electronic nicotine delivery system in a form known as a "pod" device (as opposed to more traditional "cig-a-like" devices that had previously dominated the category).[18] The product was developed by PAX Labs and introduced to the market in June 2015.[19] The JUUL Device became "the best-selling e-cigarette on the market" which some attributed to its "nicotine-salt formulation, as well as its engineering."[20]

19.    On May 10, 2016, the Food & Drug Administration ("FDA") issued a rule to regulate e-vapor products as "tobacco products" under the Family Smoking Prevention and Tobacco Control Act.[21] As a result, every e-vapor manufacturer with a product on the market prior to August 8, 2016 was required to submit an application to "undergo premarket review and receive authorization from FDA permitting the product's sale and distribution" by August 8, 2018.[22]

20.    In July 2017, FDA announced a new comprehensive plan for tobacco and nicotine regulation, under which it recognized a "continuum of risk for nicotine delivery,"

---

[14] "Cigarette Sales in the U.S. Continue Historic Decline into the First Quarter of 2019," JUUL, https://www.juullabs.com/cigarette-sales-in-the-u-s-continue-historic-decline-into-the-first-quarter-of-2019/.
[15] Altria Group, Inc. Form 10-Q filed on July 24, 2013, p. 70.
[16] "In April 2014, Nu Mark acquired the e-vapor business of Green Smoke, Inc. and its affiliates ("Green Smoke"), which has been selling e-vapor products since 2009." Altria Group Inc., Form 10-K for the Fiscal Year ended December 31, 2014, filed on February 25, 2015, p. 2.
[17] Altria 2018 Form 10-K, p. 1; *See also* Altria 2020 Form 10-K, p. 1.
[18] *See* "About Juul Labs," JUUL, https://www.juul.com/about-juul.
[19] JUUL was spun out of PAX Labs into a separate company in 2017. "Startup behind the Lambo of vaporizers just launched an intelligent e-cigarette," *The Verge*, April 21, 2015; "Timeline:  Significant Events in the History of Juul," *Reuters*, September 25, 2019.
[20] "How a startup behind the 'iPhone of vaporizers' reinvented the e-cigarette and generated $224 million in sales in a year," *Business Insider*, November 21, 2017.
[21] "Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act; Restrictions on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products; Final Rule," Federal Register, May 10, 2016, https://www.federalregister.gov/documents/2016/05/10/2016-10685/deeming-tobacco-products-to-be-subject-to-the-federal-food-drug-and-cosmetic-act-as-amended-by-the.
[22] Letter from S. Gottlieb (FDA) to K. Burns (JUUL Labs, Inc.), September 12, 2018.

with "burning cigarettes" on one end of the spectrum, and "less harmful alternative forms, efficiently delivering satisfying levels of nicotine…for adults who need or want them" on the other.[23]  FDA stated that it would "re-double [its] efforts to protect kids from all nicotine-containing products."[24]

21.    About a year and a half later, on December 7, 2018, Altria discontinued its remaining *MarkTen* and *Green Smoke* e-vapor products, citing "the [then-]current and expected financial performance of these products" as well as "regulatory restrictions that burden[ed] Altria's ability to quickly improve these products."[25]  Altria had previously removed its *MarkTen Elite* product and certain flavored products (on October 25, 2018) "in response to [FDA's] September 12, 2018 letter raising serious concerns about underage access to and use of e-vapor products."[26]

### B.    Altria's Investment in JUUL

22.    Altria announced its $12.8 billion investment in JUUL on December 20, 2018.[27]  Rumors of a possible investment in JUUL by Altria had circulated publicly by November, 28, 2018, when *The Wall Street Journal* reported that Altria and JUUL were in discussions regarding a transaction under which Altria would take "a significant minority stake" in JUUL.[28]  Additional details were released on December 19, 2018, when the media reported that Altria and JUUL were nearing a deal that would give Altria a 35% stake in JUUL for an amount that implied a total valuation for JUUL of approximately $38 billion.[29] The next day, Altria and JUUL issued press releases announcing that Altria would take a 35%

---

[23] FDA Press Release, "Protecting American Families: Comprehensive Approach to Nicotine and Tobacco," June 28, 2017.  *See* also FDA Press Release, "FDA announces comprehensive regulatory plan to shift trajectory of tobacco-related disease, death," July 27, 2017.

[24] FDA Press Release, "Protecting American Families: Comprehensive Approach to Nicotine and Tobacco," June 28, 2017.

[25] Altria Press Release, "Altria Refocuses Innovative Product Efforts," December 7, 2018.

[26] Letter from H. Willard (Altria) to S. Gottlieb (FDA), October 25, 2018.

[27] JUUL Labs Press Release, "JUUL STATEMENT ABOUT ALTRIA MINORITY INVESTMENT AND SERVICE AGREEMENTS," December 20, 2018.

[28] "Altria in Talks to Take Significant Minority Stake in Juul Labs," *The Wall Street Journal*, November 28, 2018.

[29] "Altria Is Nearing a Deal to Take a 35% Stake in Juul," *Dow Jones Institutional News*, December 19, 2018; "Deal Would Value Juul at About $38 Billion, Double Its Last Funding," *Dow Jones Institutional News*, December 19, 2018.

equity stake in JUUL for an aggregate price of $12.8 billion, which would value JUUL at $38 billion.[30,31]

23.     Altria disclosed that it would "initially account for its JUUL investment as an investment in an equity security" but would transition to the equity method of accounting upon antitrust approval of the transaction, when the shares it held in JUUL would automatically convert to voting shares and observer representatives on the JUUL board became full board members.[32]  Altria continued to account for the JUUL investment as an investment in an equity security throughout the Putative Class Period.[33]

### C.     Public Disclosures of Youth Usage and JUUL's Marketing Practices Prior to Altria's Investment

24.     Information regarding youth usage of vaping products (including those produced by JUUL) as well as the nature of, and concerns about, JUUL's marketing practices were disclosed or otherwise publicly-available before Altria's investment in JUUL on December 20, 2018.

---

[30] Additional terms of the transaction included a service agreement under which Altria would provide JUUL with access to preferential retail shelf space, cigarette pack inserts, mailings database access, logistical support, and access to Altria's deep regulatory affairs expertise.  Altria also agreed to participate in the e-vapor business only through JUUL as long as Altria is supplying JUUL services, which Altria is committed to doing for at least six years.  The extent to which JUUL would use these services was not known at the time of the announcement, but JUUL shared with the market that, in order to agree to an investment by Altria, it was important that "Altria . . . agreed to provide [JUUL] services that w[ould] accelerate [its] ability to get JUUL in the hands of adult smokers, to which then-CEO Howard Willard emphasized "connect[ing JUUL] directly with adult smokers on [Altria's] Company's databases," and Altria's "deep regulatory affairs expertise," both of which were included in the "service agreements."  *See* Altria Group, Inc., Form 8-K filed on December 20, 2018; JUUL Labs Press Release, "JUUL Statement About Altria Minority Investment and Service Agreements," December 20, 2018; "Altria Group Inc Conference Call to Discuss Investment in JUUL Labs Inc – Final," *Thomson Financial*, December 20, 2018.

[31] On December 20, 2018, S&P Global Ratings and Fitch Ratings downgraded Altria's credit rating from A- to BBB citing "the significant increase in leverage and a shift away from the company's historically conservative financial policy" stemming from the debt used to finance the JUUL and Cronos deals, as well as an "evolving regulatory landscape and growing uncertainty as to how actions by the U.S. Food & Drug Administration (FDA), as well as state and local regulators, could affect tobacco and non-tobacco products, including e-cigarettes."  *See* "S&PGR Dwngrds Altria Group To 'BBB' On JUUL Invstmt; Otlk Stbl," *Dow Jones Institutional News*, December 20, 2018.  *See also*, "Fitch Downgrades Altria's Ratings to 'BBB'; Outlook Stable," *Dow Jones Institutional News*, December 20, 2018.

[32] Altria's interest would begin as $12.8 billion shares of non-voting Class C-1 common stock which would convert to voting Class C common stock upon antitrust approval.  The deal also included a "True-Up Security." *See* Altria Group, Inc., Form 8-K filed on December 20, 2018.

[33] Because JUUL shares did not have a readily determinable fair value, Altria elected to record the investment at cost net of impairment, if any.  *See*, e.g., Altria Group, Inc., Form 10-K for the Fiscal Year ended December 31, 2018, filed on February 26, 2019, p. 55; Altria Group, Inc. Form 10-Q, filed on July 30, 2020, p. 11.

### 1.      Youth Usage of Vaping Products

25.      Information regarding the prevalence of youth usage of vaping products, including JUUL products, had been publicly available before Altria's investment in JUUL. On December 4, 2017, an article on *Shots* (the online channel for health stories from the NPR Science Desk), stated "[t]he JUUL device, with its sleek design that resembles a flash drive, is a special hit with teens."[34] *CBS This Morning* had linked JUUL's product to youth usage on February 26, 2018, stating: "[o]ne brand that has become particularly trendy is JUUL.… It's slick, it's high-tech, it looks like a thumb drive on a computer, which means you can hide it easily. And it gives a very strong hit of nicotine. So this is about an ideal tobacco product to get kids hooked."[35] Similarly, an article in *The Wall Street Journal* on April 24, 2018 that reported "Juul has become a teen status symbol and a growing problem in U.S. schools."[36]

26.      News of youth usage of vaping products had led to regulatory action before Altria made its investment in JUUL.  For example, by March 29, 2018, media reported that in November 2017, "the FDA [had] moved to limit sales of flavored e-cigarette products, such as Juul, to underage users, both in stores and online."[37]  A month later, on April 24, 2018 *The New York Times* reported that "the Food and Drug Administration on Tuesday announced a major crackdown on the vaping industry, particularly on the trendy Juul devices, aimed at curbing sales to young people."[38]  Six days later, a U.S. senator "demand[ed] further federal action to protect youth from JUUL vape products."[39]

27.      On September 12, 2018 FDA sent a letter to manufacturers, including Altria and JUUL, "raising serious concerns about underage access to and use of e-vapor products."[40] The letter demanded "prompt action to address the rate of youth use" of e-vapor products,

---

[34] "Teenagers Embrace JUUL, Saying It's Discreet Enough To Vape In Class," *NPR Shots*, December 4, 2017.
[35] "E-Cigarettes Can Potentially Release Significant Amounts of Toxic Metals in Its Vapors Which Users Inhale," *CBS This Morning News Transcripts*, February 26, 2018.
[36] "Juul E-Cigarettes Face FDA Probe," *The Wall Street Journal*, April 24, 2018.  *See also* "Is your teen 'Juuling'? Why parents and doctors are so worried," *Today*, March 29, 2018; "Experts are calling out a vape pen with 'scary' nicotine levels that teens love—here's how it affects the brain," *Business Insider*, April 19, 2018.
[37] "Is your teen 'Juuling'? Why parents and doctors are so worried," *Today*, March 29, 2018.
[38] "F.D.A. Cracks Down on 'Juuling' Among Teenagers," *The New York Times,* April 24, 2018.  *The Wall Street Journal* also stated in April 2018 that "[t]he Food and Drug Administration on Tuesday said it is moving against the sale of e-cigarettes to minors by targeting Juul Labs Inc., the maker of one of the most popular such products in the U.S."  *See* "Juul E-Cigarettes Face FDA Probe," *The Wall Street Journal*, April 24, 2018.
[39] "Monday: Juuling--Blumenthal To Demand FDA Protect Youth From Latest Stealth Vaping Trend," *Congressional Documents and Publications*, April 29, 2018.
[40] Letter from H. Willard (Altria) to S. Gottlieb (FDA), October 25, 2018.

including "[r]emoving flavored products from the market until those products can be reviewed by FDA."[41]

28.    On October 25, 2018 Altria removed *MarkTen Elite*, its pod product, from the market, and substantially limited its *MarkTen* and *Green Smoke* offerings to "only tobacco, menthol and mint varieties."[42]  Altria stated it "believe[d] e-vapor products present[ed] an important opportunity for adult smokers to switch from combustible cigarettes" but recognized that "the current situation with youth use of e-vapor products, left unchecked, ha[d] the potential to undermine that opportunity for adult smokers."[43]

29.    A few weeks later, JUUL announced "that it would suspend sales of most of its flavored e-cigarette pods in retail stores and would discontinue its social media promotions," only "keep[ing] mint, tobacco, and menthol flavors for its devices in retail stores."[44]

30.    FDA issued a statement after the "call to action" that "[t]he companies acknowledged the role that flavored e-cigarette products play in appealing to kids, as well as the role that flavored e-cigarettes can also play in helping adult smokers quit."[45]  It also stated that "[w]e still believe that new innovations that don't use combustion, such as many e-cigarettes, may offer an important opportunity for adults to transition off combustible tobacco.  We still believe that non-combustible forms of nicotine delivery may be less harmful alternatives for currently addicted adult smokers who still seek nicotine, without the risks associated with combustible cigarettes.  And we want to keep this option for adults open."[46]

31.    On November 1, 2018, a Morgan Stanley report commented that a survey conducted by analysts made them "more convinced about increased regulatory scrutiny."[47]  In

---

[41] Letter from S. Gottlieb (FDA) to K. Burns (JUUL Labs, Inc.), September 12, 2018.
[42] Altria Press Release, "Altria Reports 2018 Third-Quarter and Nine-Months Results:  Tightens 2018 Full-Year Earnings Guidance; Announces Actions to Address Underage E-Vapor Use," October 25, 2018.
[43] Letter from H. Willard (Altria) to S. Gottlieb (FDA), October 25, 2018.
[44] "Juul Suspends Selling Most E-Cigarette Flavors in Stores," *The New York Times*, November 13, 2018.
[45] FDA Press Release, "Statement from FDA Commissioner Scott Gottlieb, M.D., on meetings with industry related to the agency's ongoing policy commitment to firmly address rising epidemic rates in youth e-cigarette use," October 31, 2018.
[46] FDA Press Release, "Statement from FDA Commissioner Scott Gottlieb, M.D., on meetings with industry related to the agency's ongoing policy commitment to firmly address rising epidemic rates in youth e-cigarette use," October 31, 2018.
[47] "Cigarettes Feel a Drag as Smokers 'Pass the JUUL,'" *Morgan Stanley*, November 1, 2018, p. 1, emphasis removed.

addition, the report commented they "expect[ed] the FDA to announce new e-cig policy in November to stem the youth e-cig 'epidemic,'" and for FDA "to focus its policy on cartridge-based e-cigs."[48]

### 2.    News, Regulatory Inquiries, and Litigation Involving JUUL's Alleged Marketing Practices

32.    Prior to the start of the Putative Class Period, JUUL faced a number of regulatory inquiries and lawsuits related to its marketing strategies.  This information was in the public domain.  For example, on April 24, 2018, *The New York Times* reported that "[t]he [FDA] demanded that Juul Labs turn over company documents about the marketing and research behind its products, including reports on focus groups and toxicology, to determine whether Juul [was] intentionally appealing to the youth market despite its statements to the contrary and despite knowing its addictive potential."[49]

33.    In addition, on April 26, 2018 a lawsuit filed against JUUL alleged that "JUUL launched a multi-million dollar marketing campaign targeting children and young adults in an effort to brand the JUUL e-cigarette as a fashion accessory sold in 'limited edition' colors and candy-like flavors."[50]  The next day, Senator Richard Blumenthal asserted that "[JUUL] refuses to cease its marketing to children through candy flavors and youth-oriented accessories and the FDA has yet to ban the practice."[51]

34.    In June 2018, *The Washington Times* published an article titled "JUUL Sales Among Young People Fueled by Social Media" in which it reported that JUUL was "taking advantage of the reach and accessibility of [social media] platforms to target the youth and

---

[48] "Cigarettes Feel a Drag as Smokers 'Pass the JUUL,'" *Morgan Stanley*, November 1, 2018, p. 12, emphasis removed.  Cowen also stated on November 2, 2018 that "[the then-]FDA Commissioner Scott Gottlieb announced that the agency [wa]s 'committed to announcing a new action plan by mid-November' specifically to address youth use of e-cigarettes," and "the FDA ha[d] met with executives at Altria (MO), JUUL, … to discuss characterizing tobacco flavors as well as raising the legal purchase age for tobacco to 21 years old."  *See* "Cowen's Cigarette & Cannabis Circular," *Cowen*, November 2, 2018, pp. 1, 6.
[49] "F.D.A. Cracks Down on 'Juuling' Among Teenagers," *The New York Times,* April 24, 2018.  *See also* Office of the Senator Dick Durbin Press Release, "Durbin & Senators Press JUUL Labs, Inc. For Answers On Marketing Addictive E-Cigarette Vaping Product to Teens, Urge FDA To Take Swift Action," April 24, 2018; "Juul E-Cigarettes Face FDA Probe," *The Wall Street Journal*, April 24, 2018.
[50] Class Action Complaint, *Colgate v. Juul Labs, Inc.*, April 26, 2018, ¶ 2.
[51] "Monday: Juuling--Blumenthal To Demand FDA Protect Youth From Latest Stealth Vaping Trend," *Congressional Documents and Publications*, April 29, 2018.

young adults."[52]  In July 2018, the *Washington Post* published an article describing several lawsuits that aimed to "contradict" JUUL's claim that "its product is for adult smokers only."[53]  And in August 2018, *The New York Times* published an article detailing JUUL's "original sales campaign" which was "aimed at persuading adult smokers in their 20s and 30s to try an alternative to cigarettes" but "failed to gain traction on social media and failed to gain sales" and was thus "abandoned after five months, in the fall of 2015" prior to JUUL's sales "tak[ing] off [in] 2017."[54]

35.     This article was followed by a November 16, 2018 *Forbes* article titled, "The Disturbing Focus of Juul's Early Marketing Campaigns."  *Forbes* purported to trace "Juul's questionable marketing back to its launch campaign, 'Vaporized', [which] featured young-looking models wearing belly-exposing crop tops, ripped jeans and jean jackets with a bright color scheme."[55]  The article added that "[m]any of Juul's early live events were also youth-oriented" with the "primary purpose . . . to distribute free samples of Juul devices and flavor pods to a youthful audience to help establish JUUL in the vapor marketplace" and also that "visitors to Juul's site who entered their email, date of birth and personal information to sign up but were denied access, were still added to Juul's email list-serve and received marketing and discounts…"[56]  The "company's marketing" the article noted "clearly appealed to youth…most overtly from mid-2015 to 2016."[57]

36.     On November 29, 2018, a day after *The Wall Street Journal* reported that Altria was considering investing in JUUL,[58] Alliance Bernstein noted the following regarding JUUL's marketing practices, remarking that "everyone has an opinion on Juul":

> Media coverage in the US reached fever-pitch with an article in the New York in May of this year, suggesting that Juul was purposefully marketing to children. Since then, it seems everyone has an opinion on Juul. In April, the FDA sent Juul a letter requesting that it provide evidence of its marketing practices. And in July the Massachusetts Attorney General opened an

---

[52] "JUUL Sales Among Young People Fueled by Social Media, Says Study," *The Washington Times*, June 4, 2018.
[53] "E-cigarette maker Juul targeted teens with false claims of safety, lawsuit says," *The Washington Post*, July 30, 2018.
[54] "Did Juul Lure Teenagers and Get 'Customers for Life'?" *The New York Times*, August 27, 2018.
[55] "The Disturbing Focus of Juul's Early Marketing Campaigns," *Forbes*, November 16, 2018.
[56] "The Disturbing Focus of Juul's Early Marketing Campaigns," *Forbes*, November 16, 2018.
[57] "The Disturbing Focus of Juul's Early Marketing Campaigns," *Forbes*, November 16, 2018.
[58] "Altria in Talks to Take Significant Minority Stake in Juul Labs," *The Wall Street Journal*, November 28, 2018.

investigation into Juul, claiming that 'way too much of their product is ending up in the hands of young people and ending up in schools'. In September, the FDA followed up with a further statement, that it is concerned about an epidemic of Juul usage among youths, describing the growth of usage as 'epidemic.'[59]

37.     The Alliance Bernstein report raised the question of whether a possible Altria investment in JUUL "[made] sense given the future regulatory risk" in that FDA would "continue to assess whether its recent regulatory actions are having the desired impact of reducing youth usage of e-cigarettes."[60]

**D.     Public Disclosures of Regulatory Risks to JUUL and the E-Vapor Industry from Before and After Altria's Investment**

38.     Information regarding regulatory risks to JUUL and the e-vapor industry generally was disclosed or otherwise publicly-available both before and after Altria's investment on December 20, 2018.

39.     For example, in its 2017 Form 10-K, filed on February 27, 2018, which was the last Form 10-K filed by Altria prior to its investment in JUUL, Altria disclosed:

> Altria Group, Inc. and its subsidiaries have growth strategies involving moves and potential moves into adjacent products or processes, including innovative tobacco products [e.g., Nu Mark and Green Smoke]. Some innovative tobacco products may reduce the health risks associated with current tobacco products…. Examples include tobacco-containing and nicotine-containing products that reduce or eliminate exposure to cigarette smoke and/or constituents identified by public health authorities as harmful…. Our tobacco subsidiaries may not succeed in their efforts to introduce such new products, which would have an adverse effect on the ability to grow new revenue streams.
>
> Further, we cannot predict whether regulators, including the FDA, will permit the marketing or sale of products with claims of reduced risk to adult consumers, the speed with which they may make such determinations or whether regulators will impose an unduly burdensome regulatory framework on such products…
>
> If our tobacco subsidiaries do not succeed in their efforts to develop and commercialize innovative tobacco products or to obtain regulatory approval

---

[59] "Juul: A Jewel in Altria's Crown," *Alliance Bernstein*, November 29, 2018, p. 10, emphasis removed.
[60] "Juul: A Jewel in Altria's Crown," *Alliance Bernstein*, November 29, 2018, p. 2.

for the marketing or sale of products with claims of reduced risk, but one or more of their competitors do succeed, our tobacco subsidiaries may be at a competitive disadvantage.[61]

40.    Similar information was disclosed in Altria's 2016 Form 10-K, filed on February 27, 2017, and Altria's 2018 Form 10-Q for the quarter ending September 30, 2018, filed on October 25, 2018.[62]

41.    Altria disclosed in its 3Q 2018 Form 10-Q, filed on October 25, 2018, that FDA announced in September 2018 that it was taking steps to address underage use of e-vapor products.[63]  In its earnings call on the same day, Altria management noted the regulatory uncertainty associated with underage usage of e-vapor products:

> I don't know that we know exactly what actions [FDA is] going to take.  I would tell you that I am convinced that they are going to take action to address the increase in youth usage and drive it down.  I'm not sure exactly how, but I think they're committed to doing that.[64]

42.    Following Altria's disclosures on October 25, 2018, analysts commented on these regulatory risks.  For example:

- We think the FDA is gathering mounting evidence to support a series of actions meant to radically reduce, if not eliminate, youth access to JUUL-like cartridge-based vapor products including a possible ban on online sales and c-store purchases in addition to restricting certain e-cig flavors.[65]  (Wells Fargo, October 25, 2018)

- It is clear that the FDA wishes to make significant changes to the US vaping market soon.… [W]e have yet to see if the FDA will bring in

---

[61] Altria Group, Inc., Form 10-K for the Fiscal Year ended December 31, 2017, filed on February 27, 2018, p. 7.
[62] "[W]e cannot predict whether regulators, including the FDA, will permit the marketing or sale of products with claims of reduced risk to consumers, the speed with which they may make such determinations or whether regulators will impose an unduly burdensome regulatory framework on such products. Nor can we predict whether adult tobacco consumers' purchasing decisions would be affected by such claims if permitted. Adverse developments on any of these matters could negatively impact the commercial viability of such products. If our tobacco subsidiaries do not succeed in their efforts to develop and commercialize innovative tobacco products [e.g., Nu Mark and Green Smoke] or to obtain regulatory approval for the marketing or sale of products with claims of reduced risk, but one or more of their competitors do succeed, our tobacco subsidiaries may be at a competitive disadvantage." *See* Altria Group, Inc., Form 10-K for the Fiscal Year ended December 31, 2016, filed on February 27, 2017, p. 7.  *See also* Altria Group Inc., Form 10-Q filed on October 25, 2018 ("Altria 3Q 2018 Form 10-Q"), pp. 88–89.
[63] Altria 3Q 2018 Form 10-Q, p. 70.
[64] "Q3 2018 Altria Group Inc Earnings Call," *Thomson Financial*, October 25, 2018.
[65] "MO: Vape 'Em While You Got 'Em," *Wells Fargo*, October 25, 2018, p. 2.

> more aggressive regulations on vaping; if it does, this is likely to prevent more rapid switching from cigarettes.[66]  (Berenberg, October 26, 2018)

- Does it make sense given future regulatory risk? FDA Commissioner Scott Gottlieb was clear in his recent statement, that the FDA will continue to assess whether its recent regulatory actions are having the desired impact of reducing youth usage of e-cigarettes. If they do not (and we are not sure that they will), the FDA will look to take further, incremental action. [67]  (Alliance Bernstein, November 29, 2018)

43.    In addition to risk disclosures that Altria included in its financial statements, at the time of its announcement of the JUUL investment on December 20, 2018, Altria management acknowledged that Altria's investment in JUUL carried risks due to historical underage usage, remarking that youth usage, if not resolved, "put the whole category at risk":

> [W]hat is the risk that you assigned to the idea that JUUL's products ultimately may not receive FDA approval through the PMTA process, given their known association with underage consumption?
> …
> [W]e don't at all discount the fact that youth usage of e-vapor products is a big problem that needs to be resolved. And if it's not resolved, it's going to put the whole category at risk, including for adult cigarette smokers.
> …
> There certainly may be some disruption here as JUUL works to address with the rest of the industry, with the FDA youth usage of the product.[68]

44.    Analysts commented on these regulatory risks on and before December 20, 2018:

- We think there are legitimate questions over the timing and valuation of the deal, however. If the recently announced measures to implement tighter age verification at the point of sale do not slow the rate of teenage nicotine consumption, we would expect the FDA to impose more Draconian measures on vaping products.  This would have a negative impact on Juul, whose astonishing growth has coincided with

---

[66] "Altria Group Inc," *Berenberg*, October 26, 2018, pp. 3–4.
[67] "Juul: A Jewel in Altria's Crown?" *Alliance Bernstein*, November 29, 2018, p. 2.
[68] "Altria Group Inc Conference Call to Discuss Investment in JUUL Labs Inc – Final," *Thomson Financial*, December 20, 2018.

the recent rise in vaping product consumption among school children.[69] (Morningstar, November 28, 2018)

- [N]ot without risk as MO will not have a controlling interest in [JUUL] and uncertainty surrounding further FDA regulation:  We see risk in MO providing strategic support to a formidable competitor which will continue to operate autonomously.  The FDA has also left the door open for further e-cig regulatory action if the youth problem does not subside (the next wave of youth surveys will have brand-specific data) which could constrain JUUL's growth prospects and is still too early to tell what impact removing JUUL flavors from convenience stores will have on youth usage and overall growth.[70]  (Morgan Stanley, December 20, 2018)

- The FDA's stated goal is to reduce under-age use of nicotine products, and it recently imposed tighter age verification controls on the sale of vaping liquids.  Further restrictions may follow in the future.  This seems very likely to slow the growth of Juul, whose emergence has coincided with a sharp rise in nicotine product consumption among school children.[71]  (Morningstar, December 20, 2018)).

45.    Altria provided additional disclosure regarding these risks a few months after the investment:

"[R]egardless of whether antitrust clearance is obtained, the expected benefits of the JUUL transaction…may not materialize in the expected manner or timeframe or at all, including due to the risks encountered by JUUL in its business, such as operational risks and regulatory risks at the international, federal, and state levels, including actions by the FDA; unanticipated impacts on JUUL's relationships with employees, customers, suppliers and other third parties; potential disruptions to JUUL's management or current or future plans and operations due to the JUUL transaction; or domestic or international litigation developments, investigations, or otherwise."[72]

_____

[69] "Altria Rumoured to Be Interested in Juul Stake But Is a Little Late to the Table," *Morningstar*, November 28, 2018, p. 1.
[70] "An Expensive Holiday Purchase:  MO Invests in JUUL," *Morgan Stanley*, December 20, 2018, p. 2.
[71] "Right Asset But Wrong Price at Wrong Time:  Altria Overpays for Juul," *Morningstar*, December 20, 2018, p. 1.
[72] Altria 2018 Form 10-K, p. 10.

### E.    Summary of Allegations

46.    In the December 20, 2018 press release following its investment in JUUL, Altria stated: "Altria and JUUL are committed to preventing youth from using any tobacco products.  As recent studies have made clear, youth vaping is a serious problem, which both Altria and JUUL are committed to solve.  As JUUL previously said, 'Our intent was never to have youth use JUUL products.  But intent is not enough, the numbers are what matter, and the numbers tell us underage use of e-cigarette products is a problem.'"[73]

47.    Plaintiffs allege that Altria and JUUL made the following allegedly misleading statements, among others, during the period that began December 20, 2018:

- On February 26, 2019, when Altria stated it "responded to the FDA's request for a written plan setting forth the actions it was taking to address underage access" and issued what Plaintiffs state are "boilerplate" representations regarding the risk that the JUUL investment may fail.[74]

- On April 25, 2019, when Altria stated that its "new strategic investments" had "tremendous potential for growth."[75]

- On May 16, 2019, when Altria's then-CEO, Howard Willard, said "Altria is committed to reducing youth e-cigarette use."[76]

- On July 13, 2019, when JUUL's then-CEO, Kevin Burns, said JUUL was "not intended for [children]."[77]

- On July 25, 2019, when co-founder of JUUL, James Monsees, wrote to Congress that "[w]e never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products…. That is a serious problem. Our company has no higher priority than combatting underage use."[78]

- On July 30, 2019, when Altria issued a press release which stated that Altria "maintained [its] focus on the adult tobacco consumer and

---

[73] Complaint, ¶ 462.  Altria Press Release, "Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth," December 20, 2018.
[74] Complaint, ¶¶ 471, 473.
[75] Complaint, ¶ 480.
[76] Complaint, ¶ 488.
[77] Complaint, ¶ 496.
[78] Complaint, ¶ 498.

believe[d] that with [its] leading premium tobacco brands, U.S. commercialization rights in IQOS, investment in JUUL and pending transactions, [it was] best positioned among tobacco peers to lead through a dynamic time in the U.S."[79]

- On September 24, 2019, when JUUL told the *Los Angeles Times* that "[w]e have never marketed to youth and we never will."[80]

- On October 14, 2019, when Altria's then-CEO, Howard Willard, wrote to a U.S. Senator that "[w]e decided to pursue an economic interest in JUUL, believing that an investment would significantly improve our ability to bring adult smokers a leading portfolio of non-combustible products and strengthen our competitive position with regards to potentially reduced risk products."[81]

48.     Plaintiffs allege that these representations (and others in the Proposed Amended Complaint—See Exhibits 2A–2B) were "materially false and misleading because [the Defendants] knew or recklessly failed to disclose:  (i) that JLI's  overarching marketing scheme was directed to youth; (ii) that JUUL's products were harmful and not a tobacco cessation product; (iii) that JLI's youth marketing scheme subjected JLI, Altria, and Altria's investment in JUUL to material risk, including reputational, litigation and regulatory actions and fines; (iv) that Altria consequently failed to inform investors, or account for, material risks associated with JLI's products and marketing practices, and the true value of JLI and its products; (v) that all of the foregoing, as well as mounting public scrutiny, negative publicity, and governmental pressure on e-vapor products and JLI made it reasonably likely that Altria's investment in JLI would have a material negative impact on Altria's reputation and operations; and (vi) that the materialization of these risks would require Altria to write-down its investment in JLI."[82]

49.     It is my understanding that in its decision to deny Defendants' motion to dismiss, the Court characterized the allegations as (i) "that JUUL targeted youth" and (ii) "that Altria and JUUL knew of this marketing scheme and the risks that it posed" but "chose not to inform investors about these risks."[83]  The Court stated that it viewed "the problem of

_____

[79] Complaint, ¶ 489.
[80] Complaint, ¶ 509.
[81] Complaint, ¶ 514.
[82] Complaint, ¶ 16.
[83] MTD Order, p. 25; *see also* MTD Order, p. 19 ("Plaintiffs allege that JUUL misrepresented its intent to market to youth."); MTD Order, p. 22 ("Plaintiffs allege that [Altria's] statements misled investors, because

youth usage [as] differ[ing] from JUUL's efforts to target youths.  These different problems," the Court said, "pose[d] different risks to the value of JUUL and, the resulting value of Altria," in that "[s]olutions remedying the youth usage problem would presumably result in lost sales to those youths" whereas "punitive solutions remedying JUUL's allegedly illegal marketing practices could result in substantial judgments and regulatory fines, in addition to the loss of sales to youths."[84]

50.    Under the first theory, the Court described Plaintiffs' allegations as "that JUUL…carefully studied th[e] marketing strategies, advertisements and product designs of the tobacco industry" and "undertook marketing campaigns 'directed specifically at a youthful audience both in its substance and its delivery.'"[85] Plaintiffs claim that "internal documents demonstrate that JUUL intended to target young audiences and failed to implement standards to ensure that its product would not target youth."[86] For the second theory, Plaintiffs suggest that Altria would or should have learned this information through the due diligence it conducted before it invested in JUUL and concealed this knowledge from the market.[87]  Specifically, they allege that "JLI and the Altria Defendants knew of JLI's multi-faceted youth marketing scheme, as well as the associated risk of litigation, regulatory action, public backlash and financial and reputational harm that would certainly occur if ever discovered."[88]

51.    In the Proposed Amended Complaint, Plaintiffs propose to extend the Class Period from the period from December 20, 2018 through February 21, 2020 period to the

---

Altria failed to disclose that JUUL's [sic] directed its marketing towards youth; that JUUL's products could not act as a tobacco cessation product and instead would harm the teenagers to whom JUUL marketed its products; that JUUL's youth marketing scheme subjected JUUL and Altria to material risks and expenses associated with reputational harm, litigation and regulatory actions and fines…."); MTD Order, p. 24 ("Plaintiffs allege that [JUUL's] statements misled investors, because JUUL had intended to reach youth through its marketing strategies."); MTD Order, p. 33 ("Plaintiffs allege that Defendants knew of the illegal marketing practices undertaken by JUUL…. Specifically, Plaintiffs allege that everyone at Altria knew that JUUL marketed to youth.").

