UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| GABBY KLEIN, DONALD SHERBONDY, SARAH SHERBONDY and CONSTRUCTION LABORERS PENSION TRUST OF GREATER ST. LOUIS, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ALTRIA GROUP, INC., HOWARD A. WILLARD III, WILLIAM F. GIFFORD, JR., JUUL LABS, INC., ADAM BOWEN, JAMES MONSEES, KEVIN BURNS, and K.C. CROSTHWAITE,<br><br>Defendants. | Case No. 3:20-cv-00075-DJN |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS REPRESENTATIVES AND CLASS COUNSEL**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     THE PROPOSED CLASS REPRESENTATIVES ARE ADEQUATE ............................ 2

     A.     Sarah Sherbondy Is an Adequate Class Representative.......................................... 2

     B.     Donald Sherbondy Is an Adequate Class Representative ....................................... 4

     C.     Construction Laborers Pension Trust Is an Adequate Class Representative .......... 6

III.    THE PROPOSED CLASS REPRESENTATIVES' CLAIMS ARE TYPICAL ............... 9

     A.     The Sherbondys' Claims Are Typical .................................................................. 9

     B.     CLPT's Claims Are Typical ............................................................................. 11

IV.     DEFENDANTS HAVE NOT MET THEIR BURDEN OF PROVING LACK OF PRICE
     IMPACT ......................................................................................................... 14

     A.     Defendants Use Professor Skinner's Opinions for An Improper Purpose ............. 15

     B.     Defendants Fail to Produce Any Expert Opinion of No Price Impact for Most
         Corrective Events ............................................................................................. 16

         1.     Defendants Fail to Even Address Four Disclosures That Conclusively
             Establish That Defendants' Fraud Impacted the Price of Altria Stock ..... 17

         2.     Defendants Fail to Present Any Expert Opinion of Zero Price Impact as to
             Five Additional Corrective Events ........................................................... 18

     C.     Defendants Fail to Establish Zero Price Impact for The Remainder of the
         Corrective Events ............................................................................................. 21

V.      PLAINTIFFS' CLASS-WIDE DAMAGES METHODOLOGY SATISFIES COMCAST
     ..................................................................................................................... 25

VI.     THE REQUEST TO CERTIFY THE PROPOSED AMENDED CLASS IS
     PROCEDURALLY AND LEGALLY CORRECT ................................................... 28

VII.    THE COURT SHOULD CERTIFY THE CLASS PERIOD IN THE PROPOSED
     AMENDED COMPLAINT .................................................................................. 30

VIII.   THE JUUL DEFENDANTS' RELIANCE AND STANDING ARGUMENTS DO NOT
     DEFEAT PREDOMINANCE ............................................................................... 31

     A.     Plaintiffs Continue to Have Standing to Bring Claims Against The JUUL
         Defendants...................................................................................................... 31

     B.     Nothing in Basic or Its Progeny Limits the Presumption of Reliance to Statements
         By, or About, an Issuer.................................................................................... 32

     C.     The JUUL Defendants Have Failed to Rebut the Presumption of Reliance by
         Showing Zero Price Impact .............................................................................. 34

IX.     CONCLUSION................................................................................................. 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997).................................................................................................2

*Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)...............................................................................................21

*Ark. Teacher Ret. Sys. Goldman Sachs Grp., Inc.*,
955 F.3d 254 (2d Cir.)......................................................................................14, 18

*Ark. Teacher Ret. Sys. v. Insulet Corp.*,
177 F. Supp. 3d 618 (D. Mass. 2016) ......................................................................9

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)....................................................................................32, 33, 34

*Burges v. Bancorpsouth, Inc.*,
2017 WL 2772122 (M.D. Tenn. June 26, 2017)............................................7, 9, 12

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ........................................................................21, 22

*City of Ann Arbor Employee's Retirement System v. Sonoco Products Co.*,
270 F.R.D. 247 (D.S.C. 2010) ........................................................................8, 9, 30

*City of Miami Gen. Employees' & Sanitation Employees' Ret. Trust v. RH, Inc.*,
2018 U.S. Dist. LEXIS 175573 (N.D. Cal. 2018) ..................................................27

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)....................................................................................1, 25, 27, 28

*Epstein v. Am. Rsrv. Corp.*,
1988 WL 40500 (N.D. Ill. Apr. 21, 1988) .............................................................13

*Erica P. John Fund, Inc. v. Halliburton Co.*,
309 F.R.D. 251 (N.D. Tex. 2015) ...........................................................................24

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)............................................................................................1, 20

*Feder v. Elec. Data Sys. Corp.*,
429 F.3d 125 (5th Cir. 2005) ...................................................................................9

*FindWhat Inv'r Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) .............................................................................26

*Ft. Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
  301 F.R.D. 116 (S.D.N.Y. 2014) ..................................................................................28

*Gariety v. Grant Thornton, LLP*,
  368 F.3d 356 (4th Cir. 2004) ......................................................................................3, 5

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  119 F.R.D. 344 (S.D.N.Y. 1988),
  *aff'd*,
  903 F.2d 176 (2d Cir. 1990)............................................................................................13

*George v. China Auto. Sys., Inc.*,
  2013 U.S. Dist. LEXIS 93698 (S.D.N.Y. July 3, 2013) ..........................................11

*George v. China Auto. Sys., Inc.*,
  2013 WL 3357170 (S.D.N.Y. July 3, 2013) ..............................................................13

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
  141 S. Ct. 1951 (2021)............................................................................. *passim*

*Goldstein v. Puda Coal, Inc.*,
  827 F. Supp. 2d 348 (S.D.N.Y. 2011)...........................................................................11

*Gunnells. City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*,
  322 F. Supp. 3d 676 (D. Md. 2018) ...............................................................................8

*Gunnells v. Healthplan Servs.*,
  348 F.3d 417 (4th Cir. 2003) ...........................................................................................5

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)..................................................................................14, 15, 16

*Harbinger Cap. Partners LLC v. Deere & Co.*,
  632 F. App'x 653 (2d Cir. 2015) ..................................................................................32

*Hatamian v. Advanced Micro Devices, Inc.*,
  2016 U.S. Dist. LEXIS 34150 (N.D. Cal. Mar. 16, 2016).......................................27

*Hayes* v. *MagnaChip Semiconductor Corp.*,
  2016 WL 7406418 (N.D. Cal. Dec. 22, 2016)............................................24, 30, 31

*In re Allergan PLC Sec. Litig.*,
  2021 U.S. Dist. LEXIS 170310 (S.D.N.Y. Sep. 8, 2021).......................9, 15, 22, 28

*In re Allstate Corp. Sec. Litig.*,
  2020 U.S. Dist. LEXIS 239236 (N.D. Ill. Dec. 21, 2020).......................................16

*In re Bofi Holding, Inc. Sec. Litig.*,
2021 U.S. Dist. LEXIS 159675 (S.D. Cal. Aug. 23, 2021) ......................................28

*In re Cardinal Health, Inc. Sec. Litig.*,
226 F.R.D. 298 (S.D. Ohio 2005) ...............................................................................11

*In re CenturyLink Sales Practices & Sec. Litig.*,
337 F.R.D. 193 (D. Minn. 2020).................................................................................18

*In re Computer Scis. Corp. Sec. Litig.*,
288 F.R.D. 112 (E.D. Va. 2012) ........................................................................ *passim*

*In re DVI Inc. Sec. Litig.*,
249 F.R.D. 196 (E.D. Pa. 2008)..................................................................................10

*In re Eaton Corp. Sec. Litig.*,
2017 WL 4217146 (S.D.N.Y. Sep. 20, 2017)............................................................30

*In re Enron Corp.*,
529 F. Supp. 2d 644 (S.D. Tex. 2006) ..........................................................................8

*In re Fed. Nat'l Mortg. Ass'n*,
247 F.R.D. 32 (D.D.C. 2008)......................................................................................24

*In re IMAX Sec. Litig.*,
272 F.R.D. 138 (S.D.N.Y. 2010) ................................................................................11

*In re Kosmos Energy Ltd. Sec. Litig.*,
299 F.R.D. 133 (N.D. Tex. 2014) .................................................................................8

*In re Loewen Group Sec. Litig.*,
233 F.R.D. 154 (E.D. Pa. 2005)..................................................................................10

*See In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 105 (E.D. Va. 2009) .............................7, 11, 30

*In re NeuStar, Inc. Sec. Litig.*,
2015 U.S. Dist. LEXIS 129463 (E.D. Va. Sep. 23, 2015).........................................2

*In re NII Holdings, Inc. Sec. Litig.*,
311 F.R.D. 401 (E.D. Va. 2015) .................................................................................25

*In re Perrigo Co. PLC Sec. Litig.*,
2020 WL 5701823 (S.D.N.Y. Sept. 24, 2020)............................................................7

*In re Petrobras Sec. Litig.*,
862 F.3d 250 (2d Cir. 2017).......................................................................................22

*In re Safeguard Scis.*,
216 F.R.D. 577 (E.D. Pa. 2003)..................................................................................13

iv

*In re Salomon Analyst Litig.*,
373 F.Supp.2d 252 (S.D.N.Y.2005)...................................................................................29

*In re Salomon Analyst Metromedia Litigation*,
544 F.3d 474 (2d Cir. 2008)............................................................................................33

*In re Signet Jewelers Ltd. Sec. Litig.*,
2019 U.S. Dist. LEXIS 114695 (S.D.N.Y. July 10, 2019) ........................................... *passim*

*In re Snap Inc. Sec. Litig.*,
334 F.R.D. 209 (C.D. Cal 2019)......................................................................................31

*In re Tronox, Inc.*,
262 F.R.D. 338 (S.D.N.Y. 2009) .....................................................................................11

*In re ValuJet, Inc.*,
984 F. Supp. 1472 (N.D. Ga. 1997) .................................................................................29

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016).............................................................................................26

*In re Willis Towers Watson Plc Proxy Litig.*,
2020 WL 5361582 (E.D. Va. 2020)............................................................................9, 10, 12

*In re WorldCom, Inc. Sec. Litig.*,
294 F.Supp.2d 392 (S.D.N.Y.2003).................................................................................30

*Karinski v. Stamps.com, Inc.*,
2020 U.S. Dist. LEXIS 209256 (C.D. Cal. Nov. 9, 2020)...............................................21

*Klein v. Altria Grp., Inc.*,
2021 WL 955992 (E.D. Va. Mar. 12, 2021) ....................................................................31

*Latham v. Stein*,
2010 U.S. Dist. LEXIS 86181 (D.S.C. Aug. 20, 2010) ...................................................29

*Lewis v. Casey*,
518 U.S. 343 (1996).........................................................................................................30

*Lorenzo v. SEC*,
139 S. Ct. 1094 (2019).....................................................................................................31

*Louisiana Mun. Police Emps. Ret. Sys. v. Dunphy*,
2008 WL 700181 (D.N.J. Mar. 13, 2008)........................................................................35

*Ludlow v. BP, P.L.C.*,
800 F.3d 674 (5th Cir. 2015) ...........................................................................................27

v

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
    2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) ........................................................32

*Monroe County Employees' Ret. Sys. v. S. Co.*,
    332 F.R.D. 370 (N.D. Ga. 2019)....................................................................18, 22

