# EXHIBIT H

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

|  |  |
|---|---|
| GABBY KLEIN, DONALD SHERBONDY, SARAH SHERBONDY and CONSTRUCTION LABORERS PENSION TRUST OF GREATER ST. LOUIS, Individually and On Behalf of All Others Similarly Situated,<br><br>       Plaintiffs,<br><br>v.<br><br>ALTRIA GROUP, INC., HOWARD A. WILLARD III, WILLIAM F. GIFFORD, JR., JUUL LABS, INC., ADAM BOWEN, JAMES MONSEES, KEVIN BURNS, and K.C. CROSTHWAITE,<br><br>      Defendants. | Case No. 3:20-cv-00075-DJN |

EXPERT REPLY REPORT OF ZACHARY NYE, PH.D.

October 14, 2021

**Table of Contents**

I.   Background and Qualifications.................................................................................1

II.  Scope of Engagement .............................................................................................2

III. Bases for Opinions.................................................................................................2

IV.  Event Study Methodology .....................................................................................3

   A. Dr. Skinner Does Not Dispute the Reliability of My Event Study Used for the
      Purpose of Examining Market Efficiency in the Nye Report.......................................5

   B. Dr. Skinner's Regression Model Does Not Actually Model Altria's Stock
      Price, but Rather "Recomputed" Prices Subject to Unnecessary Measurement
      Error Which Bias His Event Study Against Finding Statistical Significance .............14

   C. Dr. Skinner's Regression Model Fails to Account for Important Economic
      Information Pertinent to Altria's Stock Price, Thereby Biasing His Findings
      Related to Price Impact.......................................................................................24

   D. Modifications That Account for Dr. Skinner's Criticisms Have Virtually No
      Effect on My Regression Model ...........................................................................28

V.   Dr. Skinner Fails to Prove That Defendants' Alleged Misstatements and
     Omissions During the Class Period Lacked Price Impact ......................................30

   A. Dr. Skinner's Opinion That "There Is Substantial Doubt" as to Whether
      Certain Alleged Corrective Events Evidence Price Impact Is Incomplete and
      Based on an Incorrect and Overly Narrow View of Plaintiffs' Allegations ...............35

      i.   April 3, 2019 .................................................................................................36

      ii.  August 29, 2019 .............................................................................................46

      iii. October 31, 2019 ............................................................................................54

      iv.  January 30, 2020 ...........................................................................................59

      v.   February 21–24, 2020 ....................................................................................71

      vi.  Additional Errors and Inconsistencies in Dr. Skinner's Price Impact
           Analysis.........................................................................................................81

   B. Dr. Skinner Omits From His Analysis Additional Alleged Corrective Events
      in the Amended Complaint, Rendering His Conclusions on Price Impact
      Incomplete and Unreliable.................................................................................83

   C. Dr. Skinner Improperly Conflates Statistical Significance and Price Impact.............86

VI.  Damages Can Be Measured on a Class-Wide Basis and in a Manner Consistent
     With Plaintiffs' Theory of Liability......................................................................92

VII.    The Nye Report Demonstrates That Altria's Stock Price Efficiently Incorporated JLI-Specific Information, and That Altria's Investment in JLI Had a Direct Relationship to the Value of Altria's Stock ...................................................................107

## I.    Background and Qualifications

1.    Previously in this matter, I submitted the Expert Report of Zachary Nye, Ph.D., dated

August 8, 2020 (the "Nye Report"), in which I opined that:

> i.    The common stock of Altria Group, Inc. ("Altria" or the "Company")
> traded in an efficient market throughout the Complaint Class Period and
> the Amended Complaint Class Period;[1,2]
>
> ii.    Damages under §10(b) ("Section 10(b)") of the Securities Exchange Act
> of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder by the
> SEC, for investors who purchased or otherwise acquired Altria stock
> during the Complaint Class Period and/or the Amended Complaint Class
> Period can be calculated using a methodology that is common to the Class
> and in a manner that is consistent with Plaintiffs' theory of liability.[3]

On August 31, 2021, I provided expert testimony at a deposition regarding my opinions

contained in the Nye Report (the "Nye Deposition").

2.    My qualifications are contained in ¶1 of the Nye Report.  My curriculum vitae, which

includes my academic research, publications in the past ten years, and prior expert testimony in

the past four years, is attached as Exhibit 1 to this Report.

---

[1] The "Complaint Class Period" is the period from December 20, 2018 through February 21, 2020, inclusive, which is the Class Period defined in Plaintiffs' Corrected Consolidated Class Action Complaint, dated July 2, 2020 (the "Complaint").  The Amended Complaint Class Period is the period from October 25, 2018 through April 1, 2020, inclusive, which is the Class Period defined in Plaintiffs' Proposed First Amended Consolidated Class Action Complaint, dated August 6, 2021 (the "Amended Complaint").  Herein, unless otherwise noted, the Complaint Class Period and the Amended Complaint Class Period are collectively referred to as the "Class Period."

[2] Nye Report, §VI.

[3] Nye Report, §VII.

## II.    Scope of Engagement

3.      I now have been asked by Counsel for Plaintiffs to reply to the Expert Report of Douglas

J. Skinner, Ph.D., dated September 17, 2021 (the "Skinner Report").[4,5]  I have also been asked to

respond to certain portions of Altria Defendants' Memorandum of Law in Opposition to Lead

Plaintiffs' Motion for Class Certification, dated September 17, 2021 ("Altria's Opposition to

Class Certification"), and the Joinder and Memorandum of Law of Defendants JUUL Labs, Inc.,

Adam Bowen, James Monsees, and Kevin Burns in Opposition to Plaintiffs' Motion for Class

Certification, dated September 17, 2021 ("JLI's Opposition to Class Certification"), to the extent

they are relevant to my opinions in the Nye Report.

## III.    Bases for Opinions

4.      My opinions are based upon my professional knowledge and experience, my review of

documents and information relevant to this matter, and the analyses described in this Report, as

well as in the Nye Report and its Exhibits.  Documents, data, and other information that I have

relied upon as bases for my opinions are cited in this Report and the Nye Report.  Such

documents and information are typically relied upon by financial experts in securities class

actions and by financial economists in their research.

5.      Counsel for Plaintiffs has informed me that the record in this matter continues to be

developed and that fact discovery is ongoing.  To the extent they are relevant, I would expect to

review additional information that may become available through discovery as well as the

---

[4] Dr. Skinner was deposed in the matter on October 5, 2021 (the "Skinner Deposition").

[5] Dr. Skinner does not dispute my conclusion that the market for Altria stock was efficient throughout the Class Period.  In fact, he was "not [] asked to review or respond to Dr. Nye's opinions or analysis regarding market efficiency," and he "assume[s], for purposes of [his] report, that Altria's common stock traded in a semi-strong form efficient market, as Dr. Nye concludes."  (Skinner Report, ¶59.)

reports and depositions of other expert witnesses.  The opinions offered in this Report are subject to refinement or revision based on continuing analysis of the documents and information listed above, as well as new or additional information that may be provided to or obtained by me in the course of this matter.

**IV.    Event Study Methodology**

6.        According to Dr. Skinner, my "event study method contains several flaws that render it unreliable for purposes of measuring Altria-specific tobacco-related stock price changes (abnormal returns) on the alleged corrective event dates."[6]  Specifically, Dr. Skinner asserts that the industry index included in my regression model—the S&P 500 Food, Beverage, and Tobacco Total Return Index—"cannot possibly [control for and remove the effect of factors that affect the U.S. tobacco sector]."[7]  Dr. Skinner complains that: (i) my industry index "completely fails to capture the effects of news and events that affect … [Altria's] primary competitors, British American Tobacco and Imperial Brands";[8] (ii) my "fail[ure] to remove Altria itself from [the S&P 500 Food, Beverage, and Tobacco Total Return Index] … is flawed as a matter of economics and statistics and inconsistent with peer-reviewed academic work" because it "introduces spurious correlation into the regression estimation";[9] (iii) "PMI has no presence in the U.S. tobacco market, which means its returns serve as a poor proxy for the effect of factors that affect that industry (e.g., its returns would not be directly affected by changes in the regulation of the U.S. tobacco market)";[10] and (iv) "the relationship between returns on PMI and

---

[6] Skinner Report, ¶65.

[7] Skinner Report, ¶66.

[8] Skinner Report, ¶68.

[9] Skinner Report, ¶70.

[10] Skinner Report, ¶71.

Altria shares may be affected by news regarding merger talks between the two companies," which "may again induce correlation unrelated to factors that affect the U.S. tobacco industry."[11]

7.      As described in the following subsections, Dr. Skinner's critique of the regression model described in the Nye Report is of remarkably little consequence.  As an initial matter, he faults my use of the S&P 500 Food, Beverage, and Tobacco Total Return Index—the very industry index selected by Altria itself—even though it includes both Altria and Philip Morris International ("PMI"), which "manufactured and sold cigarettes, smoke-free products, and other nicotine-containing products in markets outside the U.S **and shipped a version of its smoke-free products to Altria for sale in the U.S.**"[12]  Yet, he does not dispute the reliability of my event study to serve its stated purpose of examining "whether new, material corporate events or financial releases promptly caused a measurable stock price reaction after accounting for contemporaneous market and industry effects," in a manner consistent with market efficiency.[13, 14]

8.      Rather, Dr. Skinner deceptively asserts that my regression model "completely fails" to address a topic—price impact—that it was not designed to analyze.  As I testified at my deposition, "[f]or market efficiency, I examined how the total mix of information changed on the earnings-related events examined in my Exhibit 12,"[15] and whether "the price changes … on those dates are … consistent with market efficiency."[16]  Contrary to Dr. Skinner's assertions, my

---

[11] Skinner Report, ¶71.

[12] Skinner Report, ¶66.  (Emphasis added.)

[13] Nye Report, ¶53.

[14] Dr. Skinner "assume[s], for purposes of [his] report, that Altria's common stock traded in a semi-strong form efficient market, as Dr. Nye concludes."  (*See* Skinner Report, ¶59.)

[15] Nye Deposition, 49:13–15.

[16] Nye Deposition, 19:18–20.

event study was not designed to "measur[e] Altria-specific **tobacco-related** stock price changes (abnormal returns) **on the alleged corrective event dates**."[17]  It is my understanding that it is Defendants' burden, not mine, to prove that the alleged misstatements and omissions lacked price impact.

9.      Nonetheless, despite these different objectives, incorporating Dr. Skinner's misguided criticisms (this time with an eye towards price impact) provides strikingly similar results to the regression model described in the Nye Report, with respect to the direction, magnitude, and statistical significance of Altria's stock price changes on the alleged corrective event dates.  As described below, it is Dr. Skinner's regression model that suffers from severe methodological flaws that render his conclusions with respect to price impact unreliable.

### A.      Dr. Skinner Does Not Dispute the Reliability of My Event Study Used for the Purpose of Examining Market Efficiency in the Nye Report

10.     Dr. Skinner does not dispute the reliability of my event study to analyze market efficiency, which is precisely the purpose for which it was designed.[18]  More specifically, my event study was designed to "examine[] dates during the Class Periods on which Altria released quarterly or year-end financial results and/or guidance,"[19] in an effort to determine whether "Altria's stock price reflected the Company-specific information disclosed to the market, and promptly responded to the disclosure of new, material unexpected information."[20]  Since my

---

[17] Skinner Report, ¶65.  (Emphasis added.)

[18] Nye Report, ¶70: "For the purpose of examining market efficiency, I have conducted an event study to determine whether new, material, Company-specific information promptly caused a measurable stock price reaction after accounting for contemporaneous market and industry effects."

[19] Nye Report, ¶54.

[20] Nye Report, ¶57.

- 5 -

event study was not designed "for purposes of measuring Altria-specific **tobacco-related** stock price changes (abnormal returns) **on the alleged corrective event dates**,"[21] Dr. Skinner's criticisms are misplaced.  Notably, Dr. Skinner's entire report is predicated on the "assum[ption] … that Altria's common stock traded in a semi-strong form efficient market, as Dr. Nye concludes."[22]

11.     In accordance with standard practice, as part of my event study to examine market efficiency, I estimated "a regression model to remove non-company-specific effects from the security's return."[23]  As described in the Nye Report:

> In addition to market-wide factors, my regression analyses also measure the relationship between Altria stock returns and changes in industry-wide factors that would be expected to impact stocks in Altria's particular industry.  In constructing the industry index, I considered: (i) companies identified as industry competitors in analyst reports published during the Class Periods; (ii) companies identified by the Bloomberg Industry Classification System (BICS) as operating in the "Tobacco" industry; and (iii) companies identified as peers in Altria's SEC filings issued during the Class Periods.  The industry index used in this analysis is the S&P 500 Food, Beverage and Tobacco Total Return Index, to which Altria's SEC filings compare its stock price performance during the Class Period.[24]

As I testified at my deposition, I ultimately chose the S&P 500 Food, Beverage and Tobacco Total Return Index because: (i) "Altria itself [] chose this index as the relevant comparison for its industry";[25] (ii) my standard industry index selection criteria is to "use[] the company's assessment of their relevant benchmark because … they're in the strongest position to assess

---

[21] Skinner Report, ¶65.  (Emphasis added.)

[22] Skinner Report, ¶59.

[23] Nye Report, ¶52.

[24] Nye Report, ¶73, citing Altria, SEC Form 10-K for year-end 2020, filed February 26, 2021, p. 16.

[25] Nye Deposition, 85:21–22.

- 6 -

their competition";[26] and (iii) other industry indices I considered had both a worse statistical fit in terms of their adjusted $R^2$, "which means that the regression model is explaining less of the overall variance of the daily returns throughout the control periods,"[27] and "also [were not] what the … company assessed as its relevant industry benchmark."[28]

12.    Accordingly, as should be clear to anyone who has read the Nye Report and my deposition transcript, my selection of the S&P 500 Food, Beverage and Tobacco Total Return Index is not the result of "a myopic focus on increasing model R-squared," at the expense of economic theory.[29]  However, Dr. Skinner repeatedly ignores my references to the fact that Altria itself compared its stock price performance to the S&P 500 Food, Beverage and Tobacco Total Return Index, as the relevant "published industry or line-of-business index" required under Item 201(e) of SEC Regulation S-K.[30]  Item 201(e) also states that, as an alternative to providing a published industry or line-of-business index, companies may compare their stock price performance to "[p]eer issuer(s) selected in good faith," or "[i]ssuer(s) with similar market capitalization(s), but only if the registrant does not use a published industry or line-of-business index and does not believe it can reasonably identify a peer group."[31]  Thus, despite the option to choose Dr. Skinner's peer group of British American Tobacco and Imperial Brands, Altria consciously chose to report the S&P 500 Food, Beverage and Tobacco Total Return Index as its relevant industry benchmark throughout the Class Period.

---

[26] Nye Deposition, 87:13–16.

[27] Nye Deposition, 76:1–3.

[28] Nye Deposition, 88:15–17.

[29] Skinner Report, ¶67.

[30] 17 CFR § 229.201.  Available at https://www.law.cornell.edu/cfr/text/17/229.201#e.

[31] *Ibid*.

- 7 -

13.     Furthermore, Dr. Skinner ignores obvious economic reasons for such a comparison. First, according to the Global Industry Classification Standard ("GICS") created by Standard & Poor's ("S&P"), a widely cited provider of "credit ratings, indices, investment research, and risk evaluations and solutions,"[32] Altria is considered to operate in the "Consumer Staples" sector, and (more granularly) in the "Food, Beverage & Tobacco" industry group.[33]  Hence, the inclusion of Altria (and PMI) in the S&P 500 Food, Beverage and Tobacco Total Return Index.

14.     Second, it is well known that companies in the Consumer Staples sector share important characteristics in terms of product demand and stock price dynamics.  Specifically, "[c]onsumer staples are household necessities -- products that most of us use on an everyday basis and would continue to use with little regard to their cost or the overall economy":

> Examples of *consumer staples* include food, drugs, beverages, tobacco, and basic household products.  These are things that people are unlikely to reduce their demand for when times are tough because people see them as basic needs.  People often go through consumer staples frequently; meaning they usually see a constant level of demand.[34]

Given this relative demand inelasticity, Consumer Staples stocks "are considered non-cyclical stocks," with "less volatility than those stocks found in other sectors, which are more correlated to market performance.  Consumer staples stocks are also well known for paying constant dividends.  Because of this, they are considered 'defensive,'"[35] and "are regarded as safe investment bets during times of market volatility owing to the relatively stable demand for their

---

[32] Bloomberg, "DES" function for "Standard & Poor's Financial Services LLC."

[33] *See* https://www.spglobal.com/spdji/en/documents/additional-material/sp-sector-indices.pdf.

[34] *See* https://investinganswers.com/dictionary/c/consumer-staples.  (Emphasis in original.)

[35] *See* https://thecabanagroup.com/understanding-consumer-staples-may-see-portfolio/.

products."[36]  Consumer Staples stocks also share a common resilience to inflationary pressures, falling interest rates and economic uncertainty.  For example, as described by *Reuters*:

> Broadly, consumer staples companies … are seen by some strategists as relatively well equipped to pass through price increases.  "The investing premise is that the necessity aspect of Consumer Staples means their demand is inelastic, allowing for price increases during an inflationary cycle," Michael O'Rourke, chief market strategist at JonesTrading, said in a recent note.[37]

Similarly, according to *Wealth Daily*:

> Basic consumer staples stocks are also good buys in times of falling rates and economic uncertainty.  Like health care stocks, consumer staples firms benefit from inelastic demand because their products are survival necessities.  But there's another reason consumer staples companies are particularly good purchases in falling-rate environments: lots of people buy their gas, groceries, and other staples on interest-bearing credit cards. … Falling interest rates mean cheaper credit for consumers, and thus easier spending on consumer staples.[38]

As summarized by *NASDAQ.com*, the "[Consumer Staples] sector has always typified comparative strength during periods of market turmoil as money flocks to resolute business models with inelastic demand."[39]

15.     Third, Dr. Skinner fails to mention that numerous analysts specifically included Altria (and PMI) in their coverage of the Consumer Staples sector throughout the Class Period.  For example, Barclays, Goldman Sachs, Jefferies, Morgan Stanley, and Wells Fargo issued multiple reports discussing Altria in the context of the Consumer Staples sector.[40]  Moreover, contrary to

---

[36] *See* https://www.investing.com/news/stock-market-news/worried-about-a-market-correction-buy-these-4-safe-consumer-staples-stocks-2573444.

[37] *See* https://www.reuters.com/business/sectors-watch-inflation-fears-spook-us-markets-2021-05-13/.

[38] *See* https://www.wealthdaily.com/articles/the-best-stocks-to-buy-in-a-falling-rate-environment/92729.

[39] *See* https://www.nasdaq.com/articles/tobacco-stocks-weigh-consumer-staples-etfs-2018-04-24.

[40] *See, e.g.*, Barclays, "Global Consumer Staples, Barclays Consumer Wrap," September 26, 2019; Goldman Sachs, "Americas Consumer Staples: Bi-weekly Nielsen data show deceleration

- 9 -

Dr. Skinner's suggestion that beverage companies are somehow irrelevant to Altria's industry risk exposure,[41] each of these analysts explicitly included Coca-Cola and/or PepsiCo in their coverage universe of Consumer Staples companies, alongside Altria (and PMI), as well as food companies, such as General Mills, Kellogg Company, and Kraft Heinz. Given that each of these companies is also included in the S&P 500 Food, Beverage and Tobacco Total Return Index, it is clear that my (and Altria's) decision to choose this index as the relevant industry benchmark is in harmony with the opinions of these prominent analysts.

16.     Dr. Skinner also complains that the inclusion of Altria itself within the S&P 500 Food, Beverage, and Tobacco Total Return Index, "introduces spurious correlation into the regression estimation because Altria's return is included both as the dependent variable and as part of the industry index (an independent variable)."[42] However, while this certainly would be true if one were to include Altria's return alone as an independent explanatory variable on the right-hand-side of the regression equation, he fails to mention the well-known principle that when a particular stock is part of a portfolio of other stocks, such as an industry index, that stock's "unique risk"—which "stems from the fact that many of the perils that surround an individual company are peculiar to that company"—is effectively "eliminated by diversification."[43] Indeed,

---

for Bev/Tob; MNST sales turn negative," March 19, 2019; Jefferies, "Consumer Products, It's All Relative: Consumer Staples Monthly Valuation Screen, October Edition," November 1, 2018; Morgan Stanley, "Consumer Staples, North America, CAGNY 2020 Takeaways," February 23, 2020; Wells Fargo, "Staples Sector Estimate Changes In Conjunction With Our 2019 Outlook," January 10, 2019.

[41] Skinner Report, ¶66.

[42] Skinner Report, ¶70.

[43] Brealey, Richard A., Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance*, McGraw-Hill/Irwin, 8th ed., 2006, p. 162.

"[d]iversification works because prices of different stocks do not move exactly together,"[44] and "[o]n many occasions a decline in the value of one stock [is] offset by the rise in the price of [an]other," thereby "even[ing] out many of the peaks and the troughs" that are observed for the individual stocks held in the portfolio or index.[45]  Thus, "[i]f you have only a single stock, unique risk is very important; but once you have a portfolio of 20 or more stocks, diversification has done the bulk of its work."[46]  Given that the S&P 500 Food, Beverage, and Tobacco Total Return Index "comprises a total of 21 companies,"[47] Dr. Skinner's concern is unwarranted "as a matter of economics and statistics."[48]  Nevertheless, as shown in §IV.D below, the exclusion of Altria from my industry index has virtually no effect on my regression model.

17.      With respect to Dr. Skinner's attempt to paint PMI as an irrelevant company as far as Altria's industry risk is concerned, he concedes that PMI "shipped a version of its smoke-free products to Altria for sale in the U.S."[49]  Accordingly, the notion that "PMI has no presence in the U.S. tobacco market,"[50] is plainly false.  Similarly, Dr. Skinner's assertion that PMI's "returns would not be directly affected by changes in the regulation of the U.S. tobacco market,"[51] is directly contradicted by several facts, including: (i) PMI's agreements with Altria "to commercialize certain of PMI's heated tobacco products in the United States" were "subject

---

[44] Brealey, Richard A., Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance*, McGraw-Hill/Irwin, 8th ed., 2006, p. 161.

[45] Brealey, Richard A., Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance*, McGraw-Hill/Irwin, 8th ed., 2006, p. 162.

[46] *Ibid*.

[47] Skinner Report, ¶66.

[48] Skinner Report, ¶70.

[49] Skinner Report, ¶66.  (Emphasis added.)

[50] Skinner Report, ¶71.

[51] Skinner Report, ¶71.

- 11 -

to FDA authorization of the applicable products" throughout the Class Period;[52] (ii) "PMI submitted a [pre-market tobacco product application ("PMTA")] and a modified risk tobacco product application with the FDA for its electronically heated tobacco products comprising the *IQOS Tobacco Heating System*";[53] and (iii) "[i]n April 2019, the FDA authorized the PMTA for the *IQOS Tobacco Heating System*."[54]

18.     Furthermore, as discussed above, Standard & Poor's classifies PMI as operating in the "Consumer Staples" sector, and (more granularly) in the "Food, Beverage & Tobacco" industry group, just like Altria.[55]  Hence, its inclusion in the S&P 500 Food, Beverage and Tobacco Total Return Index, which is an industry group index based on the S&P 500 "parent" index.[56]  Given that Standard & Poor's describes the S&P 500 as being "[w]idely regarded as the best single gauge of the United States equity market,"[57] it is clear that PMI is considered part of the United States equity market.  This is also consistent with numerous analyst reports published during the Class Period, which identified Altria and PMI as being the only two public companies within the "US Tobacco,"[58] "Americas Tobacco,"[59] "USA | Consumer … Tobacco,"[60] "Consumer Staples |

---

[52] Altria, SEC Form 10-K for year-end 2020, filed February 26, 2021, p. 34

[53] *Ibid*.  (Emphasis in original.)

[54] *Ibid*.  (Emphasis in original.)

[55] *See* https://www.spglobal.com/spdji/en/documents/additional-material/sp-sector-indices.pdf.

[56] *Ibid*.

[57] *Ibid*.

[58] Barclays, "Global Consumer Staples, Barclays Consumer Wrap," September 26, 2019.

[59] Goldman Sachs, "Americas Tobacco: Updating MO/PM estimates ahead of 1Q19; Still favor PM," April 11, 2019.

[60] Jefferies, "Consumer Products, It's All Relative: Consumer Staples Monthly Valuation Screen, October Edition," November 1, 2018.

North America … Tobacco,"[61] and "Tobacco"[62] coverage areas.  Notably, the two favored tobacco companies that Dr. Skinner hand selected for his peer index, British American Tobacco and Imperial Brands, were not characterized as U.S. tobacco market peers in any of these analyst reports.

19.    Dr. Skinner's final attack on my industry index is that "the relationship between returns on PMI and Altria shares may be affected by news regarding merger talks between the two companies," which "may again induce correlation unrelated to factors that affect the U.S. tobacco industry."[63]  However, a simple spreadsheet analysis of daily returns, which Dr. Skinner could easily have performed, reveals no such "unrelated" correlation—the two stocks exhibited a 66.80% daily return correlation with each other over the full Amended Complaint Class Period compared to an **increased** correlation of 67.97% when the month during which potential merger talks took place is excluded from the sample.[64]  This increase implies that the two companies were actually less correlated with each other during the merger period, making Dr. Skinner's incremental fear of potentially spurious correlation yet again unfounded.

---

[61] Morgan Stanley, "Consumer Staple, North America, CAGNY 2020 Takeaways," February 23, 2020.

[62] Wells Fargo, "Staples Sector Estimate Changes In Conjunction With Our 2019 Outlook," January 10, 2019.

[63] Skinner Report, ¶71.

[64] According to Dr. Skinner, "[r]umors of possible merger discussions between PMI and Altria had been circulating publicly by August 26, 2019."  (*See* Skinner Report, footnote 131.)  On September 25, 2019, PMI "announced that merger discussions with Altria Group, Inc. … have ended."  (*See Business Wire*, "Philip Morris International Inc. and Altria Group, Inc. End Merger Discussions," September 25, 2019.)

- 13 -

**B.** **Dr. Skinner's Regression Model Does Not Actually Model Altria's Stock Price, but Rather "Recomputed" Prices Subject to Unnecessary Measurement Error Which Bias His Event Study Against Finding Statistical Significance**

20.     As is standard practice in academic literature and securities litigation, "in its most common form, an event study involves a statistical regression analysis of a time series of **security returns**, with the objective of identifying and measuring firm-specific effects of identified releases, referred to as events."[65]  As described by Mitchell and Netter (1994), which describes the application of event studies in securities litigation, "the goal is to isolate the effect of the event on the contemporaneous **stock price movement**."[66]  According to MacKinlay (1997), a widely cited academic primer on event study analysis, "[a]ppraisal of the event's impact requires a measure of the abnormal return," which "is the actual ex post **return of the security** over the event window minus the normal return of the firm over the event window."[67]  Notably, the return of the security "is simply the **change in the stock price** during the period plus any payout of dividends during the period, relative to the stock price at the beginning of the period."[68]  However, rather than adhere to decades of standard practice, Dr. Skinner chose, for

---

[65] Gold, Kevin L., Eric Korman and Ahmer Nabi, "Federal Securities Acts and Areas of Expert Analysis," *Litigation Services Handbook, The Role of the Financial Expert*, 6th ed., Ed. Roman L. Weil, Daniel G. Lentz, and Elizabeth A. Evans, John Wiley & Sons, Inc., 2017, Ch. 27, p. 9. (Emphasis added.)

[66] Mitchell, Mark L. and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, Vol. 49, pp. 545–590 ("Mitchell and Netter (1994)") at p. 560.  (Emphasis added.)

