# EXHIBIT I

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION
---------------------------------------x

GABBY KLEIN et al., Individually and
On Behalf of All Others Similarly
Situated,

         Plaintiffs,   Civil Action
                  No.
  -against-       3:20-cv-
                  00075-DJN

ALTRIA GROUP, INC., et al.,

         Defendants.

---------------------------------------x

           October 5, 2021
           10:01 a.m.

     Remote Videotaped Deposition of PROFESSOR
DOUGLAS SKINNER, taken by Plaintiffs, pursuant to
Notice, held via Zoom before Joseph R. Danyo, a
Shorthand Reporter and Notary Public within and
for the State of New York.

HUDSON COURT REPORTING & VIDEO   (212) 273-9911

Page 2

A P P E A R A N C E S :

POMERANTZ LLP
Attorneys for Lead Plaintiffs Donald Sherbondy
  and Sarah Sherbondy
  600 Third Avenue
  New York, New York 10016
  (212)661-1100

By:  MICHAEL J. WERNKE, ESQ.
    ALLISON TIERNEY, ESQ.

ROBBINS GELLER RUDMAN & DOWD LLP
Attorneys for Lead Plaintiff Laborers Pension
  Trust of Greater St. Louis
  655 West Broadway, Suite 1900
  San Diego, California 92101
  (619)231-1058

By:  DOUGLAS BRITTON, ESQ.
    MATTHEW BALOTTA, ESQ.

HUNTON ANDREWS KURTH LLP
Attorneys for Defendant Altria Group, Inc.
  951 East Byrd Street
  Richmond, Virginia 23219-4074
  (804)788-8201
By:  EDWARD J. FUHR, ESQ.

WACHTELL LIPTON ROSEN & KATZ
Attorneys for Defendant Altria Group, Inc.
  51 West 52nd Street
  New York, New York 10019
  (212)403-1000
By:  JACOB MILLER, ESQ.
    SIMON WILLIAMS, ESQ.

Page 3

A P P E A R A N C E S : (Continued)

DECHERT LLP
Attorneys for Defendant Howard A. Willard III
  35 West Wacker Drive, Suite 3400
  Chicago, Illinois 60601

By:  MELANIE MacKAY, ESQ.

CLEARY GOTTLIEB
Attorneys for Defendant Juul Labs, Inc.
  One Liberty Plaza
  New York, New York 10006
By:   RYAN MONAHAN, ESQ.
    JESSICA ROLL, ESQ.

ORRICK HERRINGTON & SUTCLIFFE LLP
Attorneys for Defendant James Monsees
  The Orrick Building
  405 Howard Street
  San Francisco, California 94105-2669

By:  TRISTAN ALLEN, ESQ.

Also Present:
  ALLIE SCHWARTZ, Cornerstone Research
  ETHAN DREW, Videographer
      ~oOo~

Page 4

         SKINNER

     THE VIDEOGRAPHER:  Good morning.  We
are on the record at 10:01 a.m. Eastern Time
on Tuesday, October 5, 2021 for the
stenographically reported and videotaped
deposition of Professor Douglas Skinner in
the action Gabby Klein, et al., versus
Altria Group, et al.  My name is Ethan
Drew, the videographer, and Mr. Joseph Danyo
is the court reporter.  We are with Hudson
Reporting & Video New York.

     This deposition is being taken remotely
with all parties attending via the Zoom
videoconferencing and all counsel will be
noted on the stenographic record.

     THE COURT REPORTER:  Will counsel please
stipulate that, in lieu of formally swearing
in the witness, the Court Reporter will
instead ask the witness to acknowledge that
the testimony will be true under the
penalties of perjury, that counsel will not
object to the admissibility of the
transcript based on proceeding in this way
and that the witness has verified that he is
in fact Professor Douglas Skinner?

Pages 1 to 4

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 5

SKINNER

THE WITNESS:  I am, yes.

(All counsel so stipulate.)

PROFESSOR  D O U G L A S  S K I N N E R, having been first duly sworn by Joseph R. Danyo, a Notary Public, was examined and testified as follows:

EXAMINATION BY MR. WERNKE:

Q.  Good morning, Professor Skinner.  My name is Michael Wernke.  I will be taking your deposition on behalf of the plaintiffs in the action.  Can you state your full name for the record?

A.  Sure.  It is Douglas J. Skinner, S-k-i-n-n-e-r.

Q.  I know you've had your deposition taken before so I will just go over a couple of basic ground rules.  It is important that we keep the record clean so let's try not to talk over each other, and when you answer, please answer audibly as opposed to a shake of the head or a nod because that doesn't get picked up well on the record. Does that sound okay?

A.  Yes.  Thank you.

Q.  You understand that you are testifying here under oath today, correct?

Page 6

SKINNER

A.  I do.  Yes.

Q.  And is there any reason that you can't testify truthfully today?

A.  No.

Q.  And you understand that there is a remote deposition protocol in place for this deposition between the parties?

A.  Yes, I do.

Q.  And as part of that, I ask that you do not interact with counsel for defendants or anyone else during the pendency of the questioning when we are on the record today.  Is that understood?

A.  Yes, it is.

Q.  Okay.  Can you open up envelope 1 or tab 1.

A.  I should open the FedEx box?

Q.  Yes.

(Plaintiffs' Exhibit 73, Expert Report of Douglas J. Skinner, Ph.D. of September 17, 2021, was so marked for identification, as of this date.)

A.  I have the envelopes.

Q.  Open up number 1.

A.  Okay.

Page 7

SKINNER

Q.  Do you recognize this document?

A.  Yes, I do.

Q.  Is this the report that you submitted in this action?

A.  I believe it is, yes.

Q.  Who assisted you in creating this report, if anyone?

A.  I had certain assistance from a team at Cornerstone Research.

Q.  Approximately how many individuals assisted you?

A.  Based on those that I interacted directly with, I think it is six or seven.

Q.  Was there one person in particular who was sort of head of the team over at Cornerstone for you?

A.  I think there are two or three primary people who were leading the team.

Q.  Do you recall their names?

A.  Yes, I do.

Q.  Who are they?

A.  So the first person I would mention would be Sasha Aganin, S-a-s-h-a, A-g-a-n-i-n, I believe.   Then Allie Schwartz and Heather Lazur,

Page 8

SKINNER

L-a-z-u-r.

Q.  Could you turn to page 25 of your report.

A.  I'm there.

Q.  In this section here you are discussing market efficiency.  I would like to direct your attention to the next page, page 26, paragraph 57, which states, "In an efficient market, securities prices react fully and rapidly to new, value relevant public information."

Do you see that?

A.  I do, yes.

Q.  So it is correct then that any new value relevant public information will be rapidly reflected in the securities price in an efficient market, correct?

A.  Yes.  That's correct.  In what I would call a semi-strong efficient market.

Q.  Does it matter if the information comes from, say, the company or a third party, assuming it is otherwise new value relevant public information?

A.  The efficient market hypothesis applies to all publicly available information, so that can

Pages 5 to 8

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 9

SKINNER

come from a number of different types of sources. It can come from company press releases, company filings, press reports, analyst reports, so anything that is publicly available.

Q. When evaluating the incorporation of new value relevant public information in an efficient market, does spikes in trading volume come into the analysis of how that information, whether or not that information is being incorporated into the price?

A. I would say that the very voluminous literature in academic journals over many years uses a number of measures to understand whether the market is reacting to newly available public information as well as how quickly it reacts, and so trading volume and relative magnitude of trading volume is one of the things that people tend to look at. Yes.

Q. And in an efficient market, generally speaking, how would you go about analyzing announcements of information that may be close to what market participants were expecting but not exactly the same? I will give you an example. Say that, taking earnings announcements. Suppose

Page 10

SKINNER

some analyst predicts that a company's earnings per share will be, for the quarter will be 45 cents per share and the company eventually announces earnings per share of let's say 46 cents per share. How do you go about analyzing whether or not that information was incorporated into the stock price?

A. Well, I think we have probably 50 or 60 years of academic research that analyzes the way the stock market responds to earnings news, and I think in the example that you have given, I think we have a fairly well established methodology. So for earnings, we have good data usually from analyst consensus forecasts of what the market is expecting, so we have a proxy, as I would call it, for what the market is expecting.

So I think in your example, that was an expectation of 45 cents per share, and if the company then announced in your example, I believe 46 cents per share, there would then be what we would call a one cent per share positive earnings surprise, so the company, the consensus by one cent, so the 46 cents minus 45 cents, so we have a one cent surprise. And so in general, what we would predict then in the usual circumstance was

Page 11

SKINNER

that would be a small positive surprise, and so other things equal, we would expect a positive market response to that and we would assess that by looking at how stock prices moved in response. And we might also look at things like unusual changes in volume, unusual changes in spreads, but I think the primary way of analyzing that would be to look at stock price movements in as narrow a window as possible around the time that that information came to the market.

Q. Now if you analyze the stock price movement following that announcement, let's say in the example I gave where that was the one cent positive surprise, if the abnormal movement, abnormal residual movement is not statistically significant, that doesn't mean the market didn't incorporate that information into the stock price, correct?

A. Well, yeah. So the way we would do that, and let's be clear about how the methodology works. So let's say that the earnings news was announced before the market on a given day of the week, and so we would look at, typically one approach would be to look at the abnormal return

Page 12

SKINNER

for the trading day following the release of the information. So let's say it was released before market on a Tuesday morning. We would look at the abnormal return close to close return usually for the Tuesday trading day and we would perform an event study analysis and look at the abnormal return, and then we would evaluate whether the abnormal return was statistically significantly different from zero using some form of a T test.

And I think the hypothetical you indicated or the example you indicated was that maybe there is no statistically significant abnormal return on that day, and if that was the case, we would be unable to reject the null hypothesis that there was no stock price movement on that day.

Q. Okay, but you wouldn't be able then to affirmatively state that that one cent earnings surprise did not have any impact on the stock price, correct?

A. Well, statistical tests are always subject to different types of error, so this is why we talk about confidence levels and significance levels, and so, yes, it is possible that the null

Pages 9 to 12

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 13

SKINNER

hypothesis was indeed -- if the null hypothesis is that there is no stock price movement associated with that and we weren't able to reject the null hypothesis, so we didn't get a statistically significant result at the normal 5 percent significance level, then we would conclude either that there was no statistically significant stock price movement, so the stock price didn't move or it may be that our test didn't have enough power to detect the movement.

Q. And can you explain a little bit when you say that the test didn't have enough power to explain the movement? It is true certainly that when you do this analysis, that certain information can impact the stock price, but simply as you stated, the power of the test isn't strong enough for the test to pick up that impact at a statistical significance level. Is that fair to say?

A. Yeah.

MR. MILLER: Objection.

A. I would put it a little differently in the sense that when we perform academic studies and we are interested, say, in a hypothesis about

Page 14

SKINNER

whether positive earnings news increases stock prices or negative earnings news decreases stock prices, we collect samples that are as large as possible, there may be thousands of companies over ten or 15 years, so you have got, say, tens of thousands or even hundreds of thousands of quarterly observations of earnings announcements, and so we try and collect large samples to ensure that we have got sufficient power to reject the null hypothesis, and that is just part of the normal statistical methodology. And again, that is built into our normal assessment of statistical evidence.

Q. You mentioned collecting samples as large as possible in creating the tests and you are observing the earnings announcements. Correct me if I'm wrong. Does the number of samples or the number of firms you are analyzing in one of these analyses impact the power of the test?

A. Yes. In general, when we are doing statistical testing of any kind, the larger the number of observations that we have usually means high levels of statistical power. So ability to reject the null hypothesis if it is false.

Page 15

SKINNER

Q. To the best that you can recall, what is the largest sample size that you recall seeing, generally speaking, to make the power of the test as strong as possible?

A. Well, I think it is well understood in terms of statistical methodology that it is hard to make definitive statements about sample size. A lot depends on the variability of the underlying distribution of whatever it is that is of interest. So to reach, if I was, let's say that I wanted to test some hypothesis about the height of people at the university here. Let's say that I wanted to test the hypothesis that people were taller than 4 feet tall, so that was my null hypothesis.

The power of a test, if I collected a sample of heights of the people at the university, the power of that test to reject the null hypothesis would depend not only on how many people were in my sample, but it would also depend on the underlying variability of the height of people. And so, for example, if I knew that the variation in the height of people was between, say, 4 feet 10 and 6 feet, I would have a different amount of power than if I knew the variation was between

Page 16

SKINNER

2 feet and 8 feet. So the underlying variability of the variable of interest, as well as the sample size, affects the power of the test. So it is not just sample size, which is why, you know, it is not really possible to just look at the sample size and get a sense of the power of the test or the precision of the estimate.

Q. Are you familiar with the phrase "type 2 error" in the context of these types of tests?

A. Yes, I believe I mentioned that before.

Q. Right. Could you just explain a little bit more what a type 2 error is in the context of these types of tests?

A. Yes. Just for completeness, I will talk about both types of error that we can have in statistical analysis. So a type 1 error is when we falsely reject the null hypothesis. So the null hypothesis is true, but our statistical analysis rejects the null hypothesis, and it does falsely.

A type 2 error is when the null hypothesis is false, but our statistical analysis leads us to conclude that the null hypothesis was true, and so we didn't reject the null hypothesis

Pages 13 to 16

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 17

SKINNER

when it was false.   That is a type 2 error.

Q.   Now could you explain those again, maybe make it a little more concrete for the discussion that we are having.   Can you explain those two errors in the context of the null hypothesis being used in the type of event study you now see here.

To start off, what was your null hypothesis in doing your event study here?

A.   So, if you are referring to the event study that I used as the basis of the results reported in Exhibit 5 and Exhibit 6, is that what we are thinking about here specifically?

Q.   Let's take a step back then.   In doing your analysis here, did you only use one type of null hypothesis, or did you vary what the null hypothesis was?

A.   I think I will just step back and say the typical null hypothesis that we would test in an event study, it is not always the case, but typically, and I believe this is the way I characterize it in describing event study methodology in my report.   The typical null hypothesis is there is no movement in the stock price, and so we are testing to see whether we can

Page 18

SKINNER

reject that null hypothesis in favor of an alternative hypothesis that there was a statistically significant movement in the stock price.   So that is the typical null hypothesis that we think about with event studies.

Q.   Okay.   It might be helpful then to if you could turn to page 27 in your report, paragraph 61.   It might help us focus the conversation a little bit.

A.   Sure.

Q.   In paragraph 61 where you are discussing event studies, you state, "For example, the researcher can test whether the abnormal return is reliably different from zero (formally, one tests the null hypothesis that the abnormal return equals zero, meaning the news did not affect the stock price)."

Do you see that?

A.   I do, and indeed that is what I was referring to before.

Q.   Okay.   So your null hypothesis here is that Altria's stock price was not impacted by what plaintiffs allege as corrective information. Correct?

Page 19

SKINNER

A.   Well, I think we should distinguish carefully a couple of different things.   In paragraph 61 here I am talking about a typical event study methodology, and the null hypothesis there is, as I mention, "that the abnormal return equals zero, meaning the news did not affect the stock price."

So that is the typical event study null hypothesis.   Now what you were alluding to in your question, I believe, is an analysis of price impact which entails more than just an event study analysis as is described in those portions of my report.

Q.   And so what additional, beyond the event study, what other analysis did you do as part of your price impact analysis beyond the event study?

A.   So, again, to be specific, when I talk about my price impact analysis, let me just distinguish a number of things that I did.   In the first part of I believe it is Section 6 of my report, which includes the price impact analysis, I did an event study analysis of the alleged misrepresentation dates, and that event study analysis is reported in Exhibit 5.   That was

Page 20

SKINNER

really a precursor to the subsequent analyses reported in Section 6 where we might generally refer to the analysis as a price impact analysis where I took a number of steps which included an event study analysis, the results of which are reported in Exhibit 6.

Q.   So then what additional analysis did you do then between -- what is the distinction between what you did as part of the event study and what you did as part of the price impact analysis?  What additional analysis beyond the event study did you do?   What was your methodology?

A.   Sure.   So I think probably the best way to answer that is to refer to the relevant portions of my report, and so, for example, for the analysis of the eight alleged corrective event dates that I discuss in Subsection B of Section 6 of my report, I describe, and this is paragraph 83, what I call the General Testing Approach, which I think is where I provide details of the analysis that I did, and, if we were to read through that paragraph, we see that I describe the event study analysis which, as I indicate in that paragraph, "allows me to determine whether the abnormal return on Altria's

Pages 17 to 20

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 21

SKINNER

common stock is statistically significant on the dates at issue, after controlling for the effects of market and industry factors." And then it goes on to say, "In addition, I analyzed other information that came to the market on each date by reviewing public press and analyst reports to determine whether there was positive news that could have offset or would otherwise have been a negative and statistically" -- let me reread that to be sure we have a clean record. "To determine whether there was positive news that could have offset what would otherwise have been a negative and statistically significant stock price movement."

Q. I think I understand, but correct me if I'm wrong. So your price impact analysis involved the event study, and then you also analyzed news around that event date to determine whether there was any positive news that could have offset what otherwise would have been the negative and statistically significant stock price movement? Is that fair?

A. I would augment that by saying this is specifically with respect to the eight dates

Page 22

SKINNER

indicated in Subsection B of Section 6 of my report, and on those dates for the event study analysis, I looked at public press over the period of the event window as well as looking at analyst reports over the period of that window, so I looked at information that came to the market through the public press as well as analyst commentary around that date as well as the event study. So essentially I am looking at a number of pieces of evidence to help me interpret and reach a conclusion as to price impact.

Q. Okay. So in that section then, if there wasn't any news, positive news that might have offset an otherwise statistically significant stock price movement, then your conclusions were resting on the information from the event study. Is that fair?

A. Well, I would say that the conclusion is based on both the event study analysis as well as my analysis of public press and commentary and analyst reports, so it is all of those things together.

Q. But, if there wasn't any for a particular date, if there wasn't any, if you don't

Page 23

SKINNER

discuss any other news on that day or analyst reports, then your conclusions and opinions are based completely on the event study then, correct?

A. Well, I put it a little differently in that I did the event study analysis and then I reviewed the public press and the analyst reports and reached the conclusion on the basis of the evaluation of all of the evidence.

Q. And then just focusing then on the event study, then, for the event study your null hypothesis was that the news did not affect Altria's stock price. Is that fair?

A. I would just say that the null hypothesis was that whatever information came to the market on that day did not affect Altria's stock price in a statistically significant fashion. Yes.

Q. So that is different than what you have in paragraph 61. In paragraph 61 on page 27 of your report, where you are discussing how an event study should be conducted, you state, "The researcher can test whether the abnormal return is reliably different from zero," and then you state, "One tests the null hypothesis that the abnormal

Page 24

SKINNER

return equals zero, meaning the news did not affect the stock price."

Do you see that?

A. Yes. And I would say that I was trying to convey exactly the same idea.

Q. Okay. So the statement in paragraph 61 that the null hypothesis was that news did not affect the stock price was the null hypothesis you used in your analysis, correct?

A. Correct. And I would just make sure that we are clear that we have got to identify the news in question, so there is some question that we are asking in the event study, and when in paragraph 61 I refer to the news, what I am referring to is whatever news is of interest to the researcher.

So, in your initial example, the news of interest to the researcher is the one cent per share positive earnings surprise. So the researcher will usually specify some news that is of interest on that date.

Q. Okay. So now kind of going back a little bit to our type 1 and type 2 error discussion, using this example to discuss type 1

Pages 21 to 24

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 25

SKINNER

and type 2 errors, if the researcher's null hypothesis is that the news did not affect the stock price, can you explain then what a type 1 and a type 2 error would be?

A.   Sure.   If the null hypothesis is that whatever news is of interest didn't affect the stock price, then a type 1 error would occur when it was truly the case that the news did not affect the stock price, but the statistical test rejects the null hypothesis in favor of a conclusion that the news did affect the stock price.   So that would be a type 1 error.

A type 2 error occurs when it is truly the case that the news did affect the stock price, but the statistical analysis did not reject the null hypothesis, and so one would conclude from the statistical analysis that there was no effect of the news.

Q.   And kind of touching back on our one cent earnings surprise, is it fair to say that there are certain pieces of information, let's say, like a one cent earnings surprise that generally everyone accepts does get incorporated and it impacts the price of a stock, but, because it was

Page 26

SKINNER

only a penny, it might not result in an abnormal return the size that can be picked up by the test? Would that be an example potentially of where a type 2 error could occur?

A.   A type 2 error and indeed a type 1 error can always occur in a statistical analysis because we have data and we are trying to reach a conclusion, and we can never be 100 percent definitively sure about what the truth is, so we use data to try and answer the question based on some statistical analysis to a specified level of confidence, which is typically the 95 percent level of confidence.

Now the researcher will always have an underlying alternative hypothesis, and so in your example, the one cent earnings surprise, depending on your underlying economic hypothesis, we might naively think, well, there is a one cent earnings surprise, so that is good news, but I think researchers would disagree maybe on the extent to which that is good news, so some people would say, well, it is actually not that big a deal for a company to hit a one cent earnings surprise, because the data tell us that most companies were

Page 27

SKINNER

able to do that most of the time, whereas other people might say, well, a one cent earnings surprise should generate a reaction that is half of what a 2 cent earnings surprise would be, and so people would, some people would argue, in other words, there is a proportionate relationship between the size of the earnings surprise and the associated stock price movement.   Other people would say there is a nonlinear relationship there.

So it is hard to answer your question in a very definitive way because people have different hypotheses about the meaning of signals like earnings surprises and the extent to which, in fact there is literally hundreds of papers that analyze stock price responses to earnings and test varying hypotheses about those.   So it is a little hard to generalize without us discussing what the underlying hypothesis of interest is.

Q.   So on page 27, paragraph 59, you state halfway through the paragraph, "I have not been asked to review or respond to Dr. Nye's opinions or analysis regarding market efficiency.   I assume, for purposes of this report, that Altria's common stock traded in a semi-strong form efficient

Page 28

SKINNER

market, as Dr. Nye concludes."

Do you see that?

A.   Yes, I do.

Q.   So you are not providing the opinion that the market for Altria common stock was not efficient, correct?

A.   That is correct.   My assignment as indicated in paragraph 11 and elaborated on here did not include an evaluation or response to Dr. Nye's opinions or analysis regarding efficiency, and, as it says there, I assume for purposes of the report that I have written here that the market for Altria's common stock is semi-strong form efficient.

Q.   Okay, and, in your report you provide a number of opinions on the price impact which we will get to here shortly, but none of those opinions are being provided by you to show that the market for Altria securities was not efficient, correct?

A.   Correct, and as I point out, I think in the next paragraph or the paragraph after that, to do an event study analysis, one essentially has to assume that the market is semi-strong form

Pages 25 to 28

Page 29

SKINNER

efficient.   That's one of the premises of event studies.

Q.   Similarly, none of your opinions concerning price impact are being offered to suggest that investors never rely on the alleged misrepresentations in the first place, correct?

A.   Well, I think what is really crossing two issues of reliance, I think we are crossing into legal ground.   As I indicated, the scope of my assignment here did not include an evaluation of market efficiency.

Q.   Turn to paragraph 63.   I believe it begins on page 28 in your report.

A.   I'm there.

Q.   In paragraph 63, you are discussing event studies and you say, "Event study analysis is subject to limitations.   First, an event study measures the price impact of all new information revealed during the study's event window; it cannot reliably apportion the price impact of a specific piece of company-specific information when multiple pieces of information are disclosed simultaneously."

So is it your opinion then that an event

Page 30

SKINNER

study cannot be used to determine whether a specific piece of information in a disclosure accounted for say 100 percent, 50 percent or zero percent of the resulting price movement?

A.   Well, I guess I would say it a little differently.   Whenever we do an event study, one of the necessary steps is to specify an event window, so in the example I indicated before, we might think of a typical event window as being one trading day.   We measure the abnormal return over that event window, and so what this sentence is indicating is that all of the news or information that comes to the market through an event window potentially could cause changes in stock price over that period, and without further analysis it is not possible to separate and attribute the stock price movements to different components of informational pieces of information that arrive during that window, which is what I meant by simultaneously.

Q.   Now you referred to, you said, you referred to further analysis in order to separate and attribute the stock price movements to different components of the information, so there are other analyses that can be used to apportion

Page 31

SKINNER

the impact of particular information.   Is that fair?

A.   There are other tools available.   So for example, we could in my example where we have a one trading day event window, one could do some type of intraday analysis and look at smaller increments of time if, say, one piece of news was announced at 10 a.m. and another piece of news was announced at 2 p.m., one could provide evidence on which of those pieces might affect stock price by doing some type of intraday analysis.

Q.   Are you aware of any other type of analyses that can be done to apportion the impact of information?

A.   Well, I think there are other techniques and a lot depends on the context, a lot depends on the type of announcement, the type of company, what other news is coming to the market and so on. Obviously the standard event study methodology tries to control for market factors and industry factors, and so we are talking about firm-specific information, but in general, there may be other tools.   It depends on the type of information we are talking about, the type of event day we are

Page 32

SKINNER

talking about and so on.

So yes, there are other tools and I can talk about some of those specific types of events, but there are some other tools.

Q.   In the course of your report, in your analysis of price impact on various dates, did you employ any tools of that nature?

A.   I did.   I did what I would call some form of intraday analysis.   For example, in my discussion of 2/24/20 I looked at how price moved from Friday afternoon through to Monday morning. So I did this to the extent it was possible.

Q.   You mentioned before that in addition to the event study, you also looked at other positive and negative news that might have come out during the window or during around the time that the other information came out.   Would you consider that the analysis you did when you discussed other news that came out around the same time as one of the analyses that can assist in apportioning whether or not a particular piece of information had any impact on the stock price?

MR. MILLER:   Objection to the form.

A.   Well, what I would say that I did here

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Page 33

SKINNER

with respect to the analyses reported in Section 6 of my report was to marry the event study analysis with my analysis of other information that came to the market. Some of the information would be what plaintiffs allege to be corrective information. Other information might be different information that is not related to allegations, and I would analyze that information in some cases, and we have already talked about this briefly in the context of the dates for which I conclude there is no price impact. It was sufficient for me to do an event study analysis and to analyze the extent to which there was positive non-allegation-related news that came to the market on that day.

So, in other words, it wasn't necessary for me to quantify or estimate the magnitude of the effect on stock prices, and so I think the best way of saying this in a general way is that as an economist, one uses a systematic approach, one uses one's training to analyze all available information including event study evidence, public press evidence, analyst report commentary to reach as definitive a conclusion as possible based on the evidence as to whether or not what plaintiffs

Page 34

SKINNER

allege to be corrective had price impact on a given day.

Q. Are you familiar with what has been referred to as a price maintenance theory in the context of these type of actions and allegations?

A. I have certainly heard that term before, and I understand, just to set the stage here, my role here as an economist, I don't have any significant or formal legal training, so I understand that this term "price maintenance" is referred to by courts in the context of this type of litigation, and as I understand it, it often pertains to alleged omissions by a defendant company, and my understanding of the allegations here is that certain of the allegations do relate to omissions.

So again based on my relatively uninformed legal opinion here, I certainly don't even have a legal opinion. I have an opinion as an economist, but, yes, it could well be the case that plaintiffs have some form of price maintenance theory in this case.

Q. And you agree it is possible that the lack of a statistically significant price reaction

Page 35

SKINNER

to an alleged misrepresentation could be explainable by the price maintenance theory. Is that fair?

A. Again, I'm not an expert on exactly what the legal ramifications of price maintenance are. I will instead just observe that I understand that certain of plaintiffs' allegations here are that there were omissions, and I also understand, in fact this is reported in Exhibit 5 in my report, that on all of the alleged misrepresentation dates, there was no statistically significant stock price movement except for one date where there was a statistically significant negative movement in price. So I guess I will leave it at that.

Q. But the existence, the fact that there was not a statistically significant stock price movement on a date of a misrepresentation, if the plaintiffs are alleging that it was a misrepresentation because the defendants failed to disclose information, it is possible then that you would not expect to see a statistically significant stock price reaction in that situation. Is that fair?

MR. MILLER: Objection to the form.

Page 36

SKINNER

A. Again I think here we are crossing into legal grounds and a legal conclusion about a price maintenance theory. I will say that, yes, I agree that I understand certain of the allegations relate to omissions, and I think what my evidence shows in Exhibit 5 is that there was no statistically significant increases in prices on any of the alleged misrepresentation days. I am presenting that evidence for what it is worth and an observation. I am careful not to reach any conclusions about any legal aspects of the case based on that.

Q. Turning to your process for evaluating price impact on Altria stock, what was your process for determining which disclosures or corrective events or any type of news, what was your process for determining which disclosures should be analyzed to determine whether the alleged misrepresentations had any price impact? How did you go about identifying which disclosures to analyze?

A. Well, I think the starting point for my analysis was to carefully read the complaint and to specifically my assignment was to analyze what I

**New York**
**212-273-9911**

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
**732-906-2078**

Page 37

SKINNER

would term the operative complaint here as opposed to the proposed amended complaint. So I analyzed carefully the operative complaint, and from that operative complaint I identified what I understand to be and discussed in the report what plaintiffs allege to be corrective events. And probably the easiest way to see all of the events I analyzed would be to just refer to Exhibit 6 and the set of alleged corrective events that I analyzed. And I believe here we have 15 different dates were identified from the complaint, and in addition, I was able to understand from the complaint what I understand plaintiff to be alleging as corrective information related to these various events. So that was the starting point for my analysis.

Q. Let's take a small step back. What is your understanding of what plaintiffs allege the defendants misrepresented to the market?

A. Sure. I think my understanding of that is captured or summarized in Exhibit 2A in my report. So Exhibit 2A contains what I understand to be alleged misrepresentations, and again Exhibit 2A refers to the operative complaint, and then I have an additional Exhibit 2B which summarizes what

Page 38

SKINNER

I understand to be additional alleged misrepresentations in the proposed amended complaint, and then Exhibit 3A summarizes what I understand to be the alleged corrective events, again events that I have mentioned, I believe there are 11 of those events that translate into 15 days to analyze, and then Exhibit 2B includes the four additional alleged corrective events from the proposed amended complaint.

Q. Right, but sitting here today, how would you describe, let's say in the operative complaint, what is generally your understanding of what plaintiffs allege defendants misrepresented to the market?

MR. MILLER: Objection.

A. Well, again, as you know, this is a very long and complex complaint, and so I have done my best to summarize it. It is hard for me to in a very simple or brief way capture the full set of allegations, but I would refer us to paragraphs 46 and following in my report where I summarize the allegations. And I guess I think this is most responsive to your question, if we were to look at paragraph 48, paragraph 48 says, "Plaintiffs allege

Page 39

SKINNER

that these representations (and others in the Proposed Amended Complaint," and refers to Exhibits 2A and 2B, "were 'materially false and misleading because (the Defendants) knew or recklessly failed to disclose, (i), that JLI's overarching marketing scheme was directed to youth, (ii), that Juul's products were harmful and not a tobacco cessation product, (iii), that JLI's youth marketing scheme subjected JLI, Altria and Altria's investment in Juul to material risk, including reputational, litigation and regulatory action and fines, (iv), that Altria consequently failed to inform investors, or account for, material risks associated with JLI's products and marketing practices, and the true value of JLI and its products, (v) that all of the foregoing, as well as mounting public scrutiny, negative publicity, and governmental pressure on e-vapor products and JLI made it reasonably likely that Altria's investment in JLI would have a material negative impact on Altria's reputation and operations, and (vi), that the materialization of these risks would require Altria to write down its investment in JLI."

So all of that is probably how I would

Page 40

SKINNER

most succinctly capture the nature of plaintiffs' allegations here as I understand them.

Q. As part of your analysis of the price impact, would you agree that any disclosure during the class period that under plaintiffs' theory corrected these misrepresentations or was a materialization of the concealed risk from these misrepresentations would be information you would want to analyze in order to determine whether or not the alleged misrepresentations had any price impact?

A. Well, I guess I would respond to that by saying as my report documents, I certainly am aware of a bunch of information that was in the public domain both before the class period and during the course of the class period from sources both outside of Altria and Juul and from the companies themselves.

So there was a lot of information that came to the market before and during the class period and my report summarizes some of that information. My report summarizes the various disclosures that the company made at various points, again before and during the class period,

Pages 37 to 40

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 41

SKINNER

and all of that allows me to make an assessment of the mix of information available and that helps inform certain of the conclusions that I draw both in Section 6 and Section 7 of my report where I go on to analyze Dr. Nye's purported damages methodology.

Q.  Putting aside what you actually did in your report, we will get to that, I am just asking about the appropriate methodology, right?   Looking at paragraph 48, you read your understanding of what plaintiffs allege defendants misrepresented. I am asking you as a matter of process or methodology in determining whether or not the alleged misrepresentations had any price impact on Altria's stock, will you agree that you should look through the information that came out during the class period and determine as an initial step what information under plaintiffs' theory could be determined to be a corrective event or a materialization of a concealed risk?

A.  Well, I think perhaps the best way to answer that is to go to my assignment, which is indicated in paragraph 11 of my report, and what my assignment included as indicated in paragraph 11

Page 42

SKINNER

was "to evaluate whether movements in Altria's stock price at the time of the alleged corrective events in the Corrected Consolidated Class Action Complaint are evidence the alleged misrepresentations impacted Altria's stock price earlier in the putative class period."

So to specifically respond to your question, my assignment was to analyze stock price movements at the time of the alleged corrective events, and so I went to the complaint and identified what I understand plaintiff is alleging to be a set of corrective events, and those are the events that for the operative complaint I have summarized in Exhibit 3A for purposes of describing and elucidating my assignment.

Q.  So as part --

MR. MILLER:  Mike, we have been going for just over an hour.   Is this a good time for a break?   In a few minutes I will be done with this line of questioning shortly.

Q.  So as part of your assignment, then you did not undertake the task to review all the information that came out during the class period to independently determine what information could

Page 43

SKINNER

be a corrective event or a materialization of the risk created by the alleged misrepresentation?

A.  I think my previous answer was responsive to that, but again as we discussed with respect to my assignment in paragraph 11 of the report, I was asked to analyze what plaintiff has alleged to be the corrective events in the operative complaint, and that is the set of corrective events that I have identified and summarized in Exhibit 3A.

Q.  So putting aside for a moment what you were specifically asked to do in this case, if you were to do an independent analysis, a new analysis, putting aside what your actual engagement was here, to assume the allegations, plaintiffs' allegations were those as stated in paragraph 48, and you wanted to determine whether or not those alleged false statements had any price impact during the alleged class period, in that situation, to make, if you were to do that analysis independently, would you take it upon yourself to look at the disclosures and information that came out during the class period to independently determine what information came out that could be a corrective

Page 44

SKINNER

event or a materialization of the risk of the alleged false statements?

A.  Well, I think that type of analysis goes well beyond my assignment here or, you know, in fact beyond my assignment at class certification stage in other cases as well.   I think also that your question presumes that, as I understand it, plaintiffs ultimately in the case need to establish loss causation and damages and inflation, and there are a number of different ways ultimately of achieving that goal.

And so one way of thinking about the task one might undertake is to analyze what happened on alleged corrective disclosure dates, but I think the other part of the analysis is one has to try and understand as an economist how any alleged or purported inflation in the stock price got into the stock price in the first place.

So essentially your question is asking to analyze, how would an economist analyze what I would call I think back end price impact.   I think the other approach one might take would be to analyze front end price impact as well, but again I have to be careful because I have a certain

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 45

SKINNER

assignment as an economist.   There are certain things that an economist can do, and understanding the complaint is something that crosses into legal ground, and so translating aspects of plaintiffs' legal theory into tasks that an economist would do I think is probably something that is challenging the limits of my understanding of how the legal process works and what would be informative to the court.

Q.   So putting aside your engagement here, putting aside any legal analysis, as an economist, if somebody came to you and said, I want you to determine based on the theory in paragraph 48 if these statements had any price impact, either the statements themselves, or as you said the back end, a corrective event or a materialization of a risk, in that situation would you take it upon yourself to analyze the information that came out during the class period and independently identify anything in your opinion that could be a corrective event or a materialization of a risk, putting aside the engagement, putting aside the legal aspect?

MR. MILLER:   Objection.   Asked and answered.

Page 46

SKINNER

A.   Again, I think part of what one would have to do, as I tried to explain in the previous answer, is understand to be again, to do some type of analysis, which I presume is part of the basis for your question that might be ultimately useful for the court, I think one would have to understand exactly what the legal ramifications and economic ramifications of plaintiffs' allegations are.

I have a certain understanding of those allegations but there is a lot of complexity in those allegations.   That leads to a lot of complexity in the necessary economic analysis which I discuss in some detail in Section 7 of my report, and in my view creates significant challenges for a damages methodology.   But like I said, I mean my assignment, which is what I can speak to, is what is indicated in paragraph 11 here which was to analyze the dates that plaintiff are alleging are corrective dates.

MR. WERNKE:   And I am almost done here, Jake.   I am really wrapping up here.

Q.   As you state, your analysis did not include the additional dates that were identified in the proposed amended complaint , correct?

Page 47

SKINNER

A.   The analysis that I did that we might call price impact analysis in Section 6 of my report did not include the four additional dates in the proposed amended complaint.   I have some commentary on those dates related to damages methodology in Section 7 of my report, but otherwise, as I said, Section 6 of my report does not analyze those dates because that was not part of my assignment.

Q.   You are not providing any opinion here today as to those additional dates as to price impact as to whether or not those dates under plaintiffs' theory would be corrective events or materialization of the risks, correct?

A.   Again, my assignment with respect to the first part of analyzing whether the movements in Altria's stock price at the time of the alleged corrective events are evidence of alleged misrepresentation impacting the stock price, I was asked to analyze the events in the operative complaint, not the proposed amended complaint, so, yes.

MR. WERNKE:   We can take a break now, Jake.

Page 48

SKINNER

MR. MILLER:   Great.

THE VIDEOGRAPHER:   The time is 11:13 a.m.   We are off the record.

(Recess taken)

THE VIDEOGRAPHER:   The time is 11:23 a.m.   We are back on the record.

BY MR. WERNKE:

Q.   Professor Skinner, could you turn to paragraph 85 of your report on page 38, and it looks like you are analyzing the date August 30, 2019.   That section.

A.   Yes.   I'm there.

Q.   And in paragraph 85 you state, "The results of my event study indicate that the abnormal return on Altria's stock on August 30, 2019 was not statistically significant at the 5 percent level."

Do you see that?

A.   Yes, I do.

Q.   In paragraph 86 you discuss a couple of other pieces of information, and in paragraph 86 you state, "Neither of these pieces of information would be expected to increase Altria's stock price and so offset what would otherwise have been a

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 49

SKINNER

negative stock price movement on this date."

Q. Do you see that?

A. Yes, I do see that.

Q. Why is that, why is the analysis of looking to see if any other pieces of information on that date would be positive or would be expected to increase Altria's stock price?

A. Well, what I am setting out to do here is to do what I would call price impact analysis, and as we can see in paragraph 87, I conclude ultimately that there is no evidence that what plaintiff alleged to be corrective information impacted the price of Altria's stock on August 30, 2019. And so what I am doing here is as we discussed earlier, I am looking at the results of my event study, which in this case indicate there was no statistically significant stock price movement, and then in paragraph 86 I analyze the available public press and analyst reports to try and understand whether there was any potentially positive news that came to the market that day that would offset what was otherwise a negative reaction to the allegedly corrective information, and then finding none, that would then allow me to conclude

Page 50

SKINNER

that there is no price impact of what plaintiffs are alleging is corrective information on that date.

Q. And you looked to see whether there was positive news because the existence of positive news could counter or mitigate an otherwise negative stock price reaction, correct?

A. That's correct. Yes. But as the paragraph indicates, I reviewed all of the available public press and analyst reports to try and understand if there was any other news that came to the market on that day other than what plaintiffs are alleging to be corrective on these dates, as I did for all of the various dates here, and specifically analyzed whether any of that information was positive information and could have offset what would otherwise have been a negative stock price reaction to the corrective information.

And what I typically do is I report any news that happened to have come to the market on that day, so I mentioned, for example, on this date that there was a news article that provided negative commentary regarding a potential merger. I mention there was some news regarding a potential

Page 51

SKINNER

class action lawsuit related to Juul over e-cigarettes, and then in a footnote I also mention that around this date, there was a whole bunch of information on patents that Altria had obtained during the period.

So it is a fairly extensive analysis of what came to the market on that day during the event window.

Q. So looking at footnote 154 where you discuss that Altria had received a patent, would you consider that positive news for Altria?

A. Well, having analyzed all of the disclosures around the full set of corrective dates as my report indicates, including these patent reports that are available in this publication known as Politics in Government Week, as we can see just in this footnote, on this one day there were relatively large number of patents just on this one day, and indeed when we looked at the class period as a whole, you find that for the class period as a whole, I think approximately one-third of the days in the class period had this type of patent news. So although one might think patent news sounds like it might be good news and perhaps it is very

Page 52

SKINNER

modestly good news, I think probably the appropriate judgment here is this patent news is very minor news for the company, and as I mentioned, based on our review, there are around a third of the days during the class period when there was this type of patent news, and so it seems like relatively routine news. And as we see in this footnote, there are a number of these patents just in this particular week.

I think the other point to make about the patent news is that this publication comes out once a week and reveals this news, but I think the main point here is that this seems like very routine information that is coming to the market. I'm not sure it was news and I am very doubtful that it would be positive news of any significant magnitude.

Q. As part of your analysis, did you do anything to specifically account or control for the offsetting presence of positive non-fraud-related information announced on the alleged corrective event dates?

A. Well, if you are asking the question in general, we have a particular example in front of

Pages 49 to 52

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 53

SKINNER

us.   So for the eight days on which I conclude there is no price impact to the alleged corrective disclosures, the analysis was examine using the event study method whether the return on the day was statistically significant, and for these eight days I found that it was not, and then to look and see whether there was positive news that came to the market on that day, the effect of which could have offset what would otherwise have been a negative reaction, and in these cases if I didn't find positive news looking at analyst reports, looking at press, doing a very comprehensive search, then I was able to conclude that there was no price impact, which is what the conclusion was on August 30 as an example.

So, in other words, if there was no positive news coming to the market on one of these dates where there was no significant abnormal return, it wasn't necessary to do any additional analysis.

Q.   Okay, but for the dates that there was positive information that came to the market, did you do anything to specifically account or control for that offsetting presence of that positive

Page 54

SKINNER

non-fraud-related information or did you look at it and make a judgment call?

A.   Well, I think now we are moving, just to be very clear, as I mentioned in Section B of Section 6 of my report, I reached a definitive or affirmative conclusion as to price impact with respect to the eight alleged corrective disclosure dates, and I did that following the methodology that I indicated earlier.

For the Subsection C of Section 6 of my report, there are various types of events, and we can go through those specifically, but on a subset of those events, again analyzed in Subsection C of Section 6 of my report, there are days on which there was positive news, and so I then did analysis of those dates that accounted for that positive news and that helped inform my opinion.

Ultimately I concluded on these remaining seven dates that there was substantial doubt about whether any stock price movements on those dates could be used as evidence of prior impact, prior stock price impact of the alleged misrepresentations.

Q.   On those other days where you found that

Page 55

SKINNER

there was other news, did you do anything to quantify or disentangle the value of the offsetting positive non-fraud-related information?

A.   So I certainly did everything I could, given the information available to me, to reach a conclusion, and I think it is hard to answer your question in the abstract.   So perhaps I can just point to an example of one of these dates.

So, if we were to look at paragraphs 132 through 136 of my report, I provide a summary of the analysis I did for September 25 of 2019.   Now this is a date where I find there was no statistically significant stock price movement, but there were a number of items of news that came to the market on that day.

One of the items of news that comes to the market on that day which is positive news potentially is summarized in the last sentence of paragraph 135, where as I indicate in the report it says, "Also, Altria announced that it was 'tightening its guidance for 2019 full-year adjusted diluted EPS to a range of $4.19 to $4.27 from a range of $4.15 to $4.27."

Some people would interpret that

Page 56

SKINNER

tightening of guidance and specifically the increase in the lower bound of the range of guidance to be good news which could potentially have a positive effect on the stock price, and so I certainly considered whether there was any quantitative analysis I could do to adjust the observed abnormal return on that date for the effect of that positive news and reach a more definitive conclusion perhaps of affirmatively concluding that there was no price impact of the alleged corrective information on that day.

Now if we were to look at Exhibit 6 of my report, we would see that the abnormal return I calculated on that day was negative 2.37 percent with a T-statistic of minus 1.5, which means it wasn't statistically significant at the 5 percent level.

So what I considered doing was use some kind of empirical analysis to try and understand and quantify the effect of what is arguably positive news being the tightening of the guidance, and there are certain ways of doing that, but ultimately in this particular situation it becomes a very challenging statistical exercise because one

Pages 53 to 56

Page 57

SKINNER

would have to do a statistical exercise, what we would refer to as an earnings response co-efficient type of analysis to try and understand the effect on price, meaning effect on stock price of the tightening of the guidance. And there are ways of doing that, but the complication here is that one would have to marry that analysis which contains the normal statistical imprecision with the statistical analysis of the abnormal return itself, and given the complexity of that and the measurement error and estimation error involved in marrying those two statistical processes, it was just not possible at this stage at least to reach a more definitive conclusion by quantifying and adjusting for the effect of the positive news.

So all of that, to give you an example of where on each of these dates I did everything I could given the data available to me at this point to try and understand and reach the most definitive conclusion I could with respect to price impact.

Q. You stated that it was not possible at this stage. Why is it not possible at this stage and would it be possible at another stage?

A. Well, again, I think in general I am

Page 58

SKINNER

being cautious because obviously we are at the class certification stage here. It is always possible that there could be further evidence that comes to light, further information becomes available, that would shed additional light on some of these dates, and so it may be possible to reach a different conclusion on the basis of additional evidence or other analyses.

Q. Going back to our discussion of the August 30th date, in that example, for that date, you saw that your event study indicated an abnormal return on Altria stock that was not statistically significant at the 5 percent level, and because you didn't see anything that you determined to be positive news, you concluded that there is no evidence that what plaintiffs allege to be corrective information impacted the prices of Altria stock on August 30th, correct?

A. Yes, I think that is a reasonably correct summary of my approach.

Q. Okay. Now you are here -- I am focusing on paragraph 87 where you have that conclusion there. Now you are not providing an affirmative opinion that the information on

Page 59

SKINNER

August 30th, 2019 had no price impact, correct?

A. Well, I think the words speak for themselves. What I write in paragraph 87 is that consequently I conclude that there is no evidence that what plaintiffs allege to be corrective information impacted the price of Altria stock on August 30 of 2019.

Q. Would you agree that there is a difference between saying that there is no affirmative evidence that the corrective information impacted the price versus affirmatively concluding there was no price impact? Do you understand there to be a distinction in those two statements?

MR. MILLER: Objection to the form.

A. Well, I think we can go to paragraph 78 of my report, for instance, where I conclude "Based on my review and analysis, I reach an affirmative opinion that there was no price impact with respect to eight alleged corrective event dates."

Q. Okay. So I want to focus in on each one individually. I want to make sure though. As to the date of August 30, did you affirmatively, are you providing an affirmative opinion that the

Page 60

SKINNER

information on August 30, 2019 had no price impact?

A. Yes. That is what paragraph 78 that I just read out, so August 30 of 2019 is one of the eight dates to which I am referring in paragraph 78, and, as I mentioned, based on my review and analysis, I reach an affirmative opinion that there was no price impact with respect to eight alleged corrective event dates, which would include August 30, 2019.

Q. Okay. And that was based on the fact that Altria's stock price on August 30th did not have an abnormal return that was statistically significant to the 5 percent level, and you didn't see any positive offsetting news, correct?

A. Correct, yes. The conclusion stated in paragraph 87 is premised on what I find that I summarize in paragraphs 85 and 86 there.

Q. So, according to your event study though, there was a negative abnormal return on August 30th of 1.69 percent, correct? Take a look at your exhibit if that would help you.

A. Yes, so in Exhibit 6, what we see there is for August 30, just reading out what is in Exhibit 6, the abnormal return is negative

Pages 57 to 60

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Page 61

SKINNER

1.69 percent, the T-statistic is negative 1.06, and that is not statistically significant at the 5 percent level, and so the conclusion from that would be there is no stock price movement on that date.

Q. Now this observed negative abnormal return of 1.69 percent, that is after your event study removed market factors and industry factors, correct?

A. Yes. That is the way that I have calculated the abnormal return as my event study methodology indicates.

Q. So the abnormal decline in Altria's stock price of 1.69 percent cannot be explained by market industry factors. Is that fair?

A. That's correct, under the event study methodology, the interpretation of an abnormal return on any day is that that is attributable to what we might call firm-specific information that came to the market on that day.

Q. Now isn't the existence of a negative abnormal return of 1.69 percent that can't be explained by industry or market factors some evidence of possible price impact?

Page 62

SKINNER

A. No. We don't have any statistical significance on this date, and I also note that that same conclusion is reached by Dr. Nye based on his event study, and essentially what the statistics is telling us there is that we can't reject the null hypothesis that the return or the abnormal return on that day is different from zero.

So in terms of the way an economist using statistical analysis would interpret the evidence from this event study, it is saying that there was no statistically significant stock price movement on that date. In other words, the 1.69 percent or negative 1.69 percent is not reliably different from zero.

Q. But the negative 1.69 percent is also not reliably different from a decline of negative 1.69 percent, correct?

A. Are you asking whether if I use a different null hypothesis?

Q. Yes. Suppose your null hypothesis then was an abnormal return of negative 1.68 percent. Then an abnormal return of 1.69 percent would not be statistically different than negative 1.68, correct?

Page 63

SKINNER

A. I will say it a little differently. I would say that certainly this test is telling us, the hypothesis here is that the null hypothesis is that the stock price movement on this day is not significantly different from zero, and that is what we are unable to reject.

Now I could test a different null hypothesis and then I would be subtracting this abnormal return from the abnormal return under your different null hypothesis, and so that would be I believe .01 percent, and dividing by the standard error, and we would get I believe an even smaller T-statistic.

Q. So you would not be able to reject the null hypothesis. You would not be able to conclude that the 1.69 percent decline is statistically different than a 1.68 percent decline, correct?

MR. MILLER: Objection to form.

A. I believe that's correct, yes.

Q. But you would not be able to conclude then affirmatively that there was a decline of 1.68 percent, you would not be able to accept your null hypothesis, correct?

Page 64

SKINNER

MR. MILLER: Objection to the form.

A. Again when you go to this language of affirmatively conclude, I think we go back to what is the underlying economic question of interest, which is we have a hypothesis. We test the hypothesis. In the case of my price impact analysis, I am trying to reach a certain conclusion based not only on the event study evidence but also on other evidence as well.

All of that to say that I would have to think about what the underlying question was behind the hypothesis that you are proposing I test and think about the analyst reports, public press and so on in analyzing that question, which was a different question.

Q. Did you undertake the task to determine why Altria's stock price had a negative abnormal return of 1.69 percent on that day?

A. As I indicated, the way an economist using statistics in a conventional way would interpret the evidence is that there is in fact no statistically reliable evidence of a stock price movement on that day, so, in other words, I wouldn't analyze that because the event study

Pages 61 to 64

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 65

SKINNER

analysis is telling me that there is no statistically reliable decline in the stock price on that day.

Q.   If you could turn to paragraph 89 of your report, and you are analyzing the date of September 9, 2019 in this section.   Correct?

A.   Yes, beginning paragraph 88, if that is what you mentioned.

Q.   And in paragraph 89 you state, "The results of my event study indicate that there was no statistically significant movement in Altria's stock price on September 9, 2019."

Do you see that?

A.   I do.   Yes.

Q.   And in paragraph 90 you state, "I did not find any positive news that could have offset what would otherwise have been a negative and statistically significant stock price movement on this date."

Do you see that?

A.   Yes.   I do see that.

Q.   Now again in footnote 59 you mention that there were announcements of patents.   Do you see that?

Page 66

SKINNER

A.   Yes, and just a minor correction.   I believe it is footnote 159.   Again, there were some reports of patents.   Sorry.   I believe a single patent.

Q.   I believe you testified earlier generally getting a patent is positive, not negative news.   Correct?

A.   I think I was careful to testify earlier that in my view, here at least based on my understanding of the volume of patents that Altria received over the course of the class period, that receiving a patent was a relatively routine event for the company, and, as I mentioned before, I believe around the third of the dates during the class period there was such patent information, so I would say it is probably not really news of any significance, meaning, if I had to venture a guess, it would be neutral news that had little or no effect on stock price.

Q.   And in paragraph 92 you state, "I conclude there is no evidence that what plaintiffs allege to be corrective information impacted the price of Altria stock on September 9, 2019."

Do you see that?

Page 67

SKINNER

A.   Yes, I do.

Q.   Okay.   So here the information that you relied on is that your event study indicated that there was not a statistical significant movement in Altria stock price on September 9 and that you didn't see any evidence of positive news that could offset any movement, and, based on that, you concluded that the information on September 9 had no price impact?

A.   I think at a high level, that's correct, yes.   I concluded that there was no statistically significant stock price movement on September 9, 2019, and then, based on my review of the public press and analyst reports, there was no positive news that could have offset what would otherwise have been a negative and significant stock price reaction.

I mention there were a couple of analyst reports on that date commenting on the possible merger, which in my assessment would not be expected to have a positive impact, and on that basis I concluded that there is no evidence that what plaintiffs allege to be corrective information on this date impacted the price of Altria stock on

Page 68

SKINNER

September 9, 2019.

Q.   Again like we did with the August 30 date, your language in paragraph 92 states that you conclude there is no evidence that what plaintiffs allege to be corrective information impacted the price of Altria stock on September 9, and we touched on this with the prior date.

Is this in your mind equivalent to you providing an opinion, an affirmative opinion, that the information on this date had no price impact on September 9?

A.   Again, I think my report is clear, and we see the language at the beginning of paragraph 78 that, with respect to these eight dates, which includes September 9, 2019, based on my review and analysis, I reach an affirmative opinion that there was no price impact with respect to the eight alleged corrective disclosure dates, including this date.

So, yes, what I am conveying in paragraph 92 is the basis for what I am concluding in paragraph 78 with respect to affirmatively finding no price impact.

Q.   Okay.   Just to be clear, do you

Pages 65 to 68

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 69

SKINNER

understand sort of the distinction potentially between the two ways that you phrase it, between the way you phrase it, I believe you said paragraph 78 as an affirmative opinion versus kind of the way it is phrased in paragraph 92, which more sounds like a lack of evidence?  Do you understand?

I'm asking the question because I can see there could be a distinction between those, and I am just looking for the clarification, which I think you've provided, but do you understand sort of distinction I am trying to draw there?

MR. MILLER:   I object to the form.

A.   I understand that there is different language here, and what I would explain really is that the language that I am using in paragraph 92 is in my mind equivalent to the language in paragraph 78, so when I say no price impact, what I'm saying is there is no evidence that what plaintiffs allege to be corrective in this case on September 9 impacted the price of Altria stock.

Q.   Have you heard the phrase before absence of evidence is not evidence of absence?

A.   I'm not sure I have heard that phrase before.

Page 70

SKINNER

Q.   Okay.  Alright.  Turn to paragraph 94 on page 40.  You are analyzing the September 11, 2019 date.

A.   Yes, I'm here.

Q.   Again here on paragraph 94 you state, "The results of my event study indicate there was no statistically significant movement in Altria's stock price on this date."

Do you see that?

A.   Yes, I do.

Q.   Then in the next paragraph 95 on the next page, you state, "I did not find any positive news that could have offset what would otherwise have been a negative and statistically significant stock price movement on this date."

Do you see that?

A.   I do see that.  Yes.

Q.   Then in paragraph 96 you state, "Consequently, I conclude that there is no evidence that what plaintiffs allege to be corrective information impacted the price of Altria's stock on September 11, 2019."

Do you see that?

A.   I do, yes.

Page 71

SKINNER

Q.   Okay.  So it sounds like similar to what the other dates we just discussed, that because there was no statistically significant movement in Altria's stock price on September 11th and you found no evidence of positive news, you concluded affirmatively that this information had no impacts on Altria's stock on September 11?

A.   That's correct.  Yes.

Q.   Turn to paragraph 98.  In this section you are reviewing the date September 24, 2019.

A.   Yes.  I'm there.

Q.   Similar with the other ones, in paragraph 98 you state that "The results of my event study indicate that the abnormal return on Altria stock on September 24, 2019 was not statistically significant at the 5 percent level." Do you see that?

A.   I do see that, yes.

Q.   Then in paragraph 100 you state about halfway down, "I did not find any positive news that could have offset what would otherwise have been a negative and statistically significant stock price movement on this date."

Do you see that?

Page 72

SKINNER

A.   Yes, I do.

Q.   Then in paragraph 101 you state, "Consequently, I conclude that there is no evidence that what plaintiffs allege to be corrective information impacted the price of Altria's stock on September 24, 2019."

Do you see that?

A.   Yes, I do.

Q.   Once again, because your event study did not indicate a statistically significant movement at the 5 percent level and you saw no evidence of positive news, you concluded, affirmatively concluded that the information alleged by plaintiffs did not impact the price of Altria's stock on September 24, correct?

A.   Yes.  That is consistent with the general methodology of how I analyzed the eight dates indicated in this section.  And again, I just point out that this section contains discussion of various other information that came to the market and why I don't see that information in analyst commentary as indicative of the existence of other positive news that could have offset or would otherwise have been a negative and statistically

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 73

SKINNER

significant stock price movement in this case September 24, 2019.

Q.  Could you turn to paragraph 106 in your report.  Page 44.  Here you are analyzing February 24-February 27, 2020.

A.  That's correct.  As I think you said, just to clarify, in this section of my report, I am analyzing the dates February 24, 2020 through February 27, 2020.

Q.  Now this part of the question has to do with a Wall Street Journal article that was disseminated before the market closed on Friday, February 21, 2020 conveying that the SEC had launched an investigation into whether Altria fully disclosed to its shareholders the risks associated with its investment in Juul, correct?

A.  Yes.  That is I believe what plaintiffs are alleging with respect to this date.

Q.  And in paragraph 106, you mention that after the disclosure of the Wall Street Journal article or once the Wall Street article was disseminated around 3:37 p.m. on February 21st, the news was reported in major news outlets, and there was intensive trading activity in the 23 minutes

Page 74

SKINNER

between the time of the announcement and the market close, and you state that these are both factors that would weigh in favor of a speedy reaction.  Do you see that in paragraph 106?

A.  I am trying to see exactly where the language about the speedy reaction is.

Q.  I believe it is the last two words of paragraph 106.

A.  Thank you.  Yes.  So the last sentence there says, "The fact that the news was reported in a major news outlet, the Wall Street Journal, and the fact that there was intensive trading activity in the 23 minutes between the time of the announcement and the market close are both factors that would weigh in favor of a speedy reaction."

Q.  Did you analyze whether Altria's abnormal return between the disclosure of this news at or about 3:37 p.m. and the close of trading on February 21, 2020 was statistically significant?

A.  As my report indicates, I spent a lot of time doing a very careful event study analysis of all of the dates here, and I certainly discussed with the Cornerstone team doing what I would call an intraday abnormal return event study analysis.

Page 75

SKINNER

One of the challenges we ran into in doing that was that to do an event study analysis on an intraday basis, you need the same ingredients that are necessary for the daily return analysis, so you need intraday movements for the market index, in this case the S&P 500, and you also need intraday data on the components of the industry peer index, and my industry peer index for purposes of my event study comprised two companies, British American Tobacco and Imperial Brands, and, based on the data that was available to us, which is the tick data we use for intraday, we did not have available to us intraday data for Imperial Brands' stock price movements.

In addition, we didn't have available to us, I believe, intraday movements for the industry index that Dr. Nye had used, which is the Food, Beverage and Tobacco Index, so unfortunately, based on the data that was available to us in this time frame, it just wasn't possible to do the intraday abnormal return analysis that I think you are alluding to there, but we certainly considered it.

We looked to see if we had the data.  I did some analysis using that intraday data over the

Page 76

SKINNER

weekend, but we didn't do an analysis of that stock price movement on the Friday afternoon, but, as I describe here in the report, whether or not that abnormal return on the afternoon of Friday, February 21 is statistically significant or not doesn't affect my conclusions with respect to February 24, 25, 26 or 27 of 2020.

Q.  And you mention here that there was intensive trading activity in the 23 minutes between the time of the announcement and the market close.  Isn't that evidence that the information had a price impact?

MR. MILLER:  Objection, mischaracterizes the report.

A.  No, not at all.  As I mentioned before, there is certainly academic work that looks at trading volume evidence as well as stock price movements.  The variable that we are most interested in is stock price movements around events.  I think there are a number of academic papers that point out that in some cases you can get relatively large movements or increases in trading volume without getting changes in the stock price.

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 77

SKINNER

So, for example, we could have some event where some news came to the market and investors disagreed on the valuation implications of that news, and so there was a lot of trading because of disagreement among investors about the implications of the news, but the stock price didn't move at all.

So I think it is well recognized in the academic literature, there is both theoretical work and empirical work that essentially makes the point, again well established in this literature, that, although you might see unusual trading volume, it doesn't necessarily mean there was any change in the market's assessment of the value of the company, and as a result, no movement in the stock price.

Q.   But in this instance on February 21, 2020, as soon as the announcement was made around 3:37 p.m., Altria's stock price did decline on the announcement.   Its absolute stock price did decline immediately.   Isn't that correct?

A.   Well, I think what we know is what is in the complaint, which is that there was a stock price decline from around 3:37, when this news

Page 78

SKINNER

became available to the market through the Wall Street Journal and the close 23 minutes later at around 4:00 p.m., there was a stock price decline.

As I mentioned before, I haven't done the analysis to determine whether that decline was statistically significant, because to do so one would need data on the intraday movement of the market during that window and the intraday movement of the industry peer index, and so that data was not available to me at this point, and so, yes, the stock price did decline.   Whether that decline was statistically significant, I just don't know at this point.

Q.   So I understand that you didn't have the data available to do the statistical significance analysis, but doesn't the fact that, as soon as the information comes out, there is a spike in volume to 2.72 million shares in the last 23 minutes on February 21, which represented 28 percent of average daily trading volume, and the stock price itself immediately declined in the last 23 minutes? Wouldn't you consider that at least evidence of price impact?

A.   Well, no.   As I said, I think before I

Page 79

SKINNER

reached a conclusion about that, I'd need to do the type of analysis that I have done on the other days, which would include the formal event study analysis.   If you were to do the event study analysis, one would find that that decline was statistically significant, and there are different ways of doing event study analyses on an intraday basis, but, without actually having done that analysis, I can't sitting here today reach a definitive conclusion about whether this announcement had stock price impact.

Q.   Putting aside whether you can reach a definitive conclusion here today, what I am asking you is the fact that the stock price itself immediately declined and on very high unusual trading volume, isn't that at least evidence of price impact?   Putting aside whether you can make a definitive absolute conclusion, doesn't that weigh in favor of price impact?

A.   Well, I think we should, if we are talking about price impact, so I have been thinking about price impact in this section with respect to February 24 and the dates that follow.   So I want to be clear that I think you are asking a question

Page 80

SKINNER

about price impact on February 21st, and that is the date on which the news was announced, and there is a different section of my report that specifically discusses my conclusions as to price impact on that day, and for February 21st, I reached the conclusion that, because there is a mismatch, I believe that there is substantial doubt about whether any stock price movement on that date, if there is a stock price movement on that date, could be used as evidence that the alleged misrepresentations had price impact earlier in the class period.

So all of that to say, if we were to look at the analysis I did of February 21, 2020, I reach a conclusion of what I call substantial doubt.   That conclusion is not dependent on whether or not this stock price decline on that day was statistically significant or not.

Q.   Did you do any analysis at all to determine whether or not the information announced on February 21, 2020 impacted the price of Altria's stock on February 21, 2020?   Whether that information impacted the price?

A.   I certainly did some analysis of that as

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 81

SKINNER

my event study in Exhibit 6 indicates.  I did the normal calculation of the abnormal return on February 21, 2020, and, if we look at the abnormal return for that day, we find it is not negative and statistically significant.

In addition, I then analyzed the information on that date and reached this conclusion about substantial doubt based on the mismatch, and we can go to the relevant section of my report.

So, yes, I did some analysis of that date as is indicated both in this section of my report and in the subsequent section where I specifically address February 21, 2020.

Q.   But your opinion that you discussed about substantial doubt, that went to whether or not the decline on this day could be attributed to price impact from the original misrepresentations. You did not provide an opinion as to whether this piece of information impacted the price of Altria stock, correct?

A.   Well, I think we have to be very careful about what we mean by this information, and so what I understand that plaintiffs allege to be

Page 82

SKINNER

corrective on this date is that the Wall Street Journal reported the SEC had launched an investigation into whether Altria fully disclosed to its shareholders the risks associated with the investment in Juul, so there is certain alleged corrective disclosures there that in the subsequent section of my report where I discuss February 21, 2020, I reach a conclusion regarding substantial doubt as to whether the evidence on that day can be used to support a conclusion that that alleged corrective disclosure impacted the stock price earlier in the period when the associated alleged misrepresentations had been made.

I just want to be clear that this section of the report that we are looking at here is really related to potential stock price impact and an assessment of that for the days beginning February 24 of 2020.

Q.   Turn to paragraph 108 in your report. This is still under the section concerning February 24 to February 27, 2020.

A.   Yes, I'm there.

Q.   Before we look specifically at 108, according to your event study, there was a negative

Page 83

SKINNER

abnormal return on February 24 of negative 2.39 percent, correct?  I believe that is in your Exhibit 6.

A.   Yes.  Just to be crystal clear about what is being reported for February 24, 2020 in Exhibit 6, my event study shows an abnormal return of minus 2.39 percent, a T-statistic of minus 1.67, which is not statistically significant at the 5 percent level.

Q.   Now it is statistically significant at the 90 percent level, correct?

A.   I haven't evaluated that, but it is certainly possible that if I was to use a 90 percent confidence interval rather than a 95 percent confidence interval, that it would be statistically significant, but as I think is pointed out in paragraph 113 of my report, my understanding is that the 95 percent confidential interval is the relevant standard here.

Q.   And the negative abnormal return that you observed in your event study, again that was after removing industry factors and market factors, correct?

A.   It is as all of these abnormal returns

Page 84

SKINNER

in Exhibit 6 are.  They are after accounting for market and industry factors.  I also point out that my conclusion with respect to February 24 of 2020 is not dependent on whether or not that return is statistically significant.  So let's say that it was statistically significant, which it is not, but if it were, for example, if the court was to decide for some reason that the 90 percent threshold was the relevant benchmark in this case, my conclusion would be the same, because my conclusion about February 24 is primarily based on the notion that Altria's stock is efficient.

If Altria's stock is semi-strong form efficient as we discussed earlier, I would expect that any response to the Wall Street Journal article on Friday afternoon of February 21 would have occurred in that period before the market closed on February 21.  And even if it wasn't as my report carefully documents, if I was to look, say, over the weekend on the path to investigate the possibility that if the full response hadn't occurred in that last 20 or 30 minutes of trading on Friday afternoon, and perhaps there was further adjustment of the weekend, I find evidence that is

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 85

SKINNER

inconsistent with that notion.

So in my view, any response to the Wall Street Journal article on February 21 was impounded by the market on that Friday afternoon. There is no evidence that there was any further response over the weekend, and so in an efficient market even if there was a negative return on February 24, it could not be associated with the news on February 21.

Q. Did you endeavor to determine whether Altria's stock price had a negative abnormal return of negative 2.39 percent on February 24, 2020?

A. Well, as I discussed before, the way an economist using statistical analysis would understand the result for that day is that there was no statistically significant negative stock price movement on February 24 so there is nothing to explain. This is a confusion that I think is very common in people that don't fully understand financial economics and statistics. And I have sat through many seminars with my colleague Dean Farmer, who always points out that, if the return is not statistically significant, then what we interpret as economists as going on on that day is

Page 86

SKINNER

that there is no stock price movement, so without confidence at the 95 percent level, essentially that movement should be interpreted as being no movement, so there is no stock price movement to explain, in other words.

Q. Professor Skinner, you will agree with me it is never acceptable for an economist in conducting an event study to accept the null hypothesis, correct?

A. I actually don't understand that. What essentially we are saying here is we are doing an analysis and we follow an accepted methodological approach to do an event study, and what we find in doing the event study is that the abnormal return on this day is not statistically significant. The clear economic interpretation of that is that there was no statistically reliable stock price movement on that day. That is the economic conclusion. That is how the academic literature, hundreds of papers and event study analysis would conclude on the basis of this type of evidence.

Q. So it is your opinion it is okay to accept the null hypothesis if there is not a statistically significant price reaction?

Page 87

SKINNER

A. I guess I would say it a different way. We have a null hypothesis. The analysis of this day, so specifically an event study of this date executed in the normal way, peer-reviewed fashion, finds that there is no statistically significant stock price movement on that day, so the conclusion is from an economic standpoint the stock price did not change on that day. That is the conclusion that I would draw.

Q. And is that equivalent to accepting the null hypothesis?

A. Well, again, subject to, as always, there is a possibility of both type 1 and type 2 errors, and that is part of the understanding that the statistics and economic training bring to us in interpreting event studies. Everyone understands there is a possibility of type 1 and type 2 errors. We can't, and we can never using any type of empirical data and experimental analysis, quasi-experimental analysis, we can't ever know for sure what the truth is. We can only do statistical analysis and use the data at hand, and that is what I have done consistent with conventional well accepted event study methodology.

Page 88

SKINNER

And on this day, February 24, we find there is no statistically significant stock price movement.

Q. So Professor Skinner, what you said, I don't think you actually answered my question. You had said previously that if you find there is no statistically significant stock price movement on that day, you conclude from an economic standpoint that the stock price did not change on that day, and I am asking you is that equivalent to accepting the null hypothesis?

A. And what I am carefully trying to explain is that the null hypothesis is that the stock price didn't move on that day, and based on the available evidence and the statistical analysis, we are unable to reject the null hypothesis. So the conclusion is that the null hypothesis is true. In other words, the stock price didn't move subject to our understanding of the possibility of type 1 and type 2 errors, which is always understood in doing statistical analysis.

MR. WERNKE: We have been going about an hour. Do you want to take a five or ten-minute break?

MR. MILLER: Okay. Is that good for

Pages 85 to 88

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 89

SKINNER

you, Professor?

THE WITNESS: Sure.   That's fine.

Thank you.

THE VIDEOGRAPHER:   The time is 12:27 p.m.   We are now off the record.

(Recess taken)

THE VIDEOGRAPHER:   The time is 12:37 p.m.   We are back on the record.

BY MR. WERNKE:

Q.   Professor Skinner, could you turn to paragraph 110 of your report.   That is on page 46.

A.   I'm there.

Q.   In paragraph 110, you state, "This section analyzes the remaining seven alleged corrective event dates.  While I find statistically significant price movements on some of those dates, given the mismatch between the contents of the corrective events and the alleged misrepresentations, there is substantial doubt as to whether any stock price movements on these dates can be used as evidence of earlier price impact."

Do you see that?

A.   I do see that.   Yes.

Q.   What is your definition, what

Page 90

SKINNER

definition, what is your definition of mismatch that you used in this context?

A.   Well, I think this is the type of analysis that economists do in many different settings.   The notion here is that part of my analyses of these dates is to consider whether the information that plaintiffs allege to be corrective with respect to these dates match the allegations that plaintiff has made, and so that is my understanding of mismatch or what I am thinking about in what I call the mismatch analysis here.

Q.   Right, but how do you determine whether something, whether a corrective event is a match with plaintiffs' allegations?   What is the method?   You say economists do it.   What is the process, the method?

A.   It is to try and understand whether, again I am writing about conclusions, that there is some substantial doubt about whether evidence of any stock price decline on these dates, if there is a stock price decline on these dates can be used as evidence that there was price impact of allegations earlier in the class period.

So what I am doing then is assessing the

Page 91

SKINNER

information that plaintiffs allege to be corrective, comparing that to what I understand the allegations to be, which I have summarized in Exhibit 2A, and trying to understand and make an inference as to whether what plaintiffs allege as being corrective is in fact matching the alleged complaints.

So, for example, on a couple of these dates, what I understand plaintiffs are alleging to be corrective seems to me to be news about the industry, and specifically the vaping industry, whereas the allegations specifically relate to Juul and Altria.   And so that would be an example of where it seems to me there is a mismatch that creates substantial doubt.

Q.   So based on your understanding of plaintiffs' allegations, what type of corrective events, whether corrective disclosures, materialization of a risk, what type of corrective events would be a match?

A.   Well, I think that in general, if I think about the types of allegations that plaintiffs make in securities cases, it is often the case, but it certainly is the case from time to

Page 92

SKINNER

time that plaintiffs allege that some fact was concealed or misrepresented.   That is an allegation earlier in the class period, and then the so-called truth about that fact might be revealed at some later point on an alleged corrective disclosure date.

So if there is a correspondence between what the corrective event reveals and the allegedly withheld truth or misrepresented truth earlier in the class period, then one would be able to conclude that there would be a match, and so clarification for this is what I observe in footnote 249, which is to point out that there doesn't have to be an exact match or a so-called mirror image disclosure, but there does need to be some correspondence between the two pieces of information, and in particular, we have also got to consider the fact that the inference we are making here is related to stock price movements and the effect on stock price movements if ultimately we are talking about assessing price impact of alleged misrepresentations and/or inflation.

Q.   So my question was based on your specific understanding of plaintiffs' allegations,

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

SKINNER

I believe that is in paragraph 48 you summarize it, what type of corrective events would be a match, whether they existed or not, whether those corrective events actually came to fruition and it happened, what type of corrective event would be a match under your understanding of plaintiffs' theory?

A.  So I think I would clarify that my understanding of the alleged misrepresentations is summarized and presented in Exhibit 2A, so plaintiffs are alleging certain information, for example, about the riskiness of Altria's investment in Juul related to Juul's alleged intentional marketing to youth.

If certain of that information was subsequently revealed so we were to find out somehow that Altria had understated those risks, then that may be a sufficient match, but here given the notion of the materialization of risk theory, given there are challenges to doing that as I have pointed out, and so I would also offer another example would be part of the allegations, as I understand them, here relate to Juul's alleged intentional marketing of its products to youth.

SKINNER

If there was some revelation at some point later in the class period that revealed that in fact Juul had been intentionally marketing to youth, then we would have potentially a match between those, but again, this is a matter of inference about what the market would be inferring from a disclosure later on in the class period and what that implied for an allegedly inflated stock price earlier in the class period.

Q.  Assuming plaintiffs are able to prove their theory of liability, specifically that the defendants misrepresented to the market when they stated that Juul never intended to market to youth, wouldn't regulatory action by various government entities and lawsuits by various government entities alleging that Juul marketed to youth be a materialization of that concealed risk, assuming that plaintiffs can prove their case that Juul in fact did market to youth?

A.  I think we want to differentiate between an assessment of price impact and an assessment of ultimately loss causation and damages and inflation, which is going beyond my assignment here.  I think one of the challenges here is with

SKINNER

respect to materialization of risk, we would have to understand the extent to which a risk was concealed and ultimately materialized as opposed to a risk that was known to the market and ultimately materialized, both of which would cause potentially a stock price effect later in the class period, when in your example there was some adverse regulatory action, and that is one of the challenges that I put forth here is related to these materializations of risk.

Q.  But I am asking you to assume that plaintiffs prove their case, right, that plaintiffs can prove that the defendants misrepresented it to the market when they said that Juul never marketed to youth, right, that in truth Juul had marketed to youth, then wouldn't regulatory action lawsuits specifically alleging that Juul marketed to youth be a materialization of that specific risk?  Do you have any opinion on that one way or the other?

A.  Yes, I certainly understand that if we were to take as given that there was a concealment of some type of risk and that that risk later materialized, that that would cause a stock price decline, and then to the extent plaintiffs were

SKINNER

able to show and a damages methodology was able to measure that the stock price declined, correctly measured the inflation attributable to that concealment of risk, that that plaintiff would have been able to establish damages with respect to that.

I think the other thing that is relevant to observe related to your question is that what would need to happen when you say there are regulatory actions, those regulatory actions would need to be a clear consequence of, in your example, the intent of Juul to market to youth that plaintiff is alleging.

Q.  Under, whether or not there is a match or a mismatch between the corrective event and the allegations, is that a binary determination or is there a spectrum of match and mismatch and how do you assess that?

A.  Again, I think the best way to understand this is in terms of one has to make an inference, which is a type of inference that economists do all of the time, and I have a footnote, this is footnote 250 in my report where I refer to the language in the Supreme Court's recent

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 97

SKINNER

decision in the Goldman Sachs case, and here I think if you read the court's language regarding the inference that one needs to make, that really it is, it is not a binary decision, it is a matter of making an inference.

And I have expressed my conclusions with regard to this inference in this language that I use that there is substantial doubt, and so I am making an inference following the approach suggested by the Supreme Court, and in the case of the seven alleged corrective events in this part of my report, I am reaching a conclusion there is substantial doubt about whether any stock price movement on these alleged corrective disclosure dates can be used as evidence that prior alleged misrepresentations had price impact.

Q. Is it your opinion that as a financial economist, you are in a position based on your expertise and analyses and tools at your disposal to come to a conclusion as to the inference to the extent to which a back end price drop equals front end inflation?

A. Yes, absolutely. I think as I mentioned, whenever an economist does empirical

Page 98

SKINNER

work, this is essentially an exercise at looking at and analyzing empirical evidence similar to what I am doing here, and that we have already discussed, to try and reach an assessment or an inference about whether a certain hypothesis is confirmed or not in the data, and that is exactly the same type of inference to which the court is referring in this quote.

So the quote there is in paragraph 146 of my report, the inference that the back end price drop equals front end inflation starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure. That type of inference, as I said, is the type of inference that we make all the time as economists using various types of analysis and examining empirical evidence to understand the answer to our hypothesis or a research question.

Q. You mentioned it is part of a spectrum. Then assuming that you find a price impact as part of the corrective event, statistically significant, you determine the information when revealed had a price impact. How do you go about determining what amount, if any, assuming there is a mismatch

Page 99

SKINNER

between the corrective event and the misrepresentation, how do you go about determining the amount of the price impact, if any, that can be apportioned or carried back to the initial inflation from the misrepresentation?

MR. MILLER: Objection to the form.

A. I think your question is conflating a couple of different things. So I am doing here what I would characterize as a price impact analysis and trying to make this inference that we have just been discussing, and when I think about the conclusion that I have reached here, my conclusion is that there is substantial doubt as to whether any stock price movement on the alleged corrective disclosure dates can be used as evidence that the alleged misrepresentations early in the class period had price impact.

So I'm not saying that some part of that stock price drop had price impact. I am saying that there is substantial doubt that any of that stock price drop can be used as evidence that the alleged misrepresentations had prior price impact.

Now the granularity, the spectrum is with respect to how confident am I in making that

Page 100

SKINNER

inference, and the language that I've deliberately chosen here is the substantial doubt language, is as those words suggest, indicating that I have substantial doubt about whether the evidence, including whether or not there is a mismatch, can be used to support an inference that those alleged misrepresentations had price impact earlier in the class period.

Q. Can you provide an example outside of this case where, an example of where the mismatch would be so extreme that you could conclude that there was no price impact, that you cannot confirm that definitively affirmatively say that there was no price impact at the misrepresentation stage?

A. So I think what I am trying to very carefully do here is to provide a methodology for understanding whether or not there is price impact. One of the complications on certain of these dates is that we may have what I would and we have already talked about, we may have positive news that comes to the market on these dates, and so it is not possible to determine what stock price response, if any, is attributable to the allegedly corrective information, and so one cannot then

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 101

SKINNER

arrive at the type of conclusion that I arrived at with respect to the eight dates discussed in Section B of this section of the report because there is, on a couple of these dates there is positive countervailing news that could offset what would otherwise have been a negative reaction.

And so in other words, to properly analyze price impact requires some judgments about what is affecting stock price on those dates, which is complicated by, for example, we have two dates where earnings was announced and the company, as usual, with an earnings announcement made a bunch of other disclosures.  One has to look for other evidence to reach a more definitive conclusion, which in some cases I did here.

Q.  My question was, can you provide an example of a situation in which there would be, the mismatch would be so extreme, it would be a complete mismatch, unrelated information, such that you would be able to conclude that despite there being a statistically significant price decline after the alleged corrective event, the mismatch was so extreme, you could say that the misrepresentation had no price impact?

Page 102

SKINNER

A.  Well, sure.  Let's think about a hypothetical example.  We could think about plaintiff making an allegation in a case that a company had reported fraudulent earnings and that had resulted in price inflation, and then at some later point in the class period, as plaintiffs have alleged in this case, we have an event, and let's say the event was the company's, I am trying to think of, let's say there was a company announcement that unexpectedly the CEO had passed away, and as a result of the unexpected passing of the CEO, there was a 10 percent drop in the stock price, which we evaluated and found was statistically significant.

In my mind, that would be an example of where the passing of the CEO would seem completely unrelated to an allegation at an earlier point in time that the company's earnings had been fraudulently misstated.

Q.  So in that instance under that hypothetical, you could provide the affirmative opinion that there was no price impact from the original misrepresentation if that was the universe of allegations?

Page 103

SKINNER

A.  Again, I think I would phrase it as there was substantial doubt, yes.  It is hard to make a reasonable inference from a stock price decline that apparently was related to the passing of the CEO that that stock price decline was evidence of price impact that the company's stock price had been inflated at an earlier point due to allegedly fraudulently reported earnings.

Q.  You used the phrase "substantial doubt." It could be there is no such situation.  What I am wondering is there a situation, any hypothetical in which you could determine that, based on what the misrepresentation, alleged misrepresentation was and what the alleged corrective event was, that the mismatch was so extreme that you as an economist could provide the affirmative opinion that even though there was a statistically significant price decline following a corrective event, the mismatch was so great that you would affirmatively opine that there was no price impact from the misrepresentation based on that evidence?

A.  Well, again, I think we can certainly reach what I would call affirmative, very affirmative opinions, and I think the example that

Page 104

SKINNER

I put forth is where I have a very high level of confidence that the mismatch was such that the stock price decline was not evidence of the earlier misrepresentation.

Q.  Have you ever analyzed, used the term "mismatch" in previous engagements you have had in securities actions?  Have you ever analyzed this mismatch of information in past securities cases?

A.  There are two somewhat different aspects to your question.  I will answer each of them. First, I haven't used this specific language before meaning the mismatch language, and as I have alluded to earlier, part of the reason I am using that language here is because that is the language that the Supreme Court used, I believe in the Goldman case, so it seems like useful language to use.

Now have I done that type of analysis in previous cases?  In my mind, yes, because we are making inferences, the same type of price impact inferences, so I have done these types of analyses before without actually using that specific language.

Q.  In what cases have you done the analysis

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 105

SKINNER

that is similar here of looking as you just described?

A. Well, I think I have done a number of securities class action cases, and as you know, and typically the case that plaintiffs allege that there is certain corrective information, and so one of the issues in these cases that economists are asked to evaluate and opine on is whether this information is in fact corrective information, meaning is there some type of connection between what is purportedly revealed on the corrective date and what was alleged at some earlier point in time.

So it seems to me it is not different from the normal type of question that arises in these cases, and indeed I think the judge's or the justice's characterization in the Goldman case is in the context of the analysis of so-called back-end and front-end price impact.

Q. In what cases have you done this analysis at the class certification case? Can you identify the cases for me?

A. So when I say I have done the analysis in certain of these previous cases, I have been asked to evaluate price impact with respect to

Page 106

SKINNER

specific dates, and I have also been asked to analyze loss causation in certain of these cases.

Q. I am interested in the ones in which you gave the opinion at the class certification, the price impact opinion.

A. Yes. So, if we were to turn to Appendix B in my report which lists my prior testimony for the last four years, I believe I was asked to make assessments of price impact in, for example, the SEB, et al., versus Symantec case, the SEB versus Endo case. I believe also in the Pelletier, et al., versus Endo case, and in the Allergan case.

I was also asked to evaluate this, there is a case there listed, Badesha Harpreet and Cronos case, which is a Canadian case where I was essentially asked to do that same type of analysis as well, although I believe they are couched in the terms of economic materiality, which is the Canadian equivalent.

Q. Thank you. Turn to paragraph 122 of your report. In this section you are discussing the October 31st, 2019 announcement of the write-down and other information that was disclosed

Page 107

SKINNER

on that day, correct?

A. Yes, and you are referring specifically to paragraph 122?

Q. Yes.

A. Okay. That's correct. That is in the context of several pages of discussion of the analysis of October 31, 2019, and specifically with respect to the first impairment charge.

Q. That first impairment charge to keep everyone up to date, is that the impairment amount announced on that day was $4.5 billion, correct?

A. Yes, approximately $4.5 billion.

Q. Okay. Now in paragraph 122, you state that your conclusion is that "The Juul impairment charge was anticipated by the market, and therefore, in an efficient market, would have been incorporated in Altria's stock price prior to the October 31, 2019 announcement."

Do you see that?

A. Yes.

Q. So if unanticipate, I understand you have your opinion about the market anticipated this, but if unanticipate, is it fair to say that a $4.5 billion write-down of the Juul investment is

Page 108

SKINNER

material value-relevant information? It comes out of the blue.

A. Well, I would say I had some familiarity with my accounting background with impairment charges and the accounting rules around the same. I also know there is a fairly significant amount of academic research that addresses impairment charges.

So the reason I am giving that preface is that I think we know from research that in some cases, even an impairment charge that may have been unexpected to the market may be negative news to the market because the underlying economics that drove the impairment charges and resulted in the impairment charges may have been known to the market.

So impairment charges result when an asset has experienced some decline in value relative to its original carrying value, and so what I am trying to communicate here is that there is certainly situations where the market fully understood that the asset had declined in value and so the company taking the impairment charge to reflect that was not actually new information,

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 109

SKINNER

because even though the impairment charge itself was unexpected, the market already knew that the asset had declined in value and that economic value of the company had gone away.

Q.  Fair enough.  I understand what you are saying.  So assume that the situation is that the announcement of taking the impairment as well as the underlying reduction in value of the Juul investment of $4.5 billion came completely by surprise.  The underlying value, reduction, everything completely by surprise.  In that situation, that would be material value-relevant information that could impact the price of the stock, correct?

A.  Well, certainly if we think about whether it is an investment in another company such as Juul or any other economic asset of the company, if the market learned for the first time that there was a $4.5 billion reduction in the value of the company or its assets that it had not anticipated, then, yes, that would result in a decline in the value of the company and the stock price would respond accordingly.

Q.  Now in your opinion, as you say in

Page 110

SKINNER

paragraph 122, is that in this situation any price impact, the price impact of the impairment would have been incorporated in Altria's stock price prior to the October 31, 2019 announcement, correct?

A.  Yeah.  Again I think we want to be careful using the terminology "price impact" because that has implications that we talked about, but essentially what I am saying here in this section is that based on my analysis of what information became publicly available before this time, so specifically this paragraph 118 and paragraph 119, there was a Wall Street Journal article on October 4, 2019, there was a Bloomberg article on November 30, 2019, both of which indicated that other investors in Juul had written down or marked down the value of their investment, and that revealed to the market those investors' valuation of Juul as a whole that would then be information that was available to the market if the market was efficient, and investors would be able to look at those press articles, understand what these other investors were valuing Juul at at this time and very clearly understand what that implied

Page 111

SKINNER

for the value of Altria's investment in Juul.

And what I also point to, which is the summary paragraph 122 that you are specifically referring to, is that there are a number of examples of analyst reports where the analysts also before October 31 had anticipated an impairment charge or write-down of that investment, and then I go on to provide examples of analyst commentary after the announcement where they are essentially commenting that investors and the market generally had anticipated the impairment charge as well as the amount of the impairment charge.

Q.  So it looks like in paragraph 120 you list a number of analyst reports there and it looks like the first one, the bullet point, is the Morningstar, October 2, 2019.

A.  Yes.  That's correct.  That is the first one in the bullet point list on page 50.

Q.  So is it your view that the reduced value of the Juul investment had incorporated Altria's stock price as early as October 2, 2019 following, as a result of Juul's other regulatory and legal troubles?

A.  I think that is going a bit beyond what

Page 112

SKINNER

my opinion is with respect to the impairment charge.  What I point out here as I just mentioned is that there was information in the public press, Wall Street Journal and Bloomberg in advance of October 31 discussing write-downs or markdowns of Juul that other Juul investors had taken.

What you just pointed out is a Morningstar report, and if we look at that Morningstar report, the Morningstar report is "Giving Juul a 75 percent cut to Altria's cost basis," which that analyst is opining "is conservative but not unrealistic."

So there is an analyst view there that the investment is worth in that case 75 percent less than its carrying value, so a much larger write-down than the company took on October 31. I'm not opining about when the market price adjusted.  My opinion is that before the Altria announcement on October 31, the market had fully anticipated not only the impairment itself, but also was not surprised by the magnitude of the impairment.

Q.  Okay.  So correct me if I'm wrong, you are not saying specifically as to what date, but

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 113

SKINNER

you are saying that prior to October 31, 2019 the reduced value of the Juul investment had been incorporated in Altria's stock price?

A. I believe that's correct. Yes. Before October 31, and indeed that is what the set of analyst reports listed at paragraph 123, indicates that the analysts themselves commented that this was not a surprise, and for example, investors had anticipated not only the write-down but also its amount, and one of the analysts, for example, says we believe today's $4.5 billion write-down and the carrying value of Juul was more than reflected in the stock price already.

Q. You don't go into providing the analysis, and correct me if I'm wrong, I might be missing it as to what caused or what led to the market, like what disclosures, in particular prior disclosures in particular, led the market to come to this assessment of the value of the Juul investment such that it would be incorporated in the stock price prior to October 31?

A. So I think as my report indicates and as I just mentioned, I think the evidence available to us, if you read either analyst reports from before

Page 114

SKINNER

October 31 or some of this public press before October 31, there was certainly information in the marketplace that Juul's value had declined from the time when Altria made its initial investment, and I read a lot of the analyst reports, in fact all of the analyst reports available to me during the course of the class period, and certainly those analysts are looking at what is going on, what is publicly known, and some of the regulatory and legal activity that is happening, some of the information that is coming to the market, for example, about vaping and seizures and so on.

And so there is a lot of information out there in the marketplace and for whatever reason other investors in Juul were marking down their assessments of the value of Juul and the value of their investments in Juul, and that analysts were also making similar types of assessments.

Q. Now as it has to do with the write-down, the impairment of $4.5 billion, unlike I believe certain other corrective events, in your report you do not opine that the $4.5 billion write-down is a, quote unquote, mismatch with plaintiffs' theory of liability, correct?

Page 115

SKINNER

A. That's correct. That is not my opinion with respect to that. I didn't consciously evaluate that because there was other evidence that led me to conclude that that disclosure didn't have price impact.

Q. Turn to paragraph 129. That is on page 54. And just to orient everyone, this involves the disclosure of the FTC scrutinizing Altria's role in the departure of Juul's CEO.

A. Yes. You specifically asked about paragraph 129?

Q. Yes. In paragraph 129 you state, "For example, the news announced on this date included Altria's third quarter 2019 Form 10-Q above-consensus earnings results."

Do you see that?

A. Yes.

Q. This would be considered positive value relevant news that was disclosed on October 31, correct?

A. Yes, as I mentioned in the previous paragraph, there are a number of pieces of information that were disclosed on that date, October 31, that could have contributed positively

Page 116

SKINNER

and negatively to the overall stock price response, and then the fact that company's earnings are above consensus is potentially positive information.

Q. Did you do anything to assess whether this positive news or the other positive news that was released on October 31 had any impact on Altria's stock price?

A. I did not analyze that specifically in part for the reason that I mentioned before, which is similar to September 25.

Q. Just refresh my recollection. What was the reason similar to September 25.

A. Well, I would say a couple of things. Similar to September 25, as I indicate, I believe in paragraph 126 here, my assessment is there is a mismatch between this allegedly corrective information and the alleged misrepresentations. I also find on this date there is no statistically significant stock price movement, and as we have just discussed, there are a number of items unrelated to allegations of news that came out on that date, positive and negative news, and so not only would it be difficult and challenging from an economic and statistical point of view to make

New York
212-273-9911
Hudson Court Reporting & Video
1-800-310-1769
New Jersey
732-906-2078

Page 117

SKINNER

those adjustments, there are a variety of pieces of information on that date that make it difficult for us to understand what the stock price effect of a particular piece of news would be.

So this is an example of a day, as I mentioned initially, and as I point out in Section 7 of my report, there is a number of items of what I would call confounding information that come to the market on this date that complicate any analysis or conclusions as to what caused the stock price change on that day. And, as I have indicated, my judgment is that there was a mismatch on this day which led me to ultimately this conclusion of substantial doubt.

Q. Looking at paragraph 131, which appears to be your concluding paragraph on this date where you state, "The lack of a statistically significant stock price movement on this date, along with the mismatch between the subject of the FTC inquiry and the alleged misrepresentations raise substantial doubt as to whether any stock price movement on October 31, 2019 can be used as evidence of earlier price impact of the alleged misrepresentations."

Do you see that?

Page 118

SKINNER

A. Yes, I do.

Q. Just to be clear though, you are not providing here the opinion that the announcement of the FTC inquiry had no price impact on Altria securities, correct?

A. Right. I think the report is clear in saying I'm not reaching an affirmative conclusion as to lack of price impact of this. However, I am reaching a conclusion that there is substantial doubt as to whether any stock price movement on that date can be used as evidence of earlier price impact of the alleged misrepresentation.

Q. And while you express, as you stated, substantial doubt, you are not opining that the stock price movement on October 31, 2019 cannot be used at all as evidence of price impact? It is not a definitive. You are just expressing your substantial doubt.

A. Correct. I am expressing the substantial doubt as I am on a number of other of these dates for the reasons that I have indicated there.

Q. When you determined, used, as you stated a few other dates, you used the phrase "substantial

Page 119

SKINNER

doubt," how do you differentiate, help me understand substantial doubt as opposed to little doubt, doubt, some doubt, substantial doubt? I mean is there any way you can categorize the levels of doubt from an economic standpoint or something to assess levels of doubt?

A. Well, I think as we have discussed before, what I am trying to do here is do some form of common sense analysis of the disclosures and information that came to the market on these dates and reach an inference about whether a stock price decline on these dates, if there is any stock price decline in these dates can be used as evidence, that alleged misrepresentations early in the class period can be used as evidence of earlier price impact.

So I am making an inference and with respect to the seven alleged corrective events that are discussed in this section of the report, my sense is that there is substantial doubt, and as words speak for themselves, it is indicating that I have substantial doubt about whether that inference can be drawn, so it seems to me that means that as I said, the words speak for themselves, so there is

Page 120

SKINNER

substantial doubt about whether one can draw that inference based on the evidence that is available to us.

Q. Can you put a percentage or anything like that on substantial doubt, the percentage of doubt? Is there any sense to quantify it?

A. No. I think as with many economic assessments, I am using words that I think are clear in connoting what I mean by the conclusion that I have drawn.

Q. You agree that the announcement of an FTC inquiry is negative news for Altria, correct?

A. Are you talking about any FTC inquiry? Because I think there are at least a couple of these.

Q. Fair enough. The FTC inquiry announced on October 31, 2019, you agree that is considered negative news for Altria, correct? It is never good for the FTC to be investigating you, I guess.

A. Well, I think that is probably right. I'm not an expert in FTC investigations, and specifically, which is why I ask the question about which one of these it was, they are making a similar investigative demand. My understanding is

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 121

SKINNER

that I'm not sure that that resulted in any type of investigation or enforcement action or anything else, and so it is hard for me to assess the import of this civil investigative demand.   It is probably not good, but as I said, I'm not an expert in the FTC process.

Q.   On October 31, your event study found that there was an abnormal return of negative 2.28 percent that could not be explained by market or industry factors, correct?

A.   Well, I probably say it just a little differently.   Just to be clear, and this is reported in Exhibit 6, on October 31, 2019, the abnormal return is minus 2.28 percent, the T-statistics is minus 1.41, and at the 95 percent level it is not statistically significant, so again my conclusion as an economist is that the stock price did not move overall on October 31, 2019.

Q.   I am correct though in the course of doing your event study, as part of the determination of the abnormal return, that this negative 2.28 percent abnormal return cannot be explained by market or industry factors?   Those were removed as part of your analysis, correct?

Page 122

SKINNER

A.   Yes, as with all of the abnormal returns reported on Exhibit 6 and elsewhere, Exhibit 5 as well, the minus 2.28 is an abnormal return, which means that I have removed market and industry factors.

MR. WERNKE:   Jake, I'm going on to another date.   Do you want to break for lunch now?

MR. MILLER:   I think that would be good. Does that work for you, Professor?

THE WITNESS:   Sure.

THE VIDEOGRAPHER:   The time is 1:35 p.m.   We are now off the record.

(Lunch recess:  1:35 p.m.)

Page 123

SKINNER

Afternoon Session

2:04 p.m.

THE VIDEOGRAPHER:   The time is 2:04 p.m.   We are back on the record.

PROFESSOR  D O U G L A S  S K I N N E R, having been previously duly sworn, was examined and testified further as follows:

EXAMINATION (Continued)

BY MR. WERNKE:

Q.   Professor Skinner, can you please turn to paragraph 132 on page 55 of your report where you discuss the September 25, 2019 date.

A.   You say paragraph 132?

Q.   Yes.

A.   I'm there.

Q.   So here you mention that on September 25, Altria issued a press release announcing that Philip Morris had called off discussions of a $200 billion merger with Altria due to scrutiny of the vaping industry and Altria's 35 percent stake in Juul, which had announced the same day that it was the subject of another federal investigation.   Do you see that?

A.   Yes, and I believe what I am quoting

Page 124

SKINNER

from there is a portion of the complaint.

Q.   As part of your analysis, did you make a determination as to whether the possibility of a merger between Altria and Philip Morris was positive or negative news for Altria?

A.   I didn't do a formal analysis of that. As I have indicated, I assessed, as I have done for all of the other dates, the statistical significance of the return on September 25, 2019, and I found from my event study that there was no statistically significant response on this date, and as I have done on other dates, I have analyzed the news on that date, and there are a couple of different pieces of news here.

I did not reach a determination about whether the market's overall assessment of the news on this date, which included an Altria press release, that the merger that was under discussion would not in fact occur.   That specific piece of information I didn't analyze.   I certainly read and I believe I discussed this in Section 7 of my report that analysts at this time discussed a number of possible explanations for the company's decisions to call off the merger talks.

Pages 121 to 124

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

SKINNER

Q.   You understand that under plaintiffs' theory of liability, defendants concealed heightened regulatory risks, litigation risks and other risks from Juul's marketing to youth, correct?

A.   Yes, I understand that is part of the allegations.

Q.   So under plaintiffs' theory, wouldn't scrutiny of Altria's investment in Juul after it had announced that it was the subject of another federal investigation and Philip Morris calling off a potential $2 billion merger be considered materialization of the risk concealed, at least under the plaintiffs' theory?

A.   Well, I think the point I am making, and this is primarily made I believe at paragraph 133, is that part of what we were observing on September 25, 2019 in terms of the market's assessment of the news on that date is the news that this merger would no longer go forward.  And what I pointed out here is that at the beginning of the class period, when those allegations were made or the alleged misrepresentations had occurred, there had been no discussion of the possibility of

SKINNER

a merger.

And I also understand, as I indicate there, that plaintiffs are not alleging misrepresentations on the part of defendants regarding whether there would be a merger.   So that then creates substantial doubt in my mind regarding whether a stock price movement on September 25, 2019 could be used as evidence that the alleged misrepresentations at the beginning of the class period had price impact at that time.

So I think that is the opinion that I am reaching on that date, has to do with the merger information that the market was perhaps responding to.

Q.   I am asking a much narrower question.  I'm not asking your overall conclusion of everything you looked at.   Under plaintiffs' theory, which is that defendants concealed the heightened risks that would be associated with Juul's marketing to youth, wouldn't the fact that a potential $200 billion merger was called off because of Philip Morris's concerns about Juul's potential marketing to youth, wouldn't that be a materialization of the risk?

SKINNER

A.   Well, again, as an economist, we have to evaluate what is happening on that day in terms of what market participants are responding to.   My sense from reading the analyst reports through this entire period, and again I elaborate on this a little more in Section 7 as well, is that during the period of several weeks between when the original merger discussions were announced, which I believe was August 27, 2019, and this date, when the companies jointly announced or each of them announced the merger talks were off, analysts had talked about a number of positive and negative aspect of the merger from each of the companies' points of view, and so all of that to say that it is not entirely clear what the market was inferring and responding to if it was responding on this date.

It could be possible that from Altria's standpoint, the merger being called off was in fact good news rather than bad news and we simply don't know that, so.

Q.   So your opinion here, what you are saying is there was a potential merger between Altria and Philip Morris of $200 billion, and the

SKINNER

fact that Philip Morris unilaterally called off the possibility of the merger could be good news?   If that was good news for Altria, then Altria could have just called off the merger.   How is it your potential business partner, unilaterally calling off the merger is good news for you?   Could you explain that?

A.   I think the premise of your question there, and I believe this is the premise of how plaintiffs are characterizing this corrective disclosure, is that this was a unilateral decision on the part of Philip Morris.   If you look at the company's press releases on this day, I believe they say something along the lines of they have agreed not to have further discussions and to call off the discussions, and so it is not obvious to me reading the disclosures on this day and reading analyst reports that in fact this was a decision on the part of Philip Morris for the reason that you have indicated, which is related to Altria's investment in Juul.

So another explanation that some of the analysts had discussed is that when Altria, the fact that Altria was considering a merger that

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

SKINNER

apparently would entail no premium to Altria shareholders, that was interpreted by some of the analysts as saying the company's ongoing underlying business was worse than we had previously thought because the company seems to be selling itself or be willing to sell itself for a relatively low multiple of around eight times, and so when it was then revealed that the companies had agreed to call off the talks of a possible merger, that interpretation flipped such that the analysts realized, oh, well, maybe it is not such a negative indicator about Altria's views of its underlying business, and so there could potentially have been a positive response to that.

I think the other thing that is important to understand here is as I convey in paragraph 133, it is hard for me to see how there is anything other than a mismatch when what is revealed on this day is that a merger is not going to occur, whatever the reason for the termination of the merger talks were, and allegations made earlier in the class period that didn't really have not much to do, in fact, didn't have anything to do with a merger, and in fact the merger hadn't even



SKINNER

been contemplated at that point, and so a part of the inference we are trying to draw here is related to whether the stock price decline, if any, on this date, September 25 of 2019, can tell us something or provide an inference related to price impact of the alleged misrepresentations early in the class period.

So I think it is that stock price inference that is also the source of my conclusion and opinion regarding the substantial doubt due to the mismatch.

Q. In paragraph 135 you identify certain information that you say "could have affected Altria's stock price." Correct? You identify certain announcements having to do with the new Juul CEO, Juul's statements that it never marketed to youth and never will, and as we discussed earlier, Altria announcing a tightening of its guidance for 2019?

A. Yes. I do discuss those pieces of information in paragraph 135.

Q. And you acknowledge in paragraph 135 that each of these pieces of information could have affected Altria's stock price, correct? I believe



SKINNER

it is the first sentence.

A. Yes, I was just reading the paragraph to ensure I fully understood or remembered what I said in this paragraph. Yes, I am identifying a number of pieces of information here including information that is included in the alleged corrective disclosure.

We have the LA Times article related to an alleged misrepresentation in the case. I will note with respect to that disclosure wherein the LA Times article apparently there was a Juul statement that it never marketed to youth and never will. That statement I believe by this point had been repeated a number of times by Juul.

So I think that may be informative as to any potential stock price effect it might have, but then we also finally have this tightening of the guidance that we had discussed before.

Q. And you acknowledge that the analyst commenting that the "Juul CEO brings responsible leadership to Juul and will aid the company to successfully navigate through the choppy waters that recent vaping illness, youth usage and regulator outrage has created," you consider that



SKINNER

to be potentially positive value-relevant news, correct?

A. I think the point of including that example is to illustrate that part of the bundle of information that I believe plaintiffs are putting forth here as an allegedly corrective disclosure or event and that is included in the quote in paragraph 132, I am just observing that at least one analyst had indicated that the leadership change that was announced by Juul on this date could be viewed as positive, and it sounds to me like that is a positive commentary from that analyst.

So I don't have strong views. I am just pointing out that could have been viewed by the market as positive information.

Q. Did you do any analysis to determine what impact, if any, this news about the Juul CEO and commentary had on the price of Altria stock?

A. I did not, and I guess part of my thinking here is under plaintiffs' allegations, as I mentioned, there is a number of elements of what plaintiffs are alleging as corrective information on this date. And so if we go back to paragraph

SKINNER

132, if we look at what the complaint says, it talks about the merger being called off. It talks about another federal investigation that Juul had announced on this date, that Juul had also announced the replacement of the CEO and that Juul had further announced that it would stop all advertising in the U.S.

So there are a number of elements to what plaintiffs are alleging as corrective information on this date. I infer from that that plaintiffs are alleging that that bundle of information would have a negative effect on stock price, and so that corrective bundle, if you like, would need to be evaluated for possible price impact.

And then we have, as mentioned in paragraph 135, the tightening of the guidance range, which seems to me to be unrelated to allegations and not corrective, which is potentially positive news.

Q. So as you point out, the plaintiffs allege that certain negative fraud-related news came out on that date, and you point out there is some unrelated, some non-fraud-related positive



SKINNER

news on that day, and I guess did you take on any assessment to determine whether the fact that there was -- you did not find any statistically significant stock price decline on that day was the result of the impact of the positive non-fraud-related news masking or mitigating the impact of the negative allegedly fraud-related news? Did you take on that analysis?

A. Sure. I am happy to speak to that. I certainly considered that, and obviously if we look at Exhibit 6, I did the event study analysis that I did on all the other corrective dates. I found that the stock price response on this date was not statistically significant, and so one then looks and says, okay, well, we've got the tightening of the guidance range, and it would be possible in some situations to do what I would call an earnings response coefficient type of analysis for this date, and I have done that in other situations.

The challenge here specifically is that it wouldn't ultimately in a statistically reliable way have allowed me to answer the question, and I believe I discussed this briefly before, but just to reiterate, so what one would have to do would be



SKINNER

to adjust the abnormal return that I have calculated and reported in Exhibit 6, and I know that we have established before that return was not statistically significant, but one would then want to try and adjust that for any positive effect of the tightening of the guidance.

Now to evaluate the stock price effect of the tightening of guidance would entail another statistical regression analysis that is somewhat different from the one that is required to calculate the abnormal return as part of the event study.

So just to put this as simply as I can, we have got a statistical process that generates the calculation of the abnormal return and the associated standard error and T-statistic. I would have to do another similar type of analysis to try and calculate the effect on stock price of the guidance that would have required a different type of regression analysis, which would have generated a different set of estimated effects and associated standard errors, and given the complications here and the data available to me, it simply wasn't possible to do that here in a



SKINNER

reliable way with the information that I had at hand.

Q. Turn to paragraph 136. 136 you state, referring to the September 25 date, you state, "The lack of statistically significant stock price movement on this date, along with the mismatch between the contents of the alleged corrective events and the alleged misrepresentations raise substantial doubt as to whether any stock price movement on September 25, 2019 can be used as evidence of earlier price impact of the alleged misrepresentations."

Do you see that?

A. I do. Yes.

Q. Just to be clear here, you are not providing the opinion here that the announcement on this date had no price impact on Altria's securities, correct?

A. Correct. Just to be clear, I will just restate that. I'm not reaching the type of conclusion that I reach with respect to the eight dates that there is no price impact. Instead, I am reaching the conclusion there is substantial doubt about whether any stock price movement on

Page 137

SKINNER

September 25, 2019 can be used as evidence of earlier price impact of the alleged misrepresentations.

Q. Similarly, I apologize if this seems similar, you are also not opining that the stock price movement on September 25, 2019 cannot be used at all as any type of evidence of price impact? You just have your doubts?

A. Well, I have substantial doubt, and I am thinking about this because there is two components here of the conclusion or bases for the conclusion. There is the lack of statistically significant stock price movement overall on this date along with the mismatch that I discuss, and both of those things together lead me to this conclusion of substantial doubt.

Q. On September 25, you found that there was an abnormal return of negative 2.37 percent, correct? That is in Exhibit 6 and a T-statistic of negative 1.496?

A. So on this date, which is September 25, 2019, the abnormal return is minus 2.37 and the T-statistic I report in Exhibit 6 is minus 1.5, which is not statistically significant at the

Page 138

SKINNER

5 percent level.

Q. And this abnormal return is after, as part of your analysis of the event study, you removed market and industry factors, correct?

A. Yes. Again as described in the event study methodology discussion in the report, that is an abnormal return, which means I have adjusted for the effect of market factors and industry factors.

Q. And you are not providing, I think you might have answered this, but you are not providing any opinion, you didn't do any analysis to determine why Altria's stock price had this negative abnormal return of negative 2.37 percent, correct?

A. Again, I want to be clear about how we as economists and statisticians interpret event study evidence. The fact that we have an abnormal return of negative 2.37 percent and the associated T-statistic that indicates that this is not statistically significant means that we are effectively saying that return is not reliably different from zero.

Q. Could you turn to paragraph 137 on page 56 as well where you are discussing the

Page 139

SKINNER

February 21, 2020 date. We touched on this a little bit earlier when we were discussing the other late February dates. Here you are discussing again the Wall Street Journal article disseminated late in the day on February 21, 2020 conveying that the SEC had begun an investigation into Altria. Correct?

A. Yes. That is what I have summarized here in paragraph 137.

Q. Now you are not opining here, as you do with some of the other corrective events, you are not opining here that there was a mismatch of information, correct?

A. Well, I would say it a little differently. I would say that all of the events in this portion of my report, I am thinking of under this general mismatch heading, and I'm including this thing here. So as I think the beginning narrative and summary of Section 6 indicates, for these seven dates, I am reaching a conclusion of substantial doubt based on the mismatch that I am seeing on these dates.

So even though I don't use the term "mismatch" here, there is as an economist an

Page 140

SKINNER

assessment of mismatch or substantial doubt about whether the inference that I believe plaintiffs are seeking to draw can be made.

Q. So is there anywhere in your report that you provide the opinion that there was a mismatch of information between the information you disclose in the Wall Street Journal having to do with the SEC investigation into Altria and the alleged false statements? Can you point anywhere in your report where you provide that opinion?

A. Sure. As I just indicated, the introductory paragraphs to Section 6, so if we were to read those paragraphs in conjunction with what I am articulating in the specific discussion here.

Q. Which paragraph? Specifically which paragraph talks about February 21, 2020 and says there is a mismatch?

A. Sure. I am pointing to these paragraphs. So for example, in paragraph 78, I say based on my review and analysis, I reach an affirmative opinion that there was no price impact with respect to eight alleged corrective disclosure dates. As for the remaining seven event dates, which would include February 21, 2020, given the

Pages 137 to 140

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 141

SKINNER

mismatch between the contents of the alleged corrective events and the alleged misrepresentation, there is substantial doubt as to whether any stock price movements on these dates can be used as evidence of earlier price impact.

Q.   So what is the mismatch between the allegation that defendants did not adequately disclose the risks associated with the investment in Juul and the SEC launching an investigation as to whether Altria fully disclosed the risks associated with its investment in Juul?  Where is the mismatch?

A.   Sure.  I think that is what I lay out in the paragraphs that begin with paragraph 137. So let me start by just indicating what plaintiffs claim as corrective on that date is that the SEC had launched an investigation as to whether Altria fully disclosed to its shareholders the risk associated with its investment in Juul.

Now what I point out here in paragraph 140, for instance, I say "First, by February 21, 2020 a number of negative developments regarding Altria's investment in Juul had become known to the market that would presumably have put the market on

Page 142

SKINNER

notice of various significant risks related to the Juul investment.   For example, plaintiffs allege a number of such negative developments as being corrective events for nearly a year before February 21, 2020.   In addition, I go on to point out that Pomerantz, a plaintiffs law firm, filed a securities class action complaint on October 2, 2019 and issued a press release on that date. That press release and the lawsuit generally make allegations regarding alleged deficiencies in Altria's risk disclosures.

So the market was aware of the risks and the market was aware of allegations that those risks were deficient in some way.   I also point out, which is the next paragraph, citing this specific academic evidence which is specifically on target for this type of disclosure is that we have academic evidence that when the SEC announces investigations, the stock price tends to go down regardless of whether those investigations actually lead anywhere.

So all of this to say, if I can finish to answer your question, which was about the mismatch, that when I look at this allegedly

Page 143

SKINNER

corrective information, in my mind, the pace of the allegedly corrective information that the SEC had launched investigation in and the subject of the investigation was the allegedly deficient risk disclosures around Altria's investment in Juul, that information was already in the marketplace.

We know from this academic evidence that SEC, sorry, SEC investigations, yes, investigations as opposed to enforcement actions have a negative effect on stock price even when they don't go anywhere, so that is what is creating the mismatch and substantial doubt in my mind.

And I also point out which I observe here that as far as we know, this investigation didn't result in an enforcement action or other adverse outcomes for the company.

Q.   My question for you, though --

MR. MILLER:   Let the witness finish.

Q.   I asked a very simple question, and basically you just read four paragraphs of your report.   I let you go for a while, but I would like to focus on something specific.

Do you agree that plaintiffs' theory of liability here is that the defendants

Page 144

SKINNER

misrepresented the risks of the investment in Juul, that is plaintiffs' theory of liability, correct, they did not adequately disclose the risks associated with Altria's investment in Juul?

A.   That is my understanding of part of the allegations, yes.

Q.   Okay.  Assuming that plaintiffs can prove their case that defendants did misrepresent the risks associated with the investment in Juul, wouldn't an SEC investigation into the fact that Altria did not adequately disclose the risks associated with its investment in Juul be a materialization of that risk?

A.   And what I am trying to point out, and I tried to clearly indicate in my answer to the previous question, is that I have substantial doubt about whether any stock price decline on February 21 can be used as evidence that those allegations of the alleged misrepresentations had price impact.

Q.   That is not my question.   I'm not asking you about your opinion on whether you had substantial doubt about price impact.   We will get there.   I am asking you whether based on

Pages 141 to 144

Page 145

SKINNER

plaintiffs' theory, assuming plaintiffs can prove their theory whether an announcement of an SEC investigation that Altria did not adequately disclose the risks associated with the investment in Juul would be a materialization of the risk under plaintiffs' theory?

MR. MILLER: Objection. Asked and answered.

A. And I think a way for me to try to respond to this is that my interpretation as an economist based on the academic evidence and the other evidence here is, when we look at this event, see materialization of some risk, the materialization or the adverse outcome that represents a materialization of some form of risk could simply be that there was an SEC investigation announced on this date separate from the content of that allegation.

Q. I just want to be clear. So, if we have a hearing on class certification in front of the judge and we ask you this question of whether or not the announcement of an SEC investigation into whether or not Altria adequately disclosed the risks associated with the Juul investment is a

Page 146

SKINNER

materialization of the risk under plaintiffs' theory, you're not going to say yes, it is a materialization of the risk under plaintiffs' theory?

MR. MILLER: Objection. Asked and answered.

A. Again, what I am trying to explain is that, as an economist looking at this event, meaning the February 21 Wall Street Journal article, what plaintiffs are essentially alleging as corrective on that date is a bundle of two pieces of information, if you like. There is an SEC investigation, and then there is the content of the SEC investigation, and I am saying, when we look at what the market was responding to on that day, which we could characterize as a materialization of some kind of risk, that there is substantial doubt in my mind as to whether that is tied to the piece of information that relates to plaintiffs' allegations that Altria had allegedly deficiently disclosed the risks, and that is the nature of the mismatch that's at issue on this date.

Q. If you could turn to paragraph 142.

Page 147

SKINNER

Again this is where you provide your sort of conclusion on the February 21 date, and this is where you have your opinion that, as a result of your analysis you discuss in the previous paragraphs, it raises substantial doubt as to whether any stock price decline on February 21, 2020 can be used as evidence of earlier price impact of the alleged misrepresentations as opposed to the market reacting to news that a government agency was investigating Altria. Do you see that?

MR. MILLER: Objection to form.

A. Yes, I do.

Q. And, just to be clear, as we did with some of the other ones, you are not providing the opinion that the announcement of the SEC investigation had no price impact on Altria securities, correct?

A. Well, I think the language in this paragraph speaks for itself in terms of the conclusion.

Q. But I just want to understand specifically what you are opining and what you're not opining just so it's clear. You are not providing the opinion that the announcement of the

Page 148

SKINNER

SEC investigation had zero price impact on Altria securities, correct?

A. So again I think the best way to respond to that is just to refer back to paragraph 78 where for eight of the alleged corrective disclosure dates, I reach an affirmative opinion that there was no price impact, whereas for the remaining seven dates, including this one, I reach a conclusion that there is substantial doubt as to whether any stock price movement on these dates can be used as evidence of earlier price impact.

Q. So you are not providing the opinion that the announcement of the SEC investigation had zero price impact on Altria securities, yes or no?

MR. MILLER: Objection, asked and answered.

Q. Either you are providing an opinion or you are not?

A. Well, I think my opinion is clear as I have pointed out in paragraph 78. The words speak for themselves and for February 21, 2020 is one of the seven dates, and as I indicate in paragraph 78, given the mismatch between the contents of the alleged corrective events and the alleged

Pages 145 to 148

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 149

SKINNER

misrepresentations, there is substantial doubt as to whether any stock price movements on these dates can be used as evidence of earlier price impact.

Q. Are you providing the opinion that the sky is blue today? Can you answer that or are you going to point me back to some other statements? I am just trying to clarify what you are opining and what you are not opining on. I don't understand why it's so difficult. So I'll ask you again. I just want to understand yes or no, you are providing the opinion. I assume you know what opinions you are providing here today.

Is it true that you are not-- I will ask you are you opining that the announcement of the SEC investigation, that the announcement of that investigation had zero price impact on Altria securities? Is that an opinion that you are providing in your report?

MR. MILLER: Objection. Asked and answered.

A. Again, I just want to be very clear and I think my report is very clear about what opinion I am offering in this case, and I think the language in the report in its entirety is clear and

Page 150

SKINNER

speaks for itself, and for the seven dates which include February 21, 2020, what I have concluded is, given the mismatch between the contents of the alleged corrective events and the alleged misrepresentation, there is substantial doubt as to whether any stock price movements on these dates can be used as evidence of earlier price impact. I think that is clear in terms of what my opinion is.

Q. Do you have an understanding as to what it means to give an opinion that a piece of information had no price impact on a security? Do you understand what that means?

A. I think my report is very clear about what that means and --

Q. Are you providing that opinion as to the announcement of the SEC investigation on February 21?

MR. MILLER: I don't think Professor Skinner finished answering that last question.

A. That's correct. I thought there was agreement that we wouldn't talk over each other, and now you've interrupted me a number of times

Page 151

SKINNER

before I finished answering, and I think, to be responsive to your previous question, as paragraph 78 indicates, among other places in my opinion, based on my review and analysis, I reach an affirmative opinion that there was no price impact with respect to eight of the alleged corrective event dates.

So I believe I do understand what it means to reach an opinion as to no price impact, and I think we have discussed earlier and my report articulates carefully what it means to reach that conclusion.

Q. Are you providing that opinion, that conclusion, as to the announcement of the SEC investigation on February 21, 2020?

A. I'm not providing that opinion, because that opinion, as I have made clear and I think the report is very clear about, relates to the eight dates that are indicated in Section B of Section 6 of my report, whereas the February 21, 2020 date is in the section where I discuss the seven event dates for which I'm opining there is substantial doubt as I call it.

Q. Okay. Can you turn to paragraph 143.

Page 152

SKINNER

This is where you are discussing the August 29, 2019 date. On this date, according to the complaint, "The Wall Street Journal reported that the FTC was investigating whether Juul used influencers and other marketing practices to appeal e-cigarettes to minors."

Do you see that?

A. I do, yes.

Q. Now you agree that this was new information to the market, correct?

A. Well, I would agree there is a Wall Street Journal article that reported that the FTC was investigating whether Juul used influencers and other marketing practices to appeal the e-cigarettes to minors.

Q. Did you as part of your analysis of this corrective event, did you make a determination as to whether the information was new or not?

A. Well, I think that is, as is standard in event study analysis, one of the things that is often the question of interest in doing event study analysis is whether in fact information is new or not.

Q. So did you do that as to the August 29

Pages 149 to 152

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 153

SKINNER

disclosure from the Wall Street Journal regarding the FTC investigation?

A.   So I certainly did an analysis as I have done for all of the other dates of the abnormal return on that date as part of my event study as reported in Exhibit 6 in the report.

Q.   Did you do an analysis as to the information disclosed on September 29, 2019 as to whether or not the information was new or whether the announcement or information had been previously disclosed to the market?

A.   Well, as I think I observed in the next paragraph in the report, the Wall Street Journal article that is referenced in paragraph 143 where I quote from the complaint discussed that there had been previous investigations by the FDA and others I believe into Juul's allegedly marketing to youth. So there had been other investigations of this, so, yes, I did analyze this and that is part of the discussion in paragraph 144.

Q.   So but you don't dispute that the announcement of the FTC investigation of August 29 was the first time that the FTC investigation was made public, correct?

Page 154

SKINNER

A.   It is my understanding that this was the first time that an FTC investigation into Juul's marketing practices had been made public.

Q.   And you agree that the announcement, this announcement was negative news, correct, for Juul and Altria?

A.   Well, I will agree, as I have reported in Exhibit 6, that on this date there was a negative and statistically significant stock price movement in the price of Altria shares.

Q.   Assuming plaintiffs can prove that defendants misled the market about Juul's marketing to minors, would you agree that the announcement of an FTC investigation into whether or not Juul marketed to minors would be a materialization of the risk concealed by defendants' allegedly misleading statements?

A.   Well, again stock price declines can generally reflect materializations of risks.   I think what I am describing here is again a mismatch in the sense that as is the case for other types of government investigations, not surprisingly when a government investigation of any kind into a company is announced, there tends to be a negative stock

Page 155

SKINNER

price response.

What I am conveying in paragraph 144 is that there were a number of previous press articles and other types of announcements that would have made the market aware that there were concerns and allegations and investigations into Juul's marketing practices, and in particular into the marketing practices to minors, and so the reason that this is included in the substantial doubt section of my report is because similar to the SEC investigation, it could be the case that the market is responding to the FTC investigation as opposed to the content and subject of that SEC investigation, which is to whether Juul used influencers and other marketing practices to appeal e-cigarettes to minors.   I think there is a word missing there.

Q.   So my question, though, goes to your analysis of making determinations based on plaintiffs' theory what would and what would not be a materialization of the risk.   Did you undertake that analysis as part of your engagement?   Did you attempt to, based on your understanding of plaintiffs' allegations, to make a determination as

Page 156

SKINNER

to what under plaintiffs' theory, assuming plaintiffs can prove their theory, what would and what would not be a materialization of the risk?

MR. MILLER:   Objection to the form.

A.   So as I understand plaintiffs' allegations, they include that the alleged intentional marketing to youth could result in certain adverse consequences to Juul and to Altria, and I further understand that plaintiffs' allegations are that at some point those risks materialized.

I think as an economist what I struggle with in this, and I think this is discussed in Section 7 of my report and elsewhere, is we know as this section points out, there was a lot of information, including from before the class period, about the nature of Juul's practices.

So the stock price impact of this type of information and the materializations of risk of a time are what generally I am raising questions about and what generally when I look at Dr. Nye's purported methodology I have concerns about, because to figure out whether these materializations of risk ultimately result in

Pages 153 to 156

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 157

SKINNER

damages, one has to separate the risks that were allegedly concealed from risks that were known and disclosed by the company, and that is part of the complication that runs throughout this case.

Q.   I'm not asking about an assessment of damages.   I am simply asking do you agree that under plaintiffs' theory, that defendants misrepresented to the market when they assured everyone repeatedly, as you pointed out earlier, that Juul never intended to market to minors, that the announcement of an FTC investigation into whether or not Juul marketed to minors would be a materialization of that risk.   Putting aside getting into details of loss causation and damages, would you agree that under plaintiffs' theory, that would be a materialization of the risk?

A.   I agree it could be a materialization of that risk.   The point I am making about the event that happened on August 29, 2019  is that we have got an event where an FTC investigation becomes public for the first time, and the subject of that investigation was related to Juul's allegedly intentional marketing to minors.  And what I am pointing out is as an economist, there is ambiguity

Page 158

SKINNER

about any market reaction on that date because it could well be in my mind that the market was responding to the fact of an SEC, sorry, an FTC investigation, as opposed to the content of that investigation, and I think the other point I make here is that this investigation has not resulted at this time in any adverse findings or enforcement action as far as we know.

Q.   Looking at paragraph 145, you state that "The prior news of investigations that focus on marketing to youth, the prior information regarding Juul's use of influencers, and the lack of analyst commentary in response to the news of the FTC investigation raise substantial doubt as to whether the negative and statistically significant stock price movement that occurred on the date the article in the Wall Street Journal was published, (August 29, 2019) can be used as evidence of earlier price impact of the alleged misrepresentations as opposed to the market reacting to news a government agency was investigating the company."

Do you see that?

A.   Yes.

Page 159

SKINNER

Q.   Now here unlike in some of your other analysis of other dates, you do not state here that there was a mismatch of information.   Are you saying that you are opining that there was a mismatch of information between the alleged false statements and the alleged corrective event?

A.   Yes, and this is where I think the structure of the report is clear.   I discuss the eight dates on which I am concluding there is no price impact.   And again, we can go back to language of paragraph 78, and then we have the seven other dates where I am opining that there is substantial doubt about price impact, and this is one of those dates and that includes the assessment that there is a mismatch and therefore an inference problem.

Q.   Okay.   Now again I am just making a distinction here between your opinions in this section and the opinions on some of the earlier days that you mentioned.   I want to be clear what opinions you are providing and what opinions you are not providing.

You are not providing an opinion that the announcements of the FTC investigation had zero

Page 160

SKINNER

price impact on Altria securities, correct?   You are not offering that opinion?

A.   Well, again I would say this date is not included in the set of dates for which I reach an affirmative opinion that there was no price impact of the corrective event.

Q.   On August 29, it was under your event study, it was statistically significant, and specifically in your Exhibit 6, you found that there was an abnormal return after removing market and industry factors of negative 5.87 percent with a T-statistic of negative 3.673.   Correct?

A.   Yes.   You seem to be adding a decimal. You said 3.673.   I think the number I report in Exhibit 6 is negative 3.67, but otherwise, what you read out was correct.

Q.   Thank you.   I was working off my own set of separate calculations, but I appreciate that.   I have done with the assistance of someone who is better at this than I am, the confidence level with the T-statistic equates to a confidence level and the confidence level of a T-statistic of negative 3.67 is equivalent to a confidence level of 99.97 percent.

Pages 157 to 160

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 161

SKINNER

I know that you might not have the information in front of you, but based on your knowledge of what the T-statistic is, does that sound in the ballpark of where this confidence level would be?

A.   Again, yes, you are correct.   I haven't got those numbers in front of me.   But certainly the confidence level would be relatively high and 99 percent does not sound implausible.

Q.   Let's just assume for the sake of our conversation here that the confidence level is 99.97 percent.   A confidence level of 99.97 percent means that one would expect to see an abnormal decline of the size that occurred on August 29, if there was no price impact from the news, only 0.03 percent of the time.   Is that correct?

A.   That is what the confidence interval means.  And again, I am cautious when you throw in the term "price impact."   What this allows us to conclude along with any date where there is a negative and statistically significant return is this tells us that there was a negative abnormal return on this day, and it is reliably negative, so

Page 162

SKINNER

we know the stock return on this date is negative and statistically significant, and that is what, with a high level of confidence as you have pointed out.

Q.   Did you do -- let me take a step back.  You don't identify any other Altria relevant news that came out on August 29, do you, or do you?

A.   I am just reading.

Q.   Sure.

A.   To be sure.   Yes.   As far as I remember, there was no other news that I was able to uncover on this date, nor were there any analyst reports on this date.

Q.   Okay.   So did you conduct any analysis, come to any conclusion to determine why Altria's stock price had declined in a negative statistically significant way after removing all industry and market factors on August 29?

A.   So I think the conclusion that I reach on this date is relatively straightforward in the sense that as we have just discussed, there was a negative and statistically significant stock price decline on this date.   There was an announcement of the FTC investigation on this date.

Page 163

SKINNER

I think the reason that I have expressed an opinion of what I call substantial doubt on this date is that as I discussed, in my view, there are two pieces of information included in the bundle that plaintiffs are pointing to as corrective information.   One is we know there was an FTC investigation announced.   We know in addition, that the FTC was investigating Juul's allegedly intentional marketing to youth.

The substantial doubt arises because that second piece had been discussed extensively in the marketplace in terms of other similar types of government investigations.   In addition, as I point out, there was information in the marketplace including from before the class period, and I cite the CNN article that tells us that it was publicly known that Juul had used influencers as part of its social media campaign.

So we know all that information was in the public domain.   So the substantial doubt I have, and the mismatch part of this comes in in understanding the extent to which the stock price reaction was due simply to the fact that there was a new FTC investigation, so we have a new

Page 164

SKINNER

government investigation, and whether the market was responding to that it seems to me is very plausible as it is in general, and as a result you could get the negative and statistically stock price reaction.

Q.   But as part of your engagement, you didn't take on the task here of analyzing which pieces of these two groups of information caused, created the price impact on August 29 or a certain percentage was as to one piece of information and a certain percentage was as to another piece of information.   As part of your engagement here, you didn't take on that task, correct?

A.   I did not at this time take on that task, no.

MR. WERNKE:   We have been going about an hour.   Do you want to take a five or ten-minute break or do you want to keep going?

MR. MILLER:   I could go for a five-minute break.

MR. WERNKE:   All right.

THE VIDEOGRAPHER:   The time is 3:09 p.m.   We are off the record.

Pages 161 to 164

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 165

SKINNER

(Recess taken)

THE VIDEOGRAPHER:  The time is 3:16 p.m. We are back on the record.

BY MR. WERNKE:

Q.   Professor Skinner, I would like to focus on footnote 249 on page 60 where you discuss the term "match" or "mismatch."

A.   Yes, I'm there.

Q.   In footnote 249, where you are discussing the term "mismatch," it states, "This does not mean that an alleged corrective event needs to exactly 'match' or 'mirror' the earlier alleged misrepresentation, but, in the absence of a clear match, an economic expert needs to employ a scientific and reliable methodology to establish that the two sets of information - one alleged to have been concealed earlier and the other to have been revealed later - have the same impact on stock price."

Do you see that?

A.   I do, yes.

Q.   So are you saying here that if there is a mismatch, the expert analyzing the mismatch has to conduct additional analyses concerning the

Page 166

SKINNER

corrective events or corrective information and the misrepresentation before providing any opinion as to whether or not the misrepresentation itself had a price impact or had no price impact?

A.   What I am trying to do there I think, and it is obviously a footnote, is I am trying to provide additional explanation for the point that I am making in the body of the text, which says that when there is a mismatch between information revealed on alleged corrective date and information that plaintiff alleged had previously misrepresented, a stock price decline on the alleged corrective disclosure date is not necessarily an indication of price impact of the prior alleged misrepresentations.

And the reason for that or explanation of that is that I'm not saying that there necessarily needs to be an exact match or mirroring between the corrective information and the alleged misrepresentation, but part of the assessment here is to what degree one can infer from the so-called back end price impact that there was price impact of the alleged misrepresentation at an earlier point in time in the class period.

Page 167

SKINNER

And so it is really just elaborating on that, and then I go on and link this discussion to what we discussed briefly before, which is my understanding of part of the Supreme Court's ruling in the Goldman Sachs case earlier this year.

Q.   In assessing the connection between the corrective information, the misrepresentation, you talk about that an expert needs to employ a scientific and reliable methodology before making conclusions as to what extent a price impact on a corrective information or lack thereof creates an inference of a price impact on a misrepresentation.

Is it your opinion that the need of an expert to employ scientific and reliable methodology, that applies equally to someone who is providing an opinion of no price impact as it would to someone who is providing an affirmative opinion of price impact?

MR. MILLER:  Objection to the form.

A.   I wouldn't put it in that way.  I think the way I think about this is that the role of an expert economist, such as is the case for me in my assignment here, is to use a reliable and well developed methodology to make an assessment in this

Page 168

SKINNER

case as to the assignment I was given, which is at a high level to assess and make judgments about price impact of the various alleged corrective events here.

I don't agree that the type of methodology is dependent on whether you are reaching an affirmative or other type of opinion. In other words, I am asked to do an assignment and I go about executing that assignment using my economic knowledge and my skills and my expertise and so on applying a reliable methodology to the best of my ability to perform my assignment.

Q.   It is your belief, I assume, that the methodology you applied in evaluating whether or not there was price impact in this case is a scientific and reliable methodology?

A.   Yes, absolutely.  I agree.

Q.   Can you take a look at paragraph 147.

A.   Yes, I'm there.

Q.   At 147 you are talking about, paragraph 147, you are discussing corrective events on April 3, 2019, August 30, 2019 and September 12, 2019 concerning news of investigations into seizures and respiratory illnesses linked to

Pages 165 to 168

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 169

SKINNER

e-cigarette products, correct?

A. That's correct.  Yes.

Q. In evaluating these days, you state, "These alleged corrective events related to the vaping industry as a whole as opposed to Juul products specifically; in contrast, the alleged misrepresentations are specific to Juul.  This mismatch raises substantial doubt as to whether any of Altria's stock price movements on these alleged corrective event dates can be used as evidence that the alleged misrepresentations impacted Altria's stock price earlier in the putative class period."

Do you see that?

A. I do, yes.

Q. As we discussed before, because this is in this section as opposed to the earlier section, I am correct you are not providing the opinion here that the announcement on April 3, 2019 had no price impact on Altria's securities, correct?

A. That's correct.  Yes.

Q. And likewise, you are not providing the opinion here that the stock price movement on September 12, sorry.  Let me rephrase.  Strike that.

Page 170

SKINNER

You are also not providing the opinion that the stock price on April 3, 2019 cannot be used at all as evidence of price impact?

A. Well, again, I think I just want to be clear about the distinction between the two sets of conclusions that I have reached with the different dates.  So as we discussed before, I think it is clearly articulated in paragraph 78 for the eight alleged corrective event dates that I discuss in Section 6B of my report, I reach an affirmative opinion that there was no price impact.

As for the remaining seven dates, which include April 3, 2019 and September 12, 2019 but not August 30, 2019, I reach a conclusion of substantial doubt based on the mismatch.

Q. Okay.  So then as to September 13, it sounds like it is correct then you are not opining that the stock price movement on September 13 had zero price impact on Altria securities, correct?

MR. MILLER:  Objection.  September 12 you mean?

MR. WERNKE:  Thank you.  I will rephrase.

Q. I think I understand you then.  You are

Page 171

SKINNER

not opining that the stock price -- you are not opining that the announcement on September 12 cannot be used -- I apologize.  I keep reading the wrong thing.  Start over.

You are not providing the opinion that the announcement on September 12, 2019 had zero price impact on Altria's securities, correct?

MR. MILLER:  Objection to the form.

A. Well, again, let me just rephrase it to make sure that we are correct.  We understand here.  So the plaintiff is making an allegation about alleged corrective information that was revealed to the market after the close on September 12.  As a result, I analyze the stock price movement on September 13, 2019 as part of my evaluation of whether that disclosure on September 12 could have had price impact, and my conclusion is that I have substantial doubt because of the mismatch.

Q. Okay.  So you are not providing the opinion then that the announcement on September 12 after the close of trading had no price impact on Altria securities on September 13, correct?

A. That's correct.  I'm not opining on that at this time.

Page 172

SKINNER

Q. Okay.  Now for April 3, 2019, you found that there was a statistically significant abnormal return of negative 4.59 percent with a T-statistic of negative 2.77.  Is that correct?

A. That's correct.  Again just for the record, this is reported in Exhibit 6 of my report.

Q. And I will represent to you we did the calculation, and we came up with a confidence level of 99.4 percent.  Now on April 3rd-- does 99 percent sound about right based on the T-statistic there?  That doesn't sound off, right?

A. Well, again, I don't have the calculations in front of me.  I think similar to what we discussed for 8/29/19, what my analysis shows and what the T-statistic shows is that there was a negative and statistically significant stock price response on that date at a relative high level of confidence that exceeds 95 percent.

Q. Okay.  Now, for April 3rd, correct me if I'm wrong, but you don't identify any other Altria-relevant news on this date, correct?

A. I believe that's correct.  Yes.

Q. As part of your engagement here, you were not asked to and you did not conduct any

Pages 169 to 172

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 173

SKINNER

analysis to determine why Altria's stock price had this negative statistically significant decline on April 3, 2019, correct?

A. Well, I think as my report earlier in this section indicates, certainly on all of these dates, whether it's the eight dates in the first part of this section of my report or the seven dates in the second part of my report, looked at analyst reports, looked at public press, so I did this analysis for all of the various dates here, and I think at various times there were footnotes which discuss information that came to the market on the various dates if there was any.

Q. But you are not providing an opinion. You are not providing an opinion. You didn't reach a conclusion as to what information caused or resulted in the price impact on April 3, 2019 or the statistically significant decline, correct?

A. So, yes, I'd just say it a little differently. As we discussed, the results of my event study indicates that there was a negative and statistically significant return on this date. Plaintiffs are alleging there was corrective disclosure on this date, which is summarized or

Page 174

SKINNER

presented in paragraph 148 regarding an FDA investigation, and what my assignment was with respect to this date as it was for all of the others was to evaluate whether any stock price decline could be used as evidence that an alleged misrepresentation early in the class period had price impact based on my analysis of the stock price movements and other information on the alleged corrective date.

Q. Were you asked as part of your engagement to determine whether or not the announcement on April 3, 2019 had a price impact on Altria's stock on April 3, 2019?

A. Well, again I think we should refer to paragraph 11 of the report which indicates my assignment for all of the dates including this one, and the assignment was to evaluate whether movements in Altria's stock price at the time of the alleged corrective events are evidence the alleged misrepresentations impacted Altria's stock price earlier in the putative class period. So that is my assignment for all of those dates.

Q. So on none of these dates you analyzed are you providing an opinion as to whether or not

Page 175

SKINNER

the information that came out on that date had a price impact on that date?

A. Well, again I would just refer to paragraph 78, which I think is a convenient summary of what I have concluded with respect to each of the dates. And there were certainly some dates for which I concluded that there was no price impact with respect to allegedly corrective information on certain of the dates.

Q. Okay, so then let's focus in on this one since it varies a little depending on the date. That is why I wanted to focus on April 3. As far as April 3 is concerned, as part of your analysis, you were not asked to and you did not conduct an analysis to determine whether the announcement on April 3, 2019 had a price impact on April 3, 2019, correct?

A. Well, again, I just want to be clear about what my assignment was, and again, I just refer to my assignment as indicated in paragraph 11, which was to evaluate whether movements in Altria's stock price at the time of the alleged corrective events, so in this case, including on April 3, 2019, are evidence that the alleged

Page 176

SKINNER

misrepresentations impacted Altria's stock price earlier in the class period.

Q. Right, and as part of that analysis, because you have various steps as to each disclosure, as part of that analysis on April 3, are you providing any opinion as to whether or not the disclosure on April 3 had a price impact on April 3?

A. Well, I think the opinion that I express with respect to April 3rd is my opinion regarding substantial doubt as we have discussed in that portion of paragraph 78.

Q. In reaching that opinion--

A. It's an opinion.

Q. Go ahead.

A. It's an opinion related to the assignment that I was given as opposed to just focusing on price impact separate and apart from the alleged misrepresentations.

Q. I am just asking that as part of reaching the substantial doubt conclusion, as part of your analysis that you did, did you come to any conclusion, did you analyze whether or not the April 3 announcement had a price impact on April 3?

Pages 173 to 176

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 177

SKINNER

Was that part of the analysis you did to reach your conclusion about substantial doubt?

A. Well, I think you are trying to decompose the analysis that I did on the various dates, and I think what my report makes clear in discussion, discussing all of these different dates, which I do very consistently, I think, is that I analyze the stock price response on each of these dates, or more correctly, I analyze whether there is a statistically significant stock price movement on each of the dates. I analyze public press and analyst reports that occur around that same date. I analyze what plaintiffs allege to be corrective information on those dates, and my assignment is to then assess on the basis of all that analysis whether any stock price movement on this alleged corrective date, in this case April 3, 2019, can be used as evidence of prior price impact of the alleged misrepresentations, so that is what I did, and again, I think you are trying to decompose that in a way that is different from the way I approach the assignment.

Q. Well, I am definitely trying to understand what you did and didn't do. Let's try

Page 178

SKINNER

it this way. So on April 3, there was the announcement on April 3, and you observed on your event study that there was a statistically significant abnormal return on that date.

Am I correct that, as part of the proper methodology for an event study, because there was a statistically significant negative residual abnormal decline, then you need to reject the null hypothesis as for April 3, 2019, correct?

A. Yes, and so the conclusion then is there was a negative statistically significant stock price movement on that date.

Q. Okay. So similarly then for the date of September 13 involving the announcement on September 12, you also found there was a statistically significant abnormal return, and this one was of negative 3.13 percent with a T-statistic of negative 1.96, and that is in Exhibit 6?

A. That's correct. That is what is in Exhibit 6.

Q. Then, according to the rules of the economics and statistics event studies, you are required in that situation to reject the null hypothesis, correct?

Page 179

SKINNER

A. Yes. So the T-statistic, if you did the relevant calculation, the abnormal return on that date minus 3.13 percent is statistically significant at the 95 percent confidence level.

Q. And correct me if I'm wrong, for the September 12 aftermarket date with the September 13 I guess impact date or analysis date, you don't identify any other Altria-relevant news that could impact the price on September 13, correct?

A. I believe that's correct. Yes.

Q. Turn to paragraph 152. You are discussing the January 30, 2020 date. This has to do with the announcement by Altria of an additional $4.1 billion charge related to the Juul investment, correct?

A. Yes. That is correct.

Q. Now you agree that, prior to this date, the market had not been informed that Altria was taking an additional $4.1 billion charge, correct?

A. That's correct. I would say that prior to January 30, 2020 the company had only made one impairment announcement with respect to its Juul investment, and this was the second impairment announcement.

Page 180

SKINNER

Q. And you agree that the announcement of an impairment, do you agree that is negative news for Altria's investors?

A. Well, again as we discussed with the first impairment announcement, in general with impairments they can constitute negative news, but there are circumstances in which impairments would not necessarily be negative news for companies.

So I think we have to analyze a little bit further before we can understand what exactly the market's response was and why it responded in a particular way.

Q. Okay. Now I believe in this section again you don't use the term "mismatch" in your conclusions having to do with the January 30th, but, since we discussed this with the other ones, are you concluding that there is a mismatch between information, the allegedly corrective information, on January 30th and the alleged misrepresentations?

A. Yes. This is certainly in the set of seven alleged corrective events that I have put in the category of substantial doubt about price impact of the alleged misrepresentations because of a mismatch.

Pages 177 to 180

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 181

SKINNER

Q.  So just focusing, I understand in these sections your substantial doubt conclusion might have several different factors that go into your substantial doubt conclusion, but focusing simply on the mismatch, what is your opinion basis for determining that there was a mismatch?

A.  This is presented in paragraph 154. "The alleged corrective event is the second impairment charge.   However, the alleged misrepresentation, as I understand them, are not regarding the value of the investment when the investment was made or that Altria would not take a second impairment charge once the first impairment charge was announced on October 31, 2019. Therefore, there is a mismatch between the alleged corrective event and what the disclosure was meant to correct."

Q.  Okay.  Now you found that there was a statistically significant abnormal stock price decline following the disclosure of this impairment, correct?   I believe that is in paragraph 153.

A.  Yes, and if we were to look at Exhibit 6, and I shouldn't have said yes, because what I

Page 182

SKINNER

just want to be sure we understand is that there was a negative and statistically significant stock price movement on January 30, 2020, but the information announced by the company on this date included the Q4 earnings disclosures, the fiscal 2019 earnings disclosures, so it was an earnings announcement date with a number of other pieces of information including information divulged from a conference call as well.

So we know the stock price went down in statistically significant fashion on this date, and we also know that there was a bunch of information disclosed as part of the company's earnings disclosures in a conference call.

Q.  So the statistically significant abnormal return on this date was negative .565 percent with a T-statistic of negative 4.07, correct?

A.  Yes, and I believe, just to correct slightly what you said, it's negative 5.65 percent, T-statistic minus 4.07.

Q.  Thank you.   Part of the methodology in the event study in your profession, that means you are required to reject the null hypothesis,

Page 183

SKINNER

correct?

A.  Yes.  As I said, there's a negative and statistically significant stock price movement and we can reach that conclusion at the 95 percent confidence level.

Q.  As part of your analysis here, were you ask to or did you take on the task of determining what information caused Altria's stock price to have this statistically significant negative stock price movement?

A.  Well, as I think my discussion in this portion of the report indicates, and I believe there is a portion of Section 7 in my report that also discusses January 30, 2020 as an example of a date where there is what we might characterize as confounding negative news coming to the market, there are a number of pieces of information that came to the market on this day.

Some of that news is arguably or potentially negative confounding news, and so as is the case with earnings announcements in general, including the previous earnings announcement on October 31, 2019, we have certain items of information, and some of them might be positive,

Page 184

SKINNER

some of them might be negative, which then makes it more difficult to interpret or provide an explanation for any stock price movement.

Q.  So, and I understand, so just for the purpose of what you were asked to do, you were not asked to or you did not take on that additional step that you described there to make that determination, correct?

A.  Well, I think, as I've done for all of these dates, I systematically went through a series of steps to reach a conclusion that was based on the assignment I was asked to perform, and I did that systematically on all of these 15 different dates and reached the conclusions that I did.

Q.  Right.   I'm asking as part of that, I'm trying to make sure, you have a long report here, and I just want to make sure I didn't miss something, you know, somewhere else in another section or somewhere else in a footnote.

I just want to make sure that as part of your analysis for the January 30, 2020 date, after seeing that there was a statistically significant abnormal negative return and you mentioned there were various pieces of information that were

Pages 181 to 184

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 185

SKINNER

revealed on that date, as part of your analysis, you did not attempt to determine to what extent the different pieces of information contributed to the price impact on Altria's stock price that day?

A.   Well, I would say thinking about what factors contributed to stock price movements on each of these days was part of what I did in performing the assignment that was asked of me including on this date, and that is why we see a fairly careful analysis of the various disclosures that occur on these dates and what inference we can draw from any stock price movements in conjunction with disclosures, public press, analyst reports and so on.

So I do the same very systematic analysis on all of these different dates in order to reach a conclusion.

Q.   Can you point to me where in your report you specifically analyze or come to the conclusion as to any piece of information as to its impact on Altria's stock price on January 30th, 2020?   I just want to know where that opinion or that conclusion exists in your report.

A.   Well, I certainly analyzed whether there

Page 186

SKINNER

was confounding news that might have helped explain the stock price decline.  So this is paragraph 161 of my report where I convey or discuss the fact that one of the things that Altria announced on this date was that it would no longer offer multiyear volume forecasts for U.S. cigarettes, and certain of the analysts and I provide an example from a Bernstein analyst viewed that as negative information, and, as I observe, that potentially could contribute to a stock price decline on that date.

Q.   But you didn't come to any conclusion as to what did contribute to the stock price decline on January 30, 2020.   I understand you say there is other information that might have done it, but you didn't take on the analysis to determine ultimately what did cause the statistically significant negative stock price decline on January 30, 2020, correct?

A.   Well, I think if what you are asking about is whether we can arrive at definitive conclusions about what caused stock price movements, and I think the reason that I am being careful here is, as I have indicated, especially on

Page 187

SKINNER

earnings announcement dates when we have multiple pieces of information, some positive, some negative, in most cases coming to the market, it is going to be very difficult to use, to arrive at a definitive conclusion at exactly what caused how much of a stock price movement.

Q.   I understand.   I am just asking to make sure that-- I understand it might be difficult.   I am just confirming that you didn't take on that difficult assignment.   That wasn't part of your engagement?

A.   Well, I don't think that is quite right, because, as I have tried to indicate, my assignment and engagement included my evaluation of all 15 of the dates in the operative complaint including this one, and, as I explained before, I did a systematic analysis of that date including everything that I could reasonably do at this point in terms of doing the event study of the stock price movement on this date, analyzing what analysts had commented on on this date, analyzing public press and certainly analyzing the company's disclosures on this date to try and reach an opinion, as I ultimately did, regarding price impact for each of the dates.

Page 188

SKINNER

Q.   So do you reach a conclusion for price impact on January 30, 2020?  For that date do you reach a price impact conclusion?

A.   I do, yes.

Q.   So, on the date of January 30, 2020, what is your opinion as to whether or not there was price impact?

A.   So this opinion is stated in paragraph 163, and it is a long paragraph, so I will not read the full paragraph out, but the paragraph begins, "These factors taken together," and there is a long dash and a listing of multiple factors, and again these "factors taken together," and then I list the factors, and then I arrive at a conclusion that those factors taken together raise substantial doubt as to whether the negative and statistically significant movement of Altria's stock price on January 30, 2020 can be used as evidence of earlier price impact of the alleged misrepresentations.

Q.   Okay.   So, as we have discussed with some of the other ones in this section, I just want to clarify this and contrast it with some of your earlier opinions in another section, you are not providing an opinion here that the announcement of

Pages 185 to 188

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 189

SKINNER

the second impairment on January 30, 2020 had zero impact on Altria securities, correct?

A. Again, just to be very clear about the language, I refer to the language of paragraph 78, and say this is not a date on which I reach an affirmative opinion that there was no price impact with respect to the alleged corrective information. Instead, I reach the opinion of substantial doubt as to whether any stock price movement on this date can be used as evidence of earlier price impact of alleged misrepresentations.

Q. So let's turn to paragraph or page 67 under the Roman numeral 7 where your heading is "Dr. Nye Does Not Offer a Viable Model or Methodology Capable of Calculating Damages on a Class-Wide Basis."

Are you there?

A. I'm there. Yes.

Q. Okay. In paragraph 166, you talk about, reference your earlier discussion about mismatches between certain information, corrective information and the alleged misrepresentations, and you reference that, and then you state, "The same difficulties exist when modeling any alleged

Page 190

SKINNER

inflation that results from the alleged misrepresentations. Dr. Nye's generic description of a proposed 'framework' fails to indicate how he would deal with such mismatches in measuring inflation."

Do you see that?

A. I do, yes.

Q. And then in paragraph 167 just below that, you go on to say, "In Section B, I discuss why Dr. Nye's proposed damages 'framework' fails to properly measure inflation under plaintiffs' materialization of concealed risk theory of liability."

Do you see that?

A. I do, yes.

Q. So in paragraph 166 and 167, in both of those you talk about the ability to properly measure inflation or to properly model the alleged inflation. Is it fair to say that your criticisms in this section under Roman numeral 7, while they vary as to the specific criticism, they ultimately all go to the ability of Dr. Nye's proposed methodology to reliably calculate the amount of inflation on any given day?

Page 191

SKINNER

A. I think that is certainly an important part of this. I think the way I would put it is that, as I have described here, essentially what Dr. Nye has put forth as his framework, to use his term, is really just a general discussion of an event study analysis along with his claim that such an analysis can be used to measure inflation and damages in this case, and I have, and it's significant, it's about 20 pages long, I have a number of concerns here including those that you have summarized.

I think in some ways they stem largely from the fact that he has, first of all, proposed a framework, an event study, that really doesn't reflect or recognize the complexities inherent in this case of which there are many, and he has simply offered an event study without any further articulation of how a simplistic event study could adequately measure damages in this case.

Q. Have you ever provided opinions in other securities cases as to whether or not an event study can be used to assess damages in that case?

A. I have, yes.

Q. And, in any of those situations, have

Page 192

SKINNER

you ever provided the opinion that the methodology, event study methodology as proposed by the plaintiffs' expert was capable of assessing damages in the case, or have you always found that the proposed model methodology by the plaintiffs' expert was not capable of reliably assessing damages?

A. So I have done a number of class certification reports, all of which include an assessment of plaintiffs' experts' damages methodology. All of these cases offer somewhat different facts and circumstances, and some cases are simpler than other cases.

This case in my experience is especially complicated, given the nature of plaintiffs' theories of liability as well as the very large number of alleged corrective events, and so I think each case has different challenges, but, to answer your question, I have not opined that a damages methodology was capable of reliably measuring damages, but, for different reasons or for varying reasons in different cases. I think one of the things that I found similar to this case is that plaintiffs' experts tend to simply point to an

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 193

SKINNER

event study as Dr. Nye has done here and in previous reports without any apparent consideration of the complexities of the case.

I further offer that, for an event study, a basic event study, to provide an adequate methodology, certain conditions would have to be met, and those conditions are relatively restrictive conditions.

Now that's not to say that some securities cases might conform to those cases. So there may be securities cases where a simple event study could do an adequate job, but the cases that I have been involved with have presented circumstances that mean that the relatively simple event study approach cannot be used to reliably measure damages, and, as I said, this case in particular offers numerous complexities and challenges because of the facts and circumstances, because of plaintiffs' liabilities, because of the nature of the corrective events and the number of corrective events that present I would say unusually difficult challenges for plaintiffs' expert.

Q. Has any court ever agreed with your

Page 194

SKINNER

assessment that the proposed methodology by plaintiffs' expert of the event study, has any court agreed that it could not reliably measure damages?

A. I think it is hard to, at least for me as a non-lawyer to understand exactly the basis for courts' decisions with respect to class certification and other matters.

In terms of whether courts have agreed with me or not, again I think that is hard for me to evaluate. I think I understand at least that there are multiple legal arguments that get considered along with economic analyses of experts such as me in courts reaching conclusions in such cases, so that makes it hard for me to evaluate whether courts, quote, agreed with me or my analysis or not.

Q. Okay. Here you would agree that, generally speaking, the plaintiffs are alleging sort of in the broadest sense, I guess, that defendants made material misrepresentations that artificially inflated Altria's stock price, and the stock price declined when the truth emerged causing financial loss to the plaintiffs in the class.

Page 195

SKINNER

Correct? Is that fair?

A. I think at a very high level that is fair. I think that's an almost generic definition of a securities case, yes.

Q. And you agree at least that the methodology proposed by Dr. Nye at least aims, its goal is to calculate the inflation on each day of the class period based on plaintiffs' theory concerning defendants' misrepresentations and inflation of the stock price and then the loss after the truth was revealed, correct?

A. Correct. I believe that's what the goal of Dr. Nye's purported analysis or methodology would be. I would just observe, as I have in the report, that Dr. Nye apparently makes no attempt to tell us anything about how his event study methodology could be used to address the many specific challenges that are present in this case.

Q. In paragraph 175, you refer to the "definition of out-of-pocket damages in a Rule 10(b)5 securities case." Do you see that?

A. I do, yes.

Q. Now you understand here that the damages that plaintiffs are seeking is referred to, as you

Page 196

SKINNER

refer to in paragraph 175, is referred to as out-of-pocket damages, correct?

A. Yes. I understand that's the usual measure of damages in cases such as this.

Q. And the usual measure of damages in a securities case for out of pocket is that it's the artificial inflation per share at the time of the purchase less the artificial inflation at the time of sale, correct?

A. I believe that is generally correct, yes.

Q. So it is not your view or your understanding that plaintiffs are seeking any other type of damages other than out-of-pocket damages, correct?

A. Again, now we are crossing into legal ground, I think, but, as an economist, that is how I would understand the damages would be assessed here.

Q. Okay. I want to take a look here now at paragraph 176 and 177. You can go ahead and read those or familiarize yourself with those. I have a few questions on these. In paragraph 176.

A. Yes.

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 197

SKINNER

Q. You state that, "while a properly specified event study can control for the effect of market and industry factors on a company's stock price, it cannot by itself control for (remove) the effect of company-specific news that is not corrective of the allegations."

Do you see that?

A. I do. Yes.

Q. And in the next paragraph, you state, "For instance, if I perform an event study and find a statistically significant stock price decline on a given corrective event, it does not mean that I can automatically use that decline to measure the change in price inflation. It could be the case that the stock price change is due to factors unrelated to the allegations that occurred to the company on the same day."

Then further down at the end of the paragraph 177, you state, "In other words, an event study alone is not sufficient to understand whether the price decline on a corrective event date is caused by the allegations or by other factors. Other tools are needed to disentangle the two."

Do you see that?

Page 198

SKINNER

A. I do see that.

Q. So, in these two paragraphs here, am I correct that your criticism is that the methodology proposed by Dr. Nye cannot by itself remove confounding factors, correct?

A. Well, I would say that these two paragraphs are pointing to two general types of limitations of the standard event study. One is the ability to control for what we might call confounding news.

The other, in addition to that, though, is what I mention in paragraph 177 is that part or all of the stock price decline could represent the materialization of some previously disclosed, perhaps adequately disclosed or known to the market risk.

Q. So is it fair to say that, I understand you are making a distinction here, but in both of these paragraphs you are talking about the ability of the methodology to remove non-fraud-related price movements. Is that fair?

A. Yes. Although I think it is important to understand, and the rest of this section of my report I think makes very clear that there are

Page 199

SKINNER

different reasons depending on whether we are talking about what I would call information that is not related to the allegations, what some people might call confounding news, that might have negatively affected the stock price, but, separate and apart from that, there is the issues related to appropriately measuring the effect of materializations of risks that might be concealed from the effect of materializations of risks that might have been adequately disclosed.

So, put simply, the event study cannot address confounding news, nor can it without further information and analysis properly measure damages from risks that plaintiffs may allege have been concealed.

Q. Now, when you refer to event study in the context of these criticisms in this section, am I correct that you are just referring to the analysis of what the total mix of information that came out on a date and evaluating whether or not the abnormal stock price return was statistically significant?

Is that correct, or when you say event study, are you anticipating an additional

Page 200

SKINNER

analysis?

MR. MILLER: Objection to form.

A. Well, of course what I'm doing in this section is evaluating Dr. Nye's methodology, and the problem that I have pertinent to the question you're asking here is that Dr. Nye has not given us any detail beyond just referring to an event study.

So without any elaboration and simply a reference to a generic event study and no discussion of the various complications, whether it's confounding news or materializations of risk here, other than simply mentioning those briefly, Dr. Nye has not really given us any specificity about what he means by an event study, and so I think, if we think about event studies in general as I've summarized earlier in my report, the answer would be yes.

What I've got to assume that Dr. Nye is referring to is an event study that calculates an abnormal return on a specific event date, and then what he does with that is try and use that as the basis for measuring inflation and damages, which is part of the source of my concern.

Q. Okay. So now here you mention that

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 201

SKINNER

other tools are needed to disentangle the two.

So, in reference to the other tools, so you agree then there are other tools beyond the event study, as you sort of described it, that can control for the effect of company-specific news that's not corrective of the allegations.   You agree that there are tools available to sort of disentangle information or address confounding information or distinguish between materialization of a concealed risk versus materialization of a disclosed risk?

A.   So there's a lot of elements that you have put forth there in your question, and, as I have alluded to and made clear in this section, there are a lot of challenges in this case, a lot of different event dates, a lot of potential confounding news, and I give some examples later in this subsection, and we have the materialization of risks, a lot of information that's out there in the market about risk, and so two things I would point out.

First, although there may be tools to address those challenges, Dr. Nye has not provided us with any guidance about what those tools might

Page 202

SKINNER

be and, as a result, provides the court with no assurance that he has available to him some methodology that would be able to reliably deal with these complications in measuring damages.

And the second point is, as we have discussed, there are just a whole bunch of complications here that in my view are unusual and challenging.   We've talked about the mismatch issue.  We have very challenging issues around materializations of risk, some of which may be in the market, some of which the company may have disclosed, some of which plaintiff is alleging were concealed, which makes it very challenging, and so I haven't evaluated exactly what tools one might use, but I believe here the onus is on Dr. Nye to put forth a reliable methodology, which in my opinion he has not.

Q.   Right, so and we will get to the specific criticisms here as we get further into the section, but I just want to understand here you talk about other tools, and so am I correct that looking at the issue of company-specific news that is not corrective of the allegations and you need to control for that, you agree that generally

Page 203

SKINNER

speaking there are tools available to an economist to control for the effect of company-specific news that is not corrective of the allegations.   There are tools at your disposal.   Correct?

A.   Well, again, I don't think one can make very general statements about this.   I would say for certain types of information, there may be tools available that would allow us to estimate the effect of certain types of news on stock price movements, but I don't think one can reach a general conclusion without some articulation of the specific challenges and then consideration of what tools might be applied to address those challenges.

It's simply not possible to say, well, there will always be tools available, which is essentially what Dr. Nye is saying.   As I said, there are some very specific challenges here, and there may or may not be tools available to address those various challenges.   All we can really say is that for some types of information there are sometimes tools available, but, when we have both quantitative information and qualitative information and a variety of pieces of information coming to the market at the same time and you throw

Page 204

SKINNER

in materializations of risks, you've got some very challenging event dates or corrective disclosure dates to try and analyze.

Q.   So, in paragraph 179, and I believe also 180, in 179 you state, "While Dr. Nye points to possible approaches such as discounted cash flow analyses, academic literature on corporate disclosures, and reviewing analyst reports, he fails to provide any indication at all as to which tools he plans to use in this case and/or how these tools could actually be used to reliably determine inflation at different points in time here."

Do you see that?

A.   I do, yes.

Q.   So am I correct that you are not providing the opinion here that the tools identified by Dr. Nye are incapable of determining inflation in this case, correct?

A.   So I put my view on this in the following way.   First of all, I believe that Dr. Nye points to these types of tools, as he calls them, in a very high level way, without giving us any understanding of how they could be applied here.

Pages 201 to 204

New York
212-273-9911
Hudson Court Reporting & Video
1-800-310-1769
New Jersey
732-906-2078

Page 205

SKINNER

So, for example, discounted cash flow analysis. If I was to apply discounted cash flow analysis to try and understand the components and the causes of stock price movements on particular days, to do that as an input, I would need to know changes in the market's expectations about the variable of interest, so, if we wanted to just think about some confounding information, we would need to know for that particular type of information, let's say the market was surprised about a particular aspect of the company's revenues, we would need to have, to use a discounted cash flow analysis to assess the effect of confounding information, we would have to have expected cash flows before and after the event in question.

Now that may be available, but in many cases that simply won't be available, so for Dr. Nye to simply point to discounted cash flow analysis and say it could solve the problem is really a giant leap, and he's asking the court to essentially go on faith he can do that when he has given us no sense that he could actually do that here, given the information and the complexities

Page 206

SKINNER

that are available.

If I go to academic literature on corporate disclosures, I don't honestly know what he is referring to there, because, again, he has provided no specificity. It's certainly possible to look at a vast array of academic literature. Is that going to provide us with the ability to parse the effect on stock price on a particular day of a particular disclosure by a company? I don't think so.

It's, without his telling us exactly what it is he has in mind, it's very difficult to have any confidence that the methodology and these tools he vaguely points to could in any way address the challenges in measuring damages and inflation that are present in the current case.

MR. MILLER: We've been going a little over an hour. Are we coming up on a good spot for a break maybe?

MR. WERNKE: We can stop right now.

THE VIDEOGRAPHER: The time is 4:23 p.m. We are now off the record.

(Recess taken)

THE VIDEOGRAPHER: The time is 4:35

Page 207

SKINNER

p.m. We are back on the record.

BY MR. WERNKE:

Q. Professor Skinner, I want to change gears a little bit back to a few questions having to do with your regression model. If you could turn to page 34 of your report, paragraph 76.

A. Yes, I'm there.

Q. Okay, so in paragraph 76, you state, "For the purposes of my event study, I recomputed Altria's daily returns to remove the effect of changes in the value of AB InBev and Cronos shares (these companies did not operate in the tobacco industry)."

Do you see that?

A. Yes, I do.

Q. Okay. In any of your published academic work or reports submitted in securities litigations, have you ever, quote unquote, recomputed the daily returns of a parent company in this manner for the purposes of conducting an event study to assess the price impact of specific corporate events?

A. I have not, although I think what I'm doing here is a very sensible adjustment. I

Page 208

SKINNER

think, I won't say it's unusual, but certainly in the other cases I've done, and we're not talking about a huge number of different companies here, I have not come across a situation like we have here for Altria where we have a publicly traded company that has minority investment stakes in other publicly traded companies that are in somewhat different sectors, and so, as I indicate in some detail in the footnote, I very carefully remove the effect of changes in the values of these other investee companies, because the focus here is on Altria in its main business, which is primarily the tobacco business, and, for instance, if we were to look at AB InBev, which is primarily a beverage company obviously, maybe not obviously, a beer company, removing the effect of that from Altria's return is a way of getting a more precise measure of the variable that we're interested in here, which is the effect of tobacco and nicotine-related specific information to the company.

So, in other words, it's giving us a cleaner measure of what we really want to focus on in a way that, if we believe the market is efficient and securities are priced efficiently in

Pages 205 to 208

**New York**
**212-273-9911**

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
**732-906-2078**

Page 209

SKINNER

those markets, is a common sense adjustment.

Q.  So okay.  So, in the context of single firm event studies, is the manner in which you removed the effect of changes and the values of subsidiary equity investments, quote unquote, generally accepted in the scientific community?

A.  I would say that this is a type of adjustment that is very consistent with the literature, and I pointed to three academic studies here as the basis for this calculation.  I would also say that the spirit of this adjustment, meaning the way that I do this analysis, is consistent with how analysts that followed Altria thought about the company.

So, in other words, a number of analysts who followed Altria used what I would call a sum of the parts valuation, and what they did effectively was to remove the effect of AB InBev and Cronos and in fact the Juul investment in analyzing the valuation of the core business of Altria.

So I think it's accepted in the academic literature.  I also think it's something that analysts would do, and really what I'm doing here is nothing more than observing that Altria's

Page 210

SKINNER

overall stock price is really nothing more than a portfolio of Altria's core business and AB InBev and Cronos put together, and so what I'm doing, and again I would say this is a very reliable approach, is to remove the effect of these other portfolio investments from Altria's returns to get a cleaner measure of the variable with interest.

Q.  Have you ever seen the manner in which you remove the effect of changes in the values of subsidiary equity investments, have you ever seen it used in a single firm event study?

A.  Well, I just would like to clarify. These are not subsidiaries, these are investee companies, so, for example, Altria has I think approximately a 10 percent interest in AB InBev and a somewhat higher interest in Cronos.  So these are not subsidiary companies, these are investee companies, and Altria does not have a controlling interest in these other companies.

Q.  Have you ever seen the analysis that you did here, the analysis you're discussing, have you ever seen it done specifically in a single firm event study?

A.  Well, as I was going to go on to say, in

Page 211

SKINNER

terms of single firm event studies, if we look at the academic literature, there's very, very little in the way of single firm event studies, because primarily what academics are interested in in peer-reviewed literature, as we mentioned briefly this morning, is looking at hundreds, if not thousands of firms in so doing very aggregated analysis.

So, in terms of single firm event studies, there are very few such studies in the academic literature, but here again I don't think this is in any way a controversial methodology, because we've got very clean data on the values of these investments, and so removing the effect of AB InBev, which is primarily a beverage company, and Cronos, which is primarily a company that operates in the cannabinoid space, is a way of isolating the returns of interest before we're doing our event study analysis.

I think, as we've discussed somewhat before, and Dr. Nye does a somewhat different event study methodology, which I believe is flawed, but the inferences I ultimately get from my event study are quite similar in some ways to some of the

Page 212

SKINNER

inferences that he draws.

Q.  So I'm not asking you about Dr. Nye's event study.  I'm not asking -- I'm just trying to ask a very few specific questions about just so I can understand what you've done here.

So, as to the recomputation method that you've employed here, can you state what is the known or potential rate of error?

A.  Well, in an efficient market it would be very, very small, because both Cronos and AB InBev are publicly traded companies, and so from one day to the next we have observable information from a deep liquid market just like the market for Altria shares themselves.  So we can observe this share price from day to day.  We can observe any dividends that they pay from one day to the next, and so I can very precisely estimate exactly how much on a given day Altria's investment in AB InBev is worth simply by taking the number of shares that Altria holds in AB InBev, multiplying by the observable share price for that company, AB InBev, on a given day, so I would say there's very little, if any, estimation error involved in this.

Q.  But you don't know if the market value

Pages 209 to 212

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 213

SKINNER

for AB InBev restricted shares is the same or different than the value of its publicly traded ordinary shares, right?

A. Well, I would say that what I'm doing with those shares is consistent with how Altria itself values those shares in the sense that Altria values both the restricted shares and the traded shares as having the same amount of value. So it values them exactly the same.

Q. So, but you're assuming that they ultimately are the same value?

A. I think that is a reasonable assumption because that is what Altria itself does, and I'll put it a little differently as well. If we weren't to do this, then to properly try and control for non-firm-specific events, what I would otherwise have to do or ideally would do would be to control for the effect on Altria's stock price of things that affected AB InBev's business or Cronos' business during the event period.

And I'll point out that estimation error from that exercise in my view would be substantially or certainly larger than the estimation error from the approach that I've done,

Page 214

SKINNER

and just to make this very clear because I understand there is some complexity, if we didn't remove the effect of say Cronos, and Cronos is a company that operates in the cannabis business, there are things that affect the cannabis business that would affect Cronos that would be reflected in Altria's stock price, had I not done this exercise of removing the effect of Cronos.

Similarly, if there was something that affected AB InBev's beer business, and I hadn't removed the effect of AB InBev, then the effects of that AB InBev-specific information would be reflected in Altria's share price, and that would not be something that would add noise and imprecision to my event study analysis.

Q. So, in footnote 137 on page 34, you state, "This approach is consistent with academic studies that adjust the market value of a parent company for the market value of a public subsidiary," and then you cite to three academic papers, right?

A. That's correct.

Q. Okay. Do any of these three papers perform a single firm event study?

Page 215

SKINNER

A. Well, we can look, but, for example, the Lamont and Thaler paper, which I'm quite familiar with, certainly analyzes the stock prices of individual companies.

Now it doesn't do, as far as I know, an event study similar to what I've done here, but they are certainly interested in the relative prices of those securities, and so, given the research question that they're interested in there, a single firm event study is simply not what this study is about, but the premise of that paper is that in fact the paper is testing a form of market efficiency and the reason that that paper is cited is because it gives us the conceptual basis for doing exactly the adjustment that I am doing here.

Q. So, but none of these three papers adjust daily returns by subtracting the market value of a parent company's public equity investments and then dividing by the number of common shares outstanding for that day, correct?

A. No, but again these papers provide a conceptual basis for doing this, and I'll say it in a slightly different way. One of the underlying premises of market efficiency and portfolio theory

Page 216

SKINNER

and the capital asset pricing model is that, in an efficient market, portfolios of securities are priced in a way that's consistent with bundles, equivalent bundles of the underlying securities. So that simply says that, when I do this calculation, really what I am assuming, and again with very little measurement error or estimation error, is simply that we've got an efficient market such that these shares are priced in a way individually that is the same as they would be priced when put together in the combination that we observe in Altria's holdings of these securities.

Q. And none of these three papers attempt to assess the price impact of specific corporate disclosures on a given day either, correct?

A. No. These papers are not doing the type of analysis that's common in securities litigation, which I guess is not too surprising.

Q. And do any of these three papers attempt to isolate and remove the effect of a parent company's public investments in other sectors from the parent company's stock returns?

A. Again, no, because they are not focused on doing single firm event studies similar to what

Pages 213 to 216

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

SKINNER

I'm doing here, but again the economic and conceptual basis for what I'm doing here is really simply the elements of modern finance theory, which are portfolio theory, efficient markets and the existence of arbitrage such as any pricing opportunities are eliminated, which I would observe is part of the basis for some of Dr. Nye's conclusions in his market efficiency section.

Q.   Now you cite to the Mitchell, Pulvino and Stafford paper.   In that paper, don't they acknowledge that this method is not problem-free, because it does not account for off-balance sheet liabilities, which could be substantial?

A.   Well, they may acknowledge that.   I think that may be applicable to the type of calculation that they are doing.   What we are doing here I believe is a somewhat different exercise.

As I said, all we are doing here or all I'm doing here is essentially assuming that the market for these securities is efficient and removing the estimated values of these securities on each day from Altria's stock.  Even all information available to the market.

SKINNER

Now I think it is unlikely, although admittedly I haven't checked for whether Cronos or AB InBev have off-balance sheet liabilities.   I will offer that I'm somewhat familiar with Cronos' financial statements, having analyzed those for a different case, and my recollection is that they would not have significant off-balance sheet liabilities, but, even if these companies did have off-balance sheet liabilities that were reflected in their financial footnotes, in an efficient market the value effects of those would actually be impounded in their share price, if the market again was semi-strong form efficient, and so that would present no problems for the type of analysis and calculation that I've done here.

Q.   So, but you haven't accounted for Altria's significant potential tobacco liabilities in this analysis, correct?

A.   Well, I don't understand how that would be relevant to removing the effect of AB InBev securities or Cronos InBev securities.  So can you repeat again.   You're talking about some kind of liabilities that Altria might have?

Q.   Well, and we don't have to get deep into

SKINNER

the paper here, but in the paper that you reference, they have a discussion there on page 554, 555, I don't want to get deep into it, so, if you don't recall, if you are not sure, if you don't understand, that's fine, but they state there, they say, "For example, potential tobacco liabilities are not reported on Nabisco Brands' balance sheet, but they might explain a significant portion of Nabisco Brands' negative stub value.   As a practical matter, obtaining estimates of the market value of off-balance sheet liabilities is difficult, and we do not attempt to measure them in this paper."

So that's where that led to the question from me to you is I want you to confirm that you have not accounted for Altria's potential tobacco liabilities in your assessment here?

A.   Well, I think, with respect, I think that paper may have been written some time ago, so I'm not seeing the date of that paper, but the point is that I'm not aware that Altria currently or during the class period would have had significant tobacco liabilities.

However, to the extent it did, those

SKINNER

liabilities would be something that the market would be aware of.   As a result, they would be impounded in an efficient market in Altria's share price, and again that would present no problem for my analysis.

Now I'm guessing that these authors are talking about a time period when certain tobacco companies would have faced significant liabilities, and that might have presented challenges, but again I would say that the market is generally aware of companies' liabilities including off-balance liabilities and certainly aware of Altria's liabilities or regulatory risk with respect to tobacco, and that would be factored into the market price in an efficient market, and so it would not present any type of problem for the exercise that I'm doing here.

Q.   Rather than subtracting the market values of Altria's public equity investments and then dividing by the number of common shares outstanding for the day, couldn't you have added stock indices designed to capture industry factors specific to the, quote unquote, drink & brewing and cannabinoid companies to your regression analysis?

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Page 221

SKINNER

A. As I briefly mentioned before, I could have done that, but that would have been a more noisy and less precise way of doing this exercise.

In other words, the exercise I'm doing is getting exactly to the right return that I need for my analysis on the left-hand side of my event study regression models.

The exercise you're suggesting which Dr. Nye could have done, but didn't do, the exercise you're suggesting would measure the effects of interest with error, because even though I could have, for example, put a beverage index on the right-hand side of the regression to try and remove the effect on the beverage industry of whatever AB InBev information there might have been, that would have done so with some error, and so this was very carefully thought about at the front end, and again the approach that I have put forth here is a very reliable method in an efficient market, let alone no measurement error, and so I would absolutely stand by this as the right way to do the analysis.

Q. But would you agree, though, that this regression-based approach to controlling for

Page 222

SKINNER

various industry dynamics is generally accepted in the scientific community?

A. I will put it this way. That, if I was to present an academic paper that used this methodology for Altria with these adjustments, upstairs in the finance workshop where I have on the usual day three Nobel Laureates in economics sitting in the room along with a bunch of Fischer Black Prize winners, I'm very confident that they would sign off on this as the appropriate methodology. One of those people, by the way, is a co-author on one of these studies.

So super-confident that in an efficient market this is the way to proceed.

Q. But you're not aware of any analysis, academic study, testimony or published report, peer-reviewed that has ever done this in a single firm event study, correct?

A. Well, I haven't scoured all of those different sources to find this, and it would take me some time to do so, but, if my response to the previous question wasn't sufficiently compelling, I would also point to the fact as I did before that this is exactly the exercise that a number of the

Page 223

SKINNER

analysts who followed Altria during this period did. They did a so-called sum of the parts valuation, which removed from Altria's value or added to Altria's value, in trying to get the total value of the company, the publicly traded values of the equity of AB InBev, of Cronos, as well as an estimate for Juul, so they were doing exactly the same exercise.

Q. So how did you come I guess to construct this specific index that you used? Was this -- did you sit back one day and say and it kind of came to you, you know, I want to use this indice and then with the various tobacco companies that I want to pull out these aspects having to do with Cronos and what's it called? IB Bev? Is that the name of it?

A. AB as in Anheuser-Busch.

Q. Oh, thank you. Yeah. AB Bev. Or did you start off with, you know, a different indice or a different version of this and then adjust it? How did you come to settle on this particular index, if I'm using the right phrase, index?

A. So I think I know what you mean, and I don't think you mean index.

Page 224

SKINNER

So the goal here is to measure, as it is for any event study, the firm-specific information that comes to the market on a given day about a company of interest. The company of interest here of course is Altria, but what we're interested in Altria, with respect to Altria, is the return on its business, but not the aspect of the business or not the investments it has in AB InBev and Cronos.

So all I'm doing, and it's not conceptually a difficult idea. I'm simply removing from Altria's returns the value of its AB InBev investment and the value of its Cronos investment, both of which, as I've indicated, are very readily observable on deep liquid secondary markets, which I'm assuming are efficient markets, and so this analysis is really I'm not coming up with an index. I'm not thinking about some crazy thing.

This is just simply saying I want to measure the return on Altria after excluding the effect of its investments in AB InBev and Cronos and simply subtracting the values of those investments in calculating the return.

So this is not something that, as I said, is complex or challenging, either

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 225

SKINNER

conceptually or in terms of the empirical analysis.

Q.   So the analysis you did having to do with taking out these aspects of their business and using the other tobacco companies the way that you describe it in your section of how you conducted your analysis, is this, was this the only way that you considered to conduct this?   Did you sit down and say this is the way to do it and you tried it, or did you first try other things and then came to a realization that maybe you should, you know, take out certain things or add in a different company, or did someone else originally construct this for you? Did someone from Cornerstone present this to you? How did this come to be?

A.   Well, I think, as usual in these types of assignments, I read the materials that are available to me such as the complaint, and I understand the assignment that I'm given, and really the first thing that I do is ask for basic financial information about the companies, and so the first thing that I probably look at are company 10-K filings, and that's what I did here.

So the first thing I do is I pick up Altria's 10-K's for the period.  I review those

Page 226

SKINNER

10-K's.  You look at the balance sheet of the company.  You see they have these investments in AB InBev and Cronos.  I've been aware of the Cronos investment through my work on the Cronos case, and then, when I understand that part of my assignment here will be to do an event study, then you start thinking about exactly how you would run the event study.

To maximize the power of the test we ultimately are going to perform, to maximize the power of the test which we were discussing this morning in the context of the type 2 errors, one wants to make sure that one removes, if you like, extraneous noise and estimation error, and so, as I said, it doesn't take a lot of thought to realize that, if I want the return that measures the performance of Altria's core business, so primarily the tobacco business, I want to remove the effect of AB InBev and Cronos.

Q.   My -- sorry.  Go ahead.

A.   If I can finish, and so then, if I've got publicly traded entities and I have minority stakes in those, then it is a relatively simple matter of doing a calculation that removes the

Page 227

SKINNER

values of those investments from the value of Altria shares and computing the returns that way.

Q.   So my question was how it came to be, meaning did you do this analysis, you know, removing these factors, was that the first draft when you came to do this, you said this is what we need to do, or did you do something, do the analysis and run the regression with a different without doing that, and then in a second draft or a third draft or additional analyses you did with you and Cornerstone, did you then come to remove this?

A.   I think I was responsive, and you had initially asked how I came up with this, and that's how I -- I was explaining how I came up with this through analyzing the 10-K, and so the import of that answer is that I came up with this initially, and this is the variable that I've used for my only and primary event study analysis as presented in my report here.

There were not multiple drafts or versions or different event study analyses.  This has always been the primary model, and as my report indicates, the sensitivity that I ran was to use both equal and value-weighted industry peer

Page 228

SKINNER

indices, but other than that sensitivity which is reported in my report, this has always been the primary deep-ended variable and basis for the event study.

Q.   Are you aware of -- you said you worked with a number of people from Cornerstone.   Are you aware if they had done other analyses prior to you determining this method?   Are you aware, had they checked other methods, removing information or try other indices rather than the peer industry indice that you constructed?

A.   I'm not aware that they have.   The way that these assignments usually work and the Cornerstone support is provided is that, again, I ask for my assignment.   I find out my assignment. I look at the relevant materials, and then I reach decisions about what analyses need to be done and how those analyses are done, and so I direct Cornerstone, and so, as was the case here, I directed Cornerstone to calculate the returns in this way.

And we of course had discussions about how one might do that.  But I primarily direct this, and, as I said, as an economist, this is

Pages 225 to 228

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 229

SKINNER

logically how one should proceed to do this, and indeed this is what also we see several of the analysts for Altria doing.

Q. Okay. Now this process or analysis you did of removing Cronos and AB Bev, did you make that same adjustment with the peer index that you created, the companies in the peer index?

A. Well, I think the point of removing AB InBev and Cronos is to get a measure of Altria's performance in its primary business, which is tobacco, and as a result, if I'm thinking about the right industry index to use, I've established or I've got on the left-hand side of my regression Altria in its tobacco business, so that necessarily means that what I want as my industry index and I think my report, both in criticizing Dr. Nye's method and in explaining my method, is very clear about I choose the two peer companies that also operate in the U.S. tobacco sector, and so I have done exactly what I should be doing, given that I've removed from Altria's shares the effect of non-tobacco business.

So all of that to say the adjustment that you just mentioned actually doesn't make sense

Page 230

SKINNER

in the context of the analysis that I'm going to be doing.

Q. I was concerned that it might not.

A. Well, you were right.

MR. WERNKE: I have no further questions for you at this time.

MR. MILLER: Nothing from Altria, except that I will note on the record that we are not designating anything in the transcript as confidential.

MR. WERNKE: No further questions from me. Unless someone speaks, we are all done.

THE VIDEOGRAPHER: The time is 5:12 p.m. This concludes today's deposition. We are off the record.

(Time noted: 5:12 p.m.)

Page 231

CERTIFICATION

I, JOSEPH R. DANYO, a Shorthand Reporter and Notary Public, within and for the State of New York, do hereby certify:

That I reported the proceedings in the within entitled matter, and that the within transcript is a true record of such proceedings.

I further certify that I am not related, by blood or marriage, to any of the parties in this matter and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 6th day of October, 2021.

JOSEPH R. DANYO

Page 232

INDEX

| Witness | Page |
| --- | --- |
| PROFESSOR DOUGLAS SKINNER | 5 |

EXHIBITS

| Plaintiffs' | Page |
| --- | --- |
| Exhibit 73  Expert Report of Douglas J. Skinner, Ph.D. of September 17, 2021 | 6 |

~oOo~

Pages 229 to 232

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 233

SIGNATURE PAGE OF DOUGLAS SKINNER

Page    Line         Should be Changed to Read

____   ____    _____

____   ____    _____

____   ____    _____

____   ____    _____

____   ____    _____

____   ____    _____

____   ____    _____

____   ____    _____

____   ____    _____

____   ____    _____

____   ____    _____

____   ____    _____

____   ____    _____

____   ____    _____

____   ____    _____

I, DOUGLAS SKINNER, hereby certify that I have read the transcript of my testimony taken under oath and that the transcript is a true and complete record of my testimony, and that the answers on the record as given by me are true and correct.

_____

DOUGLAS SKINNER

Sworn to before me this_____ day of _____, 2021

_____

Notary Public

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

| A | | | |
|---|---|---|---|
| **A-g-a-n-i-n** 7:24 | 23:23,25 26:2 30:11 48:16 53:19 56:8 56:14 57:10 58:12 60:13,20 60:25 61:7 61:12,14 61:18,23 62:8,22,23 63:10,10 64:18 71:15 74:18,25 75:22 76:5 81:3,4 83:2,7,21 83:25 85:12 86:15 121:9,15 121:22,23 122:2,4 135:2,12 135:16 137:19,23 138:3,8,14 138:18 153:5 160:11 161:15,24 172:3 178:5,9,17 179:3 181:20 182:17 184:24 199:22 200:21 | 97:24 168:18 221:22 **abstract** 55:8 **academic** 9:13 10:9 13:24 76:17,21 77:10 86:20 108:8 142:17,19 143:8 145:12 204:8 206:3,7 207:17 209:10,22 211:3,12 214:18,21 222:5,17 **academics** 211:5 **accept** 63:24 86:9,24 **acceptable** 86:8 **accepted** 86:13 87:25 209:7,22 222:2 **accepting** 87:11 88:11 **accepts** 25:24 **account** 39:14 52:20 53:24 | **achieving** 44:12 **acknowledge** 4:19 130:23 131:20 217:12,15 **action** 1:6 4:7 5:11 7:5 39:12 42:4 51:2 94:15 95:9 95:17 105:5 121:3 142:8 143:16 158:9 **actions** 34:6 96:11,11 104:8 143:10 **activity** 73:25 74:13 76:10 114:11 **actual** 43:15 **add** 214:15 225:12 **added** 220:22 223:5 **adding** 160:14 **addition** 21:5 32:14 | 166:8 179:14,20 184:7 199:25 227:11 **address** 81:15 195:18 199:13 201:9,24 203:14,19 206:15 **addresses** 108:8 **adequate** 193:6,13 **adequately** 141:8 144:4,12 145:4,24 191:20 198:16 199:11 **adjust** 56:7 135:2,6 214:19 215:18 223:21 **adjusted** 55:23 112:19 138:8 |
| **a.m** 1:12 4:3 31:9 48:4 48:7 | | | |
| **AB** 207:12 208:15 209:19 210:3,16 211:15 212:11,19 212:21,22 213:2,20 214:11,12 214:13 218:4,21 221:16 223:7,18 223:19 224:9,12 224:21 226:3,20 229:6,9 | | | |
| **ability** 14:24 168:13 190:18,23 198:10,20 206:8 | | | |
| **able** 12:18 13:4 27:2 37:13 53:14 63:15,16 63:22,24 92:11 94:11 96:2 96:2,6 101:21 110:22 162:12 202:4 | | 217:13 **accounted** 30:4 54:17 218:17 219:17 **accounting** 84:2 108:5 108:6 | 37:12 75:16 81:7 142:6 163:8,14 198:12 **additional** 19:15 20:8 20:12 37:25 38:2 38:9 46:24 47:4,12 53:20 58:6 58:8 165:25 | 207:25 209:2,9,12 215:16 229:7,24 **adjustments** 117:2 222:6 **admissib...** 4:22 **admittedly** 218:3 **advance** 112:5 **adverse** 95:8 |
| **abnormal** 11:15,16 11:25 12:5 12:7,9,14 18:14,16 19:6 20:25 | **above-co...** 115:16 **absence** 69:22,23 165:14 **absolute** 77:21 79:19 **absolutely** | | **adjustment** 84:25 |

| | | | | |
|---|---|---|---|---|
| 143:17 | **agency** | 38:21,23 | 37:10,23 | 151:7 |
| 145:15 | 147:11 | 40:3 43:16 | 38:2,5,9 | 156:7 |
| 156:9 | 158:22 | 43:16 46:9 | 40:11 | 158:20 |
| 158:8 | **aggregated** | 46:11,12 | 41:15 42:3 | 159:6,7 |
| **advertising** | 211:8 | 90:9,15,23 | 42:5,10 | 165:12,14 |
| 133:8 | **ago** 219:20 | 91:4,13,18 | 43:3,8,18 | 165:17 |
| **affect** 18:17 | **agree** 34:24 | 91:23 | 43:20 44:3 | 166:11,12 |
| 19:7 23:12 | 36:4 40:5 | 92:25 | 44:15,18 | 166:14,16 |
| 23:16 24:2 | 41:16 59:9 | 93:23 | 47:18,19 | 166:20,24 |
| 24:9 25:3 | 86:7 | 96:17 | 49:13 | 168:4 |
| 25:7,9,12 | 120:12,18 | 102:25 | 52:22 53:3 | 169:5,7,10 |
| 25:15 | 143:24 | 116:22 | 54:8,23 | 169:12 |
| 31:11 76:7 | 152:10,12 | 125:8,23 | 56:12 | 170:10 |
| 214:6,7 | 154:5,8,14 | 129:22 | 59:21 60:8 | 171:13 |
| **affirmative** | 157:7,16 | 132:22 | 68:19 | 174:6,10 |
| 54:7 58:25 | 157:18 | 133:20 | 72:14 | 174:20,21 |
| 59:11,19 | 168:6,18 | 142:11,14 | 80:11 82:6 | 175:23,25 |
| 59:25 60:7 | 179:18 | 144:7,20 | 82:11,13 | 176:20 |
| 68:10,17 | 180:2,3 | 146:21 | 89:15,19 | 177:18,20 |
| 69:5 | 194:19 | 155:7,25 | 91:7 92:6 | 180:20,22 |
| 102:22 | 195:6 | 156:7,11 | 92:22 | 180:24 |
| 103:17,24 | 201:4,8 | 197:7,17 | 93:10,14 | 181:9,10 |
| 103:25 | 202:25 | 197:23 | 93:24 | 181:16 |
| 118:8 | 221:24 | 199:4 | 97:12,15 | 188:20 |
| 140:22 | **agreed** | 201:7 | 97:16 | 189:8,12 |
| 148:7 | 128:16 | 202:24 | 99:15,17 | 189:23,25 |
| 151:6 | 129:9 | 203:4 | 99:23 | 190:2,19 |
| 160:6 | 193:25 | **allege** 18:24 | 100:7 | 192:18 |
| 167:18 | 194:4,10 | 33:6 34:2 | 101:23 | **allegedly** |
| 168:8 | 194:17 | 37:7,18 | 102:8 | 49:24 92:9 |
| 170:11 | **agreement** | 38:14,25 | 103:14,15 | 94:9 |
| 189:7 | 150:24 | 41:12 | 105:13 | 100:24 |
| **affirmat...** | **ahead** 176:16 | 58:17 59:6 | 116:18 | 103:9 |
| 12:19 | 196:22 | 66:23 | 117:21,24 | 116:17 |
| 56:10 | 226:21 | 67:24 68:6 | 118:13 | 132:7 |
| 59:12,24 | **aid** 131:22 | 69:20 | 119:15,19 | 134:8 |
| 63:23 64:4 | **aims** 195:7 | 70:21 72:5 | 125:24 | 142:25 |
| 68:23 71:7 | **al** 1:4,8 4:7 | 81:25 90:8 | 126:10 | 143:3,5 |
| 72:13 | 4:8 106:11 | 91:2,6 | 130:7 | 146:21 |
| 100:14 | 106:13 | 92:2 105:6 | 131:7,10 | 153:18 |
| 103:20 | **allegation** | 133:23 | 136:8,9,12 | 154:17 |
| **aftermarket** | 92:4 102:4 | 142:3 | 137:3 | 157:3,23 |
| 179:7 | 102:18 | 177:14 | 140:9,23 | 163:9 |
| **afternoon** | 141:8 | 199:15 | 141:2,3 | 175:9 |
| 32:12 76:3 | 145:19 | **alleged** | 142:11 | 180:19 |
| 76:5 84:17 | 171:12 | 19:23 | 144:20 | **alleging** |
| 84:24 85:5 | **allegations** | 20:17 29:6 | 147:9 | 35:19 |
| 123:2 | 33:8 34:6 | 34:14 35:2 | 148:6,25 | 37:14 |
| **against-** 1:7 | 34:15,16 | 35:11 36:9 | 148:25 | 42:12 |
| **Aganin** 7:24 | 35:8 36:5 | 36:19 | 150:5,5 | 46:19 50:3 |

50:14
73:19
91:10
93:12
94:17
95:18
96:14
126:4
132:24
133:10,12
146:11
173:24
194:20
202:13
**ALLEN** 3:16
**Allergan**
106:14
**Allie** 3:20
7:25
**ALLISON** 2:8
**allow** 49:25
203:9
**allowed**
134:23
**allows** 20:24
41:2
161:21
**alluded**
104:14
201:15
**alluding**
19:10
75:23
**Alright** 70:2
**alternative**
18:3 26:16
**Altria** 1:8
2:16,21
4:8 28:6
28:20
36:15
39:10,13
39:24
40:18 51:5
51:11,12
55:21
58:13,19
59:7 66:11
66:24 67:6
67:25 68:7

69:21
71:16
73:15
81:21 82:4
91:14
93:18
112:19
114:5
118:5
120:13,19
123:18,20
124:5,6,18
127:25
128:4,4,24
128:25
129:2
130:19
132:20
139:8
140:9
141:11,18
144:12
145:4,24
146:21
147:11,17
148:2,15
149:17
154:7,11
156:9
160:2
162:7
170:20
171:23
179:14,19
181:13
186:5
189:3
208:6,13
209:14,17
209:21
210:15,19
212:14,21
213:6,7,14
218:24
219:22
222:6
223:2
224:6,7,7
224:20
227:3

229:4,15
230:8
**Altria's**
18:23
20:25
23:13,16
27:24
28:14
39:10,20
39:22
41:16 42:2
42:6 47:18
48:16,24
49:8,14
60:12
61:14
64:18
65:12 70:8
70:22 71:5
71:8 72:6
72:15
74:17
77:20
80:22
84:13,14
85:12
93:13
107:18
110:4
111:2,22
112:11
113:4
115:9,15
116:8
123:21
125:10
127:19
128:21
129:13
130:15,25
136:18
138:13
141:24
142:12
143:6
144:5
162:16
169:10,12
169:20
171:8

173:2
174:14,19
174:21
175:23
176:2
180:4
183:9
185:5,22
188:18
194:23
207:11
208:17
209:25
210:3,7
212:19
213:19
214:8,14
216:13
217:24
218:18
219:17
220:4,13
220:20
223:4,5
224:12
225:25
226:18
229:10,22
**Altria-r...**
172:22
179:9
**ambiguity**
157:25
**amended** 37:3
38:3,10
39:3 46:25
47:5,22
**American**
75:11
**amount** 15:24
98:25 99:4
107:11
108:7
111:13
113:11
190:24
213:9
**analyses**
14:20 20:2
30:25

31:14
32:21 33:2
58:9 79:8
90:7 97:20
104:23
165:25
194:14
204:8
227:11,22
228:8,18
228:19
**analysis** 9:9
12:7 13:15
16:17,20
16:23
17:15
19:11,13
19:16,17
19:19,22
19:23,25
20:4,4,6,8
20:11,12
20:16,21
20:23
21:17 22:4
22:20,21
23:6 24:10
25:16,18
26:7,12
27:23
28:11,24
29:17
30:16,22
31:7,12
32:7,10,19
33:3,4,13
36:24
37:16 40:4
43:14,14
43:21 44:4
44:16
45:12 46:5
46:13,23
47:2,3
49:5,10
51:7 52:19
53:4,21
54:16
55:12 56:7
56:20 57:4

57:8,10
59:19 60:7
62:10 64:8
65:2 68:17
74:22,25
75:3,5,22
75:25 76:2
78:6,17
79:3,5,6
79:10
80:15,20
80:25
81:12
85:15
86:13,21
87:3,20,21
87:23
88:16,21
90:5,12
98:17
99:11
104:19,25
105:18,21
105:23
106:18
107:8
110:11
113:16
117:11
119:10
121:25
124:3,7
132:18
134:9,12
134:19
135:10,18
135:21
138:4,12
140:21
147:5
151:5
152:17,21
152:23
153:4,8
155:20,23
159:3
162:15
172:15
173:2,11
174:8

175:14,16
176:4,6,23
177:2,5,17
179:8
183:7
184:22
185:2,11
185:17
186:17
187:18
191:7,8
194:18
195:14
199:14,20
200:2
205:3,4,14
205:21
209:13
210:21,22
211:9,20
214:16
216:18
218:15,19
220:6,25
221:7,23
222:16
224:17
225:2,3,7
227:5,9,19
229:5
230:2
**analyst** 9:4
10:2,14
21:7 22:5
22:8,22
23:2,7
33:23
49:20
50:11
53:12
64:14
67:15,19
72:22
111:6,9,15
112:12,14
113:7,25
114:6,7
127:5
128:19
131:20

132:10,14
158:13
162:13
173:10
177:13
185:14
186:9
204:9
**analysts**
111:6
113:8,11
114:9,18
124:23
127:12
128:24
129:4,11
186:8
187:21
209:14,16
209:24
223:2
229:4
**analyze**
11:12
27:15 33:9
33:13,21
36:22,25
38:8 40:10
41:6 42:9
43:7 44:14
44:21,21
44:24
45:19
46:19 47:9
47:21
49:19
64:25
74:17
101:9
106:3
116:9
124:21
153:20
171:15
176:24
177:9,10
177:12,14
180:10
185:20
204:4

**analyzed**
21:5,18
36:19 37:3
37:8,10
50:16
51:13
54:14
72:18 81:7
104:6,8
124:13
174:24
185:25
218:6
**analyzes**
10:9 89:15
215:4
**analyzing**
9:21 10:6
11:8 14:19
47:17
48:11
64:15 65:6
70:3 73:5
73:9 98:3
164:8
165:24
187:21,22
187:23
209:20
227:16
**and/or** 92:23
204:11
**ANDREWS** 2:16
**Anheuser...**
223:18
**announced**
10:19
11:23 31:9
31:10
52:22
55:21 80:3
80:21
101:12
107:12
115:14
120:17
123:22
125:11
127:9,11
127:12

132:11
133:5,6,7
145:18
154:25
163:8
181:15
182:5
186:5
**announce...**
11:13
31:18 74:2
74:15
76:11
77:19,21
79:12
101:13
102:11
106:24
107:19
109:8
110:5
111:10
112:20
118:4
120:12
136:17
145:3,23
147:16,25
148:14
149:15,16
150:18
151:15
153:11,23
154:5,6,14
157:12
162:24
169:19
171:3,7,21
174:13
175:16
176:25
178:3,15
179:14,23
179:25
180:2,6
182:8
183:23
187:2
188:25
**announce...**

9:22,25
14:8,17
65:24
130:16
155:5
159:25
183:22
**announces**
10:4
142:19
**announcing**
123:19
130:19
**answer** 5:19
5:19 20:15
26:11
27:11
41:23 43:4
46:4 55:7
98:19
104:11
134:23
142:24
144:16
149:6
192:19
200:17
227:17
**answered**
45:25 88:5
138:11
145:9
146:7
148:17
149:21
**answering**
150:21
151:2
**answers**
233:20
**anticipated**
107:16,23
109:21
111:7,12
112:21
113:10
**anticipa...**
199:25
**apart** 176:19
199:7

**apologize**
137:5
171:4
**apparent**
193:3
**apparently**
103:5
129:2
131:12
195:16
**appeal** 152:6
152:15
155:16
**appears**
117:16
**Appendix**
106:8
**applicable**
217:16
**applied**
168:15
203:14
204:24
**applies** 8:24
167:16
**apply** 205:3
**applying**
168:12
**apportion**
29:21
30:25
31:14
**apportioned**
99:5
**apportio...**
32:21
**appreciate**
160:19
**approach**
11:25
20:20
33:20
44:23
58:21
86:14
97:10
177:23
193:16
210:5
213:25

214:18
221:19,25
**approaches**
204:7
**appropriate**
41:10 52:3
222:11
**appropri...**
199:8
**approxim...**
7:11 51:22
107:13
210:16
**April** 168:23
169:19
170:3,14
172:2,10
172:20
173:4,18
174:13,14
175:13,14
175:17,17
175:25
176:6,8,9
176:11,25
176:25
177:18
178:2,3,10
**arbitrage**
217:6
**arguably**
56:21
183:20
**argue** 27:6
**arguments**
194:13
**arises**
105:15
163:11
**array** 206:7
**arrive** 30:19
101:2
186:22
187:5
188:15
**arrived**
101:2
**article**
50:23
73:12,22

73:22
84:17 85:4
110:15,16
131:9,12
139:5
146:11
152:13
153:15
158:18
163:17
**articles**
110:23
155:4
**articulated**
170:9
**articulates**
151:12
**articula...**
140:15
**articula...**
191:19
203:12
**artificial**
196:8,9
**artifici...**
194:23
**aside** 41:8
43:12,15
45:11,12
45:22,23
79:13,18
157:14
**asked** 27:22
43:7,13
45:24
47:21
105:9,25
106:2,10
106:15,18
115:11
143:20
145:8
146:6
148:16
149:20
168:9
172:25
174:11
175:15
184:6,7,13

185:9
227:14
**asking** 24:14
41:9,13
44:20
52:24
62:19 69:8
79:14,25
88:10
95:12
126:16,17
144:23,25
157:6,7
176:21
184:16
186:21
187:8
200:7
205:22
212:3,4
**aspect** 45:23
127:14
205:12
224:8
**aspects**
36:12 45:5
104:10
223:15
225:4
**assess** 11:4
96:19
116:5
119:7
121:4
168:3
177:16
191:23
205:14
207:22
216:15
**assessed**
124:8
196:19
**assessing**
90:25
92:22
167:7
192:4,7
**assessment**
14:13 41:2

77:15
82:18
94:22,22
98:5
113:20
116:16
124:17
125:20
134:3
140:2
157:6
159:15
166:21
167:25
192:11
194:2
219:18
**assessments**
106:10
114:17,19
120:9
**asset** 108:19
108:23
109:4,18
216:2
**assets**
109:21
**assignment**
28:8 29:11
36:25
41:23,25
42:9,16,22
43:6 44:5
44:6 45:2
46:17
47:10,16
94:24
167:24
168:2,9,10
168:13
174:3,17
174:18,23
175:20,21
176:18
177:16,23
184:13
185:9
187:11,14
225:19
226:6

228:16,16
**assignments**
225:17
228:14
**assist** 32:21
**assistance**
7:9 160:20
**assisted** 7:7
7:12
**associated**
13:3 27:9
39:15
73:16 82:5
82:13 85:9
126:20
135:17,23
138:19
141:9,12
141:20
144:5,10
144:13
145:5,25
**assume** 27:23
28:12,25
43:16
95:12
109:7
149:12
161:11
168:14
200:19
**assuming**
8:21 94:11
94:18
98:21,25
144:8
145:2
154:12
156:2
213:11
216:7
217:21
224:16
**assumption**
213:13
**assurance**
202:3
**assured**
157:9
**attempt**

155:24
185:3
195:16
216:14,20
219:13
**attending**
4:13
**attention**
8:8
**Attorneys**
2:4,10,16
2:21 3:4,9
3:14
**attribut...**
61:19 96:4
100:24
**attribute**
30:17,23
**attributed**
81:18
**audibly** 5:19
**augment**
21:24
**August** 48:11
48:16
49:14
53:16
58:11,19
59:2,8,24
60:2,4,10
60:12,21
60:24 68:3
127:10
152:2,25
153:23
157:20
158:19
160:8
161:16
162:8,19
164:10
168:23
170:15
**authors**
220:7
**automati...**
197:14
**available**
8:25 9:5
9:15 31:4

33:21 41:3
49:20
50:11
51:16 55:6
57:19 58:6
75:12,14
75:16,20
78:2,11,16
88:15
110:12,21
113:24
114:7
120:3
135:24
201:8
202:3
203:2,9,16
203:19,22
205:18,19
206:2
217:25
225:18
**Avenue** 2:5
**average**
78:21
**aware** 31:13
40:14
142:13,14
155:6
219:22
220:3,11
220:13
222:16
226:4
228:6,8,9
228:13

---
**B**

**B** 20:18 22:2
54:5 101:4
106:8
151:20
190:10
232:7
**back** 17:14
17:18
24:23
25:20
37:17
44:22

45:16 48:7
58:10 64:4
89:9 97:22
98:11 99:5
123:5
132:25
148:5
149:7
159:11
162:6
165:4
166:23
207:2,5
223:12
**back-end**
105:19
**background**
108:5
**bad** 127:21
**Badesha**
106:16
**balance**
219:8
226:2
**ballpark**
161:5
**BALOTTA** 2:14
**based** 4:23
7:13 22:20
23:4 26:11
33:24
34:18
36:13
45:14 52:5
59:18 60:6
60:11 62:4
64:9 66:10
67:8,14
68:16
75:11,19
81:9 84:12
88:14
91:17
92:24
97:19
103:13,22
110:11
120:3
139:22
140:21

144:25
145:12
151:5
155:20,24
161:3
170:16
172:11
174:8
184:12
195:9
**bases** 137:12
**basic** 5:16
  193:6
  225:20
**basically**
  143:21
**basis** 17:11
  23:8 46:5
  58:8 67:23
  68:22 75:4
  79:9 86:22
  112:12
  177:16
  181:6
  189:17
  194:7
  200:23
  209:11
  215:15,23
  217:3,8
  228:4
**beer** 208:16
  214:11
**beginning**
  65:8 68:14
  82:18
  125:22
  126:10
  139:20
**begins** 29:14
  188:11
**begun** 139:7
**behalf** 1:5
  5:10
**belief**
  168:14
**believe** 7:6
  7:25 10:19
  16:11
  17:21

19:11,21
29:13
37:11 38:6
63:12,13
63:21 66:3
66:4,6,15
69:4 73:18
74:8 75:17
80:8 83:3
93:2
104:16
106:9,12
106:19
113:5,12
114:21
116:15
123:25
124:22
125:17
127:10
128:10,14
130:25
131:14
132:6
134:24
140:3
151:9
153:18
172:23
179:11
180:14
181:22
182:20
183:13
195:13
196:11
202:16
204:5,21
208:24
211:23
217:18
**benchmark**
  84:10
**Bernstein**
  186:9
**best** 15:2
  20:14
  33:18
  38:19
  41:22

96:20
148:4
168:13
**better**
  160:21
**Bev** 223:16
  223:19
  229:6
**beverage**
  75:19
  208:15
  211:16
  221:13,15
**beyond** 19:15
  19:17
  20:12 44:5
  44:6 94:24
  111:25
  200:8
  201:4
**big** 26:23
**billion**
  107:12,13
  107:25
  109:10,20
  113:12
  114:21,23
  123:20
  125:13
  126:22
  127:25
  179:15,20
**binary** 96:17
  97:5
**bit** 13:12
  16:13
  18:10
  24:24
  111:25
  139:3
  180:11
  207:5
**Black** 222:10
**blood** 231:11
**Bloomberg**
  110:15
  112:5
**blue** 108:3
  149:6
**body** 166:9

**bound** 56:3
**box** 6:17
**Brands** 75:11
**Brands'**
  75:14
  219:8,10
**break** 42:20
  47:24
  88:24
  98:12
  122:8
  164:19,22
  206:20
**brewing**
  220:24
**brief** 38:20
**briefly**
  33:10
  134:24
  167:4
  200:13
  211:6
  221:2
**bring** 87:16
**brings**
  131:21
**British**
  75:10
**BRITTON** 2:13
**broadest**
  194:21
**Broadway**
  2:11
**Building**
  3:14
**built** 14:13
**bullet**
  111:16,19
**bunch** 40:15
  51:4
  101:13
  182:13
  202:7
  222:9
**bundle** 132:5
  133:12,14
  146:12
  163:5
**bundles**
  216:4,5

**business**
  128:6
  129:5,14
  208:13,14
  209:21
  210:3
  213:20,21
  214:5,6,11
  224:8,8
  225:4
  226:18,19
  229:11,15
  229:23
**Byrd** 2:17

---
### C

**C** 2:2 3:2
  54:11,14
  231:2,2
**calculate**
  135:12,19
  190:24
  195:8
  228:21
**calculated**
  56:15
  61:12
  135:3
**calculates**
  200:20
**calculating**
  189:16
  224:23
**calculation**
  81:3
  135:16
  172:9
  179:3
  209:11
  216:7
  217:17
  218:16
  226:25
**calculat...**
  160:19
  172:14
**California**
  2:12 3:15
**call** 8:19
  10:15,21

```
20:19  32:9        36:11          168:2,16        94:23          93:16 98:6
44:22  47:3        44:25  66:9    175:24          106:3          100:19
49:10  54:3        74:22          177:18          157:15         105:7,24
61:20              81:23          183:22          cause 30:15    106:3
74:24              110:8          191:9,17        95:6,24        114:22
80:16              185:11         191:20,23       186:18         130:13,16
90:12              186:25         192:5,15        caused         133:23
103:24             carefully      192:19,24       113:17         156:9
117:9              19:3  36:24    193:4,17        117:11         164:10,12
124:25             37:4  84:20    195:5,19        164:9          175:10
128:16             88:12          195:22          173:17         183:24
129:9              100:17         196:7           183:9          186:8
134:18             151:12         197:15          186:23         189:22
151:24             208:10         201:16          187:6          193:7
163:3              221:18         204:11,19       197:23         203:8,10
182:10,15          carried 99:5   206:17          causes 205:5   220:8
198:10             carrying       218:7           causing        225:12
199:3,5            108:20         226:5           194:24         certainly
209:17             112:16         228:20          cautious       13:14  34:7
called             113:13         cases 33:9      58:2           34:19
123:19             case 12:15     44:7  53:11     161:20         40:14  55:5
126:22             17:20  25:9    76:22           cent 10:21     56:6  63:3
127:20             25:15          91:24           10:23,24       74:23
128:2,5            34:21,23       101:16          11:14          75:23
133:3              36:12          104:9,20        12:19          76:17
223:16             43:13  44:9    104:25          24:19          80:25
calling            49:17  64:7    105:5,8,16      25:21,23       83:14
125:12             69:20  73:2    105:20,22       26:17,19       91:25
128:6              75:7  84:10    105:24          26:24  27:3    95:21
calls 204:22       91:25,25       106:3           27:5           103:23
campaign           94:19          108:12          cents 10:3,5   108:22
163:19             95:13  97:2    187:4           10:18,20       109:16
Canadian           97:11          191:22          10:23,23       114:3,8
106:17,21          100:11         192:12,13       CEO 102:11     124:21
cannabinoid        102:4,8        192:14,23       102:13,17      134:11
211:18             104:17         193:11,11       103:6          153:4
220:25             105:6,17       193:12,13       115:10         161:8
cannabis           105:21         194:16          130:17        173:6
214:5,6            106:11,12      196:5           131:21         175:7
capable            106:13,14      205:19          132:19         180:21
189:16             106:16,17      208:3           133:6          185:25
192:4,7,21         106:17         cash 204:7      certain 7:9    187:22
capital            112:15         205:2,3,14      13:15          191:2
216:2              131:10         205:16,20       25:22          206:6
capture            144:9          categorize      34:16  35:8    208:2
38:20  40:2        149:24         119:5           36:5  41:4     213:24
220:23             154:22         category        44:25  45:2    215:4,8
captured           155:12         180:23          46:10         220:13
37:21              157:5          causation       56:23  64:8    certific...
careful            167:6,23       44:10           82:6  93:12    44:6  58:3
```

| | | | | |
|---|---|---|---|---|
| 105:21 | characte... | clarify 73:8 | clear 11:21 | 85:22 |
| 106:5 | 17:22 | 93:9 149:8 | 24:12 54:5 | collect 14:4 |
| 145:21 | 99:10 | 188:23 | 68:13,25 | 14:9 |
| 192:10 | 146:17 | 210:13 | 79:25 | collected |
| 194:9 | 183:16 | class 40:6 | 82:15 83:5 | 15:16 |
| certify | characte... | 40:16,17 | 86:17 | collecting |
| 231:6,10 | 128:11 | 40:21,25 | 96:12 | 14:15 |
| 233:19 | charge 107:9 | 41:18 42:4 | 118:3,7 | combination |
| cessation | 107:10,16 | 42:7,24 | 120:10 | 216:12 |
| 39:8 | 108:12,24 | 43:20,24 | 121:13 | come 9:2,3,8 |
| challenge | 109:2 | 44:6 45:20 | 127:16 | 32:16 |
| 134:21 | 111:8,12 | 51:2,20,21 | 136:16,20 | 50:21 |
| challenges | 111:13 | 51:23 52:6 | 138:16 | 97:21 |
| 46:15 75:2 | 112:3 | 58:3 66:12 | 145:20 | 113:19 |
| 93:21 | 179:15,20 | 66:16 | 147:14,24 | 117:9 |
| 94:25 | 181:10,14 | 80:13 | 148:20 | 162:16 |
| 95:10 | 181:15 | 90:24 92:4 | 149:22,23 | 176:23 |
| 192:19 | charges | 92:11 94:3 | 149:25 | 185:20 |
| 193:19,23 | 108:6,9,15 | 94:8,10 | 150:9,15 | 186:13 |
| 195:19 | 108:16,18 | 95:7 99:18 | 151:18,19 | 208:5 |
| 201:16,24 | checked | 100:9 | 159:9,21 | 223:10,22 |
| 203:13,14 | 218:3 | 102:7 | 165:15 | 225:15 |
| 203:18,20 | 228:10 | 105:5,21 | 170:6 | 227:12 |
| 206:16 | Chicago 3:5 | 106:5 | 175:19 | comes 8:20 |
| 220:10 | choose | 114:8 | 177:6 | 30:14 |
| challenging | 229:19 | 119:15 | 189:4 | 52:12 |
| 45:7 56:25 | choppy | 125:23 | 198:25 | 55:17 58:5 |
| 116:24 | 131:23 | 126:11 | 201:15 | 78:18 |
| 202:9,10 | chosen 100:3 | 129:23 | 214:2 | 100:22 |
| 202:14 | cigarettes | 130:7 | 229:18 | 108:2 |
| 204:3 | 186:7 | 142:8 | clearly | 163:22 |
| 224:25 | circumst... | 145:21 | 110:25 | 224:4 |
| change 77:15 | 10:25 | 156:17 | 144:16 | coming 31:19 |
| 87:9 88:9 | circumst... | 163:16 | 170:9 | 52:15 |
| 117:12 | 180:8 | 166:25 | CLEARY 3:8 | 53:18 |
| 132:11 | 192:13 | 169:13 | close 9:22 | 114:12 |
| 197:15,16 | 193:15,19 | 174:7,22 | 12:5,5 | 183:17 |
| 207:4 | cite 163:16 | 176:3 | 74:3,15,19 | 187:4 |
| Changed | 214:21 | 192:9 | 76:12 78:3 | 203:25 |
| 233:2 | 217:10 | 194:8,25 | 171:14,22 | 206:19 |
| changes 11:6 | cited 215:14 | 195:9 | closed 73:13 | 224:17 |
| 11:7 30:15 | citing | 219:23 | 84:19 | commentary |
| 76:24 | 142:16 | Class-Wide | CNN 163:17 | 22:8,21 |
| 205:7 | civil 1:6 | 189:17 | co-author | 33:23 47:6 |
| 207:12 | 121:5 | clean 5:18 | 222:13 | 50:24 |
| 208:11 | claim 141:17 | 21:11 | co-effic... | 72:23 |
| 209:5 | 191:7 | 211:14 | 57:3 | 111:9 |
| 210:10 | clarific... | cleaner | coefficient | 132:13,20 |
| characte... | 69:10 | 208:23 | 134:19 | 158:14 |
| 105:17 | 92:13 | 210:7 | colleague | commented |

113:8
187:21
**commenting**
67:20
111:11
131:21
**common** 21:2
27:24 28:6
28:14
85:20
119:10
209:2
215:21
216:18
220:21
**communicate**
108:21
**community**
209:7
222:3
**companies**
14:5 26:25
40:18
75:10
127:11
129:9
180:9
207:13
208:4,8,12
210:15,18
210:19,20
212:12
215:5
218:9
220:9,25
223:14
225:5,21
229:8,19
**companies'**
127:14
220:12
**company** 8:21
9:3,3 10:4
10:19,22
26:24
31:18
34:15
40:24 52:4
66:14
77:16

101:12
102:5,10
108:24
109:5,17
109:18,21
109:23
112:17
129:6
131:22
143:17
154:24
157:4
158:23
179:22
182:5
197:18
202:12
206:10
207:20
208:6,16
208:17,21
209:15
211:16,17
212:22
214:5,20
223:6
224:5,5
225:12,22
226:3
**company's**
10:2 102:9
102:19
103:7
116:3
124:24
128:14
129:4
182:14
187:23
197:4
205:12
215:19
216:22,23
**company-...**
29:22
197:6
201:6
202:23
203:3
**comparing**

91:3
**compelling**
222:23
**complaint**
36:24 37:2
37:3,4,5
37:12,13
37:24 38:4
38:10,12
38:18 39:3
42:5,11,14
43:9 45:4
46:25 47:5
47:22,22
77:24
124:2
133:2
142:8
152:4
153:16
187:16
225:18
**complaints**
91:8
**complete**
101:20
233:20
**completely**
23:4
102:17
109:10,12
**complete...**
16:15
**complex**
38:18
224:25
**complexi...**
191:16
193:4,18
205:25
**complexity**
46:11,13
57:11
214:3
**complicate**
117:10
**complicated**
101:11
192:16
**complica...**

57:7 157:5
**complica...**
100:19
135:24
200:11
202:5,8
**components**
30:18,24
75:8
137:11
205:4
**comprehe...**
53:13
**comprised**
75:10
**computing**
227:3
**concealed**
40:8 41:21
92:3 94:18
95:4 125:3
125:14
126:19
154:17
157:3
165:18
190:13
199:9,16
201:11
202:14
**concealment**
95:22 96:5
**conceptual**
215:15,23
217:3
**conceptu...**
224:11
225:2
**concern**
200:24
**concerned**
175:14
230:4
**concerning**
29:5 82:21
165:25
168:24
195:10
**concerns**
126:23

155:6
156:23
191:11
**conclude**
13:7 16:24
25:17
33:11
49:11,25
53:2,14
59:5,18
63:17,22
64:4 66:22
68:5 70:20
72:4 86:21
88:8 92:12
100:12
101:21
115:5
161:22
**concluded**
54:19
58:16 67:9
67:12,23
71:7 72:13
72:14
150:3
175:6,8
**concludes**
28:2
230:16
**concluding**
56:11
59:13
68:22
117:17
159:10
180:18
**conclusion**
22:12,19
23:8 25:11
26:9 33:24
36:3 53:15
54:7 55:7
56:10
57:15,21
58:8,24
60:16 61:4
62:4 64:8
79:2,11,14
79:19 80:7

81:9 82:9
82:11 84:4
84:11,12
86:19 87:7
87:9 88:17
97:13,21
99:13,14
101:2,15
107:15
117:15
118:8,10
120:10
121:18
126:17
130:10
136:22,24
137:12,12
137:16
139:22
147:3,21
148:10
151:13,15
162:16,20
170:15
171:18
173:17
176:22,24
177:3
178:11
181:3,5
183:5
184:12
185:18,20
185:24
186:13
187:6
188:2,4,15
203:12
**conclusions**
22:16 23:3
36:12 41:4
76:7 80:5
90:19 97:7
117:11
167:11
170:7
180:16
184:15
186:23
194:15

217:9
**concrete**
17:4
**conditions**
193:7,8,9
**conduct**
162:15
165:25
172:25
175:15
225:8
**conducted**
23:22
225:6
**conducting**
86:9
207:21
**conference**
182:10,15
**confidence**
12:24
26:13,14
83:15,16
86:3 104:3
160:21,22
160:23,24
161:5,9,12
161:13,19
162:4
172:9,19
179:5
183:6
206:14
**confident**
99:25
222:10
**confiden...**
83:19
230:11
**confirm**
100:13
219:16
**confirmed**
98:6
**confirming**
187:10
**conflating**
99:8
**conform**
193:11

**confounding**
117:9
183:17,21
186:2
198:6,11
199:5,13
200:12
201:9,18
205:9,15
**confusion**
85:19
**conjunction**
140:14
185:13
**connection**
105:11
167:7
**connoting**
120:10
**consciously**
115:3
**consensus**
10:14,22
116:4
**consequence**
96:12
**conseque...**
156:9
**conseque...**
39:13 59:5
70:20 72:4
**conserva...**
112:13
**consider**
32:18
51:12
78:23 90:7
92:19
131:25
**consider...**
193:3
203:13
**considered**
56:6,19
75:23
115:19
120:18
125:13
134:11
194:14

225:8
**considering**
128:25
**consistent**
72:17
87:24
209:9,14
213:6
214:18
216:4
**consiste...**
177:8
**Consolid...**
42:4
**constitute**
180:7
**construct**
223:10
225:13
**constructed**
228:12
**contains**
37:22 57:8
72:20
**contempl...**
130:2
**content**
145:18
146:14
155:14
158:5
**contents**
89:18
98:13
136:8
141:2
148:24
150:4
**context**
16:10,13
17:6 31:17
33:10 34:6
34:12 90:3
105:18
107:7
199:18
209:3
226:13
230:2
**Continued**

3:2 123:9
**contrast**
169:7
188:23
**contribute**
186:11,14
**contributed**
115:25
185:4,7
**control**
31:21
52:20
53:24
197:3,5
198:10
201:6
202:25
203:3
213:17,19
**controlling**
21:3
210:19
221:25
**controve...**
211:13
**convenient**
175:5
**conventi...**
64:21
87:25
**conversa...**
18:9
161:12
**convey** 24:6
129:17
186:4
**conveying**
68:21
73:14
139:7
155:3
**core** 209:21
210:3
226:18
**Cornerstone**
3:20 7:10
7:16 74:24
225:14
227:12
228:7,15

228:20,21
**corporate**
 204:8
 206:4
 207:23
 216:15
**correct** 5:25
 8:14,17,18
 11:19
 12:21
 14:17
 18:25
 21:16 23:4
 24:10,11
 28:7,8,21
 28:22 29:7
 46:25
 47:15 50:8
 50:9 58:19
 58:21 59:2
 60:15,16
 60:21
 61:10,17
 62:18,25
 63:19,21
 63:25 65:7
 66:8 67:11
 71:9 72:16
 73:7,17
 77:22
 81:22 83:3
 83:12,24
 86:10
 107:2,6,12
 109:15
 110:6
 111:18
 112:24
 113:5,16
 114:25
 115:2,21
 118:6,20
 120:13,19
 121:11,20
 121:25
 125:6
 130:15,25
 132:3
 136:19,20
 137:20

138:5,15
139:8,14
144:3
147:18
148:3
150:23
152:11
153:25
154:6
160:2,13
160:17
161:7,18
164:14
169:2,3,18
169:20,21
170:18,20
171:8,11
171:23,24
172:5,6,20
172:22,23
173:4,19
175:18
178:6,10
178:20,25
179:6,10
179:11,16
179:17,20
179:21
181:18,22
182:19,20
183:2
184:9
186:20
189:3
195:2,12
195:13
196:3,10
196:11,16
198:4,6
199:19,24
202:22
203:5
204:16,19
214:23
215:21
216:16
218:19
222:19
233:21
**corrected**

40:7 42:4
**correction**
 66:2
**corrective**
 18:24
 20:17 33:6
 34:2 36:16
 37:7,10,14
 38:5,9
 41:20 42:3
 42:10,13
 43:2,8,10
 43:25
 44:15
 45:17,21
 46:20
 47:14,19
 49:13,24
 50:3,14,19
 51:14
 52:22 53:3
 54:8 56:12
 58:18 59:6
 59:11,21
 60:9 66:23
 67:24 68:6
 68:19
 69:20
 70:21 72:5
 82:2,7,12
 89:16,19
 90:8,14
 91:3,7,11
 91:18,19
 91:20 92:7
 92:9 93:3
 93:5,6
 96:16
 97:12,15
 98:14,22
 99:2,16
 100:25
 101:23
 103:15,19
 105:7,10
 105:12
 114:22
 116:17
 119:19
 128:11

131:7
132:7,24
133:10,14
133:20
134:13
136:8
139:12
140:23
141:3,17
142:5
143:2,3
146:12
148:6,25
150:5
151:7
152:18
159:7
160:7
163:6
165:12
166:2,2,11
166:14,20
167:8,12
168:4,22
169:5,11
170:10
171:13
173:24
174:10,20
175:9,24
177:15,18
180:19,22
181:9,17
189:8,22
192:18
193:21,22
197:7,13
197:22
201:7
202:24
203:4
204:3
**correctly**
 96:3
 177:10
**correspo...**
 92:8,17
**cost** 112:11
**couched**
 106:19

**counsel** 4:14
 4:16,21
 5:3 6:11
**counter** 50:7
**counterv...**
 101:6
**couple** 5:16
 19:3 48:21
 67:19 91:9
 99:9 101:5
 116:14
 120:15
 124:14
**course** 32:6
 40:17
 66:12
 114:8
 121:20
 200:4
 224:6
 228:23
**court** 1:2,25
 4:10,16,18
 45:10 46:7
 84:8 97:11
 98:8
 104:16
 193:25
 194:4
 202:2
 205:22
**court's**
 96:25 97:3
 167:5
**courts** 34:12
 194:10,15
 194:17
**courts'**
 194:8
**crazy** 224:18
**created** 43:3
 131:25
 164:10
 229:8
**creates**
 46:15
 91:16
 126:7
 167:12
**creating** 7:7

14:16
143:12
**criticism**
190:22
198:4
**criticisms**
190:20
199:18
202:20
**criticizing**
229:17
**Cronos**
106:16
207:12
209:19
210:4,17
211:17
212:11
214:4,4,7
214:9
218:3,22
223:7,16
224:9,13
224:21
226:4,4,5
226:20
229:6,10
**Cronos'**
213:21
218:5
**crosses** 45:4
**crossing**
29:8,9
36:2
196:17
**crystal** 83:5
**current**
206:17
**currently**
219:22
**cut** 112:11

D

**D** 5:4 123:6
232:2
**daily** 75:5
78:21
207:11,20
215:18
**damages** 41:6

44:10
46:16 47:6
94:23 96:2
96:6 157:2
157:7,15
189:16
190:11
191:9,20
191:23
192:4,8,11
192:20,22
193:17
194:5
195:21,24
196:3,5,6
196:15,15
196:19
199:15
200:23
202:5
206:16
**Danyo** 1:16
4:9 5:5
231:4,18
**dash** 188:13
**data** 10:13
26:8,11,25
57:19 75:8
75:12,13
75:14,20
75:24,25
78:8,10,16
87:20,23
98:7
135:24
211:14
**date** 6:22
21:6,19
22:9,25
24:22
35:13,18
48:11 49:2
49:7 50:4
50:22 51:4
55:13 56:8
58:11,11
59:24 61:6
62:3,13
65:6,20
67:20,25

68:4,8,11
68:20 70:4
70:9,16
71:11,24
73:19 80:3
80:10,11
81:8,13
82:2 87:4
92:7
105:12
107:11
112:25
115:14,24
116:19,23
117:3,10
117:17,19
118:12
122:8
123:13
124:12,14
124:18
125:20
126:13
127:10,18
130:5
132:11,25
133:5,11
133:24
134:14,20
136:5,7,18
137:14,22
139:2
141:17
142:9
145:18
146:12,24
147:3
151:21
152:3,3
153:6
154:9
158:2,17
160:4
161:22
162:2,13
162:14,21
162:24,25
163:4
166:11,14
172:18,22

173:23,25
174:4,10
175:2,3,12
177:14,18
178:5,13
178:14
179:4,7,8
179:8,13
179:18
182:5,8,12
182:17
183:16
184:22
185:2,10
186:6,12
187:18,21
187:22,23
188:3,6
189:6,10
197:22
199:21
200:21
219:21
**dates** 19:24
20:17 21:3
21:25 22:3
32:7 33:11
35:11
37:11
44:15
46:19,20
46:24 47:4
47:6,9,12
47:13
50:15,15
51:14
52:23
53:19,22
54:9,17,20
54:22 55:9
57:18 58:7
59:21 60:5
60:9 66:15
68:15,19
71:3 72:19
73:9 74:23
79:24
89:16,17
89:21 90:7
90:9,21,22

91:10
97:16
99:16
100:19,22
101:3,5,10
101:11
106:2
118:22,25
119:11,13
119:14
124:9,13
134:13
136:23
139:4,21
139:23
140:24,24
141:5
148:7,9,11
148:23
149:3
150:2,7
151:8,20
151:23
153:5
159:3,10
159:13,15
160:5
169:11
170:8,10
170:13
173:7,7,9
173:11,14
174:17,23
174:24
175:7,7,10
177:6,8,10
177:12,15
184:11,15
185:12,17
187:2,16
187:25
201:17
204:3,4
**day** 11:23
12:2,6,14
12:17 23:2
23:16
30:11 31:6
31:25
33:15 34:3

| | | | | |
|---|---|---|---|---|
| 49:22 | 53:7 54:15 | 181:21 | 142:11 | 5:15 6:7,8 |
| 50:13,22 | 54:25 79:4 | 186:3,11 | **deficient** | 230:16 |
| 51:8,18,20 | 82:18 | 186:14,19 | 142:15 | **describe** |
| 53:5,9 | 159:21 | 197:12,14 | 143:5 | 20:19,23 |
| 55:16,18 | 169:4 | 197:22 | **deficiently** | 38:12 76:4 |
| 56:12,15 | 185:8 | 198:14 | 146:22 | 225:6 |
| 61:19,21 | 205:6 | **declined** | **definitely** | **described** |
| 62:8 63:5 | **deal** 26:23 | 78:22 | 177:24 | 19:13 |
| 64:19,24 | 190:5 | 79:16 96:3 | **definition** | 105:3 |
| 65:4 80:6 | 202:4 | 108:23 | 89:25 90:2 | 138:6 |
| 80:18 81:5 | **Dean** 85:22 | 109:4 | 90:2 195:4 | 184:8 |
| 81:18 | **DECHERT** 3:4 | 114:4 | 195:21 | 191:4 |
| 82:10 | **decide** 84:9 | 162:17 | **definitive** | 201:5 |
| 85:16,25 | **decimal** | 194:24 | 15:8 27:12 | **describing** |
| 86:16,19 | 160:14 | **declines** | 33:24 54:6 | 17:22 |
| 87:4,7,9 | **decision** | 154:19 | 56:10 | 42:15 |
| 88:2,8,10 | 97:2,5 | **decompose** | 57:15,20 | 154:21 |
| 88:14 | 128:12,19 | 177:5,22 | 79:11,14 | **description** |
| 107:2,12 | **decisions** | **decreases** | 79:19 | 190:3 |
| 117:6,12 | 124:25 | 14:3 | 101:15 | **designating** |
| 117:14 | 194:8 | **deep** 212:14 | 118:18 | 230:10 |
| 123:23 | 228:18 | 218:25 | 186:22 | **designed** |
| 127:3 | **decline** | 219:4 | 187:6 | 220:23 |
| 128:14,18 | 61:14 | 224:15 | **definiti...** | **despite** |
| 129:20 | 62:17 | **deep-ended** | 26:10 | 101:21 |
| 134:2,5 | 63:17,19 | 228:4 | 100:14 | **detail** 46:14 |
| 139:6 | 63:23 65:3 | **defendant** | **degree** | 200:8 |
| 146:17 | 77:20,22 | 2:16,21 | 166:22 | 208:10 |
| 161:25 | 77:25 78:4 | 3:4,9,14 | **delibera...** | **details** |
| 183:19 | 78:6,12,12 | 34:14 | 100:2 | 20:21 |
| 185:5 | 79:6 80:18 | **defendants** | **demand** | 157:15 |
| 190:25 | 81:18 | 1:9 6:11 | 120:25 | **detect** 13:11 |
| 195:8 | 90:21,22 | 35:20 | 121:5 | **determin...** |
| 197:18 | 95:25 | 37:19 | **departure** | 96:17 |
| 206:9 | 101:22 | 38:14 39:5 | 115:10 | 121:22 |
| 212:12,16 | 103:5,6,19 | 41:12 | **depend** 15:19 | 124:4,16 |
| 212:16,17 | 104:4 | 94:13 | 15:20 | 152:18 |
| 212:19,23 | 108:19 | 95:14 | **dependent** | 155:25 |
| 215:21 | 109:22 | 125:3 | 80:17 84:5 | 184:9 |
| 216:16 | 119:13,14 | 126:5,19 | 168:7 | **determin...** |
| 217:24 | 130:4 | 141:8 | **depending** | 155:20 |
| 220:22 | 134:5 | 143:25 | 26:17 | **determine** |
| 222:8 | 144:18 | 144:9 | 175:12 | 20:25 21:8 |
| 223:12 | 147:7 | 154:13 | 199:2 | 21:11,19 |
| 224:4 | 161:15 | 157:8 | **depends** 15:9 | 30:2 36:19 |
| 231:15 | 162:24 | 194:22 | 31:17,17 | 40:10 |
| 233:23 | 166:13 | **defendants'** | 31:24 | 41:18 |
| **days** 36:9 | 173:3,19 | 154:17 | **deposition** | 42:25 |
| 38:7 51:22 | 174:6 | 195:10 | 1:14 4:6 | 43:18,24 |
| 52:6 53:2 | 178:9 | **deficien...** | 4:12 5:10 | 45:14 |

| | | | | |
|---|---|---|---|---|
| 64:17 78:6 | 63:18 | 224:11 | 115:5,9 | 165:7 |
| 80:21 | 64:16 | **difficul...** | 128:12 | 170:10 |
| 85:11 | 69:14 79:7 | 189:25 | 131:8,11 | 173:13 |
| 90:13 | 80:4 87:2 | **diluted** | 132:7 | 186:4 |
| 98:23 | 90:5 99:9 | 55:23 | 140:23 | 190:10 |
| 100:23 | 104:10 | **direct** 8:7 | 142:18 | **discussed** |
| 103:13 | 105:14 | 228:19,24 | 148:6 | 32:19 37:6 |
| 132:18 | 124:15 | **directed** | 153:2 | 43:5 49:16 |
| 134:3 | 135:11,20 | 39:7 | 166:14 | 71:3 74:23 |
| 138:13 | 135:22 | 228:21 | 171:17 | 81:16 |
| 162:16 | 138:23 | **directly** | 173:25 | 84:15 |
| 173:2 | 170:7 | 7:14 | 176:6,8 | 85:14 98:4 |
| 174:12 | 177:7,22 | **disagree** | 181:17,21 | 101:3 |
| 175:16 | 181:4 | 26:21 | 204:3 | 116:21 |
| 185:3 | 184:14 | **disagreed** | 206:10 | 119:8,20 |
| 186:17 | 185:4,17 | 77:4 | **disclosures** | 124:22,23 |
| 204:12 | 192:13,19 | **disagree...** | 36:16,18 | 128:24 |
| **determined** | 192:22,23 | 77:6 | 36:21 | 130:18 |
| 41:20 | 199:2 | **disclose** | 40:24 | 131:19 |
| 58:15 | 201:17 | 35:21 39:6 | 43:23 | 134:24 |
| 118:24 | 204:13 | 140:7 | 51:14 53:4 | 151:11 |
| **determining** | 208:4,9 | 141:9 | 82:7 91:19 | 153:16 |
| 36:16,18 | 211:22 | 144:4,12 | 101:14 | 156:14 |
| 41:14 | 213:3 | 145:5 | 113:18,19 | 162:22 |
| 98:24 99:3 | 215:24 | **disclosed** | 119:10 | 163:4,12 |
| 181:7 | 217:18 | 29:23 | 128:18 | 167:4 |
| 183:8 | 218:7 | 73:16 82:4 | 142:12 | 169:16 |
| 204:18 | 222:21 | 106:25 | 143:6 | 170:8 |
| 228:9 | 223:20,21 | 115:20,24 | 182:6,7,15 | 172:15 |
| **developed** | 225:12 | 141:11,19 | 185:11,14 | 173:21 |
| 167:25 | 227:9,22 | 145:24 | 187:23 | 176:12 |
| **developm...** | **differen...** | 146:22 | 204:9 | 180:5,17 |
| 141:23 | 94:21 | 153:9,12 | 206:4 | 188:21 |
| 142:4 | 119:2 | 157:4 | 216:16 | 202:7 |
| **Diego** 2:12 | **differently** | 182:14 | **discounted** | 211:21 |
| **difference** | 13:23 23:5 | 198:15,16 | 204:7 | **discusses** |
| 59:10 | 30:7 63:2 | 199:11 | 205:2,3,14 | 80:5 |
| **different** | 121:13 | 201:12 | 205:20 | 183:15 |
| 9:2 12:10 | 139:16 | 202:13 | **discuss** | **discussing** |
| 12:23 | 173:21 | **disclosure** | 20:18 23:2 | 8:6 18:12 |
| 15:24 | 213:15 | 30:3 40:5 | 24:25 | 23:21 |
| 18:15 19:3 | **difficult** | 44:15 54:8 | 46:14 | 27:18 |
| 23:19,24 | 116:24 | 68:19 | 48:21 | 29:16 |
| 27:12 | 117:3 | 73:21 | 51:11 82:8 | 99:12 |
| 30:18,24 | 149:10 | 74:18 | 123:13 | 106:23 |
| 33:7 37:11 | 184:3 | 82:12 92:7 | 130:21 | 112:6 |
| 44:11 58:8 | 187:5,9,11 | 92:16 94:8 | 137:15 | 138:25 |
| 62:8,15,17 | 193:23 | 97:15 | 147:5 | 139:3,5 |
| 62:20,24 | 206:13 | 98:15 | 151:22 | 152:2 |
| 63:6,8,11 | 219:13 | 99:16 | 159:9 | 165:11 |

168:22
177:7
179:13
210:22
226:12
**discussion**
17:4 24:25
32:11
58:10
72:20
107:7
124:19
125:25
138:7
140:15
153:21
167:3
177:7
183:12
189:21
191:6
200:11
219:3
**discussions**
123:20
127:9
128:16,17
228:23
**disentangle**
55:3
197:24
201:2,9
**disposal**
97:20
203:5
**dispute**
153:22
**dissemin...**
73:13,23
139:6
**distinction**
20:9 59:14
69:2,9,12
159:19
170:6
198:19
**distinguish**
19:2,20
201:10
**distribu...**

15:10
**DISTRICT** 1:2
1:2
**dividends**
212:17
**dividing**
63:12
215:20
220:21
**DIVISION** 1:3
**divulged**
182:9
**document** 7:2
**documents**
40:14
84:20
**doing** 14:21
17:9,14
31:12
49:15
53:13
56:19,23
57:7 74:22
74:24 75:3
79:8 86:12
86:15
88:21
90:25
93:21 98:4
99:9
121:21
152:22
187:19
200:4
207:25
209:24
210:4
211:8,19
213:5
215:16,16
215:23
216:17,25
217:2,3,17
217:18,20
217:21
220:18
221:4,5
223:8
224:10
226:25

227:10
229:4,21
230:3
**domain** 40:16
163:21
**Donald** 2:4
**doubt** 54:21
80:8,17
81:9,17
82:10
89:20
90:20
91:16 97:9
97:14
99:14,21
100:3,5
103:3,10
117:15,22
118:11,15
118:19,21
119:2,3,4
119:4,4,4
119:6,7,21
119:23
120:2,6,7
126:7
130:11
136:10,25
137:10,17
139:22
140:2
141:4
143:13
144:17,24
146:19
147:6
148:10
149:2
150:6
151:24
155:10
158:15
159:14
163:3,11
163:21
169:9
170:16
171:19
176:12,22
177:3

180:23
181:3,5
188:17
189:9
**doubtful**
52:16
**doubts** 137:9
**Douglas** 1:15
2:13 4:6
4:25 5:13
6:20 232:4
232:9
233:1,19
233:22
**DOWD** 2:10
**Dr** 27:22
28:2,11
41:6 62:4
75:18
156:22
189:15
190:3,11
190:23
191:5
193:2
195:7,14
195:16
198:5
200:5,7,14
200:19
201:24
202:16
203:17
204:6,18
204:22
205:20
211:22
212:3
217:8
221:10
229:17
**draft** 227:6
227:10,11
**drafts**
227:21
**draw** 41:4
69:12
87:10
120:2
130:3

140:4
185:13
**drawn** 119:24
120:11
**draws** 212:2
**Drew** 3:21
4:9
**drink** 220:24
**Drive** 3:5
**drop** 97:22
98:12
99:20,22
102:13
**drove** 108:15
**due** 103:8
123:21
130:11
163:24
197:16
**duly** 5:5
123:7
**dynamics**
222:2

_____

**E**

**E** 2:2,2 3:2
3:2 5:4
123:6
231:2
232:2,7
**e-cigarette**
169:2
**e-cigare...**
51:3 152:7
152:16
155:17
**e-vapor**
39:19
**earlier** 42:7
49:16
54:10 66:6
66:9 80:12
82:13
84:15
89:22
90:24 92:4
92:10
94:10
100:8
102:18

| | | | | |
|---|---|---|---|---|
| 103:8 | 103:9 | 196:18 | 221:12 | 127:6 |
| 104:4,14 | 115:16 | 203:2 | **efficiency** | **elaborated** |
| 105:13 | 116:3 | 228:25 | 8:7 27:23 | 28:9 |
| 117:23 | 134:18 | **economists** | 28:12 | **elaborating** |
| 118:12 | 182:6,7,7 | 85:25 90:5 | 29:12 | 167:2 |
| 119:16 | 182:14 | 90:16 | 215:14,25 | **elaboration** |
| 129:23 | 183:22,23 | 96:23 | 217:9 | 200:9 |
| 130:19 | 187:2 | 98:17 | **efficient** | **elements** |
| 136:12 | **easiest** 37:8 | 105:8 | 8:9,16,19 | 132:23 |
| 137:3 | **East** 2:17 | 138:17 | 8:24 9:7 | 133:9 |
| 139:3 | **Eastern** 1:2 | **EDWARD** 2:19 | 9:20 27:25 | 201:13 |
| 141:6 | 4:3 | **effect** 25:18 | 28:7,15,20 | 217:4 |
| 147:8 | **economic** | 33:18 53:9 | 29:2 84:13 | **eliminated** |
| 148:12 | 26:18 46:8 | 56:5,9,21 | 84:15 85:7 | 217:7 |
| 149:4 | 46:13 64:5 | 57:4,5,16 | 107:17 | **elucidating** |
| 150:8 | 86:17,19 | 66:20 | 110:22 | 42:16 |
| 151:11 | 87:8,16 | 92:21 95:7 | 208:25 | **emerged** |
| 157:10 | 88:8 | 117:4 | 212:10 | 194:24 |
| 158:20 | 106:20 | 131:17 | 216:3,9 | **empirical** |
| 159:20 | 109:4,18 | 133:13 | 217:5,22 | 56:20 |
| 165:13,18 | 116:25 | 135:6,8,19 | 218:11,14 | 77:11 |
| 166:24 | 119:6 | 138:9 | 220:4,16 | 87:20 |
| 167:6 | 120:8 | 143:11 | 221:21 | 97:25 98:3 |
| 169:13,17 | 165:15 | 197:3,6 | 222:14 | 98:18 |
| 173:5 | 168:11 | 199:8,10 | 224:16 | 225:2 |
| 174:22 | 194:14 | 201:6 | **efficiently** | **employ** 32:8 |
| 176:3 | 217:2 | 203:3,10 | 208:25 | 165:15 |
| 188:19,24 | **economics** | 205:14 | **eight** 20:17 | 167:9,15 |
| 189:11,21 | 85:21 | 206:9 | 21:25 53:2 | **employed** |
| 200:17 | 108:14 | 207:11 | 53:6 54:8 | 212:8 |
| **early** 99:17 | 178:23 | 208:11,17 | 59:21 60:5 | **endeavor** |
| 111:22 | 222:8 | 208:20 | 60:8 68:15 | 85:11 |
| 119:15 | **economist** | 209:5,19 | 68:18 | **Endo** 106:12 |
| 130:7 | 33:20 34:9 | 210:6,10 | 72:18 | 106:13 |
| 174:7 | 34:21 | 211:15 | 101:3 | **enforcement** |
| **earnings** | 44:17,21 | 213:19 | 129:8 | 121:3 |
| 9:25 10:2 | 45:2,3,6 | 214:4,9,12 | 136:22 | 143:10,16 |
| 10:4,10,13 | 45:12 62:9 | 216:21 | 140:23 | 158:8 |
| 10:21 | 64:20 | 218:21 | 148:6 | **engagement** |
| 11:22 | 85:15 86:8 | 221:15 | 151:7,19 | 43:15 |
| 12:19 14:2 | 97:19,25 | 224:21 | 159:10 | 45:11,23 |
| 14:3,8,17 | 103:16 | 226:19 | 170:9 | 155:23 |
| 24:20 | 121:18 | 229:22 | 173:7 | 164:7,13 |
| 25:21,23 | 127:2 | **effectively** | **either** 13:7 | 172:24 |
| 26:17,19 | 139:25 | 138:22 | 45:15 | 174:12 |
| 26:24 27:3 | 145:12 | 209:18 | 113:25 | 187:12,15 |
| 27:5,8,14 | 146:9 | **effects** 21:3 | 148:18 | **engagements** |
| 27:16 57:3 | 156:13 | 135:22 | 216:16 | 104:7 |
| 101:12,13 | 157:25 | 214:12 | 224:25 | **ensure** 14:9 |
| 102:5,19 | 167:23 | 218:12 | **elaborate** | 131:4 |

| | | | | |
|---|---|---|---|---|
| **entail** 129:2 | 135:17 | **estimates** | 22:17,20 | 138:4,6,17 |
| 135:9 | 212:9,24 | 219:11 | 23:4,6,10 | 140:24 |
| **entails** | 213:22,25 | **estimation** | 23:11,21 | 145:13 |
| 19:12 | 216:8,9 | 57:12 | 24:14 | 146:9 |
| **entire** 127:6 | 221:12,17 | 212:24 | 28:24 29:2 | 151:8,22 |
| **entirely** | 221:21 | 213:22,25 | 29:17,17 | 152:18,21 |
| 127:16 | 226:15 | 216:8 | 29:18,20 | 152:22 |
| **entirety** | **errors** 17:6 | 226:15 | 29:25 30:7 | 153:6 |
| 149:25 | 25:2 87:15 | **et** 1:4,8 4:7 | 30:8,10,12 | 157:19,21 |
| **entities** | 87:18 | 4:8 106:11 | 30:14 31:6 | 159:7 |
| 94:16,17 | 88:20 | 106:13 | 31:20,25 | 160:7,8 |
| 226:23 | 135:23 | **Ethan** 3:21 | 32:15 33:3 | 165:12 |
| **entitled** | 226:13 | 4:8 | 33:12,22 | 169:11 |
| 231:8 | **especially** | **evaluate** | 41:20 43:2 | 170:10 |
| **envelope** | 186:25 | 12:8 42:2 | 44:2 45:17 | 173:22 |
| 6:15 | 192:15 | 105:9,25 | 45:21 | 178:4,7,23 |
| **envelopes** | **ESQ** 2:7,8,13 | 106:15 | 48:15 | 181:9,17 |
| 6:23 | 2:14,19,24 | 115:4 | 49:17 51:9 | 182:24 |
| **EPS** 55:23 | 2:24 3:6 | 127:3 | 52:23 53:5 | 187:20 |
| **equal** 11:3 | 3:11,11,16 | 135:8 | 58:12 | 191:7,15 |
| 227:25 | **essentially** | 174:5,18 | 59:21 60:9 | 191:18,19 |
| **equally** | 22:10 | 175:22 | 60:19 61:8 | 191:22 |
| 167:16 | 28:24 | 194:12,16 | 61:12,17 | 192:3 |
| **equals** 18:16 | 44:20 62:5 | **evaluated** | 62:5,11 | 193:2,5,6 |
| 19:7 24:2 | 77:11 86:3 | 83:13 | 64:9,25 | 193:12,16 |
| 97:22 | 86:12 98:2 | 102:14 | 65:11 | 194:3 |
| 98:12 | 106:18 | 133:15 | 66:13 67:4 | 195:17 |
| **equates** | 110:10 | 202:15 | 70:7 71:15 | 197:3,11 |
| 160:22 | 111:10 | **evaluating** | 72:10 | 197:13,20 |
| **equity** 209:6 | 146:11 | 9:6 36:14 | 74:22,25 | 197:22 |
| 210:11 | 191:4 | 168:15 | 75:3,10 | 198:9 |
| 215:19 | 203:17 | 169:4 | 77:3 79:4 | 199:12,17 |
| 220:20 | 205:23 | 199:21 | 79:5,8 | 199:24 |
| 223:7 | 217:21 | 200:5 | 81:2 82:25 | 200:8,10 |
| **equivalent** | **establish** | **evaluation** | 83:7,22 | 200:15,16 |
| 68:9 69:17 | 44:9 96:6 | 23:9 28:10 | 86:9,14,15 | 200:20,21 |
| 87:11 | 165:16 | 29:11 | 86:21 87:4 | 201:5,17 |
| 88:10 | **established** | 171:16 | 87:17,25 | 204:3 |
| 106:21 | 10:12 | 187:15 | 89:16 | 205:16 |
| 160:24 | 77:12 | **event** 12:7 | 90:14 92:9 | 207:10,21 |
| 216:5 | 135:4 | 17:7,9,10 | 93:6 96:16 | 209:4 |
| **error** 12:23 | 229:13 | 17:20,22 | 98:22 99:2 | 210:12,24 |
| 16:10,13 | **estimate** | 18:6,13 | 101:23 | 211:2,4,10 |
| 16:16,17 | 16:8 33:17 | 19:5,9,12 | 102:8,9 | 211:19,22 |
| 16:22 17:2 | 203:9 | 19:15,17 | 103:15,19 | 211:24 |
| 24:24 25:5 | 212:18 | 19:23,24 | 121:8,21 | 212:4 |
| 25:8,13,14 | 223:8 | 20:6,10,12 | 124:11 | 213:21 |
| 26:5,6,6 | **estimated** | 20:17,23 | 132:8 | 214:16,25 |
| 57:12,12 | 135:22 | 21:18,19 | 134:12 | 215:7,11 |
| 63:13 | 217:23 | 22:3,5,9 | 135:12 | 216:25 |

221:7
222:19
224:3
226:7,8
227:19,22
228:4
**events** 32:4
  36:17  37:7
  37:8,10,15
  38:5,6,7,9
  42:4,11,13
  42:14  43:8
  43:10
  47:14,19
  47:21
  54:12,14
  76:21
  89:19
  91:19,21
  93:3,5
  97:12
  114:22
  119:19
  136:9
  139:12,16
  141:3
  142:5
  148:25
  150:5
  166:2
  168:5,22
  169:5
  174:20
  175:24
  180:22
  192:18
  193:21,22
  207:23
  213:17
**eventually**
  10:4
**evidence**
  14:14
  22:11  23:9
  31:10
  33:22,23
  33:25  36:6
  36:10  42:5
  47:19
  49:12

54:22  58:4
58:9,17
59:5,11
61:25
62:11  64:9
64:10,22
64:23
66:22  67:7
67:23  68:5
69:7,19,23
69:23
70:20  71:6
72:4,12
76:12,18
78:23
79:17
80:11
82:10
84:25  85:6
86:22
88:15
89:22
90:20,23
97:16  98:3
98:18
99:16,22
100:5
101:15
103:7,22
104:4
113:24
115:4
117:23
118:12,17
119:14,16
120:3
126:9
136:12
137:2,8
138:18
141:6
142:17,19
143:8
144:19
145:12,13
147:8
148:12
149:4
150:8
158:19

169:11
170:4
174:6,20
175:25
177:19
188:19
189:11
**exact** 92:15
  166:19
**exactly** 9:24
  24:6  35:5
  46:8  74:6
  98:7
  165:13
  180:11
  187:6
  194:7
  202:15
  206:12
  212:18
  213:10
  215:16
  221:6
  222:25
  223:8
  226:8
  229:21
**EXAMINATION**
  5:7  123:9
**examine** 53:4
**examined** 5:6
  123:7
**examining**
  98:18
**example** 9:24
  10:11,17
  10:19
  11:14
  12:12
  15:22
  18:13
  20:16
  24:18,25
  26:4,17
  30:9  31:5
  31:5  32:10
  50:22
  52:25
  53:16  55:9
  57:17

58:11  77:2
84:8  91:9
91:14
93:13,23
95:8  96:12
100:10,11
101:11,18
102:3,16
103:25
106:11
113:9,12
114:13
115:14
117:6
132:5
140:20
142:3
183:15
186:8
205:2
210:15
215:2
219:7
221:13
**examples**
  111:6,9
  201:18
**exceeds**
  172:19
**excluding**
  224:20
**executed**
  87:5
**executing**
  168:10
**exercise**
  56:25  57:2
  98:2
  213:23
  214:8
  217:19
  220:17
  221:4,5,9
  221:11
  222:25
  223:9
**exhibit** 6:19
  17:12,12
  19:25  20:7
  35:10  36:7

37:9,21,22
37:23,25
38:4,8
42:15
43:11
56:13
60:22,23
60:25  81:2
83:4,7
84:2  91:5
93:11
121:14
122:3,3
134:12
135:3
137:20,24
153:7
154:9
160:10,16
172:7
178:19,21
181:24
232:9
**Exhibits**
  39:3
**exist** 189:25
**existed** 93:4
**existence**
  35:16  50:6
  61:22
  72:23
  217:6
**exists**
  185:24
**expect** 11:3
  35:22
  84:15
  161:14
**expectation**
  10:18
**expectat...**
  205:7
**expected**
  48:24  49:7
  67:22
  205:16
**expecting**
  9:23  10:15
  10:16
**experience**

192:15
**experienced**
108:19
**experime...**
87:20
**expert** 6:19
35:5
120:22
121:6
165:15,24
167:9,15
167:23
192:4,7
193:24
194:3
232:9
**expertise**
97:20
168:11
**experts**
192:25
194:14
**experts'**
192:11
**explain**
13:12,14
16:12 17:3
17:5 25:4
46:3 69:15
85:19 86:6
88:13
128:8
146:8
186:2
219:9
**explainable**
35:3
**explained**
61:15,24
121:10,24
187:17
**explaining**
227:15
229:18
**explanation**
128:23
166:8,17
184:4
**explanat...**
124:24

**express**
118:14
176:10
**expressed**
97:7 163:2
**expressing**
118:18,20
**extensive**
51:7
**extensively**
163:12
**extent** 26:21
27:14
32:13
33:13 95:3
95:25
97:22
163:23
167:11
185:3
219:25
**extraneous**
226:15
**extreme**
100:12
101:19,24
103:16

_____
**F**
**F** 231:2
**faced** 220:9
**fact** 4:25
27:14
35:10,16
44:6 60:11
64:22
74:11,13
78:17
79:15 91:7
92:2,5,19
94:4,20
105:10
114:6
116:3
124:20
126:21
127:20
128:2,19
128:25
129:24,25

134:3
138:18
144:11
152:23
158:4
163:24
186:4
191:14
209:20
215:13
222:24
**factored**
220:15
**factors** 21:4
31:21,22
61:9,9,16
61:24 74:3
74:15
83:23,23
84:3
121:11,24
122:6
138:5,9,9
160:12
162:19
181:4
185:7
188:12,13
188:14,15
188:16
197:4,16
197:23
198:6
220:23
227:6
**facts** 192:13
193:19
**failed** 35:20
39:5,13
**fails** 190:4
190:11
204:10
**fair** 13:19
21:23
22:18
23:13
25:21 31:3
35:4,24
61:16
107:24

109:6
120:17
190:20
195:2,4
198:18,22
**fairly** 10:12
51:7 108:7
185:11
**faith** 205:23
**false** 14:25
16:23 17:2
39:4 43:19
44:3 140:9
159:6
**falsely**
16:18,21
**familiar**
16:9 34:4
215:3
218:5
**familiarity**
108:4
**familiarize**
196:23
**far** 143:15
158:9
162:11
175:13
215:6
**Farmer** 85:23
**fashion**
23:17 87:5
182:12
**favor** 18:2
25:11 74:4
74:16
79:20
**FDA** 153:17
174:2
**February**
73:6,9,10
73:14,23
74:20 76:6
76:8 77:18
78:20
79:24 80:2
80:6,15,22
80:23 81:4
81:15 82:8
82:19,22

82:22 83:2
83:6 84:4
84:12,17
84:19 85:4
85:8,10,13
85:18 88:2
139:2,4,6
140:17,25
141:22
142:6
144:19
146:10
147:3,7
148:22
150:3,19
151:16,21
**federal**
123:23
125:12
133:4
**FedEx** 6:17
**feet** 15:15
15:23,24
16:2,2
**figure**
156:24
**filed** 142:7
**filings** 9:4
225:23
**finally**
131:18
**finance**
217:4
222:7
**financial**
85:21
97:18
194:25
218:6,11
225:21
**find** 51:21
53:12
55:13
60:17
65:17
70:13
71:21 79:6
81:5 84:25
86:14 88:2
88:6 89:16

98:21
116:19
134:4
197:11
222:21
228:16
**finding**
49:25
68:24
**findings**
158:8
**finds** 87:6
**fine** 89:3
219:6
**fines** 39:12
**finish**
142:23
143:19
226:22
**finished**
150:21
151:2
**firm** 142:7
209:4
210:12,23
211:2,4,10
214:25
215:11
216:25
222:19
**firm-spe...**
31:22
61:20
224:3
**firms** 14:19
211:8
**first** 5:5
7:23 19:21
29:7,18
44:19
47:17
104:12
107:9,10
109:19
111:16,19
131:2
141:22
153:24
154:3
157:22

173:7
180:6
181:14
191:14
201:23
204:21
225:10,20
225:22,24
227:6
**fiscal** 182:6
**Fischer**
222:9
**five** 88:23
164:18
**five-minute**
164:22
**flawed**
211:23
**flipped**
129:11
**flow** 204:7
205:2,3,14
205:20
**flows** 205:16
**focus** 18:9
59:22
143:23
158:11
165:6
175:11,13
208:12,23
**focused**
216:24
**focusing**
23:10
58:23
176:19
181:2,5
**follow** 79:24
86:13
**followed**
209:14,17
223:2
**following**
11:13 12:2
38:22 54:9
97:10
103:19
111:23
181:21

204:21
**follows** 5:6
123:8
**Food** 75:18
**footnote**
51:3,10,18
52:9 65:23
66:3 92:14
96:24,24
165:7,10
166:7
184:20
208:10
214:17
**footnotes**
173:12
218:11
**forecasts**
10:14
186:7
**foregoing**
39:17
**form** 12:10
27:25
28:15,25
32:10,24
34:22
35:25
59:16
63:20 64:2
69:13
84:14 99:7
115:15
119:9
145:16
147:12
156:5
167:20
171:9
200:3
215:13
218:14
**formal** 34:10
79:4 124:7
**formally**
4:17 18:15
**forth** 95:10
104:2
132:7
191:5

201:14
202:17
221:20
**forward**
125:21
**found** 53:7
54:25 71:6
102:14
121:8
124:11
134:13
137:18
160:10
172:2
178:16
181:19
192:5,24
**four** 38:8
47:4 106:9
143:21
**frame** 75:21
**framework**
191:5,15
**framework'**
190:4,11
**Francisco**
3:15
**fraud-re...**
133:23
134:8
**fraudulent**
102:5
**fraudule...**
102:20
103:9
**Friday** 32:12
73:13 76:3
76:5 84:17
84:24 85:5
**front** 44:24
52:25
97:22
98:12
145:21
161:3,8
172:14
221:19
**front-end**
105:19
**fruition**

93:5
**FTC** 115:9
117:20
118:5
120:13,14
120:17,20
120:22
121:7
152:5,13
153:3,23
153:24
154:3,15
155:13
157:12,21
158:4,14
159:25
162:25
163:7,9,25
**FUHR** 2:19
**full** 5:11
38:20
51:14
84:22
188:11
**full-year**
55:22
**fully** 8:10
73:15 82:4
85:20
108:22
112:20
131:4
141:11,19
**further**
30:16,22
58:4,5
84:24 85:6
123:8
128:16
133:7
156:10
180:11
191:18
193:5
197:19
199:14
202:20
230:6,12
231:10

| G | | | | |
|---|---|---|---|---|
| **G** 5:4  123:6 | 200:10 | 113:15 | 56:4  88:25 | 131:19 |
| **Gabby** 1:4 | **getting** 66:7 | 125:21 | 120:20 | 133:18 |
| 4:7 | 76:24 | 132:25 | 121:6 | 134:17 |
| **gears** 207:5 | 157:15 | 142:6,20 | 122:10 | 135:7,9,20 |
| **GELLER** 2:10 | 208:18 | 143:11,22 | 127:21 | 201:25 |
| **general** | 221:6 | 159:11 | 128:3,4,7 | |
| 10:24 | **giant** 205:22 | 164:21 | 206:19 | H |
| 14:21 | **give** 9:24 | 167:3 | **GOTTLIEB** 3:8 | **H** 232:7 |
| 20:20 | 57:17 | 168:10 | **government** | **half** 27:4 |
| 31:23 | 150:12 | 176:16 | 51:17 | **halfway** |
| 33:19 | 201:18 | 181:4 | 94:15,16 | 27:21 |
| 52:25 | **given** 10:11 | 190:10,23 | 147:10 | 71:21 |
| 57:25 | 11:23  34:2 | 196:22 | 154:23,24 | **hand** 87:23 |
| 72:18 | 55:6  57:11 | 205:23 | 158:22 | 136:3 |
| 91:22 | 57:19 | 206:3 | 163:14 | 231:15 |
| 139:18 | 89:18 | 210:25 | 164:2 | **happen** 96:10 |
| 164:4 | 93:19,21 | 226:21 | **governme...** | **happened** |
| 180:6 | 95:22 | **goal** 44:12 | 39:19 | 44:15 |
| 183:22 | 135:23 | 195:8,14 | **granularity** | 50:21  93:6 |
| 191:6 | 140:25 | 224:2 | 99:24 | 157:20 |
| 198:8 | 148:24 | **goes** 21:4 | **great** 48:2 | **happening** |
| 200:16 | 150:4 | 44:4 | 103:20 | 114:11 |
| 203:7,12 | 168:2 | 155:19 | **Greater** 2:11 | 127:3 |
| **generalize** | 176:18 | **going** 24:23 | **ground** 5:17 | **happy** 134:10 |
| 27:18 | 190:25 | 42:18 | 29:10  45:5 | **hard** 15:7 |
| **generally** | 192:16 | 58:10 | 196:18 | 27:11,17 |
| 9:20  15:4 | 197:13 | 85:25 | **grounds** 36:3 | 38:19  55:7 |
| 20:3  25:23 | 200:7,14 | 88:22 | **Group** 1:8 | 103:3 |
| 38:13  66:7 | 205:24,25 | 94:24 | 2:16,21 | 121:4 |
| 111:11 | 212:19,23 | 111:25 | 4:8 | 129:18 |
| 142:10 | 215:9 | 114:9 | **groups** 164:9 | 194:6,11 |
| 154:20 | 216:16 | 122:7 | **guess** 30:6 | 194:16 |
| 156:21,22 | 224:4 | 129:20 | 35:15 | **harmful** 39:8 |
| 194:20 | 225:19 | 146:3 | 38:23 | **Harpreet** |
| 196:11 | 229:21 | 149:7 | 40:13 | 106:16 |
| 202:25 | 233:20 | 164:17,20 | 66:18  87:2 | **head** 5:20 |
| 209:7 | **gives** 215:15 | 187:5 | 120:20 | 7:16 |
| 220:11 | **giving** | 206:8,18 | 132:21 | **heading** |
| 222:2 | 108:10 | 210:25 | 134:2 | 139:18 |
| **generate** | 112:11 | 226:11 | 179:8 | 189:14 |
| 27:4 | 204:23 | 230:2 | 194:21 | **heard** 34:7 |
| **generated** | 208:22 | **Goldman** 97:2 | 216:19 | 69:22,24 |
| 135:22 | **go** 5:16  9:21 | 104:17 | 223:10 | **hearing** |
| **generates** | 10:6  36:21 | 105:17 | **guessing** | 145:21 |
| 135:15 | 41:5,23 | 167:6 | 220:7 | **Heather** 7:25 |
| **generic** | 54:13 | **good** 4:2  5:8 | **guidance** | **height** 15:12 |
| 190:3 | 59:17  64:3 | 10:13 | 55:22  56:2 | 15:21,23 |
| 195:4 | 64:4  81:10 | 26:20,22 | 56:4,22 | **heightened** |
| | 98:24  99:3 | 42:19 | 57:6 | 125:4 |
| | 111:9 | 51:25  52:2 | 130:20 | 126:20 |

| | | | | |
|---|---|---|---|---|
| **heights** | 8:24 12:16 | 46:24 | 54:7,23,23 | 137:3,8 |
| 15:17 | 13:2,2,5 | 204:18 | 56:11 | 140:22 |
| **held** 1:16 | 13:25 | **identify** | 57:21 59:2 | 141:6 |
| **help** 18:9 | 14:11,25 | 24:12 | 59:13,20 | 144:21,24 |
| 22:11 | 15:12,14 | 45:20 | 60:2,8 | 147:9,17 |
| 60:22 | 15:15,19 | 105:22 | 61:25 64:7 | 148:2,8,12 |
| 119:2 | 16:18,19 | 130:13,15 | 67:10,22 | 148:15 |
| **helped** 54:18 | 16:20,23 | 162:7 | 68:11,18 | 149:4,17 |
| 186:2 | 16:24,25 | 172:21 | 68:24 | 150:8,13 |
| **helpful** 18:7 | 17:6,9,16 | 179:9 | 69:18 | 151:6,10 |
| **helps** 41:3 | 17:17,19 | **identifying** | 72:15 | 156:19 |
| **hereunto** | 17:24 18:2 | 36:21 | 76:13 | 158:20 |
| 231:14 | 18:3,5,16 | 131:5 | 78:24 | 159:11,14 |
| **HERRINGTON** | 18:22 19:5 | **ii** 39:7 | 79:12,18 | 160:2,6 |
| 3:13 | 19:10 | **iii** 3:4 39:9 | 79:20,22 | 161:16,21 |
| **high** 14:24 | 23:12,15 | **Illinois** 3:5 | 79:23 80:2 | 164:10 |
| 67:11 | 23:25 24:8 | **illness** | 80:6,12 | 165:19 |
| 79:16 | 24:9 25:3 | 131:24 | 81:19 | 166:5,5,15 |
| 104:2 | 25:6,11,17 | **illnesses** | 82:17 | 166:23,23 |
| 161:9 | 26:16,18 | 168:25 | 89:22 | 167:11,13 |
| 162:4 | 27:19 62:7 | **illustrate** | 90:23 | 167:17,19 |
| 168:3 | 62:20,21 | 132:5 | 92:22 | 168:4,16 |
| 172:18 | 63:4,4,9 | **image** 92:16 | 94:22 | 169:20 |
| 195:3 | 63:11,16 | **immediately** | 97:17 | 170:4,12 |
| 204:23 | 63:25 64:6 | 77:22 | 98:21,24 | 170:20 |
| **higher** | 64:7,13 | 78:22 | 99:4,10,18 | 171:8,18 |
| 210:17 | 86:10,24 | 79:16 | 99:20,23 | 171:22 |
| **hit** 26:24 | 87:3,12 | **impact** 12:20 | 100:8,13 | 173:18 |
| **holdings** | 88:11,13 | 13:16,18 | 100:15,18 | 174:8,13 |
| 216:13 | 88:17,18 | 14:20 | 101:9,25 | 175:3,8,17 |
| **holds** 212:21 | 98:6,19 | 19:11,17 | 102:23 | 176:8,19 |
| **honestly** | 178:10,25 | 19:19,22 | 103:7,21 | 176:25 |
| 206:4 | 182:25 | 20:4,11 | 104:22 | 177:19 |
| **hour** 42:19 | **hypothet...** | 21:17 | 105:19,25 | 179:8,10 |
| 88:23 | 12:11 | 22:12 | 106:6,10 | 180:24 |
| 164:18 | 102:3,22 | 28:17 29:5 | 109:14 | 185:5,21 |
| 206:19 | 103:12 | 29:19,21 | 110:3,3,8 | 187:25 |
| **Howard** 3:4 | | 31:2,14 | 115:6 | 188:3,4,8 |
| 3:15 | **I** | 32:7,23 | 116:7 | 188:20 |
| **Hudson** 1:25 | **IB** 223:16 | 33:12 34:2 | 117:24 | 189:3,7,11 |
| 4:10 | **idea** 24:6 | 36:15,20 | 118:5,9,13 | 207:22 |
| **huge** 208:4 | 224:11 | 39:21 40:5 | 118:17 | 216:15 |
| **hundreds** | **ideally** | 40:12 | 119:17 | **impacted** |
| 14:7 27:15 | 213:18 | 41:15 | 126:11 | 18:23 42:6 |
| 86:20 | **identifi...** | 43:19 | 130:6 | 49:14 |
| 211:7 | 6:22 | 44:22,24 | 132:19 | 58:18 59:7 |
| **HUNTON** 2:16 | **identified** | 45:15 47:3 | 133:16 | 59:12 |
| **hypotheses** | 37:5,12 | 47:13 | 134:6,8 | 66:23 |
| 27:13,17 | 42:12 | 49:10 50:2 | 136:12,18 | 67:25 68:6 |
| **hypothesis** | 43:10 | 53:3,15 | 136:23 | 69:21 |

70:22 72:6
80:22,24
81:21
82:12
169:12
174:21
176:2
**impacting**
47:20
**impacts**
25:25 71:8
**impairment**
107:9,10
107:11,15
108:5,8,12
108:15,16
108:18,24
109:2,8
110:3
111:7,12
111:13
112:2,21
112:23
114:21
179:23,24
180:3,6
181:10,14
181:14,22
189:2
**impairments**
180:7,8
**Imperial**
75:11,14
**implausible**
161:10
**implicat...**
77:4,7
110:9
**implied** 94:9
110:25
**import** 121:4
227:16
**important**
5:17
129:17
191:2
198:23
**impounded**
85:4
218:13

220:4
**imprecision**
57:9
214:16
**InBev** 207:12
208:15
209:19
210:3,16
211:16
212:11,19
212:21,22
213:2
214:12
218:4,21
218:22
221:16
223:7
224:9,12
224:21
226:4,20
229:10
**InBev's**
213:20
214:11
**InBev-sp...**
214:13
**incapable**
204:18
**include**
28:10
29:11
46:24 47:4
60:9 79:4
140:25
150:3
156:7
170:14
192:10
**included**
20:5 41:25
115:14
124:18
131:7
132:8
155:10
160:5
163:5
182:6
187:15
**includes**

19:22 38:8
68:16
159:15
**including**
33:22
39:11
51:15
68:19
100:6
131:6
132:4
139:19
148:9
156:17
163:16
174:17
175:24
182:9
183:23
185:10
187:16,18
191:11
220:12
**inconsis...**
85:2
**incorporate**
11:18
**incorpor...**
9:10 10:7
25:24
107:18
110:4
111:21
113:4,21
**incorpor...**
9:6
**increase**
48:24 49:8
56:3
**increases**
14:2 36:8
76:23
**increments**
31:8
**independent**
43:14
**independ...**
42:25
43:21,24
45:20

**index** 75:7,9
75:9,18,19
78:10
221:13
223:11,23
223:23,25
224:17
229:7,8,13
229:16
**indicate**
20:24
48:15
49:17
55:20
65:11 70:7
71:15
72:11
116:15
126:3
144:16
148:23
187:14
190:4
208:9
**indicated**
12:12,12
22:2 28:9
29:10 30:9
41:24,25
46:18
54:10
58:12
64:20 67:4
72:19
81:13
110:17
117:13
118:22
124:8
128:21
132:10
140:12
151:20
175:21
186:25
224:14
**indicates**
50:10
51:15
61:13

74:21 81:2
113:8,23
138:20
139:21
151:4
173:6,22
174:16
183:13
227:24
**indicating**
30:13
100:4
119:22
141:16
**indication**
166:15
204:10
**indicative**
72:23
**indicator**
129:13
**indice**
223:13,20
228:11
**indices**
220:23
228:2,11
**individual**
215:5
**individu...**
1:4 59:23
216:11
**individuals**
7:11
**industry**
21:4 31:21
61:9,16,24
75:8,9,17
78:10
83:23 84:3
91:12,12
121:11,24
122:5
123:21
138:5,9
160:12
162:19
169:6
197:4
207:14

220:23
221:15
222:2
227:25
228:11
229:13,16
**infer** 133:11
166:22
**inference**
91:6 92:19
94:7 96:22
96:22 97:4
97:6,8,10
97:21 98:5
98:8,11,15
98:16
99:11
100:2,7
103:4
119:12,18
119:23
120:3
130:3,6,10
140:3
159:16
167:13
185:12
**inferences**
104:21,22
211:24
212:2
**inferring**
94:7
127:16
**inflated**
94:9 103:8
194:23
**inflation**
44:10,18
92:23
94:24 96:4
97:23
98:12 99:6
102:6
190:2,6,12
190:19,20
190:25
191:8
195:8,11
196:8,9

197:15
200:23
204:13,19
206:16
**influencers**
152:6,14
155:16
158:13
163:18
**inform** 39:13
41:4 54:18
**information**
8:11,15,20
8:23,25
9:7,9,10
9:16,22
10:7 11:10
11:18 12:3
13:15
18:24 21:6
22:7,17
23:15
25:22
29:19,22
29:23 30:3
30:13,19
30:24 31:2
31:15,23
31:24
32:18,22
33:4,5,6,7
33:7,9,21
35:21
37:15 40:9
40:15,20
40:23 41:3
41:17,19
42:24,25
43:23,25
45:19
48:22,23
49:6,13,24
50:3,17,17
50:19 51:5
52:15,22
53:23 54:2
55:4,6
56:12 58:5
58:18,25
59:7,12

60:2 61:20
66:16,23
67:3,9,24
68:6,11
70:22 71:7
72:6,14,21
72:22
76:12
78:18
80:21,24
81:8,21,24
90:8 91:2
92:18
93:12,16
98:23
100:25
101:20
104:9
105:7,10
105:10
106:25
108:2,25
109:14
110:12,21
112:4
114:3,12
114:14
115:24
116:4,18
117:3,9
119:11
124:21
126:14
130:14,22
130:24
131:6,6
132:6,17
132:24
133:11,13
136:2
139:14
140:7,7
143:2,3,7
146:13,20
150:13
152:11,19
152:23
153:9,10
153:11
156:17,20

158:12
159:4,6
161:3
163:5,7,15
163:20
164:9,11
164:13
165:17
166:2,10
166:11,20
167:8,12
171:13
173:13,17
174:9
175:2,9
177:15
180:19,19
182:5,9,9
182:13
183:9,18
183:25
184:25
185:4,21
186:10,16
187:3
189:8,22
189:22
199:3,14
199:20
201:9,10
201:20
203:8,21
203:23,24
203:24
205:9,11
205:15,25
208:21
212:13
214:13
217:25
221:16
224:3
225:21
228:10
**informat...**
30:18
**informative**
45:9
131:16
**informed**

179:19
**ingredients**
75:4
**inherent**
191:16
**initial**
24:18
41:18 99:5
114:5
**initially**
117:7
227:14,17
**input** 205:6
**inquiry**
117:20
118:5
120:13,14
120:17
**instance**
59:18
77:18
102:21
141:22
197:11
208:14
**intended**
94:14
157:11
**intensive**
73:25
74:13
76:10
**intent** 96:13
**intentional**
93:14,25
156:8
157:24
163:10
**intentio...**
94:4
**interact**
6:11
**interacted**
7:13
**interest**
15:10 16:3
24:16,19
24:22 25:7
27:19 64:5
152:22

205:8
210:8,16
210:17,20
211:19
221:12
224:5,5
**interested**
13:25
76:20
106:4
208:19
211:5
215:8,10
224:6
231:12
**interpret**
22:11
55:25
62:10
64:22
85:25
138:17
184:3
**interpre...**
61:18
86:17
129:11
145:11
**interpreted**
86:4 129:3
**interpre...**
87:17
**interrupted**
150:25
**interval**
83:15,16
83:20
161:19
**intraday**
31:7,12
32:10
74:25 75:4
75:6,8,13
75:14,17
75:21,25
78:8,9
79:8
**introduc...**
140:13
**investee**

208:12
210:14,18
**investigate**
84:21
**investig...**
120:20
147:11
152:5,14
158:23
163:9
**investig...**
73:15 82:4
121:3
123:24
125:12
133:4
139:7
140:9
141:10,18
143:4,5,15
144:11
145:4,17
145:23
146:14,15
147:17
148:2,14
149:16,17
150:18
151:16
153:3,23
153:24
154:3,15
154:24
155:12,13
155:15
157:12,21
157:23
158:5,6,7
158:15
159:25
162:25
163:8,25
164:2
174:3
**investig...**
120:22
142:20,21
143:9,9
153:17,19
154:23

155:7
158:11
163:14
168:24
**investig...**
120:25
121:5
**investment**
39:10,20
39:24
73:17 82:6
93:13
107:25
109:10,17
110:18
111:2,8,21
112:15
113:3,21
114:5
125:10
128:22
141:9,12
141:20,24
142:3
143:6
144:2,5,10
144:13
145:5,25
179:15,24
181:12,13
208:7
209:20
212:19
224:13,13
226:5
**investments**
114:18
209:6
210:7,11
211:15
215:20
216:22
220:20
224:9,21
224:23
226:3
227:2
**investors**
29:6 39:14
77:4,6

110:17,22
110:24
111:11
112:7
113:10
114:16
180:4
**investors'**
110:19
**involved**
21:17
57:12
193:14
212:24
**involves**
115:8
**involving**
178:15
**isolate**
216:21
**isolating**
211:18
**issue** 21:3
146:23
202:10,23
**issued**
123:18
142:9
**issues** 29:9
105:8
199:7
202:10
**items** 55:15
55:17
116:21
117:8
183:24
**iv** 39:12

---

**J**

**J** 2:7,19
5:13 6:20
232:9
**JACOB** 2:24
**Jake** 46:22
47:25
122:7
**James** 3:14
**January**
179:13,22

180:16,20
182:4
183:15
184:22
185:22
186:15,20
188:3,6,19
189:2
**JESSICA** 3:11
**JLI** 39:10,16
39:19,21
39:24
**JLI's** 39:6,9
39:15
**job** 193:13
**jointly**
127:11
**Joseph** 1:16
4:9 5:5
231:4,18
**Journal**
73:12,21
74:12 78:3
82:3 84:16
85:4
110:14
112:5
139:5
140:8
146:10
152:4,13
153:2,14
158:18
**journals**
9:13
**judge** 145:22
**judge's**
105:16
**judgment**
52:3 54:3
117:13
**judgments**
101:9
168:3
**justice's**
105:17
**Juul** 3:9
39:11
40:18 51:2
73:17 82:6

91:13
93:14 94:4
94:14,17
94:19
95:15,16
95:18
96:13
107:15,25
109:9,18
110:17,20
110:24
111:2,21
112:7,7,11
113:3,13
113:20
114:16,17
114:18
123:22
125:10
128:22
130:17
131:12,15
131:21,22
132:11,19
133:4,5,6
141:10,12
141:20,24
142:3
143:6
144:2,5,10
144:13
145:6,25
152:5,14
154:7,15
155:15
156:9
157:11,13
163:18
169:6,8
179:15,23
209:20
223:8
**Juul's** 39:7
93:14,24
111:23
114:4
115:10
125:5
126:21,23
130:17

153:18
154:3,13
155:7
156:18
157:23
158:13
163:9

_____
**K**
_____
**K** 5:4 123:6
**KATZ** 2:21
**keep** 5:17
107:10
164:19
171:4
**kind** 14:22
24:23
25:20
56:20 69:5
146:18
154:24
218:23
223:12
**Klein** 1:4
4:7
**knew** 15:22
15:25 39:5
109:3
**know** 5:15
16:5 38:17
44:5 77:23
78:13
87:21
105:5
108:7,11
127:22
135:3
143:8,15
149:12
156:15
158:9
161:2
162:2
163:7,8,20
182:11,13
184:19
185:23
205:6,10
206:4
212:25

215:6
223:13,20
223:24
225:11
227:5
**knowledge**
161:4
168:11
**known** 51:17
95:5
108:16
114:10
141:24
157:3
163:18
198:16
212:9
**KURTH** 2:16

_____
**L**
_____
**L** 5:4 123:6
**L-a-z-u-r**
8:2
**LA** 131:9,11
**Laborers**
2:10
**Labs** 3:9
**lack** 34:25
69:7
117:18
118:9
136:6
137:13
158:13
167:12
**Lamont** 215:3
**language**
64:3 68:4
68:14
69:15,16
69:17 74:7
96:25 97:3
97:8 100:2
100:3
104:12,13
104:15,15
104:17,24
147:19
149:25
159:12

189:5,5
**large** 14:4,9
14:16
51:19
76:23
192:17
**largely**
191:13
**larger** 14:22
112:16
213:24
**largest** 15:3
**late** 139:4,6
**launched**
73:15 82:3
141:18
143:4
**launching**
141:10
**Laureates**
222:8
**law** 142:7
**lawsuit** 51:2
142:10
**lawsuits**
94:16
95:17
**lay** 141:14
**Lazur** 7:25
**lead** 2:4,10
137:16
142:22
**leadership**
131:22
132:10
**leading** 7:19
**leads** 16:24
46:12
**leap** 205:22
**learned**
109:19
**leave** 35:15
**led** 113:17
113:19
115:5
117:14
219:15
**left-hand**
221:7
229:14

**legal** 29:10
34:10,19
34:20 35:6
36:3,3,12
45:4,6,8
45:12,23
46:8
111:24
114:11
194:13
196:17
**let's** 5:18
10:5 11:13
11:21,22
12:3 15:11
15:13
17:14
25:22
37:17
38:12 84:6
102:2,8,10
161:11
175:11
177:25
189:13
205:11
**level** 13:7
13:19
26:12,13
48:18
56:18
58:14
60:14 61:4
67:11
71:17
72:12
83:10,12
86:3 104:2
121:17
138:2
160:22,23
160:23,24
161:6,9,12
161:13
162:4
168:3
172:9,19
179:5
183:6
195:3

204:23
**levels** 12:24
  12:25
  14:24
  119:5,7
**liabilities**
  193:20
  217:14
  218:4,9,10
  218:18,24
  219:7,12
  219:18,24
  220:2,9,12
  220:13,14
**liability**
  94:12
  114:25
  125:3
  143:25
  144:3
  190:14
  192:17
**Liberty** 3:9
**lieu** 4:17
**light** 58:5,6
**likewise**
  169:22
**limitations**
  29:18
  198:9
**limits** 45:8
**line** 42:21
  233:2
**lines** 128:15
**link** 167:3
**linked**
  168:25
**LIPTON** 2:21
**liquid**
  212:14
  224:15
**list** 111:15
  111:19
  188:14
**listed**
  106:16
  113:7
**listing**
  188:13
**lists** 106:8

**literally**
  27:15
**literature**
  9:13 77:10
  77:12
  86:20
  204:8
  206:3,7
  209:10,23
  211:3,6,12
**litigation**
  34:13
  39:12
  125:4
  216:18
**litigations**
  207:19
**little** 13:12
  13:23
  16:12 17:4
  18:10 23:5
  24:24
  27:17 30:6
  63:2 66:19
  119:3
  121:12
  127:7
  139:3,15
  173:20
  175:12
  180:10
  206:18
  207:5
  211:3
  212:23
  213:15
  216:8
**LLP** 2:4,10
  2:16 3:4
  3:13
**logically**
  229:2
**long** 38:18
  184:17
  188:10,12
  191:10
**longer**
  125:21
  186:6
**look** 9:19

11:6,8,24
11:25 12:4
12:7 16:6
31:7 38:24
41:16
43:22 53:7
54:2 55:10
56:13
60:21
80:15 81:4
82:24
84:20
101:14
110:23
112:9
128:13
133:2
134:11
142:25
145:13
146:16
156:22
168:19
181:24
196:21
206:7
208:15
211:2
215:2
225:22
226:2
228:17
**looked** 22:4
  22:6 32:11
  32:15 50:5
  51:20
  75:24
  126:18
  173:9,10
**looking** 11:5
  22:5,10
  41:10 49:6
  49:16
  51:10
  53:12,13
  69:10
  82:16 98:2
  105:2
  114:9
  117:16

146:9
158:10
202:23
211:7
**looks** 48:11
  76:17
  111:14,15
  134:15
**loss** 44:10
  94:23
  106:3
  157:15
  194:25
  195:11
**lot** 15:9
  31:17,17
  40:20
  46:11,12
  74:21 77:5
  114:6,14
  156:16
  201:13,16
  201:16,17
  201:20
  226:16
**Louis** 2:11
**low** 129:7
**lower** 56:3
**lunch** 122:9
  122:15

————————
**M**
————————
**MacKAY** 3:6
**magnitude**
  9:17 33:17
  52:18
  112:22
**main** 52:14
  208:13
**maintenance**
  34:5,11,22
  35:3,6
  36:4
**major** 73:24
  74:12
**making** 92:19
  97:6,10
  99:25
  102:4
  104:21

114:19
119:18
120:24
125:16
155:20
157:19
159:18
166:9
167:10
171:12
198:19
**manner**
  207:21
  209:4
  210:9
**markdowns**
  112:6
**marked** 6:21
  110:18
**market** 8:7,9
  8:17,19,24
  9:8,15,20
  9:23 10:10
  10:14,16
  11:4,11,17
  11:23 12:4
  21:4,6
  22:7 23:16
  27:23 28:2
  28:6,14,20
  28:25
  29:12
  30:14
  31:19,21
  33:5,15
  37:19
  38:15
  40:21
  49:22
  50:13,21
  51:8 52:15
  53:9,18,23
  55:16,18
  61:9,16,21
  61:24
  72:21
  73:13 74:2
  74:15 75:6
  76:11 77:3
  78:2,9

83:23 84:3
84:18 85:5
85:7 94:7
94:13,14
94:20 95:5
95:15
96:13
100:22
107:16,17
107:23
108:13,14
108:17,22
109:3,19
110:19,21
110:22
111:11
112:18,20
113:18,19
114:12
117:10
119:11
121:10,24
122:5
126:14
127:4,16
132:17
138:5,9
141:25,25
142:13,14
146:16
147:10
152:11
153:12
154:13
155:6,12
157:9,11
158:2,3,21
160:11
162:19
164:2
171:14
173:13
179:19
183:17,19
187:4
197:4
198:16
201:21
202:12
203:25

205:11
208:24
212:10,14
212:14,25
214:19,20
215:13,18
215:25
216:3,9
217:9,22
217:25
218:12,13
219:11
220:2,4,11
220:15,16
220:19
221:21
222:15
224:4

**market's**
77:15
124:17
125:19
180:12
205:7

**marketed**
94:17
95:15,16
95:18
130:17
131:13
154:16
157:13

**marketing**
39:6,9,15
93:15,25
94:4 125:5
126:21,24
152:6,15
153:18
154:4,13
155:8,9,16
156:8
157:24
158:12
163:10

**marketplace**
114:4,15
143:7
163:13,15

**markets**

209:2
217:5
224:15,16

**marking**
114:16

**marriage**
231:11

**marry** 33:3
57:8

**marrying**
57:13

**masking**
134:7

**match** 90:9
90:14
91:21
92:12,15
93:3,7,19
94:5 96:15
96:18
165:8,15
166:19

**match'**
165:13

**matching**
91:7

**material**
39:11,14
39:21
108:2
109:13
194:22

**materiality**
106:20

**material...**
39:23 40:8
41:21 43:2
44:2 45:17
45:22
47:15
91:20
93:20
94:18 95:2
95:19
125:14
126:25
144:14
145:6,14
145:15,16
146:2,4,18

154:16
155:22
156:4
157:14,17
157:18
190:13
198:15
201:10,11
201:19

**material...**
95:11
154:20
156:20,25
199:9,10
200:12
202:11
204:2

**material...**
95:4,6,24
156:12

**materially**
39:4

**materials**
225:17
228:17

**matter** 8:20
41:13 94:6
97:5
219:11
226:25
231:8,12
231:13

**matters**
194:9

**MATTHEW** 2:14

**maximize**
226:10,11

**mean** 11:17
46:16
77:14
81:24
119:5
120:10
165:12
170:22
193:15
197:13
223:24,25

**meaning**
18:17 19:7

24:2 27:13
57:5 66:18
104:13
105:11
146:10
209:13
227:5

**means** 14:23
56:16
119:24
122:5
138:8,21
150:12,14
150:16
151:10,12
161:14,20
182:24
200:15
229:16

**meant** 30:20
181:17

**measure**
30:11 96:3
190:12,19
191:8,20
193:17
194:4
196:5,6
197:14
199:14
208:18,23
210:8
219:13
221:11
224:2,20
229:10

**measured**
96:4

**measurement**
57:12
216:8
221:21

**measures**
9:14 29:19
226:17

**measuring**
190:5
192:21
199:8
200:23

202:5
206:16
**media** 163:19
**MELANIE** 3:6
**mention** 7:23
19:6 50:25
51:3 65:23
67:19
73:20 76:9
123:17
198:13
200:25
**mentioned**
14:15
16:11
32:14 38:6
50:22 52:5
54:5 60:6
65:9 66:14
76:16 78:5
97:25
98:20
112:3
113:24
115:22
116:10
117:7
132:23
133:17
159:21
184:24
211:6
221:2
229:25
**mentioning**
200:13
**merger** 50:24
67:21
123:20
124:5,19
124:25
125:13,21
126:2,6,13
126:22
127:9,12
127:14,20
127:24
128:3,5,7
128:25
129:10,20

129:22,25
129:25
133:3
**met** 193:8
**method** 53:5
90:15,17
212:7
217:12
221:20
228:9
229:18,18
**methodol...**
86:13
**methodology**
10:12
11:21
14:12 15:7
17:23 19:5
20:13
31:20 41:7
41:10,14
46:16 47:7
54:9 61:13
61:18
72:18
87:25 96:2
100:17
138:7
156:23
165:16
167:10,16
167:25
168:7,12
168:15,17
178:7
182:23
189:16
190:24
192:2,3,6
192:12,21
193:7
194:2
195:7,14
195:18
198:4,21
200:5
202:4,17
206:14
211:13,23
222:6,12

**methods**
228:10
**Michael** 2:7
5:9
**Mike** 42:18
**MILLER** 2:24
13:22
32:24
35:25
38:16
42:18
45:24 48:2
59:16
63:20 64:2
69:13
76:14
88:25 99:7
122:10
143:19
145:8
146:6
147:12
148:16
149:20
150:20
156:5
164:21
167:20
170:21
171:9
200:3
206:18
230:8
**million**
78:19
**mind** 68:9
69:17
102:16
104:20
126:7
143:2,13
146:19
158:3
206:13
**minor** 52:4
66:2
**minority**
208:7
226:23
**minors** 152:7

152:16
154:14,16
155:9,17
157:11,13
157:24
**minus** 10:23
56:16 83:8
83:8
121:15,16
122:4
137:23,24
179:4
182:22
**minutes**
42:20
73:25
74:14
76:10 78:3
78:19,22
84:23
**mirror** 92:16
**mirror'**
165:13
**mirroring**
166:19
**mischara...**
76:15
**misleading**
39:4
154:18
**misled**
154:13
**mismatch**
80:8 81:10
89:18 90:2
90:11,12
91:15
96:16,18
98:13,25
100:6,11
101:19,20
101:23
103:16,19
104:3,7,9
104:13
114:24
116:17
117:13,20
129:19
130:12

136:7
137:15
139:13,18
139:23,25
140:2,6,18
141:2,7,13
142:25
143:12
146:23
148:24
150:4
154:21
159:4,6,16
163:22
165:8,11
165:24,24
166:10
169:9
170:16
171:19
180:15,18
180:25
181:6,7,16
202:9
**mismatches**
189:21
190:5
**misrepre...**
144:9
**misrepre...**
19:24 35:2
35:11,18
35:20 36:9
43:3 47:20
98:14 99:3
99:6
100:15
101:25
102:24
103:14,14
103:22
104:5
118:13
131:10
141:4
150:6
165:14
166:3,4,21
166:24
167:8,13

| | | | | |
|---|---|---|---|---|
| 174:7 | **missing** | 77:8 88:14 | 184:4 | 5:11 |
| 181:11 | 113:17 | 88:19 | 187:7,20 | 223:17 |
| **misrepre...** | 155:18 | 121:19 | 188:18 | **names** 7:20 |
| 29:7 36:20 | **misstated** | **moved** 11:5 | 189:10 | **narrative** |
| 37:23 38:3 | 102:20 | 32:11 | **movements** | 139:20 |
| 40:7,9,11 | **Mitchell** | **movement** | 11:9 30:18 | **narrow** 11:9 |
| 41:15 42:6 | 217:10 | 11:13,15 | 30:23 42:2 | **narrower** |
| 54:24 | **mitigate** | 11:16 | 42:10 | 126:16 |
| 80:12 | 50:7 | 12:16 13:3 | 47:17 | **nature** 32:8 |
| 81:19 | **mitigating** | 13:9,11,14 | 54:21 75:6 | 40:2 |
| 82:14 | 134:7 | 17:24 18:4 | 75:15,17 | 146:23 |
| 89:20 | **mix** 41:3 | 21:15,22 | 76:19,20 | 156:18 |
| 92:23 | 199:20 | 22:16 27:9 | 76:23 | 192:16 |
| 93:10 | **model** 189:15 | 30:5 35:13 | 89:17,21 | 193:21 |
| 97:17 | 190:19 | 35:14,18 | 92:20,21 | **navigate** |
| 99:17,23 | 192:6 | 49:2,19 | 141:5 | 131:23 |
| 100:8 | 207:6 | 55:14 61:5 | 149:3 | **nearly** 142:5 |
| 116:18 | 216:2 | 62:13 63:5 | 150:7 | **necessarily** |
| 117:21,24 | 227:23 | 64:24 | 169:10 | 77:14 |
| 119:15 | **modeling** | 65:12,19 | 174:9,19 | 166:15,19 |
| 125:24 | 189:25 | 67:5,8,13 | 175:22 | 180:9 |
| 126:5,10 | **models** 221:8 | 70:8,16 | 185:7,13 | 229:15 |
| 130:7 | **modern** 217:4 | 71:5,24 | 186:24 | **necessary** |
| 136:9,13 | **modestly** | 72:11 73:2 | 198:22 | 30:8 33:16 |
| 137:4 | 52:2 | 76:3 77:16 | 203:11 | 46:13 |
| 144:20 | **moment** 43:12 | 78:8,9 | 205:5 | 53:20 75:5 |
| 147:9 | **MONAHAN** 3:11 | 80:9,10 | **moving** 54:4 | **need** 44:9 |
| 149:2 | **Monday** 32:12 | 85:18 86:2 | **multiple** | 75:4,6,7 |
| 158:21 | **Monsees** 3:14 | 86:4,5,5 | 29:22 | 78:8 79:2 |
| 166:16 | **morning** 4:2 | 86:18 87:7 | 129:8 | 92:16 |
| 169:8,12 | 5:8 12:4 | 88:3,7 | 187:2 | 96:10,12 |
| 174:21 | 32:12 | 97:15 | 188:13 | 133:15 |
| 176:2,20 | 211:7 | 99:15 | 194:13 | 167:14 |
| 177:20 | 226:13 | 116:20 | 227:21 | 178:9 |
| 180:20,24 | **Morningstar** | 117:19,22 | **multiplying** | 202:24 |
| 188:20 | 111:17 | 118:11,16 | 212:21 | 205:6,10 |
| 189:12,23 | 112:9,10 | 126:8 | **multiyear** | 205:13 |
| 190:3 | 112:10 | 136:7,11 | 186:7 | 221:6 |
| 194:22 | **Morris** | 136:25 | | 227:8 |
| 195:10 | 123:19 | 137:7,14 | **N** | 228:18 |
| **misrepre...** | 124:5 | 148:11 | **N** 2:2 3:2 | **needed** |
| 37:19 | 125:12 | 154:11 | 5:4,4 | 197:24 |
| 38:14 | 127:25 | 158:17 | 123:6,6 | 201:2 |
| 41:12 92:3 | 128:2,13 | 169:23 | 231:2 | **needs** 97:4 |
| 92:10 | 128:20 | 170:19 | 232:2 | 165:13,15 |
| 94:13 | **Morris's** | 171:15 | **Nabisco** | 166:19 |
| 95:14 | 126:23 | 177:12,17 | 219:8,10 | 167:9 |
| 144:2 | **mounting** | 178:13 | **naively** | **negative** |
| 157:9 | 39:18 | 182:4 | 26:19 | 14:3 21:10 |
| 166:13 | **move** 13:9 | 183:4,11 | **name** 4:8 5:9 | 21:13,21 |

32:16
35:14
39:18,21
49:2,23
50:8,18,24
53:11
56:15
60:20,25
61:2,7,22
62:14,16
62:17,22
62:24
64:18
65:18 66:8
67:17
70:15
71:23
72:25 81:5
82:25 83:2
83:21 85:8
85:12,13
85:17
101:7
108:13
116:23
120:13,19
121:9,23
124:6
127:13
129:12
133:13,23
134:8
137:19,21
138:14,14
138:19
141:23
142:4
143:10
154:6,10
154:25
158:16
160:12,13
160:16,24
161:23,24
161:25
162:2,17
162:23
164:5
172:4,5,17
173:3,22

178:8,12
178:18,19
180:3,7,9
182:3,17
182:18,21
183:3,10
183:17,21
184:2,24
186:9,19
187:4
188:17
219:10
**negatively**
116:2
199:6
**Neither**
48:23
**neutral**
66:19
**never** 26:9
29:6 86:8
87:19
94:14
95:15
120:19
130:17,18
131:13,13
157:11
**new** 1:18 2:6
2:6,22,22
3:10,10
4:11 8:10
8:14,22
9:6 29:19
43:14
108:25
130:16
152:10,19
152:23
153:10
163:25,25
231:5
**newly** 9:15
**news** 10:10
11:22 14:2
14:3 18:17
19:7 21:8
21:12,18
21:20
22:14,14

23:2,12
24:2,8,13
24:15,16
24:18,21
25:3,7,9
25:12,15
25:19
26:20,22
30:13 31:8
31:9,19
32:16,19
33:14
36:17
49:22 50:6
50:7,12,21
50:23,25
51:12,23
51:24,25
52:2,3,4,7
52:8,12,13
52:16,17
53:8,12,18
54:16,18
55:2,15,17
55:18 56:4
56:9,22
57:16
58:16
60:15
65:17 66:8
66:17,19
67:7,16
70:14 71:6
71:21
72:13,24
73:24,24
74:11,12
74:18 77:3
77:5,7,25
80:3 85:9
91:11
100:21
101:6
108:13
115:14,20
116:6,6,22
116:23
117:5
120:13,19
124:6,14

124:15,17
125:20,20
127:21,21
128:3,4,7
132:2,19
133:21,23
134:2,7,9
147:10
154:6
158:11,14
158:22
161:17
162:7,12
168:24
172:22
179:9
180:3,7,9
183:17,20
183:21
186:2
197:6
198:11
199:5,13
200:12
201:6,18
202:23
203:3,10
**nicotine...**
208:20
**Nobel** 222:8
**nod** 5:20
**noise** 214:15
226:15
**noisy** 221:4
**non-alle...**
33:14
**non-firm...**
213:17
**non-frau...**
52:21 54:2
55:4
133:25
134:7
198:21
**non-lawyer**
194:7
**non-tobacco**
229:23
**nonlinear**
27:10

**normal** 13:6
14:12,13
57:9 81:3
87:5
105:15
**not--** 149:14
**Notary** 1:17
5:5 231:5
233:25
**note** 62:3
131:11
230:9
**noted** 4:15
230:18
**notice** 1:16
142:2
**notion** 84:13
85:2 90:6
93:20
**November**
110:16
**null** 12:15
12:25 13:2
13:4 14:11
14:25
15:15,18
16:18,19
16:20,22
16:24,25
17:6,8,16
17:16,19
17:23 18:2
18:5,16,22
19:5,9
23:11,14
23:25 24:8
24:9 25:2
25:6,11,17
62:7,20,21
63:4,8,11
63:16,25
86:9,24
87:3,12
88:11,13
88:16,17
178:9,24
182:25
**number** 6:24
9:2,14
14:18,19

14:23
19:20 20:5
22:10
28:17
44:11
51:19 52:9
55:15
76:21
105:4
111:5,15
115:23
116:21
117:8
118:21
124:24
127:13
131:5,15
132:23
133:9
141:23
142:4
150:25
155:4
160:15
182:8
183:18
191:11
192:9,18
193:21
208:4
209:16
212:20
215:20
220:21
222:25
228:7
**numbers**
161:8
**numeral**
189:14
190:21
**numerous**
193:18
**Nye** 28:2
62:4 75:18
189:15
191:5
193:2
195:7,16
198:5

200:7,14
200:19
201:24
202:16
203:17
204:6,18
204:22
205:20
211:22
221:10
**Nye's** 27:22
28:11 41:6
156:22
190:3,11
190:23
195:14
200:5
212:3
217:8
229:17

_____
**O**
_____
**O** 5:4 123:6
231:2
**oath** 5:25
233:19
**object** 4:22
69:13
**Objection**
13:22
32:24
35:25
38:16
45:24
59:16
63:20 64:2
76:14 99:7
145:8
146:6
147:12
148:16
149:20
156:5
167:20
170:21
171:9
200:3
**observable**
212:13,22
224:15

**observation**
36:11
**observat...**
14:8,23
**observe** 35:7
92:13 96:9
143:14
186:10
195:15
212:15,16
216:13
217:7
**observed**
56:8 61:7
83:22
153:13
178:3
**observing**
14:17
125:18
132:9
209:25
**obtained**
51:5
**obtaining**
219:11
**obvious**
128:17
**obviously**
31:20 58:2
134:11
166:7
208:16,16
**occur** 25:8
26:5,7
124:20
129:21
177:13
185:12
**occurred**
84:18,23
125:24
158:17
161:15
197:17
**occurs** 25:14
**October** 1:12
4:4 106:24
107:8,19
110:5,15

111:7,17
111:22
112:6,17
112:20
113:2,6,22
114:2,3
115:20,25
116:7
117:23
118:16
120:18
121:8,14
121:19
142:8
181:15
183:24
231:15
**off-balance**
217:13
218:4,8,10
219:12
220:12
**offer** 93:22
186:6
189:15
192:12
193:5
218:5
**offered** 29:5
191:18
**offering**
149:24
160:3
**offers**
193:18
**offset** 21:9
21:13,20
22:15
48:25
49:23
50:18
53:10
65:17 67:8
67:16
70:14
71:22
72:24
101:6
**offsetting**
52:21

53:25 55:3
60:15
**oh** 129:12
223:19
**okay** 5:22
6:15,25
12:18 18:7
18:22
22:13 24:7
24:23
28:16
53:22
58:22
59:22
60:11 67:3
68:25 70:2
71:2 86:23
88:25
107:6,14
112:24
134:16
144:8
151:25
159:18
162:15
170:17
171:20
172:2,20
175:11
178:14
180:14
181:19
188:21
189:20
194:19
196:21
200:25
207:9,17
209:3
214:24
229:5
**omissions**
34:14,17
35:9 36:6
**once** 52:13
72:10
73:22
181:14
**one's** 33:21
**one-third**

51:22
ones 71:13
  106:4
  147:15
  180:17
  188:22
ongoing
  129:4
onus 202:16
oOo 3:22
  232:11
open 6:15,17
  6:24
operate
  207:13
  229:20
operates
  211:17
  214:5
operations
  39:22
operative
  37:2,4,5
  37:24
  38:12
  42:14 43:9
  47:21
  187:16
opine 103:20
  105:9
  114:23
opined
  192:20
opining
  112:12,18
  118:15
  137:6
  139:11,13
  147:23,24
  149:8,9,15
  151:23
  159:5,13
  170:18
  171:2,3,24
opinion 28:5
  29:25
  34:19,20
  34:20
  45:21
  47:11

54:18
58:25
59:20,25
60:7 68:10
68:10,17
69:5 81:16
81:20
86:23
95:20
97:18
102:23
103:17
106:5,6
107:23
109:25
112:2,19
115:2
118:4
126:12
127:23
130:11
136:17
138:12
140:6,11
140:22
144:23
147:4,16
147:25
148:7,13
148:18,20
149:5,12
149:18,23
150:9,12
150:17
151:4,6,10
151:14,17
151:18
159:24
160:3,6
163:3
166:3
167:14,17
167:18
168:8
169:18,23
170:2,12
171:6,21
173:15,16
174:25
176:7,10

176:11,15
176:17
181:6
185:23
187:24
188:7,9,25
189:7,9
192:2
202:18
204:17
opinion--
  176:14
opinions
  23:3 27:22
  28:11,17
  28:19 29:4
  103:25
  149:13
  159:19,20
  159:22,22
  188:24
  191:21
opportun...
  217:7
opposed 5:20
  37:2 95:4
  119:3
  143:10
  147:9
  155:13
  158:5,21
  169:6,17
  176:18
order 30:22
  40:10
  185:17
ordinary
  213:4
orient 115:8
original
  81:19
  102:24
  108:20
  127:9
originally
  225:13
Orrick 3:13
  3:14
out-of-p...
  195:21

196:3,15
outcome
  145:15
  231:13
outcomes
  143:17
outlet 74:12
outlets
  73:24
outrage
  131:25
outside
  40:18
  100:10
outstanding
  215:21
  220:22
overall
  116:2
  121:19
  124:17
  126:17
  137:14
  210:2
overarching
  39:6

_____
        P
_____
P 2:2,2 3:2
  3:2
p.m 31:10
  73:23
  74:19
  77:20 78:4
  89:6,9
  122:14,15
  123:3,5
  164:25
  165:3
  206:23
  207:2
  230:16,18
pace 143:2
page 8:3,8,8
  18:8 23:20
  27:20
  29:14
  48:10 70:3
  70:13 73:5
  89:12

111:19
115:7
123:12
138:24
165:7
189:13
207:7
214:17
219:3
232:3,8
233:1,2
pages 107:7
  191:10
paper 215:3
  215:12,13
  215:14
  217:11,11
  219:2,2,14
  219:20,21
  222:5
papers 27:15
  76:22
  86:21
  214:22,24
  215:17,22
  216:14,17
  216:20
paragraph
  8:8 18:8
  18:12 19:4
  20:19,22
  20:24
  23:20,20
  24:7,15
  27:20,21
  28:9,23,23
  29:13,16
  38:25,25
  41:11,24
  41:25 43:6
  43:17
  45:14
  46:18
  48:10,14
  48:21,22
  49:11,19
  50:10
  55:20
  58:23 59:4
  59:17 60:3

| | | | | |
|---|---|---|---|---|
| 60:5,17 | 158:10 | 93:23 | 92:18 | **people** 7:19 |
| 65:5,8,10 | 159:12 | 97:12 | 113:18,19 | 9:18 15:12 |
| 65:16 | 168:19,21 | 98:20,21 | 117:5 | 15:14,17 |
| 66:21 68:4 | 170:9 | 99:19 | 155:8 | 15:19,21 |
| 68:14,22 | 174:2,16 | 104:14 | 180:13 | 15:23 |
| 68:23 69:4 | 175:5,21 | 116:10 | 193:18 | 26:22 27:3 |
| 69:6,16,18 | 176:13 | 121:21,25 | 205:5,10 | 27:6,6,9 |
| 70:2,6,12 | 179:12 | 124:3 | 205:12 | 27:12 |
| 70:19 | 181:8,23 | 125:7,18 | 206:9,10 | 55:25 |
| 71:10,14 | 186:3 | 126:5 | 223:22 | 85:20 |
| 71:20 72:3 | 188:9,10 | 128:13,20 | **parties** 4:13 | 199:4 |
| 73:4,20 | 188:11,11 | 130:2 | 6:8 231:11 | 222:12 |
| 74:5,9 | 189:5,13 | 132:5,21 | **partner** | 228:7 |
| 82:20 | 189:20 | 135:12 | 128:6 | **percent** 13:6 |
| 83:18 | 190:9,17 | 138:4 | **parts** 209:18 | 26:9,13 |
| 89:12,14 | 195:20 | 144:6 | 223:3 | 30:4,4,5 |
| 93:2 98:10 | 196:2,22 | 152:17 | **party** 8:21 | 48:18 |
| 106:22 | 196:24 | 153:6,20 | **passed** | 56:15,17 |
| 107:4,14 | 197:10,20 | 155:23 | 102:11 | 58:14 |
| 110:2,13 | 198:13 | 157:4 | **passing** | 60:14,21 |
| 110:14 | 204:5 | 163:18,22 | 102:12,17 | 61:2,4,8 |
| 111:4,14 | 207:7,9 | 164:7,13 | 103:5 | 61:15,23 |
| 113:7 | **paragraphs** | 166:21 | **patent** 51:11 | 62:14,14 |
| 115:7,12 | 38:21 | 167:5 | 51:15,23 | 62:16,18 |
| 115:13,23 | 55:10 | 171:16 | 51:24 52:3 | 62:22,23 |
| 116:16 | 60:18 | 172:24 | 52:7,12 | 63:12,17 |
| 117:16,17 | 140:13,14 | 173:8,9 | 66:5,7,13 | 63:18,24 |
| 123:12,14 | 140:20 | 174:11 | 66:16 | 64:19 |
| 125:17 | 141:15 | 175:14 | **patents** 51:5 | 71:17 |
| 129:18 | 143:21 | 176:4,6,21 | 51:19 52:9 | 72:12 |
| 130:13,22 | 147:6 | 176:22 | 65:24 66:4 | 78:20 83:3 |
| 130:23 | 198:3,8,20 | 177:2 | 66:11 | 83:8,10,12 |
| 131:3,5 | **parent** | 178:6 | **path** 84:21 | 83:15,16 |
| 132:9,25 | 207:20 | 182:14,23 | **pay** 212:17 | 83:19 84:9 |
| 133:18 | 214:19 | 183:7 | **peer** 75:9,9 | 85:13 86:3 |
| 136:4 | 215:19 | 184:16,21 | 78:10 | 102:13 |
| 138:24 | 216:21,23 | 185:2,8 | 227:25 | 112:11,15 |
| 139:10 | **parse** 206:9 | 187:11 | 228:11 | 121:10,15 |
| 140:16,17 | **part** 6:10 | 191:3 | 229:7,8,19 | 121:16,23 |
| 140:20 | 14:11 | 198:13 | **peer-rev...** | 123:22 |
| 141:15,21 | 19:16,21 | 200:24 | 87:5 211:6 | 137:19 |
| 142:16 | 20:10,11 | 217:8 | 222:18 | 138:2,14 |
| 146:25 | 40:4 42:17 | 226:6 | **Pelletier** | 138:19 |
| 147:20 | 42:22 | **particip...** | 106:13 | 160:12,25 |
| 148:5,21 | 44:16 46:2 | 9:23 127:4 | **penalties** | 161:10,13 |
| 148:23 | 46:5 47:9 | **particular** | 4:21 | 161:14,17 |
| 151:3,25 | 47:17 | 7:15 22:25 | **pendency** | 172:4,10 |
| 153:14,15 | 52:19 | 31:2 32:22 | 6:12 | 172:11,19 |
| 153:21 | 73:11 | 52:10,25 | **penny** 26:2 | 178:18 |
| 155:3 | 87:15 90:6 | 56:24 | **Pension** 2:10 | 179:4,5 |

182:18,21
183:5
210:16
**percentage**
 120:5,6
 164:11,12
**perform** 12:6
 13:24
 168:13
 184:13
 197:11
 214:25
 226:11
**performance**
 226:18
 229:11
**performing**
 185:9
**period** 22:4
 22:6 30:16
 40:6,16,17
 40:22,25
 41:18 42:7
 42:24
 43:20,24
 45:20 51:6
 51:20,21
 51:23 52:6
 66:12,16
 80:13
 82:13
 84:18
 90:24 92:4
 92:11 94:3
 94:8,10
 95:7 99:18
 100:9
 102:7
 114:8
 119:16
 125:23
 126:11
 127:6,8
 129:23
 130:8
 156:18
 163:16
 166:25
 169:13
 174:7,22

176:3
195:9
213:21
219:23
220:8
223:2
225:25
**perjury** 4:21
**person** 7:15
 7:23
**pertains**
 34:14
**pertinent**
 200:6
**Ph.D** 6:20
 232:9
**Philip**
 123:19
 124:5
 125:12
 126:23
 127:25
 128:2,13
 128:20
**phrase** 16:9
 69:3,4,22
 69:24
 103:2,10
 118:25
 223:23
**phrased** 69:6
**pick** 13:18
 225:24
**picked** 5:21
 26:3
**piece** 29:22
 30:3 31:8
 31:9 32:22
 81:21
 117:5
 124:20
 146:20
 150:12
 163:12
 164:11,12
 185:21
**pieces** 22:10
 25:22
 29:23
 30:19

31:11
48:22,23
49:6 92:17
115:23
117:2
124:15
130:21,24
131:6
146:13
163:5
164:9
182:8
183:18
184:25
185:4
187:3
203:24
**place** 6:7
 29:7 44:19
**places** 151:4
**plaintiff**
 2:10 37:14
 42:12 43:7
 46:19
 49:13
 90:10 96:5
 96:14
 102:4
 166:12
 171:12
 202:13
**plaintiffs**
 1:6,15 2:4
 5:10 18:24
 33:6,25
 34:22
 35:19 37:6
 37:18
 38:14,25
 41:12 44:9
 50:2,14
 58:17 59:6
 66:22
 67:24 68:5
 69:20
 70:21 72:5
 72:15
 73:18
 81:25 90:8
 91:2,6,10

91:24 92:2
93:12
94:11,19
95:13,13
95:25
102:7
105:6
126:4
128:11
132:6,24
133:10,12
133:22
140:3
141:16
142:3,7
144:8
145:2
146:11
154:12
156:3
163:6
173:24
177:14
194:20,25
195:25
196:14
199:15
**plaintiffs'**
 6:19 35:8
 40:2,6
 41:19
 43:16 45:5
 46:9 47:14
 90:15
 91:18
 92:25 93:7
 114:24
 125:2,9,15
 126:18
 132:22
 143:24
 144:3
 145:2,7
 146:2,4,21
 155:21,25
 156:2,6,10
 157:8,16
 190:12
 192:4,6,11
 192:16,25

193:20,23
194:3
195:9
232:8
**plans** 204:11
**plausible**
 164:4
**Plaza** 3:9
**please** 4:16
 5:19
 123:11
**pocket** 196:7
**point** 28:22
 36:23
 37:16
 52:11,14
 55:9 57:19
 72:20
 76:22
 77:12
 78:11,14
 84:3 92:6
 92:14 94:3
 102:7,18
 103:8
 105:13
 111:3,16
 111:19
 112:3
 116:25
 117:7
 125:16
 130:2
 131:14
 132:4
 133:22,24
 140:10
 141:21
 142:6,15
 143:14
 144:15
 149:7
 156:11
 157:19
 158:6
 163:15
 166:8,25
 185:19
 187:19
 192:25

201:21
202:6
205:20
213:22
219:22
222:24
229:9

**pointed**
83:18
93:22
112:8
125:22
148:21
157:10
162:4
209:10

**pointing**
132:16
140:19
157:25
163:6
198:8

**points** 40:25
85:23
127:15
156:16
204:6,13
204:22
206:15

**Politics**
51:17

**Pomerantz**
2:4 142:7

**portfolio**
210:3,6
215:25
217:5

**portfolios**
216:3

**portion**
124:2
139:17
176:13
183:13,14
219:9

**portions**
19:13
20:15

**position**
97:19

**positive**
10:21 11:2
11:3,15
14:2 21:8
21:12,20
22:14
24:20
32:15
33:14 49:7
49:22 50:6
50:6,17
51:12
52:17,21
53:8,12,18
53:23,25
54:16,17
55:4,18
56:5,9,22
57:16
58:16
60:15
65:17 66:7
67:7,15,22
70:13 71:6
71:21
72:13,24
100:21
101:6
115:19
116:4,6,6
116:23
124:6
127:13
129:15
132:2,12
132:13,17
133:21,25
134:6
135:6
183:25
187:3

**positively**
115:25

**possibility**
84:22
87:14,18
88:20
124:4
125:25
128:3

**possible**
11:10
12:25 14:5
14:16 15:5
16:6 30:17
32:13
33:24
34:24
35:21
57:14,22
57:23,24
58:4,7
61:25
67:20
75:21
83:14
100:23
124:24
127:19
129:10
133:15
134:17
135:25
203:15
204:7
206:6

**potential**
50:24,25
82:17
125:13
126:22,24
127:24
128:6
131:17
201:17
212:9
218:18
219:7,17

**potentially**
26:4 30:15
49:21
55:19 56:4
69:2 94:5
95:6 116:4
129:14
132:2
133:21
183:21
186:10

**power** 13:10

13:13,17
14:10,20
14:24 15:4
15:16,18
15:25 16:4
16:7
226:10,12

**practical**
219:11

**practices**
39:16
152:6,15
154:4
155:8,9,16
156:18

**precise**
208:18
221:4

**precisely**
212:18

**precision**
16:8

**precursor**
20:2

**predict**
10:25

**predicts**
10:2

**preface**
108:10

**premise**
128:9,10
215:12

**premised**
60:17

**premises**
29:2
215:25

**premium**
129:2

**presence**
52:21
53:25

**present** 3:19
193:22
195:19
206:17
218:15
220:5,17
222:5

225:14

**presented**
93:11
174:2
181:8
193:14
220:10
227:19

**presenting**
36:9

**press** 9:3,4
21:7 22:4
22:8,21
23:7 33:22
49:20
50:11
53:13
64:14
67:15
110:23
112:4
114:2
123:18
124:18
128:14
142:9,10
155:4
173:10
177:13
185:14
187:22

**pressure**
39:19

**presumably**
141:25

**presume** 46:5

**presumes**
44:8

**previous**
43:4 46:3
104:7,20
105:24
115:22
144:17
147:5
151:3
153:17
155:4
183:23
193:3

| | | | | |
|---|---|---|---|---|
| 222:23 | 49:18 50:2 | 92:22 | 135:8,19 | 176:2,8,19 |
| **previously** | 50:8,19 | 94:10,22 | 136:6,10 | 176:25 |
| 88:6 123:7 | 53:3,15 | 95:7,24 | 136:12,18 | 177:9,11 |
| 129:5 | 54:7,21,23 | 96:3 97:14 | 136:23,25 | 177:17,19 |
| 153:11 | 55:14 56:5 | 97:17,22 | 137:3,7,8 | 178:13 |
| 166:12 | 56:11 57:5 | 98:11,21 | 137:14 | 179:10 |
| 198:15 | 57:5,21 | 98:24 99:4 | 138:13 | 180:23 |
| **price** 8:16 | 59:2,7,12 | 99:10,15 | 140:22 | 181:20 |
| 9:11 10:7 | 59:13,20 | 99:18,20 | 141:5,6 | 182:4,11 |
| 11:9,12,18 | 60:2,8,12 | 99:20,22 | 142:20 | 183:4,9,11 |
| 12:16,21 | 61:5,15,25 | 99:23 | 143:11 | 184:4 |
| 13:3,9,9 | 62:12 63:5 | 100:8,13 | 144:18,21 | 185:5,5,7 |
| 13:16 | 64:7,18,23 | 100:15,18 | 144:24 | 185:13,22 |
| 17:25 18:5 | 65:3,13,19 | 100:23 | 147:7,8,17 | 186:3,11 |
| 18:18,23 | 66:20,24 | 101:9,10 | 148:2,8,11 | 186:14,19 |
| 19:8,11,17 | 67:6,10,13 | 101:22,25 | 148:12,15 | 186:23 |
| 19:19,22 | 67:17,25 | 102:6,14 | 149:3,4,17 | 187:7,20 |
| 20:4,11 | 68:7,11,18 | 102:23 | 150:7,8,13 | 187:25 |
| 21:14,17 | 68:24 | 103:4,6,7 | 151:6,10 | 188:2,4,8 |
| 21:22 | 69:18,21 | 103:8,18 | 154:10,11 | 188:18,20 |
| 22:12,16 | 70:9,16,22 | 103:21 | 154:19 | 189:7,10 |
| 23:13,17 | 71:5,24 | 104:4,21 | 155:2 | 189:11 |
| 24:3,9 | 72:6,15 | 105:19,25 | 156:19 | 194:23,24 |
| 25:4,8,10 | 73:2 75:15 | 106:6,10 | 158:17,20 | 195:11 |
| 25:12,15 | 76:3,13,18 | 107:18 | 159:11,14 | 197:5,12 |
| 25:25 27:9 | 76:20,25 | 109:14,23 | 160:2,6 | 197:15,16 |
| 27:16 | 77:7,17,20 | 110:2,3,4 | 161:16,21 | 197:22 |
| 28:17 29:5 | 77:21,25 | 110:8 | 162:17,23 | 198:14,22 |
| 29:19,21 | 78:4,12,21 | 111:22 | 163:23 | 199:6,22 |
| 30:5,15,17 | 78:24 | 112:18 | 164:6,10 | 203:10 |
| 30:23 | 79:12,15 | 113:4,14 | 165:20 | 205:5 |
| 31:11 32:7 | 79:18,20 | 113:22 | 166:5,5,13 | 206:9 |
| 32:11,23 | 79:22,23 | 115:6 | 166:15,23 | 207:22 |
| 33:11 34:2 | 80:2,5,9 | 116:2,8,20 | 166:23 | 210:2 |
| 34:5,11,22 | 80:10,12 | 117:4,12 | 167:11,13 | 212:16,22 |
| 34:25 35:3 | 80:18,22 | 117:19,22 | 167:17,19 | 213:19 |
| 35:6,12,15 | 80:24 | 117:24 | 168:4,16 | 214:8,14 |
| 35:17,23 | 81:19,21 | 118:5,9,11 | 169:10,13 | 216:15 |
| 36:3,15,20 | 82:12,17 | 118:12,16 | 169:19,23 | 218:13 |
| 40:4,11 | 85:12,18 | 118:17 | 170:3,4,12 | 220:5,16 |
| 41:15 42:3 | 86:2,5,18 | 119:12,13 | 170:19,20 | **priced** |
| 42:6,9 | 86:25 87:7 | 119:16 | 171:2,8,15 | 208:25 |
| 43:19 | 87:8 88:3 | 121:19 | 171:18,22 | 216:4,10 |
| 44:18,19 | 88:7,9,14 | 126:8,11 | 172:18 | 216:12 |
| 44:22,24 | 88:19 | 130:4,6,9 | 173:2,18 | **prices** 8:10 |
| 45:15 47:3 | 89:17,21 | 130:15,25 | 174:5,8,9 | 11:5 14:3 |
| 47:12,18 | 89:22 | 131:17 | 174:13,19 | 14:4 33:18 |
| 47:20 | 90:21,22 | 132:20 | 174:22 | 36:8 58:18 |
| 48:24 49:2 | 90:23 | 133:14,15 | 175:3,8,17 | 215:4,9 |
| 49:8,10,14 | 92:20,21 | 134:5,14 | 175:23 | **pricing** |

| | | | | |
|---|---|---|---|---|
| 216:2 | **proceeding** | 190:23 | 58:24 | 215:19 |
| 217:6 | 4:23 | 191:14 | 59:25 | 216:22 |
| **primarily** | **proceedings** | 192:3,6 | 68:10 | 220:20 |
| 84:12 | 231:7,9 | 194:2 | 113:15 | 231:5 |
| 125:17 | **process** | 195:7 | 118:4 | 233:25 |
| 208:13,15 | 36:14,15 | 198:5 | 136:17 | **publication** |
| 211:5,16 | 36:17 | **proposing** | 138:10,11 | 51:16 |
| 211:17 | 41:13 45:9 | 64:13 | 147:15,25 | 52:12 |
| 226:18 | 90:16 | **protocol** 6:7 | 148:13,18 | **publicity** |
| 228:24 | 121:7 | **prove** 94:11 | 149:5,12 | 39:18 |
| **primary** 7:18 | 135:15 | 94:19 | 149:13,19 | **publicly** |
| 11:8 | 229:5 | 95:13,14 | 150:17 | 8:25 9:5 |
| 227:19,23 | **processes** | 144:9 | 151:14,17 | 110:12 |
| 228:4 | 57:13 | 145:2 | 159:22,23 | 114:10 |
| 229:11 | **product** 39:9 | 154:12 | 159:24 | 163:17 |
| **prior** 54:22 | **products** | 156:3 | 166:3 | 208:6,8 |
| 54:23 68:8 | 39:8,15,17 | **provide** | 167:17,18 | 212:12 |
| 97:16 | 39:19 | 20:21 | 169:18,22 | 213:3 |
| 99:23 | 93:25 | 28:16 | 170:2 | 223:6 |
| 106:8 | 169:2,7 | 31:10 | 171:6,20 | 226:23 |
| 107:18 | **profession** | 55:11 | 173:15,16 | **published** |
| 110:5 | 182:24 | 81:20 | 174:25 | 158:18 |
| 113:2,18 | **Professor** | 100:10,17 | 176:7 | 207:17 |
| 113:22 | 1:14 4:6 | 101:17 | 188:25 | 222:17 |
| 158:11,12 | 4:25 5:4,8 | 102:22 | 204:17 | **pull** 223:15 |
| 166:16 | 48:9 86:7 | 103:17 | **proxy** 10:15 | **Pulvino** |
| 177:19 | 88:4 89:2 | 111:9 | **public** 1:17 | 217:10 |
| 179:18,21 | 89:11 | 130:6 | 5:6 8:11 | **purchase** |
| 228:8 | 122:11 | 140:6,11 | 8:15,22 | 196:9 |
| **Prize** 222:10 | 123:6,11 | 147:2 | 9:7,15 | **purported** |
| **probably** | 150:20 | 166:8 | 21:7 22:4 | 41:6 44:18 |
| 10:8 20:14 | 165:6 | 184:3 | 22:8,21 | 156:23 |
| 37:7 39:25 | 207:4 | 186:8 | 23:7 33:22 | 195:14 |
| 45:7 52:2 | 232:4 | 193:6 | 39:18 | **purportedly** |
| 66:17 | **proper** 178:6 | 204:10 | 40:15 | 105:12 |
| 120:21 | **properly** | 206:8 | 49:20 | **purpose** |
| 121:6,12 | 101:8 | 215:22 | 50:11 | 184:6 |
| 225:22 | 190:12,18 | **provided** | 64:14 | **purposes** |
| **problem** | 190:19 | 28:19 | 67:14 | 27:24 |
| 159:17 | 197:2 | 50:23 | 112:4 | 28:13 |
| 200:6 | 199:14 | 69:11 | 114:2 | 42:15 75:9 |
| 205:21 | 213:16 | 191:21 | 153:25 | 207:10,21 |
| 220:5,17 | **proporti...** | 192:2 | 154:4 | **pursuant** |
| **problem-...** | 27:7 | 201:24 | 157:22 | 1:15 |
| 217:12 | **proposed** | 206:6 | 163:21 | **put** 13:23 |
| **problems** | 37:3 38:3 | 228:15 | 173:10 | 23:5 95:10 |
| 218:15 | 38:10 39:3 | **provides** | 177:12 | 104:2 |
| **proceed** | 46:25 47:5 | 202:2 | 185:14 | 120:5 |
| 222:15 | 47:22 | **providing** | 187:22 | 135:14 |
| 229:2 | 190:4,11 | 28:5 47:11 | 214:20 | 141:25 |

| | | | | |
|---|---|---|---|---|
| 180:22 | 55:8 64:5 | 220:24 | 162:20 | 113:25 |
| 191:3,5 | 64:12,15 | **quoting** | 170:11,15 | 114:6 |
| 199:12 | 64:16 69:8 | 123:25 | 173:16 | 124:21 |
| 201:14 | 73:11 | | 177:2 | 140:14 |
| 202:17 | 79:25 88:5 | **R** | 183:5 | 143:21 |
| 204:20 | 92:24 96:9 | **R** 1:16 2:2 | 184:12 | 160:17 |
| 210:4 | 98:19 99:8 | 3:2 5:4,5 | 185:18 | 188:10 |
| 213:15 | 101:17 | 123:6 | 187:24 | 196:22 |
| 216:12 | 104:11 | 231:2,4,18 | 188:2,4 | 225:17 |
| 221:13,19 | 105:15 | **raise** 117:21 | 189:6,9 | 233:2,19 |
| 222:4 | 120:23 | 136:9 | 203:11 | **readily** |
| **putative** | 126:16 | 158:15 | 228:17 | 224:14 |
| 42:7 | 128:9 | 188:16 | **reached** 23:8 | **reading** |
| 169:13 | 134:23 | **raises** 147:6 | 54:6 62:4 | 60:24 |
| 174:22 | 142:24 | 169:9 | 79:2 80:7 | 127:5 |
| **putting** 41:8 | 143:18,20 | **raising** | 81:8 99:13 | 128:18,18 |
| 43:12,15 | 144:17,22 | 156:21 | 170:7 | 131:3 |
| 45:11,12 | 145:22 | **ramifica...** | 184:15 | 162:9 |
| 45:22,23 | 150:22 | 35:6 46:8 | **reaching** | 171:4 |
| 79:13,18 | 151:3 | 46:9 | 97:13 | **realization** |
| 132:6 | 152:22 | **ran** 75:2 | 118:8,10 | 225:11 |
| 157:14 | 155:19 | 227:24 | 126:13 | **realize** |
| | 192:20 | **range** 55:23 | 136:21,24 | 226:16 |
| **Q** | 200:6 | 55:24 56:3 | 139:21 | **realized** |
| **Q4** 182:6 | 201:14 | 133:19 | 168:8 | 129:12 |
| **qualitative** | 205:17 | 134:17 | 176:14,22 | **really** 16:6 |
| 203:23 | 215:10 | **rapidly** 8:10 | 194:15 | 20:2 29:8 |
| **quantify** | 219:15 | 8:15 | **react** 8:10 | 46:22 |
| 33:17 55:3 | 222:23 | **rate** 212:9 | **reacting** | 66:17 |
| 56:21 | 227:4 | **reach** 15:11 | 9:15 | 69:15 |
| 120:7 | **questioning** | 22:11 26:8 | 147:10 | 82:17 97:4 |
| **quantifying** | 6:12 42:21 | 33:23 | 158:22 | 129:23 |
| 57:15 | **questions** | 36:11 55:6 | **reaction** | 167:2 |
| **quantita...** | 156:21 | 56:9 57:14 | 27:4 34:25 | 191:6,15 |
| 56:7 | 196:24 | 57:20 58:7 | 35:23 | 200:14 |
| 203:23 | 207:5 | 59:19 60:7 | 49:23 50:8 | 203:20 |
| **quarter** 10:3 | 212:5 | 64:8 68:17 | 50:19 | 205:22 |
| 115:15 | 230:7,12 | 79:10,13 | 53:11 | 208:23 |
| **quarterly** | **quickly** 9:16 | 80:16 82:9 | 67:18 74:4 | 209:24 |
| 14:8 | **quite** 187:13 | 98:5 | 74:7,16 | 210:2 |
| **quasi-ex...** | 211:25 | 101:15 | 86:25 | 216:7 |
| 87:21 | 215:3 | 103:24 | 101:7 | 217:3 |
| **question** | **quote** 98:9 | 119:12 | 158:2 | 224:17 |
| 19:11 | 98:10 | 124:16 | 163:24 | 225:20 |
| 24:13,13 | 114:24 | 136:22 | 164:6 | **reason** 6:3 |
| 26:11 | 132:8 | 140:21 | **reacts** 9:16 | 84:9 |
| 27:11 | 153:16 | 148:7,9 | **read** 20:22 | 104:14 |
| 38:24 42:9 | 194:17 | 151:5,10 | 36:24 | 108:10 |
| 44:8,20 | 207:19 | 151:12 | 41:11 60:4 | 114:15 |
| 46:6 52:24 | 209:6 | 160:5 | 97:3 | 116:10,13 |

128:20
129:21
155:9
163:2
166:17
186:24
215:14
**reasonable**
103:4
213:13
**reasonably**
39:20
58:20
187:19
**reasons**
118:22
192:22,23
199:2
**recall** 7:20
15:2,3
219:5
**received**
51:11
66:12
**receiving**
66:13
**recess** 48:5
89:7
122:15
165:2
206:24
**recklessly**
39:5
**recognize**
7:2 191:16
**recognized**
77:9
**recollec...**
116:12
218:7
**recomput...**
212:7
**recomputed**
207:10,20
**record** 4:3
4:15 5:12
5:18,21
6:13 21:11
48:4,7
89:6,9

122:14
123:5
164:25
165:4
172:7
206:23
207:2
230:9,17
231:9
233:20,20
**reduced**
111:20
113:3
**reduction**
109:9,11
109:20
**refer** 20:4
20:15
24:15 37:9
38:21 57:3
96:25
148:5
174:15
175:4,21
189:5
195:20
196:2
199:17
**reference**
189:21,24
200:10
201:3
219:3
**referenced**
153:15
**referred**
30:21,22
34:5,12
195:25
196:2
**referring**
17:10
18:21
24:16 60:5
98:8 107:3
111:5
136:5
199:19
200:8,20
206:5

**refers** 37:24
39:3
**reflect**
108:25
154:20
191:16
**reflected**
8:16
113:14
214:7,14
218:10
**refresh**
116:12
**regard** 97:8
**regarding**
27:23
28:11
50:24,25
82:9 97:3
126:6,8
130:11
141:23
142:11
153:2
158:12
174:2
176:11
181:12
187:25
**regardless**
142:21
**regression**
135:10,21
207:6
220:25
221:8,14
227:9
229:14
**regressi...**
221:25
**regulator**
131:25
**regulatory**
39:12
94:15 95:9
95:17
96:11,11
111:23
114:10
125:4

220:14
**reiterate**
134:25
**reject** 12:15
13:4 14:10
14:25
15:18
16:18,25
18:2 25:16
62:7 63:7
63:15
88:16
178:9,24
182:25
**rejects**
16:20
25:10
**relate** 34:16
36:5 91:13
93:24
**related** 33:8
37:15 47:6
51:2 82:17
92:20
93:14
95:10 96:9
103:5
128:21
130:3,6
131:9
142:2
157:23
169:5
176:17
179:15
199:4,7
231:10
**relates**
146:20
151:19
**relation...**
27:7,10
**relative**
9:17
108:20
172:18
215:8
**relatively**
34:18
51:19 52:8

66:13
76:23
129:7
161:9
162:21
193:8,15
226:24
**release** 12:2
123:18
124:19
142:9,10
**released**
12:3 116:7
**releases** 9:3
128:14
**relevant**
8:11,15,22
9:7 20:15
81:10
83:20
84:10 96:8
115:20
162:7
179:3
218:21
228:17
**reliable**
64:23 65:3
86:18
134:22
136:2
165:16
167:10,15
167:24
168:12,17
202:17
210:5
221:20
**reliably**
18:15
23:24
29:21
62:15,17
138:22
161:25
190:24
192:7,21
193:16
194:4
202:4

204:12
**reliance**
  29:9
**relied** 67:4
**rely** 29:6
**remaining**
  54:20
  89:15
  140:24
  148:8
  170:13
**remember**
  162:12
**remembered**
  131:4
**remote** 1:14
  6:7
**remotely**
  4:12
**remove** 197:5
  198:5,21
  207:11
  208:10
  209:19
  210:6,10
  214:4
  216:21
  221:15
  226:19
  227:12
**removed** 61:9
  121:25
  122:5
  138:5
  209:5
  214:12
  223:4
  229:22
**removes**
  226:14,25
**removing**
  83:23
  160:11
  162:18
  208:17
  211:15
  214:9
  217:23
  218:21
  224:11

227:6
228:10
229:6,9
**repeat**
  218:23
**repeated**
  131:15
**repeatedly**
  157:10
**rephrase**
  169:24
  170:24
  171:10
**replacement**
  133:6
**report** 6:19
  7:4,8  8:4
  17:23  18:8
  19:14,22
  20:16,18
  22:3  23:21
  27:24
  28:13,16
  29:14  32:6
  33:3,23
  35:10  37:6
  37:22
  38:22
  40:14,22
  40:23  41:5
  41:9,24
  43:7  46:14
  47:4,7,8
  48:10
  50:20
  51:15  54:6
  54:12,15
  55:11,20
  56:14
  59:18  65:6
  68:13  73:5
  73:8  74:21
  76:4,15
  80:4  81:11
  81:14  82:8
  82:16,20
  83:18
  84:20
  89:12
  96:24

97:13
98:11
101:4
106:8,23
112:9,10
112:10
113:23
114:22
117:8
118:7
119:20
123:12
124:23
137:24
138:7
139:17
140:5,10
143:22
149:19,23
149:25
150:15
151:11,19
151:21
153:7,14
155:11
156:15
159:9
160:15
170:11
172:7
173:5,8,9
174:16
177:6
183:13,14
184:17
185:19,24
186:4
195:16
198:25
200:17
207:7
222:17
227:20,23
228:3
229:17
232:9
**reported** 4:5
  17:12
  19:25  20:3
  20:7  33:2

35:10
73:24
74:11  82:3
83:6  102:5
103:9
121:14
122:3
135:3
152:4,13
153:7
154:8
172:7
219:8
228:3
231:7
**reporter**
  1:17  4:10
  4:16,18
  231:4
**Reporting**
  1:25  4:11
**reports** 9:4
  9:4  21:7
  22:6,22
  23:3,7
  49:20
  50:11
  51:16
  53:12
  64:14  66:4
  67:15,20
  111:6,15
  113:7,25
  114:6,7
  127:5
  128:19
  162:14
  173:10
  177:13
  185:14
  192:10
  193:3
  204:9
  207:18
**represent**
  172:8
  198:14
**represen...**
  39:2
**represented**

78:20
**represents**
  145:16
**reputation**
  39:22
**reputati...**
  39:11
**require**
  39:23
**required**
  135:11,20
  178:24
  182:25
**requires**
  101:9
**reread** 21:10
**research**
  3:20  7:10
  10:9  98:19
  108:8,11
  215:10
**researcher**
  18:14
  23:23
  24:17,19
  24:21
  26:15
**research...**
  25:2
**researchers**
  26:21
**residual**
  11:16
  178:8
**respect**
  21:25  33:2
  43:6  47:16
  54:8  57:21
  59:20  60:8
  68:15,18
  68:23
  73:19  76:7
  79:23  84:4
  90:9  95:2
  96:6  99:25
  101:3
  105:25
  107:9
  112:2
  115:3

| | | | | |
|---|---|---|---|---|
| 119:19 | **responses** | **return** 11:25 | 221:6 | 41:10 |
| 131:11 | 27:16 | 12:5,5,8,9 | 224:7,20 | 90:13 |
| 136:22 | **responsible** | 12:14 | 224:23 | 95:13,16 |
| 140:23 | 131:21 | 18:14,16 | 226:17 | 118:7 |
| 151:7 | **responsive** | 19:6 20:25 | **returns** | 120:21 |
| 174:4 | 38:24 43:5 | 23:23 24:2 | 83:25 | 164:23 |
| 175:6,9 | 151:3 | 26:3 30:11 | 122:2 | 172:11,12 |
| 176:11 | 227:13 | 48:16 53:5 | 207:11,20 | 176:4 |
| 179:23 | **rest** 198:24 | 53:20 56:8 | 210:7 | 184:16 |
| 189:8 | **restate** | 56:14 | 211:19 | 187:13 |
| 194:8 | 136:21 | 57:10 | 215:18 | 202:19 |
| 219:19 | **resting** | 58:13 | 216:23 | 206:21 |
| 220:14 | 22:17 | 60:13,20 | 224:12 | 213:4 |
| 224:7 | **restricted** | 60:25 61:8 | 227:3 | 214:22 |
| **respiratory** | 213:2,8 | 61:12,19 | 228:21 | 221:6,23 |
| 168:25 | **restrictive** | 61:23 62:7 | **revealed** | 223:23 |
| **respond** | 193:9 | 62:8,22,23 | 29:20 92:6 | 229:13 |
| 27:22 | **result** 13:6 | 63:10,10 | 93:17 94:3 | 230:5 |
| 40:13 42:8 | 26:2 77:16 | 64:19 | 98:23 | **right-hand** |
| 109:24 | 85:16 | 71:15 | 105:12 | 221:14 |
| 145:11 | 102:12 | 74:18,25 | 110:19 | **risk** 39:11 |
| 148:4 | 108:18 | 75:5,22 | 129:9,20 | 40:8 41:21 |
| **responded** | 109:22 | 76:5 81:3 | 165:19 | 43:3 44:2 |
| 180:12 | 111:23 | 81:5 83:2 | 166:11 | 45:17,22 |
| **responding** | 134:6 | 83:7,21 | 171:13 | 91:20 |
| 126:14 | 143:16 | 84:5 85:8 | 185:2 | 93:20 |
| 127:4,17 | 147:4 | 85:12,23 | 195:12 | 94:18 95:2 |
| 127:17 | 156:8,25 | 86:15 | **reveals** | 95:3,5,11 |
| 146:16 | 164:4 | 121:9,15 | 52:13 92:9 | 95:19,23 |
| 155:13 | 171:15 | 121:22,23 | **revelation** | 95:23 96:5 |
| 158:4 | 202:2 | 122:4 | 94:2 | 125:14 |
| 164:3 | 220:3 | 124:10 | **revenues** | 126:25 |
| **responds** | 229:12 | 135:2,4,12 | 205:13 | 141:19 |
| 10:10 | **resulted** | 135:16 | **review** 27:22 | 142:12 |
| **response** | 102:6 | 137:19,23 | 42:23 52:5 | 143:5 |
| 11:4,5 | 108:15 | 138:3,8,14 | 59:19 60:6 | 144:14 |
| 28:10 57:3 | 121:2 | 138:19,22 | 67:14 | 145:6,14 |
| 84:16,22 | 158:7 | 153:6 | 68:16 | 145:16 |
| 85:3,6 | 173:18 | 160:11 | 140:21 | 146:2,4,18 |
| 100:24 | **resulting** | 161:23,25 | 151:5 | 154:17 |
| 116:2 | 30:5 | 162:2 | 225:25 | 155:22 |
| 124:12 | **results** | 172:4 | **reviewed** | 156:4,20 |
| 129:15 | 17:11 20:6 | 173:23 | 23:7 50:10 | 156:25 |
| 134:14,19 | 48:15 | 178:5,17 | **reviewing** | 157:14,17 |
| 155:2 | 49:16 | 179:3 | 21:7 71:11 | 157:19 |
| 158:14 | 65:11 70:7 | 182:17 | 204:9 | 190:13 |
| 172:18 | 71:14 | 184:24 | **Richmond** 1:3 | 198:17 |
| 177:9 | 115:16 | 199:22 | 2:17 | 200:12 |
| 180:12 | 173:21 | 200:21 | **right** 16:12 | 201:11,12 |
| 222:22 | 190:2 | 208:18 | 38:11 | 201:21 |

202:11
220:14
**riskiness**
93:13
**risks** 39:14
39:23
47:15
73:16 82:5
93:18
125:4,4,5
126:20
141:9,11
142:2,13
142:15
144:2,4,10
144:12
145:5,25
146:22
154:20
156:11
157:2,3
199:9,10
199:15
201:20
204:2
**ROBBINS** 2:10
**role** 34:9
115:9
167:22
**ROLL** 3:11
**Roman** 189:14
190:21
**room** 222:9
**ROSEN** 2:21
**routine** 52:8
52:15
66:13
**RUDMAN** 2:10
**Rule** 195:21
**rules** 5:17
108:6
178:22
**ruling** 167:5
**run** 226:8
227:9
**runs** 157:5
**RYAN** 3:11

───────
**S**
───────
**S** 2:2 3:2

5:4,4
123:6,6
232:7
**S-a-s-h-a**
7:24
**S-k-i-n-...**
5:14
**S&P** 75:7
**Sachs** 97:2
167:6
**sake** 161:11
**sale** 196:10
**sample** 15:3
15:8,17,20
16:3,5,6
**samples** 14:4
14:9,15,18
**San** 2:12
3:15
**Sarah** 2:5
**Sasha** 7:24
**sat** 85:21
**saw** 58:12
72:12
**saying** 21:24
33:19
40:14
59:10
62:11
69:19
86:12
99:19,20
109:7
110:10
112:25
113:2
118:8
127:24
129:4
138:22
146:15
159:5
165:23
166:18
203:17
224:19
**says** 28:12
38:25
55:21
74:11

113:12
133:2
134:16
140:17
166:9
216:6
**scheme** 39:7
39:9
**Schwartz**
3:20 7:25
**scientific**
165:16
167:10,15
168:17
209:7
222:3
**scope** 29:10
**scoured**
222:20
**scrutini...**
115:9
**scrutiny**
39:18
123:21
125:10
**search** 53:14
**SEB** 106:11
106:12
**SEC** 73:14
82:3 139:7
140:9
141:10,17
142:19
143:3,9,9
144:11
145:3,17
145:23
146:14,15
147:16
148:2,14
149:16
150:18
151:15
155:11,14
158:4
**second**
163:12
173:9
179:24
181:9,14

189:2
202:6
227:10
**secondary**
224:15
**section** 8:6
19:21 20:3
20:18 22:2
22:13 33:2
41:5,5
46:14 47:3
47:7,8
48:12 54:5
54:6,11,15
65:7 71:10
72:19,20
73:8 79:23
80:4 81:10
81:13,14
82:8,16,21
89:15
101:4,4
106:23
110:11
117:7
119:20
124:22
127:7
139:20
140:13
151:20,20
151:22
155:11
156:15,16
159:20
169:17,17
170:11
173:6,8
180:14
183:14
184:20
188:22,24
190:10,21
198:24
199:18
200:5
201:15
202:21
217:9
225:6

**sections**
181:3
**sector**
229:20
**sectors**
208:9
216:22
**securities**
8:9,16
28:20
91:24
104:8,9
105:5
118:6
136:19
142:8
147:18
148:3,15
149:18
160:2
169:20
170:20
171:8,23
189:3
191:22
193:11,12
195:5,22
196:7
207:18
208:25
215:9
216:3,5,13
216:18
217:22,23
218:22,22
**security**
150:13
**see** 8:12
17:7,25
18:19
20:23 24:4
28:3 35:22
37:8 48:19
49:3,4,6
49:11 50:5
51:17 52:8
53:8 56:14
58:15
60:15,23
65:14,21

65:22,25
66:25 67:7
68:14 69:9
70:10,17
70:18,24
71:18,19
71:25 72:8
72:22 74:5
74:6 75:24
77:13
89:23,24
107:20
115:17
117:25
123:24
129:18
136:14
145:14
147:11
152:8
158:24
161:14
165:21
169:14
185:10
190:7,15
195:22
197:8,25
198:2
204:14
207:15
226:3
229:3
**seeing** 15:3
139:23
184:23
219:21
**seeking**
140:4
195:25
196:14
**seen** 210:9
210:11,21
210:23
**seizures**
114:13
168:25
**sell** 129:7
**selling**
129:6

**semi-strong**
8:19 27:25
28:15,25
84:14
218:14
**seminars**
85:22
**sense** 13:24
16:7
119:10,21
120:7
127:5
154:22
162:22
194:21
205:24
209:2
213:7
229:25
**sensible**
207:25
**sensitivity**
227:24
228:2
**sentence**
30:12
55:19
74:10
131:2
**separate**
30:17,22
145:18
157:2
160:19
176:19
199:6
**September**
6:21 55:12
65:7,13
66:24 67:6
67:9,13
68:2,7,12
68:16
69:21 70:3
70:23 71:5
71:8,11,16
72:7,16
73:3
116:11,13
116:15

123:13,18
124:10
125:19
126:9
130:5
136:5,11
137:2,7,18
137:22
153:9
168:23
169:24
170:14,17
170:19,21
171:3,7,14
171:16,17
171:21,23
178:15,16
179:7,7,10
232:9
**series**
184:11
**Session**
123:2
**set** 34:8
37:9 38:20
42:13 43:9
51:14
113:6
135:22
160:5,19
180:21
231:14
**sets** 165:17
170:6
**setting** 49:9
**settings**
90:6
**settle**
223:22
**seven** 7:14
54:20
89:15
97:12
119:19
139:21
140:24
148:9,23
150:2
151:22
159:13

170:13
173:8
180:22
**shake** 5:20
**share** 10:3,4
10:5,5,18
10:20,21
24:20
196:8
212:15,22
214:14
218:13
220:4
**sharehol...**
73:16 82:5
129:3
141:19
**shares** 78:19
154:11
207:12
212:15,20
213:2,4,6
213:7,8,9
215:21
216:10
220:21
227:3
229:22
**shed** 58:6
**sheet** 217:13
218:4,8,10
219:8,12
226:2
**Sherbondy**
2:4,5
**Shorthand**
1:17 231:4
**shortly**
28:18
42:21
**show** 28:19
96:2
**shows** 36:6
83:7
172:16,16
**side** 221:7
221:14
229:14
**sign** 222:11
**signals**

27:13
**SIGNATURE**
233:1
**signific...**
12:24 13:7
13:19 62:3
66:18
78:16
124:10
**significant**
11:17
12:13 13:6
13:8 18:4
21:2,14,22
22:15
23:17
34:10,25
35:12,14
35:17,22
36:8 46:15
48:17
49:18
52:17 53:6
53:19
55:14
56:17
58:14
60:14 61:3
62:12
65:12,19
67:5,13,17
70:8,15
71:4,17,23
72:11 73:2
74:20 76:6
78:7,13
79:7 80:19
81:6 83:9
83:11,17
84:6,7
85:17,24
86:16,25
87:6 88:3
88:7 89:17
98:22
101:22
102:15
103:18
108:7
116:20

117:18
121:17
124:12
134:5,15
135:5
136:6
137:13,25
138:21
142:2
154:10
158:16
160:9
161:23
162:3,18
162:23
172:3,17
173:3,19
173:23
177:11
178:5,8,12
178:17
179:5
181:20
182:3,12
182:16
183:4,10
184:23
186:19
188:18
191:10
197:12
199:23
218:8,18
219:9,24
220:9
**signific...**
12:9 63:6
**similar** 71:2
71:13 98:3
105:2
114:19
116:11,13
116:15
120:25
135:18
137:6
155:11
163:13
172:14
192:24

211:25
215:7
216:25
**similarly**
1:5 29:4
137:5
178:14
214:10
**SIMON** 2:24
**simple** 38:20
143:20
193:12,15
226:24
**simpler**
192:14
**simplistic**
191:19
**simply** 13:16
127:21
135:14,25
145:17
157:7
163:24
181:5
191:18
192:25
199:12
200:9,13
203:15
205:19,20
212:20
215:11
216:6,9
217:4
224:11,19
224:22
**simultan...**
29:24
30:20
**single** 66:5
209:3
210:12,23
211:2,4,10
214:25
215:11
216:25
222:18
**sit** 223:12
225:8
**sitting**

38:11
79:10
222:9
**Situated** 1:5
**situation**
35:23
43:20
45:18
56:24
101:18
103:11,12
109:7,13
110:2
178:24
208:5
**situations**
108:22
134:18,20
191:25
**six** 7:14
**size** 15:3,8
16:4,5,6
26:3 27:8
161:15
**skills**
168:11
**Skinner** 1:15
4:1,6,25
5:1,8,13
6:1,20 7:1
8:1 9:1
10:1 11:1
12:1 13:1
14:1 15:1
16:1 17:1
18:1 19:1
20:1 21:1
22:1 23:1
24:1 25:1
26:1 27:1
28:1 29:1
30:1 31:1
32:1 33:1
34:1 35:1
36:1 37:1
38:1 39:1
40:1 41:1
42:1 43:1
44:1 45:1
46:1 47:1

48:1,9
49:1 50:1
51:1 52:1
53:1 54:1
55:1 56:1
57:1 58:1
59:1 60:1
61:1 62:1
63:1 64:1
65:1 66:1
67:1 68:1
69:1 70:1
71:1 72:1
73:1 74:1
75:1 76:1
77:1 78:1
79:1 80:1
81:1 82:1
83:1 84:1
85:1 86:1
86:7 87:1
88:1,4
89:1,11
90:1 91:1
92:1 93:1
94:1 95:1
96:1 97:1
98:1 99:1
100:1
101:1
102:1
103:1
104:1
105:1
106:1
107:1
108:1
109:1
110:1
111:1
112:1
113:1
114:1
115:1
116:1
117:1
118:1
119:1
120:1
121:1

122:1
123:1,11
124:1
125:1
126:1
127:1
128:1
129:1
130:1
131:1
132:1
133:1
134:1
135:1
136:1
137:1
138:1
139:1
140:1
141:1
142:1
143:1
144:1
145:1
146:1
147:1
148:1
149:1
150:1,21
151:1
152:1
153:1
154:1
155:1
156:1
157:1
158:1
159:1
160:1
161:1
162:1
163:1
164:1
165:1,6
166:1
167:1
168:1
169:1
170:1
171:1

172:1
173:1
174:1
175:1
176:1
177:1
178:1
179:1
180:1
181:1
182:1
183:1
184:1
185:1
186:1
187:1
188:1
189:1
190:1
191:1
192:1
193:1
194:1
195:1
196:1
197:1
198:1
199:1
200:1
201:1
202:1
203:1
204:1
205:1
206:1
207:1,4
208:1
209:1
210:1
211:1
212:1
213:1
214:1
215:1
216:1
217:1
218:1
219:1
220:1
221:1

222:1
223:1
224:1
225:1
226:1
227:1
228:1
229:1
230:1
232:4,9
233:1,19
233:22
**sky** 149:6
**slightly**
 182:21
 215:24
**small** 11:2
 37:17
 212:11
**smaller** 31:7
 63:13
**so-called**
 92:5,15
 105:18
 166:22
 223:3
**social**
 163:19
**solve** 205:21
**somebody**
 45:13
**somewhat**
 104:10
 135:10
 192:12
 208:8
 210:17
 211:21,22
 217:18
 218:5
**soon** 77:19
 78:17
**sorry** 66:4
 143:9
 158:4
 169:24
 226:21
**sort** 7:16
 69:2,11
 147:2

194:21
201:5,8
**sound** 5:22
 161:5,10
 172:11,12
**sounds** 51:24
 69:6 71:2
 132:12
 170:18
**source**
 130:10
 200:24
**sources** 9:2
 40:17
 222:21
**space** 211:18
**speak** 46:17
 59:3
 119:22,25
 134:10
 148:21
**speaking**
 9:21 15:4
 194:20
 203:2
**speaks**
 147:20
 150:2
 230:13
**specific**
 19:18
 29:21 30:3
 32:4 92:25
 95:19
 104:12,24
 106:2
 124:20
 140:15
 142:17
 143:23
 169:8
 190:22
 195:19
 200:21
 202:20
 203:13,18
 207:22
 208:21
 212:5
 216:15

220:24
223:11
**specific...**
 17:13
 21:25
 36:25 42:8
 43:13
 50:16
 52:20
 53:24
 54:13 56:2
 80:5 81:15
 82:24 87:4
 91:12,13
 94:12
 95:18
 107:3,8
 110:13
 111:4
 112:25
 115:11
 116:9
 120:23
 134:21
 140:16
 142:17
 147:23
 160:10
 169:7
 185:20
 210:23
**specificity**
 200:14
 206:6
**specified**
 26:12
 197:3
**specify**
 24:21 30:8
**spectrum**
 96:18
 98:20
 99:24
**speedy** 74:4
 74:7,16
**spent** 74:21
**spike** 78:18
**spikes** 9:8
**spirit**
 209:12

**spot** 206:20
**spreads** 11:7
**St** 2:11
**Stafford**
 217:11
**stage** 34:8
 44:7 57:14
 57:23,23
 57:24 58:3
 100:15
**stake** 123:22
**stakes** 208:7
 226:24
**stand** 221:22
**standard**
 31:20
 63:12
 83:20
 135:17,23
 152:20
 198:9
**standpoint**
 87:8 88:9
 119:6
 127:20
**start** 17:8
 141:16
 171:5
 223:20
 226:7
**starting**
 36:23
 37:16
**starts** 98:12
**state** 1:18
 5:11 12:19
 18:13
 23:22,24
 27:20
 46:23
 48:14,23
 65:10,16
 66:21 70:6
 70:13,19
 71:14,20
 72:3 74:3
 89:14
 107:14
 115:13
 117:18

136:4,5
158:10
159:3
169:4
189:24
197:2,10
197:20
204:6
207:9
212:8
214:18
219:6
231:5
**stated** 13:17
43:17
57:22
60:16
94:14
118:14,24
188:9
**statement**
24:7
131:12,14
**statements**
15:8 43:19
44:3 45:15
45:16
59:15
130:17
140:10
149:7
154:18
159:7
203:7
218:6
**states** 1:2
8:9 68:4
165:11
**statistical**
12:22
13:19
14:12,13
14:22,24
15:7 16:17
16:19,23
25:10,16
25:18 26:7
26:12
56:25 57:2
57:9,10,13

62:2,10
67:5 78:16
85:15
87:23
88:15,21
116:25
124:9
135:10,15
**statisti...**
11:16 12:9
12:13 13:5
13:8 18:4
21:2,10,14
21:22
22:15
23:17
34:25
35:12,14
35:17,22
36:7 48:17
49:18 53:6
55:14
56:17
58:13
60:13 61:3
62:12,24
63:18
64:23 65:3
65:12,19
67:12 70:8
70:15 71:4
71:17,23
72:11,25
74:20 76:6
78:7,13
79:7 80:19
81:6 83:9
83:11,17
84:6,7
85:17,24
86:16,18
86:25 87:6
88:3,7
89:16
98:22
101:22
102:15
103:18
116:19
117:18

121:17
124:12
134:4,15
134:22
135:5
136:6
137:13,25
138:21
154:10
158:16
160:9
161:23
162:3,18
162:23
164:5
172:3,17
173:3,19
173:23
177:11
178:4,8,12
178:17
179:4
181:20
182:3,12
182:16
183:4,10
184:23
186:18
188:17
197:12
199:22
**statisti...**
138:17
**statistics**
62:6 64:21
85:21
87:16
178:23
**stem** 191:13
**stenogra...**
4:15
**stenogra...**
4:5
**step** 17:14
17:18
37:17
41:18
162:6
184:8
**steps** 20:5

30:8 176:5
184:12
**stipulate**
4:17 5:3
**stock** 10:7
10:10 11:5
11:9,12,18
12:16,20
13:3,8,9
13:16 14:2
14:3 17:24
18:4,17,23
19:8 21:2
21:14,22
22:16
23:13,17
24:3,9
25:4,8,10
25:12,15
25:25 27:9
27:16,25
28:6,14
30:15,17
30:23
31:11
32:23
33:18
35:12,17
35:23
36:15
41:16 42:3
42:6,9
44:18,19
47:18,20
48:16,24
49:2,8,14
49:18 50:8
50:19
54:21,23
55:14 56:5
57:5 58:13
58:19 59:7
60:12 61:5
61:15
62:12 63:5
64:18,23
65:3,13,19
66:20,24
67:6,13,17
67:25 68:7

69:21 70:9
70:16,22
71:5,8,16
71:23 72:6
72:16 73:2
75:15 76:2
76:18,20
76:24 77:7
77:17,20
77:21,24
78:4,12,21
79:12,15
80:9,10,18
80:23
81:22
82:12,17
84:13,14
85:12,17
86:2,5,18
87:7,8
88:3,7,9
88:14,18
89:21
90:21,22
92:20,21
94:9 95:7
95:24 96:3
97:14
99:15,20
99:22
100:23
101:10
102:13
103:4,6,7
104:4
107:18
109:15,23
110:4
111:22
113:4,14
113:22
116:2,8,20
117:4,11
117:19,22
118:11,16
119:12,13
121:18
126:8
130:4,9,15
130:25

131:17
132:20
133:13
134:5,14
135:8,19
136:6,10
136:25
137:6,14
138:13
141:5
142:20
143:11
144:18
147:7
148:11
149:3
150:7
154:10,19
154:25
156:19
158:16
162:2,17
162:23
163:23
164:5
165:19
166:13
169:10,13
169:23
170:3,19
171:2,15
172:17
173:2
174:5,8,14
174:19,21
175:23
176:2
177:9,11
177:17
178:12
181:20
182:3,11
183:4,9,10
184:4
185:5,7,13
185:22
186:3,11
186:14,19
186:23
187:7,20

188:18
189:10
194:23,24
195:11
197:4,12
197:16
198:14
199:6,22
203:10
205:5
206:9
210:2
213:19
214:8
215:4
216:23
217:24
220:23
**stop** 133:7
206:21
**straight...**
162:21
**Street** 2:17
2:22 3:15
73:12,21
73:22
74:12 78:3
82:2 84:16
85:4
110:14
112:5
139:5
140:8
146:10
152:4,13
153:2,14
158:18
**Strike**
169:24
**strong** 13:17
15:5
132:15
**structure**
159:9
**struggle**
156:13
**stub** 219:10
**studies**
13:24 18:6
18:13 29:3

29:17
87:17
178:23
200:16
209:4,10
211:2,4,11
211:11
214:19
216:25
222:13
**study** 12:7
17:7,9,11
17:20,22
19:5,9,12
19:16,17
19:23,24
20:6,10,12
20:23
21:18 22:3
22:9,17,20
23:4,6,11
23:11,22
24:14
28:24
29:17,18
30:2,7
31:20
32:15 33:3
33:13,22
48:15
49:17 53:5
58:12
60:19 61:9
61:12,17
62:5,11
64:9,25
65:11 67:4
70:7 71:15
72:10
74:22,25
75:3,10
79:4,5,8
81:2 82:25
83:7,22
86:9,14,15
86:21 87:4
87:25
121:8,21
124:11
134:12

135:13
138:4,7,18
152:21,22
153:6
160:9
173:22
178:4,7
182:24
187:20
191:7,15
191:18,19
191:23
192:3
193:2,6,6
193:13,16
194:3
195:17
197:3,11
197:21
198:9
199:12,17
199:25
200:8,10
200:15,20
201:5
207:10,22
210:12,24
211:20,23
211:24
212:4
214:16,25
215:7,11
215:12
221:8
222:17,19
224:3
226:7,9
227:19,22
228:5
**study's**
29:20
**subject**
12:23
29:18
87:13
88:19
117:20
123:23
125:11
143:4

155:14
157:22
**subjected**
39:10
**submitted**
7:4 207:18
**subsection**
20:18 22:2
54:11,14
201:19
**subsequent**
20:2 81:14
82:7
**subseque...**
93:17
**subset** 54:13
**subsidia...**
210:14
**subsidiary**
209:6
210:11,18
214:21
**substantial**
54:20 80:8
80:16 81:9
81:17 82:9
89:20
90:20
91:16 97:9
97:14
99:14,21
100:3,5
103:3,10
117:15,21
118:10,15
118:19,21
118:25
119:3,4,21
119:23
120:2,6
126:7
130:11
136:10,24
137:10,17
139:22
140:2
141:4
143:13
144:17,24
146:19

| | | | | |
|---|---|---|---|---|
| 147:6 | 60:18 93:2 | 162:10,11 | 63:14 83:8 | 19:18 32:4 |
| 148:10 | **summarized** | 171:11 | 135:17 | 150:24 |
| 149:2 | 37:21 | 182:2 | 137:20,24 | 167:9 |
| 150:6 | 42:15 | 184:17,18 | 138:20 | 189:20 |
| 151:23 | 43:11 | 184:21 | 160:13,22 | 190:18 |
| 155:10 | 55:19 91:4 | 187:9 | 160:23 | 202:22 |
| 158:15 | 93:11 | 219:5 | 161:4 | **talked** 33:10 |
| 159:14 | 139:9 | 226:14 | 172:4,12 | 100:21 |
| 163:3,11 | 173:25 | **surprise** | 172:16 | 110:9 |
| 163:21 | 191:12 | 10:22,24 | 178:18 | 127:13 |
| 169:9 | 200:17 | 11:2,15 | 179:2 | 202:9 |
| 170:16 | **summarizes** | 12:20 | 182:18,22 | **talking** 19:4 |
| 171:19 | 37:25 38:4 | 24:20 | **T-statis...** | 31:22,25 |
| 176:12,22 | 40:22,23 | 25:21,23 | 121:16 | 32:2 79:22 |
| 177:3 | **summary** | 26:17,20 | **tab** 6:16 | 92:22 |
| 180:23 | 55:11 | 26:24 27:4 | **take** 17:14 | 120:14 |
| 181:3,5 | 58:21 | 27:5,8 | 37:17 | 168:21 |
| 188:16 | 111:4 | 109:11,12 | 43:22 | 198:20 |
| 189:9 | 139:20 | 113:9 | 44:23 | 199:3 |
| 217:14 | 175:5 | **surprised** | 45:18 | 208:3 |
| **substant...** | **super-co...** | 112:22 | 47:24 | 218:23 |
| 213:24 | 222:14 | 205:11 | 60:21 | 220:8 |
| **subtracting** | **support** | **surprises** | 88:23 | **talks** 124:25 |
| 63:9 | 82:11 | 27:14 | 95:22 | 127:12 |
| 215:18 | 100:7 | **surprising** | 134:2,9 | 129:10,22 |
| 220:19 | 228:15 | 216:19 | 162:6 | 133:3,3 |
| 224:22 | **Suppose** 9:25 | **surprisi...** | 164:8,14 | 140:17 |
| **successf...** | 62:21 | 154:23 | 164:15,18 | **tall** 15:15 |
| 131:23 | **Supreme** | **SUTCLIFFE** | 168:19 | **taller** 15:14 |
| **succinctly** | 96:25 | 3:13 | 181:13 | **target** |
| 40:2 | 97:11 | **swearing** | 183:8 | 142:18 |
| **sufficient** | 104:16 | 4:17 | 184:7 | **task** 42:23 |
| 14:10 | 167:5 | **sworn** 5:5 | 186:17 | 44:14 |
| 33:12 | **sure** 5:13 | 123:7 | 187:10 | 64:17 |
| 93:19 | 18:11 | 233:23 | 196:21 | 164:8,14 |
| 197:21 | 20:14 | **Symantec** | 222:21 | 164:16 |
| **sufficie...** | 21:11 | 106:11 | 225:11 | 183:8 |
| 222:23 | 24:11 25:6 | **systematic** | 226:16 | **tasks** 45:6 |
| **suggest** 29:6 | 26:10 | 33:20 | **taken** 1:15 | **team** 7:9,16 |
| 100:4 | 37:20 | 185:16 | 4:12 5:15 | 7:19 74:24 |
| **suggested** | 52:16 | 187:17 | 48:5 89:7 | **techniques** |
| 97:11 | 59:23 | **systemat...** | 112:7 | 31:16 |
| **suggesting** | 69:24 | 184:11,14 | 165:2 | **tell** 26:25 |
| 221:9,11 | 87:22 89:3 | | 188:12,14 | 130:5 |
| **Suite** 2:11 | 102:2 | ———————— | 188:16 | 195:17 |
| 3:5 | 121:2 | **T** | 206:24 | **telling** 62:6 |
| **sum** 209:17 | 122:12 | **T** 12:10 | 233:19 | 63:3 65:2 |
| 223:3 | 134:10 | 231:2,2 | **talk** 5:18 | 206:12 |
| **summarize** | 140:12,19 | 232:7 | 12:24 | **tells** 161:24 |
| 38:19,22 | 141:14 | **T-statistic** | 16:16 | 163:17 |
| | | 56:16 61:2 | | |

| | | | | |
|---|---|---|---|---|
| **ten** 14:6 | **testify** 6:4 | 190:13 | 52:11,13 | 148:4,20 |
| **ten-minute** | 66:9 | 195:9 | 54:4 55:7 | 149:23,24 |
| 88:24 | **testifying** | 215:25 | 57:25 | 150:9,15 |
| 164:19 | 5:24 | 217:4,5 | 58:20 59:3 | 150:20 |
| **tend** 9:18 | **testimony** | **thereof** | 59:17 64:4 | 151:2,11 |
| 192:25 | 4:20 106:9 | 167:12 | 64:12,14 | 151:18 |
| **tends** 142:20 | 222:17 | **thing** 96:8 | 66:9 67:11 | 152:20 |
| 154:25 | 233:19,20 | 129:16 | 68:13 | 153:13 |
| **tens** 14:6 | **testing** | 139:19 | 69:11 73:7 | 154:21 |
| **term** 34:7,11 | 14:22 | 171:5 | 75:22 | 155:17 |
| 37:2 104:6 | 17:25 | 224:18 | 76:21 77:9 | 156:13,14 |
| 139:24 | 20:20 | 225:20,22 | 77:23 | 158:6 |
| 161:21 | 215:13 | 225:24 | 78:25 | 159:8 |
| 165:8,11 | **tests** 12:22 | **things** 9:18 | 79:21,25 | 160:15 |
| 180:15 | 14:16 | 11:3,6 | 81:23 | 162:20 |
| 191:6 | 16:10,14 | 19:3,20 | 83:17 | 163:2 |
| **termination** | 18:15 | 22:22 45:3 | 85:19 88:5 | 166:6 |
| 129:21 | 23:25 | 99:9 | 90:4 91:22 | 167:21,22 |
| **terminology** | **text** 166:9 | 116:14 | 91:23 93:9 | 170:5,8,25 |
| 110:8 | **Thaler** 215:3 | 137:16 | 94:21,25 | 172:14 |
| **terms** 15:7 | **thank** 5:23 | 152:21 | 96:8,20 | 173:5,12 |
| 62:9 96:21 | 74:10 89:4 | 186:5 | 97:3,24 | 174:15 |
| 106:20 | 106:22 | 192:24 | 99:8,12 | 175:5 |
| 125:19 | 160:18 | 201:21 | 100:16 | 176:10 |
| 127:3 | 170:23 | 213:20 | 102:2,3,10 | 177:4,6,8 |
| 147:20 | 182:23 | 214:6 | 103:2,23 | 177:21 |
| 150:9 | 223:19 | 225:10,12 | 103:25 | 180:10 |
| 163:13 | **that--** 187:9 | **think** 7:14 | 105:4,16 | 183:12 |
| 187:19 | **theoretical** | 7:18 10:8 | 108:11 | 184:10 |
| 194:10 | 77:10 | 10:11,11 | 109:16 | 186:21,24 |
| 211:2,10 | **theories** | 10:17 11:7 | 110:7 | 187:13 |
| 225:2 | 192:17 | 12:11 15:6 | 111:25 | 191:2,3,13 |
| **test** 12:10 | **theory** 34:5 | 17:18 18:6 | 113:23,24 | 192:18,23 |
| 13:10,13 | 34:23 35:3 | 19:2 20:14 | 118:7 | 194:6,11 |
| 13:17,18 | 36:4 40:6 | 20:20 | 119:8 | 194:12 |
| 14:20 15:4 | 41:19 45:6 | 21:16 | 120:8,9,15 | 195:3,4 |
| 15:12,14 | 45:14 | 26:19,20 | 120:21 | 196:18 |
| 15:16,18 | 47:14 93:8 | 28:22 29:8 | 122:10 | 198:23,25 |
| 16:4,7 | 93:20 | 29:9 30:10 | 125:16 | 200:16,16 |
| 17:19 | 94:12 | 31:16 | 126:12 | 203:6,11 |
| 18:14 | 114:24 | 33:18 36:2 | 128:9 | 205:9 |
| 23:23 | 125:3,9,15 | 36:6,23 | 129:16 | 206:11 |
| 25:10 26:3 | 126:19 | 37:20 | 130:9 | 207:24 |
| 27:16 63:3 | 143:24 | 38:23 | 131:16 | 208:2 |
| 63:8 64:6 | 144:3 | 41:22 43:4 | 132:4 | 209:22,23 |
| 64:13 | 145:2,3,7 | 44:4,7,16 | 138:10 | 210:15 |
| 226:10,12 | 146:3,5 | 44:22,22 | 139:19 | 211:12,21 |
| **testified** | 155:21 | 45:7 46:2 | 141:14 | 213:13 |
| 5:6 66:6 | 156:2,3 | 46:7 51:22 | 145:10 | 217:16 |
| 123:7 | 157:8,16 | 51:24 52:2 | 147:19 | 218:2 |

219:19,19
223:24,25
225:16
227:13
229:9,17
**thinking**
17:13
44:13
79:22
90:11
132:22
137:11
139:17
185:6
224:18
226:8
229:12
**third** 2:5
8:21 52:6
66:15
115:15
227:11
**thought**
129:5
150:23
209:15
221:18
226:16
**thousands**
14:5,7,7
211:8
**three** 7:18
209:10
214:21,24
215:17
216:14,20
222:8
**threshold**
84:10
**throw** 161:20
203:25
**tick** 75:13
**tied** 146:20
**TIERNEY** 2:8
**tightening**
55:22 56:2
56:22 57:6
130:19
131:18
133:18

134:16
135:7,9
**time** 4:3
11:10 27:2
31:8 32:17
32:20 42:3
42:10,19
47:18 48:3
48:6 74:2
74:14,22
75:20
76:11 89:5
89:8 91:25
92:2 96:23
98:16
102:19
105:13
109:19
110:13,25
114:5
122:13
123:4
124:23
126:11
153:24
154:3
156:21
157:22
158:8
161:17
164:15,24
165:3
166:25
171:25
174:19
175:23
196:8,9
203:25
204:13
206:22,25
219:20
220:8
222:22
230:7,15
230:18
**times** 129:8
131:9,12
131:15
150:25
173:12

**tobacco** 39:8
75:11,19
207:13
208:14,20
218:18
219:7,17
219:24
220:8,15
223:14
225:5
226:19
229:12,15
229:20
**today** 5:25
6:4,13
38:11
47:12
79:10,14
149:6,13
**today's**
113:12
230:16
**tools** 31:4
31:24 32:3
32:5,8
97:20
197:24
201:2,3,4
201:8,23
201:25
202:15,22
203:2,5,9
203:14,16
203:19,22
204:11,12
204:17,22
206:15
**total** 199:20
223:5
**touched** 68:8
139:2
**touching**
25:20
**traded** 27:25
208:6,8
212:12
213:3,8
223:6
226:23
**trading** 9:8

9:17,17
12:2,6
30:11 31:6
73:25
74:13,19
76:10,18
76:24 77:5
77:13
78:21
79:17
84:23
171:22
**training**
33:21
34:10
87:16
**transcript**
4:23
230:11
231:8
233:19,20
**translate**
38:7
**translating**
45:5
**tried** 46:3
144:16
187:14
225:9
**tries** 31:21
**TRISTAN** 3:16
**troubles**
111:24
**true** 4:20
13:14
16:19,25
39:16
88:18
149:14
231:9
233:20,20
**truly** 25:9
25:14
**Trust** 2:11
**truth** 26:10
87:22 92:5
92:10,10
95:16
194:24
195:12

**truthfully**
6:4
**try** 5:18
14:9 26:11
44:17
49:20
50:11
56:20 57:4
57:20
90:18 98:5
135:6,19
145:10
177:25
187:24
200:22
204:4
205:4
213:16
221:14
225:10
228:10
**trying** 24:5
26:8 64:8
69:12 74:6
88:12 91:5
99:11
100:16
102:9
108:21
119:9
130:3
144:15
146:8
149:8
166:6,7
177:4,21
177:24
184:17
212:4
223:5
**Tuesday** 4:4
12:4,6
**turn** 8:3
18:8 29:13
48:9 65:5
70:2 71:10
73:4 82:20
89:11
106:7,22
115:7

123:11
136:4
138:24
146:25
151:25
179:12
189:13
207:7
**Turning**
36:14
**two** 7:18
17:5 29:9
57:13
59:14 69:3
74:8 75:10
92:17
101:11
104:10
137:11
146:12
163:5
164:9
165:17
170:6
197:24
198:3,7,8
201:2,21
229:19
**type** 16:9,13
16:17,22
17:2,7,15
24:24,24
24:25 25:2
25:4,5,8
25:13,14
26:5,6,6
31:7,12,13
31:18,18
31:24,25
34:6,12
36:17 44:4
46:4 51:23
52:7 57:4
79:3 86:22
87:14,14
87:18,18
87:19
88:20,20
90:4 91:18
91:20 93:3

93:6 95:23
96:22 98:7
98:15,16
101:2
104:19,21
105:11,15
106:18
121:2
134:19
135:18,21
136:21
137:8
142:18
156:19
168:6,8
196:15
205:10
209:8
216:17
217:16
218:15
220:17
226:13
**types** 9:2
12:23
16:10,14
16:16 32:4
54:12
91:23
98:17
104:22
114:19
154:22
155:5
163:13
198:8
203:8,10
203:21
204:22
225:16
**typical**
17:19,23
18:5 19:4
19:9 30:10
**typically**
11:24
17:21
26:13
50:20
105:6

—— U ——
**U** 5:4 123:6
**U.S** 133:8
186:7
229:20
**ultimately**
44:9,11
46:6 49:12
54:19
56:24
92:21
94:23 95:4
95:5
117:14
134:22
156:25
186:18
187:24
190:22
211:24
213:12
226:11
**unable** 12:15
63:7 88:16
**unantici...**
107:22,24
**uncover**
162:13
**underlying**
15:9,21
16:2 26:16
26:18
27:19 64:5
64:12
108:14
109:9,11
129:4,13
215:24
216:5
**understand**
5:24 6:6
9:14 21:16
34:8,11,13
35:7,9
36:5 37:5
37:13,14
37:22 38:2
38:5 40:3
42:12 44:8

44:17 46:4
46:7 49:21
50:12
56:20 57:4
57:20
59:14 69:2
69:7,11,14
78:15
81:25
85:16,20
86:11
90:18 91:3
91:5,10
93:24 95:3
95:21
96:21
98:18
107:22
109:6
110:23,25
117:4
119:3
125:2,7
126:3
129:17
147:22
149:10,11
150:14
151:9
156:6,10
170:25
171:11
177:25
180:11
181:2,11
182:2
184:5
186:15
187:8,9
194:7,12
195:24
196:4,19
197:21
198:18,24
202:21
205:4
212:6
214:3
218:20
219:6

225:19
226:6
**understa...**
34:15
37:18,20
38:13
41:11 45:3
45:8 46:10
66:11
83:19
87:15
88:19
90:11
91:17
92:25 93:7
93:10
100:18
120:25
144:6
150:11
154:2
155:24
163:23
167:5
196:14
204:24
**understands**
87:17
**understated**
93:18
**understood**
6:13 15:6
88:21
108:23
131:4
**undertake**
42:23
44:14
64:17
155:22
**unexpected**
102:12
108:13
109:3
**unexpect...**
102:11
**unfortun...**
75:19
**unilateral**
128:12

unilater... 128:2,6
uninformed 34:19
UNITED 1:2
universe 102:24
university 15:13,17
unquote 114:24
207:19
209:6
220:24
unrealistic 112:13
unrelated 101:20
102:18
116:22
133:19,25
197:17
unusual 11:6
11:7 77:13
79:16
202:8
208:2
unusually 193:23
upstairs 222:7
usage 131:24
use 17:15
26:11
56:19
62:19
75:13
83:14
87:23 97:9
104:18
139:24
158:13
167:24
180:15
187:5
191:5
197:14
200:22
202:16
204:11

205:13
223:13
227:24
229:13
useful 46:6
104:17
uses 9:14
33:20,20
usual 10:25
101:13
196:4,6
222:8
225:16
usually 10:13 12:5
14:23
24:21
228:14

———————
V
———————

v 39:17
vaguely 206:15
valuation 77:4
110:20
209:18,21
223:4
value 8:10
8:14,22
9:7 39:16
55:3 77:15
108:19,20
108:23
109:4,4,9
109:11,20
109:23
110:18
111:2,21
112:16
113:3,13
113:20
114:4,17
114:17
115:19
181:12
207:12
212:25
213:3,9,12
214:19,20

215:19
218:12
219:10,12
223:4,5,6
224:12,13
227:2
value-re... 108:2
109:13
132:2
value-we... 227:25
values 208:11
209:5
210:10
211:14
213:7,8,10
217:23
220:20
223:6
224:22
227:2
valuing 110:24
vaping 91:12
114:13
123:21
131:24
169:6
variability 15:9,21
16:2
variable 16:3 76:19
205:8
208:19
210:8
227:18
228:4
variation 15:22,25
varies 175:12
variety 117:2
203:24
various 32:7
37:15
40:23,24

50:15
54:12
72:21
94:15,16
98:17
142:2
168:4
173:11,12
173:14
176:5
177:5
184:25
185:11
200:11
203:20
222:2
223:14
vary 17:16
190:22
varying 27:16
192:22
vast 206:7
venture 66:18
verified 4:24
version 223:21
versions 227:22
versus 4:7
59:12 69:5
106:11,12
106:13
201:11
vi 39:22
Viable 189:15
Video 1:25
4:11
videocon... 4:14
videogra... 3:21 4:2,9
48:3,6
89:5,8
122:13
123:4
164:24

165:3
206:22,25
230:15
videotaped 1:14 4:5
view 46:15
66:10 85:3
111:20
112:14
116:25
127:15
163:4
196:13
202:8
204:20
213:23
viewed 132:12,16
186:9
views 129:13
132:15
Virginia 1:2
2:17
volume 9:8
9:17,18
11:7 66:11
76:18,24
77:14
78:18,21
79:17
186:7
voluminous 9:12

———————
W
———————

WACHTELL 2:21
Wacker 3:5
Wall 73:12
73:21,22
74:12 78:2
82:2 84:16
85:3
110:14
112:5
139:5
140:8
146:10
152:4,12
153:2,14

| | | | | |
|---|---|---|---|---|
| 158:18 | **way** 4:23 | 211:19 | 30:14,20 | 212:20 |
| **want** 40:10 | 10:9 11:8 | 224:6 | 31:6 32:17 | **wouldn't** |
| 45:13 | 11:20 | **we've** 134:16 | 51:9 78:9 | 12:18 |
| 59:22,23 | 17:21 | 202:9 | **winners** | 64:25 |
| 79:24 | 20:14 | 206:18 | 222:10 | 78:23 |
| 82:15 | 27:12 | 211:14,21 | **withheld** | 94:15 |
| 88:23 | 33:18,19 | 216:9 | 92:10 | 95:17 |
| 94:21 | 37:8 38:20 | **week** 11:24 | **witness** 4:18 | 125:9 |
| 110:7 | 41:22 | 51:17 | 4:19,24 | 126:21,24 |
| 122:8 | 44:13 | 52:10,13 | 5:2 89:3 | 134:22 |
| 135:5 | 61:11 62:9 | **weekend** 76:2 | 122:12 | 144:11 |
| 138:16 | 64:20,21 | 84:21,25 | 143:19 | 150:24 |
| 145:20 | 69:4,5 | 85:7 | 231:14 | 167:21 |
| 147:22 | 85:14 87:2 | **weeks** 127:8 | 232:3 | **wrapping** |
| 149:11,22 | 87:5 95:20 | **weigh** 74:4 | **wondering** | 46:22 |
| 159:21 | 96:20 | 74:16 | 103:12 | **write** 39:24 |
| 164:18,19 | 119:5 | 79:19 | **word** 155:17 | 59:4 |
| 170:5 | 134:23 | **went** 42:11 | **words** 27:7 | **write-down** |
| 175:19 | 136:2 | 81:17 | 33:16 | 106:25 |
| 182:2 | 142:15 | 182:11 | 53:17 59:3 | 107:25 |
| 184:18,21 | 145:10 | 184:11 | 62:13 | 111:8 |
| 185:23 | 148:4 | **weren't** 13:4 | 64:24 74:8 | 112:17 |
| 188:22 | 162:18 | 213:16 | 86:6 88:18 | 113:10,13 |
| 196:21 | 167:21,22 | **Wernke** 2:7 | 100:4 | 114:20,23 |
| 202:21 | 177:22,23 | 5:7,9 | 101:8 | **write-downs** |
| 207:4 | 178:2 | 46:21 | 119:22,25 | 112:6 |
| 208:23 | 180:13 | 47:24 48:8 | 120:9 | **writing** |
| 219:4,16 | 191:3 | 88:22 | 148:21 | 90:19 |
| 223:13,15 | 204:21,23 | 89:10 | 168:9 | **written** |
| 224:19 | 206:15 | 122:7 | 197:20 | 28:13 |
| 226:17,19 | 208:18,24 | 123:10 | 208:22 | 110:17 |
| 229:16 | 209:13 | 164:17,23 | 209:16 | 219:20 |
| **wanted** 15:11 | 211:4,13 | 165:5 | 221:5 | **wrong** 14:18 |
| 15:13 | 211:18 | 170:23 | **work** 76:17 | 21:17 |
| 43:18 | 215:24 | 206:21 | 77:10,11 | 112:24 |
| 175:13 | 216:4,10 | 207:3 | 98:2 | 113:16 |
| 205:8 | 221:4,23 | 230:6,12 | 122:11 | 171:5 |
| **wants** 226:14 | 222:4,12 | **West** 2:11,22 | 207:18 | 172:21 |
| **wasn't** 22:14 | 222:15 | 3:5 | 226:5 | 179:6 |
| 22:24,25 | 225:5,7,9 | **WHEREOF** | 228:14 | |
| 33:16 | 227:3 | 231:14 | **worked** 228:6 | **X** |
| 53:20 | 228:13,22 | **Willard** 3:4 | **working** | **x** 1:3,10 |
| 56:17 | 231:12 | **WILLIAMS** | 160:18 | 232:2,7 |
| 75:21 | **ways** 44:11 | 2:24 | **works** 11:22 | |
| 84:19 | 56:23 57:6 | **willing** | 45:9 | **Y** |
| 135:25 | 69:3 79:8 | 129:7 | **workshop** | **yeah** 11:20 |
| 187:11 | 191:13 | **window** 11:9 | 222:7 | 13:21 |
| 222:23 | 211:25 | 22:5,6 | **worse** 129:5 | 110:7 |
| **waters** | **we're** 208:3 | 29:20 30:9 | **worth** 36:10 | 223:19 |
| 131:23 | 208:19 | 30:10,12 | 112:15 | **year** 142:5 |

167:6
**years** 9:13
  10:9 14:6
  106:9
**York** 1:18
  2:6,6,22
  2:22 3:10
  3:10 4:11
  231:6
**youth** 39:7,9
  93:15,25
  94:5,14,17
  94:20
  95:16,17
  95:18
  96:13
  125:5
  126:21,24
  130:18
  131:13,24
  153:18
  156:8
  158:12
  163:10

**Z**

**zero** 12:10
  18:15,17
  19:7 23:24
  24:2 30:4
  62:8,15
  63:6
  138:23
  148:2,15
  149:17
  159:25
  170:20
  171:7
  189:2
**Zoom** 1:16
  4:13

**0**

**0.03** 161:17
**00075-DJN**
  1:8
**01** 63:12

**1**

**1** 6:15,16,24

16:17
24:24,25
25:4,8,13
26:6 87:14
87:18
88:20
**1.06** 61:2
**1.41** 121:16
**1.496** 137:21
**1.5** 56:16
  137:24
**1.67** 83:8
**1.68** 62:22
  62:24
  63:18,24
**1.69** 60:21
  61:2,8,15
  61:23
  62:14,14
  62:16,18
  62:23
  63:17
  64:19
**1.96** 178:19
**1:35** 122:13
  122:15
**10** 15:23
  31:9
  102:13
  210:16
**10-K** 225:23
  227:16
**10-K's**
  225:25
  226:2
**10-Q** 115:15
**10(b)5**
  195:22
**10:01** 1:12
  4:3
**100** 26:9
  30:4 71:20
**10006** 3:10
**10016** 2:6
**10019** 2:22
**101** 72:3
**106** 73:4,20
  74:5,9
**108** 82:20,24
**11** 28:9 38:7

41:24,25
43:6 46:18
70:3,23
71:8
174:16
175:22
**11:13** 48:3
**11:23** 48:6
**110** 89:12,14
**113** 83:18
**118** 110:13
**119** 110:14
**11th** 71:5
**12** 168:23
  169:24
  170:14,21
  171:3,7,14
  171:17,21
  178:16
  179:7
**12:27** 89:5
**12:37** 89:8
**120** 111:14
**122** 106:22
  107:4,14
  110:2
  111:4
**123** 113:7
**126** 116:16
**129** 115:7,12
  115:13
**13** 170:17,19
  171:16,23
  178:15
  179:7,10
**131** 117:16
**132** 55:10
  123:12,14
  132:9
  133:2
**133** 125:17
  129:18
**135** 55:20
  130:13,22
  130:23
  133:18
**136** 55:11
  136:4,4
**137** 138:24
  139:10

141:15
214:17
**140** 141:22
**142** 146:25
**143** 151:25
  153:15
**144** 153:21
  155:3
**145** 158:10
**146** 98:10
**147** 168:19
  168:21,22
**148** 174:2
**15** 14:6
  37:11 38:7
  184:14
  187:15
**152** 179:12
**153** 181:23
**154** 51:10
  181:8
**159** 66:3
**161** 186:3
**163** 188:10
**166** 189:20
  190:17
**167** 190:9,17
**17** 6:21
  232:9
**175** 195:20
  196:2
**176** 196:22
  196:24
**177** 196:22
  197:20
  198:13
**179** 204:5,6
**180** 204:6
**1900** 2:11

**2**

**2** 16:2,9,13
  16:22 17:2
  24:24 25:2
  25:5,14
  26:5,6
  27:5 31:10
  87:14,18
  88:20
  111:17,22

125:13
142:8
226:13
**2.28** 121:10
  121:15,23
  122:4
**2.37** 56:15
  137:19,23
  138:14,19
**2.39** 83:3,8
  85:13
**2.72** 78:19
**2.77** 172:5
**2/24/20**
  32:11
**2:04** 123:3,4
**20** 84:23
  191:10
**200** 123:20
  126:22
  127:25
**2019** 48:12
  48:17
  49:15
  55:12,22
  59:2,8
  60:2,4,10
  65:7,13
  66:24
  67:14 68:2
  68:16 70:4
  70:23
  71:11,16
  72:7 73:3
  106:24
  107:8,19
  110:5,15
  110:16
  111:17,22
  113:2
  115:15
  117:23
  118:16
  120:18
  121:14,19
  123:13
  124:10
  125:19
  126:9
  127:10

130:5,20
136:11
137:2,7,23
142:9
152:3
153:9
157:20
158:19
168:23,23
168:24
169:19
170:3,14
170:14,15
171:7,16
172:2
173:4,18
174:13,14
175:17,17
175:25
177:19
178:10
181:15
182:7
183:24
**2020** 73:6,9
 73:10,14
 74:20 76:8
 77:19
 80:15,22
 80:23 81:4
 81:15 82:9
 82:19,22
 83:6 84:5
 85:13
 139:2,6
 140:17,25
 141:23
 142:6
 147:8
 148:22
 150:3
 151:16,21
 179:13,22
 182:4
 183:15
 184:22
 185:22
 186:15,20
 188:3,6,19
 189:2

**2021** 1:12
 4:4 6:21
 231:15
 232:10
 233:23
**21** 73:14
 74:20 76:6
 77:18
 78:20
 80:15,22
 80:23 81:4
 81:15 82:8
 84:17,19
 85:4,10
 139:2,6
 140:17,25
 141:22
 142:6
 144:19
 146:10
 147:3,7
 148:22
 150:3,19
 151:16,21
**212** 1:25
**212)403-...**
 2:23
**212)661-...**
 2:6
**21st** 73:23
 80:2,6
**23** 73:25
 74:14
 76:10 78:3
 78:19,22
**23219-4074**
 2:17
**24** 71:11,16
 72:7,16
 73:3,9
 76:8 79:24
 82:19,22
 83:2,6
 84:4,12
 85:8,13,18
 88:2
**24-February**
 73:6
**249** 92:14
 165:7,10

**25** 8:3 55:12
 76:8
 116:11,13
 116:15
 123:13,18
 124:10
 125:19
 126:9
 130:5
 136:5,11
 137:2,7,18
 137:22
**250** 96:24
**26** 8:8 76:8
**27** 18:8
 23:20
 27:20 73:6
 73:10 76:8
 82:22
 127:10
**273-9911**
 1:25
**28** 29:14
 78:20
**29** 152:2,25
 153:9,23
 157:20
 158:19
 160:8
 161:16
 162:8,19
 164:10
**2A** 37:21,22
 37:24 39:4
 91:5 93:11
**2B** 37:25
 38:8 39:4

—————————
**3**
—————————
**3** 168:23
 169:19
 170:3,14
 172:2
 173:4,18
 174:13,14
 175:13,14
 175:17,17
 175:25
 176:6,8,9
 176:25,25

177:18
 178:2,3,10
**3.13** 178:18
 179:4
**3.67** 160:16
 160:24
**3.673** 160:13
 160:15
**3:09** 164:24
**3:16** 165:3
**3:20-cv-** 1:7
**3:37** 73:23
 74:19
 77:20,25
**30** 48:11,16
 49:14
 53:16 59:8
 59:24 60:2
 60:4,10,24
 68:3 84:23
 110:16
 168:23
 170:15
 179:13,22
 182:4
 183:15
 184:22
 186:15,20
 188:3,6,19
 189:2
**30th** 58:11
 58:19 59:2
 60:12,21
 180:16,20
 185:22
**31** 107:8,19
 110:5
 111:7
 112:6,17
 112:20
 113:2,6,22
 114:2,3
 115:20,25
 116:7
 117:23
 118:16
 120:18
 121:8,14
 121:19
 181:15

183:24
**31st** 106:24
**34** 207:7
 214:17
**3400** 3:5
**35** 3:5
 123:22
**38** 48:10
**3A** 38:4
 42:15
 43:11
**3rd** 172:20
 176:11
**3rd--** 172:10

—————————
**4**
—————————
**4** 15:15,23
 110:15
**4.07** 182:18
 182:22
**4.1** 179:15
 179:20
**4.15** 55:24
**4.19** 55:23
**4.27** 55:23
 55:24
**4.5** 107:12
 107:13,25
 109:10,20
 113:12
 114:21,23
**4.59** 172:4
**4:00** 78:4
**4:23** 206:22
**4:35** 206:25
**40** 70:3
**405** 3:15
**44** 73:5
**45** 10:3,18
 10:23
**46** 10:5,20
 10:23
 38:21
 89:12
**48** 38:25,25
 41:11
 43:17
 45:14 93:2

—————————
**5**
—————————

**5** 1:12  4:4
13:6  17:12
19:25
35:10  36:7
48:18
56:17
58:14
60:14  61:4
71:17
72:12
83:10
122:3
138:2
232:4
**5.65** 182:21
**5.87** 160:12
**5:12** 230:15
230:18
**50** 10:8  30:4
111:19
**500** 75:7
**51** 2:22
**52nd** 2:22
**54** 115:8
**55** 123:12
**554** 219:4
**555** 219:4
**56** 138:25
**565** 182:17
**57** 8:8
**59** 27:20
65:23

---
### 6

**6** 15:24
17:12
19:21  20:3
20:7,18
22:2  33:2
37:9  41:5
47:3,8
54:6,11,15
56:13
60:23,25
81:2  83:4
83:7  84:2
121:14
122:3
134:12
135:3

137:20,24
139:20
140:13
151:20
153:7
154:9
160:10,16
172:7
178:19,21
181:25
232:9
**60** 10:8
165:7
**600** 2:5
**60601** 3:5
**61** 18:9,12
19:4  23:20
23:20  24:7
24:15
**619)231-...**
2:12
**63** 29:13,16
**655** 2:11
**67** 189:13
**6B** 170:11
**6th** 231:15

---
### 7

**7** 41:5  46:14
47:7  117:8
124:22
127:7
156:15
183:14
189:14
190:21
**73** 6:19
232:9
**75** 112:11,15
**76** 207:7,9
**78** 59:17
60:3,6
68:15,23
69:5,18
140:20
148:5,21
148:23
151:4
159:12
170:9

175:5
176:13
189:5

---
### 8

**8** 16:2
**8/29/19**
172:15
**804)788-...**
2:18
**83** 20:19
**85** 48:10,14
60:18
**86** 48:21,22
49:19
60:18
**87** 49:11
58:23  59:4
60:17
**88** 65:8
**89** 65:5,10

---
### 9

**9** 65:7,13
66:24  67:6
67:9,13
68:2,7,12
68:16
69:21
**90** 65:16
83:12,15
84:9
**92** 66:21
68:4,22
69:6,16
**92101** 2:12
**94** 70:2,6
**94105-2669**
3:15
**95** 26:13
70:12
83:16,19
86:3
121:16
172:19
179:5
183:5
**951** 2:17
**96** 70:19
**98** 71:10,14

**99** 161:10
172:11
**99.4** 172:10
**99.97** 160:25
161:13,14