UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division


GABBY KLEIN, ET AL.                }
                                   }
v.                                 }    Civil Action No.
                                   }    3:20 CV 75
ALTRIA GROUP INC., ET AL           }

                                        March 31, 2022


        COMPLETE TRANSCRIPT OF FINAL FAIRNESS HEARING
            BEFORE THE HONORABLE DAVID J. NOVAK
              UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

Jeremy A. Lieberman, Esquire
Michael J. Wernke, Esquire
POMERANTZ LLP
600 Third Avenue
New York, New York  10016

Steven J. Toll, Esquire
COHEN MILSTEIN SELLERS & TOLL PLLC (DC)
1100 New York Avenue NW
Suite 500, West Tower
Washington, DC  20005-3965

David A. Rosenfeld, Esquire
ROBBINS GELLER RUDMAN & DOWD, LLP
58 South Service Road, Suite 200
Melville, New York  11747

Douglas R. Britton, Esquire
Ellen G. Stewart, Esquire
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, California  92101


        Counsel on behalf of the Plaintiffs

                KRISTA L. HARDING, RMR
               OFFICIAL COURT REPORTER
             UNITED STATES DISTRICT COURT

APPEARANCES:   (Continued)


Stephen R. DiPrima, Esquire
Jacob Miller, Esquire
WACHTELL, LIPTON ROSEN & KATZ
51 West 52nd Street
New York, New York  10019

Edward J. Fuhr, Esquire
HUNTON ANDREWS KURTH LLP
951 East Byrd Street, Riverfront Plaza
Richmond, Virginia  23219

Jared M. Gerber, Esquire
CLEARY GOTTLIEB STEEN & HAMILTON, LLP
One Liberty Plaza
New York, New York  10006

Brian E. Pumphrey, Esquire
MCGUIRE WOODS LLP (Richmond)
800 East Canal Street
Richmond, Virginia  23219


        Counsel on behalf of the Defendants

(The proceeding commenced at 11:59 a.m.)

THE CLERK:  Case Number 3:20 CV 75.  *Gabby Klein, et al v. Altria Group, Inc. et al.*

Representing the plaintiff, David Rosenfeld, Jeremy Lieberman, Doug Britton, Ellen Stewart, Steven Toll and Michael Wernke.

On behalf of the defendant, Stephen DiPrima, Edward Fuhr, Jacob Miller, Jared Gerber and Brian Pumphrey.

Counsel, are we ready to proceed?

MR. LIEBERMAN:  Yes.

THE COURT:  Who's speaking for the plaintiffs?

MR. LIEBERMAN:  Good afternoon, Your Honor.

Jeremy Lieberman, Pomerantz LLP on behalf of the plaintiffs.

THE COURT:  Okay.

And who's going to speak for the defendants then?

MR. DiPRIMA:  Your Honor, to the extent anything needs to be said, I'll be speaking.

THE COURT:  Okay.  And remind me again.

MR. DiPRIMA:  Stephen DiPrima.

THE COURT:  That's right.  Okay.  Okay.

Well, there are lots of lawyers here.  That tells me there's a lot of money at stake.  That's how we

get lots of lawyers.

All right.  We're here for the final approval of this class action settlement.

So, Mr. Lieberman, do you want to put on the record what the agreement is?

MR. LIEBERMAN:  Good afternoon, Your Honor.

The proposed settlement is a $90,000,000 settlement on behalf of the class.  We think, clearly, the settlement meets the *Jiffy Lube* factors in this circuit.  It was a hard fought litigation.

It is a case that went almost to the end of discovery.  We have taken 11 -- taken defendant 11 depositions in the case.  We were already finalizing seven expert reports.  That's in addition to the two expert reports that were submitted in favor of class certification.  And it's a case that this Court had made a lot of colorful remarks as to his scepticism regrading how far we'd go.

THE COURT:  I'm a colorful guy.

MR. LIEBERMAN:  Yes.

THE COURT:  But what I was trying to tell you, and I think this is what your point was, that just because you made it past the motion to dismiss, which was a tough hurdle for you, I was worried about whether you would next meet the next hurdle, which was summary judgment.  I had

not made a decision yet, of course, because we hadn't gotten there. But I was worried about that for your perspective.

But I also knew that if you did get past summary judgment and we had gone to trial, on the other hand the defense was looking at possibly a significant higher damage amount than what they're paying here, which is what the balance is, right? It's all about a risk/reward.

We received one correspondence where somebody, unsigned, indicated that if I approved your attorneys' fees I ought to be impeached. I don't know if that's an objection or not. To the extent it's an objection, it's overruled because I don't want to be impeached.

But are you aware of any other objections?

MR. LIEBERMAN: It's our position that objection is not a valid objection. It came beyond the deadline. It also didn't identify who was the objector. And it also didn't set forth its shares and its holdings. We don't even know if it was a class member in this case. That's A.

