**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(Richmond Division)**

| | |
|---|---|
| GABBY KLEIN, et al., Individually and On Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>v.<br><br>ALTRIA GROUP, et al.,<br>                    Defendants. | Civil Action No. 3:20-cv-0075-DJN<br><br>CLASS ACTION |

**DECLARATION OF JORDAN BROKER**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION DISTRIBUTION OF CLASS**
**ACTION SETTLEMENT PROCEEDS**

I, JORDAN BROKER, declare as follows:

1.     I am a Project Manager for Epiq Class Action & Claims Solutions, Inc. ("Epiq"). The following statements are based on my personal knowledge and information provided to me by other Epiq employees, and I could and would competently testify to these facts if called upon to do so.

2.     Pursuant to the Court's Order Preliminarily Approving Settlement and Providing for Notice dated December 13, 2021 (ECF No. 303) (the "Preliminarily Approval Order"),[1] Epiq was appointed as the Claims Administrator to supervise and administer the notice procedure as well as the processing of claims in connection with the proposed Settlement of the above-captioned action (the "Action").

3.     The Court's Final Order and Judgment Approving Class Action Settlement, dated March 31, 2022, granted final approval of the Settlement, and adopted its terms (the "Final

---

[1] All capitalized terms not otherwise defined in this document shall have the same meaning ascribed to them as set forth in the Amended Stipulation and Agreement of Settlement ("Stipulation").

1

Approval Order"). The Final Approval Order also approved the proposed plan for allocating the net settlement proceeds among eligible Settlement Class Members as set forth in the Notice (the "Plan of Allocation"). Epiq has completed processing all Proofs of Claim received through November 18, 2022, in accordance with the Stipulation and the Plan of Allocation, and now submits its administrative determinations accepting and rejecting the Proofs of Claim in preparation for a distribution of the Net Settlement Fund to Authorized Claimants.

## DISSEMINATION OF THE NOTICE

4.    As more fully described in my Supplemental Declaration Regarding Notice Dissemination and Requests for Exclusion and Objections Received to Date dated March 24, 2022 (the "Supplemental Mailing Declaration"), Epiq mailed an aggregate of 1,221,001 Postcard Notices to potential Settlement Class Members and nominees through March 24, 2022. Since that date, 36,823 additional Postcard Notices have been mailed. In total, Epiq has disseminated 1,257,824 Postcard Notices to potential Settlement Class Members and nominees.

5.    Epiq also caused the Summary Notice to be transmitted over *PR Newswire* and published once in *Investor's Business Daily* on January 10, 2022.

## PROCEDURES FOLLOWED IN PROCESSING CLAIM FORMS

6.    Under the terms of the Preliminary Approval Order, and as set forth in the Notice, each Settlement Class Member who wished to be eligible to receive a distribution from the Net Settlement Fund was required to complete and submit to Epiq a properly executed Proof of Claim postmarked no later than April 5, 2022, together with adequate supporting documentation for the transactions and holdings reported therein.  Through November 18, 2022, Epiq has received 401,082 Proofs of Claim.

2

7.      In preparation for receiving and processing Proofs of Claim, Epiq: (i) conferred with Lead Counsel regarding the project guidelines for processing Proofs of Claim; (ii) created a unique database to store Proofs of Claim details and images of Proofs of Claim and supporting documentation; (iii) trained staff in the specifics of the project so that Proofs of Claim would be properly processed; (iv) formulated a system so that telephone and email inquiries would be properly responded to; (v) developed various computer programs and screens for entry of Settlement Class Members' identifying information and transactional information; and (vi) developed a proprietary "calculation module" that would calculate Recognized Loss pursuant to the Court-approved Plan of Allocation set forth in the Notice.