[84] MTD Order, p. 25.

[85] MTD Order, p. 4.  As part of the marketing efforts, Plaintiffs allege misstatements regarding the "potential of e-cigarettes to reduce harm."  See, e.g., Complaint, ¶¶ 456–457.

[86] MTD Order, p. 5.

[87] Complaint, ¶ 532 ("In a December 24, 2018 article in the *Winston-Salem Journal* titled '*Altria-Juul partnership puts additional pressure on BAT, Reynolds*,' Stephen Pope, managing principal for industry research firm Spotlight Ideas of London, discussing the investment, stated 'I can only assume Altria has undertaken its due diligence and looked at the situation from every angle.'")  The Proposed Amended Complaint has additional allegations that Altria knew of youth marketing from its due diligence.  *See*, Proposed Amended Complaint, ¶¶ 387–92.

[88] Complaint, ¶ 14; Proposed Amended Complaint, ¶ 14.

period from October 25, 2018 through April 1, 2020.[89]  Plaintiffs propose this under the additional theory that Altria made "statements [that] were materially false and misleading because [defendants] knew…that Altria removed certain e-cigarette products from the market because of a non-compete condition of its planned investment in [JUUL]" which concealed the "material risks associated with…Altria's contemplated non-compete agreement with JLI."[90]  It is my understanding that Defendants have opposed Plaintiffs' proposed amendments to the Complaint outlined in the Proposed Amended Complaint and that the Court has not yet ruled on Plaintiffs' motion.

52.    Exhibits 3A and 3B list what Plaintiffs allege as corrective events.

### F.    Market Capitalization Declines on Alleged Corrective Event Dates

53.    Plaintiffs originally claimed that the above actions resulted in Altria's stock price being artificially inflated during the Putative Class Period, and that this inflation was removed from the stock price through a series of alleged corrective events that occurred from April 3, 2019 through February 21, 2020, listed as follows:[91]

| Alleged Disclosure Date | Description of Alleged Corrective Event | Alleged Disclosure Event Date(s) | Stock Price Change[92] | Complaint Paragraph(s) |
|---|---|---|---|---|
| 4/3/2019 | FDA announced an investigation into seizures related to e-cigarette use. | 4/3/2019 | -4.78% | 478–479 |
| 8/29/2019 | The Wall Street Journal reported that the FTC was investigating whether JUUL used influencers and other marketing practices to appeal to youth. | 8/29/2019 | -3.49% | 500–501 |
| 8/30/2019 | FDA and CDC announced investigation of e-vaping related cases of illnesses. | 8/30/2019 | -1.15% | 502–503 |

---

[89] Complaint, ¶ 2; Proposed Amended Complaint, ¶ 2.
[90] Proposed Amended Complaint, ¶¶ 16, 468.
[91] Complaint, ¶¶ 478–479, 500–512, 517–522.
[92] The stock price change in this column is the raw or unadjusted stock price change mentioned in the Complaint, unless otherwise noted.

| Alleged Disclosure Date | Description of Alleged Corrective Event | Alleged Disclosure Event Date(s) | Stock Price Change[92] | Complaint Paragraph(s) |
|---|---|---|---|---|
| 9/9/2019 | FDA issued a warning letter to JUUL regarding its marketing practices about the risk of harm of its products. | 9/9/2019 | NA[93] | 504 |
| 9/11/2019 | Reports surfaced that the federal government was considering a ban on flavored e-cigarettes. | 9/11/2019 | NA[94] | 505 |
| 9/12/2019 | Reports surfaced that state governments were considering a ban on flavored e-cigarettes. | 9/13/2019 | -3.62%[95] | 506–507 |
| 9/23/2019 | News sources began reporting that federal prosecutors in California were conducting a criminal probe into JUUL. | 9/24/2019 | -0.37% | 508, 512 |
| 9/25/2019 | Altria announced that Philip Morris had called off discussion of a $200 billion merger with Altria; JUUL announced a federal investigation and that it would stop all advertising in the U.S. and replace its CEO. | 9/25/2019 | -0.42% | 511–512 |
| 10/31/2019 | Altria announced it was taking a $4.5 billion write-down on its JUUL investment and that it received a civil investigative demand from the FTC. | 10/31/2019 | -2.55% | 517–518 |
| 1/30/2020 | Altria announced an additional $4.1 billion write-down on its JUUL investment. | 1/30/2020 | -4.21% | 519–520 |

---

[93] The Complaint does not allege a decline on this date or include a return. Altria's raw return on September 9, 2019 was 0.43%.

[94] The Complaint does not allege a decline on this date or include a return. Altria's raw return on September 11, 2019 was 1.09%.

[95] The Complaint provides a raw return of -5.51%, but this figure is not adjusted for September 13, 2019 being an ex-dividend date. Adjusting for the dividend payment yields a -3.62% return.

| Alleged Disclosure Date | Description of Alleged Corrective Event | Alleged Disclosure Event Date(s) | Stock Price Change[92] | Complaint Paragraph(s) |
|---|---|---|---|---|
| 2/21/2020 | The Wall Street Journal reported that the SEC had launched an investigation into whether Altria had fully disclosed the risks associated with its JUUL investment. | 2/21/20 <br> 2/24/20 <br> 2/25/20 <br> 2/26/20 <br> 2/27/20 | 0.72%[96] <br> -4.55%[97] <br> -2.99% <br> -0.87% <br> -4.32% | 521–522 |

54.    Plaintiffs' Proposed Amended Complaint contains four additional alleged corrective events.  Three of these events predate the filing of the Complaint and the last predates the filing of the Proposed Amended Complaint.

| Alleged Disclosure Date | Description of Alleged Corrective Event | Alleged Disclosure Event Date(s) | Stock Price Change[98] | Amended Complaint Paragraph(s) |
|---|---|---|---|---|
| 3/19/2019 | FDA commissioner Scott Gottlieb said he had a "difficult" meeting with Altria and JUUL, expressed concern about the pace of efforts to curb youth vaping, and suggested that FDA may need to pull pod-based nicotine products from the market. | 3/19/2019 | -2.25% | 494–495 |
| 6/21/2019 | CNBC reported that Gottlieb said, "I don't know how JUUL gets through a[] [Premarket Tobacco Product] | 6/21/2019 | -4.50%[99] | 507–508 |

---

[96] The 0.72% stock price change shown corresponds to the change from market close on 2/20/20 to market close on 2/21/20.  The Complaint alleges an intraday decline of $0.29 from 3:30pm to market close on 2/21/20.

[97] The Complaint alleges an Altria stock price change of -4.8% on 2/24/20.

[98] The stock price change in this column is the raw or unadjusted stock price change mentioned in the Proposed Amended Complaint, unless otherwise noted.

[99] The Proposed Amended Complaint alleges an Altria stock price change of -4.3% on 6/21/19.

| Alleged Disclosure Date | Description of Alleged Corrective Event | Alleged Disclosure Event Date(s) | Stock Price Change[98] | Amended Complaint Paragraph(s) |
|---|---|---|---|---|
| | [A]pplication process" because "[t]hey have so much historical youth use with their product." | | | |
| 11/19/2019 | The New York Attorney General announced a lawsuit against JUUL. | 11/19/2019 | -2.92% | 541–542 |
| 4/1/2020 | The FTC filed a lawsuit seeking to force Altria to unwind its investment in JUUL. | 4/2/2020 | -3.70%[100] | 547–548 |

55.    If one aggregates the set of unadjusted declines in Altria's market capitalization across all of the event dates associated with the alleged corrective disclosure events contained in the Proposed Amended Complaint one obtains an approximate $41.5 billion loss in Altria's market capitalization, an amount *more than three times* its initial $12.8 billion investment in JUUL (the analogous amount is $29.7 billion if one instead uses the set of alleged corrective events in the Complaint).

## V.    Securities Price Behavior in an Efficient Market

### A.    Market Efficiency

56.    In an efficient market, stock prices represent the market's consensus expectation of the present value of future cash flows to shareholders,[101] and fully reflect all publicly available information.[102]  The efficient market hypothesis, which holds that "prices of securities observed at any time are based on 'correct' evaluation of all information available at that time" posits three "forms" of efficiency:  weak form, semi-strong form, and

---

[100] The Proposed Amended Complaint alleges an Altria stock price change of -6.96% on 4/2/20.
[101] Brealey, R. A., et al., *Principles of Corporate Finance*, 10th ed., McGraw-Hill/Irwin, 2010, p. 80.
[102] *See* Fama, E., *Foundations of Finance: Portfolio Decisions and Securities Prices*, Basic Books, Inc., 1976 ("Fama (1976)"), p. 133; *See also* Fama, E. (1970), "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance*, 25(2), 1970 ("Fama (1970)"), pp. 383–417 at 383.

strong form efficiency.[103]  Weak form efficiency requires that "past price (or return) histories" cannot be used to predict future prices.  Semi-strong form efficiency requires that prices quickly and fully adjust to "publicly available information."  Strong form efficiency requires that prices also reflect non-public information possessed by "any investor or groups."[104] When discussing market efficiency in this report, unless indicated otherwise, I am referring to semi-strong form market efficiency.

57.    In an efficient market, securities prices react fully and rapidly to new, value-relevant public information.[105]  Academic studies find that it may take only minutes for securities prices to reflect new, value-relevant information.[106]

58.    Consistent with the notion that security prices quickly reflect newly available public information, the use of a single day event window has been well established in the academic literature for many years.  Thirty years ago, Nobel laureate Eugene Fama observed "[w]hen the announcement of an event can be dated to the day, daily data allow precise measurement of the speed of price response—the central issue for market efficiency. … The typical result in event studies on daily data is that, on average, stock prices seem to adjust within a day to event announcements.  The result is so common that this work now devotes little space to market efficiency."[107]  Because we can now in most cases identify not only the date but also the time when news becomes publicly available, it is even more strongly evident that the appropriate event window is no longer than a single trading day.  While some academic studies use multi-day event windows, these are typically studies for which the timing of announcements cannot be measured precisely (e.g., only the day of an announcement is known).  Because we can, for the events at issue here, identify the time

---

[103] Fama (1976), p. 133; Fama (1970), p. 383.

[104] Fama (1970), p. 388.

[105] Fama (1970), pp. 383–417.

[106] For example, Greene and Watts (1996) find that price adjusts rapidly over the first post-announcement half hour on both the NYSE and NASDAQ.  Greene, J. T., and S. G. Watts (1996), "Price Discovery on the NYSE and the NASDAQ: The Case of Overnight and Daytime News Releases," *Financial Management*, 25(1) ("Greene and Watts (1996)"), pp. 19–42.  In addition, Busse and Green (2002) examines intraday price movements in response to CNBC shows Morning Call and Midday Call and find that "stocks discussed positively experience a statistically and economically significant price impact beginning seconds after the stock is first mentioned and lasting approximately one minute. The response to negative reports is more gradual, lasting 15 minutes, perhaps due to the higher costs of short selling."  Busse, J. A., and Green, T.C. (2002), "Market efficiency in real time," *Journal of Financial Economics*, 65, pp. 415–37 at 416.

[107] *See* Fama, E. (1991), "Efficient Capital Markets:  II," *The Journal of Finance*, 46(5), pp. 1575−1617, at p. 1601.

news becomes available to the market, I use single trading day event windows, consistent with Professor Fama's recommendation.

59.     Dr. Nye asserts that "the market for Altria stock was efficient throughout the Complaint Class Period and the Amended Complaint Class Period."[108]  I have not been asked to review or respond to Dr. Nye's opinions or analysis regarding market efficiency.  I assume, for purposes of this report, that Altria's common stock traded in a semi-strong form efficient market, as Dr. Nye concludes.[109]

### B.     Event Study Methodology

### 1.     Event Studies

60.     Event studies use financial market data to isolate and evaluate the economic impact of a company-specific event, such as a press release or financial restatement, on securities prices.  This approach is well accepted in the academic literature.[110]  In an efficient market, event studies can be used to measure the price impact (if any) of new public information.

61.     To assess whether a disclosure (event) affects securities prices, an event study compares the actual stock price movement on the event date to an estimate of what that return would have been absent the disclosure.[111]  To do this, the event study must account for other factors that affect the returns on a particular security, such as overall market movements and industry news.  This is typically done by estimating the normal relation between the security's returns and market and industry returns during an "estimation period," which allows the researcher to compute an "abnormal" or "residual" return on the event date, i.e., the stock's actual return minus a "normal" (or "predicted") return that accounts for the effect of these other factors on that same day.  Once this is done, the researcher performs a

---

[108] Nye Report, ¶ 7.

[109] *See*, e.g., Nye Report, footnote 17.

[110] For example, Campbell, J. Y., et al., "Event-Study Analysis," in *The Econometrics of Financial Markets,* Princeton University Press, 1997, pp. 149–180 ("Campbell, et al. (1997)"), p. 149, states that "[t]he usefulness of [event studies] comes from the fact that, given rationality in the marketplace, the effect of an event will be reflected immediately in asset prices. Thus the event's economic impact can be measured using asset prices observed over a relatively short time period."

[111] I refer here to (common) stocks, even though all of these statements typically apply equally to securities more generally, assuming those securities trade in (semi-strong form) efficient markets.  Detailed discussions of event study methodology can be found in Campbell, et al. (1997), Chapter 4, and in Kothari, S. P., and Warner, J. B., "Econometrics of Event Studies," in *Handbook of Corporate Finance: Empirical Corporate Finance*, Volume 1, B. E. Eckbo ed., Elsevier, 2007, pp. 5–36.

statistical analysis to assess whether this abnormal return is statistically significant.  For example, the researcher can test whether the abnormal return is reliably different from zero (formally, one tests the null hypothesis that the abnormal return equals zero, meaning the news did not affect the stock price) by comparing the size of the abnormal return with a measure of the typical volatility of the abnormal return.  This involves computing a $t$-statistic, the ratio of the measured abnormal return to its standard error (a measure of the typical volatility of the abnormal returns measured during the estimation period).  A sufficiently large (in absolute value) $t$-statistic allows one to reject the null hypothesis and conclude that the abnormal return is statistically significant and that the price responded to event period news.[112]

62.     Statistically significant abnormal returns for a company's stock during a given event window (e.g., on a given trading day) can be interpreted as indicating significant changes in the *total mix* of public information regarding the company during that event window.  Abnormal returns that are not statistically significant cannot be reliably attributed to any change in the *total mix* of information regarding the company, as they cannot be distinguished from the typical price fluctuations of the company in the absence of new information (that is, they are not reliably different from zero).[113]

63.     Event study analysis is subject to limitations.  First, an event study measures the price impact of *all* new information revealed during the study's event window; it cannot reliably apportion the price impact of a specific piece of company-specific information when multiple pieces of information are disclosed simultaneously.  Second, an event study cannot

---

[112] The size of the $t$-statistic necessary to establish statistical significance depends on the degrees of freedom (which is based on the number of observations used for estimation and the complexity of the model being estimated) as well as the relevant "p-value" (confidence level) for the test.  *See*, for example, Dielman, T. E., *Applied Regression Analysis*, 4th ed., South-Western, 2005, pp. 80–84.  Detailed discussions of event study methodology can be found in Campbell, et al. (1997), Chapter 4, and in Kothari, S. P., and Warner, J. B., "Econometrics of Event Studies," in *Handbook of Corporate Finance: Empirical Corporate Finance*, Volume 1, B. E. Eckbo ed., Elsevier, 2007, pp. 5–36.

[113] In *Halliburton II* on remand, the Court stated "To show that a corrective disclosure had a negative impact on a company's share price, courts generally require a party's expert to testify based on an event study that meets the 95% confidence standard."  Memorandum Opinion and Order, *Erica P. John Fund, Inc. v. Halliburton Co. et al.*, No. 3:02-CV-1152-M ("*Halliburton II Remand*"), p. 9.  The Court denied class certification for five disclosure dates based on Defendants' argument that there was no price impact based on lack of statistical significance.  *See*, e.g., *Halliburton II Remand*, pp. 21, 24–25, 30.  Therefore, I understand that in the context of class certification in securities class actions, a finding that a stock price reaction is not statistically significant is evidence of no price impact.  Defendants' expert in *Halliburton II* used the same statistical test ($t$-test) to determine statistical significance that I am using in this case.  *See*, e.g., Expert Report of Lucy P. Allen, *The Archdiocese of Milwaukee Supporting Fund, Inc. et al., v. Halliburton Company, et al.*, September 10, 2014, ¶¶ 21–22.

measure the price impact of information that is not publicly revealed.  Third, an event study measures the market's reaction to the total mix of new, unexpected, firm-specific information when that information is released to the market; it cannot be used to measure the price reaction to the same information at a different point in time or under different circumstances or to evaluate the price reaction to different information.

### 2.    Dr. Nye's Event Study

64.    Dr. Nye purports to perform "a standard event study for Altria stock."[114]  He selects the S&P 500 Index and the S&P 500 Food, Beverage and Tobacco Total Return Index to proxy for market and industry factors, respectively.[115]  Based on these choices, Dr. Nye estimates abnormal returns for each day from the beginning of the Amended Complaint Class Period through approximately three months after the end of the Amended Complaint Class Period—October 25, 2018 to June 30, 2020—using a one-year estimation period that ends the day before each event (e.g., the estimation period for the October 31, 2019 event date extends from October 31, 2018 to October 30, 2019).[116]

65.    Dr. Nye's event study method contains several flaws that render it unreliable for purposes of measuring Altria-specific tobacco-related stock price changes (abnormal returns) on the alleged corrective event dates.

66.    First, Dr. Nye selects the S&P 500 Food, Beverage and Tobacco Total Return Index in an attempt to measure the performance of companies that operate in the same industry as Altria.  However, most companies included in this index operate outside the tobacco sector, which represents the large majority of Altria's business.  In fact, this index—which comprises a total of 21 companies—includes only *one* other tobacco company (Philip Morris International ("PMI")), during the Putative Class Period and the Amended Complaint Class Period.[117]  During both periods, PMI manufactured and sold cigarettes, smoke-free products, and other nicotine-containing products in markets *outside* the U.S and shipped a

---

[114] Nye Report, ¶ 53.
[115] Nye Report, Appendix A, ¶¶ 72–73.
[116] Nye Report, ¶ 71.  Dr. Nye provides his daily results in Exhibits 11A and 11B.
[117] *Refinitiv*.

version of its smoke-free products to Altria for sale in the U.S.[118]  Other companies in this index include Coca-Cola and PepsiCo., which are primarily beverage companies with no exposure to the U.S. tobacco sector.  In fact, the *only* company in this index with exposure to U.S. tobacco is Altria itself, which means that the index used by Dr. Nye to purportedly control for and remove the effect of factors that affect the U.S. tobacco sector cannot possibly serve this purpose, and his use of this index is thus inconsistent with well-established event study methodology.  As a result, Dr. Nye's purported measure of Altria firm-specific returns on the various event dates at issue here includes the effects of industry factors as well as the effect of Altria news and so are confounded and unreliable.

67.    Furthermore, when Dr. Nye was asked why he failed to obtain or construct an index of companies with exposure to the U.S. tobacco sector, he indicated that he had tested a number of indices (including those based on the tobacco sector) but that he chose to use the S&P 500 Food, Beverage, and Tobacco index because that choice resulted in a regression with a higher R-squared (a measure of the explanatory power of the regression).[119]  This reasoning is completely misguided as a matter of economics and statistics.  Proper event study methodology requires one to remove the effects of *industry* factors in computing abnormal returns.[120]  However, it is well-known in econometrics that a myopic focus on increasing model R-squared may result in poorly specified models.[121]  For example, if one

---

[118] Philip Morris International Inc., Form 10-K for the Fiscal Year ended December 31, 2018, filed on February 7, 2019; Philip Morris International Inc., Form 10-K for the Fiscal Year ended December 31, 2019, filed on February 7, 2020.

[119] Deposition of Zachary Nye, Ph.D., August 31, 2021 ("Nye Deposition"), 73:10–22; 88:6–17.

[120] Dr. Nye himself recognizes this, stating in his report that he "performed [event study] regression analyses to measure the relationship between Altria stock returns and … changes in industry-wide factors *that would be expected to impact stocks in the 'Tobacco' industry.*" Nye Report, ¶ 73, emphasis added.  This use of an industry index has long been recognized as being important for explaining firm-level returns in the peer-reviewed empirical finance literature; for example, B. King (1966, p. 143) states that "an index for a particular industry should be correlated with components of price change that affect the *group of stocks falling under that industrial classification only.*"  King, B. (1966), "Market and Industry Factors in Stock Price Behavior," *The Journal of Business*, 39(2), pp. 139–190 at p. 143, emphasis added).  Campbell, Lo, and MacKinlay (1997, p. 155), a source that Dr. Nye himself relies on to support his event study methodology, discuss the use of event study models that include industry indices, citing work by Nobel laureate William F. Sharpe: "Sharpe (1970) and Sharpe, Alexander, and Bailey (1995) discuss index models with factors based on industry classification" (Dr. Nye references work by Professor Sharpe to justify his choice of overall market index).

[121] For example, see Kennedy, Peter, A Guide to Econometrics, MIT Press, 1998, p. 95: "The first and foremost ingredient in a search for the correct set of explanatory variables (in regression) is economic theory.  If economic theory cannot defend the use of a variable as an explanatory variable, it should not be included in the set of potential independent variables.  Such theorizing should take place *before* any empirical testing of the appropriateness of potential independent variables; this guards against the adoption of an independent variable just because it happens to 'explain' a significant portion of the variation in the dependent variable in the particular sample at hand." (emphasis in original).

tries to explain the returns of Altria by correlating them with returns of Altria through a regression framework, one would get a perfect fit (i.e., an R-squared of 100%). However, this model would be economically meaningless.

68.    Dr. Nye's purported "industry index" does not include even a single company (other than Altria) with exposure to the U.S. tobacco sector, from which Altria derives the vast majority of its revenues. This means that his purported event study regression *completely fails* to capture the effects of news and events that affect the industry as a whole (for example, the effects of U.S. tobacco regulation) that the sell-side analysts that followed Altria, along with its primary competitors, British American Tobacco and Imperial Brands – the three biggest players in the U.S. tobacco market – consistently discussed in their reports. For example, when analyzing changes in U.S. cigarette sales, Barclays includes volume changes for Altria, British American Tobacco, and Imperial Brands.[122]  Similarly, Cowen includes Altria, British American Tobacco, and Imperial Brands data to analyze U.S. tobacco industry cigarette sales.[123]   In addition, Citi's analysis of the potential impact of regulation on e-vapor products on the tobacco industry includes the potential impact on cigarette sales of Altria, British American Tobacco, and Imperial Brands.[124]

69.    It is surprising that Dr. Nye used an industry index that failed to in any way reflect the U.S. tobacco sector, given that in a past matter Dr. Nye stressed the importance of constructing an index of firms that analysts would consider industry peers for the company at issue.[125]  In the same matter, he chose peer firms that operated both in the same industry and country because of his view that there were important country-specific factors.[126,127]  This methodology is at odds with the method he has used in the current matter.

───────────────

[122]"MSA reports -4.5% US cig volumes as e-cigs stall," *Barclays*, November 2, 2019, p. 1.

[123] *See* "Tobacco Analysis: Nielsen XAOC + C-Store," *Cowen*, June 25, 2019, Figures 1–12.

[124] "Tobacco – FDA seems likely to impose severe restrictions on JUUL*," *Citi*, November 9, 2018, pp. 2–4.

[125] "A: But, most importantly, these are considered peers by most of the analysts." Deposition of Zachary Nye, Ph.D., Strougo v. Barclays, August 11, 2015, ("Nye Deposition Strougo v. Barclays"), 101:10-12.

[126] "Q: Why did you only consider British banks? A: Because Barclays, though it has global operations, is compared with the analyst -- you know, these banks in particular -- and a lot of their operations are centered on the -- on the UK banking industry. Q: Is there something unique to the fact that it's centered in the UK banking industry that would make it different than, for example, a large US bank in terms of, you know, how the stock price would move overall? …A: Yes, because there was – there was quite a lot of regulation changes in this period. And so I felt that the differences across -- they have kind of global standards. And there is also country-specific regulations that are at issue here and changing during this period. So it -- my best judgment was that it was -- it was -- I wanted to make sure we had a comparable set, a peer set that reflected the industry risk of Barclays itself." Nye Deposition, Strougo v. Barclays 98:21-99:24.

[127] In the Strougo v. Barclays matter, Dr. Nye selected three banks as Barclays' industry peers: HSBC, Royal Bank of Scotland, and Lloyds.

70. In addition, Dr. Nye fails to remove Altria itself from his purported industry index, another choice that is flawed as a matter of economics and statistics and inconsistent with peer-reviewed academic work.[128] On a market capitalization basis, Altria represented a non-trivial portion of the index (e.g., approximately 11.3% of the index as of October 25, 2018 and 7.6% of the index as of April 1, 2020).[129] By failing to remove Altria from the index, Dr. Nye introduces spurious correlation into the regression estimation because Altria's return is included *both* as the dependent variable and as part of the industry index (an independent variable). Dr. Nye stated at deposition that his model "fits with Altria's stock returns very well,"[130] an unsurprising outcome given that he failed to remove Altria from the industry index included on the right-hand side of the regression.

71. The only other tobacco company in the index is PMI. However, PMI has no presence in the U.S. tobacco market, which means its returns serve as a poor proxy for the effect of factors that affect that industry (e.g., its returns would not be directly affected by changes in the regulation of the U.S. tobacco market). In addition, the relationship between returns on PMI and Altria shares may be affected by news regarding merger talks between the two companies.[131] This may again induce correlation unrelated to factors that affect the U.S. tobacco industry.

### 3. My Event Study

72. I performed an event study analysis to calculate abnormal returns for Altria common stock on the alleged corrective event dates. Specifically, for each event date I

---

[128] *See* Langetieg, T. (1978), "An Application of a Three-Factor Performance Index to Measure Stockholder Gains from Merger," *Journal of Financial Economics*, 6, pp. 365−383; Langetieg, T., Haugen, R., and Wichern, D. (1980), "Merger and Stockholder Risk," *The Journal of Financial and Quantitative Analysis*, 15(3), pp. 689−717.

[129] *Refinitiv.*

[130] Nye Deposition, 69:17–18.

[131] Rumors of possible merger discussions between PMI and Altria had been circulating publicly by August 26, 2019. "Pressure On PM's Stock Today – Could A PM/MO Combo Finally Be In The Works?" *Wells Fargo*, August 26, 2019. Altria and PMI confirmed preliminary merger discussions on August 27, 2019. "Press Release: Philip Morris International Inc. Confirms Discussions with Altria Group, Inc. Regarding Potential All-Stock, Merger of Equals," *Dow Jones Institutional News*, August 27, 2019, 9:23 AM ET; "Press Release: Altria Group, Inc. Confirms Discussions With Philip Morris International, Inc. Regarding Potential All-Stock, Merger of Equals," *Dow Jones Institutional News*, August 27, 2019, 9:32 AM ET. Subsequent news articles and analysts provided commentary regarding the potential merger deal between Altria and PMI. For example, *see* "Philip Morris, Altria Deal Seen as Public Health 'Nightmare'; Remerger Would Form Patchwork Family Consisting of Three Top Tobacco Brands," *Calgary Herald*, August 29, 2019; "PM + MO: Then and Now," *Morgan Stanley*, September 9, 2019; "Downgrade to Neutral: Potential Deal Raises Questions; Vapor Clarity a Ways Off," *Piper Jaffray*, September 9, 2019.

estimate a "market model" regression of the relationship between daily returns for Altria's stock and the corresponding daily returns for the market and industry indices. Following standard event study methodology, I use total (including dividends) returns on: (1) the S&P 500 Index, to proxy for the return on the market, and (2) a value-weighted peer index comprising British American Tobacco and Imperial Brands (discussed in further detail below), Altria's main competitors in the U.S. tobacco market, to proxy for industry returns.[132] Returns are continuously compounded (log) returns.[133]

73.    I estimate these market model regressions as "rolling" regressions over the 252-trading day period ending the trading day prior to the event date associated with each alleged corrective disclosure.[134] I determine the event date associated with each of the alleged corrective disclosures by reference to the earliest time each alleged corrective event became publicly available by searching public press for the relevant timestamps. If the earliest timestamp is before market close (i.e., 4 PM ET) on a given date, the event date is set as the date of the alleged corrective event; if the earliest timestamp is on or after market close, the event date is set as the next trading day.[135] I exclude the event dates of alleged misrepresentations and alleged corrective events from the various estimation periods.

74.    As discussed in the previous section, Dr. Nye's industry index (the S&P 500 Food, Beverage and Tobacco Total Return Index) suffers from a number of serious flaws. I constructed a peer index that consisted of Altria's principal competitors in the U.S. tobacco market. While Altria has some business in ancillary areas such as wine, over 96% of Altria's net revenues in 2018, 2019, and 2020 were from its U.S. tobacco business (see Exhibit 1).

75.    To identify Altria's competitors, I reviewed analyst reports as well as relevant market share data during the Putative Class Period and the Amended Complaint Class Period. As shown in Exhibit 4, during the Amended Complaint Class Period, Altria, British American Tobacco, and Imperial Brands together accounted for approximately 92% of

---

[132] The value-weighting is based on market capitalizations in U.S. dollars from the prior trading date. Using an equal-weighted index does not change the statistical significance of Altria's return on any of the relevant dates.
[133] Continuously compounded (log) returns are standard in the academic literature. *See* Campbell, Lo, and MacKinlay (1997), p. 11. The dividend-adjusted stock returns of British American Tobacco and Imperial Brands are calculated using their respective American Depository Receipts' prices and dividends designated in U.S. dollars.
[134] I exclude from the estimation sample any alleged misrepresentation dates and any alleged corrective event dates mentioned in the Complaint.
[135] In this case, there is one date where the news was released at 3:59 PM ET, essentially at market close. I analyze the stock price movement on the next trading day in this case.

conventional cigarettes sales volume in the U.S. market. Altria's main cigarette products included Marlboro and L&M; British American Tobacco's main cigarette products included Camel, Newport, Pall Mall, and Natural American; and Imperial Tobacco's main cigarettes products included Winston and Kool.[136]  Based on these data, I use British American Tobacco and Imperial Brands as the components of my industry peer index.

76.     Allegations in this matter concern Altria's investment in JUUL and do not relate to Altria's public investments in other sectors. Thus, for purposes of my event study I recomputed Altria's daily returns to remove the effect of changes in the values of AB InBev and Cronos shares (these companies did not operate in the tobacco industry).[137]  As discussed in Section V.A above, Altria had an equity investment in AB InBev throughout the Amended Complaint Class Period and in Cronos starting on March 8, 2019.  During the Amended Complaint Class Period, AB InBev was a drink and brewing company and Cronos was a cannabinoid company.[138]

77.     The results of my event study analysis of the alleged misrepresentation dates are shown in Exhibit 5; results for the alleged corrective event dates are shown in Exhibit 6.

---

[136] "US Cigarette & E-cig Scanner Data Through 12/29," *Morgan Stanley*, January 8, 2019, Exhibit 1.

[137] To isolate and remove the effect of Altria's public investments in other sectors from Altria's stock returns, I compute adjusted daily returns for Altria using the following methodology:  (1) I calculate the market values of Altria's equity investments in AB InBev and Cronos during the Putative Class Period based on security prices and Altria's equity holdings of these two companies; (2) I calculate Altria's adjusted stock price on a given day as the market capitalization of Altria common stock minus the market values of Altria's public equity investments, divided by the number of Altria common shares outstanding for that day; and (3) I compute Altria's adjusted daily returns after accounting for any dividends paid by Altria and AB InBev (Cronos did not pay dividends).  The market values of Altria's equity investment in AB InBev are calculated using prices of AB InBev ordinary shares and information on Altria's ownership of AB InBev ordinary shares and restricted shares. This approach assumes that the market value of each restricted share is on the same as the value of an ordinary share, which is the valuation approach used by Altria (*See* Altria 2019 Form 10-K, p. 60).  The market values of Altria's equity investment in Cronos are calculated using prices of Cronos common shares and information on Altria's ownership of Cronos common shares.  Changes in Altria's market value due to changes in market values of InBev and Cronos are calculated after accounting for dividends on ex dividend dates.  This approach is consistent with academic studies that adjust the market value of a parent company for the market value of a public subsidiary.  *See,* for example, Mitchell, M., Pulvino, T., and Stafford, E., "Limited Arbitrage in Equity Markets," *The Journal of Finance*, 57(2), pp. 551–584; Lamont, O., and Thaler, R. (2003), "Can the Market Add and Subtract?  Mispricing in Tech Stock Carve-outs," *Journal of Political Economy*, 111(2), 2003, pp. 227–268; Bayar, O., Chemmanur, T.J. and Liu, M.H. (2011), "A Theory of Equity Carve-outs and Negative Stub Values under Heterogeneous Beliefs," *Journal of Financial Economics*, 100(3), pp. 616–638.  Altria also held derivatives securities including Fixed-price Preemptive Rights and a warrant to acquire additional common shares of Cronos.  Altria assigned a $303 million value to its holdings of Cronos derivatives on 12/31/19.  This represented less than 0.3% of the value of Altria's common stock on that day.  Altria 2019 Form 10-K, p. 64; *Refinitiv*.

[138] Anheuser-Busch InBev SA/NV Form 20-F, filed on March 22, 2019, p. 29; Anheuser-Busch InBev SA/NV Form 20-F filed on March 23, 2020, p. 33; Anheuser-Busch InBev SA/NV Form 20-F filed on March 19, 2021, p. 29; Cronos Group Inc., Form 10-K for the Fiscal Year ended December 31, 2019, filed on March 2, 2020, p. 3; Cronos Group Inc., Form 10-K for the Fiscal Year ended December 31, 2020, filed on February 26, 2021, p. 4.