*Monroe v. City of Charlottesville*,
    2007 WL 2461746 (W.D. Va. Aug. 27, 2007) ..........................................................8

*Morris v. Wachovia Securities, Inc.*,
    223 F.R.D. 284 (E.D. Va. 2004) ..........................................................................3, 5

*National Resources Defense Council, Inc. v. Rauch*,
    244 F. Supp. 3d 66 (D.D.C. 2017) .........................................................................24

*Ogden v. AmeriCredit Corp.*,
    225 F.R.D. 529 (N.D. Tex. 2005) ............................................................................8

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) .....................................................28

*Pirnik v. Fiat Chrysler Autos., N.V.*,
    327 F.R.D. 38 (S.D.N.Y. 2018) .......................................................................23, 27

*Plumbers & Pipefitters Nat. Pension Fund v. Burns*,
    292 F.R.D. 515 (N.D. Ohio 2013) ...........................................................................7

*Rocco v. Nam Tai Elecs., Inc.*,
    245 F.R.D. 131 (S.D.N.Y. 2007) ...........................................................................13

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
    2020 U.S. Dist. LEXIS 81661 (N.D. Cal. May 8, 2020) ........................................27

*Sicav v. Wang*,
    2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) ...........................................................28

*Smith v. Wyeth-Ayerst Labs.*
    Co., 278 F. Supp. 2d 684 (W.D.N.C. 2003)............................................................24

*Soutter v. Equifax Info. Servs., LLC*,
    307 F.R.D. 183 (E.D. Va. 2015) ...............................................................................6

*Spears v. Metro. Life Ins.*,
    2007 WL 1468697 (N.D. Ind. May 17, 2007) ........................................................29

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016) ...........................................................................20

*TFWS, Inc. v. Franchot*,
    572 F.3d 186 (4th Cir. 2009) ..................................................................................31, 32

*Tsereteli v. Residential Asset Securitization Tr. 2006-A8*,
    283 F.R.D. 199 (S.D.N.Y. 2012) ....................................................................................12

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)................................................................................. *passim*

## Statutes

PSLRA ....................................................................................................................................29

## Rules

Fed. R. Civ. P. 23.................................................................................................1, 26, 27, 35

Rule 10b-5.............................................................................................................................31

I.      INTRODUCTION

Forced to concede that the market for Altria securities was efficient during the Class Period, Defendants argue the facially absurd—that the numerous disclosures of regulatory investigations into and lawsuits about JUUL's marketing to minors and Altria's $8.6 billion in write-downs of the JUUL investment resulting from those actions had absolutely zero impact on Altria's stock price and that investors never relied on Defendants' repeated assurances that JUUL never marketed to children. Plaintiffs' expert, Dr. Zachary Nye, has concluded—based on an event study and price impact analysis—that Defendants' alleged misrepresentations had a price impact on Altria stock. Defendants offer nothing but their own speculation in return. Even Defendants' expert, Professor Douglas Skinner, testified that he is ***not*** providing an opinion that there was no price impact. It was Defendants' burden to prove lack of price impact by a preponderance of the evidence. *See Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1963 (2021) ("*Goldman*"). Having failed to proffer expert evidence of zero price impact, Defendants cannot rebut the presumption of reliance, especially in the face of the overwhelming affirmative evidence of price impact marshalled by Plaintiffs.

In their last-ditch challenge to class certification, Defendants advance loss causation arguments under the guise of *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) that are inappropriate for resolution on a Rule 23 motion (*See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011) ("*Halliburton I*")) and baseless adequacy and typicality arguments that mischaracterize testimony from three lead plaintiffs (including an institutional investor) that have ***already demonstrated*** that they are typical and are protecting the class. Defendants have failed to proffer any evidence suggesting that the lead plaintiffs are not typical or adequate or that damages cannot be proven by means of common evidence. Instead, all of Defendants' criticisms concern class-wide issues like the disaggregation of non-fraud factors and the

1

fluctuation of inflation during the Class Period that courts universally have rejected. *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017).

For the reasons stated below, the remainder of Defendants' arguments should be rejected and Plaintiffs' Motion for Class Certification should be granted.

## II.    THE PROPOSED CLASS REPRESENTATIVES ARE ADEQUATE

"The adequacy requirement is met when (1) the named plaintiff does not have interests antagonistic to those of the class; and (2) plaintiff's attorneys are 'qualified, experienced, and generally able to conduct the litigation.'" *In re NeuStar, Inc. Sec. Litig*., 2015 U.S. Dist. LEXIS 129463, at *10 (E.D. Va. Sep. 23, 2015) (citation omitted). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods. v. Windsor*, 521 U.S. 591, 597 (1997).

### A.    Sarah Sherbondy Is an Adequate Class Representative

Defendants do not identify any interest of Mrs. Sherbondy that is antagonistic to those of the class or dispute the quality, experience and skill of her attorneys. Instead, they argue that Mrs. Sherbondy has not dedicated sufficient time and effort to the litigation because, they assert, she did not spend enough time reviewing two filings in the case.

Mrs. Sherbondy's dedication to and supervision of this action is beyond reproach. She and her husband have met with their counsel "every couple weeks or so" and "many times" and that she has kept notes of important issues in the case. Def. Ex. 25 (S. Sherbondy Transcript) at 15:3-6, 15:15-18, 78:21-25. Defendants' counsel showed Mrs. Sherbondy numerous documents from the litigation, each of which she recognized and discussed in detail. *E.g.*, *id*. at 23:16-22, 38:2-4, 39:2-40:23, 65:22-66:3, 68:25-69:21, 95:2-25, 116:2-16. She explained the crux of the allegations (*id*. at 54:25-55:16), named all six individual defendants and the company for which they worked (*id*. at 52:13-25, 54:3-11), described a class action (*id.* at 74:11-21) and understands

2

her duties as a class representative. *Id*. at 74:25-75:7. She knows the class period, knows that Plaintiffs have moved to amend the complaint and extend the class period (*id*. at 103:3-104:1) and even learned that Judge Novak is from her hometown, Greensburg, Pennsylvania, and attended Saint Vincent College. *Id*. at 135:17-23. She is an adequate class representative. *See Gariety v. Grant Thornton, LLP* , 368 F.3d 356, 370 (4th Cir. 2004) (affirming adequacy where plaintiff had "read[] pleadings and confer[ed] with…his counsel regarding strategy."); *Morris v. Wachovia Securities, Inc.*, 223 F.R.D. 284, 296 (E.D. Va. 2004) ("'a general understanding of the facts and claims at issue, as well as illustrat[ing] a commitment to the case'" is sufficient).[1]

Defendants claim that Mrs. Sherbondy is not willing to authorize a settlement in this case. Altria Br. at 13. However, Mrs. Sherbondy testified that she did not understand the question (Def. Ex. 25 at 89:9-25), to which counsel objected (*id.* at 87:16-18), then made it crystal clear that she (i) understood one of her responsibilities is "to approve any settlement offer" (*id*. at 86:21-24); (ii) is willing to participate in settlement discussions (*id.* at 83:9-13, 86:3-7); (iii) is aware the parties had mediated and that it was unsuccessful (*id*. at 85:20-22); and (iv) would evaluate any settlement offer by "talk[ing] it over with my attorneys." *Id*. at 86:25-87:4. Mrs. and Mr. Sherbondy both participated in the mediation before Magistrate Judge Colombell on September 24, 2021, disproving Defendants' assertions of inadequacy.[2]

---

[1] Defendants assert Mrs. Sherbondy is not an adequate representative because (i) she recalled spending 30 minutes reviewing the original complaint prior to requesting appointment as lead plaintiff and (ii) she did not recall reviewing the proposed amended complaint prior to her counsel filing the motion to amend. Altria. Br. at 13. Defendants refused to show Mrs. Sherbondy the original complaint at her deposition, the "Substantive Allegations" section of which is only 11 pages, which can easily be reviewed in 30 minutes. Mrs. Sherbondy testified that she reviewed the original complaint "a few times." Def. Ex. 25 at 72:7-10. As for the proposed amendment, Defendants omit that Mrs. Sherbondy stated that she specifically discussed the amendments with her counsel prior to filing the document. *Id*. at 106:20-21.

[2] Defendants incorrectly assert that Mrs. Sherbondy testified that Mr. Sherbondy made all investment decisions alone and that calling him the "boss" somehow makes her inadequate.

### B.    Donald Sherbondy Is an Adequate Class Representative

Mr. Sherbondy is an 88-year-old retired steel worker with recent health issues that have, among other things, limited his ability to travel. Defendants' attempt to use Mr. Sherbondy's condition to their tactical advantage should not be countenanced.

Defendants incorrectly assert that Mr. Sherbondy thinks this case involves cigarettes "being sold back in 1959." Altria Br. at 11. Mr. Sherbondy testified that the case involves Altria's investment in JUUL (Def. Ex. 23 at 41:20-43:12; *see also id.* at 76:3-13), is about "e-vapor" or "e-cigarettes," and that the first time he heard about it was when he learned that JUUL and Altria were "trying to push…this stuff onto the kids." *Id.* at 37:8-38:3. The Sherbondys thought there may have been fraud (*id.* at 85:12-25) and sold their shares on October 14, 2019. *Id.* at 84:2-5; *see also id* . at 85:18-25, 86:17-21. As for the reference to 1959, Mr. Sherbondy clearly just misspoke, and he quickly corrected himself, stating "I g[a]ve you the wrong class period….I told you '59 instead of '19 was the – was the actual year." *Id*. at 55:21-23.

While Mr. Sherbondy did not recall all the specifics, he testified—consistent with the recollection of Mrs. Sherbondy—that he had been overseeing and directing his counsel throughout the litigation (*id.* at 109:15-17), communicating with his attorneys through bi-weekly calls (*id*. at 110:3-19, 120:2-23), which is how he supervises his attorneys and monitors the case. *Id*. at 115:16-19, 119:10-17. While he did not recall the specific titles of filings, he confirmed—again, consistent with Mrs. Sherbondy's testimony—that he had reviewed "a lot of paper" from the case, which was sent to him from counsel by FedEx, and he would discuss it with his

---

Altria Br. at 13. But Mr. and Mrs. Sherbondy each testified repeatedly that they are both involved in researching investments (Def. Ex. 25 at 27:13-25, 31:19-24, 35:1-17, 44:22-25), and that they made their decision to purchase Altria stock together. *Id.* at 45:4-22, 48:20-49:5, 49:22-50:3, 51:13-52:12, 129:18-23, 129:25-130:3, 238:10-12, 238:18-25; Def. Ex. 23 (D. Sherbondy Transcript) at 32:13-33:5. Defendants also omit Mrs. Sherbondy's testimony that "the boss" is simply a term of love and respect for her husband of 64 years. Def. Ex. 25 at 130:8-20.

attorneys every couple of weeks. *Id*. at 112:5-12, 128:4-16. "This [type of close involvement] is certainly sufficient to establish that [the plaintiff] is an adequate class representative." *Morris*, 223 F.R.D. at 296; *see Gariety,* 368 F.3d at 370. As the Fourth Circuit has observed: "The lack of knowledge contention is particularly meritless":

> It is hornbook law…that "in a complex lawsuit, such as one in which the defendant's liability can be established only after a great deal of investigation and discovery by counsel against a background of legal knowledge, the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative."