[67] MacKinlay, A. Craig, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, pp. 13–39 ("MacKinlay (1997)") at p. 15.  (Emphasis added.)  According to Google Scholar, MacKinlay (1997) has been cited by at least 6,843 other academic publications.

[68] Mitchell and Netter (1994) at p. 560.  (Emphasis added.)  *See also id*. at footnote 96 ("The logarithmic return is a continuously compounded return whereas the return described in the text is a simple return.  For practical purposes the distinction between these two return measures is relatively minor."); Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments*, McGraw-

the first time in his long academic and consulting career,[69] to perform his event study in this particular litigation, using "adjusted daily returns,"[70] which have been "recomputed … to remove the effect of changes in the values of AB InBev and Cronos shares."[71]

21.     According to Dr. Skinner, he performed this re-computation "[t]o isolate and remove the effect of Altria's public investments in other sectors from Altria's stock returns," since the "[a]llegations in this matter concern Altria's investment in JUUL and do not relate to Altria's public investments in other sectors."[72]  Specifically, Dr. Skinner "calculate[s] Altria's adjusted stock price on a given day as the market capitalization of Altria common stock minus the market values of Altria's public equity investments, divided by the number of Altria common shares outstanding for that day."[73]  In doing so, however, Dr. Skinner makes two major unsupported assumptions that introduce so-called "measurement error" in his re-computed "adjusted daily returns," which improperly bias his regression model against finding statistical significance for the Company-specific returns observed on the alleged corrective event dates.  Specifically, Dr. Skinner assumes that: (i) the ordinary shares **and restricted shares** of AB InBev, and the

---

Hill/Irwin, 7th ed., 2008, Ch. 5, p. 153 ("We should say at the outset that for short periods of up to 1 month, the difference between the normal and lognormal distribution is sufficiently small to be safely ignored."); and Berk, Jonathan and Peter DeMarzo, *Corporate Finance*, Pearson Education, Inc., 1st ed., 2007, Ch. 5, p. 128 ("As a practical matter, compounding more frequently than daily has a negligible impact on the effective annual rate and is rarely observed.").

[69] Skinner Deposition, 207:17–25.

[70] Skinner Report, footnote 137.

[71] Skinner Report, ¶76.

[72] Skinner Report, footnote 137.

[73] Skinner Report, footnote 137.

common shares of Cronos, traded in an efficient market during the Class Period;[74] and (ii) "the market value of each restricted share [of AB InBev] is … the same as the value of an ordinary share [of AB InBev]."[75]

22.    As an initial matter, despite the fact that Dr. Skinner has never re-computed "adjusted daily returns" in this manner—nor has he even seen this methodology ever used in a single-firm event study[76]—he asserts that "[t]his approach is consistent with academic studies that adjust the market value of a parent company for the market value of a public subsidiary."[77]  In support, Dr. Skinner cites three academic papers,[78] which address the issue of so-called "negative stub values" that occur (very rarely) when a "firm's market value is less than the value of its ownership stake in a publicly traded subsidiary."[79]  At his deposition, however, Dr. Skinner conceded that none of these three papers: (i) perform a single-firm event study similar to Dr. Skinner's;[80] (ii) "adjust daily returns by subtracting the market value of a parent company's public equity investments and then dividing by the number of common shares outstanding for

---

[74] Skinner Deposition, 217:20–24 ("… all I'm doing here is essentially assuming that the market for these securities is efficient and removing the estimated values of these securities on each day from Altria's stock.")

[75] Skinner Report, footnote 137.

[76] Skinner Deposition, 210:9–212:2.

[77] Skinner Report, footnote 137.

[78] Skinner Report, footnote 137, citing Mitchell, M., Pulvino, T., and Stafford, E., 2002, "Limited Arbitrage in Equity Markets," *The Journal of Finance*, Vol. 57, No. 2, pp. 551–584 ("Pulvino and Stafford (2002)"); Lamont, O., and Thaler, R., 2003, "Can the Market Add and Subtract? Mispricing in Tech Stock Carve-outs," *Journal of Political Economy*, Vol. 111, No. 2, pp. 227–268; Bayar, O., Chemmanur, T.J. and Liu, M.H., 2011, "A Theory of Equity Carve-outs and Negative Stub Values under Heterogeneous Beliefs," *Journal of Financial Economics*, Vol. 100, No. 3, pp. 616–638.

[79] Pulvino and Stafford (2002) at p. 552.

[80] Skinner Deposition, 214:24–215:16.

that day";[81] (iii) "attempt to assess the price impact of specific corporate disclosures on a given day";[82] or (iv) "attempt to isolate and remove the effect of a parent company's public investments in other sectors from the parent company's stock returns."[83]  Indeed, Dr. Skinner grossly mischaracterizes these studies as being supportive of his use of re-computed "adjusted daily returns" to examine the price impact of the alleged misstatements and omissions on the corrective event dates.  To my knowledge, and Dr. Skinner's, this methodology has never been employed in academia or in securities litigation.

23.     Even more problematic, and almost certainly why this methodology has never been seen before, is that re-computing the daily returns of an efficiently priced stock introduces unnecessary measurement error into an otherwise pristine observation of a firm's equity value. As established in the Nye Report,[84] "Altria's stock price reflected the Company-specific information disclosed to the market, and promptly responded to the disclosure of new, material unexpected information."[85]  Similarly, Dr. Skinner assumes "that Altria's common stock traded in a semi-strong form efficient market,"[86] meaning that "prices quickly and fully adjust to 'publicly available information.'"[87]  In other words, given market efficiency, Altria's stock price on any given day is an accurate measure of the Company's equity value (*i.e.*, there is no measurement error).  As a result, any manipulation of Altria's stock price can only serve to

---

[81] Skinner Deposition, 215:17–216:13.

[82] Skinner Deposition, 216:14–216:19.

[83] Skinner Deposition, 216:20–217:9.

[84] Nye Report, §VI.

[85] Nye Report, ¶57.

[86] Skinner Report, ¶59.

[87] Skinner Report, ¶56.

- 17 -

introduce measurement error with respect to the price impact of Company-specific disclosures. As described below, such measurement error in the dependent variable of a regression model (here, the series of daily stock returns) can severely inhibit the model's ability to detect truly abnormal outcomes.

24.    The first source of measurement error in Dr. Skinner's model comes from his assumption that the ordinary shares **and restricted shares** of AB InBev, and the common shares of Cronos—*i.e.*, the shares that Dr. Skinner subtracts from Altria's stock market capitalization—traded in an efficient market during the Class Period.[88]  However, unlike my rigorous analyses establishing that Altria stock traded in an efficient market, Dr. Skinner has not provided any analysis demonstrating that the stock prices of AB InBev and Cronos "quickly and fully adjust[ed] to 'publicly available information'" during the Class Period.[89]  This is particularly problematic for AB InBev's restricted shares, which "are unlisted and not admitted to trading on any stock exchange."[90]  Thus, Dr. Skinner has no basis to assume that the publicly traded prices of these companies accurately reflect the equity value of Altria's respective shareholdings.  To the extent AB InBev and/or Cronos stock exhibited **inefficient** price dynamics during the Class Period, such an assumption can lead to significant measurement error in Dr. Skinner's regression model.

25.    The second source of measurement error is Dr. Skinner's assumption that "the market value of each restricted share [of AB InBev] is … the same as the value of an ordinary share [of

---

[88] Skinner Deposition, 217:20–24 ("… all I'm doing here is essentially assuming that the market for these securities is efficient and removing the estimated values of these securities on each day from Altria's stock.")

[89] Skinner Report, ¶56.

[90] Altria Group, Inc., SEC Form 10-K for year-end 2019, filed February 25, 2020, p. 59.

AB InBev]."[91]  As described above, there is no basis for such an assumption, given that no market existed for AB InBev's restricted shares throughout the Class Period.  Dr. Skinner also fails to mention that the vast majority (approximately 94%) of Altria's equity interest in AB InBev consisted of restricted shares,[92] which could not "be sold or transferred for a period of five years following the [AB InBev] Transaction," and that "[t]hese transfer restrictions … require[d] [Altria] to bear the risks associated with [its] investment in [AB InBev] for a five-year period that expires on October 10, 2021" (*i.e.*, approximately three years and 1.5 years after the beginning and the end of the Class Period, respectively).[93]  Altria's SEC filings further noted that:

> in the event that our ownership percentage in [AB InBev] were to decrease below certain levels, we may be subject to additional tax liabilities, the number of directors that we have the right to have appointed to the [AB InBev] board of directors could be reduced from two to one or zero and our use of the equity method of accounting for our investment in [AB InBev] could be challenged.[94]

26.     Yet, Dr. Skinner completely ignores the incremental risks posed by AB InBev's restricted stock, despite the fact that "[h]ow marketability affects security prices is one of the most important issues in finance."[95]  Indeed, Silber (1991), which "[c]ompar[es] the price of restricted stock with the price of an otherwise identical class of common stock traded in the open market," finds that "restricted stocks [with a two-year period of illiquidity] … sold at an average price

---

[91] Skinner Report, footnote 137.

[92] "At December 31, 2019, Altria had a 10.1% economic and voting interest in [AB InBev], consisting of **185 million restricted shares** … and 12 million ordinary shares."  (*See* Altria Group, Inc., SEC Form 10-K for year-end 2019, filed February 25, 2020, p. 59.  (Emphasis added.))

[93] Altria Group, Inc., SEC Form 10-K for year-end 2019, filed February 25, 2020, p. 11.

[94] *Ibid*.

[95] Longstaff, Francis A., 1995, "How Much Can Marketability Affect Security Values?," *The Journal of Finance*, Vol. 50, No. 5, pp. 1767–1774 ("Longstaff (1995)") at 1767.

discount of 33.75 per cent."[96]  Similarly, "Pratt (1989) summarizes the evidence from eight

separate studies of restricted stock.  The median percentage discount found in these studies is

approximately 35 to 40 percent."[97]  Longstaff (1995) derives an analytical model of the value of

marketability using option-pricing theory, which "closely approximate[s]" the empirical

discounts reported by Pratt (1989) and Silber (1991).[98]  The author explains that the size of the

discount for restricted stock "is an increasing function of length of the marketability

restriction,"[99] meaning that the discount changes over time, and "that discounts for lack of

marketability can potentially be large even when the illiquidity period is very short."[100]

Accordingly, Dr. Skinner's assumption that AB InBev's restricted shares are of equivalent value

to its ordinary shares is egregiously incorrect, and results in severe measurement error in his re-

computed "adjusted daily returns."  Even applying the most conservative restricted stock

discount above (*i.e.*, 33.75%), and ignoring the fact that this discount would only increase prior

to October 11, 2019 (*i.e.*, when the illiquidity period was longer than the two-year lock-up for

stocks examined in Silber (1991)), Dr. Skinner's re-computation methodology incorrectly

overvalues Altria's equity investment in AB InBev by an average of $5.3 billion **per day** during

the Class Period.[101]

---

[96] Silber, William L., 1991, "Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices," *Financial Analysts Journal*, Vol. 47, No. 4, pp. 60–64 ("Silber (1991)") at 60.

[97] Longstaff (1995) at p. 1773, citing Pratt, S. P., 1989, Valuing a Business, (Irwin, Homewood, IL).

[98] Longstaff (1995) at p. 1773.

[99] Longstaff (1995) at p. 1770.

[100] Longstaff (1995) at p. 1767.

[101] During the Class Period, the average market value of Altria's equity investment in AB InBev was $15,837,505,872, under Dr. Skinner's faulty methodology.  33.75% of this amount equals $5,345,158,231.

27.     These measurement errors fundamentally undermine the reliability of Dr. Skinner's event study.  As described by Pindyck and Rubinfeld (1997),[102] an econometrics textbook prominently cited in the *Reference Manual on Scientific Evidence* published by the Federal Judicial Center and the National Research Council,[103] "measurement errors … can substantially alter the properties of the estimated regression parameters."[104]  Specifically, "the effect of the presence of measurement error in the dependent variable is to increase the error variance [of the regression model]," which is "accounted for in the … estimated residual variance."[105]  Here, the "residual" returns are Dr. Skinner's dependent variable of re-computed "adjusted daily returns" less market and industry effects estimated by his regression model.  However, the presence of measurement error serves to bias a regression model against finding statistical significance, *ceteris paribus*, given that: (i) "[t]he standard approach [to assessing statistical significance in securities litigation] is to calculate a test statistic based on the observed [residual] return on the event day divided by the standard deviation of [residual] returns";[106] (ii) "[i]f the test statistic exceeds a 'critical' value, the return is said to be 'statistically significant'";[107] and (iii) in this context, the sample standard deviation of residual returns is equivalent to the estimated residual variance of the regression model (discussed above).  Simply stated, measurement error spuriously inflates

---

[102] Pindyck, Robert S. and Daniel L. Rubinfeld, *Econometric Models and Economic Forecasts*, Irwin/McGraw-Hill, 4th ed., 1997 ("Pindyck and Rubinfeld (1997)").

[103] Rubinfeld, Daniel L., "Reference Guide on Multiple Regression," in Federal Judicial Center and National Research Council, *Reference Manual on Scientific Evidence*, National Academies Press, 3rd ed., 2011, pp. 303–357 ("Reference Guide on Multiple Regression").

[104] Pindyck and Rubinfeld (1997) at p. 180.

[105] Pindyck and Rubinfeld (1997) at p. 181.

[106] Brav, Alon and J. B. Heaton, 2015, "Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias," *Washington University Law Review*, Vol. 93, No. 2, pp. 583–614 at p. 591.

[107] *Ibid*.

the denominator of the test statistic, thereby depressing the test statistic and hindering its ability to reach the presupposed critical value necessary to be considered statistically significant.

28.    Measurement error also affects the "fit" of the regression. According to Greene (2012), another "cost of the measurement error is in the precision of the estimator," which "implies that the fit of the regression … will, at least broadly in expectation, be inferior to that [of an otherwise equivalent model without measurement error]."[108] Thus, in statistical jargon, measurement error in the dependent variable causes the "$R^2$" of a regression model— "a statistic that measures the percentage of variation in the dependent variable that is accounted for by all the explanatory variables," and "provides a measure of the overall goodness of fit of the multiple regression equation"[109]—to decline relative what would be otherwise observed without measurement error.

29.    Objective testing confirms the presence of severe measurement error in Dr. Skinner's regression model. An empirical test of whether Dr. Skinner's regression model contains a problematic level of measurement error is to compare the $R^2$ of his model to one that simply replaces his re-computed "adjusted daily returns" with Altria's actual efficiently traded stock returns, which are free from measurement error. After all, assuming Dr. Skinner's re-computation method of "removing AB InBev and Cronos is to get a measure of Altria's performance in its primary business, which is tobacco,"[110] then his regression model, which purportedly controls for the industry dynamics of the "U.S. tobacco market,"[111] should easily be

[108] Greene, William H., *Econometric Analysis*, Prentice Hall, 2012, 7th Ed. ("Greene (2012)"), Ch. 4, p. 98.

[109] Reference Guide on Multiple Regression, p. 345.

[110] Skinner Deposition, 229:9–12.

[111] Skinner Report, ¶74.

able to explain more of the variation in his "adjusted daily returns" than Altria's actual daily returns, which also include "the effect of non-tobacco business."[112]  On the other hand, if Dr. Skinner's U.S.-tobacco-industry index does a better job explaining Altria's actual daily returns (*i.e.*, has a higher $R^2$), then this implies that the measurement error embedded in his "adjusted daily returns" is extreme enough to overwhelm any imprecision caused by a lack of non-tobacco control variables (*i.e.*, omitted-variable bias) in his model.[113]

30.     Using the back-up computer code Dr. Skinner produced to Counsel for Plaintiffs, I have replicated his regression results summarized in Exhibits 5 and 6 to the Skinner Report, and have estimated his regression model over both the Complaint Class Period (December 20, 2018 through February 21, 2020) and the Amended Complaint Class Period (October 25, 2018 through April 1, 2020).  The $R^2$ values of these models are 25.57% and 43.19%, respectively. However, simply substituting Altria's actual daily returns as the dependent variable,[114] and making no other changes, causes the $R^2$ values to **increase** to 32.93% and 53.52%, respectively. For the reasons stated above, the severe measurement error created by Dr. Skinner's decision to deviate from widely accepted principles and methods, undermine his ability to reliably opine on statistical significance and price impact more broadly.

---

[112] Skinner Deposition, 229:22–23.

[113] The omitted-variable bias of Dr. Skinner's regression model is addressed in §V.C below.

[114] These regressions use Altria's daily total returns, which include the effect of dividends paid throughout the Class Period.

**C.        Dr. Skinner's Regression Model Fails to Account for Important Economic Information Pertinent to Altria's Stock Price, Thereby Biasing His Findings Related to Price Impact**

31.        As described above, Dr. Skinner's re-computation methodology fails to accurately or reliably measure "Altria's performance in its primary business, which is tobacco."[115]  Thus, his regression model is biased against finding statistical significance associated with the alleged corrective event dates.  However, the higher $R^2$ values achieved by simply changing the dependent variable in his model implies that the explanatory variables in his regression model, including "British American Tobacco and Imperial Brands as the components of [his] industry peer index,"[116] are strongly associated with Altria's actual daily returns.  Importantly, this is not the result of "a myopic focus on increasing model R-squared" at the expense of economic theory, as Dr. Skinner asserts.[117]  Indeed, there is no question that the majority of Altria's stock price reflects its tobacco business, which as Dr. Skinner points out accounted for "over 96% of Altria's net revenues in 2018, 2019, and 2020."[118]  Furthermore, even under Dr. Skinner's erroneous assumption that AB InBev's restricted shares are of equivalent value to its ordinary shares, the average value of Altria's equity investment in AB InBev was approximately $15.8 billion during the Class Period, while the Cronos investment never got higher than $3.6 billion.  Though significant, these investments represented less than 30% of Altria's market capitalization during this time.  Given that economic theory (and common sense) dictates that a company primarily operating in the tobacco business would be affected by changing dynamics in the tobacco industry, the fact that an industry index consisting of British American Tobacco and Imperial

---

[115] Skinner Deposition, 229:9–12.

[116] Skinner Report, ¶75.

[117] Skinner Report, ¶67.

[118] Skinner Report, ¶74.

Brands is significantly associated with Altria's actual daily returns is entirely consistent with economic theory.

32.     However, as described in the Nye Report, my event study shows that Altria's actual daily returns were also significantly associated with the S&P 500 Food, Beverage and Tobacco Total Return Index,[119] and, importantly, more so than with Dr. Skinner's tobacco-specific index.[120] This is hardly surprising, given that, as described in §IV.A above, there are obvious economic reasons why Altria's stock price would be affected by changing market dynamics in the Consumer Staples sector, and (more granularly) in the Food, Beverage & Tobacco industry group.[121]  Again, Altria itself consciously chose to report the S&P 500 Food, Beverage and Tobacco Total Return Index as its relevant industry benchmark throughout the Class Period.[122] The fact that Altria conducted "business in ancillary areas such as wine,"[123] and held multibillion dollar equity investments in AB InBev (a drink and brewing company) and Cronos (a cannabinoid company) further supports the need for a regression model that controls for the Company's exposure to both tobacco and non-tobacco risk factors.  As its name suggests, the

---

[119] Nye Report, ¶74.

[120] Using the back-up computer code and input data Dr. Skinner produced to Counsel for Plaintiffs, I have estimated his regression model over both the Complaint Class Period and the Amended Complaint Class Period, using Altria's daily total returns as the dependent variable. The $R^2$ values of these regression models are 32.93% and 53.52%, respectively.  The corresponding $R^2$ values of my regression models, which use the S&P 500 Food, Beverage and Tobacco Total Return Index, are higher at 36.52% and 58.46%, respectively.  Similarly, the *t*-statistic, which measures the strength of the statistical association between Altria's daily total returns and the industry index, is higher for the S&P 500 Food, Beverage and Tobacco Total Return Index (9.72 and 11.22) than Dr. Skinner's tobacco-specific index (8.81 and 9.38) for both the Complaint Class Period and the Amended Complaint Class Period, respectively.

[121] *See supra* at ¶¶13–15.

[122] *See supra* at ¶12.

[123] Skinner Report, ¶74.

- 25 -

S&P 500 Food, Beverage and Tobacco Total Return Index accomplishes this goal, and in a manner consistent with economic theory. The question that comes to mind, however, is whether there is an incremental benefit to including **both** the S&P 500 Food, Beverage and Tobacco Total Return Index and Dr. Skinner's tobacco-specific index as explanatory values in the regression model.

33.     At his deposition, Dr. Skinner testified that, as an alternative to his re-computation methodology, he considered "put[ting] a beverage index on the right-hand side of the regression to try and remove the effect on the beverage industry."[124]  In other words, in addition to controlling for broad market-wide effects (*i.e.*, the S&P 500 Index, which both Dr. Skinner and I use as the first explanatory variable in our models) and the U.S.-tobacco market, Dr. Skinner acknowledges that it is possible to control for Altria's non-tobacco risk exposure by adding a third explanatory variable to a regression model of Altria's actual daily returns. As described in Greene (2012), "[a] common test … of the relevance of a variable in the regression" is to add the variable of interest to the set of pre-existing explanatory variables, and then examine the corresponding *t*-statistic for that variable.[125]  If the *t*-statistic rejects "the null hypothesis that the coefficient is zero," then "[t]he coefficient (actually, the associated variable) is said to be 'statistically significant,'" and should be included in the model.[126]

34.     Performing this specification test reveals that adding the S&P 500 Food, Beverage and Tobacco Total Return Index provides incremental explanatory power to Dr. Skinner's regression

---

[124] Skinner Deposition, 221:13–17.

[125] Greene (2012) at p. 116.

[126] *Ibid*. *See also* Pindyck and Rubinfeld (1997) at pp. 194, 195.

model.[127]  As shown in Table 1 below, the *t*-statistic on the S&P 500 Food, Beverage and Tobacco Total Return Index is statistically significant at the 99.99% confidence level for both the Complaint Class Period and the Amended Complaint Class Period.[128]  This implies that the S&P 500 Food, Beverage and Tobacco Total Return Index is a relevant variable to the description of Altria's actual daily returns, but which Dr. Skinner's model omits.  Yet, it is well understood among academics that "[f]ailure to include a relevant variable in a regression model can lead to biased and inconsistent estimators."[129]  This is also commonly referred to as "omitted-variable bias,"[130] which severely inhibits the ability of Dr. Skinner's regression model to reliably estimate the Company-specific portions of Altria's stock returns on the alleged corrective event dates.  Simply stated, by omitting the S&P 500 Food, Beverage and Tobacco Total Return Index, Dr. Skinner's regression model fails to account for important economic information pertinent to Altria's stock price, thereby biasing his findings related to price impact.

---

[127] The regressions underlying this test exclude Altria from the S&P 500 Food, Beverage and Tobacco Total Return Index.

[128] The regression models underlying Table 1 have been estimated using residual industry index returns that exclude the effects of the preceding explanatory variables in the regression equation. In other words, for Dr. Skinner's tobacco-specific index (*i.e.*, the second explanatory variable), the regression uses the portions of daily returns on this index which are not explained by the market index, as determined from a regression of Dr. Skinner's tobacco-specific index returns on market index returns during the control period.  Similarly, for the S&P 500 Food, Beverage and Tobacco Total Return Index (*i.e.*, the third explanatory variable), the regression uses the portions of daily returns on this index which are not explained by the market index or Dr. Skinner's tobacco-specific index, as determined from a regression of S&P 500 Food, Beverage and Tobacco Total Return Index returns on market index returns and Dr. Skinner's tobacco-specific index returns during the control period.  The use of residual industry index returns rather than raw returns eliminates any statistical problems due to multicollinearity.  (*See* Greene, William H., *Econometric Analysis*, Prentice Hall, 2012, 7th ed., Ch. 4, p. 89.)

[129] Pindyck and Rubinfeld (1997) at p. 194.

[130] Greene (2012) at pp. 56–58.

**Table 1**

| Complaint Class Period | | | |
|---|---|---|---|
| **Explanatory Variable** | **Coefficient** | ***t*-Statistic** | **Confidence Level** |
| Intercept | 0.00 | 1.00 | 68.00% |
| S&P 500 Index | 0.59 | 8.07 | 100.00% |
| Skinner Tobacco-Specific Index | 0.42 | 9.18 | 100.00% |
| **S&P 500 Food, Beverage and Tobacco Total Return Index** | **0.44** | **3.99** | **99.99%** |

| Amended Complaint Class Period | | | |
|---|---|---|---|
| **Explanatory Variable** | **Coefficient** | ***t*-Statistic** | **Confidence Level** |
| Intercept | 0.00 | 0.35 | 27.69% |
| S&P 500 Index | 0.72 | 18.81 | 100.00% |
| Skinner Tobacco-Specific Index | 0.42 | 9.88 | 100.00% |
| **S&P 500 Food, Beverage and Tobacco Total Return Index** | **0.53** | **6.01** | **100.00%** |

### D.    Modifications That Account for Dr. Skinner's Criticisms Have Virtually No Effect on My Regression Model

35.    As discussed in §IV.A above, my event study was not designed "for purposes of measuring Altria-specific **tobacco-related** stock price changes (abnormal returns) **on the alleged corrective event dates**."[131]  Rather, my event study was designed to "examine[] how the total mix of information changed on the earnings-related events examined in my Exhibit 12,"[132] and whether "the price changes … on those dates are … consistent with market efficiency."[133] Nonetheless, I have examined the overall effect of Dr. Skinner's misguided criticisms by re-estimating my regression model with the following modifications: (i) I have added Dr. Skinner's tobacco-specific industry index consisting of British American Tobacco and Imperial Brands as a third explanatory variable;[134] and (ii) I have removed Altria from the S&P 500 Food, Beverage

---

[131] Skinner Report, ¶65.  (Emphasis added.)

[132] Nye Deposition, 49:13–15.

[133] Nye Deposition, 19:18–20.

[134] Skinner Report, ¶¶66–69.

and Tobacco Total Return Index.[135]  As shown in Table 2 below,[136] these adjustments reveal that

Dr. Skinner's criticisms do not undermine my event study—they, in fact, have virtually no effect

on my regression model.  The direction, magnitude, and statistical significance of Altria's

Company-specific stock returns on the alleged corrective event dates are strikingly similar to the

results obtained from the regression model described in the Nye Report.  Accordingly, Dr.

Skinner's criticisms are irrelevant at best.

---

[135] Skinner Report, ¶70.

[136] Given that the modified model includes a third explanatory variable (*i.e.*, a third regressor), Table 2 reports the adjusted $R^2$ as the comparative "fit" measure for both models.  As discussed in Greene (2012), "it is possible to push $R^2$ as high as desired just by adding regressors.  This possibility motivates the use of the adjusted $R^2$ …, instead of $R^2$ as a method of choosing among alternative models.  Since [adjusted $R^2$] incorporates a penalty for reducing the degrees of freedom [caused by adding regessors to the model] while still revealing an improvement in fit, one possibility is to choose the specification that maximizes [adjusted $R^2$]."  (*See* Greene (2012) at p. 44.)