And, B, we haven't received any other objections, let alone valid objections.

THE COURT: All right.

Look, I'll just say this: When somebody receives something in the mail and they see that attorneys

are making $27,000,000, my first reaction is what any other citizen's reaction would be is, oh, my God, that's a lot of money, right?  Why are we doing that?

But I don't think until you do this work that you understand why that amount exists.  And of course that's lower than the norm.  I basically told you I wasn't going to go over 30 percent.  You were at least looking for 33 percent.  In our district, it's been as high as 40 percent that's been approved.  So I was on the lower side of that.

But again, the only reason you can get able counsel like you-all into these cases is a risk/reward.  Are you willing to put in, first, the amount of money.  You had $1.5 million in expenses up front.

Then the amount of manpower that goes into this.  You put your lodestar number in there as well.  And if you're not willing -- if you're not going to receive some kind of reasonable outcome, firms are not willing do that.

MR. LIEBERMAN:  That is correct, Your Honor.  We've got, as Your Honor mentioned, a lot of attorneys representing the defendants, and the class needs just as able and adequate class representation.

THE COURT:  A hundred percent.

MR. LIEBERMAN:  And only if they get paid does that occur.

THE COURT: Right. And that's really the balance. And so whoever that person was that sent that in, I just -- it's an emotional reaction as opposed to understanding what the reason for this is.

Okay. Do you want to talk about the notice? You talked about all this in your papers?

MR. LIEBERMAN: Yes.

THE COURT: And I intend to approve this, but I will just let you put it on the record a little bit.

MR. LIEBERMAN: Sure.

The notice had gone out to over 1.2 million individuals who were listed as having health securities during the relevant period, which they -- they have now the opportunity for them to file their claim forms, which is due in five days from now. Then we will know the extent of the participation in the settlement.

We anticipate the -- I mean, as an almost certainly, the settlement monies of $60,000,000 left that we -- that will be left after attorneys' fees and expenses, will be completely exhausted by many multiples. And so it will go completely to shareholders.

So that that was -- it was a very robust notice program. And the fact that after that program you have zero objections. You have exclusions. Really, 32 listed exclusions. Of those, only seven are valid representing

1,500 shares.

And so the Fourth Circuit has recognized -- I mean, the class has spoken here, and there's no -- there's no institutional investor, despite significant institutional investor holdings that went ahead and either, A, objected to the settlement thinking that there should be a better deal or, B, excluded themselves and said, well, I can go and do better in this Court under my own private litigation with my own attorney hired by me. So that's very telling as to the result here.

At the end of the day, given all the risks to the class, as Your Honor noted multiple times, this is a -- going to be a $60,000,000 dividend, essentially, to investors.  That's meaningful.

THE COURT:  And they may have gotten nothing. If they had fully litigated this case, they may have not gotten a thing.

MR. LIEBERMAN:  They would have gotten nothing. And the theories in this case were somewhat -- somewhat unique, somewhat cutting edge.  There was the issue as to whether or not Juul could be held liable.  There was an issue of standing.  You know, we're litigating that now in the Second Circuit under similar circumstances.

And actually some of my counsel here is defending that appeal.  And the District Court there ruled

there should be no standing.  I'm in a situation very similar, and so that was a novel legal theory.

And then all the information that was out there in the marketplace regarding the investigations into the potential or alleged marketing to youth was also very -- a very significant risk to the class as to whether or not those claims would ultimately survive summary judgment on a truth and market defense or a materiality defense.

THE COURT:  All right.

Two other points I just want to make before you have a seat, and that's this:  I'm not going to give you interest on your expenses.  You're making enough money.  You can afford the interest.  We don't do that, number one.

MR. LIEBERMAN:  Fair enough.

THE COURT:  Number two, to the extent that there is any money left, I think I talked to you before about this, I'm very watchful over what the *cy-près* are going to be.  That they're not to be, so-called, charities that are really litigation vehicles.

The ones that I have approved here before is Feed More in Richmond.  If there is a need for a cy-prè*s*, it needs to be a true charity.  Not something that's used to generate cases for plaintiff's lawyers.

Two, it must be Richmond-based and something

addressing the poor. You know, this is a case involving smoking, but really -- the people that are generally harmed in that really are more poor, which is why I reach for Feed More. So if you're -- I'm not telling you you have to use Feed More, but I am telling you it has to be something like that. And I want to approve it before you use it, okay? I'm not sure there is going to be a need for a *cy-près* here. But if there is, I want you to come back to me.

If you are going to use Feed More, you don't have to come back to me. I have approved that in advance. Feed More is based here in Richmond.

MR. LIEBERMAN: Your Honor, the process as we anticipate it occurring is that we'll go through -- we've had the notice -- we've had the notice processed. There is now the claims filing process. There will be some several months of going through those claims.