**Processing Paper Proofs of Claim and Online Claims**

8.      Of the 401,082 Claims, 18,532 Claims were submitted as paper Claims ("Paper Claims") received through the mail or submitted using the Settlement Website ("Online Claims"). Once received, the Paper Claims were opened and prepared for scanning. This process included unfolding documents, removing staples, copying documents with nonconforming sizes, and sorting documents. This manual task of preparing the paper Proofs of Claim is very laborious and time intensive. Once prepared, the paper Proofs of Claim were scanned into a database together with all submitted documentation. Each Proof of Claim was assigned a unique Proof of Claim number. Once scanned, the information from each Proof of Claim, including the claimant's name, address, account number/information from the supporting documentation, and purchase/acquisition transactions, sale transactions, and holdings listed on the Proof of Claim, were entered into a database developed by Epiq to process Proofs of Claim. Next, the documentation provided by each claimant in support of his, her, or its Proof of Claim was reviewed to determine: (i) whether the claimant purchased or otherwise acquired Altria common stock

3

during the period from October 25, 2018, through April 1, 2020, inclusive (the "Settlement Class Period"); (ii) whether the transaction information entered on the Proof of Claim was supported by the documentation; (iii) that the claimant did not have any additional trades not reflected on his, her, or its Proof of Claim; (iv) that the name of the claimant matched the information on the trade documentation, or additional documentation was provided to support any name changes; and (v) that the beneficial owner on the trade documentation, or a valid representative, was the person who signed the Proof of Claim. Online Claims were similarly uploaded to the Settlement Database.

9.    In order to process the transactions detailed on the Proofs of Claim, Epiq utilized internal codes to identify and classify any deficiency or ineligibility conditions that existed within those Proofs of Claim. The appropriate codes were assigned to the Proofs of Claim as they were processed. For example, where a Proof of Claim was submitted by a claimant who did not have any eligible transactions in the during the Class Period, that Proof of Claim would receive a defective code that denoted ineligibility. Similar defective codes were used to denote other ineligible conditions, such as duplicate Proofs of Claim. These codes indicate to Epiq that the claimant was not eligible to receive any payment from the Net Settlement Fund with respect to that Proof of Claim unless the deficiency was cured in its entirety. Examples of conditions of ineligibility are as follows:

| | |
|---|---|
| ND | Inadequate or No Documentation Submitted for the Entire Claim Form |
| DP | Duplicate Claim Form |
| PO | No Eligible Purchases During the Class Period |
| SG | No Signature |
| ZR | No Recognized Loss |
| EN | No Ending Holdings documented |

10.    Because a Proof of Claim may be deficient only in part, but otherwise acceptable, Epiq utilized codes that are only applied to specific transactions within a Proof of Claim. For example, if a claimant submitted a Proof of Claim with supporting documentation for all but one

4

purchase transaction, that one transaction would receive a transaction-specific defective code. That code indicates that one transaction was deficient, but that the Proof of Claim was otherwise eligible for payment if other transactions in the Proof of Claim calculated to a Recognized Loss according to the Plan of Allocation. Thus, even if the deficiency was never cured, the Proof of Claim could still be partially accepted.

**Processing Proofs of Claim Submitted Electronically Via Spreadsheet**

11.    A total of 401,082 Proofs of Claim were received by Epiq through November 18, 2022. Of the 401,082 Proofs of Claim, 382,550 were filed electronically. Electronic Claims are typically submitted by institutional investors who may have hundreds, thousands, or even millions of transactions during the Class Period. Rather than provide reams of paper requiring data entry, the institutional investors filing electronic Claims either mail a computer disc or electronically submit a file to Epiq so that Epiq may electronically upload all transactions to its proprietary database developed for the Settlement.

12.    Epiq's Securities Team coordinates and supervises the receipt and handling of all electronic Claims. In this case, the Securities Team reviewed and analyzed each electronic file to ensure that it was formatted in accordance with Epiq's required format, and to identify any potential data issues or inconsistencies within the file. If any issues or inconsistencies arose, Epiq notified the sender. If the electronic file was deemed to be in an acceptable format, it was then loaded to Epiq's database.

13.    Once the file was loaded, the electronic Claims were coded to identify them as electronic Claims and codes were applied to denote any deficiencies or ineligible conditions that existed within them. These codes are similar to those applied to paper Proofs of Claim. In lieu of manually applying codes, the Securities Team performed programmatic reviews on electronic

Claims to identify deficient and ineligible conditions including, but not limited to, price per share/net amount validation issues, out of balance conditions, and transactions outside the Class Period. The output was thoroughly verified and confirmed as accurate.

14. The review process also included flagging any electronic Claims that were not accompanied by a signed Proof of Claim, which serves as a "Master Proof of Claim" for all accounts referenced on the electronic file submitted. This process was reviewed by Epiq's Securities Team and, where appropriate, Epiq contacted the institutional filers whose electronic files were missing information. This process ensured that all claims were submitted by properly authorized representatives of the claimants.