**VI.** **There Was No Price Impact with Respect to Eight Alleged Corrective Event Dates and, For the Remaining Seven, There Is Substantial Doubt as to Whether Any Stock Price Changes on These Dates Can Be Used as Evidence of Earlier Price Impact**

78.     Based on my review and analysis, I reach an affirmative opinion that there was no price impact with respect to eight alleged corrective event dates. As for the remaining seven event dates, given the mismatch between the contents of the alleged corrective events and the alleged misrepresentations, there is substantial doubt as to whether any stock price movements on these dates can be used as evidence of earlier price impact.

79.     First, I find that there was no statistically significant movement in Altria's stock price on days with alleged misrepresentations, except for one day when the movement was negative and statistically significant (Section A). Second, I find that Altria's stock price did not react to allegedly corrective information on eight alleged corrective event dates and I do not find positive news that could explain the lack of a price reaction (Section B). Third, substantial doubt exists as to whether any of Altria's stock price changes on the other seven alleged corrective event dates can be used as evidence of prior price impact of the alleged misrepresentations (Section C).

**A.** **There Was No Statistically Significant Movement In Altria's Stock Price on Days with Alleged Misrepresentations, Except One Day When The Movement Was Negative and Statistically Significant**

80.     I start my analysis of potential price impact with an observation that my event study shows that there was no statistically significant movement in Altria's stock price on days with alleged misrepresentations, except one day when the movement was negative and statistically significant (see Exhibit 5).[139] For example, on December 20, 2018, Altria announced its investment in JUUL and made allegedly misleading statements in its press release, including that JUUL's "*intent was never to have youth use JUUL products*" and "JUUL's mission to switch adult smokers to e-vapor products."[140] The market had largely expected the financial terms of Altria's investment in JUUL because prominent news sources reported on December 19, 2018 that Altria was "[n]earing a [d]eal to [t]ake a 35% [s]take in

---

[139] Dr. Nye does not find statistically significant stock price changes on these dates except for two dates on which the movements were negative and statistically significant. (See Exhibit 5.)
[140] Complaint, ¶ 15 (emphasis in original).

Juul" which "[w]ould [v]alue Juul at [a]bout $38 billion."[141] Therefore, any stock price reaction on December 20, 2018 would likely have been in response to other commentary, including the alleged misrepresentations that were made before market open on December 20, 2018.[142] But Altria's stock price did not react in a statistically significant manner on December 20, 2018.

81. In order to address Plaintiffs' possible contention that price impact could be inferred from the dates on which they identify alleged corrective events, I also analyze Altria's stock price changes on such dates to investigate whether there was evidence of price impact of the alleged misrepresentations on December 20, 2018 (and other dates).

**B.    Altria's Stock Price Did Not React to Allegedly Corrective Information on Eight Alleged Corrective Event Dates**

82. For each of the eight alleged corrective event dates (August 30, 2019, September 9, 2019, September 11, 2019, September 24, 2019, and February 24–27, 2020), I do not find statistically significant and negative stock price movements, and my review of the news indicates that there was no positive news that could have offset what would otherwise have been a negative and statistically significant stock price movements on these dates.[143] As a result, I reach an affirmative opinion that the allegedly corrective information did not impact Altria's stock price on these dates. In addition, if the market for Altria's shares was efficient, as Dr. Nye claims, I would not expect that the allegedly corrective information released during market hours on February 21, 2020 would affect Altria's stock price on February 24–27, 2020, and, according to my analysis, it did not.

**1.    General Testing Approach**

83. To determine whether Altria' stock price movements on August 30, 2019, September 9, 2019, September 11, 2019, September 24, 2019, and February 24–27, 2020 provide evidence that can support a conclusion that the alleged misrepresentations impacted

---

[141] "Altria Is Nearing a Deal to Take a 35% Stake in Juul," *Dow Jones Institutional News*, December 19, 2018; "Deal Would Value Juul at About $38 Billion, Double Its Last Funding," *Dow Jones Institutional News*, December 19, 2018.

[142] Altria Group, Inc, Form 8-K filed on December 20, 2018, 8:56 AM, Exhibit 99.1.

[143] Dr. Nye does not find a statistically significant stock price movement on any of the following corrective event dates: August 30, 2019, September 9, 2019, September 11, 2019, September 24, 2019, February 21, 2020, and February 25–27, 2020. Nye Report, Exhibit 11B.

Altria's stock price earlier in the Putative Class Period, I performed an event study using the event study method described in Section V.B.3. Event study analysis allows me to determine whether the abnormal return on Altria's common stock is statistically significant on the dates at issue,[144] controlling for the effects of market and industry factors. In addition, I analyzed other information that came to the market on each date (by reviewing public press the day prior and day of each event, and analyst reports from three calendar days prior through five calendar days after each event date) to determine whether there was positive news that could have offset what would otherwise have been a negative and statistically significant stock price movement. If the abnormal return was not statistically significant and there was no positive news that could explain the lack of a price reaction, I conclude that Altria's stock price was not impacted by what Plaintiffs allege as corrective information.[145,146]

### 2.      August 30, 2019

84.      Plaintiffs allege that on August 30, 2019 "both the FDA and the CDC announced that they were collaborating to investigate e-cigarette related cases of illnesses and 'working tirelessly to investigate the distressing incidents of severe respiratory disease associated with use of e-cigarette products.'"[147] Plaintiffs claim that "[o]n this news, Altria's stock price fell an additional $0.51 per share, or 1.15%, to close at $43.74 per share on August 30, 2019—a total loss of $2.11 per share, or 4.6%, since closing at $45.85 per share two trading days earlier on August 28, 2019."[148] Because the announcement that Plaintiffs

---

[144] For news released before or during trading hours, I analyze stock returns on the date of the news release; for news released after trading hours or on a non-trading day, I analyze stock returns on the next trading day. On one of the dates I am studying the news that was released at 3:59 pm, essentially at market close. I have analyzed the next trading day in this case, as described below.

[145] As discussed in more detail in footnote 113 above, I understand that in the context of class certification in securities class actions, finding that a stock price reaction is not statistically significant is evidence of no price impact.

[146] As discussed in Section VI.C.1.a), for October 31, 2019, I analyzed whether the allegedly corrective information regarding the impairment charge that Altria took on its investment in JUUL constituted new, unexpected information and could, therefore, have impacted Altria's stock price on this date, using data on market expectations derived from analyst reports and public press commentary. My conclusion regarding the lack of price impact with respect to information on this impairment charge does not depend on whether there was a statistically significant movement in Altria's stock price on this date.

[147] Complaint, ¶ 502.

[148] Complaint, ¶ 503.

allege contained corrective information was released during market hours on August 29, 2019,[149] I used this date as the event date for my event study.

85.    The results of my event study indicate that the abnormal return on Altria stock on August 30, 2019 was not statistically significant at the 5% level (see Exhibit 6).[150]

86.    I reviewed available public press and analyst reports between market close on August 29, 2019 and market close on August 30, 2019 to determine if other information came to the market that day that could have affected Altria's stock price.[151]  One news article provided negative commentary regarding the potential merger between Altria and PMI.[152]  In addition, there was news that JUUL was facing a potential class action lawsuit over e-cigarettes.[153]  Neither of these pieces of information would be expected to increase Altria's stock price and so offset what would otherwise have been a negative stock price movement on this date.[154]  In addition, no analyst reports available to me commented on the news that Plaintiffs allege to be corrective (in fact, I was unable to find any analyst reports specific to Altria issued on August 30 or 31 of 2019).

87.    Consequently, I conclude that there is no evidence that what Plaintiffs allege to be corrective information impacted the price of Altria's stock on August 30, 2019.

---

[149] "Juul Devices Cited in Seizure Reports That Triggered FDA Probe," *Bloomberg*, August 29, 2019, 2:23 PM ET.

[150] Dr. Nye's event study also does not find a statistically significant stock price movement of Altria's stock on this date.  (See Exhibit 6.)

[151] For my public press search, I used Factiva to identify articles that were tagged under Altria or JUUL or had "Altria" or "JUUL" in the headline or lead paragraph of the article.  This search included all Factiva sources (as opposed to major business publications).  I also reviewed Bloomberg sources that were tagged under Altria or JUUL.  For my analyst report search, I reviewed the analyst reports Dr. Nye produced as well as additional reports that I identified.

[152] "Philip Morris, Altria Deal Seen as Public Health 'Nightmare'; Remerger Would Form Patchwork Family Consisting of Three Top Tobacco Brands," *Calgary Herald*, August 29, 2019.

[153] "JUUL LABS: Faces Potential Class Action Over E-Cigarettes," *Class Action Reporter*, August 30, 2019.

[154] There were also reports between August 29, 2019 and August 30, 2019 that Altria submitted a patent application and that it received a patent.  "Altria Client Services LLC; 'E-Vaping Device With Vaporizing Heater And Ejector, And Method Of Operating The E-Vaping Device' in Patent Application Approval Process (USPTO 20190246702)," *Politics & Government Week*, August 29, 2019; "Altria Client Services LLC; Patent Application Titled 'Mounting System With Horizontally-Slideable Bracket And Support Bracket' Published Online (USPTO 20190246815)," *Politics & Government Week*, August 29, 2019; "Altria Client Services LLC; Researchers Submit Patent Application, 'Pod Assembly, Dispensing Body, And E-Vapor Apparatus Including The Same', for Approval (USPTO 20190246700)," *Politics & Government Week*, August 29, 2019; "Altria Client Services LLC; 'Smokeless Tobacco Article' in Patent Application Approval Process (USPTO 20190246685)," *Chemicals & Chemistry*, August 30, 2019; "Philip Morris USA Inc. Patent Issued for Smokeless Tobacco Product Sized, Shaped And Adapted For Oral Consumption (USPTO 10,383,355)," *Chemicals & Chemistry*, August 30, 2019; "Altria Client Services LLC; Researchers Submit Patent Application, 'Alternative Nicotine Carriers For Solid Products', for Approval (USPTO 20190246686)," *Chemicals & Chemistry*, August 30, 2019.

### 3.    September 9, 2019

88.    Plaintiffs allege that on September 9, 2019 "the FDA issued a warning letter to JUUL asserting that its statements regarding the risk of harm presented by JUUL constitute unauthorized modified risk claims under federal law and regulation, directing JLI to cease making or publishing such statements and to take immediate corrective action.'"[155]  Plaintiffs do not allege Altria's stock price declined in response to this information.  The news was released during market hours,[156] therefore I use September 9, 2019 as the event date for my event study.

89.    The results of my event study indicate that there was no statistically significant movement in Altria's stock price on September 9, 2019 (see Exhibit 6).[157]

90.    I reviewed available public press and analyst reports between market close on September 6, 2019, the trading day prior to September 9, 2019, and market close on September 9, 2019 to determine if other information came to the market that could have affected Altria's stock price on this date.[158]  I did not find any positive news that could have offset what would otherwise have been a negative and statistically significant stock price movement on this date.[159]

91.    Analyst reports released on this date commented on the possible merger between Altria and PMI:

- We revisit the key reasons MO and PM separated eleven years ago. The industry backdrop has evolved since, driven by greater global tobacco consolidation and shifting consumer preferences towards [reduced-risk products].  However, we believe much of the rationale

---

[155] Complaint, ¶ 504.

[156] "FDA Sends Warning Letter to Juul Labs Over Marketing Practices," *Theflyonthewall.com*, September 9, 2019, 10:39 AM ET.

[157] Similarly, Dr. Nye's event study does not find a statistically significant stock price movement of Altria's stock on September 9, 2019.  (See Exhibit 6.)

[158] For my public press search, I used Factiva to identify articles that were tagged under Altria or JUUL or had "Altria" or "JUUL" in the headline or lead paragraph of the article.  This search included all Factiva sources (as opposed to major business publications).  I also reviewed Bloomberg sources that were tagged under Altria or JUUL.  For my analyst report search, I reviewed the analyst reports Dr. Nye produced as well as additional reports that I identified.

[159] There were reports on September 9, 2019 that Altria received a patent.  "Philip Morris USA Inc. Patent Issued for Electrically Heated Smoking System (USPTO 10,390,564)," *Journal of Engineering*, September 9, 2019; "Altria Client Services LLC; Patent Issued for Hybrid E-Vaping Cartridge, E-Vaping Device Including A Hybrid E-Vaping Cartridge (USPTO 10,390,567)," *Journal of Engineering*, September 9, 2019.

behind the 2008 split remains valid today.[160]  (Morgan Stanley, September 9, 2019)

- We have less confidence in Altria's outlook following company discussions between Altria and PM of a potential merger of equals (i.e. no premium).  We do not know the terms of a deal, if one happens, but any interest in a deal without a premium could suggest more stress on the underlying fundamentals and management's outlook for the future than we had appreciated.[161]  (Piper Jaffray, September 9, 2019)

92.     However, this information, if new, would not be expected to have a positive impact on Altria's stock price, and, therefore, I conclude that there is no evidence that what Plaintiffs allege to be corrective information impacted the price of Altria's stock on September 9, 2019.  Moreover, I note that information regarding the possible merger between PMI and Altria being structured as a merger of equals was disclosed by Altria in its press release on August 27, 2019 announcing merger discussions between the two companies.[162] Therefore, this information was publicly available before September 9, 2019.

### 4.     September 11, 2019

93.     Plaintiffs allege that on September 11, 2019 "news sources reported that the Trump administration was preparing a ban on flavored e-cigarettes as federal agencies probe an outbreak of a lung problem that killed at least six people and reportedly led to the sickness of hundreds of others."[163]  Plaintiffs do not allege Altria's stock price declined in response to this information.  Because the news was released during market hours,[164] I use September 11, 2019 as the event date for my event study.

94.     The results of my event study indicate there was no statistically significant movement in Altria's stock price on this date (see Exhibit 6).[165]

---

[160] "PM + MO: Then and Now," *Morgan Stanley*, September 9, 2019, p. 1.
[161] "Downgrade to Neutral: Potential Deal Raises Questions; Vapor Clarity a Ways Off," *Piper Jaffray*, September 9, 2019, p. 1.
[162] Altria Press Release, "Altria Group, Inc. Confirms Discussions With Philip Morris International, Inc. Regarding Potential All-Stock, Merger of Equals," August 27, 2019, 9:32 AM ET.
[163] Complaint, ¶ 505.
[164] "Trump could ban sale of flavored vapes, Fox News' John Roberts," *Theflyonthewall.com*, September 11, 2019, 12:35 PM ET.
[165] Similarly, Dr. Nye's event study does not find a statistically significant stock price movement of Altria's stock on September 11, 2019.  (See Exhibit 6.)

95. I reviewed available public press and analyst reports between market close on September 10, 2019 and market close on September 11, 2019 to determine if other information came to the market that could have affected Altria's stock price on that date.[166] I did not find any positive news that could have offset what would otherwise have been a negative and statistically significant stock price movement on this date.[167] There was news that Altria and PMI were progressing towards a potential merger deal, which was "not expected to be announced this week but could be done 'fairly soon'" according to a CNBC reporter.[168] This piece of information, if new, would not be expected to have a positive impact on Altria's stock price. For example, on September 11, 2019 Barclays stated that it "think[s] both PM and MO stocks are capped till [sic] clarity emerges around the strategic rationale for such a combination."[169]

96. Consequently, I conclude that there is no evidence that what Plaintiffs allege to be corrective information impacted the price of Altria's stock on September 11, 2019.

### 5. September 24, 2019

97. Plaintiffs allege that "[o]n September 23, 2019, during after-market hours, news sources began reporting that federal prosecutors in California were conducting a criminal probe into JUUL."[170] They further claim that this alleged corrective event in combination with that on September 25, 2019 caused Altria's stock price "to close at $40.56 per share on September 25, 2019—a total loss of $0.32 per share, or 0.78%, since closing at $40.88 per share two trading days earlier on September 23, 2019."[171] Because the announcement that Plaintiffs allege to have contained corrective information was released at

---

[166] For my public press search, I used Factiva to identify articles that were tagged under Altria or JUUL or had "Altria" or "JUUL" in the headline or lead paragraph of the article. This search included all Factiva sources (as opposed to major business publications). I also reviewed Bloomberg sources that were tagged under Altria or JUUL. For my analyst report search, I reviewed the analyst reports Dr. Nye produced as well as additional reports that I identified.

[167] There was a news article published on September 11, 2019 stating that JUUL launched its e-cigarettes in China. "Juul Labs Launches Its E-Cigarettes in China," *Dow Jones Institutional News*, September 11, 2019, 12:40 PM ET.

[168] "Philip Morris, Altria Progress Towards Merger Deal, CNBC's Faber...," *Theflyonthewall.com*, September 11, 2019, 9:48 AM ET.

[169] "Dank Vape and 2019 Youth Tobacco Survey Forces FDA's Hand," *Barclays*, September 12, 2019, p. 2.

[170] Complaint, ¶ 508.

[171] Complaint, ¶ 512.

3:59 PM ET on September 23, 2019, and so effectively at market close on that day,[172] I used the next trading date (September 24, 2019) as the event date for my event study.

98.    The results of my event study indicate that the abnormal return on Altria stock on September 24, 2019 was not statistically significant at the 5% level (see Exhibit 6).[173]

99.    While Plaintiffs allege a two-day stock price decline (over the trading days of September 24 and 25) in response to the alleged corrective information that came to the market at close on September 23 and to corrective information that allegedly came to the market during trading hours on September 25, if the market for Altria's shares was efficient (as Dr. Nye claims), information that came to the market at close on September 23 would have been impounded into Altria's stock price during the trading day on September 24, and would not have affected Altria's stock price on September 25.  Therefore, I only consider Altria's stock price change on September 24, 2019 when analyzing the alleged corrective information regarding the federal criminal probe.

100.    I reviewed available public press and analyst reports between market close on September 23, 2019 and market close on September 24, 2019 to determine if other information came to the market that day that could have affected Altria's stock price on September 24, 2019.[174]  I did not find any positive news that could have offset what would otherwise have been a negative and statistically significant stock price movement on this date.[175]  One analyst (Wells Fargo) mentioned the "new federal criminal probe" at one point

---

[172] "Federal Prosecutors in California Are Conducting Criminal Probe of Juul – Sources," *Dow Jones Institutional News*, September 23, 2019, 3:59 PM ET.

[173] Similarly, Dr. Nye's event study does not find a statistically significant stock price movement of Altria's stock on this date.  (See Exhibit 6.)

[174] For my public press search, I used Factiva to identify articles that were tagged under Altria or JUUL or had "Altria" or "JUUL" in the headline or lead paragraph of the article.  This search included all Factiva sources (as opposed to major business publications).  I also reviewed Bloomberg sources that were tagged under Altria or JUUL.  For my analyst report search, I reviewed the analyst reports Dr. Nye produced as well as additional reports that I identified.

[175] There was news published on September 24, 2019 stating that CDC said hundreds of vaping-tied illness cases were reported.  In addition, there was a news article stating that a Morgan Stanley analyst expected Altria and PMI to announce the potential merger outcome in the coming week and maintained an Equal Weight rating with a $44 price target on Altria shares.  Both pieces of information, if new, would not be expected to have a positive impact on Altria's stock price.  "CDC Says Hundreds of Vaping-Tied Illness Cases Reported:  CNBC," *Bloomberg*, September 24, 2019, 12:12 PM ET.  "Altria Could Rise 20%+ If Deal an Acquisition, Not Merger, Says Morgan...," *Theflyonthewall*.com, September 24, 2019.  There were two additional pieces of information in news articles published on September 24, 2019, a report that JUUL was preparing to restructure its staff in response to changing regulation and a report that JUUL was requesting that its patents be enforced on some of its imported pod competitors.  "Juul Preparing Staff Restructuring as It Braces for U.S. Crackdown – Sources," *Dow Jones Institutional News*, September 24, 2019, 3:42 PM ET; "Vaping Pioneer Juul Asks Agency to Block Pod-Making Competitors," *Bloomberg News*, September 24, 2019, 1:20 PM ET.

in a 19-page report that focused on the "Risks/Merits" of a potential merger between PMI and Altria.[176]  Even though I did not find any new information, it should be noted that Plaintiffs allege a misrepresentation on September 24, 2019 ("[o]n September 24, 2019, JLI stated to the *Los Angeles Times* (which was later posted on the internet) that 'We have never marketed to youth and we never will').[177]  However, the *Los Angeles Times* article was not posted online until 6:53 PM ET, after market close on that day, so it would not be expected to impact Altria's stock price on September 24, 2019.[178]

101.    Consequently, I conclude that there is no evidence that what Plaintiffs allege to be corrective information impacted the price of Altria's stock on September 24, 2019.

### 6.    February 24–27, 2020

102.    Plaintiffs claim that an article in *The Wall Street Journal* disseminated before market close on Friday February 21, 2020 conveying that "the SEC had launched an investigation into whether Altria fully disclosed to its shareholders the risks associated with its investment in JUUL" caused Altria's stock price to fall "an additional $2.09 per share, or 4.8%, to close at $43.80 per share on the next trading day February 24, 2020, and continued to decline to $40.30 on February 27, 2020, for a total decline of $5.88, or 12.7%."[179]

103.    I performed an event study analysis for each of the four trading days, Monday, February 24, 2020 through Thursday, February 27, 2020.  The results of my event study indicate that none of the abnormal returns for Altria stock on these dates were statistically significant at the 5% level (see Exhibit 6).[180]

104.    The Complaint does not allege that any additional corrective information was released during this period (from the market close on February 21, 2020 through the end of the trading day on February 27, 2020).  Consequently, according to the Complaint, it took the

---

[176] "Tobacco - Bull-Bear Debate On PM/MO," *Wells Fargo*, September 24, 2019.

[177] Complaint, ¶ 509.

[178] "Column: Studies show how Juul exploited social media to get teens to start vaping," *Los Angeles Times*, September 24, 2019, https://www.latimes.com/business/story/2019-09-24/hiltzik-juul-target-teens.

[179] Complaint, ¶¶ 521–22.  As of September 9, 2021, the SEC had not yet brought an enforcement action against Altria and Altria's most recent 10-Q filed on July 29, 2021 stated "the U.S. Securities and Exchange Commission ('SEC') commenced an investigation relating to Altria's acquisition, disclosures and accounting controls in connection with the JUUL investment."  Altria Group, Inc., Form 10-Q filed on July 29, 2021, p. 58.

[180] Dr. Nye's event study similarly does not find statistically significant stock price movements for Altria's stock on February 25, 2020, February 26, 2020, or February 27, 2020.  However, Dr. Nye found a negative and statistically significant stock price movement on February 24, 2020 in his flawed event study.  (See Exhibit 6.)

market nearly a *week* to fully impound the news contained in the alleged corrective event (from February 21, 2020 through February 27, 2020).

105.    In an efficient market, prices react quickly and fully to newly available public information (see Section V.A).  Dr. Nye seems to agree:  "[i]f the security price responds quickly, the response supports a conclusion that the market for the security is efficient."[181] Plaintiffs' claim that the market would take nearly a week to incorporate information that became widely available on February 21, 2020 is thus inconsistent with the conclusion that the market for Altria stock was efficient during the Putative Class Period.  As I discussed in Section V.A above, academic studies find that it may take only *minutes* for stock prices to reflect new, value-relevant information, and the use of a single event day in event studies is well established in the academic literature and has been for many years.

106.    Therefore, if the market for Altria shares was efficient, as Dr. Nye claims, whether or not Altria's stock price movements on any of the dates February 24–27, 2020 were statistically significant and negative does not affect my conclusion as to price impact. The allegedly corrective information was published in *The Wall Street Journal*, a prominent news outlet, at 3:37 PM on February 21, 2020.[182]  2.72 million shares changed hands between 3:37 PM and market close on this day, which suggests unusually large trading activity almost immediately upon the publication of this news.[183]  Based on Dr. Nye's calculated average weekly trading volume during the Putative Class Period, the 2.72 million shares traded in the last 23 minutes of February 21, 2020 represents 28% of average daily trading volume.  As discussed above, in an efficient market, stock prices quickly and fully react to new value-relevant information, within the same trading day.  The fact that the news was reported in a major news outlet, *The Wall Street Journal*, and the fact that there was intensive trading activity in the 23 minutes between the time of the announcement and the market close are both factors that would weigh in favor of a speedy reaction.

---

[181] Nye Report ¶ 18.

[182] "SEC Investigates Altria's Investment in Juul; Regulators investigating Marlboro maker's disclosures after two charges totaling $8.6 billion," *Wall Street Journal*, February 21, 2020, 3:37 PM ET.  The time is also the same as that indicated in the Complaint.  Complaint, ¶ 521.

[183] Based on the average weekly trading volume data that Dr. Nye reports for the Putative Class Period, the 2.7 million shares traded in the last 23 minutes of February 21, 2020 represents around 28% of average daily trading volume, supporting the view that trading activity was unusually large immediately after the Wall Street Journal disseminated this news.  *See* Nye Report, ¶ 28.  The average weekly trading volume during the Putative Class Period based on Nye Report is 47.3 million, which implies an average daily trading volume of 9.5 million.  2.7 million shares are 28% of 9.5 million.

107.    Even if one were to assume that the stock price did not fully reflect the allegedly corrective information by market close on Friday, February 21, 2020, this news would have been incorporated over the weekend and so reflected in the opening price on Monday, February 24, 2020, the next trading day.[184]  In fact, Altria's stock price declined less (i.e., *performed better*) than either the market or my peer index from the close on February 21, 2020 to the open on Monday, February 24, 2020, which is hard to reconcile with the notion that the market was continuing to absorb what Plaintiffs claim to be a negative response to this news.[185]

108.    I reviewed available public press and analyst reports between market close on February 21, 2020 and market open on February 24, 2020 to determine if there was other positive information that came to the market that could have offset what would otherwise have been an abnormal decline in the price of Altria's stock over the weekend.[186]  At 7:00 AM ET on February 24, 2020,  *Reuters* reported that JUUL was halting sales of its products in Indonesia and that "[t]he firm's decision to retreat from the world's fourth most populous nation - which ha[d] not been previously reported – mark[ed] a major setback for Juul's larger

---

[184] For example, Greene and Watts (1996) document statistically significant price changes between market close and the next day's open for earnings announcements made during trading hours for firms traded on Nasdaq but not for firms traded on the NYSE.  The authors also *did not* find any statistically significant stock returns for announcements made during trading hours on the prior day after the market opened the next day for either group. (See Greene and Watts (1996), Tables 4 and 5.)  Alarming news emerged over the weekend about the spread of COVID-19 infections with Italy effectively locking down. https://www.cdc.gov/museum/timeline/covid19.html.

[185] From the February 21, 2020 close to the February 24, 2020 open the S&P 500 Total Return Index (the overall market index that both Dr. Nye and I use) declined by 3.34%.  In Dr. Nye's regression analysis, the coefficient on the S&P 500 Total Return Index is 0.523 on February 24, 2020 (Nye Report, Exhibit 11A), meaning that every 1% decline in the S&P 500 index would be expected to result in a 0.523% decline in Altria's stock price, on average and other things being equal.  From the February 21, 2020 close to the February 24, 2020 open Altria's stock declined by 1.31%, which is smaller in magnitude than 0.523 times the decline in the S&P 500 Total Return Index (-3.34%*0.523 = -1.75%).  I also note that the stock prices of both constituents of my industry index, British American Tobacco and Imperial Brands, and both of Altria's publicly listed equity holdings, Anheuser-Busch InBev and Cronos Group, declined by more than Altria's stock from the February 21, 2020 close to the February 24, 2020 open (British American Tobacco's stock declined by 3.99%, Imperial Brands' stock declined by 2.12%, Anheuser-Busch InBev's stock declined by 3.92%, and Cronos Group's stock declined by 5.73%).  All open and close prices are from Thomson Reuters Refinitiv; British American Tobacco's, Imperial Brands', and Anheuser-Busch InBev's prices are based on their respective American Depository Receipts designated in U.S. dollars.  I was unable to identify a reliable source of close-to-open price data for Dr. Nye's industry index (the S&P 500 Food, Beverage and Tobacco Total Return Index).  I also looked at data for an hour after market open and the performance differential persisted.

[186] For my public press search, I used Factiva to identify articles that were tagged under Altria or JUUL or had "Altria" or "JUUL" in the headline or lead paragraph of the article.  This search included all Factiva sources (as opposed to major business publications).  I also reviewed Bloomberg sources that were tagged under Altria or JUUL.  For my analyst report search, I reviewed the analyst reports Dr. Nye produced as well as additional reports that I identified.

plans to expand in Asia."[187]  Furthermore, Jefferies issued a short report late on February 23, 2020 updating its estimates for Altria.  Jefferies increased fiscal year 2020 adjusted EPS but lowered projected growth between fiscal years 2020 and 2022 while leaving 2021 and 2022 EPS estimates unchanged.  The report also lowered the price target for Altria from $48 to $45 per share, which was below the closing price of $45.89 the prior day.[188]  Both of these piece of information, if new, would not be expected to have a positive impact on Altria's stock price on February 24, 2020, and, therefore, does not change my conclusion that any news conveyed by *The Wall Street Journal* article on February 21, 2020 did not impact the price of Altria's stock on February 24, 2020.

109.    On the basis of this analysis, and if it were the case, as Dr. Nye claims, that Altria's stock traded in an efficient market, its stock price over the period February 24–27, 2020 could not have been impacted by the alleged corrective event on February 21, 2020. Consequently, I conclude that there is no evidence that what Plaintiffs allege to be corrective information on February 21, 2020 impacted the price of Altria's stock on any of the dates February 24, 2020 through February 27, 2020.

      **C.**       **Substantial Doubt Exists as to Whether Any of Altria's Stock Price Changes on the Other Seven Alleged Corrective Event Dates Can Be Used as Evidence of Prior Price Impact of the Alleged Misrepresentations**

110.    This section analyzes the remaining seven alleged corrective event dates. While I find statistically significant price movements on some of those dates, given the mismatch between the contents of the corrective events and the alleged misrepresentations, there is substantial doubt as to whether any stock price movements on these dates can be used as evidence of earlier price impact.

111.    Section 1 below discusses three additional alleged corrective event dates— October 31, 2019, September 25, 2019, and February 21, 2020—for which I did not find statistically significant stock price movements using my event study model.  On each of these dates, Plaintiffs allege corrective disclosures in the form of government investigations into

---

[187] "EXCLUSIVE-Juul halts Indonesia e-cig sales, throwing Asia expansion in doubt," *Reuters News*, February 24, 2020, 7:00 AM ET.
[188] "Updating Numbers: Risk Better Captured but Near Term Multiple Upside Limited This information," *Jefferies*, February 24, 2020.

JUUL and, in the case of October 31, 2019 and September 25, 2019, other alleged corrective events. Section 2 discusses August 29, 2019, where the alleged corrective event is an additional disclosures of government investigation into JUUL. Finally, in Section 3, I discuss April 3, 2019, August 30, 2019, September 13, 2019, and January 30, 2020, as additional examples of a mismatch between the contents of the alleged corrective events and the alleged misrepresentations.

### 1. Additional Alleged Corrective Event Dates without Statistically Significant Stock Price Changes

112. In addition to the eight alleged corrective event dates discussed above, three additional alleged corrective event dates in the Complaint do not show statistically significant stock price movements using my model. Sections a) and b) discuss October 31, 2019 and September 25, 2019, dates that have potentially positive and potentially negative news. Section c) discusses February 21, 2020, for which Plaintiffs assert an intraday stock price decline.

### a) October 31, 2019

113. On October 31, 2019, before market open, Altria announced results for its fiscal 2019 third quarter and announced a new medium-term EPS growth objective. It also held its normal quarterly earnings call with analysts. As part of these disclosures, the Company announced an approximately $4.5 billion non-cash impairment charge related to its JUUL investment.[189]

114. Plaintiffs allege two pieces of corrective information on October 31, 2019: "On October 31, 2019, Altria announced that it was taking a $4.5 billion write-down on its investment in JUUL. Altria also announced that the FTC was scrutinizing Altria's role in the departure of JUUL's CEO, stating that on October 1, 2019, Altria received a civil investigative demand 'seeking information regarding, among other things, Altria's role in the resignation of JUUL's former chief executive officer and the hiring by JUUL of any current

---

[189] Altria Press Release, "Altria Reports 2019 Third-Quarter and Nine-Months Results; Announces New 2020 - 2022 Adjusted Diluted EPS Growth Objective to Advance Strategic Business Platform," October 31, 2019, 7:15 AM ET.

or former Altria director, executive or employee.'"[190]  Plaintiffs allege that "[o]n this news, Altria's stock price fell an additional $1.15 per share, or 2.5%, to close at $44.06 per share on October 31, 2019."[191]

115.    The results of my event study indicate that the abnormal return on Altria stock on October 31, 2019 was not statistically significant at the 5% level (see Exhibit 6).[192]

116.    I discuss below each of the pieces of information that Plaintiffs allege as corrective.  I reach an affirmative opinion on the lack of price reaction with respect to the announcement of the impairment charge by providing evidence that both the impairment charge and its magnitude had been fully expected by the market before the disclosure, a conclusion that analysts reaffirmed in reports issued after the announcement.  As to the FTC inquiry—which was announced alongside with other potentially positive and potentially negative news—the lack of a statistically significant stock price movement on this date along with the mismatch between the subject of the FTC inquiry and the alleged misrepresentations raise substantial doubt as to whether any stock price movement on October 31, 2019 can be used as evidence of earlier price impact of the alleged misrepresentations.

### (1)    Altria's Write-Down on JUUL Investment

117.    As discussed below, market participants, including the sell-side analysts that followed Altria, expected that Altria would take an impairment charge on its JUUL investment and were not surprised by the amount of the charge, in part because news that other JUUL investors had taken write-downs of their own JUUL investments, including the valuations implied by those write-downs, became publicly available before October 31, 2019. Consequently, as discussed in detail below, the impairment charge did not convey new value-relevant information to the market on October 31, 2019 and, therefore, could not have impacted the price of Altria's stock on this date if the market for Altria stock was efficient.