*Gunnells v. Healthplan Servs.*, 348 F.3d 417, 430 (4th Cir. 2003) (citations omitted).

Defendants' assertion that Mr. Sherbondy is unwilling or incapable of performing his responsibilities is another mischaracterization of the record. Defendants assert "Mr. Sherbondy says performing the duties he swore he could perform would be 'close to an impossibility' for him." Altria Br. at 13. What Mr. Sherbondy actually said was that, given his lack of ***mobility***, he may not be able to fulfill some requirements if they required travel, stating "that's very hard to do for an aged person. A young person can drive around and do that. I haven't drove in five years…what we're talking about there is a very close to an impossibility." Def. Ex. 23 at 112:14-20; *see also id* . at 112:22-113:16. But Mr. Sherbondy explained that he is able to participate in proceedings through videoconference as he did at his deposition. *Id*. at 129:15-7.[3]

At bottom, Mr. Sherbondy's willingness to discharge his duties is demonstrated by the fact that ***he has alread y success fully done so*** over the last two years. He ***did*** participate in

---

[3]Instead of explaining to Mr. Sherbondy that fulfilling his obligations would require little to no travel and that he had already fulfilled most of the obligations ("participating in discovery," sitting for his deposition, "providing evidence relating to an investment in Altria securities," "participate in settlement discussions," and "authorize any potential settlement"), Defendants' counsel asked questions that suggested that Mr. Sherbondy could only fulfill his duties if he was able to travel, asking about "attendance at an in-person hearing in Richmond" (Def. Ex. 23 at 136:12-137:2), "attend[ing] trial if necessary," and "participate in settlement discussions," in a manner that Mr. Sherbondy clearly thought required his in-person attendance. *Id*. at 139:5-15.

discovery; he ***did*** provide evidence of his transactions in Altria securities; he ***did*** attend his deposition; he ***did*** attend the Court-ordered mediation on September 24, 2021; and he ***did*** participate in settlement discussions with Judge Colombell.[4] Mr. Sherbondy understands he has a duty to absent class members to stay informed, monitor his attorneys and try to get the best result for the class, and that he will fulfill the duties as best he can. *Id.* at 123:21-124:11. He and Mrs. Sherbondy have done precisely that. He is an adequate class representative.

### C.    Construction Laborers Pension Trust Is an Adequate Class Representative

While Defendants contend that CLPT is an inadequate class representative, Altria Br. at 15-16, they fail to identify any "speculative or hypothetical" conflict of interest, let alone a "fundamental" one, required to defeat CLPT's adequacy. *Soutter v. Equifax Info. Servs.*, LLC, 307 F.R.D. 183, 212-213 (E.D. Va. 2015). The reason, of course, is that no such conflict exists and no legitimate argument has been raised to credibly challenge CLPT's adequacy or the adequacy of its attorneys.

As an initial matter, Defendants claim that CLPT is inadequate because its representative lacks sufficient knowledge of the facts of this case and has had limited involvement in the litigation. Altria Br. at 15-16. This argument is both factually and legally inaccurate. Mr. Willey, CLPT's designee, testified that he participated in calls concerning the litigation every couple of weeks and personally reviewed specific filings in this action. Def. Ex. 26 at 11:9-22, 113:9-18. He explained the basis of the lawsuit, the meaning of class certification, the

---

[4] Defendants assert that Mr. Sherbondy did not know of the "court-ordered mediation" in June (Altria Br. at 12), but it was clear that Mr. Sherbondy thought they were asking about a trial or arbitration, where you "got to court" and "find out whether it has merit" and "adjust how much money they should get. Def. Ex. 23 at 140:23-141:5. Then Defendants' counsel incorrectly told him "That's correct." *Id.* at 141:9. Mr. Sherbondy testified that he was aware that his attorneys had met with Defendants' attorneys to see whether a settlement could be reached. *Id.* at 130:22-131:7.

6

misleading nature of an alleged misstatement, and differences between the operative complaint and the proposed amended complaint. *Id.* at 75:4-7, 79:6-19, 108:16-109:4, 116:11-117:2. He also testified that he reviewed the motions to transfer, to dismiss and to amend, and he identified the different defendants. *See id.* at 113:9-18, 116:19-119:14. Mr. Willey even knew why the March 19, 2019 statements by the FDA Commissioner revealed securities fraud by Altria. *Id.* at 79:1-21. That is more than sufficient.

While Defendants argue that CLPT "asked no questions" before getting involved in this case, Altria Br. at 15, the record demonstrates otherwise. As Mr. Willey testified, CLPT takes its fiduciary duties seriously and, in fulfillment of those duties, engages professionals to handle matters of expertise for CLPT. To that end, it engages managers to select and oversee its fund managers (Def. Ex. 26 at 39:9-40:1) and engaged Fund counsel to oversee Lead Counsel (Robbins Geller) in this case. In truth, Mr. Willey asked about the complaint and has conferred extensively with Fund counsel about the case since its inception. *See id.* at 57:17-22, 60:6-11, 72:8-12, 110:21-111:22. Moreover, CLPT's board of trustees followed a deliberative process in deciding to seek appointment as lead plaintiff. *See id.* at 51:20-23, 56:2-57:22, 69:19-70:18 (discussing "the pros and cons" of a lawsuit (in consultation with Fund counsel) and then voting on whether to be a lead plaintiff). These facts universally support a finding of adequacy.[5] Even if Defendants' assertions had any basis in fact, arguments about a plaintiff lacking sufficient knowledge and control "are particularly meritless" under the Fourth Circuit's decision in

---

[5] *See In re Perrigo Co. PLC Sec. Litig.*      , 2020 WL 5701823 (S.D.N.Y. Sept. 24, 2020) ("cooperation [between fund plaintiff's general counsel and lead counsel] is to be commended"); *see also In re Mills* , 257 F.R.D. at 109 (a class representative can rely on counsel to stay informed and make strategic decisions); *Burges*, 2017 WL 2772122, at *6 (representation by outside law firm "will ensure" adequacy); *Plumbers & Pipefitters Nat. Pension Fund v. Burns* , 292 F.R.D. 515, 522-23 (N.D. Ohio 2013) (same).

*Gunnells*. *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ* , 322 F. Supp. 3d 676, 683-84 (D. Md. 2018).[6]

Defendants also incorrectly assert that "the Trust did not even know it had invested in Altria securities until after November 20, 2019." Altria Br. at 15. In truth, DL Carlson (CLPT's investment manager that purchased Altria securities) included Altria transactions among the transactions listed in the quarterly investment reports provided to CLPT. Def. Ex. 26 at 35:9-13. And CLPT—like practically every pension fund—is not itself involved in the decision-making of which investments to purchase or sell. Rather, in fulfillment of its fiduciary obligations, CLPT uses a professional investment consultant to monitor the performance of its managers. *Id.* at 41:15-23. Defendants' mischaracterizations ignore the record. [7]

Defendants also criticize CLPT's use of portfolio monitoring services, Altria Br. at 15, even though CLPT was not obligated to hire Robbins Geller to pursue this (or any other) lawsuit. Pl. Ex. L at 2. In fact, as discussed above, before deciding to proceed as a lead plaintiff, CLPT considered the specific case and voted on how to proceed. *See* Def. Ex. 26 at 57:20-22; *see also City of Ann Arbor Employee's Retire ment System v. Sonoco Products Co.* , 270 F.R.D. 247, 253 (D.S.C. 2010) (board of trustees' process of voting after reviewing complaint and conferring with counsel supported adequacy). Courts in this Circuit (as elsewhere) have found

---

[6] Defendants' mostly out-of-circuit case law is easily distinguished. *See Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529, 535 (N.D. Tex. 2005) (plaintiff had no knowledge "beyond knowing that money was lost"); *Monroe v. City of Charlottesv ille*, 2007 WL 2461746, at *4 (W.D. Va. Aug. 27, 2007) (no evidence that plaintiff took "a supervisory role"); *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 149 (N.D. Tex. 2014) (plaintiff had "lack of knowledge and understanding regarding crucial matters"); *In re Enron Corp.* , 529 F. Supp. 2d 644, 733 (S.D. Tex. 2006) (plaintiffs knew only that they were "involved in a bad business deal"). CLPT's designee demonstrated far more intimate knowledge than the plaintiffs in those cases.

[7] Defendants' insinuation that CLPT (at the discretion of its money manager) holding Altria securities after the filing of this lawsuit renders it inadequate, Altria Br. at 16, is also baseless. *In re Computer Scis. Corp. Sec. Litig.*, 288 F.R.D. 112, 124-25 (E.D. Va. 2012) (rejecting argument that continuing to hold one million shares rendered plaintiff inadequate).

that this type of standard arrangement—adopted by numerous institutional investors to fulfill their fiduciary obligations—does not render a Plaintiff inadequate. *See In re Willis Towers Watson Plc Proxy Litig.*, 2020 WL 5361582, at \*15 (E.D. Va. 2020) (rejecting argument that plaintiff "had not considered bringing claims" until outside counsel suggested it "pursuant to a portfolio monitoring agreement"); *see Burges v. Bancorpsouth, Inc.*, 2017 WL 2772122, at \*5 (M.D. Tenn. June 26, 2017) (monitoring agreement did not render Fund inadequate). The same is true with respect to the indemnity clause in CLPT's retention agreement with Robbins Geller. *See Sonoco*, 270 F.R.D. at 252 (rejecting argument based on indemnity agreement). Defendants do not cite a single case holding otherwise.[8]

## III.    THE PROPOSED CLASS REPRESENTATIVES' CLAIMS ARE TYPICAL

### A.    The Sherbondys' Claims Are Typical

Defendants again assert that the Sherbondys are atypical and subject to unique defenses because they purchased Altria securities after the first partial corrective disclosure in the case. Altria Br. at 13-14. "The fact that an investor has purchased shares after a partial corrective disclosure does not necessarily make that investor an atypical or inadequate class representative." *Ark. Teacher Ret. Sys. v. Insu let Corp.*, 177 F. Supp. 3d 618, 625 (D. Mass. 2016) (citing *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 138 (5th Cir. 2005)). "[P]ost-disclosure purchases will not destroy a lead plaintiff's typicality unless they threaten to become the focus of the litigation." *In re C omput. Scis.*, 288 F.R.D. at 124. Here, Defendants do not

---

[8] Defendants cite *Grupo* and *Allergan* to suggest that Plaintiffs' counsel lack candor and will not adequately represent the class. Altria Opp. at 19, n.4. Plaintiffs' counsel submit that those decisions involved unique circumstances, were wrongly decided, and stand in stark contrast to numerous decisions nationwide holding the precise opposite with respect to both firms. Defendants in this case tried mightily to use discovery to find a parallel situation in this case and failed. They were left with nothing more than a bare inapplicable footnote.

9

even attempt to argue that the parties have spent *any* time, effort or "focus" on this issue during discovery, which is near its end, proving that Defendants' argument is meritless.