**Table 2**

| Impact Date | Nye Report Model | | Nye Modified Model | |
|---|---|---|---|---|
| | Company-Specific Return | Confidence Level | Company-Specific Return | Confidence Level |
| 3/19/2019 | -1.91% | (90.14%) | -2.14% | (92.38%) |
| 4/3/2019 | -3.36% | (99.61%) | -3.25% | (99.28%) |
| 6/21/2019 | -4.15% | (99.96%) | -4.36% | (99.97%) |
| 8/29/2019 | -2.94% | (98.71%) | -3.82% | (99.87%) |
| 8/30/2019 | -1.23% | (70.41%) | -1.57% | (81.76%) |
| 9/9/2019 | 0.79% | (49.71%) | 0.73% | (46.84%) |
| 9/11/2019 | 0.54% | (35.14%) | -0.11% | (7.80%) |
| 9/13/2019 | -2.47% | (96.91%) | -2.22% | (94.77%) |
| 9/24/2019 | -0.65% | (42.68%) | 0.25% | (16.99%) |
| 9/25/2019 | -0.89% | (56.23%) | -1.68% | (85.24%) |
| 10/31/2019 | -2.95% | (98.75%) | -2.28% | (94.80%) |
| 11/19/2019 | -2.72% | (98.24%) | -3.06% | (99.16%) |
| 1/30/2020 | -5.96% | (100.00%) | -5.54% | (100.00%) |
| 2/21/2020 | 0.15% | (12.30%) | 0.18% | (15.53%) |
| 2/24/2020 | -1.98% | (96.71%) | -1.86% | (95.49%) |
| 2/25/2020 | -1.37% | (86.26%) | -1.67% | (92.80%) |
| 2/26/2020 | -0.65% | (52.30%) | -0.71% | (55.95%) |
| 2/27/2020 | -0.06% | (5.00%) | -1.30% | (84.00%) |
| 4/2/2020 | -6.57% | (100.00%) | -7.63% | (100.00%) |

| | | |
|---|---|---|
| Adjusted $R^2$ Complaint Class Period | 36.06% | 36.85% |
| Adjusted $R^2$ Amended Complaint Class Period | 58.22% | 58.83% |

**V.    Dr. Skinner Fails to Prove That Defendants' Alleged Misstatements and Omissions During the Class Period Lacked Price Impact**

36.    It is my understanding that Defendants seeking to rebut the presumption of reliance at class certification bear the burden of persuasion to prove a lack of price impact.[137] Defendant

---

[137] *See Goldman Sachs Group, Inc., et al., Petitioners v. Arkansas Teacher Retirement System, et al.*, 141 S.Ct. 1951 (2021) ("*Goldman*").

Altria has retained Dr. Skinner "to evaluate whether movements in Altria's stock price at the time of the alleged corrective events in the Corrected Consolidated Class Action Complaint are evidence the alleged misrepresentations impacted Altria's stock price earlier in the Putative Class Period."[138]  He concludes the following:

> Based on my review and analysis to date, … I reach an affirmative opinion that there was no price impact with respect to eight of the alleged corrective event dates.  As for the remaining seven event dates, given the mismatch between the contents of the alleged corrective events and the alleged misrepresentations, there is substantial doubt as to whether any stock price movements on these dates can be used as evidence of earlier price impact.[139]

37.    As discussed further below, Dr. Skinner's assessment of price impact in this matter is incomplete and flawed, rendering his conclusions unreliable.  As an initial matter, by his own admission, Dr. Skinner is unable to reach an affirmative opinion on price impact for most of the alleged corrective events.  As shown in Table 3 below, for seven alleged corrective events, he asserts there is, at most, "**substantial doubt**" that the price declines associated with these dates "can be used as evidence of **earlier** price impact."[140]  Furthermore, Dr. Skinner omits from his analysis four additional alleged corrective events contained in the Amended Complaint, three of which are associated with a statistically significant stock price decline at above the 95% confidence level under his event study, and one of which is associated with a statistically

---

[138] Skinner Report, ¶11.  (Internal citations omitted.)

[139] Skinner Report, ¶13.  The "eight alleged corrective event dates" referred to by Dr. Skinner are: August 30, 2019; September 9, 2019; September 11, 2019; September 24, 2019, and four days during the period February 24–27, 2020 following the alleged corrective event on Friday, February 21, 2020.  The "remaining seven event dates" are: April 3, 2019; August 29, 2019; September 13, 2019; September 25, 2019; October 31, 2019; January 30, 2020; and February 21, 2020.  (*See* Skinner Report, §VI.B and VI.C.)

[140] Skinner Report, ¶13.  (Emphasis added.)  *See also, e.g.*, Skinner Deposition 54:19–24.

significant stock price decline at the 93.5% confidence level under his event study.[141] Dr. Skinner proffers an affirmative opinion on price impact for just four events, two of which are not alleged to be corrective,[142] based solely, and improperly, on a finding of statistically insignificant stock price movements.[143] Unsurprisingly, the Skinner Report is void of any conclusive opinions on price impact that apply to the alleged misstatements and omissions during the Class Period as a whole. He does not conclude, because he cannot, that Defendants' alleged misrepresentations regarding the Company's investment in JLI did not impact the price of Altria stock during the Class Period. Indeed, as noted in the circuit court decision on appeal in *Halliburton II*,[144] "[p]rice impact can be shown either by an increase in price following a fraudulent public statement **or a decrease in price following a revelation of the fraud**."[145] As noted above, the Skinner Report describes numerous statistically significant decreases in price following the alleged revelation of fraud in this case.

---

[141] Skinner Deposition, 46:23–47:10:

> Q. As you state, your analysis did not include the additional dates that were identified in the proposed amended complaint, correct?
>
> A. The analysis that I did that we might call price impact analysis in Section 6 of my report did not include the four additional dates in the proposed amended complaint. … [T]hat was not part of my assignment.

[142] *See* Skinner Report, footnote 93 ("The Complaint does not allege a decline on this date or include a return. Altria's raw return on September 9, 2019 was 0.43%."), and footnote 94 ("The Complaint does not allege a decline on this date or include a return. Altria's raw return on September 11, 2019 was 1.09%.")

[143] *See* §V.C below for my discussion of Dr. Skinner's improper conflation of statistical significance and price impact.

[144] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014) ("*Halliburton II*").

[145] *Erica P. John Fund, Inc. v. Halliburton Co.,* 718 F.3d 423, 434 (5th Cir. 2013) *vacated and remanded on other grounds,* 134 S. Ct. 2398 (U.S. 2014). (Emphasis added.) My understanding is that this definition of price impact was not challenged in the Supreme Court.

**Table 3**

**Summary of Dr. Skinner's Conclusion on Price Impact**

| Date | Alleged Corrective Event | Skinner Model Abnormal Return | Skinner Model Confidence Level | |
|---|---|---|---|---|
| **Affirmative Opinion on Price Impact Because Not Statistically Significant at 95% Confidence Level** | | | | |
| 8/30/2019 | FDA and CDC announced investigation of e-vaping-related cases of illnesses. | -1.69% | 70.94% | |
| 9/9/2019 | Not an alleged corrective event. (FDA issued a warning letter to JUUL regarding its marketing practices about the risk of harm of its products.) | 0.21% | 10.52% | |
| 9/11/2019 | Not an alleged corrective event. (Reports surfaced that the federal government was considering a ban on flavored e-cigarettes.) | 0.08% | 4.09% | |
| 9/24/2019 | News sources began reporting that federal prosecutors in CA were conducting a criminal probe into JUUL. | 1.87% | 76.10% | |
| **"Substantial Doubt" Evidence of Earlier Price Impact** | | | | |
| 4/3/2019 | FDA announced an investigation into seizures related to e-cigarette use. | -4.59% | 99.40% | ** |
| 8/29/2019 | The WSJ reported that the FTC was investigating whether JUUL used influencers and other marketing practices to appeal to youth. | -5.87% | 99.97% | ** |
| 9/13/2019 | Reports surfaced that state governments were considering a ban on flavored e-cigarettes. | -3.13% | 94.90% | ** |
| 9/25/2019 | Altria announced that Philip Morris had called off discussion of a $200 billion merger with Altria; JUUL announced a federal investigation and that it would stop all advertising in the U.S. and replace its CEO. | -2.37% | 86.40% | |
| 10/31/2019[1] | Altria announced it was taking a $4.5 billion write-down on its JUUL investment and that it received a civil investigative demand from the FTC. | -2.28% | 84.12% | ** |
| 1/30/2020 | Altria announced an additional $4.1 billion write-down on its JUUL investment. | -5.65% | 99.99% | ** |
| 2/21/2020[2] | At 3:37PM, the WSJ reported that the SEC had launched an investigation into whether Altria had fully disclosed the risks associated with its JUUL investment. | 1.01% | 53.88% | |
| | *Next trading day (2/24/2021).* | -2.39% | 90.38% | ** |
| **Corrective Events Not Examined by Dr. Skinner** | | | | |
| 3/19/2019 | Gottlieb statement that he had a "difficult" meeting the prior week with Altria and JUUL, was concerned about the slow pace of efforts to curb youth vaping, and believed that the FDA may need to pull pod-based nicotine products off the market as it combats a surge in teen vaping. | -3.04% | 93.54% | * |
| 6/21/2019 | Gottlieb statement "I don't know how Juul gets through [the PMTA] process" because "[t]hey have so much historical youth use with their product." | -5.55% | 99.94% | ** |
| 11/19/2019 | NYAG announced a lawsuit against JLI for deceptive and misleading marketing of its e-cigarettes, which contributed to the ongoing youth vaping epidemic in NY | -3.88% | 98.56% | ** |
| 4/2/2020 | FTC announced that it was filing suit to force Altria to unwind its $12.8 billion investment in JUUL. | -8.18% | 100.00% | ** |

Notes:

"*" and "**" indicates statistically significance at above the 90% and 95% confidence level, respectively, under the Nye event study.

[1] For October 31, 2019, Dr. Skinner concludes there is a "substantial doubt as to whether any stock price movement ... can be used as evidence of earlier price impact" with respect to the FTC inquiry, and he "reach[es] an affirmative opinion on the lack of price reaction with respect to the announcement of the impairment charge." (Skinner Report, ¶116.)

[2] For February 21, 2020, Dr. Skinner concludes that there is "substantial doubt as to whether any stock price decline on February 21, 2020 can be used as evidence of earlier price impact of the alleged misrepresentations," and "there is no evidence" of price impact for "any of the dates February 24, 2020 through February 27, 2020." (Skinner Report, ¶¶109, 142.)

38.    The unreliability of Dr. Skinner's price impact analysis is further exacerbated by several flaws and omissions. First, Dr. Skinner does not dispute that the alleged corrective information

- 33 -

caused, at least in part, the Company-specific stock price declines on the event dates he examined. In fact, he does not actually opine one way or the other as to the cause of such stock price declines. Instead, his opinions are limited to whether there is a "mismatch between the contents of the alleged corrective events and the alleged misrepresentations."[146] While he insists that "an economic expert needs to employ a scientific and reliable methodology to establish that the two sets of information—one alleged to have been concealed earlier and the other to have been revealed later—have the same impact on stock price,"[147] the Skinner Report fails to describe, even generally, what constitutes a "mismatch" (or match) in his view, or the criteria he employed to make an inference either way. Furthermore, Dr. Skinner's conclusions that there is a "mismatch" between alleged corrective events and Defendants' misrepresentations are premised on an incorrect and overly narrow view of Plaintiffs' allegations. He simply asserts that alleged corrective events constitute a mismatch, when such events clearly relate back to the alleged misrepresentations regarding JLI's marketing practices, the safety of their products, and the attendant risks that were virtually certain to materialize.

39.     In addition, Dr. Skinner improperly conflates statistical significance and price impact. Contrary to his position, a finding of statistical insignificance does **not** allow a researcher to attribute causation to "typical price fluctuations … in the absence of new information,"[148] and thereby rule out price impact. Furthermore, as described above, Dr. Skinner's regression model contains numerous flaws that negatively bias his findings with respect to statistical significance associated with the Company-specific stock price declines on October 31, 2019 and February

---

[146] Skinner Report, ¶13.

[147] Skinner Report, footnote 249.

[148] Skinner Report, ¶62.

21–24, 2020 (as well as on all of the other corrective event dates). The reliability of Dr. Skinner's price impact analysis is further belied by his failure to disentangle the price effects of offsetting positive non-fraud-related information he identifies on dates he claims are associated with statistically insignificant stock price movements.

40.    In sum, Dr. Skinner has failed to prove that the alleged misstatements and omissions during the Class Period lacked price impact. And since Defendants' basis for this argument is Dr. Skinner, Defendants' argument simply fails. Contrary to Defendants' assertions, it is my understanding that price impact may be demonstrated using the Company-specific declines in the price of Altria stock following the disclosures and/or materialization-of-risk events that allegedly corrected the misstatements and omissions described in the Amended Complaint. The majority of these alleged corrective events are statistically significant at the 95% confidence level threshold employed by Dr. Skinner, even under his own model.

**A.    Dr. Skinner's Opinion That "There Is Substantial Doubt" as to Whether Certain Alleged Corrective Events Evidence Price Impact Is Incomplete and Based on an Incorrect and Overly Narrow View of Plaintiffs' Allegations**

41.    For seven alleged corrective events, Dr. Skinner asserts that "given the mismatch between the contents of the alleged corrective events and the alleged misrepresentations, there is substantial doubt as to whether any stock price movements on these dates can be used as evidence of earlier price impact."[149] In the following subsections, for each of these dates, I describe the flaws in Dr. Skinner's analysis that render his conclusions on price impact unreliable. Furthermore, while it is my understanding that Plaintiffs do not bear the burden of proving price impact at this time, and I have not determined the degree to which the corrective

---

[149] Skinner Report, ¶13.

events contributed to the decline in the price of Altria stock relative to other negative Company-specific information released on these dates, as demonstrated below, it is clear that Altria's stock price was negatively impacted by the disclosure of information and events that are directly related to the allegedly concealed risks Altria faced due to its investment in JLI.

### i. April 3, 2019

42.     Before market open on Wednesday, April 3, 2019, the FDA "notif[ied] the public of another potential emerging safety issue" that was "related to seizures reported following e-cigarette use, particularly in youth and young adults":

> Today, we're notifying the public of another potential emerging safety issue of which the FDA has recently become aware. We have reports indicating that some people who use e-cigarettes, especially youth and young adults, are experiencing seizures following their use. Seizures or convulsions are known potential side effects of nicotine poisoning and have been reported in scientific literature in relation to intentional or accidental swallowing of nicotine-containing e-liquids. However, an FDA review of voluntary adverse event reports for these products submitted to the agency and to poison control centers has identified a total of 35 reported cases of seizures following use of e-cigarettes between 2010 and early 2019. While 35 cases may not seem like much compared to the total number of people using e-cigarettes, we are nonetheless concerned by these reported cases. We also recognize that not all of the cases may be reported. We believe these 35 cases warrant scientific investigation into whether there is in fact a connection. …

> [D]ue to the voluntary nature of these case reports, we must also recognize that there may be more instances of seizure in e-cigarette users than have been reported. We are actively seeking additional reporting. We're encouraging health care professionals, consumers, parents, teachers and other concerned adults, as well as youth and young adult users to be aware of this potential health issue and report any past or future incidents of seizures following e-cigarette use to the FDA. Additional reports or information about these incidents may help us determine if there's a connection and help identify common risk factors and if any e-cigarette product attributes, such as nicotine content or formulation, may contribute to seizures.

> We're asking that any unexpected health or product issues experienced with e-cigarettes or any tobacco product be reported to the FDA through our Safety Reporting Portal. Information about the specific product used (including brand name), whether it was modified in any way or if other tobacco products, medications, supplements or other substances were used, as well as details about product use preceding the adverse event, are critical pieces of information to help

- 36 -

fully assess this issue more broadly. We need more information before we can determine if there's in fact a link between e-cigarette use and the reported incidents.  It's our hope that these public steps to solicit additional reports of adverse events, along with other agency efforts, will allow us to understand whether there's a connection.[150]

43.     *Bloomberg* reported on the agency's announcement, noting the "FDA has been particularly concerned about an epidemic of youth vaping associated with popular e-cigarettes made by Juul."[151]  While Altria declined to comment on the "FDA alert," a JUUL spokesman reassured the public that it would "vigilantly monitor for any evidence of safety issues":

> The agency is raising the issue to encourage the public to report adverse events related to e-cigarettes to the FDA's online portal. Seizures are a known risk associated with ingestion of nicotine liquids used in e-cigarettes.

> The FDA has been particularly concerned about an epidemic of youth vaping associated with popular e-cigarettes made by Juul Labs Inc. and recently proposed to restrict sales of flavored products in retail stores.  The agency said in its statement on Wednesday that in many of the seizure reports, it couldn't identify a specific brand or sub-brand of device.

> Shares of tobacco makers who are trying to diversify away from traditional cigarettes by embracing electronic devices declined on Wednesday.  Altria Group, which has a large stake in Juul Labs, fell 3 percent to $55 at 1:02 p.m. in New York, while Philip Morris International Inc. declined 2.2 percent to $86.06.

> An Altria spokesman declined to comment on the FDA alert.  Juul spokesman Joshua Raffel said in a statement that the company has "robust safety monitoring systems in place and will vigilantly monitor for any evidence of safety issues."

---

[150] FDA Statement, "Statement from FDA Commissioner Scott Gottlieb, M.D., and Principal Deputy Commissioner Amy Abernethy, M.D., Ph.D., on FDA's ongoing scientific investigation of potential safety issue related to seizures reported following e-cigarette use, particularly in youth and young adults," April 3, 2019 (available at https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-and-principal-deputy-commissioner-amy-abernethy-md-phd).  *See also Bloomberg*, "FDA Investigating Whether E-Cigarettes Linked to Seizure Risk," April 3, 2019, 8:53 AM.

[151] *Bloomberg*, "FDA Investigating Possible Seizure Risk With E-Cigarette Use (5)," April 3, 2019, 1:04 PM.

Philip Morris is seeking U.S. approval for IQOS, a heated-tobacco device that would compete with Juul's e-cigarette and that is already sold in many countries. Altria has a deal to market IQOS if cleared for sale in the U.S.[152]

44.    Dr. Skinner and I both "find[] that Altria's stock price movement[] [was] negative and statistically significant at the 5% level on April 3, 2019."[153]  He does not dispute that the FDA alert was the cause of this decline.[154]  Instead, he argues that this event constitutes a "mismatch," because the "alleged corrective events related to the vaping industry as a whole as opposed to JUUL products specifically; in contrast, the alleged misrepresentations are specific to JUUL."[155] According to Dr. Skinner, "[t]his mismatch raises substantial doubt as to whether any of Altria's stock price movement[]" on April 3, 2019 "can be used as evidence that the alleged misrepresentations impacted Altria's stock price earlier in the Putative Class Period."[156] However, to be clear, Dr. Skinner does **not** opine that "the announcement on April 3, 2019 had no price impact."[157]

45.    Contrary to Dr. Skinner's assertions, the market readily connected the FDA alert to the agency's "concern[s] about an epidemic of youth vaping associated with popular e-cigarettes

---

[152] *Ibid*.

[153] Skinner Report, ¶147; Nye Report, Exhibit 11B.  Dr. Skinner's reference to statistical significance at the "5% level" is equivalent to statistical significance at the 95% confidence level.  Statistical significance at the "10% level" is equivalent to statistical significance at the 90% confidence level.

[154] Skinner Report, ¶¶147–151. Dr. Skinner has not identified any news other than the FDA alert that could have contributed to the price decline that day.

[155] Skinner Report, ¶147.

[156] Skinner Report, ¶147.

[157] Skinner Deposition, 169:16–21 ("Q. As we discussed before, because this is in this section as opposed to the earlier section, I am correct you are not providing the opinion here that the announcement on April 3, 2019 had no price impact on Altria's securities, correct?  A. That's correct.  Yes.").

made by Juul."[158]  Further evidencing this connection is the fact that JUUL responded to the

FDA's alert by issuing a public statement vowing to monitor for such safety concerns.[159]  Dr.

Skinner states that he "understand[s]" that "these [seizure] cases were [] not specifically linked to

JUUL," because they "**first** occurred years before JUUL marketed its first product."[160]

However, he fails to mention that "the FDA observed a slight but noticeable increase in reports

of seizures" "[s]ince June 2018," which was **after** JUUL had marketed its first product:

> The FDA has been receiving voluntary adverse experience reports about tobacco
> products since 1988, including accepting online reports since 2014 via the Safety
> Reporting Portal (SRP).  Consumers have also reported adverse experience
> information directly to poison control centers.  **Since June 2018, the FDA**
> **observed a slight but noticeable increase in reports of seizures.**  After
> examining poison control centers' reports between 2010 and early 2019, the FDA
> determined that, between the poison control centers and the FDA, there were a
> total of 35 reported cases of seizures mentioning use of e-cigarettes within that
> timeframe.  Due to the voluntary nature of these case reports, there may be more
> instances of seizure in e-cigarette users than have been reported.[161]

---

[158] *Bloomberg*, "FDA Investigating Possible Seizure Risk With E-Cigarette Use (5)," April 3, 2019, 1:04 PM.

[159] *Ibid*.

[160] Skinner Report, ¶150, citing FDA Press Release, "Some E-cigarette Users Are Having Seizures, Most Reports Involving Youth and Young Adults," April 10, 2019 (available at https://www.fda.gov/tobacco-products/ctp-newsroom/some-e-cigarette-users-are-having-seizures-most-reports-involving-youth-and-young-adults.).  *See also* Altria's Opposition to Class Certification, p. 25 ("Plaintiffs' own complaint notes that these 'recent cases' dated back to 2010, years before JUUL even existed.")  (Emphasis added.)

[161] FDA Press Release, "Some E-cigarette Users Are Having Seizures, Most Reports Involving Youth and Young Adults," April 10, 2019 (available at https://www.fda.gov/tobacco-products/ctp-newsroom/some-e-cigarette-users-are-having-seizures-most-reports-involving-youth-and-young-adults).  (Emphasis added.)  *See also CNN*, "FDA investigates reports of seizures after vaping," April 3, 2019 (available at https://lite.cnn.com/en/article/h_df00fdd09 aa6c2ba7a478e0555239276): "The FDA has identified 35 such cases of seizures -- particularly among younger users -- between 2010 and early 2019, it said in a statement Wednesday. The agency has also seen a 'slight but noticeable increase in reports of seizures' since June."

46.     Furthermore, the FDA posted four "redacted reports of past incidents" on its website in order to "assist medical evaluations of seizures."[162]  Three of the four incidents reportedly involved a JUUL device: (i) a June 23, 2018 incident involving Juul Cool Mint 5% strength; (ii) a September 16, 2018 incident; and (iii) a January 30, 2019 incident.[163]  The "Problem Summary" reported for each of these incidents follows:

- June 23, 2018 Incident:

  Problem Summary: "After inhaling on a Juul device, of which I was unaware he was using, my teenage son preceded to have a grand mal seizure.  He describes inhaling from the device and seeing an eye aura immediately in his left eye.  The eye aura turned into a what he describes as a dark shadow coming at him that he was trying to get away from and then he remembers nothing after that.  From that point I became involved as I heard him crash to the floor in the room above me.  I reached him as he was fully seizing, convulsions, turning blue, eyes rolled up in his head.  He was unconscious once the convulsions stopped about a minute after they probably started.  He does not remember anything until starting to come to in the ambulance.  Paramedics found the Juul device underneath him and when I asked him about it at the hospital, he admitted using it right before the seizure.  This is a perfectly healthy teenager with no underlying issues."

  \*\*\*

  Additional Information: "My son has said that 'Everyone' in high school has a JUUL device and is vaping.  He is not someone that you would expect to use it, so if he is doing it, then I believe him when he says everyone.  Teenagers think this device is not harmful to them.  Thinks it's 'cool'.  Clearly something has to be done and quickly!  I truly believe this product caused my son's seizure.  We will be able to rule out any underlying issues with regard to his health by the end of the next three weeks, however, even if he is found to have an underlying issue, this product at the very least triggered it.  However, myself and his pediatrician feel this seizure is directly related to the JUUL device and pod used.  Time to fast track regulation of these devices!"

- September 16, 2018 Incident:

  Problem Summary: "Our son's addiction to the Juul has been a year-long battle.  Not only has it resulted in the typical adolescent nicotine-related

---

[162] *Ibid.*

[163] https://www.fda.gov/media/122794/download.

- 40 -

symptoms of a brand new attention deficit struggle, lessening cognitive function, and increased impulsivity (went from high achieving 'A' student to struggling 'F' student) but is also causing disturbing health problems. Recently, our son had a grand mal seizure following his Juul use. While doctors are not yet trained to say for certain that the Juul is behind the problem, it is obvious to us and other parents fighting the same battle that the high nicotine content of the Juul is toxic to our children. Our son has seen a neurologist (who can't say what caused the seizure), a cardiologist (who believes his chest pains and cold sweats are connected to his Juul use), an attention deficit specialist (who can't treat his ADHD because it's caused by nicotine), a pediatrician (who can only recommend behavioral therapy to get off nicotine), a psychiatrist (who prescribed Wellbutrin to help him control the impulse to use the Juul), and a counselor (who is trying to help him stop using the Juul). The addiction is so strong that it is beyond a teenager's control. Requiring Juul to change their marketing towards teens or even punishing Juul with fines is not going to get this new generation of addicts off nicotine. Now that they're addicted, they'll find nicotine elsewhere if the Juul is not available. They can always find an older friend to purchase nicotine products. Someone needs to come up with an effective treatment to cure the addiction. As a parent fighting the battle to salvage her child's future successes, I can say the Juul problem is worse that the public realizes."

- <u>January 30, 2019 Incident</u>:

  Problem Summary: "My daughter was on the way to school with friends and hit a JUUL handful of times in a short period. She immediately went into a tonic/clonic seizure that lasted 2-5 minutes. [T]he remainder of the day she had a severe headache and nausea."

  ***

  Additional Information: "This seems to be an epidemic with our teenagers. There are no warning labels notifying consumers of the possibilities of nicotine overdoes [*sic*]. This is not the first incident of seizures that has been reported."[164]

47.     Jefferies published a report following the FDA alert, discussing possible implications, including removal of all pods from the market. Jefferies concluded that JUUL products had the most exposure:

  Reports yesterday the FDA is investigating cases of people suffering from seizures after vaping. While the link has not been proven, our understanding is if there is a link it's likely due to too much nicotine vs vaping itself. This could

---

[164] *Ibid*.

- 41 -

have implications therefore for nicotine concentrations (US allows 5% while Europe is limited to 2%) vs the removal of all vapour. It could however in our view support the case for removal of all Pods (and therefore Juul). …

Unlikely to lead to a vapour ban but could result in lower nic concentrations Tobacco stocks sold off yesterday on the news, with incoming calls concerned around the possibility of product bans, not just in the US, but globally. We think such action is very unlikely. Leaving aside that there may be other factors at play, our understanding is if it was possible, and we are not saying it isn't, it is more likely to be linked to high nicotine concentrations. We know in severe cases, nicotine poisoning through too much nicotine can lead to seizures, even death. Direct implications of this are likely to be actions around nicotine concentrations vs banning vapour altogether. The US for example allows 5% nicotine compared to Europe that only allows 2%. We could see the FDA require all vapour products in the US also be 2%. **We would say Juul product has most exposure to this as almost all of its volumes are 5% and seizure instances such as this could also support the FDA case for removal of all pods (and therefore Juul) from the market.**[165]

48.    Thus, contrary to Dr. Skinner's assertions, the market clearly understood that the FDA's alert of potential seizures due to e-cigarettes directly related to JUUL products. Dr. Skinner is also incorrect to presume that the alleged misrepresentations are not related to the "vaping industry as a whole." Under Plaintiffs' theory of liability, and as acknowledged by Altria, "JUUL's youth marketing had **created** the youth vaping epidemic."[166] Thus, the FDA's action taken to "protect the public, especially our nation's youth, from the dangers of e-cigarettes" is indeed directly related to and a foreseeable consequence of the alleged misstatements and omissions.

49.    In an attempt to diminish the fact that his own model shows that Altria suffered a statistically significant stock price decline in response to this news, Dr. Skinner argues that "the industry index used in [his] event study does not provide a good control for news that affects the

---

[165] Jefferies, "FDA Looking at Link of E-Cigarettes to Seizures," April 4, 2019. (Emphasis added.)