And likely there will be one or two distributions, and then there will be an assessment of whether or not it's economical to make yet another distribution.

THE COURT: All right.

MR. LIEBERMAN: And at that stage, -- through that whole process there will be a -- before we make the first distribution, we will make a motion for

distribution.  And in that motion, we will suggest that if there is any *cy-près* it should be, in all likelihood, the charity mentioned by Your Honor.

THE COURT:  All right.  Well, again, I'm not mandating.  I'm just very -- I don't like it when plaintiff's lawyers use so-called charities that are really just vehicles to get cases.  I'm sure you wouldn't do that, but I'm just saying I'm advising.

Number two is this:  At the end of the case, and I've added this into the order, that after all the distributions are made, I would like you to file a report to the Court saying the distributions have been made, and who they have been made to and the amounts.  So you would say -- I don't want individual names of class members.

You would say collectively to the class, $60,000,000, okay?  Attorneys' fees paid out, $27,000,000, the expenses paid, you know, X.  And if there was any *cy-près*, you would put that in there.

So within 30 days after the full distributions have been made just so there is a public accounting as to who got what money.  Again, I do not want you to go Mr. Smith got $1,000.  I just want you to say collectively this is what was disbursed to the class members.

Does that make sense?

MR. LIEBERMAN:  Yes, that's fine.

THE COURT:  I think that's what I'm going to do going forward in these cases.

So, Mr. Pumphrey, you will know that in the future because you're going to keep settling cases, so we're going to have that as a continued requirement.

MR. PUMPHREY:  Yes, sir.

THE COURT:  Is there anything else you want to say?

MR. LIEBERMAN:  Nothing further, Your Honor. And we just want to thank Your Honor for the attention to the case.  And, ultimately, I think everyone's effort here yielded a good result for the class.

THE COURT:  Well, the real hero is Magistrate Judge Colombell.

MR. LIEBERMAN:  That's for sure.

THE COURT:  You know, I keep hearing about retired Judge Phillips is the greatest mediator known to mankind, but it took the free guy to get it done.

MR. LIEBERMAN:  We'll move on to Judge Phillips on our next --

THE COURT:  Well, I've had him in like three or four cases I had to come in afterwards.  And I'm sure he's just as great as everybody says, but, you know, the free guys are the ones that are getting it done in this courthouse.

MR. LIEBERMAN:  No doubt.

THE COURT:  And Mr. Pumphrey can tell you that from experience.  And I mean no disrespect to Judge Phillips.

I want to make one observation.  We gave public notice here in case anybody wanted to come to object.  They needed to come in person.  I see nobody here as an objector.  You have reported none as well.  I've overruled that one comment.

I will just ask Mr. DiPrima did you want to say anything, or are you aware of any objectors?

MR. DiPRIMA:  No, Your Honor.  And we're supportive of the settlement, the defendants are supportive, and we thank the Court and Judge Colombell.

THE COURT:  Okay.  All right.

Well, I'm going to make my findings then.  We will begin with notice.  Because this is a 23(b)(3) class settlement, the Court must assess whether the notice here was directed in a reasonable manner to all class members.

Under the rule, the notice to the class must be the best practical -- practicable under the circumstances, and include individual notice to all members who can be identified through reasonable efforts.  In an easy to understand language, the notice must clearly state the nature of the case and the claims involved.

You must also inform class members of their opportunity to opt out.  That the judgment will bind all the class members who did not opt out.  And any class members who do not opt out may enter an appearance through counsel.

Here I find that the notice to class was directed in a reasonable manner to potential class members through a combination of the U.S. Mail and publications. The class administrator, working with the parties, brokerage firms, and nominees obtained the names and contact information of potential class members.

And as of March the 24th of this year, the class administrator had mailed 1,221,001 copies of the notice to potential class members.  And the class administrator also had published a notice in *Investor's Business Daily* and *P.R. Newswire*.

So I find that this notice program was the best practicable under the circumstances, and that it satisfied the requirements of both Rule 23 and due process.

I'm moving on to the terms of the settlement, and evaluating the settlement under the *Jiffy Lube* factors determining that it is fair, reasonable and adequate under those factors.

I find that the settlement is fair and reasonable to the class members based on the following:

The parties had engaged in a thorough investigation of legal claims and facts surrounding the case. The parties had fully briefed multiple motions to dismiss, and a motion to amend the complaint and a motion for class certification. Parties engaged in significant discovery, including the production and review of tens of millions of pages of documents, as well as the deposition of 11 witnesses, as well as reviewing the depositions and related matters.

The parties engaged in multiple extensive arm's length negotiations that were contentious and complex with the supervision and guidance of an experienced private mediator, who I referenced was retired Judge Phillips. And then again multiple mediations that proved to be successful in front of our Magistrate Judge Mark Colombell, who deserves a lot of credit here.