15. Finally, at the end of the process, Epiq performed various targeted reviews of electronic Claims. Specifically, Epiq used the calculated Recognized Losses and other identified criteria to flag and reach out to a number of electronic filers and request that various sample exchanges, purchases, sales, and holdings selected by Epiq be documented by providing confirmation slips or other transaction-specific supporting documentation. These targeted reviews helped to ensure that electronic data supplied by claimants did not contain inaccurate information. Epiq also performed additional targeted reviews in connection with the largest Claims.

## EXCLUDED PERSONS

16. Epiq reviewed all Proofs of Claims to ensure that they were not submitted by, or on behalf of, excluded persons to the extent that the identities of such persons or entities were known to Epiq through the list of Defendants, and other excluded persons and entities set forth in the Stipulation and the Notice, and through the claimants' certifications on the Proofs of Claim.

## PAPER CLAIM DEFICIENCY PROCESS

17.    Approximately 11,162 of the 18,532 paper Proofs of Claim, or approximately 60% of the paper Proofs of Claim submitted, were incomplete or had one or more defects or conditions of ineligibility, such as the Proof of Claim not being signed, not being properly documented, or indicating no eligible transactions.

18.    A majority of Epiq's efforts in handling an administration involve claimant communications, so that all claimants have a sufficient opportunity to cure any deficiencies and file a complete Proof of Claim. The "Deficiency Process," which primarily involves mailing letters to claimants and, in response, making and receiving calls and sending and receiving emails to and from claimants to assist them in properly completing their otherwise deficient submissions so that they may be eligible to receive a distribution from the Net Settlement Fund.

19.    If a Proof of Claim was determined to be defective or ineligible, a Notice of Incomplete Proof of Claim Submission ("Deficiency Notice") was sent to the claimant describing the defect(s) or condition(s) of ineligibility in their Proof of Claim and what was necessary to cure any "curable" defect(s) in the Proof of Claim. The Deficiency Notice advised the claimant that the submission of the appropriate information and/or documentary evidence to complete the Proof of Claim had to be sent within twenty (20) days from the date of the letter, or the Proof of Claim would be recommended for rejection to the extent the deficiency or condition of ineligibility was not cured. The Deficiency Notice also advised claimants that if they desired to contest the administrative determination, they were required to submit a written statement to Epiq requesting Court review of the determination and setting forth the basis for the request. Epiq mailed, by First-Class Mail, a total of 11,162 Deficiency Notices to claimants. Attached hereto as Exhibit A is an example of the Deficiency Notice.

20.    Claimants' responses to the Deficiency Notices were scanned into Epiq's database and associated with the corresponding Proof of Claim. The responses were then carefully reviewed and evaluated by Epiq's team of processors. If a claimant's response corrected the defect(s), Epiq updated the database manually to reflect the change in status of the Proof of Claim.

## ELECTRONIC CLAIM DEFICIENCY PROCESS

21.    Using the following process, Epiq provided claim submitters who filed electronically via spreadsheet and whose submissions were deficient with an email attaching a Transaction Report, which listed the specific electronic Claims that were incomplete along with a list of the specific portions of the Claims that were incorrect or incomplete. The Transaction Reports:

(a)    were sent electronically to 98 filers who submitted 179,462 deficient or ineligible electronic Claims;[2]

(b)    identified individual transactions and entire electronic Claims that were found to be deficient or ineligible so that the filer on behalf of the claimant had the opportunity to correct the deficient condition or contest the determination of ineligibility;

(c)    stated that any deficient transactions or electronic Claims that remain uncured, as well as any transactions or electronic Claims that were identified as ineligible on the Transaction Report, would be recommended for rejection;

(d)    notified the filer that it could, on behalf of the claimant, request that the Court review Epiq's administrative determination if it wished to contest the rejection of any transactions or electronic Claims; and

---

[2] Electronic Claim submissions are typically submitted by nominees on behalf of numerous beneficial owners. It is not uncommon for an electronic submission to include thousands of claims. The 382,550 electronic Claims received were submitted by 315 filers. Of those 382,550 electronic Claims, 179,462 were deficient or ineligible.

8

(e)    provided Epiq's contact information so that the filer could reach out to Epiq if it had any questions or required assistance.