---

[190] Complaint, ¶ 517.
[191] Complaint, ¶ 518.
[192] Dr. Nye found a negative and statistically significant stock price movement on October 31, 2019 using his flawed event study approach.  (See Exhibit 6.)

(a)    **Write-downs of JUUL Investments by Other Investors**

118.    Other JUUL investors wrote down their investments in JUUL before Altria's October 31, 2019 disclosures.  On October 4, 2019, *The Wall Street Journal* reported that "[h]edge fund Darsana Capital Partners recently wrote down its investment in Juul Labs Inc. by more than a third and now holds it at a price that values the e-cigarette company at $24 billion."[193]  A $24 billion valuation for JUUL implies that Altria's 35% stake was worth $8.4 billion and that the investment was impaired by $4.4 billion, close to the actual $4.5 billion impairment.[194]  Analysts took note of this news.  On October 18, 2019, Cowen stated:  "While [Altria] has yet to write down its investment in JUUL…other investors have already taken that step.  According to the Wall Street Journal, one large investor recently marked down its investment to reflect a $24bn valuation, which would imply a $4.4 bn loss for MO."[195]

119.    In addition, on October 30, 2019 *Bloomberg Law* reported that Fidelity Investments had reduced "[t]he value of [Fidelity Blue Chip Growth Fund's] Juul stake…to $386 million from $738 million during September."[196]  In an efficient market, this information, specifically that other investors had determined that JUUL was currently worth substantially less than what Altria had paid for its stake, would be incorporated into Altria's stock price prior to its disclosure of the write-down.

(b)    **Analyst Commentary Prior to October 31, 2019**

120.    Before the Company's October 31, 2019 disclosures, multiple analysts commented on the possibility that Altria would take a significant impairment charge on its JUUL investment, including discussions of the likely magnitude which, in some cases, exceeded the actual $4.5 billion charge:

_____

[193] "Hedge Fund Darsana Slashes Juul's Valuation by More Than a Third; Proposed federal ban on most vape flavors, investigations into marketing practices cloud e-cigarette company's prospects," *The Wall Street Journal*, October 4, 2019.
[194] $24 billion times 0.35 equals $8.4 billion.  Because Altria's initial investment was $12.8 billion, an $8.4 billion value implies a $4.4 billion impairment ($12.8 billion minus $8.4 billion).
[195] "Vexed on Vape? Hello Volatility," *Cowen*, October 18, 2019, p. 24.
[196] "Fidelity Fund Slashes Value of Its Juul Labs Stake by Almost 50%," *Bloomberg Law*, October 30, 2019, 2:59 PM ET.

- Altria's investment in Juul is certainly worth less than the $12 billion paid last year. The extent of the value destruction is difficult to measure, but it does seem to be fully priced into the stock.… The valuation of [the JUUL] investment has been impaired, but it appears the market has already discounted that.  Giving Juul a 75% cut to Altria's cost basis [is] conservative but not unrealistic.[197]  (Morningstar, October 2, 2019)

- These worries largely stem from 5 sources: … iii) the precipitous decline in the valuation of JUUL (-35% since MO's investment, per CNBC).[198]  (Bank of America Merrill Lynch, October 7, 2019)

- We would not be surprised to see MO take an impairment charge on its investment in JUUL given its slower growth prospects.[199]  (Morgan Stanley, October 16, 2019)

- [T]he most important topics for MO to address this quarter will likely be:  … (iii) discussions of a potential writedown of JUUL (which we believe are valid, noting we effectively value JUUL at roughly $12.4 billion, a third of the value at which MO acquired its stake).[200] (Deutsche Bank, October 23, 2019)

- Will Altria write down the value of JUUL investment? Yes – we think it is likely that Altria writes down the value of JUUL's investment at either Q319 or FY19 results. There are two reasons: (a) Investors have recently valued JUUL at $24bn vs. the $38bn valuation of Altria's investment, according to WSJ. (b) Today, WSJ reported that JUUL is cutting 500 jobs, and will take a "more methodical approach" to international expansion. International opportunity was a key justification for Altria's valuation. With the US growth opportunity also in question due to youth access issues, we think it will be hard to continue to value JUUL at $38bn.[201]  (Barclays, October 30, 2019, emphasis removed)

- Recent adverse developments could trigger MO to take an impairment charge on its investment in JUUL. According to an unconfirmed report in the WSJ several JUUL investors have marked down the value of the company to $24 bn compared to $38 bn when MO invested in December 2018.

---

[197] "Vaping Category Implosion Is Priced In and Should Boost Long-Term Margins," *MorningStar*, October 2, 2019, pp. 1–2.
[198] "Dividend Cut Concerns Overblown Due to Pricing and Overall Flexibility," *Bank of America Merrill Lynch*, October 7, 2019, p. 1.
[199] "Q3 EPS Preview," *Morgan Stanley*, October 16, 2019, p. 5.
[200] "What we are watching for next thursday," *Deutsche Bank*, October 23, 2019, p. 1.
[201] "JUUL UK and Europe financials," *Barclays*, October 30, 2019, p. 1.

> …
>
> A potential impairment (or lack thereof) would ultimately reflect MO's view on the value of JUUL as GAAP requires fair value remeasurement upon impairment. Importantly MO may value JUUL differently relative to other investors. If MO were to value its investment in JUUL at $20-25 bn it could lead to a $4.1-5.8 bn write-down equating to 4.7-6.7% of MO's market cap.[202] (Morgan Stanley, October 30, 2019, emphasis removed)

121.    Consistent with the above analyst commentary, CNBC published an article on October 17, 2019 noting that "Juul has lost more than a third of its value."[203]

122.    These comments further support a conclusion that the JUUL impairment charge was anticipated by the market and, therefore, in an efficient market, would have been incorporated in Altria's stock price prior to the October 31, 2019 announcement.

**(c)       Analyst Commentary after the October 31, 2019 Announcement**

123.    Analyst commentary that followed the Company's October 31, 2019 disclosures also suggest, and in some cases explicitly indicate, that the impairment charge was expected and did not impact Altria's stock price on that date:

- Although a $4.5 billion writedown of JUUL is negative in absolute terms, **we believe investors had come to expect such an event** given the negative political/regulatory challenges JUUL now faces.[204] (Deutsche Bank, October 31, 2019, emphasis added)

- **Consistent with our expectations,** MO announced a $4.5 bn impairment charge on its investment in JUUL due to the increased likelihood of FDA action to remove flavored products from the market and various e-vapor bans. MO's impairment implies a $23.7 bn total

---

[202] "Vapor Clouds:  Potential JUUL Impairment?" *Morgan Stanley*, October 30, 2019, p. 1.  This analyst also mentions examples of a few other companies and states that "[s]everal precedents suggest a potentially negative share price reaction in the event of an impairment."

[203] "Juul Has Lost More Than a Third of Its Value, Sources Say," *CNBC*, October 17, 2019.  Moreover, an article in *The Wall Street Journal* published on October 29, 2019 reported that JUUL "plan[ned] to cut roughly 500 jobs" as "part of a broader reorganization" and was undergoing a "necessary reset." "Juul to Cut About 500 Jobs," *The Wall Street Journal*, October 29, 2019.  BAML noted this in an analyst report published the same day, stating that JUUL "confirmed plans to cut 500 (of 4,100) positions as its new CEO made senior management changes and continued to reset JUUL operations ahead of anticipated regulatory changes for nicotine-based vaping." "JUUL Adapting Quickly to Evolving Market Conditions," *Bank of America Merrill Lynch*, October 29, 2019.

[204] "Quick Take - MO's 3Q19 Results," *Deutsche Bank*, October 31, 2019, p. 1.

value for the business vs. $38 bn at the time of MO's investment in December 2018.[205]  (Morgan Stanley, October 31, 2019, emphasis added)

- The $4.5 billion write-down in JUUL was already contemplated in the stock price, in our view (and likely more).[206]  (Stifel, October 31, 2019)

- **Counter to our initial expectation, MO shares declined roughly -2.5% today** (vs. the S&P down -0.3%), reversing early-day strength on the back of strong 3Q results.  While we acknowledge several headline "negatives" in the quarter, including the writedown of JUUL, the lowering of the medium-term EPS aspiration (now +5%-8%), and the delay in assumed FTC approval to 1Q of the JUUL investment, **these were all known pre-market open (and widely discussed/generally anticipated ahead of results)**.[207]  (Deutsche Bank, October 31, 2019, emphasis added)

- In an otherwise in-line quarter, Altria wrote down its investment in Juul Labs by $4.5 billion and lowered its medium-term guidance. **Neither of these developments was a surprise to us**, and we have made few changes to our valuation model.[208]  (Morningstar, November 1, 2019, emphasis added)

- MO took a $4.5bn impairment chg (-35%) on its investment in JUUL (**as investors anticipated**).[209]  (Bank of America, November 1, 2019)

- The takeaways from this quarter went well beyond the strong quarterly performance as the company outlined a new 5%-8% medium-term EPS outlook, an expansion of its IQOS launch already (Richmond, VA), and **a much anticipated write-down** in the value of its JUUL investment ($4.5 billion).
  …
  While we continue to field questions on JUUL from investors, **we believe today's $4.5 billion write-down in the carrying value of JUUL was more than reflected in the stock price already**.  The negative headlines of late had led investors to reduce their view of the

---

[205] "Q3 EPS Beat but Results Highlight MO's Challenges," *Morgan Stanley*, October 31, 2019, p. 1.
[206] "3Q19 EPS Overview," *Stifel*, October 31, 2019, p. 1.
[207] "Some Patience Still Required," *Deutsche Bank*, October 31, 2019, p. 1.
[208] "Shares Already Price In Altria's Lower Guidance and Impairment Charge on Juul," *Morningstar*, November 1, 2019, p. 1.
[209] "Addressing issues and opportunities directly; Reiterate Buy," *Bank of America Merrill Lynch*, November 1, 2019, p. 1.

value of this stake below Altria's new value on its balance sheet of $8 billion.[210] (Stifel, November 1, 2019, emphasis added)

- Altria has now written off 35% of the valuation, in based on our analysis in "Will the JUUL hedge work?" **this was already in the price (indeed the shares did not react to this**). Our work suggested to us a ~50% haircut was being applied by the market to the $12.8bn valuation; 7% of Altria's market cap at the time. JUUL investors have taken similar haircuts.[211] (UBS, November 4, 2019, emphasis added)

124. For the reasons discussed above, I conclude that, if the market for Altria's stock was efficient during the Putative Class Period, as Dr. Nye claims, the Company's October 31, 2019 announcement of a $4.5 billion impairment charge did not impact its stock price on that date.[212]

### (2) Disclosure of FTC Scrutinizing Altria's Role in the Departure of JUUL's CEO

125. As discussed above, Plaintiffs allege that the second piece of corrective information that entered the market on October 31, 2019 was a civil investigative demand from the FTC.[213] Altria provided this information to the market through an SEC Form 10-Q filed at 10:40 AM ET.[214]

126. Importantly, the disclosure stated that FTC was "seeking information regarding, among other things, Altria's role in the resignation of JUUL's former chief executive officer and the hiring by JUUL of any current or former Altria director, executive or employee."[215] However, my understanding is that none of the alleged misrepresentations concern JUUL's management or Altria's role in management changes.

127. Using my event study model I do not find a statistically significant stock price movement on October 31, 2019 (see Exhibit 6).[216] While Dr. Nye finds that Altria's stock

---

[210] "EPS Upside and an Achievable Medium-Term Target," *Stifel*, November 1, 2019.

[211] "Next generation targets," *UBS*, November 4, 2019.

[212] My conclusion regarding the lack of price impact with respect to information on this impairment charge does not depend on whether there was a statistically significant change of Altria's stock price on October 31, 2019.

[213] Complaint, ¶ 518.

[214] Altria Group, Inc., Form 10-Q filed on October 31, 2019, p. 71.

[215] Altria Group, Inc., Form 10-Q filed on October 31, 2019, p. 71.

[216] Exhibit 6.

price movement on this date was negative and statistically significant,[217] this conclusion is unreliable because, as described in Section V.B.2, his statistical model suffers from a number of flaws.

128.    As discussed above, Altria's announcement of the JUUL impairment, including its magnitude, was expected by the market and, therefore, did not impact Altria's stock price.  In addition to the impairment and the civil investigative demand disclosures, both of which Plaintiffs allege as corrective information, there were other pieces of information disclosed on October 31, 2019 that could have contributed, both positively and negatively, to the overall stock price change.

129.    For example, the news announced on this date included Altria's 3Q 2019 Form 10-Q above-consensus earnings results; Altria's disclosure of information on cigarette volumes; Altria's disclosure that is was replacing its long-term adjusted diluted EPS growth aspiration with a new objective for years 2020 through 2022, along with additional information contained in Altria's earnings disclosures and 3Q 2019 Form 10-Q filing.[218]

130.    In response to these disclosures, analysts noted that reported results were mixed and expressed particular concern about cigarette volumes.  An Exane report noted that "[l]ooking at market share, Altria's cigarette share contracted 60bps in the quarter."[219] Similarly, a Jefferies report stated:  "The market will no doubt not like the fact there has not been an upgrade to cigarette industry volume guidance for the year on the back of the recent vapour slowdown."[220]

131.    The lack of a statistically significant stock price movement on this date, along with the mismatch between the subject of the FTC inquiry and the alleged misrepresentations raise substantial doubt as to whether any stock price movement on October 31, 2019 can be used as evidence of earlier price impact of the alleged misrepresentations.

---

[217] Exhibit 6; Nye Report, Exhibit 11B.
[218] "3Q19 adj. EPS was $1.19, c3% above consensus (cons. $1.15; Jeff $1.13)." "3Q19: Beat but Medium Term Guidance Lowered and Impairment Taken on Juul," *Jefferies*, October 31, 2019; See also, "3Q19 EPS Beat, Lower 2020-22 Growth Objective," *Piper Jaffray*, October 31, 2019; "3Q19 EPS Overview," *Stifel*, October 31, 2019.
[219] "3Q19 Results," Exane, October 31, 2019, p. 1.
[220] "3Q19: Beat but Medium Term Guidance Lowered and Impairment Taken on Juul," Jefferies, October 31, 2019, p. 1.

**b)      September 25, 2019**

132.     The Complaint describes the alleged corrective event on September 25, 2019 as follows: "Altria issued a press release announcing that Philip Morris had called off discussions of a $200 billion merger with Altria due to scrutiny of the vaping industry and the Company's 35% stake in market leader JUUL, which had announced the same day that it was the subject of another federal investigation.  JUUL also announced that it was replacing its CEO Kevin Burns with longtime Altria executive K.C. Crosthwaite, and also announced that JUUL would stop all advertising in the U.S."[221]  Plaintiffs claim that "[o]n this news, Altria's stock price fell an additional $0.17 per share, or 0.42%, to close at $40.56 per share on September 25, 2019—a total loss of $0.32 per share, or 0.78%, since closing at $40.88 per share two trading days earlier on September 23, 2019."[222]

133.     Importantly, part of what Plaintiffs allege as corrective on September 25, 2019 is the news of "Philip Morris [calling] off [merger] discussions"[223] with Altria.  However, at the start of the Putative Class Period, the possibility of a merger had not yet been publicly announced (and in fact would not be announced until more than six months later).[224]  Further, I understand that Plaintiffs do not allege any misrepresentations regarding whether a merger would occur.  Therefore, there is a mismatch between contents of the alleged corrective event and the alleged misrepresentations.

134.     The results of my event study indicate that the abnormal return on Altria stock on this date was not statistically significant at the 5% level (see Exhibit 6).[225]

---

[221] Complaint, ¶ 511.

[222] Complaint, ¶ 512.  It appears that the federal investigation discussed in the Complaint is the criminal probe by federal prosecutors in California that was announced at 3:59 pm ET on September 23, 2019 (see Section VI.B.5).  *The New York Times* referred to this investigation in its article issued on September 25, 2019.  "Juul Replaces Its C.E.O. With a Tobacco Executive," *The New York Times*, September 25, 2019.  To the extent that plaintiffs contend that the news of the criminal probe by federal prosecutors made public on September 23, 2019 affected JUUL's stock price on September 25, 2019, two trading days later, such contention is inconsistent with the assumption of an efficient market where news gets incorporated into the stock price quickly and fully (See Section V.A).  Furthermore, as discussed in Section VI.B.5 above, there is no evidence that the announcement of the investigation by federal prosecutors in California impacted the price of Altria's stock on September 24, 2019.

[223] Complaint, ¶ 511.

[224] Altria and PMI confirmed preliminary merger discussions on August 27, 2019.  "Press Release:  Philip Morris International Inc. Confirms Discussions with Altria Group, Inc. Regarding Potential All-Stock, Merger of Equals," *Dow Jones Institutional News*, August 27, 2019, 9:23 AM ET.

[225] Dr. Nye's event study does not find a statistically significant stock price movement of Altria's stock on this date.  (See Exhibit 6.)

135.    I reviewed available public press and analyst reports between market close on September 24, 2019 and market close on September 25, 2019 to determine if other information came to the market that could have affected Altria's stock price on that date.[226]  I found press and analyst commentary on the PMI-related news and the announcements about changes at JUUL.  For example, one analyst commented that the new JUUL CEO "brings responsible leadership to JUUL and will aid the company to successfully navigate through the choppy waters that recent vaping illness, youth usage and regulator outrage has created."[227]  In addition, the *Los Angeles Times* reported after market close on September 24, 2019 that JUUL "told [it] by email" that it has "never marketed to youth and…never will."[228]  Also, Altria announced that it was "tighten[ing] its guidance for 2019 full-year adjusted diluted EPS to a range of $4.19 to $4.27 from a range of $4.15 to $4.27."[229]

136.    The lack of a statistically significant stock price movement on this date, along with the mismatch between the contents of the alleged corrective events and the alleged misrepresentations raise substantial doubt as to whether any stock price movement on September 25, 2019 can be used as evidence of earlier price impact of the alleged misrepresentations.

### c)    February 21, 2020

137.    Plaintiffs claim that a *Wall Street Journal* article disseminated at 3:37 PM on February 21, 2020 conveyed that "the SEC had launched an investigation into whether Altria fully disclosed to its shareholders the risks associated with its investment in JUUL."[230]  I understand that this investigation has not resulted in adverse findings or the commencement of an enforcement action to this day.

---

[226] For my public press search, I used Factiva to identify articles that were tagged under Altria or JUUL or had "Altria" or "JUUL" in the headline or lead paragraph of the article.  This search included all Factiva sources (as opposed to major business publications).  I also reviewed Bloomberg sources that were tagged under Altria or JUUL.  For my analyst report search, I reviewed the analyst reports Dr. Nye produced as well as additional reports that I identified.

[227] "MO to remain independent," *Bank of America Merrill Lynch*, September 25, 2019.

[228] "Column: Studies show how Juul exploited social media to get teens to start vaping," *Los Angeles Times*, September 24, 2019, 6:53 PM ET.

[229] Altria Press Release, "Altria and Philip Morris International End Merger Discussions; Altria Provides Statement on JUUL Leadership Change; Tightens 2019 Full-year Earnings Guidance," September 25, 2019.

[230] Complaint, ¶ 521.  As of September 16, 2021, the SEC had not yet brought an enforcement action against Altria and Altria's most recent Form 10-Q filed on July 29, 2021 stated that "the U.S. Securities and Exchange Commission ('SEC') commenced an investigation relating to Altria's acquisition, disclosures and accounting controls in connection with the JUUL investment."  Altria Group Inc., Form 10-Q filed on July 29, 2021, p. 58.

138. Altria's abnormal return for February 21, 2020 (the full trading day) was not statistically significant at the 5% level in my event study (see Exhibit 6).[231] I reviewed available public press and analyst reports between market close on February 20, 2020 and market close on February 21, 2020 to determine if other information came to the market that day that could have affected Altria's stock price.[232] There were news articles stating that a school district joined litigation against JUUL, twenty lawyers were picked to lead lawsuits against JUUL in California state courts, and one of the lawsuits against JUUL was transferred to the Pennsylvania District Court.[233] This information, if new, would not be expected to have a positive impact on Altria's stock price.[234] Consequently, I did not find evidence of any positive countervailing news that could have offset what would otherwise have been a negative and statistically significant stock price movement on this date.

139. While I do not find a statistically significant stock price movement on February 21, 2020, Plaintiffs point to an intraday stock price decline of $0.29 or 0.63% from $46.18 to $45.89 between 3:30 PM and market close at 4 PM on February 21, 2020.[235] As described below, even when considering the intraday stock price movement, substantial doubt exists as to whether the intraday stock price movement can be used as evidence of prior price impact of the alleged misrepresentations.

140. First, by February 21, 2020 a number of negative developments regarding Altria's investment in JUUL had become known to the market that would presumably have put the market on notice of various significant risks related to the JUUL investment. For example, Plaintiffs allege a number of such negative developments as being corrective events for nearly a year before February 21, 2020 (the first being April 3, 2019).[236] In addition,

---

[231] Dr. Nye's event study does not find a statistically significant stock price movement of Altria's stock on this date. (*See* Exhibit 6.)

[232] For my public press search, I used Factiva to identify articles that were tagged under Altria or JUUL or had "Altria" or "JUUL" in the headline or lead paragraph of the article. This search included all Factiva sources (as opposed to major business publications). I also reviewed Bloomberg sources that were tagged under Altria or JUUL. For my analyst report search, I reviewed the analyst reports Dr. Nye produced as well as additional reports that I identified.

[233] "Hopkins County Schools Join Litigation Against JUUL," *The Messenger*, February 20, 2020; "20 Lawyers Picked to Lead Juul Lawsuits in California State Courts; FROM THE COURTS," *Broward Daily Business Review*, February 21, 2020; "JUUL LABS: O'Reilly Suit Transferred to Pa. Dist. Ct.," *Class Action Reporter*, February 21, 2020.

[234] There was also a report on February 20, 2020 that Altria submitted a patent application. "Altria Client Services LLC; Researchers Submit Patent Application, 'Electronic Vaping Device and Cartridge for Electronic Vaping Device', for Approval (USPTO 20200029627)," *Politics & Government Week*, February 20, 2020.

[235] Complaint, ¶¶ 521–522.

[236] Complaint, ¶¶ 478–479, 500–512, 517–520.

Pomerantz LLP, a plaintiffs law firm, filed a securities class action complaint on October 2, 2019 and issued a press release at 6:05 PM ET the same day.[237]  The press release included allegations that Altria's risk disclosures regarding its JUUL investment had been deficient.[238]

141.    Second, academic literature provides helpful insight into information conveyed by disclosures of SEC investigations.  A recent study provides evidence of statistically significant stock price declines in response to voluntary disclosures of SEC investigations *even when* these investigations ultimately did not result in an enforcement action.  The authors find that "firms that have no ultimate action taken against them have a return of -2.90 percent when they disclose the existence of the investigation."[239]  They note, "[o]ur findings are consistent with regulatory investigations creating a stigma that attaches to firms and managers, even if they are ultimately exonerated."[240]  For the firms experiencing the 2.9% stock price declines, on average, when they voluntarily announce that they are being investigated, the presence of statistically significant stock price declines *is not* evidence that they have previously made misrepresentations much less that these prior alleged misrepresentations had price impact.

142.    These findings from the academic literature, along with the fact that there were many prior negative public disclosures regarding Altria's investment in JUUL,

---

[237] Class Action Complaint, *Gabby Klein, et. al v. Altria Group, Inc., et al,* October 2, 2019.  Pomerantz LLP Press Release, "Pomerantz Law Firm Announces the Filing of a Class Action against Altria Group, Inc. and Certain Officers – MO," October 2, 2019.

[238] The press release stated, "Defendants made false and/or misleading statements and/or failed to disclose that: (i) Altria had conducted insufficient due diligence into JUUL prior to the Company's $12.8 billion investment, or 35% stake, in JUUL; (ii) Altria consequently failed to inform investors, or account for, material risks associated with JUUL's products and marketing practices, and the true value of JUUL and its products; (iii) all of the foregoing, as well as mounting public scrutiny, negative publicity, and governmental pressure on e-vapor products and JUUL made it reasonably likely that Altria's investment in JUUL would have a material negative impact on the Company's reputation and operations; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times."  My event study analysis shows that there was no statistically significant stock price movement on October 3, 2019, the first trading day after the Pomerantz press release.  I find an abnormal return of 1.78% and a t-statistic of 1.12.  Dr. Nye's event study also indicates the stock price movement on this date was not statistically significant.  Nye Report, Exhibit 11B.

[239] David H. Solomon and Eugene Soltes, "Is "Not Guilty" the Same as "Innocent"? Evidence from SEC Financial Fraud Investigations," *Journal of Empirical Legal Studies*, Volume 18, Issue 2, 287–327, June 2021, p. 303.  This article uses abnormal returns measured over three-day windows around the times of the announcements (from one day before to one day after the disclosure).  When researchers do not know the exact timing of the news, it is customary to use event windows of two or three-day length.  In this case, the authors obtain event dates from press releases and regulatory filings and are able to obtain the day but not the time of the initial disclosures.  As discussed above (Section V.A), academic studies find that it may take only minutes for securities prices to reflect new, value-relevant information in an efficient market.

[240] David H. Solomon and Eugene Soltes, "Is "Not Guilty" the Same as "Innocent"? Evidence from SEC Financial Fraud Investigations," *Journal of Empirical Legal Studies*, Volume 18, Issue 2, 287–327, June 2021, p. 291.

including the securities litigation publicizing allegations that Altria's risk disclosures with respect to its JUUL investment were purported to be inadequate, raise substantial doubt as to whether any stock price decline on February 21, 2020 can be used as evidence of earlier price impact of the alleged misrepresentations, as opposed to the market reacting to news that a government agency was investigating Altria.

### 2.    Additional Alleged Corrective Event Date with Investigation – August 29, 2019

143.    According to the Complaint, on August 29, 2019 "The Wall Street Journal reported that the FTC was investigating whether JUUL used influencers and other marketing practices to appeal e-cigarettes to minors."[241]  I understand that the investigation announced on August 29, 2019 has not resulted in adverse findings or the commencement of an enforcement action to this day.  According to my event study, Altria's stock price movement on August 29, 2019 was negative and statistically significant at the 5% significance level (see Exhibit 6).[242]

144.    The article in *The Wall Street Journal* at issue here also discussed previous news of investigations into JUUL's marketing practices: "The Food and Drug Administration and several state attorneys general also are investigating Juul's marketing practices. FDA last October conducted a surprise inspection of Juul's headquarters and collected documents about its marketing."[243]  The surprise inspection was reported by *The New York Times* on October 2, 2018, almost a year before the FTC investigation report.[244]  The article stated: "The F.D.A. said it was particularly interested in whether Juul deliberately targeted minors as

---

[241] Complaint, ¶ 500.
[242] Dr. Nye's event study also finds a negative and statistically significant return on this date. (See Exhibit 6.) The abnormal returns from my event study are not directly comparable to those calculated by Dr. Nye for three main reasons.  First, the abnormal returns in my event study are calculated after removing the impact of Altria's holdings in two listed companies (Anheuser-Busch InBev SA/NV and Cronos Group Inc.) from Altria's stock return. Second, I use a value-weighted industry peer index comprising British American Tobacco and Imperial Brands, while Dr. Nye uses the S&P 500 Food, Beverage and Tobacco Total Return Index that includes Altria but does not include any competitors of Altria in the U.S. tobacco market. I use the S&P 500 Total Return Index as the market index, which Dr. Nye also uses in his event study model. Third, I use logarithmic continuously compounded stock returns, while Dr. Nye's model uses simple arithmetic stock returns.  Continuously compounded returns are standard in the literature (e.g., see Campbell, Lo, and MacKinlay (1997, p. 11)).
[243] "Juul's Marketing Practices Under Investigation by FTC," *The Wall Street Journal*, August 29, 2019.
[244] FDA inspection was reported on October 2, 2018.  "The Food and Drug Administration conducted a surprise inspection of the headquarters of the e-cigarette maker Juul Labs last Friday, carting away more than a thousand documents it said were related to the company's sales and marketing practices."  "F.D.A. Seizes Documents From Juul Headquarters," *The New York Times*, October 2, 2018.

consumers."[245]  In addition, information about JUUL's use of influencers was publicly reported and acknowledged by JUUL before Altria's investment.[246]  Further, in my review of analyst reports between August 26, 2019 and September 5, 2019, there were no mentions of the FTC investigation and, in fact, I did not find any analyst reports from August 29, 2019 through September 2, 2019.[247]

145.    The prior news of investigations that focus on marketing to youth,[248] the prior information regarding JUUL's use of influencers, and the lack of analyst commentary in response to the news of the FTC investigation raise substantial doubt as to whether the negative and statistically significant stock price movement that occurred on the date the article in *The Wall Street Journal* was published (August 29, 2019) can be used as evidence of earlier price impact of the alleged misrepresentations as opposed to the market reacting to news a government agency was investigating the Company.  As discussed above, news of government investigations can impact stock prices even if the underlying investigation does not lead to any further action.

### 3.    Additional Examples of Mismatch between the Contents of Alleged Misrepresentations and the Alleged Corrective Events

146.    When there is a mismatch between information revealed on an alleged corrective event date and information that Plaintiffs allege had previously been misrepresented, a stock price decline on the alleged corrective event date is not necessarily an indication of price impact of the prior alleged misrepresentations.[249]  Dr. Nye seems to

---

[245] "F.D.A. Seizes Documents From Juul Headquarters," *The New York Times*, October 2, 2018.

[246]  "#JUUL: How social media hyped nicotine for a new generation," *CNN*, December 19, 2018.

[247] This is based on the set of analyst reports on Altria that are available to me.

[248] For example, on April 8, 2019, 11 democratic U.S. senators opened an investigation into JUUL regarding youth marketing.  "Senate opens investigation into Juul's marketing practices to minors," *San Francisco Chronicle:  Web Edition,* April 8, 2019, 2:25 PM ET.  It was also reported on June 13, 2019 that "House Democrats [were] pressing e-cigarette leader Juul for a slew of internal documents examining the company's marketing strategies as part of a broad investigation into the teen vaping epidemic....  The subcommittee requested documents related to Juul's marketing strategies to minors."  *See* "House panel demands internal documents from Juul in teen vaping probe," *CNBC*, June 13, 2019, 10:00 AM ET.  *See also* "MEDIA-U.S. House Panel Presses Juul in Teen Vaping Investigation - Bloomberg," *Reuters News*, June 12, 2019, 8:17 PM ET.

[249] This does not mean that an alleged corrective event needs to exactly "match" or "mirror" the earlier alleged misrepresentation, but, in the absence of a clear match, an economic expert needs to employ a scientific and reliable methodology to establish that the two sets of information—one alleged to have been concealed earlier and the other to have been revealed later—have the same impact on stock price.

acknowledge this at deposition, agreeing that "the inference that the back end price drop equals front end inflation starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure."[250]  I have already discussed examples of mismatch between the content of alleged misrepresentations and alleged corrective events in Section VI.C.1 above.  Below I discuss this type of mismatch in the context of additional corrective events alleged in this case, and demonstrate why those mismatches raise substantial doubt as to whether any stock price movements on the days of these alleged corrective events can be used as evidence of earlier price impact of the alleged misrepresentations.

### a)    April 3, 2019 and September 12, 2019

147.    The alleged corrective events on April 3, 2019, August 30, 2019, and September 12, 2019 (after market close) represent news of investigations into seizures and respiratory illness linked to e-cigarette products.  I find that Altria's stock price movements were negative and statistically significant at the 5% level on April 3, 2019 and September 13, 2019 but not on August 30, 2019 (see Exhibit 6).[251]  These alleged corrective events related to the vaping industry as a whole as opposed to JUUL products specifically; in contrast, the alleged misrepresentations are specific to JUUL.  This mismatch raises substantial doubt as to whether any of Altria's stock price movements on these alleged corrective event dates can be used as evidence that the alleged misrepresentations impacted Altria's stock price earlier in the Putative Class Period.  Note that the industry index used in my event study does not provide a good control for news that affects the e-cigarette sector because neither of the companies in the index has significant presence in that sector (the same is true of Dr. Nye's

_____

[250] Nye Deposition, 178:19–24.  I understand that this statement is closely related to the recent SCOTUS opinion in *Goldman*: "Plaintiffs typically try to prove the amount of inflation indirectly: They point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation…. But that final inference—that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure."  *See Goldman Sachs Group, Inc., et al., Petitioners v. Arkansas Teacher Retirement System, et al.*, 141 S.Ct. 1951 (2021) ("*Goldman*").

[251] The alleged corrective event on August 30, 2019 is discussed in Section VI.B.2.  Because I have already demonstrated that this alleged corrective event did not impact Altria's stock price, I do not discuss August 30, 2019 again here.  Dr. Nye's event study also finds that Altria's stock price movement was negative and statistically significant at the 5% level on April 3, 2019 and September 13, 2019 but not on August 30, 2019. (See Exhibit 6.)

industry index, which—apart from PMI and Altria—does not contain any companies in the nicotine or tobacco sectors). As a result, any abnormal returns that Dr. Nye and I calculate in our respective event studies will reflect news that affects the e-cigarette industry sector as a whole as well as news specific to Altria/JUUL.