"[T]he substantial majority of [] cases hold that post-disclosure purchases do not disqualify a potential class representative." *In re Comput. Scis. Corp. Sec. Litig* ., 288 F.R.D. at 124 (citation omitted). This is because "[a]n investor who purchases a security after the disclosure of adverse information still relies on the fact that the newly-released information will be absorbed by the market and therefore reflected in the post-disclosure price." *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 204 (E.D. Pa. 2008); *see also In re Loewen Group Sec. Litig.* , 233 F.R.D. 154, 163 (E.D. Pa. 2005) ("minor factual differences between the plaintiffs' dates of purchase will not preclude class certification" because "all plaintiffs are advocating the same theory of recovery: that defendants' prolonged course of fraudulent conduct continued ***throughout*** the class period and served to artificially inflate TLGI securities for the ***entire*** period") (emphases added).

Accordingly, courts consider the nature—*e.g.*, the source, strength, content, and extent, among other factors—of the partial disclosure at issue, to determine whether a lead plaintiff movant is subject to a potential unique defense of non-reliance and thus atypical. Here, all of the partial corrective disclosures that occurred prior to the Sherbondys' purchases—on March 19, 2019, April 3, 2019 and June 21, 2019—were issued by third parties and none included a concession by Defendants that their prior statements were false or that they had committed fraud. Purchases after such partial corrective disclosures do not render a proposed class representative atypical. *See Willis Towers* , 2020 WL 5361582, at *13-14 (rejecting argument that purchases after initial corrective disclosure rendered plaintiff atypical); *In re Comput. Scis. Corp. Sec. Litig* ., 288 F.R.D. at 124 (rejecting argument that post-corrective disclosure

10

purchases rendered plaintiff atypical); *Goldstein v. Puda Coal, Inc* ., 827 F. Supp. 2d 348, 355

(S.D.N.Y. 2011) (investors who purchased after a partial corrective disclosure were not atypical

because the article that alleged fraud was by a third party and "could not 'actually concede[] the

existence of the fraudulent schemes at issue in this litigation'"); *In re Tronox, Inc.* , 262 F.R.D.

338, 346 (S.D.N.Y. 2009) (same).[9] Defendants' argument, if accepted, would render investors

who purchased Altria shares during more than two-thirds of the Class Period to be *per se*

atypical representatives, a dubious assertion.[10]

> **B.** **CLPT's Claims Are Typical**

CLPT's claims "are plainly typical of the claims of the class, as [CLPT] possesses the

same interest and has suffered the same injury as the other class members." *In re Comput. Scis.*,

288 F.R.D. at 122.  The mere existence of an arguable defense is not enough to defeat typicality.

As discussed above, unique defenses must be likely to become central to the litigation.  *See In re*

*Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 105 (E.D. Va. 2009). That is certainly not the case here.

---

[9] The cases cited by Defendants are distinguishable because the plaintiffs purchased shares after
they had learned the details of the alleged fraud. *See George v. China Auto. Sys., Inc* ., 2013 U.S.
Dist. LEXIS 93698, at *9 (S.D.N.Y. July 3, 2013) (the plaintiffs continued to purchase stock
after the only corrective disclosure in the case and "each had allegedly learned of the fraud"); *In
re Cardinal Health, Inc. Sec. Litig.* , 226 F.R.D. 298, 310 (S.D. Ohio 2005) ("New Jersey began
buying Cardinal at almost exactly the same time that Cardinal Health began to disclose publicly
the ongoing investigations."). Here, there were no such definitive corrective events and
Defendants also repeatedly reassured investors throughout the Class Period that JUUL never
marketed to minors. The Sherbondys testified that they would not have purchased Altria
securities if they had known that Defendants had been lying. Def. Ex. 25 at 134:22-135:3; Def.
Ex. 23 at 131:14-24.

[10] Defendants' one-paragraph argument that the Sherbondys are not typical because they sold
their shares in October 2019 once they suspected they had been defrauded is similarly meritless.
The single case upon which they rely, *In r e IMAX Sec.  Litig* ., 272 F.R.D. 138, 148-155
(S.D.N.Y. 2010), involved a plaintiff that either made all of its purchases prior to any
misrepresentation or made all of its sales before any corrective event and, therefore, could not
establish loss causation. Here, the Sherbondys were clearly damaged because they made all their
purchases after the first false statement and sold all their shares after several corrective events.

11

Defendants contend that CLPT did not rely on the alleged misrepresentations, citing to testimony from DL Carlson analyst Jennifer Johnsrud ("Ms. Johnsrud"), who purchased Altria securities on behalf of the Fund. Altria Br. at 16-17. But while Ms. Johnsrud testified to her view that JUUL had marketed to minors, she also clarified that she "never would have bought Altria had I known that there were all of these issues" (Def. Ex. 27 at 207:6-10), that she believed that Altria was going to be "taking steps to address youth usage" (*id*. at 206:3-17), and that Altria would not have made such a large investment in JUUL "without making sure that the youth usage problem was being addressed." *Id*. at 117:9-118:18. Defendants do not explain how this testimony is inconsistent with Plaintiffs' theory or reconcile it with the testimony they claim shows a lack of reliance. Nor can they.  Ms. Johnsrud testified that she reviewed and considered statements at issue in this case. *See id.*  at 106:23-110:18, 134:19-135:15. In any event, investment manager opinions are not binding on the plaintiff and do not defeat typicality. *Burges*, 2017 WL 2772122, at *6 (contention that investment manager's view of the facts "clashes with important allegations" in complaint did not defeat typicality, and defendants did not show that investment manager employee's statements were "binding on the Fund"); *In re Willis Towers*, 2020 WL 5361582, at *13-14 (purported views of plaintiff's investment advisers did not disqualify plaintiff).[11]

Defendants cherry-pick parts of Ms. Johnsrud's testimony to (incorrectly) argue her lack of reliance. Altria Br. at 16-17. Defendants highlight Ms. Johnsrud's opinion that JUUL was overvalued and her rationale for purchasing Altria. *Id.* at 17. But these citations do not show

---

[11] The *Tsereteli* case that Defendants cite regarding an investment advisor's **knowledge** being imputed to an investor is distinguishable. Altria Br. at 19 (citing *Tsereteli v. Res idential Asset Securitization Tr. 2006-A8* , 283 F.R.D. 199, 475 n.109 (S.D.N.Y. 2012)). There, the court referred to imputing an advisor's knowledge of facts to the investor, but not the mere speculation or opinions that Ms. Johnsrud testified about in this case.

what she thought, let alone knew, about the connection between JUUL's marketing and youth usage and the increased regulatory and legal risk Defendants concealed. While Defendants point to youth usage being "on [Ms. Johnsrud's] mind," *id.*, this merely illustrates the materiality of the issue. Defendants also point to Ms. Johnsrud's speculation about JUUL's strategy, *id.*, but ignore her testimony that undermines their argument of no reliance, including that she believed "Altria was going to play along and get along with the FDA by taking steps to address youth usage." Def. Ex. 27 at 205:23-206:7. Nor do Ms. Johnsrud's post disclosure purchases render CLPT's claims atypical. Altria Br. at 18. As discussed above, post-disclosure purchases do not defeat typicality. *Supra* at III.A; *see also Comput. Scis*, 288 F.R.D. at 124 (rejecting argument that post-corrective disclosure purchases rendered plaintiff atypical).[12]

Finally, focusing on only two of the alleged disclosures, Defendants argue (again incorrectly) that Ms. Johnsrud "admitted that a number of corrective disclosures" revealed no fraud. Altria Br. at 18. That is untrue. Regarding the March 19, 2019 disclosure, Ms. Johnsrud merely testified that "[f]raud hadn't crossed [her] mind" at the time and indicated that she was more immediately concerned with the stock having dropped. Def. Ex. 27 at 130:3-14. And regarding the August 30, 2019 disclosure, Ms. Johnsrud only testified that she personally did not

---

[12] Defendants attempt to distinguish *Comput. Scis.* by suggesting that Ms. Johnsrud purportedly had "knowledge with respect to the alleged fraud." Altria Br. at 18 n.3. But Ms. Johnsrud had no such knowledge.  Ex. 27 at 207:6-10 ("I never would have bought Altria had I known that there were all of these issues."). Defendants' entirely out-of-circuit case law is inapposite. *See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* , 119 F.R.D. 344, 348 (S.D.N.Y. 1988), *aff'd*, 903 F.2d 176 (2d Cir. 1990) (continued purchasing after fraud was revealed through private phone call); *In re Safeguard Scis.*, 216 F.R.D. 577, 582 (E.D. Pa. 2003) (plaintiff would have purchased stock "regardless" of fraud and suffered from "serious concerns with credibility"); *Epstein v. Am. Rsrv. Corp.*, 1988 WL 40500, at *4-5 (N.D. Ill. Apr. 21, 1988) (broker "may have acted on inside information" or out of self-interest); *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (plaintiff knew about allegedly manipulated finances" prior to public disclosure); *George v. China Auto. Sys., Inc.* , 2013 WL 3357170, at *6-7 (S.D.N.Y. July 3, 2013) (plaintiffs were individual "in-and-out traders").

know how vaping cases and the CDC related to fraud, not that they affirmatively do not. *Id.* at 152:14-20.  Defendants do not explain how this testimony would affect CLPT's claim, let alone how it would become a central issue in the litigation.  CLPT is clearly typical.

## IV.  DEFENDANTS HAVE NOT MET THEIR BURDEN OF PROVING LACK OF PRICE IMPACT

Plaintiffs and their expert, Dr. Nye, have demonstrated that the market for Altria securities was efficient during the Class Period. *See* Pl. Br. (ECF No. 221) at 19-25; Pl. Ex. A (Nye Report) at §VI. Defendants and their expert, Dr. Skinner, do not contest market efficiency. *See, e.g.*, Def. Ex. 1 (Skinner Report) at ¶59; Pl. Ex. I (Skinner Transcript) at 28:5-15. Because Plaintiffs have established the applicability of *Basic*'s presumption of reliance, the burden shifts to the defendants to prove "that the alleged misrepresentation did not actually affect the stock's price—that is, that the misrepresentation had no 'price impact." *Halliburton Co. v. Erica P. John Fund, Inc* ., 573 U.S. 258, 263-64 (2014) ("*Halliburton II*"). Defendants must prove the alleged fraud had ***zero*** price impact on Altria's securities "by a preponderance of the evidence." *Goldman*, 141 S. Ct. at 1963.

"[F]or a defendant to erase the inference that the corrective disclosure had price impact - *i.e.*, that it played some role in the price decline — it must demonstrate…that the *other even ts explain the **<u>entire</u>** price drop*." *Ark. Teacher Ret. Sys. Goldman Sachs Grp., Inc*., 955 F.3d 254, 270 n.18 (2d Cir.) (emphasis added) vacated on other grounds by *Goldman*, 141 S. Ct. at 1963. "[M]erely suggesting that another factor … also contributed to an impact on a security's price does not establish" a lack of price impact. *Id*. Because Plaintiff can proceed on either a "front end" or "back end" price impact theory, Defendants must affirmatively disprove both to satisfy their burden. *Waggoner*, 875 F.3d at 104-05. They have fallen far short.

Defendants' "front-end" price impact argument is unpersuasive. Defendants' contention that there was no statistically significant positive price reaction in Altria securities on the dates of the alleged misstatements (Altria Br. at 22-23) does not satisfy their burden (and Defendants cite no case law saying that it does) because Plaintiffs allege that Defendants' misrepresentations artificially maintained the price of Altria stock, which would have declined if Defendants had disclosed the truth. *See In re All ergan PLC Se c. Li tig.*, 2021 U.S. Dist. LEXIS 170310, at *31 (S.D.N.Y. Sept. 8, 2021) ("Professor Skinner's opinion in this regard is unpersuasive …At bottom, it does not matter one bit for the price maintenance theory whether the alleged misstatements were directly correlated with an increase in Allergan's share price").