[166] Amended Complaint, ¶413. (Emphasis added.)

e-cigarette sector because neither of the companies in the index has significant presence in that

sector (the same is true of Dr. Nye's industry index …)."[167]  He concludes that "any abnormal

returns that Dr. Nye and I calculate in our respective event studies will reflect news that affects

the e-cigarette industry sector as a whole as well as news specific to Altria/JUUL."[168]  This

argument is unfounded.  The industry index used by Dr. Skinner is a "value-weighted peer index

comprising British American Tobacco ["BAT"] and Imperial Brands."[169]  Both BAT and

Imperial Brands emphasized the importance of the vaping industry to their business strategy.

For example, BAT featured its e-cigarette products on the cover page of its 2018 Annual Report,

titled "Transforming Tobacco":[170]



---

[167] Skinner Report, ¶147.

[168] Skinner Report, ¶147.

[169] Skinner Report, ¶72.

[170] British American Tobacco, Annual Report and Form 20-F 2018 (available at
https://www.bat.com/group/sites/UK__9D9KCY.nsf/vwPagesWebLive/DOAWWGJT/$file/Ann
ual_Report_and_Form_20-F_2018.pdf).

In this report, BAT touts itself as "one of the world's leading vapour companies," whose

"ambition [is] to positively impact the lives of millions of [its] consumers by providing them

with lower-risk tobacco and nicotine products":[171]

> While smokers have historically had very few alternatives to combustible cigarettes, innovation is now providing adult consumers with a greater choice of tobacco and nicotine products that are potentially less risky than cigarettes.
>
> **BAT is at the forefront** of the development and sale of a whole range of potentially reduced-risk products that provide much of the enjoyment of smoking without burning tobacco.
>
> Our growing portfolio of potentially reduced-risk products (which we call PRRPs) includes **vapour, tobacco heating products (THPs)**, modern oral products, as well as traditional oral products such as Swedish-style snus and American moist snuff.
>
> Our acquisition of Reynolds American has transformed us into **one of the world's leading vapour companies** and has also allowed us to significantly increase the size of our oral tobacco and nicotine products range.
>
> Never before have so many of our consumers around the world had access to so many alternatives to combustible cigarettes.  We continue to develop new and ever more innovative products to add to this range of potentially less risky choices.[172]

50.     Similarly, Imperial Brands featured its "blu" vapor product on the cover page of its 2018

Annual Report, titled "Something Better":

---

[171] *Id.*, pp. 1, 2.

[172] *Id.*, p 2.  (Emphasis added.)



In this report, Imperial Brands describes its business as having "particular focus on the vapour category":

> Our strategy is aligned to our purpose of creating something better for the world's smokers and focuses on driving results in three key areas.  In Tobacco we are maximising opportunities for our Growth Brands in priority markets.  **Through our growing portfolio of Next Generation Products we are providing adult smokers with a range of less harmful alternatives to cigarettes, with a particular focus on the vapour category.**  The disciplined approach we take to managing cost and cash provides the funds to invest in growth.  Our updated sustainability strategy supports our commercial and public health ambitions, and everything we do is underpinned by high standards of governance.[173]

51.    Furthermore, following the FDA's April 3, 2019 alert about possible seizures related to vaping, news commentators noted that "[s]hares of tobacco makers who are trying to diversify away from traditional cigarettes by embracing electronic devices declined."[174]  News

---

[173] Imperial Brands Annual Report and Accounts 20018, p. 3 (available at https://www.imperialbrandsplc.com/investors/annual-report-accounts-2020/annual-report-archive.category1.year2018.html).  (Emphasis added.)

[174] *Pittsburgh Post-Gazette,* "The FDA is investigating a possible risk of seizures with e-cigarette use," April 3, 2019 (available at https://www.post-gazette.com/news/health/2019/04/03/FDA-investigating-vaping-e-cigarettes-use-US-reports-risk-seizures/stories/201904030178).

commentators cited the declines in stocks of Altria, Phillip Morris, BAT and Imperial Brands.[175]

Thus, Dr. Skinner's assertion that the statistically significant Company-specific decline that he

and I both estimate for April 3, 2019 does not control for "news that affects the e-cigarette

sector" is demonstrably false.[176]

52.      In sum, Dr. Skinner fails to demonstrate that there is a "mismatch between the contents of

the alleged corrective events [on April 3, 2019] and the alleged misrepresentations."[177]  As such,

his conclusion that "there is substantial doubt" as to whether the decline in Altria's stock price

that day "can be used as evidence of earlier price impact"[178] is meritless.

### ii.   August 29, 2019

53.      On Thursday, August 29, 2019, *The Wall Street Journal* reported that the FTC was

investigating whether JLI engaged in "deceptive marketing" that targeted minors, including the

use of "influencers":

> The Federal Trade Commission is investigating whether e-cigarette startup Juul
> Labs Inc. used influencers and other marketing to appeal to minors, according to
> people familiar with the matter, ratcheting up pressure on a company whose
> products are blamed for a rise in vaping among teens.
>
> The probe, which hasn't previously been disclosed, began before the agency's
> antitrust review of a December deal in which tobacco giant Altria Group Inc.
> invested $12.8 billion to take a 35% stake in Juul, those and other people familiar
> with the matter said.  The FTC is also determining whether to seek monetary
> damages, one of the people said.
>
> "We fully cooperate and are transparent with any government agency or regulator
> who have interest in our category," a Juul spokesman said.  The company says it

---

[175] *Ibid.*; *CNBC*, "Tobacco stocks drop as FDA probes possible link between seizures and vaping," April 3, 2019 (available at https://www.cnbc.com/2019/04/03/tobacco-stocks-drop-as-fda-announces-probe-of-seizures-after-vaping.html).

[176] Skinner Report, ¶147.

[177] Skinner Report, ¶13.

[178] Skinner Report, ¶13.

has never marketed to youth and that its products are intended for adult cigarette smokers.

"Our paid influencer program, which was never formalized, was a small, short-lived pilot" that ended last year, the spokesman said. The company paid less than $10,000 to fewer than 10 adults who were smokers or former smokers over the age of 30, he said.

Influencer marketing involves paying people with large social-media followings to promote a product.

The FTC and Altria declined to comment.

The agency in September first sent Juul a letter requesting information about its marketing, two of the people said. FTC investigators are looking at whether Juul engaged in deceptive marketing. The agency has designated the investigation as nonpublic.

The regulatory risks surrounding Juul have taken on new weight for Altria as the Marlboro maker engages in advanced talks to merge with Philip Morris International Inc. …

Altria's shares fell 3.5% on Thursday.

The Food and Drug Administration and several state attorneys general also are investigating Juul's marketing practices. The FDA last October conducted a surprise inspection of Juul's headquarters and collected documents about its marketing.

The FTC's separate antitrust review will determine whether Altria can appoint representatives to Juul's board and convert its 35% nonvoting shares to voting shares.

The FTC has a history of scrutinizing the marketing practices of tobacco companies and, with the ability to issue subpoenas, it wields more investigative power than the FDA. In 1997, the trade commission prodded R.J. Reynolds Tobacco Co. to end its Joe Camel ad campaign, deeming it too appealing to children.

Altria, the maker of Marlboro cigarettes, recently invested almost $13 billion in e-cigarette company Juul. Some experts say in its early days Juul mirrored the tobacco industry's promotional playbook in an effort to hook young people.

Juul's first marketing campaign in 2015, called "Vaporized," pitched the brand as a cool lifestyle accessory with images of people in their 20s and 30s, which critics say made the brand attractive to teens. Later, as sales of the sleek devices took off in 2017, Juul-related posts exploded on Instagram and Twitter with photos posted by young people using the product.

- 47 -

Vaping among teens jumped 78% from 2017 to 2018, federal data show.

Referring to the Vaporized campaign, the Juul spokesman said, "There is no evidence that it drove use, youth or otherwise. Nonetheless, we regret that the campaign was executed in a way that was perceived as appealing to minors."[179, 180]

54. Several news articles attributed the decline in the Company's stock price that day to news of the FTC investigation. For example:

- *Seeking Alpha*: "Shares of stakeholder Altria (MO -3%) have moved lower since the WSJ report broke."[181]

- *Business Insider*: "Altria Group sank as much as 5% Thursday after The Wall Street Journal reported the Federal Trade Commission is investigating Juul Labs for dubious ads."[182]

- *Reuters*: "Shares of Altria Group Inc, which has a 35% stake in Juul, fell 4.1% to $43.96 in afternoon trading after the Wall Street Journal earlier reported the probe."[183, 184]

---

[179] *The Wall Street Journal*, "Juul's Marketing Practices Under Investigation by FTC; Federal probe examines whether e-cigarette maker engaged in deceptive marketing; Juul says it hasn't targeted minors, has stopped using paid influencers," updated August 29, 2019, 5:57 PM. *See also Dow Jones Institutional News*, "Juul's Marketing Practices Under Investigation by FTC," August 29, 2019, 12:27 PM; *TheStreet.com*, "Juul's Marketing Practices Being Investigated by FTC – Report," August 29, 2019, 2:00 PM.

[180] Also, on August 29, 2019, JLI announced that it was "implementing a series of new measures in the United States that build upon [its] existing efforts to combat the issue of youth access, appeal, and use of vapor products." *See* "Juul Labs Continues to Build on National Program to Reduce Underage Use," August 29, 2019 (available at https://www.juullabs.com/youth-prevention/). *See also* "Retail Access Control Standards" (available at https://www.juullabs.com/retail-access-control-standards-2/); and "Our Actions to Combat Underage Use" (available at https://www.juullabs.com/our-actions-to-combat-underage-use/).

[181] *Seeking Alpha*, "FTC said to be probing Juul," August 29, 2019, 12:55 PM.

[182] *Business Insider*, "Altria sinks on report that the FTC is investigating whether Juul's marketing is deceptive and targets minors (MO)," August 29, 2019, 3:09 PM.

[183] *Reuters*, "UPDATE 3-FTC probes marketing practices of e-cigarette maker Juul -source," August 29, 2019, 3:30 PM.

[184] *See also, e.g.*, *TheStreet.com*, "Juul's Marketing Practices Being Investigated by FTC – Report," August 29, 2019, 2:00 PM; *Dow Jones Institutional News*, "FTC Is Investigating E-cigarette Maker Juul Over Targeting Young People: WSJ – MarketWatch," August 29, 2019,

- 48 -

55.     According to both Dr. Skinner's event study and mine, Altria's Company-specific "stock price movement on August 29, 2019 was negative and statistically significant at the 5% significance level."[185, 186]  Dr. Skinner does not dispute that this stock price decline was in response to news of the FTC investigation, and he has not identified any other negative confounding information that could have contributed to Altria's stock price decline that day.[187] To be clear, Dr. Skinner does **not** opine that "the announcements of the FTC investigation had zero price impact."[188]  Instead, he argues that "prior news of investigations that focus on marketing to youth," "prior information regarding JUUL's use of influencers," and  "lack of analyst commentary":

> raise substantial doubt as to whether the negative and statistically significant stock price movement that occurred on the date the article in *The Wall Street Journal* was published (August 29, 2019) can be used as evidence of earlier price impact of the alleged misrepresentations as opposed to the market reacting to news a government agency was investigating the Company.  As discussed above, news of government investigations can impact stock prices even if the underlying investigation does not lead to any further action.[189]

56.     However, Dr. Skinner fails to articulate **why** these factors "raise substantial doubt" as to whether the August 29, 2018 price decline is demonstrative of price impact.  Instead, he simply asserts that they do.  Dr. Skinner does not deny the that the FTC's investigation was regarding matters that are virtually identical to the allegations underlying Plaintiffs' theory of liability.

---

12:46 PM; *TheFlyontheWall.com*, "MO: FTC investigating the marketing practices of Juul Labs, WSJ," August 29, 2019, 12:37 PM; *Bloomberg*, "Altria Falls After Dow Jones Reports FTC Investigation of Juul," August 29, 2019, 12:39 PM.

[185] Skinner Report, ¶143; Nye Report, Exhibit 11B.

[186] Statistical significance at the 5% significance level is equivalent to statistical significance at the 95% confidence level.

[187] Skinner Report, ¶¶143–145.  *See also* Skinner Deposition, 162:6–14.

[188] Skinner Deposition, 159:24–160:7.

[189] Skinner Report, ¶145.

Indeed, Plaintiffs allege that Defendants' misstatements and omissions during the Class Period were materially false and misleading because they failed to disclose, *inter alia*, "that JLI's overarching marketing scheme was directed to youth,"[190] and "[t]he purpose of [JLI's promotional] events was to place JUUL's product directly into the hands of hip and trendy youth 'influencers' who, through social media, would help JUUL permeate its target market with JUUL products."[191]  The FTC's investigation was likewise concerning "whether Juul engaged in deceptive marketing, including by targeting minors or using influencers."[192]

57.      To the extent Dr. Skinner is proffering a "truth-on-the market" defense, this is merely a product of his overly narrow and incorrect view of Plaintiffs' theory of liability.  Specifically, Plaintiffs do not allege that Defendants concealed the fact that Altria and JLI faced regulatory scrutiny throughout the Class Period, nor that various regulators were investigating JLI's marketing practices.  Plaintiffs acknowledge that "[f]ollowing Altria's multi-billion-dollar investment, JLI (which held over 75% of the e-cigarette market) and other e-vapor products increasingly became the subject of public and regulatory scrutiny throughout the country."[193]  Under Plaintiffs' theory of liability, however, "[w]hen regulators and Congress caught onto JLI's relentless focus on children, Defendants simply lied, even though they knew well that JLI had purposefully targeted youth in their marketing and those efforts had been breathtakingly

---

[190] Skinner Report, ¶48, citing Complaint, ¶16.

[191] Amended Complaint, ¶260.

[192] *Dow Jones Institutional News*, "Juul's Marketing Practices Under Investigation by FTC," August 29, 2019, 12:27 PM.  *See also The Wall Street Journal*, "Juul's Marketing Practices Under Investigation by FTC; Federal probe examines whether e-cigarette maker engaged in deceptive marketing; Juul says it hasn't targeted minors, has stopped using paid influencers," August 29, 2019, 5:57 PM.

[193] Amended Complaint, ¶17.

successful."[194]  According to Plaintiffs, Defendants understood the risks associated with "JLI's

multi-faceted youth marketing scheme," including "risk of litigation, regulatory action, public

backlash and financial and reputational harm that would certainly occur if ever discovered":[195]

> Defendants recognized that one of the keys to growing and preserving the number
> of nicotine-addicted e-cigarette users (and thus JLI's staggering market share),
> was to mislead potential customers about the true nature of JUUL products.
> Defendants knew that if it became public that JUUL was designed as a way to
> introduce nicotine to youth and otherwise hook new users with its potent nicotine
> content and delivery, it would not survive the public and regulatory backlash.
> Therefore, the JLI Defendants and the Altria Defendants repeatedly made false
> and misleading statements to the public that JUUL was created and designed as a
> smoking cessation device, and falsely and misleadingly spread the subterfuge.
> The JLI Defendants and the Altria Defendants committed these deceptive,
> misleading and fraudulent acts intentionally and knowingly.  In making these
> representations, the JLI Defendants and the Altria Defendants intended that
> consumers, the public, investors, and regulators would rely on their
> misrepresentations that JUUL products were designed to assist smoking
> cessation.[196]

58.     As this Court has recognized, the alleged corrective events, including *The Wall Street

Journal's* report that "the FTC was investigating JUUL's practices of marketing to minors,"

effectively match the alleged misstatements and omissions in this matter:

> [T]he disclosures relate back to Defendants' alleged misrepresentations regarding
> their marketing practices and the safety of their products for youth.  Indeed, these
> facts speak to JUUL's exposure, which Plaintiffs allege that they misrepresented.
> Although several of the disclosures revealed additional investigations into JUUL,
> JUUL continued to deny throughout this period that it had ever intended youth
> use of its product. … Altria's share price declined following each disclosure of
> new negative information regarding the potential for increased litigation or
> regulatory action relating to Defendants' claims about its products and marketing
> to youths.  The facts came to light as a result of outside sources and from

---

[194] Amended Complaint, ¶11.  *See also* Opinion on Motions to Dismiss, p. 28.  ("Defendants also
claim that Plaintiffs have not alleged actionable statements, because the public already had
available to it information regarding the issues with youth usage of e-cigarettes.  This defense
runs into two problems at this stage.  First, Defendants actively denied that it intended to target
youths with its marketing.")  (Internal citations omitted.)

[195] Amended Complaint, ¶14.

[196] Amended Complaint, ¶176.

- 51 -

Defendants themselves, therefore supporting Plaintiffs' allegations of loss causation.[197]

59.     Furthermore, prior to August 29, 2019, the FTC "probe [had not] previously been disclosed,"[198] even though it "began before the agency's antitrust review of a December deal in which tobacco giant Altria Group Inc. invested $12.8 billion to take a 35% stake in Juul."[199]  The FTC had "designated the investigation as nonpublic."[200]  While the market was aware of a separate investigation by the FDA into JLI's marketing practices, it also understood that the FTC "wields more investigative power than the FDA."[201]  Moreover, following the disclosure of the FDA investigation on October 2, 2018, JLI's then CEO, Defendant Burns, issued a statement assuring the public of its commitment to preventing underage usage:

> In a statement Tuesday, Juul Lab's chief executive Kevin Burns said that the company is "committed to preventing underage use, and we want to engage with FDA, lawmakers, public health advocates and others to keep Juul out of the hands of young people."
>
> Burns added that last week's meetings with the FDA "gave us the opportunity to provide information about our business from our marketing practices to our industry-leading online age-verification protocols to our youth prevention efforts. It was a constructive and transparent dialogue."[202]

60.     Dr. Skinner further attempts to downplay price impact by suggesting that Altria's August 29, 2019 stock price decline reflects "the market reacting to news a government agency was

---

[197] Opinion on Motions to Dismiss, pp. 37–39.  (Internal citations omitted.)

[198] Skinner Deposition, 153:22–154:4.

[199] *The Wall Street Journal*, "Juul's Marketing Practices Under Investigation by FTC; Federal probe examines whether e-cigarette maker engaged in deceptive marketing; Juul says it hasn't targeted minors, has stopped using paid influencers," August 29, 2019, 5:57 PM.

[200] *Ibid*.

[201] *Ibid*.

[202] *The Washington Post*, "FDA seizes Juul e-cigarette documents in surprise inspection of headquarters," October 2, 2018 (available at https://www.washingtonpost.com/health/2018/10/02/fda-seizes-juul-e-cigarette-documents-surprise-inspection-headquarters/).

investigating the Company," and that "news of government investigations can impact stock prices even if the underlying investigation does not lead to any further action."[203] However, Dr. Skinner fails to recognize that investor losses can be caused by events which reveal material information about the fraud, or events which are within a "zone of risk" that investors did not anticipate.[204] By conceding that the "market [was] reacting" to news of the FTC investigation, but concluding that such a reaction is not demonstrative of price impact, Dr. Skinner is effectively requiring corrective information to include only admissions of fraud by Defendants or statements by Defendants which explicitly mirror their prior misrepresentations on a one-to-one basis. On the contrary, Counsel for Plaintiffs has informed me that no such mirror-image requirement exists, and that "'neither a single complete disclosure nor a fact-for-fact disclosure of the relevant truth to the market is a necessary prerequisite to establishing loss causation.'"[205]

61.     In sum, Dr. Skinner fails to demonstrate that there is a "mismatch between the contents of the alleged corrective events [on August 29, 2019] and the alleged misrepresentations."[206] As such, his conclusion that "there is substantial doubt" as to whether the decline in Altria's stock price that day "can be used as evidence of earlier price impact"[207] is meritless.

---

[203] Skinner Report, ¶145.

[204] *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (finding that "[a] misrepresentation is 'the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations'" and foreseeable) (quoting *Lentell*, 396 F.3d at 173) (emphasis in original).

[205] Opinion on Motions to Dismiss, p. 39.

[206] Skinner Report, ¶13.

[207] Skinner Report, ¶13.

### iii.  October 31, 2019

62.     Before market open on Thursday, October 31, 2019, the Company announced its third-quarter 2019 financial results.  For the quarter, Altria reported revenues net of excise taxes ("net revenue") of $5.41 billion and adjusted EPS of $1.19.[208]  The consensus estimates for the Company's quarterly net revenue and adjusted EPS were $5.31 billion and $1.15, respectively.[209]  The Company also announced that it had taken a $4.5 billion write-down "related to its investment in JUUL":

> Altria recorded a third-quarter non-cash pre-tax impairment charge of $4.5 billion related to its investment in JUUL.  While there was no single determinative event or factor, Altria considered impairment indicators in totality, including: increased likelihood of U.S. Food & Drug Administration (FDA) action to remove flavored e-vapor products from the market pending a market authorization decision, various e-vapor bans put in place by certain cities and states in the U.S. and in certain international markets, and other factors.[210]

63.     The Company discussed the write-down during its conference call that day, citing a lower projection for "e-vapor category volumes in the U.S.":

> In e-vapor, we participate in the category through our 35% economic investment in JUUL.  We made the investment based on our belief that JUUL's product development strength, early signs of brand equity and potential to convert adult smokers set it apart from all other e-vapor products in the market. We also believed that the investment would enhance Altria's growing portfolio of noncombustible product offerings.  Given the dramatic shifts in the current e-vapor regulatory and marketplace environments, we have revised our transaction assumptions.  In preparing our financials this quarter, we performed

---

[208] *Business Wire*, "Altria Reports 2019 Third-Quarter and Nine-Months Results; Announces New 2020 - 2022 Adjusted Diluted EPS Growth Objective to Advance Strategic Business Platform," October 31, 2019, 7:00 AM.

[209] *Bloomberg First Word*, "Altria Records $4.5B Charge on Juul, 3Q Adj. EPS Beats Ests.," October 31, 2019, 7:09 AM.

[210] *Business Wire*, "Altria Reports 2019 Third-Quarter and Nine-Months Results; Announces New 2020 - 2022 Adjusted Diluted EPS Growth Objective to Advance Strategic Business Platform," October 31, 2019, 7:00 AM.

a valuation analysis on our JUUL investment, which considered multiple regulatory and marketplace scenarios.

In aggregate, we're now projecting lower e-vapor category volumes in the U.S. versus our original estimates, which resulted in a third quarter noncash impairment charge of $4.5 billion related to our JUUL investment. Also factoring into this determination were other changes to our original assumptions. For example, we expect it may take longer for JUUL to realize the strong margin performance that we previously communicated. We've also revised our estimates of JUUL's international business due to recent market developments. Despite this impairment charge, we remain committed to JUUL's success. We are pleased with the recent decisions by JUUL to change leadership and we are optimistic about JUUL's focus and prioritization in key areas, such as establishing industry-leading responsible practices and pursuing regulatory authorization of their products.[211]

64.    That morning, after market open, Altria also filed an SEC Form 10-Q, disclosing that it had received a "Civil Investigative Demand" from the FTC "seeking information regarding, among other things, Altria's role in the resignation of JUUL's former chief executive officer."[212]

65.    According to my event study, the Company-specific return on October 31, 2019 was negative and statistically significant at the 95% confidence level.[213]  Under Dr. Skinner's model, "the abnormal return on Altria stock on October 31, 2019 was not statistically significant at the 5% level."[214, 215]

66.    With respect to the Company's disclosure of the FTC inquiry, Dr. Skinner opines that "the lack of a statistically significant stock price movement on this date along with the mismatch between the subject of the FTC inquiry and the alleged misrepresentations raise substantial doubt

---

[211] *Thomson Reuters StreetEvents*, "MO – Q3 2019 Altria Group Inc Earnings Call, Event Date/Time: October 31, 2019 / 1:00PM GMT," (9:00 AM ET).

[212] Altria Group, Inc., SEC Form 10-Q, accepted October 31, 2019, 10:40 AM, p. 71.

[213] Nye Report, Exhibit 11B.

[214] Skinner Report, ¶115

[215] Statistical significance at the 5% significance level is equivalent to statistical significance at the 95% confidence level.

- 55 -

as to whether any stock price movement on October 31, 2019 can be used as evidence of earlier price impact of the alleged misrepresentations."[216]  However, to be clear, Dr. Skinner does not opine that "the announcement of the FTC inquiry had no price impact."[217]  Moreover, Dr. Skinner's own findings are unsupportive of such a conclusion.  First, he states that "there were other pieces of information disclosed on October 31, 2019 that **could have** contributed, both positively and negatively, to the overall stock price change."[218]  However, he is silent as to whether, or to what extent, such pieces of information impacted Altria's stock price that day.  This alone renders his conclusion on price impact unreliable.  According to Dr. Skinner, "news announced on [October 31, 2019] included Altria's 3Q 2019 Form 10-Q **above-consensus** earnings results."[219]  As Dr. Skinner knows, such "positive news … could have offset what would otherwise have been a negative and statistically significant stock price movement[]" on this date.[220]  He also cites "Altria's disclosure that it was replacing its long-term adjusted diluted EPS growth aspiration with a new objective for years 2020 through 2022," as one of the "other [presumably negative] pieces of information."[221]  However, he fails to consider the relevance of this disclosure to Plaintiffs' theory of liability, despite the fact the new growth objective gave "[Altria] the opportunity, if necessary, to push out some of the contributions from JUUL that [it]

---

[216] Skinner Report, ¶116.

[217] Skinner Deposition, 118:3–9.

[218] Skinner Report, ¶128.  (Emphasis added.)

[219] Skinner Report, ¶129.  (Emphasis added.)

[220] Skinner Report, ¶82.

[221] Skinner Report, ¶129.  Dr. Skinner also cites vaguely to "additional information contained in Altria's earnings disclosures and 3Q 2019 Form 10-Q filing," without specifying what that additional information is, or whether it was unexpected material positive or negative news. (Skinner Report, ¶129.)

expected on [its] equity income line beyond next year."[222]  Dr. Skinner also ignores analyst commentary that "attribute[d] the reversal in intraday performance [of Altria's stock price]," in part, to a "newly disclosed Civil Investigation Demand from the FTC examining the recent c-suite changes at JUUL."[223]

67.    Furthermore, Dr. Skinner's conclusion that there is a "mismatch" between the FTC inquiry and the alleged misrepresentations appears to be an assumption, rather than an opinion, as his entire discussion of this "mismatch" is limited to the following:

> Importantly, the disclosure stated that FTC was "seeking information regarding, among other things, Altria's role in the resignation of JUUL's former chief executive officer and the hiring by JUUL of any current or former Altria director, executive or employee."  However, my understanding is that none of the alleged misrepresentations concern JUUL's management or Altria's role in management changes.[224]

68.    With respect to Altria's disclosure of a $4.5 write-down of its investment in JLI, Dr. Skinner does not contend there is a mismatch between this news and the alleged misrepresentations.  Instead, he "reach[es] an affirmative opinion on the lack of price reaction … by providing evidence that both the impairment charge and its magnitude had been fully expected by the market before the disclosure."[225]  However, Dr. Skinner's unwillingness to specify what caused the Company-specific decline in Altria's stock price on October 31, 2019 renders his conclusion speculative, at best.  Indeed, both Altria's $4.5 billion impairment charge related to its investment in JUUL, and the FTC's investigation into JUUL hires, were widely

---

[222] *Thomson Reuters StreetEvents*, "MO – Q3 2019 Altria Group Inc Earnings Call, Event Date/Time: October 31, 2019 / 1:00PM GMT," (9:00 AM ET).

[223] Deutsche Bank, "Altria, Some Patience Still Required," October 31, 2019.

[224] Skinner Report, ¶126.  (Internal citations omitted.)

[225] Skinner Report, ¶116.

discussed in the public press, and several news commentators attributed the Company's stock price decline that day to these disclosures.[226]

69.     Additionally, as discussed at §V.C, Dr. Skinner's opinion is erroneously predicated on his improper conflation of statistical significance and price impact.  Indeed, it has been concretely established by numerous authorities that a finding of statistical insignificance does not allow a researcher to attribute causation to "typical price fluctuations … in the absence of new information,"[227] and thereby rule out price impact.