Class counsels' experience and expertise in the field of securities class actions also speaks to the fairness and reasonableness of the settlement reached. Class counsel and defense counsel on both sides are highly skilled in this area of the law. Each zealously representing the respective clients' best interest. And all counsel endorsed the settlement before the Court as fair, reasonable and adequate. Considering the number of lawyers that are in this room, too, involved in this

should speak to that as well.

As to adequacy, with that in mind, I also find that the settlement is adequate in its representation of the class members. Both parties have presented substantive and contested arguments throughout the course of the litigation. Even though I denied the motions to dismiss, defendants, I believe, had some strong defenses that they could have raised both as to merits and class certification.

Continuing litigation, therefore, would have proved extremely costly and time-consuming to both sides with extensive risk.

I have also considered the degree of opposition to the proposed settlement. As we have already discussed, there are no objections to the settlement.

Further, only 32 class members have opted out of the class settlement which represents a miniscule percentage of the shares outstanding during the class settlement period. So, overwhelmingly, the class as a whole has supported this proposed settlement.

And finally, as I have already mentioned, the extent of discovery, the circumstances of the multiple settlement negotiations, experience of counsel in securities law and class action litigation, all favor a finding that the settlement here was adequate.

And as to plan of allocation, the plaintiffs have proposed a plan as to the allocation and the net proceeds of the settlement.  Their damage expert calculated the estimate amount of the alleged artificial inflation in the share prices of the common stock.  The plan of allocution -- I'm sorry, allocation, calculates a recognized loss amount for each purchase of the Altria common stock during the settlement class period.  So in approving the plan of allocation, I find it to be fair, adequate and reasonable.

As to the service awards now for each of the class numbers or class representatives, no class member has objected to the service awards, and the defendants do not oppose them.

So pursuant to Title 15, United States Code, Section 78u-4(a)(4), the plaintiffs request a service award of $20,000 each for Donald Sherbondy and Sarah Sherbondy, and $28,775 for the Construction Laborers Pension Trust of Greater St. Louis.  I find their requested awards to be appropriate, and they'll be paid from the settlement.

As to the attorneys' fees, as I mentioned, class counsel seeks $27,000,000 in fees.  This represents 30 percent of the settlement fund.  As I noted before, that is actually a lower percentage than a norm in these

cases.  I think the request was probably based upon my nudge that I was not going to go over 30 percent.  But it is more common to be in the 33 to 40 percent range.

Cross-checked against the lodestar amount of $14,321,432, the fee requested is a 1.88 multiplier of the lodestar.  I believe that the fee request is appropriate.

I understand that the final number is high, but I've already addressed really the reasons for that.  Given the extensive amounts of time and labor that plaintiffs' counsel have expended in this case, and the significant risk involved in this case that I have discussed before, I believe that it is appropriate.

The settlement, obviously, provides substantial benefits to shareholders.  They're getting $60,000,000 that they would not have gotten before, even though there was substantial risk.

And notably, no class member has objected to the fee award.  I just got that one comment that somebody would like to have me impeached if I approved it, but they can do what they want to do.

Class counsel also requests reimbursement of their litigation expenses, which I'm going to approve in the amount $1,544,748.17; although, I deny their request for interest on that amount.  They have made enough money here.

In light of the fact that approximately $60,000,000 will go to the class members after paying out the attorneys' fees, litigation expenses, lead plaintiff awards, and the settlement, the administrator's anticipated cost, I believe that these fees and expenses are appropriate.

I reaffirm the settlement class as the final settlement class pursuant to Rule 23 for the reasons I previously set forth in the preliminary approval order. I find that the action -- I find that the action for the purposes of the settlement may be maintained as a class action on behalf of the settlement class. As I said, I'm going to have you do that report in 30 days after the final disbursement.

Is there anything else that we need to do? Because the final answer is I'm approving it.

MR. LIEBERMAN: Thank you very much, Your Honor. Nothing for class plaintiffs.

THE COURT: Okay.

Anything else from the defendants?

MR. DiPRIMA: No, sir.

THE COURT: All right.

I appreciate all of your hard work.

And again, I want to commend Magistrate Judge Colombell for his great work.

MR. LIEBERMAN:  Thank you, Your Honor.

MR. DiPRIMA:  Thank you.

(The proceeding concluded at 12:20 p.m.)


REPORTER'S CERTIFICATE

I, Krista Liscio Harding, OCR, RMR, Notary Public in and for the Commonwealth of Virginia at large, and whose commission expires March 31, 2024, Notary Registration Number 149462, do hereby certify that the pages contained herein accurately reflect the notes taken by me, to the best of my ability, in the above-styled action.
Given under my hand this 4th day of May, 2022.

/s/
Krista Liscio Harding, RMR
Official Court Reporter