22.    The responses to the Transaction Reports were reviewed by Epiq's Securities Team, scanned, and/or loaded into Epiq's database, and associated with the corresponding electronic Claim. If the response corrected the defect(s) or affected the electronic Claim's status, Epiq manually and/or programmatically updated the database to reflect the change in status of the electronic Claim.

## DISPUTED CLAIMS

23.    As noted above, Claimants were advised that they had the right to contest Epiq's administrative determination of deficiencies or ineligibility within twenty (20) days from the date of notification and that they could request that the dispute be submitted to the Court for review. More specifically, such persons and entities were advised in the Deficiency Notice and in the Transaction Reports that to dispute Epiq's determinations, they needed to provide a statement of reasons indicating their grounds for contesting the rejection, along with supporting documentation.

24.    A total of 159 Claimants contested Epiq's administrative determinations and requested review by the Court. To resolve the disputes without necessitating the Court's intervention, Epiq contacted the persons requesting Court review, and with respect to those Claimants who were reached, Epiq answered all their questions, fully explained Epiq's determination of the Claim's status, and facilitated the submission of missing information or documentation where applicable.

25.    As a result of these efforts, 152 of the 159 requests for Court Review have either been cured or the request for Court Review has been retracted. Attached hereto as Exhibit B are copies of the Proof of Claims and supporting documentation of the 7 disputed claims. Exhibit B-1 contains all disputed claims that were rejected for not calculating to a recognized loss under the

Plan of Allocation. Exhibit B-2 contains all disputed claims that were rejected for other reasons such as not providing adequate documentation to support their claim.

### LATE BUT OTHERWISE ELIGIBLE CLAIMS

26.     Through November 18, 2022, Epiq received 36,211 Proofs of Claim that were postmarked or received after April 5, 2022, the submission deadline established by the Court. Epiq processed all late Proofs of Claim received through November 18, 2022, and 6,449 have been found to be otherwise eligible in whole or in part (the "Late But Otherwise Eligible Claims"). Epiq has not rejected any Proofs of Claim received through November 18, 2022, solely based on its late submission, and Epiq believes no delay has resulted from the provisional acceptance of these Late But Otherwise Eligible Claims. To the extent they are eligible but for the fact that they were late, Epiq recommends that they be eligible for payment.

27.     However, there must be a final cut-off date after which no more Proofs of Claim will be accepted so that there may be a proportional distribution of the Net Settlement Fund and the distribution may be accomplished. Acceptance of additional Proofs of Claim received during the finalization of the administration and the preparation of this application would necessarily require a delay in the distribution. Accordingly, upon approval by the Court, Epiq intends that no Proofs of Claim received after November 18, 2022, shall be eligible for payment in the initial distribution.

### QUALITY ASSURANCE

28.     An integral part of all Epiq's settlement administration projects is its quality assurance review. Epiq personnel worked throughout the entire administration process to ensure that Proofs of Claim were processed properly; that deficiency and ineligibility message codes were properly applied to Proofs of Claim; that Deficiency Notices were mailed to the appropriate claimants; and that Epiq's computer programs were operating properly.

29.     In support of the work described above, Epiq staff designed, implemented, and tested the following programs for this administration: (i) data entry screens that store Proof of Claim information (including all transactional data included on each Proof of Claim and in any supporting documentation), attach message codes and, where necessary, apply text to denote conditions existing within the Proof of Claim; (ii) screens for the analyst to review images of the Proof of Claim and any supporting documentation provided; (iii) programs to load and analyze transactional data submitted electronically for all electronic Claims (the load program converts the data submitted into the format required by the calculation program, and the analysis program determines if the data is consistent and complete); (iv) a program to compare the claimed transaction prices against the reported market prices to confirm that the claimed transactions were within an acceptable range of the reported market prices; (v) a calculation program to analyze the transactional data for all Proofs of Claim and calculate the Recognized Losses; and (vi) programs to generate various reports throughout and at the conclusion of the administration, including lists of all eligible and ineligible Proofs of Claim.