148.    According to Plaintiffs, information that came to the market on these dates revealed certain facts regarding investigations and other actions taken by government and regulatory bodies that relate to certain health and safety issues believed to be associated with vaping products, including possible restrictions on the sale of these products. Specifically, the Complaint alleges the following as corrective events:

> April 3, 2019: "the FDA announced its investigation into nearly three dozen recent cases of people suffering from seizures after vaping. Between 2010 and 2019, the FDA said it received thirty-five reports of people, especially children and young adults, experiencing seizures after using e-cigarettes."[252]
>
> August 30, 2019: "the FDA and the CDC announced that they were collaborating to investigate e-cigarette related cases of illnesses and 'working tirelessly to investigate the distressing incidents of severe respiratory disease associated with use of e-cigarette products.'"[253]
>
> September 12, 2019 (after market): "On September 12, 2019, during after-market hours, Reuters reported that, '[w]ithin weeks, New Jersey could become the latest state to restrict e-cigarette use, with the governor on Thursday launching a task force to find ways to curb vaping, linked by U.S. health officials to hundreds of respiratory illnesses and a half-dozen deaths.' Additionally, that same day, the CDC reported that as of September 11, 2019, 380 confirmed cases, and probably cases of lung disease associated with vaping, had been reported by thirty-six states and the U.S. Virgin Islands, with six total deaths confirmed in six states."[254]

149.    In addition to constituting a mismatch because the alleged corrective events represent news that affected the industry as a whole while the alleged misrepresentations relate to JUUL and its products specifically, the fact that the alleged corrective information did not impact Altria's stock price on August 30, 2019 (see Section VI.2.B) raises additional doubt as to whether the negative and statistically significant movement in Altria's stock price

---

[252] Complaint, ¶ 478.
[253] Complaint, ¶ 502.
[254] Complaint, ¶ 506.

on September 13, 2019, a later date, can be used as evidence of earlier price impact due to the alleged misrepresentations.

150.    Furthermore, I understand from counsel that the cases of respiratory illnesses were not linked to JUUL but to usage of other off-label vaping products.  Similarly, for the seizure cases, my understanding is that these cases were also not specifically linked to JUUL.  Both the Complaint and FDA's website report 35 cases of seizures between 2010 and 2019.[255] These cases first occurred years before JUUL marketed its first product.[256]  This further supports my view that there is a mismatch, in this case between what could and should have been disclosed at the start of the Putative Class Period and what was disclosed on the alleged corrective event dates.

151.    This raises additional doubt as to whether the statistically significant stock price movements on April 3, 2019 or September 13, 2019 can be used as evidence of earlier price impact of alleged misrepresentations.

### b)    January 30, 2020

152.    Plaintiffs allege that on January 30, 2020 Altria announced "that it was taking an additional $4.1 billion charge related to its JUUL investment" citing "the increased number of legal cases pending against JUUL and the expectation that the number of legal cases against JUUL will continue to increase."[257]  Plaintiffs allege a decline of $2.11 or 4.2% to $48.00 a share on January 30, 2020.[258]

153.    I find that Altria's stock price movement was negative and statistically significant at the 5% level on January 30, 2020 (see Exhibit 6).[259]

154.    The alleged corrective event is the second impairment charge.  However, the alleged misrepresentations, as I understand them, are not regarding the value of the investment when this investment was made or that Altria would not take a second impairment charge once the first impairment charge was announced on October 31, 2019.  Therefore,

_____

[255] *See* FDA Press Release, "Some E-cigarette Users Are Having Seizures, Most Reports Involving Youth and Young Adults," April 10, 2019, https://www.fda.gov/tobacco-products/ctp-newsroom/some-e-cigarette-users-are-having-seizures-most-reports-involving-youth-and-young-adults. *Also see* Complaint, ¶ 478.
[256] See Section IV.A.
[257] Complaint, ¶ 519; Altria Group, Inc., Form 8-K filed on January 30, 2020, Ex. 99.1 at p. 2.
[258] Complaint, ¶ 520.
[259] Dr. Nye also finds a negative and statistically significant stock price movement on this date.  (See Exhibit 6.)

there is a mismatch between the alleged corrective event and what the disclosure was meant to correct.

155.    This second impairment charge occurred more than a year after Altria's initial investment and several months after Pomerantz LLP, co-lead counsel in this case, filed a securities class action complaint (on October 2, 2019) and issued a press release alleging that Altria had committed securities fraud in connection with its JUUL investment.[260]

156.    In addition, Altria had previously taken an approximately $4.5 billion impairment charge related to the JUUL investment on October 31, 2019 (see Section VI.C.1.a)(1)).  It had also disclosed the possibility of an additional impairment charge to investors in its securities filings, in particular in its 10-Q the previous quarter: [261]

> Although Altria's discounted cash flow analysis was based on assumptions that Altria's management considered reasonable and are based on the best available information at the time that the analysis was developed, there is significant judgment used in determining future cash flows.  ***Altria believes the following factors have the most potential to impact projected future cash flows and, therefore, Altria's valuation of JUUL***:  federal, state, local and international regulatory developments; ***JUUL's execution of its strategy, including the success of its planned international market expansions; category growth rates; e-vapor-related litigation***; consumer preferences and competitive activity.

> While Altria's management believes that the estimated fair value of its investment in JUUL as of September 30, 2019 is appropriate, JUUL's actual performance in the short term or long term could be significantly different from forecasted performance due to changes in the factors noted in the prior paragraph.  ***One or more such changes could result in additional impairment charges to Altria's investment in JUUL in future periods.***

157.    Further, Altria stated that "the risks generally related to our investments in JUUL and Cronos, including … ***domestic or international litigation developments … and impairment of our investments***."[262]  In a section labeled "the expected benefits of the JUUL transaction may not materialize in the expected manner or timeframe or at all," Altria explained that "***the risks identified … continue to present ongoing risk of impairment***

---

[260] Class Action Complaint, *Gabby Klein, et. al v. Altria Group, Inc., et al*, October 2, 2019.  Pomerantz LLP Press Release, "Pomerantz Law Firm Announces the Filing of a Class Action against Altria Group, Inc. and Certain Officers – MO," October 2, 2019.
[261] Altria Group, Inc., Form 10-Q filed on October 31, 2019, pp. 56–57, emphasis added.
[262] Altria Group, Inc., Form 10-Q filed on October 31, 2019, p. 82, emphasis added.

***charges. If any additional impairment charges occur, such charges could have a material adverse effect on Altria's consolidated financial position or earnings***."[263]

158.    Altria also issued warnings specifically relating to the possibility that litigation could impact the value of its JUUL investment.  In its 10-Q for the third quarter of 2019, Altria warned that "e-vapor-related litigation" was one of the "factors [that] have the most potential to impact projected future cash flows and, therefore, Altria's valuation of JUUL."[264]  In the same filing, Altria also warned that "the expected benefits of the JUUL transaction … may not materialize in the expected manner or timeframe or at all, including due to the risks encountered by JUUL in its business, such as … domestic or international litigation developments."[265]  In fact, a number of lawsuits were filed between October 31, 2019 and January 30, 2020, for instance litigations filed by the attorney generals of California, New York, and Illinois regarding JUUL's alleged marketing to youth.[266]

159.    I understand that Plaintiffs have not alleged that these statements in Altria's securities filings—that disclosed the risk of further impairment charges—were false or misleading or that the size of the impairment charge that Altria took in Q3 2019 was insufficient.[267]  As a result of these intervening disclosures, it is doubtful that Plaintiffs could establish that any price decline in response to the second write-down can be used as evidence of earlier price impact of the alleged misrepresentations.

160.    Moreover, analyst commentary indicates that the second impairment charge was not unexpected.  For example, Bernstein noted "That there has been a further write-down is not a surprise, but the scale of it is perhaps a surprise."[268]  Similarly Citi noted: "It has been widely reported that Juul faces litigation, so this is not new news, although it is possible that it wasn't adequately considered before now."[269]  And Bank of America noted: "Given the rapid changes in the US vapor category (youth access, flavor bans, lawsuits, vaping lung injuries and likely FDA application concerns), it was not unexpected that mgmt took another

---

[263] Altria Group, Inc., Form 10-Q filed on October 31, 2019, p. 85, emphasis added.
[264] Altria Group, Inc., Form 10-Q filed on October 31, 2019, pp. 56–57.
[265] Altria Group, Inc., Form 10-Q filed on October 31, 2019, p. 85.
[266] "California sues e-cigarette maker Juul alleging targeting of teens and shoddy oversight; 17 shipments sent to someone named 'Beer Can'," *CNBC*, November 18, 2019.  "New York sues Juul, says e-cigarette giant 'took a page from Big Tobacco's playbook'," *CNBC*, November 19, 2019.  "Illinois sues e-cig maker Juul for allegedly targeting minors," *Chicago Tribune*, December 13, 2019.
[267] Section XIII of Complaint.
[268] "Altria FY19: What a mess…," *Alliance Bernstein*, January 30, 2020.
[269] "Mo-Alert, We believe today's share price decline is too extreme," *Citi*, January 30, 2019, emphasis in original.

write-down of its JUUL inv."[270,271]  This would likewise raise substantial doubt that the second impairment establishes price impact relating to alleged misrepresentations pre-dating the third quarter warning.

161.     Furthermore, there was confounding news that accompanied the announcement of the second impairment charge, which may explain the price decline.  The announcement of the impairment charge was part of the set of disclosures made by Altria to announce its fourth quarter and fiscal year 2019 financial results, which, as is typically true of quarterly earnings disclosures, included a number of items of likely interest to Altria investors.  While Altria's reported EPS results were largely in-line with analyst expectations, several analysts commented on mixed results due to lower than expected revenues.[272]  In addition, analysts commented on Altria's announcement that it would no longer offer multi-year volume forecasts for U.S. cigarettes due to volatility across tobacco categories.[273]  For example, a Bernstein report stated:

> [M]anagement has also decided that it no longer intends to give medium-term cigarette volume guidance, due to the "continued volatility across tobacco categories".  One common refrain that we've heard from investors over the past eighteen months, is that the lack of clarity around medium/long-term outlook is what has caused the recent underperformance of tobacco, rendering the space "uninvestable". If even management of the dominant player (across essentially all US tobacco categories!) cannot forecast medium-term volumes, we struggle to envisage how they plan on selling the investment case to investors.[274]

---

[270] "MO's -underlying business resilient; JUUL investment weighs on NT outlook," *Bank of America Merrill Lynch*, January 30, 2020.

[271] Examples of lawsuits filed against JUUL in Q4 2019 include a lawsuit announced by California State AG on November 18, 2019 and a lawsuit announced by NYAG on November 19, 2019.  "California sues e-cigarette maker Juul alleging targeting of teens and shoddy oversight; 17 shipments sent to someone named 'Beer Can'," *CNBC*, November 18, 2019.  *Also see* "California Announces Lawsuit Against Juul for Marketing to Teens," *Theflyonthewall.com*, November 18, 2019, 1:09 PM ET.  "BRIEF-New York AG Letitia James Files Lawsuit Against Juul Labs," *Reuters News*, November 19, 2019, 10:10 AM ET.

[272] "4Q19:  Underlying industry volume improvement, but further JUUL write-offs," *UBS*, January 30, 2020 ("Overall mixed numbers, with lower-than-expected revenue and write-offs on JUUL offsetting a better underlying industry number…").  "Long-term EPS guidance lowered, 4Q 19 cig industry volumes better at -4.5%", *Barclays*, January 30, 2020 ("Altria reported 4Q19 net revenues of $4.8bn, slightly lower than Bloomberg consensus and Barc estimates $4.9bn.").

[273] Altria Group, Inc., Form 8-K filed on January 30, 2020, Exhibit 99.1, p. 3.  ("Altria expects continued volatility across tobacco categories and will no longer provide a multi-year forecast for U.S. cigarette volume declines").

[274] "Altria FY19: What a mess…" *Bernstein*, January 30, 2020, p. 1.

162.    Altria also provided guidance for 2020 full-year adjusted diluted EPS, and lowered its 2020–2022 adjusted diluted EPS growth objective.[275]  I understand that Plaintiffs have not alleged that the medium-term guidance previously provided on October 31, 2019 was misleading.[276]

163.    These factors taken together—Altria's prior impairment charge in Q3 2019 that Plaintiffs do not contend was insufficient; prior warnings that a second impairment charge was possible; the substantial amount of information available to investors about the risks of the JUUL investment; the downward revision of forward looking guidance for Altria on the date of the second JUUL impairment from the levels that Plaintiffs do not content were misleading; and the fact that some analysts were focused on the confounding news and commented that the impairment was not a surprise—raise substantial doubt as to whether the negative and statistically significant movement of Altria's stock price on January 30, 2020 can be used as evidence of earlier price impact of the alleged misrepresentations.

**VII.    Dr. Nye Does Not Offer a Viable Model or Methodology Capable of Calculating Damages on a Class-Wide Basis**

164.    As described in Section IV above, according to the Complaint, Defendants allegedly made misrepresentations about JUUL's marketing practices and concealed or understated the risk of future adverse regulatory action or litigation against JUUL and Altria. The Complaint alleges that when the "truth" emerged and the concealed risks allegedly materialized, inflation was removed from Altria's stock price and investors were harmed.[277] Given Plaintiffs' allegations of concealed or under-disclosed risks, Dr. Nye needs to provide a reliable methodology that could quantify the effect of these concealed risks on inflation.  He would also need to be able to do this over the course of the Putative Class Period, including at times before these risks materialized.

---

[275] On its Q4 2019 earnings call, Altria explained, "Upon antitrust clearance, we expect to account for our equity investment in JUUL using the fair value option. Under this option, Altria's income statement will include any cash dividends received from the investment and quarterly changes in the fair value of the investment. Quarterly changes in the fair value of the investment will be treated as a special item and excluded from adjusted diluted EPS. We don't currently expect to receive equity earnings contributions from JUUL over the next 3 years. Therefore, we've lowered our 2020 through 2022 compounded annual adjusted diluted EPS earnings growth objective to 4% to 7% from our previously announced objective of 5% to 8%." "Q4 2019 Altria Group Inc. Earnings Call – Final," *Thomson Financial,* January 30, 2020.

[276] Section XIII of Complaint.

[277] Complaint, ¶ 22.

165.    In Section A below, I discuss why Dr. Nye fails to put forth a damages methodology suited to the theories of liability put forth by Plaintiffs in this case.  Indeed, at deposition, Dr. Nye acknowledged that he has used the same discussion of damages in other securities class action cases.[278]  Dr. Nye's simplistic damages "framework" is really nothing more than a general definition of damages in 10b-5 securities cases accompanied by a short, general discussion of event study analysis with a claim that an event study can measure inflation in all such cases,[279] and so falls short of constituting a damages methodology that can be applied to reliably measure damages here.  I am not suggesting that Dr. Nye needs to have performed an assessment of damages at this stage.  However, I am observing that Dr. Nye's simplistic framework falls well short of describing a methodology capable of addressing the many complications at issue in the present matter, and so cannot reliably measure damages under Plaintiffs' theories of liability here.

166.    I discussed earlier in (Section VI.C.3) why mismatches between contents of the alleged misrepresentations and the contents of the alleged corrective events raise substantial doubt about Plaintiffs' ability to use price changes at the time of alleged corrective events as evidence of prior price impact of alleged misrepresentations.  The same difficulties exist when modeling any alleged inflation that results from the alleged misrepresentations.  Dr. Nye's generic description of a proposed "framework" fails to indicate how to he would deal with such mismatches in measuring inflation.

167.    In Section B, I discuss why Dr. Nye's proposed damages "framework" fails to properly measure inflation under Plaintiffs' materialization of concealed risk theory of liability.  Dr. Nye's proposed use of an event study of the alleged corrective events to measure inflation ignores the fact that stock prices can decline even if there are no misrepresentations and the risks that materialized were adequately disclosed.  As a result, this proposed approach necessarily overstates inflation by including the full stock price declines that resulted from the materialization of risks (when these risks are realized as adverse outcomes) as opposed to properly measured inflation attributable to an earlier failure to fully disclose certain risks (when the adverse outcome was still uncertain).

---

[278] Nye Deposition, 174:7–22.
[279] Nye Report, Section VII.

168.     In Section C, I discuss Dr. Nye's failure to provide a methodology capable of assisting the trier of fact in determining whether a particular stock price drop in the future was "foreseeable" earlier in the Putative Class Period.

169.     In Section D, I discuss Dr. Nye's failure to provide a methodology that could measure inflation over time, which is crucial here given changes in the mix of information that occurred during the Putative Class Period as the regulatory landscape and the market's perception of regulatory and litigation risks evolved over time.

170.     In Section E, I discuss Dr. Nye's failure to provide a methodology capable of reliably separating the stock price effect of allegedly corrective information from the effect of confounding news not corrective of the allegations; here again, the generic event study that Dr. Nye offers up simply cannot do what is required.

171.     Finally, in Section F, I discuss the Proposed Amended Complaint in which Plaintiffs propose to start the class period on October 25, 2018, before any public disclosure of Altria's investment in JUUL, and which adds four alleged corrective event dates and an additional theory of liability.[280]  As discussed below, the Proposed Amended Complaint only compounds the problems in Dr. Nye's proposed damages "framework."

### A.      Dr. Nye Fails to Propose a Methodology that Can Be Used to Assess Damages in This Case

172.     Dr. Nye fails to provide a damages model or methodology that can be applied on a class-wide basis in this case.  While Dr. Nye's proposed general approach *may* be able to measure damages on a class-wide basis in a securities class action with certain facts, Dr. Nye has not demonstrated that his simplistic approach can do so here given the facts at issue in this case.

173.     In fact, Dr. Nye does not mention Plaintiffs' allegations or theories of liability in his report.  Instead, he claims to have provided "the ***general*** economic framework for quantifying per-security damages on a Class-wide basis, which reflect methodologies [he] would propose to use if asked to calculate damages in this matter."[281]  He further claims that

---

[280] Rumors of a possible investment in JUUL by Altria had been circulating publicly by November 28, 2018. "Altria in Talks to Take Significant Minority Stake in Juul Labs," *The Wall Street Journal*, November 28, 2018. Altria announced its investment in JUUL on December 20, 2018.  Altria Group, Inc., Form 8-K filed on December 20, 2018.

[281] Nye Report, ¶ 63, emphasis added.

"the methodologies for calculating damages described [in his report] would be commonly applicable to each Class member in this matter."[282]  In other words, instead of providing a damages methodology that can be applied on a class-wide basis in this case, he claims to propose a "framework" of methodologies that is "the same as in other cases."[283]

174.    When asked why there were "virtually no changes at all" between the damages section of Dr. Nye's report in this matter and the corresponding section in his report for another recent securities matter, he admitted that he provided the same generic description for both.[284]  He stated that the two cases had "similar theories of liability" because they both had "material misstatements and omissions that conceal the truth, inflate the stock price and prices decline causing actual losses to investors upon revelation of the relevant truth."[285]  Dr. Nye's answer illustrates a fundamental flaw with his purported methodology—he assumes that *any* securities case with the general pattern he describes will have the same damages framework.  However, he agreed that the actual damages opinions would be "starkly differences [sic] from case to case."[286]

175.    As a part of his "framework," Dr. Nye defines damages as the difference between inflation at purchase and inflation at sale.  This is not a *methodology* but rather a generic *definition* of out-of-pocket damages in Rule 10b-5 securities cases.  As such, it fails to provide any information at all about how alleged inflation could actually be measured in this case that focuses on alleged understatement of risk.

176.    The only method that Dr. Nye proposes to use to measure inflation is an event study.  He claims that an event study can be used on a class-wide basis to isolate the impact of "Company-specific price movement caused by the revelation of true facts related to the alleged fraud from price movement caused by other factors."[287]  However, as I discuss in Section V.B above, while a properly specified event study can control for the effect of market and industry factors on a company's stock price, it cannot by itself control for (remove) the effect of company-specific news that is *not* corrective of the allegations.

---

[282] Nye Report, ¶ 63.
[283] Nye Deposition, 174:11.
[284] Nye Deposition, 176:6–17.
[285] Nye Deposition, 176:6–177:4.
[286] Nye Deposition, 176:18–25.
[287] Nye Report, ¶ 65.

177.    For instance, if I perform an event study and find a statistically significant stock price decline on a given corrective event day, it does not mean that I can automatically use that decline to measure the change in price inflation.  It could be the case that the stock price change is due to factors unrelated to the allegations that occurred to the company on the same day.  Critically for this case, it could also be the case that the stock price decline represents the materialization of some previously disclosed risk (see example of materialization of risk involving an oil field in Section B below).  In other words, an event study alone is not sufficient to understand whether the price decline on the corrective event date is caused by the allegations or by other factors.  Other tools are needed to disentangle the two.

178.    At deposition, Dr. Nye claimed that when he referred to the event study in this report, he meant the use of *other* tools, in addition to the event study regression analysis described in his report:

> I mean, the event study methodology, which is more than a regression, although the regression analysis many times can accomplish just what you're talking about. Sometimes, though, you go in with discounted cash flow analyses. Sometimes you go in with looking at the average effects of other corporate disclosures that occur and robust samples studied by an academic economists [sic]. Sometimes you'll get analyst reports and their assessment of the situation. Sometimes you look at the company's internal documents.[288]

179.    Leaving aside the fact that Dr. Nye does not describe these tools in his report, asserting that there are *possible* tools he *might* use to calculate damages without serious consideration of the particular facts and complications at issue here cannot constitute a methodology capable of reliably measuring damages in the present matter.  While Dr. Nye points to possible approaches such as discounted cash flow analyses, academic literature on corporate disclosures, and reviewing analyst reports, he fails to provide any indication at all as to which tools he plans to use in this case and/or how these tools could actually be used to reliably determine inflation at different points in time here.  Dr. Nye acknowledged at deposition that he has not "given…more specific details of the methodology [he proposes] to

[288] Nye Deposition, 122:5–15.

employ here in this case relevant to facts specific to Altria" and claimed that doing so "would happen, as it always does, appropriately at -- you know, post class certification."[289]

180.    In making this statement, Dr. Nye is effectively asking the Court to trust that he would be able to evaluate some unspecified counterfactual disclosures, using an unspecified methodology, to reliably determine how much these hypothetical disclosures would have affected Altria's stock price on each day of the Putative Class Period.[290]  In other words, the "framework" described by Dr. Nye fails to provide any guidance as to how one could reliably measure inflation by separating the stock price effects of the alleged fraud from the effects of the materialization of adequately disclosed risks or confounding news not corrective of the alleged fraud, either on the alleged corrective event dates or at earlier points in in time during the Putative Class Period.

181.    Finally, Dr. Nye's general discussion of damages fails to recognize the complexities at issue here.  There *could* be situations for which an event study regression model is sufficient to measure inflation.  However, that is not the case here.  As discussed in Sections B–F below, there are a number of complications here that need to be addressed in order to measure inflation.  Most importantly, under Plaintiffs' theory of materialization of concealed risks, it will be crucial to understand which risks were disclosed and which were concealed over the course of the Putative Class Period and to be able to measure changes in inflation accordingly.  An *ex post* event study provides no information (or quantification) of the extent to which risks were understated or how the stock price would have reacted to disclosures of incremental risks *ex ante*.  Additional complications result from the large number of alleged corrective event dates and changes in the information mix between the event dates as the regulatory and litigation landscape evolved over the course of the Putative Class Period.  Finally, there are a number of days on which news comes to the market that is not causally-linked to the allegations.  For these dates, the impact of any such confounding news will need to be identified and removed from that due to the alleged corrective events in order to properly measure changes in inflation.  These issues lead to complexities much more significant than what Dr. Nye acknowledges in his report or at deposition, and he fails to provide the methodology necessary to deal with these complexities.

---

[289] Nye Deposition, 93:7–21.
[290] Unless otherwise noted, all opinions and discussions of the Putative Class Period in this report also hold for the Amended Complaint Class Period.

B.      **Dr. Nye Fails to Provide a Methodology to Measure Inflation under Plaintiffs' Materialization of Concealed Risks Theory of Liability**

182.    Dr. Nye claims that "(p)rice inflation may be measured…by analyzing the change in a security's price caused by a corrective event and/or the materialization of a concealed risk" and proposes to use an event study to measure any such security price changes.[291]  As discussed below, Dr. Nye's proposed approach ignores the fact that stock prices can change even if there were *no* misrepresentations and the risks that materialized were adequately disclosed.  As a result, this proposed approach necessarily overstates inflation by including the entire stock price decline that occurs when risks materialize (when these risks are realized as adverse outcomes) as opposed to properly measured inflation attributable to an alleged failure to fully disclose certain risks at an earlier point in time (when the adverse outcome was still uncertain).

183.    At deposition, Dr. Nye admitted that his damages "framework" does not distinguish between a corrective event and the materialization of a concealed risk and so proposed using an event study of the alleged corrective events to measure security price changes attributable to both types of disclosure events.[292]  He testified that he understood the difference to be "a legal distinction."[293]  While I agree that the terms "corrective disclosure" and "materialization of a concealed risk" have legal connotations, there are distinct economic concepts related to these legal constructs that require different methodological approaches, which Dr. Nye has failed to take into account in putting forth his damages "framework."

184.    First, Dr. Nye fails to provide a damages methodology that could account for the fact that the price can change following the materialization of any risk (when that risk becomes a certainty) even if there were *no* misrepresentations and the risks that materialized were adequately disclosed.

185.    A simplified example provides intuition on this point.  Consider an oil company that discloses the discovery of an oil field it believes may contain 1,000,000 barrels of oil.[294]  At the time of this discovery—say on day 1 of the Putative Class Period—the

---

[291] Nye Report, ¶ 65.
[292] Nye Deposition, 138:20–24.
[293] Nye Deposition, 138:20–24.
[294] To keep the example simple, I describe the value of common shares (and later, inflation) on an aggregate, as opposed to on a per-share basis but the concepts apply equally well on a per-share basis.

company truthfully discloses a 90% chance the field will yield 1,000,000 barrels of oil and a 10% chance the oil field will be dry and yield no oil.  The oil price on this date is $50/barrel.  An efficient market would value the field at its expected value of $45 million (90% x 1,000,000 barrels x $50/barrel + 10% x 0 barrels).  Let's further assume that at the end of the Putative Class Period, based on new information from its exploration and evaluation team, the company learns the field contains no economically viable reserves, i.e., the 10% risk that the field was dry materializes.  The company now knows the field is worthless and promptly discloses this fact to the market.  In an efficient market (and assuming other factors, including the price of oil, did not change over the class period), the company's market capitalization will fall by $45 million (in total) to reflect this loss in value.

186.     The stock price change that occurs when this risk materializes ($45 million in total) reflects the realization of an adverse outcome – what was merely a risk at the beginning of the class period has materialized (become a certainty).  Before the risk materializes, it is uncertain how the risk might evolve over time and what its ultimate realization might be.  Consequently, to the extent the risk is misrepresented or concealed at an earlier time, any inflation on those earlier alleged misrepresentation dates when the realization of the risk is still uncertain, would be different, and likely much smaller, than the price decline that occurs when the risk ultimately materializes into an adverse outcome (on the alleged corrective event dates).

187.     In the example above, there can be no inflation because there is no difference between the market's and the company's assessment of the risk (the company truthfully disclosed the risk).  Yet, the stock price declines when the risk is realized.  This demonstrates that the stock price change in response to the materialization of a risk may occur *even when the company truthfully discloses the risk* and so clearly illustrates why the full stock price change cannot be used to assess the stock price effect of previously concealed or understated risks on the alleged corrective event date or measure any earlier inflation attributable to these concealed risks.  By taking the full residual stock price decline on the alleged corrective dates, Dr. Nye fails to provide a methodology capable of measuring inflation attributable *only* to those risks that were allegedly concealed or understated.[295]

---

[295] Dr. Nye refers to "materialization of a concealed risk" without defining what he means by concealed risk. For the purposes of this report, I will assume that concealed risk is any risk that has been allegedly understated.

188.    Dr. Nye acknowledged at deposition that his purported methodology is incapable of properly separating a price decline due to the materialization of an allegedly concealed risk from a price decline due to the materialization of a risk that was adequately disclosed,[296] which is crucially important given the nature of the corrective events alleged in the Complaint.  For instance, Dr. Nye has not provided a methodology that could translate the price decline that occurs when the risk of a regulatory investigation materializes (e.g., when an investigation is actually announced) into inflation earlier in the Putative Class Period when a regulatory investigation was possible but not certain.  Put differently, it may well be the case that the stock price change reflects the materialization of an adequately disclosed risk so that the correctly measured change in inflation on the date when the investigation was announced is zero, as with the oil example above.

189.    Second, Dr. Nye's proposed approach necessarily overstates inflation by including the full stock price decline that resulted from the materialization of risks (when these risks are realized as adverse outcomes) as opposed to properly measured inflation attributable to an earlier failure to fully disclose certain risks (when the adverse outcome was still uncertain).  Dr. Nye even admitted this overstatement in deposition by stating: "It's, of course, true that in a vacuum if you were to announce a risk of something, it's going to be less impactful than if the risk had materialized just because of the uncertainty of it."[297]  The oil field analogy helps to illustrate the implications of this important admission.

190.    Assume, as before, that on day 1 the company disclosed a 90% likelihood the oil field would yield 1,000,000 barrels (and a 10% likelihood of no oil).  However, assume now that in addition to this disclosed risk, the company had an additional risk that it concealed from the market, and the true likelihood of yielding 1,000,000 barrels was only 85% (so that there was a 15% chance of no oil due to the combination of disclosed and undisclosed risks).  Based on the company's day 1 disclosure, the initial expected value remains at $45 million, which would then also be the decline in value when it later announced there was no oil.[298]  However, on day 1, the company's undisclosed risk created

---

Dr. Nye does not distinguish between risk that has been fully and partially concealed (Nye Deposition, 138:3–19).

[296] Nye Deposition, 40:25–41:13.

[297] Nye Deposition, 158:13–16.

[298] I note that, for the purposes of this illustrative example, I assume that other factors, including the price of oil, including the price of oil, remain unchanged over time.

price inflation that is smaller than the observed decline in value when the risks eventually materialize. Had the oil company disclosed the additional risk on that day (the counterfactual disclosure), the market would have valued the oil field at an expected value of $42.5 million (85% x 1,000,000 barrels x $50/barrel + 15% x 0 barrels). Because the market instead valued the oil field at $45 million, properly measured inflation associated with the undisclosed risk would be $2.5 million on day 1 (the difference between $45 million and $42.5 million).[299] Thus, using the full value decline of $45 million at the time the disclosed risk materialized, as Dr. Nye's simplistic back-casting approach would do, substantially overstates inflation due to the Company's alleged under-disclosure of risk – in other words, using this example Dr. Nye's approach would estimate inflation of $45 million versus the correct $2.5 million.

191. Moreover, there is no way to modify or adjust Dr. Nye's approach to correct this fundamental defect—as discussed above, there is no economic link between the stock price decline when the risk materializes and correctly measured inflation. Critically, Dr. Nye cannot assume that discovery will provide him with an analogue of the comparison between the actually disclosed risk (10%) and the concealed risk (15%) that determines inflation in the oil example. I have not seen probabilistic quantifications of relevant dimensions of risks in available analyst reports, and Dr. Nye cannot assume away the real possibility that none emerge from the discovery process. As far as I can tell, Dr. Nye has no Plan B other than his inapplicable event study to calculate inflation due to the alleged understatement of risks.[300] As discussed above, an event study alone cannot quantify the degree to which a risk was understated or measure the impact of the understatement on inflation.

192. The combination of the two methodological flaws, failing to provide a methodology capable of distinguishing between realization of risk and understatement of risk and failing to provide a methodology capable of isolating inflation due solely to allegedly

---

[299] Inflation equals $50 million times the difference between the 15% internal risk assessment and the 10% market risk assessment.

[300] None of the potential additional analyses that Dr. Nye mentioned at deposition (see ¶178 above) address the methodological problem of the mismatch between the price effect of disclosure of incremental risk and the price effect of materialization of the risk. For example, a discounted cash flow model needs to have *expected cash flows* as an input. However, Dr. Nye provides no methodology for adjusting market expectations of cash flows for incremental risk *ex ante* (an analog of multiplying $50 million by the difference between the 15% internal risk assessment and the 10% market risk assessment in the example above). Referring to a discounted cash flow analysis does not solve the problem of not having an estimate for the internal risk assessment of 15% in the oil example.

concealed risk means that Dr. Nye fails to provide a methodology for assessing damages under materialization of concealed risks theory of liability.

193.    This issue applies to all of the stock price changes that accompany alleged corrective events that represent the materialization of risks that Plaintiffs allege Altria had concealed, such as announcements of regulatory restrictions, investigations and litigation, impairment charges and any other events claimed by Plaintiffs as materialization of concealed risks.

194.    As an example of Dr. Nye's failure to provide a methodology that could measure inflation under materialization of risk, consider January 30, 2020.  As discussed in Section VI.C.3, Altria announced that it took an impairment charge of $4.5 billion when announcing financial results for 3Q 2019 on October 31, 2019.  Altria had issued a warning regarding the possibility of an additional impairment charge in the Form 10-Q it filed on October 31, 2019, which stated: "…JUUL's actual performance in the short term or long term could be significantly different from forecasted performance due to changes in the factors noted in the prior paragraph. ***One or more such changes could result in additional impairment charges to Altria's investment in JUUL in future periods***."[301]  A number of lawsuits were filed between October 31, 2019 and January 30, 2020, for instance litigations filed by the attorney generals of California, New York, and Illinois regarding JUUL's alleged marketing to youth.[302]  Then, on January 30, 2020, Altria took a second impairment charge of $4.1 billion.  As described above in Section VI.C.3.b), a number of analysts were not surprised by the fact that Altria was taking a second consecutive impairment charge on its investment.

195.    If Dr. Nye were to use the stock price decline on January 30th to measure inflation, as he has proposed, he will overstate inflation during the Putative Class Period.  One reason for the overstatement is that any stock price change following the announcement of an impairment will most likely be higher than the change that would have been observed earlier in the Putative Class Period, before the impairment was known with certainty.  Furthermore, analysts commented that they were not surprised that Altria was taking on

---

[301] Altria Group, Inc., Form 10-Q filed on October 31, 2019, p. 57, emphasis added.
[302] "California sues e-cigarette maker Juul alleging targeting of teens and shoddy oversight; 17 shipments sent to someone named 'Beer Can'," *CNBC*, November 18, 2019.  "New York sues Juul, says e-cigarette giant 'took a page from Big Tobacco's playbook'," *CNBC*, November 19, 2019.  "Illinois sues e-cig maker Juul for allegedly targeting minors," *Chicago Tribune*, December 13, 2019.

another impairment and that the impairment was due to an increase in legal cases against JUUL. This means that the risk of the impairment was, at the very least, known to the market.