On the back-end, Dr. Nye demonstrated through an event study that following nine allegedly corrective events Altria's stock price immediately declined in a statistically significant manner and that the disclosures had a price impact on Altria's stock. Pl. Ex. H (Nye Rebuttal Report) at ¶¶40, 41, 44, 102, 103. Defendants' assertions to the contrary are meritless. *First*, Defendants' own expert confirmed that for these nine alleged corrective events he is *not* providing an opinion that they had no price impact—a fact that dooms Defendants' argument. *Second*, for the remaining disclosures that Professor Skinner affirmatively opines had no price impact, he was only able to reach that conclusion by violating a fundamental principle of statistical analysis, rendering his analysis unreliable.

### A.    Defendants Use Professor Skinner's Opinions for an Improper Purpose

An expert's price impact analysis can be used only for a limited purpose. That is, "defendants may introduce price impact evidence at the class certification stage, *so long as it is for the purpose of count ering a plai ntiff's showi ng of m arket effici ency, rather t han direct ly rebutting the presumption*." *Halliburton Co. v. Eric a P. John Fund, Inc* ., 573 U.S. 258, 280, 134 S. Ct. 2398, 2414-15 (2014). But here, Professor Skinner (i) was not asked to opine on market

efficiency; (ii) assumes that the market for Altria securities was efficient (Skinner Report at ¶59; Skinner Tr. 28:5-15); and (iii) even relies on Altria's efficient market to reach his conclusions that certain corrective events had no price impact and that there is "substantial doubt" as to the evidence of price impact on other dates. *Id*. at ¶¶82, 99, 106, 109, 117, 119, 122, 124. As courts have previously recognized, this admission requires the Court to reject Defendants' price impact argument:

> Allen concludes that, because Allstate operated in an efficient market, the statements could not have affected the stock price because the market already knew about Allstate's underwriting strategy. Far from rebutting plaintiffs' showing of an efficient market, Allen agrees—or at least accepts for the purposes of her argument—that Allstate was trading in an efficient market. It is thus difficult for the court to square Allen's report with the purpose-based inquiry identified in *Halliburton II*.

*In re Allstate Corp. Sec. Litig.* , 2020 U.S. Dist. LEXIS 239236, at *16 (N.D. Ill. Dec. 21, 2020). Given that Professor Skinner expressly admitted at his deposition that he was not offering his price impact opinions "to show that the market for Altria securities was not efficient" (Skinner Tr. 28:16-22), Defendants are utilizing his opinions for an improper purpose.

## B. Defendants Fail to Produce Any Expert Opinion of No Price Impact for Most Corrective Events

Although it is not Plaintiffs' burden to do so, they have affirmatively and conclusively demonstrated price impact. For corrective events on nine days—March 19, 2019, April 3, 2019, June 21, 2019, August 29, 2019, October 31, 2019, November 19, 2019, January 30, 2020, February 21, 2020 and April 1, 2020—Dr. Nye found that each disclosure was immediately followed by a statistically significant stock price decline and that the disclosures had a price impact on Altria's stock price. Nye Rebuttal at ¶¶ 41, 44, 55, 65, 77, 87, 99, 102. Critically, as detailed below, Professor Skinner acknowledged that almost all of these disclosures were followed by a statistically significant "abnormal return" that could not be explained by market or industry factors

16

and he confirmed that he is __*not*__ providing an opinion that the disclosures had zero price impact. Instead, Professor Skinner provides only the opinion that he has some undefinable and unquantifiable "substantial doubt" (Skinner Tr. at 120:5-8) about whether the stock price change following these disclosures "can be used as evidence of earlier price impact." Skinner Report at §VI. However, "it is Defendants' burden to show the *absence* of price impact—***not merely to challenge Plaintiff on th    e persuasiveness of its    own price impact claim    *** —once *Basic*'s presumption of reliance attaches." *In re Signet Jewelers Ltd. Sec. Litig.* , 2019 U.S. Dist. LEXIS 114695, at *48 (S.D.N.Y. July 10, 2019) (quoting, *Waggoner* , 875 F.3d at 104-05 (emphasis added)).

### 1.    Defendants Fail to Even Address Four Disclosures That Conclusively Establish That Defendants' Fraud Impacted the Price of Altria Stock

Defendants' attempt to demonstrate that the alleged fraud had *zero* impact on the price of Altria securities can be easily rejected because they completely ignore the price impact of the following four alleged corrective events.

- **March 19, 2019** – FDA Commissioner Scott Gottlieb announced that he had a "difficult" meeting the prior week with Altria and JUUL and was concerned about the slow pace of their efforts to curb youth vaping.
- **June 21, 2019** – Former FDA Commissioner Gottlieb said that he does not know how JUUL will ever get through a Premarket Tobacco Product Application process.
- **November 19, 2019** – The New York Attorney General announced a lawsuit against JUUL for deceptive and misleading marketing of its e-cigarettes.
- **April 1, 2020** – After the close of trading, the FTC announced that it was filing suit to force Altria to unwind its $12.8 billion investment in JUUL.

Neither Defendants nor Professor Skinner dispute that these disclosures are corrective events that "match" the alleged misstatements. Indeed, despite being aware of these alleged disclosures, Professor Skinner did not analyze them. Skinner Tr. at 46:23–47:10. Each was immediately followed by an undisputed statistically significant stock price decline, and Dr. Nye

17

concluded that these disclosures had a price impact on Altria's securities. Nye Rebuttal at ¶35, 41, 102. Because it is undisputed that these disclosures had a price impact, Defendants cannot carry their burden of demonstrating that the alleged fraud had zero price impact. *Goldman*, 955 F.3d at 270 n.18 (defendants must prove that "*other events explain the **entire** price drop*"); *see also In re CenturyLink Sales Practices & Sec. Litig.*, 337 F.R.D. 193, 211 (D. Minn. 2020) ("statistically significant price drops following two of the three disclosure dates…is sufficient to prevent Defendants from 'sever[ing] the link' between the alleged misrepresentations and any impact on CenturyLink's stock price."); *Monroe County Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 395 (N.D. Ga. 2019) ("[statistically significant price decline] dooms Defendants' attempt to rebut the presumption of reliance because the inquiry is whether Defendants have proven a complete lack of price impact during the Class Period, not whether the stock price decline following individual corrective disclosures was caused by the alleged misrepresentations, which is a loss causation analysis not appropriate at this stage").[13]

### 2. Defendants Fail to Present Any Expert Opinion of Zero Price Impact as to Five Additional Corrective Events

Defendants argue (without support) that the Court should limit its analysis to only the corrective events identified in the original Complaint. Altria Br. at 23 n.7. But even that does not help Defendants—they cannot carry their burden of proving zero price impact. Professor Skinner confirmed at his deposition that he is ***not*** providing an opinion that any of the following

---

[13] Tellingly, Professor Skinner was told by Defendants to ***not*** provide any price impact analysis for these dates. Skinner Tr. 47:11-23. Moreover, Professor Skinner testified that he was not asked to conduct an independent analysis of all news disclosed during the Class Period to identify any disclosures relevant to a price impact analysis, which he acknowledged would be the proper analysis. *Id*. at 42:22-44:12. Instead, Defendants instructed him to consider only certain disclosures in the Complaint, even if other disclosures, such as those identified above, are alleged to be corrective events by Plaintiffs. *Id*. at 40:4-47:23. Professor Skinner's opinions are unreliable—his myopic analysis is contrary to how an independent analysis should be conducted.

18

disclosures—each of which were accompanied by a statistically significant stock price decline—had no price impact:

- **April 3, 2019** - the FDA announced its investigation into nearly three dozen cases of people suffering from seizures after using e-cigarettes.

- **August 29, 2019** – *The Wall Street Journal* reported that the FTC was investigating whether JUUL had used marketing practices to promote e-cigarettes to minors.

- **September 12, 2019** – New Jersey announced possible restrictions on e-cigarette use, and the CDC announced cases of vaping-related lung disease.

- **October 31, 2019** – Altria announced that it was taking a $4.5 billion write-down on its investment in JUUL and that the FTC was scrutinizing Altria's role in the departure of former JUUL CEO Kevin Burns.

- **January 30, 2020** – Altria announced that it was taking an additional $4.1 billion charge related to its JUUL investment, citing an increase in litigation against JUUL.

- **February 21, 2020** –*The Wall Street Journal* reported that the SEC was investigating whether Altria misrepresented the risks associated with its investment in JUUL.

*Each of these announcements    was followed by  a  statistically significant stock price decline* under Dr. Nye's event study. Nye Rebuttal at ¶¶35, 44, 55, 65, 77, 87, 99. And even Professor Skinner's event study (i) found statistically significant declines following the disclosures on April 3, 2019, August 29, 2019, September 12, 2019, and January 30, 2020, (ii) found "abnormal returns" on October 31, 2019, and February 24, 2020 that could not be explained by market or industry factors at a 84% and 90% confidence level, respectively, and (iii) agreed that Altria's price reacted immediately to the February 21, 2020 disclosure, with trading volume skyrocketing. Skinner Report at ¶¶106, 143, 147, 153; Skinner Report, Exhibit 6; Skinner Tr. 82:24-84:3. While he asserts that he has some undefinable and unquantifiable "substantial doubt" (Skinner Tr. 120:5-8) as to whether the stock price change following these disclosures "can be used as evidence of earlier price impact" (Skinner Report at §VI), he provides no opinion as to what could have caused the stock price declines, if not the corrective events. *See, e.g.*, Skinner Tr. 164:7-16; 116:5-11. And critically, as to each corrective event, *Professor Skinner testified that he is not*

19

***providing any opinion that the disclosure had no price impact***. *Id*. at 169:16-21; 159:24-160:7; 118:3-7; 188:21-189:12; 151:9-24. As discussed above, this "dooms" Defendants' bid to rebut the presumption of reliance. *Supra*, at 18.