70.     In sum, Dr. Skinner's analysis of price impact is incomplete at best.  He has not even attempted to demonstrate that there is a "mismatch between the contents of the alleged corrective events [on October 31, 2019] and the alleged misrepresentations,"[228] and he has failed to disentangle the price impact of the FTC inquiry and the write-down from other obviously confounding news released contemporaneously.  As such, his conclusion that "there is substantial doubt" as to whether the decline in Altria's stock price that day "can be used as evidence of earlier price impact"[229] is meritless.

---

[226] *See, e.g.*, *Bloomberg News*, "Altria Probed by U.S. FTC Over Role in Resignation of Juul's CEO," October 31, 2019, 3:40 PM; *Associated Press*, "Altria Writes Down Juul Investment Amid Vaping Backlash," October 31, 2019, 3:27 PM; *The Wall Street Journal*, "Altria Cuts Value of Juul Stake by $4.5 Billion; Marlboro maker, which paid $12.8 billion for a 35% stake in e-cigarette maker, cites proposed flavor bans for write-down," October 31, 2019, 3:36 PM; *City A.M.*, "Altria swings to loss amid Juul backlash costs," November 1, 2019; *TheStreet.com*, "Altria writes Down Juul Investment by $4.5 Billion," October 31, 2019, 4:49 PM; *Associated Press*, "Altria Takes a $4.5 Billion Hit on Juul Amid Vaping Backlash," October 31, 2019, 6:13 PM; *SF Chronicle*, "Juul's value plunges $14 billion after Altria slashes its investment," October 31, 2019, 10:32 PM; National Post, "Altria takes US$4.5B charge on Juul; E-Cigarettes," November 1, 2019; *The Times*, "Marlboro owner Altria sees $4.5bn of Juul's value go up in smoke," October 31, 2019, 8:02 PM.

[227] Skinner Report, ¶62.

[228] Skinner Report, ¶13.

[229] Skinner Report, ¶13.

### iv.  January 30, 2020

71.      Before market open on Thursday, January 30, 2020, the Company announced its fourth-quarter and year-end 2019 financial results.  For the quarter, Altria reported net revenue of $4.80 billion and adjusted EPS of $1.02.[230]  The consensus estimates for the Company's quarterly net revenue and adjusted EPS were $4.89 billion and $1.02, respectively.[231]  Altria also announced that it had taken another impairment charge related to its investment in JUUL in the amount of $4.1 billion, "primarily due to the increased number of legal cases pending against JUUL and the expectation that the number of legal cases against JUUL will continue to increase":

> Altria recorded a fourth-quarter, non-cash pre-tax impairment charge of $4.1 billion related to its investment in JUUL.  This impairment is primarily due to the increased number of legal cases pending against JUUL and the expectation that the number of legal cases against JUUL will continue to increase.  Since October 31, 2019, the number of legal cases pending against JUUL has increased by more than 80%.  Altria has not made any assumptions, or drawn any conclusions, regarding the merits or likelihood of success of any of these cases, litigation is subject to uncertainty and it is possible that there could be adverse developments in pending or future cases.  For 2019, Altria recorded a total of $8.6 billion in non-cash pre-tax impairment charges to its JUUL investment, bringing the value of its JUUL investment to $4.2 billion as of December 31, 2019.
>
> Altria now expects a resolution with respect to antitrust clearance in the first half of 2020.[232]

---

[230] *Business Wire*, "Altria Reports 2019 Fourth-Quarter and Full-Year Results; Provides 2020 Full-Year Earnings Guidance; Revises 2020 - 2022 Adjusted Diluted EPS Growth Objective; Revises Terms of JUUL Transaction," January 30, 2020, 7:00 AM.

[231] *Bloomberg First Word*, "Altria Records $4.1b Charge Related to Juul (1)," January 30, 2020, 7:17 AM.

[232] *Business Wire*, "Altria Reports 2019 Fourth-Quarter and Full-Year Results; Provides 2020 Full-Year Earnings Guidance; Revises 2020 - 2022 Adjusted Diluted EPS Growth Objective; Revises Terms of JUUL Transaction," January 30, 2020, 7:00 AM.

72.    The Company also disclosed that "Altria and JUUL agreed to revised terms governing Altria's minority investment in JUUL, which include the following provisions":[233]

> Altria and JUUL are focusing their work together to create compelling pre-market tobacco product applications (PMTA) based on rigorous scientific research and data-driven underage use prevention efforts. As a result, Altria will continue providing regulatory affairs services to JUUL, which includes supporting the company in preparing and submitting its PMTA. Altria will discontinue all other services by the end of March 2020 that were part of the original investment agreement.
>
> JUUL will, upon antitrust clearance from the U.S. Federal Trade Commission under the Hart-Scott-Rodino Act, restructure its board of directors to consist of two directors designated by Altria, three independent directors, the JUUL CEO and three directors designated by JUUL stockholders other than Altria.
>
> Upon antitrust clearance, the restructured JUUL Board of Directors will add a nominating committee and a litigation oversight committee to its existing compensation and audit committees.
>
> Altria has the option to be released from its non-compete obligation if JUUL is prohibited by federal law from selling e-vapor products in the U.S. for at least a year, or if Altria's carrying value of the JUUL investment is not more than 10% of its initial carrying value of $12.8 billion.
>
> "This agreement is a continuation of the reset initiated by JUUL's leadership team." said Willard [then-Altria's Chairman and CEO]. "We look forward to working with the company under this structure to support JUUL's commitment to working with regulators and submitting the best possible PMTA."

73.    Willard commented on the Company's quarterly results and the "challenges related to [its] investment in JUUL":

> Altria's core tobacco businesses delivered outstanding performance in 2019. In addition, Altria exceeded its $575 million annualized cost savings target and increased the dividend for the 54th time in 50 years. …
>
> Despite the unexpected challenges related to our investment in JUUL, which led to impairment charges and reported losses, we made significant progress advancing and building our noncombustible business platform with the launch of IQOS and completion of the on! transaction. We enter 2020 with

---

[233] *Ibid.*

- 60 -

continued focus on harm reduction.  We believe Altria's enhanced business platform best positions us to succeed under various future category scenarios.[234]

74.      Altria also "lower[ed] its compounded annual adjusted diluted EPS growth objective to 4% to 7% for the years 2020 through 2022 from its previously announced objective of 5% to 8%, primarily to reflect Altria's current expectation for no equity earnings contributions from JUUL through 2022."[235]  The Company provided full-year 2020 guidance as follows:

> Altria expects its 2020 full-year adjusted diluted EPS to be in a range of $4.39 to $4.51, representing a growth rate of 4% to 7% from an adjusted diluted EPS base of $4.22 in 2019 ….  Altria's 2020 guidance reflects increased investments related to PM USA's commercialization efforts for IQOS, Helix's plans to manufacture and expand U.S. distribution of on! and one extra shipping day in the first quarter.  …
>
> Altria expects the 2020 full-year total domestic cigarette industry adjusted volume decline rate to be in a range of 4% to 6%, which includes the impact of federal legislation raising the minimum age to purchase all tobacco products to 21.  Altria expects continued volatility across tobacco categories and will no longer provide a multi-year forecast for U.S. cigarette volume declines.
>
> Altria expects its 2020 full-year adjusted effective tax rate will be in a range of 23.5% to 24.5%.
>
> Altria expects its 2020 capital expenditures to be between $225 million and $275 million and depreciation and amortization expenses of approximately $240 million.

75.      During the Company's morning conference call, Willard discussed the revised terms governing Altria's investment in JUUL, as well as the Company's financial outlook:

> This morning, we announced that we've reached an agreement with JUUL to revise some of the terms governing our investment.  We've agreed with JUUL to continue providing regulatory affairs services, including supporting JUUL's efforts to prepare and submit its PMTA filings by May 2020.  And we will discontinue all other services by the end of March 2020.  Our regulatory affairs team is working collaboratively with JUUL on its PMTA

---

[234] *Ibid.*

[235] *Ibid.*

- 61 -

effort and we're committed to helping JUUL achieve this critical milestone. We also agreed that JUUL will create a new or independent board structure after we receive antitrust clearance from the FTC. We believe the new board structure will provide diverse perspectives and independent expertise to help JUUL's management team successfully and responsibly navigate the very dynamic e-vapor market going forward. …

Let's turn to our financial outlook. For our JUUL investment, we now expect HSR resolution in the first half of 2020. Upon antitrust clearance, we expect to account for our equity investment in JUUL using the fair value option. Under this option, Altria's income statement will include any cash dividends received from the investment and quarterly changes in the fair value of the investment. Quarterly changes in the fair value of the investment will be treated as a special item and excluded from adjusted diluted EPS. We don't currently expect to receive equity earnings contributions from JUUL over the next 3 years. Therefore, we've lowered our 2020 through 2022 compounded annual adjusted diluted EPS earnings growth objective to 4% to 7% from our previously announced objective of 5% to 8%.[236]

76.    Several news articles attributed the decline in the Company's stock price on January 30, 2020 to Altria's announcement of a second write down to its investment in JLI, as well as the revised terms governing the investment.[237]

---

[236] *Thomson Reuters StreetEvents*, "MO – Q4 2019 Altria Group Inc Earnings Call, Event Date/Time: January 30, 2020 / 2:00PM GMT," (9:00 AM ET).

[237] *See, e.g.*, *Barron's*, "Altria Stock Slumps After Meeting Earnings Forecasts. Here's Why," January 30, 2020, 10:30 AM; *Reuters News*, "UPDATE 4-Altria takes another $4 bln hit on Juul investment, revises deal terms," January 30, 2020, 8:59 PM; *RTT News*, "Stock Alert: Altria Shares Down After Taking Huge Charge On Juul Investment," January 31, 2020; *Bloomberg First Word*, "Altria Accounting Change May Keep Big Loss Out of P&L: Bernstein," January 30, 2020, 10:34 AM; *The Wall Street Journal*, "Altria Takes $4.1 Billion Charge on Juul Investment; Tobacco giant cites mounting lawsuits against e-cigarette maker for second big write-down," January 30, 2020, 1:18 PM; *The Times*, "Juul vaping investment burns $4bn hole in Altria value," January 30, 2020, 6:21 PM; *Reuters*, "UPDATE 4-Altria takes another $4 bln hit on Juul investment, revises deal terms," January 30, 2020, 8:59 PM; *Seeking Alpha*, "Shaky confidence in Altria," January 30, 2020.

77.     Both Dr. Skinner and I "find that Altria's stock price movement was negative and statistically significant at the 5% level on January 30, 2020."[238, 239]  Dr. Skinner does not dispute that the Company-specific stock price decline that day was due, at least in part, to "the second impairment charge."  To be clear, Dr. Skinner does **<u>not</u>** opine that "the announcement of the second impairment on January 30, 2020 had zero impact."[240]  Instead, he argues that "there is a mismatch" between the alleged corrective disclosure and the misrepresentations:

> [T]he alleged misrepresentations, as I understand them, are not regarding the value of the investment when this investment was made or that Altria would not take a second impairment charge once the first impairment charge was announced on October 31, 2019.  Therefore, there is a mismatch between the alleged corrective event and what the disclosure was meant to correct.[241]

78.     However, Dr. Skinner's portrayal of Plaintiffs' theory of liability is simply incorrect.  On the contrary, Plaintiffs allege that Defendants' false and misleading statements concealed from investors "that JUUL's youth marketing had created the youth vaping epidemic, [and] that their intentional misconduct could render JLI valueless."[242]  "[B]y not disclosing the risks created by JUUL's illegal marketing practices targeting underage consumers,"[243] Plaintiffs allege that Defendants exposed investors, unwittingly, to foreseeable stock price declines upon the materialization of these risks, including "punitive solutions remedying JUUL's allegedly illegal marketing practices[, which] could result in substantial judgments and regulatory fines, in

---

[238] Skinner Report, ¶153, Exhibit 6; Nye Report, Exhibit 11B.

[239] Statistical significance at the 5% significance level is equivalent to statistical significance at the 95% confidence level.

[240] Skinner Deposition, 188:21–189:8.

[241] Skinner Report, ¶¶152–163.

[242] Amended Complaint, ¶413.  *See also, e.g.*, Complaint, ¶404.

[243] Opinion on Motions to Dismiss, p. 1.

addition to the loss of sales to youth,"[244] thereby "caus[ing] Altria to write-down a material portion of its investment in JUUL."[245, 246]

79.    Dr. Skinner's contention that the alleged misrepresentations "are not … that Altria would not take a second impairment charge once the first impairment charge was announced on October 31, 2019,"[247] further distorts Plaintiffs' theory of liability, as it fails to recognize that the second write-down was part of a series of partial corrective disclosures that revealed the relevant truth:

> Following Altria's multi-billion-dollar investment, JLI (which held over 75% of the e-cigarette market) and other e-vapor products increasingly became the subject of public and regulatory scrutiny throughout the country.  Revelations about JLI's youth marketing techniques, along with mounting skepticism, fear, and negative publicity in the media regarding e-cigarettes' safety led to increased scrutiny, litigation and regulation by government authorities of JUUL and other vaping products.  As a result of these disclosures, Altria's stock price dropped precipitously.  Moreover, Altria announced write-downs on its investment in JLI of $4.5 billion and $4.1 billion on October 31, 2019 and January 30, 2020, respectively (a total write-down of 67% of Altria's investment), causing Altria's stock price to decline further.[248]

80.    Moreover, by asserting that Altria's $4.1 billion write-down—which was "due to the increased number of legal cases pending against JUUL and the expectation that the number of legal cases against JUUL will continue to increase"[249]—somehow mismatches Defendants'

---

[244] Opinion on Motions to Dismiss, p. 25.

[245] Opinion on Motions to Dismiss, p. 23.

[246] *See also* Amended Complaint, ¶¶15, 16, discussing that Defendants allegedly overstated the "true value of JLI and its products," and "that the materialization of [the allegedly concealed] risks would require Altria to write-down its investment in JLI."  *See also* Skinner Report, ¶48, quoting these allegations.

[247] Skinner Report, ¶154.

[248] Amended Complaint ¶17.

[249] *Business Wire*, "Altria Reports 2019 Fourth-Quarter and Full-Year Results; Provides 2020 Full-Year Earnings Guidance; Revises 2020 - 2022 Adjusted Diluted EPS Growth Objective; Revises Terms of JUUL Transaction," January 30, 2020, 7:00 AM.

alleged failure to disclose "that JUUL's youth marketing had created the youth vaping epidemic, [and] that their intentional misconduct could render JLI valueless,"[250] Dr. Skinner effectively requires corrective information to include only admissions of fraud by Defendants or statements by Defendants which mirror **his incorrect understanding** of prior alleged misrepresentations on a one-to-one basis.  Indeed, contrary to Dr. Skinner's assertions, Plaintiffs explicitly allege that Defendants "failed to inform investors, or account for, material risks associated with … the true value of JLI and its products,"[251] and "that the materialization of these risks would cause Altria to write-down a material portion of its investment in JUUL."[252] Dr. Skinner once again fails to recognize that investor losses can be caused by events which reveal material information about the fraud, or events which are within a "zone of risk" that investors did not anticipate.[253]

81.     In an apparent truth-on-the-market defense, Dr. Skinner also points to statements in Altria's SEC filings he claims "disclosed the risk of further impairment charges."[254, 255]  He adds that "analyst commentary indicates that the second impairment charge was not unexpected," which "would likewise raise substantial doubt that the second impairment establishes price

---

[250] Amended Complaint, ¶413.  *See also, e.g.*, Complaint, ¶404.

[251] Amended Complaint, ¶16.  *See also* Complaint, ¶16.

[252] Opinion on Motions to Dismiss, pp. 22, 23.

[253] *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (finding that "[a] misrepresentation is 'the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations'" and foreseeable) (quoting *Lentell*, 396 F.3d at 173) (emphasis in original).

[254] Skinner Report, ¶¶156–159.

[255] I note that such statements were accompanied by Defendants' assurances regarding its valuation of JLI, including, for example, that it was "based on assumptions that Altria's management considered reasonable and are based on the best available information at the time that the analysis was developed," and "management believes that the estimated fair value of its investment in JUUL as of September 30, 2019 is appropriate."  (Altria, SEC Form 10-Q for third-quarter 2019, filed October 31, 2019.)

impact."[256]  However, as can be seen from the analyst commentary he cites, the magnitude of the impairment charge was clearly a negative surprise to analysts—a fact Dr. Skinner does not dispute:

> For example, Bernstein noted "That there has been a further write-down is not a surprise, but **the scale of it is perhaps a surprise**."  Similarly Citi noted: "It has been widely reported that Juul faces litigation, so this is not new news, **although it is possible that it wasn't adequately considered before now**."[257]

Dr. Skinner also quotes Bank of America as stating, "Given the rapid changes in the US vapor category (youth access, flavor bans, lawsuits, vaping lung injuries and likely FDA application concerns), it was not unexpected that mgmt took another write-down of its JUUL inv."[258] However, Bank of America also wrote that "JUUL weigh[ed] on [Altria's] stock price and [near-term] outlook" after the Company took a "2nd JUUL write down [that was] unfortunate but not unexpected."  The analyst reduced its price target for the Company to $58 from $60, "which [it] s[aw] as warranted given FDA concerns."[259]

82.     Dr. Skinner also fails to mention several analyst reports that attributed Altria's January 30, 2020 stock price decline to news of the JLI-related impairment.  For example:

- **Cowen** wrote that the Company "again" lowered its EPS growth rate outlook, "principally driven by lower expectations for JUUL," and called the new JUUL terms "likely a modest negative."[260]

---

[256] Skinner Report, ¶160.

[257] Skinner report, ¶160, citing Alliance Bernstein, "Altria FY19: What a mess…," January 30, 2020, and Citi, "Mo-Alert, We believe today's share price decline is too extreme," January 30, 2019.  (Emphasis added.  Internal citations omitted.)

[258] Skinner Report, ¶160, citing BofA Securities, "Altria Group, MO's underlying business resilient; JUUL investment weighs on NT outlook," January 30, 2020.

[259] BofA Securities, "Altria Group, MO's underlying business resilient; JUUL investment weighs on NT outlook," January 30, 2020.

[260] Cowen & Company, "Altria Group, Challenges Continue as the US Outlook Remains Murky," January 30, 2020.

- **Deutsche Bank** wrote that "MO once again wrote down its JUUL investment (now valued at roughly one-third of the original $12.8 billion paid only ~13 months ago) to factor in substantial litigation liability risk, as well as ongoing fundamental pressures."  The analyst also commented that "the company ratcheted down its +5%-8% EPS algorithm offered last quarter, now targeting +4%-7% (largely the result of lower equity income expected from JUUL)."  Overall, Deutsche Bank felt that the Company's disclosures were "disappointing."[261]

- **Morningstar** wrote that the Company's results were "in line with [its] forecasts, reflecting another year of above-average volume declines."  The analyst stated that "[t]he big news was another $4.1 billion impairment charge on the Juul Labs investment, as management renegotiated the terms of its cooperation agreement with the electronic cigarette maker."[262]

- **RBC** wrote that the key negative takeaways from the quarter were: "1) Management lowered their expectation for the go-forward EPS CAGR from +5–8% to +4–7%, with the reduction solely based on the assumption that Altria will not see any equity earnings from JUUL"; and "2) MO recorded a 4Q non-cash pre-tax impairment charge of $4.1B related to its investment in JUUL.  This impairment is primarily due to the increased number of legal cases pending against JUUL and the expectation that the number will continue growing."  According to RBC, "[t]he poor timing on JUUL is clearly a black eye on management."[263]

- **UBS** wrote "JUUL value reduced again: Altria has taken another $4.1bn impairment to its JUUL investment due the mounting number of legal cases, valuing it at only $4.2bn, 33% the purchase price back in Dec-18.  Unlike the 3Q19, we view the magnitude of this impairment as a negative surprise."[264]

83.    Dr. Skinner also misleadingly contends that the Company's lowered EPS growth

objective is somehow unrelated to, or corrective of, the alleged misrepresentations:

> Altria also provided guidance for 2020 full-year adjusted diluted EPS, and
> lowered its 2020–2022 adjusted diluted EPS growth objective.  I understand

---

[261] Deutsche Bank, "Altria, Fortitude Required," January 30, 2020.

[262] Morningstar, "Altria Group Inc., Altria Feeds the Bears With Its Capitulation on Juul but Stock Prices in Unrealistic Scenario," January 31, 2020.

[263] RBC Capital Markets, "Altria Group, Inc., Is a 7% dividend yield the bear or bull case?" February 3, 2020.

[264] UBS, "Altria Group Inc, 4Q19: Underlying industry volume improvement, but further JUUL write-offs," January 30, 2020.

that Plaintiffs have not alleged that the medium-term guidance previously provided on October 31, 2019 was misleading.[265]

However, he neglects to mention that the Company "lower[ed] its compounded annual adjusted diluted EPS growth objective" for the years 2020 through 2022 "primarily to reflect Altria's current expectation for no equity earnings contributions from JUUL through 2022."[266] According to Plaintiffs, Altria Defendants were determined to invest in JLI because they were "desperate for growth."[267]  Defendants allegedly "touted" its investment in JLI "as [a] factor[] that would accelerate Altria's growth and long-term success."[268]  Plaintiffs further allege that Defendants "generic, boilerplate representations regarding the risk that Altria's expected benefits from its investment in JUUL may fail to materialize in the manner or time expected, if at all," were false and misleading because "Defendants knew or recklessly disregarded but failed to disclose the true risks of its investment in JUUL."[269]  Thus, Dr. Skinner's suggestion that the Company's reduction to its growth projections—which was primarily due to "no equity earnings

---

[265] Skinner Report, ¶162.

[266] *Business Wire*, "Altria Reports 2019 Fourth-Quarter and Full-Year Results; Provides 2020 Full-Year Earnings Guidance; Revises 2020 - 2022 Adjusted Diluted EPS Growth Objective; Revises Terms of JUUL Transaction," January 30, 2020, 7:00 AM.  *See also Thomson Reuters StreetEvents*, "MO – Q4 2019 Altria Group Inc Earnings Call, Event Date/Time: January 30, 2020 / 2:00PM GMT," (9:00 AM ET):

> We don't currently expect to receive equity earnings contributions from JUUL over the next 3 years.  Therefore, we've lowered our 2020 through 2022 compounded annual adjusted diluted EPS earnings growth objective to 4% to 7% from our previously announced objective of 5% to 8%.

[267] Amended Complaint, §X.

[268] Complaint, ¶498.

[269] Complaint, ¶¶489–490, discussing Altria's 2018 Form 10-K, filed February 26, 2019.  *See also, e.g.*, Complaint, ¶499, discussing the Company's April 3, 2019 first-quarter 2019 press release, and Complaint, ¶¶509–511, discussing the Company's second-quarter 2019 press release.

contributions from JUUL"—is somehow unrelated to the alleged misrepresentations is unfounded.

84.    Dr. Skinner further speculates that "there was confounding news that accompanied the announcement of the second impairment charge, which **may explain** the price decline."[270]  He points to "lower than expected revenues" and "Altria's announcement that it would no longer offer multi-year volume forecasts for U.S. cigarettes."[271]  However, he offers no opinion one way or the other as to whether these factors "explain," or even contributed to, the decline in Altria's stock price that day, thereby rendering his conclusion unreliable.  Instead, he merely opines that "some analysts were focused on the confounding news."[272]  With respect to "lower than expected revenues," he cites just two analyst reports: UBS and Barclays.[273]  However, UBS concluded that overall numbers were "mixed," as results were offset by "better underlying industry numbers," which was among the "most noteworthy areas," along with the "$4.1bn impairment to [the Company's] JUUL investment due the mounting number of legal cases."[274]  Barclays said quarterly revenues were just "slightly" lower than consensus, and did not even mention Altria's revenue in its "Consumer Wrap" report the following day summarizing the Company's results.[275]  With respect to Altria no longer offering multi-year U.S. cigarette volume forecast, according to

---

[270] Skinner Report, ¶161.  (Emphasis added.)

[271] *Ibid*.

[272] Skinner Report, ¶163.

[273] Skinner Report, footnote 272, citing UBS, "Altria Group Inc, 4Q19: Underlying industry volume improvement, but further JUUL write-offs," January 30, 2020, and Barclays, "Altria Group Inc., Long-term EPS guidance lowered, 4Q 19 cig industry volumes better at -4.5%," January 30, 2020.

[274] UBS, "Altria Group Inc, 4Q19: Underlying industry volume improvement, but further JUUL write-offs," January 30, 2020.  ("Q: How did the results compare vs expectation?  A: Overall mixed numbers …")

[275] Barclays, "Barclays Consumer Wrap," January 31, 2020.

the Bernstein report cited by Dr. Skinner, "[o]ne common refrain that we've heard from investors over the past eighteen months, is that lack of clarity around medium/long-term outlook is what has caused the recent underperformance of tobacco."  Thus, contrary to Dr. Skinner's assertion, the unpredictability of U.S. cigarette volumes was not new Company-specific information as of January 30, 2020.[276]  In fact, previously, on October 31, 2019, Citi concluded that the "central message" from the Company was that its business was becoming more volatile due to unpredictable cigarette volume trends:

> The central message of the 3Q conference call was that MO is moving from a highly predictable business to one with more volatile earnings – In the past, MO used to produce almost exactly 8% EPS growth every year, reflecting highly predictable volume trends in cigarettes and moist smokeless tobacco. In today's call, MO acknowledged that the nicotine business has become much more complex and that as a result its year-to-year financial results will probably become more volatile.[277]

Regardless, nowhere does Dr. Skinner opine that second impairment charge to Altria's JLI investment cannot "explain" the Company's stock price decline that day.

85.    In sum, Dr. Skinner's analysis of price impact fails to demonstrate that there is a "mismatch between the contents of the alleged corrective events [on January 30, 2020] and the alleged misrepresentations,"[278] and has not even attempted to disentangle the price impact of purportedly confounding news released contemporaneously.  As such, his conclusion that "there is substantial doubt" as to whether the decline in Altria's stock price that day "can be used as evidence of earlier price impact"[279] is meritless.

---

[276] Bernstein, "Altria FY19: What a mess...," January 30, 2020.

[277] Citi, "Altria, Alert: MO flags 'investment years' as it prepares for the New World of Tobacco," October 31, 2019.

[278] Skinner Report, ¶13.

[279] Skinner Report, ¶13.

### v.   February 21–24, 2020

86.      Shortly before the 4:00 PM close of trading on Friday, February 21, 2020, *The Wall Street Journal* reported that the SEC was "investigating whether Altria adequately disclosed to shareholders the risks when it spent $12.8 billion in 2018 to take a 35% stake in Juul."  The SEC had "issued subpoenas to Altria and Juul and both companies [had] responded," and "Juul ha[d] turned over documents including correspondence with Altria and financial projections Juul shared with Altria before the deal."[280]

> Securities regulators have opened a probe related to Altria Group Inc.'s investment in controversial e-cigarette startup Juul Labs Inc., according to people familiar with the matter.
>
> The Securities and Exchange Commission is investigating whether Altria adequately disclosed to shareholders the risks when it spent $12.8 billion in 2018 to take a 35% stake in Juul, the people said.
>
> The tobacco giant in January took a $4.1 billion charge on its Juul stake, following a $4.5 billion write-down in October.
>
> Altria's investment initially valued Juul at $38 billion, making it one of the country's most valuable startups.  But since then the e-cigarette maker has been battered by lawsuits, regulatory crackdowns and investigations into whether it marketed its products to underage children and teenagers.
>
> Blamed for a surge in underage vaping, the startup voluntarily pulled most of its flavors from the U.S. market and scaled back its international expansion.
>
> The SEC has issued subpoenas to Altria and Juul and both companies have responded, some of the people said.  Juul has turned over documents including correspondence with Altria and financial projections Juul shared with Altria before the deal, one of the people said. …
>
> Announcing the second write-down in January, Altria's Chief Executive Howard Willard said he was "highly disappointed in the performance of our Juul investment."  He cited a number of surprises, including a vaping-related lung illness that prompted U.S. health officials to warn consumers last year not to use

---

[280] *The Wall Street Journal*, "SEC Investigates Altria's Investment in Juul; Regulators investigating Marlboro maker's disclosures after two charges totaling $8.6 billion," February 21, 2020, 3:37 PM.  *See also Dow Jones Institutional News*, "SEC Has Opened Probe of Altria's Investment in Juul, Sources Say," February 21, 2020, 3:37 PM.

e-cigarettes before they determined the illnesses were linked not to e-cigarettes but to vaping devices containing marijuana extracts and vitamin E oil.