30.     Epiq's Securities Team performed a final quality control check once all the accepted Claims were processed, Deficiency Notices were mailed, and deficiency responses were reviewed and processed, to ensure the correctness and completeness of all of the Proofs of Claim processed, before Epiq prepared its final reports to Lead Counsel. Here, in connection with this quality assurance wrap-up, Epiq: (i) confirmed that Proofs of Claim that are recommended for approval have no messages denoting ineligibility; (ii) confirmed that Proofs of Claim that are recommended for rejection have messages denoting ineligibility; (iii) confirmed that all Proofs of Claim requiring "deficiency" notices were sent such notices; (iv) performed a sample review of deficient Proofs of Claim; (v) reviewed a sampling of Proofs of Claim with high Recognized

11

Losses; (vi) sampled Proofs of Claim that had been determined to be ineligible, including those with no Recognized Losses calculated in accordance with the Plan of Allocation, in order to verify that all transactions had been captured correctly; and (vii) retested the accuracy of the calculation program.

31.    As part of its due diligence in processing the Claims, Epiq conducted a questionable claim filer search of all Proofs of Claim and electronic Claims filed in the Settlement. Epiq maintains a database of known questionable filers. This database contains names, addresses, and aliases of individuals compiled from previous settlements that Epiq has administered and of individuals from whom fraudulent claims were received. Epiq updates this database on a regular basis. The database for the Settlement was searched for all individuals identified in our questionable claim filer database. Epiq performed searches based on name, aliases, address, and city/zip code. In addition, all Epiq's claim processors are trained to identify any potentially inauthentic documentation when processing claims, including for claims submitted by claimants not previously captured in our database as questionable claim filers. Processors are instructed to flag claims as questionable claims and route them to the project manager and Securities Team for review.

## DISPOSITION OF PROOFS OF CLAIM

32.    Epiq has completed the processing of the 401,082 Proofs of Claim that were received through November 18, 2022, and has determined that 244,892 are acceptable, and 156,190 should be wholly rejected because they are either ineligible, wholly deficient, or have no Recognized Loss when calculated in accordance with the Plan of Allocation.

33.    The 156,190 rejected Proofs of Claim are ineligible for the following reasons:

**Summary of Rejected Proofs of Claim**

| Reason for Rejection | Number of Claim Forms |
| --- | --- |
| No Eligible Purchases/Acquisitions During the Class Period | 89,164 |
| Proof of Claim Did Not Result in a Recognized Loss | 52,376 |
| Deficient Proof of Claim Never Cured | 4,636 |
| Duplicate Proof of Claim | 301 |
| Withdrawn Proof of Claim | 9,713 |
| **TOTAL** | 156,190 |

34. A list of the Proofs of Claim submitted and Epiq's intended disposition is contained in the Administrator's Report attached hereto as Exhibits C-1 through C-3. Exhibit C-1, entitled "Timely Eligible Claims," lists all timely filed, provisionally accepted Proofs of Claim, and states their Recognized Loss. Exhibit C-2, entitled "Late But Otherwise Eligible Claims," lists all late-filed, provisionally accepted Proofs of Claim and states their Recognized Loss. Exhibit C-3, entitled "Rejected Claims," lists all wholly rejected Proofs of Claim and states the reason for their rejection. For privacy reasons, Exhibits C-1 through C-3 provide only the claimant's claim number and Recognized Loss or reason for rejection (no names, addresses, taxpayer ID, social security or social insurance numbers are disclosed).

35. Epiq has determined that 244,892 Proofs of Claim should be accepted. The Proofs of Claim identified for acceptance represent total Recognized Losses of $4,532,112,328.74. Of that total, $3,882,077,799.88 is for Timely Eligible Claims and $650,034,528.86 is for Late But Otherwise Eligible Claims. According to the Plan of Allocation, each Authorized Claimant shall be allocated a *pro rata* share of the Net Settlement Fund based on his, her, or its Recognized Loss in comparison to the total Recognized Losses of all Authorized Claimants. Epiq will prepare and mail checks (or wire transfers where applicable) to Authorized Claimants for their payment amount subject to the provisions of the Court-approved distribution plan.

**EPIQ'S REQUESTED FEES AND DISBURSEMENTS**

36.     Epiq agreed to be the Claims Administrator in exchange for payment of its fees and expenses, which are paid pursuant to the Stipulation. To date, Epiq has incurred $1,852,145.69 for its work performed on behalf of the Class, including its estimate of fees and expenses to complete the Initial Distribution. Attached hereto as Exhibit D is a copy of Epiq's invoices. To date, Epiq has received payment of its fees and expenses in the amount of $1,166,234.97. Therefore, the final amount owed to Epiq for work performed through the Initial Distribution is $685,910.72.