196. Dr. Nye has not provided a methodology that could translate any price decline that occurred on January 30, 2020 in response to the risk of a second impairment materializing into inflation earlier in the Putative Class Period when another impairment was possible but not certain. Put differently, it may well be the case that any stock price decline on January 30, 2020 in response to the second impairment reflects the materialization of an adequately disclosed risk so that the correctly measured change in inflation on this date was zero, as with the first oil example. Dr. Nye's approach of using the stock price decline on January 30, 2020 as a measure of inflation would overstate inflation and at the same time fail to measure inflation that was due only to allegedly concealed risk and not to risk that was known or disclosed, as shown in the second oil example.

197. The shortcoming that is described here for January 30, 2020 applies to all of the other dates for which Plaintiffs have alleged a materialization of concealed risks.

### C. Dr. Nye Fails to Present a Methodology to Assist the Trier of Fact in Determining Whether a Particular Stock Price Drop in the Future Was "Foreseeable" Earlier in the Putative Class Period

198. Dr. Nye testified that it is his understanding "that the foreseeable consequences, the ramifications, materializations of risks associated with underlying alleged misconduct are demonstrative of loss causation and part of compensable damages under Section 10(b)."[303] Dr. Nye also testified that it is his understanding that "foreseeability" does not need to be 100% as a matter of law, that "foreseeability" is something that the trier of fact would need to determine and that he is "provid[ing] helpful information to the trier of fact as an economist".[304] However, Dr. Nye does not present any methodology to assist the trier of fact in determining whether a particular stock price drop in the future would be understood by the market to be more likely (or certain) had hypothetical alternative disclosure been made in December 2018 or at other points of the Putative Class Period. As discussed above, stock prices can decline in a statistically significant manner in response to value-relevant news that

---

[303] Nye Deposition, 119:13–18.
[304] Nye Deposition, 146:8–147:15.

Page 78

reflects the materialization of risks even if the company and investors have the *same* information about this risk *ex ante*.

**D.** **Dr. Nye Fails to Provide a Damages Methodology that Could Take into Account the Changing Mix of Information over the Putative Class Period**

199.    As detailed above, the only damages approach proposed by Dr. Nye is an event study on the alleged corrective event dates—an approach that fails to acknowledge, much less account for, the complications relating to materialization of concealed risks.  In other words, Dr. Nye's purported methodology cannot account for changes in the mix of information regarding the allegedly concealed risks and associated changes in the regulatory environment during the Putative Class Period—because it is focused on the alleged corrective event dates only—even though under the Plaintiffs' theories of liability, the market was getting progressively more informed about these risks over time.

200.    For example, information regarding regulatory and legal challenges in the vaping industry, including for JUUL specifically, emerged during the Putative Class Period.[305]  There are many examples of such releases over the course of the Putative Class Period.  Some examples discussed elsewhere in this report include a Senate and House investigations into JUUL's marketing practices announced on April 8, 2019 and June 12, 2019, respectively, and litigation against JUUL by the California Attorney General and the North Carolina Attorney General, announced on May 15, 2019 and November 18, 2019, respectively.[306]  A methodology that captures changes in inflation over the Putative Class Period is particularly crucial in this matter, because of the amount of information about JUUL and related regulatory and litigation developments that was released during the Putative Class Period.[307]

---

[305] See Section IV.D.

[306] "Senate opens investigation into Juul's marketing practices to minors," *San Francisco Chronicle:  Web Edition*, April 8, 2019, 2:25 PM ET.  "House panel demands internal documents from Juul in teen vaping probe," *CNBC*, June 13, 2019, 10:00 AM ET.  *Also see* "MEDIA-U.S. House Panel Presses Juul in Teen Vaping Investigation - Bloomberg," *Reuters News*, June 12, 2019, 8:17 PM ET.  *Also see* "North Carolina sues Juul, claiming deceptive marketing and targeting youth," *CNN*, May 15, 2019.  "California sues e-cigarette maker Juul alleging targeting of teens and shoddy oversight; 17 shipments sent to someone named 'Beer Can'," *CNBC*, November 18, 2019.  *Also see* "California Announces Lawsuit Against Juul for Marketing to Teens," Theflyonthewall.com, November 18, 2019, 1:09 PM ET.

[307] Complaint, Section XIV.

201.    A damages methodology that focuses only on stock price changes on alleged corrective events dates to measure inflation, as Dr. Nye's purported methodology seems to imply here, is often described as a methodology based on "back-casting." A "back-casting" approach assumes that: (i) Plaintiff is able to reliably attribute a price decline of, for example $10, to the disclosure of alleged corrective information on a given alleged corrective event date, and (ii) per-share inflation remains constant at $10 on each day over the course of the carry-back period, i.e., the full Putative Class Period. For this "back-casting" technique to be valid economically, one has to assume the information could and should have been disclosed as early as the first day of the Putative Class Period, and that it would have had exactly the same stock price effect as that which actually occurred on the alleged corrective event days. Given the developments described above that occurred over the course of the Putative Class Period, including regulatory and legal challenges in the vaping industry, and for JUUL specifically, these assumptions are unsupported.

202.    When asked in deposition whether he was planning to use back-casting and whether and how he would propose to adjust inflation on days between alleged corrective events, Dr. Nye admitted that he has not done this exercise. When asked what methodology he could use to determine how to conduct such an exercise, Dr. Nye pointed to the event study and out-of-pocket damages and acknowledged that his proposed methodology "has not been applied specifically to the plaintiffs' theory of liability in this case."[308]

203.    Hence, Dr. Nye provides no methodology that can assist the trier of fact in determining whether particular risks that were allegedly concealed at the start of the Putative Class Period were adequately disclosed before the first alleged corrective event or at other times during the Putative Class Period and he does not provide a damages methodology that would take this into account.

      **E.**      **Dr. Nye Fails to Provide a Methodology Capable of Reliably Separating the Stock Price Effect of Allegedly Corrective Information from the Effect of News that Is Not Corrective of the Allegations**

204.    In addition to failing to provide a methodology capable of addressing Plaintiffs' materialization of concealed risk theory, Dr. Nye fails to provide a methodology

---

[308] Nye Deposition, 152:14–153:3.

that can reliably separate the price effect of news alleged to be corrective of the allegations from the effect of other news not corrective of the allegations (*i.e.*, confounding news).  In Section VI above, I discussed different pieces of confounding news released on alleged corrective event dates, including financial results, as well as other information, disclosed through earnings releases and disclosures regarding the reason for the dissolution of the Philip Morris merger talks.  I revisit some of this discussion here.

205.    There are two alleged corrective event dates on which earnings were released: October 31, 2019 and January 30, 2020.  As described in detail in Section VI.C.1, on October 31, 2019, Plaintiffs allege that two pieces of corrective information were disclosed:  (1) the first impairment of Altria's investment in JUUL and (2) that the FTC issued a civil investigative demand.[309]  In addition, earnings results, including sales volumes for traditional cigarette products, was disclosed, as was updated guidance.  While some of this information likely had positive implications and other information likely had negative implications, Dr. Nye cannot assume that the effects of such positive and negative information cancel out.  Dr. Nye has not provided a methodology capable of separating the stock price reaction to the FTC civil investigative demand from that to the other information disclosed, a step that is necessary to calculate damages due to the alleged misrepresentations.  Dr. Nye cannot attribute any change in inflation to the impairment since, as I concluded in Section VI.C.1.a), the impairment did not impact Altria's stock price.  Similarly, on January 30, 2020, earnings and other business information as well as the second impairment (the allegedly corrective information) were disclosed (see Section VI.C.3.b)) and Dr. Nye fails to provide a methodology that can separate any stock price reaction to the second impairment from the stock price reaction to other information that was disclosed on this date.

206.    The September 25, 2019 alleged corrective event (according to the Complaint, an announcement that "Philip Morris had called off discussions of a $200 billion merger with Altria due to scrutiny of the vaping industry and the Company's 35% stake in market leader JUUL"[310]) also included confounding information.  While Plaintiffs allege the dissolution of the merger talks was due to Altria's investment in JUUL,[311] analysts discussed other reasons.

---

[309] Complaint, ¶ 517.
[310] Complaint, ¶ 511.
[311] Complaint, ¶ 533.

For example, analysts flagged Altria's rate of cigarette volume decline,[312] the lack of merger premium, and Altria's low share price[313] as other reasons why the merger talks failed. Dr. Nye has not provided a methodology that can separate the stock price reaction to such factors from that resulting from alleged misrepresentations by Altria and JUUL.

207.    In sum, Dr. Nye has not provided a methodology to separate the stock price effects of information corrective of the allegations from non-corrective information on the alleged corrective event dates. Therefore, he has not shown there is a class-wide damages methodology in this case that is consistent with the Plaintiffs' theories of liability.

### F.    Proposed Amended Complaint Compounds Problems Associated with Dr. Nye's Damages "Framework"

208.    The Proposed Amended Complaint alleges misrepresentations starting on October 25, 2018, before the market knew of Altria's potential investment in JUUL.[314] Plaintiffs allege an additional four alleged corrective event dates in the Proposed Amended Complaint – March 19, 2019,[315] June 21, 2019,[316] November 19, 2019,[317] and April 1, 2020,[318] along with an additional theory of liability under which Altria allegedly made false and misleading statements regarding removing "certain e-cigarette products from the market because of a non-compete condition of its planned investment in [JUUL]" and concealing from the market "material risks associated with… Altria's contemplated non-compete

---

[312]  *See* e.g., "End of Merger Talks = Logical Outcome," *Cowen*, September 25, 2019, p. 1 ("The motivation for MO was clear as a takeout (even at a no premium deal) would have protected it from further downside risk on continued cigarette volume declines… With management revising down its industry cigarette volume declines twice so far this year (which is very un-Altria like) … we could understand management's motivation to seek strategic alternatives to turn-around momentum."); "PM and MO announce their merger is off," *Citi*, September 25, 2019 ("We have said that the current rate of cigarette volume declines (about -6%) means that MO will run out of road in the next few years. The proposed deal was officially described as a (potential) no-premium merger, but it could also be seen as management being willing to lose control for no premium, implying that they agree the medium-term future looks bleak."); "PM/MO Ending Merger Discussions – Clearer Heads Prevailed," *Stifel*, September 25, 2019, p. 1 ("it is evident that … weak volumes led to this decision [to end merger discussions].").

[313]  *See*, e.g., "PM-MO: Will the merger be back?" *Barclays*, September 25, 2019, p. 1 ("The real problem, in our view, has been that Altria's stock price is too low to contemplate a merger, especially when it has $15/share of non-consolidated assets such as 10% stake in ABI,  35% stake in JUUL and Cronos."); "Takeaways from Our Meeting with Management," *Morgan Stanley*, September 25, 2019, p. 1 ("We have been cautious on the strategic and financial merits of a potential recombination and we believe the combination of PM investor pushback, MO's low share price/lack of premium and proliferating negative JUUL headlines contributed to the companies' decision to conclude the merger discussions.").

[314] Proposed Amended Complaint, ¶¶ 407–411.

[315] Proposed Amended Complaint, ¶¶ 494–495.

[316] Proposed Amended Complaint, ¶¶ 507–508.

[317] Proposed Amended Complaint, ¶¶ 541–542.

[318] Proposed Amended Complaint, ¶¶ 547–548.

agreement with JLI."[319]  Additional alleged misrepresentations, additional alleged corrective events, and Dr. Nye's lack of a methodology to account for the additional theory of liability presented by Plaintiffs compound the problems with his purported damages methodology identified in Sections A through E above.

### 1.  March 19, 2019

209.    In the Proposed Amended Complaint, Plaintiffs allege that comments by Dr. Scott Gottlieb, the then-FDA Commissioner, on March 19, 2019 caused Altria's stock price to decline "$1.29, per share, or 2.25%, to close at $56.01 per share."[320]  Dr. Nye's event study does not find a statistically significant change in Altria's stock price on that day.[321]

210.    According to Plaintiffs, the allegedly corrective statement includes the following: "[Dr. Gottlieb] said he had a 'difficult' meeting the prior week with Altria and JUUL, was concerned about the slow pace of efforts to curb *youth vaping*, and believed that the FDA may need to pull pod-based nicotine products off the market as it combats a *surge in teen vaping*."[322]

211.     I understand that the District Court's MTD Opinion distinguishes disclosures and other announcements that convey information regarding youth usage of JUUL products from what Plaintiffs allege to be JUUL's marketing to youth.  The MTD Opinion states: "[T]he problem of youth usage differs from JUUL's direct efforts to target youths. *These different problems pose different risks to the value of JUUL and, resultingly, the value of Altria*."[323]

212.    As discussed in Section IV.C above, risks related to youth usage of JUUL's products had previously been publicly discussed by Altria at the time of the JUUL investment.[324]  Dr. Gottlieb's remarks also make clear that concerns regarding youth vaping were publicly known before the start of the Amended Complaint Class Period:

---

[319] Proposed Amended Complaint, ¶¶ 16, 468.

[320] Proposed Amended Complaint, ¶¶ 494–495.

[321] Nye Report, Exhibit 11B.

[322] Proposed Amended Complaint, ¶¶ 494–95, emphasis added.

[323] MTD Opinion, p. 25, emphasis added.

[324] Specifically, Altria stated the following on December 20, 2018: "we don't at all discount the fact that youth usage of e-vapor products is a big problem that needs to be resolved. And if it's not resolved, it's going to put the whole category at risk, including for adult cigarette smokers.... There certainly may be some disruption here as JUUL works to address with the rest of the industry, with the FDA youth usage of the product."  "Altria Group,

> We started to see the anecdotal reports of a Juul epidemic early in 2018, in January 2018. If you look at the press you started to see those reports, but it really wasn't until we saw the data from the National Youth Tobacco Survey in August of 2018. It first was revealed to me August 31, 2018, when my Senate director came to me with that data that we had sense of what was underway. ***Within two weeks, I was giving the speech in September calling it an epidemic, alluding to the data, I couldn't release it at that time, demanding action from the manufacturers***. And then we followed that up in November with an announcement of what we would do.[325]

213.    Dr. Nye claims that the distinction between allegations of youth usage and marketing to youth flagged by the District Court is "not important to [his] opinion that there is a damage methodology that exists."[326]   This statement highlights the key problem with his purported damages framework – it is so general that Dr. Nye cannot tell whether it is applicable to this case.

214.    To the extent the trier of fact ultimately determines that statements regarding youth usage are not actionable while those relating to JUUL's intentional marketing to youth are actionable, it is incumbent on Dr. Nye to provide a methodology capable of reliably distinguishing and measuring the price effect of news that relates to youth usage from that which relates to alleged intentional marketing to youth.  Dr. Nye has failed to propose a methodology capable of doing this.[327]

## 2.    June 21, 2019

215.    In the Proposed Amended Complaint, Plaintiffs allege that "[o]n June 21, 2019, CNBC reported that then-former FDA Commissioner Scott Gottlieb stated, 'I don't know how Juul gets through a[] [Premarket Tobacco Product] [A]pplication process' because '[t]hey have so much historical youth use with their product.'[328]  Plaintiffs claim that "[o]n

---

Inc., Conference Call to Discuss Investment in JUUL Labs Inc – Final," *Thomson Financial*, December 20, 2018.

[325]  "A Conversation with FDA Commissioner Scott Gottlieb on his Tenure and Policy Reforms," *The Brookings Institution*, March 19, 2019, pp. 6–7, emphasis added.

[326] Nye Deposition 110:20–22.

[327] If both allegations regarding marketing to youth and youth usage are actionable, Dr. Nye's purported methodology is still deficient in measuring the stock price effect of previously concealed or understated risks on the alleged corrective event dates or any earlier inflation attributable to these concealed risks because it fails to account for the distinction between price effect of allegedly concealed risks and price effect of materialization of the risks (see Section VII.B).

[328] Proposed Amended Complaint, ¶ 507.

this news, Altria's stock price fell $2.26 per share, or 4.3%, to close at $48.00 per share on June 21, 2019."[329]

216.   The alleged corrective event on June 21, 2019 presents analytical challenges that are similar to those on March 19, 2019.  Dr. Gottlieb participated in an interview broadcast on CNBC.  The Proposed Amended Complaint explicitly points out the reference to youth vaping.  Again, Dr. Nye has not provided a methodology that could establish the extent to which, if at all, these statements were related to intent to marketing to youth rather than to youth usage.[330]  To the extent the trier of fact finds that claims related to youth usage are not actionable, Dr. Nye has failed to provide a methodology that could reliably calculate inflation.

### 3.   November 19, 2019

217.   Plaintiffs allege in the Proposed Amended Complaint that on November 19, 2019 "New York Attorney General announced a lawsuit against JLI for deceptive and misleading marketing of its e-cigarettes, which contributed to the ongoing youth vaping epidemic in New York State."[331]

218.   Prior to the NYAG announcing its lawsuit, North Carolina announced a lawsuit on May 15, 2019 and the California State AG announced a lawsuit on November 18, 2019.[332]  Dr. Nye's has not provided a methodology to measure inflation on this day given the earlier litigations related to JUUL's marketing practices.

219.   Dr. Nye has also not provided a methodology that could translate any price decline that occurred on November 19, 2019 in response to the risk of another litigation materializing into inflation earlier in the Amended Complaint Class Period when litigation was possible but not certain.  It is possible that any stock price decline on November 19, 2019 in response to the NYAG litigation reflects the materialization of an adequately disclosed risk so that the correctly measured change in inflation on this date was zero.  Dr. Nye's approach

---

[329] Proposed Amended Complaint, ¶ 508.
[330] I have not seen these remarks discussed in contemporaneous analyst reports.
[331] Proposed Amended Complaint, ¶ 541.
[332] "North Carolina sues Juul, claiming deceptive marketing and targeting youth", *CNN*, May 15, 2019. "California sues e-cigarette maker Juul alleging targeting of teens and shoddy oversight; 17 shipments sent to someone named 'Beer Can'," *CNBC*, November 18, 2019.  *Also see* "California Announces Lawsuit Against Juul for Marketing to Teens," *Theflyonthewall.com*, November 18, 2019, 1:09 PM ET.

of using the stock price decline on November 19, 2019 as a measure of inflation would overstate inflation and, at the same time, fail to measure inflation due only to allegedly concealed risk and not to risk that was known or disclosed.

### 4.       April 1, 2020

220.    Plaintiffs allege in the Proposed Amended Complaint that on April 1, 2020, after the close of trading, "the FTC announced that it was filing suit to force Altria to unwind its $12.8 billion investment in JUUL. The press release announcing the complaint, which was filed the same day, stated Altria and JUUL 'entered a series of agreements, including Altria's acquisition of a 35% stake in JUUL, that eliminated competition in violation of federal antitrust laws,' including 'by agreeing not to compete in return for a substantial ownership interest in JUUL.'"[333]

221.    As discussed above, Dr. Nye's proposed approach to measuring inflation using the stock price decline at the time the risk materialized (*i.e.,* a suit was filed) systematically overstates inflation by including the full stock price declines that resulted from the materialization of risks as opposed to properly measured inflation attributable to an earlier failure to fully disclose certain risks.

222.    An additional important consideration associated with expanding the class period to October 25, 2018 through April 1, 2020 involves the ability to back-cast inflation to an earlier time during the class period.  Dr. Nye's purported damages "framework" makes no distinction between the initial and the expanded class periods.  As a result, he fails to address an additional problem with defining a class period that begins on October 25, 2018, before Altria first disclosed its JUUL investment.

223.    If Dr. Nye assumes that the full amount of inflation was reflected in Altria's stock price at the beginning of the Amended Complaint Class Period starting on October 25, 2018 (as his general description implies), before Altria's December 20, 2018 announcement of its investment in JUUL and before any rumors or market commentary regarding the possible investment in JUUL had emerged,[334] then he assumes that investors who purchased

---

[333] Proposed Amended Complaint, ¶ 547.
[334] Based on my review, the first news that Altria was in talks to purchase a stake in JUUL were reported by public press on November 28, 2018.  *See* ¶ 22.

Altria stock before this announcement were impacted by the alleged misrepresentations in the same way as investors who purchased Altria stock after the announcement.

224.    To illustrate why this is problematic, consider the following purported "truth" alleged by Plaintiffs: "(i) Altria was not removing certain of its products from the market because the Altria Defendants did not want to risk contributing to underage access and use but because of a non-compete condition to the anticipated investment in JLI; (ii) Altria was pursuing an investment in JLI, which Willard had internally admitted 'has created a youth usage epidemic' because 'Juul overlooked their responsibility obligations to prevent youth vaping and it could ultimately destroy their business'; (iii) removal of all-pod based e-cigarette products would have resulted in a 'swift end to the youth epidemic'; (iv) material risks associated with the foregoing and with Altria's contemplated non-compete agreement with JLI; and (v) that all of the foregoing, as well as mounting public scrutiny, negative publicity, and governmental pressure on e-vapor products and JLI made it reasonably likely that Altria's investment in JLI would have a material negative impact on Altria's reputation and operations."[335]

225.    If Dr. Nye uses the stock price declines on the alleged corrective event dates to measure purported inflation as of October 25, 2018, as he proposes, he is in effect assuming that Altria's stock price would have reacted to these but-for disclosures in the same way *regardless* of whether Altria had disclosed that it would be investing in JUUL (as opposed to "pursuing an investment") or disclosed the terms of the investment in JUUL, which were not known by the market as of October 25, 2018.  As a matter of economics, it is hard to understand how Altria's price would respond to these but-for disclosures if investors had no knowledge of whether the investment would indeed occur or the terms under which Altria might invest in JUUL (because these disclosures had yet to occur).

226.    To put this in sharper relief, the sum of all price declines on the corrective event dates alleged in the Proposed Amended Complaint is $41.5B, which is *more than three times* Altria's investment in JUUL.  If one were to rely on a simplistic back-casting approach to assess the effect of these but-for disclosures on Altria's equity value before its investment in JUUL, and use Dr. Nye's event study results on alleged corrective event dates for which he finds negative and statistically significant residual returns, one would conclude that Altria's

---

[335] Proposed Amended Complaint, ¶ 468, emphasis removed.

value would have fallen by approximately $29.4 billion (or $16 per share), and so by *more than two times* the amount of Altria's entire investment in JUUL.  It is implausible that such a massive decline would have occurred even though the market was not yet aware that Altria would be investing in JUUL (and before any terms were disclosed to the market) and yet this is what Dr. Nye's proposed approach implies.

Executed this 17th of September, 2021.

_____

Douglas J. Skinner, Ph.D.

**APPENDIX A**

**DOUGLAS J. SKINNER**
Deputy Dean for Faculty
Eric J. Gleacher Distinguished Service Professor of Accounting
The University of Chicago Booth School of Business
5807 South Woodlawn Avenue
Chicago, IL 60637
Phone: 773-702-7137
dskinner@chicagobooth.edu
Google Scholar: https://scholar.google.com/citations?user=B-ThwOIAAAAJ&hl=en
SSRN: http://ssrn.com/author=16759

**Education**

B.Ec. (First Class Honours), Accounting/Finance, Macquarie University, 1985.
M.S., Applied Economics, University of Rochester, 1988.
Ph.D., Accounting (major area), Finance (minor area), University of Rochester, 1989.

**Appointments**

University of Chicago, Booth School of Business
    Deputy Dean for Faculty, 2015-2016, 2017-
    Interim Dean, 2016-2017
    Eric J. Gleacher Distinguished Service Professor of Accounting, 2014-
    John P. and Lillian A. Gould Professor of Accounting, 2006-2013
    Executive Director, Accounting Research Center, 2011-2016
    Professor of Accounting and Neubauer Family Faculty Fellow, 2005-2006
    Neubauer Faculty Fellow and Visiting Professor of Accounting, 2003-2004

Independent Trustee, Audit Committee Chair, Harbor Funds, 2020-

Senior Fellow, Asian Bureau of Finance and Economic Research (ABFER), 2017-

University of Melbourne, Faculty of Business and Economics
    Professorial Fellow, 2010-

*Journal of Accounting Research*
    Senior Editor, 2006-present.

*Journal of Accounting & Economics*
    Editor, 2000-2005.
    Associate Editor, 1994-2000.

University of Michigan Business School
    KPMG Professor of Accounting, 1998-2005
    Accounting Area Chair, 2001-2003

**APPENDIX A**

Professor of Accounting, 1997-2005
Associate Professor of Accounting, 1993-1997
Assistant Professor of Accounting, 1989-1993

Coopers & Lybrand (Sydney)
Auditor, 1980-82.

**Scholarly Honors and Awards**

FARS 2020 Best Paper Prize for "Run EDGAR Run: SEC Dissemination in a High Frequency World." With Jonathan L Rogers and Sarah L. C. Zechman.

Distinguished Ph.D. Mentoring Award, 2020, Financial Reporting Section, American Accounting Association.

BlackRock prize for best paper, 2015 Review of Accounting Studies conference ("The role of the media in disseminating insider trading news." With Jonathan Rogers and Sarah Zechman.)

Hillel J Einhorn Excellence in Teaching Award, 2014.

Emory Williams Award for Teaching Excellence, 2013.

FARS 2009 Best Paper Prize for "Earnings Momentum and Earnings Management." With James Myers and Linda Myers.

Jensen Prize for best paper in Corporate Finance and Organizations published in the *Journal of Financial Economics* in 2004. ("Are Dividends Disappearing? Dividend Concentration and the Consolidation of Earnings." With Harry DeAngelo and Linda DeAngelo.)

CQA/IBES Research Competition, 1998. ("Earnings Surprises, Growth Expectations, and Stock Returns or Don't Let an Earnings Torpedo Sink Your Portfolio." With Richard Sloan. Review of Accounting Studies, 7, 2/3, June/September 2002: 289-312.)

KPMG Peat Marwick Faculty Fellow 1993-1996.
KPMG Peat Marwick Research Fellow 1991-1993.
Deloitte Haskins & Sells Foundation Doctoral Fellow 1986-88.
University of Rochester Sproull Fellow 1985-1987.

**Main Publications**

"Options Markets and Stock Return Volatility." Journal of Financial Economics 23, 1, June 1989: 61-78.

**APPENDIX A**

"Options Markets and the Information Content of Accounting Earnings Releases."  Journal of Accounting & Economics 13, 3, October 1990: 191-211.

"Dividends and Losses."  With Harry DeAngelo and Linda DeAngelo.  Journal of Finance 47, 5, December 1992: 1837-1863.

"The Investment Opportunity Set and Accounting Procedure Choice: Preliminary Evidence."  Journal of Accounting & Economics 16, 4, October 1993: 407-445.

"Accounting Choice in Troubled Companies."  With Harry DeAngelo and Linda DeAngelo.  Journal of Accounting & Economics 17, 1-2, January 1994: 113-143.

"How Do Taxes Affect Investors' Stock Market Realizations? Evidence from Tax-Return Panel Data."  With H. Nejat Seyhun.  Journal of Business 67, 2, April 1994: 231-262.

"Why Firms Voluntarily Disclose Bad News."  Journal of Accounting Research 32, 1, Spring 1994: 38-60.  (This article is abstracted in The CFA Digest 24, 4, Fall 1994.)

"Reversal of Fortune: Dividend Policy and the Disappearance of Sustained Earnings Growth."  With Harry DeAngelo and Linda DeAngelo.  Journal of Financial Economics 40, 3, March 1996: 341-371.

"Earnings Disclosures and Stockholder Lawsuits."  Journal of Accounting & Economics 23, 3, November 1997: 249-282.

"Determinants of the Valuation Allowance for Deferred Tax Assets under SFAS-109."  With Gregory S. Miller.  The Accounting Review 73, 2, April 1998: 213-233.

"An Empirical Examination of Conference Calls as a Voluntary Disclosure Medium."  With Richard Frankel and Marilyn Johnson.  Journal of Accounting Research 37, 1, Spring 1999: 133-150.

"Earnings Management: Reconciling the Views of Accounting Academics, Practitioners, and Regulators."  With Patricia Dechow.  Paper delivered at the AAA/FASB Financial Reporting Issues Conference in December, 1999.  Accounting Horizons, 14, 2, June 2000: 235-250.

"Special Dividends and the Evolution of Dividend Signaling."  With Harry DeAngelo and Linda DeAngelo.  Journal of Financial Economics, 57, 3, September 2000: 309-354.

"Earnings Surprises, Growth Expectations, and Stock Returns or Don't Let an Earnings Torpedo Sink Your Portfolio."  With Richard Sloan.  Review of Accounting Studies, 7, 2/3, June/September 2002: 289-312.
- Winner, 1998 Chicago Quantitative Alliance/IBES Research Competition.

**APPENDIX A**

"Large Sample Tests of the Debt Covenant Hypothesis."  With Ilia Dichev.  Journal of Accounting Research, 40, 4, September 2002: 1091-1123.

"The Role of Supplementary Statements with Management Earnings Forecasts."  With Amy P. Hutton and Gregory S. Miller.  Journal of Accounting Research 41, 5, December 2003: 867-890.

"Employee Stock Options, EPS Dilution, and Stock Repurchases."  With Daniel Bens, Venky Nagar, and M. H. Franco Wong.  Journal of Accounting and Economics, 36, 1-3, December 2003: 51-90.

"Are Dividends Disappearing?  Dividend Concentration and the Consolidation of Earnings."  With Harry DeAngelo and Linda DeAngelo.  Journal of Financial Economics, 72, 3, June 2004: 425-456.
- Jensen Prize for best paper, Corporate Finance and Organizations.

"Earnings Momentum and Earnings Management."  With James Myers and Linda Myers.  Journal of Accounting, Auditing and Finance, 22, 2, Spring 2007: 249-284.
- FARS Best paper prize, 2009.

"Does Earnings Guidance Affect Market Returns?  The Nature and Information Content of Aggregate Earnings Guidance."  With Carol Anilowski and Mei Feng.  Journal of Accounting and Economics 44, 1-2, September 2007: 36-63.

"The Evolving Relation between Earnings, Dividends, and Stock Repurchases."  Journal of Financial Economics 87, 3, March 2008: 582-609.

"Accounting for Intangibles – A Critical Review of Policy Recommendations."  Accounting and Business Research 38, 3, 2008: 191-204.

"A reply to Lev's rejoinder to 'Accounting for Intangibles – A Critical Review of Policy Recommendations.'"  Accounting and Business Research 38, 3, 2008: 215-216.

"The Rise of Deferred Tax Assets in Japan: The Role of Deferred Tax Accounting in the Japanese Banking Crisis." Journal of Accounting and Economics 46, 2-3, 2008: 218-239.  Lead article.

"Corporate Payout Policy."  With Harry DeAngelo and Linda DeAngelo.  Foundations and Trends in Finance 3, 2-3, 2008: 95-287.

"Management Forecasts in Japan: An Empirical Study of Forecasts that are Effectively Mandated" (Previously titled "When Voluntary Disclosure Isn't Voluntary: Management Forecasts in Japan.")  With Kazuo Kato and Michio Kunimura.  The Accounting Review 84, 5 (September 2009): 1575-1606.

**APPENDIX A**

"Earnings Guidance and Market Uncertainty."  With Jonathan Rogers and Andrew Van Buskirk.  <u>Journal of Accounting and Economics</u> 48, 1 (October 2009): 90-109.

"Implications for GAAP from an analysis of positive research in accounting."  With S. P. Kothari and Karthik Ramanna.  (Previously titled: "What Should GAAP Look Like?  A Survey and Economic Analysis.")  <u>Journal of Accounting and Economics</u> 50, 2-3 (December 2010): 246-286.  (Invited review paper.)

"What Do Dividends Tell Us About Earnings Quality?"  With Eugene Soltes.  <u>Review of Accounting Studies</u> 16, 1 (March 2011): 1-28.

"Measuring Securities Litigation Risk."  With Irene Kim.  <u>Journal of Accounting and Economics</u> 53, 1-2 (February-April 2012): 290-310.

"Audit Quality and Auditor Reputation:  Evidence from Japan."  With Suraj Srinivasan.  <u>The Accounting Review</u> 87, 5 (September 2012): 1737-1765.

"The Politics of Accounting Standard-Setting: A Review of Empirical Research."  With Brandon Gipper and Brett J. Lombardi.  <u>Australian Journal of Management</u> 38, 3 (December 2013): 523-551.

"Payout policy through the financial crisis: The growth of repurchases and the resilience of dividends."  With Eric Floyd and Nan Li. <u>Journal of Financial Economics</u> 118, 2 (November 2015): 299-316.

"The role of the media in disseminating insider trading news."  With Jonathan L. Rogers and Sarah L. C. Zechman. <u>Review of Accounting Studies</u> 21, 3 (September 2016): 711-739.
- BlackRock prize for best paper, <u>Review of Accounting Studies</u> conference, 2015.

"Is Japan Really a "Buy"?  The Corporate Governance, Cash Holdings, and Economic Performance of Japanese Companies."  With Kazuo Kato and Meng Li.  <u>Journal of Business Finance & Accounting</u> 44, 3 & 4 (March/April 2017): 480-523.

"Run EDGAR Run: SEC Dissemination in a High Frequency World."  With Jonathan L Rogers and Sarah L. C. Zechman.  <u>Journal of Accounting Research</u> 55, 2 (May 2017): 459-505.
- FARS Best paper prize, 2020.

## Conference Proceedings

"Stock Returns, Trading Volume, and Bid-Ask Spreads Around Earnings Announcements: Evidence from the NASDAQ National Market System."  <u>Proceedings: Seminar on the Analysis of Security Prices</u>, 36, 1, May 1991: 289-329.