Faced with the overwhelming (yet, unsurprising) evidence that lying about marketing e-cigarettes to children will have a price impact, Defendants assert a hodgepodge of arguments that essentially argue a lack of loss causation. They claim that the April 3, 2019 disclosure is a "mismatch" with the alleged misrepresentations, Altria Br. at 25, that the August 29, 2019 and February 21, 2020 announcements of investigations are "insufficient to establish loss causation," *id*. at 25, 29, and that the October 31, 2019, and January 30, 2020, impairments were largely anticipated by analysts.[14] *Id*. at 27-28. While Professor Nye debunks each of these assertions in detail (Nye Rebuttal at ¶¶41-98), it is not necessary. Even the cases cited by Defendants acknowledge that these are loss causation arguments, which are inappropriate to resolve at class certification. *Halliburton I*, 563 U.S. at 815 ("The fact that a subsequent loss may have been caused by factors other than the revelation of a misrepresentation has nothing to do with whether an investor relied on the misrepresentation in the first place, either directly or presumptively through the fraud-on-the-market theory"); *Strougo v. Barclays PLC*, 312 F.R.D. 307, 329 n.27 (S.D.N.Y. 2016) ("[W]hile defendants presume that disclosure of the NYAG lawsuit is not related to the alleged fraud as a matter of law…it is a merits-based inquiry relating to loss causation that is not ripe for resolution on class certification."). In any event, the Court has already held that these disclosures "relate back to Defendants' alleged misrepresentations

---

[14] For the October 31, 2019 impairment, Professor Skinner merely opines that the risk materialized earlier in the Class Period and that there ***was a price impact*** from the alleged fraud, just not on that particular day. Skinner Tr. 112:24-114:19.

regarding their marketing practices…[and] speak to JUUL's exposure" (ECF No. 140 at 38), a finding that supports loss causation.[15]

### C.    Defendants Fail to Establish Zero Price Impact for the Remainder of the Corrective Events

For the handful of the remaining corrective events, Professor Skinner opines that because the disclosure was not followed by a statistically significant stock price decline there was "no price impact." Skinner Report at §VI.B; Altria Br. at 23.[16] He reaches this conclusion of "no price impact" by "accepting" the "null hypothesis," a fundamental statistical mistake that makes his analysis unreliable. Nye Rebuttal at ¶¶104-111.

An event study is "a statistical regression analysis that examines the effect of an event…on a dependent variable, such as a company's stock price." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 80 (S.D.N.Y. 2015) (citation omitted). An event study begins with identifying the "null hypothesis." In securities litigations, the null hypothesis is that the event being analyzed (*e.g.*, the corrective disclosure) had ***zero price impact*** on the company's stock. If the difference between the actual stock return and the expected stock return (the "abnormal return") is "statistically significant" – that is, sufficiently different from zero – then the null hypothesis that the announcement had zero price impact can be rejected and one may conclude that the announcement ***did*** impact the price of the stock. The converse is not true, however. That is, the ***lack*** of a

---

[15] Defendants also argue that because JUUL's marketing was public, the market could evaluate it for itself and incorporate the risk of regulatory action despite Defendants' assurances to the contrary. Def. Br. at 26. "This argument amounts to a truth-on-the-market defense and is not properly considered at the class certification stage." *Karinski v. Stam ps.com, Inc.*, 2020 U.S. Dist. LEXIS 209256, at *18-19 (C.D. Cal. Nov. 9, 2020) citing *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 475, 482 (2013)). In any event, as this Court already held, this defense is not available where, as here, Defendants continued throughout the Class Period (and to this day) to deny that JUUL ever marketed to youth. ECF No. 140 at 29.

[16] Referring to impact dates of August 30, 2019, September 9, 2019, September 11, 2019, September 12, 2019, and September 24, 2019.

statistically significant stock price movement does ***not*** suggest that the event did ***not*** cause the abnormal price movement. It merely demonstrates that the abnormal return was not sufficiently different from zero to allow one to conclude with scientific certainty that the abnormal price movement was caused by the news. The results either permit one to reject the null hypothesis or not reject the null hypothesis.  Critically, one may never ***accept*** the null hypothesis:

> "[A]s we know, the hypothesis-testing procedure allows us only to ***reject*** the null or ***fail to reject it***. ***We can never confirm that a theory is in fact true***, which is often what people want to do.

Pl. Ex. M, De Veaux, Velleman, Bock, Stats: Data & Models, at 662-63, (emphasis in original); *see also id*. at 497 ("we haven't proven that the null hypothesis is true"); Steven Goodman, *A Dirty Dozen: Twelve P-Value Misconceptions*, 45 Seminars in Hematology 135, 136 (2008) ("A nonsignificant [effect] … does not make the null effect [*i.e.*, the hypothesis of no price impact] the most likely. The effect best supported by the data from a given experiment is always the observed effect, regardless of its significance.").

Professor Skinner's acceptance of the null hypothesis was a fundamental error, especially under the circumstances in this case. Courts have recognized that the lack of statistical significance is particularly unhelpful when studying a single firm as is done in securities litigations. *Carpenters*, 310 F.R.D. at 95.  This is because "the [single firm event study] can detect very large price impacts reliably, but it cannot detect smaller price impacts reliably." Brav and Heaton, 903 Wash. U. L. at 594. *In re Petrobras Sec. Litig.*, 862 F.3d 250, 278 (2d Cir. 2017) ("only very large-impact events will be detectible"). As a result, "numerous courts have noted that, '[t]he failure of an event study to find price movement does not prove lack of price impact with scientific certainty.'" *In re Allergan*, 2021 U.S. Dist. LEXIS 170310, at *38 (citation omitted); *see Monroe Cty. Emps.' Ret. Sys. v. Southern Co.*, 332 F.R.D. 370, 393 (N.D. Ga. 2019) (arguments that the absence of a statistically significant price decline "prove lack of price impact" are "routinely reject[ed]")

22

(collecting cases); *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 46-47 (S.D.N.Y. 2018) (same); *Signet*, 2019 U.S. Dist. LEXIS 114695, at *48 ("it is Defendants' burden to show the *absence* of price impact—**not merely to challenge Plaintiff on the persuasiveness of its own price impact claim**—once *Basic*'s presumption of reliance attaches").

Here, Professor Skinner acknowledged that his null hypothesis was "the news did not affect the stock price" (Skinner Report ¶61), *i.e.* no price impact. Professor Skinner concluded that each of the disclosures on August 30, 2019, September 9, 2019, September 11, 2019, September 12, 2019 and September 23, 2019 had no price impact based solely on the lack of a statistically significant price reaction following the disclosures. *Id.* at ¶¶85, 87, 89, 92, 94, 96, 98, 101. For example, on August 30, 2019, the FDA and the CDC announced that they were collaborating to investigate e-cigarette related cases of illnesses. Professor Skinner's event study demonstrated a negative "abnormal return" at a 70.94% confidence level, below his statistical significance level of 95%. Skinner Report ¶85. Based on this result, he "reach[ed] the affirmative opinion that there was no price impact." Skinner Tr. 58:10-60:3; *see* Skinner Report ¶87. When confronted with the impropriety of his analysis, Professor Skinner openly admitted that he committed the cardinal sin in statistics of accepting the null hypothesis.

> Q:      You had said previously that if you find there is no statistically significant stock price movement on that day, you conclude from an economic standpoint that the stock price did not change on that day, and *I am asking you is that equivalent to accepting the null hypothesis*?
>
> A.      And what I am carefully trying to explain is that the null hypothesis is that the stock price didn't move on that day, and based on the available evidence and the statistical analysis, *we are unable to reject the null hypothesis. So the conclusion is that the null hypothesis is true*.

Skinner Tr. 88:6-18.[17]

---

[17] Professor Skinner's assertion that he also considered other news on the corrective disclosure date before accepting the null hypothesis does not remedy his flawed methodology because, as

Professor Skinner's failure to follow one of the most basic tenets of statistical analysis renders his opinions unreliable. *See National Resources Defense Council, Inc. v. Rauch*, 244 F. Supp. 3d 66, 93-96 (D.D.C. 2017) (accepting the null hypothesis was "arbitrary and capricious," "a common [statistical] mistake[]," and an "error of logic" that "constitutes an unreasoned choice"). "As the D.C. Circuit has explained, a 'fail[ure] to reject the null hypothesis' *might* mean that no trend in fact exists, but it is equally consistent with [the] proposition that a trend does exist and the test 'merely lacked sufficient power to detect [it].'" *Id.* at 90, quoting *Am. Petroleum Inst.* 684 F.3d at 1350 (same); *see also, e.g.*, *Smith v. Wyeth-Ayerst Labs. Co.*, 278 F. Supp. 2d 684, 693 n.14 (W.D.N.C. 2003) (same).[18]

\*   \*   \*   \*   \*

The Supreme Court has stated that the question of whether Defendants' fraud had any price impact on Altria's securities should be "aided by a good dose of common sense." *Goldman*, 141 S. Ct. at 1960. It is "common sense" that Defendants' repeated specific and express denials of JUUL marketing to youth, if false and misleading when made, would have had a price impact on Altria's stock price given the critical importance of the issue. This "common sense" is borne out by Dr. Skinner's own analysis, which shows statistically significant stock price declines following

---

he acknowledged, there was no other value relevant news on August 30, 2019 that would have been expected to impact Altria's stock price. *See* Skinner Report at ¶¶86, 90, 95, 100. Therefore, the only basis for his conclusion of no price impact is the lack of a statistically significant stock price decline.

[18] The cases upon which Defendants rely for their assertion that "courts routinely remove corrective disclosures that lack merit" at the class certification stage (Altria Opp. at 23 n. 8) are inapposite. In *Hayes* v. *MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at \*8 (N.D. Cal. Dec. 22, 2016) and *In re Fed. Nat'l Mortg. Ass'n*, 247 F.R.D. 32, 39-41 (D.D.C. 2008), the courts merely ended the class period on the date on which the Defendants publicly and unequivocally disavowed the accuracy of the company's financial statements, warning investors that they could no longer be relied upon. In *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 280 (N.D. Tex. 2015), the district court wrongly concluded that the lack of statistical significance proves lack of price impact.

regulatory actions taken against JUUL for such improper marketing to youth and the resulting write-downs by Altria.

## V.    PLAINTIFFS' CLASS-WIDE DAMAGES METHODOLOGY SATISFIES *COMCAST*

*Comcast v. Behrend*, 569 U.S. 27 (2013), merely requires "plaintiffs to 'be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Signet*, 2019 U.S. Dist. LEXIS 114695, at *56. Here, Plaintiffs propose an event study to measure damages (*e.g.*, Nye Report at §VII), which is "the generally accepted method for measuring damages in a securities fraud class action." *Signet*, 2019 U.S. Dist. LEXIS 114695, at *57. The damages methodology proposed here thus "pose[s] no obstacle to class certification." *Waggoner*, 875 F.3d at 106-07. In fact, Dr. Nye's damages model in *Waggoner*, where the plaintiff was proceeding under a materialization of the risk theory, is virtually identical to the one proposed here. *See id.* at 106.

*Comcast* was a unique case, where the plaintiffs originally had four different theories of antitrust violations, three of which were rejected by the court. At class certification, however, the plaintiffs' expert presented a damages analysis based on all four theories, the impacts of which he admitted could not be disentangled to match the court's narrowing of defendants' liability to only one of the alleged violations. *See* 569 U.S. at 36-38. Thus, the expert's damages analysis did not match plaintiffs' remaining liability claim, and he could not calculate damages for class members based on the one remaining viable claim. *See id*. For this reason, *Comcast* challenges have been overwhelmingly rejected in securities cases. *See, e.g., In re NII Holdings, Inc. Sec. Litig*., 311 F.R.D. 401, 413 (E.D. Va. 2015) ("*Comcast* merely held that a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly

25

establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)").