He was pressed on the wisdom of the deal this week by shareholders and analysts in a private session at an analyst conference in Florida, according to a person who attended the event.  Mr. Willard said Altria had recently revised its agreement with Juul and the new deal had the full support of Altria's board, this person said.

Under the revised agreement, Altria will no longer provide marketing and retail distribution for Juul as the companies had originally agreed.  Altria will assist Juul with the submission of its products for authorization by the Food and Drug Administration to remain on sale in the U.S.

The new deal also gives Altria the option to launch its own e-cigarettes if Juul is prohibited by federal law from selling vaping products in the U.S. for at least a year or if the value of Altria's investment in Juul falls to $1.28 billion or less. The stake is currently valued at $4.2 billion.

87.    Following the news of the SEC investigation, Altria's stock price declined approximately -$0.29 (-0.63%) late in the day on February 21, 2020.[281]  News articles attributed the decline to *The Wall Street Journal's* report.  For example:

- *Seeking Alpha*: "Altria (MO +0.5%) shares are sliding in response to a *WSJ* report that the SEC has opened an investigation into the company's investment in Juul."[282]

- *Bloomberg*: "Altria Group Inc. shares dipped Friday after a report in the Wall Street Journal that the U.S. Securities and Exchange Commission had opened a probe into the cigarette maker's $12.8 billion investment into vaping company Juul Labs Inc."[283]

---

[281] Source: Bloomberg.  *See also* Skinner Report, ¶139.

[282] *Seeking Alpha*, "SEC to probe Altria's investment in Juul – WSJ," February 21, 2020, 3:50 PM.

[283] *Bloomberg*, "Altria Dips After Report SEC Investigating Probe of Juul Stake," February 21, 2020, 4:05 PM.  *See also, e.g.*, *Theflyonthewall.com*, "SEC investigating Altria risk disclosures around Juul stake, WSJ reports," February 21, 2020.

As shown in the following chart, Altria's stock price continued to decline another -$2.09 (-4.55%) during the next trading day, Monday, February 24, 2020, to close at $43.80 from $45.89 as of market close on February 21, 2020:[284]



**Altria Group, Inc. Intraday Stock Price**
**February 21-24, 2020**

Source: 1-minute interval prices from Bloomberg.

Under Dr. Skinner's model, the Company-specific return on February 24, 2021 was negative and statistically significant at the 90.4% confidence level.[285]  Under my event study, the Company-specific return was negative and statistically significant at above the 95% confidence level.[286]

---

[284] Altria's stock price continued to decline over the next three days from a close of $43.80 on February 24, 2020 to a close of $40.30 on February 27, 2020.

[285] *See* Skinner Report, Exhibit 6; and Table 3 above.

[286] Nye Report, Exhibit 11B.

88.     With respect to the intraday decline in the Company's stock price on February 21, 2020, Dr. Skinner does not dispute that it was in response to the *The Wall Street Journal's* disclosure of the SEC investigation, and he has not identified any other negative confounding information that could have contributed to that decline.[287]  In fact, he acknowledges that *The Wall Street Journal* is a "prominent news outlet," and that there was "unusually large trading activity almost immediately upon the publication of this news."[288]  To be clear, Dr. Skinner does not opine that "the announcement of the SEC investigation on February 21, 2020" had "no price impact."[289]

89.     Nor does Dr. Skinner deny that the SEC investigation was regarding matters at the center of Plaintiffs' theory of liability.  According to the *Wall Street Journal*, the SEC was investigating "whether Altria adequately disclosed to shareholders the risks" associated with its $12.8 billion investment in JLI.  Plaintiffs likewise allege that Defendants concealed the fact that its $12.8B investment in JLI was "a risky bet on a company with soaring profits but widespread illegal marketing practices."[290]  Defendants allegedly failed to disclose that "JLI's youth marketing scheme subjected JLI, Altria, and Altria's investment in JUUL to material risk, including reputational, litigation and regulatory actions and fines."[291]  Similarly, Altria allegedly "failed to inform investors, or account for, material risks associated with JLI's products and marketing practices, the true value of JLI and its products, and material risks associated with Altria's non-

---

[287] Skinner Report, ¶¶137–142.

[288] Skinner Report, ¶106, finding that "2.72 million shares changed hands between 3:37 PM and market close on this day, which suggests unusually large trading activity almost immediately upon the publication of this news."

[289] Skinner Deposition, 151:9–24.

[290] Amended Complaint, ¶384.

[291] Amended Complaint, ¶16.

compete agreement with JLI."[292]  The alleged misconduct, "as well as mounting public scrutiny, negative publicity, and governmental pressure on e-vapor products and JLI made it reasonably likely that Altria's investment in JLI would have a material negative impact on Altria's reputation and operations."[293]  Under Plaintiffs' theory of liability, the "materialization of these risks" would ultimately "require Altria to write-down its investment in JLI."[294, 295]

90.     Instead, Dr. Skinner argues that "substantial doubt exists as to whether the intraday stock price movement can be used as evidence of prior price impact of the alleged misrepresentations," because: (i) "by February 21, 2020 a number of negative developments regarding Altria's investment in JUUL had become known to the market that would **presumably** have put the market on notice of **various** significant risks related to the JUUL investment"; and (ii) academic literature finds that "regulatory investigations creat[e] a stigma that attaches to firms and managers, even if they are ultimately exonerated."[296]  However, Dr. Skinner's "truth-on-the market" defense, which relies on vague references to "a number of negative developments" and

---

[292] *Ibid*.

[293] *Ibid*.

[294] *Ibid*.

[295] *See also, e.g.*, Amended Complaint, ¶15:

> when announcing Altria's $12.8 billion investment in JLI through mirroring press releases issued simultaneously on December 20, 2018, both Altria and JLI assured Altria's investors that there would be no day of reckoning related to any improper youth marketing, bluntly representing that "[JUUL's] intent was never to have youth use JUUL products."  Moreover, according to the press releases, the service agreements related to the transaction would accelerate "JUUL's mission to switch adult smokers to e-vapor products."  Throughout the Class Period, Altria and JLI also repeatedly represented to Altria investors that JUUL was a tobacco cessation product for adult smokers that was not harmful.

[296] Skinner Report, ¶¶139–141.  (Emphasis added.)

"various significant risks," is once again the product of his overly narrow and incorrect portrayal of Plaintiffs' theory of liability.

91.    Specifically, Dr. Skinner ignores Plaintiffs allegations that Defendants understood but failed to disclose the risks associated with "JLI's multi-faceted youth marketing scheme," including "risk of litigation, regulatory action, public backlash and financial and reputational harm that would certainly occur if ever discovered,"[297] and that when confronted by such "negative developments," "Defendants simply lied, even though they knew well that JLI had purposefully targeted youth in their marketing and those efforts had been breathtakingly successful."[298]  As such, Dr. Skinner fails to consider the countervailing effect these statements had on investor expectations regarding the likelihood of debilitating regulatory actions, lawsuits and public backlash, thereby maintaining the Company's stock price at artificially inflated levels until the allegedly concealed risk materialized, as it did (in part) on February 21, 2020, when *The Wall Street Journal* reported that the SEC was investigating the JLI investment.  Furthermore, given that Altria's stock traded in an efficient market, its "price reflected the Company-specific information disclosed to the market, and promptly responded to the disclosure of new, material unexpected information."[299]  Thus, immediately preceding each of the alleged corrective events, Altria's stock price would have already reflected the entire information set available to investors at the time, including the "negative developments" and "various significant risks" alluded to by

---

[297] Amended Complaint, ¶14.

[298] Amended Complaint, ¶11.  *See also* Opinion on Motions to Dismiss, p. 28.  ("Defendants also claim that Plaintiffs have not alleged actionable statements, because the public already had available to it information regarding the issues with youth usage of e-cigarettes.  This defense runs into two problems at this stage.  First, Defendants actively denied that it intended to target youths with its marketing.")  (Internal citations omitted.)

[299] Nye Report, ¶57.

Dr. Skinner.  Accordingly, such factors would not have materially contributed to the Company's stock price declines on February 21–24, 2020.

92.     With respect to Dr. Skinner's contention that Altria's February 21, 2021 stock price decline reflects "the market reacting to news that a government agency was investigating Altria" (or "stigma"),[300] he once again fails to recognize that investor losses can be caused by events which reveal material information about the fraud, or events which are within a "zone of risk" that investors did not anticipate.[301]  By conceding that the "market [was] reacting" to news of the SEC investigation, but concluding that the price reaction is not demonstrative of price impact, Dr. Skinner is again effectively requiring corrective information to include only admissions of fraud by Defendants, or statements by Defendants which explicitly mirror their prior misrepresentations on a one-to-one basis.  On the contrary, Counsel for Plaintiffs has informed me that no such mirror-image requirement exists, and that "'neither a single complete disclosure nor a fact-for-fact disclosure of the relevant truth to the market is a necessary prerequisite to establishing loss causation.'"[302]

93.     With respect to the decline in Altria's stock price the next trading day, February 24, 2021, Dr. Skinner argues that Altria's stock price would have completely absorbed the news within the 23 minutes between the release of *The Wall Street Journal* article and market close on February 21, 2020.  Thus, he reasons that "whether or not Altria's stock price movements on any of the

---

[300] Skinner Report, ¶¶141, 142, citing David H. Solomon and Eugene Soltes, "Is 'Not Guilty' the Same as 'Innocent'?  Evidence from SEC Financial Fraud Investigations," *Journal of Empirical Legal Studies*, Volume 18, Issue 2, 287–327, June 2021, p. 291 ("Solomon and Soltes 2021").

[301] *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (finding that "[a] misrepresentation is 'the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations'" and foreseeable) (quoting *Lentell*, 396 F.3d at 173) (emphasis in original).

[302] Opinion on Motions to Dismiss, p. 39.

dates February 24–27, 2020 were statistically significant and negative does not affect [his] conclusion as to price impact."[303]  In support of this, Dr. Skinner misleadingly equates a 23-minute intraday event window with the "use of a single event day in event studies," which he claims "is well established in the academic literature and has been for many years."[304]  Citing to Fama (1991), Dr. Skinner describes his choice of an event window as follows:

> Consistent with the notion that security prices quickly reflect newly available public information, the use of a single day event window has been well established in the academic literature for many years.  Thirty years ago, Nobel laureate Eugene Fama observed "[w]hen the announcement of an event can be dated to the day, daily data allow precise measurement of the speed of price response—the central issue for market efficiency. … The typical result in event studies on daily data is that, on average, **stock prices seem to adjust within a day to event announcements**.  The result is so common that this work now devotes little space to market efficiency."  Because we can now in most cases identify not only the date but **also the time when news becomes publicly available**, it is even more strongly evident that the appropriate event window is no longer than **a single trading day**.  While some academic studies use multi-day event windows, these are typically studies for which the timing of announcements cannot be measured precisely (e.g., only the day of an announcement is known).  Because we can, for the events at issue here, identify the time news becomes available to the market, **I use single trading day event windows**, consistent with Professor Fama's recommendation.[305]

94.    However, contrary to Dr. Skinner's suggestion, Fama (1991) does not advocate use of a 23-minute event window.  Instead, Fama (1991) considers "not only the date but also the time when news becomes publicly available."  The core trading session for U.S. markets, including

---

[303] Skinner Report, ¶106.  *See also* Skinner Deposition, 85:3–10.

[304] Skinner Report, ¶105.

[305] Skinner Report, ¶58, citing Fama, E. (1991), "Efficient Capital Markets: II," *The Journal of Finance*, 46(5), pp. 1575−1617, at p. 1601 ("Fama (1991)").  (Emphasis added.)  Notably, On the same page of Fama (1991) cited by Dr. Skinner, Fama discusses "when the stock-price response to an event is large and concentrated **in a few days**, …," and that "in mergers and tender offers, the average increase in the stock price of target firms in the **3 days** around the announcement is more than 15%."

- 78 -

the NYSE where Altria stock was listed, is 6.5 hours from 9:30 AM to 4:00 PM ET.[306]  In this case, as the news became publicly available at 3:37 PM on Friday, February 21, 2020, just 23 minutes before market close, stock price adjustments "within a day" would, by definition, include trading on Monday, February 24, 2020.

95.     Nevertheless, the use of a two-day event window is entirely consistent with the academic event-study literature, which often considers the price impact of material information over multi-day event windows.  For example, Mitchell and Netter (1994), authored by former SEC staff, state that one-, two-, and three-day event windows are commonly used in securities litigation:

> Because the efficient markets hypothesis, supported by considerable empirical evidence, suggests that stock prices react quickly to the release of new information, in many cases the event window will be relatively short, sometimes as short as one trading day.
>
> ***
>
> The current academic standard is to extend the event period to the close of trading on the day after the release of the pertinent information.  [n94 This is particularly true when the researcher examines a sample of several occurrences of the same type event such as a merger announcement.  For a single event that is generally the norm in a securities fraud case, depending upon market factors, the window often can extend beyond the close of trading the day after the public announcement.]
>
> ***
>
> [I]n many securities fraud cases the relevant information is revealed slowly over time, while during the same period investors receive other, sometimes unrelated, information about the firm(s) in question.  In the latter case, it is relatively difficult to choose an appropriate window.  The main advice is to carefully identify the exact dates during which the information is in question reached the market, and then restrict the window to a short period, if possible, generally two or three days around each release of new information.[307]

---

[306] https://www.nyse.com/markets/hours-calendars.

[307] Mitchell, Mark L. and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, Vol. 49, pp. 545–590 ("Mitchell and Netter (1994)") at 558, 559.

96.    Similarly, MacKinlay (1997), a widely cited academic primer on event study analysis, explicitly allows for event windows longer than one day, stating that "[e]ven if the event being considered is an announcement on a given date it is typical to set the event window length to be larger than one. This facilitates the use of abnormal returns around the event day in the analysis."[308]  As Dr. Skinner acknowledges, Solomon and Soltes (2021) "uses abnormal returns measured over three-day windows around the times of the announcements."[309]  In fact, Dr. Skinner has used multi-day event windows in some of his previous academic research.[310] Furthermore, in 2014, the Supreme Court acknowledged the debate among economists about the efficiency of capital markets and refused to "endorse 'any particular theory of how quickly and completely publicly available information is reflected in market price.'"[311]

97.    Thus, it is clear from the above that practitioners of event studies, whether financial economists conducting research in academia or in the arena of securities litigation, agree that the use of a multi-day event window is a reliable and scientific methodology for estimating the price impact of certain corporate events in a manner that is consistent with market efficiency.

98.    In sum, Dr. Skinner's analysis of price impact is incomplete at best.  He fails to demonstrate that there is a "mismatch between the contents of the alleged corrective events [on

---

[308] MacKinlay (1997) at p. 19.

[309] Skinner Report, footnote 239.

[310] *See, e.g.*, Anilowskia, Carol, Mei Feng, Douglas J. Skinner, 2007, "Does earnings guidance affect market returns?  The nature and information content of aggregate earnings guidance," *Journal of Accounting and Economics*, Vol. 44, pp. 36–63, which "reports on the stock price reaction to management earnings forecasts" over "the three trading day window centered on the date of the management earnings forecast."  (*Id.*, p. 45.)

[311] *Halliburton II*, 134 S. Ct. 2398, 2403 (2014), quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 248 at n. 28.

February 21, 2020] and the alleged misrepresentations,"[312] and he improperly ignores the statistically significant price decline on February 24, 2020, which provides ample evidence of price impact in this matter.  As such, his conclusion that "there is substantial doubt" as to whether the intraday decline on February 21, 2020, and the full-day decline on February 24, 2020, "can be used as evidence of earlier price impact"[313] is meritless.

### vi.   Additional Errors and Inconsistencies in Dr. Skinner's Price Impact Analysis

99.      Dr. Skinner's price impact analysis contains numerous additional errors and inconsistencies with respect to his opinions regarding the alleged corrective events on September 13, 2019 and September 25, 2019.[314]  Under Dr. Skinner's event study, "Altria's stock price movement[] [was] negative and statistically significant at the 5% level on … September 13, 2019."[315, 316, 317]  However, he relies on the statistically insignificant stock price movement on an earlier date (*i.e.*, August 30, 2019) to argue that there is "doubt as to whether the negative and statistically significant movement in Altria's stock price on September 13, 2019, a later date, can be  used as evidence of earlier price impact due to the alleged misrepresentations."[318]  His

---

[312] Skinner Report, ¶13.

[313] Skinner Report, ¶13.

[314] Dr. Skinner analyzes September 13, 2019 and April 3, 2019 collectively (Skinner Report, ¶¶147–151).  My opinions on Dr. Skinner's analysis of April 3, 2019 are contained in §V.A.i herein, and they apply equally to his opinions on September 13, 2019.

[315] Skinner Report, ¶147.

[316] Statistical significance at the 5% significance level is equivalent to statistical significance at the 95% confidence level.

[317] Under my regression model, used to analyze market efficiency, the Company-specific return on September 13, 2019 is statistically significant at above the 95% confidence level.  (*See* Nye Report, Exhibit 11B.)

[318] Skinner Report, ¶149.

assertion is nonsensical, especially considering that he fails to proffer any explanation for the stock price decline on September 13, 2019 other than the alleged corrective events.[319]

100.     With respect to September 25, 2019, while Dr. Skinner finds that the stock price decline that day was "not statistically significant at the 5% level,"[320, 321] he identifies positive offsetting information on this date that he neglects to disentangle from the alleged corrective information, including Altria's announcement that it was "tighten[ing] its guidance for 2019 full-year adjusted diluted EPS to a range of $4.19 to $4.27 from a range of $4.15 to $4.27."[322, 323]  Furthermore, Dr. Skinner states that there were four distinct alleged corrective disclosures on September 25, 2019: (i) "Philip Morris had called off discussions of a $200 billion merger with Altria due to scrutiny of the vaping industry and the Company's 35% stake in market leader JUUL"; (ii) JLI "announced the same day that it was the subject of another federal investigation"; (iii) "JUUL also announced that it was replacing its CEO Kevin Burns with longtime Altria executive K.C. Crosthwaite"; and (iv) JLI "also announced that JUUL would stop all advertising in the U.S."[324] However, his analysis of whether the alleged corrective disclosures on September 25, 2019

---

[319] Skinner Deposition, 179:6–11.

[320] Skinner Report, ¶134.

[321] Statistical significance at the 5% significance level is equivalent to statistical significance at the 95% confidence level.

[322] Skinner Report, ¶135.

[323] *See also* Skinner Deposition, 55:17–57:16, in which Dr. Skinner states he considered performing a "statistical exercise" to determine the "effect on stock price of the tightening of the guidance," but decided not to perform it; "given the complexity of that and the measurement error and estimation error involved in marrying those two statistical processes, it was just not possible at this stage at least to reach a more definitive conclusion by quantifying and adjusting for the effect of the positive news." *See also* Skinner Deposition, 124:3–7, in which Dr. Skinner stated he "didn't do a formal analysis of" whether the possibility of a merger between Altria and Philip Morris was positive or negative news for Altria.

[324] Skinner Report, ¶132, citing Complaint, ¶511.

constitute a "match" with the misrepresentations is solely focused on the Philip Morris merger talks being called off:

> Importantly, **part of** what Plaintiffs allege as corrective on September 25, 2019 is the news of "Philip Morris [calling] off [merger] discussions" with Altria. However, at the start of the Putative Class Period, the possibility of a merger had not yet been publicly announced (and in fact would not be announced until more than six months later). Further, I understand that Plaintiffs do not allege any misrepresentations regarding whether a merger would occur. Therefore, there is a mismatch between contents of the alleged corrective event and the alleged misrepresentations.[325]

Given Dr. Skinner's failure to analyze whether the other three distinct alleged corrective disclosures on September 25, 2019 had price impact, his analysis is incomplete at best.

> **B.    Dr. Skinner Omits From His Analysis Additional Alleged Corrective Events in the Amended Complaint, Rendering His Conclusions on Price Impact Incomplete and Unreliable**

101.    While Dr. Skinner acknowledges that Plaintiffs have expanded their allegations in the proposed Amended Complaint, including a longer Class Period with four additional alleged corrective events, he omits these disclosures from his assessment of price impact. Dr. Skinner does not explain this glaring omission from his price impact analysis other than to state his "understanding that Defendants have opposed Plaintiffs' proposed amendments to the Complaint outlined in the Proposed Amended Complaint and that the Court has not yet ruled on Plaintiffs' motion."[326] Curiously, Dr. Skinner does include the additional alleged corrective events in his

---

[325] Skinner Report, ¶133. (Emphasis added. Internal citations omitted.)

[326] Skinner Report, ¶51. *See also* Skinner Deposition, 46:23–47:23, in which Dr. Skinner states that a "price impact analysis" of the four additional alleged corrective events was "not part of my assignment."

- 83 -

discussion of the Class-wide damages methodology.[327]  Dr. Skinner summarizes the four

additional corrective events alleged in the Amended Complaint as follows:

- "[O]n March 19, 2019, FDA Commissioner Scott Gottlieb said he had a 'difficult' meeting the prior week with Altria and JUUL, was concerned about the slow pace of efforts to curb youth vaping, and believed that the FDA may need to pull pod-based nicotine products off the market as it combats a surge in teen vaping."

- "On June 21, 2019, CNBC reported that then-former FDA Commissioner Scott Gottlieb stated, 'I don't know how Juul gets through a[] [Premarket Tobacco Product] [A]pplication process' because '[t]hey have so much historical youth use with their product.'  On this news, Altria's stock price fell $2.26 per share, or 4.3%, to close at $48.00 per share on June 21, 2019."

- "On November 19, 2019, the New York Attorney General announced a lawsuit against JLI for deceptive and misleading marketing of its e-cigarettes, which contributed to the ongoing youth vaping epidemic in New York State.  On this news, Altria's stock price fell $1.41 per share, or 2.92%, to close at $46.93 per share on November 19, 2019."

- "On April 1, 2020, after the close of trading, the FTC announced that it was filing suit to force Altria to unwind its $12.8 billion investment in JUUL.  The press release announcing the complaint, which was filed the same day, stated Altria and JUUL 'entered a series of agreements, including Altria's acquisition of a 35% stake in JUUL, that eliminated competition in violation of federal antitrust laws,' including 'by agreeing not to compete in return for a substantial ownership interest in JUUL': The Commission alleges that Altria dealt with this competitive threat [from JUUL] by agreeing not to compete in return for a substantial ownership interest in JUUL.  Weeks after Altria declared its intention to wind down its e-cigarette business, Altria and JUUL announced an agreement that made Altria JUUL's largest shareholder, allowed Altria to appoint an observer to JUUL's Board of Directors, and would have permitted Altria to appoint three members of JUUL's Board after converting its shares to voting securities.  JUUL received over $12 billion, an agreement that Altria would not compete with JUUL for six years, and a range of support

---

[327] Skinner Report, ¶¶208–226.  Dr. Skinner also includes the four additional alleged corrective events when he opines: "If one aggregates the set of unadjusted declines in Altria's market capitalization across all of the event dates associated with the alleged corrective disclosure events contained in the Proposed Amended Complaint one obtains an approximate $41.5 billion loss in Altria's market capitalization, an amount *more than three times* its initial $12.8 billion investment in JUUL."  (Skinner Report, ¶55.)  (Emphasis in original.)

service.  On this news, Altria's stock price declined $1.39 per share, or 6.96%, to close at $36.22 per share on April 2, 2020."[328]

102.    According to Dr. Skinner's event study analysis, three of these alleged corrective events are associated with a statistically significant stock price decline at above the 95% confidence level, and one is associated with a statistically significant stock price decline at the 93.5% confidence level under his model:[329], [330]

---

[328] Skinner Report, Exhibit 3B, citing Amended Complaint, ¶¶494–495, 507–508, 541–542, 547–548.

[329] Using the back-up computer code Dr. Skinner produced to Counsel for Plaintiffs, I have replicated his regression results summarized in Exhibits 5 and 6 to the Skinner Report, and have estimated his regression model for the four additional alleged corrective events shown in the table below.

[330] Under my regression model, used to analyze market efficiency, the Company-specific returns on these dates are also statistically significant at the same conventional confidence levels.  (*See* Nye Report, Exhibit 11B.)  As described in the Reference Guide on Multiple Regression, "[t]he use of [99]%, [95]%, and, sometimes, [90]% [confidence] levels for determining statistical significance remains a subject of debate"; "[a]lthough the [95]% criterion is typical, reporting of more stringent [99]% significance tests or less stringent [90]% tests can also provide useful information."  (*See* Reference Guide on Multiple Regression, pp. 320, 321.)  As described by *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 46–47 (S.D.N.Y. 2018):

> A confidence level of 92.12% with a *p*-level of 7.88% indicates that the return under study is among the top 7.88% of "normal" returns in terms of absolute magnitude or, in this case, among the bottom 3.94% of the most negative returns. (*See* Nye Rebuttal ¶ 8).  That is obviously less comfort than a result that is statistically significant at a confidence level of 95%, but it does not prove the *absence* of price impact. *See, e.g.*, Merritt B. Fox, Halliburton II*: It All Depends on What Defendants Need to Show to Establish No Impact on Price*, 70 BUS. LAW. 437, 459 (2015) (noting that a 95% confidence-level burden "appears to be a heavier burden than the normal probabilities, just better than a 50% chance, required of the moving party to establish its position by the civil liability's preponderance of the evidence rule"); *see also, e.g.*, *Bing Li v. Aeterna Zentaris, Inc.*, No. 14-CV-7081 (PGS) (TJB), 2018 WL 1147082, at *10 (D.N.J. Feb. 28, 2018) (holding that the plaintiffs' expert's report "[did] not demonstrate the absence of a price impact," even though he failed to find price impact with 95% confidence).

- 85 -

| Corrective Events Not Examined by Dr. Skinner | | |
|---|---|---|
| Impact Date | Skinner Event Study | |
| | Abnormal Return | Confidence Level |
| 3/19/2019 | -3.0% | 93.5% |
| 6/21/2019 | -5.6% | 99.9% |
| 11/19/2019 | -3.9% | 98.6% |
| 4/2/2020 | -8.2% | 100.0% |

Notably, nowhere in his report, including the 19 paragraphs he devotes to a discussion of these dates as they pertain to Class-wide damages, does Dr. Skinner dispute that the alleged corrective events caused the corresponding decline in the price of Altria stock.[331]

103.    Dr. Skinner's omission of alleged corrective events from his analysis renders his conclusions on price impact incomplete and unreliable.  Furthermore, the fact that the alleged corrective events are associated with statistically significant stock price declines provides ample evidence of price impact under Dr. Skinner's own standards.

### C.    Dr. Skinner Improperly Conflates Statistical Significance and Price Impact

104.    Dr. Skinner's conclusion that there is no price impact associated with certain corrective events is based on an unjustified prerequisite of statistical significance at the 95% confidence level.[332]  According to Dr. Skinner:

> [s]tatistically significant abnormal returns for a company's stock during a given event window (e.g., on a given trading day) can be interpreted as indicating significant changes in the *total mix* of public information regarding the company during that event window.  Abnormal returns that are not statistically significant cannot be reliably attributed to any change in the *total mix* of information regarding the company, as they cannot be distinguished from the typical price fluctuations of the company in the absence of new information (that is, they are not reliably different from zero).[333]

---

[331] Skinner Report, ¶¶208–226.