**DISTRIBUTION PLAN FOR THE NET SETTLEMENT FUND**

37.     Should the Court concur with Epiq's recommendations and determinations concerning the provisionally accepted and rejected Claims, including the Late But Otherwise Eligible Claims, Epiq recommends the following distribution plan (the "Distribution Plan"):

(a)     Epiq will distribute 100% of the available balance of the Net Settlement Fund after deducting any Notice and Administration Costs, Taxes, and Tax Expenses to Authorized Claimants who would receive at least $10.00 based on their Recognized Loss in comparison to the total Recognized Losses of all Authorized Claimants.

(b)     In order to encourage Authorized Claimants to promptly deposit their payments, all distribution checks will bear a notation "DEPOSIT PROMPTLY, VOID AND SUBJECT TO RE-DISTRIBUTION IF NOT NEGOTIATED WITHIN 90 DAYS OF DISTRIBUTION."[3]

---

[3] For Authorized Claimants whose checks are returned as undeliverable, Epiq will attempt to locate new addresses by reasonable methods. Where a new address is located, Epiq will update the database accordingly and re-issue a distribution check to the Authorized Claimant at the new address. In the event an Authorized Claimant loses or damages his, her or its check, or otherwise requires a new check, Epiq will issue replacements. Distribution re-issues will be undertaken only upon written instructions from the Authorized Claimant, provided that the Authorized Claimant returns the previous check where appropriate. For all checks, Epiq will void the initial payment prior to re-issuing a payment. Authorized Claimants will be informed that, if they do not cash their distribution checks within 90 days from the mail date, or they do not cash check reissues within 30 days of the mailing of such reissued check, their check will lapse, their entitlement to recovery will be irrevocably forfeited and the funds will be re-allocated to other Authorized

(c)     Authorized Claimants who do not negotiate their distribution checks within the time allotted or on the conditions set forth in footnote 3 will irrevocably forfeit all recovery from the Settlement. The funds allocated to all such stale-dated checks will be available to be distributed to other Authorized Claimants if Lead Counsel, in consultation with Epiq, determines that it is feasible to conduct a re-distribution. Similarly, Authorized Claimants who do not negotiate their subsequent distributions (should such distributions occur) within the time allotted or on the conditions set forth in footnote 3 will irrevocably forfeit any further recovery from the Net Settlement Fund.

(d)     Consistent with the Plan of Allocation, after Epiq has made reasonable and diligent efforts to have Authorized Claimants negotiate their distribution checks, and if it is economically reasonable to do so, any balance remaining in the Net Settlement Fund at least six months after the initial distribution of such funds shall be re-distributed on a pro rata basis to Settlement Class Members who have cashed their initial distributions, after payment of any unpaid costs or fees incurred in administering the Net Settlement Fund for such redistribution.  These redistributions shall be repeated until the balance in the Net Settlement Fund is no longer economical to distribute.

(e)     No new Claims may be accepted after November 18, 2022, and no further adjustments to previously received Claims that would result in an increased Recognized Claim amount may be made.

(f)     Any balance that still remains in the Net Settlement Fund after redistribution(s) which are not feasible or economical to reallocate, after payment of any unpaid costs or fees

---

Claimants. Reissue requests for lost or damaged checks will be granted after the void date on the checks as long as the request for the reissue is received prior to the next planned distribution. Requests for reissued checks in connection with any re-distribution will be handled in the same manner.

15

incurred in administering the Net Settlement Fund, shall be contributed to a 501(c)(3) non-profit organization unaffiliated with the Parties or their counsel, and approved by the Court.

(g)     Unless otherwise ordered by the Court, one year after the final distribution, Epiq will destroy the paper copies of the Proofs of Claim and all supporting documentation, and one year after all funds have been distributed, Epiq will destroy electronic copies of the same. During case closure, Epiq will notify the parties via letter indicating that physical paper documents will be destroyed within 90 days of the letter. Electronic data and media will be archived within 1 year of the letter and data purges will occur within 3 years of the letter. Any further case mail will be returned to sender stamped "Case Closed".

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on January 25, 2023, in Seattle, Washington.

_____

JORDAN BROKER