**APPENDIX A**

## Current Working Papers

"Lucky or Good: Audit market concentration and the emergence of the Big 4 in Australia." (Previously titled: "Why is the audit market concentrated?  The emergence of the Big 4 in Australia."  "The evolution of audit market structure and the emergence of the Big Four: Evidence from Australia.")  With Matthew Pinnuck and Colin Ferguson (deceased). Revised, August 2020. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2431727

"Moving Forward: Management Guidance and Earnings Announcement Returns."  With Yao Lu.  April 2020, Revised September 2020. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3687764

"Importing Activists: Determinants and Consequences of Increased Cross-border Shareholder Activism."  With Mark G. Maffett and Anya Nakhmurina.  October 2020, Revised May 2021.  https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3721680

## Invited Discussions and Commentaries (non-refereed)

"Are Disclosures About Bank Derivatives and Employee Stock Options 'Value Relevant'?" Journal of Accounting & Economics 22, 1-3, Aug.-Dec. 1996: 393-405.

"What Motivates Managers' Choice of Discretionary Accruals?"  With Victor L. Bernard. Journal of Accounting & Economics 22, 1-3, Aug.-Dec. 1996: 313-325.

"Do Options Markets Improve Informational Efficiency?"  Contemporary Accounting Research 14, 2, Summer 1997: 193-201.

"How Well Does Net Income Measure Firm Performance?  A Discussion of Two Studies." Journal of Accounting & Economics, 26, 1-3, January 1999: 105-111.

"Should Firms Disclose Everything to Everybody? A Discussion of 'Open versus closed conference calls: The determinants and effects of broadening access to disclosure.'" Journal of Accounting and Economics 34, 1-3, January 2003: 181-187.

'Comments on "The Effects of Taxes on Market Responses to Dividend Announcements and Payments: What Can We Learn from the 2003 Dividend Tax Cut?"' by Raj Chetty, Joseph Rosenberg, and Emmanuel Saez, in Alan J. Auerbach, James R. Hines, Jr., and Joel Slemrod, eds., Taxing Corporate Income in the 21st Century (Cambridge University Press, 2007): 36-40.

'Discussion of "The implications of unverifiable fair-value accounting: Evidence from the political economy of goodwill accounting"' Journal of Accounting and Economics 45, 2-3, August 2008, 282-288.

**APPENDIX A**

'Discussion of "Accounting standards and debt covenants: Has the "Balance Sheet Approach" led to a decline in the use of balance sheet covenants?"' Journal of Accounting and Economics 52, 2-3, November 2011: 203-208.

"Accounting research in the Japanese setting." The Japanese Accounting Review, 1, 2011: 135-140.

"How should we think about earnings quality?  A discussion of "Earnings quality: Evidence from the field."  With Mark W. Nelson.  Journal of Accounting and Economics 56, 2-3 (December 2013): 34-41.

"The Evolving Disclosure Landscape: How Changes in Technology, the Media, and Capital Markets Are Affecting Disclosure."  With Gregory S. Miller.  Journal of Accounting Research 53, 2 (May 2015): 221-239.

**Other Publications**

"Are the SEC's Safe Harbor Provisions Effective in Encouraging the Disclosure of Forward-Looking Information?"  Financial Analysts Journal 51, 4, July-August 1995: 38-44.

"Issues in Foreign Exchange Hedge Accounting."  With Michael H. Moffett.  Journal of Applied Corporate Finance 8, 5, Fall 1995: 82-94.

"Bad News Rings True."  With Amy P. Hutton and Gregory S. Miller.  Investor Relations Quarterly 6, 2, 2004: 49-56.

"Japan's Window Dressing Hid Olympus Fraud,"  Bloomberg Opinion, November 30, 2011, https://www.bloomberg.com/opinion/articles/2011-12-01/japan-s-window-dressing-hid-olympus-fraud-commentary-by-douglas-skinner

"Why U.S. Companies Continue to Pay Dividends," Bloomberg Opinion, April 11, 2012, https://www.bloomberg.com/opinion/articles/2012-04-11/why-u-s-companies-continue-to-pay-dividends

"Corporate America is Enriching Shareholders at the Expense of the Economy." fivethirtyeight.com  July 15, 2014. http://fivethirtyeight.com/features/corporate-america-is-enriching-shareholders-at-the-expense-of-the-economy/

The Financial Accounting Standards Committee of the AAA is charged with responding to requests by standards setters on issues related to financial reporting. As a member of that Committee from 1999 until 2002 I contributed to comment letters to the Financial Accounting Standards Board (FASB), the International Accounting Standards Committee (IASC), and the U.S. Securities and Exchange Commission (SEC).  Published versions of these comment letters for which I served as principal author are as follows:
- Response to the FASB Preliminary Views: Reporting Financial Instruments and Certain Related Assets and Liabilities at Fair Value.  (with J. M. Wahlen, Chair, J. R. Boatsman,

**APPENDIX A**

R. H. Herz, G. J. Jonas, K. G. Palepu, S. G. Ryan, K. Schipper, and C. M. Schrand). <u>Accounting Horizons</u> December 2000, Vol. 14, No. 4, pp. 501-508.

- Implications of Accounting Research for the FASB's Initiatives on Disclosure of Information about Intangible Assets.  With L. A. Maines, Chair, E. Bartov, P. M. Fairfield, D. E. Hirst, T. E. Iannaconi, R. Mallett, C. M. Schrand, L. Vincent. <u>Accounting Horizons</u> June 2003, Vol. 17, No. 2, pp. 175-185.

**Selected Media Coverage**

"Dividends, Wall Street's Battered Status Symbol," <u>The New York Times</u>, February 13, 2016.

"As Stock Prices Slump, Don't Count on Buybacks," <u>Wall Street Journal</u>, January 25, 2016.

"Fast Traders Are Getting Data From SEC Seconds Early," <u>Wall Street Journal</u>, October 29, 2014.

"High-frequency traders said to get SEC filings early," <u>Financial Times</u>, October 29, 2014.

"Certain Traders May Get Early Looks at S.E.C. Filings, Paper Finds," <u>The New York Times</u>, October 29, 2014.

"Flush with Cash, Apple Plans Buyback and Dividend," <u>The New York Times</u>, March 19, 2012.

**Professional Activities**

*Journal of Accounting Research:* Senior Editor, 2006-present.

*Accounting and Finance*, Editorial Board, 2012-2016.

*Asia-Pacific Journal of Accounting & Economics*, Associate Editor, 1999-2005.

*Journal of Accounting & Economics*:
    Editor, 2000-2005.
    Associate Editor, 1994-2000.

*The Accounting Review*, Editorial Advisory and Review Board, 1992-1996; 1997-1999.

*Review of Accounting Studies*, Co-Editor, 1999-2000.

Ad hoc referee for numerous accounting and finance journals.

Member: American Accounting Association, American Finance Association.

American Accounting Association Committees:
- Financial Accounting Standards Committee, 1999-2002.

- AAA/FASB Annual Financial Reporting Issues Conference Organizing Committee, 1999, 2000, 2005.
- 2001-2002 Competitive Manuscript Prize Committee.


**Ph.D. Committees (chronological order with initial placements)**

*At Michigan:*
Arun Kumar (Finance)
Christine Botosan.  Washington University, St Louis.
Li Li Eng.  Singapore National University.
Karen Nelson.  Stanford.
Lillian Mills.  Arizona.
Brian Bushee.  Harvard Business School.
Marlene Plumlee (Chair).  Utah.
David Heike (Finance).  Western Ontario.
Timothy Burch (Finance).  Miami (FL).
Gregory Miller (Chair).  Harvard Business School.
Mark Bradshaw.  Harvard.
Anchada Charoenrook (Finance). Vanderbilt.
Darren Roulstone (Co-chair).  Chicago.
Linda Myers (Chair).  Washington (Seattle).
Irem Tuna (Chair).  Wharton.
Scott Richardson.  Wharton.
Fai Cang (Finance).  Vanderbilt.
Jef Doyle.  Utah.
Irene Kim (Chair).  Duke.
Mei Feng (Chair).  Pittsburgh.
Wei Tang (Chair).  Georgetown.

*At Chicago:*
Regina Wittenberg Moerman.  Wharton.
Yu Gao.  Minnesota.
Eugene Soltes (Chair).  Harvard Business School.
Ningzhong Li.  London Business School.
Lawrence Takeuchi (finance).
Pepa Kraft.  NYU.
Jeff Ng.  Chinese University of Hong Kong.
Anna Costello. (Chair).  MIT.
Alon Kalay. Columbia.
Jonathan Milian.  (Chair). Florida International University.
Meng Li (Co-chair). UT-Dallas.
Joao Granja.  MIT.
Christine Cuny.  NYU.
Joshua Madsen (Chair).  Minnesota.
Marina Niessner (finance). Yale.

Eric Floyd.  Rice.
Nan Li (Chair).  Toronto.
Gerardo Perez Cavazos (Chair).  Harvard Business School.
Frank Zhou (Chair).  Wharton.
Matthew Bloomfield.  Wharton.
Brett Lombardi (Chair).  Monash (Australia).
Oleg Kuriukhin.  Cornerstone Research.
Anya Nakhmurina.  Yale.
Johanna Shin.  Capital Group.
Yao Lu. Cornell.

**APPENDIX B**

**Douglas J. Skinner, Testimony (last four years)**

*Baker Hughes Incorporated v. United States of America*, United States District Court for the Southern District of Texas, Civil Action H-15-2675 (2017).

*SEC v. RPM International et al.*, United States District Court for the District of Columbia, Civil Action No. 16-1803 (ABJ) (2018, 2019).

*SEB Investment Management AB, Individually and on behalf of others similarly situated v. Endo International plc et al.*, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 2: 17-CV-3711-TJS (2019).

*Tribune Media Company, f.k.a. Tribune Company & Affiliates v. Commissioner of Internal Revenue*, United States Tax Court, Docket Nos. 20940-16 and 201941-16 (2019).

*SEB Investment Management AB, Individually and on behalf of others similarly situated v. Symantec Corporation and Gregory S. Clark*, United States District Court for the Northern District of California, Case No.: 2:18-cv-02902-WHA (2020, 2021).

*In re Allergan plc Securities Litigation*, United States District Court for the Southern District of New York, Civil Action No. 18-cv-12089 (2020).

*Alexandre Pelletier, Individually and on behalf of others similarly situated v. Endo International plc et al.*, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 2: 17-cv-05114-MMB (2020, 2021).

*Purple Mountain Trust v. Wells Fargo & Company, et al.*, United States District Court Northern District of California, Civil Action No. 3:18-cv-03948-JD (2020).

*Washtenaw County Employees Retirement System, Individually and on behalf of others similarly situated v. Walgreen Co. et al.,* United States District Court Northern District of Illinois Eastern Division, No. 1:15-cv-3187 (2021).

*In re Novo Nordisk Securities Litigation*, United States District Court District of New Jersey, Master File No.: 3:17-cv-00209-BRM-LHG (2021).

*Badesha Harpreet and Cronos Group Inc., et al.*, Ontario Superior Court of Justice, Court File No.: CV-20-00641990-00CP (2021).

*Plumbers & Pipefitters National Pension Fund and Juan Francisco Nieves, as Trustee of the Gonzales Coronado Trust, Individually and on Behalf of All Others Similarly Situated v. Kevin Davis and Amir Rosenthal*, United States District Court Southern District of New York, Civil Action No. 1:16-CV-3591-GHW (2021).

*In Re CVR Refining, LP Unitholder Litigation.* In the Court of Chancery of the State of Delaware. Consolidated C.A. No. 2019-0062-KSJM (2021).

**APPENDIX B**

*Christakis Vrakas, et al., v. United States Steel Corporation, et al.*, United States District Court Western District of Pennsylvania, Civil Action No. 17-579 (2021).

# Documents Relied Upon

## Academic Articles

- Bayar, O., Chemmanur, T.J. and Liu, M.H. (2011), "A Theory of Equity Carve-outs and Negative Stub Values under Heterogeneous Beliefs," *Journal of Financial Economics*, 100(3), pp. 616–638.

- Busse, J. A., and Green, T.C. (2002), "Market efficiency in real time," *Journal of Financial Economics*, 65, pp. 415–437.

- Fama, E. (1970), "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance*, 25(2), pp. 383–417.

- Fama, E. (1991), "Efficient Capital Markets: II," *The Journal of Finance*, 46(5), pp. 1575−1617.

- Greene, J. T., and Watts, S. G. (1996), "Price Discovery on the NYSE and the NASDAQ: The Case of Overnight and Daytime News Releases," *Financial Management*, 25(1), pp. 19–42.

- King, B. (1966), "Market and Industry Factors in Stock Price Behavior," *The Journal of Business*, 39(2), pp. 139–190.

- Lamont, O. A., and Thaler, R. H. (2003), "Can the Market Add and Subtract? Mispricing in Tech Stock Carve-outs," *Journal of Political Economy*, 111(2), pp. 227–268.

- Langetieg, T. (1978), "An Application of a Three-Factor Performance Index to Measure Stockholder Gains from Merger," *Journal of Financial Economics*, 6, pp. 365−383.

- Langetieg, T., Haugen, R., and Wichern, D. (1980), "Merger and Stockholder Risk," *The Journal of Financial and Quantitative Analysis*, 15(3), pp. 689−717.

- Mitchell, M., Pulvino, T., and Stafford, E. (2002), "Limited Arbitrage in Equity Markets," *The Journal of Finance*, 57(2), pp. 551–584.

- Solomon, D. H., and Soltes, E. (2021), "Is 'Not Guilty' the Same as 'Innocent'? Evidence from SEC Financial Fraud Investigations," *Journal of Empirical Legal Studies*, 18(2), pp. 287–327.

## Analyst Reports

- "3Q19 EPS Overview," *Stifel*, October 31, 2019.

- "3Q19 Results," *Exane*, October 31, 2019.

- "3Q19: Beat but Medium Term Guidance Lowered and Impairment Taken on Juul," *Jefferies*, October 31, 2019.

- "4Q19: Underlying industry volume improvement, but further JUUL write-offs," *UBS*, January 30, 2020.

- "Addressing Issues and Opportunities Directly; Reiterate Buy," *Bank of America Merrill Lynch*, November 1, 2019.

- "Altria FY19: What a mess…," *Alliance Bernstein*, January 30, 2020.

- "Altria Group Inc," *Berenberg*, October 26, 2018.

- "Altria Rumoured to Be Interested in Juul Stake But Is a Little Late to the Table," *Morningstar*, November 28, 2018.

- "An Expensive Holiday Purchase:  MO Invests in JUUL," *Morgan Stanley*, December 20, 2018.

- "Cigarettes Feel a Drag as Smokers 'Pass the JUUL,'" *Morgan Stanley*, November 1, 2018.

- "Cowen's Cigarette & Cannabis Circular," *Cowen*, November 2, 2018.

- "Dank Vape and 2019 Youth Tobacco Survey Forces FDA's Hand," *Barclays*, September 12, 2019.

- "Dividend Cut Concerns Overblown Due to Pricing and Overall Flexibility," *Bank of America Merrill Lynch*, October 7, 2019.

- "Downgrade to Neutral: Potential Deal Raises Questions; Vapor Clarity a Ways Off," *Piper Jaffray*, September 9, 2019.

- "End of Merger Talks = Logical Outcome," *Cowen*, September 25, 2019.

- "EPS Upside and an Achievable Medium-Term Target," *Stifel*, November 1, 2019.

- "Gottlieb on Vapour Pods, Menthol and Nicotine Rule; San Fran May Ban Vapour," *Jefferies*, March 19, 2019.

- "JUUL Adapting Quickly to Evolving Market Conditions," *Bank of America Merrill Lynch*, October 29, 2019.

- "JUUL UK and Europe Financials," *Barclays*, October 30, 2019.

- "Juul: A Jewel in Altria's Crown?" *Alliance Bernstein*, November 29, 2018.

- "Long-term EPS guidance lowered, 4Q 19 cig industry volumes better at -4.5%," *Barclays*, January 30, 2020.

- "MO to remain independent," *Bank of America Merrill Lynch*, September 25, 2019.

**APPENDIX C**

- "MO: Vape 'Em While You Got 'Em," *Wells Fargo*, October 25, 2018.

- "Mo-Alert, We believe today's share price decline is too extreme," *Citi*, January 30, 2020.

- "MO's underlying business resilient, JUUL investment weighs on NT outlook," *Bank of America Merrill Lynch*, January 30, 2020.

- "MSA reports -4.5% US cig volumes as e-cigs stall," *Barclays*, November 2, 2019.

- "Next generation targets," *UBS*, November 4, 2019.

- "Nielsen:  Tobacco All Channel Data Thru 5/18 – Cig Vol Declines Strengthen," *Wells Fargo*, May 28, 2019.

- "PM and MO announce their merger is off," *Citi*, September 25, 2019.

- "PM/MO Ending Merger Discussions - Clearer Heads Prevailed," *Stifel*, September 25, 2019.

- "PM + MO: Then and Now," *Morgan Stanley*, September 9, 2019.

- "PM-MO: Will the merger be back?" *Barclays*, September 25, 2019.

- "Pressure On PM's Stock Today – Could A PM/MO Combo Finally Be In The Works?" *Wells Fargo*, August 26, 2019.

- "Q3 EPS Beat but Results Highlight MO's Challenges," *Morgan Stanley*, October 31, 2019.

- "Q3 EPS Preview," *Morgan Stanley*, October 16, 2019.

- "Quick Take - MO's 3Q19 Results," *Deutsche Bank*, October 31, 2019.

- "Right Asset But Wrong Price at Wrong Time:  Altria Overpays for Juul," *Morningstar*, December 20, 2018.

- "Shares Already Price In Altria's Lower Guidance and Impairment Charge on Juul," *Morningstar*, November 1, 2019.

- "Some Patience Still Required," *Deutsche Bank*, October 31, 2019.

- "Takeaways from Our Meeting with Management," *Morgan Stanley*, September 25, 2019.

- "Tobacco - Bull-Bear Debate On PM/MO," *Wells Fargo*, September 24, 2019.

- "Tobacco – FDA seems likely to impose severe restrictions on JUUL*," *Citi*, November 9, 2018.

- "Tobacco Analysis: Nielsen XAOC + C-Store," *Cowen*, June 25, 2019.

- "Updating Numbers: Risk Better Captured but Near Term Multiple Upside Limited," *Jefferies*, February 24, 2020.

- "US Cigarette & E-cig Scanner Data Through 1/26," *Morgan Stanley*, February 5, 2019.

- "US Cigarette & E-cig Scanner Data Through 10/06," *Morgan Stanley*, October 16, 2018.

- "US Cigarette & E-cig Scanner Data Through 11/03," *Morgan Stanley*, November 13, 2018.

- "US Cigarette & E-cig Scanner Data Through 12/01," *Morgan Stanley*, December 11, 2018.

- "US Cigarette & E-cig Scanner Data Through 12/29," *Morgan Stanley*, January 8, 2019.

- "US Cigarette & E-cig Scanner Data Through 2/23," *Morgan Stanley*, March 5, 2019.

- "US Cigarette & E-cig Scanner Data Through 3/23," *Morgan Stanley*, April 2, 2019.

- "US Cigarette & E-cig Scanner Data Through 4/18," *Morgan Stanley*, April 28, 2020.

- "US Cigarette & E-cig Scanner Data Through 4/20," *Morgan Stanley*, April 30, 2019.

- "US Cigarette & E-cig Scanner Data Through 6/15," *Morgan Stanley*, June 25, 2019.

- "US Cigarette, E-cig, & Smokeless Scanner Data Through 1/25," *Morgan Stanley*, February 4, 2020.

- "US Cigarette, E-cig, & Smokeless Scanner Data Through 10/5," *Morgan Stanley*, October 15, 2019.

- "US Cigarette, E-cig, & Smokeless Scanner Data Through 11/2," *Morgan Stanley*, November 12, 2019.

- "US Cigarette, E-cig, & Smokeless Scanner Data Through 11/30," *Morgan Stanley*, December 10, 2019.

- "US Cigarette, E-cig, & Smokeless Scanner Data Through 12/28," *Morgan Stanley*, January 7, 2020.

- "US Cigarette, E-cig, & Smokeless Scanner Data Through 2/22," *Morgan Stanley*, March 3, 2020.

- "US Cigarette, E-cig, & Smokeless Scanner Data Through 7/13 – Restated Data," *Morgan Stanley*, July 30, 2019.

- "US Cigarette, E-cig, & Smokeless Scanner Data Through 8/10," *Morgan Stanley*, August 20, 2019.

**APPENDIX C**

- "US Cigarette, E-cig, & Smokeless Scanner Data Through 9/7," *Morgan Stanley*, September 17, 2019.

- "US Cigarette, E-cig, & Smokeless Scanner Data Through 3/21," *Morgan Stanley*, March 31, 2020.

- "Vaping Category Implosion Is Priced In and Should Boost Long-Term Margins," *MorningStar*, October 2, 2019.

- "Vapor Clouds: Potential JUUL Impairment?" *Morgan Stanley*, October 30, 2019.

- "Vexed on Vape? Hello Volatility," *Cowen*, October 18, 2019.

- "What We Are Watching for Next Thursday," *Deutsche Bank*, October 23, 2019.

- Other Altria analyst reports between October 25, 2018 and April 6, 2020.

## Conference Calls

- "Altria Group Inc Conference Call to Discuss Investment in JUUL Labs Inc – Final," *Thomson Financial*, December 20, 2018.

- "Q3 2018 Altria Group Inc Earnings Call," *Thomson Financial*, October 25, 2018.

- "Q3 2019 Altria Group Inc. Earnings Call – Final," *Thomson Financial*, October 31, 2019.

- "Q4 2019 Altria Group Inc. Earnings Call – Final," *Thomson Financial,* January 30, 2020.

## Depositions

- Deposition of Zachary Nye, Ph.D., *Strougo v. Barclays*, August 11, 2015.

- Deposition of Zachary Nye, Ph.D., *Gabby Klein, et al v. Altria Group, Inc.*, August 31, 2021.

## Expert Reports

- Expert Report of Lucy P. Allen, *The Archdiocese of Milwaukee Supporting Fund, Inc. et al., v. Halliburton Company, et al.*, September 10, 2014.

- Expert Report of Zachary Nye, Ph.D., *Gabby Klein, et al v. Altria Group, Inc., et al.*, August 6, 2021 and associated production.

## Legal Documents

- Class Action Complaint, *Colgate v. Juul Labs, Inc.*, April 26, 2018.

**APPENDIX C**

- Class Action Complaint, *Gabby Klein, et. al v. Altria Group, Inc., et al,* October 2, 2019.

- Corrected Consolidated Class Action Complaint, *Gabby Klein, et al v. Altria Group, Inc., et al.*, July 2, 2020.

- Memorandum Opinion and Order, *Erica P. John Fund, Inc. v. Halliburton Co. et al.*, No. 3:02-CV-1152-M.

- Memorandum Opinion on Motion to Dismiss, *Gabby Klein, et al v. Altria Group, Inc., et al*, March 12, 2021.

- Opinion of the Court, *Goldman Sachs Group, Inc., et al., Petitioners v. Arkansas Teacher Retirement System, et al.*, 141 S.Ct. 1951 (2021).

- Proposed First Amended Consolidated Class Action Complaint, *Gabby Klein, et al. v. Altria Group, Inc., et al.*, August 6, 2021.

**Press Releases**

- Altria Press Release, "Altria and Philip Morris International End Merger Discussions; Altria Provides Statement on JUUL Leadership Change; Tightens 2019 Full-year Earnings Guidance," September 25, 2019.

- Altria Press Release, "Altria Becomes Largest Shareholder in Cronos Group, a Leading Global Cannabinoid Company," March 8, 2019.

- Altria Press Release, "Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth," December 20, 2018.

- Altria Press Release, "Altria Refocuses Innovative Product Efforts," December 7, 2018.

- Altria Press Release, "Altria Reports 2018 Third-Quarter and Nine-Months Results: Tightens 2018 Full-Year Earnings Guidance; Announces Actions to Address Underage E-Vapor Use," October 25, 2018.

- Altria Press Release, "Altria Reports 2019 Third-Quarter and Nine-Months Results; Announces New 2020 - 2022 Adjusted Diluted EPS Growth Objective to Advance Strategic Business Platform," October 31, 2019.

- Altria Press Release, "Press Release:  Altria Group, Inc. Confirms Discussions With Philip Morris International, Inc. Regarding Potential All-Stock, Merger of Equals," *Dow Jones Institutional News*, August 27, 2019.

- Altria Press Release, "Press Release:  Philip Morris International Inc. Confirms Discussions with Altria Group, Inc. Regarding Potential All-Stock, Merger of Equals," *Dow Jones Institutional News*, August 27, 2019.

**APPENDIX C**

- FDA Press Release, "FDA announces comprehensive regulatory plan to shift trajectory of tobacco-related disease, death," July 27, 2017.

- FDA Press Release, "Protecting American Families: Comprehensive Approach to Nicotine and Tobacco," June 28, 2017.

- FDA Press Release, "Some E-cigarette Users Are Having Seizures, Most Reports Involving Youth and Young Adults," April 10, 2019.

- FDA Press Release, "Statement from FDA Commissioner Scott Gottlieb, M.D., on meetings with industry related to the agency's ongoing policy commitment to firmly address rising epidemic rates in youth e-cigarette use," October 31, 2018.

- JUUL Labs Press Release, "Juul Statement About Altria Minority Investment and Service Agreements," December 20, 2018.

- Office of the Senator Dick Durbin Press Release, "Durbin & Senators Press JUUL Labs, Inc. For Answers On Marketing Addictive E-Cigarette Vaping Product to Teens, Urge FDA To Take Swift Action," April 24, 2018.

- Pomerantz LLP Press Release, "Pomerantz Law Firm Announces the Filing of a Class Action against Altria Group, Inc. and Certain Officers – MO," October 2, 2019.

**Public Press**

- "#JUUL: How social media hyped nicotine for a new generation," *CNN*, December 19, 2018.

- "'We don't want them in our city': SF officials seek Juul crackdown," *San Francisco Chronicle*, March 19, 2019.

- "20 Lawyers Picked to Lead Juul Lawsuits in California State Courts; FROM THE COURTS," *Broward Daily Business Review*, February 21, 2020.

- "A conversation with departing FDA Commissioner Scott Gottlieb on his tenure and policy reforms," *The Brookings Institution*, March 19, 2019.

- "A Conversation with FDA Commissioner Scott Gottlieb on his Tenure and Policy Reforms," *The Brookings Institution*, March 19, 2019.

- "Altria Client Services LLC; 'E-Vaping Device With Vaporizing Heater And Ejector, And Method Of Operating The E-Vaping Device' in Patent Application Approval Process (USPTO 20190246702)," *Politics & Government Week*, August 29, 2019.

- "Altria Client Services LLC; 'Smokeless Tobacco Article' in Patent Application Approval Process (USPTO 20190246685)," *Chemicals & Chemistry*, August 30, 2019.

- "Altria Client Services LLC; Patent Application Titled 'Mounting System With Horizontally-Slideable Bracket And Support Bracket' Published Online (USPTO 20190246815)," *Politics & Government Week*, August 29, 2019.

- "Altria Client Services LLC; Patent Issued for Hybrid E-Vaping Cartridge, E-Vaping Device Including A Hybrid E-Vaping Cartridge (USPTO 10,390,567)," *Journal of Engineering*, September 9, 2019

- "Altria Client Services LLC; Researchers Submit Patent Application, 'Electronic Vaping Device and Cartridge for Electronic Vaping Device', for Approval (USPTO 20200029627)," *Politics & Government Week*, February 20, 2020.

- "Altria Client Services LLC; Researchers Submit Patent Application, 'Pod Assembly, Dispensing Body, And E-Vapor Apparatus Including The Same', for Approval (USPTO 20190246700)," *Politics & Government Week*, August 29, 2019.

- "Altria Client Services LLC; Researchers Submit Patent Application, "'Alternative Nicotine Carriers For Solid Products', for Approval (USPTO 20190246686)," *Chemicals & Chemistry*, August 30, 2019.

- "Altria Could Rise 20%+ If Deal an Acquisition, Not Merger, Says Morgan...," *Theflyonthewall.com*, September 24, 2019.

- "Altria in Talks to Take Significant Minority Stake in Juul Labs," *The Wall Street Journal*, November 28, 2018.

- "Altria Is Nearing a Deal to Take a 35% Stake in Juul," *Dow Jones Institutional News*, December 19, 2018.

- "BRIEF-New York AG Letitia James Files Lawsuit Against Juul Labs," *Reuters News*, November 19, 2019.

- "California Announces Lawsuit Against Juul for Marketing to Teens," *Theflyonthewall.com*, November 18, 2019.

- "California sues e-cigarette maker Juul alleging targeting of teens and shoddy oversight; 17 shipments sent to someone named 'Beer Can'," *CNBC*, November 18, 2019.

- "CDC Says Hundreds of Vaping-Tied Illness Cases Reported: CNBC," *Bloomberg*, September 24, 2019.

- "Column: Studies show how Juul exploited social media to get teens to start vaping," *Los Angeles Times*, September 24, 2019.

- "Deal Would Value Juul at About $38 Billion, Double Its Last Funding," *Dow Jones Institutional News*, December 19, 2018.

- "Did Juul Lure Teenagers and Get 'Customers for Life'?" *The New York Times*, August 27, 2018.

**APPENDIX C**

- "E-cigarette maker Juul targeted teens with false claims of safety, lawsuit says," *The Washington Post*, July 30, 2018.

- "E-Cigarettes Can Potentially Release Significant Amounts of Toxic Metals in Its Vapors Which Users Inhale," *CBS This Morning News Transcripts*, February 26, 2018.

- "EXCLUSIVE-Juul halts Indonesia e-cig sales, throwing Asia expansion in doubt," *Reuters News*, February 24, 2020.

- "Experts are calling out a vape pen with 'scary' nicotine levels that teens love—here's how it affects the brain," *Business Insider*, April 19, 2018.

- "F.D.A. Cracks Down on 'Juuling' Among Teenagers," *The New York Times,* April 24, 2018.

- "F.D.A. Seizes Documents From Juul Headquarters," *The New York Times*, October 2, 2018.

- "FDA Sends Warning Letter to Juul Labs Over Marketing Practices," *Theflyonthewall.com*, September 9, 2019.

- "Federal Prosecutors in California Are Conducting Criminal Probe of Juul – Sources," *Dow Jones Institutional News*, September 23, 2019.

- "Fidelity Fund Slashes Value of Its Juul Labs Stake by Almost 50%," *Bloomberg Law*, October 30, 2019.

- "Fitch Downgrades Altria's Ratings to 'BBB'; Outlook Stable," *Dow Jones Institutional News*, December 20, 2018.

- "Hedge Fund Darsana Slashes Juul's Valuation by More Than a Third; Proposed federal ban on most vape flavors, investigations into marketing practices cloud e-cigarette company's prospects," *The Wall Street Journal*, October 4, 2019.

- "Hopkins County Schools Join Litigation Against JUUL," *The Messenger*, February 20, 2020.

- "House panel demands internal documents from Juul in teen vaping probe," *CNBC*, June 13, 2019.

- "How a startup behind the 'iPhone of vaporizers' reinvented the e-cigarette and generated $224 million in sales in a year," *Business Insider*, November 21, 2017.

- "Illinois sues e-cig maker Juul for allegedly targeting minors," *Chicago Tribune*, December 13, 2019.

- "Is your teen 'Juuling'? Why parents and doctors are so worried," *Today*, March 29, 2018.

- "Juul Devices Cited in Seizure Reports That Triggered FDA Probe," *Bloomberg*, August 29, 2019.

- "Juul E-Cigarettes Face FDA Probe," *The Wall Street Journal*, April 24, 2018.

- "Juul Has Lost More Than a Third of Its Value, Sources Say," *CNBC*, October 17, 2019.

- "Juul Labs Launches Its E-Cigarettes in China," *Dow Jones Institutional News*, September 11, 2019.

- "JUUL LABS: Faces Potential Class Action Over E-Cigarettes," *Class Action Reporter*, August 30, 2019.

- "JUUL LABS: O'Reilly Suit Transferred to Pa. Dist. Ct.," *Class Action Reporter*, February 21, 2020.

- "Juul Preparing Staff Restructuring as It Braces for U.S. Crackdown – Sources," *Dow Jones Institutional News*, September 24, 2019.

- "JUUL Sales Among Young People Fueled by Social Media, Says Study," *The Washington Times*, June 4, 2018.

- "Juul Suspends Selling Most E-Cigarette Flavors in Stores," *The New York Times*, November 13, 2018.

- "Juul to Cut About 500 Jobs," *The Wall Street Journal*, October 29, 2019.

- "Juul's Marketing Practices Under Investigation by FTC," *The Wall Street Journal*, August 29, 2019.

- "MEDIA-U.S. House Panel Presses Juul in Teen Vaping Investigation - Bloomberg," *Reuters News*, June 12, 2019.

- "Monday: Juuling--Blumenthal To Demand FDA Protect Youth From Latest Stealth Vaping Trend," *Congressional Documents and Publications*, April 29, 2018.

- "New York sues Juul, says e-cigarette giant 'took a page from Big Tobacco's playbook'," *CNBC*, November 19, 2019.

- "Nicotine Reduction and E-cig Regulation in Focus at FDA," *Morgan Stanley*, March 19, 2019.

- "North Carolina sues Juul, claiming deceptive marketing and targeting youth," *CNN*, May 15, 2019.

- "Philip Morris USA Inc. Patent Issued for Electrically Heated Smoking System (USPTO 10,390,564)," *Journal of Engineering*, September 9, 2019.

**APPENDIX C**

- "Philip Morris USA Inc. Patent Issued for Smokeless Tobacco Product Sized, Shaped And Adapted For Oral Consumption (USPTO 10,383,355)," *Chemicals & Chemistry*, August 30, 2019.

- "Philip Morris, Altria Deal Seen as Public Health 'Nightmare'; Remerger Would Form Patchwork Family Consisting of Three Top Tobacco Brands," *Calgary Herald*, August 29, 2019."Philip Morris, Altria Progress Towards Merger Deal, CNBC's Faber...," *Theflyonthewall.com*, September 11, 2019.