Here, Plaintiffs have a single theory of liability: Defendants issued false and misleading statements that artificially inflated the price of Altria's securities and caused investors losses when the relevant truth was revealed. The Court upheld all aspects of Plaintiffs' theory. The use of an event study, like that proposed by Dr. Nye, "to determine whether, and the extent to which, [a defendant's] stock price was artificially high (*i.e.*, inflated) during the Class Period due to the market's misapprehension of … risk," is "standard operating procedure in federal securities litigation." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016); *see also FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1313 n.31 (11th Cir. 2011) ("The methodology of event studies has been sustained by many circuits."). As Defendants acknowledge, Dr. Nye has proposed this same methodology in dozens of securities class actions and ***no court has ever found it deficient***. Indeed, Defendants' own expert, Professor Skinner, agreed that the methodology proposed by Dr. Nye "aims…to calculate the inflation on each day of the class period based on plaintiffs' theory concerning defendants' misrepresentations and inflation of the stock price and then the loss after the truth was revealed." Skinner Tr. 195:7-13.

Nevertheless, Defendants assert that the event study methodology proposed by Dr. Nye is inadequate because, they assert, Dr. Nye has not explained how he would (i) specifically apply the methodology to the facts of this case (Altria Br. at 31-32); (ii) separate damages from the materialization of the concealed risks from losses from disclosed risks (*id*. at 32-34); (ii) separate fraud-related losses from losses from "confounding information" unrelated to the fraud (*id.* at 35-36); and (iii) "account for changes in price inflation on days between alleged corrective disclosures" as risks changed. *Id*. at 36-38. Each of the criticisms of the methodology

26

advanced by Defendants go to issues of loss causation and the accuracy of any damages figures calculated by the methodology, not whether the methodology aligns with Plaintiffs' theory of liability or will interject individual issues that will predominate over common questions. *See* Nye Rebuttal at ¶¶112-123. The court decisions rejecting these exact same arguments at this stage are legion:

- ***Plaintiffs' proposed methodology is not requir ed at th is stage to address the specific facts of the case***. *City of Miami Gen. Employees' & Sanitatio n Employees' Ret. Trust v. RH, Inc.* , 2018 U.S. Dist. LEXIS 175573, *8 n.3 (N.D. Cal. 2018) (rejecting the defendants' argument "that plaintiffs' proposed method does not contain anything that 'addresses any of the specifics of this litigation,'" because "this assertion seems to reflect the fact that securities fraud cases fit Rule 23 'like a glove,' rather than suggest that class treatment is inappropriate").

- ***Plaintiffs' proposed methodolog y is not required at this stage to disaggregate confounding factors*** . *See Signet* , 2019 U.S. Dist. LEXIS 114695, at *58 ("[W]hile Plaintiff ultimately will need to disaggregate confounding factors to prove economic loss, it need not do so at this juncture to establish that common issues relating to damages predominate"); *SEB Inv. Mgmt. AB v. Symantec Corp.* , 2020 U.S. Dist. LEXIS 81661, at *30 (N.D. Cal. May 8, 2020) (same).

- ***Plaintiffs' proposed methodology is not required  at this stage to isolate the impact of the materialization of k nown risks***. *See Signet*, 2019 U.S. Dist. LEXIS 114695, at *59 (S.D.N.Y. July 10, 2019) ("[Defendants' expert's] contention that Plaintiff's methodology did not adequately isolate the impact of the materialization of known risks from the impact of allegedly concealed risks is simply a loss causation argument in disguise, because it tests the causal relationship between the alleged misstatements and the price decline.  Such an argument 'goes beyond the Rule 23 inquiry'").

- ***Plaintiffs' proposed methodol ogy is not required at     this stage to address any "mismatch" between correctiv e events  and mis  representation***. *See Hatamian v. Advanced Micro Devices, Inc.*, 2016 U.S. Dist. LEXIS 34150, at *28 (N.D. Cal. Mar. 16, 2016) ("Defendants['] attack [on] the 'fit' between an alleged corrective disclosure and a prior alleged fraudulent statement… is nothing more than an attack on loss causation").

- ***Plaintiffs' proposed methodology is not required  to account for variations in inflation over time*** . *See Pirnik* , 327 F.R.D. at 47-48 (rejecting defendants' argument under *Comcast* "that Dr. Nye's damages model…fails to account for the possibility of variation in inflation over time;…[and] does not control for confounding information").[19]

---

[19] Defendants' argument that Dr. Nye's proposed methodology is inadequate because it does not "account for investors who would have purchased even knowing the true risk," as in *Ludlow v.*

Indeed, in *In re Allerga n PLC Sec. Litig .*, 2021 U.S. Dist. LEXIS 170310, at *42-43,

defendants, relying on Professor Skinner, advanced the same criticisms of the event study

methodology proposed by Dr. Nye, which the court rejected:

> Nye's opinions about class-wide damages are no different from those he offered in a different case, where the Second Circuit upheld his methodology as complying with *Comcast*. In *Waggoner v. Barclays PLC*, Nye offered an opinion on a damages model that "complie[d] with *Comcast*" because it "directly measured" the harm associated with earlier misrepresentations by observing "the drop in price" of a corrective disclosure. 875 F.3d at 106. This Court does not see any noticeable difference between Nye's event study damages model in *Waggoner* and the event study damages model that he offers in this case. And insofar as Allergan is insisting that an event study damages model is unable to isolate the price drop attributable to any specific misrepresentation or corrective disclosure, this Court has in the past "reject[ed] the suggestion that an event study is incapable of disaggregating the effects of confounding information. Were it otherwise, nearly every securities fraud class action would fail." *Signet*, 2019 WL 3001084, at *20. As this Court has previously noted, there is "no reason why an event study – the generally accepted method for measuring damages in a securities fraud class action – cannot work in this case." *Ibid*. That same principle applies, here.

*Id*.

Accordingly, *Comcast* provides no basis to deny Plaintiffs' motion for class certification.

## VI.   THE REQUEST TO CERTIFY THE PROPOSED AMENDED CLASS IS PROCEDURALLY AND LEGALLY CORRECT

Plaintiffs adhered to the scheduling order, requesting leave to amend prior to the

deadline and within weeks of Defendants' first document production of over 20 million pages of

---

*BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015), has similarly been repeatedly rejected. *See, e.g.*, *In re Allergan*, 2021 U.S. Dist. LEXIS 170310, at *47; *In re BofI Holding, Inc. Sec. Litig .*, 2021 U.S. Dist. LEXIS 159675, at *26 (S.D. Cal. Aug. 23, 2021). The remainder of the cases relied on by Defendants are easily distinguishable. *See Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *19 (N.D. Ohio Aug. 14, 2018) (the expert identified three separate methodologies but had not decided which he would ultimately use); *Ft. Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co .*, 301 F.R.D. 116, 141-42 (S.D.N.Y. 2014) (plaintiffs had not chosen which measure of damages under Section 11 they would utilize); *Sicav v. Wan g*, 2015 WL 268855, at *6 (S.D.N.Y. Jan. 21, 2015) (plaintiffs did not identify any model for calculating damages).

documents. *See* ECF No. 194. Given Plaintiffs' expedience and the lack of prejudice to Defendants, a stay is inappropriate.    But even if it was warranted, it would not make certification of the amended class procedurally or legally defective.

Defendants assert that they will move to dismiss the amended complaint if leave is granted and contend that this will implicate the PSLRA discovery stay. Altria Br. at 39. But an additional stay would serve no purpose, and Defendants identify none. Fact discovery is essentially completed (*see* ECF No. 285), and Defendants deposed Plaintiffs' expert, Zachary Nye, on the additional disclosures in the proposed first amended complaint on August 31, 2021. The proposed amendments will thus require no additional discovery as the subjects of the amendments have always been a part of the case and were encompassed in previous discovery efforts. *See* ECF No. 256 at 12 n.2. A stay would be inappropriate. *See Latham v. Stein*, 2010 U.S. Dist. LEXIS 86181, at *11 (D.S.C. Aug. 20, 2010) ("the purpose of the statutory stay has been served in this case" where the court sustained previous allegations and plaintiffs did not intend or need to pursue additional discovery); *In re Sa lomon Analyst Litig*., 373 F. Supp. 2d 252, 254-55 (S.D.N.Y.2005) ("In a case where the court has already sustained the legal sufficiency of the complaint, *this purpose ['to prevent abusive, expensive discovery in frivo lous lawsuits'] has been served*.") (emphasis added). A stay with no purpose or benefit should not defeat certification.[20]

Defendants repeat the standing and limitations arguments that they made in opposition to Plaintiffs' motion for leave to amend. Altria Br. at 39-40.  But they do not explain, or cite any authority, suggesting that those arguments would "infect class certification" or that they could

---

[20]    Defendants' authority does not hold otherwise. Altria Br. at 39 (citing *Spears v. Metro. Life Ins.*, 2007 WL 1468697 at *3 (N.D. Ind. May 17, 2007), and *In re ValuJe t, Inc*., 984 F. Supp. 1472, 1476 (N.D. Ga. 1997)). In both cases, unlike here, the courts imposed a stay of discovery where discovery was not yet complete, and the cases were in their infancy.

not be decided at this stage. Both arguments are meritless. The standing inquiry focuses on the named plaintiffs, each of whom have standing. *See Lewis v. Casey*, 518 U.S. 343, 395 (1996); *see also In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 422 (S.D.N.Y.2003) ("claims [of named plaintiffs] determine whether there is standing ..."). And Plaintiffs filed the proposed amended complaint well within the two-year limitations period, making their claims timely. [21]

## VII.    THE COURT SHOULD CERTIFY THE CLASS PERIOD IN THE PROPOSED AMENDED COMPLAINT

This Court should not certify a liability class or otherwise "cut off the class period on September 25, 2019," as Defendants suggest. Altria Br. at 40. The determination of whether all curative information was communicated to the market is a highly fact intensive inquiry that should not be resolved at class certification. *See In re Mills*, 257 F.R.D. at 106 ("[A]t the class certification stage courts generally do not close a class period on the basis of one disclosure when a subsequent disclosure caused a significant drop in stock price.  The reason is that such cases present factual issues as to whether early disclosures were fully or partially curative."); *see also Sonoco*, 270 F.R.D. at 258 ("Where parties dispute the curative effect of a disclosure[,]" creating a substantial question of fact, the larger class period should be certified.").[22]

---

[21]    The *Eaton* case does not help Defendants. Altria Br. at 39-40. There, the court rejected amendment because it occurred two years after the single corrective disclosure that Plaintiff alleged disclosed the fraud.  *In re Eaton Corp. Sec. Litig.*, 2017 WL 4217146, at \*5 (S.D.N.Y. Sep. 20, 2017). Here, Plaintiffs filed their motion on August 6, 2021, one year and seven months after the April 1, 2020 disclosure revealing that the additional statement was false.  *See* ECF No. 217. And Defendants' contention that Plaintiffs' attempt to extend the class backward to October 25, 2018 is "logically flawed," Altria Br. at 40, n.15, is a factual argument inappropriate for resolution at this stage. Regardless, Defendants overlook that the statements and relevant disclosure concerned Altria's reasons for removing its products from the market not "misrepresentations about JUUL's marketing," as they contend. *Id.*

[22] *Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418 (N.D. Cal. Dec. 22, 2016), on which Defendants rely, does not hold otherwise. Altria Br. at 40. Unlike in *Hayes*, Defendants here did not tell investors in any later disclosure not to rely on their misrepresentations in previous disclosures.  Under these circumstances, courts have refused to follow the approach in

## VIII.  THE JUUL DEFENDANTS' RELIANCE AND STANDING ARGUMENTS DO NOT DEFEAT PREDOMINANCE

### A.    Plaintiffs Continue to Have Standing to Bring Claims Against The JUUL Defendants

This Court has already held that Plaintiffs have statutory standing to bring claims against the JUUL Defendants for primary violations of Section 10(b).  *See Klein v. Altria Grp., Inc* ., 2021 WL 955992, at *10 (E.D. Va. Mar. 12, 2021). In making that determination, the Court relied on Supreme Court and Fourth Circuit precedent confirming that primary liability under §10(b) is not limited to an issuer (or its insiders) of the securities purchased by the plaintiff. *Id*.[23]

The JUUL Defendants ignore this authority and recycle the same standing argument that the Court previously considered and rejected. *Klein*, 2021 WL 955992, at *9 ("Given the intertwined nature of Altria's and JUUL's businesses and the alleged causal effect of JUUL's misrepresentations on the value of Altria's stock, . . . the connections between JUUL's alleged misstatements and Plaintiffs' purchase of Altria's stock are much more closely related than the remote connection in *Nortel Networks* ."). The Court's decision on standing is the law of the case. *See TFWS, Inc. v. Franchot*   , 572 F.3d 186, 191 (4th Cir. 2009). Defendants have not pointed to any substantially different evidence or new controlling authority or shown that the Court's holding was clearly erroneous.