[332] Skinner Report, ¶¶61–62.

[333] Skinner Report, ¶62.  (Emphasis in original.)

- 86 -

However, contrary to Dr. Skinner's opinion, a finding of statistical insignificance does **not** allow a researcher to attribute causation to "typical price fluctuations … in the absence of new information," and thereby rule out price impact.

105.    As an initial matter, it is important to note that the confidence level associated with a given company-specific return is measured as one minus the "$p$-value" of that return, where the $p$-value represents the conditional probability of observing a return as extreme as, or more extreme than, the return at issue.  Thus, consistent with the standard frequently employed by social scientists, statistical significance in the context of securities litigation merely indicates that a given company-specific return is a relatively rare occurrence.[334]  For example, statistical significance at the 95% confidence level (*i.e.*, a return with a $p$-value less than or equal to 5%) merely connotes that the return under study is among the top 5% of "normal" returns observed during the control period in terms of absolute magnitude (*i.e.*, either among the bottom 2.5% of the most negative returns or among the top 2.5% of the most positive returns).

106.    In his event study, Dr. Skinner's null hypothesis is effectively that the alleged corrective events had **no effect** on Altria's stock price, and that the observed price changes were simply the result of "typical price fluctuations of the company in the absence of new information."[335]  When testing the null hypothesis of "no effect," a statistically significant result will have a small $p$-value (*i.e.*, less than 5%, when applying the 95% confidence level), thereby indicating "the observed data are far from what is expected under the null hypothesis—too far to be readily

---

[334] Kaye, David H. and David A. Freedman, "Reference Guide on Statistics," in Federal Judicial Center, *Reference Manual on Scientific Evidence*, National Academies Press, 3rd ed., 2011 ("Reference Guide on Statistics"), pp. 250–252.  ("Statistical significance is determined by comparing a $p$ [*i.e.*, the probability of observing data as extreme as, or more extreme than, the actual data—given that the null hypothesis is true] to a preset value, called the significance level."  Thus, statistical significance "is merely a label for a certain kind of $p$-value.")

[335] Skinner Report, ¶62.

explained by the operations of chance.  That discredits the null hypothesis."[336]  However, while the *p*-value "gives the chance of getting evidence against the null hypothesis as strong or stronger than the evidence at hand,"[337] it "does not give the chance that the null is true,"[338] nor "the probability that ... the results occurred because of chance."[339]  Indeed, "[a]ccording to the frequency theory of statistics, there is no meaningful way to assign a numerical probability to the null hypothesis."[340]

107.    Thus, Dr. Skinner's conclusion that certain corrective events had no price impact because they did not induce a statistically significant stock price decline is a fundamental error of statistical inference since he improperly infers that his null hypothesis is true (*i.e.*, that the corrective events had **no effect**).  To see why, consider that, according to Dr. Skinner's regression model, Altria's Company-specific return of -2.28% on October 31, 2019 is also not statistically significantly different from -5.43% (at the 95% confidence level).[341]  Thus, if one were to commit the fallacy of accepting any null hypothesis that is not rejected at a 95% significance level (as Dr. Skinner does), one would have to accept that both of the following

---

[336] Reference Guide on Statistics, p. 251.

[337] *Id.*, p. 250.

[338] *Ibid*.

[339] Hubbard, Raymond and R. Murray Lindsay, "Why *P* Values Are Not a Useful Measure of Evidence in Statistical Significance Testing," *Theory & Psychology*, Vol. 18(1), pp. 69–88, at p. 70.

[340] Reference Guide on Statistics, p. 250.

[341] Dr. Skinner's regression results are summarized in Exhibit 6 to the Skinner Report.  For the October 31, 2019 alleged corrective event, the standard error of his regression is 1.61%, which equals the "Abnormal Return" of -2.28% divided by the "t-Stat" of -1.41.  Accordingly, a hypothesis test of whether an estimated abnormal return of -2.28% can be statistically distinguished from -5.43% yields a t-statistic of 1.93 (*i.e.*, the quantity -2.28% minus -5.43%, divided by 1.61%), which is statistically significant at the 94.85% confidence level, under Dr. Skinner's regression analysis.

propositions are true: (i) the true Company-specific return is zero, and (ii) the true excess Company-specific return is -5.43%. Obviously, both cannot be true, which is precisely why accepting a null hypothesis is fallacious. Indeed, for the October 31, 2019 alleged corrective event, every Company-specific return between -5.54% and +0.89% would be true based on Dr. Skinner's flawed methodology. The same logic applies to all of the alleged corrective events, as well as every other day during the Class Period.

108.    Furthermore, "[i]t is well known among applied scientists that a lack of impact or effect is not sufficiently established by a failure to demonstrate statistical significance. A failure to reject the null hypothesis of no effect may be the result of low statistical power when an important effect actually exists and the null hypothesis of no effect is in fact false."[342] Dr. Skinner's acceptance of the null hypothesis is particularly improper, given the well-known fact that single-firm event studies, such as those he conducted for the Altria stock, have low statistical "power,"[343] and are prone to "accepting the null hypothesis when the alternative hypothesis is true" (*i.e.*, prone to making Type II errors).[344] As was recently noted by the *Carpenters* court in the U.S. District Court for the Southern District of New York:

> In academic research, event studies are almost exclusively conducted with large samples of securities from a number of different firms. When the event study is used in a litigation to examine a single firm, the chances of finding statistically significant results decrease dramatically. "[T]he event study technique improves as the number of firms in the sample increase, as the number of days in the announcement window decrease, and as the alternative of a larger abnormal return is considered against the null hypothesis of zero abnormal return." As to the latter

---

[342] Hoenig, John M. and Dennie M. Heisey, 2001, "The Abuse of Power: The Pervasive Fallacy of Power Calculations for Data Analysis," *The American Statistician*, Vol. 55, No. 1, pp. 1–6 at p. 1.

[343] *Carpenters Pension Trust Fund of St. Louis, et al. v. Barclays PLC, et al.*, Case No. 12-cv-5329 (SAS), Opinion and Order, dated August 20, 2015 ("*Carpenters*"), pp. 33–35. (Internal citations omitted.)

[344] Reference Guide on Statistics, p. 254, footnote 106.

point, neither the Supreme Court nor the Second Circuit has indicated whether the abnormal return must meet a particular threshold level, yet the success of an event study will depend on the size of the return it attempts to measure.  The following example from the literature highlights the problems inherent in placing too much emphasis on event studies to measure market efficiency:

[i]n a sample size of twenty-five companies, the probabilities of detecting an abnormal return (or an effect on the stock price) of 0.5%, 1% and 2% is 24%, 71% and 100% respectively.  But if the sample size is increased to 100 companies, the probabilities of detecting an abnormal return of 0.5%, 1%, and 2% is 71%, 94%, and 100% respectively.  Thus, there is significant difference in detecting an abnormal return, or effect on the stock price, depending on the size of the event study.[345]

109.    Consistent with *Carpenters*, the Second Circuit has stated that "[e]vent studies offer the seductive promise of hard numbers and dispassionate truth, but methodological constraints limit their utility in the context of single-firm analyses….  Notably, small sample sizes may limit statistical power, meaning that only very large-impact events will be detectible."[346]  In other words, single-firm event studies are inclined not to find statistical significance, when in fact a company-specific return was caused by the release of material, value-relevant information on a given event date.[347]  Thus, contrary to Dr. Skinner's blind acceptance of the null hypothesis, given the low statistical power of single-firm event studies, it is entirely plausible that "[t]he null is false—but, by chance, the data happened to be of the kind expected under the null."[348]  Indeed, "[w]hen a study with low power fails to show a significant effect, the results may therefore be

---

[345] *Carpenters*, pp. 33–35.

[346] *In re Petrobras Securities*, Case No. 16-1914-cv (2d Cir. Jul. 7, 2017), pp. 64, 65.  (Internal citations omitted.)

[347] *Id.*, p. 65, footnote 30, citing Alon Brav & J. B. Heaton, *Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias*, 93 Wash. U. L. Rev. 583 (2015).

[348] Reference Guide on Statistics, p. 254.

more fairly described as inconclusive than negative.  The proof is weak because power is low."[349]

110.    Additionally, there is no requirement in economics that material information must induce a price reaction that is considered to be statistically significant at a particular level.  Indeed, the notion that material information must induce a statistically significant price reaction is incongruous with the fundamental tenets of financial economics.  Specifically, the science of financial economics is predicated on 1) the "Law of One Price," which "implies that the price of a security should equal the present value of the expected cash flows an investor will receive from owning it";[350] 2) the axiom of "semi-strong" form market efficiency, which states that "all publicly available information regarding the prospects of a firm must be reflected already in the [security's] price";[351] and 3) arbitrage pricing theory, which posits that security returns are determined by their systematic risk exposure, "plus another (zero expected value) random amount attributable to firm-specific events."[352]  Absent from these widely-accepted scientific principles is any reference to statistical significance.  Accordingly, Dr. Skinner's assertion that the lack of any statistically significant price reaction implies a lack of price impact is simply false.  The science of financial economics explicitly allows for security prices to efficiently adjust to new information that even minimally affects the "present value of the expected cash flows an investor will receive from owning it," which by definition will not induce a price reaction large enough to qualify as being statistically significant.

---

[349] *Ibid.*

[350] Berk, Jonathan and Peter DeMarzo, 2007, *Corporate Finance*, Pearson Education, Inc., 1st Ed., Ch. 9, p. 245.

[351] Bodie, Zvi, Alex Kane, and Alan J. Marcus, 2008, *Investments*, McGraw-Hill/Irwin, 7th ed., Ch. 11, p. 361.

[352] *Id.*, pp. 332–345 at p. 332.

111.    By design, the calculation of statistical significance does not entail any analysis of company-specific news.  Thus, while statistical significance may be an objective manner in which to establish whether a return is extreme enough to be considered rare, it is not a necessary condition to demonstrate price impact, nor does the lack of statistical significance constitute statistical proof of the absence of price impact.  As "the goodness or badness of a hypothesis cannot be decided on merely statistical grounds,"[353] the determination of whether company-specific news is economically material must at least consider the content of the news itself, in order to determine if it can plausibly explain the contemporaneous price movement.[354]  Indeed, it is my understanding that "the premise that statistical significance is the only reliable indication of causation … is flawed," and that such a "categorical rule would 'artificially exclud[e]' information that 'would otherwise be considered significant to the trading decision of a reasonable investor.'"[355]

## VI.    Damages Can Be Measured on a Class-Wide Basis and in a Manner Consistent With Plaintiffs' Theory of Liability

112.    The analyses set forth in the Nye Report establish a foundation for estimating damages on a Class-wide basis.[356]  Specifically, by controlling for changes in market and industry factors, an event study can isolate the price change of the stock due to the release of Company-specific information on every day of the Class Period, including the alleged corrective event dates.  Thus,

---

[353] McCloskey, Donald N., 1985, "The Loss Function Has Been Mislaid: The Rhetoric of Significance Tests," *The American Economic Review,* Vol. 75, No. 2, Papers and Proceedings of the Ninety-Seventh Annual Meeting of the American Economic Association, p. 203.

[354] Bodie, Zvi, Alex Kane, and Alan J. Marcus, 2008, *Investments*, McGraw-Hill/Irwin, 7th ed., Ch. 11, pp. 366–368.

[355] *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011), quoting *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

[356] Nye Report, §VII.

as the decline in a security's price in response to corrective disclosures and/or the materialization of a concealed risk reflects the dissipation of price inflation created by earlier misrepresentations and/or omissions, such Company-specific price changes are the natural starting point from which to measure—on a Class-wide basis—the level of price inflation present during the Class Period. Indeed, the "out-of-pocket, or event study, method is the standard measurement of damages in Section 10(b) securities cases."[357]

113.    At this early stage of the litigation, I have not conducted an analysis of loss causation or calculated Class-wide damages.  Nonetheless, as described in the Nye Report, a damages methodology that can be commonly applied to all Class members involves measuring the Company-specific returns (*i.e.*, abnormal returns) in response to the alleged corrective disclosures and/or risk materialization events, adjusting for any confounding news, and then calculating the amount of inflation in Altria stock throughout the Class Period.[358]  "Once the daily levels of price inflation have been calculated throughout the Class Period, a Class member's actual trading activity in the security can be used to mechanically calculate damages on an individual basis."[359]  This is precisely the same damages methodology that I put forth at

---

[357] *City of Miami Gen. Empls. Ret. Trust v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018). *See also, e.g., Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972) (out-of-pocket method is "the correct measure of damages" in Exchange Act case); *Hatamaian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *8 (N.D. Cal. Mar. 16, 2016); *In re SanDisk LLC Sec. Litig.*, 2018 WL 4293336, at *2 (N.D. Cal. Sept. 4, 2018) ("The out-of-pocket method is widely considered an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation."); *In re Pfizer, Inc. Sec. Litig.*, 819 F.3d 642, 649 (2d Cir. 2016).

[358] Nye Report, ¶65, citing *In re Pfizer, Inc. Sec. Litig.*, 819 F.3d 642, 649 (2d Cir. 2016).

[359] Nye Report, ¶66.

the class certification phase in *Waggoner* v. *Barclays PLC*, and which was endorsed by the Second Circuit.[360]

114.    Here, my understanding of Plaintiffs' theory of liability is that: (i) Defendants' misstatements and omissions "artificially inflate[d] and maintain[ed] the market price of Altria securities," throughout the Class Period;[361] and (ii) "[t]he market price of Altria securities declined sharply upon public disclosure of the facts alleged [in the Amended Complaint] to the injury of Plaintiffs and Class members."[362]  Furthermore, my understanding is that Plaintiffs do not allege that Defendants lied about the **existence** of the youth vaping epidemic before and during the Class Period, but rather that Defendants' false and misleading statements concealed from investors "that JUUL's youth marketing had **created** the youth vaping epidemic, [and] that their intentional misconduct could render JLI valueless."[363]  Indeed, "by not disclosing the risks created by JUUL's illegal marketing practices targeting underage consumers,"[364] as well as the "material risks associated with Altria's non-compete agreement with JLI,"[365] Plaintiffs allege that Defendants exposed investors, unwittingly, to foreseeable stock price declines upon the materialization of these risks, including "punitive solutions remedying JUUL's allegedly illegal marketing practices[, which] could result in substantial judgments and regulatory fines, in

---

[360] *Waggoner* v. *Barclays PLC*, 875 F.3d 79, 105 (2d Cir. 2017).

[361] Complaint, ¶564; and Amended Complaint, ¶590.

[362] Complaint, ¶569; and Amended Complaint, ¶595.

[363] Amended Complaint, ¶413.  (Emphasis added.)  *See also, e.g.*, Complaint, ¶404.

[364] Opinion on Motions to Dismiss, p. 1.

[365] Amended Complaint, ¶16.

addition to the loss of sales to youth,"[366] thereby "caus[ing] Altria to write-down a material portion of its investment in JUUL."[367]

115.    Thus, given Plaintiffs' single price maintenance theory, which alleges a causal connection between the alleged misstatements and omissions and the actual losses suffered by Class members upon the materialization of the previously concealed risk on the corrective event dates, it is clear that "this is a case in which the Plaintiff's 'proposed measure for damages is ... directly linked with their underlying theory of classwide liability ... and is therefore in accord with the Supreme Court's ... decision in *Comcast.*' *U.S. Foodservice*, 729 F.3d at 123 n.8."[368] Moreover, the use of an event study, like mine, "to determine whether, and the extent to which, [a defendant's] stock price was artificially high (*i.e.*, inflated) during the Class Period due to the market's misapprehension of … risk," is "standard operating procedure in federal securities litigation."[369]

116.    Dr. Skinner, however, grossly mischaracterizes the constitution and capability of the event study methodology.  Without citing any supporting authority, Dr. Skinner asserts that "an event study measures the price impact of all new information revealed during the study's event window; it cannot reliably apportion the price impact of a specific piece of company-specific information when multiple pieces of information are disclosed simultaneously."[370]  On the

---

[366] Opinion on Motions to Dismiss, p. 25.

[367] Opinion on Motions to Dismiss, p. 23.

[368] *Waggoner* v. *Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017).

[369] *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016), quoting *United States v. Gushlak*, 728 F.3d 184, 201 (2d Cir. 2013); *See also, FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1313 n.31 (11th Cir. 2011) ("The methodology of event studies has been sustained by many circuits.").

[370] Skinner Report, ¶63.

contrary, to the extent that any truly confounding information is disclosed simultaneously, it is widely recognized that an event study can be fashioned so as to isolate the effects of confounding events. Indeed, MacKinlay (1997), a widely cited academic primer on event study analysis, states that:

> Over the decades from the early 1930s until the late 1960s the level of sophistication of event studies increased. John H. Myers and Archie Bakay (1948), C. Austin Barker (1956, 1957, 1958), and John Ashley (1962) are examples of studies during this time period. The improvements included removing general stock market price movements and separating out confounding events.
>
> ***
>
> Ideally the empirical results will lead to insights relating to understanding the sources and causes of the effects (or lack of effects) of the event under study. Additional analysis may be included to distinguish between competing explanations.[371]

117. Furthermore, Dr. Skinner fails to provide any evidence contradicting my opinion that "out-of-pocket" damages in this matter can be calculated formulaically on a Class-wide basis using a method that is common to the Class and consistent with Plaintiffs' theory of liability. Rather, without basis, Dr. Skinner insists that a "reliable methodology" must not only "quantify the effect of [allegedly] concealed risks on inflation," but also "be able to do this over the course of the Putative Class Period, including at times before these risks materialized."[372] More specifically, Dr. Skinner proffers that Plaintiffs' damages methodology must "evaluate … counterfactual disclosures … to reliably determine how much these hypothetical disclosures would have affected Altria's stock price on each day of the Putative Class Period."[373] In other

---

[371] MacKinlay (1997) at pp. 14–16. According to Google Scholar, MacKinlay (1997) has been cited by at least 6,843 other academic publications.

[372] Skinner Report, ¶164.

[373] Skinner Report, ¶180.

words, rather than measure inflation based on an observed empirical fact—the price reaction upon the disclosure of corrective information—Dr. Skinner would measure inflation based on an unobserved hypothetical price reaction that **might** have occurred if Defendants had counterfactually told the truth earlier in the Class Period.  However, Dr. Skinner fails to acknowledge that specifying what counterfactual disclosures the Company should have made on each day during the class period, and then estimating the effects of those counterfactual disclosures on Altria's stock price, necessarily requires an assessment of "loss causation—a causal connection between the defendants' alleged misrepresentations and the plaintiffs' economic losses,"[374] which I understand is not required at this stage of the litigation.[375]

118.    Dr. Skinner offers similarly veiled loss causation opinions, when he argues that, at the class certification phase, Plaintiffs must describe with specificity how the proposed damages methodology will:

    i.    "deal with [mismatches between contents of the alleged misrepresentations and the contents of the alleged corrective events] in measuring inflation";[376, 377]

---

[374] *Halliburton II*, 134 S. Ct. at 2406.  (Internal quotations omitted.)

[375] *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011).

[376] Skinner Report, ¶166.

[377] Skinner Deposition, 90:6–12 ("The notion here is that part of my analyses of these dates is to consider whether the information that plaintiffs allege to be corrective with respect to these dates match the allegations that plaintiff has made, and so that is my understanding of mismatch or what I am thinking about in what I call the mismatch analysis here.").

ii.    "measure inflation that was due only to allegedly concealed risk and not to risk that was known or disclosed";[378, 379]

iii.    disentangle "price declines that resulted from the materialization of risks (when these risks are realized as adverse outcomes) as opposed to properly measured inflation attributable to an earlier failure to fully disclose certain risks (when the adverse outcome was still uncertain)";[380]

iv.    "determin[e] whether a particular stock price drop in the future was 'foreseeable' earlier in the Putative Class Period";[381]

v.    "capture[] changes in inflation over the Putative Class Period";[382]

vi.    "separat[e] the stock price effect of allegedly corrective information from the effect of confounding news not corrective of the allegations";[383]

vii.    "account for the [purported] additional theory of liability,"[384] regarding Altria's removal of certain e-cigarette products from the market because of a non-compete condition of its planned investment in JLI;

viii.    "distinguish[] and measur[e] the price effect of news that relates to youth usage from that which relates to alleged intentional marketing to youth,"

---

[378] Skinner Report, ¶196. *See also* Skinner Report, ¶184 ("Dr. Nye fails to provide a damages methodology that could account for the fact that the price can change following the materialization of any risk (when that risk becomes a certainty) even if there were no misrepresentations and the risks that materialized were adequately disclosed.").

[379] *See also* Skinner Deposition, 156:19–157:5:

> So the stock price impact of this type of information and the materializations of risk of a time are what generally I am raising questions about and what generally when I look at Dr. Nye's purported methodology I have concerns about, because **to figure out whether these materializations of risk ultimately result in damages**, one has to separate the risks that were allegedly concealed from risks that were known and disclosed by the company, and that is part of the complication that runs throughout this case. (Emphasis added.)

[380] Skinner Report, ¶167.

[381] Skinner Report, ¶168.

[382] Skinner Report, ¶200.

[383] Skinner Report, ¶170.

[384] Skinner Report, ¶208.

"**[t]o the extent** the trier of fact ultimately determines that statements regarding youth usage are not actionable";[385] and

ix.    "assess the effect of these but-for disclosures on Altria's equity value before its investment in JUUL."[386]

These are all quintessential loss causation issues, many of which require the weighing of discovery evidence regarding Defendants' liability in this matter, which I understand is not the role of a financial economist, but rather the trier of fact. Again, Dr. Skinner fails to appreciate that the resolution of such issues is not required, nor proper, at this stage of the litigation.[387, 388]

---

[385] Skinner Report, ¶214. (Emphasis added.)

[386] Skinner Report, ¶226.

[387] *Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. 804 (2011). *See also In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM) (RWL), 2019 U.S. Dist. LEXIS 114695, at *59 (S.D.N.Y. July 10, 2019):

> Professor Ferrell's contention that Plaintiff's methodology did not adequately isolate the impact of the materialization of known risks from the impact of allegedly concealed risks is simply a loss causation argument in disguise, because it tests the causal relationship between the alleged misstatements and the price decline. Such an argument "goes beyond the Rule 23 inquiry." *Pirnik*, 327 F.R.D. at 47 (citing, inter alia, *Amgen*, 568 U.S. at 475 ("[P]laintiff's are not required to establish loss causation ... on class certification.")).

[388] *See also, e.g.*, the following cases, rejecting similar arguments by Dr. Skinner requiring plaintiff's damages methodology to analyze loss causation at the class certification phase:

*SEB Inv. Mgmt. AB v. Symantec Corp.*, No. C 18-02902 WHA, 2020 U.S. Dist. LEXIS 81661, at *30 (N.D. Cal. May 8, 2020):

> Defendants argue that an event study cannot work here because there is allegedly no evidence of price increases following the alleged misrepresentations and no evidence of price declines following any disclosure of the alleged truth concerning what defendant contends are plaintiff's liability theories. Defendants' arguments are not, as defendants would have it, an attack on Dr. Hartzmark's damages model. Rather defendants assert that plaintiff will be unable to disaggregate the artificial inflation from confounding events. This is an inquiry into loss causation and loss causation need not be analyzed at the class certification stage. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813, 131 S.Ct. 2179, 180 L.Ed.2d 24 (2011).

*In re Allergan PLC Sec. Litig.*, 2021 U.S. Dist. LEXIS 170310, at \*41–44 (S.D.N.Y. Sep. 8, 2021):

> Allergan insists that the damages model Nye offers does not correspond with its only remaining theory of liability, but would rather calculate generalized damages, which would conflate several different theories of liability (some of which were dismissed in the Court's prior order discussing Allergan's motion to dismiss).
>
> But Allergan's damages model is consistent with its liability case.
>
> \*\*\*
>
> Additionally, Nye's opinions about class-wide damages are no different from those he offered in a different case, where the Second Circuit upheld his methodology as complying with *Comcast*. In *Waggoner v. Barclays PLC*, Nye offered an opinion on a damages model that "complie[d] with *Comcast*" because it "directly measured" the harm associated with earlier misrepresentations by observing "the drop in price" of a corrective disclosure. 875 F.3d at 106. This Court does not see any noticeable difference between Nye's event study damages model in *Waggoner* and the event study damages model that he offers in this case. And insofar as Allergan is insisting that an event study damages model is unable to isolate the price drop attributable to any specific misrepresentation or corrective disclosure, this Court has in the past "reject[ed] the suggestion that an event study is incapable of disaggregating the effects of confounding information. Were it otherwise, nearly every securities fraud class action would fail." *Signet*, 2019 WL 3001084, at \*20. As this Court has previously noted, there is "no reason why an event study – the generally accepted method for measuring damages in a securities fraud class action – cannot work in this case." *Ibid*. That same principle applies, here.
>
> There is no reason to conclude that the event study model offered in this case is flawed. Of course, DeKalb will ultimately need to disaggregate any legitimate confounding factors to *prove* economic loss, but it need not do so at this juncture to establish that common issues relating to damages predominate for purposes of class certification. *See Waggoner,* 875 F.3d at 106. Courts have long held that "Plaintiffs are not required at [the class certification] stage to demonstrate that any price impact was due to the prior misrepresentation alone." *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 46 (S.D.N.Y. 2018); *see also Haliburton I*, 563 U.S. at 807. Rather, a plaintiff's burden at this stage is simply to propose a methodology for calculating damages that corresponds to its theory of liability. The methodology that Nye describes, which applies on a class-wide basis, is capable of measuring the out-of-pocket losses suffered by the class members.

- 100 -

*See also, e.g.*, the following cases in which Dr. Skinner's colleagues at Cornerstone Research proffered strikingly similar arguments regarding the estimation of damages at the class certification phase, which were rejected by the court:

*Hatamian v. Advanced Micro Devices, Inc.*, 2016 U.S. Dist. LEXIS 34150; Fed. Sec. L. Rep. (CCH) P99, 040; 2016 WL 1042502, at *28 (N.D. Cal. Mar. 16, 2016):

> Defendants argue that Plaintiffs' simplistic damages model is insufficient because it reflects a misalignment between certain misrepresentations and later corrective disclosures. In other words, Defendants attack the "fit" between an alleged corrective disclosure and a prior alleged fraudulent statement. This is nothing more than an attack on loss causation, or Plaintiffs' ability to "show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss." *Halliburton I*, 131 S.Ct. at 2186 (emphasis in original). So too is Defendants' argument that Professor Coffman's methodology would not be able to "disaggregate the price inflation" attributable to particular theories of liability. (Oppo. at 24:16-21.) As explained by Professor Coffman, this inquiry is appropriately understood as a loss causation analysis. (Coffman Rebuttal ¶ 56.) *See, e.g. In re SLM Corp. Sec. Litig.* 2012 U.S. Dist. LEXIS 8158, 2012 WL 209095, at *5 (S.D.N.Y. Jan. 24, 2012) ('evaluating potentially confounding information on the disclosure dates, and determining whether it was material, is tantamount to a loss causation analysis'). These sorts of inquiries into loss causation are properly addressed by a fact-finder on the merits; Plaintiffs need not show loss causation as a condition of class certification. *See Halliburton I,* 131 S. Ct. at 2186. Defendants' arguments are therefore misplaced.

*Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 47-48 (S.D.N.Y. 2018):

> Defendants contend that Dr. Nye's damages model (1) fails to account for the possibility of variation in inflation over time; (2) "rests on flawed assumptions, such as that FCA could have disclosed the 'truth' of its alleged misstatements at the beginning of the class period in a manner equivalent to supposed 'corrective disclosures'"; and (3) does not control for confounding information. (Dfs.' Opp'n 22). The Second Circuit has held, however, that *Comcast* does not require Plaintiffs to account for variations in inflation throughout the class period at the class certification stage. *See Waggoner*, 875 F.3d at 106
>
> \*\*\*
>
> Similarly, Defendants' second and third challenges go to the question of loss causation (that is, whether Plaintiffs' damages were caused by the alleged fraud alone or by other market factors), and the Supreme Court has held "that loss causation . . . [is a] common question[] that need not be adjudicated before a class is certified." *Amgen*, 568 U.S. at 475 (citing *Halliburton I*, 563 U.S. at 809); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105 (S.D.N.Y. 2016) ("[P]laintiffs are not required to establish loss causation . . . on class certification."). Accordingly, Comcast provides no basis to deny Plaintiffs' motion for class certification.