- "S&PGR Dwngrds Altria Group To 'BBB' On JUUL Invstmt; Otlk Stbl," *Dow Jones Institutional News*, December 20, 2018.

- "SEC Investigates Altria's Investment in Juul; Regulators investigating Marlboro maker's disclosures after two charges totaling $8.6 billion," *Wall Street Journal*, February 21, 2020.

- "Senate opens investigation into Juul's marketing practices to minors," *San Francisco Chronicle:  Web Edition*, April 8, 2019.

- "Startup behind the Lambo of vaporizers just launched an intelligent e-cigarette," *The Verge*, April 21, 2015.

- "Teenagers Embrace JUUL, Saying It's Discreet Enough To Vape In Class," *NPR Shots*, December 4, 2017.

- "The Disturbing Focus of Juul's Early Marketing Campaigns," *Forbes*, November 16, 2018.

- "Timeline:  Significant Events in the History of Juul," *Reuters*, September 25, 2019.

- "Trump could ban sale of flavored vapes, Fox News' John Roberts," *Theflyonthewall.com*, September 11, 2019.

- Vaping Pioneer Juul Asks Agency to Block Pod-Making Competitors," *Bloomberg News*, September 24, 2019.

- *Factiva* and *Bloomberg* headlines and other articles between October 1, 2018 and June 30, 2020.

**Public Websites**

- "ABInBev Share Information—Listings," AB InBev, https://www.ab-inbev.com/investors/share-information/listings/.

- "About Juul Labs," JUUL, https://www.juul.com/about-juul.

- "Altria Stock Performance," Altria, https://investor.altria.com/stock-performance/default.aspx?src=topnav

APPENDIX C

- "Cigarette Sales in the U.S. Continue Historic Decline into the First Quarter of 2019," JUUL, https://www.juullabs.com/cigarette-sales-in-the-u-s-continue-historic-decline-into-the-first-quarter-of-2019/.

- "Cronos Group Investor FAQs," Cronos, https://ir.thecronosgroup.com/investor-faqs.

- "Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act; Restrictions on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products; Final Rule," Federal Register, May 10, 2016, https://www.federalregister.gov/documents/2016/05/10/2016-10685/deeming-tobacco-products-to-be-subject-to-the-federal-food-drug-and-cosmetic-act-as-amended-by-the.

**Regulatory Communications**

- Letter from S. Gottlieb (FDA) to K. Burns (JUUL Labs, Inc.), September 12, 2018.

- Letter from H. Willard (Altria) to S. Gottlieb (FDA), October 25, 2018.

**SEC Filings**

- Altria Group, Inc., Form 10-K for the Fiscal Year ended December 31, 2014, filed on February 25, 2015.

- Altria Group, Inc., Form 10-K for the Fiscal Year ended December 31, 2016, filed on February 27, 2017.

- Altria Group, Inc., Form 10-K for the Fiscal Year ended December 31, 2017, filed on February 27, 2018.

- Altria Group, Inc., Form 10-K for the Fiscal Year ended December 31, 2018, filed on February 26, 2019.

- Altria Group, Inc., Form 10-K for the Fiscal Year ended December 31, 2019, filed on February 25, 2020.

- Altria Group, Inc., Form 10-K for the Fiscal Year ended December 31, 2020, filed on February 26, 2021.

- Altria Group, Inc., Form 10-Q filed on July 24, 2013.

- Altria Group, Inc., Form 10-Q filed on July 29, 2021.

- Altria Group, Inc., Form 10-Q filed on July 30, 2020.

- Altria Group, Inc., Form 10-Q filed on October 25, 2018.

- Altria Group, Inc., Form 10-Q filed on October 31, 2019.

- Altria Group, Inc., Form 8-K filed on December 20, 2018.

- Altria Group, Inc., Form 8-K filed on January 30, 2020.

- Anheuser-Busch InBev SA/NV Form 20-F, filed on March 19, 2021.

- Anheuser-Busch InBev SA/NV Form 20-F, filed on March 22, 2019.

- Anheuser-Busch InBev SA/NV Form 20-F, filed on March 23, 2020.

- Cronos Group Inc., Form 10-K for the Fiscal Year ended December 31, 2019, filed on March 2, 2020.

- Cronos Group Inc., Form 10-K for the Fiscal Year ended December 31, 2020, filed on February 26, 2021.

- Cronos Group Inc., Schedule 13-D, filed on March 18, 2019.

- Philip Morris International Inc., Form 10-K for the Fiscal Year ended December 31, 2019, filed on February 7, 2020.

**Textbooks**

- Brealey, R. A., et al., *Principles of Corporate Finance*, 10th ed., McGraw-Hill/Irwin, 2010.

- Campbell, J. Y., et al., "Event-Study Analysis," in *The Econometrics of Financial Markets,* Princeton University Press, 1997, pp. 149–180.

- Dielman, T. E., *Applied Regression Analysis*, 4th ed., South-Western, 2005.

- Fama, E., *Foundations of Finance: Portfolio Decisions and Securities Prices*, Basic Books, Inc., 1976.

- Kennedy, Peter, *A Guide to Econometrics*, MIT Press, 1998.

- Kothari, S. P., and Warner, J. B., "Econometrics of Event Studies," in *Handbook of Corporate Finance: Empirical Corporate Finance*, Volume 1, B. E. Eckbo ed., Elsevier, 2007, pp. 5–36.

**Data Sources**

- *Bloomberg*

- *CRSP*

- *FactSet*

- *The Nielsen Company*

- *Refinitiv*

**APPENDIX C**

- *S&P Capital IQ*

- *TICK Data*

**Note:  In addition to the documents on this list, I relied upon all documents cited in my report and my exhibits to form my opinions.**

**EXHIBIT 1**

# Altria Group, Inc.
# Altria Annual Net Revenue Breakdown
## FY2018–FY2020

| Revenue Category | FY2018 | | FY2019 | | FY2020 | |
|---|---|---|---|---|---|---|
| | Net Revenue (millions) | Percent of Total Net Revenue | Net Revenue (millions) | Percent of Total Net Revenue | Net Revenue (millions) | Percent of Total Net Revenue |
| **Tobacco Products** | **$24,559** | **96.8%** | **$24,363** | **97.0%** | **$25,622** | **98.0%** |
| - Cigarettes and/or Combustible Products[1] | $22,297 | 87.9% | $21,996 | 87.6% | $23,089 | 88.3% |
| Cigarettes | $21,506 | 84.8% | $21,158 | 84.3% | $22,135 | 84.6% |
| Cigars | $791 | 3.1% | $838 | 3.3% | $954 | 3.6% |
| - Oral Tobacco Products[2] | $2,262 | 8.9% | $2,367 | 9.4% | $2,533 | 9.7% |
| **Wine** | **$691** | **2.7%** | **$689** | **2.7%** | **$614** | **2.3%** |
| **Total Net Revenue** | **$25,364** | | **$25,110** | | **$26,153** | |

Source:  Altria 2020 Form 10-K filed February 26, 2021 (p. 86)

Note:
[1]  Cigarettes and/or combustible products include combustible cigarettes, machine-made large cigars and pipe tobacco.
[2]  Oral tobacco products include moist smokeless tobacco and snus products and oral nicotine pouches.

**EXHIBIT 2A**

# Altria Group, Inc.
## Alleged Misrepresentations in the Complaint

| Date | Quote from Complaint[1] | Company or Affiliation of Employee Issuing Statement |
|---|---|---|
| 12/20/18 | "The Class Period begins on December 20, 2018, when Altria and JUUL both issued press releases announcing that Altria had signed and closed a $12.8 billion investment in JUUL, the purported U.S. leader in e-vapor products, including e-cigarettes." (¶ 454)<br><br>"Altria's December 2018 Press Release also quoted Defendant Willard, who touted Altria's investment in JUUL as the 'biggest' in the Company's history, and a move that the Company made in an effort to promote products that reduced harm..." (¶ 456)<br><br>"Altria's December 2018 Press Release also quoted JUUL's CEO, Kevin Burns, who stated, in relevant part: '***Altria's investment sends a very clear message that JUUL's technology has given us a truly historic opportunity to improve the lives of the world's one billion adult cigarette smokers*** . . . . This investment and the service agreements will accelerate our mission to increase the number of adult smokers who switch from combustible cigarettes to JUUL devices.'" (¶ 458)<br><br>"Additionally, Altria's December 2018 Press Release touted multiple purported benefits associated with Altria's investment in JUUL, including that it purportedly 'Advances Altria's Long-Term Tobacco Harm Reduction Goal.'" (¶ 460)<br><br>"Finally, Altria's December 2018 Press Release attempted to assure investors that Altria's investment in JUUL was made with an ongoing commitment to prevent underage tobacco consumption, promising that Altria and JUUL would work together to prevent underage use of JUUL's products." (¶ 462)<br><br>"Also on December 20, 2018, sixteen minutes after Altria's December 2018 Press Release was distributed, JUUL issued its own press release, in a coordinated fashion, mirroring that of Altria's, titled 'JUUL Statement About Altria Minority Investment and Service Agreements.' Discussing the rise in youth vaping and Altria's investment, JUUL likewise stated that its 'intent was never to have youth use JUUL products' and the company identified Altria's investment as furthering JUUL's purported mission to prevent underage vaping..." (¶ 464)<br><br>"During a December 20, 2018 call with analysts and investors discussing the investment, Defendant Willard again assured everyone that 'Importantly, Altria and JUUL are committed to preventing kids from using any tobacco products. As recent studies have made clear, youth vaping is a serious problem, which both Altria and JUUL are committed to solve...' and 'I think it's hard to nail down exactly how much of the volume could be contributed to -- could be attributed to underage use. We believe it's quite a small percentage…'" (¶¶ 466, 468) | Altria/JUUL |

**EXHIBIT 2A**

## Altria Group, Inc.
## Alleged Misrepresentations in the Complaint

| Date | Quote from Complaint[1] | Company or Affiliation of Employee Issuing Statement |
|---|---|---|
| 2/26/19 | "On February 26, 2019, Altria filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2018 (the '2018 10-K'). The 2018 10-K downplayed FDA concern with Altria's investment into JUUL while simultaneously touting Altria's continued commitment to preventing underage vaping. Specifically, the 2018 10-K stated, in relevant part: ...<br>In October 2018, Altria responded to the FDA's request for a written plan **setting forth the actions it was taking to address underage access and met with the FDA** . . . . Later in December, Altria purchased, through a wholly owned subsidiary, a 35% economic interest in JUUL. Following the announcement of this investment, Altria requested a meeting with the FDA to discuss the transaction and its ongoing support for underage tobacco prevention. In February 2018 [sic], the FDA sent Altria a letter expressing concern about this investment given the rise in underage use of e-vapor products and issued a statement indicating that, if the increased trend in underage use of e-vapor products does not reverse, the FDA may unilaterally take action to address the trend. **Altria responded by reaffirming its ongoing and long-standing investment in underage tobacco prevention efforts** . For example, Altria is advocating raising the minimum legal age to purchase all tobacco products to 21 at the federal and state levels to further address underage tobacco use. Altria will meet with the FDA to continue discussing underage e-vapor use." (¶ 471) | Altria |
| 4/25/19 | "On April 25, 2019, Altria issued a press release announcing its financial and operating results for the first quarter of 2019 (the '1Q19 Press Release'). The 1Q19 Press Release quoted Defendant Willard, who touted Altria's recent investments, which included JUUL, as factors that would accelerate Altria's growth and long-term success, stating, in relevant part:<br>After taking steps to position Altria for long-term success at the end of 2018, we entered 2019 with an evolved business platform that includes our strong core tobacco businesses and **new strategic investments** with tremendous potential for growth . . . . We believe we've made significant progress in the first quarter on key initiatives to realize the potential of our evolved business platform. The 1Q19 Press Release also asserted that Altria's investment into JUUL had included, among other factors, an evaluation of the following: [T]he possibility that the expected benefits of the transaction may not materialize in the expected manner or timeframe, if at all; the potential inaccuracy of the financial projections (including projections relating to JUUL's domestic growth and international expansion); prevailing economic, market, **regulatory or business conditions** , or changes in such conditions, negatively affecting the parties . . . [and] the fact that Altria's reported earnings, financial position and expected use of equity accounting and any future dividends paid by JUUL on shares owned by Altria may be adversely affected by tax and other factors, including the risks encountered (**including regulatory and litigation risks** ) and decisions made by JUUL in its business[.]" (¶¶ 480–481) | Altria |
| 5/16/19 | "On May 16, 2019, Altria held its annual shareholder meeting. As reported by CNBC, Willard was grilled by investors: 'Analysts and investors worried Altria paid too much for its 35% stake in JUUL and very little say over its operations, especially with the e-cigarette giant facing regulatory scrutiny.' Willard defended the terms of the deal, saying the e-cigarette market wasn't growing much before JUUL entered.... As reported by CNBC, 'Willard in response to a shareholder question on how Altria would make itself less vulnerable to JUUL's legal risks said **Altria was aware of early litigation when he made the investment in JUUL.** He said Altria is committed to reducing youth e-cigarette use….'" (¶ 488) | Altria |

**EXHIBIT 2A**

## Altria Group, Inc.
## Alleged Misrepresentations in the Complaint

| Date | Quote from Complaint[1] | Company or Affiliation of Employee Issuing Statement |
|---|---|---|
| 7/13/19 | "On July 13, 2019, in an interview with CNBC, that was later posted on the internet, Burns stated: 'First of all, I'd tell them that I'm sorry that their child's using the product. ***It's not intended for them. I hope there was nothing that we did that made it appealing to them*** . As a parent of a 16-year-old, I'm sorry for them, and I have empathy for them, in terms of what the challenges they're going through.'" (¶ 496) | JUUL |
| 7/25/19 | "On July 25, 2019, Monsees stated to Congress through written testimony: 'We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products. . . .That is a serious problem. Our company has no higher priority than combatting underage use.'" (¶ 498) | JUUL |
| 7/30/19 | "On July 30, 2019, Altria issued a press release announcing its financial and operating results for the second quarter of 2019 (the '2Q19 Press Release'). The 2Q19 Press Release quoted Defendant Willard, who continued to describe the JUUL transaction as a factor that would contribute to Altria's future growth and success, stating, in relevant part:<br><br>Altria delivered excellent second quarter adjusted diluted earnings per share growth of nearly 9%, driven by our core tobacco businesses . . . . We've maintained our focus on the adult tobacco consumer and believe that with our leading premium tobacco brands, U.S. commercialization rights to IQOS, ***investment in JUUL*** and pending transactions, we are best positioned among tobacco peers to lead through a dynamic time in the U.S.<br><br>The 2Q19 Press Release contained generic, boilerplate representations concerning risk factors related to Altria's investment in JUUL[.]" (¶¶ 489–490) | Altria |
| 9/24/19 | "On September 24, 2019, JLI stated to the Los Angeles Times (which was later posted on the internet) that 'We have never marketed to youth and we never will.'" (¶ 509) | JUUL |
| 10/14/19 | "On October 14, 2019, Willard stated to Congress through a letter to Senator Durbin: 'In late 2017 and into early 2018, we saw that the previously flat e-vapor category had begun to grow rapidly. JUUL was responsible for much of the category growth and had quickly become a very compelling product among adult vapers. We decided to pursue an economic interest in JUUL, believing that an investment would significantly improve our ability to bring adult smokers a leading portfolio of non-combustible products and strengthen our competitive position with regards to potentially reduced risk products.'" (¶ 514) | Altria |

Source: Corrected Consolidated Class Action Complaint ("Complaint"), filed July 2, 2020

Note:

[1] Similar alleged misrepresentations made in both the Complaint and the Proposed Amended Complaint are included above and cited to paragraph numbers in the Complaint. Emphasis is in cited document.

**EXHIBIT 2B**

# Altria Group, Inc.
## Additional Alleged Misrepresentations
## in the Proposed Amended Complaint

| Date | Quote from Proposed Amended Complaint[1] | Company or Affiliation of Employee Issuing Statement |
|---|---|---|
| 10/25/18 [2] | "The Class Period begins on October 25, 2018 when Altria sent a letter to FDA Commissioner Gottlieb in response to Gottlieb's September 12, 2018 letter concerning the youth vaping epidemic....The letter reiterated that Altria 'will remove from the market our *MarkTen Elite* and *Apex by MarkTen* pod-based products' and '[f]or our remaining *MarkTen* and *Green Smoke* cig-a-like products, we will sell only tobacco, menthol and mint varieties' because 'we do not want to risk contributing to [the rise in youth use of e-vapor products].' That same day—October 25, 2018—Altria continued its deception on an earnings call with investors. Altria fraudulently described its decision to remove its pod-based products from the market as one intended to address the dramatic increase in youth e-cigarette use... Willard emphasized that Altria's withdrawal of its own pod-based products was intended to address youth use: '[W]e really feel like in light of this dramatic increase in youth usage, withdrawing those products until the PMTA is filed is one path forward.' He later said: 'And frankly, the actions we took were the actions that we thought we could take that would have the biggest impact on addressing the increased use of e-vapor products by youth . . . we wanted to make a significant contribution to addressing the issue.'" (Proposed Amended Complaint, ¶¶ 465–467) | Altria |
| 8/8/19 [3] | "On August 8, 2019, the *Washington Post* reported that Ashley Gould, JLI's Chief Administrator Officer, stated that underage use 'was not anticipated and completely unexpected to us.'" (Proposed Amended Complaint, ¶ 520) | JUUL |

Source:  Corrected Consolidated Class Action Complaint ("Complaint"), filed July 2, 2020; Proposed First Amended Consolidated Class Action Complaint ("Proposed Amended Complaint"), dated August 6, 2021

Note:

[1] For similar alleged misrepresentations in both the Complaint and the Proposed Amended Complaint, the alleged misrepresentations are included in Exhibit 2A.  New alleged misrepresentations in the Proposed Amended Complaint, but not in the Complaint are included above.  Emphasis is in cited document.

[2] Events on October 25, 2018 were also discussed in the Complaint, but were not included in "Section XIII.  Materially False and Misleading Statements Made During the Class Period."

[3] The Proposed Amended Complaint alleges that this *Washington Post* article was published on August 8, 2019.  A review of the public press indicates that this article was published a year earlier on August 8, 2018.

## Altria Group, Inc.
## Alleged Corrective Events in the Complaint

| Date | Quote from Complaint[1] |
|---|---|
| 4/3/19 | "[O]n April 3, 2019, the FDA announced its investigation into nearly three dozen recent cases of people suffering from seizures after vaping. Between 2010 and 2019, the FDA said it received thirty-five reports of people, especially children and young adults, experiencing seizures after using e-cigarettes. On this news, Altria's stock price fell $2.71 per share, or 4.78%, to close at $53.98 per share on April 3, 2019." (¶¶ 478–479) |
| 8/29/19 | "On August 29, 2019, The *Wall Street Journal* reported that the FTC was investigating whether JUUL used influencers and other marketing practices to appeal e-cigarettes to minors. On this news, Altria's stock price fell $1.60 per share, or 3.49%, to close at $44.25 per share on August 29, 2019." (¶¶ 500–501) |
| 8/30/19 | "Additionally, on August 30, 2019, both the FDA and the CDC announced that they were collaborating to investigate e-cigarette related cases of illnesses and 'working tirelessly to investigate the distressing incidents of severe respiratory disease associated with use of e-cigarette products.' On this news, Altria's stock price fell an additional $0.51 per share, or 1.15%, to close at $43.74 per share on August 30, 2019—a total loss of $2.11 per share, or 4.6%, since closing at $45.85 per share two trading days earlier on August 28, 2019." (¶¶ 502–503) |
| 9/9/19 | "On September 9, 2019, the FDA issued a warning letter to JUUL asserting that its statements regarding the risk of harm presented by JUUL constitute unauthorized modified risk claims under federal law and regulation, directing JLI to cease making or publishing such statements and to take immediate corrective action. These statements included those made to students during JUUL's youth outreach and education program indicating that JUUL was about to be approved by the FDA and that it was at least 99% safer than cigarettes, as well as JLI's former CEO, Kevin Burns, making statements regarding the supposedly reduced levels of harmful compounds produced by JUUL's temperature control system." (¶ 504) |
| 9/11/19 | "On September 11, 2019, news sources reported that the Trump administration was preparing a ban on flavored e-cigarettes as federal agencies probe an outbreak of a lung problem that killed at least six people and reportedly led to the sickness of hundreds of others. President Trump and U.S. Health Secretary Azar reportedly both confirmed that a ban was possible after the vaping issues were investigated." (¶ 505) |
| 9/12/19 | "On September 12, 2019, during after-market hours, Reuters reported that, '[w]ithin weeks, New Jersey could become the latest state to restrict e-cigarette use, with the governor on Thursday launching a task force to find ways to curb vaping, linked by U.S. health officials to hundreds of respiratory illnesses and a half-dozen deaths.' Additionally, that same day, the CDC reported that as of September 11, 2019, 380 confirmed cases, and probably cases of lung disease associated with vaping, had been reported by thirty-six states and the U.S. Virgin Islands, with six total deaths confirmed in six states. On this news, Altria's stock price fell $2.45 per share, or 5.51%, to close at $42.01 per share on September 13, 2019." (¶¶ 506–507) |

# Altria Group, Inc.
## Alleged Corrective Events in the Complaint

| Date | Quote from Complaint[1] |
|------|-------------------------|
| 9/23/19 | "On September 23, 2019, during after-market hours, news sources began reporting that federal prosecutors in California were conducting a criminal probe into JUUL." (¶ 508) |
| 9/25/19 | "On September 25, 2019, Altria issued a press release announcing that Philip Morris had called off discussions of a $200 billion merger with Altria due to scrutiny of the vaping industry and the Company's 35% stake in market leader JUUL, which had announced the same day that it was the subject of another federal investigation. JUUL also announced that it was replacing its CEO Kevin Burns with longtime Altria executive K.C. Crosthwaite, and also announced that JUUL would stop all advertising in the U.S. According to an SEC filing, Altria made a 'special recognition' payment of $2.5 million upon Crosthwaite's departure from Altria to JUUL. Crosthwaite had served as an observer on JUUL's board of directors after Altria's investment in JUUL. On this news, Altria's stock price fell an additional $0.17 per share, or 0.42%, to close at $40.56 per share on September 25, 2019—a total loss of $0.32 per share, or 0.78%, since closing at $40.88 per share two trading days earlier on September 23, 2019." (¶¶ 511–512) |
| 10/31/19 | "On October 31, 2019, Altria announced that it was taking a $4.5 billion write down on its investment in JUUL. Altria also announced that the FTC was scrutinizing Altria's role in the departure of JUUL's CEO, stating that on October 1, 2019, Altria received a civil investigative demand 'seeking information regarding, among other things, Altria's role in the resignation of JUUL's former chief executive officer and the hiring by JUUL of any current or former Altria director, executive or employee.' On this news, Altria's stock price fell an additional $1.15 per share, or 2.5%, to close at $44.06 per share on October 31, 2019." (¶¶ 517–518) |
| 1/30/20 | "On January 30, 2020, Altria announced that it was taking an additional $4.1 billion charge related to its JUUL investment. It cited 'the increased number of legal cases pending against JUUL and the expectation that the number of legal cases against JUUL will continue to increase.' On this news, Altria's stock price fell an additional $2.11 per share, or 4.2%, to close at $48.00 per share on January 30, 2020." (¶¶ 519–520) |
| 2/21/20 | "On February 21, 2020, at 3:37 pm (just before the close of trading), the *Wall Street Journal* reported that the SEC had launched an investigation into whether Altria fully disclosed to its shareholders the risks associated with its investment in JUUL. On this news, Altria's stock price fell $0.29 from $46.18 at 3:30 pm to $45.89 at the close of trading on February 21, 2020. Altria's stock price fell an additional $2.09 per share, or 4.8%, to close at $43.80 per share on the next trading day February 24, 2020, and continued to decline to $40.30 on February 27, 2020, for a total decline of $5.88, or 12.7%." (¶¶ 521–522) |

Source:  Corrected Consolidated Class Action Complaint ("Complaint"), filed July 2, 2020
Note:

[1]  Similar alleged corrective events made in both the Complaint and the Proposed Amended Complaint are included above and cited to paragraph numbers in the Complaint.  Emphasis is in cited document.

**EXHIBIT 3B**

## Altria Group, Inc.
## Additional Alleged Corrective Events
## in the Proposed Amended Complaint

| Date | Quote from Proposed Amended Complaint[1] |
|---|---|
| 3/19/19 | "[O]n March 19, 2019, FDA Commissioner Scott Gottlieb said he had a 'difficult' meeting the prior week with Altria and JUUL, was concerned about the slow pace of efforts to curb youth vaping, and believed that the FDA may need to pull pod-based nicotine products off the market as it combats a surge in teen vaping.  On this news, Altria's stock price fell $1.29, per share, or 2.25%, to close at $56.01 per share on March 19, 2019."  (Proposed Amended Complaint, ¶¶ 494–495) |
| 6/21/19 | "On June 21, 2019, CNBC reported that then-former FDA Commissioner Scott Gottlieb stated, 'I don't know how Juul gets through a[] [Premarket Tobacco Product] [A]pplication process' because '[t]hey have so much historical youth use with their product.' On this news, Altria's stock price fell $2.26 per share, or 4.3%, to close at $48.00 per share on June 21, 2019." (Proposed Amended Complaint, ¶¶ 507–508) |
| 11/19/19 | "On November 19, 2019, the New York Attorney General announced a lawsuit against JLI for deceptive and misleading marketing of its e-cigarettes, which contributed to the ongoing youth vaping epidemic in New York State.  On this news, Altria's stock price fell $1.41 per share, or 2.92%, to close at $46.93 per share on November 19, 2019." (Proposed Amended Complaint, ¶¶ 541–542) |
| 4/1/20 | "On April 1, 2020, after the close of trading, the FTC announced that it was filing suit to force Altria to unwind its $12.8 billion investment in JUUL. The press release announcing the complaint, which was filed the same day, stated Altria and JUUL 'entered a series of agreements, including Altria's acquisition of a 35% stake in JUUL, that eliminated competition in violation of federal antitrust laws,' including 'by agreeing not to compete in return for a substantial ownership interest in JUUL':  The Commission alleges that Altria dealt with this competitive threat [from JUUL] by agreeing not to compete in return for a substantial ownership interest in JUUL. Weeks after Altria declared its intention to wind down its e-cigarette business, Altria and JUUL announced an agreement that made Altria JUUL's largest shareholder, allowed Altria to appoint an observer to JUUL's Board of Directors, and would have permitted Altria to appoint three members of JUUL's Board after converting its shares to voting securities. JUUL received over $12 billion, an agreement that Altria would not compete with JUUL for six years, and a range of support service.  On this news, Altria's stock price declined $1.39 per share, or 6.96%, to close at $36.22 per share on April 2, 2020."  (Proposed Amended Complaint, ¶¶ 547–548) |

Source:  Corrected Consolidated Class Action Complaint ("Complaint"), filed July 2, 2020; Proposed First Amended Consolidated Class Action Complaint ("Proposed Amended Complaint"), dated August 6, 2021
Note:
[1]  For similar alleged corrective events in both the Complaint and the Proposed Amended Complaint, the alleged corrective events are included in Exhibit 3A. New alleged corrective events in the Proposed Amended Complaint, but not in the Complaint are included above.  Emphasis is in cited document.

**EXHIBIT 4**



## U.S. Cigarette Market Shares
## Latest 12 Weeks
10/6/18 – 4/18/20

Source: *The Nielsen Company*; Morgan Stanley & CO, LLC; Wells Fargo Securities, LLC

Note:  Represents the latest 12-week volume share for a given company in the cigarette industry as of each date with available Morgan Stanley or Wells Fargo scanner data report.  On May 18, 2019, data are sourced from Wells Fargo because the Morgan Stanley report is unavailable, for all other dates data are sourced from Morgan Stanley.

**EXHIBIT 5**

**Altria Group, Inc.**
**Event Study Analysis**
**Alleged Misrepresentation Dates**
Putative Class Period: 12/20/18–2/21/20

| Alleged Misrepresentation Date[1] | My Event Study[2] | | | Dr. Nye's Event Study[2] | | |
|---|---|---|---|---|---|---|
| | Abnormal Return | t-Stat | Statistically Significant[3] | Abnormal Return | t-Stat | Statistically Significant[3] |
| 12/20/18 | -2.08% | -1.36 | | -0.13% | -0.14 | |
| 2/26/19 | 0.68% | 0.41 | | 0.47% | 0.41 | |
| 4/25/19 | -6.25% | -3.89 | * | -4.85% | -4.23 | * |
| 5/16/19 | -0.27% | -0.17 | | -0.77% | -0.68 | |
| 7/15/19 | -0.88% | -0.54 | | -0.05% | -0.04 | |
| 7/25/19 | -1.55% | -0.95 | | -0.25% | -0.21 | |
| 7/30/19 | -2.51% | -1.55 | | -2.88% | -2.51 | * |
| 9/25/19 | -2.37% | -1.50 | | -0.89% | -0.78 | |
| 10/15/19 | 1.07% | 0.67 | | 1.75% | 1.51 | |

Source: *CRSP*; *Refinitiv*; Altria Form 10-Ks, AB InBev Form 20-Fs, Cronos SC 13Ds, and Press Releases; Corrected Consolidated Complaint dated July 2, 2020

Note:
[1] 7/15/19 is the next trading date after an alleged misrepresentation on Saturday, 7/13/19 (an interview of Mr. Burns with CNBC). 9/25/19 is the next trading date after an alleged misrepresentation on 9/24/19 after market close (JUUL's statement to the Los Angeles Times). 10/15/19 is the next trading date after an alleged misrepresentation on 10/14/19 (Mr. Willard's letter to Congress is dated 10/14/19 but was publicly available on Altria's website with an associated date of 10/15/19).
[2] See Section V.B for a discussion of my event study and Dr. Nye's event study. As I explain in Section V.B, the abnormal returns computed based on my event study model and Dr. Nye's event study model are not directly comparable for three main reasons. First, the abnormal returns computed based on my event study model are calculated after removing the impact of Altria's holdings in two listed companies (Anheuser-Busch InBev SA/NV and Cronos Group Inc.) from Altria's stock return. Second, I use a value-weighted industry peer index comprising British American Tobacco and Imperial Brands, while Dr. Nye uses the S&P 500 Food, Beverage and Tobacco Total Return Index that includes Altria but does not include any competitors of Altria in the U.S. tobacco market. I use the S&P 500 Total Return Index as the market index, which Dr. Nye also uses in his event study model. Third, I use continuously compounded stock returns, while Dr. Nye's model uses simple stock returns.
[3] Statistical significance is assessed at the 5% level.

**EXHIBIT 6**

## Altria Group, Inc.
## Event Study Analysis
## Alleged Corrective Event Dates
Putative Class Period: 12/20/18–2/21/20

| Alleged Corrective Event Date | My Event Study[1] | | | Dr. Nye's Event Study[1] | | |
|---|---|---|---|---|---|---|
| | Abnormal Return | t-Stat | Statistically Significant[2] | Abnormal Return | t-Stat | Statistically Significant[2] |
| 4/3/19 | -4.59% | -2.77 | * | -3.36% | -2.92 | * |
| 8/29/19 | -5.87% | -3.67 | * | -2.94% | -2.50 | * |
| 8/30/19 | -1.69% | -1.06 | | -1.23% | -1.05 | |
| 9/9/19 | 0.21% | 0.13 | | 0.79% | 0.67 | |
| 9/11/19 | 0.08% | 0.05 | | 0.54% | 0.46 | |
| 9/13/19 | -3.13% | -1.96 | * | -2.47% | -2.17 | * |
| 9/24/19 | 1.87% | 1.18 | | -0.65% | -0.56 | |
| 9/25/19 | -2.37% | -1.50 | | -0.89% | -0.78 | |
| 10/31/19 | -2.28% | -1.41 | | -2.95% | -2.52 | * |
| 1/30/20 | -5.65% | -4.07 | * | -5.96% | -6.20 | * |
| 2/21/20 [3] | 1.01% | 0.74 | | 0.15% | 0.15 | |
| 2/24/20 | -2.39% | -1.67 | | -1.98% | -2.15 | * |
| 2/25/20 | -1.85% | -1.31 | | -1.37% | -1.49 | |
| 2/26/20 | -0.89% | -0.65 | | -0.65% | -0.71 | |
| 2/27/20 | -1.94% | -1.32 | | -0.06% | -0.06 | |

Source: *CRSP*; *Refinitiv*; Altria Form 10-Ks, AB InBev Form 20-Fs, Cronos SC 13Ds, and Press Releases; Corrected Consolidated Complaint dated July 2, 2020

Note:
[1] See Section V.B for a discussion of my event study and Dr. Nye's event study. As I explain in Section V.B, the abnormal returns computed based on my event study model and Dr. Nye's event study model are not directly comparable for three main reasons. First, the abnormal returns computed based on my event study model are calculated after removing the impact of Altria's holdings in two listed companies (Anheuser-Busch InBev SA/NV and Cronos Group Inc.) from Altria's stock return. Second, I use a value-weighted industry peer index comprising British American Tobacco and Imperial Brands, while Dr. Nye uses the S&P 500 Food, Beverage and Tobacco Total Return Index that includes Altria but does not include any competitors of Altria in the U.S. tobacco market. I use the S&P 500 Total Return Index as the market index, which Dr. Nye also uses in his event study model. Third, I use continuously compounded stock returns, while Dr. Nye's model uses simple stock returns.
[2] Statistical significance is assessed at the 5% level.
[3] The Complaint alleges an intraday decline of $0.29 from 3:30pm to market close on 2/21/20. The event studies shown for this date are based on daily returns, as is the case for all other dates reported in this exhibit. Thus, for 2/21/20, the event studies analyze Altria's stock return from 2/20/20 market close to 2/21/20 market close.