Here, discovery has confirmed a close connection between the JUUL Defendants' misstatements and Plaintiffs' purchases of Altria's stock. Defendant Burns testified that ███

██████████████████████████████████████████████████████████████████

---

*Hayes*.  *See In re Snap Inc. Sec. Litig*., 334 F.R.D. 209, 225, n.11 (C.D. Cal 2019) (distinguishing *Hayes* and allowing the expanded class period, explaining that, unlike in *Hayes*, defendant had not clearly stated previous disclosures "should not be relied upon").

[23] *See also  Lorenzo v. SEC* , 139 S. Ct. 1094, 1104 (2019) (a third party "'may be liable as a primary violator under Rule 10b-5' so long as 'all of the requirements for primary liability are met'").



*See* Pl. Ex. K (Burns Transcript) at 19:10-20:8; *see also* [Proposed] First Amended Complaint ("FAC") (ECF No. 219-1) at ¶469 ( ); Pl. Ex. J (Willard Transcript) at 79:22-80:5, 86:10-12 ( ). He testified that Pl. Ex. J (Willard Transcript) at 87:14-88:10. Burns likewise confirmed that

*See* Pl. Ex. K (Burns Transcript) at 33:2-25.[24]

### B. Nothing in *Basic* or Its Progeny Limits the Presumption of Reliance to Statements by, or About, an Issuer

The JUUL Defendants' argument that Plaintiffs are not entitled to invoke the *Basic* presumption of reliance with respect to statements made by JUUL about itself, JUUL Br. at 4-6, fails as a matter of law and fact. Nothing in *Basic* or its progeny restricts the presumption of

---

[24] The two additional cases that Defendants cite, *Harbinger Cap. Partners LLC v. Deere & Co.*, 632 F. App'x 653 (2d Cir. 2015), and *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021), are not "controlling authority," and do not provide a basis for departing from the law of the case. *TFWS, Inc.*, 572 F.3d at 191. In *Harbinger*, there was not even a business relationship between the broadband company whose stock the plaintiff purchased, and the GPS manufacturers it sought to sue under Section 10(b). 632 F. App'x at 655-56. Unlike in *Menora* (which only addressed standing in *dicta*), here, the JUUL Defendants spoke directly to Altria's investors—through a press release jointly prepared by the two companies and issued by Altria about both companies—and made specific statements designed to assure Altria's investors about JUUL's marketing practices and its purported commitment to working together with Altria to curtail youth usage. *See* FAC at ¶¶469, 474, 478, 480, 516, 518, 520.

32

reliance to statements by, or about, an issuer. To the contrary, the Supreme Court relied on the "premise that the market price of shares traded on well-developed markets reflects *all* publicly available information, and, hence, *any* material misrepresentations." *Basic Inc. v. Levinson* , 485 U.S. 224, 246 (1988) (emphasis added). And the Supreme Court has repeatedly confirmed *Basic*'s premise. *See, e.g.*, *Goldman*, 141 S. Ct. at 1958 (2021). Indeed, *In re Salomon Analyst Metromedia Litigation*, 544 F.3d 474, 482 (2d Cir. 2008), the Second Circuit held that there was "no reason in law or logic" to prohibit "the application of the *Basic* presumption in suits against secondary actors such as research analysts":

> Defendants argue that the *Basic* presumption should be limited to suits involving misrepresentations made by issuers….But they cite no case, and we have found none, that supports such a rule.  Moreover, the *Basic* Court did not so limit its holding and its logic counsels against doing so.  The reason is simple: the premise of *Basic* is that, in an efficient market, share prices reflect "*all* publicly available information, and, hence, *any* material misrepresentations."  It thus does not matter, for purposes of establishing entitlement to the presumption, whether the misinformation was transmitted by an issuer, an analyst, or anyone else.

*Id*. at 481 (internal citation omitted). The Second Circuit's reasoning applies with equal force here. Because Altria's stock traded in an efficient market—a fact that Defendants do not dispute—its share price reflected all publicly available information, including the JUUL Defendants' material misrepresentations. Nye Report ¶¶16-60.

Even if the limitation the JUUL Defendants propose existed, it would be inapplicable here. As discussed above, the JUUL Defendants' misstatements concerned Altria's investment in JUUL, required JUUL's approval, and addressed JUUL's past marketing in the context of the two companies' purported commitment to combatting youth usage—topics that were important to Altria's investors. *See supra* at §VIII.A. Under these circumstances, the JUUL Defendants' misstatements were *not* solely statements about JUUL's business but were also statements *about Altria*. Applying *Basic*'s presumption of reliance to the JUUL Defendants' misstatements here is

33

straightforward, and does not require any expansion of the presumption—let alone an expansion of Section 10(b)'s private right of action—as the JUUL Defendants suggest.

### C.    The JUUL Defendants Have Failed to Rebut the Presumption of Reliance by Showing Zero Price Impact

As discussed above, and in Plaintiffs' opening brief, Plaintiffs have satisfied the requirements for invoking *Basic*'s presumption of reliance, including by demonstrating that Altria stock traded in an efficient market.  *See* ECF No. 221 ("Pl. Mem.") at 18-25; Nye Report ¶¶16-60.[25] Having done so, the burden now shifts to Defendants to "rebut the *Basic* presumption . . . by showing 'that an alleged misrepresentation did not actually affect the market price of the stock.'"  *Goldman*, 141 S. Ct. at 1959 (citation omitted). Defendants have failed to carry that burden. *Supra*, at 14-24.

The JUUL Defendants misstate the law and invent legal requirements, arguing that Plaintiffs must "demonstrate" that "Altria's stock was…efficient with respect to" the JUUL Defendants' misstatements, by showing that those misstatements "had an immediate effect on Altria's stock price." JUUL Br. at 6-7. This argument finds no support in the law. There is simply no requirement that Plaintiffs demonstrate market efficiency with respect to each alleged misstatement. This is because the fraud-on-the-market theory rests on the "premise that the market price of shares traded on well-developed markets reflects **all** publicly available information, and, hence, **any** material misrepresentations." *Basic*, 485 U.S. at 246 (emphasis added). Defendants' own expert, Professor Skinner, stated he does not dispute market efficiency and that because Altria's market was efficient it would incorporate all publicly available

---

[25] "To invoke the *Basic* presumption, a plaintiff must prove: (1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed." *Goldman*, 141 S. Ct. at 1958.

information—including from a "third party" like JUUL. Skinner Tr. 8:14-19:5 ("anything that is publicly available"). Indeed, when conducting event studies, experts use regression analyses to remove the price impact of market and industry factors, precisely because in an efficient market all publicly available information is reflected in the stock price. Skinner Report ¶61. As Dr. Nye explains, Altria's stock price efficiently incorporated JUUL-specific information, including the JUUL Defendants' misrepresentations. Nye Rebuttal at §VII. To the extent JUUL believes there is some magical exception for its statements, it was required to prove no price impact, which it has failed to do.[26]

## IX.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (i) certify this action as a class action pursuant to Rules 23(a) and 23(b)(3); (ii) appoint the Proposed Class Representatives as Class Representatives; and (iii) appoint Co-Lead Counsel Pomerantz and Robbins Geller as Class Counsel.

---

[26] The JUUL Defendants assert that "the market was not efficient because even sophisticated investors" such as Plaintiff CLPT's investment advisor, Jennifer Johnsrud of D.L. Carlson, "did not consider JUUL's disclosures when transacting in Altria stock." JUUL Br. at 9.  However, what a single investor relied upon when making an investment decision is irrelevant to whether the *entire market* for Altria's stock was efficient, and it has no bearing on price impact. *See, e.g.*, *Louisiana Mun. Police Emps. Ret. Sys. v. Dunphy*, 2008 WL 700181, at *5 (D.N.J. Mar. 13, 2008) (certifying class even though testimony of "investment manager contradicts the allegations in the complaint"). And in fact, Ms. Johnsrud testified that she *did* consider the JUUL Defendants' public statements when investing in Altria, and that those alleged misstatements would have *influenced her decision to invest in Altria*. *See* Declaration of Jessica M. Roll (ECF No. 271-1) Ex. B, Johnsrud Tr. at 200:21-201:20.

DATED:  October 14, 2021

By: */s/ Steven J. Toll*

Steven J. Toll (VSB #15300)
Daniel S. Sommers
S. Douglas Bunch
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave., NW Suite 500
Washington, DC  20005
Telephone:  202/408-4600
202/408-4699 (fax)
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com

*Local Counsel for Lead Plaintiffs*

Jeremy A. Lieberman
Michael J. Wernke
POMERANTZ LLP
600 Third Avenue
New York, NY  10016
Telephone:  212/661-1100
212/661-8665 (fax)
jalieberman@pomlaw.com
mjwernke@pomlaw.com

*Lead Counsel for Lead Plaintiffs Donald Sherbondy
and Sarah Sherbondy*

Samuel H. Rudman
David A. Rosenfeld
Erin W. Boardman
Philip T. Merenda
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
eboardman@rgrdlaw.com
pmerenda@rgrdlaw.com

36

Douglas R. Britton
Kevin A. Lavelle
Matthew J. Balotta
ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dougb@rgrdlaw.com
klavelle@rgrdlaw.com
mbalotta@rgrdlaw.com

*Lead Counsel for Lead Plaintiff Laborers Pension*
*Trust of Greater St. Louis*


Brian Schall
THE SCHALL LAW FIRM
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: 310/301-3335
brian@schallfirm.com

*Additional Counsel for Lead Plaintiffs Donald*
*Sherbondy and Sarah Sherbondy*

37

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 14, 2021, I caused the foregoing to be electronically filed with the Clerk of Court via CM/ECF, which will send a notice of electronic filing to all registered users.

By: */s/ Steven J. Toll*

Steven J. Toll (VSB #15300)
COHEN MILSTEIN SELLERS &
TOLL PLLC
1100 New York Ave., NW Suite 500
Washington, DC  20005
Telephone:  202/408-4600
202/408-4699 (fax)
stoll@cohenmilstein.com

*Local Counsel for Lead Plaintiffs*

38