119.    Moreover, Dr. Skinner provides absolutely no basis (academic, legal, or otherwise) for his understanding of what constitutes a "reliable methodology" for estimating damages under Section 10(b), and his assertion that the proposed damages methodology must specify "counterfactual disclosures … to reliably determine how much these hypothetical disclosures would have affected Altria's stock price on each day of the Putative Class Period,"[389] amounts to pure *ipse dixit*.  Indeed, Dr. Skinner advocates for the measurement of damages "at the moment the transaction takes place,"[390] by arguing that price inflation can only be measured by speculating as to the effect counterfactual information, which was never actually disclosed, might have had on a security's price had it been disclosed earlier in the Class Period.  Not surprisingly, Dr. Skinner suggests, **but does not demonstrate**, that damages under his "front-end" hypothetical method would be less than the price impact observed upon the actual materialization of the concealed risk in this case:

> Dr. Nye's proposed approach ignores the fact that stock prices can change even if there were no misrepresentations and the risks that materialized were adequately disclosed.  As a result, this proposed approach necessarily overstates inflation by

*City of Miami Gen. Employees' & Sanitation Employees' Ret. Trust v. RH, Inc.*, 2018 U.S. Dist. LEXIS 175573, *8 n.3 (N.D. Cal. 2018):

> In support of their second agreement, that plaintiffs' proposed method does not contain anything that "addresses any of the specific of this litigation," defendants aver that "Dr. Feinstein could replace the two referenced to 'RH' with the name of another company and come to the conclusion that this same general methodology would apply in any other set of circumstances involving securities litigation." (Opp. at 5.)  However, this assertion seems to reflect the fact that securities fraud cases fit Rule 23 "like a glove," rather than suggest that class treatment is inappropriate.
>
> ***
>
> The Court is unpersuaded by defendants' argument at the October 1, 2018 hearing that this case is much more complicated than those cases in which courts have approved use of a out-of-pocket or event theory method of damages calculation.

[389] Skinner Report, ¶180.

[390] *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342–43 (2005).

including the entire stock price decline that occurs when risks materialize (when these risks are realized as adverse outcomes) as opposed to properly measured inflation attributable to an alleged failure to fully disclose certain risks at an earlier point in time (when the adverse outcome was still uncertain).[391]

120.    On the contrary, the use of an event study, like mine, "to determine whether, and the extent to which, [a defendant's] stock price was artificially high (*i.e.*, inflated) during the Class Period due to the market's misapprehension of … risk," is "standard operating procedure in federal securities litigation."[392]  MacKinlay (1997), a widely cited academic primer on event study analysis, similarly notes that "in legal liability cases event studies are used to assess damages."[393]  Furthermore, as noted in the Nye Report, the Second Circuit's decision in *Pfizer* clearly states that price inflation is appropriately measured based on the "residual return" (*i.e.,* the Company-specific return) "on a day when the market discovers allegedly concealed information":

> Just as the existence of a residual return on a day when the market discovers allegedly concealed information shows that the company's stock price was artificially inflated, the *size* of the residual return on such a day provides evidence of the *amount* by which concealing that particular information inflated the defendant company's stock.  As a result, if concealed information reached the market through multiple corrective disclosures, the sum of the residual returns associated with those disclosures provides evidence about the amount of artificial inflation in the company's stock after the fraud but before those corrections.  Thus, an expert using an event study can estimate the amount of artificial inflation in the defendant company's stock price when shareholders purchased their shares, which is equivalent to estimating the difference between what those investors

---

[391] Skinner Report, ¶182.

[392] *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016), quoting *United States v. Gushlak*, 728 F.3d 184, 201 (2d Cir. 2013); *See also*, *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1313 n.31 (11th Cir. 2011) ("The methodology of event studies has been sustained by many circuits.").

[393] MacKinlay (1997), p. 13, citing Mitchell, Mark L. and Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, Vol. 49, pp. 557, 558.  According to Google Scholar, MacKinlay (1997) has been cited by at least 6,843 other academic publications.

should have paid for the shares but-for the alleged fraud, and what they actually paid.[394]

The Seventh Circuit's decision in *Glickenhaus* similarly states that "[t]he best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward, on the assumption that the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect."[395]

121.    Accordingly, it is my understanding that the measure of price inflation, and thus per-share damages, is premised on the actual losses suffered by investors when "the truth makes its way into the marketplace,"[396] rather than on speculation regarding the value implications of "hypothetical disclosures … on each day of the Putative Class Period," as Dr. Skinner would

---

[394] Nye Report, ¶65, quoting *In re Pfizer, Inc. Sec. Litig.*, 819 F.3d 642, 649 (2d Cir. 2016). (Internal citations omitted, emphasis in original.)

[395] *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015) ("*Glickenhaus*").

[396] *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342–43 (2005).  Specifically, the *Dura* court stated that:

> [A]s a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value.  Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong.  Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss.  If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss.  But that is far from inevitably so.  When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.  (The same is true in respect to a claim that a share's higher price is lower than it would otherwise have been—a claim we do not consider here.)  Other things being equal, the longer the time between purchase and sale, the more likely that this is so, *i.e.*, the more likely that other factors caused the loss.  (Emphasis in original.)

- 104 -

have it.[397]  Indeed, event studies, like mine, establish whether there is the necessary "causal connection" between an alleged misrepresentation and subsequent economic loss, which "in turn, allows an expert to make inferences about the degree to which the company's stock price may have been artificially inflated on the basis of the market's misconception as to the truth prior to the release of that information."[398]  Dr. Skinner's speculative "front-end" damages methodology garners no such endorsement in the case law or academic literature.

122.    As part of his "front-end" damages estimation methodology, Dr. Skinner elaborates that "changes in inflation over the Putative Class Period [are] particularly crucial in this matter, because of the amount of information about JUUL and related regulatory and litigation developments that was released during the Putative Class Period."[399]  However, this entirely ignores Plaintiffs allegations that: (i) Defendants' false and misleading statements concealed from investors "that JUUL's youth marketing had **created** the youth vaping epidemic, [and] that their intentional misconduct could render JLI valueless";[400] and (ii) "by not disclosing the risks created by JUUL's illegal marketing practices targeting underage consumers,"[401] as well as the "material risks associated with Altria's non-compete agreement with JLI,"[402] Defendants exposed investors, unwittingly, to foreseeable stock price declines upon the materialization of these risks, including "punitive solutions remedying JUUL's allegedly illegal marketing practices[, which] could result in substantial judgments and regulatory fines, in addition to the

---

[397] Skinner Report, ¶180.

[398] *In re Vivendi S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016).

[399] Skinner Report, ¶200.

[400] Amended Complaint, ¶413.  (Emphasis added.)  *See also, e.g.*, Complaint, ¶404.

[401] Opinion on Motions to Dismiss, p. 1.

[402] Amended Complaint, ¶16.

loss of sales to youth,"[403] thereby "caus[ing] Altria to write-down a material portion of its investment in JUUL."[404] Accordingly, Dr. Skinner presents no argument as to why Defendants are not liable for the full extent of the harm caused by the direct and foreseeable consequences of the alleged fraud. Moreover, he fails to demonstrate how the actual losses incurred by investors who held Altria shares on the alleged corrective event dates are somehow less significant because Defendants allegedly continued to mislead investors after the initial date of purchase. Regardless, it is my understanding that the Second Circuit's decision in "*Waggoner* explicitly rejected the notion that *Comcast* requires 'that damage calculations [ ] be so precise' as to account for 'variations in inflation over time.'"[405, 406]

---

[403] Opinion on Motions to Dismiss, pp. 25.

[404] Opinion on Motions to Dismiss, p. 23.

[405] *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM) (RWL), 2019 U.S. Dist. LEXIS 114695, at *59 (S.D.N.Y. July 10, 2019), quoting *Waggoner* v. *Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017).

[406] *See also, e.g.*, the following cases in which Dr. Skinner's colleagues at Cornerstone Research proffered strikingly similar arguments regarding time-varying price inflation at the class certification phase, which were rejected by the court: *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 47 (S.D.N.Y. 2018):

> Defendants contend that Dr. Nye's damages model [] fails to account for the possibility of variation in inflation over time…. The Second Circuit has held, however, that Comcast does not require Plaintiffs to account for variations in inflation throughout the class period at the class certification stage. *See Waggoner*, 875 F.3d at 106.

*Vrakas v. United States Steel Corp.*, 2019 U.S. Dist. LEXIS 222783, *25-26:

> Plaintiffs also provide additional information in their Reply to address Defendants' concern that Plaintiffs have not provided guidance on accounting for "variations in alleged price inflation." Pl. Class Cert. Reply at 7. First, Plaintiffs highlight that the inflation ribbon will be applied the same way for all proposed Class members—and also note that Defendants' expert, Dr. Zurek agrees that inflation would be the same for all class members. *Id.* They then maintain that this argument is premature for the class certification stage because it has no bearing on whether the damages methodology itself applies to all Class members, citing examples of other courts that have held that this argument more

123.    In sum, all of Dr. Skinner's criticisms of the damages methodology described in the Nye Report involve loss causation and damages issues that are necessarily common among all Class members.  The event study analysis applies to all Class members, regardless of the extent to which the stock price movement is due to a corrective disclosure and/or the materialization of a concealed risk.  Nothing in the Skinner Report changes my opinion that damages under Section 10(b), for investors who purchased or otherwise acquired Altria stock during the Complaint Class Period and/or the Amended Complaint Class Period, can be calculated using a methodology that is common to the Class and in a manner that is consistent with Plaintiffs' theory of liability.

**VII.    The Nye Report Demonstrates That Altria's Stock Price Efficiently Incorporated JLI-Specific Information, and That Altria's Investment in JLI Had a Direct Relationship to the Value of Altria's Stock**

124.    In their Opposition to Class Certification, the JLI Defendants argue that "Plaintiffs have not met their burden of proving that Altria stock was efficient with respect to the JLI Defendants' statements."[407]  To satisfy this burden, they assert that "Plaintiffs would have to show that the JLI Defendants' statements had an immediate effect on Altria's stock price."[408]  In the alternative, they note that Plaintiffs may offer "other evidence showing that the value of JLI's private stock has a 'direct relationship' to the value of Altria's public stock, such that statements about JLI are presumed to affect the value of Altria's stock."[409]  The JLI Defendants attempt to

---

appropriately applies to the "quantification and allocation of damages" rather than whether common issues of law and fact predominate. *RH*, 2018 U.S. Dist. LEXIS 175573, 2018 WL 4931543, at *4 (noting that "courts consistently find [these criticisms] are not appropriately raised at the class certification stage").  The Court agrees.

[407] JLI's Opposition to Class Certification, p. 2.

[408] JLI's Opposition to Class Certification, p. 7.

[409] JLI's Opposition to Class Certification, pp. 8, 9.

- 107 -

downplay this possible alternative route to establishing market efficiency by asserting that "the value of the two stocks was not 'contractually or otherwise linked.'"[410]

125.    Of course, both of these arguments are meritless.  As demonstrated in the Nye Report,[411] and as "[Dr. Skinner] assume[s], for purposes of []his report, … Altria's common stock traded in a semi-strong form efficient market,"[412] throughout the Amended Complaint Class Period.  Thus, "Altria's stock price reflected the Company-specific information disclosed to the market, and promptly responded to the disclosure of new, material unexpected information."[413]  Contrary to the assertions of the JLI Defendants, however, Company-specific information is not limited just to statements made by Altria, but rather includes "all publicly available information" pertinent to the value of Altria stock.[414]  Indeed, it is well established that, in an efficient market, the "Law of One Price implies that the price of a security should equal the present value of the expected cash flows an investor will receive from owning it."[415]  Thus, any "new information that causes the market to significantly alter its expectation of future cash flows will cause a prompt repricing of the stock to reflect the new expectations."[416]  Given that Altria paid $12.8 billion for a 35% economic interest in JLI in the form of convertible common stock, which was expected to be

---

[410] JLI's Opposition to Class Certification, p. 9, quoting *Duane & Virginia Lanier Tr. v. SandRidge Mississippian Tr.*, 361 F. Supp. 3d 1162, 1170 (W.D. Okla. 2019).

[411] Nye Report, §VI.

[412] Skinner Report, ¶59.

[413] Nye Report, ¶57.

[414] Nye Report, footnote 17, citing Elton, E., M. Gruber, S. Brown and W. Goetzmann, *Modern Portfolio Theory and Investment Analysis*, 6th ed., John Wiley and Sons, Inc., 2007, p. 400.

[415] Berk, Jonathan and Peter DeMarzo, 2007, *Corporate Finance*, Pearson Education, Inc., 1st Ed., Ch. 9, p. 245.

[416] Torchio, Frank, 2009, "Proper Event Study Analysis in Securities Litigation," *Journal of Corporation Law*, Vol. 35, Issue 1, pp. 159–168, at p. 160.

"highly cash generative" for Altria "though dividends" and "other potential opportunities," and that "[JLI's] income [would] flow through [Altria's] financial statements,"[417] it is clear that information pertaining to JLI's prospects and risk would be economically material to investors, and reflected in Altria efficiently traded stock price.  Indeed, as described in §V.A above, Altria stock suffered numerous statistically significant price declines (under both my regression model and Dr. Skinner's) as a result of adverse news and events regarding JLI's prospects and risk throughout the Amended Complaint Class Period.  While Dr. Skinner may have "substantial doubt as to whether any stock price movements on these dates can be used as evidence of earlier price impact,"[418] he does not dispute that Altria's stock was negatively affected by adverse information related to JLI.

126.    Additionally, Altria's SEC filings clearly describe a "direct relationship" between the value of JLI and Altria's stock price, acknowledging that: (i) "the expected benefits of the JUUL transaction may not materialize in the expected manner or timeframe or at all, including due to the risks encountered by JUUL in its business"; (ii) "[f]ailure to realize the expected benefits of our JUUL investment could adversely affect the value of the investment"; and (iii) "[i]f the fair value of our investment in JUUL continues to decrease, it could have a material adverse effect on Altria's consolidated financial position or earnings."[419]  Altria's 40-page "Purchase Agreement" and 55-page "Relationship Agreement" with JLI, which were filed as exhibits to an SEC Form 8-K on December 20, 2018,[420] also lay out, in gory detail, numerous contractual agreements

---

[417] *CQ FD Disclosure*, "Altria Group Inc Conference Call to Discuss Investment in JUUL Labs Inc – Final," December 20, 2018.

[418] Skinner Report, ¶13.

[419] Altria Group, Inc., SEC Form 10-K for year-end 2019, filed February 25, 2020, p. 10.

[420] Altria Group, Inc., SEC Form 8-K, filed December 20, 2018, Exhibits 2.1 and 2.2.

associated with Altria's investment in JLI, including "a services agreement pursuant to which Altria has agreed to provide JUUL with certain commercial services on a cost plus 3% basis for an initial term of six years,"[421] and a "voting agreement," which "entitle[d] Altria to immediately designate one board observer to the JUUL board of directors, as long as the Applicable Percentage is at least 30%, and, once antitrust clearance has been obtained, to designate one-third of the members of the JUUL board of directors."[422]  Thus, not only did Altria's stock price efficiently incorporate JLI-specific information, but there existed a direct contractual relationship between the value of JLI and Altria's stock price.

127.    My work in this matter is ongoing.  My opinions in this Report are subject to refinement or revision based on analysis of new information which may be provided to me, including the opinions of other experts, receipt of additional documents and data, and based on further analysis of the data and materials described herein.  I understand that discovery is ongoing.  Should additional relevant information be provided to me, my opinions may be supplemented at a later date.

Executed on October 14, 2021, at Redwood City, California.

Zachary Nye, Ph.D.

---

[421] Altria Group, Inc., SEC Form 8-K, filed December 20, 2018, p. 3.
[422] Altria Group, Inc., SEC Form 8-K, filed December 20, 2018, p. 4.

Exhibit 1



702 MARSHALL STREET, SUITE 200
REDWOOD CITY, CA  94063
650.298.0200
WWW.SCGINC.COM

## Zachary R. Nye
*Email:* zach@scginc.com

---

### Education

**Ph.D. – University of California, Irvine**                                        2009
Finance                                                                  Irvine, California

- Dissertation: Macro-Augmented Volatility Forecasting.

- Research Interests: Market efficiency of underlying and derivative securities, volatility forecasting, risk management, financial econometrics, valuation and corporate finance.

- Teaching Experience: Corporate Finance, Investments, and Risk Management.

**M.Sc. – London Business School**                                                 2004
Finance                                                                 London, England

- Earned distinction for Masters Thesis on the informational efficiency of credit-linked notes.

**A.B. – Princeton University**                                                     2001
Economics                                                          Princeton, New Jersey

---

### Employment History

**Vice President**                                                   Summer 2015 – present
Stanford Consulting Group, Inc.                                       Redwood City, California

The Stanford Consulting Group, Inc. provides economic research and expert testimony for business litigation, as well as regulatory and legislative proceedings.

Responsibilities include:

- quantifying economic damages (*e.g.*, present value of expected future earnings, price inflation, lost profits, unjust enrichment, reasonable royalties);

- enterprise, project, equity, debt, derivative-security and intellectual-property valuation;

- assessing the informational efficiency of financial securities;

- analyzing fairness opinions related to corporate mergers and acquisitions;

- econometric modeling and analysis;

- marginal cost analysis;

- preparing expert reports and declarations;

- providing deposition and trial testimony; and

- supporting counsel in preparation for cross examination of opposing experts.

**Senior Consultant**                                         Summer 2009 – Summer 2015
Stanford Consulting Group, Inc.                                       Redwood City, California

# Exhibit 1

**Associate**                                              Summer 2004 – Summer 2005
Stanford Consulting Group, Inc.                              Redwood City, California

**Mortgage Consultant**                                     Fall 2002 – Summer 2003
Woolwich PLC                                                          Oxford, UK

**Trading Desk Specialist**                                 Fall 2001 – Summer 2002
Merrill Lynch, Defined Asset Funds                          Plainsboro, New Jersey

---

## Academic Research

Nye, Zachary and Mark Washburn, 2013, "Macro-Augmented Volatility Forecasting," *Western Decision Sciences Institute Proceedings*. Paper presented at the WDSI Annual Meeting, Long Beach, California, March 27, 2013. Winner of the 2013 Best Theoretical/Empirical Research Paper Awards.

Nye, Zachary and Philippe Jorion, 2009, "Macro-Augmented Volatility Forecasting," Working Paper, University of California at Irvine.

Nye, Zachary and Timothy C. Johnson, 2005, "Market Efficiency's Hidden Teeth: An Unambiguous Test for Derivative Securities," Working Paper, London Business School.

---

## Testimony

In re Advance Auto Parts, Inc. Securities Litigation, United States District Court, District of Delaware, Case No. 1:18-CV-00212-RGA
        Deposition               July 14, 2020
        Deposition               September 30, 2021

In re Allergan PLC Securities Litigation, United States District Court, Southern District of New York, Civil Action No. 18-CV-12089-CM
        Deposition               May 19, 2020
        Deposition               September 27, 2021

Gabby Klein, et al. v. Altria Group, Inc., et al., United States District Court, Eastern District of Virginia, Richmond Division, Case No. 3:20-cv-00075-DJN
        Deposition               August 31, 2021

In re Tahoe Resources, Inc. Securities Litigation, United States District Court, District of Nevada, Case No. 2:17-cv-01868-RFB-NJK
        Deposition               August 4, 2021

Hawaii Structural Ironworkers Pension Trust Fund, et al. v. AMC Entertainment Holdings, Inc., et al., United States District Court, Southern District of New York, Case 1:18-cv-00299-AJN-SLC
        Deposition               July 9, 2020
        Deposition               July 28, 2021

In re Mylan N.V. Securities Litigation, United States District Court, Southern District of New York, Case No. 1:16-CV-07926 (JPO)
        Deposition               November 22, 2019
        Deposition               July 20, 2021

Oregon Laborers Employers Pension Trust Fund, et al. v. Maxar Technologies Inc., et al., United States District Court, District of Colorado, Case No. 1:19-cv-00124-WJM-SKC
        Deposition               May 28, 2021

# Exhibit 1

Roei Azar, et al. v. Yelp, Inc., et al., United States District Court, Northern District of California, Case No. 3:18-cv-00400-EMC
     Deposition             March 2, 2021

Roofers' Pension Fund, et al. v. Joseph C. Papa, et al., United States District Court, District of New Jersey, Civil Action No. 2:16-cv-02805-MCA-LDW
     Deposition             April 2, 2019
     Deposition             January 14, 2021

Utah Retirement Systems, et al. v. Healthcare Services Group, Inc., et al., United States District Court, Eastern District of Pennsylvania, Case No. 2:19-cv-01227-ER
     Deposition             December 10, 2020

Matt Karinski, et al. v. Stamps.com, Inc., et al., United States District Court, Central District of California, Case No. 2:19-cv-01828-MWF-SK
     Deposition             August 14, 2020

Montcrieff, et al. v. Peripheral Vascular Associates, P.A., United States District Court, Western District of Texas, Case No. SA-17-CA-0317FB
     Deposition             July 31, 2020

Alexandre Pelletier, et al. v. Endo International PLC, et al., United States District Court, Eastern District of New Pennsylvania, Civil Action No. 2:17-cv-05114-MMB
     Deposition             July 27, 2020

In re Zillow Group, Inc. Securities Litigation, United States District Court, Western District of Washington at Seattle, Case No. 2:17-cv-01387-JCC
     Deposition             March 10, 2020

Joseph Prause, et al. v. TechnipFMC plc, et al., United States District Court, Southern District of Texas, Houston Division, Case No. 4:17-cv-02368
     Deposition             February 5, 2020
     Deposition             March 9, 2020

In re Quorum Health Securities Litigation, United States District Court, Middle District of Tennessee, Case No. 3:16-cv-02475
     Deposition             August 17, 2018
     Deposition             January 14, 2020

In re Snap Inc. Securities Litigation, United States District Court, Central District of California, Western Division, Case No. 2:17-cv-03679-SVW-AGR
     Deposition             December 13, 2019

Jet Capital Master Fund, L.P., et al. v. American Realty Capital Properties, Inc., et al., United States District Court, Southern District of New York, Case No. 1:15-cv-00307-AKH
     Deposition             July 26, 2019

United States of America ex rel. Lori Morsell, et al. v. Symantec Corporation, United States District Court for the District of Columbia, Civil Action No. 12-cv-0800 (RC)
     Deposition             March 13, 2019

City of Pontiac General Employees' Retirement System, et al. v. Dell Inc., et al., United States District Court, Western District of Texas, Austin Division, Case No. 1:15-cv-00374-LY
     Deposition             April 19, 2017
     Deposition             November 6, 2018

# Exhibit 1

Pirnik v. Fiat Chrysler Automobiles N.V., et al., United States District Court, Southern District of New York, Case No. 1:15-CV-07199-JMF

        Deposition                 February 2, 2018

        Deposition                 September 13, 2018

Teresa Doskocz, et al. v. ALS Lien Services, et al., Superior Court of California, County of Contra Costa, Case No. C17-01486

        Deposition                 April 23, 2018

Bradley Cooper, et al. v. Thoratec Corporation, et al., United States District Court, Northern District of California, Oakland Division, Case No. 4:14-cv-00360-CW

        Deposition                 March 6, 2018

L-3 Communications Corporation, et al. v. Serco, Inc., United States District Court for the Eastern District of Virginia, Case No. 1:15-cv-701-GBL-JFA

        Deposition                 October 22, 2015

        Deposition                 October 18, 2017

In re Juno Therapeutics, Inc., United States District Court of Western District of Washington at Seattle, Case No. C16-1069RSM

        Deposition                 October 4, 2017

Brad Mauss, et al. v. NuVasive, Inc., et al., United States District Court, Southern District of California, Case No.: 13-cv-02005-JM

        Deposition                 December 20, 2016

        Deposition                 August 28, 2017

In re Akorn, Inc. Securities Litigation, United States District Court, Northern District of Illinois, Eastern Division, Case No. 15-CV-01944

        Deposition                 June 21, 2017

In re Ocwen Financial Corporation Securities Litigation, United States District Court, Southern District of Florida, Case 14-81057-CIV-WPD

        Deposition                 September 23, 2016

        Deposition                 March 28, 2017

Stephen Calfo, et al. v. John P. Messina, Sr., et al., United States District Court, Southern District of New York, Civil Action No. 15 Civ. 04010 (LGS)

        Deposition                 January 5, 2017

In re EZCORP, Inc. Securities Litigation, United States District Court, Southern District of New York, Case No. 14-cv-6834 (ALC)

        Deposition                 October 14, 2016

Arthur Menaldi, et al. v. Och-Ziff Capital Management Group LLC, et al., United States District Court, Southern District of New York, No. 14-CV-03251-JPO

        Deposition                 October 3, 2016

Keith Thomas, et al. v. MagnaChip Semiconductor Corp., et al., United States District Court, Northern District of California, Case No. 3:14-cv-01160-JST

        Deposition                 September 16, 2016

In re Rocket Fuel, Inc. Securities Litigation, United States District Court, Northern District of California, Oakland Division, Case No. 4:14-cv-03998-PJH

        Deposition                 September 14, 2016

# Exhibit 1

Barbara Strougo, Individually and on Behalf of All Others Similarly Situated v. Barclays PLC, et al., United States District Court, Southern District of New York, Case No. 14-cv-5797 (SAS)

|  |  |
|---|---|
| Deposition | August 11, 2015 |
| Evidentiary Hearing | November 5, 2015 |
| Deposition | June 16, 2016 |

In re Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation, United States District Court, District of New Jersey, Case Numbers: 05-cv-5060; 07-cv-4021; 07-cv-4022; 07-cv-4023; 07-cv-4024; 07-cv-4546; 11-cv-6259; and 15-cv-518

|  |  |
|---|---|
| Deposition | December 6, 2013 |
| Deposition | October 1, 2015 |

Richard Thorpe and Darrel Weisheit, Individually and on Behalf of All Others Similarly Situated v. Walter Investment Management Corp., et al., United States District Court, Southern District of Florida, Case No. 1:14-cv-20880-UU

|  |  |
|---|---|
| Deposition | September 16, 2015 |

City of Austin Police Retirement System, *Individually and on Behalf of All Others Similarly Situated* v. Kinross Gold Corporation, et al., United States District Court, Southern District of New York, Civil Action No. 1:12-cv-01203-VEC-KNF

|  |  |
|---|---|
| Deposition | November 19, 2014 |

In re El Paso Partners, L.P. Derivative Litigation, Court of Chancery of the State of Delaware, C.A. No. 7141-CS

|  |  |
|---|---|
| Deposition | September 24, 2013 |
| Trial | November 12 and 13, 2014 |

L-3 Communications Corporation, et al. v. Jaxon Engineering & Maintenance, Inc., et al., United States District Court for the District of Colorado, Civil Action No. 10-cv-02868-MSK-KMT

|  |  |
|---|---|
| Deposition | August 7, 2014 |

Axa Corporate Solutions Assurance, et al. v. Honeywell International, Inc., et al., Superior Court of the State of Arizona in and for the County of Maricopa, No. CV2011-019334

|  |  |
|---|---|
| Deposition | February 24, 2014 |

In re Heckmann Corporation Securities Litigation, United States District Court for the District of Delaware, Case No. 1:10-cv-00378-LPS-MPT

|  |  |
|---|---|
| Deposition | November 9, 2012 |